4. Mem. of Law

Civ.      (    ) (    )

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PAUL SCRIMO,

Petitioner,

-against-

WILLIAM LEE,

Superintendent, Green Haven Correctional Facility,

Respondent.

MEMORANDUM OF LAW
IN SUPPORT OF A
PETITION FOR A
WRIT OF HABEAS CORPUS

Submitted by:

PAUL SCRIMO
Petitioner, pro se
Green Haven Correctional Facility
PO Box 4000
Stormville, NY 12582

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

SYNOPSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

GROUND 1:  Petitioner Was Denied A Fundamentally Fair Trial
            For The Reasons Enumerated In His Direct Appeal . . . . . . . 6

GROUND 2:  The Failure Of The State To Grant A Meaningful
            Appeal Is A Violation Of Due Process Of Law . . . . . . . . . . 16

GROUND 3:  Petitioner Was Deprived Of Effective
            Assistance Of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

EXHIBITS

i

## TABLE OF AUTHORITIES

**Cases:**                                                              **Page**

Aguilar v Texas                   378 US 108   . . . . . . . . . . . . . . . . . . . .   7
Arizona v Rumsey                  467 US 203   . . . . . . . . . . . . . . . . . .   19
Berger v United States            295 US 78    . . . . . . . . . . 11, 12, 13, 17
Bousley v United States           523 US 614   . . . . . . . . . . . . . . . . . 1, 15
Chambers v Mississippi            410 US 284   . . . . . . . . . . . . . . . . . .   11
Chapman v California              386 US 18    . . . . . . . . . . . . . . . . . .   20
Corcoran v Levenhagen             130 SCt 8    . . . . . . . . . . . . . . . . .   16
Doyle v Ohio                      426 US 610   . . . . . . . . . . . . . . . . . .   8
Dunaway v New York                99 SCt 2248  . . . . . . . . . . . . . . . . . .   6
Evitts v Lucey                    469 US 387           . . . . . . . . . . 18, 20, 21
Fahy v Connecticut                375 US 85    . . . . . . . . . . . . . . . . .   20
Fama v Comm'r of Corr. Svcs.      235 F3d 804  . . . . . . . . . . . . . . . . . .   19
Fry v Pliler                      127 SCt 2321 . . . . . . . . . . . . . . . . . .   11
Herrera v Collins                 506 US 390   . . . . . . . . . . . . . . . . . .   15
Matthews v Eldridge               424 US 319   . . . . . . . . . . . . . . . . . .   21
McMann v Richardson               397 US 759   . . . . . . . . . . . . . . . . . .   21
New York Cent. R. Co. v Johnson   279 US 310   . . . . . . . . . . . . . . . . . .   12
O'Sullivan v Boerckel             526 US 838   . . . . . . . . . . . . . . . . . .   1
Payne v Tennessee                 501 US 808   . . . . . . . . . . . . . . . . . .   19
Pension v Ohio                    488 US 75    . . . . . . . . . . . . . . . . .   19
Smith v Robbins                   528 US 259   . . . . . . . . . . . . . . . . . .   19
Soto v LeFevre                    651 FSupp 588 . . . . . . . . . . . . . . . . .   11
Spinelli v United States          393 US 410   . . . . . . . . . . . . . . . . . .   7
Strickland v Washington           466 US 668   . . . . . . . . . . . . . . . 22, 24
United States v Agurs             96 SCt 2392  . . . . . . . . . . . . . . . . . .   11
Washington v Texas                388 US 14    . . . . . . . . . . . . . . . . .   10


People v Baldi                    54 NY2d 137  . . . . . . . . . . . . . . . . .   13
People v Benevento                91 NY2d 708  . . . . . . . . . . . . . . . . .   13
People v Bianculli                9 NY2d 468   . . . . . . . . . . . . . . . . .   23
People v Crimmins                 36 NY2d 230  . . . . . . . . . . . . . . . . .   20
People v Hudy                     73 NY2d 40   . . . . . . . . . . . . . . . . .   10
People v Watson                   109 AD2d 409 . . . . . . . . . . . . . . . . .   7


**NY Statutes:**

Criminal Procedure Law §450.10      . . . . . . . . . . . . . . . . . . . . . . . . .   19
Criminal Procedure Law §470.25(1)   . . . . . . . . . . . . . . . . . . . . 17, 18, 21

# GROUNDS FOR RELIEF

## GROUND 1
### WHETHER PETITIONER WAS DENIED A FUNDAMENTALLY FAIR TRIAL FOR THE REASONS ENUMERATED IN HIS DIRECT APPEAL?

## GROUND 2
### WHETHER THE FAILURE OF THE STATE TO GRANT A MEANINGFUL APPEAL IS A VIOLATION OF DUE PROCESS OF LAW?

## GROUND 3
### WHETHER THE PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL?

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x

PAUL SCRIMO,                                                    **MEMORANDUM**
                              Petitioner,                        **OF LAW**

                                                          Civil Number Unassigned

        -against-

WILLIAM LEE, Superintendent,
Green Haven Correctional Facility,
                              Respondent.
------------------------------------------------x


1.   This Memorandum of Law is submitted in support of Paul Scrimo's
petition pursuant to 28 USC §2254 to vacate his judgement of conviction.
All facts necessary for a determination of the issues raised are contained in
the preceeding petition and accompanying appendix.  Select Exhibits which
are part of the record have been included for the convenience of the Court.

2.   All of the grounds for relief presented below have been exhausted; each
issue having been raised before the highest state court.  See, O'Sullivan v
Boerckel, 526 US 838, 940 (1999).  Petitioner has informed the state court
of both the factual and legal premises of the claims he asserts in federal
court. See, Bousley v United States, 523 US 614, 617 (1998).

3.   Petitioner exhausted his state remedies as required by the AEDPA. He
argued his Direct Appeal constitutional violations in his letter application to
the New York Court of Appeals, and adequately put the state courts on notice

1

of the federal nature of the claims he advances in his habeas petition. Additionally, petitioner's post-conviction constitutional claims were presented to all levels of the state courts, giving each an opportunity to adjudicate petitioner's constitutional claims and thus satisfying the AEDPA's exhaustion requirements.

## SYNOPSIS

Petitioner contends that after a night of frequenting local bars with John Kane he was purchasing beer and cigarettes at a nearby 7-Eleven store when Kane strangled Ruth Williams in her apartment. He learned of the crime in the parking lot behind the victim's apartment shortly afterward from Kane himself, but did not report it to the police. Kane was taken into custody three weeks later, and after being told by detectives that he would be charged with murder, he told them that Paul Scrimo (petitioner) committed the crime, and the petitioner was subsequently arrested that same night. While out on bail petitioner made a statement to Police Officer Pamela Stark, but portions of that statement were deemed self-serving and not permitted into evidence.

Kane testified at petitioner's trial, and to support Kane's unsubstantiated testimony regarding the actual crime the prosecutor attempted to show that a mixed sample of DNA from a Budweiser[1] beer bottle, which was purchased from the last bar[2] the defendant and Kane frequented that night and was later found in the victim's apartment, tied the defendant to the crime. The People's

---

[1] Petitioner purchased Coors Lite at 7-Eleven (People's 84; Exh. 1), 7-Eleven clerk's testimony (T. 1318 l. 18; 1344 l. 1)

[2] The bartender's DNA was not tested for comparison, nor that of the other bar patrons

own DNA expert, Meghan Clement, would not commit to such a claim, stating only that 1 in 6,800 Caucasians could have contibuted to that mixed sample and that the defendant (a Caucasian) could not be excluded as a *possible* contributor.

The prosecutor also introduced expert witnesses regarding a Leatherman multi-tool the defendant was wearing three weeks after the crime and its possible use to cut the ligature wire used in the stangulation murder. Both the FBI and Nassau County Police Department experts, consistant with their own reports submitted during Discovery (Exh. 2, 3), testified that the Leatherman could not be linked to the ligature wire (T. 807-808; 941), but the prosecutor then had the Police expert conduct a surprise in-court demonstration over the strenuous objections of defense counsel. After the demonstration the judge initially sustained defense counsel's objections, agreeing that the expert's drawings were confusing to the jury, but the prosecutor successfully argued that the jury had already seen it and the Court then overruled itself, granting an exception (T. 857-858; Exh. 4).

The defendant did not testify, and because all of the physical evidence inculpated only Kane, defense counsel did not present any defense witnesses at all, relying instead upon his ability to convince the jury of Kane's guilt during summation.

During the People's summation, the prosecutor made numerous prejudicial statements which exceeded the bounds of propriety, including the disparagement of defense counsel, expressing improper conclusions regarding the evidence, inflaming the jury's sentiments, expressing his own belief as to the defendant's guilt, bolstering the police witnesses' credibility, misstating the

record, asking the jury to think about what the defendant *doesn't* tell the police, giving unsworn expert testimony, asking the jurors to consider items not in evidence, making improper inferences as to the presence of the Leatherman on the night of the crime, expressing his own opinion of the evidence, and by displaying a picture of the victim and telling the jury (T. 1780 l. 18-20) "You have to look at that photograph, when you are thinking about what Mr. Scrimo was thinking ...".

The jury deliberated for two days, making requests for readbacks of both lawyer's summations, a list of the witnesses, a list of the evidence, and the chart of pictures.  Ironically, the only request which the Court granted was the request for the pictures that the Court had previously stated were confusing (T. 1836-1837; Exh. 5).  Unable to obtain the lists they requested, the jury was constrained by the Court to deliberate in a state of uncertainty before returning with a verdict of 'guilty'.

The petitioner appealed, and the Appellate District Attorney (ADA), repeated the prosecutor's attempt to bolster the weak eyewitness testimony, creating more evidence than was adduced at trial when she stated not less than seven times in her Respondent's Brief that there was conclusive DNA evidence linking the defendant to the crime[3], despite the testimony of the People's own expert who testified that she did not calculate a statistical estimate (for the defendant in relation to the beer bottle) as it is generally not possible with a mixed sample (T. 1043 l. 22-23, 1070 l. 20-23;  Exh. 5), and which the ADA

_____

[3] This error was exacerbated when the same ADA repeated her claim of conclusive DNA evidence in her responses to post-conviction motions, despite having been made aware of the inaccuracy of her initial claim.

cited in her own Respondent's Brief (RB p. 37; Exh. 6). Furthermore, even the trial prosecutor downplayed the DNA and fingerprint evidence that inculpated only his own eyewitness by telling the jury during summation that "The only items missing from the crime scene ... (the beer and cigarettes purchased at 7-Eleven, which were never in the victim's apartment and were not in evidence) are the items which could connect Paul Scrimo with that murder" (T. 1769; Exh. 8) and that the missing items were more important than the DNA and a fingerprint "any day of the week". (T. 1770 l. 4-1; Exh. 9). It is evident that the appellate court did not investigate the ADA's transcript citations as she cited the very testimony that belies her claim regarding the conclusiveness of the DNA evidence.[4]

The conviction was affirmed by the Appellate Division (Decision 1) and the New York Court of Appeals denied leave to appeal (D. 2).

Subsequent petitions for Reconsideration (D. 3), State Habeas Corpus (D. 4) and a CPL §440 motion to vacate conviction (D. 5) along with a request for Leave to Appeal the 440 (D. 6) were denied.

---

[4] The argument below includes the failure of the appellate court to review the transcript citations carefully, and the misapplication of the 'harmless error' doctrine. Petitioner begs this court to thoroughly analyze what Clement actually said.

5

## GROUNDS FOR RELIEF

**Application**
**Paragraph #**

12.                                   ## Ground 1

### PETITIONER WAS DENIED A FUNDAMENTALLY
### FAIR TRIAL FOR THE REASONS ENUMERATED
### IN HIS DIRECT APPEAL

Defendants are guaranteed a fair trial by the Sixth and Fourteenth

Amendments of the Constitution of the United States. The issues that

denied the defendant a fair trial and were subsequently presented in his

Direct Appeal are listed below in an abbreviated format. Each issue is

presented in greater detail in the petitioner's 'Appellant's Brief'.


**1.   The Police Lacked Probable Cause For The Defendant's Arrest:**

John Kane was taken into custody three weeks after the murder. He

had denied any knowledge of the murder during a prior interview, and again

denied knowing anything during this interrogation. When told that he was

going to be charged with murder, however, he told the detectives that Paul

Scrimo (petitioner) committed the murder and signed a statement to that

effect. The detectives did not seek a warrant but instead waited near the

petitioner's home and arrested him when he arrived a few hours later.

At the pretrial Dunaway Hearing (Dunaway v New York, 99 SCt 2248),

detectives claimed that they had verified several highly significant details

of Kane's story, but there is no evidence that the detectives questioned

anyone between the time they got Kane's statement and the petitioner's

6

arrest shortly thereafter.

To sustain a warrantless arrest under the two-pronged *Aguilar-Spinelli* standard (Aguilar v Texas, 378 US 108; Spinelli v United States, 393 US 410), it must be shown the the information from the informant was reliable *and* that the informant was credible.  In this case, there was no showing that Kane had any history of providing reliable information to the police, and was instead a suspect in custody who was being threatened with a murder charge.  The second prong of *Aguilar-Spinelli* could only be satisfied by the showing that the information provided by Kane had been independantly corroborated.  New York courts have held that verification must be about the crime in question (People v Watson, 109 AD2d 409, 411 [1st Dept. 1985]), not merely that the petitioner was seen in local bars with Kane and the victim  hours before the murder in the victim's apartment, in agreement with the petitioner's own previously stated version of events.

The failure to meet the *Aguilar-Spinelli* standard and the Court's failure to uphold that standard is contrary to clearly established federal guidelines regarding warrantless arrest.


**2.   The Defendant Was Severely Prejudiced By The Improper Testimony About His Interrogation:**

Petitioner did not confess or make any admissions regarding the crime.  During trial, however, detectives testified as to the petitioner's demeanor, that they *knew* he was lying, and repeatedly commented on his silence and failure to answer questions (T. 1150 l. 17-T. 1151 l. 4; T. 1153 l. 4-6; T. 1154 l. 8-10; T. 1157 l. 4-5; T. 1281 l. 1-5; T. 1283 l. 2-9; T. 1283 l. 19- T.

7

1285 l. 24; T. 1363 l. 21-23; T. 1364 l. 14-16; T. 1365 l. 9-23).

The appellate court did not address this issue, and the detective's testimony regarding the defendant's refusal to answer post-arrest questions, compounded by the prosecutor's summation in which he asked the jury to think about what the defendant *doesn't* tell the police, is a clear *Doyle* violation (Doyle v Ohio, 426 US 610 [1976]) concerning a defendant's right to remain silent; a constitutional error that warrants independant review by this court.

3. The Defendant's Right To A Fair Trial Was Severely Prejudiced By The People's Presentation of Misleading Evidence Intended To Show That The Leatherman Tool He Carried On His Belt Was Used To Cut The Wire With Which The Murder Victim Was Strangled:

At the time of his arrest three weeks after the murder, petitioner was wearing a Leatherman multi-tool on his belt. There was no testimony or statement which claimed that the petitioner was in possession of the Leatherman on the night of the murder, nor did alleged eyewitness Kane ever suggest that the Leatherman was used to cut the ligature wire. The Leatherman should not have been allowed into evidence as it had no link to the crime charged.

In pursuit of evidence to support Kane's eyewitness testimony, the prosecutor had the FBI and Nassau County Police Dept. tools and forensics labs test the Leatherman and the ligature wire. Though the thin wire was determined to have been cut with a scissor-type object and the Leatherman cuts in a similar manner, they could not match the Leatherman or a piece of

8

black plastic found in the Leatherman's jaws to the ligature wire. (Like bullet ballistics, a cut wire has signature scratches that would match the cutting tool) and they each submitted a report detailing their findings. Despite these negative lab reports and over defense counsel's strenuous objections, the prosecutor staged a surprise in-court demonstration wherein the police tool expert compared several types of cutting tools with different types of wire. This demonstration was fundamentally biased as he did not include scissors among the tools tested in his demonstration of a wire that had been cut with a scissor-type action, even though he opened the evidence bags in the courtroom *using a pair of scissors.*

Like the lab tests, this demonstration failed to match the Leatherman to the wire, but the subsequent testimony that the Leatherman had "unique" characteristics and could have cut the wire was confusing, misleading, and highly prejudicial.

After the demonstration, defense counsel again objected and the judge agreed that the demonstration was confusing but the prosecutor argued that the jury had already seen it and for that inappropriate reason the judge allowed the misleading demonstration to stand. Given the prosecutor's knowledge of the contents of the lab reports, the misleading courtroom demonstration can only be viewed as a deliberate attempt to confuse the jury in regard to the negative reports already submitted by the People into evidence.

This abuse of discretion by the trial court deprived the defendant of a fair trial and deserves independant review by this Court.

9

**4.** <u>The Trial Court Erred In Excluding As "Collateral" Testimony About A</u>
<u>Prior Choking Incident Involving John Kane And His Sale Of Illegal Drugs</u>:

"Just as an accused has a right to confront the prosecution's witnesses for
the purpose of challenging their testimony, he has the right to present his own
witnesses to establish a defense. This right is a fundamental element of due
process of law." (<u>Washington v Texas</u>, 388 US 14, 19 [1967]).

It was the defense's claim that Kane was a local drug dealer who sold
drugs to the victim in the past and had strangled another woman over a drug
deal in the past, though that victim survived. That victim was willing to testify
but the judge would not allow collateral attacks on Kane. The other witnesses
who were not allowed to testify had purchased drugs from Kane and one had
recently shared drugs with Kane and the victim. The New York Court of
Appeals has held that proof of a witness' motive to fabricate or falsely accuse
someone else of committing a crime is never "collateral" (<u>People v Hudy</u>, 73
NY2d 40, 56 [1988]) and it was an abuse of the court's discretion to prohibit
those witnesses.

In particular, the proposed testimony of Jennifer Hartman, that during a
dispute over drugs Kane grabbed her by the neck and choked her, would have
lent plausibility to the defense claim that it was during a dispute over drugs
that Kane grabbed Ruth Williams by the throat and strangled her. The fact that
the Hartman incident occurred three years prior to the murder in this case did
not make it "too remote" in time, as the prosecutor argued, since other defense
witnesses would have testified that Kane was still dealing drugs in April of
2000, when the murder occurred. The jurors should have been able to hear this
testimony and give it whatever weight they deemed appropriate. When

considered in conjunction with the other evidence against Kane, the proposed testimony would have created a reasonable doubt about the guilt of the defendant that did not otherwise exist. (see, Soto v LeFevre, 651 F Supp 588, 594 [SDNY 1986] citing US v Agurs, 96 SCt 2392, 2402 [1976]).

This issue was not addressed by the appellate court, and that failure to recognize a *Chambers* error (Chambers v Mississippi, 410 US 284 [1973]) is an unreasonable application of clearly established federal law (see Fry v Pliler, 127 SCt 2321 [2007]) and merits review by this court.

**5.**   **Defense Counsel Was Ineffective In Failing To Request A Charge Of Consciousness of Guilt and In Failing To Object To The Court's Proposed Charge of Confessions And Admissions:**

In the interest of brevity, this issue will be argued in the Ineffective Counsel claim (item **7.**) below.

**6.**   **The Defendant Was Unfairly Prejudiced By The Prosecutor's Summation:**

Decided over 75 years ago, Berger v US, 295 US 78 [1935] is still good law and is exactly on point for the instant case where, as in *Berger*, there is only weak evidence in the form of a single eyewitness who had a criminal record and who could otherwise be charged with the crime, combined with repeated misconduct by the prosecutor during summation.

This issue was addressed in two sentences by the appellate court. The first reads "The defendant's contention that certain statements made by the prosecution deprived him of a fair trial is unpreserved for appellate review."

11

This despite six objections on the record, four of them sustained by the judge.
On the sixth objection, for the prosecutor's use of the term "charade" to
describe the defense, exactly the same infraction for which the court had
sustained an objection previously (T. 1738 l. 1-5; Exh. 10), the prosecutor
stated "I can characterize this case and what they presented any way I want,
judge." (T. 1752 l. 17-18, Exh. 11) and the judge then overruled the objection.
The prosecutor proceeded to use that and other derogatory terms like "sham"
and "swill" over and over again without further objection.   With the Court
now operating under the assumption that the prosecutor can say whatever he
wants during summation, it was unreasonable to rule that the improper remarks
were not preserved for appeal.  Defense counsel's silence was responsive to the
Court's prior ruling, however misguided.  These improper suggestions and
inflammatory remarks by the prosecuting attorney were apt to carry much
weight against the accused where they should properly carry none. (*Berger*,
supra at 88).  Such an attack on petitioner's conduct of the case, under
circumstances tending to stir the resentment and arouse the prejudice of the
jury, should have been promptly suppressed.   The failure of the trial judge to
sustain petitioner's objection or otherwise make certain that the jury would
disregard the appeal could only have left them with the impression that they
might properly be influenced by it in rendering their verdict, and thus its
prejudicial effect was greatly enhanced. (New York Cent. R. Co. v Johnson,
279 US 310, 318 [1929])

The second sentence reads "In any event, the challenged comments
constituted fair comment on the evidence, were responsive to arguments
presented in defense counsel's summation, or constituted harmless error."

12

The two sentence ruling constitutes a generic catchall phrase that may be applicable in *other* cases, but is not applicable in the instant case wherein the issue is preserved at least in part and the harmless error doctrine cannot be applied as there is only weak eyewitness evidence. Moreover, we do not have a case here where the misconduct of the prosecuting attorney was slight or confined to a single sentence, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury that cannot be disregarded as inconsequential. *(Berger*, supra, at 88)

Additionally, this decision does not begin to address the trial judge's misunderstanding of the law after having been misled by the prosecutor into believing that he can say whatever he wants during summation, a claim the prosecutor knew or should have known to be false. That misconception alone deserves comment by this court.

7. <u>Defendant Was Deprived Of The Effective Representation Of Counsel As Guaranteed By The Constitution Of The State of New York And The Constitution Of The United States</u>:

This multi-faceted issue was addressed by the appellate court in a single sentence; "Viewing the totality of the evidence, the law, and the circumstances of the case, we find defendant's trial counsel provided meaningful representation. (see <u>People v Benevento</u>, 91 NY2d 708; <u>People v Baldi</u>, 54 NY2d 137)". The citations are included here to illustrate that the state courts failed to consider the Federal (Strickland) standard of ineffective counsel, though it was properly presented in the petitioner's appellate brief. The State would have it both ways; Some colorable issues are held to be

13

unpreserved by trial counsel for appellate review (and so an appellant who did not receive a fair trial would have his conviction affirmed as a direct result of trial counsel's errors/omissions) and yet they contend that trial counsel provided meaningful representation. The inconsistency of this ruling is repugnant, contradicts accepted governing law as set forth by the United States Supreme Court, and warrants further review by this court.

**8.** <u>The Verdict Was Against The Weight Of The Evidence</u>:

This issue was denied by the appellate court without adequate explanation.

The evidence that Ruth Williams was murdered by JOHN KANE was overwhelming; including fingerprints, DNA evidence, Kane's scratched face and statements to the authorities which were contradictory, incredible, refuted by other evidence, admittedly false and demonstrating a consciousness of guilt.

The petitioner was convicted on the word of John Kane, a drug dealer with a lengthy criminal past about whom the defense was prohibited from showing the jury had strangled a woman in the past in a dispute over drugs. He initially denied any knowledge of the crime in an interview with the police but his fingerprints were later identified among the latents found in the victim's apartment and he was taken into custody for further interrogation. Kane's DNA was identified on cigarette butts and under the fingernails of the victim of the strangulation murder, and the detectives who questioned Kane three days after the murder noted scratches on his face.   The prosecutor argued that the presence of Kane's DNA actually *supports* Kane's testimony that he was present in the victim's apartment and that the defendant wiped up

14

only his own fingerprints. The overwhelming evidence against Kane should have been enough to create reasonable doubt as to the defendant's guilt. The jurors apparently did not understand the unreliability of unsubstantiated eyewitness evidence, perhaps believing the prosecutor when he told them to ignore the fingerprint and DNA evidence and instead think about what was missing from the crime scene; the evidence that could have tied the defendant to the crime. The appellate courts should have recognized how weak the People's case was, but it may be that the ADA's misrepresentation of the defendant's DNA evidence as "conclusive" tipped the scales against the petitioner. The defense was prohibited from presenting witnesses during trial to establish Kane's motive to fabricate a story to avoid his own prosecution for the murder he himself committed, and while the appellate courts were informed about Kane's past indiscretions they apparently were not sufficiently influenced by them. The habeas court (should) make its determination concerning the petitioner's innocence in light of all of the evidence, including that which was alleged to have been illegally admitted, and evidence claimed to have been wrongfully excluded. (Bousley v US, 118 SCt 1604, 1615 [1998]) While a claim of actual innocence is not grounds for habeas relief, federal habeas courts sit to ensure that individuals are not imprisoned in violation of the constitution. (Herrera v Collins, 506 US 390) The federal habeas corpus statute, 28 USC §2254, states that an application for a writ of habeas corpus shall not be granted unless the adjudication of the claim - (2) resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in a State court proceeding, and it is now up to the discretion of this Court to determine if, in light of the overwhelming evidence

15

inculpating John Kane combined with the appellate court's added information regarding Kane's propensity to strangle women, the state appellate court properly decided that Kane's word alone was sufficient to convict the petitioner.

––––––––––

Collectively the eight issues presented in the petitioner's direct appeal illustrate the broad range of errors which contributed to the fundamental unfairness of the petitioner's trial. Each issue presented in the appeal had the potential to require reversal of the conviction, and the failure of the state courts to properly review the issues and apply clearly established law leaves the proper adjudication of each issue up to this Court.

## Ground 2

### THE FAILURE OF THE STATE TO GRANT A MEANINGFUL APPEAL IS A VIOLATION OF DUE PROCESS OF LAW

Petitioner claims actual innocence, and for an innocent man to be convicted in a court of law, mistakes must have occurred. It is the appellant's task to point out those mistakes to the appellate courts and to cite pertinent case law. It is then the appellate court's solemn duty to examine those mistakes, comparing the issues presented to those presented in the past in order to properly form a judicious opinion. It has been held to be error for appellate courts to dispose of non-frivolous appellate claims without providing an explanation. (see, Corcoran v Levenhagen, 558 US __, 130 SCt 8 [2009] As the US Supreme Court has held that an appeal as of right must be a

16

meaningful appeal, and failure to grant a meaningful appeal is a due process error (see Evitts v Lucey, 469 US 387 [1985]), petitioner contends that his incarceration is illegal as a result of that due process violation.

In the instant case the petitioner was convicted solely on the word of John Kane, an individual who had been taken into custody for the crime for which the petitioner was convicted. Upon being told that he would be charged with the murder, Kane implicated the petitioner, who was then arrested without a warrant. Kane testified at the trial, though his testimony was not substantiated by any physical evidence. The other prosecution witnesses did not testify about the crime charged, but only about events that occurred at other locations prior to the murder inside the victim's apartment.

A conviction based upon the word of an eyewitness without further evidence, particularly when that witness is alleged to have committed that same crime, has long been held to be based upon 'weak' evidence. (see, Berger v US, supra). Petitioner properly exercised his right to appeal and the Appellate Division, 2nd Dept. affirmed the conviction (see Decision 1).

### New York's Statutory Requirement to Determine an Appeal

Article VI of the United States Constitution states that the Constitution is the supreme Law of the Land, which proscribes states from enacting laws which are contrary to the Constitution and federal laws. The Fourteenth Amendment of the Constitution provides that "No State shall make or enforce any law which shall abridge the privilages or immunities of citizens of the United States".

Criminal Procedure Law §470.25(1) states that "An order of an

17

intermediate appellate court which affirms a judgment, sentence or order of a criminal court need only state such affirmance.". Taken literally, this statute allows the appellate courts to arbitrarily decline to review any or all of the issues presented in an appeal as of right. This creates a paradox wherein the state courts may legally deny an appellant an appeal despite the constitutional requirement that an appeal as of right be meaningful. The failure to provide a meaningful appeal, however sanctioned by the state, violates a defendant's right to due process. (<u>Evitts v Lucey</u>, supra)

The United States Supreme Court has held that an appeal as of right must be meaningful, and New York's CPL §470.25(1), which allows New York appellate courts to pay lip service to an appellant's statutory right to appeal while circumventing their obligation to grant a meaningful appeal, is therefore in contravention to the rights provided by Article VI and the Fourteenth Amendment. As has occurred in the petitioner's appeal, the lax requirements of CPL §470.25 allow New York's appellate courts to arbitrarily and capriciously ignore issues and precedents without explanation, depriving an appellant of the constitutional right to due process.

<u>The intermediate appellate court failed to deliver a meaningful appeal in the following manner:</u>

1. When declaring unspecified issues to be "without merit", the state appellate court ignored the doctrine of *stare decisis*, thus depriving appellant of his right to due process. "When a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review

18

or without merit', the validity of the claims is preserved and is subject to federal review." (Fama v Comm'r of Corr. Svcs., 235 F3d 804, 810 (2nd Cir. 2000)

New York's CPL §450.10 authorizes an appeal as of right, and when a State grants a statutory right to appeal, due process compels States to make certain that the defendant's rights are not forgone and that substantial legal and factual arguments are not passed over. (see, Pension v Ohio, 488 US 75, 85 [1988]) Thus, the State's procedure must afford "adequate and effective" appellate review, and a State's procedure provides such review so long as it resonably ensures that an appeal will be resolved in a way that it is related to the merit of that appeal. (see, e.g., Smith v Robbins, 528 US 259, 276 [2000])

Petitioner was represented on appeal by a court-appointed attorney who properly pointed out the mistakes which deprived the defendant of a fair trial. Counsel cited pertinent case law decided by both State and Federal courts, but the appellate court misapplied the law, ignored precedencial case law and otherwise chose not to address several colorable issues. As these issues were supported by binding case law, it was error for the court to stray from those precedents without explanation. *Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. (Payne v Tennessee, 501 US 808, 827) and although adherence to precedence is not rigidly required in constitutional cases, any departure from the doctrine of stare decisis demands special justification (Arizona v Rumsey, 467 US 203, 212 [1984]). In the instant case the appellate court offered no justification at all for ignoring the

19

precedents cited in the petitioner's appellate briefs, and this failure to explain their actions is a due process violation which warrants consideration by this court.

2. The application of New York's *Crimmins* harmless error standard (People v Crimmins, 36 NY2d 230 [1975]) was an abuse of discretion as there was no "overwhelming" evidence. *Crimmins* itself is based upon the harmless error standard set by the Supreme Court of the United States in Chapman v California, 386 US 18 and Fahy v Connecticut, 375 US 85. (*Crimmins* at 237). As there was only weak eyewitness evidence as defined in *Berger*, supra, any reliance upon 'harmless error' to affirm the instant conviction is thus contrary to accepted Federal standards as determined by the Supreme Court as well as the identical State standard, and warrants further review by this court.

3. In affirming the conviction in an appeal as of right, the intermediate appellate court failed to afford adequate and effective appellate review.

A system of appeal as of right is established precisely to assure that only those who are validly convicted have their freedom drastically curtailed (Evitts, supra, at 399). Appellate counsel submitted a 116 page Appellant's Brief, the People responded with a 94 page Respondent's Brief, and appellate counsel replied with a 67 page Appellant's Reply Brief. The combined 277 pages of briefs were admittedly a burden on the appellate court, and the court exemplified their preference for brevity by rendering a Decision which addressed those 277 pages in a mere 7 *sentences*. It is clear that the court did

20

not investigate each claim adequately as evidenced by their failure to recognize that the ADA cited the very trial testimony that disproved her claim that there was conclusive DNA evidence tying the defendant to the crime.

While this brief inquiry and Decision is acceptable in accordance with New York's statute governing the determination of appeals (CPL §470.25[1]), it renders the appeal virtually meaningless as the Supreme Court has long held that it is a fundamental requirement of due process that an appellant be heard "at a meaningful time and in a meaningful manner" (Matthews v Eldridge, 424 US 319, 333 [1976]). "[A] State may certainly enforce a vital procedural rule by imposing sanctions against the attorney, rather than against the client. Such a course may well be more effective than the alternative of refusing to decide the merits of an appeal and will reduce the possibility that a defendant who was powerless to obey the rules will serve a term of years in jail on an unlawful conviction." (Evitts, supra, at 399). The failure of the state court to comply with clearly established Federal law is a due process error which warrants further review by this Court.

## Ground 3

### PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." This right to counsel is "the right to effective assistence of counsel." (McMann v Richardson, 397 US 759, 771 [1970]). The Supreme

Court has explained that in giving meaning to this requirement we must be guided by its purpose - "to insure a fair trial" - and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversial process that the trial cannot be relied on as having produced a just result." (Strickland v Washington, 466 US 668, 686 [1984])  In order to prevail on a Sixth Amendment claim, a petitioner must prove that both the counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms", *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been diferent," *id.* at 694.  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *id.* at 694.  The petitioner's conviction was based on the testimony of a single eyewitness, as discussed above, and because the evidence was 'weak', trial counsel's effective conduct was even more essential to the assurance of a fair trial.

On Direct Appeal, appellate counsel presented examples of trial counsel's errors in the Appellant's Brief (the Brief).  While each of the following instances of ineffective counsel may be cause for a reversal of the petitioner's conviction, the cumulative effect of trial counsel's errors and omissions more than adequately served to undermine the confidence in the fundamental fairness of the defendant's trial.

1.  Point II of the Brief addresses defense counsel's (counsel) failure to properly object or move to strike the improper testimony of the detectives. The detectives who interrogated the defendant after his arrest repeatedly

22

referred to his state of mind and his failure to answer certain questions. The New York Court of Appeals has long held that "Persistant and repeated introduction of evidence of this type, for whatever purpose, cannot help but have the effect of implanting in the minds of jurors the impression that the defendant's refusals to answer were so inconsistant with innocence as to amount to admissions of guilt." (People v Bianculli, 9 NY2d 468, 472 [1961]) Counsel's failure to object rendered this highly prejudicial issue unpreserved for appellate review.

2. Point III of the Brief discusses the failure of counsel to object to the presentation of the Leatherman and the toolmark tests into evidence as it (they) had no connection to the crime. Additionally, counsel failed to present his own toolmark expert, though the defense had one readily available, the record indicates that counsel intended to present this expert witness, and there was no strategic reason for his failure to do so.

3. Point V of the Brief states that counsel was ineffective for failing to object to the court's charge on Confessions and Admissions, and in failing to request a charge on Consciousness of Guilt. These two errors allowed the detective's testimony regarding their feelings about the actions and constitutionally protected silence of the defendant during post-arrest interrogation to influence the jury without proper remedial instruction from the Court.

4. In addition to the three specific headings regarding ineffective counsel outlined above, appellate counsel submitted a Point VII, which is a claim of ineffective counsel in violation of the rights guaranteed by the State and Federal Constitutions. The arguments presented in Point VII include:

23

a) Defense counsel gave an opening statement which was rambling and included ill-advised remarks which prejudiced the defendant.

b) Counsel should have moved to strike testimony by the victim's brother, employer, and co-worker and should have objected to the admission of photographs of the victim alive as they concerned only the general appearance and personality of the victim and were not relevant to material facts to be proved at trial. The witnesses and photographs only served to garner sympathy from the jury, and indeed the prosecutor blatantly did just that when he displayed the picture of the victim during his summation and told the jury "You have to look at that photograph, when you are thinking about what Mr. Scrimo was thinking ..."

c) The Court repeatedly had to explain to counsel the proper way that things had to be done (T. 518-519; 1250-1251; 1255; 1569-1570; 1580-1581; 1586-1587; 1600); at one point stating to counsel that "That seems to be the problem during the course of this trial." (T. 1569 l. 9-10)

———————

Given the weak nature of the evidence against the defendant, there is a reasonable probability that absent the errors of trial counsel the jury would have had reasonable doubt regarding the defendant's guilt (Strickland, supra, at 695). This failure of trial counsel to fulfill his role as "effective" counsel is a violation of the defendant's Sixth Amendment right to Assistance of Counsel and is properly before this Court for consideration.

24

## <u>CONCLUSION</u>

WHEREFORE,  Petitioner respectfully requests that this honorable court grant

his request for a writ of habeas corpus and grant such other and further relief

that this court deems just and proper.


Dated: August 22, 2011

Paul Scrimo 02A3677
Petitioner, pro se
Green Haven C.F.
PO Box 4000
Stormville, NY 12582

25

**5. Exhibits**

# <u>EXHIBITS</u>

1) People's 84 (7-Eleven Store Record)
2) FBI Leatherman Lab Report
3) NCPD Leatherman Lab Report
4) T. 857-858; (confusing demonstration)
5) T. 1836-1837; (jury requests)
6) T. 1043,1070; (Clement "did not" , "not possible")
7) RB 37; (ADA's DNA citations)
8) T. 1769; ("The only items missing ...")
9) T. 1770; ("... any day of the week")
10) T. 1738; ("charade" sustained)
11) T. 1752; ("I can ... any way I want, judge")

<u>Scrimo v Lee,</u>   (Civ. No. Unassigned)

```
TAX1 0.00   TAX2 0.10   TAX3 0.10   TAX4 0.00   TAX5      0.10
0.00   TAX6 0.00

        TOTAL DUE                                      1.29
        CASH                                  1        1.29

04/12 03:58 01 END OF TRANSACTION *** NORMAL SALE

04/12 04:14 01 Shift# 4 Employee: MOHAMMAD SHAHID    Transaction #: 1016173
IF# 20 PLU# 00071990300692 ITEM# 2000548 (NR)
Coors lt 12 pak bottle Single                  1       7.99   T
VISUALLY APPROVED FOR AGE 21
Bottle Deposits - Non FS                       1       0.60
IF# 26 PLU# 00012300706995 ITEM# 2000282 (NR)
VANTAGE UL LIGHT Pack                          1       4.25   T
IF# 120301 PLU# 00028200008015 ITEM# 120454
Marlboro Box King Pack                         1       4.25   T

04/12 04:14 01 END OF TRANSACTION *** NORMAL SALE   (ABORTED)

04/12 04:14 01 Shift# 4 Employee: MOHAMMAD SHAHID    Transaction #: 1016174
NO SALE

04/12 04:14 01 END OF TRANSACTION *** NO SALE

04/12 04:15 01 Shift# 4 Employee: MOHAMMAD SHAHID    Transaction #: 1016175
NO SALE

04/12 04:15 01 END OF TRANSACTION *** NO SALE
```

7-Eleven Store System

Being Accessed...    Clock In/Out    Start

Exh. 1

: 5-18-99)



# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

## Report of Examination

| | | | |
|---|---|---|---|
| Examiner Name: | Carlo J. Rosati | Date: | October 17, 2000 |
| Unit: | Firearms / Toolmarks | Phone No.: | 202-324-4378 |
| Case ID No.: | 95A-HQ-1321020 | Lab No.: | 000630020 EA |

Results of Examinations:

Specimen Q1 exhibits shearing type toolmarks like those produced by the K1 Multi-tool. However, it could not be determined whether or not these marks were produced by the K1 multi-tool to the exclusion of all other shearing type tools.

FTU - Page 1 of 1

23
NS: 52
Exh. 2

## POLICE DEPARTMENT, COUNTY OF NASSAU, NEW YORK
## SCIENTIFIC INVESTIGATION BUREAU RECEIPT/REPORT

PDCN 303B - REV 11/94

| DEFENDANT(S) OR SUSPECT(S) | ADDRESS | PAGE    OF |
|---|---|---|
| 1. | | THREE |
| 2. | | DATE OF INCIDENT 4/13/00 |
| 3. | | FILE CLASSIFICATION PHYSICAL EXAM |
| 4. | | S.I.B. NO. C-66-00 |

| RECEIVED BY DET. VITO SCHIRALDI | RECEIVED FROM D/SGT. N. MATTIA, SERIAL NUMBER 5902, SIB |
|---|---|

| DATE 11/8/00 | TIME 1354 | CRIME MURDER | O.D. NO. HOM-231-00 |
|---|---|---|---|

| WHERE RECEIVED LABORATORY | INVOICE NO. 00-3275/3850 |
|---|---|

### QUANTITY AND DESCRIPTION OF MATERIALS SUBMITTED

A sealed paper bag marked "00003275..." containing the following items:

1. A clear sample bag marked "Q1 9-000630020 EA." containing a black wire cord (K1 VS).

2. A sample box marked "FROM K1 000630020 EA 9..." (Q1 VS).

3. A sealed plastic bag marked "00003850..." containing a black pouch.

### REPORT OF ANALYSIS OR EXAMINATION

Stereomicroscopical examination of the submitted questioned material from the "LEATHERMAN" type tool found in the sample box (Item 2; Q1 VS) revealed it to be a small hard substance approximately 1.5 mm$^2$ and a piece of toothpick-like wood.

Optical and chemical methods were used to compare the small hard substance (from Item 2; Q1 VS) to the black wire cord exterior wrap/insulation (from Item 1; K1 VS).   These tests revealed the substance (from Item 2; Q1 VS) to be dissimilar to the wrap/insulation found on the black wire cord (from Item 1; K1 VS).

Therefore, the small hard substance removed from the "LEATHERMAN" type tool (Item 2; Q1 VS) could not have originated from the wrap/insulation found on the black wire cord (Item 1; K1 VS).

I have completed the analysis of the above material on __11- 14-00__ and certify that I am a public servant of the County of Nassau, New York and am employed as a forensic scientist to examine the above described materials and the above report was made by me in the normal course of my duties. I understand that any false statements made herein are punishable as a class A Misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

| DATE 11-14-00 | SIGNATURE OFFICER PERFORMING ANALYSIS OR EXAMINATION | SECTION SUPERVISORS INITIALS | COMMANDING OFFICERS INITIALS |
|---|---|---|---|

Exh.3

1              THE COURT:  Well, now we're up here, Mr.

2      Chamberlain.

3              MR. CHAMBERLAIN:  I said I thought it was

4      based upon my prior objection and also it's confusing

5      to the jury.  Your Honor just sustained it, I thought.

6              THE COURT:  I did and I did find it confusing

7      to the jury.

8              MR. BIANCAVILLA:  Judge, what I'm saying is

9      that if -- first of all, the jury has already seen it.

10     It's been viewed.  It is actually something that the

11     detective used during the course of his presentation in

12     front of the jury.  If they have any questions

13     regarding the drawings, his testimony will be read back

14     and my problem is that how can you exclude something

15     that they've seen during the course of this detective's

16     testimony?

17             THE COURT:  That's true.  I didn't think of

18     it in that light.

19             MR. CHAMBERLAIN:  If it's confusing, it's

20     confusing.

21             THE COURT:  It may be confusing to us as lay

22     people.  What can be done is the jury can ask for the

23     detective's testimony be read back with respect to any

24     particular segment of the drawing itself.  Now, as you

25     look at in a vacuum, I agree with you it is confusing.

Exh. 4A

Det. Schiraldi - Cross/Chamberlain                    858

 1          However, we've heard the testimony of the detective as

 2     he was drawing the particular diagrams on these two

 3     pages that are up there.  What I'm going to do is I'm

 4     going to overrule it.

 5                    MR. BIANCAVILLA:  Thank you, Judge.

 6                    THE COURT:  You have an exception, Mr.

 7     Chamberlain.

 8     (Whereupon, the proceedings continued in open court.)

 9                    THE COURT:  The objection is overruled.

10     Cross-examination.

11     (Whereupon, People's Exhibits 78 and 79 were marked in

12                          evidence.)

13                    MR. BIANCAVILLA:  Judge, I just asked the

14     detective to put the evidence away.

15                    THE COURT:  Yes, we'll take a moment to do

16     that.

17     CROSS-EXAMINATION

18     BY MR. CHAMBERLAIN:

19          Q.   Detective, how are you this morning?

20          A.   Good morning.  Very well.

21          Q.   What's left of it.  First of all, your duties here

22     in the Scientific Investigation Bureau in the manner you've

23     already described, you made these -- you made an

24     investigation.  You made a report to whom?

25          A.   A report?

Exh. 4ₛ

Proceedings

1    from the jury.  The first one is marked Court Exhibit

2    VI.  It says, We the jury would like to see the

3    People's Exhibit of the chart of pictures.  Pursuant

4    to your stipulation, that was in evidence, that was

5    given to them.

6        Then they say, List of evidence and list of

7    witnesses.

8        Now, with respect to the list of evidence, I

9    will tell them the exhibits are in evidence, if

10   that's what they want.  I will be glad to give them

11   all of the evidence upon there request.

12       MR. CHAMBERLAIN:  If I may, Judge, with respect

13   to that, would your Honor indicate they may have all

14   or any of the evidence.

15       THE COURT:  Of course.

16       Then, with respect to the list of witnesses, the

17   names of the witness are in evidence.  I will be glad

18   to read them the list of witness but I will not give

19   them the list of witnesses, if that's what they are

20   looking for.

21       Counsel, do you have any objection to that?

22       MR. CHAMBERLAIN:  No, Judge.

23       MR. BIANCAVILLA:  No, Judge.

24       THE COURT:  The second note says -- and it's

25   marked Court Exhibit VII -- We the jury would like to

Exh. 5A

Proceedings

1   have the summation of both lawyers read back to us.

2        I will tell the jury that the summations are not

3   in evidence and I can not do that.

4        COURT OFFICER:  Jury entering.

5            (Whereupon, the sworn jurors entered the

6        courtroom and resumed their respective seats.)

7        THE CLERK:  Do both sides stipulate that all

8   sworn jurors are present and seated properly?

9        MR. BIANCAVILLA:  So stipulated.

10       MR. CHAMBERLAIN:  So stipulated.

11       THE COURT:  Good morning, ladies and gentlemen.

12  I have received two notes from you which I will read.

13       The first note marked Court Exhibit VI says, We

14  the jury would like to see the People's Exhibit of

15  the chart of pictures, comma, list of evidence and

16  list of witnesses.

17       We have already provided to you pursuant to your

18  request the chart of pictures.  With respect to the

19  list of evidence, that I cannot give you a list of

20  the evidence.

21       However, if you should desire to have any of the

22  evidence, all you have to do is request any of it.

23  You can have all of it or any of it.  Just send us a

24  note.

25       With respect to the list of witnesses, I will

Exh.5B

People - Clement - Cross

1    cigarette butt number seven which matched Ruth Williams.

2    We did not -- excuse me.  I'm sorry.  For cigarette butt

3    number nine which matched Ruth Williams.  We did not

4    calculate a statistic for number seven.  We calculated it

5    for nine because nine we had a larger profile.

6        Q    What statistical analysis did you provide for nine

7    then?

8        A    The probability of randomly selecting an unrelated

9    individual which would have a profile at the eight systems

10   that we obtained for cigarette number nine which matched

11   Ruth Williams would be approximately 1 in greater than

12   6 billion in the African-American population, 1 in greater

13   than 6 billion for the Caucasian population, and 1 in

14   4,450,000,000 for the Hispanic population.

15       Q    I am going to ask you further questions regarding

16   that but merely limit you are answers to the Caucasian

17   population?

18       A    Certainly.

19       Q    Did you come up with a determination with respect

20   to the beer bottle?  You indicated you had found a mixture

21   in the beer bottle?

22       A    We did find a mixture on the beer bottle and, no,

23   we did not calculate a statistical estimate.

24       Q    Did you calculate whether or not Ruth Williams

25   could have been included on the beer bottle?

Exh.6a

People - Clement - Cross

1    reportable mixture obtained in the second half of the swab

2    only, the probability of me randomly selecting someone who

3    would not be excluded would be 1 in 6,800 for the

4    Caucasian population.  This calculation was on the

5    mixture.  It wasn't on a major profile.  It was on the

6    overall reportable mixture.

7        Q    Didn't your report say John Kane cannot be

8    excluded as a major contributor to the genetic material in

9    this sample?

10       A    Yes, that's what the report said.

11       Q    Doesn't that analysis refer to the major

12   contributor who can be included?

13       A    No, it doesn't refer to the major contributor.  It

14   refers to the overall mixture of the reportable profile.

15       Q    Would it refer to a minor contributor, possible

16   minor contributor?

17       A    Yes, it would.

18       Q    When you have a DNA profile, do you not -- do you

19   provide statistical analysis for minor contributors?

20       A    If you can differentiate a major profile and a

21   minor profile, we would calculate a statistic strictly for

22   minor contributor, however, generally, that's not possible

23   to separate.  It's easy to identify a major profile

24   because it's more concentrated.

25       Q    In all your other reports you identified major

Exh. 6B

hours before her death (Catanese: 752, 758; Dr. THOMAS MANNING: 776, 778-83, 785, 787-89).

None of the latent prints found at the crime scene matched defendant's. The wineglass taken from Williams' kitchen table bore her fingerprint. A fingerprint on the CD case belonged to Kane. Two fingerprints found on the photo album and another fingerprint on a sheet of paper taken from the table could not be matched to anyone. No other identifiable fingerprints were recovered from any other surface in the apartment, including the ligature around Williams' neck (Detective CHARLES COSTELLO [Latent Fingerprint Section]: 707-15, 717-21; McHugh: 1190, 1209-10, 1261, 1266, 1271).

DNA testing established that the neck of the beer bottle on the kitchen table contained DNA from defendant, Kane, and Williams, with Kane the major contributor. DNA on the Vantage cigarette butts found under the ashtray on the kitchen table and under Williams' body were consistent with her profile, while the "major profile" of the DNA on the two brown cigarette butts was consistent with Kane's (Police serologist KEVIN MCCARTHY: 953-56, 960-61, 966-67, 977, 984, 998-99, 1004; MEGHAN CLEMENT [Laboratory Corporation of America]: 1021-31, 1043-55, 1057, 1064, 1069-70).

Microscopic examination of the ten fingernail clippings the medical examiner had taken from Williams during her autopsy revealed a mixture of a "brownish" substance and flecks of old nail polish

37

Exh. 7

Summation - People

1  probably.  There is a mixture of DNA on that

2  Budweiser bottle.  Remember what Meghan Clement from

3  LabCorp told you?  There's a major contributor and

4  minor contributor; John Kane is a major contributor,

5  Mr. Scrimo is a minor contributor.

6       What does that mean?  John Kane was drinking out

7  of the bottle more than Mr. Scrimo was drinking out

8  of the bottle.  That's what that means.  That's why

9  there's a mixture of DNA on it, ladies and gentlemen.

10  That's why there's a mixture of DNA.

11       Scrimo doesn't care about the Budweiser bottle

12  because it can't connect him with the crime.  Scrimo

13  doesn't care about the cigarette butts because he's

14  not a smoker and they can't connect him with the

15  crime.  The only items missing from that crime scene,

16  ladies and gentlemen, are the items that could

17  connect Paul Scrimo with that murder, items that he

18  admitted to buying at 7-Eleven, items that the

19  7-Eleven clerk observed him buying and you have a

20  store record for.

21       Do you think that it's coincidence that the only

22  items missing from that crime scene are things that

23  connect him with that murder?  I suggest not, ladies

24  and gentlemen.

25       The reason why the Budweiser bottle was left is

Exh. 8

Summation - People

1   he didn't care about the Budweiser bottle.  There

2   were no fingerprints on the Budweiser bottle, just

3   the cigarettes are gone and the Coors Light are gone.

4       Now, think about it.  I would take that, ladies

5   and gentlemen, over DNA and a fingerprint any day of

6   the week, because when the only items that are

7   missing from a crime scene can be shown to have been

8   purchased by this defendant, not only by independent

9   evidence but also by his own admission to Police

10  Officer Stark, and those are the only items that are

11  missing from a murder scene, that speaks volumes,

12  ladies and gentlemen, as much as any DNA or any

13  fingerprint.

14      Now, here is where it even gets more interesting

15  because you really have to think about the 7-Eleven

16  purchase and 7-Eleven clerk.  Down the road, he's got

17  a real problem.  He's got a real problem.  May 5th

18  the police department and detectives find that

19  7-Eleven clerk.  They find the 7-Eleven clerk and the

20  clerk remembers a sale about 4:00 a.m..  He remembers

21  the sale.  He made a sale to a regular customer.  He

22  made a sale to a regular customer, Mr. Scrimo.  He

23  makes a sale to a regular customer of particular

24  items and it was peculiar that Mr. Scrimo would be

25  buying a 12 pack of Coors Light and a package of

Exh. 9

Summation - People

1    by this charade and I'm confident that you will not

2    be fooled by his charade.

3         MR. CHAMBERLAIN:  I object to these improper

4    comments, Judge.

5         THE COURT:  Sustained as to charade.

6         MR. BIANCAVILLA:  In a little while we are going

7    to go over the evidence and I'll probably take about

8    40 minutes.  I am going to take the evidence in this

9    case, ladies and gentlemen, and we are going to turn

10   it upside down and inside out and you're going to look

11   at it and I suggest to you when you are done turning

12   it upside down and turning it inside out, it's all

13   going to point to that man, the killer of Ruth

14   Williams.

15        Before I do that, I want to thank you for

16   participating as jurors in this case.  We've taken

17   you away from your businesses.  We have taken you

18   away from your daily routines and we've asked you to

19   come and sit here and now we are into almost the

20   third week of trial.  I appreciate your attentiveness

21   during the course of the trial and just ask you

22   continue to be attentive just a little longer while I

23   make my final remarks.

24        Witnesses, let me talk about witnesses for a

25   moment.  I am not going to go through each and every

Exh. 10

Summation - People

1    looking for him.

2         MR. CHAMBERLAIN:  Objection, Judge, to

3    presumably.

4         THE COURT:  Sustained.

5         MR. BIANCAVILLA:  He doesn't call the police on

6    the 18th.  He doesn't call the police on the 19th.  It

7    isn't until the 20th that he sees Detective McHugh on

8    Main Street that he calls him.

9         Now, think about that.  Think about that and

10   this is why.  He is setting up a charade.

11        MR. CHAMBERLAIN:  I would object to that.

12        MR. BIANCAVILLA:  Judge, charade is fair comment

13   on the evidence and fair response to Mr. Chamberlain's

14   arguments.

15        MR. CHAMBERLAIN:  Not at all, Judge, not that

16   characterization.

17        MR. BIANCAVILLA:  I can characterize this case

18   and what they presented any way I want, Judge.

19        MR. CHAMBERLAIN:  Judge, he's commenting on his

20   operation of --

21        THE COURT:  No.  No.  Mr. Chamberlain.

22        I'll permit the assistant district attorney to

23   go forward.

24        MR. BIANCAVILLA:  Thank you, Judge.

25        He is setting up a charade, ladies and

Exh. 1