# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

11-CV-4171 (SJF)

PAUL SCRIMO,

*Petitioner,*

-*against*-

WILLIAM LEE,

*Respondent.*

---

### RESPONDENT'S AFFIDAVIT AND MEMORANDUM OF LAW
### IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

---

**KATHLEEN M. RICE**
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Tammy J. Smiley
Ilisa T. Fleischer
    Assistant District Attorneys
        *Of Counsel*

## TABLE OF CONTENTS

Page

Respondent's Affidavit In Opposition
   To Habeas Petition ........................................ i-vi

Respondent's Memorandum of Law
     Statement of Facts
     Introduction ........................................... 1
     The Suppression Hearing
         The People's Case ................................. 2
         The Defense Case ................................. 19
         The Court's Decision ............................ 19
     The Trial
         The People's Case ................................ 20
         The Defense Case ................................. 42
         The Verdict and Sentence ......................... 42
         Petitioner's Appeal from his
           Judgment of Conviction ......................... 42
         Petitioner's Post-Judgment Motions ................ 44
         The Petition for a Federal Writ
           of Habeas Corpus ............................... 45

Point I
     Petitioner's Fourth Amendment Claim Is
     Precluded By Stone v. Powell ........................... 46

Point II
     Petitioner's Claim That The Verdict Was
     Against The Weight Of The Evidence Does
     Not Entitle Him to Habeas Corpus Review ................ 50

Point III
     Petitioner's Evidentiary Claims Are Not
     Subject To Federal Habeas Corpus Review ................ 52

Point IV
     Petitioner's Claim That He Was Denied A
     Fair Trial Due To Prosecutorial Misconduct
     In Summation Is Procedurally Barred.  In
     Any Event, Petitioner Is Not Entitled To
     Habeas Corpus Relief On This Ground Because
     It Does Not Raise a Meritorious Claim .................. 57

Point V
     Petitioner Was Afforded The Effective
     Assistance of Counsel ................................. 65

Point VI
     Petitioner Received A Fair Appeal ...................... 75

Conclusion ................................................ 80

Certificate of Service

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
PAUL SCRIMO,

                     Petitioner,

      -against-

WILLIAM LEE,

                   Respondent.
-------------------------------X
STATE OF NEW YORK)
          ) ss.:
COUNTY OF NASSAU )

**RESPONDENT'S AFFIDAVIT
IN OPPOSITION TO HABEAS
PETITION**

11-CV-4171 (SJF)

    ILISA T. FLEISCHER, being sworn, deposes and states as follows:

    1.  I am an assistant district attorney, of counsel to Kathleen M. Rice, the District Attorney of the County of Nassau, New York, attorney for respondent, and am admitted to practice before this Court.

    2.  This affidavit is submitted in opposition to petitioner's pro se application for a writ of habeas corpus.

    3.  This affidavit is made upon information and belief, based upon my review of the records and files of the Nassau County District Attorney's Office concerning petitioner's state criminal prosecution, including a review of the trial transcripts.

4.   On April 12, 2000, petitioner used his hands and a ligature to strangle forty-eight-year-old Ruth Williams to death in her apartment in Farmingdale, Nassau County, New York.   An eyewitness to the crime identified petitioner as the killer, and petitioner's DNA was found at the crime scene.   In addition, both before and after his arrest, petitioner made false statements to police about his actions on the night of the crime.   Moreover, at the time of his arrest, petitioner wore on his belt a Leatherman's tool, the blades of which could have made the marks left on the ligature used to strangle Williams.

5.   Petitioner was charged, by Nassau County Indictment number 1456N/2000, with two counts of murder in the second degree (New York Penal Law §§ 125.25[1] and [2]).

6.   Following a jury trial in the County Court of Nassau County, on May 21, 2002, petitioner was convicted of intentional murder.   On June 18, 2002, petitioner was sentenced to an indeterminate state prison sentence of twenty-five years to life.

7.   Petitioner appealed from the judgment of conviction to the Appellate Division, Second Department.   In his brief on appeal, petitioner argued that:   (1) the police lacked probable cause for his arrest;   (2) he was prejudiced by improper testimony about his police interrogation;   (3) his right to a

ii

fair trial was infringed upon by the admission at trial of evidence intended to show that a tool he carried on his belt was used to cut the ligature with which Williams was strangled; (4) the trial court erred in excluding testimony about a prior choking incident involving the eyewitness to the crime and his sales of illegal drugs; (5) defense counsel was ineffective; (6) he was unfairly prejudiced by the prosecutor's summation; and (7) the verdict was against the weight of the evidence. On November 10, 2009, the Appellate Division unanimously affirmed petitioner's conviction. See People v. Scrimo, 67 A.D.3d 825 (2d Dept. 2009).

    8.   Petitioner sought leave to appeal from the affirmance of his conviction to the New York Court of Appeals. Appellate counsel argued that:  the suppression court's decision that there had been probable cause for petitioner's arrest was error; the Second Department had erroneously applied harmless error analysis because the evidence against petitioner was far from overwhelming; petitioner was deprived of his right to present the defense that the eyewitness was the actual killer; the trial court abused its discretion in allowing the testimony of a prosecution tool-mark expert and permitting that witness to give an in-court demonstration; and defense counsel was ineffective. In a supplementary pro se letter, petitioner sought leave on the

ground that he was denied his right to a meaningful appeal because the Appellate Division had not fully examined his claims, relied on sound legal principles, or articulated their reasoning in denying his appeal. The People opposed, and on March 29, 2010, a judge of the Court of Appeals denied petitioner's application. See People v. Scrimo, 14 N.Y.3d 805 (2010) (Read, J.). Petitioner sought reconsideration of his leave application and, on July 30, 2010, that application was denied. See People v. Scrimo, 15 N.Y.3d 778 (2010).

9.    On or about September 21, 2010, petitioner moved, pro se, for an order vacating the judgment of conviction pursuant to New York Criminal Procedure Law Section 440.10. In support of that application, petitioner argued that the Appellate Division had misapplied the harmless error doctrine because the evidence of his guilt was not overwhelming, and that the court abused its discretion in stating that some of his claims on appeal were without merit. Petitioner also claimed actual innocence and argued that New York Criminal Procedure Law Section 470.25 (1) is unconstitutionally vague. The People opposed petitioner's application, and on November 24, 2010, it was denied.

10.    In January 2010, petitioner sought leave to appeal to the Appellate Division from the Nassau County Court's denial of his Section 440.10 motion. The People opposed, and on or about

iv

May 10, 2011, the Appellate Division denied petitioner's application.

11. Now, in an un-notarized petition, filed on August 26, 2011, petitioner requests habeas corpus relief. In support of his application, he raises all of the claims he raised on direct appeal to the Appellate Division (see Petition, Ground 1). Petitioner also argues that he was denied due process by "[t]he failure of the State to grant a meaningful appeal" (Petition, Ground 2). In addition, petitioner renews all of the claims of ineffective assistance of counsel he raised on direct appeal (see Petition, Grounds 1 and 3).

12. Petitioner's claims are exhausted, but do not set forth a basis upon which habeas corpus relief should be granted. The state courts' rulings are not contrary to, and do not involve any unreasonable applications of, clearly established federal law, as determined by the United States Supreme Court.

13. Pursuant to this Court's order of September 16, 2011, respondent is filing, electronically, a copy of the state court records, which include hearing and trial transcripts, copies of the briefs filed on appeal, and motion papers filed in regard to petitioner's N.Y.C.P.L. § 440.10 motion and his appeal from the denial of that motion, as well as state court decisions on those motions. In addition, respondent is filing copies of

v

petitioner's applications for leave to the New York Court of Appeals, respondent's letter in opposition, and the written denial of that application.

WHEREFORE, for the reasons set forth in this affidavit and those in the accompanying memorandum of law, the petition for a writ of habeas corpus should be summarily denied.

Dated: Mineola, New York
      January 17, 2012

                            /s/Ilisa T. Fleischer
                            ILISA T. FLEISCHER


Sworn to before me this
17th day of January, 2012


/s/Susan Beallias
Notary Public
SUSAN BEALLIAS
Notary Public, State of New York
No. 30-4728937
Qualified in Nassau County
Commission Expires April 30, 2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
PAUL SCRIMO,

                Petitioner,        11-CV-4171 (SJF)

      -against-

WILLIAM LEE,

                Respondent.
------------------------------X


### RESPONDENT'S MEMORANDUM OF LAW


### STATEMENT OF FACTS

### Introduction

    On April 12, 2000, petitioner used his hands and a ligature to strangle Ruth Williams to death in her apartment in Farmingdale, Nassau County, New York. An eyewitness to the crime identified petitioner as the killer, and petitioner's DNA was found at the crime scene. In addition, both before and after his arrest, petitioner made false statements to police about his actions on the night of the crime. Moreover, at the time of his arrest, petitioner wore on his belt a Leatherman's tool, the blades of which could have made the marks left on the ligature used to strangle Williams.

1

The Suppression Hearing[1]

The People's Case

On the evening of April 13, 2000, Homicide Detective JOHN MCHUGH learned of the apparent homicide of Ruth Williams at her apartment in Farmingdale, Nassau County, New York. When McHugh arrived at the apartment a short time later, Williams lay dead on the bedroom floor, fully dressed. A ligature, which appeared to be a cord from a telephone answering machine, was wrapped around her neck. The medical examiner subsequently determined that Williams had been strangled to death (McHugh: H232-39, H349, H505-06).

While investigating Williams' final hours, McHugh obtained information about John Kane. Witnesses described Kane as a white man in his thirties, five-feet-seven or eight-inches tall, with a thin build, a ponytail, and a long beard. On the morning of April 15, after a bartender gave Kane a message from the detectives, Kane contacted them. Later that day, McHugh and Detective JAMES CEREGHINO interviewed Kane. Kane said he had known Williams for about a year and a half, primarily from the Falcon's Nest bar. Kane had been at Williams' apartment two or three times; the last time, three or four weeks before, she had

---

[1]Parenthetical references preceded by "H" are to the suppression hearing. Unless otherwise noted, all other parenthetical references are to the trial transcript.

2

given him oral sex, but he did not consider himself her boyfriend and did not know about any boyfriends she may have had. Kane said he had learned of Williams' death from "Ross." Asked about a bald, heavily-tattooed man who had been in Y.L. Child's bar on the night before Williams died, Kane said he did not know anyone who matched that description. He did not recall having being in Child's that night; he had been at another bar until 1:00 that morning, and then gone to a friend's home (McHugh: H240-42, H355-58, H361-64, H366-68, H399-400, H425, H434-37, H446).

Between April 19 and 26, McHugh conducted separate interviews with Francine Quinn, Jennifer DeRenzis, Thomas Hardman, and Melissa Notarilcola, each of whom, in the early morning hours of April 12, had seen Williams at Child's with Kane and a stocky white man in his forties with a shaved head and tattoos. Notarilcola observed Williams dropping the straps on her overalls as she talked to the men, and Quinn saw Williams "making out" with the shaven-headed man. Quinn, DeRenzis, and Hardman also recalled that Williams had left the bar alone, and that ten to twenty minutes later, the two men left together

3

(McHugh: H242-47, H266-72, H2925-27, H368-70, H399, H413-14, H416).[2]

A short time later, Quinn and her roommate left Child's and walked toward their car in the lot behind the Downtown Bar, above which Williams lived.  As Quinn reached the car, she heard "loud raised voices" and saw Williams arguing with the shaven-headed man near the entrance to Williams' building; Quinn heard the man say "fuck."  Only about sixty feet away, Quinn had a clear view of the couple.  On April 13, McHugh himself had observed that the parking lot had "[e]xcellent" lighting (McHugh: H232-33, H247-49, H264, H369-70, H395-99, H402-03, H406, H408, H447, H478-80).

At about 4:00 p.m. on April 20, as McHugh and Detective Cole walked on Main Street in Farmingdale, they saw a man they later learned was petitioner walking toward them.  About ten minutes later, petitioner telephoned the Homicide Squad and left a message with Detective BRIAN PARPAN.  Petitioner gave his name and said that he understood McHugh was looking for him because he was the "big bald headed guy" who "went to that bar."  Parpan gave McHugh petitioner's telephone number and an account of the conversation.  McHugh telephoned petitioner, who agreed to meet McHugh in ten minutes at the command bus set up behind the crime

---

[2]DeRenzis remembered that Williams left Child's some time after 3:00 a.m., while Hardman recalled that she left at 4:00 a.m. (McHugh: H267, H271-72, H414, H416).

4

scene.   When petitioner arrived, McHugh noticed that his head was completely shaven and he wore a pouch on his belt.   Petitioner said that he had heard that McHugh wanted to speak to a "big bald headed man who had been with Williams that Tuesday night at Child's," and acknowledged that he was that man (Parpan: H118, H140; McHugh: H272-77, H331, H353-54, H503).

Petitioner recounted that, on April 11, he had played darts at the Falcon's Nest until midnight with his teammates, one of whom was a long-haired man whom he knew only as "John." Afterward, petitioner went to Granny's bar, and then to Child's. At Child's, he saw Williams, and they spoke for about ten minutes. Petitioner could not remember their conversation because "he had been drinking"; however, he recalled that there were about eight people in the bar, none of whom resembled him.   At about 3:00 a.m. on April 12, petitioner walked straight home.   Petitioner added that if he had known that Williams was "going to go home and get herself killed, he would have remembered more or tried to help more."   At the end of the interview, McHugh showed petitioner a photo of a black man named Jeff Johnson, whom petitioner said he knew from "around town."   Petitioner said Johnson used to live over the Shamrock Bar, and may have been a drug dealer.   Later that afternoon, petitioner called Parpan and told him that he now remembered that he saw Johnson every morning on Conklin and

5

Secatogue Streets (Parpan: H119, H140; McHugh: H276-84, H425, H527).

On the evening of May 2, Detective Cereghino stopped Kane on the street, and Kane voluntarily[3] came to police headquarters for questioning.  Beginning at about 7:00 p.m., McHugh and Parpan interviewed Kane, who provided his pedigree information and criminal history.[4]  Kane stated that he had met Williams a couple of years before, and that she had given him oral sex a few times, most recently four to six weeks earlier.  He had seen her once or twice with a "big blond guy."  Kane again claimed to have learned about Williams' death from "Ross" (Cereghino: H73-74, H88; Parpan: H168; McHugh: H288-90, H425-27).

Kane said his relationship with petitioner was limited to their Tuesday night darts team at the Falcon's Nest.  McHugh reminded Kane that, during their first interview, he had said he knew no big, bald man with tattoos and pointed out that

---

[3]While at police headquarters, Kane was not under arrest, was not given his constitutional rights, was not handcuffed, and was free to leave at any time but never asked to do so (Parpan: H156; McHugh: H288, H426-27, H443).

[4]Kane stated that he had been arrested at age sixteen in Pennsylvania for a robbery or larceny involving a stolen car, and had served eight months in jail.  About ten years earlier, he had been convicted of petit larceny in Suffolk County.  A drug arrest upstate in 1999 involved a pipe containing residue of crack-cocaine.  Kane admitted that he was a heavy drinker but denied using cocaine.  He had not worked steadily in two months (Parpan: H165-66, H212-13; McHugh: H427-29, H432-34, H476-77).

6

petitioner fit that description.   Kane said he did not think of petitioner as big and did not consider him bald because he had shaved his head only recently.   McHugh informed Kane that detectives believed that Kane might have more information than he had offered.   Asked if he had any involvement in the murder, Kane said he did not.   The detectives replied that he then had nothing to worry about and should just tell the truth.   Kane said he was "scared," "nervous," and "confused" (Parpan: H161, H170-72, H174-76, H219; McHugh: H290-92, H438-42).

McHugh told Kane that witnesses had seen him in Child's at the end of the night that Williams was killed.   Kane said that, two weeks after the murder, petitioner had told him not to worry and to keep his mouth shut because the police believed a black man had killed Williams.   (McHugh believed petitioner had reached that conclusion because McHugh had shown him a photograph of a black man.)   Kane added, "[I]t wasn't me, I didn't do it, Scrimo did it" (Parpan: H192; McHugh: H442, H480-81).

Kane said that he had gone to the Falcon's Nest to play darts at about 8:00 p.m. on Tuesday, April 11, and that he and petitioner drank while playing.   Afterward, the pair went to Granny O'Shea's and, soon thereafter, went to Child's, where Williams approached Kane.   As they stood by the bar, Williams danced and "dropp[ed] the straps on her overalls," and Williams

7

and Kane kissed.  Petitioner asked Williams, "[W]hat about me?" and she replied, "[N]o, you're married."  Five to fifteen minutes after Williams left the bar, Kane and petitioner left together (Parpan: H161, H166, H170-73, H177-79, H219; McHugh: H292-93, H401-02, H407, H434, H444, H446).

As they walked down Main Street, Kane suggested to petitioner that they "continue the party" at Williams' apartment. The men walked to Williams' building, went upstairs, and knocked on her door; she invited them in.  Williams had no beer, and petitioner volunteered to buy beer and cigarettes at the nearby 7-Eleven.  After petitioner left, Kane put on some music and Williams performed oral sex on him; however, anticipating petitioner's return, Kane stopped Williams before he ejaculated. After ten to fifteen minutes, petitioner returned with a twelve-pack of Budweiser bottles, a package of Vantage Light 100 cigarettes for Williams, and a package of Marlboro cigarettes for Kane.  Kane told petitioner that Williams had "sucked his dick" while petitioner was gone (Parpan: H178-84; McHugh: H293-94, H297, H400, H406-10, H444-58, H478).[5]

---

[5]Kane did not believe Williams left the apartment while he was there but acknowledged that she was not in his view at all times.  He was also unaware of any altercation outside the apartment (McHugh: H408-09, H467).

Petitioner and Kane sat at the kitchen table, drinking beer. Then, as Kane listened to the music, petitioner and Williams had a discussion that included a reference to petitioner's wife. A short time later, petitioner got up and said, "I'm out of here." As petitioner headed toward the door, Kane asked him why he was leaving. Williams interjected, "[A]h, fuck him. Let him go home to his fat ugly wife." Petitioner turned around and "charged" at Williams, who stood near the doorway between the kitchen and the bedroom. They both fell onto the bedroom floor, with petitioner on top. Petitioner choked Williams around the neck with both hands. Kane pulled on petitioner's back and shoulders and yelled, "[W]hat the fuck are you doing? Stop." Despite his efforts, Kane could not stop petitioner from choking Williams. As Kane stood in the kitchen, petitioner got up and walked to the left side of the bedroom, from which Kane then heard what sounded like something being knocked over. Petitioner returned with a "cord," which he wrapped around Williams' neck and used to choke her from behind for "about a minute." During and after the strangulation, Williams made no sounds or movements, and her eyes were "rolled up into her head" (Parpan: H179, H184-88; McHugh: H294-95, H297, H453-54).

Petitioner yelled at Kane to turn off the music and to collect the empty beers; Kane complied and loaded all of the beer

bottles into the carrying case.  Meanwhile, petitioner wiped down the kitchen table and doorknob with a napkin.  As petitioner walked Kane home, he admonished Kane, "[J]ust keep your mouth shut.  It's only me and you in this, and if you keep your mouth shut we'll be okay" (Parpan: H188-91; McHugh: H294-96, H454-55).

That evening, McHugh informed Cereghino of Kane's statement and asked Cereghino to arrest petitioner.  McHugh described petitioner and advised Cereghino that petitioner played darts on Tuesday nights at the Falcon's Nest.  Detectives Cereghino and Cole drove to Farmingdale and, at about 10:00 p.m., parked between the Falcon's Nest and petitioner's home.  Detectives ROBERT DEMPSEY and Warren Zimmerman parked nearby (Dempsey: H5-8, H21, H332-35; Cereghino: H40-44, H77-79, H85, H88-89, H91-93; McHugh: H301, H502-05).

Just after midnight, Cereghino saw a man matching petitioner's description leave the Falcon's Nest and walk north on Main Street.  After briefly losing sight of the man, Cereghino approached petitioner and asked, "Paul Scrimo?"  Petitioner said, "[Y]es."  Pointing his handgun at petitioner, Cereghino identified himself as a police officer and told petitioner to lie face-down on the ground and place his hands behind his head.  Petitioner complied (Dempsey: H8-9; Cereghino: H44-45, H80, H93, H97-99, H570).

Cereghino holstered his gun, handcuffed petitioner, and frisked him. Cereghino then removed a tool from a pouch petitioner wore on the right side of his belt. Cereghino considered the dark, metal tool a "possible weapon." Because there was a "distinct possibility" that petitioner could reach the pouch with his hands cuffed, Cereghino confiscated the tool and pouch. Petitioner said he had been drinking, but he did not appear to be intoxicated; he was rational, logical, responsive, compliant, and oriented as to time, place, and circumstance (Dempsey: H9; Cereghino: H45-48, H97-99, H570-71).

Cereghino seated petitioner next to Dempsey in the back seat of Dempsey and Zimmerman's car. En route to police headquarters, at about 12:15 a.m., petitioner asked Dempsey, "What am I being arrested for?" Dempsey replied, "[F]or murder." Petitioner said he could not have committed a murder because he had been in a bar shooting darts all night. Dempsey responded, "You're being arrested for the murder of a woman that was found in her apartment a few weeks ago." Petitioner stated, "I knew her from town, but I had nothing to do with it." At that point, Dempsey instructed petitioner to "listen carefully" and advised him of his rights. After petitioner assured Dempsey that he understood each of his rights, Dempsey asked if petitioner was willing to talk to him without first speaking to a lawyer or having one present.

11

Petitioner replied, "I'll talk to you, but I had nothing to do with her murder.  And I told you that I knew her from town" (Dempsey: H10-12, H14, H20, H27-31, H37-38; Cereghino: H46, H48, H97).

At about 12:40 a.m., Dempsey and Zimmerman escorted petitioner into the homicide squad.  Dempsey removed petitioner's handcuffs and seated him in an interview room.  Dempsey and Zimmerman informed McHugh and Parpan that petitioner had waived his rights.  Dempsey also described petitioner's statements (Dempsey: H12-14; McHugh: H301-02, H508-11, H514-15).At about 1:00 a.m., Parpan and McHugh entered the interview room.  As McHugh introduced Parpan to petitioner, petitioner insisted, "[Y]ou have the wrong man, you made a mistake," and said he had nothing to hide.  McHugh ascertained that petitioner had been given his rights and would speak with McHugh without a lawyer. Petitioner then repeated that the police had the wrong man (Parpan: H120-22, H193-95, H201-03, H210-11; McHugh: H302-03, H515, H518-22, H525).

Asked what had happened "on the night in question," petitioner replied that it was a Tuesday night, and he had played darts and drunk beer at the Falcon's Nest from 8:00 p.m. to midnight.  Petitioner then had a drink at Granny's before moving on to Child's, where he had two more drinks and spoke with

12

Williams for five or ten minutes; however, he did not remember the topic of their conversation. He did not know when Williams left or where she went afterward. Petitioner had known Williams for about six months and had seen her occasionally in bars. He sometimes talked to Williams, but there was nothing "going on" between them (Parpan: H122-24, H151-52, McHugh: H525-26).

Although "very vague" about time, petitioner insisted that he had gone directly home from Child's. Reminded that stores often have surveillance videocameras, petitioner became "obviously nervous." He put his head down and thought for a few seconds. Then, in a "different, excited type of voice," petitioner said, "[Y]ou know, that's right, I did. I went to 7-Eleven. . . . I bought beer and cigarettes."[6] Asked why he would buy cigarettes when he said he was a non-smoker, petitioner claimed that he sometimes smoked. He explained his purchase of beer after a night of drinking as "what alcoholics do." Petitioner refused to tell Parpan what brand of cigarettes and beer he had bought and dismissed these details as "not important" (Parpan: H124-26, H150, H153; McHugh: H278, H527-30).

After petitioner conceded that he and his wife drank at home only rarely, Parpan again asked petitioner why he had bought beer

_____

[6]On April 18, McHugh had reviewed videotape from the 7-Eleven, but the relevant time-frame had been taped over (McHugh: H485-87).

13

to take home.  Petitioner repeated that he was a "drunk" and an "alcoholic."  When petitioner questioned why he would be a suspect since he had done nothing more than see Williams shortly before her death, Parpan noted that witnesses from the bar had described "a little light sexual contact" between petitioner and Williams. Petitioner insisted that she had simply kissed him on the cheek, and Parpan replied that the witnesses had said that petitioner and Williams had been "making out at the bar to [a point] where people took notice."  Petitioner again responded that he had been drunk.  Parpan observed that he had a "very selective memory" and used his alcohol problem as an excuse not to answer certain questions.  The detectives also told petitioner that he was lying (Parpan: H127-30, H149-50, H153-55, H208-09; McHugh: H526-27, H530-35, H543).

Next, the detectives told petitioner that the police knew that he had been inside Williams' apartment.  Petitioner denied this.  Parpan told petitioner that nothing is secret if more than one person knows about it.  Petitioner asked what that meant, and the detectives advised him that they had "spoken to everybody" (Parpan: H130-31; McHugh: H535-36).

At that point, petitioner stopped and looked away "for a while."  He then suggested that the detectives ask "John" where he had been that night.  Parpan asked, "John?  John who?  Where did

14

John come from?"  Petitioner asserted that he had always told the detectives he had been with John.  Both detectives pointed out that petitioner's only previous reference to John was as a darts-team member, and that petitioner had never before claimed to have spoken with anyone other than Williams that night.  Petitioner nonetheless insisted that he had previously mentioned John to the detectives (Parpan: H127-28, H131-32; McHugh: H486-87, H537-38).

After a forty-five-minute break, the detectives told petitioner that John's last name was Kane.  Petitioner stated that he had known Kane for about a year as a darts-player and alcoholic.  Asked if John and Williams had any type of a relationship, petitioner said he would not "talk about other people's business."  Petitioner denied having gone to Williams' apartment with Kane, even after the detectives said they had evidence to prove he had done so.  Asked if Williams had been murdered "because she made a remark," petitioner "reacted a little bit," but told the detectives, "We're on different sides of the fence here.  I can't help you."  At about 5:10 a.m., the detectives left the room again (Parpan: H132-33, H196, H205; McHugh: H516-17, H543-48).

Cereghino then briefed McHugh about the arrest and gave him the Leatherman's tool and pouch he had recovered from petitioner's belt.  McHugh recalled having seen a similar pouch on petitioner's

15

person when he first met him on April 20 (Cereghino: H45-47, H49-50; McHugh: H304-05).

Cereghino and Cole then interviewed petitioner. Asked to go over the events of the night of the murder, petitioner stated that he had been at the Falcon's Nest, playing darts and "drinking heavily." He then walked down the block to Granny's and continued drinking. Next, petitioner walked to Child's, where he drank some more and saw Williams. A short time later, petitioner saw Williams leave; he remained in the bar until it closed. He went home. Petitioner made no mention of Kane or of having kissed Williams, and volunteered no information about any stops he made on the way home. However, when asked if he had stopped at the 7-Eleven, petitioner again conceded that he might have (Cereghino: H51-54; Parpan: H134, H155; McHugh: H307).

Petitioner again denied having been in Williams' apartment that night. However, when Cereghino asked if petitioner might have forgotten being there, petitioner replied that it was possible. He added that he was a "heavy drinker" and had blackouts. Cereghino said the police knew petitioner was in the apartment that night. Petitioner became "sullen" and "withdrawn" and stopped talking. Eventually, however, petitioner repeated his denial that he had been in the apartment. Cereghino then informed petitioner that Kane had been with detectives for the

16

last several hours, and that they knew what had "happened in the apartment that night." Petitioner did not reply. Cereghino left the room and spoke with McHugh and Parpan (Cereghino: H33, H54-69, H81-84; McHugh: H552).

Five or ten minutes later, Parpan and McHugh re-entered the room. They told petitioner it was obvious that he had been lying and using drinking as an excuse for a "selective memory." Petitioner said, "[W]ell, you call them lies, I call them protection. My son trusted the police, and he's now in jail. And if I tell you my story, I might wind up in jail." The detectives told petitioner he was under arrest and going to jail. They asked him to tell them what happened. Petitioner said, "I can't tell you my story, I'm going to have the lawyer do it for me." At that time, about 7:15 a.m., the interview was terminated. Petitioner telephoned his wife and told McHugh that she was going to contact an attorney (Parpan: H134-35, H142, H204; McHugh: H307-09, H517, H524, H532, H553-55).

At about 3:00 p.m. on May 3, 2000, petitioner, with his attorney present, participated in a lineup. Child's patrons Quinn and DeRenzis separately viewed the lineup, but neither identified petitioner. Then, at about 3:25 p.m., Child's bartender Hardman viewed the lineup for no more than twenty seconds, and identified petitioner as the man he had seen on April 12 at Child's with

17

Williams and Kane (Cereghino: H62-68, H70, H72-73; Detective JERALD MULLEN: H101-02, H108-12; Parpan: H136-37; McHugh: H312).

On May 5, McHugh interviewed Mohammed Hussain, the late-shift clerk at the 7-Eleven store near both Williams' and petitioner's apartments. Hussain identified petitioner as an almost daily customer. Hussain recalled that, at about 3:00 on the morning of the crime, petitioner had come into the store and bought a twelve-pack of Coors Light bottles, a pack of Marlboro cigarettes, and a pack of Vantage Light 100 cigarettes. The Vantage Lights were stocked specifically for Williams, who was the only customer who had bought them during the eight months Hussain had worked there. Hussain recalled asking petitioner, "[A]re these for the girl?" and petitioner's replying, "[Y]es, the blond, . . . but don't tell my wife." At that point, Hussain rang up the beer, cigarettes, and a package of condoms and wished petitioner "a good time" (McHugh: H318-25, H330-31, H338, H457, H483, H489-92, H497, H512-13).

On May 9, 2000, McHugh re-interviewed Quinn, who explained that, at the lineup, she had been confused by the lighting, by all of the participants having bald or shaved heads, and by her inability to see the participants' body types because of the sheet covering their bodies. Quinn showed McHugh a photograph from the May 5 issue of Newsday that her roommate had shown her on the day

18

it was published.    After viewing the photo, Quinn had become
"positive" that one of the men in the photo -- petitioner -- was
the man she had seen with Williams on the morning of her death,
first at Child's and then arguing with Williams outside her
building (McHugh: H313-17, H331-34, H374-76).

### The Defense Case

Petitioner presented no witnesses at the suppression
hearing.

### The Court's Decision

In a written decision filed on April 9, 2001, the court
denied petitioner's suppression motions in their entirety.  First,
the court found that Kane's account of the crime was sufficiently
reliable to provide probable cause for petitioner's arrest because
it was a "declaration against penal interest," in that it
subjected him to criminal liability" as an "accessory after the
fact" (Decision at 13).  The court also credited Kane's statement
that he and petitioner had been with Williams shortly before her
murder because it was corroborated by the testimony of various
other witnesses, one of whom had seen Williams arguing with a man
who matched petitioner's description just before she died (id.).
Further, because "the detectives had confirmed significant details
of John Kane's story," the court concluded that Kane was "reliable
and that the information available to the detectives constituted

19

probable cause to believe that [petitioner] had committed the murder" (id. at 13-14).   Accordingly, the court found that petitioner's arrest was lawful and, as petitioner's pouch and Leatherman's tool were recovered incident to that arrest, they were admissible at trial (id. at 14).

Next, the court denied petitioner's motion to suppress his statements, concluding that he had been adequately advised of his constitutional rights and "knowingly and voluntarily waived them until the time that he reasserted his right to counsel and the interview was terminated" (id. at 14).

Finally, the court denied petitioner's application to suppress identification testimony.   The lineup procedure was not unduly suggestive.   Moreover, because the Newsday photograph was in no way police-arranged, witnesses who identified petitioner from that photograph would be permitted to identify him at trial (id. at 15).

The Trial

   The People's Case

A.   In the early morning hours of April 12, 2000, petitioner strangles Ruth Williams to death.

From about 8:30 to midnight on April 11, 2000, the Falcon's Nest bar on Main Street in Farmingdale, Nassau County, New York,

sponsored its Tuesday night dart team, which included bar owner FRANK DEFALCO, thirty-two-year-old JOHN KANE, and petitioner. Kane had long brown hair, a long goatee, weighed about 150 pounds and was about five-feet-six-inches tall; petitioner, a stocky man about five-feet-ten-inches tall, had a shaved head and tattooed arms (THOMAS HARDMAN [Y.L. Child's bartender]: 386-88, 392-98, 401-02, 412, 414-15; MELISSA NOTARNICOLA [off-duty Child's bartender]: 446-47; PENNY SHOUSE [Granny O'Shea's bartender]: 449-50, 452, 477-78; DeFalco: 420-23, 425-26; FRANCINE QUINN[7] [Downtown's bartender]: 601; Detective JOHN MCHUGH: 1138, 1203-04; Kane: 1425-28, 1507, 1521).

Forty-eight-year-old Ruth Williams was also out in Farmingdale that night. Williams came into the Downtown bar with a thin, dark-haired white man of average height. Quinn served Williams a Coors Light, and Williams remained at Downtown for a short time (JOHN MILLER WILLIAMS [Williams' brother]: 356; Quinn: 500-01, 516). At about midnight, Williams went to Granny's bar with a man who appeared to Shouse to have a "bad toupee." The pair sat at the bar for about fifteen minutes, during which time

---

[7]On August 1, 2001, Quinn was arrested and charged with drug sales and possession.   Pursuant to an agreement with the District Attorney's Office, Quinn's testimony at defendant's trial would not be used in the case against Quinn.   Quinn was represented by counsel during her testimony at defendant's trial (Quinn: 496-97, 499-500, 527-28, 575-76, 579).

Shouse served Williams a bottle of Coors Light (Shouse: 451, 453, 477).

After Williams left Granny's, Kane and petitioner came in together and had a drink. Upon leaving at about 1:00 a.m., petitioner and Kane walked to Child's, sat at the bar, and continued drinking. After a while, Williams approached them.[8] The trio was "hanging out," drinking and talking, and Williams was dancing and flirting with Kane. Notarnicola noticed that Williams was taking down the straps of her overalls as she danced "on top of" petitioner. Kane recalled that he "made out" with Williams and, when petitioner said, "[W]hat about me," Williams said, "[O]h, you're married." Notarnicola and Quinn, who had arrived at Child's at about 3:00 a.m., remembered Williams kissing petitioner (Hardman: 388, 398-99; Notarnicola: 442-44; Shouse: 452-53, 477-78; Quinn: 502, 552; Kane: 1428-29).

Right after "last call," Hardman missed his keys, including the bar keys. At about 4:00 a.m., the bar owner locked everyone in the bar and searched for Hardman's keys. Shortly thereafter, once a search revealed that she did not have the keys, Williams left the bar alone. Some time later, Kane and petitioner left

---

[8]Hardman and Notarnicola recalled that Williams entered Child's with Kane and defendant (Hardman: 386-88, 392-98, 401, 412, 414-15; Notarnicola: 441-42, 446).

together (Hardman: 380, 389-90, 402-07, 410-12, 444; Notarnicola: 444-45; Quinn: 503, 517, 553-57; Kane: 1430).[9]

As Kane and petitioner walked down Main Street toward the Falcon's Nest, Kane said, "Why don't we go over to Ruthy's and have a drink." Petitioner agreed and they walked to 196 Main Street, where Williams lived in an apartment above Captain Andy's restaurant. They entered the building's back door, went upstairs, and knocked on Williams' door. She let them in. Williams had no beer, so petitioner volunteered to buy some. Williams asked petitioner to buy her a pack of cigarettes too (J.M. Williams: 351-52; SVEN BOST [building owner]: 604-06, 612-13; Kane: 1430-31, 1475, 1574-75).

At approximately 4:00 a.m., petitioner entered the 7-Eleven store at 150 North Main Street in Farmingdale, where clerk MOHAMMED HUSSAIN[10] recognized him as an almost daily customer who lived across the street. Petitioner purchased a twelve-pack of Coors light beer, a box of Marlboro Light cigarettes, and a box of Vantage 100 Light cigarettes. Hussain asked petitioner, "[Y]ou

---

[9]The only outgoing call made from Williams' home telephone on April 12, 2000, was placed at 4:00 a.m. to directory assistance (GERARD CONNELL [Verizon Communications]: 481-86, 488-80).

[10]Hussain testified through an Urdu interpreter (Hussain: 1311, 1322).

buy for the blonde lady. I know she is my only customer who buy those."[11] Petitioner said, "[Y]es, . . . [b]ut don't tell my wife." Hussain promised not to say anything and rang up petitioner's cash purchase at 4:14 a.m. He handed petitioner a packet of condoms and said, "[Y]ou take condom too." Smiling, petitioner said, "[O]kay," and left (LISA LAWSON [store manager]: 1089, 1091-93; Hussain: 1314, 1318-20, 1340-41, 1344).[12]

Meanwhile, after petitioner left the apartment, Kane sat at the kitchen table. Kneeling between his legs, Williams performed oral sex on him, ran her fingers through his hair, and stroked his back, buttocks, and penis. After several minutes, Kane asked Williams to stop because he knew petitioner would be returning soon. Kane got up, zipped his pants, and told Williams he was "going to put on some tunes." While she remained in the kitchen, Kane walked through the bedroom into the living-room and put on an Allman Brothers CD (Kane: 1432-33, 1574-77, 1580-81, 1585, 1621).[13]

---

[11]Williams was the only customer who bought Vantage Ultra Light cigarettes from Hussain, purchasing them two to three times a week (Hussain: 1313, 1318, 1331).

[12]The tapes in the store videocameras are taped over every twenty-four hours (Lawson: 1092).

[13]Kane did not see Williams leave the apartment at any time. However, he did not know her exact whereabouts at all times (Kane: 1572, 1577-79, 1581).

About fifteen minutes after Williams had left the bar, Quinn and her roommate walked one block from Child's to her car, which was parked behind Williams' apartment building. Upon reaching her car, Quinn heard "loud, escalated voices" and the word "fuck." She turned to see what was happening. From about fifty feet away, Quinn had a clear view of Williams, who stood outside the back entrance to her building, arguing with a man. In the light from a "high intensity" flood-light above the back door, Quinn observed the man's shaved head and build. Although unable to see his face, she recognized petitioner (Hardman: 403; Quinn: 502-10, 512, 522-25, 528-31, 535-36, 553-59, 562-66, 590-93, 598-600; Bost: 606).

By the time Kane walked back into the kitchen after attending to the music, petitioner had returned with a twelve-pack of beer.[14] The trio sat down at the kitchen table and each had a beer and listened to the music. After a while, Kane began "vegging out to the music, listening to the lyrics" while petitioner and Williams talked. Suddenly, petitioner stood up and said, "I'm not going to take this. I'm out of here." He began walking toward the door. Kane asked, "What are you doing? We just got here. We just got some beers. . . . [H]ang out." Williams

---

[14]Defendant had been gone about ten minutes. When defendant first returned, Kane was in the living-room and could not see defendant and Williams (Kane: 1575, 1577-78, 1587, 1622).

25

interjected, "Fuck it.   Let him go home to his fat ugly wife" (Kane: 1434-35, 1441, 1475, 1578, 1585, 1587-88, 1621-22).

At that point, petitioner "snapped."  He turned, pushed Kane aside and went "right to Ruthy," who stood in the doorway between the kitchen and the bedroom.  Petitioner grabbed Williams by the shoulders and threw her down on the floor of the bedroom.  Kane looked over petitioner's shoulder and saw Williams between petitioner's knees as he was "strangling" her.  Her eyes were rolled up in the back of her head, her mouth was "agape," and she did not appear to be struggling.  Kane ran to petitioner, pulled on his shoulder with both hands, and asked what he was doing. Petitioner was "like a rock," and Kane could not budge him (Kane: 1435-37, 1442-43, 1475, 1588-89, 1591-93, 1596, 1606, 1621-25).

Petitioner strangled Williams for another "minute or two" and then got up and walked into the bedroom, out of Kane's view.  Kane then heard a snapping sound, as if something had been "ripped out."  At that point, Williams, lying on the floor, "looked dead." Seconds later, petitioner returned, holding a cord in his hands. He stepped behind Williams, wrapped the cord around her neck, and "yanked up" on it (Kane: 1437, 1441, 1592-94, 1596-99, 1623-25).

As Kane stood with his back against the kitchen counter, petitioner    screamed    at    him,    "Get    the    fucking    stereo." "[R]eluctantly," Kane stepped over Williams' legs, walked into the

26

living-room, and shut off the music.  When Kane returned to the kitchen, petitioner was wiping down the table and chairs with a napkin and a rag.  Petitioner told Kane to "[g]et the fucking beers," so Kane grabbed the bottles from the table and replaced them in the case, which he carried down the hallway.  Petitioner followed immediately behind him, wiping off the handles on each door they passed through as they left the building (Kane: 1438-39, 1442-43, 1445-47, 1588, 1600-05).

As they walked toward Kane's home, petitioner instructed Kane, "[D]on't say nothing.  It's all taken care of.  We are in this together.  Just keep your mouth shut" (Kane: 1439, 1443-44, 1604).[15]

B.   On April 13, 2000, Williams' body is discovered.

On April 13, after Williams was unaccountably absent for a second day from her job as manager of a florist shop, co-worker CAROLINE DALY sent a delivery driver to her home.  He reported that Williams' truck was in the parking lot.  Prompted by Daly, landlord Bost telephoned Williams, knocked on her door, and called her name, but got no reply (Daly: 361-64; Bost: 607-08).

---

[15]At the next Tuesday night's darts tournament, defendant repeated this admonition.  At the darts competition the week after that, he added that Kane should not "worry" because the "cops were looking for a black guy" in connection with Williams' murder (Kane: 1439-40, 1443-44, 1479-80, 1520).

That evening, Bost called the police, and Police Officer PAMELA STARK responded to 196 Main Street at about 9:15 p.m. Bost and Stark knocked on and yelled at the door. Getting no response, Stark climbed onto the roof and looked through the windows into Williams' apartment; unable to see into all of the rooms, she had Bost unlock the apartment door (Bost: 608-11; Stark: 1387-91, 1396-97, 1412-13).

Looking from the kitchen toward the bedroom, Stark saw "two white socks." She walked to the doorway of the bedroom, where Williams lay fully dressed and slumped over on the floor. Her right hand lay palm up and her left palm down; all of the nails were intact. Obvious lividity demonstrated that Williams was dead. As Stark shone her flashlight on Williams' face, she noticed the cord around her neck (Bost: 610; Stark: 1392-1400).

Detective DENNIS DOWNES arrived at Williams' apartment at about 11:00 p.m. Dressed in overalls and a white shirt, Williams' body lay next to the bed. Knotted tightly around her neck was a black telephone cord. After Williams' body was removed by the medical examiner, Downes found a Vantage 100 cigarette and a burn mark on the carpet beneath where her leg had been (Downes: 618-19, 622, 627-29, 655-57, 680, 700; McHugh: 1115, 1168, 1170-71, 1186).

The apartment was generally neat, with only a few things in disarray.  On the kitchen table lay various items, including a photo album, song lyrics on a piece of paper, an open bottle of Budweiser, a wineglass, and an ashtray with one brown and one white Vantage 100 cigarette butt underneath it.  There were also some napkins on the floor at the threshold of the kitchen.  On the bedroom floor lay a telephone/answering machine.  In the otherwise orderly living-room, the phone jack had been ripped out of the wall, and an Allman Brothers CD lay next to the stereo (Stark: 1394-95, 1398-1400, 1410; Downes: 627-29, 654, 656-59, 674).

C.  <u>Detectives   investigate   Williams'   murder   and   arrest   petitioner.</u>

On April 15, 2000, McHugh interviewed Kane at his home. Kane had no visible scratches, but bore an "old," scabbed-over injury on his forehead.  McHugh asked Kane about a "male white who had a shaved head and tattoos that was in Y.L. Child's."  Kane untruthfully said he did not know anyone of that description, and he omitted petitioner when listing the names of those who had stayed at Child's until closing time on April 12.  Kane also falsely told detectives that he had learned of Williams' death from "Ross" (McHugh: 1137, 1200-02, 1203, 1205-09; Kane: 1478, 1484, 1535-38).

29

Shortly after 4:00 p.m. on April 20, Detective BRIAN PARPAN received a telephone call from petitioner. Petitioner said that people at a bar he frequented had told him that McHugh was looking for a "big bald guy," and that he met that description. Parpan took petitioner's telephone number, paged McHugh, and conveyed petitioner's message (McHugh: 1137-38; Parpan: 1273-75).

McHugh telephoned petitioner, who said, "I understand you are looking to speak to a big, bald-headed guy that was out at Y.L. Child's on Tuesday night." Petitioner agreed to come to the command bus behind the crime scene. When petitioner arrived there a short time later, McHugh noticed a black pouch attached to his belt. During their ensuing conversation, petitioner acknowledged that he knew Williams, and that he had spoken to her briefly at Child's on the morning she died. Petitioner said he had left Child's at about 3:00 a.m. and walked straight home. Shown a photograph of a black man named Jeff Johnson, petitioner identified Johnson as a drug dealer who lived over the Shamrock Bar. Petitioner added that he sometimes saw Johnson on Route 109. Later that afternoon, petitioner called the Homicide Squad and told Parpan that he frequently saw Johnson when he ran errands on Secatogue Avenue and Conklin Street (McHugh: 1138-47, 1159; Parpan: 1276).

30

On the afternoon of May 2, Kane agreed to speak with McHugh again.  Kane said that he had met Williams in a bar, known her for two years, and received oral sex from her two or three times, most recently four to six weeks before the murder.  However, he was not Williams' boyfriend.  He also told McHugh he "didn't know anything" about the crime.  Kane played on a Tuesday night darts team with petitioner, but denied knowing a "big bald tattooed guy" (Cereghino: 1370, 1372-74; Kane: 1478, 1481-83, 1493-94, 1518-21, 1524-31, 1555-56).

After the detectives said they had evidence tying him to the crime scene, however, Kane finally told them "the full story."  He stated that, on the night of April 11, he had played darts and had some drinks with petitioner.  They then went to Granny's and finally to Child's, where Williams was coming on to Kane and kissing him.  After leaving Child's, Kane and petitioner went to Williams' apartment.  There, after Kane had put on an Allman Brothers' CD, he found petitioner in the kitchen after having purchased a twelve-pack of Budweiser (McHugh: 1147, 1226-27, 1262; Parpan: 1299; Kane: 1560-62, 1564, 1571-72, 1578, 1587, 1591).

Later that evening, McHugh sent Detectives JAMES CEREGHINO, ROBERT DEMPSEY, Michael Cole, and Warren Zimmerman to Farmingdale to arrest petitioner.  At about 10:00 p.m., Dempsey and Zimmerman

parked in a lot facing petitioner's apartment complex.  Cereghino and Cole parked between the Falcon's Nest and petitioner's home (Dempsey: 1099-100, 1106-07, 1111-12; McHugh: 1227-28; Cereghino: 1358-59, 1362, 1369).

At about 12:10 a.m., Cereghino confronted petitioner in a parking lot.  After petitioner confirmed his identity, Cereghino arrested and handcuffed him.  Cereghino frisked petitioner and recovered a pouch containing a Leatherman's tool from the right side of his belt (Dempsey: 1101, 1111; Cereghino: 1360, 1362).

As Zimmerman drove petitioner to police headquarters, petitioner was seated in the back seat next to Dempsey.  After about five minutes, petitioner asked why he was being arrested. Dempsey replied, "You're being arrested for murder."  Petitioner responded, "Well, I couldn't have done any murders tonight because I was in the bar shooting darts all night."  Informed that he was being arrested for "the murder of a woman who was found in her apartment about three weeks" before, petitioner replied, "I knew her from town but I had nothing to do with it."  At that point, Dempsey gave petitioner his constitutional rights; petitioner said he understood and waived his rights and was willing to speak with Dempsey without an attorney.  However, petitioner insisted, "I had nothing to do with her murder and I told you I knew her

32

from town" (Dempsey: 1101-03, 1112-13; McHugh: 1242; Cereghino: 1361-63).

At about 12:40 a.m., Dempsey brought petitioner to the Homicide Squad and left him seated and unhandcuffed in an interview room.  There, at 1:00 a.m., McHugh and Parpan interviewed petitioner.  Petitioner said he had been at the Falcon's Nest until midnight on the night of April 11.  He went on to Granny's, and then to Child's.  At Child's, petitioner spoke to Williams for five to ten minutes.  He did not know what time she left or where she went.  He walked home at about 3:00 a.m. Petitioner acknowledged that he had known Williams for about six months, and that both were "drinkers" (Dempsey: 1103-04; McHugh: 1148-49, 1216, 1238; Parpan: 1276-78, 1280, 1299).

Asked for more detail, petitioner repeated that he had walked home down Main Street, arriving about 3:00 a.m., and insisted that he had made no stops.  Petitioner added that both he and Williams were alcoholics, and attributed his failure to remember many details of April 11-12 to his drinking (McHugh: 1150-51; Parpan: 1280-84, 1307).

After explaining to petitioner that some businesses are equipped with videocameras, the detectives again asked petitioner if he was sure he had not stopped somewhere on the way home on the night of the murder.  Petitioner "put his head down," sat

33

there for "a couple of moments," "appeared to be getting nervous," and said, "I went to 7-Eleven for beer and cigarettes." Petitioner, however, refused to specify what brand of products he had purchased.   He dismissed these details as "not important." Asked why he bought cigarettes when he did not smoke, petitioner now claimed that he sometimes smoked.   Petitioner said he was buying beer at that time of morning because he was an alcoholic (McHugh: 1152-53, Parpan: 1281-85).

The detectives also told petitioner that witnesses at Child's had described "some light sexual contact" between him and Williams, but petitioner insisted that she had merely kissed him on the cheek.   The detectives said witnesses reported that petitioner and Williams had kissed so passionately that they "drew the attention" of many people.   Told that evidence placed petitioner in Williams' apartment, petitioner said, "No, that's wrong."   Parpan said, "Paul, nothing is a secret when more than one person knows about it" (McHugh: 1153-54, 1223; Parpan: 1286-88).

Petitioner again "dropped his head" and paused for a couple of minutes, appearing "very nervous."   He said he had told them "everything" and suggested they speak to "John" to verify his statements.   The detectives asked, "[W]ho is John?" and petitioner insisted that he had told them about John.   McHugh pointed out

that petitioner's only previous reference to "John" had been as his darts teammate, but petitioner insisted that he had mentioned John as someone he had been out with that night.   Petitioner again urged them to talk to John, and claimed that he had left Child's with John.   They had then separated, and petitioner had gone "right home."   Petitioner then conceded that he had gone to 7-Eleven before going home (McHugh: 1154-55; Parpan: 1288-89, 1305).

After a forty-five-minute break, petitioner said he knew John from darts and from the bar, and that John was an alcoholic. Asked about John's relationship with Williams, petitioner said, "I don't talk about other people." However, petitioner denied having had a relationship with Williams.   Parpan then asked, "Look, did this happen maybe because she made a remark, maybe she said something that set you off?"   Petitioner lowered his head, hesitated, and his voice sounded "upset" as he quickly said, "You know, I can't help you with this.  We are on different sides here" (McHugh: 1155-56, Parpan: 1289-93, 1303-04).

At 5:10 a.m., McHugh and Parpan left room and spoke with Cole and Cereghino, who then questioned petitioner.   Petitioner stated that he had been drinking "heavily" that night at the Falcon's Nest, and later that night went down the block to Granny's, and ultimately to Child's.   While drinking there, he saw

35

Williams and then saw her leave alone. When the bar closed, petitioner walked home. In response to Cereghino's question, petitioner admitted he might have stopped at the 7-Eleven. At that point, Cereghino told petitioner, "We know that you had bought beer in the 7-Eleven that night," but petitioner did not respond. He then denied having been in Williams' apartment that night. When petitioner sought to excuse his spotty memory by claiming to have alcohol-induced "blackouts," Cereghino asked if he might have forgotten having been in Williams' apartment that night. Petitioner conceded that was "possible." Cereghino said, "We know you were in the apartment that night." Petitioner said nothing. Cereghino then told petitioner that Kane had told detectives what had happened in the apartment that night. Petitioner again denied any involvement (McHugh: 1157, 1239; Parpan: 1293; Cereghino: 1363-65, 1374-77).

At about 7:00 a.m., McHugh and Parpan returned to the interview room and again urged petitioner to "tell the truth." Petitioner said his son had told the police the truth and wound up in jail, so petitioner "wanted his attorney to tell his side of the story." The detectives immediately stopped questioning petitioner, and shortly thereafter petitioner called his wife (McHugh: 1157-58, 1238; Parpan: 1293-94).

36

On May 3, 2000, Hardman identified petitioner from a lineup as one of the men he had seen with Williams in Child's in the early morning of April 12, 2000.  Quinn viewed the same lineup, but was unable to identify anyone because "[a]ll the people in the lineup looked the same" and had their bodies covered with a sheet; Quinn's inability to see the stature of the men in the lineup had affected her ability to make an identification (Hardman: 390-92, 404; Quinn: 512, 562-66, 593-95).

On May 4, 2000, Quinn saw a photograph in the newspaper that depicted McHugh and petitioner.  Quinn told McHugh that the man in the newspaper photo was the same man she had seen with Williams at Child's and at the back door of Williams' building on the morning of the murder (Quinn: 595; McHugh: 1119-20, 1158, 1161-62, 1165-67).

D.  Evidence is collected and analyzed.

On April 14, 2000, Nassau County medical examiner Doctor GERARD CATANESE conducted an autopsy on Williams.  A ligature was wrapped three times and knotted tightly around Williams' neck. Deep scalp bruises on the front and left side of Williams' head, visible only when the scalp was peeled back, were caused by two ante-mortem blunt impacts.  Williams had also suffered bruising to her neck muscles, fractures of her hyoid bone and thyroid cartilage, and bruising behind her larynx, all of which indicated

37

manual strangulation while she was alive, as did a bruise on her tongue, a "frictional" abrasion on her neck, and hemorrhages in her eyes and eyelids.  Based on these factors and "ligature abrasion furrows" on the skin of Williams' neck, Catanese concluded that Williams had died of both manual and ligature strangulation.  Catanese also observed that Williams' hands and fingernails were uninjured (Catanese: 727-29, 743-58, 760-66).

Williams' blood alcohol was .26 percent at the time of her death; that reading would have rendered her "severely intoxicated."  However, Williams had no toxicological indication of any kind of drug abuse.  Williams definitely had not used cocaine in the forty-eight hours before her death (Catanese: 752, 758; Dr. THOMAS MANNING: 776, 778-83, 785, 787-89).

None of the latent prints found at the crime scene matched petitioner's.  The wineglass taken from Williams' kitchen table bore her fingerprint.  A fingerprint on the CD case belonged to Kane.  Two fingerprints found on the photo album and another fingerprint on a sheet of paper taken from the table could not be matched to anyone.  No other identifiable fingerprints were recovered from any other surface in the apartment, including the ligature around Williams' neck (Detective CHARLES COSTELLO [Latent Fingerprint Section]: 707-15, 717-21; McHugh: 1190, 1209-10, 1261, 1266, 1271).  DNA testing established that the neck of the

38

beer bottle on the kitchen table contained DNA from petitioner, Kane, and Williams, with Kane the major contributor. DNA on the Vantage cigarette butts found under the ashtray on the kitchen table and under Williams' body were consistent with her profile, while the "major profile" of the DNA on the two brown cigarette butts was consistent with Kane's (Police serologist KEVIN MCCARTHY: 953-56, 960-61, 966-67, 977, 984, 998-99, 1004; MEGHAN CLEMENT [Laboratory Corporation of America]: 1021-31, 1043-55, 1057, 1064, 1069-70).

Microscopic examination of the ten fingernail clippings the medical examiner had taken from Williams during her autopsy revealed a mixture of a "brownish" substance and flecks of old nail polish under the fingernails of the index, middle, and pinky fingers of the right hand.  The material under Williams' right index and pinky fingernails contained DNA consistent with Williams'.  Williams and Kane were the contributors to the mixture of DNA found under Williams' middle fingernail, with Kane the "major donor."  Subsequent testing by the Suffolk County Crime Lab established that the index and pinky nail clippings contained no seminal fluid and that the middle fingernail clipping contained no human hemoglobin (Catanese: 751; McCarthy: 956-58, 960-63, 972, 975-77, 990, 997, 1004; Clement: 1025-27, 1029-30, 1045-51, 1069-70).

39

Detective VITO SCHIRALDI of the Police Department's Scientific Investigation Bureau described the ligature removed from Williams' neck as "similar to the power cord that would be used on a phone or answering type machine." Based on their respective examinations, Schiraldi and FBI firearms and toolmark examiner CARLO ROSATI each concluded that the cord was cut with a "sharp implement" with a one-directional, "shearing type" of force. Each found that the mark on the cord could have been made by "any type of shearing tool,"[16] including petitioner's Leatherman's tool, the blades of which pass "alongside of each other" as they cut through material. Neither Rosati nor Schiraldi could conclude that petitioner's Leatherman's tool definitively had made the original cut in the ligature. Moreover, a piece of black polymer-like material found on the Leatherman's tool did not come from the ligature (Schiraldi: 805-10, 815-28, 854-55, 900, 909-10, 915, 921; Rosati: 933-36, 939, 941, 943, 946).

E.   <u>Months after his arrest, petitioner makes a statement about the murder.</u>

At 7:12 p.m. on October 18, 2000, Officer Stark received a call of a disturbance at 25 Elizabeth Street in Farmingdale,

---

[16]A shearing tool is one that has two blades that "pass alongside of each other" as they cut. When cutting wire, the bottom jaw holds the wire stable, while the "shearing jaw" cuts and creates a "flattening" of the wire (Schiraldi: 919-21, 925; Rosati: 933, 945).

petitioner's home, and responded to that location, where she saw petitioner "pacing" inside the lobby.   Petitioner came outside, and Stark asked his name.   Petitioner immediately raised his hands in the air and said, "Paul Scrimo.   I didn't do it.   John Kane did.   I was never in that apartment."   Officer Wadsworth asked, "[T]hen why are we here tonight?"   Petitioner described an "ongoing problem" he was having with an Hispanic man, but said that the man "wasn't there anymore" (Stark: 1400-01, 1406-08, 1414).

Petitioner then resumed talking about Williams' murder.   He said that he, Kane, and Williams had been at Child's, and that Williams had kissed him, but only to whisper in his ear that "she wanted drugs from Kane," who, petitioner explained, was a drug dealer and did not give drugs away for free.   Petitioner said that they all left the bar and walked toward Williams' apartment, but that he went to 7-Eleven to buy beer and cigarettes while Williams and Kane went directly to the apartment.   After completing his purchase, petitioner met Kane in an alleyway, gave him the beer and cigarettes, and said he had to get home because his "old lady [was] going to be really angry at [him]." Petitioner explained that, when the police picked him up, he had never mentioned Kane "because of the drugs."   Finally, petitioner said to Stark, "You're the officer who found Ruthy . . . I'm really

41

sorry. I saw those pictures. They looked real terrible" (Stark: 1408-09, 1419).

### The Defense Case

Defendant presented no evidence at trial.

### The Verdict and Sentence

On May 21, 2002, the jury found petitioner guilty of intentional murder. On June 18, 2002, petitioner was sentenced to an indeterminate state prison sentence of twenty-five years to life.

### Petitioner's Appeal from his Judgment of Conviction

In his brief on direct appeal to the Appellate Division, Second Department, petitioner's assigned counsel argued that: (1) the police lacked probable cause for petitioner's arrest; (2) petitioner was severely prejudiced by improper testimony about his police interrogation; (3) petitioner was severely prejudiced by the admission at trial of evidence intended to show that a tool he carried on his belt was used to cut the ligature with which Williams was strangled; (4) the trial court erred in excluding testimony about a prior choking incident involving the eyewitness to the crime, John Kane, and his sales of illegal drugs; (5) trial counsel was ineffective; (6) petitioner was unfairly prejudiced by the prosecutor's summation; and (7) the verdict was against the weight of the evidence.

In an order dated November 10, 2009, the Appellate Division
unanimously affirmed petitioner's conviction. See People v.
Scrimo, 67 A.D.3d 825 (2d Dept. 2009). It held that the hearing
court properly denied petitioner's suppression motion because the
police had probable cause to arrest him. In addition, the court
determined that petitioner's challenges to statements made by the
prosecutor in summation were unpreserved for appellate review
and, in any event, the remarks at issue constituted fair comment
on the evidence, were responsive to arguments by petitioner's
attorney, or were harmless error. The court further concluded
that the verdict was fully supported by the weight of the
evidence, and that trial counsel provided petitioner with
meaningful representation. Finally, the court dismissed
petitioner's remaining claims as being without merit. See People
v. Scrimo, 67 A.D.3d at 825-86.

In his subsequent application for leave to appeal to the New
York Court of Appeals, petitioner's attorney argued that: the
suppression court's decision that there had been probable cause
for petitioner's arrest was error; the Appellate Division
erroneously applied harmless error analysis because the evidence
against petitioner was far from overwhelming; petitioner was
deprived of his right to present the defense that eyewitness John
Kane was the actual killer as a result of the trial court's

43

denial of his application to present witnesses to testify about Kane's alleged drug-dealing, the victim's drug use, and an incident in which Kane had allegedly choked a woman in a dispute over a drug deal; the trial court abused its discretion in allowing the testimony of a prosecution tool-mark expert and permitting that witness to give an in-court demonstration; defense counsel was ineffective; and petitioner was unfairly prejudiced by the prosecutor's summation. Petitioner filed a pro se supplemental application for review by the New York Court of Appeals of a claim that he was denied his right to a meaningful appeal when the Appellate Division "failed to fully examine his appeal or rely on sound legal principles and articulate their reasoning in denying his appeal" (Petitioner's pro se leave application, dated January 25, 2010). Leave to appeal was denied on March 29, 2010. See People v. Scrimo, 14 N.Y.3d 805 (2010) (Read, J.). Petitioner sought reconsideration of his leave application, and on July 30, 2010, that application was denied. See People v. Scrimo, 15 N.Y.3d 778 (2010).

Petitioner's Post-Judgment Motions

On or about September 21, 2010, petitioner moved, pro se, for an order vacating the judgment of conviction pursuant to New York Criminal Procedure Law Section 440.10. In support of that application, petitioner argued that the Appellate Division had

misapplied the harmless error doctrine because the evidence of his guilt was not overwhelming and abused its discretion in stating that some of his claims on appeal were without merit. Petitioner also claimed actual innocence and argued that New York Criminal Procedure Law Section 470.25(1) is unconstitutionally vague. The People opposed petitioner's application, and on November 24, 2010, it was denied. In January 2010, petitioner sought leave to appeal to the Appellate Division from the Nassau County Court's denial of his Section 440.10 motion. The People opposed, and on or about May 10, 2011, the Appellate Division denied petitioner's application.

<u>The Petition for a Federal Writ of Habeas Corpus</u>

In his pro se petition for a writ of habeas corpus, filed on August 26, 2011, petitioner requests habeas corpus relief on all of the grounds he raised on direct appeal to the Appellate Division and in his applications for leave to appeal to the New York Court of Appeals.

POINT I

PETITIONER'S FOURTH AMENDMENT CLAIM IS PRECLUDED BY <u>STONE V.</u>
<u>POWELL</u> (responding to Petition, Ground 1, Section 1).

In his bid for habeas relief, petitioner first argues that
the police lacked probable cause for his arrest (Petition, Ground
1, Section 1). Petitioner's claim is explicitly precluded from
review by the Supreme Court's decision in <u>Stone v. Powell</u>, 428
U.S. 465 (1976).

In <u>Stone</u>, the Court held that, "where the State has provided
an opportunity for full and fair litigation of a Fourth Amendment
claim, the Constitution does not require that a state prisoner be
granted federal habeas corpus relief on the ground that evidence
[unconstitutionally] obtained was introduced at his trial." 428
U.S. at 482; <u>accord</u> <u>Capellan v. Riley</u>, 975 F.2d 67, 70 (2d Cir.
1992); <u>Jackson v. Scully</u>, 781 F.2d 291, 297 (2d Cir. 1986); <u>Lopez</u>
<u>v. Lee</u>, 2011 WL 6068119 *8 (E.D.N.Y. 2011).[17]

Here, petitioner fully litigated his suppression claim in
the state courts. In a pre-trial suppression hearing, the state
court determined that police arrested petitioner upon probable
cause and, therefore, evidence obtained incident to his arrest
was admissible at trial. The Appellate Division affirmed that

---

[17] Hard copies of all decisions available only in an
electronic database are being mailed to petitioner, along with
respondent's opposition to the habeas petition.

finding.  See People v. Scrimo, 67 A.D.3d 825 (2d Cir. 2009).
Thus, petitioner's present claim should be denied by this Court.

Because petitioner fully availed himself of the adequate
state procedures to litigate his Fourth Amendment claim, the
limited exceptions to Stone do not apply.  The Second Circuit has
instructed that federal review of Fourth Amendment claims is
warranted only under two circumstances: "(a) if the state has
provided no corrective procedures at all to redress the alleged
Fourth Amendment violation; or (b) if the state has provided a
corrective mechanism, but defendant was precluded from using that
mechanism because of an unconscionable breakdown in the
underlying process." Capellan v. Riley, 975 F.2d at 70; accord
Lopez v. Lee, 2011 WL 6068119 at *8.  Neither exception applies
here.

As to the first prong of this test, New York provides
defendants the opportunity to litigate Fourth Amendment claims
prior to trial.  See N.Y.C.P.L. §§ 710.20-710.70.  These
procedures have repeatedly been found facially adequate -- a
well-settled holding petitioner does not challenge.  See, e.g.,
Capellan v. Riley, 975 F.2d at 70 n.1; Gates v. Henderson, 568
F.2d 830, 837 (2d Cir. 1977) (en banc), cert. denied, 434 U.S.
1038 (1978); Lopez v. Lee, 2011 WL 6068119 at *8; Walker v.
Walker, 259 F.Supp.2d 221, 225 (E.D.N.Y. 2003); Taylor v.

47

Kuhlmann, 36 F.Supp.2d 534, 549 (E.D.N.Y. 1999).

Nor does petitioner allege that he was unable to fully and fairly litigate his Fourth Amendment claim under the established statutory procedure.   In order to establish an "unconscionable breakdown" in the state court process, a petitioner must show that the state courts "failed to conduct a reasoned method of inquiry into relevant questions of fact and law." Capellan v. Riley, 975 F.2d at 71 (internal quotations and citations omitted).

Here, as noted, following petitioner's motion to suppress evidence, the state court held an evidentiary hearing.   It issued a written decision finding that the police had probable cause to arrest petitioner, and that the resulting evidence from his arrest would be admissible at trial.   Additionally, petitioner fully raised his Fourth Amendment claims before the Appellate Division, which affirmed the lower court ruling, holding that "the County Court properly determined that the police had probable cause to arrest [defendant] . . . Accordingly, the County Court properly denied those branches of the defendant's omnibus motion which were to suppress physical evidence and his statements to law enforcement officials." People v. Scrimo, 67 A.D.3d at 825.

48

Petitioner raises no objection to the process by which he litigated these claims, but rather the resulting decisions from the state courts.   This claim cannot provide a basis for relief. Even if this Court were to find the decisions of the state courts erroneous, a writ may not be issued, since the focus must be on the corrective process, not the outcome of the procedures used. See Capellan v. Riley, 975 F.2d at 71; Singh v. Miller, 104 Fed. Appx. 770, 772 (2d Cir.), cert. denied, 543 U.S. 1026 (2004). Because petitioner makes no showing of fault in the state court process, habeas corpus review of his Fourth Amendment claim is precluded.

In sum, because the suppression court's decision did not constitute an unconscionable breakdown in the proceedings, under Stone v. Powell, defendant is barred from making a Fourth Amendment claim in his petition for a writ of habeas corpus.   See Capellan v. Riley, 975 F.2d at 70.

49

POINT II

PETITIONER'S CLAIM THAT THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE DOES NOT ENTITLE HIM TO HABEAS CORPUS REVIEW (responding to Ground 1, Section 8 of the Petition).

Petitioner seeks habeas corpus relief on the ground that the guilty verdict was not supported by the weight of the evidence (Petition, Ground 1, Section 8). Petitioner's claim does not provide a proper ground for habeas corpus relief.

A federal court can consider an application for a writ of habeas corpus only on the ground that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States. See 28 U.S.C. § 2254(a). It is well settled, however, that an argument concerning the weight of the evidence is purely grounded in state law. See Gaither v. Artus, 2011 WL 2009470 *3 (E.D.N.Y. 2011) (citing Sweeney v. Superintendent of the Watertown Corr. Facility, 2007 WL 2176987 *8 [E.D.N.Y. 2007]); Correa v. Duncan, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001). Thus, unlike the state intermediate appellate court, which rejected petitioner's claim as meritless, this Court has no authority to review the weight of the evidence supporting the jury's verdict. See 28 U.S.C. § 2254(a); see also Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985), cert. denied, 476 U.S. 1123 (1986) ("A federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is

50

against the 'weight' of the evidence . . . "). Accordingly, petitioner's weight-of-the-evidence claim should be summarily denied.

In any event, for all of the reasons set forth in Point II of respondent's brief to the Appellate Division (see Respondent's Brief to the Appellate Division, Point II, pp. 47-54), petitioner's claim in this regard is meritless.

In sum, petitioner's claim that the verdict was unsupported by the weight of the evidence does not present a ground upon which habeas corpus relief may be granted.

## POINT III

PETITIONER'S EVIDENTIARY CLAIMS ARE NOT SUBJECT TO FEDERAL HABEAS CORPUS REVIEW (answering Petition, Ground 1, Sections 2-4).

Petitioner claims that he was denied his constitutional rights to a fair trial by the admission of certain evidence and the exclusion of other evidence at trial. First, petitioner asserts that he was severely prejudiced by police testimony regarding his interrogation, including observations about his demeanor and failure to answer questions, and the detectives' conclusions that he was lying (Petition, Ground 1, Section 2). Second, petitioner alleges that his right to a fair trial was violated by the admission of evidence that his Leatherman's tool could have been used to cut the wire used to strangle Williams (Petition, Ground 1, Section 3). And third, petitioner claims that the trial court erred in precluding proposed defense testimony regarding allegations that Kane had sold illegal drugs and had choked a woman during a dispute over drugs three years before the murder of Williams (Petition, Ground 1, Section 4). Petitioner's claims do not entitle him to habeas relief because he has failed to establish that the rulings about which he complains violated his federal constitutional rights.

A federally issued writ of habeas corpus "reaches only convictions obtained in violation of some provision of the United

States Constitution." Smith v. Phillips, 455 U.S. 209, 221 (1982); see 28 U.S.C. § 2254(a); accord Estelle v. McGuire, 502 U.S. 62, 68 (1991). Moreover, an application for a writ of habeas corpus does not lie with respect to any claim that was adjudicated on the merits in a state court proceeding unless such adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d)(1).

The admission of evidence at a petitioner's trial generally does not rise to the level of an error of constitutional dimension. See United States ex rel. Di Giacomo v. Franzen, 680 F.2d 515, 517 (7th Cir. 1982); Silva v. Miller, 2009 WL 4060946 *2 (S.D.N.Y. 2009); Mitchell v. Smith, 481 F.Supp. 22, 25 (E.D.N.Y. 1979), aff'd, 633 F.2d 1009 (2d Cir. 1980), cert. denied, 449 U.S. 1088 (1981) (all holding that admissibility of evidence in state court is matter of state law and generally unreviewable in federal habeas corpus proceeding). Moreover, the admission of evidence rests within the "broad discretion of the trial court," whose rulings will be disturbed "only for an abuse of that discretion." United States v. Walker, 142 F.3d 103, 110 (2d Cir.), cert. denied, 525 U.S. 896 (1998); accord United

States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003); United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002).

Here, as the People argued in their brief to the Appellate Division (see Respondent's Brief to the Appellate Division, Points III-IV, VI, pp. 55-68, 81-83), the trial court properly exercised its discretion in permitting the prosecutor to introduce evidence regarding the Leatherman's tool and petitioner's interrogation and in precluding petitioner from introducing the prior-bad-acts evidence relating to Kane. Because petitioner's evidentiary claims do not embrace a federal constitutional issue and because the court's decisions in these regards were not contrary to clearly established federal law as determined by the Supreme Court of the United States, he is not entitled to habeas corpus relief on this ground.

Of course, even if this Court were to find that the state court improperly admitted the prosecution's evidence and improperly excluded petitioner's, "[i]t is well-established that an erroneous evidentiary ruling ordinarily will not rise to the level of constitutional error sufficient to warrant the issuance of a writ of habeas corpus." Thomas v. Scully, 854 F.Supp. 944, 955 (E.D.N.Y. 1994); accord Martin v. Brown, 2010 WL 2740432 *11 (E.D.N.Y. 2010); Alfini v. Lord, 245 F.Supp.2d 493, 499 (E.D.N.Y. 2003); Warren v. Miller, 78 F.Supp.2d 120, 134-35 (E.D.N.Y.

2000).   Thus, even where a state court has made an improper evidentiary ruling, to warrant habeas corpus relief, a petitioner must show that the evidentiary ruling "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Alfini v. Lord, 245 F.Supp.2d at 500 (quoting McClean v. McGinnis, 29 F.Supp.2d 83, 93 [E.D.N.Y. 1998], aff'd, 189 F.3d 461 [2d Cir.], cert. denied, 528 U.S. 1050 [1999]) (quotations omitted); accord Martin v. Brown, 2010 WL 1740432 at *11.  Here, any purported error was truly harmless in light of the overwhelming evidence of petitioner's guilt (see Respondent's Brief to the Appellate Division, Point II, pp. 47-54).  This evidence demonstrated unequivocally that petitioner committed the crimes of which he was convicted.   Accordingly, because these evidentiary rulings could not have "had [a] substantial and injurious effect or influence in determining the jury's verdict" (McLean v. McGinnis, 29 F.Supp.2d at 93), petitioner's complaints do not warrant habeas corpus relief.

In sum, petitioner's evidentiary claims do not merit habeas corpus relief because the trial court's rulings did not violate any federal constitutional right, nor were they contrary to clearly established federal law as determined by the United States Supreme Court.  Moreover, petitioner has failed even to raise a meritorious claim because the court's rulings did not

prejudice him or deprive him of the right to a fair trial.   For these reasons, petitioner's evidentiary claims should be summarily rejected.

POINT IV

PETITIONER'S CLAIM THAT HE WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT IN SUMMATION IS PROCEDURALLY BARRED.   IN ANY EVENT, PETITIONER IS NOT ENTITLED TO HABEAS CORPUS RELIEF ON THIS GROUND BECAUSE IT DOES NOT RAISE A MERITORIOUS CLAIM (responding to Petition, Ground 1, Section 6).

Petitioner asserts that he was denied a fair trial as a result of the prosecutor's summation (see Petition, Ground 1, Section 6).   Petitioner's claim is procedurally barred and meritless.

As a threshold matter, petitioner's claim in this regard is procedurally barred.   As noted in respondent's brief to the Appellate Division (see Respondent's Brief to the Appellate Division, Point V, pp. 69-70), on direct appeal to that court, petitioner conceded that most of his complaints about the prosecutor's summation were unpreserved for appellate review (see Appellant's Brief to the Appellate Division, Point VI, pp. 94, 106).   Obviously agreeing, the Appellate Division specifically noted that petitioner's "contention that certain statements made by the prosecutor during summation deprived him of a fair trial is unpreserved for appellate review," and went on to hold that, "[i]n any event, the challenged comments constituted fair comment on the evidence .· . . , were responsive to the arguments presented in defense counsel's summation . . . , or constituted harmless error."   People v. Scrimo, 67 A.D.3d at 825.   Because

the Appellate Division "expressly relied on a procedural default as an independent and adequate state ground" (Velasquez v. Leonardo, 898 F.2d 7, 9 [2d Cir. 1990]) in denying petitioner's unpreserved claim, his current complaint about the prosecutor's summation is procedurally barred from habeas corpus review.  See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) ("even where a state court says that a claim is 'not preserved for appellate review but then rules 'in any event' on the merits, such a claim is procedurally defaulted."); Fama v. Commissioner of Correctional Services, 235 F.3d 804, 810-11 & n.4 (2d Cir. 2001) (same); Glenn v. Bartlett, 98 F.3d 721, 724-25 & n.3 (2d Cir. 1996), cert. denied, 520 U.S. 1108 (1997) (state decision that denied prosecutorial misconduct claim as not preserved for appellate review represented an independent and adequate state procedural ground even though court addressed merits of claim "in the interests of justice"); Vargas v. Keane, 86 F.3d 1273, 1280 (2d Cir.), cert. denied, 519 U.S. 895 (1996) (petitioner's failure to preserve for appellate review claimed error in prosecutor's summation rendered habeas corpus claim on that ground procedurally barred); Velasquez v. Leonardo, 898 F.2d at 9 (state decision that denied claims as unpreserved but then alternatively addressed merits rested on adequate and independent

state ground); <u>Washington v. Ercole</u>, 2011 WL 1527789 *4 (E.D.N.Y. 2011) (same).

Moreover, there is no reason for this Court to consider the merits of petitioner's claim. In a habeas corpus proceeding, a federal court may reach the merits of a procedurally barred claim only in limited circumstances. The petitioner must establish cause for his procedural default and resulting prejudice, or he must establish that the federal court's failure to review his claim will result in a fundamental miscarriage of justice, <u>i.e.</u>, that he is actually innocent of the crimes of which he was convicted. <u>See Coleman v. Thompson</u>, 501 U.S. 722, 748-51 (1991); <u>Murray v. Carrier</u>, 477 U.S. 478, 496 (1986); <u>Collins v. Artus</u>, 2009 WL 2633636 *8 (S.D.N.Y. 2009); <u>see also Bousley v. United States</u>, 523 U.S. 614, 623 (1998); <u>Schlup v. Delo</u>, 513 U.S. 298, 327-28 (1995). Here, petitioner makes no showing at all with respect to those standards. He has not even alleged any cause for his procedural default, much less demonstrated that he was prejudiced as a result. Furthermore, petitioner has not -- and cannot -- make a showing that he is actually innocent of the charges (<u>see</u> Respondent's Brief to the Appellate Division, Point II, pp. 47-54).

In any case, petitioner's quibble with the prosecutor's summation affords him no basis for relief. Here, as noted, the

59

Appellate Division rejected petitioner's challenge to the prosecutor's summation as unpreserved, but found that, in any case, the remarks were appropriate and, to the extent any may not have been entirely proper, they constituted harmless error. See People v. Scrimo, 67 A.D.3d at 825. That determination was an entirely reasonable application of Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). Accordingly, habeas relief is not warranted.

Generally, issues concerning the propriety of comments made by a prosecutor during opening or summation do not present meritorious federal questions. See, e.g., United States v. Robinson, 485 U.S. 25, 31 (1988) (in light of comments by defense counsel, prosecutor's statement in summation did not violate his constitutional rights); United States v. Tocco, 135 F.3d 116, 130 (2d Cir.), cert. denied sub nom. Ferranti v. United States, 523 U.S. 1096 (1998) (same). Indeed, the Supreme Court has held that a criminal conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone" in an otherwise fair proceeding. United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004) (quoting United States v. Young, 470 U.S. 1, 11 [1985] [prosecutor's improper expression of his personal belief that petitioner was guilty did not constitute reversible error]); see also Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990) ("The

appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.") (internal quotation marks and citations omitted). "In order to reach the level of a constitutional violation," a prosecutor's remarks must cause the petitioner "substantial prejudice" and "'so infect the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 [1974]); accord Dawkins v. Artuz, 152 F. Appx. 45, 46-47 (2d Cir. 2005), cert. denied, 549 U.S. 906 (2006); United States v. Salameh, 152 F.3d 88, 98 (2d Cir. 1998), cert. denied, 526 U.S. 1028 (1999); United States v. Rivera, 22 F.3d 430, 437 (2d Cir. 1994); see Martin v. Brown, 2010 WL 1740432 at *14. In other words, the remarks must constitute "egregious misconduct" in order to warrant relief. Donnelly v. DeChristoforo, 416 U.S. at 747; United States v. Elias, 284 F.3d 183, 190 (2d Cir. 2002).[18] Here, no such unfairness occurred.

---

[18]In the federal courts, where no objections to the comments were advanced at trial, reversal is appropriate only for "flagrant abuse." United States v. Zichettello, 208 F.3d 72, 103 (2d Cir. 2000), cert. denied sub nom. Lysaght v. United States, 531 U.S. 1143 (2001).

Indeed, for the reasons set forth in the prosecution's brief to the Appellate Division, and as that court agreed, virtually all of the statements petitioner complains about constituted fair responses to defense counsel's cross-examination and summation or were fair comments on the evidence (see People v. Scrimo, 69 A.D.3d at 825; Respondent's Brief to the Appellate Division, pp. 69-76).

However, even if the prosecutor exceeded the broad bounds of permissible advocacy in summation, petitioner would not be entitled to relief. In assessing whether a prosecutor's improper comments have substantially prejudiced a petitioner and whether the error was harmless, federal courts consider three factors: (1) the severity of the prosecutor's conduct; (2) the measures taken by the trial court to cure the error and prevent prejudice; and (3) whether the petitioner's conviction was certain absent the prejudicial conduct. See Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994), cert. denied, 516 U.S. 1152 (1996); Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991); Martin v. Brown, 2010 WL 174032 at *14. Additionally, the federal court may consider whether or not the petitioner objected to the challenged comment, on the theory that a petitioner's failure to object may indicate that the remark was not perceived as having a substantial adverse effect or as advancing an improper cause. See Cargill v. Turpin,

62

120 F.3d 1366, 1379 (11th Cir. 1997), <u>cert. denied</u>, 523 U.S. 1080 (1998); <u>Nichols v. Scott</u>, 69 F.3d 1255, 1278 (5th Cir. 1995), <u>cert. denied</u>, 518 U.S. 1022 (1996).

Here, any error in the prosecutor's summation was harmless in light of the speculative nature of the alleged prejudice, the propriety of the prosecutor's summation as a whole, and the overwhelming evidence of petitioner's guilt.  Indeed, as shown in Point II of respondent's brief to the Appellate Division, petitioner's culpability was compellingly established by the evidence the People educed at trial (<u>see</u> Respondent's Brief to the Appellate Division, pp. 47-54).  In light of the powerful proof of petitioner's guilt and his failure to challenge most of the prosecutor's remarks below (and even where he did advance an objection, none was sufficiently specific to preserve his appellate complaints) (<u>see</u> 1734-38, 1740-42, 1744, 1746-69, 1752-53, 1763, 1765-72, 1775, 1777-81, 1783), it is plain that the comments at issue could not have prejudiced petitioner, much less to a substantial degree.

This is particularly true in light of the court's unequivocal instructions to the jury that the prosecution alone bore the burden of proof (1792-94), that the jury should not accord greater credibility to police testimony than to that of other witnesses (1804), that the arguments of counsel were not

evidence (1786-87, 1790), that any "verbal exchanges" between the attorneys should be ignored (1790-91), that the jurors were the sole and exclusive judges of the facts (1788-89, 1803), and that they were to rely on their own recollection of the evidence (1803-06). Since the jury presumably heeded these instructions (see, e.g., Weeks v. Angelone, 528 U.S. 225, 234 [2000]; Richardson v. Marsh, 487 U.S. 200, 211 [1984]), petitioner could not have suffered any prejudice as a result of the prosecutor's closing argument.

In sum, petitioner's challenge to the prosecutor's summation is procedurally barred and, in any case, it fails to present a meritorious federal constitutional claim. Moreover, the Appellate Division's rejection of petitioner's summation claim on its merits was not an unreasonable application of Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). Accordingly, petitioner is not entitled to federal habeas corpus relief on this ground.

POINT V

PETITIONER WAS AFFORDED THE EFFECTIVE ASSISTANCE OF COUNSEL
(answering Petition, Ground 1, Sections 5, 7; Ground 3).

In support of his bid for habeas relief, petitioner alleges that his trial counsel was ineffective in a plethora of ways. He alleges that counsel was ineffective for failing to: request a consciousness-of-guilt charge and in failing to object to the court's proposed charge on confessions and admissions (Petition, Ground 1, Sections 5, 7; Ground 3, para. 3); properly object or move to strike the improper testimony of the detectives about petitioner's interrogation (Petition, Ground 3, para. 1); object to the introduction into evidence of the Leatherman's tool and tool-mark tests (id., para. 2); present his own tool-mark expert (id.); move to strike testimony by the victim's brother, employer, and co-worker; and object to the admission of photographs of the victim alive as irrelevant (id., para. 4b). Additionally, petitioner complains that trial counsel's opening statement was rambling and contained remarks that prejudiced him (id., para. 4a). Finally, petitioner asserts that his attorney was ineffective because the trial court repeatedly explained to him "the proper way that things had to be done" (id., para. 4c).

Petitioner's claims are meritless, for the state court's ruling that petitioner received the effective assistance of

counsel was manifestly correct.  The standard by which a claim of ineffective assistance of counsel must be determined was set forth in Strickland v. Washington, 466 U.S. 668, 689 (1984).  A criminal defendant or habeas petitioner seeking relief on this ground must establish that counsel's performance was "outside the wide range of professionally competent assistance," and that there exists a "reasonable probability" that, but for the deficiency, "the result of the proceeding would have been different."  Id. at 690, 694; accord Bierenbaum v. Graham, 607 F.3d 36, 51 (2d Cir. 2010), cert. denied, ___U.S.___, 131 S.Ct. 1693 (2011); Puglisi v. United States, 586 F.3d 209, 215 (2d Cir. 2009); Diaz v. United States, 2008 WL 4360994 *1 (E.D.N.Y. 2008).  The Supreme Court has also held that Section 2254(d) "preserves authority to issue the [federal] writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with this Court's precedents.  [H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Harrington v. Richter, ___U.S.___, 131 S.Ct. 770, 786 (2011) (citations omitted).  Applying these principles, and for the reasons set forth below, it is evident that petitioner's complaint of ineffective

66

assistance of counsel was properly rejected by the state court as meritless.

The record supports the conclusion that petitioner's trial counsel was vigilant and aggressive in protecting petitioner's rights and the result was a fair trial. For example, counsel pursued his only viable defense: to try to pin the murder on Kane, who was admittedly present during the murder. To that end, he highlighted the weaknesses in the physical evidence, i.e., that Kane's DNA -- not petitioner's -- was found under Williams' fingernail, that none of petitioner's fingerprints was found in Williams' apartment, and the lack of unequivocal evidence linking petitioner's Leatherman's tool to the ligature used to strangle Williams.

Counsel also lost no opportunity throughout the trial to attack the credibility of the prosecution witnesses, particularly Kane, Hussain, and Quinn, whose testimony was the most damaging to the defense. Additionally, he effectively emphasized that Quinn had been unable to see the face of the man who argued with Williams outside her building, and that Kane never saw Williams leave the apartment during that time-frame and was unaware of any argument between her and petitioner. Further, counsel urged the jury to conclude that petitioner's statements to police were

involuntary because he was drunk when he made them and/or was coerced into speaking to police.   Additionally, counsel offered numerous objections and gave lengthy, effective opening and closing statements.   Plainly, then, counsel provided exemplary representation.

Nonetheless, petitioner attacks counsel's representation in myriad ways.   These claims should be rejected.

Petitioner's complaints that defense counsel should have objected to or moved to strike various aspects of the prosecution's evidence are uniformly meritless.   As argued in respondent's brief to the Appellate Division (see Respondent's Brief to the Appellate Division, Point III, pp. 56-63; Point VI, pp. 80-84) and in response to petitioner's current complaint about the introduction at trial of the Leatherman's tool, the tool-mark evidence, and testimony about petitioner's police interrogation (see Point III, supra), without exception, the evidence and testimony about which petitioner complains was properly admitted at trial.   Thus, counsel obviously -- and properly -- recognized that he had no cause to move to strike this testimony.   See Torres v. Fisher, 2010 WL 1338088 *8 (S.D.N.Y. 2010) ("A trial counsel is not deemed ineffective for failing to make a pointless objection to the admission of

68

evidence which had already been deemed admissible by the court."); Adeyi v. United States, 2007 WL 203962 *4 (E.D.N.Y. 2007) (failure to make a meritless objection cannot constitute ineffective assistance of counsel). And, as further argued on direct appeal (see Respondent's Brief to the Appellate Division, Point VI, pp. 82-83), counsel likely had reasonable strategic explanations for his decisions not to seek to preclude this evidence. Accordingly, because petitioner has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound [legal] strategy,'" (United States v. Caracappa, 614 F.3d 30, 46 (2d Cir.), cert. denied, ___ U.S. ___, 131 S.Ct. 675 (2010) [quoting United States v. Gaskin, 364 F.3d 438, 468 (2d Cir. 2004)]), he has not demonstrated that counsel was ineffective for opting not to seek to preclude this evidence.

The same holds true with respect to counsel's decision not to move to preclude or strike the testimony of Williams' brother, employer, and a co-worker, and not to object to admission into evidence of two photographs of Williams while alive. As argued in respondent's brief to the Appellate Division (see Respondent's Brief to the Appellate Division, Point VI, pp. 90-91), these decisions did not constitute ineffectiveness because the

photographs and testimony were necessary, relevant, and properly admitted. Here, again, counsel was not ineffective for choosing not to make motions that were not only meritless but could well have antagonized the court and the jury.

Petitioner also seeks to brand counsel as ineffective because he opted not to object to the court's instructions as to how the jury should assess his statements to police. But this complaint ignores that these instructions were in fact necessary because counsel's arguments to the jury that the detectives had tried to coerce petitioner into confessing (1679, 1709-11, 1713) had placed the voluntariness of petitioner's statement squarely in issue (see Respondent's Brief to the Appellate Division, Point VI, pp. 86-87). As noted, counsel cannot be faulted for failing to pursue what surely would have been a fruitless exercise.

Petitioner's claim that counsel was ineffective for not calling tool-mark and DNA experts as defense witnesses is likewise baseless. As argued below (see Respondent's Brief to the Appellate Division, Point VI, pp. 84-85), this claim was unreviewable on direct appeal because, inasmuch as it questioned the reasons for counsel's decisions not to call witnesses that petitioner assumed would give favorable testimony, it involved matters dehors the record. But even on the existing record, it

appears likely that counsel determined that, in light of the equivocal testimony from both the People's tool-mark and DNA experts, there was simply no need for him to call additional witnesses. The decision not to call a particular witness "'is typically a question of trial strategy.'" Bierenbaum v. Graham, 607 F.3d at 55 (quoting Greiner v. Wells, 417 F.3d 305, 323 [2d Cir. 2005], cert. denied sub nom. Wells v. Ercole, 546 U.S. 1184 [2006][in turn quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998), cert. denied sub nom. Parise v. United States, 526 U.S. 1164 (1999)]). Thus, since there is a reasonable explanation for counsel's decision, it cannot be viewed as a sign of ineffectiveness, even if it ultimately failed. See United States v. Caracappa, 614 F.3d at 46; McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999); Silent v. Perlmann, 2008 WL 5113418 *11 (E.D.N.Y. 2008).

Petitioner further accuses counsel of ineffectiveness because he did not request that the court charge the jury on consciousness of guilt and did not object when the court charged the jury on how to consider petitioner's statements. These complaints, too, cannot withstand scrutiny because, as argued on direct appeal (see Respondent's Brief to the Appellate Division, Point VI, pp. 85-86), had counsel made such a request, the court

71

would surely have denied it.  And here, again, petitioner ignores the possible strategic reasons for counsel's omissions. Moreover, as respondent detailed below (see Respondent's Brief to the Appellate Division, Point VI, p. 86), even without a consciousness-of-guilt instruction, the court's charge to the jury as a whole provided sufficient instruction on how the jury should consider this evidence.

As for petitioner's insistence that counsel's opening statement was "rambling" and included "ill-advised remarks which prejudiced" him (Petition, Ground 3, para. 4a), not surprisingly petitioner does not point to any specific comments that purportedly harmed him, much less explain how they did so.  And here, again, petitioner's claims cannot be considered fully because counsel's decisions and strategies in formulating his opening cannot be evaluated on the existing record.  Simply put, petitioner's vague and nebulous claims in this regard fail to establish that counsel was ineffective.

Equally baseless is petitioner's allegation that counsel was deficient because "[t]he Court repeatedly [had to] explain to [him] the way that things had to be done" (Petitioner, Ground 3, para. 4c).  As argued in greater detail below (see Respondent's Brief to the Appellate Division, Point VI, pp. 91-92), petitioner

not only fails to account for likely strategic reasons behind counsel's conduct, but he fails utterly to explain how counsel's purported errors adversely affected his representation.

Of course, even if counsel did err in any of the ways petitioner alleges, petitioner still cannot establish that he was denied the effective assistance of counsel because he cannot demonstrate that he was prejudiced by counsel's purported deficiencies. Here, the evidence of petitioner's guilt was nothing short of compelling (see Respondent's Brief to the Appellate Division, Point II, pp. 47-54). Accordingly, petitioner cannot show, as he must, that, but for counsel's supposed errors, the outcome of the trial would have been different. See Strickland v. Washington, 466 U.S. at 690, 694.

In sum, counsel provided a coherent, strategically valid, and vigorous defense, which was constrained by the veritable wall of evidence built by the prosecution. That evidence included the testimony of an eyewitness to the entire murder, DNA evidence establishing petitioner's presence in the victim's apartment, evidence of a dispute between petitioner and the victim shortly before the crime, petitioner's possession of a tool capable of causing the type of marks found on the ligature, as well as statements from petitioner's own mouth that demonstrated

73

consciousness of guilt.   When the actions of petitioner's trial counsel are properly considered in the context of the trial as a whole, it is clear that the fairness of the proceedings was not adversely affected by the largely strategic actions and inactions of counsel.   His ineffective counsel claim should, therefore, be rejected.

POINT VI

PETITIONER RECEIVED A FAIR APPEAL (responding to Petition, Ground 2).

Petitioner asserts that he is entitled to a writ of habeas corpus because he was denied a meaningful appeal, in violation of his right to due process of law (see Petition, Ground 2). In particular, petitioner argues that the Appellate Division denied him a meaningful appeal when it dismissed his "remaining contentions" -- his three evidentiary claims -- as being "without merit" (see Petition, Ground 2, Section 1, p. 18, quoting People v. Scrimo, 67 A.D.3d at 826). Additionally, petitioner claims that "[t]he application of New York's *Crimmins* harmless error standard (People v. Crimmins, 36 N.Y.2d 230 [1975]) [by the Appellate Division] was an abuse of discretion as there was no 'overwhelming' evidence" (Petition, Ground 2, Section 2, p. 20). Finally, petitioner complains that "the intermediate appellate court failed to afford adequate and effective appellate review" because it "render[ed] a Decision which addressed th[e] 277 pages [of pages encompassed in the appellate briefs filed by appellant and respondent] in a *mere 7 sentences*" (Petition, Ground 2, Section 3, p. 20) (emphasis in original). Petitioner's claims are meritless.

First, as petitioner himself acknowledges (see Petition,

Ground 2, Section 3, p. 21), under New York Criminal Procedural Law Section 470.25 (1), "an order of an intermediate appellate court which affirms a judgment, sentence or order of a criminal court need only state such affirmance." Thus, as petitioner implicitly agrees, the Appellate Division's summary dismissal of his evidentiary claims and the relative brevity of its decision violated no state rules governing appeals.

Moreover, petitioner fails to demonstrate that the conciseness of the court's ruling was contrary, to or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, as he must in order to prevail on his bid for habeas relief. See 28 U.S.C. § 2254(d)(1). Nor can he, for this Court has specifically held that an intermediate appellate court's dismissal of a claim as meritless suffices to constitute adjudication of his claim and does not deny a defendant his right to a fair appeal. See Rodriguez v. Connell, 2009 WL 792092 *6 (E.D.N.Y. 2009); see also Vidal v. Artus, 2011 WL 2580324 *2 (E.D.N.Y. 2011) (claims are adjudicated when Appellate Division states that "defendant's remaining contentions are without merit."); Bierenbaum v. Graham, 607 F.3d at 48 (quoting Dallio v. Spitzer, 343 F.3d 553, 560 [2d Cir. 2003], cert. denied, 541 U.S. 961 [2004]) ("[T]o qualify as an adjudication 'on the merits,' a state court decision need not

mention a particular argument or explain the reasons for rejecting it."); Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (state court adjudicates a state prisoner's federal claim when it disposes of the claim "on the merits"); Brown v. Artuz, 283 F.3d 492, 498 (2d Cir. 2002) (appellate court's holding that "[d]efendant's remaining contentions are without merit" constitutes adjudication of his claim); Aparicio v. Artuz, 269 F.3d 78, 93-94 (2d Cir. 2001) ("A state court need only dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required.") Thus, habeas corpus relief may not be granted on the ground that the Appellate Division did not fairly adjudicate petitioner's claims. See 28 U.S.C. § 2254 (d)(1).

Petitioner's complaint that the Appellate Division improperly applied a harmless error standard in its denial of his complaints about the prosecutor's summation is equally meritless. Relief may not be granted on this claim unless this Court finds that the state court's finding of harmless error constituted an unreasonable application of the standard set forth in Chapman v. California, 386 U.S. 18 (1967). Chapman held that, to be deemed harmless, the error must be harmless beyond a reasonable doubt, requiring federal courts to determine "whether there is a

reasonable possibility that the evidence complained of might have contributed to the conviction." 386 U.S. at 24 (quoting Fahy v. State of Connecticut, 375 U.S. 85, 86-87 [1963]); accord Mitchell v. Esparza, 540 U.S. 12, 17-18 (2003); Perkins v. Herbert, 596 F.3d 161, 175 (2d Cir.), cert. denied, ___U.S.___, 131 S.Ct. 318 (2010); Zapulla v. New York, 391 F.3d 462, 467 (2d Cir. 2004), cert. denied, 546 U.S. 957 (2005); Gutierrez v. McGinnis, 389 F.3d at 306.

Applying that standard here, it is clear that the court's decision was not only reasonable, but entirely correct. After all, as discussed in respondent's brief to the Appellate Division (see Respondent's Brief to the Appellate Division, Point II, pp. 47-54), the evidence of petitioner's guilt was truly compelling. And, as argued supra (see Point IV) and in respondent's brief to the Appellate Division (see Respondent's Brief to the Appellate Division, Point V, p. 75), even if any of the prosecutor's remarks in summation could have been viewed as error, the trial court's instructions to the jury undoubtedly ameliorated any prejudice petitioner could have suffered as a result. Accordingly, the Appellate Division's harmless error ruling was a

correct application of the standard in <u>Chapman</u>. [19]

     In sum, defendant was afforded a fair appeal.

---

[19] Notably, the Second Circuit has held that the harmless error standard of review in <u>Crimmins</u> incorporates the <u>Chapman</u> standard of review. <u>See</u> <u>Perkins v. Herbert</u>, 597 F.3d at 172 n.5; <u>Gutierrez v. McGinnis</u>, 389 F.3d at 307-08.

CONCLUSION

THE PETITION FOR A WRIT OF HABEAS CORPUS SHOULD BE DENIED.


Dated:   Mineola, New York
         January 17, 2012


                              Respectfully submitted,

                              Kathleen M. Rice
                              District Attorney, Nassau County
                              Attorney for Respondent
                              262 Old Country Road
                              Mineola, New York 11501
                              (516) 571-3800

                     By:  /s/Ilisa T. Fleischer
                          ILISA T. FLEISCHER


Tammy J. Smiley
Ilisa T. Fleischer
   Assistant District Attorneys
      Of Counsel


                              80

## Certificate of Service

I hereby certify that, on January 17, 2012, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon:

        Paul Scrimo
        Petitioner Pro Se
        02-A-3677
        Green Haven Correctional Facility
        P.O. Box 4000
        Stormville, New York 12582-0010


            Kathleen M. Rice
            District Attorney, Nassau County
            Attorney for Respondent
            262 Old Country Road
            Mineola, New York 11501
            (516) 571-3800


        By:  Ilisa T. Fleischer