*Fluscher / Noll - ed*

To be argued by: Charles Holster
Time requested: 15 minutes

# Supreme Court of the State of New York
# Appellate Division : Second Department

---

THE PEOPLE OF THE STATE OF NEW YORK,

2002-06660

- against -

PAUL SCRIMO,

Indictment
No. 1456-00

Defendant/Appellant.

---

# APPELLANT'S BRIEF

---

submitted by:

CHARLES E. HOLSTER III, ESQ.
Attorney for Defendant/Appellant
100 East Old Country Road
Mineola, New York 11501
(516) 747-2330

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
----------------------------------------------------------------x

People of the State of New York,

- against -                                    STATEMENT
                                               UNDER
PAUL SCRIMO,                                   CPLR 5531

Defendant/Appellant.

----------------------------------------------------------------x

1.    The Indictment number in the Court below was 1456N-00.

2.    The full names of the parties are as set forth above. There have been no changes.

3.    The action was commenced in the County Court, Nassau County.

4.    The June 18, 2002 Judgment appealed from convicted the Defendant of the crime of murder in the second degree, a class A-1 felony, and sentenced him to an indeterminate term of imprisonment of 25 years to life.

5.    This appeal is being prosecuted on the original record.

-ii-

Table of Contents

                                                                    page

Statement Pursuant to CPLR 5531 .............................................. ii

Table of Authorities ............................................................. iii

Questions Presented .............................................................. 1


STATEMENT OF FACTS:  SUPPRESSION HEARING ................................. 5


Point I.

THE POLICE LACKED PROBABLE
CAUSE FOR THE DEFENDANT'S ARREST ..................................... 15

A.    JOHN KANE'S May 2, 2000 Statement Did *Not*
      Constitute A Declaration Against Penal Interest ......................... 15

B.    The Police Did *Not* "Verify"
      "Significant Details" of Kane's story ...................................... 17

C.    The Denial of Suppression Was Not Harmless ........................... 20


STATEMENT OF FACTS:  TRIAL  ................................................. 23


Point II.

THE DEFENDANT WAS SEVERELY PREJUDICED BY THE
IMPROPER TESTIMONY ABOUT HIS INTERROGATION ..................... 58

A.    Defense Counsel Was Ineffective in Failing
      to Move to Strike the Detectives' Speculative
      Testimony as to Changes in the Defendant's

State of Mind Upon Being Asked Certain Questions ................................ 59

B.   Defense Counsel Was Ineffective in Failing
to Move to Strike the Detectives' Testimony
That They *Knew* the Defendant Was *Lying* ........................................... 61

C.   Defense Counsel Was Ineffective in Failing to
Move to Strike the Detectives' Testimony
That After the Defendant's Arrest He
(1) Declined to Answer Certain Questions
(2) Remained Silent When Accused of the Murder
(3) Declined to Answer Any Further Questions
and Requested an Attorney ......................................................... 63

Point III.

THE DEFENDANT'S RIGHT TO A FAIR TRIAL
WAS SEVERELY PREJUDICED BY THE PEOPLE'S
PRESENTATION OF  MISLEADING EVIDENCE
INTENDED TO SHOW THAT A TOOL HE CARRIED
ON HIS BELT WAS USED TO CUT THE WIRE WITH
WHICH THE MURDER VICTIM WAS STRANGLED ............................ 67

A.   Defense Counsel Should Have Moved *In Limine*
To Preclude the People's Anticipated "Tool Mark" Evidence ............... 67

B.   Defense Counsel Was Ineffective In Allowing
The Admission of the Defendant's *Leatherman Tool* ............................70

C.   It Was An Abuse of Discretion For The Trial Court To
Allow the Prosecution To *Surprise* The Defense With
Expert Testimony From Detective Schiraldi As To Certain
Allegedly "Unique" Features Of The Defendant's Leatherman Tool ..... 71

D.   It Was An abuse of Discretion For The Court
To Allow Detective Schiraldi To Conduct A
Fundamentally Flawed, Surprise, In-Court Demonstration ..................... 73

(1)   Unfair Surprise ................................................ 73

(2)   The Conditions Were Not Sufficiently
Similar To The Time In Question ................................... 74

    a.     The time in question ............................. 75

    b.     The Condition Of The Cut End Of The Ligature ................ 76

    c.     The Use of Dissimilar Wire ............................ 77

    d.     The Condition of the Leatherman Tool .............. 78

    e.     Other Prejudicial Aspects of the Demonstration ............ 79

E.   The Defendant Was Prejudiced By Detective
Schiraldi's Improper References to Tests
Conducted By the Defense's "Tool Mark" Expert ........................ 81

F.   Defense Counsel's Failure To
Call The Defense's Tool Mark Expert ....................... 81


Point IV.

THE COURT ERRED IN EXCLUDING AS "COLLATERAL"
TESTIMONY ABOUT A PRIOR CHOKING INCIDENT
INVOLVING JOHN KANE AND HIS SALES OF ILLEGAL DRUGS ............ 83


Point V.

DEFENSE COUNSEL WAS INEFFECTIVE IN
FAILING TO OBJECT TO THE COURT'S
CHARGE ON *CONFESSIONS AND ADMISSIONS*
(1 CJI 11.01) AND IN FAILING TO REQUEST A
CHARGE ON *CONSCIOUSNESS OF GUILT* (1 CJI 9.16) ......................... 86

A.   Consciousness of Guilt (1 CJI [NY] 9.16) ............................... 86

B.   Confessions, Admissions and Statements (1 CJI [NY] 11.01) ................ 90

Point VI.

THE DEFENDANT WAS UNFAIRLY
PREJUDICED BY THE PROSECUTOR'S SUMMATION ............................ 92

  A.   The Prosecutor Denigrated The Defendant and His Attorney
      and Vouched For the Credibility of Prosecution Witnesses ................... 92

  B.   The Prosecutor Called Upon the Jury to Draw Conclusions
      Which Could Not Be Fairly Inferred from the Evidence ................... 96

Point VII.

DEFENDANT WAS DEPRIVED OF THE EFFECTIVE
REPRESENTATION OF COUNSEL AS GUARANTEED
BY THE CONSTITUTION OF THE STATE OF NEW YORK
AND THE CONSTITUTION OF THE UNITED STATES .......................... 107

Point VIII.

THE VERDICT WAS AGAINST
THE WEIGHT OF THE EVIDENCE ............................................................... 113

Conclusion ....................................................................................................... 116

Certification of Compliance

# TABLE OF AUTHORITIES

*page*

*Statutes*

Criminal Procedure Law § 470.15[6][a] .............................................................. 105

Penal Law § 205.50 [5] ...................................................................................... 15

*New York State Cases*

*Calandriello v New York Racing Ass'n,*
    203 AD2d 503, 611 NYS2d 247 [2d Dept 1994] ....................................... 77

*Cramer v Kuhns,*
    213 AD2d 131, 630 NYS2d 128 [3d Dept 1995] ...................................... 78

*Gomez v New York City Housing Authority,*
    217 AD2d 110, 636 NYS2d 271 [1st Dept 1995] ...................................... 96

*Goverski v Miller,*
    282 AD2d 789, 723 NYS2d 526 [3d Dept 2001] .......................................77

*McCabe v Queensboro Farm Products, Inc.,*
    21 AD2d 675, 250 NYS2d 91 [2d Dept  1964] ......................................... 103

*Norfleet v New York City Transit Authority,*
    124 AD2d 715, 508 NYS2d 468 [2d Dept 1986] ...................................... 79

*O'Donnell v State,*
    26 AD3d 59, 808 NYS2d 266 [2d Dept 2005] .......................................... 113

*People v Abdul-Malik,*
    61 AD2d 657, 403 NYS2d 253 [1st Dept 1978] .................................. 86-88

*People v Acevedo,*
    40 NY2d 701, 389 NYS2d 811 [1976] .................................................... 73

*People v Alexander,*
    94 NY2d 382, 705 NYS2d 551 [1999] .......................................... 95, 98, 106

*People v Al-Kanani,*
    26 NY2d 473, 311 NYS2d 846 [1970] ...................................................... 64

*People v Allen (Barry),*
    74 AD2d 640, 425 NYS2d 144 [2d Dept 1980] ..............................61-62, 96

*People v Allen (Warren),*
    222 AD2d 441, 635 NYS2d 40 [2d Dept 1995] .................................... 61, 96

*People v Almonor,*
    93 NY2d 571, 693 NYS2d 861 [1999] ..................................................... 72

*People v Anderson,*
    35 AD3d 871, 830 NYS2d 161 [2d Dept 2006] ....................................... 105

*People v Archbold,*
    40 AD3d 403, 835 NYS2d 577 [1st Dept 2007] ........................................ 84

*People v Ashwal,*
    39 NY2d 105, 383 NYS2d 204 [1976] ............................................. 92, 95-97

*People v Barbot,*
    133 AD2d 274, 519 NYS2d 63 [2d Dept 1987] ....................................... 108

*People v Basora,*
    75 NY2d 992, 557 NYS2d 263 [1990] ...................................................... 60

*People v Beauliere,*
    36 AD3d 623, 831 NYS2d 88 [2d Dept 2007] ........................................... 63

*People v Benevento,*
    91 NY2d 708, 711-712 [1998] ................................................................ 107

*People v Benzinger,*
    36 NY2d 29, 364 NYS2d 855 [1974] ........................................................ 86

*People v Bernal,*
    162 AD2d 362, 557 NYS2d 319 [1st Dept 1990] ..................................... 109

*People v Bianculli,*
    9 NY2d 468, 215 NYS2d 33 [1961] ......................................... 63-64

*People v Bierenbaum,*
    301 AD2d 119, 748 NYS2d 563 [1st Dept 2002] ...................................... 86

*People v Blake,*
    139 AD2d 110, 530 NYS2d 578 [1st Dept 1988] ...................................... 62

*People v Bouton,*
    50 NY2d 130, 428 NYS2d 218 [1980] ....................................... 21

*People v Brensic,*
    70 NY2d 9, 517 NYS2d 120 [1987] ......................................... 58

*People v Brown (Melvin),*
    24 AD3d 812, 805 NYS2d 171 [3d Dept 2005] ...................................... 113

*People v Brown (Terrence),*
    26 AD3d 392, 812 NYS2d 561, 563 [2d Dept 2006] .................... 92-94, 106

*People v Brown (Erick),*
    300 AD2d 314, 752 NYS2d 347 [2d Dept 2002] .............................. 91, 112

*People v Caballero,*
    34 AD3d 690, 824 NYS2d 427 [2d Dept 2006] ................................. 73, 79

*People v Cabus,*
    40 AD3d 540, 837 NYS2d 83 [1st Dept 2007] ........................................ 84

*People v Cahill,*
    2 NY3d 14, 777 NYS2d 332 [2003] ........................................ 112

*People v Capella,*
    111 AD2d 179, 488 NYS2d 808 [2d Dept 1985] ................................ 68, 70

*People v Carter,*
 149 AD2d 83, 545 NYS2d 125 [1st Dept 1989] ......................................... 65

*People v Cassella,*
 143 AD2d 192, 531 NYS2d 639 [2d Dept 1988] ...................................... 18

*People v Chatman,*
 14 AD3d 620, 789 NYS2d 208 [2d Dept 2005] ................................... 64-66

*People v Clark,*
 46 AD3d 566, 846 NYS2d 378 [2d Dept 2007] ........................................ 21

*People v Cleague,*
 22 NY2d 363, 292 NYS2d 861 [1968] ................................................... 106

*People v Cobb,*
 104 AD2d 656, 480 NYS2d 33 [2d Dept 1984] ....................................... 40

*People v Cohen,*
 50 NY2d 908, 431 NYS2d 446 [1980],
 later appeal 58 NY2d 844, 450 NYS2d 18, cert den 461 US 930 .............. 78

*People v Colon,*
 163 AD2d 133, 557 NYS2d 358 [1st Dept 1990] ................................... 114

*People v Connelly,*
 35 NY2d 171, 359 NYS2d 266 [1974] ..................................................... 76

*People v Conners,*
 149 AD2d 722, 540 NYS2d 818[2d Dept 1989] ........................................ 97

*People v Corniel,*
 258 AD2d 812, 686 NYS2d 159 [3d Dept 1999] ....................................... 84

*People v Cortez,*
 296 AD2d 465, 745 NYS2d 467 [2d Dept 2002] ...................................... 91

*People v Cyrus,*
    48 AD3d 150, 848 NYS2d 67 [1st Dept 2007] ........................ 109

*People v Davila,*
    108 AD2d 108, 488 NYS2d 409 [2d Dept 1985] ................ 86, 115

*People v Davis (Stancil),*
    53 AD2d 870, 385 NYS2d 345 [2d Dept 1976] ........................ 93

*People v Davis (Johnnie),*
    151 AD2d 596, 542 NYS2d 354 [2d Dept 1989] ...................... 70

*People v DiFalco,*
    80 NY2d 693, 594 NYS2d 679 [1993] ................................ 18

*People v Douglas,*
    24 AD3d 794, 807 NYS2d 393 [2d Dept 2005] ................... 76-77

*People v Droz,*
    39 NY2d 457, 384 NYS2d 404 [1976] ................................ 91

*People v Duncan,*
    46 NY2d 74, 412 NYS2d 833 [1978] ................................ 109

*People v Evans,*
    111 AD2d 830, 490 NYS2d 252 [2d Dept 1985] ...................... 72

*People v Flores,*
    276 AD2d 710, 714 NYS2d 528 [2d Dept 2000] ...................... 21

*People v Garvin,*
    37 AD3d 372, 830 NYS2d 549 [1st Dept 2007] ...................... 84

*People v Georgiou,*
    38 AD3d 155, 828 NYS2d 541[2nd Dept 2007] ...................... 107

*People v Graydon,*
    43 AD2d 842, 351 NYS2d 172 [2d Dept 1974] ................... 61-62

*People v Greene,*
    153 AD2d 439, 552 NYS2d 640 [2d Dept 1990] ........................................ 81

*People v Grice,*
    100 AD2d 419, 474 NYS2d 152 [4th Dept 1984] ................................. 80, 99

*People v Griffin,*
    121 AD2d 927, 504 NYS2d 433 [1st Dept 1986] ...................................... 89

*People v Guliano,*
    65 NY2d 766, 492 NYS2d 939 [1985] ....................................................... 69

*People v Guzman,*
    259 AD2d 364, 688 NYS2d 10 [1st Dept 1999] ...................................... 114

*People v Harris,*
    148 AD2d 469, 538 NYS2d 621 [2d Dept 1989] ...................................... 57

*People v Hayes,*
    284 AD2d 1008, 726 NYS2d 891 [4th Dept 2001] ................................. 113

*People v Hicks,*
    102 AD2d 173, 478 NYS2d 256 [1st Dept 1984] ...................................... 94

*People v Hollins,*
    221 AD2d 863, 634 NYS2d 561 [3d Dept 1995] ...................................... 71

*People v Hudy,*
    73 NY2d 40, 538 NYS2d 197 [1988] ......................................................... 83

*People v Jackson,*
    20 AD2d 918, 249 NYS2d 646 [2d Dept 1964] ........................................ 62

*People v Jodhan,*
    37 AD3d 376, 831 NYS2d 53 [1st Dept 2007] .......................................... 97

*People v Johnson,*
    66 NY2d 398, 497 NYS2d 618 [1985] ........................................... 17-18, 114

*People v Johnson*,
239 AD2d 123, 657 NYS2d 36 [1st Dept 1997] ......................................... 89

*People v Karamanites*,
104 AD2d 899 [2d Dept 1984] ................................................. 111

*People v Lockerby*,
178 AD2d 805, 577 NYS2d 703 [3d Dept 1991] ....................................... 67

*People v Loliscio*,
187 AD2d 172, 593 NYS2d 991 [2d Dept 1993] ..................................... 114

*People v Lunsford*,
46 AD2d 612, 359 NYS2d 676 [1st Dept 1974] ......................................... 67

*People v Maerling*,
46 NY2d 289, 413 NYS2d 316 [1978] ................................................ 16, 114

*People v Marin*,
102 AD2d 14, 478 NYS2d 650 [2d Dept 1984] ......................................... 86

*People v Miller*,
210 AD2d 724, 620 NYS2d 179 [3d Dept 1994] ....................................... 98

*People v Mitchell*,
10 AD3d 554, 782 NYS2d 45 [1st Dept 2004] ......................................... 113

*People v Mitchell*,
64 AD2d 119, 408 NYS2d 513 [2d Dept 1978] ......................................... 69

*People v Moolenaar*,
262 AD2d 60, 694 NYS2d 348 [1st Dept 1999] ......................................... 75

*People v Mosiurchak*,
157 AD2d 1023, 550 NYS2d 754 [3d Dept 1990] ................................... 113

*People v Mountain*,
66 NY2d 197, 495 NYS2d 944 [1985] ....................................... 70

-xiii-

*People v Nelson,*
    125 AD2d 339, 509 NYS2d 67 [2d Dept 1986] .................................. 16, 18

*People v Neupert,*
    190 App Div 929, 179 NYS2d 941 [4th Dept 1919] ................................ 74

*People v Nicholas,*
    286 AD2d 861, 731 NYS2d 99 [4th Dept 2001] ........................................ 65

*People v Nunez,*
    74 AD2d 805, 426 NYS2d 2 [1st Dept 1980] ............................................ 95

*People v Ozuna,*
    7 NY3d 913, 915, 828 NYS2d 275[2006] ................................................ 107

*People v Primo,*
    96 NY2d 351, 728 NYS2d 735 [2001] ...................................................... 83

*People v Pugh,*
    258 AD2d 674, 686 NYS2d 764 [2d Dept 1999] ...................................... 16

*People v Raife,*
    250 AD2d 864, 674 NYS2d 377 [2d Dept 1998] ...................................... 15

*People v Ralfopoulos,*
    274 AD2d 437, 710 NYS2d 121 [2d Dept 2000] ...................................... 22

*People v Rios,*
    223 AD2d 390, 636 NYS2d 753 [1st Dept 1996] ..................................... 83

*People v Roberto,*
    10 NY2d 428, 224 NYS2d 1 [1962] .......................................................... 94

*People v Roberts,*
    26 AD2d 655, 272 NYS2d 625 [2d Dept 1966] ........................................ 96

*People v Robinson (Phillip),*
    191 AD2d 595, 594 NYS2d 801 [2d Dept 1992] ...................................... 93

*People v Robinson (Latee),*
    287 AD2d 315, 731 NYS2d 370 [1st Dept 2001] ..................................... 101

*People v Rodriguez,*
    135 AD2d 586, 521 NYS2d 800 [2d Dept 1987] ................................. 88-89

*People v Rojas,*
    213 AD2d 56, 630 NYS2d 28 [1st Dept 1995] ........................................ 80

*People v Roll,*
    1 AD3d 617, 767 NYS2d 467 [2d Dept 2003] ........................................ 92

*People v Rutter,*
    202 AD2d 123, 616 NYS2d 598 [1st Dept 1994] ..................................... 76

*People v Sanchez (Edwin),*
    92 AD2d 595 [2d Dept 1983] ....................................................... 58

*People v Sanchez (Rene),*
    293 AD2d 499, 742 NYS2d 58,  [2d Dept 2002] ..................................... 83

*People v Scott,*
    294 AD2d 661, 742 NYS2d 681 [3d Dept 2002] .................................... 113

*People v Sibadan,*
    240 AD2d 30, 671 NYS2d 1 [1st Dept 1998] ..................................... 84-85

*People v Singleton,*
    121 AD2d 752, 504 NYS2d 167 [2d Dept 1986] ..................................... 90

*People v Stevens,*
    76 NY2d 833, 560 NYS2d 119 [1990] ............................................. 108

*People v Sugrue,* 103 AD2d 785, 477 NYS2d 425 [2d Dept 1984] ............... 74-75

*People v Taddio,*
    292 NY 488 [1944] .................................................................. 67

*People v Tankleff*,
46 AD3d 846, 848 NYS2d 277 [2d Dept 2007] ........................................ 113

*People v Tankleff*,
49 AD3d 160, 177, 848 NYS2d 286 [2d Dept 2007] ............................... 113

*People v Thompson*,
19 AD3d 516, 798 NYS2d 472 [2d Dept 2005] ................................. 89, 101

*People v Torres*,
111 AD2d 885, 490 NYS2d 793 [2d Dept 1985] ................................. 93-94

*People v Trait*,
139 AD2d 937, 527 NYS2d 920 [4th Dept 1988] .................................... 107

*People v Travato*,
309 NY 382 [1955] ..................................................................... 63-64

*People v Turner*,
5 NY3d 476, 806 NYS2d 154 [2005] ......................................... 108

*People v Valtin*,
284 AD2d 203, 728 NYS2d 435 [1st Dept 2001] ...................................... 89

*People v Vielman*,
31 AD3d 674, 818 NYS2d 291 [2d Dept 2006] ......................................... 99

*People v Von Werne*,
41 NY2d 584, 394 NYS2d 183 [1977] ................................................. 64-65

*People v Walters*,
251 AD2d 433, 674 NYS2d 114 [2d Dept 1998] ......................... 93-94, 106

*People v Watson*,
109 AD2d 409, 492 NYS2d 605 [1st Dept 1985] ......................... 16, 18, 114

*People v Whatley*,
121 AD2d 341, 503 NYS2d 705 [1st Dept 1986] ................................ 89, 101

*People v White,*
    117 AD2d 127, 503 NYS2d 59 [2d Dept 1986] .......................................... 60

*People v Wilson,*
    168 AD2d 696, 563 NYS2d 561 [3d Dept 1990] ....................................... 68

*People v Winston (Deacon),*
    134 AD2d 546 [2d Dept 1987]....................... .......................................... 43

*People v Winston (John),*
    52 AD2d 432, 384 NYS2d 457 [1st Dept 1976] ........................................ 68

*State v Grajales,*
    8 NY3d 861, 832 NYS2d 466 [2007] ........................................................ 42

*State v Thompson,*
    34 AD3d 852, 824 NYS2d 682 [2d Dept 2006] ...................................... 108

*Van Guilder v Fallsburgh,*
    25 AD2d 338, 269 NYS2d 562 [3d Dept 1966] ......................................... 75

*Weinstein v Daman,*
    132 AD2d 547, 517 NYS2d 278 [2d Dept 1987] ................................. 73-74

## Federal Cases

*Aguilar v Texas,*
    378 U.S. 108, 84 S Ct 1509, 12 L Ed 2d 723 ............................................ 17

*Eze v Senkowski,*
    321 F3d 110 [2d Cir 2003] ...................................................................... 111

*Gersten v Senkowski,*
    426 F3d 588 [2d Cir 2005] ...................................................................... 111

*Mason v Scully,*
    16 F3d 38 [2d Cir 1994] ......................................................................... 107

*Quartararo v Fogg,*
    679 F Supp 212 [ED NY 1988] ................................................................ 111

*Soto v Lefeve,*
    651 F Supp 588 [SD NY 1986], affd 812 F2d 713,
    cert den 107 S Ct 2486, 482 US 907, 96 L Ed 2d 378 ................................ 85

*Spinelli v United States,*
    393 US 410, 89 S Ct 584, 21 L Ed 2d 637.................................................... 17

*U.S. v Glenn,*
    312 F3d 58 [2d Cir 2002] ......................................................................... 69

*United States v Martinez-Medina,*
    279 F3d 105 [1st Cir 2002] ...................................................................... 96

*Washington v Texas,*
    388 US 14, 18 L Ed 2d 1019, 87 S Ct 1920 [1967] .................................... 83

*Zappulla v New York,*
    391 F3d 462 [2d Cir 2004] ....................................................................... 19

## Treatises

6 N.Y. Prac., Criminal Law § 23:9 ................................................................. 15

Freedman, New York Objections [James Publishing: 1999 ed.], § 13-110 .......... 74

Prince, Richardson on Evidence, § 4-105 [11th ed.] ...................................... 58

Prince, Richardson on Evidence, § 4-219 [11th ed.] ...................................... 74

*Criminal Jury Instructions*

1 CJI [NY] 4.00 ..................................................................................... 59

1 CJI [NY] 4.01 ..................................................................................... 59

1 CJI [NY] 4.02 ..................................................................................... 58

1 CJI [NY] 4.53 ..................................................................................... 59

1 CJI [NY] 9.16 ........................................................................ 56, 87-88, 101

1 CJI [NY] 11.01 .......................................................................... 56, 90-91

1 CJI [NY] 11.02 .............................................................................. 55, 86

CJI2d [NY] Consciousness of Guilt
   [Revised June 2005]] [www.nycourts.gov/cji] ........................................... 87

*Internet*

http://factfinder.census.gov/ .................................................................. 35

## QUESTIONS PRESENTED

1.      Is the reliability of an informant established by the fact that his

statement constituted a "declaration against penal interest" where (a) there was no

evidence that he was *aware* that the statement was adverse to his penal

interest, (b) the statement was *largely exculpatory* and intended to minimize his

involvement, and (c) the circumstances under which the statement was made

suggest that the informant had a *strong motivation to lie* in order to avoid being

prosecuted for a far more serious crime?

> The court below implicitly answered this question in
> the *affirmative*.

2.      Is there "probable cause" for the police to make a warrantless arrest

based upon the statement of an "informant" who has no history of providing

accurate information to the police, and whose statement about the crime was *not*

corroborated?

> The lower court found that the informant's
> statement was "corroborated" regarding "significant
> details," and held that there was "probable cause"
> for the defendant's arrest.

3.      Where the defendant had *not* given the police a *confession* or made

any *admissions*, and the prosecutor asked police witnesses about defendant's

statements, is it evidence of defense counsel's ineffectiveness that he failed to object to the

-*1*-

questions as calling for *hearsay*?

The court below *did not address* this question.

4.    Where the detectives who participated in the defendant's interrogation (a) described and interpreted the defendant's alleged *non-verbal* responses to certain questions; and testified (b) that the defendant refused to answer certain questions, (c) that the defendant remained silent when he was implicitly accused of committing the murder; (d) and that they told the defendant they knew he was lying, is it evidence of ineffectiveness that defense counsel failed to move to strike, and to request a curative instruction and an admonition?

The court below *did not address* this question.

5.    Where detectives who interrogated the defendant following his arrest testified that the defendant refused to answer any further questions, and invoked his right to counsel, is it evidence of ineffectiveness that defense counsel failed to move for a mistrial?

The court below *did not address* this question.

6.    Where evidence of a defendant's allegedly "false" statement was being presented to show "consciousness of guilt," is it evidence of ineffectiveness that defense counsel failed to request a limiting instruction based upon (1 CJI [NY] 9.16) ("Consciousness of Guilt"), and that the jury again be given such

-2-

instruction in the Court's charge?

> The court below *did not address* this question.

7.     Where the prosecution has introduced evidence of the defendant's alleged statements to the police as evidence of *consciousness of guilt*, rather than as proof of a *confession* or *admission*, is it evidence of ineffectiveness that defense counsel failed to object when the court stated that its charge would include the standard instruction on "Confessions, Admissions, Statements" (1 CJI [NY] 11.01)?

> The court below *did not address* this question.

8.     Given the fact that there was no *connection* between the Defendant's "Leatherman" tool and the murder, is it evidence of defense counsel's ineffectiveness that he failed to object when the prosecutor moved the tool into evidence?

> The Court below *did not address* this question.

9.     Should the prosecution be permitted to surprise the defense with incriminating expert testimony on a subject that was not disclosed before trial in the testifying expert's written reports?

> The Court below answered this question in the *affirmative.*

-3-

10.    Should a prosecutor be permitted, in his closing statement, to denigrate the defendant and his attorney, to vouch for the credibility of the People's witnesses, and to call upon jurors to draw conclusions which cannot be fairly inferred from the evidence?

> The Court below implicitly answered this
> question in the *affirmative*.

11.    Was the Defendant deprived of the effective representation of counsel as guaranteed by the Constitution of the State of New York and the Constitution of the United States?

> The court below *did not address* this question.

12.    Should a verdict be set aside as being *against the weight of the evidence* where it appears that jurors gave *too little* weight to the indisputable *physical evidence,* which had *high* probative value, and pointed to someone other than the defendant as the murderer, and gave *too much* weight to the alleged evidence of the defendant's *consciousness of guilt,* which had *low* probative value, and to the *opinions* of the detectives and the *"unsworn testimony"* of the prosecutor, which had *no* probative value?

> The Court below *did not address* this question.

-4-

## STATEMENT OF FACTS:  THE SUPPRESSION HEARING

This appeal brings up for review the County Court's April 5, 2001 Decision and Order which, after a hearing, found the Defendant's warrantless arrest to be lawful, and denied his motion to suppress identification testimony, physical evidence, and statements ("Decision," pp.13-14).

The Indictment alleges that the murder of Ruth Williams was committed on April 12, 2000) (T.317-318).  Detective John McHugh testified that the police discovered Ms. Williams' lifeless body on the night of April 13, 2000 in her apartment in Farmingdale, New York (H.232, 234-235, 254).  She was lying on the floor in her bedroom, fully clothed.  There was a ligature around her neck that was made from the power cord to her telephone/answering machine. (H.235-236).

On April 14, 2000, the Medical Examiner performed an autopsy and concluded that the cause of death was strangulation (Decision, p.2; H.237-238).  There was no testimony that the Medical Examiner had reached a conclusion as to the *time* or *date* of death.  Nor did the People introduce the Death Certificate or the Autopsy Report.

The Detectives learned from several witnesses that, during the early morning hours of April 12, 2000, Ruth Williams had been at a bar in Farmingdale called "Y.L. Child's."  According to Thomas Hardman, Ms. Williams arrived

-5-

between 2:00 A.M. and 2:30 A.M. (People's "5"; H.67-68). Williams was at one

end of the bar, in the company of JOHN KANE and the Defendant, Paul Scrimo

(Decision, pp.3, 10, 13;  People's "5," "7";  H.67-68, 246:4-13, 266, 272, 285-

286).

One witness knew KANE by his full name (H.368). The others knew him

as "John," or by his nickname, "John D" or "John Doe" (H.358, 361-362). KANE

was a male white in his thirties, about 5'7" - 5'8" tall, with a thin build, a ponytail

and a beard (H.361-362).

No witness identified Paul Scrimo by name. He was described as a male

white in his 40s, with a stocky build, in a sleeveless shirt, with tattoos on his arms

and chest, and a shaved or bald head (People's "5," "7";  H.67, 246, 248, 266-267,

270-272, 285-286).

On April 15, 2000, Detectives interviewed KANE. He denied any

knowledge of the murder (T.240-242). KANE told the Detectives that the last

time that he had been to Ruth's apartment was 3 or 4 weeks before she died, at

which time she performed oral sex upon him (T.241). When asked about the "big

bald headed guy with tattoos" that he was with that night at "Y.L. Child's,"

KANE denied being with anyone who fit that description (H.242, 290).

On April 19, 2000, the Detectives interviewed *Francine Quinn*. Ms. Quinn

told them that on the night in question she arrived at "Y.L. Child's" at about 2:30-3:00 A.M. and saw Ruth there with JOHN and a man with a shaved head and tattoos. She allegedly observed that, toward the end of the night, Ruth and the man with the shaved head and tattoos were "making out" (People's "7," p.2; H.246:14-17; H.333:23 - H.334:2; H.464).

After "Y.L. Child's" closed, Quinn walked to the parking lot where her roommate's car was parked (People's "7," p.2-3). It was behind the "Downtown" bar, where Ms. Quinn worked, and "Captain Andy's" restaurant. She heard loud voices, and turned to see Ruth standing behind "Captain Andy's," near the door that led up to her second floor apartment. (People's "7," p.3; H.233, 375). According to Quinn, Ruth was arguing with a bald headed, husky man, and Quinn thought it was the same man that she had seen with Ruth at "Y.L. Child's" (People's "7," p.3; H.248, 375-376, 394-395, 466).

Det. McHugh testified that Quinn told him that the man also *had tattoos* (H.248:1-3). However, this was not in Quinn's written statement (People's "7," p.3; H.249, 260).

Quinn's statement does *not* indicate the *time* that she had left "Y.L. Child's" or the *time* that she allegedly observed these individuals arguing.

On April 20, 2000, Detectives were contacted by Paul Scrimo, and he came

-7-

to be interviewed in the "Command Bus" outside the crime scene.  Mr. Scrimo

told them that he had heard that they were looking for the big bald headed man

who was talking to Ruth Williams at "Y.L. Child's" on the night in question, and

he was that man (H.274, 276).  He knew Ruth from the local bars; and he talked to

her that night for about ten minutes (Decision, p.13; H.276, 279).  He denied any

direct knowledge of her murder, and denied knowing where Ruth lived (H.279-

282).

On May 2, 2000, the Detectives picked up KANE and brought him to Police

Headquarters (H.287-288, 426-427).  McHugh questioned KANE concerning "his

criminal history, which included arrests for robbery, auto theft, petit larceny, and

drug charges" (Decision, p.6;  H.289).

During the first hour and a half, KANE continued to deny having

knowledge of the murder, and being with any "big bald-headed guy with tattoos"

(H.290, 367-368, 436, 434-435, 478-479).  However, KANE was told that "he had

some problems."  Since he was first interviewed, they had gathered crime scene

evidence, and spoken to witnesses, and they believed he had not told them

everything he knew (H.161-162, 174, 292, 441-442).  They believed KANE "may

have been *in the apartment* that evening" (emphasis added) (H.442).  They told

-8-

KANE he "was in trouble" (H.175).[1]  When Det. Cereghino was asked if KANE

was told that he was about to be charged with the murder, he replied that "it was

probably insinuated" (H.175).

KANE became "scared" (H.176, 442, 444), and admitted for the first time

that he was present during the murder.  However, he alleged that the murder was

committed by Paul Scrimo. (H.292-297, 176-192).

The written statement taken from KANE (People's "8") indicates that he

and Scrimo were members of a Tuesday night darts team at the "Falcon's Nest, "

and that after darts ended about 11:30-12:00 P.M., they went out for drinks - first

to "Granny's," and then to "Y.L. Child's" (Id., p.1).  At "Y. L. Child's," there were

"about a dozen people in the place" (Id., p.2).  Ruth Williams came over, whom

KANE had known for 2 years (Id., p.2;  H.292).  Ruth was talking to KANE and,

at times, Scrimo would join in the conversation (Id., p.2)

Ruth was dancing in front of KANE and dropping the straps of her overalls,

and KANE was kissing and fondling her (People's "8," p.2;  H.173: 19-25;

H.177:14-20;  H.292:24 - H.293:5;  H.446).  At one point, Paul said "What about

---

[1]        The police also obtained a DNA sample from KANE during the May 2, 2000
interrogation, but this was not disclosed to the Hearing Court (T.1147:15-24).

me?" And Ruth said to him, "You're married." (People's "8," p.2). [2]

Ruth left the bar before he and Scrimo did, [3] and as "Y.L. Child's" was about to close, KANE allegedly invited Scrimo to come with him to Ruth's apartment for a drink. (People's "8," p.2; Decision, p.6). He and Scrimo allegedly arrived at Williams' apartment at about 4:00 A.M. (People's "8," p.2 ).

After *an unspecified period of time*, Paul allegedly left Williams' apartment to get beer and cigarettes from the nearby "7-Eleven" store (People's "8," p.3; Decision, p, 6), and was gone "about 10 minutes" (People's "8," p.3). According to KANE, Ruth began performing oral sex upon him, but he stopped her because he knew Paul would be coming back. (People's "8," p.3; Decision, p. 6). "I went into the livingroom and put an Allman brothers CD into the player. I went back into the kitchen and Paul came back with a 12-pack of Budweiser bottles." (People's "8," p.3).

Allegedly, when Ruth went into the bathroom, KANE told Scrimo that she had performed oral sex upon him (People's "8," p.3; Decision, p. 6). After Ruth

---

[2]    Although, the Detectives apparently considered this exchange to be significant, since they included it in the KANE'S statement, there is no evidence that KANE considered it significant.

[3]    KANE did not estimate the time that Ruth left. The Court would find that Williams left "Y.L. Child's" at 4:00 A.M., based upon the statement of Thomas Hardman (Decision, p.4; People's "5," p.2; H.68, 271). Hardman told Detectives that KANE and Scrimo left about 15 minutes later (*Id.*).

came back and joined them in the kitchen, they "hung out," talking, and having a

beer (People's "8," p.3 ).  Some time later, (KANE'S statement does *not* indicate

*how much* later), while they were all still in the kitchen, "Ruth and Paul had some

words.  I don't know about what." (*Id.*, pp.3-4).

    According to KANE, Paul got up to leave, but as he was walking toward the

door, Ruth said, "Let him go home to his fat, ugly wife."  Paul allegedly grabbed

Ruth by the neck; they fell to the floor with him on top of her; and he choked her

until she stopped moving. (*Id.*, p.4;  Decision, p.6).  KANE'S statement goes on to

say that Scrimo got off Williams, went into a different part of the bedroom, and

returned with a plastic looking cord.  He wrapped the cord around Williams' neck

and pulled on it for about a minute. (People's '8," p.5).  KANE did *not* state the

*time* the murder occurred.

    Allegedly, Scrimo yelled at KANE to turn off the stereo and to collect the

beer bottles, and Scrimo used a napkin and a rag to wipe off the kitchen table and

the outside door knob (*Id.*, p.5).  Before they parted company, Scrimo reportedly

told Kane "don't say nothing." (*Id.*, p.5;  Decision, p.7).

    KANE's written statement was completed at 9:30 P.M. (H.297-300).

Within 15 minutes, two teams of Detectives were dispatched to arrest Scrimo

(H.5-8, 41-42, 300-301).  At that time, Mr. Scrimo was living with his wife and

-11-

two children, in the "Elizabeth Gardens" Apartments, in Farmingdale, New York, where he was employed as the Superintendent. This was "across the street" from the victim's apartment. (Decision, p.5; H.44, 274, 277, 331). However, the arrest was made outside the "Falcon's Nest," as Mr. Scrimo came out after his regular Tuesday night dart game (H.9-10, 42). The arrest occurred at 12:10 A.M on May 3, 2000 (H.44-45; Decision, p.7) - less than three hours after KANE had signed his statement (H.297-300). The Defendant was wearing on his belt a multi-purpose tool. As a precaution, it was seized (H.45-48, 304-306).

Detective Cereghino testified that the basis for the decision to arrest Paul Scrimo was *what they had been told by JOHN KANE, and Detective McHugh's opinion that KANE was truthful* (H.85:16-21; H.88:13-14; H.92:24 - H.93:4).

According to the prosecutor, however, KANE'S statement was *not* the *only* basis for probable cause (H.356). He elicited the following testimony from the Detectives which showed that probable cause was also based upon the statement of *Francine Quinn*. On direct, McHugh and Parpan testified that after Mr. Scrimo was arrested, they told him that it was because of his *kissing* Ruth at "Y.L. Child's" that he had become a suspect (H.129:21 - H.130:6; H.533:9-14; H.534:1-3); and during cross, when McHugh was asked to state the bases for his conclusion that he had probable cause to arrest Paul Scrimo, the *first* thing that he

-12-

mentioned was

> Francine Quinn's observations of the interaction between
> the defendant and the victim at Y.L. Child's.

(H.464).

The *second* thing Det. McHugh mentioned as a basis for probable cause was

> Francine Quinn's subsequent observation in the rear door
> area of the victim's apartment in the early morning
> hours, which is the last time the victim was seen alive.

(H.466).

## Decision

In its April 5, 2001 Decision, the Hearing Court denied suppression, holding

that "the information available to the detectives constituted probable cause that

Mr. Scrimo had committed the murder" and that "the warrantless arrest of Mr.

Scrimo was lawful." (pp.13-14).   The Court found that JOHN KANE was a

"reliable" informant (*Id.*, 13), for two reasons.  First,  KANE'S statement that he

removed beer bottles from the victim's apartment was an "admission against penal

interest" (*Id.*, 11-13):

> In the case at bar, John Kane admitted that he assisted
> Mr. Scrimo in tidying up the crime scene, and thus
> disposing of potential evidence.  This statement was a
> declaration against penal interest because it subjected

-13-

him to criminal liability, albeit as an accessory after the
fact rather than as an accomplice to the murder.  See
*People v Hayes*, 184 A.D.2d 335 (1st Dep't 1992).

(*Id.*, 13).

Secondly, the detectives had been able to verify "significant details" of

KANE'S story:

To be sure, the fact that he initially provided false
information to the police and that he had a criminal
record detract from his credibility. However, the
detectives had been able to verify *a highly significant
detail* of KANE'S story, that Mr. Scrimo had, in fact
been in the company of John Kane and the deceased
*shortly before her murder*.  At least three witnesses had
placed Ruth in the company of John Kane and "the bald
headed man" at Y.L. Child's, and Mr. Scrimo himself
had admitted to speaking with Ruth at the bar that
evening.  Additionally, Francine Quinn had seen Ruth
arguing with the bald headed man outside her apartment
*shortly before the time she was murdered*.  Since the
detectives had confirmed *significant details* of John
Kane's story, the court concludes that the information
available to the detectives constituted probable cause to
believe that Mr. Scrimo had committed the murder.
(*emphasis added*).

(*Id.*, 13-14).

Point I.

## THE POLICE LACKED PROBABLE CAUSE FOR THE DEFENDANT'S ARREST

A.   JOHN KANE'S May 2, 2000 Statement Did *Not* Constitute A Declaration Against Penal Interest

The older offense of "being an accessory after the fact" has been replaced by the statutes defining the various degrees of the offense of "hindering prosecution." (6 N.Y. Prac., Criminal Law § 23:9).  Penal Law § 205.50, subdivision [5], provides that a person can be guilty of "rendering criminal assistance" by "any act of concealment .. [of] .. physical evidence"  However, such *act* must be accompanied by the "intent to prevent, hinder or delay the discovery or apprehension of, or the lodging of a criminal charge against, a person who he knows or believes has committed a crime."(P.L. 205.50).

KANE'S statement does not indicate that he acted with such intent when he removed beer bottles from the victim's apartment.  He states that he removed the bottles because Scrimo yelled at him to "get the beers" (People's "8," at p.5) (H.188-189; H.295:9-12; H.298, 300).  "A statement which is largely exculpatory and made under circumstances which suggest that it is intended to minimize the declarant's criminal involvement is not 'clearly opposed to the declarant's interest.'" (*People v Raife*, 250 AD2d 864, 865 [2d Dept 1998]).   There is no

-15-

indication that KANE was aware that the beer bottles could be *evidence*, or that by removing them he could be committing a *crime*. "[T]he declarant must be *aware* that the statement was adverse to his penal interest" (emphasis added) (*People v Pugh*, 258 AD2d 674 [2d Dept 1999]; *People v Nelson*, 125 AD2d 339 [2d Dept 1986]).

Assuming that KANE had such awareness, the *circumstances* suggest that the "paltry proof of reliability" that would have provided by an admission to "hindering prosecution" was far outweighed by KANE'S obvious *motive to fabricate* in order to avoid being prosecuted for *murder*. (cf., *People v Maerling*, 46 NY2d 289, 301 [1978]).

The statement by which JOHN KANE implicated Paul Scrimo in the murder of Ruth Williams "was neither spontaneous nor promptly made" (*Maerling, supra*, 46 NY2d at 289, at 301). It came three weeks after the crime, and not "in an honest and forthright manner," as a private citizen doing his civic duty, but as a *suspect* who was seeking to avoid his own prosecution for the crime (H.278-288, 292-299) (*People v Watson*, 109 AD2d 409, 412 [1st Dept 1985]). In fact, the Hearing Court concluded that KANE was "in custody" at the time he accused Mr. Scrimo, reasoning that if KANE had been "free to leave," he would presumably have left police headquarters once he signed his statement at 9:30 P.M., and not

-16-

remained until 10:00 A.M. the following morning. (Decision, p.13) (see, H.426-427).

The Court of Appeals has cautioned that admissions against penal interest "are not guarantees of truthfulness and they should be accepted only after careful consideration of all the relevant circumstances of the case indicates that there exists a basis for finding reliability." (*People v Johnson*, 66 NY2d 398, 403-404 [1985]). The circumstances in *Johnson* were similar to the case at bar. The informant had no history of giving reliable information to the police. He had not come forward to report the murder. When the police approached him and asked about it, he initially denied having any personal knowledge. Then, he admitted having first hand knowledge, but accused the defendant of committing the murder. (66 NY2d at 401). As in the case at bar, there were no exigencies in *Johnson* which would have prevented the police from applying for a warrant (66 NY2d at 416-417). The Court of Appeals held that under these circumstances, suppression should have been *granted* (66 NY2d at 408).

B.    The Police Did *Not* verify
"highly significant details" of KANE'S story

To sustain a warrantless arrest under the two-pronged *Aguilar-Spinelli* standard (*Aguilar v Texas*, 378 U.S. 108; *Spinelli v United States*, 393 US 410), it

-17-

must be shown that the information from the informant was reliable *and* that the informant was credible. (*Johnson*, *supra*, 66 NY2d 398, 402-403; *People v Watson*, 109 AD2d 409, 411 [1st Dept 1985]).

In this case, there was no showing that KANE or Quinn had any history of providing accurate reliable information to the police, and therefore, the second prong of the *Aguilar-Spinelli* standard could only be satisfied by showing that the information provided by KANE had been independently *corroborated*. (Decision, pp.12-13) (*People v DiFalco*, 80 NY2d 693, 699 [1993]; *Watson*, *supra*, 109 AD2d 409, 411-412.   The law requires verification of the informant's allegations *regarding the crime in question.* (*Watson*, *supra*, 109 AD2d 409, 410, 412; *People v Cassella*, 143 AD2d 192, 195 [2d Dept 1988]).

    1.    Being in the company of Ruth Williams
           and JOHN KANE at "Y. L. Child's"

While KANE'S statement that he and Scrimo had been in the company of Ruth Williams at "Y.L. Child's" during the early morning hours of April 12, 2000 (People's "8," p.2) was "corroborated" by witnesses interviewed previously [4] (*Nelson*, *supra*, 125 AD2d 339), this was *not* a "highly significant detail," as it in

---

    [4]. There is no evidence that the Detectives spoke to any other witnesses between the time they took JOHN KANE'S written statement and their decision, 15 minutes later, to arrest Paul Scrimo (H.5-8, 41-42, 297-301).

no way verified KANE'S allegations *about the murder*.

Furthermore, Paul Scrimo was only one of about a dozen people who were at "Y.L. Child's" while Williams was there (People's "8," p.2), and one of those other people was JOHN KANE, the logical "other suspect" in this case. (*Zappulla v New York*, 391 F3d 462, 469 [2d Cir 2004]).

What *the Detectives* considered "significant," presumably because they thought it related to *motive*, was the fact that, *according to Francine Quinn*," the "big bald headed guy" was "making out" with Ruth toward the end of the night at "Y.L. Child's (H.464, lines 12-20; H.533, lines 9-14).

However, this meant that the Detectives did *not* credit KANE's statement that *he* was the one kissing and fondling Ruth (People's "8 ," p.2; H.173:19-25; H.177:14-20; H.292:24 - H.293:5). If the Detectives did not believe KANE as to who was kissing Ruth at the bar, then how could they rely upon KANE'S statement as to who murdered Ruth up in her apartment? This critical question was not addressed in the Detectives' testimony or in the Court's Decision.


2.   The "Argument" Behind "Captain Andy's" Restaurant

The Court's finding that the argument observed by Quinn occurred "shortly before" the murder (p.13) is without support in the record.   Det. McHugh

-19-

had not testified that his investigation had led him to such a conclusion (People's "7," p.2; H.398), and the prosecution had *not* proved the time of the *murder*, or the time of the *argument* that Quinn allegedly observed.

Quinn's observations after leaving "Y.L. Child's" did *not* corroborate KANE'S. They each described different *events*, occurring in different *locations*, at, perhaps, different *times*.

KANE told the police of the murrder he allegedly observed *inside* Williams' second floor apartment. He did *not* state the *time*. KANE was not aware of any argument *outside* involving Ruth (H.400, lines 18-21; H.409:5-10), and "[h]e didn't believe she left the apartment" while he was there (H.408:21-25).

Quinn did *not* say that she observed anything that happened *inside* Williams' apartment. Nor did she state the *time* of the argument that she allegedly observed *outside* (People's "7," p.2-3; H.248, 375-376, 394-395, 466).

For all of the foregoing reasons, the police lacked "probable cause" for the arrest of Paul Scrimo, and suppression should have been *granted*.

### C.   The Denial of Suppression Was Not Harmless

All of the evidence that the Defendant sought to suppress was relied upon by the People at trial, and it is unlikely that a conviction could have been obtained

without it. Therefore, the denial of suppression was *not* harmless. (*People v Clark*, 46 AD3d 566, 567 [2d Dept 2007]).

    *Statements.* Detective Cereghino testified that no written statement was taken from Mr. Scrimo during his post-arrest interrogation because he had *not* made any *admissions* (H.146:12 - H.147:4). However, the People would argue at trial that the Defendant's guilt was demonstrated by the fact that he made statements that were *inconsistent* and *false* (T.330:22 - T.331:6; T.333; T.1746:7-16; T.1749:25 - T.1750:2; T.1758:24 - T.1759:3; T.1776:24 - 1777:16). Since the Defendant's arrest was without probable cause, the statements which he allegedly made should have been suppressed. (*People v Bouton*, 50 NY2d 130, 136 [1980]).

    *Line-up.* Thomas Hardman testified that he signed a Statement of Identification (People's Hearing Exhibit "5"/ Trial Exhibit "3") stating that he recognized Paul Scrimo in the May 3, 2000 lineup as being the man he had seen at "Y.L. Child's" (H.62-66), and he identified the photo of the line-up (People's Hearing Exhibit "6") (H.105-107)/(People's Trial Exhibit "4") (T.390-394). "Because the defendant's arrest was unlawful, evidence that he was identified in [a] lineup[] should have been suppressed as the fruit of the illegal police conduct." (*People v Flores*, 276 AD2d 710, 712 [2d Dept 2000]).

-21-

*Photo identifications.* In a photo which appeared in the May 5, 2000 edition

of Newsday, Mr. Scrimo was allegedly recognized by Francine Quinn, who had

*not* been able to recognize him in the line-up on May 3, 2000 (People's Hearing

Exhibit "9") (H.107-108, 314-318, 331-334) (People's Trial Exhibit "86") (T.595,

1119-1120, 1160-1161).

The other photo was the Defendant's "mug shot" (Hearing Exhibit "1")

(Trial Exhibit "89"), in which he was identified by a clerk at the 7-Eleven store

(H.318-319, 322, 324-326, 330-331, 338-339) (Hearing Exhibit "11"[Statement])

(T.1320). These photos would not have been taken of him if it were not for

Defendant's wrongful arrest. Accordingly, they should have been suppressed.

*Physical evidence.* The police seized Defendant's "Leatherman" tool (H.45-

48, 304-306) (People's Hearing Exhibit "4") (People's Trial Exhibit "44"). It was

implied at trial, in the testimony of Det. Schiraldi (T.837:8-15; T.826-828, 842-

844, 854-855) and the prosecutor's summation (T.1772-1774), that this tool cut

the cord used as a ligature. Since the Defendant's arrest was *not* lawful, the

*physical evidence* should have been suppressed. (*People v Ralfopoulos*, 274 AD2d

437 [2d Dept 2000]).

-22-

## STATEMENT OF FACTS:  THE TRIAL

1.   Opening Statements

a.   The People

The prosecutor asserted that the Defendant, Paul Scrimo, was on trial for the murder of Ruth Williams, which occurred in Williams' apartment, in Farmingdale, New York on April 12, 2000.   The murder occurred some time after [5] Williams arrived home "around four a.m.," following a night of drinking in the local bars. (T.320-323).

Witnesses would testify that during the time that Williams was at a bar called "Y.L. Child's," she appeared to be intoxicated, and she was dancing seductively in front of prosecution witness JOHN KANE and the Defendant.  The witnesses did not know Mr. Scrimo by name, but gave descriptions of him as having a bald or shaved head and tattoos.  The prosecutor told jurors that Williams was later seen passionately kissing Scrimo. (T.321).

The People would prove their case, he said, through the testimony of eye witness, JOHN KANE, who was in the apartment, and saw Scrimo strangle Williams (T.324-325).

---

[5]      Not until the prosecutor made his closing statement did he state the time of *the murder* as being about 4:30 A.M. (T.1739).

The prosecutor acknowledged that the defense would argue that Williams was murdered by KANE (T.320:16-18).

> [T]here was DNA obtained from one of the fingernails of Ruth Williams that came back to John Kane. John Kane's DNA was found on cigarette butts on the kitchen table in the apartment. And John Kane's fingerprint was found on the CD case.

(T.329:20-24).

It would have been easy, the prosecutor said, for the Detectives to "hang" the crime on KANE - if they just wanted to close out this case (T.329-330). However, if JOHN KANE was the murderer, he rhetorically asked, then why did Paul Scrimo lie to the police about where he was and what he did (T.330:22 - T.331:6), and give such inconsistent statements? (T.333). Whereas, the Defendant had told the detectives that he went straight home from "YL Child's," two witnesses would be called to show that this was not true (T.326). According to the prosecutor, when Paul Scrimo was confronted with these "facts," he tried to make excuses for his "lies" (T.328-329).

One of the witnesses would be a clerk from the nearby "7-Eleven" store. The prosecutor told jurors that the clerk knew Mr. Scrimo and his wife as regular customers, and that they lived directly across the street (T.327-328). He would testify that the Defendant was in the store at about 4:00 A.M. on the night in

-24-

question, purchasing "Coors Light" beer and "Vantage Ultra Light 100s"
cigarettes (T.327-328).  The clerk thought it was strange because the only person
who bought "Vantage Ultra Light 100s" was "the blonde lady" (Ruth Williams).
He told Detectives that he asked Mr. Scrimo if he was going to see "the blonde
lady," and that Scrimo smiled and said, "yeah, don't tell my wife." Allegedly, the
clerk then put two condoms in Mr. Scrimo's bag. (T.327).

The second witness would be *Francine Quinn*.  She would testify that, after
she left "Y.L. Child's," she walked to the parking lot where her car was parked,
which was near the entrance to Ruth's apartment; and that "about 4:15, 4:20 in the
morning," [6] she saw Ruth arguing with a man that she believed to be the same big
bald guy with tattoos that she had seen with Ruth at "YL Child's" (T.328).

The prosecutor told jurors that Ruth had gone back downstairs "to let Mr.
Scrimo back into the apartment" (T.322, lines 23-24).  (He failed to state that this
was merely his *theory*, and that it would not be supported by KANE'S testimony
or any other *evidence*.   It also made no sense because the downstairs door was not
locked [T.1572:5-10]).

The District Attorney told jurors that the cut mark on the wire that was used

---

[6]     The *time* of the *argument* had *not* been indicated in Quinn's April 19, 2000
Statement [People's Hearing Exhibit "7"].  Nor would she testify that she saw the argument at
"about 4:15, 4:20 in the morning." She would testify, however, *for the first time*, that she left
"Y.L. Child's" at about 4:00 A.M. (T.503).

to strangle Ruth Williams was "consistent" with the kind of cut mark that is made

by the "scissor type tool" that Mr. Scrimo wore on his belt, "whose blades were

not exactly in alignment" (T.331:16-24).  He argued that it was not a mere

"coincidence" that Mr. Scrimo

> ...just happened to have that particular type of tool that
> cut that cord that was found wrapped around Ruth
> Williams neck, and the jaws of it were not closing
> together properly and would have made a type of cut.

(T.332:1-8).

Evidence would also be presented that Mr. Scrimo "could not be excluded"

as being one of the "minor" contributors to the "mixed DNA" that was recovered

from the mouth of a Budweiser beer bottle that was found on the victim's kitchen

table (T.332-333).

Lastly, the prosecutor told jurors that the Budweiser bottle did *not* have any

fingerprints on it, whereas two other nearby items did, including a photo album

and a piece of paper on which the decedent had written a poem (T.333).  He asked

the jurors to think about that when they listen to the testimony by KANE about

Scrimo wiping things down as he was leaving the apartment (T.333).

*The Defense*

Defense counsel argued that Ruth Williams was murdered by JOHN KANE; and that KANE had accused Paul Scrimo only to divert the attention of the police away from himself (T.335:10-13;  T.336:24 - T.337:1;  T.338:21 - T.342:10).  He asserted that the evidence suggests that KANE was a cocaine dealer; that he was apparently providing cocaine to Williams in return for her performing oral sex upon him; and that it was during a dispute related to drugs that KANE murdered Williams (T.337-338;  T.340:12-15).

Jurors were told that at the time that Mr. Scrimo was arrested, the police had not yet received the results of the DNA tests, which indicated a high probability that the killer was KANE (T.340-341).  All the credible evidence showed that KANE was the murderer (T.336:24 - T.337:1;  T.341:6-10;  T.342:7-10).

Defense counsel misstated the issue regarding the Defendant's "Leatherman" tool, saying "they're trying to tie this tool into my defendant" (T.344:4-5).  There was no question that Mr. Scrimo was the owner of this tool. The issue was whether it was this tool that cut the cord used as a ligature.

"[Y]ou're going to find when you listen to the experts, that they are going to say they couldn't say it was this tool." (T.344:8-14), but rather, they could only say that it was "that type of tool or other shearing type tool" (T.344:8-11).  (This

-27-

assertion was based on the Report of Examination of F.B.I. Agent Carlo Rosati, which had been provided to the defense before trial [T.829-832, 839-840]).

It would be more reasonable, he said, to infer that the Defendant's Leatherman tool had *not* been used to cut the ligature, since Mr. Scrimo had not taken any steps to hide it during the three weeks since the murder (T.344:15-19).

Counsel told jurors that Mr. Scrimo had not made any admissions or given any written statements (T.336). If some of his statements were inaccurate or incomplete, this did not prove that he committed the murder. He may not have remembered everything he was asked about, or there could have been other reasons why he did not answer all of the questions fully. (T.335-336).

However, some of defense counsel's remarks were better left unsaid. He suggested that the reasons why the Defendant might not have fully answered the detectives questions may have included "things that a man would not want his wife to know." (T.335:21-23). (The prosecutor had just told jurors that when Mr. Scrimo was asked by the 7-Eleven Clerk if he was going to see "the blonde lady," Mr. Scrimo said "Yea. Don't tell my wife.") (T.327).

Another ill-conceived remark was the following:

> But the issue isn't who did this. The real issue here is, after this case is over, have they proved that my defendant did this?

-28-

(T.336:21-23).

Jurors may have inferred that the defense was *not really disputing* the fact that the Defendant committed the murder, but only the prosecution's ability to *prove* it.

There was also a remark that may have been interpreted to mean the defense was *not really disputing* that Defendant was *inside* Williams' apartment:

> And it's not whether he was in the apartment or not,
> that's not the issue. Their whole -- everything they're
> going to try to point to, to show he was there. That's not
> the issue.

(T.341:3-6).

Mr. Scrimo had *denied* that he was inside Williams' apartment (T.1156, 1287, 1364-1365), and this was expected to be part of his defense (Minutes 9/27/00, p.7). If the defense was *conceding* that Scrimo was inside the apartment, then the lack of physical evidence of his presence would be immaterial, and the physical proof of KANE'S presence would not necessarily mean that he was the killer. Also, if the Defendant lied when he told Detectives he was never in the apartment, jurors could conclude that *everything* he said was a lie.

-29-

## THE TRIAL TESTIMONY

### Appeal for Sympathy

Ruth Williams' brother testified that she was a good person, and her family

loved her (T.347-357).  Her boss, and a fellow employee testified that Ruth was

dependable and well-liked (T.357-365).  This testimony was not relevant to the issues

to be determined at trial.  It was intended to inflame the emotions of jurors, as was

the photographs of Williams while she was alive (People's 1 and 2;  T.352-355).

Yet, defense counsel failed to object.  Furthermore, he reminded jurors of this

testimony in his summation (T.1680:10-13).

### The Physical Evidence

Crime Scene and Autopsy

The body of Ruth Williams was found in the bedroom of her apartment,

fully clothed (T.1387, 1393, 1400).  Around her neck was an electrical cord which

had been fashioned into a type of slip knot (T.627-628, 727-729, 743-744, 1623-

1624;  People's "46", "47," 49, "51," "52" [photos]).  The Deputy Medical

Examiner concluded that the cord (People's "43") had been used as a ligature and

that the cause of death was *both* manual strangulation *and* strangulation with the

ligature (T.740, 742;  T.752:15 - T.753:8;  T.753:20 - T.754:7).

-30-

specimens (T.1025:15-18).

Clement explained that when it is said that an individual's DNA profile is "consistent" with (T.1046) or "matches" (T.1045:18 - T.1045:1) the profile of the DNA that was found on a victim or at a crime scene, it means that it is *possible* that the DNA came from that individual.  This is also expressed by saying that the individual "is included" among the *possible* contributors, or that he "cannot be excluded"(T.1046:7-20;  T.1049:20 - T.1050:9).

Clement further explained that, in order to express how *common* or *rare* a DNA profile is, statistical estimates are used (T.1042:17-20).  The probability of randomly selecting an unrelated individual in the Caucasian population [7]  that would have a profile which matched the profile of the DNA on these "brown" cigarette butts was 1 in 18,100,000  (T.1046-1047).

*Fingernail clipping "R3"*

On one of the victim's *fingernail* clippings ("R3"),  Labcorp found "mixed DNA," meaning that it came from more than one person (T.1026, 1029).  Paul Scrimo was expressly *excluded* (T.1050:16 - T.1051:13).  Ruth Williams could *not*

---

[7]     The Crime scene and autopsy photos show that Williams was Caucasian.  Scrimo was described as 'white" in the witness statements admitted at the Hearing.  KANE was Caucasian also.

Fingerprints

A latent fingerprint (People's "40") (T.672, 660, 705) was lifted from a CD

case (People's "34") (T.671-672) in Williams' apartment (T.659-660) that

matched the "known inked impressions" of JOHN KANE (T.710, 1209-1210,

1261), which were on file due to his previous involvements with the criminal

justice system (T.1495-1518).  None of the latent fingerprints matched the prints

of Paul Scrimo which were taken after his arrest (T.713-714, 1209-1210, 1261).


DNA

*Cigarette butts*

A "brown" filtered cigarette butt was found *under* the ash tray on Williams'

kitchen table.  A second "brown" filtered cigarette was found on the floor in the

hallway outside the apartment (T.660-661).

According to the People's DNA expert, Ms. Meghan Clement, of Labcorp,

the profile of the DNA on these two "brown" cigarette butts (items # 8 and #15)

"was consistent with" the DNA of JOHN KANE (T.1046).   It was implicit that the

DNA on these cigarette butts  was *not* consistent with Paul Scrimo or Ruth

Williams, since each item of DNA evidence was also compared to their DNA

-31-

be *excluded* as being a "minor" donor (T.1026, 1029). The profile of the DNA

which was found in the greater concentration (the "major profile") was consistent

with the DNA profile of JOHN KANE (T.1048-1049). The probability of

randomly selecting an unrelated individual in the Caucasian population that would

have a DNA profile matching this "major profile" was 1 in 2,600,000 (T.1050).

Clement conceded that the DNA under Williams' fingernail could have

been transferred from her attacker, assuming that her fingernail came in contact

with the attacker (T.1086-1088).


*The Budweiser bottle*

On the kitchen table in the deceased victim's apartment, the police found an

open Budweiser beer bottle (People's "39") with some beer in it (T.665:1-2).

They swabbed the mouth of the bottle to recover any DNA that might be on it

(T.977; T.1021:21-23; T.627:2-13; T.664:21 - T.665:11). The swab was sent to

Labcorp, which extracted the DNA (T.1034:10-23). It was "mixed" DNA from

more than one person (T.1069). JOHN KANE could not be excluded as the

"major" donor (T.1069). Ruth Williams could not be excluded as a possible

"minor" donor (T.1069), and Paul Scrimo could not be excluded as a possible

"minor" donor (T.1069).

-33-

Labcorp's report did *not* state a probability statistic for the "major" profile.[8]
Instead, Labcorp stated a "mixture calculation" (T.1069), which Clement
explained as follows:

> A mixture calculation takes into consideration all
> of the characteristics that are found in the mixture and
> the various combinations of characteristics from a
> particular individual which can be a contributor.
>
> For instance, if you have three characteristics, and
> let's call them 9, 10 and 11, at any particular DNA site, a
> person who is a 9-9 could be considered part of the
> mixture, a person who is a 9-10 could be part of that
> mixture, 9-11 could be part of that, a 10-10, a 10-11, an
> 11-11. So you actually calculate the frequency of all of
> these combinations and add them together to determine
> at that particular location this percentage of the
> population could be included as a potential contributor
> of this.
>
> You'll then look at the next genetic system and do
> that for all the combinations of characteristics there.
> Basically, you have to take into consideration every
> potential combination of profiles that could be joined to
> that mixture.

(T.1080:3-21).

Labcorp found that the probability of randomly selecting an individual in

---

[8]     Labcorp had stated a probability statistic for the "major" profile in the "mixed"
DNA on fingernail clipping "R3" (T.1050). No explanation was given for why this was not done
for the "major" profile in the mixed DNA from the Budweiser bottle. In both instances, the
"major" profile matched KANE (T.1048-1049, 1069).

the Caucasian population, with a DNA profile that would be included as a possible contributor to the "mixture," was 1 in 6,800 (T.1069-1070, 1081).

(To place this statistic in perspective, in New York State alone, where in the year 2000 there were some 12,893,689 persons who described themselves as "White" to the U.S. Census Bureau,[9] some 1,896 persons [10] would have been included among those who could have contributed to this DNA mixture. This number is *high* when compared to the probability statistic of 1 in 2,600,000 for the "major profile" in the "mixed" DNA from under Williams' fingernail (T.1050), or 1 in 18,100,000 for the individual DNA profile from the "brown" cigarette butts (T.1046-1047).

A review of Labcorp's data by the defense's own DNA expert had led the defense to make two pre-trial motions that called into question the validity of Labcorp's conclusions regarding the DNA from the Budweiser bottle. (Defendant's Notices of Motion dated 9/26/01 and 2/21/ 02). The defense's expert was Howard J. Baum, Ph.D., from the Office of the Medical Examiner of New York County. (See 3/26/02 Reply Affirmation, pp.8-9). As explained in those motions, Dr. Baum had posited that the "mixture" of DNA on the Budweiser bottle

---

[9]      http://factfinder.census.gov/

[10]     12,893,689 divided by 6,800 = 1896.

could have been the result of *contamination* of the DNA evidence.  In the People's opposing papers, Labcorp did not dispute that "mixed" DNA can result from cross-contamination of DNA specimens; Clement merely denied that this had occurred in the present case.

It was Dr. Baum's opinion that Labcorp's results needed to be verified by independent tests.  However, Labcorp had consumed what was left of the swab that had been used to obtain the DNA from the Budweiser beer bottle, when it performed a *second* test on that DNA, in March of 2001, at the request of the District Attorney.  Although Labcorp still had some of the DNA which it had extracted from the swab, Dr. Baum contended that retesting the extract would serve no purpose if it was during the extraction process that the DNA had been contaminated.  (*Id.*).

The Court nevertheless found that because of LabCorp's retention of the DNAextract, there had been no prejudice to the Defendant; and it would not preclude the People from using the new test results at trial (January 16, 2002, Decision, p.7).  "However, if defendant is able to establish at trial that the extract is inadequate for the purpose of comparing DNA profiles, he will be permitted to comment on the People's failure to notify him of their intention to undertake DNA testing and their failure to preserve the original sample." (p.8).

-36-

Some of the other issues that Dr. Baum was expected to adress, are suggested by defense counsel's cross-examination.(Minutes, 9/27/00, p.4, lines 3-15;  (T.1052-1064).

The trial record is replete with indications that Dr. Baum would be a key witness for the defense (T.58:4;  T.1055-1063;  Defendant's "K";  T.1061; T.1247;  T. 1296:10-12;  T.1542:1-11;  T.1553, 1627;  T.1628;  T.1642). However, defense counsel inexplicably ~~failed to~~ rested without presenting a defense case.

Dr. Baum was also *not* present in court to assist the defense during the testimony of the People's DNA expert (T.1062-1063).  Defense counsel's cross-examination reveals an ignorance of the terminology of forensic DNA testing, and the underlying science, as well as a misunderstanding of Labcorp's findings in this particular case (T.1042:8-20;  T.1044:2-3;  T.1047,  T.1049:1 - T.1050:15; T.1051:18 - T.1052:9;  T.1066:7-15).


Francine Quinn

At the time Ms. Quinn testified at the Defendant's trial in May of 2002, she stood accused of *six* counts of *possession* of a controlled substance and *six* counts of *sale* of a controlled substance (T.575-576).  These charges were based upon

-37-

Quinn's possession and sale of cocaine while she was working as a bartender at the "Downtown" bar in Farmingdale prior to her arrest on August 1, 2001 (T.498-500). The "Downtown" was in the building adjacent to "Captain Andy's" restaurant, above which Ms. Williams' apartment was located (T.498, 505, 507). The same Nassau County District Attorney's Office which was prosecuting Mr. Scrimo's murder case was prosecuting Quinn's drug charges (T.500, 526-528).

Quinn testified that during the early morning hours of April 12, 2000, she was at "Y.L. Child's." She saw JOHN KANE and Ruth Williams there with a second man she described as follows: "Um, he just had a buzzed short hair and he had tattoos and, you know, that's about it." (T.502: 6-7). Immediately thereafter, the prosecutor used leading questions to cause Quinn to *change* her testimony to say that the man's head was "shaved ..bald" (T.502:8-12).

Two years had passed since the night in question, and the Defendant had let his hair grow out (T.1735:11-16). The tattoos on his arms and chest were covered by the suit he was wearing (T.1740:23 - T.1741:3). (The tattoos are visible in the photos admitted as People's "3," "5" and "89"). The prosecutor *pointed out* Mr. Scrimo in the courtroom and asked Quinn if he was the man she had seen in "Y.L. Child's" that night. Incredibly, defense counsel remained silent. Quinn responded in the affirmative. (T.501:20 - T.502:3).

-38-

Quinn testified that on April 12, 2000 she stayed at "Y.L. Child's" until it closed at about 4:00 A.M. (T.502-503). (This time had *not* been indicated in Quinn's 4/19/00 Statement [Hearing Exhibit "7"] *or* in the Hearing testimony of the Detectives). She left with her roommate, James Grella, to walk a few short blocks to where his car was parked in the lot behind the "Downtown" bar and "Captain Andy's" restaurant (T.503-504, 529). As she reached the car, she heard loud voices coming from the direction of "Captain Andy's," by the entrance that leads up to Ruth's second floor apartment (T.505). The area by the door is depicted in the photo admitted as People's "8," but her view was not that close up (T.508).

Quinn turned and saw Ruth there, arguing with a man (T.504-506, 510). Based on the man's height, his "stocky" build, and his "shaved head," she believed it was the same man that she had seen with Ruth at "Y.L. Child's" (T.504:17 - T.505:6). "He was just, like a stocky, like, you know, full chested, you know, about five-ten, same shaved head." (T.505:2-3).

Up to that point in the trial, Quinn had *not* described the man at "Y.L. Child's" as "stocky"or "full chested" (T.502:6-7). Conversely, she *had* testified that the man at "Y.L. Child's" had *tattoos* (T.502:6-7), and but had *not* testified that she saw *tattoos* on the man outside Ruth's apartment (T.596:17 - T.598:4).

-39-

Subsequently, however, the prosecutor *again* led Quinn to effectively *change* her testimony, by asking a question that assumed that the man arguing with Ruth *had tattoos* - a fact not in evidence - while purporting to refer back to testimony that Quinn had previously given (T.506:13-17). In this way, the prosecutor *bolstered* Quinn's identification of the man outside Williams' apartment as being the same man that she had seen earlier at "Y.L. Child's." Yet, defense counsel failed to object. [11]

Quinn's roommate's car was in the third row of parked cars away from where Ruth was (T.529, 536) (Defendant's "B" [photo]). She was *not* able to *see* the man's *face* (T.525) or *hear* what the arguing was about (T.558).

Quinn's observation was apparently very brief. She had walked quickly because it was cold out (T.505:8-9; T.523:1-7; T.557:18-21), and presumably, she wasted no time opening the door and getting inside. The car was parked at a diagonal, facing away from where Ruth was (T.565:7-9). Thus, Quinn would have to face away from Williams in order to sit in the car. As soon as Quinn got in, she drove away (T.505:7-9; T.565:19-22).

Quinn conceded that, earlier that night, she had seen Ruth at the

---

[11]      (*People v Cobb*, 104 AD2d 656, 657 [2d Dept 1984]). The error should be reached in the interests of justice because it pertained to key testimony and was highly prejudicial. (*Id*, at 658)

"Downtown" with a man *other than Mr. Scrimo*, who "had like tattoos on his arms and you know he was a little stocky. He had a big chest, big arms." (T.516:6 - T.517:4). This raised the possibility that it was this other man, and not Paul Scrimo, that Quinn later saw outside Williams' apartment.

Although there were only about 10 people in "Y.L. Child's" when it closed, Quinn was unable to state whether the Defendant had left before she did (T.503, 521-522, 553). If he did not, it would have been impossible for Scrimo to have reached the area behind "Captain Andy's" *before* Quinn did. Moreover, the prosecutor asserted in his opening that, before the argument outside with Williams, Scrimo had already been up in Williams' apartment, had gone out to the "7-Eleven," and had returned with beer and cigarettes (T.322:23-24; T.327-328). (Quinn, incidentally, does not mention that the man with Ruth was holding a 12-pack of beer or a grocery bag).

On May 3, 2000, just *three weeks* after the murder, the police asked Quinn to view a line-up, which included the Defendant and 4 other men. A sheet covered the bodies of the five men so that only their faces and bald or shaved heads were visible. (People's "4" - Photo). Quinn viewed the line-up from 5-6 feet away, and did *not* recognize *any* of the men as being the person she had seen at "Y.L. Child's" (T.512, 562-563). "All the people in the lineup looked the same" (T.512).

-41-

On May 5, 2000, a photo of the Defendant, alongside of Detective McHugh, appeared in Newsday (T.1119-1120) (People's "86"). The photo shows the Defendant only from the chest up, and his left arm is almost completely out of view. Mr. Scrimo does *not* appear "stocky" or "full-chested" in the photo, as Ms. Quinn had described the man she had seen behind "Captain Andy's" (T.505). Nor can his tattoos be seen. Clothing covers everything except Mr. Scrimo's head (T.1164) - just like the sheet at the lineup. Yet, Quinn testified that when she saw the Newsday photo, she "recognized" the Defendant (T.595).

It came out during the suppression hearing that this photo was published with an article about Mr. Scrimo being arrested and charged with Williams' murder. (April 5, 2001 Decision, pp.10-11, 14-15). Thus, it was highly suggestive. The Hearing Court decided not to preclude Quinn from making an in-court identification at trial if she is able to do so, but stated that "the issue of possible taint from having seen the newspaper article may be explored on cross examination." (*Id*, at p.15). Defense counsel failed to explore this issue.

Defense counsel allowed Quinn's photo identification of the Defendant to be elicited indirectly *during the People's case-in-chief.* [12] First, the prosecutor elicited from Quinn that she had recognized the Defendant in a photograph in

---

[12]     (*State v Grajales*, 8 NY3d 861, 862 [2007]).

Newsday (T.595).  Then, during the testimony of Det. McHugh, the photograph itself was moved into evidence.  Initially, defense counsel objected on relevancy grounds; but at a side bar, the prosecutor argued that *this was the photograph in which Quinn had recognized the Defendant*.  Incredibly, this caused defense counsel to withdraw his objection. (T.1160-1161).  After the Newsday photo was admitted, Det. McHugh identified the two men in the photo as being himself and the Defendant (T.1161).

The error was compounded during defense counsel's cross-examination, when he had McHugh state explicitly what the jury had undoubtedly already inferred - that *it was this photo in which Quinn had identified the Defendant* (T.1166-1167).

> Q     What did she tell you with respect to identifying him from this photograph?
>
> A     That the gentleman in that photograph was the same man that she had seen at the back door of Ruth's apartment and he was the same man that had just left in the company of Ruth from Y.L. Child's on the night of the occurrence.

(T.1166:24 - T.1167:4).

This testimony could not have been properly elicited by the prosecutor.[13]

---

[13]     *(People v Winston (Deacon)*, 134 AD2d 546, 547 [2d 1987]).

Furthermore, it was *more damaging* than the testimony that had been given by

Quinn herself.  Quinn had only testified that she recognized the man in the

Newsday photo as having been with Ruth *at "Y.L. Child's"* (T.595).   She had *not*

testified, as McHugh did, that she recognized the man in the Newsday photo as

being the man that she had later seen by the outer entrance to Ruth's apartment.

Nor had Quinn testified, as McHugh did, that the Defendant "left in the company

of Ruth from Y.L. Child's." Also, Quinn had testified that she had *not* seen the

*face* of the man that was behind Ruth's apartment (T.525); but defense counsel

asked McHugh if Quinn had told him that she recognized the man in the Newsday

photo  from "seeing his face," and McHugh said "Yes." (T.1167:17-23).


### JOHN KANE

JOHN KANE did not report the murder of Ruth Williams to the police.  He

contacted the Detectives on April 15, 2000 only because he was told that they

wanted to speak to him (T.1481, 1534-1535).  Then, he lied, telling the Detectives

that he was *not present* in Williams' apartment when the murder occurred, and that

he did not have any direct knowledge of it (T.1478;  T.1484;  T.1492:19-24).  He

also denied being at "Y.L. Child's" that night with "a male white with a shaved

head and tattoos" (T.1484:21-25;  T.1492: 19-22) - a description that fit Paul

-44-

Scrimo (T.388, 392-394, 443, 452).

Detective McHugh testified that when he interviewed KANE on April 15, 2000, KANE had an "injury to his head that was scabbed over" (emphasis added) (T.1137, lines 9-12). McHugh described the injury as "old" (T.1137, line 11). However, there was no testimony that McHugh was qualified to estimate the age of the wound. Its appearance was apparently not documented by a photograph, since none was introduced.

When KANE was picked up and interrogated at Police Headquarters on May 2, 2000, he *again lied* (T.1493-1495, 1528-1529). He told the Detectives that he had learned about the murder from "Ross" (T.1534). When asked the names of the people he was with at "Y.L. Child's" on the night of the murder, KANE *again* did *not* name Paul Scrimo (R.1535-1536); and he *again* denied being with anyone who fit Scrimo's description (T.1538, 1555).

The Detectives decided to obtain a sample of KANE'S DNA (T.1147:15-24). There is no indication that a DNA sample had been obtained from anyone else.

KANE was apparently told that there was evidence that linked him to the crime scene (T.1563-1564). He admitted to the Detectives that he had, in fact, been to Ruth's apartment 5-6 times (T.1430-1431), during which they had sex

-45-

(T.1483-1484).  However, he said that the last such occasion was a month prior to the murder (T.1528;  T.1529:8-10;  T.1530:1-3).

There came a point though when it must have appeared to KANE that he was about to be charged with the murder (T.1563-1564; H.175:6-11).  He admitted that, on the night in question, he was with Ruth Williams at "Y.L. Child's," and that she was "coming on to" him and "kissing" him (T.1571-1572).  "Ruthy" left the bar before he did (T.1430), but, when "Y.L. Child's" closed, KANE went over to her apartment, and she performed oral sex upon him (T.1432).

KANE had withheld this material information from the Detectives for almost *three weeks* (T.1529).  He had all of that time to think about what he would tell them if they were to link him to the crime (T.1564).  What KANE told them was that when he went to Williams' apartment that night, he brought Paul Scrimo with him to "have a drink" (T.1431:11-12); and that it was Paul who committed the murder (T.1435-1437).  He said this was "what had really happened" (T.1494), and his prior story was "untrue" (T.1492:19-24).

KANE'S testimony during cross-examination provided *some* circumstantial support for the defense theory that there was a sex-for-drugs relationship between Williams and KANE (T.335:10-13;  T.336:24 - T.337:1;  T.338:21 - T.342:10).

KANE admitted having no documented means of support.  He had filed no

-46-

tax returns for at least the last 5 years, and did only sporadic "odd jobs" (T.1465-1468). Yet, he was able to afford to drink heavily in the local bars 3-4 days a week (T.1467-1468, 1470). KANE'S nickname in the bars was "John Doe" (T.1521-1523), and there was a drink called a "John Doe" that was named after him (T.426-427).

KANE was not Ruth Williams' boyfriend, and they had never gone out anywhere together (T.1616-1617). Yet, he had a history of sexual relations with Williams that consisted *only* of *her* performing oral sex upon *him*, without them even getting undressed (T.1483, 1525-1526, 1528, 1531-1532, 1618-1620).

## The Defendant's Post-Arrest Interrogation

Although Paul Scrimo did not confess to the murder, and did not make any admissions, three different Detectives gave accounts of the interrogation that followed his arrest.

Each Detective described the Defendant's alleged *non-verbal* reactions to certain questions and statements, such as the movement of his eyes and his head, the pauses between answers, and the change in the tone of his voice; and the Detectives stated or implied what they thought was going on in the Defendant's mind (T.1153:1-3; T.1154:24 - T.1155:1; T.1281:23-24; T.1284:3-4; T.1288:5-

-47-

6; T.1286:17; T.1291:10; T.1292:1-3; T.1365:12; T.1365:22-23).

Jurors also heard each of these Detectives voice his *opinion* that the Defendant was *lying* (T.1293:21-24; T.1153:15-17; T.1150:10-15; T.1151:1-4; T.1153:21-22; T.1155:6-7).

The Detectives testified that the Defendant declined to answer certain questions (T.1364:14-16; T.1365:9-23[Det. Cereghino]; T.1153:4-6 [McHugh]; T.1283:2-9 [Parpan]), and that he had tried to avoid damaging questions by stating that he could not remember because he was drunk (T.1285: 21-23; T.1154:8-10; T.1150:17 - T.1151:4; T.1157:4-5; T.1281:1-5; T.1283:19 - T.1285:24; T.1363:21-23).

During the People's case in chief, Detective Parpan testified that Mr. Scrimo remained silent when he was implicitly accused of committing the murder (T.1290:22 - T.1291:6).

Finally, there was testimony that there came a point in time that the Defendant declined to answer *any further* questions and *requested an attorney* (T.1157:23 - T.1158:3; T.1293:17 - T.1294:10).

<u>Police Officer Pamela Stark</u>

Officer Stark was permitted, over defense counsel's *hearsay* objection, to

-48-

testify to certain statements that Mr. Scrimo allegedly made to her on October 18, 2000, while he was out on bail (T.1401-1409). The prosecutor argued that the statements he was asking Stark about constituted "admissions," and that he would not ask about the Defendant's statements to Stark which were "self-serving" (T.1380-1383).

However, in the prosecutor's summation, he cited only one such alleged "admission" - that the Defendant told her he had bought the *Coors Light* Beer and the *Vantage 100*s cigarettes (T.1766-1768) - and this assertion had no support in the record.   Stark had only testified that the Defendant told her he bought "beer" and "cigarettes" (T.1408:22 - T.1409:4).

Later in the prosecutor's summation, he took a very different position, arguing that *all* of the Defendant's statements to her were "lies" (T.1771-1772, 1776-1777).

### The "Tool Mark" Evidence

Paul Scrimo was employed as the Superintendent of the "Elizabeth Gardens" Apartments, in Farmingdale, New York, where he also resided (T.1362). Presumably, this is why he was wearing a "Leatherman" brand multi-purpose tool on his belt at the time of his initial interview by the police, as well as at the time of

his arrest (T.1137, 1140-1141, 1360-1361, 1363). Based upon these facts, the

prosecutor argued that the Defendant regularly carried this tool (T.331-332, 1759-

1760), the implication being that he had it on the night of the murder.

However, there was no testimony by KANE that Scrimo had the tool with

him at the time of the crime. The Leatherman tool had *not* been found at the scene

of the crime, nor had any trace evidence from the crime scene been found on the

tool. There was a black plastic-like speck on the tool, but when it was tested, to

see if it matched the insulation on the wire that was used as the ligature, it did *not*

match (T.807-808).

Nevertheless, the prosecution attempted to convince jurors that the

"Leatherman" tool had cut the wire that was used as a ligature. They presented

the testimony of *two* different experts (T.814-927; T.927- 947), and introduced

*ten* exhibits (People's 70 through 79).

It came as a surprise to the defense that one of these experts (Detective Vito

Schiraldi) testified *about the tool*, because Schiraldi's reports, which were

disclosed before trial, did *not* indicate that *the tool* was a subject of his scientific

analysis (T.829:8-11). Over defense counsel's strenuous objection, Schiraldi was

allowed to testify about the tool, *and* to conduct a misleading in-court

demonstration (T.815-855). (See Point III).

The defense had retained its own "tool mark " expert, Nicholas Petraco, but he was not present to assist defense counsel with his cross-examination of the People's "tool mark" experts. Nor was he called as a witness for the defense. (T.57, line 25; Court Exhibit II; T.344:6-14; T.821, 838, 921-923).


## No Defense Case

The Court ruled that it would not permit defense counsel to question three proposed defense witnesses about matters which the Court considered "collateral" (T.1629, 1634-1638). Therefore, the witnesses were not called. An offer of proof had been made that the witnesses were prepared to testify as follows:

- *Stephanie Domaradzski* would testify that she made multiple drug purchases from JOHN KANE, some of which were made within a short time prior to the murder of Ruth Williams, at which time the cocaine she purchased was shared with *Ruth Williams* (T.1455).

- *Charles Ball* would testify that he made a purchase of a half gram of cocaine from KANE in 1998 at "The Falcon's Nest" (T.1447-1448, 1628).

- *Jennifer Hartman* would testify that some time in 1997, she made a purchase of drugs from KANE at the "Falcon's Nest." Upon discovering that the drugs had been "cut," she tried to get her money back by reaching

-51-

for some of the money that KANE had on the bar, but KANE grabbed her by the throat and started choking her (T.1453-1454).

As mentioned above, the defense's DNA expert, Howard J. Baum, Ph.D, and its "tool mark" expert, Nicholas Petraco, were inexplicably *not* called by defense counsel to testify on Defendant's behalf.

Summations

*The Defense*

The Defendant's attorney began his inept summation by describing the People's case as "a mountain of evidence, a mountain, a tremendous amount of evidence ..." (T.1675:25 - T.1676:3) .. "you have mountains of evidence.." (T.1732:6).

He inexplicably reminded jurors of the sympathetic testimony about the kind of person Ruth Williams was when she was alive (T.1680:10-13).

The Defendant's attorney also reminded jurors that three Detectives who interrogated Mr. Scrimo after his arrest had testified that, in response to certain questions, the Defendant looked down, could not look the Detective in the eye, and became sullen and withdrawn (T.1679:5-15;  T.1710:22 - T.1711:3;

-52-

T.1711:18-22). He explained (as if it wasn't clear enough already), that the Detectives wanted the jurors to draw conclusions as to what Mr. Scrimo's "internal thought process was" (T.1712:17-19), i.e., that the Defendant was being "evasive" and was "lying" (T.1679:10-12; T.1711:15-16).

He urged jurors to ask themselves what it was that Ruth Williams had been receiving in return on all the occasions when she had sex with JOHN KANE which consisted of only her performing oral sex upon him, and suggested that the answer was *drugs* (T.1728-1731).

Defense counsel failed to go through the many reasons why the testimony of Francine Quinn was entitled to little, *if any*, weight (T.1685-1688). Although he mentioned the drug charges against Quinn, he failed to explain that the same Nassau County District Attorney's office that was prosecuting Mr. Scrimo would also be deciding what disposition would be offered in Quinn's case, and that this could be a motive for Quinn to curry favor with the prosecutor (T.1685).

He incorrectly stated that, after Quinn had failed to recognize Scrimo in the May 3, 2000 line-up, she subsequently told the Detectives that she recognized Scrimo because of his *tattoos* (T.1687:19 - T.1687:3). (Quinn had allegedly recognized Scrimo in the May 5, 2000 Newsday photo, in which no tattoos are visible)(People's "86")(T.594-595, 1160-1161).

-53-

Defense counsel failed to *accurately* summarize the all-important DNA evidence (T.1677, 1693-1694, 1698-1699, 1702, 1707).

Not only did defense counsel fail to remind jurors about the "scab"that Det. McHugh observed on KANE'S head (T.1137:9-12); he stated that Det. McHugh did *not* see any "scratches" (T.1707:16-23).

He failed to minimize in any way the significance of the People's "tool mark" evidence (T.1699-1701). He did not explain that there was no connection between the Leatherman tool and the murder. He failed to explain why the in-court demonstration by Det. Schiraldi was defective and misleading. He did not summarize the respects in which the testimony of Det. Schiraldi was contradicted by F.B.I. Agent Rosati.

He inaccurately recounted KANE'S testimony by stating that, after Scrimo returned from buying beer and cigarettes, it was "about another ten minutes" before the murder occurred (T.1687:20-21). KANE had *not* estimated this period of time, nor had he stated the time that the murder occurred. As a result of defense counsel's blunder, it may have appeared that the prosecutor's subsequent argument that the murder occurred at about 4:30 A.M. (T.1739) was plausible.

It may have been inferred from some of defense counsel's "inartful" remarks that the Defendant *was* present when the murder occurred (T.1713:11-14;

-54-

T.1718:12-16;  T.1731:21-23;  T.1692:1-5).

## *The Prosecution*

Capitalizing on defense counsel's remark, the prosecutor also referred to the People's case as consisting of a "mountain of evidence" (T.1776:14-18).

He suggested that the Leatherman tool was a link between the Defendant and the murder (T.1759:14 - T.1760:12;  T.1772:10 - T.1774:4).  He made reference to the defense's own tool mark expert having examined the tool (T.1773: 1-5).  By this time, defense counsel understood the negative "inference" that could be drawn, and objected, but was overruled (T.1773:8-17).

Jurors were *again* reminded of the testimony about the Defendant's alleged "nervous" reactions, and were told that this was proof that the defendant was lying, and that he was lying because he was guilty of the murder (T.1744-1746, 1748-1749).

The prosecutor repeatedly denigrated the Defendant and his attorney (T.1733-1738, 1741, 1744, 1752-1753, 1756-1757, 1763-1766, 1777), bolstered the prosecution witnesses (T.1740-1741, 1747-1749), and called upon jurors to draw inferences that could not fairly be drawn from the evidence (T.1751-1752, 1753, 1766-1772, 1775, 1778-1783).  (See Point VI).

-55-

Jury Charge

Although the People had argued that the Defendant made *false* and

*inconsistent* statements to the police (T.326-333), it was not proposed during the

pre-charge conference, by the Court *or* by *either* attorney (T.1744-1759), that the

Court give the standard jury instruction on "Consciousness of Guilt," which was in

effect at the time of the Defendant's trial in 2002 (1 CJI [NY] 9.16).

Instead, the Court proposed that it would read "11.0 with respect to

confessions, admissions and statements." Neither side objected. (T.1655:19 -

T.1656:2). The Court first charged "Confessions, Admissions and Statements:

General Instructions" (1 CJI [NY] 11.01, pp.656-660) (T.1809:15 - T.1813:22).

Then it read, with some variations, the specific instruction on the "In Custody"

issue (1 CJI [NY] 11.02, pp.661-665) (T.1814:2 - T.1816:22), with respect to the

alleged statements to Det. McHugh and Det. Parpan only (T.1813:24 - T.1814:1).

During the *post-charge* conference, *the prosecutor* argued that these

instructions were *inapplicable* to this case because there had been *no confession*

(T.1827). He also argued that the charge was also inapplicable because the Court

had instructed jurors to *disregard* the Defendant's statements if it found that the

statements were *not truthful* (T.1809:15 - T.1810:21;  T.1812:7 - T.1813:10), and

his whole purpose in presenting proof of the Defendant's statements was to show

-56-

that they were *not truthful* (T.1826:13-14; T.1825:13-17).  (See Point V).

Jury Deliberations and Verdict

During 12 days of trial, jurors had heard testimony from 26 witnesses (T.347-1825).  The prosecution had introduced some 89 exhibits, of which 86 had been admitted into evidence, and the defense had introduced 25 Exhibits, of which 2 had been admitted (T.1850-1853).  The Trial Court had not permitted jurors to take notes (T.316, lines 9-16).

During the first full day of deliberations, the jury foreman sent notes to the Judge requesting a *list of the evidence*, a *list of the witnesses*, and a *read back of the closing statements* (T.1836-1837).  The Court would only read aloud the names of the witnesses.  It told jurors that they could ask for a read back of any testimony they wanted to hear, and that they could have any exhibits sent to them that they wanted to see (T.1836-1838).  At 2:45 P.M. on that same date, the jury (without requesting *any* read backs *or* exhibits) reached its verdict (T.1844-1845).

Sentence

For the crime of Murder in the Second Degree, the Defendant received an indeterminate sentence of 25 years to life (Minutes of Sentence, 6/18/02, pp.8-9).

-57-

Point II.

## THE DEFENDANT WAS SEVERELY PREJUDICED BY THE IMPROPER TESTIMONY ABOUT HIS INTERROGATION

The Defendant did ^not^ give a confession or make any "admissions." [14] [15]   The

first time that the prosecution attempted to elicit testimony from one of the

Detectives about an alleged statement by the Defendant, defense counsel should

have objected to it as *hearsay*.[16]   It would then have been up to the prosecutor to

show that the statement fell within one of the recognized exceptions to the rule

against *hearsay*, or that the statement was not being offered for its truth.

If the statement was not being offered for its truth, the prosecutor would

have to state the purpose for which it was being offered, and jurors would have to

be instructed to consider the evidence only for that limited purpose. [17]   The

---

[14]     "Any act or declaration of the accused inconsistent with his innocence is admissible as an admission (see, *People v. Bretagna*, 298 NY 323; Richardson, Evidence §212 [Prince 10th ed])." (*People v Harris*, 148 AD2d 469 [2d Dept 1989]).

[15]     "An 'admission' is a declaration by the defendant from which, either alone or with other evidence, his guilt may be inferred. See, Richardson on Evidence (10th Ed. Prince) §540." (1 CJI [NY] 11.00, p.608).  See, e.g., *People v Sanchez (Edwin)*, 92 AD2d 595 [2d Dept 1983] (defendant did not admit strangling the victim, but admitted striking her after she insulted him).

[16]     "Out-of-court statements introduced to prove the truth of the matters they assert are hearsay.  They may be received in evidence only if they fall within one of the recognized exceptions to the hearsay rule, and then only if the proponent demonstrates that the evidence is reliable (*People v Nieves*, 67 NY2d 125, 131)." (*People v Brensic*, 70 NY2d 9, 14 [1987]).

[17]     Prince, Richardson on Evidence, §4-105 "Evidence Relevant for Limited Purpose" (11th ed.), pp.140-141;  1 CJI [NY] 4.02 Limiting Charge: Sample.

-58-

instruction would have to be given at the time the evidence is received, and again in the court's charge (1 CJI [NY] 4.00, 4.01, 4.53, pp.138, 142).

Since defense counsel failed to make a hearsay objection, the prosecutor was not required to state the purpose for which the testimony was being presented.

> A. Defense Counsel Was Ineffective in Failing to Move to Strike the Detectives' Speculative Testimony as to the Operation of the Defendant's Mind In Response to Being Asked Certain Questions

The Detectives testified to what they thought was going on in the Defendant's mind after certain questions or statements were put to him, and/or this was *implied* by their descriptions of Defendant's alleged *non-verbal* reactions, such as the movement of his eyes and head, the pauses between his answers, and the change in the tone of his voice (T.1153:1-3; T.1154: 24 - T.1155:1; T.1281; T.1284:3-4; T.1286; T.1288; T.1291; T.1365:12; T.1365:22-23).

One of the first times that this occurred, defense counsel "objected," and the Court sustained the "objection," on the apparent ground that the Detective had improperly testified to his *conclusion*, rather than limiting his testimony to what he *observed* (T.1292:11-13). However, even the *observation* that the Defendant *lowered his head* was improper because it was being offered as evidence of the operation of the Defendant's mind. The prosecutor's summation left no doubt

-59-

about this:

> You know when someone is telling you a lie. *They can't*
> *look you in the eye and talk to you.*  You know when
> someone is telling you a lie and needs to think about what
> the answer is.  *They look down.*  (emphasis added).

(T.1748:19-22).

In *People v White*, 117 AD2d 127, 132 [2d Dept 1986], this Court held that

the fact that the defendant "appeared to be avoiding eye contact" was "ambiguous."

When an act is ambiguous, its probative value is minimal, and it is erroneous for

the Trial Court to receive it.  (*People v Basora*, 75 NY2d 992, 994 [1990]). Also

ambiguous, and without probative value, were the alleged *pauses* between Mr.

Scrimo's answers (T.1152), and *changes in the tone of his voice* (T.1292).

Defense counsel was ineffective in not moving to strike *any* of this

testimony.  Moreover, he had one of the Detectives repeat his testimony during

cross-examination, without dissipating its prejudicial effect (T.1306, lines 20-25).

Jurors would again be reminded of it in the summation of defense counsel *and* in

the summation of the prosecutor (T.1679, 1710-1712, 1748-1749).

-60-

B.   Defense Counsel Was Ineffective in Failing
to Move to Strike the Detectives' Testimony
That They *Knew* the Defendant Was *Lying*

It is "improper for the trial court to allow the prosecutor to ask questions

regarding a detective's opinion on the truth of the defendant's statement, the effect

of which was to solicit his opinion of the defendant's credibility (*People v*

*Graydon*, 43 AD2d 842)." *People v Allen (Warren)*, 222 AD2d 441, 442 [2d Dept

1995], lv den 88 NY2d 844.

Here, none of the prosecutor's questions asked for the detective's opinion as

to the truthfulness of the Defendant's statements.  However, each Detective stated

his opinion that the Defendant was *lying* in the context of his narrative of the

Defendant's interrogation (T.1150:10-15;  T.1151:1-4;  T.1153:15-17, 21-22;

T.1155:6-7;  T.1293:21-24).  Jurors were not given any instruction that the

Detectives' statements were not being presented for their truth; and thus, they had

no reason to view the Detectives' statements as anything other than expressions of

their actual opinions.  Moreover, this view would be reinforced by the prosecutor's

summation, which "essentially asked the jury to view this case from the perspective

of [the] Detective[s]" (*People v Allen (Barry)*, 74 AD2d 640, 642 [2d Dept 1980])

and to conclude, as the Detectives had, that the Defendant was *lying* (T.1749: 6-

11).

-61-

As this Court stated in *Allen (Barry)*, *supra*, "The fact that the police believed they had apprehended the perpetrator of the crime was irrelevant to the question of defendant's guilt and highly prejudicial to the defendant as well" (74 AD2d at 642). Thus, such testimony was patently improper. (*People v Graydon*, 43 AD2d 842, 843 [2d Dept 1974]; *People v Blake*, 139 AD2d 110, 115 [1st Dept 1988]).

The first time such improper testimony was uttered, defense counsel should have moved to strike, and the trial court should have instructed jurors to disregard it, to direct the prosecutor not to elicit any further testimony of this kind, and to direct the Detective "not to volunteer" it. (*People v Jackson*, 20 AD2d 918 [2d Dept 1964]).

Defense counsel did not "object" until it was too late, i.e., when the prosecutor made reference to this testimony in his *summation* (T.1749:6-16). But, since it severely prejudiced Defendant's right to a fair trial, the error should be considered in the *interests of justice*, In the alternative, defense counsel's failure to act should be considered as evidence of *ineffectiveness*.

-62-

C.   Defense Counsel Was Ineffective in Failing to Move to Strike the Detectives' Testimony That After the Defendant's Arrest He (1) Declined to Answer Certain Questions; (2) Remained Silent When Accused of the Murder; And Finally (3) Declined to Answer Any Further Questions and Requested an Attorney

(1)

The Defendant was prejudiced by the Detectives' testimony that he declined to answer *certain* questions (T.1150:17 - T.1151:4; T.1153:4-6; T.1154:8-10; T.1157:4-5; T.1281:1-5; T.1283:2-9; T.1283:19 - T.1285:24; T.1363:21-23; T.1364:14-16; T.1365:9-23). "Persistent and repeated introduction of evidence of this type, for whatever purpose, cannot help but have the effect of implanting in the minds of jurors the impression that the defendants' refusals to answer were so inconsistent with innocence as to amount to admissions of guilt." (*People v Bianculli*, 9 NY2d 468, 472 [1961]). Defense counsel's cross-examination only exacerbated the prejudicial effect (T.1306:20-25).

Once it became apparent that this testimony had been elicited for no other reason but to "develop that defendant had refused to answer damaging questions while he was in custody," it should have been *struck*. (*People v Travato*, 309 NY 382, 387 [1955]). Defense counsel failed to seek such relief; and thus, failed to preserve the evidentiary issue for appeal. (*People v Beauliere*, 36 AD3d 623 [2d Dept 2007]). The error should nevertheless be considered in the interests of

-63-

justice.  Alternatively, defense counsel's failure should be considered as evidence

of *ineffectiveness*.


(2)

It is well-settled that a defendant's silence in the face of an accusation is

without any probative force to establish his guilt, and that since a jury might draw

an impermissible inference of guilt from such silence, evidence of it may not be

admitted at trial.  (*Bianculli, supra*, 9 NY2d 463, at 471-472;  *Travato, supra*, 308

NY 382, at 386.  Thus, it was improper for Detective Parpan to testify that Paul

Scrimo did not respond when he was implicitly accused of the murder (T.1290, line

22 - T. 1291, line 6).


(3)

It was improper for the Detectives to testify during the People's case in chief,

that after the Defendant had been interrogated for several hours, he declined to

answer any further questions and invoked his right to counsel (T.1157:23 -

T.1158:3;  T.1293:17 - T.1294:10).  The admission of such testimony was

prejudicial error "which, quite by itself, requires reversal and a new trial."  (*People

v Von Werne*, 41 NY2d 584, 588, 590 [1977].  See also *People v Chatman*, 14

-64-

AD3d 620, 621 [2d Dept 2005]; *People v Al-Kanani*, 26 NY2d 473, 478 [1970];

*Bianculli, supra*, 9 NY2d 463, at 471-472).  There was simply no need for jurors to

know the reason *why* the Detectives' custodial interrogation of the Defendant

concluded when it did.  (*People v Carter*, 149 AD2d 83, 90 [1st Dept 1989]).

"[W]here as here, such testimony is elicited or volunteered, the court should

give curative instructions (citations)." (*People v Nicholas*, 286 AD2d 861, 862

[4th Dept 2001]).  Since "defense counsel did not seek, nor did the court give, any

curative instructions ... the likelihood that these uncorrected constitutional errors

contributed to the defendant's conviction cannot be discounted *(People v Conyers,

supra*, 49 NY2d, at 183)." (*Carter, supra*, 149 AD2d 83, at 90).

The prejudice that flowed from the Detectives' objectionable testimony was

also not dissipated by an appropriate instruction in the Court's charge (T.1785-

1825).  Since the trial court "did not instruct jurors to draw no inference from

defendant's declination to answer further police inquiries ... there is a reasonable

possibility that this constitutional error may have contributed to the conviction, and

hence, was not harmless beyond a reasonable doubt (citations)." (*Von Werne,

supra*, 41 NY2d at 588).

Also, the error was not an isolated one.  The same constitutionally infirm

testimony was given by both Detective McHugh and Detective Parpan.  The error

in admitting such testimony should be considered in the interest of justice. (*Chatman, supra*, 14 AD3d 620, at 621).

Defense counsel's failure to move to strike this improper testimony, to request a curative instruction, or to request an appropriate instruction in the Court's charge, is also evidence of *ineffectiveness*.

III.

THE DEFENDANT'S RIGHT TO A FAIR TRIAL
WAS SEVERELY PREJUDICED BY THE PEOPLE'S
PRESENTATION OF MISLEADING EVIDENCE
INTENDED TO SHOW THAT A TOOL HE CARRIED
ON HIS BELT WAS USED TO CUT THE WIRE WITH
WHICH THE MURDER VICTIM WAS STRANGLED

A.     Defense Counsel Should Have Moved *In Limine*
       To Preclude the People's Anticipated "Tool Mark" Evidence

Based upon the fact that the Defendant had the Leatherman tool on his belt

when he was initially interviewed on April 20, 2000 *and* when he was arrested on

May 3, 2000 (T.1137, 1140-1141, 360-1361, 1363), jurors could fairly infer that it

was Mr. Scrimo's habit to carry this tool, and that he had it on his belt on the night

of the murder, as the prosecutor argued (T. 331, 759-1760). *However*, it would *not*

have been permissible, based upon this inference, to draw the further inference that

the tool had been used to cut the ligature (T.1808) (*People v Lunsford*, 46 AD2d

612 [1st Dept 1974]).   Indeed, it would be more reasonable to infer the contrary,

since Mr. Scrimo had not disposed of the tool during the three weeks since the

murder (T.344:15-19). (*People v Taddio*, 292 NY 488, 494 [1944];  *People v

Lockerby*, 178 AD2d 805, 807 [3d Dept 1991]).

In order for the Defendant's Leatherman tool to be admissible, the

prosecution would have to show a connection between the tool and the murder of

-67-

Ruth Williams (*People v Wilson*, 168 AD2d 696, 698 [3d Dept 1990]). Otherwise, the tool would be irrelevant, and its introduction would have no other purpose than to prejudice jurors against the defendant. (*People v Winston (John)*, 52 AD2d 432 [1st Dept 1976] [error to admit knife found on defendant at time of arrest, but not connected to crime]).

Since there was no connection between the Leatherman tool and the murder (see above, p.52), there could be no evidentiary foundation for its admission. (*People v Capella*, 111 AD2d 179, 180 [2d Dept 1985]). It follows that there could also be no foundation for receiving *expert testimony* about the tool.

The anticipated *expert testimony* would also have *no probative value*. Prior to trial, the People turned over the report of F.B.I. Agent Carlo Rosati, which stated that he had *not* been able to determine if the Defendant's Leatherman tool had been used to cut the wire that was used to form the ligature (T.829:8-11; T.839:24 - T.840:1; T.831:25 - T.832:3). Agent Rosati concluded that the Leatherman was a "shearing type" (scissor-like) tool, but that the cut on the cord could have been made with *any* "shearing type" (scissor-like) tool, including *a pair of scissors* (T.830-832, 839-840). (See People's Voluntary Disclosure form dated July 11, 2000, and Agent Rosati's Report of Examination in the original County

-68-

Court file).[18]

Since a pair of scissors is such a common item, "a sizable inferential leap" would have been required to conclude that the ligature had been cut by the Defendant's Leatherman tool. (*U.S. v Glenn*, 312 F3d 58, 67 [2d Cir 2002]. See also *People v Guliano*, 65 NY2d 766, 769, 771 [1985]; *People v Mitchell*, 64 AD2d 119, 126 [2d Dept 1978]). The probative value was further diminished by the fact that the police had *not* searched for a scissor-like tool in the victim's apartment (T.681-682, 701; T.1169, line 16 - T.1171, line 14). (*Mitchell, supra*, at 126).

Yet, if the tool and Agent Rosati's testimony were to be admitted, jurors would naturally infer that the tool *does* somehow connect Paul Scrimo to the murder. Moreover, it could be anticipated that Rosati's testimony would be given *substantial weight*. "Tool mark" evidence was his area of expertise (T.928-929, 932), and because he had performed his tests at the F.B.I. Crime Lab in Quantico, Virginia (T.928, 931), as opposed to the Nassau County Police Department, he would probably be seen as an independent and disinterested witness.

"In cases where the defendant can show that the potential prejudice outweighs the probative value the court may in its discretion exclude the

---

[18]    Rosati's report was part of a packet of discovery materials that were filed by A.D.A. William Dempsey with the County Court under cover of letter dated 9/5/01.

evidence." (*People v Mountain*, 66 NY2d 197, 203 [1985]; *Capella, supra,* 111

AD2d 179, at 180). Thus, defense counsel should have moved *in limine* to exclude

the Defendant's Leatherman tool *and* the testimony of the People's "tool mark"

expert. (*People v Davis (Johnie)*, 151 AD2d 596, 596-597 [2d Dept 1989]).


    B.    Defense Counsel Was Ineffective In Allowing
          The Admission of the Defendant's *Leatherman Tool*

Before the prosecutor moved the Leatherman tool into evidence, jurors had

heard only the testimony of Detective Schiraldi that he had examined the tool in

connection with this case (T.806-807). Yet, defense counsel consented to its

admission (People's "44;" T.806-807). Even with the subsequent testimony by

McHugh and Cereghino, a proper foundation was not laid (T.1137, 1140-1141;

T.1360-1363).

If defense counsel had objected to the admission of the Leatherman tool, and

it had been properly excluded, there would have been no foundation for the lengthy

expert "tool mark" testimony that would follow (T.792-947). The *ligature* would

have still been in evidence, but no probative value could have been attributed to the

appearance of the cut end of it.

Where there can be no plausible tactical reason why trial counsel took a

particular action at trial, and it appears that such action actually prejudiced the

-70-

defendant's case, it is an indication of counsel's ineffectiveness. (*People v Hollins*, 221 AD2d 863 [3d Dept 1995]).

C.    It Was An Abuse of Discretion For The Trial Court To Allow the Prosecution To *Surprise* The Defense With Expert Testimony From Detective Schiraldi As To Certain Allegedly "Unique" Features Of The Defendant's Leatherman Tool

Based upon the expert reports which the prosecution turned over to the defense prior to trial, Detective Vito Schiraldi was *not* expected to testify *about the Leatherman tool.* He was expected to testify about the *cord* that was used as the ligature, the *hair* and *fiber* evidence, and the analysis of the *plastic-like speck* that had been found on the tool (T.829:8-13; T.835:15-19). Therefore, when he proceeded to testify about *the Leatherman tool,* defense counsel strenuously objected.

The Court overruled defense counsel's objections, stating that any discrepancies between the People's pre-trial disclosures and the testimony that was being given by Schiraldi could be brought out on cross-examination. (T.834:16-17; T.834:23 - T.835:4; T.837:18-21; T.840:10-12). The Trial Court's determination was apparently based upon the prosecutor's representation that the defense had been provided with "full discovery" (T.839), which was presumably a reference to the prosecution's production of Det. Schiraldi's written reports, as required by

C.P.L. 240.20(1)(c).  But Schiraldi's reports did not disclose that he had analyzed *the tool*.  The Court should have exercised its discretion and precluded Schiraldi from testifying as an *additional, undisclosed* "tool mark" expert. (cf., *People v Almonor*, 93 NY2d 571, 576-577, 582 [1999]).

The Court's ruling was prejudicial not just because Schiraldi's testimony came as a *surprise*, but because his testimony was significantly *different* from, and more *incriminating* than, what was stated in the report of Agent Rosati.  Schiraldi testified that the Defendant's Leatherman tool had certain "unique" features which would be reflected in the cuts it makes (T.826-828, 842-844, 854-855), and the Court agreed with defense counsel that Schiraldi's testimony implied that *only the Defendant's Leatherman tool could have cut the end of the ligature* (T.837:8-15).  The prosecutor's argument to the contrary (T.830:8-11) was implicitly rejected.

If the Defendant's counsel had known from the outset of the testimony that would be given by Schiraldi, he would have been able to adopt different trial tactics.  Therefore, the surprise testimony was grounds for a mistrial. *(People v Evans*, 111 AD2d 830 [2d Dept 1985]).

D.   It Was An abuse of Discretion For The Court
     To Allow Detective Schiraldi To Conduct A
     Surprise, Fundamentally Flawed, *In-Court Demonstration*

"[T]hough tests and demonstrations in the courtroom are not lightly to be rejected when they would play a positive and helpful role in the ascertainment of truth, courts must be alert to the danger that, when ill-designed or not properly relevant to the point at issue, instead of being helpful they may serve but to mislead, confuse, divert or otherwise prejudice the purposes of the trial' (*People v Acevedo, supra* at 704)." (*People v Caballero*, 34 AD3d 690, 691-692 [2d Dept 2006]).

In the present case, defense counsel objected to the demonstration by Det. Schiraldi on several grounds (T.819, lines 20-24;  T.820, lines 7-8;  T.821, lines 12-13), two of which had merit: (1) that the demonstration *unfairly surprised* the defense ; and (2) that the demonstration was not being conducted "under similar conditions" to "the time in question."

(1)   Unfair Surprise

In order for an experiment or a demonstration to be admissible, it must be conducted under controlled conditions; and this applies with equal force to experiments conducted *in the courtroom.* (*Weinstein v Daman*, 132 AD2d 547,

-73-

548-549 [2d Dept 1987]);  *People v Sugrue*, 103 AD2d 785 [2d Dept 1984];

Freedman, New York Objections [James Publishing: 1999 ed.], § 13-110).  Defense

counsel argued that because Det. Schiraldi's in-court experiment came as a

surprise, the defendant was deprived of an adequate opportunity to scrutinize the

methodology of the experiment before it was conducted to ensure that its results

would be valid (T.821:10-12;  T.822:21-22;  T.823:1-2).


> (2)   The Conditions Were Not Sufficiently
> Similar To The Time In Question

In order for the results of an experiment to be *admissible*, it has to be shown

that the conditions under which the experiment or test was conducted were

"sufficiently similar" to those existing at "the time in question" to make the result

achieved by the test relevant to the issue.  (*Weinstein v Daman, supra*, 132 AD2d

547, at 548-549;  *People v Sugrue*, 103 AD2d 785 [2d Dept 1984]).

If a foundation of "sufficient similarity" is laid, then any respects in which

the experiment may be dissimilar go to its *weight*.  (Prince, Richardson on

Evidence, supra, § 4-219, pp.154-155;  *People v Acevedo*, 40 NY2d 701, 704

[1976]).  But if the conditions of the demonstration are *not* sufficiently similar, the

evidence of the test results is *not competent* and should not be received.  (*People v

Neupert*, 190 App Div 929, 179 NYS2d 941 [4th Dept 1919]).  There is no

-74-

guarantee that cross-examination by the defense would be sufficient to prevent the evidence from confusing and misleading the jury. (*People v Moolenaar*, 262 AD2d 60 [1st Dept 1999]. See, e.g. *Van Guilder v Fallsburgh*, 25 AD2d 338, 339 [3d Dept 1966]).

Defense counsel preserved for appeal the argument that the proposed demonstration by Det. Schiraldi was "not under similar conditions." (T.848:22-23; T.847:8-13), albeit, his understanding of *how* it was not similar was incorrect (T.833:24 - T.834:1;  T.846:1-9).

### a.  The time in question

In the context of a criminal case, "the time in question" is usually the time that the crime was committed. (*People v Sugrue, supra,* 103 AD2d 785; *People v Rutter,* 202 AD2d 123, 125, 135 [1st Dept 1994]).  Since it was alleged in the Indictment that the murder of Ruth Williams occurred on April <u>12</u>, 2000 (T.317-318), the Court was correct, initially, when it sought an offer of proof that the conditions of the demonstration would be similar to what they were on April <u>12</u>, 2000 (T.846:14-17;  T.820;  T.823:12-15;  T.846:14-17;  T.847:20-22;  T.848:5).

However, the prosecutor made no such offer of proof (T.846:19-22), and, after the Court heard further incorrect arguments by both attorneys, it adopted the

*erroneous* view that the conditions of cutting the wire in court *could not* be similar to the night of the murder (April 12, 2000), and that the "time in question" was April 20, 2000, when the ligature was examined and photographed by Det. Schiraldi (T.833:24 - T.834:1; T.846:1-9; T.849:3-5, 12-19).

b.    The Condition Of The Cut End Of The Ligature

Det. Schiraldi's conclusion that the ligature had been cut with a shearing-type (scissor-like) tool was based upon his observation that the *soft* (T.854:6-7), *tiny* strands of filament protruding from the cut end of the ligature were folded over to one side (T.852:23-25; T.815:9-12; T.919:3-4). His conclusion that the tool that made the cut had some "play" in it was based upon the fact that some of the filaments, which are normally "round" (cylindrical), were flattened (T.853:12-16; T.855:15-17; T.919:4-5).

However, Schiraldi's observations were made some 8 days after the alleged date of the murder (T.813:18 - T.814:5; T.850:19 - T.851:14). The appearance of the filament at that time would only be relevant and probative if its appearance had remained *unchanged* since the cord was cut, or if the filament was *not "capable of being...altered."* (*People v Connelly*, 35 NY2d 171, 174 [1974]). See also *People v Rutter*, 202 AD2d 123, 136 [1st Dept 1994]; *People v Douglas*, 24 AD2d 794

-76-

[2d Dept 2005]). Schiraldi apparently *assumed* that the appearance of the cut end of the ligature had remained unchanged (T.850:4-5). However, expert testimony may not be based upon an assumption that is unsupported by the record (*Goverski v Miller*, 282 AD2d 789, 790 [3d Dept 2001]).

Since there was no showing that the condition of the cut end of the ligature, as depicted in the photographs taken on April 20, 2000 (People's "71" and "72") was the same as it was at the time it was cut, the photos were irrelevant and inadmissible (*Calandriello v New York Racing Ass'n*, 203 AD2d 503, 504 [2d Dept 1994]), and the comparison between these photos and the cut that Det. Schiraldi made in open court had no probative value (T.817:6-10; T.849:6 - T.850:11). Defense counsel's failure to object when the photos were offered (T.813-814), *or* to subsequently move to strike them, was further evidence of ineffectiveness, as was his failure to move to strike Schiraldi's testimony about the appearance of the protruding filament as of April 20, 2000.

### c.   The Use of Dissimilar Wire

Another flaw in the demonstration, which defense counsel was ineffective in failing to assert, was that many of the test cuts were made on *mono*-filament wire (T.825:7-19; T.826:1-8; T.920:11-23; T.843:15-16; T.844:11-25), which was

-77-

significantly *different in its physical composition and properties* from the *multi*-filament wire that had been used as a ligature (T.824:24 - T.825:6;  T.828:5-14). (*People v Cohen*, 50 NY2d 908, 910 [1980], later appeal 58 NY2d 844, cert den 461 US 930;  *Cramer v Kuhns*, 213 AD2d 131, 132 [3rd Dept 1995]).

According to Schiraldi, when the "*mono*-filament" wire was cut with the Leatherman tool, he could observe in the impression left on the wire the "unique" indentations and scratches on the blades of the Leatherman tool; whereas, he could *not* observe those "unique" indentations and scratches in the impressions that the Leatherman tool left on a "*multi*-filament" wire, such as that which was used to form the ligature (T.843: 13 - T.844:7;  T.852:11-19;  T.854:5-7).  Therefore, the "unique indentations and scratches" on the Leatherman tool were *irrelevant* to the facts of this case, and it was *misleading and confusing* to discuss them, and to use the *mono*-filament wire in the demonstration.

### d.    The Condition of the Leatherman Tool

There was no testimony that the condition of the Defendant's Leatherman tool had remained unchanged since the night of the murder.  Moreover, the fact that Det. Schiraldi had difficulty making cuts with it in court suggested that its condition may, in fact, have changed (T.854:8-9,15;  T.932-935;  T.940:18 -

-78-

T.941:7;  T.922-923).  If not, then perhaps Schiraldi did not use the Leatherman tool in the same manner that it had been used by Agent Rosati.  This would underscore the necessity of ensuring that an in-court demonstration is conducted under controlled conditions.

"Here, it was within the Supreme Court's broad discretion to conclude that the value of the demonstration did not outweigh its potential for prejudice as the conditions surrounding the demonstration in the courtroom were not substantially similar..." (*People v Caballero, supra,* 34 AD3d at 692).  Perhaps, the Court would have reached that conclusion if defense counsel had made the *correct* arguments as to *how* the conditions were not similar.

Or if, in defense counsel's cross-examination and summation, he had "emphatically highlighted the variations" between the conditions existing at the time of the crime and the conditions under which the demonstration had been conducted at trial, he might have minimized the significance to be attached to it. (*Norfleet v New York City Transit Authority,* 124 AD2d 715, 717 [2d Dept 1986]).

e.    Other Prejudicial Aspects of the Demonstration

Since there was no evidentiary connection between the Defendant's Leatherman tool and the murder, it was highly prejudicial for jurors to see wires

-79-

being cut with it during Det. Schiraldi's in-court demonstration, especially since the Defendant's Leatherman tool was *the only "shearing-type" (scissor-like) tool that jurors saw making cuts in the courtroom.* Although a pair of *scissors* is a "shearing-type" tool (T.933), and Detective Schiraldi had scissors with him on the witness stand, and used them to make a demonstration cut on a piece of *paper*, he did not use the scissors to cut any of the *wires* (T.904:15-25; T.919:14 - T.920:4).

The prejudice was compounded by the fact that the Leatherman also was *the only tool admitted into evidence* (T.649, 729; People's "44"). Defense counsel inexplicably went along with the prosecution's suggestion that only *photos* of the *other* tools be admitted (T.815-819, 823; People's "73," "74," and "75").

When Det. Schiraldi used the Defendant's Leatherman tool in open court to cut a section of the ligature, the only "record" of the appearance of the cut was his testimony (T.817, lines 6-10; T.849, lines 6 - T.850, line 11). The prosecutor did *not* move into evidence the section of the ligature that he cut, or a microscopically enlarged photo of it. In fact, the trial record does not include *any* of the wires that were cut in Court, *or* photos of them. "[T]he People have left appellate review, to a large extent, to speculation." (*People v Rojas*, 213 AD2d 56, 70 [1st Dept 1995]).

E. The Defendant Was Prejudiced By Detective
Schiraldi's Improper References to Tests
<u>Conducted By the Defense's "Tool Mark" Expert</u>

During Det. Schiraldi's *re-direct* examination, he testified for the first time

that his conclusions about the "unique" characteristics of the Leatherman tool were

reached while he was observing tests being conducted on the tool by the defense's

"tool mark" expert, Nicholas Petraco (T.921:25 - T.922:4; T.922:21-23). Jurors

would naturally infer from this testimony that if Petraco were to be called as a

witness, he too would testify that the Leatherman had these "unique" characteristics

(*People v Grice*, 100 AD2d 419 [4th Dept 1984]). This placed an impermissible

burden on the defense to call Mr. Petraco as a witness. (*People v Greene*, 153

AD2d 439, 445 [2d Dept 1990]).

Defense counsel was ineffective in failing to move to strike Schiraldi's re-

direct testimony about Petraco's tests, or to dispel its prejudicial effect during his

re-cross (T.924). Jurors would be reminded of this testimony in the prosecutor's

summation (T.1773:1-5).

F. Defense Counsel's Failure To
<u>Call The Defense's Tool Mark Expert</u>

Given the inordinate attention that the prosecution gave the "tool mark"

evidence, and defense counsel's failure to keep it out or diminish its significance, it

-81-

had to be countered with testimony from the defense's tool mark expert, Nicholas

Petraco.  It is manifest on this record that defense counsel intended to present

testimony from Petraco (T.57: 25;  Court Exhibit II;  T.344:6-14;  T.821, 838, 921-

923), and no strategic reason is discernible for his failure to do so.

Point IV.

## THE TRIAL COURT ERRED IN EXCLUDING AS "COLLATERAL" TESTIMONY ABOUT A PRIOR CHOKING INCIDENT INVOLVING JOHN KANE AND HIS SALES OF ILLEGAL DRUGS

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." (*Washington v Texas*, 388 US 14, 19 [1967]).

Pursuant to this right, a defendant may call witnesses to prove that a person other than he committed the crimes charged. The admissibility of such evidence is subject only to "the general balancing analysis that governs the admissibility of all evidence," i.e., that its probative value is not outweighed by the risk of trial delay, undue prejudice or jury confusion. (*People v Primo*, 96 NY2d 351, 355-357 [2001]; *People v Sanchez (Rene)*, 293 AD2d 499, 500 [2d Dept 2002]). Proof of a witness's motive to fabricate, or to falsely accuse someone else of committing a crime, is never "collateral." (*People v Hudy*, 73 NY2d 40, 56-57 [1988]; *People v*

-83-

*Rios*, 223 AD2d 390, 391 [1st Dept 1996]).

The testimony of the defense's proposed witnesses (T.1447-1448, 1453-1455, 1628) would have provided "necessary background information" about KANE (*People v Sibadan*, 240 AD2d 30 (1st Dept. 1998), helped to "explain the relationship" between KANE and Williams, to "place the events in question in a believable context," and to establish a motive for KANE to have strangled Williams. (*People v Garvin*, 37 AD3d 372 [1st Dept 2007]; *People v Archbold*, 40 AD3d 403 [1st Dept 2007]); *People v Corniel*, 258 AD2d 812, 814 [3d Dept 1999]; *People v Cabus*, 40 AD3d 540 [1st Dept 2007]).

In *Corniel*, *supra*, 258 AD2d 812, 814, it was held that evidence of the defendant's involvement in *drug activity* was not "collateral" because it showed a "potential motive" for the stabbing and tended to confirm the prosecution's theory that the stabbing was part of a "drug feud." Similarly, in *Cabus*, *supra*, 40 AD3d 540, involving an attempted robbery, it was held that

> .. the pattern of marijuana dealings was directly connected to the incident at issue. This evidence demonstrated defendant's motive and intent and was admissible as background material to explain the parties' meeting and to provide the jury with an appreciation of the interwoven events.

In particular, the proposed testimony by Jennifer Hartman, that during a dispute over drugs, KANE grabbed her by the neck and choked her, would have

lent plausibility to the defense theory that, it was during a dispute over drugs that KANE grabbed Ruth Williams by the throat and strangled her (T.1453-1454) (*Sibadan*, *supra*, 240 AD2d 30, at 37). The fact that this incident occurred in 1997, some three years prior to the murder in this case, did *not* make it "too remote" in time, as the prosecutor argued (T.1452:4-9), especially since the testimony of Stephanie Domaradzky would have established that KANE was still a cocaine dealer in April of 2000, when Williams was murdered (T.1455). Jurors should have been permitted to hear this testimony, and to give it whatever weight they deemed appropriate.

When considered in conjunction with the other evidence against KANE, the proposed testimony "would have created a reasonable doubt about the guilt of Paul Scrimo that did not otherwise exist." (*Soto v Lefeve*, 651 F Supp 588, 594 (SD NY 1986), affd 812 F2d 713, cert den 107 S Ct 2486). Therefore, its exclusion cannot be deemed harmless. (*Id.*)

-85-

V.

DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST
A CHARGE ON *CONSCIOUSNESS OF GUILT* (1 CJI [NY] 9.16)
AND IN FAILING TO OBJECT TO THE COURT'S PROPOSED
CHARGE ON *CONFESSIONS AND ADMISSIONS* (1 CJI [NY] 11.01)

A.    Consciousness of Guilt (1 CJI [NY] 9.16)

The prosecutor's opening statement placed great emphasis on the

Defendant's allegedly "false" and "inconsistent" statements to the police (T.325:9 -

T.329:11; T.330:22 - T.331:6; T.333:15-17). (*People v Marin*, 102 AD2d 14, 23

[2d Dept 1984]).   Four police witnesses testified to the alleged statements (T.1137-

1158 [Det. McHugh]; T.1273-1294 [Det. Parpan]; T.1363-1366 [Det. Cereghino];

T.1407-1408 [P.O. Stark]).

Since the Defendant had neither confessed to the murder of Ruth Williams

nor admitted explicitly or implicitly any of the acts necessary to establish his

commission of the crime, any conflict in his statements could only have been

considered as circumstantial evidence of *consciousness of guilt*. (*Marin, supra*, 102

AD2d 14, at 26-27). (See also *People v Benzinger*, 36 NY2d 29 [1974]; *People v.*

*Davila*, 108 AD2d 108, 116-117 [2d Dept 1985]; *People v Bierenbaum*, 301 AD2d

119, 124-131, 136-140 [1st Dept 2002]).   Otherwise, the statements were

inadmissible *hearsay*. (*People v Abdul-Malik*, 61 AD2d 657, 664 [1st Dept 1978]).

Therefore, it is difficult to fathom why the standard instruction on "Consciousness of Guilt," which was in effect at the time of the Defendant's trial in 2002 (1CJI [NY] 9.16), was not proposed by the Court *or* by *either* attorney (T.1651-1667).

The instruction requires the court to specify the conduct that the prosecution contends is evidence of the defendant's "consciousness of Guilt" (1CJI [NY] 9:16, p.486), and then to instruct jurors that it is for them alone to determine, "whether evidence of the defendant's conduct upon which the People rely, *if believed by you*, does in fact evidence a consciousness of guilt on the part of the defendant." (emphasis added).

In the present case, where the People contended that the Defendant made *false* statements to the police, jurors would first have to determine whether the statements attributed to the Defendant had, in fact, been *made* by him;[19] and if so, whether the statements had been *proven* to be *false*. (*Abdul-Malik*, *supra*, 61 AD2d 657, 661). The Court's charge would have to "delineate for the jury the precise portion of the statement which they could consider on consciousness of guilt" and identify the independent evidence by which the People have attempted to disprove it. (*Id.*, at 662).

---

[19]     This is stated more explicitly in the current instruction (CJI2d [NY] Consciousness of Guilt [Revised June 2005]): "You must decide first, whether you believe that such conduct took place .."

Here, there was no such instruction from the court. Furthermore, jurors were misled by the erroneous statement in the prosecutor's summation that they could find that Mr. Scrimo made *false* statements if they merely believed that there were "inconsistencies" between statements (T.1763:11-15; T.1758:9 - T.1759:13; T.1765:4-5; T.1745-1765; T.1775:18 - T.1776:19; T.1776:25 - T.1777:15), and that his explanations for these inconsistencies were "unreasonable." (T.1744-1746; T.1760:22 - T.1763:10). As the First Department stated in *Abdul-Malik, supra*, 61 AD2d 657, at 662-663:

> It is one thing to disbelieve a defendant. That is a jury's right. It is quite another, though, to suggest to a jury that they could, at the same time, transpose such disbelief into corroboration of the People's case. This tends impermissibly to shift the burden of proof. Hence, the rule permits only that part of a defense which *by independent proof is shown to be a fabrication* to be considered, for the inference of consciousness of guilt. (*People v Russell*, 266 NY 147, *supra*; *People v Deitsch*, 237 NY 300, 303.). (*emphasis* added)

The "Consciousness of Guilt" instruction provides that if jurors find that a defendant did make false statements, they must next determine whether this evidenced a consciousness of guilt, or there was some other, innocent explanation; and "if an innocent purpose may be drawn from the evidence, you must disregard it completely." (1 CJI [NY] 9.16, pp.486-487; *People v Rodriguez*, 135 AD2d 586,

-88-

587-588 [2d Dept 1987]).

Lastly, but very importantly, if a jury does find that a defendant's conduct is evidence of consciousness of guilt, such evidence has only "slight value." (1 CJI [NY] 9.16, p.487).  (*People v Thompson*, 19 AD3d 516 [2d Dept 2005];  *People v Whatley*, 121 AD2d 341, 344-345 [1st Dept 1986]).

The failure to give a consciousness of guilt charge has been deemed to be harmless in cases where there was *overwhelming* evidence of guilt, and the evidence of consciousness of guilt was only a *minor* part of the prosecution's case (*People v Valtin*, 284 AD2d 203 [1st Dept 2001];  *People v Johnson*, 239 AD2d 123 [1st Dept. 1997]).  But in the present case, the evidence against Mr. Scrimo was *not overwhelming,* and the Defendant's allegedly false or inconsistent statements were a *major* part of the prosecution's case (*People v Griffin*, 121 AD2d 927, 928 [1st Dept 1986]).

In the prosecutor's opening, he implied that the Defendant's false statements *outweighed* the physical evidence that pointed to KANE as the killer (T.329-331). In his closing statement, he argued that it was "important that when we look at this evidence, we *start with the statements that he gave to the police*.." (emphasis added) (T.1744:18-20); and, in no uncertain terms, he asserted that the reason why the Defendant gave the police "false," and "inconsistent" statements was that he

-89-

was *guilty* (T.1746:7-16; T.1777:13-15). Thus, the failure to give the charge was *not harmless*.

Since defense counsel did not request a "Consciousness of Guilt" charge, the error was not preserved. (*People v Singleton*, 121 AD2d 752 [2d Dept 1986]). But because the error undoubtedly contributed to the Defendant's being deprived of a fair trial, it should be considered in the *interest of justice*. (C.P.L. 470.15 [6][a]). Alternatively, defense counsel's failure should be considered *ineffectiveness*.

B.   "Confessions, Admissions and Statements" (1 CJI [NY] 11.01)

Ironically, it was the prosecutor who correctly argued, during the post-charge conference, that this charge was *inapplicable*. His first reason was that there had been *no confessions* in this case (T.1809-1810). Secondly, he argued that "the truthfulness portion" [20] of the instruction (T.1825:14 - T.1826:2) does not fit the facts of this case, because it directs jurors to disregard the Defendant's statements if they were not truthful; whereas, he had argued to the jury that *everything* that the

---

[20]    The requirement that jurors find the Defendant's statement to be *truthful* is *not* an *optional* part of the charge. It is a part of the "General Instructions"(1 CJI [NY]11.01, pp.656-659) that are to be used "in submitting all issues of voluntariness of statements to the jury." (1 CJI [NY] 11.0, p.654). The Note to 1 CJI [NY] 11.01 (p.658) states that "the court should give the jury instructions on 'truthfulness' of the statement, *whether or not the defendant raises such an issue.*"

Defendant told the police was a *lie*. (T.1809:15 - T.1810:21;  T.1812:7 - T.1813:10;  T.1826:13-14;  T.1825:13-17).  It was implicit in the second argument that there were no *admissions* in this case, since an admission must be *true*. [21]

It would be natural for jurors to infer from the reading of 1 CJI [NY] 11.01 that some of the Defendant's statements did, in fact, constitute proof of his guilt.  Therefore, it was misleading and prejudicial.  Defense counsel's failure to object appears to have been the result of his  uncertainty about what constitutes an "admission." (T.1308:6-17;  T.1678:23 - T.1679:15 [cross-examination]; T.1710, T.1711:22-24;  T.1710-1712 [summation]).  He *did* make a hearsay objection to questions asked of Officer Stark about statements the Defendant allegedly made to her, stating "there are no admissions so there is no exception to the hearsay rule" (T.1401:4-10); but he did *not* make any hearsay objections when the Detectives were asked about the Defendant's statements.  His failure to know or investigate the applicable law deprived the Defendant of meaningful representation. (*People v Droz*, 39 NY2d 457, 462 [1976]; *People v Brown (Erick)*, 300 AD2d 314, 315 [2d Dept 2002];  *People v Cortez*, 296 AD2d 465, 466 [2d Dept 2002]).

---

[21]      An "admission" is one form of "statement" (1 CJI [NY] 11.00, pp.608-609), and if a jury does not find a "statement" to be *true*, it may not give it any probative value.  "For just as the jury is required to disregard any testimony of a witness given during trial which it finds false, it must also disregard any statements of the defendant which it finds to be false in whole or in part."(1 CJI [NY] 11.01, p.659) (T.1812:17-21).

## VI.

## THE DEFENDANT WAS UNFAIRLY
## PREJUDICED BY THE PROSECUTOR'S SUMMATION

A.     The Prosecutor Denigrated The Defendant and His Attorney
       and Vouched For the Credibility of Prosecution Witnesses

When a prosecutor ridicules the defendant and his attorney while vouching

for the credibility of the witnesses for the prosecution, he "exceeds the bounds of

legitimate advocacy" and undermines the accused's right to a fair trial. (*People v*

*Brown (Terrence)*, 26 AD3d 392, 393, [2d Dept 2006]; *People v Robinson*, 191

AD2d 595, 597 [2d Dept 1992]; *People v Walters*, 251 AD2d 433, 434-435 [2d

Dept 1998]).

The prosecutor began his summation by deliberately misstating what had

just been said by defense counsel in his closing argument (T.1734:8-11; T.1673:12-

18; T.1675:14-21; T.1714:18-20 ).  The County Court was required to "specifically

instruct the jury to ignore the prosecutor's factually inaccurate statement" (*People v*

*Roll*, 1 AD3d 617, 618 [2d Dept 2003]).  Instead, it overruled defense counsel's

objection (T.1734:9-15), giving standing to the statement of the district attorney as

a legitimate argument," and greatly enhancing the possibility of prejudice. (*People*

*v Ashwal*, 39 NY2d 105, 111, 383 NYS2d 204 [1976]).

He also misrepresented the testimony of the toxicologist, Dr. Manning (T.773-789), while ridiculing defense counsel for allegedly doing the same thing (T.1735:24 - T.1736:23). (While it may be true that a person must be *alive* in order for the evidence of cocaine in her body to dissipate after a couple of days, Manning did *not* say that).

The prosecutor told jurors that Mr. Scrimo and his attorney were putting on a "charade" (T.1734, 1739, 1752).  Such denigrating characterizations are patently improper.  Compare, *Brown (Terrence)*, *supra*, 26 AD3d 392, 393 [2d Dept 2006]("story ... load of garbage"); *People v Torres*, 111 AD2d 885, 886-887 [2d Dept 1985] ("doomsday sham ... smokescreen defense"); *People v Robinson*, 191 AD2d 595, 597 [2d Dept 1992] ( "con job" ... attempt to "dupe" jurors); *People v Davis (Stancil)*, 53 AD2d 870 [2d Dept 1976] ("tries to pull the wool over your eyes").

Yet, when defense counsel objected, he was again overruled (T.1752). "[T]he prosecutor's misconduct was not only condoned in the eyes of the jury, but perhaps also encouraged" (*Walters*, *supra*, 251 AD2d 433, 435).  Indeed, the prosecutor would subsequently use the word "charade" *over and over again* (T.1752:25;  T.1753:1, 5;  T.1763:15, 20, 22, 23;  T.1766:6;  T.1771:13;  T.1772:7;  T.1777:13), along with other denigrating words like "sham" (T.1757, line 16

(*Torres*, *supra*, 111 AD2d 885, 886-887), and "swill" (T.1765:22-25).

While defense counsel's objection to the foregoing errors preserved them for appeal (*People v Roberto*, 10 NY2d 428, at 430 [1962]), he failed to register objections to the prosecutor's subsequent denigrating remarks, presumably because he believed it would be futile.

The prosecutor argued that Defendant thought the police and the jury must be stupid (T.1734, 1737), and urged jurors to "tell Mr. Scrimo he's not as smart as he thinks he is," by coming back with a guilty verdict (T.1783). In *People v Hicks*, 102 AD2d 173 [1st Dept 1984], the prosecutor had similarly suggested that the defense was an insult to the intelligence of the jury, and the Court held that, "[e]xcept to arouse the prejudice of the jury, there can be no valid purpose for such inflammatory language." (*Id*, at 184).

It is improper to argue that a defendant "tailored" his testimony to fit the People's proof. (*Brown*, *supra*, 26 AD3d 392, 393; *Walters*, *supra*, 251 AD2d 433, at 434). Here, the Defendant did not testify, but the prosecutor argued that the Defendant had tailored his statements to the police to fit whatever evidence he thought they had, and that his attorney had similarly tailored the defense (T.1744, 1765). The Trial Court "might have dissipated the prejudice by promptly and clearly advising the jury that the comments were improper and must be completely

disregarded." (*People v Ashwal, supra*, 39 NY2d 105, at 111).  But here, the "error was compounded by the court's failure to give a curative instruction or otherwise rectify the situation." (*People v Alexander*, 94 NY2d 382, 385 [1999]).

There was also "improper comment on the dress and physical characteristics of the defendant at trial." (*People v Nunez*, 74 AD2d 805, 806 [1st Dept 1980]). The prosecutor noted that Mr. Scrimo (whose head was shaved on the night of the murder) had let his hair grow out by the time of trial, and was wearing a suit (T.1735:11-18), whereas, the appearance of JOHN KANE had *not* changed since the night of the murder, i.e., he still had his long hair and beard (T.1740:6 - T.1741:3;  T.387, 425-426, 1203-1204, 1306).  The prosecutor then asserted that the People are not there to "stage" anything (T.1740), implying that a performance was being staged by Mr. Scrimo.  "What you should really begin to wonder about is what they are trying to do here because this is not the Mr. Scrimo of April 11[th], 2000, and just because you walk around in a suit and tie and have a briefcase, that doesn't make you any less of a killer." (T.1740:23 - T.1741:3).  "Think about whose benefit that is for" (T.1735:16-18).

The prosecutor vouched for the testimony of Det. McHugh and Det. Parpan by arguing that, between them, they had 50 years of experience at determining if homicide suspects are telling the truth, and suggesting that jurors should accept the

Detectives' conclusion that Mr. Scrimo *lied* to them (T.1742, 1746-1749). This improperly attributed evidentiary value to the Detectives' "hunches" (*Gomez v New York City Housing Authority*, 217 AD2d 110, 117 [1st Dept 1995]), and invited jurors to view them as "expert" witnesses, qualified to give an *opinion* on the defendant's *credibility*. (*People v Allen (Warren)*, 222 AD2d 441, 442 [2nd Dept 1995]).

It was improperly argued that if the Detectives in this case just wanted a conviction, and were willing to make up a lie, they could have come up with a better story than they did (T.1741:8 - T.1742:12). (*United States v Martinez-Medina*, 279 F3d 105, 119-120 [1st Cir 2002]). This error was "all the more problematic given that it ... was not followed by a cautionary instruction." (*Id.*, 279 F3d at 120). It was also improper to imply that if jurors did not find that the police "framed" the Defendant, they must find him guilty (T.1741, lines 12-20). (See *People v Roberts (Phillip)*, 26 AD2d 655 [2d Dept 1966]; *People v Allen (Barry)*, 74 AD2d 640, 643 [2d Dept 1980]).

B.   The Prosecutor Called Upon the Jury to Draw Conclusions
     Which Could Not Be Fairly Inferred from the Evidence

The District Attorney may not call upon jurors to draw conclusions which are not fairly inferrable from the evidence. (*People v Ashwal*, 39 NY2d 105, 110

[1976]; *People v Conners*, 149 AD2d 722, 723 [2d Dept 1989]).

### *JOHN KANE was too small*

The prosecutor argued that KANE was "too small," at 150 lbs, to have

murdered the 165 lb victim without there being a struggle and the furniture being

disturbed (T.1778-1779). "It took a big and powerful man to take her down in one

shot." (T.1779:2-4). These assertions were nothing more than the District

Attorney's speculative "unsworn testimony." (*People v Jodhan*, 37 AD3d 376, 377

[1st Dept 2007]).

Assuming that McHugh was correct in estimating that KANE weighed only

150 lbs (T.1203), this does not necessarily mean that he was not physically

*stronger* than ~~KANE~~ WILLIAMS. Although KANE worked only sporadically, the work that he

did was physical, i.e., installing floors (T.1425, 1465) and constructing dormers

(T.1465-1468). Also, the lack of a struggle can be explained by the medical

evidence which showed that Williams was "severely intoxicated"(T.752,

785(T.774;  T.780:4-6;  T.778-779) and she had sustained two blunt traumas to her

head (T.728:10-12;  T.761:19 - T.762:1;  T.754-758;  T.758;  T.762:17-22).

The District Attorney further "testified" that KANE could not have murdered

Williams because "[i]t took a big and powerful man to crush her throat and break

-97-

the bones that were testified to by the medical examiner" (T.1779:4-5). While the Deputy Medical Examiner had testified that the victim's hyoid bone and larynx were fractured, and that this had occurred as a result of the *manual* strangulation (T.728, 750) (*People v Miller*, 210 AD2d 724, 725 [3d Dept 1994]), he had *not* testified that it took "a big and powerful man" to do this, *or* that KANE was physically incapable of it.

Since the foregoing arguments were made *for the first time during closing argument*, the prosecutor had "the sole, final, inapt word on the subject." (*People v Alexander*, 94 NY2d 382, 385 [1999]).

The prosecutor also implied that Williams' death had occurred as a result of *manual* strangulation *alone* - before the ligature was used. He told jurors that the Defendant "grabbed her by the throat and threw her right down on the ground. *Just like that, she was dead.*" (emphasis added) (T.1783:2-4); and *twice* he stated that the intent of the Defendant in wrapping the cord around Williams' neck was for her to "stay dead" (T.1780:14 - T.1781:1; T.1783:4-5).

This was contrary to the testimony of the Deputy Medical Examiner, Dr. Catanese, who testified that the death was *not* caused by *manual* strangulation *alone*; it was caused by *both* manual strangulation *and* strangulation with the ligature (T.725; T.752:15 - T.753:8; T.753:20 - T.754:7).

-98-

Assuming the accuracy of KANE'S testimony that Ms. Williams was *first* strangled *manually*; and *then*, with the *ligature* [22] (T.1436-1437), it follows from Dr. Catenese's testimony that Ms. Williams was *still alive after the manual strangulation*; and that she *remained alive until some point in time during or after the use of the ligature*. Thus, if *any* inference could reasonably be drawn as to the murderer's ability to strangle the victim to death with just his bare hands, it would be that he had *not* been able to do so, and that this was why he had subsequently used the ligature. If we were to accept the prosecutor's *assumption* that an individual's *strength* corresponds with his *size*, the fact that JOHN KANE was *smaller* than Paul Scrimo would suggest that KANE was the murderer.

The District Attorney's deliberate misstatement of the Medical Examiner's conclusions in his *closing* statement (*People v Grice*, 100 AD2d 419, 420 [4th Dept 1984]) was "a blatant attempt to mislead the jury." (*People v Vielman*, 31 AD3d 674, 675 [2d Dept 2006]). It was also highly inflammatory in that it literally accused the Defendant of "overkill."

### *Misrepresenting the DNA Evidence*

The prosecutor again gave "unsworn testimony" when he asserted that the

---

[22]     Appellant contends that KANE was describing his own actions.

DNA mixture on the Budweiser bottle meant that both Scrimo and KANE had been drinking out of this bottle (T.1769, lines 1-10). The People's DNA Expert had merely testified that she *could not exclude* KANE, Scrimo or Williams as *possible* contributors to the "mixed" DNA from the Budweiser bottle (T.1052:3-12), along with one out of every 6,800 persons in the Caucasian population (T.1069:16-21).

### Lack of Evidence As Proof of Guilt

The prosecutor argued, in effect, that the physical evidence that JOHN KANE had been in the victim's apartment should be seen as proof that KANE was *innocent*, and that the lack of physical evidence that Mr. Scrimo had been in the apartment should be viewed as proof that Scrimo was *guilty*.

> If Kane was cleaning up the crime scene to try to distance himself, why is the Budweiser bottle still on the table, the CD case still in the rack, his fingerprints on it? Why are his cigarette butts still on the kitchen table? If John Kane was cleaning the crime scene, those things would have been gone, ladies and gentlemen.

(T.1777:21 - T.1778:2).

The prosecutor asserted that the *absence* from the apartment of a 12-pack of *Coors Light* beer and a pack of *Vantage 100* cigarettes pointed to Mr. Scrimo as the killer because the Defendant had purchased those items from the 7-Eleven store on

-100-

the night of the murder (T.1766-1760;  T.1775:1-8, 14-17;  T.1777:16-20;

T.1778:3-4;  T.1783:6-9).  He went so far as to tell jurors that he considered the

*absence* of the *Coors Light* beer bottles and (unsmoked) *Vantage 100* cigarettes to

be more compelling than the *presence* of the *DNA and fingerprints* that matched

JOHN KANE (T.1770:4-13).

Firstly, this argument did not take into account the DNA under Williams'

fingernail that matches KANE'S DNA.

Secondly, as a matter of *law*, the argument was erroneous because disposing

of evidence shows "consciousness of guilt" (*People v Robinson (Lattee)*, 287

AD2d 315 [1st Dept 2001], which is only entitled to "slight value."  (1 CJI [NY]

9.16, p.487; *Thompson, supra*, 19 AD3d 516;  *Whatley, supra*, 121 AD2d 341, 344-

345).

Third, the argument was also not supported by the proven *facts*.  Although

the 7-Eleven clerk testified that the Defendant purchased *Coors Light* and *Vantage*

*100s* on the night of the murder (T.1313), there was no evidence that a 12-pack of

*Coors Light* beer *or* a new pack of *any brand* of cigarettes was ever *inside the*

*victim's apartment* on the night in question, much less that Paul Scrimo brought it

there.

KANE testified that, before Paul Scrimo left to go to the store, he had agreed

to get "Ruthy" a "pack of smokes" (T.1431:20-24), but KANE did *not* testify that

Paul did, in fact, bring back cigarettes.  He only mentioned that Scrimo brought "a

twelve pack of beers" (T.1434:18-20).  During his direct examination, KANE did

*not* say what *brand* of beer Scrimo allegedly brought back (T.1434), and during

cross, he acknowledged that he told the police on May 2, 2000 that it was

*Budweiser* (T.1578:17-21;  T.1587:21-25;  T.1591:2-8).  He did *not* testify to a

present recollection that it was *Coors Light*.

Contrary to the prosecutor's assertions (T.1766:23 - T.1767:6;  T.1768:3-4;

T.1770:4-13), Police Officer Pamela Stark did *not* testify that Mr. Scrimo told her

that he purchased "Coors Light" beer and "Vantage 100s." Officer Stark only

testified that Mr. Scrimo told her that he had purchased "beer" and "cigarettes"

(T.1408:23 - T.1409:3). Officer Stark also testified that Mr. Scrimo told her that he

gave the "beer" and "cigarettes" to JOHN KANE in an "alleyway" and did not go

up to the apartment (T.1409).  The other the police witnesses also testified that

Scrimo *denied* that he was ever in the apartment (T.1156, 1287, 1364-1365).

Assuming that a 12-pack of *some brand* of beer and a new pack of *some*

*brand* of cigarettes was in the apartment on the night in question, their absence

when the police entered the apartment late the next day can easily be explained by

their having been removed *by KANE* because *he* had brought them into the

-102-

apartment and they could have *his* fingerprints or DNA on them.

The prosecutor argued that "Scrimo didn't care about the Budweiser bottle because it can't connect him with the crime" (T.1769:11-12). However, this was inconsistent with the prosecutor's earlier assertion that the "mixed" DNA on the lone Budweiser bottle on the kitchen table was the result of both KANE *and Scrimo* having drunk from it (T.1769:1-10). If that were true, the bottle would be potentially inculpatory of both KANE *and Scrimo*, and it would not have made any sense for Scrimo to intentionally leave it on the table. Nor could the Defendant have felt safe doing so if, as the prosecutor speculated, he wiped off the sides of it to remove fingerprints [23] (T.1769:25 - T.1770:1).

In fact, there was no proof that the bottle on the kitchen table was left there *intentionally*. KANE testified that he was the one who carried out the beer bottles (T.1438:19-21) (T.1588:9-11) and that he was *not aware* that one bottle of beer was left on the table. Nor did he recall the police asking him about it (T.1588:6-8; T.1590:15- T.1591:1). Since the prosecution had presented no evidence as to how the lone Budweiser bottle came to be on the kitchen table, no inferences can logically be drawn from its presence. (*McCabe v Queensboro Farm Products, Inc.*,

---

[23]    KANE did *not* testify that this was done. Det. Costello, the People's fingerprint expert, testified that there are other possible explanations for the lack of fingerprints on the bottle, including condensation (T.711-712).

-103-

21 AD2d 675, 676 [2d Dept 1964]).

Contrary to what the prosecutor asserted in his summation, JOHN KANE did *not* testify that he "can tell you where the Budweiser bottle came from probably." (T.1768:23 - T.1769:1). It is plausible, however, that KANE left the bar with this bottle. And since KANE and Scrimo were drinking alongside of one another at "Y.L. Child's" (T.386, 1429), it is possible that Mr. Scrimo drank from this bottle *while they were at the bar.*

It would be entirely consistent with the physical evidence to conclude that it was KANE who used the napkins that were found on the floor by the police (T.626:25 - T.627:2; T.1394:3-5; T.1394:11-13) to wipe off the table in the kitchen and the door knobs in an attempt to remove *his* fingerprints (T.1438:12-16; T.1439:1-3), and that KANE simply forgot that he had handled the CD case in the livingroom.

It may not have occurred to KANE that the "brown" filtered cigarettes that he smoked could have traces of his DNA on them. But if it did, he could have simply overlooked the two cigarette butts that the police found at the crime scene. One was found *under* the ash tray on the kitchen table. The other was found *outside* the apartment, in the second floor hallway (T.660-661), and might have been left there on his way in.

-104-

*Unsubstantiated Negative Inferences*

"The prosecutor also sought to inflame the jury against the defendant by making statements about the defendant's behavior even though the prosecutor's characterization of that behavior was unsupported by the record." (*People v Anderson*, 35 AD3d 871, 872 [2d Dept 2006]). The Assistant District Attorney asserted that, according to Det. Parpan, the only reason Mr. Scrimo contacted the Detectives when he did was that "ten minutes earlier you saw McHugh on Main Street.." (T.1753:10-14). While Parpan had testified that "You called because you knew that Detective McHugh was looking for you.." (T.1286:4-6), he had *not* testified that this was because the Defendant had seen McHugh on Main Street. Parpan testified that Mr. Scrimo said he called *because people at the bar told him* that Detective McHugh wanted to talk to the big bald headed guy who was there on the night of the murder (T.1274:6-19). KANE too had told the Detectives that he contacted them when he did because people at the bar told him that McHugh wanted to talk to him (T.1534:25 - T.1535:10).

Although there had been testimony from Detective McHugh that he made "eye contact" with Mr. Scrimo on Main Street (T.1137-1138), the Detective did *not* testify to what the Defendant *saw*; nor would he have been competent to do so. But even if it were assumed that Mr. Scrimo did *see* McHugh, it does not follow that he

*recognized* McHugh as being *a Detective*. This was rank conjecture, or worse, a deliberate attempt to mislead; and it may have led jurors to "elevate coincidence and, therefore, suspicion into permissible inference." (*People v Cleague*, 22 NY2d 363, 368 [1968]).

Given the fact that the evidence in this case was *not* overwhelming, and turned primarily on the assessment of a single witness, the prosecutor's prejudicial comments cannot be deemed harmless, and the Defendant should be granted a new trial (*Alexander, supra*, 94 NY2d 382, at 385).

Most of the Defendant's contentions regarding comments made by the prosecutor during summation were not properly preserved for appellate review. They should nevertheless be reviewed in the interest of justice (see CPL 470.15[6][a]. (*Brown, supra*, 26 AD3d 392, 393; *Walters, supra*, 251 AD2d 433, at 434). In the alternative, they were evidence of ineffectiveness.

Point VII.

### DEFENDANT WAS DEPRIVED OF THE EFFECTIVE REPRESENTATION OF COUNSEL AS GUARANTEED BY THE CONSTITUTION OF THE STATE OF NEW YORK AND THE CONSTITUTION OF THE UNITES STATES

The Defendant was deprived of his right to the effective assistance of counsel, as guaranteed by the Constitution of the State of New York, in that he did not receive a fair trial. (*People v Georgiou*, 38 AD3d 155, 160-161 [2nd Dept 2007]; *People v Ozuna*, 7 NY3d 913, 915 [2006]; *People v Turner*, 5 NY3d 476, 480 [2005]; *People v Benevento*, 91 NY2d 708, 711-712 [1998]).

Defense counsel's errors and omissions also establish a claim of ineffective assistance of counsel under the Constitution of the United States in that his performance fell below an objective standard of reasonableness, and but for the deficiency, the likely outcome of the proceeding would have been different. (*Mason v Scully*, 16 F3d 38, 42 [2d Cir 1994]). (citing *Strickland v Washington*, 466 US 668, 687-96 [1984]); *Quartararo v Fogg*, 679 F Supp 212, 239 [ED NY 1988]).

In addition to the errors and omissions noted under the Point headings above, defense counsel gave an opening statement which was rambling and disjointed (T.334-345 ) (*People v Trait*, 139 AD2d 937, 938 [4th Dept 1988]). It also included erroneous and ill-advised remarks (T.344:4-5; T.335:21-23;

-107-

T.336: 21-23) which probably prejudiced the Defendant (*People v Barbot*, 133 AD2d 274, 275 [2d Dept 1987]).

Defense counsel should have moved to preclude or to strike the testimony of the victim's brother, her employer, and a co-worker (T.347-362), and should have o objected to the admission of photographs of the victim alive (People's 1 and 2), since they concerned only the victim's general appearance and personality, and other matters not relevant to a material fact to be proved at trial. (*State v Thompson*, 34 AD3d 852, 854 [2d Dept 2006]; *People v Stevens*, 76 NY2d 833, 836 [1990]; *People v Turner*, 5 NY3d 476, 478-479 [2005]). The prejudice was compounded when defense counsel alluded to this testimony in his own summation (T.1680:10-13).

Defendant's attorney failed to make appropriate objections (e.g., T.347-365; T.501:20 - T.502:3; T.502:8-12; T.506:13-17; T.595; T.740, 742; T.1160:7 - T.1162:4; People's 1, 2, 43, 86).

During his cross-examination and re-cross, he had witnesses repeat damaging testimony (T.1436-1438, 1441-1442, 1475), *including KANE'S account of the strangulation* (T.1588-1589, 1591-1600, 1606-1610, 1624-1625). "I basically brought up that it happened the way he testified on direct." (T.1623:16-17). This opened the door for the prosecutor to have KANE repeat his account

-108-

*again* during the prosecutor's *redirect* (T.1620-1624).

Often, he brought out additional damaging testimony (T.1167, lines 17-23; T.525) (T.1166, line 24 - T.1167, line 4;  T.595) (T.1262, lines 15-22) (T.1574, lines 19-23;  T.1575, 1577), e.g., having KANE, for the first time, quantify as just "a minute or two" the period of time between their arrival at Ruth's apartment and the time that Scrimo allegedly left to get beer and cigarettes (T.1574:19-23), thus filling in a gap in the time line leading up to the murder.  He also elicited testimony from KANE which made the prosecutor's theory, that Ruth had an argument outside with Scrimo without KANE being aware of it, appear more plausible (T.1578:3-24;  T.1580:3-9;  T.1585:7-15;  T.1587:11-16;  T.1611).  Opening the door to the admission of damaging testimony against the accused has often led to a finding of ineffective assistance of counsel. (*People v Cyrus*, 48 AD3d 150 [1st Dept 2007]).

The trial Court had to repeatedly explain to the Defendant's attorney the proper way that things should be done (T.518-519, 1250-1251, 1255, 1569-1570, 1576, 1580-1581, 1586-1587, 1600).  More often than not, he failed to lay the proper foundation for confronting a witness with a prior inconsistent statement (T.518, 521, 523). (*People v Duncan*, 46 NY2d 74, 80-81 [1978];  *People v Bernal*, 162 AD2d 362, 363 [1st Dept 1990]).  Or, he confronted witnesses with a prior

statement which was *not* inconsistent (T.1249-1259).  At times he incorporated in

his question a quote from the witness's prior statement even though it was not in

evidence (T.940-941).  He purported to use a prior statement to "refresh the

recollection" of the witnesses even though the witness had not indicated that he

could not remember (T.941, lines 4-5;  T.1224, 1609).  At times, after the court

sustained prosecutor's objections, legitimate avenues of inquiry were abandoned

(e.g., T.1208, 1587).

Defendant's attorney asked numerous compound questions (e.g., T.1213,

1233, 1259, 1270-1271, T.1603, T.1167, lines 14-16), questions which called for

hearsay (e.g., T.1196, 1201-1205, 1208-1209, 1216, 1222, 1227, 1229, 1263,

1268), that assumed facts not in evidence (T.1270), that called for legal or factual

conclusions (e.g. "admissions" T.1209, e.g., "inconsistent" T.1263), that made no

sense (T.1230), and that were in improper form (T.1230, 1231, 1245, 1260).  The

foregoing examples are merely illustrative.

Defense counsel's ineptness was largely responsible for the trial running

behind schedule (T.1, 41, 308;  T.333:18-20;  T.378:8-10;  T.1295:16-21;  T.1247;

T.1296:12-15;  T.1626;  T.1647:11-12;  T.1668, 1785-1834).  There were an

inordinate number of side bars.  The prosecutor repeatedly complained that defense

counsel was *unnecessarily prolonging* the presentation of the People's case (T.832,

846, 848, 997, 1000).  Undoubtedly, the patience of the jury was worn thin, and this may have contributed to defense counsel's decision not to put the defense's experts on the stand (T.1675:22-25).

Defense counsel's failure to call the defense's DNA expert and tool mark expert left the incriminating contentions of the People's experts unanswered.  (*Eze v Senkowski*, 321 F3d 110, 126-129 [2d Cir 2003] (remanded for hearing).  This was particularly prejudicial given the deficiencies of defense counsel's cross-examination. (*Gersten v Senkowski*, 426 F3d 588, 605-606 [2d Cir 2005]).

His "rambling, disjointed summation cannot be considered within `an objective standard of reasonableness,' *Strickland, supra,* 466 U.S. at 688, because it performed none of the functions that summations are intended to fulfill in a criminal trial." (*Quartararo v Fogg*, 679 F Supp 212, 244 [ED NY 1988]).  He failed to review the evidence, to focus on the critical issues, and to point out the weaknesses in the prosecution's case (T.1673-1733).  (*Id.*).

In fact, defense counsel's summation caused further damage (see above, pp.59-62).  He "effectively eliminated one of the greatest weaknesses in the People's case" (*People v Karamanites*, 104 AD2d 899, 900 [2d Dept 1984]) by *incorrectly* stating that, after Scrimo returned from buying beer and cigarettes, it was "about another ten minutes" before the murder occurred (T.1687:20-21).

-111-

KANE had *not* estimated the length of this time interval *or* estimated the time that the murder occurred.  As a result of this blunder, it appeared that the only remaining gap in the time line leading up to the murder had been filled (see also T.1574:19-23), making the prosecutor's subsequent argument that the murder occurred at *about* 4:30 A.M. seem plausible (T.1739).

Inartful remarks may have given rise to an inference that the Defendant was inside Williams apartment, and had personal knowledge of the murder (T.1713:11-14;  T.1718:12-16;  T.1731:21-23;  T.1692:1-5).

If "no single error on counsel's part would constitute ineffective assistance of counsel ... the cumulative effect of these errors deprived defendant of meaningful representation." (*Brown (Erick)*, *supra*, 300 AD2d 314, 315).

## VIII.

## THE VERDICT WAS AGAINST
## THE WEIGHT OF THE EVIDENCE

"It is abhorrent to our sense of justice and fair play to countenance the possibility that someone innocent of a crime may be incarcerated or otherwise punished for a crime which he or she did not commit." (*People v Tankleff*, 49 AD3d 160, 177 [2d Dept 2007]).

"[W]eight of the evidence" review under CPL 470.15 requires that "[i]f `based on all the credible evidence a different finding would not have been unreasonable' and if the `trier of fact has failed to give the evidence the weight it should be accorded,' the appellate court may set aside the verdict." (*People v Cahill*, 2 NY3d 14, 57-58 [2003]).

Here, there can be no confidence that the Court's erroneous instructions and the prosecutor's prejudicial and misleading summation did not cause the jury to give *too little* weight to the indisputable *physical evidence,* which had *high* probative value, and pointed to JOHN KANE as the murderer, and gave *too much* weight to the alleged evidence of Paul Scrimo's *consciousness of guilt,* which had *low* probative value, and to the *opinions* of the detectives and the "*unsworn testimony*" of the prosecutor, which had *no* probative value.

The jury's requests for a *list of the witnesses*, a *list of the evidence*, and a

-113-

*read back of the summations* (T.1836-1837) were indicative of its confusion.

The evidence that Ruth Williams was murdered by JOHN KANE was *overwhelming*. (*People v Mitchell*, 10 AD3d 554, 555 [1st Dept 2004]) (fingerprints, DNA evidence, statements to the authorities which were contradictory, incredible and refuted by other evidence).

KANE'S latent fingerprint on the CD case was *direct* evidence that he had been in the victim's apartment. (*People v Mosiurchak*, 157 AD2d 1023, 1025-1026 [3d Dept 1990]).

KANE'S DNA matched the DNA under one of Ruth William's fingernails. According to the forensic pathologist who performed the autopsy in *People v Scott*, 294 AD2d 661, 664 [3d Dept 2002], and took scrapings from beneath the victim's fingernails, it is "*extremely uncommon* to find blood or tissue from another individual in such scrapings" (emphasis added). It logically follows that if tissue from another individual is found under a victim's fingernails, *and* the DNA profile of the tissue is *rare*, as in this case, a match will constitute *compelling* evidence, inculpating the guilty party (see, e.g. *People v Brown (Melvin)*, 24 AD3d 812, 813 [3d Dept 2005]) *and* exonerating the innocent (see, e.g. *O'Donnell v State*, 26 AD3d 59, 61 [2d Dept 2005]; *People v Tankleff*, 46 AD3d 846 [2d Dept 2007]; *People v Hayes*, 284 AD2d 1008 (4th Dept 2001]).

The DNA under William's fingernail takes on greater significance when considered in conjunction with the "wound" seen on KANE'S head three days after the alleged date of the murder. *(Brown (Melvin), supra,* 24 AD3d 812, at 813).

DNA matching KANE'S was found on two cigarette butts at the scene.

KANE did not report the murder *(People v Guzman,* 259 AD2d 364, 365, 688 NYS2d 10 [1st Dept 1999]. When he was questioned by the police, he lied, denying any direct knowledge. *(Johnson, supra,* 66 NY2d 398, 401). KANE also denied he was with Paul Scrimo that night, attempting to distance himself from someone who had seen first hand his passionate interaction with Ruth at "Y,L Child's." *(Davila, supra,* 108 AD2d 108, 116).

Only when it appeared that KANE was about to be charged with the murder, did he admit he was with Scrimo that night and accuse him of the murder. *(Johnson,* at 401; *Maerling,* 46 NY2d 289, 301; *Watson,* 109 AD2d 409, 412). Then he not only admitted that he was with Williams that night, but that he also had sex with her. *(People v Loliscio,* 187 AD2d 172, 174-176 [2d Dept 1993]). His earlier *admittedly false* (T.1492:19-24) exculpatory statements demonstrated consciousness of guilt. *(People v Colon,* 163 AD2d 133 [1st Dept. 1990]), which adds to the strength of all the physical evidence. The verdict must be set aside and a new trial granted.

-115-

<u>CONCLUSION</u>

The June 18, 2002 Judgment of conviction and sentence should be *reversed* and a new trial should be granted.

The April 5, 2001 Decision and Order should also be reversed, and suppression should be granted.

Dated: August 16, 2008

Respectfully submitted:

*Charles E. Holster III*

CHARLES E. HOLSTER III, ESQ.
Attorney for *Defendant/Appellant*
100 East Old Country Road
Mineola, New York 11501
(516) 747-2330

-116-

## Certification of Compliance

This Brief has a one inch margin on all sides of each page. It was prepared on a computer using Times New Roman, a proportionally-spaced font, in 14 point size. Exclusive of the cover page, table of contents, table of authorities and this Certification, this Brief contains 24,990 words.

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------x

The People of the State of New York,

         - against -

PAUL SCRIMO,

              Defendant.

-----------------------------------------------------------------x

                                    AFFIRMATION
                                    OF SERVICE

                                    Indictment No.
                                    1456N-00

      CHARLES E. HOLSTER III, ESQ., an attorney duly admitted to practice before the Courts of the State of New York, affirms the following under the penalty of perjury:

      On August 26, 2008, I served the within NOTICE OF MOTION AND SUPPORTING PAPERS by depositing a true copy thereof into an official depository of the United States Postal Service, addressed to each of the following persons at the last known address set forth after each name:

                    A.D.A. Ilisa T. Fleischer
                    Appeals Bureau
                    Office of District Attorney
                    272 Old Country Road
                    Mineola, New York 11501

Dated:    August 25, 2008

                        _Charles E Holster, all_

                        Charles E. Holster III

1