To be argued by: Charles Holster
Time requested: 30 minutes

# 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔱𝔥𝔢 𝔖𝔱𝔞𝔱𝔢 𝔬𝔣 𝔑𝔢𝔴 𝔜𝔬𝔯𝔨
# 𝔄𝔭𝔭𝔢𝔩𝔩𝔞𝔱𝔢 𝔇𝔦𝔳𝔦𝔰𝔦𝔬𝔫 : 𝔖𝔢𝔠𝔬𝔫𝔡 𝔇𝔢𝔭𝔞𝔯𝔱𝔪𝔢𝔫𝔱

---

THE PEOPLE OF THE STATE OF NEW YORK,

2002-06660

- against -

PAUL SCRIMO,

Indictment
No. 1456-00

Defendant/Appellant.

---

# APPELLANT'S REPLY BRIEF

---

submitted by:

CHARLES E. HOLSTER III, ESQ.
Attorney for Defendant/Appellant
100 East Old Country Road
Mineola, New York 11501
(516) 747-2330

Table of Contents

page

Reply to Respondent's Misstatement of the DNA Evidence ................................... 1

Point I.

THE POLICE LACKED PROBABLE
CAUSE FOR THE DEFENDANT'S ARREST ....................................................... 3

Point II.

DEFENDANT WAS SEVERELY PREJUDICED BY
THE IMPROPER TESTIMONY ABOUT HIS INTERROGATION ................... 12

Point III.

DEFENDANT'S RIGHT TO A FAIR TRIAL WAS
SEVERELY PREJUDICED BY THE PEOPLE'S PRESENTATION
OF MISLEADING EVIDENCE INTENDED TO SHOW THAT
A TOOL HE CARRIED ON HIS BELT WAS USED TO CUT THE
WIRE WITH WHICH THE MURDER VICTIM WAS STRANGLED ........... 17

Point IV.

THE COURT ERRED IN EXCLUDING AS "COLLATERAL"
TESTIMONY ABOUT A PRIOR CHOKING INCIDENT
INVOLVING JOHN KANE AND HIS SALES OF ILLEGAL DRUGS .......... 31

Point V.

DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING
TO OBJECT TO THE COURT'S CHARGE ON
CONFESSIONS AND ADMISSIONS AND IN FAILING TO
REQUEST A CHARGE ON CONSCIOUSNESS OF GUILT ........................... 39

Point VI.

THE DEFENDANT WAS UNFAIRLY
PREJUDICED BY THE PROSECUTOR'S SUMMATION ................................. 44

Point VII.

DEFENDANT WAS DEPRIVED OF THE EFFECTIVE
REPRESENTATION OF COUNSEL AS GUARANTEED
BY THE CONSTITUTION OF THE STATE OF NEW YORK
AND THE CONSTITUTION OF THE UNITED STATES .......................... 50

Point VIII.

THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE ........... 56

Conclusion ............................................................................................................ 65

Certification of Compliance ................................................................................. 66

<u>Reply to Respondent's Misstatement of the DNA Evidence</u>

In Appellant's initial Brief, it was shown that the prosecutor gave "unsworn testimony" when he asserted that the DNA mixture on the Budweiser bottle on Williams' kitchen table "means" that both JOHN KANE and Paul Scrimo had been drinking out of it (DB99-100). The People's DNA Expert, Meghan Clement, had testified that it was "*not* a matter of calculating whether somebody is actually found in [the] mixture" (T.1044:2-3). Rather, it was Labcorp's task to determine whether one or more of the persons under consideration could *possibly* have been a contributor (T.1080-1081).

Clement concluded that she *could not exclude* KANE, Scrimo or Williams as *possible* contributors to the "mixed" DNA from the Budweiser bottle, along with one out of every 6,800 persons in the Caucasian population, 1 out of every 51,500 persons in the African American population, and 1 out of every 80,600 persons in the Hispanic population (DB33-35, 100).

Instead of curtailing their misrepresentation of the DNA testimony, the People *expand* upon it:

- "Defendant's DNA was also found at the crime scene" (RB1)

- "DNA testing established that the neck of the beer bottle on the kitchen table contained DNA from defendant.." (RB37)

- "[T]he discovery of defendant's DNA on the neck of a beer bottle on

-1-

Williams' kitchen table after her death demonstrates that defendant was drinking beer in Williams apartment that night." (RB48-49)

- "The presence of defendant's DNA on the neck of the beer bottle indicates: (1) that he drank from it; and (2) that he did not simply purchase the beer."(RB49 [fn.21]);

- There was "..DNA evidence establishing that defendant had been inside Williams' apartment just before she died." (RB50); and

- The "wall of evidence" against defendant included "DNA evidence establishing defendant's presence in the victim's apartment.." (RB92).


The testimony of the People's DNA expert is cited as scientific "evidence" that the Defendant drank from the bottle and was in the victim's apartment, although this is *not* what Ms. Clement said.

Point I.

## THE POLICE LACKED PROBABLE CAUSE FOR DEFENDANT'S ARREST

It was not established that the *veracity* prong of the *Aguilar-Spinelli* test was satisfied in this case, since the Respondent failed to show that the *informant himself* was *credible* <u>or</u> that the *specific information* he supplied was *reliable*. (see People v DiFalco, 80 NY2d 693, 696-697 [1993]).

A.     JOHN KANE'S Statement That He Removed Beer Bottles from the Victim's Apartment Did *Not* Constitute *A Declaration Against Penal Interest*

A statement does not constitute an admission against penal interests if it does not establish the *intent* element of the crime in question. (People v Johnson, 66 NY2d 398, 404-405 [1985]).

It was shown in Appellant's initial Brief that in order for JOHN KANE to be guilty of "hindering prosecution" for removing beer bottles from the victim's apartment, he must have acted with the

> "...intent to prevent, hinder or delay the discovery or apprehension of, or the lodging of a criminal charge against, a person who he knows or believes has committed a crime"

(P.L. 205.50).

-3-

It was further shown that there was no indication in KANE'S statement that

he was *aware* that the beer bottles were *evidence*, or that by removing them he was

committing a *crime* (DB15-16, 43). The People have failed to address this

argument, and therefore, the point has been implicitly conceded. (People v

Mucciolo, 104 AD2d 905, 906 [2d Dept 1984]).

It was also argued in Appellant's initial Brief that admissions against penal

interest "are not guarantees of truthfulness and they should be accepted only after

careful consideration of all the relevant circumstances of the case indicates that

there exists a basis for finding reliability." (DB17).

The People do not dispute that KANE'S statement, that he removed the

bottles *because Scrimo "was yelling at me"* to get the beers" was "largely

exculpatory and made under circumstances which suggest that it [was] intended to

minimize the declarant's criminal involvement," and that a statement made under

such circumstances, "is not 'clearly opposed to the declarant's interest'" (DB15).

There is no indication in this case that the police ever considered charging

KANE with hindering prosecution. Where it is unlikely that an admission would

have been used against an informant, the statement is "not sufficiently contrary to

his penal interest to establish reliability." (People v Griminger, 127 AD2d 74, 72

[2d Dept 1987]).

-4-

It is not disputed that the statement by which JOHN KANE implicated Paul Scrimo in the murder of Ruth Williams was made *three weeks* after the crime - and only after the Detectives had gone out and picked up KANE, and insinuated that he was about to be charged with the murder (DB8-9). [1] The People do not dispute that where the declarant has a motive to fabricate in order to avoid being prosecuted for the crime of *murder*, an admission to the crime of *hindering prosecution* provides "paltry proof of reliability" (DB16).

Respondent points out that KANE was *not under arrest* when he was at Police Headquarters on May 2, 2000, and cites the Detectives' testimony that KANE was *free to leave* any time he wanted. (RB5[incl. fn.3]). But the Hearing Court found that KANE was apparently *not* free to leave, and that he was "in custody" when he inculpated Scrimo (Decision, at 13).

Respondent argues that an informant who is "in custody" actually has a strong motivation *to tell the truth*. (RB46 [fn.20]). But what the Court of Appeals stated in <u>Rodriguez</u> was that where an informant is in custody,

> ...this does *not necessarily* render him unreliable.
> Neither, however, can we blithely accept as true the

----

[1]     The prosecution cites one line of the *redirect* testimony by Det. McHugh, that KANE stated he had not come forward sooner *out of fear of Scrimo* (RB44[fn.18]). It does not appear that the Court was impressed by this testimony, since there is no mention of it in the 15-page Decision.

accusations of an informant unless *some other good
reason for doing so* has been established.
(emphasis supplied)

(52 NY2d 483, at 489).

The "other good reason for doing so" in <u>Rodriguez</u> was that much of what

the informant told the police was "confirmed" by information the police had

already obtained from other sources. (<u>Id.</u>, at 490).

In <u>Comforto</u>, the Court of Appeals concluded that "on this record no

reasonable inference could be drawn that *the informant himself* was trustworthy"

(emphasis supplied) (69 NY2d 725, 726), but the "particular tip" supplied could

be considered credible because part of the statement was *corroborated*, and it

constituted an *admission against penal interests* (<u>Id.</u>, at 727).

> B.   The Police Did *Not* Corroborate
> <u>"highly significant details" of KANE'S story</u>
>
> 1.   Being in the Company of Ruth Williams
> <u>and JOHN KANE at "Y. L. Child's"</u>

The prosecution has not disputed Defendant's assertion that JOHN KANE

was the logical "other suspect" in this case (DB19).  Nor has it explained why it

should be viewed as "significant" that Williams was in the company of Scrimo at

"Y.L. Child's," when she was also there in the company of KANE, and it was

-6-

KANE who admitted kissing Williams at the bar, and going to her apartment afterwards and receiving oral sex (People's 8, at 6).

Respondent makes the preposterous suggestion that Williams was kissing *both* KANE *and* Scrimo, and that KANE was simply *unaware* of it, or *forgot* about it (RB45). If Williams had been "making out" with *both* men that night, it would have been quite a spectacle, and at least one of the other nine persons [2] present would have noticed - if not *all* of them. The kissing took place right at the bar, [3] where Williams, KANE and Scrimo had positioned themselves with their drinks. [4] Yet, no witness said that Williams was kissing more than *one* man. The likely explanation is that Francine Quinn was simply mistaken when she remembered seeing Williams kissing Scrimo. (Her statement was not given until a week later). (People's 7).

In any event, the Court did *not* find that Paul Scrimo was *kissing* Williams. The only stated basis for the Court's decision was its finding that other witnesses besides KANE had corroborated KANE'S statement that he and Scrimo were "in

---

[2]     According to KANE, there were a total of about 12 people present (People's "8," p.2).

[3]     People's "8 ," p.2; H.173:19-25; H.177:14-20; H.292:24 - H.293:5; People's "7," p.2; H.246:14-17; H.333:23 - H.334:2; H.464, lines 12-20; H.533, lines 9-14.

[4]     Decision, pp.3, 10, 13; People's "5," "7"; H.67-68; H.246:4-13; H.266, 272, 285-286.

-7-

the company" of Williams at "Y.L. Child's" during the early morning hours of April 12, 2000. Respondent has not explained how this lent plausibility to KANE'S statement about what later happened up in Ruth's apartment. While corroboration of "non-criminal" details may be considered, they may not be merely "peripheral," but must be "significant and essential to carrying .. out" the crime (DiFalco, 80 NY2d 693, 699).

The People's Brief repeats the Court's finding that KANE and Scrimo were at "Y.L. Child's" with Williams *shortly before* the murder (RB18-19, 45) but fails to cite any support for this finding in the record. In point of fact, the prosecution never established *when* the murder occurred (DB5, 11, 19-20).

### 2.   The "Argument" Behind "Captain Andy's" Restaurant

Although the Court found that the argument observed by Quinn occurred "shortly before" the murder (Decision, p.13), it was shown in Appellant's initial Brief that the prosecution had *not* proven the time of the *argument*, or the time of the *murder* (DB19-20). The People repeat the Court's finding without demonstrating any basis in the evidence (RB18-19).

It was shown in the Appellant's initial Brief that Quinn's observations after leaving "Y.L. Child's" did *not* corroborate KANE'S. They each described

-8-

*different* events, occurring in *different* locations, at perhaps *different* times. (DB 20).  The People essentially concede that "Kane's statement .. was not substantiated by" Quinn's KANE's statement (RB46).

Respondent argues that "the reliability of Kane's statement" was not "weakened by his unawareness of defendant's argument with Williams (observed by Quinn) outside of Williams apartment (DB20)." (RB45-46).  But the Court's determination that the *specific information* KANE supplied was *reliable* was based solely upon its finding that some of that information had been *corroborated* - in this instance, by Quinn (Decision, at 12-13).  So, the only relevant inquiry was whether Quinn's statement *corroborated* KANE'S, and it did *not*.

Accordingly, *neither* of the stated bases for the Court's finding of probable cause has a sound and substantial basis in the record.


C.    The People's Alternate Theories of Probable Cause

While Respondent argues that the Decision of the Hearing Court "should not be disturbed" (RB42), it attempts to rewrite the Decision by suggesting alternative theories of probable cause (RB42, 45).  Since none of these theories were argued in the suppression Court, they should not be considered on appeal.

(People v Parris, 83 NY2d 342, 350-351, 610 NYS2d 464 [1994]).  If they are considered, they should be rejected.

The People argue that probable cause was shown by the statement which the police obtained from Mohammed Houssain, the clerk at the 7-Eleven store (RB45).  But according to Det. McHugh, he did not obtain a statement from Houssain until May 5, 2000 (RB17;  H.318), some *two days after* the Defendant's arrest on May 3, 2000 (Decision, p.7;  H.44-45).

It is also argued that the reliability prong of the *Aguilar-Spinelli* test was satisfied by the fact that KANE gave the police a *sworn* written statement (RB42).  But in this case, the statement of JOHN KANE was *not* a "`sworn statement[] of [a] private citizen[], who report[ed] a crime in an honest and forthright manner'(People v Hicks, supra, at p 94)," but of someone who was himself facing possible prosecution. (People v Watson, 109 AD2d 409, 412 [1st Dept 1985]).  While the Court did take the sworn statement into account (Decision, pp.6-7, 12-13), it did *not* consider it to be sufficient evidence of reliability (Decision, pp.12-13).

Lastly, Respondent cites KANE'S statement to Detective McHugh that, on April 25, 2000, Scrimo told him that the police were "looking for a black guy." (RB6-7, 45) (H.481-483) (People's 8, pp.5-6).  The People assert that KANE'S

-10-

statement was "substantiated by McHugh's recollection that he had shown defendant a photograph of a black man" (RB45).  But, given Scrimo's unawareness of who the murderer was (T.1139-1147), his statement was not inconsistent with innocence.   The Hearing Court evidently did not find this testimony to be significant, since it is not mentioned in the Decision.

The People have implicitly conceded that the denial of suppression was *not harmless* (DB20-22).

-11-

Point II.

## DEFENDANT WAS SEVERELY PREJUDICED BY THE IMPROPER TESTIMONY ABOUT HIS INTERROGATION

(In reply to Respondent's Point VI [RB80-83]).

The People implicitly concede Defendant's argument that he did *not* give the police a confession, or make any "admissions" (DB58). They appear to agree that the Defendant's statements were *hearsay*, which could *not* properly have been admitted for their *truth* (DB58). They have taken the position that the statements were *false* and were admissible as evidence of consciousness of guilt (RB47, 49-52, 54, 82-83, 85, 92).

Respondent does not disagree that, if defense counsel had objected to such testimony, and the prosecutor stated that the purpose was to show *consciousness of guilt*, the Court would have been required to give a limiting instruction based upon 1 CJI [NY] 9.16 (DB58-59).

A.   Defense Counsel Was Ineffective in Failing to Move to Strike the Detectives' Speculative Testimony as to the Operation of the Defendant's Mind In Response to Being Asked Certain Questions

The People assert that defense counsel was not ineffective for not moving to strike this testimony because the Detectives merely related their

-12-

"observations" of Defendant's "conduct" (RB80-81). However, they do not deny that the Detectives *implied* what they thought was going on inside Mr. Scrimo's mind. The prosecutor exploited this in his closing argument, stating that each time the Detectives observed the Defendant lower his head, he was *lying* (DB80).

At other times, the Detectives *explicitly* stated what they believed the Defendant was thinking or feeling, i.e., that he "couldn't" look at them (T.1288:6;  T.1292:15); and that he appeared "nervous"(T.1153:2;  T.1281:23; T.1288:5), "upset" (T.1284:3-4), "taken aback" (T.1286:17), "agitated" (T.1291:10), "sullen," and "withdrawn" (T.1365:23). Respondent does not dispute that such testimony was rank speculation, and yet, it was received as incriminating "evidence."

The prejudice was exacerbated when defense counsel had one of the Detectives repeat his testimony during cross-examination, and then reminded jurors of it in his summation (DB60).

The prosecution argues that defense counsel tried to use it to the Defendant's advantage, that the Detectives had described the Defendant as "nervous," when he suggested to the jury, in summation, that these were "sophisticated homicide detectives who were expert at getting admissions"

-13-

(RB81).  But the Detectives had *not* gotten any admissions; and defense

counsel's remark may have caused jurors to think they had.  Also, the Detectives

testified that the Defendant only got nervous over *certain* questions.

The prejudice was further exacerbated when the jury was reminded of the

testimony *again* during the summation of the prosecutor (DB60).

> B.   Defense Counsel Was Ineffective in Failing
>      to Move to Strike the Detectives' Testimony
>      That They *Knew* the  Defendant Was *Lying*

Respondent does not dispute that it is prejudicial and improper to ask a

police witness whether he thought the Defendant was lying, or is guilty (DB61-

62).  Here, the same improper result was achieved, but through a less direct

approach, i.e: "each Detective stated his opinion that the Defendant was lying *in*

*the context of his narrative of the Defendant's interrogation*" (DB61).

The People do not deny that it would be natural for jurors to regard the

Detectives' statements during the interrogation as expressions of their actual

opinions.  Shattering any illusion that such a result was not exactly what was

intended, the prosecutor urged jurors to

> "..reach the same conclusion as Detective Parpan and
> McHugh and that is that he was lying"

(T.1749:6-11) (DB61).

C.    Defense Counsel Was Ineffective in Failing to Move to Strike the Detectives' Testimony That After the Defendant's Arrest He (1) Declined to Answer Certain Questions; (2) Remained Silent When Accused of the Murder; And Finally (3) Declined to Answer Any Further Questions and Requested an Attorney

(1)

It was shown in Appellant's initial Brief that once it becomes apparent that testimony has been elicited for no other reason but to "develop that defendant had refused to answer damaging questions while he was in custody," it should be *struck* (DB63).  The People cite irrelevant cases which stand for the proposition that *when a defendant testifies at his trial*, he may be impeached by what he omitted from his pre-trial statements to police (RB82).  Mr. Scrimo did *not* testify.

(2)

Respondent concedes that it was impermissible for Detective Parpan to testify that Paul Scrimo did not respond when he was implicitly accused of the murder (DB64).  It argues that this could not have led the jury astray, because of the instructions given in the Court's charge (RB83), but cites no legal support, and ignores the cases cited by Appellant which suggest otherwise (DB64).  The Court needed to *strike* the testimony, and give a *prompt curative instruction*,

-15-

e.g., that the Defendant's failure to respond to Det. Parpan's accusation "signified nothing." (People v Travato, 309 NY 382, at 386).

(3)

It was shown in Appellant's initial Brief, that the admission of testimony that Mr. Scrimo refused to answer any further questions and invoked his right to counsel, was prejudicial error "which, quite by itself, requires reversal and a new trial" (DB64-66). Respondent's assertion that the prejudice was ameliorated because the court's charge included the standard instruction on *right to counsel* (RB83), is unsupported and without merit. The trial court needed to strike the testimony, and specifically "instruct jurors to draw no inference from defendant's declination to answer further police inquiries." (DB65). Neither of these curative actions was requested due to defense counsel's ineffectiveness.

Respondent argues that any error was harmless, citing Hernandez (RB83), but in our case, the jury *twice* heard testimony about Defendant's invocation of his right to counsel (DB65-66), and the evidence against him was *not overwhelming*.

III.

DEFENDANT'S RIGHT TO A FAIR TRIAL WAS SEVERELY
PREJUDICED BY THE PEOPLE'S PRESENTATION OF
MISLEADING EVIDENCE INTENDED TO SHOW THAT A
TOOL HE CARRIED ON HIS BELT WAS  USED TO CUT THE
<u>WIRE WITH WHICH THE MURDER VICTIM WAS STRANGLED</u>

(Replying to that part of Respondent's Point VI [RB83-85] which answers
Appellant's Point III, sub-points A, B and F, and to Respondent's Point III
[RB55-63], which answers Appellant's Point III, sub-points C, D and E).

A.    Defense Counsel Should Have Moved *In Limine*
<u>To Preclude the People's "Tool Mark" Evidence</u>

Respondent contends that, because the tool mark evidence was

"equivocal" and "not conclusive," it *could not have affected the verdict*, and

therefore,  defense counsel was *not ineffective* for failing to move to preclude it

(RB83-84).

Prior to trial, the only tool mark reports that the defense received from the

prosecution were the reports by F.B.I. Agent Rosati, which were, in fact,

inconclusive (DB68-69).  It is precisely because Rosati's testimony would have

had such little probative value that it should be excluded if there was *any*

potential for prejudice (DB69-70).  Respondent does not deny that jurors would

naturally infer from the admission of the expert's testimony and the Defendant's

Leatherman tool that the tool *was* somehow connected to the murder - even

-17-

though it was not (DB69). Under such circumstances, the Trial Court had the

discretion to exclude it, and defense counsel should have asked that the Court do

so (DB70).

 

      B.     Defense Counsel Was Ineffective In Allowing
                The Admission of the Defendant's *Leatherman Tool*

Respondent contends that it was a proper exercise of *discretion* for the

court below to admit the Leatherman because its probative value outweighed any

potential for prejudice (RB60, 62). But the trial Court never engaged in that

weighing process, because defense counsel stated that he did not oppose the

tool's admission (T.806:24-25) (DB70).

The People assert that there *was* a connection between the *tool* and the

*Defendant,* because it was recovered from his person (RB62); but they do not

argue that this made the tool admissible. They implicitly concede that the tool

had to be *connected* to the crime (DB68).

Respondent argues that "defendant overlooks that the tool was originally

introduced into evidence in connection with Schiraldi's recovery of a piece of

plastic-like substance from it" (RB62). But since Schiraldi had determined that

the speck found on the tool did *not* come from the ligature (T.806-808), there

was no reason to even mention the speck *or* the tool, much less admit them.

The Defendant's Leatherman tool was *not* admitted as a "demonstrative aid" (RB61-62). The jury was told that the Leatherman had been *recovered from Mr. Scrimo* (T.1361, T.1759-1760), and the goal of Det. Schiraldi's demonstration was to have the jury conclude that the Leatherman was *the tool actually used to cut the ligature* (T.1772-1774).

Respondent does not disagree that, if the Leatherman had been excluded from evidence, there would have been no foundation for the lengthy tool mark testimony and demonstration that followed (DB70).

C.   It Was An Abuse of Discretion For The Trial Court To Allow the Prosecution To *Surprise* The Defense With Expert Testimony From Detective Schiraldi As To Certain Allegedly "Unique" Features Of The Defendant's Leatherman Tool

The fact that Detective Schiraldi may have been *qualified* to testify about the Leatherman tool (RB57) is irrelevant to the issue of whether his testimony came as an *unfair surprise*.

Respondent asserts that defense counsel "did not assert that he was surprised by Schiraldi's testimony about the Leatherman tool or by the in-court demonstrations Schiraldi used..," and that counsel's "complaint of surprise was confined to the introduction of the lineman dikes, ..wire cutters, and pocket knife" (RB55-59). Actually, the defense *withdrew* its objections to the

-19-

admission of photographs of the foregoing tools (T.820). But, it is worth noting that one of his objections was that they "weren't provided with any prior knowledge" of the photos (T.816:11-12), and the Respondent recognized this to be a complaint of *surprise*.

The word "surprise" was also not used by defense counsel while he was objecting to Det. Schiraldi's testimony about the Leatherman tool, but it is manifest that *surprise* was the nature of his complaint. Defense counsel stated that he *had not been given any notice* that Schiraldi might testify *about the Leatherman tool*:

> We were given Rosario material and discovery material that indicates his findings with respect to this cord [the ligature], not with respect to the [Leatherman] tool..
> [bracketed matter inserted]

(T.829:8-11)(DB50).

Defense counsel also complained at length that he was surprised by the *substance* of Schiraldi's testimony, "which we have not gotten any prior notice of.." (T.835:15-18), i.e., it was significantly *different* from what was stated in the reports turned over to the defense prior to trial (T.829:4-5, 11-17, 23-25; T.330:3-6; T.831:13 - T.832:3; T.834:9-15; T.837:6-13; T.840:8-9).

Respondent points out that the People appended 16 pages of Det.

-20-

Schiraldi's notes to their Voluntary Disclosure Form (RB56). However, it does not deny that these notes pertained only to his examination of the *ligature*, and his testing of the *hair* and *fiber* evidence, and the *black, plastic-like speck* that had been found on the Leatherman (DB71-72).

Respondent notes that defense counsel did not request an adjournment to prepare for Schiraldi's testimony about the Leatherman tool (RB57), but does not explain how doing so would have ameliorated the prejudice. There was still no report from Schiraldi indicating his analysis and conclusions about the tool or setting forth the details of the demonstration he would conduct.

The testimony of Det. Schiraldi was not merely "cumulative" (RB59) of what F.B.I Agent Rosati's testimony would be. Although they both concluded that the Leatherman was a "shearing type" (scissor-like) tool, and that the cut mark on the ligature was made with a "shearing type" tool, there were significant *differences*.

Agent Rosati concluded that the cut on the ligature could have been made with *any* "shearing type" (scissor-like) tool (T.932-933).

In contrast, Detective Schiraldi testified that the cut was made with a "shearing type" tool "that had that play in it to allow those multi-filaments to be flattened." (T.855:15-17).

-21-

Schiraldi had previously testified that this *flattening* was an indication that the tool that made the cut on the ligature had some "play" in its *jaws* (T.852:21-T.853:16). He had also testified that the Defendant's Leatherman tool had play in its jaws (T.828:2-21; T.842:24 - T.843:10; T.844:11-25). Thereafter, he testified that when he cut the ligature in the courtroom with the Leatherman, the filaments were *flattened* (T.845:1; T.853:12-16; T.854:8-11).

Schiraldi also testified that the *blades* of the Defendant's Leatherman tool had "unique" scratches and indentations, which would be reflected in the cuts it makes; and he demonstrated this using a *mono*-filament wire (T.827:2-16; 843:13-23). During colloquy, the trial Court expressly agreed with defense counsel, that Schiraldi's testimony implied that *only the Defendant's Leatherman tool could have cut the ligature* (T.837:8-15). [5] Thus, this is not merely "defendant's view," or a "newfound claim" (RB58).

The prejudicial effect of the testimony about the unique indentations and scratches on the blades of the Leatherman was *not* ameliorated by Schiraldi's testimony that these indentations and scratches would "*not* really leave an impression on *multiple* filament wire" such as that used to form the ligature (T.852:11-20; T.843:24 - T.844:2) (RB58). Since the testimony about the

---

[5]     In so doing, the Court implicitly rejected the prosecutor's argument to the contrary (T.830:8-11).

indentations and scratches on the blades was *irrelevant* and *misleading*, as was

the use of the *mono*-filament wire in the demonstration, the Court had to *strike*

the testimony *and* the demonstration and instruct the jury to disregard both.


D.     It Was An abuse of Discretion For The Court To Allow Det. Schiraldi
       To Conduct A Surprise, Fundamentally Flawed, *In-Court Demonstration*


                    (1)    Unfair Surprise

       The People assert *for the first time on appeal* that the defense was *not*

surprised by Det. Schiraldi's demonstration (RB56).  In the Court below, when

defense counsel voiced his surprise at the demonstration and advised the Court

that he had no idea what it would involve (T.821:8-12;  T.822:14-16, 21-22;

T.823:1-2) (DB74), the prosecutor's response was that he had no obligation to

give the defense any advance notice (T.839:3-6).  After the Court allowed the

demonstration to proceed, defense counsel voiced surprise over what the

demonstration was purportedly showing, i.e., that the Leatherman tool had

certain "unique, individualizing" characteristics, which are reflected in the cuts it

makes (T.828-840).

(2)     The Conditions Were Not Sufficiently
Similar To The Time In Question

a.   The time in question

The People tacitly concede that, in a criminal case, "the time in question"

is usually the time that the crime was committed; that the time in question in this

case, based upon the Indictment, had to be April <u>12</u>, 2000, when the murder was

allegedly committed; and that it was incorrect for the Court to use the date of

April <u>20</u>, 2000, when the ligature was examined and photographed by Det.

Schiraldi (DB75-76).

b.   The Condition Of The Leatherman
Tool and the Cut End Of The Ligature

It also was shown in Appellant's initial Brief that Det. Schiraldi's

conclusion that the ligature had been cut with a shearing-type (scissor-like) tool

was based upon his observation that the *soft, tiny* strands of filament protruding

from the cut end of the ligature were pushed or folded over to one side (T.815:9-

12; T.852:24-25)(DB76).  This is the result of the "shearing" effect, i.e., one

blade passing alongside the other (T.815:9-12).

Det. Schiraldi's conclusion that the particular shearing tool that made the

cut on the ligature had some "play" in its jaws was based upon the fact that some

-24-

of the filaments, which are normally "round" (cylindrical), were "flattened" (DB76) (T.919:4-5;  T.853:12-16;  T.855:15-17; T.854:8-11;  T.919:3-4).

Respondent incorrectly states that such "flattening" was a normal characteristic of a "shearing type" tool (DB38[fn.16]).  Only one of the pages that Respondent cites mentions the flattening of the filament (T.919).  Schiraldi is explaining on re-direct why he considers a "shearing" cut to be "one directional"(T.918:3-T920:8).  Describing a shearing action generally, he states that when the blade that does the cutting comes down, it tends to bends the wire over to one side (T.919:3-4).  In the midst of this explanation, however, he apparently makes a passing reference to the Leatherman tool (People's 44) and to the 2 microscopic photos of the cut end of the ligature (Peoples 71-72) and says:

> The slight play within that tool gives that flattening that
> those pictures depict.

(T.919:4-5).

It is not disputed that the prosecution failed to show that the appearance of the ligature had remained *unchanged* since it was cut, or that the filament protruding from the cut end was *not "capable of being...altered."* (DB77).  Nor has Respondent distinguished the cases holding that, under such  circumstances, the evidence is *irrelevant* and *lacks probative value* (DB76).

-25-

Respondent argues that even if there was a change in the condition of the tool or the ligature, this did not warrant exclusion of the *demonstration* because a "variation in circumstances affects the *weight* of the evidence, but is not a basis for its exclusion." (emphasis added) (RB60). Respondent left out the previous sentence in Mariner:

> Demonstrative evidence is *admissible,* in the court's discretion, *provided* that the conditions under which the experiment are conducted are *similar* to those existing at the time of the incident at issue. (emphasis supplied).

(147 AD2d  659, at 660).

If the conditions are similar, but not identical, the jury must "arrive[] at its determination with a full awareness of any variations" (*Id.*, at 660). In this case, the jury was not made aware of any variations, or told how they might affect the results of the demonstration.

c.   The Use of Dissimilar Wire

Respondent tacitly concedes that Schiraldi's use of *mono*-filament wire in his demonstration, to show the impression left by the "unique indentations and scratches" on the blades of the Leatherman tool, was *misleading and confusing*, because the blades would *not* have left such an impression on the *multi*-filament

-26-

wire that was used as the ligature (DB77-78) (RB58, 60-61).

        d.    <u>Other Prejudicial Aspects of the Demonstration</u>

Respondent tacitly concedes that, since there was no evidentiary connection between the Defendant's Leatherman tool and *the murder*, it was prejudicial for jurors to see wires being cut with it during Det. Schiraldi's in-court demonstration, especially since the Leatherman tool was the only "shearing-type" (scissor-like) tool that was used (DB79-80).

Respondent disagrees that it was prejudicial that the Leatherman tool was *the only tool admitted into evidence*, but does not explain why this was not unfairly suggestive (DB32) (RB62[fn.23]).

        e.  <u>Discretion</u>

Respondent argues that it was a proper exercise of *discretion* for the trial Court to allow Det. Schiraldi to conduct an in-court demonstration because the probative value exceeded the potential for prejudice (RB60-62). However, the Court never engaged in this weighing process because the issue was not argued.

E.   The Defendant Was Prejudiced By Detective
Schiraldi's Improper References to Tests
Conducted By the Defense's "Tool Mark" Expert

Respondent asserts that Det. Schiraldi's re-direct testimony "in no way established Petraco as an expert, tool-mark or otherwise, in the eyes of the jury." (RB59). However, Det. Schiraldi expressly referred to Petraco as an "expert." (T.922:2-3). It was plain that Petraco was a *tool mark* expert, from Schiraldi's testimony that Petraco examined and tested the Leatherman tool, making cuts with it and examining the cuts under the stereo microscope (T.922:3, 16-25).

Schiraldi testified that Petraco was an "outside" expert who appeared at Police Headquarters *with defense counsel*, Mr. Chamberlain (T.932), and one of the prosecutor's questions referred to "[t]his examination *by* Mr. Petraco *and Mr. Chamberlain*." (T.923:8-9). Thus, the jury heard that Mr. Petraco was working *for the defense*. The prosecutor would also make reference to the Defendant's "expert" (T.1773:1-5) while discussing the tool mark evidence in his summation (T.1772-1773):

> Think about something else that Detective Schiraldi told you, his expert, his expert [apparently pointing to Defendant], went to the Nassau County Police Department laboratory, took the tool and cut several of pieces of wire. Think about that. His own expert used that tool. [bracketed matter supplied]

-28-

(T.1773:1-7).

This remark could have had no other purpose but to suggest to the jury that Petraco was not called as a witness because his testimony would not have helped the defense.

> It is, of course, absolutely improper for a prosecutor to suggest that a defendant has an obligation to call witnesses on his own behalf, or that he failed to call certain witnesses because their testimony would have been unfavorable.

People v Grice, 100 AD2d 419, 422[4th Dept 1984].

The Davis case cited by Respondent did *not* involve the *burden of proof* (RB60). The trial court in that case instructed jurors not to consider certain improper testimony that it *struck*, and the Court of Appeals agreed with the prosecution that the jury presumably followed this instruction. In our case, the improper re-direct testimony by Det. Schiraldi was *not struck*, and it is defense counsel's failure to request that it be struck that is the basis of Appellant's ineffectiveness argument, along with his failure to dispel its prejudicial effect during re-cross (DB81).

Respondent asserts that Schiraldi's testimony did *not* imply that if Petraco had testified, he would have described the same unique, individualizing features of the Leatherman tool that Schiraldi had (RB59). But this is the inference that

-29-

would naturally be drawn from Schiraldi's testimony that he did not perform any of his own on tests on the Leatherman (T.921:20-22), and that he first observed the "unique" characteristics of the Leatherman while observing the tests being conducted by Petraco (T.921:25 - T.922:4; T.922:21-23).

F.    Defense Counsel's Failure To
      Call The Defense's Tool Mark Expert

The People do not dispute that the defense planned to call its own tool mark expert, Nicholas Petraco (DB82). They argue that defense counsel may have concluded that there was "no need" to do so because the People's tool mark evidence was "equivocal" (RB84). This ignores defense counsel's strenuous argument that Schiraldi's testimony and demonstration implied that the cut on the ligature *could only have been made with the Defendant's Leatherman tool*; and the fact that the Court *agreed* with this view (T.837:8-15) and implicitly rejected the prosecutor' argument to the contrary (T.830:8-11)(DB72).

Point IV.

## THE TRIAL COURT ERRED IN EXCLUDING AS "COLLATERAL" TESTIMONY ABOUT A PRIOR CHOKING INCIDENT INVOLVING JOHN KANE AND HIS SALES OF ILLEGAL DRUGS

The People implicitly concede that the right of an accused to present a defense includes not only the right to confront the witnesses against him, but also to present his own witnesses, including witnesses to prove that a person other than him committed the crimes charged (DB83). The defense that Defendant sought to present could only be proved through the testimony of Stephanie Domaradsky, Charles Ball and Jennifer Hartman.

Defendant was *not* provided with a meaningful opportunity to present his defense when the Court merely permitted defense counsel to ask JOHN KANE questions based upon information that these three individuals had provided (RB65). KANE denied the allegations, and the defense was bound by his answers. [6]

Nor was a meaningful opportunity afforded when the Court permitted defense counsel to cross-examine other prosecution witness who were familiar with JOHN KANE from the bars in Farmingdale (RB67). The Court ruled that

---

[6]    T.1550:23-24;  T.1636;  T.1446:10-16;  T.1449:8-16;  T.1550:18-22;  T.1446-1457).

each witness could only be questioned about his or her own drug use within a day or so before the murder and on the date of testifying at trial (T.459-460, 475). They could not be questioned about drug use by KANE or by Williams (T.473:18 - T.475:8; T.460:17-19)

The People do not disagree, that if Jennifer Hartman had been permitted to testify that JOHN KANE *choked* her during a dispute over drugs she purchased from him (T.1453-1454) (DB84-85), the jury may have found it plausible that KANE *strangled* Ruth Williams during a dispute over drugs. Thus, her testimony would have had a direct bearing on the issues of *guilt* and *innocence*.

The People also do not disagree that evidence of a *defendant's* drug activity is *not* "collateral" where it provides "necessary background information," helps to "explain the relationship" between the defendant and the victim, "place[s] the events in question in a believable context," or establishes the defendant's *motive* for the crime. (DB84-85). Nor do the People suggest that the applicable law should be any different where it is the *defendant* who is seeking to introduce evidence of drug activity to demonstrate that someone else committed the crime.

Respondent contends, however, that "[a]t no time did defendant ever propose any such *motive*, either expressly or implicitly, in the course of his

each witness could only be questioned about his or her own drug use within a day or so before the murder and on the date of testifying at trial (T.459-460, 475). They could not be questioned about drug use by KANE or by Williams (T.473:18 - T.475:8; T.460:17-19)

The People do not disagree, that if Jennifer Hartman had been permitted to testify that JOHN KANE *choked* her during a dispute over drugs she purchased from him (T.1453-1454) (DB84-85), the jury may have found it plausible that KANE *strangled* Ruth Williams in a dispute over drugs. Thus, her testimony would have had a direct bearing on the issues of *guilt* and *innocence*.

The People also do not disagree that evidence of a *defendant's* drug activity is *not* "collateral" where it provides "necessary background information," helps to "explain the relationship" between the defendant and the victim, "place[s] the events in question in a believable context," or establishes the defendant's *motive* for the crime. (DB84-85). Nor do the People suggest that the applicable law should be any different where it is the *defendant* who is seeking to introduce evidence of drug activity to demonstrate that someone else committed the crime.

Respondent contends, however, that "[a]t no time did defendant ever propose any such *motive*, either expressly or implicitly, in the course of his

arguments to the jury, in his arguments to the court for the introduction of the evidence, or in the course of his cross-examination of the witnesses." (emphasis added) (RB68).

While defense counsel never used the word "motive," and his arguments were inartful, it is nevertheless apparent from the record as a whole that the aim of his cross-examination, as well as his reason for offering the testimony of Hartman, Ball, and Domaradsky, was to advance the theory that it may have been during a dispute related to drugs that KANE strangled Williams.

In defense counsel's opening, he asserted that the proof would show beyond doubt that it was JOHN KANE who murdered Ruth Williams (T.335:7-17; T.342:8-10). KANE had received oral sex from Ruth in the past; and he admitted that he received oral sex from Williams at her apartment on the night of her murder (T.339:12-14). Defense counsel rejected the notion that KANE invited anyone to go with him to Ruth's apartment (T.339:14-15).

He told jurors that the evidence would show that KANE was *a cocaine dealer* in the local bars (T.337-338), and that Williams may have hoped to receive *drugs* from KANE on the night of the murder (T.340:11-13).

> Whether she was after him for sex *or drugs* is a question
> you're going to have to ask yourselves.

-33-

(T.340:13-14).

During cross-examination of one of the local bar patrons, Penny Shouse, defense counsel asked if she used cocaine, or knew if Ruth Williams did. The Court sustained the prosecutor's objection to both questions (T.454). It would only permit counsel to ask if the witness used drugs on the day she was testifying at trial, or within a day or so of the murder (T.454-460). It would *not* allow defense counsel to ask the witness about drug use *by JOHN KANE*[7] at *any* time (T.460:17-19).

Defense counsel argued that he "should be allowed to inquire into Ms. Shouse's knowledge of KANE being a drug dealer." (T.461:8-9). He argued that it was *not* merely to establish KANE'S lack of credibility, but to establish the *relationship* between the parties (T.461:1-8).

> I have evidence that the witness was a party not only that got drugs from Kane, or John Doe as he was known, but she partied, she used cocaine with *the victim* who *also got drugs from John Doe.* (emphasis supplied)

(T.461:16-19).

> THE COURT:   You keep using the word relationship. What do you mean by the word "relationship," Mr. Chamberlain?

---

[7]     The Court was undoubtedly referring to KANE, but said "the defendant." (T.3460:18).

> MR. CHAMBERLAIN:   I mean *drug
> relationship.* * * *  I believe there will be evidence that
> there was a *drug transaction* going on *that night.*
> (emphasis supplied)

(T.462:24 - T.463:7).

The Court, however, deemed it "irrelevant" that there may have been a

drug relationship, or that Williams, on the night of her murder, may have

purchased drugs or partied with drugs - even if they were obtained from KANE

(T.463: 12-13, 21-23; T.473:18 - T.475:8).

The Court and the prosecutor repeatedly asserted that defense counsel's

questions about drugs were nothing more than an attempt to impeach KANE'S

*credibility,* and that accordingly, the testimony would be "collateral" (T.460:24 -

463:7; T.472-474; T.567, 571-573; T.1544:15-20; T.1544:25 - T.1546:5;

T.1629:12-T.1630:4; T. 1631:7 - T.1632:9;  T.1637:5-6; T.1637:24 - T.1638:9;

T.1642:22 - T.1643:5).   Defense counsel maintained that he was *not* simply

seeking to impeach KANE'S credibility; he was attempting to prove the *drug*

*relationship* between KANE and Williams (T.460:24 - 463:7;  T.472-474;  T.567,

571-573;  T.1543:19 - T.1544:3;  T.1544:21-22;  T.1629:8-11;  T.1630:20 -

T.1631:6;  T.1637:1-4, 7-20;  T.1638:3-6).

> MR. CHAMBERLAIN:  * * I think it implies - - I will
> have evidence that this was a *relationship involving*

-35-

*drugs* that *he was supplying drugs to her*, and I have evidence to support that. (emphasis supplied)

(T.1549:4-7)

Defense counsel's cross-examination of KANE was aimed at eliciting that he was a drug dealer in the local bars, that he was providing Williams with drugs, and that Williams was providing KANE with oral sex (DB46-47). The colloquy shows that defense counsel was attempting to provide a theory as to *what led to the murder* of Williams, and *who did it*:

> MR. CHAMBERLAIN:  *** the *relationship* between the victim and the witness is crucial to the issue here, the issues before this jury.
> *It's a question of who did it.* * * * his *relationship* to the victim is crucial in this case. (emphasis supplied)

(T.1637:7-20).

> MR. CHAMBERLAIN:  I submit *it would be on point as to what happened here*, Judge, not collateral. (emphasis supplied)

(T.1638:3-4).

There did come a point when defense counsel unsuccessfully advanced the *additional*, *alternative* argument that the Court should allow the testimony about KANE'S drug sales to come in as "reputation in the community for truth and veracity" (T.1547:20 - T.1548:21;  T.1632:10 - T.1635:17; T.1632:10-16;

-36-

T.1632: 25 - T.1633:3;  T.1633:25 - T.1634:5).  But as shown above, this was not the basis upon which the testimony was initially offered.

During the colloquy preceding the Court's ruling that it would *not* allow *any* of the proposed testimony by Ball, Domaradsky or Hartman, the Court was not asking the *reasons* why the testimony was being offered.  It had already ruled on that.  It was asking for an offer of proof as to what the *substance* of the testimony would be, because if it was the same  assertions KANE had *denied*, the testimony would *not* be allowed.  (T.1542-1551, 1627-1638)

Respondent argues that testimony about KANE'S drug sales to Hartman, Domoradsky and Ball would not have been probative on the issue of whether he provided drugs to Williams.  But, their testimony that KANE *sold* drugs would support the theory that KANE expected to receive something in return for any drugs he supplied to Williams, whether it was money, or sex.  If the expectation of either party was not met, it could result in a violent dispute.

In defense counsel's summation, he reminded jurors that it was KANE'S normal pursuit to go from bar to bar, and suggested that KANE was selling *drugs* (T.1721, lines 2-4).  He mentioned Officer Stark's testimony that Defendant told her that KANE was providing *drugs* to Williams (T.1718:1-3).  "[W]hat you understood of that relationship, and what you believe of that relationship, I think

-37-

that's central to this case." (T.1718: 9-11).

He urged jurors to ask themselves what it was that Ruth Williams had been receiving in return on all the occasions when she had sex with JOHN KANE, which *always* consisted of *only* her performing oral sex upon him, and he suggested that the answer was *drugs* (T.1728-1731).  He suggested that on the night Williams was murdered, there may have been an argument about oral sex

> ..or it may have been there was an argument ... about
> drugs.

(T.1694, lines 14-16).

There can be no doubt that the jury understood what defense counsel meant.  In the event, however, that defense counsel did not adequately preserve this issue, it should be considered in the interests of justice or as evidence of ineffectiveness.

V.

THE PEOPLE HAVE NOT COUNTERED DEFENDANT'S ARGUMENT
THAT DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING TO
REQUEST A CHARGE ON CONSCIOUSNESS OF GUILT (1 CJI [NY]
9.16) AND IN FAILING TO OBJECT TO THE COURT'S PROPOSED
CHARGE ON CONFESSIONS AND ADMISSIONS (1 CJI [NY] 11.01)

(Replying to *part* of Respondent's Point VI [RB85-87]).

A.    Consciousness of Guilt (1 CJI [NY] 9.16)

The People argue *for the first time on appeal* that the Defendant's

statements were evidence of consciousness of guilt (RB47, 49-52, 54, 82-83, 85,

92). This was never stated by the prosecutor at trial. Nor was the jury given a

consciousness of guilt instruction.

(1)

The People argue that defense counsel's failure to request an instruction on

consciousness of guilt did not render his assistance ineffective, because such

evidence was limited to defendant's statements, and it constituted a *minor*

component of the People's case (RB85-86). This argument is belied by the trial

record as well as the Respondent's Brief.

The prosecutor's opening statement suggested that the Defendant's "false"

-39-

statements *outweighed* the physical evidence (DB86, 89). Defendant's

statements were then discussed in minute detail by 4 police witnesses (DB86). In

the prosecutor's closing, he argued that it was "important that when we look at

this evidence, we *start with the statements that he gave to the police..*" (emphasis

added); and, in no uncertain terms, he asserted that the reason why the Defendant

gave the police "false," and "inconsistent" statements was that he was guilty

(DB89-90). In Point III of Respondent's Brief, the consciousness of guilt

evidence is described as "extensive" (RB47), and Defendant's statements are

discussed throughout Respondent's Brief (RB4-5, 10-16, 23, 29-35, 45, 48-51,

53-54, 80-83, 86). It is beyond serious dispute that Defendant's statements were

a *major* part of the prosecution's case.


(2)

The People argue that it may have been a "strategic" choice on counsel's

part not to request a consciousness of guilt instruction so as not to draw further

attention to the inconsistencies in the Defendant's statements (RB86). But they

were already the focus of attention. The jury needed to hear that mere

"inconsistencies" are not admissible as consciousness of guilt. The standard

instruction requires jurors to first determine (1) whether the statements attributed

to the Defendant had, in fact, been *made* by him; and if so, (2) whether the

statements had been *proven* to be *false* (DB87). The instruction requires the

Court to identify the independent evidence by which the People have attempted to

disprove it. (*Id.*)


(3)

Respondent argues that the jury was provided with sufficient guidance on

how to evaluate *consciousness of guilt* evidence by the court's charge as a whole,

which included instructions on how to assess the credibility of witnesses, a "two

inference" charge, and instructions on the evaluation of defendant's statements to

police personnel (RB86 [incl. fn28]).

The Court's instructions on credibility and on "statements to police

personnel" (RB86[fn.28]) were *inapplicable*, because they provided that, before

the jury may consider the defendant's statements, they must find them to be

*truthful* (T.1788-1806, T.1809-1816), whereas, consciousness of guilt evidence is

*not* offered for its *truth*.

The cases cited by Respondent do not support the proposition that the

Court's "two inference" charge regarding *circumstantial evidence* generally

(T.1809:2-10), was an adequate substitute for the standard instruction on

-41-

*consciousness of guilt*, which has many other important elements (DB87).  Nor was the jury instructed, in any event, that the Defendant's statements could be viewed as *circumstantial evidence*.  The only instruction the jury received concerning the Defendant's statements was 1 CJI [NY] 11.01 regarding *confessions* and *admissions*.

The failure to instruct the jury on consciousness of guilt was *not* harmless (DB89).  Nor has Respondent countered Appellant's argument that defense counsel's failure to request the instruction on *Consciousness of guilt* may be considered in the *interest of justice* or as evidence of *ineffectiveness* (DB86-90).

### B.   "Confessions, Admissions and Statements" (1 CJI [NY] 11.01)

The People should not be permitted to take a position on appeal which is inconsistent with that which the prosecutor took below. (In the Matter of Sbuttoni, 16 AD3d 693, 694 [2d Dept 2005]).  The prosecutor argued that the Court's charge based on 1 CJI [NY] 11.01 "doesn't apply" to the facts of this case (T.1825-1827).

Respondent asserts that "such instructions were in fact necessary because, due to counsel's *arguments* to the jury that the detectives had tried to coerce defendant into confessing (1679, 1709-11, 1713) there was a "'genuine question

-42-

of fact as to the voluntariness of [his] statement.' <u>People v White</u>, 27 AD3d 884,

886 (3d Dept 2006) (citing <u>People v Cefaro</u>, 23 NY2d 283, 288-289 [1968])."

(emphasis added) (RB86-87).

<u>White</u> actually held that "[s]uch an instruction is required only if the

*evidence* presents a genuine question of fact as to the voluntariness of the

statement.." (emphasis supplied) (*Id*, at 886).  Similarly, <u>Cefaro</u> held that "[a]

Trial Judge is required to charge on voluntariness only if an issue has been raised

at the trial by a proper objection, and *evidence* sufficient to raise a factual dispute

has been adduced either by direct or cross-examination" (emphasis supplied) (*Id*.,

at 288-289).  Here, there was no evidence (or argument) regarding coercion.

Respondent has not countered Appellant's argument that defense counsel's

failure to object to the charge on *Confessions, Admissions and Statements* may be

considered in the *interests of justice*, or as evidence of *ineffectiveness* (DB90-91).

## VI.

## DEFENDANT WAS UNFAIRLY
## PREJUDICED BY THE PROSECUTOR'S SUMMATION

(Replying to Respondent's Point V [RB69-75])

A.      The Prosecutor Denigrated the Defendant and His Attorney
        and Vouched For the Credibility of Prosecution Witnesses

The People argue that it is permissible for the prosecutor to make a

"tempered challenge" to a *defendant's credibility*, when the credibility of the

prosecution witnesses is attacked during defense counsel's summation (RB72).

But in each of the cases cited by Respondent, *the defendant testified* (People v

Humphrey, 15 AD3d 683, 684, 686 [3d Dept 2005]; People v Overlee, 236

AD2d 133, 135 [1st Dept 1997]). Here, *Mr. Scrimo did not testify.* And contrary

to what is asserted in Respondent's Brief (RB73-74), defense counsel did *not*

"create[] a credibility contest" by "expressly urg[ing] the jury to credit *his*

*account* over that of prosecution witnesses (T.1673-1732)"(emphasis added)

(RB74) (citing defense counsel's *entire* summation).

Nor was the People's response "tempered." Respondent does not disagree

that the Courts of this State have universally condemned the type of denigrating

remarks that were used in the prosecutor's summation about the Defendant and

his attorney, i.e., characterizing the defense as a "charade," a "sham," and "swill;"

-44-

stating that Defendant must have thought the police and the jury were stupid; that the defense was an insult to the intelligence of the jury; that the Defendant had tailored his statements to the police to fit whatever evidence he thought they had, and that his attorney had similarly tailored the defense (DB92-95).

The People respond that these terms were "almost exclusively" aimed at the Defendant (RB71), implicitly conceding that *some* of the improper remarks were also aimed at *defense counsel*.

Respondent argues that the prosecutor's comments on the Defendant's physical appearance at trial (DB95), were a proper response to defense counsel's attempts to discredit JOHN KANE (RB72). But only a few of the pages of the record that are cited by Respondent are from defense counsel's summation (T.1682-1683, 1694, 1718-27), and defense counsel's arguments on those pages do *not* in any way justify the prosecutor's remark that the Defendant and his attorney were staging a performance for the jury by having Mr. Scrimo come to court wearing a suit, with his head no longer shaved.   The People have not distinguished Nunez which condemned the prosecutor's comments on the dress and physical characteristics of the defendant at trial (DB95).

In Appellant's initial Brief, it was argued that it was improper for the prosecutor to invite jurors to view the Detectives as "expert" witnesses, with 50

-45-

years combined experience in determining if homicide suspects are telling the truth (T.1742, 1746-1749), who were uniquely qualified to give an opinion on the defendant's *credibility*, and to urge jurors to *agree* with the Detectives that the Defendant was *lying* (DB95-96).  The prosecution argues that the prosecutor was only defending *the Detectives' credibility*, which had been attacked (RB72-73).  However, the remarks were not about the Detectives' credibility; they were about the Detectives' assessment of the Defendant's "credibility."

B.     The Prosecutor Called Upon the Jury to Draw Conclusions
       <u>Which Could Not Be Fairly Inferred from the Evidence</u>

The People fail to cite *any* record evidence from which *any* of the complained of arguments could have been fairly inferred (RB74).

1.     <u>Misrepresenting the Testimony of the Medical Examiner</u>

Respondent tacitly concedes that the prosecutor's summation misrepresented the testimony of the Medical Examiner (DB97-99).

The People have *abandoned* the prosecutor's argument that the attacker had to be *big and powerful* (DB97), in favor of arguing that the attack must have been *quick* (RB51-52) - which is in no way probative that the attacker was Scrimo rather than KANE.  Respondent acknowledges that Williams was "severely

-46-

intoxicated" at the time (RB36), and does not dispute that this could at least partially explain the lack of signs of a struggle (DB97).

The People have also abandoned the prosecutor's argument that Williams *died* during the *manual* strangulation, and prior to the use of the ligature. They now argue that she was quickly "rendered ...unconscious" (RB52), and "looked dead" to KANE when her eyes rolled back in her head (RB25).

Contrary to Respondent's assertion (RB74[fn.25]), the Defendant *does* contend that the District Attorney's misstatement of the Medical Examiner's conclusions was in bad faith. Appellant asserted that it was "a blatant attempt to mislead the jury" (DB99).


## 2.    Misrepresenting the DNA Evidence

Please see above, at pp.1-2.


## 3.    Lack of Evidence As Proof of Guilt

Appellant's initial Brief showed that neither the record evidence nor logic supports the prosecutor's unconventional argument that the *presence* of physical evidence that KANE had been in Williams' apartment and in contact with her body should be seen as proof that KANE was *innocent*, whereas, the *absence* of

-47-

physical evidence that Mr. Scrimo had been in the apartment should be viewed as proof that he was *guilty* (DB100-104). [8] Respondent makes no attempt to address Appellant's argument.


### 4. Unsubstantiated Negative Inferences

It was argued in Appellant's initial Brief that the prosecutor sought to inflame the jury against the defendant by making statements about the defendant's behavior even though the prosecutor's characterization of that behavior was unsupported by the record (DB105). This argument is implicitly conceded.

Respondent argues that there was no prejudice because of the overwhelming proof of guilt (referring to Respondent's Point II) and the instructions that the jury received in the Court's charge (RB75), but cites no legal authority or explain how the instructions cited ameliorated the prejudice.

Respondent notes that most of the Appellant's arguments about the prosecutor's summation are not preserved (RB75), but tacitly concedes that they may be reviewed in the interest of justice, or as evidence of ineffectiveness

---

[8] Part of the prosecutor's argument is regurgitated in Respondent's Point II (weight of the evidence) (RB51-53), where the one citation to the record merely establishes that KANE'S fingerprint was found.

(DB106).  Given the fact that the evidence in this case was *not* overwhelming, and turned primarily on the assessment of a single witness, the prosecutor's prejudicial comments cannot be deemed harmless, and the Defendant should be granted a new trial.

Point VII.

THE PEOPLE HAVE NOT COUNTERED THE ARGUMENT
THAT DEFENDANT WAS DEPRIVED OF THE EFFECTIVE
REPRESENTATION OF COUNSEL AS GUARANTEED
BY THE CONSTITUTION OF THE STATE OF NEW
YORK AND THE CONSTITUTION OF THE UNITED STATES

(Replying to part of Respondent's Point VI [RB76-93])

Contrary to Respondent's assertion (RB76[fn.26]), Appellant's initial Brief

states that Defendant's ineffectiveness of counsel argument is based upon *both*

the Constitution of the State of New York *and* the Constitution of the United

States (DB107).

Respondent's arguments regarding ineffectiveness and the Defendant's

*interrogation* (RB82-83), the tool mark evidence (RB79, 83-85), and the jury

instructions (RB85-87), are addressed above in Points II, III and V, respectively.

Respondent purports to list the things that Defendant's trial attorney did

which were correct (RB79), but fails to provide a single supporting reference to

the record. Most of the weaknesses in the People's case, which the People credit

Defendant's trial counsel for bringing out, were actually conceded in the

prosecutor's opening statement (RB79; T.329-330).

Appellant argued in his initial Brief that some of the remarks made during

-50-

defense counsel's opening statement were "erroneous and ill advised"(DB107-108) (citing T.344:4-5; T.335:21-23; T.366:21-23).  The People argue that Appellant failed to specify what was wrong with these remarks (RB88). Appellant did so in his Statement of Facts (DB27-29).

It was argued in Appellant's initial Brief that defense counsel "failed to make appropriate objections" (DB108; citing T.347-365; T.501:20 - T.502:3; T.502:8-12; T.506:13-17; T.595; T.740, 742; T.1160:7 -T.1162:4; People's 1, 2, 43, 86).  The People argue that Appellant failed to state the basis upon which an objection should have been made (RB88).

In Appellant's Statement of Facts, it was noted that defense counsel failed to object when:

- the witness was asked a *leading* question which prompted her in-court identification of Defendant (DB38)(T.501:20 - T.502:3):

- the People introduced a pre-trial photo identification by Francine Quinn *during their case in chief* (DB42-43)(People's 86)(T.595 and T.1160:7 - T.1162:4)

- the prosecutor led Quinn to change her testimony (DB38, DB40)(T.502:8-12 and T.506:13-17)

- the ligature was admitted into evidence (People's 43) without any

-51-

showing that there had been no change in the condition of the filament protruding from the cut end of it, or any limiting instruction (DB76-77) (T.740, and T.742) (also see, *supra*, Point III).

The reasons why defense counsel should have objected to the admission of People's 1 and 2 [photos of the victim alive], as well as the testimony at pages 347-365 [the victim's brother and co-workers], are set forth on page 108 of Appellant's initial Brief (DB108).

Respondent argues that defense counsel was not ineffective in not objecting to this evidence because "the identification by Williams' brother of the two photographs were, of course, relevant to her identity, given the distortion of her features caused by the strangulation." (RB90). However, the People cite no part of the record showing that the identity of the victim was ever an issue in this case, or that those who knew the victim could not have identified her from the crime scene or autopsy photos which would be going into evidence (see, e.g., People v Jones, 43 AD2d 1296, 1298 [4th Dept 2007]).

Also, Mr. Williams' testimony was not limited to an identification, or to providing his sister's address, age and occupation (RB91). He discussed his sister as a person, her life, education, occupation, personality, and their brother/sister relationship (T.349-356). He also discussed the rest of the family

(who are depicted in the photo admitted as People's 1), and Ruth's relationship with them (T.348-354). None of this information related to any of the facts to be proved at the trial. It could only have been introduced to evoke sympathy.

Respondent argues that defense counsel would only have antagonized the jury and appeared callous to them, if he had objected to this testimony (RB90-91). But once defense counsel realized that the witness was a member of the victim's family, he could have requested a side bar, demanded that the prosecutor make an offer of proof outside the jury's hearing, and then made his objection. The prosecutor took such pre-emptive action with regard the defense's three proposed fact witnesses (T.1627).

Respondent argues that the testimony of the victim's co-workers were necessary to explain the events leading up to the discovery of her body (RB9), but fails to explain how such events were relevant. It was sufficient for the jury to hear the testimony of Officer Stark that she discovered Williams' dead body in her apartment at 9:15 P.M. on April 13, 2000 (T.1386-1389).

Respondent does not dispute that defense counsel elicited damaging testimony during cross-examination (DB108). It argues that "in the course" of doing so, defense counsel *also* elicited information that assisted the defense, but fails to show that any benefit was gained (RB88-89).

-53-

It was shown in Appellant's Brief, with a small fraction of the examples that could have been cited, that the trial Court had to repeatedly explain to the Defendant's attorney the proper way that things should be done (DB109-110). Respondent suggests that defense counsel may have been "trying to skirt the rules of evidence," in a zealous attempt to gain some advantage (RB91-92). But this argument is purely hypothetical, and fails to address the examples cited, which illustrate ineptness, not zeal (DB109-110) (RB92).

Respondent argues that the Court's correction of defense counsel did not necessarily "affect" his representation. Appellant's point was that the Court's corrections were an *indicator* of such representation's deficiencies. It is likely, however, the comments themselves did have a cumulative, adverse affect upon the jury's view of the defense. The People do not dispute that defense counsel's ineptness was largely responsible for the trial running behind schedule (DB110). They only object to speculation about what effect this may have had upon the jury, and upon defense counsel's decision not to put on a defense (RB92).

It is not disputed that defense counsel made inartful remarks in summation that implied that the Defendant was *inside* Williams apartment, and had *direct knowledge* of the murder (DB112). It is also not disputed that defense counsel's summation effectively eliminated one of the greatest weaknesses in the People's

-54-

case, by *incorrectly* stating that, after Scrimo returned from buying beer and cigarettes, it was "about another ten minutes" before the murder occurred, as a result of which it appeared that the only remaining gap in the time line leading up to the murder had been filled, making the prosecutor's subsequent argument that the murder occurred at *about* 4:30 A.M. appear plausible (DB111-112).

VIII.

## THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE

(Replying to Respondent's Point II [RB47-54]).

### PROSECUTION WITNESSES

Respondent's discussion of two prosecution witnesses (RB48-50)

requires comment.

### Francine Quinn

The People assert that the testimony of Francine Quinn is "the most

damaging to the defense" (RB79).  Allegedly, she saw Scrimo kissing Williams at

"Y.L. Child's" and then later saw them arguing behind the building where

Williams' apartment is located (RB48).

Presumably, if Ms. Quinn thought that her observations on the night of the

murder were significant, she would have taken the initiative and spoken to the

police right away.  *She did not.*  A full week passed before she gave a statement to

Detective McHugh in the Command Bus - even though it was parked right behind

the "Downtown" bar where Quinn worked (H.242-243).

The passage of time could not have helped Quinn's recollection.  Her

testimony that Ruth Williams was kissing Paul Scrimo at "Y.L. Child's" on April

-56-

12, 2000 was directly contradicted by the People's chief witness, JOHN KANE, who testified that *he* was the one making out with Ruth (DB9, 19, 46).

Quinn's alleged observation of a subsequent argument outside the building in which Williams' apartment was located is also of questionable reliability (DB7, 19-20, 25, 37-42). Furthermore, there is no support in the record for the People's assertion that the argument occurred *shortly before* the murder (RB48, 50; DB7, 19-20).

### Mohammed Houssain

Respondent cites the testimony of Mohamed Houssain, a clerk at the 7-Eleven store, that shortly after 4:00 A.M. on April 12, 2000, Mr. Scrimo came into the store and purchased beer, cigarettes for "the blonde," and a condom (RB48).

The records of the 7-Eleven store do *not* confirm that it was Mohammed Houssain who was working as the clerk on the night in question - they indicate that the employee on duty at that time was a Mohammed *Shaheed* (T.1092-1093). Nor could the manager, Lisa Lawson, confirm who was actually working that night, because she was not there (T.1093:17-19).

The alleged record of the purchase of Coors Light beer, Vantage Ultra

-57-

Light cigarettes and Marlboro box cigarettes at 4:14 A.M. on April 12, 2000 indicates that the transaction was "aborted." (People's 84;  T.1091-1093). According to the manager, this meant that no cash was received (T.1093-1094). Houssain could not explain this (T.1344-1347).

According to Houssain, "the blonde lady" (Ruth Williams) was a regular customer at the 7-Eleven store, as was Mr. Scrimo (T.1313-1314).  On Thursday, April 13, 2000, he saw police cars on Main Street, and learned that someone had been murdered (T.1314-1315, 1321, 1327-1328, 1339).  On Friday, April 14, 2000, he became aware that the murder victim was Williams, when he saw her in a police poster and in the newspaper (T.1315-1316, 1331, 1340-1341, 1356). Yet, Houssain did *not* contact the police at that time, and tell them about Scrimo's alleged purchase on April 12 (T.1356).  He told this story to the police for the first time more than two weeks later, in early May, after he had learned of the reward that was being offered (T.1332, 1343, 1357).


B.      THE PHYSICAL EVIDENCE

The People have not overcome Defendant's argument that it is the indisputable physical evidence in this case which has the greatest probative value, and that it points to JOHN KANE.

<u>Finger print</u>

The People concede the presence of KANE'S fingerprint on a CD case in

the victim's apartment and the fact that no fingerprints were found that matched

Paul Scrimo (RB37, 52).  They argue, however, that

> Kane made no attempt to remove his own fingerprints
> from the scene because he knew he had played no part
> in the murder.

(RB52).

This problem with this theory is that it has no support in the record.  KANE

did *not* testify that he remembered touching the CD case, or that it occurred to

him that his fingerprint might be on it, much less that he decided not to wipe it

off.   It is also inconsistent with KANE'S failure to report the crime to the police.

<u>DNA Evidence</u>

*Cigarette butts*

The profile of the DNA that was found on the "brown" cigarette butts,

which was consistent with JOHN KANE, was *rare* (1/18,100,000 in the

Caucasian population alone)(DB32).  As this Court acknowledged in <u>People v.</u>

<u>Rush</u>, 242 AD2d 108, 110, 672 NYS2d 362 (2nd Dept. 1998), "DNA profiling

`consisting of *unique* genetic characteristics belonging to an individual, can

provide strong evidence of a person's presence at and participation in a criminal act.' (emphasis added). Therefore, a jury could reasonably conclude that it was, in fact, KANE'S DNA. The People *expressly concede* that it was (RB37).

They tacitly concede that none of the cigarette butts found at the crime scene matched Defendant's DNA (DB31-32).


*Victim's fingernail*

Respondent *expressly concedes* that the Defendant was excluded as a possible donor to the mixed DNA under Williams' right index finger (DB31-32) (RB51-52). This DNA profile matched JOHN KANE, and it was *rare* (1/2,600,000 in the Caucasian population alone)(DB32). Therefore, a jury could reasonably conclude that it was, in fact, KANE'S DNA. The People *expressly concede* that it was (RB37).

The People do not disagree that it is "*extremely uncommon* to find blood or tissue from another individual in such scrapings" (emphasis added) and that such evidence (usually) constitutes *compelling* evidence against the guilty party and exonerating the innocent (DB114). They argue, however, that in this particular case:

> ..Kane's DNA under Williams' fingernail not only
> failed to incriminate him, but also supported his account

> that he was merely a witness to defendant's fatal attack
> on Williams. Because the material that contained
> Kane's DNA included no hemoglobin, it could not have
> lodged under Williams' fingernail through a scratch that
> drew blood, as would have been likely had Williams
> tried to fight off her killer. Thus, the jury had every
> basis to conclude, reasonably, that Williams had gotten
> Kane's DNA under her fingernail through benign
> contact, i.e., the oral sex Kane described.

(RB53).

None of these arguments were made by the prosecutor below (T.1733-1784).

Respondent's assertion that a struggling victim is "likely" to scratch her attacker and draw blood is nothing but conjecture.

Respondent's argument regarding the lack of hemoglobin in "the material that contained Kane's DNA" assumes that if a victim's fingernail does make a scratch, which results in bleeding, and skin cells become embedded under that fingernail, the same fingernail will necessarily have blood under it. The prosecutor did not establish this to be a fact during the testimony of the People's serologist or their DNA expert.

Only one fingernail clipping out of a total of ten was tested by the Police Department for hemoglobin. At Labcorp, 50% of the material on that clipping had been removed with a swab and distilled water so that it could be

-61-

tested for DNA. (T.961-963, 976, 992-993, 1003-1007, 1025-1026, 1026-1030, 1697-1699). Det. McCarthy conceded that if, when Labcorp swabbed the clipping, it removed all of the hemoglobin, this would account for the negative result on the hemoglobin test (T.984-987). McCarthy did *not* testify that he was certain that there was no hemoglobin on any of the other 9 fingernail clippings which were not tested (T.950-1007).

The People's DNA expert testified that it was not necessary that there be a scratch in order for the attacker's DNA to become embedded under the victim's fingernail. As long as there is contact, the nail could pick up DNA contained in the attacker's skin cells (T.1075:11-15, 20-25; T.1066:15 - T.1077:12; T.1037:6-7, 17-25; T.1086:19 - T.1088:3).

### The "mixed" DNA on the Budweiser bottle.

The People *concede* that JOHN KANE was the major contributor to the mixed DNA on the Budweiser bottle on Williams' kitchen table (RB37).

They assert, as if it were a proven fact, that the DNA of Paul Scrimo was also present in this mixture (RB1, 37, 47-49, 50, 92). As discussed above (pp.1-2), the People's DNA expert did *not* testify that this mixed DNA came from any particular persons. That "ultimate issue of fact" was left to the jury. (People v Abreau, 114 AD2d 853, 854 [2d Dept 1985]).

-62-

The People do not disagree that they did not prove where the Budweiser

bottle came from or how it got on Williams' kitchen table, and that accordingly,

if Scrimo's DNA was on this bottle, it would not necessarily prove that he had

been in the apartment (DB103-104).  According to KANE, Williams had *no beer*

in her apartment (T.1431), and based upon the testimony of the clerk at the 7-

eleven store, the prosecutor argued that the beer that Scrimo  purchased was

*Coors Light* (T.1767).  It was suggested in Appellant's initial Brief that KANE

could have brought the bottle of *Budweiser* from "Y.L. Child's," and that because

the two men had been standing next to each other at the bar, Scrimo may have

drunk from it (DB104).  The People do not deny that this is a plausible scenario.

The People also do not take issue with the argument that the number of

possible contributors to the DNA mixture on the Budweiser bottle was *relatively*

*high* (1/6,800 in the Caucasian population, 1 out of every 51,500 persons in the

African American population, and 1 out of every 80,600 persons in the Hispanic

population) (DB33-35, 100).  It logically follows that the probative value of this

circumstantial evidence is *relatively low*.  Thus, a jury could reasonably decide to

give it *no* weight.

It was certainly entitled to *little* weight compared to the *conceded* presence

of KANE'S DNA on the Budweiser bottle, on the two "brown" cigarette butts,

and under the victim's fingernail, and the *conceded* presence of KANE'S

fingerprint on the victim's CD case.   The People's argument that all of this physical evidence actually *supports* KANE'S claim of *innocence* is manifestly illogical.

### B.    Consciousness of Guilt

Respondent does not deny that JOHN KANE did not report the murder; that when he was questioned by the police on April 19, 2000, he lied, denying any direct knowledge; and not mentioning that he was with Paul Scrimo that night in the bars (DB115).  It is also not disputed that it was only after KANE was asked to give a DNA sample, and it appeared he was about to be charged with the murder, that he admitted he was with Williams that night at her apartment, and that she performed oral sex on him (DB115).

The People argue that Paul Scrimo also did not report the murder (RB53). However, this is consistent with his having no direct knowledge of it - an assertion that never changed.  In contrast, KANE admitted that his earlier exculpatory statements were *false* (T.1492:19-24).

Only a few of the Defendant's statements that Respondent cites were arguably contradicted by independent evidence (RB53-54).  Moreover, it was up to the jury - *not the Detectives or the prosecutor* - to determine if such contradictory evidence *proved* that a statement was *false,* and if so, whether it was

-64-

evidence of consciousness of guilt, or there was some innocent explanation

(DB87-88). Since the jury did not receive the appropriate instruction, there can

be no confidence that consciousness of guilt was inferred "reasonably" (RB53).

Moreover, it is likely that the jury gave the statements undue weight because of

the lack of an instruction from the Court, and the undue emphasis they were given

in the testimony of the Detectives, and the summation of the prosecutor.


Notwithstanding Respondent's bare assertion to the contrary, the cases

cited in Appellant's initial Brief demonstrate that the quality and the quantity of

the proof against JOHN KANE would have provided "overwhelming" evidentiary

support for his conviction (DB 114-115). Since the evidence against Paul Scrimo

was *not* "overwhelming," the verdict against him must be set aside as being

against the weight of the evidence.


## CONCLUSION

The June 18, 2002 Judgment of conviction and sentence should be *reversed*

and a new trial should be granted.

The April 5, 2001 Decision and Order should also be reversed, and

suppression should be granted.

Dated: March 9, 2009

-65-

Respectfully submitted:

CHARLES E. HOLSTER III, ESQ.
Attorney for *Defendant/Appellant*
100 East Old Country Road
Mineola, New York 11501
(516) 747-2330

## Certification of Compliance

This Brief has a one inch margin on all sides of each page. It was prepared on a computer using Times New Roman, a proportionally-spaced font, in 14 point size. Exclusive of the cover page, table of contents, table of authorities and this Certification, this Brief contains 12,478 words.