# Court of Appeals
## State of New York

---

### PEOPLE OF THE STATE OF NEW YORK

*- against -*

### PAUL SCRIMO,

*Defendant-Applicant.*

---

### DEFENDANT'S MEMORANDUM OF LAW
### IN SUPPORT OF LEAVE APPLICATION

---

CHARLES E. HOLSTER III, ESQ.
Attorney for *Defendant-Applicant*
100 East Old Country Road
Mineola, New York 11501
Telephone: (516) 747-2330
Facsimile: (516) 877-0476

---

Supreme Court, Nassau County,  Indictment No. 1456N/2000

TABLE OF CONTENTS

page

Preliminary Statement ........................................................................................... 1


Point I.

THE COUNTY COURT'S CONCLUSION THAT THERE WAS
PROBABLE CAUSE FOR DEFENDANT'S WARRANTLESS ARREST
WAS BASED UPON A MISAPPLICATION OF THE LAW AND UPON
FINDINGS OF FACT FOR WHICH THERE WAS NO EVIDENTIARY SUPPORT ............... 2

A.   The "informant's" statement did not constitute a "declaration against penal
     interest" and therefore did not establish the credibility of the informant ......................... 5

B.   The "non-criminal" details provided by the "informant," that the police verified,"
     were not sufficient within the meaning of the test set forth in People v DiFalco,
     to establish the reliability of the particular tip that was supplied ..................................... 11

C.   The People's alternative grounds for finding probable cause may not be considered ...... 15


Point II.

IT WAS ERRONEOUS FOR THE APPELLATE DIVISION
TO APPLY HARMLESS ERROR ANALYSIS SINCE THE EVIDENCE
AGAINST THE DEFENDANT WAS FAR FROM OVERWHELMING ................................ 17


Point III.

DEFENDANT WAS DEPRIVED OF HIS RIGHT TO PRESENT
THE DEFENSE THAT THE MURDER WAS ACTUALLY
COMMITTED BY PROSECUTION WITNESS JOHN KANE ................................................. 36


Point IV.

IT WAS AN ABUSE OF DISCRETION FOR THE TRIAL COURT TO
ALLOW THE PROSECUTION TO PRESENT THE TESTIMONY OF A
SECOND, UNDISCLOSED "TOOL MARK" EXPERT WHO GAVE
UNEXPECTED INCRIMINATORY TESTIMONY, AND TO ALLOW HIM

TO CONDUCT A SURPRISE, MISLEADING, IN-COURT DEMONSTRATION ................ 40

Point V.

DEFENDANT WAS DEPRIVED OF THE EFFECTIVE
REPRESENTATION OF COUNSEL AS GUARANTEED
BY THE CONSTITUTION OF THE STATE OF NEW YORK
AND BY THE CONSTITUTION OF THE UNITED STATES ................................................ 46

A.    DEFENSE COUNSEL WAS INEFFECTIVE IN REGARD TO THE
      PEOPLE'S PRESENTATION OF EVIDENCE INTENDED TO SHOW
      THAT A TOOL HE CARRIED ON HIS BELT WAS USED TO CUT
      THE WIRE WITH WHICH THE MURDER VICTIM WAS STRANGLED ...............47

B.    DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING
      TO OBJECT TO IMPROPER TESTIMONY ABOUT THE
      DETECTIVES' INTERROGATION OF THE DEFENDANT ....................................... 55

C.    DEFENSE COUNSEL WAS INEFFECTIVE IN
      AGREEING TO THE COURT'S CHARGE ON
      "CONFESSIONS AND ADMISSIONS" AND IN FAILING TO
      REQUEST A CHARGE ON "CONSCIOUSNESS OF GUILT" .................................. 59

D.    DEFENSE COUNSEL WAS INEFFECTIVE IN
      FAILING TO OBJECT TO SEVERELY PREJUDICIAL
      REMARKS IN THE PROSECUTOR'S SUMMATION ........................................... 63

E.    DEFENSE COUNSEL WAS INEFFECTIVE IN
      COMMITTING OTHER PREJUDICIAL ERRORS AND OMISSIONS ...................... 77

Conclusion ...................................................................................................................... 86

## Preliminary Statement

If this Court excises the erroneously admitted testimony and exhibits, and the patently improper remarks of the prosecutor, the evidence is "overwhelming" (<u>Crimmins</u>) that the murder of which the Defendant stands convicted was actually committed by prosecution witness JOHN KANE. (DB31-33, 114-115).

The Appellate Division's affirmance was contrary to the precedents set by this Court, and if allowed to stand, it will be misleading to the other appellate and trial courts of this State, as well as to prosecutors and police.

This case presents an opportunity for this Court to clarify the law regarding a myriad of issues that arise on a recurring basis throughout the State.

Point I.

THE COUNTY COURT'S CONCLUSION THAT THERE WAS
PROBABLE CAUSE FOR DEFENDANT'S WARRANTLESS ARREST
WAS BASED UPON A MISAPPLICATION OF THE LAW AND UPON
<u>FINDINGS OF FACT FOR WHICH THERE WAS NO EVIDENTIARY SUPPORT</u>

<u>Appellate Division Disposition</u>

In the Appellate Division's November 10, 2009 Decision and Order, it *affirmed* the Trial

Court's denial of suppression, stating as follows:

> The appeal brings up for review the denial, after a hearing (Ort, J.),
> of those branches of the defendant's omnibus motion which were to
> suppress physical evidence and his statements to law enforcement
> officials.
>
> Contrary to the defendant's contention, the County Court properly
> determined that the police had probable cause to arrest him (*see
> People v Thomas*, 231 AD2d 749, 750; *People v Crawford*, 221
> AD2d 462). Accordingly, the County Court properly denied those
> branches of the defendant's omnibus motion which were to
> suppress physical evidence and his statements to law enforcement
> officials.

<u>Reviewability</u>

"The question of probable cause is a mixed question of law and fact.  Determination of

the facts and circumstances bearing on the issue, which hinges primarily on questions of witness

credibility, is a question of fact. However, it is a question of law whether the facts found to exist

are sufficient to constitute probable cause. (E.g., *People v Oden*, 36 NY2d 382, 384.)" <u>People v</u>

<u>Morales</u>, 42 NY2d 129, 397 NYS2d 587 [1977]).

This Court is "empowered to reverse an order denying a motion to suppress where it

determines that the evidence is insufficient as a matter of law to support a requisite finding of

-2-

probable cause.." ( see Karger, Powers of the New York Court of Appeals § 21:6, at 758-759 [3d ed. rev.] ). (citing, inter alia, People v Cohen, 90 NY2d 632, 641-642, 665 NYS2d 673 [1997]; People v Gonzalez, 88 NY2d 289, 295-296, 644 NYS2d 673 [1996]; People v McIntosh, 96 NY2d 521, 525-526, 730 NYS2d 265 [2001]).

This Court "is also empowered to reverse as a matter of law where an erroneous legal standard has been applied below." ( Karger, Powers of the New York Court of Appeals § 21:6, at 760 [3d ed. rev.] ). (See, e.g., People v Ferro, 63 NY2d 316, 321, 482 NYS2d 237 [1984]).

Preservation

"The right to appellate review of the denial of his suppression motion is statutorily preserved to defendant (CPL 710.70, subd. 2)." (People v Di Raffaele, 55 NY2d 234, 239,448 N.Y.S.2d 448 [1982]). As indicated in the County Court's Aril 5, 2001 Decision and Order, a suppression hearing was held pursuant to a "Stipulation in Lieu of Motions." The Stipulation, dated "7/18/00" states that it "shall be deemed an omnibus pretrial motion..." and it expressly provides for a hearing on the issue of suppression.

On the last day of the Hearing (2/23/01) (H. 596-597), it was indicated on the record that the case was being adjourned to March 1, 2001 for the attorneys to make closing arguments. However, no closing arguments were made on that or any other date. Nor were summations submitted in writing.

In the Appellate Division, the issue of probable cause was argued under Point I of the Defendant's Brief. (DB15-22; DRB1-11).

<u>Argument</u>

It was not established that the *veracity* prong of the *Aguilar-Spinelli* test was satisfied in this case, since the Respondent failed to show that the *informant himself* was *credible* <u>or</u> that the *specific information* he supplied was *reliable.* (see <u>People v DiFalco</u>, 80 NY2d 693, 696-697 [1993]).

The facts adduced at the suppression hearing are summarized at pages 5 to 13 of the Defendant's initial Brief below (hereafter abbreviated as "DB").[1]

In its April 5, 2001 Decision, the Hearing Court denied suppression, erroneously holding that "the information available to the detectives constituted probable cause that Mr. Scrimo had committed the murder" and that "the warrantless arrest of Mr. Scrimo was lawful." (pp.13-14). The Court found that JOHN KANE was a "reliable" informant (*<u>id.</u>*, 13), for two reasons.

First, it was the finding of the Hearing Court that the *informant himself* was *credible*. This finding was based upon the Court's conclusion that JOHN KANE'S statement that he removed beer bottles from the victim's apartment, after the murder, was a "declaration against penal interest" (*<u>id.</u>*, 11-13):

> In the case at bar, John Kane admitted that he assisted Mr. Scrimo in tidying up the crime scene, and thus disposing of potential evidence. This statement was a declaration against penal interest because it subjected him to criminal liability, albeit as an accessory after the fact rather than as an accomplice to the murder. See *People v Hayes*, 184 A.D.2d 335 (1st Dep't 1992).

(*<u>Id.</u>*, 13).

---

[1]     This is consistent with the abbreviations that were used in the Appellate Division Briefs. The People's Respondent's Brief is abbreviated "RB." Defendant's Reply Brief is abbreviated as "DRB."

Secondly, the Hearing Court found that the *specific information* the informant supplied

was *reliable*. It based this finding upon its conclusion that detectives had been able to verify

"significant details" of JOHN KANE'S "story":

> To be sure, the fact that he initially provided false information to
> the police and that he had a criminal record detract from his
> credibility. However, the detectives had been able to verify *a
> highly significant detail* of KANE'S story, that Mr. Scrimo had, in
> fact been in the company of John Kane and the deceased *shortly
> before her murder*. At least three witnesses had placed Ruth in the
> company of John Kane and "the bald headed man" *at Y.L. Child's,*
> and Mr. Scrimo himself had admitted to speaking with Ruth at the
> bar that evening. Additionally, Francine Quinn had seen Ruth
> arguing with the bald headed man *outside her apartment shortly
> before the time she was murdered.* Since the detectives had
> confirmed *significant details* of John Kane's story, the court
> concludes that the information available to the detectives
> constituted probable cause to believe that Mr. Scrimo had
> committed the murder.
> (*emphasis added*).

(*Id.*, 13-14).

The cases that were cited didactically in the Second Department's Decision indicate that

its affirmance was based solely upon the *first* ground that the Trial Court had cited, since both

*Thomas* and *Crawford* involve *declarations against penal interest*, but do *not* involve the

*verification* of details provided by an informant.

A.     As a Matter of Law, JOHN KANE'S Statement That
               He Removed Beer Bottles from the Victim's Apartment
               Did *Not* Constitute *A Declaration Against Penal Interest*

*On this point*, Defendant is not disputing the *facts* found by the Hearing Court. He is only

disputing the *legal conclusion* that was reached on the basis of those facts. Thus, a question of

*law* is presented, which is reviewable by this Court.  (Morales, supra).

As shown above, the County Court held that KANE'S statement was a declaration against penal interest because it subjected him to criminal liability, "albeit as an accessory after the fact rather than as an accomplice to the murder." (4/5/01 Decision, p.13).

The older offense of "being an accessory after the fact" has been replaced by the statutes defining the various degrees of the offense of "hindering prosecution." (6 N.Y. Prac., Criminal Law § 23:9). (DB15).  Penal Law § 205.50, subdivision [5], provides that a person can be guilty of "rendering criminal assistance" by "any act of concealment .. [of] .. physical evidence." *However*, such act must be accompanied by the "intent to prevent, hinder or delay the discovery or apprehension of, or the lodging of a criminal charge against, a person who he knows or believes has committed a crime."(P.L. 205.50).  (DB15).  A statement that does not establish the *intent* element of the crime in question does not constitute an admission against penal interests. (See People v Johnson, 66 NY2d 398, at 404-405 [1985]).

The People did not dispute that KANE'S statement, that he removed the bottles *because Scrimo "was yelling at me* to get the beers" was "largely exculpatory and made under circumstances which suggest that it [was] intended to minimize the declarant's criminal involvement," and that a statement made under such circumstances, "is not 'clearly opposed to the declarant's interest'" (DB15).  (Also see, People v Morgan, 76 NY2d 493, 496-497, 499, 561 NYS2d 408 [1990]; and People v Brensic, 70 NY2d 9, 517 NYS2d 120 [1987]).

No evidence was presented at the suppression hearing from which it could be inferred that KANE was *aware* that the beer bottles could be *evidence*, or that by removing them he could be committing a *crime*. (DB15-16, 43).  This Court has held that "[t]he declarant * * * must have

known at the time the statement was made that it was against his or her penal interests.( *People v. Brensic*, 70 N.Y.2d 9, 15, 517 N.Y.S.2d 120, 509 N.E.2d 1226 [1987]; *see People v. Settles*, 46 N.Y.2d 154, 167, 412 N.Y.S.2d 874, 385 N.E.2d 612 [1978] )" (People v Ennis, 11 NY3d 403, 412-413 [2008]; also see People v Blades, 93 NY2d 166, 176, 689 NYS2d 1 [1999]; Maerling, supra, 46 NY2d 289, at 300-301). The People failed to address this argument in their Respondent's Brief, and therefore, the point was implicitly conceded. (People v Mucciolo, 104 AD2d 905, 906 [2d Dept 1984]).

Also, this Court has cautioned that admissions against penal interest "are not guarantees of truthfulness and they should be accepted only after careful consideration of all the relevant circumstances of the case indicates that there exists a basis for finding reliability." (People v Johnson, 66 NY2d 398, 403-404 [1985]). (DB17).

The People did not dispute Defendant's argument that where a declarant has a motive to fabricate in order to avoid being prosecuted for *murder*, his admission to an act that would constitute *hindering prosecution* would provide "paltry proof of reliability"(DB16). (Compare, Maerling, supra, 46 NY2d at 301). *Murder in the second degree* is a class A-I felony (P.L. § 125.25), for which the Court must impose an indeterminate sentence with a minimum of not less than 15 years nor more than 25 years, and a maximum term of life (P.L. § 70.00 [3][a][i]; [2][a]; whereas, *Hindering prosecution in the first degree*[2] is only a class D felony (Penal Law § 205.65), for which the Court must impose an indeterminate sentence with a minimum term of no

---

[2]     "A person is guilty of hindering prosecution in the first degree when he renders criminal assistance to a person who has committed a class A felony, knowing or believing that such person has engaged in conduct constituting a class A felony.Hindering prosecution in the first degree is a class D felony."(Penal Law § 205.65)

less than 1 year and a maximum term of no more than 7 years (P.L. § 70.00 [2][d], [3]).

As this Court explained in <u>Maerling</u>, <u>supra</u>, it is the adverse consequences of an admission that is the basis for the presumption that the statement would not have been made unless it was true.  Where the consequences of the admission are trivial, or making the admission actually inures to the declarant's benefit, the statement is *not* to be presumed reliable. (46 NY2d at 300-301).  Applying these criteria in <u>Maerling</u>, this Court held that the admission of the hearsay statements in question as "declarations against interest" was an "abuse of discretion as a matter of law" to" (*id.*, at 299-300).

In our case, the cases cited by the Appellate Division (<u>Thomas</u> and <u>Crawford</u>), were clearly inapposite, since each of those opinions indicate that the informant had participated in the same "criminal enterprise" as the defendant. The common law implication of this terminology is that the two parties had shared the same intent and acted in concert.  (See <u>People v Reid</u>, 27 AD3d 297, 812 NYS2d 472 [1st Dept 2006], leave to appeal denied 6 NY3d 852, 816 NYS2d 758; <u>People v Williams</u>, 106 AD2d 786, 484 NYS2d 255 (3d Dept 1984).  This is also apparent upon reading the cases cited as authority in <u>Thomas</u> and <u>Crawford</u>, one of which expressly refers to the informant as an "accomplice."  In other words, the informant in each of those cases could have been charged with the same crime as the defendant.  That was not true, in the case at bar.

Moreover, there was no testimony that the police considered using KANE'S statement against him as a basis for charging him with *hindering prosecution* or *any other crime*.  Where it is unlikely that an admission would have been used against an informant, the statement is "not sufficiently contrary to his penal interest to establish reliability." (<u>People v Griminger</u>, 127 AD2d 74, 72 [2d Dept 1987]).

-8-

KANE'S written statement to the police contained an acknowledgment that he had been told "that any false statements made herein are punishable as a class A Misdemeanor pursuant to Section 210.45 of the NYS Penal Law." (People's Hearing Exhibit "8"). Although relevant, this did *not* conclusively establish the reliability of KANE'S statement. (Compare, <u>People v Morgan</u>, <u>supra</u>, 76 NY2d at 493). It was just one of the factors considered by the suppression Court. Obviously, the adverse consequences of being convicted of *murder* far outweigh those of being convicted of a class A *misdemeanor* for filing a false statement.

The statement by which JOHN KANE implicated Paul Scrimo in the murder of Ruth Williams "was neither spontaneous nor promptly made" (see <u>People v Maerling</u>, 46 NY2d 289, 301, 413 NYS2d 316 [1978]). It came *three weeks* after the crime, and not "in an honest and forthright manner," as a private citizen doing his civic duty, but as a *suspect* who was seeking to avoid his own prosecution for the crime (<u>People v Watson</u>, 109 AD2d 409, 412 [1st Dept 1985]). (DB16). It was only after the Detectives had insinuated that KANE was about to be charged with the murder that he implicated Paul Scrimo. (DB8-9; DRB5).

The Hearing Court concluded that KANE was "in custody" at the time he accused Mr. Scrimo, reasoning that if KANE had been "free to leave," he would presumably have left police headquarters once he signed his statement at 9:30 P.M., and not remained until 10:00 A.M. the following morning. (DB16-17). As this Court reiterated in <u>People v Paulman</u>, 5 NY3d 122, 129, 800 NYS2d 96 [2005], "[t]he standard for assessing a suspect's custodial status is whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave (citations)."

In Respondent's Brief, the People pointed out that KANE was *not under arrest* when he

-9-

was at Police Headquarters on May 2, 2000, and cited the Detectives' testimony that KANE was *free to leave* any time he wanted. (RB5[incl. fn.3]). But this ignored the Hearing Court's express finding that KANE was apparently *not* free to leave. (DRB, 5).

Respondent argued, alternatively, that an informant who is "in custody" may have a strong motivation to tell the truth so as not to exacerbate his own criminal predicament. (RB46 [fn.20]). But this Court did *not* find, in either of the cases Respondent cited, that the fact that the informant was in custody had led the Court to conclude that the informant was reliable. (See People v Rodriguez, 52 NY2d 483, at 489; and People v Comforto, 69 NY2d 725, at 726).

Furthermore, those cases are factually distinguishable. The informants in Rodriguez and Comforto had drug charges pending against them which were separate and apart from the charges which would be brought against the defendants. In the hope of receiving leniency in their own cases, they had supplied information which led to the defendants' arrests. They could not have expected to curry favor with the District Attorney if the information they supplied proved to be inaccurate.

In our case, there were no pending charges against KANE for other crimes at the time that he was undergoing a custodial interrogation regarding the murder of Ruth Williams. Being guilty of the murder, and believing he was about to be charged with the commission of that crime, KANE had a very strong incentive to *lie* in order to deflect the suspicion away from himself.

There is no dispute as to the operative *facts* relative to this point. However, the *legal conclusion* that the Hearing Court reached on the basis of such facts was *erroneous*. KANE'S statement that *he removed beer bottles from the victim's apartment* was *not a declaration against penal interest*. Treating it as such, as a basis for establishing the veracity of JOHN KANE as an

-10-

informant, and probable cause for the Defendant's warrantless arrest, was an abuse of discretion, as a matter of law. (Maerling, supra, 46 NY2d 299-300).

The circumstances in People v Johnson, supra, were similar to the case at bar. The informant had no history of giving reliable information to the police. He had not come forward to report the murder. Furthermore, when the police approached him and asked about it, he denied having any personal knowledge. It was not until a later point in time that he admitted having first hand knowledge, and only then did he accuse the defendant of committing the murder. (66 NY2d at 401).

As in the case at bar, there were no exigencies in *Johnson* which would have prevented the police from applying for a warrant. (66 NY2d at 416-417). This Court held that, under such circumstances, suppression should have been *granted.* (66 NY2d at 408).

> Here, the only evidence leading to defendant's arrest was the statement of an individual with no history of giving reliable information to the police and who exculpated himself from a homicide charge by implicating the defendant in the crime. There being no exigency, the police should have applied for a warrant, placing the informant under oath (*see, People v Cantre*, 65 NY2d 790; *People v Hicks*, 38 NY2d 90) or, at least, producing him before a magistrate (*People v Brown*, 40 NY2d 183). Because the officers did not do so, suppression is appropriate under the judicially formulated rule of exclusion.

(66 NY2d 398, at 415-416 [concurring opinion]).

B.   The Police Did *Not* Corroborate
"highly significant details" of KANE'S story

As noted above, the second ground for the Hearing Court's decision that there was

-11-

probable cause for the Defendant's warrantless arrest was its finding that *the particular tip* provided by JOHN KANE was *reliable*.

As this Court stated in <u>People v DiFalco</u>, the principal assurance that a particular tip is reliable "is furnished by corroboration of the statement through a factor independent of the statement's contents--i.e., the conclusion by the police from their own separate investigation that significant details of the information provided have been verified as accurate. The theory is that if significant details have been verified as true it is reasonable to suppose that other details, which remain unverified, are also true." (80 NY2d 693, at 699).

This Court further stated in <u>DiFalco</u>, that while corroboration of "non-criminal" details may be considered, they may not be merely "peripheral," but must be "significant and essential to carrying .. out" the crime. (80 NY2d 693, at 699).

Thus, in <u>DiFalco</u>, which involved the arrest of a drug dealer, it was deemed sufficient that, prior to the arrest of the dealer in his vehicle, the police had verified the accuracy of the tip in so far as the identification of the defendant's car was concerned, the route that it took, and the time that the trip took place, all of which allowed the police to intercept the car on its return trip from the City at which the dealer had, in fact, purchased cocaine. (80 NY2d at 695, 700-701). Although the details that had been verified prior to the arrest were "non-criminal" in themselves, the car and the trip that it took were "significant and essential to carrying .. out" the crime of drug possession.

Citing <u>DiFalco</u>, the Hearing Court in the present case stated its conclusion that certain "significant details" of JOHN KANE'S story had been corroborated by other witnesses whom the police had interviewed. (DB14). As will be shown below, the first "detail," although

-12-

corroborated, was not "significant," within the meaning of the test stated in DiFalco. In the second example cited by the Court, there was *not* any corroboration.

1.  Being in the Company of Ruth Williams
    and  JOHN  KANE  at  "Y. L. Child's"

As argued in Appellant's initial Brief, the evidence adduced at the Hearing did *not* support the County Court's statement that Williams had been at a bar called "Y.L. Child's" in the company of KANE and Scrimo *"shortly before her murder."* (DB14).  The prosecution had not proved *when* the murder occurred - not through KANE, the only alleged eye witness, nor through the Medical Examiner.  (The body was not found until more than 36 hours after the time that the prosecution alleged that the murder took place). (DB5, 11, 19-20).

Although Appellant had asserted that there was no record evidence of such *temporal proximity*, Respondent's Brief merely repeated the County Court's statement that KANE and Scrimo were at "Y.L. Child's" with Williams *"shortly before her murder"* (RB18-19, 45).  It cited no evidence to support this finding, thus confirming that none exists.

The fact that Scrimo had been in the company of KANE and Williams at a bar called "Y.L. Child's" did not render it reasonable to suppose that the other details of KANE'S story, which remained unverified, were also true. (DiFalco, at 699).  That is, it did not lend plausibility to KANE'S statement that it was Scrimo who murdered Williams up in her apartment.

Nor can it be said that the fact that Williams was in the company of KANE and Scrimo at the bar was "significant and essential to carrying .. out" the crime. (DiFalco, at 699).  Thus, it was not the sort of "non-criminal" detail, the corroboration of which, would satisfy the

-13-

requirement set by this Court in <u>DiFalco</u> for establishing the reliability of the particular tip supplied.

      2.   <u>The "Argument" Behind "Captain Andy's" Restaurant</u>

As noted above, the Hearing Court's Decision cited, as a second instance in which the story of informant JOHN KANE was "verified," an argument that was observed outside Williams' apartment:

> Additionally, Francine Quinn had seen Ruth arguing with the bald headed man *outside her apartment shortly before the time she was murdered*. Since the detectives had confirmed *significant details* of John Kane's story, the court concludes that the information available to the detectives constituted probable cause to believe that Mr. Scrimo had committed the murder.

(Decision, p.14).

Francine Quinn had told the Detectives that, after "Y.L. Child's" closed, she walked to the parking lot where her roommate's car was parked. It was behind the "Downtown" bar, where Ms. Quinn worked, which was next to "Captain Andy's" restaurant. She heard loud voices, and turned to see Ruth standing behind "Captain Andy's," near the door that led up to Ruth's second floor apartment. According to Quinn, Ruth was arguing with a bald headed, husky man, and Quinn thought it was the same man that she had seen with Ruth at "Y.L. Child's." (DB7).

Det. McHugh testified that Quinn told him that the man also *had tattoos*. However, this was *not* in Quinn's written statement (DB7).

In Defendant's initial Brief, it was asserted that there was no support in the Hearing record for the Hearing Court's statement that the "arguing" observed by Quinn occurred "shortly

-14-

before" the murder.  Quinn's statement did *not* indicate the *time* that she had left "Y.L. Child's" or the *time* that she allegedly observed these individuals arguing.  Nor had the prosecution otherwise proven the time of the *argument*, or the time of the *murder*. (DB19-20).  Despite this direct challenge, the People's Brief merely repeated the Court's finding, without demonstrating that it had any basis in the evidence (RB18-19).

It was also argued in the Appellant's initial Brief that Quinn's observations after leaving "Y.L. Child's" did *not* "corroborate" KANE'S statement in any way.  They each described *different* events, occurring in *different* locations, at perhaps *different* times. (DB20).  (KANE had said nothing about any argument outside the building; nor had Quinn observed anything that happened inside the second floor apartment).  The People conceded that "Kane's statement .. was not substantiated by" Quinn's KANE's statement (RB46).

In conclusion, each of the two stated bases for the Hearing Court's finding of probable cause lacked a sufficient basis in the record *and* was based upon a misapplication of the controlling law.  Under these circumstances, the suppression courts' determination may be disturbed. (People v Gonzalez, 99 NY2d 76, 751 NYS2d 830 [2002]).


    C.     The People's Alternate Theories of Probable Cause

While Respondent argued in the Appellate Division that the Decision of the Hearing Court "should not be disturbed" (RB42), it actually attempted to rewrite the Decision by suggesting alternative theories of probable cause (RB42, 45).  Since none of those theories were argued before the suppression Court, or ruled on by it, they could not have properly been considered by the Appellate Division.  Nor may they be considered by this court. (People v

Parris, 83 NY2d 342, 350-351, 610 NYS2d 464 [1994]; People v LaFontaine, 92 NY2d 470,

473-474, 682 NYS2d 671 [1998])(citing CPL 470.35 [1]; 470.15 [1]; *People v Romero*, 91 NY2d

750, 753-754; *People v Goodfriend*, 64 NY2d 695, 697-698).

     If they are considered, they should be rejected for the reasons stated in Defendant's Reply

Brief (DRB, at 9-11).

     In Appellant's initial Brief, it was argued that the denial of suppression was *not harmless*

(DB20-22).  Inasmuch as the People failed to respond to this argument, the point has been

implicitly conceded.  (People v Mucciolo, supra, 104 AD2d at 906).

-16-

II.

## IT WAS ERRONEOUS FOR THE APPELLATE DIVISION
## TO APPLY HARMLESS ERROR ANALYSIS SINCE THE EVIDENCE
## AGAINST THE DEFENDANT WAS FAR FROM OVERWHELMING

The Appellate Division stated that, if it were to consider the Defendant's *unpreserved*

arguments about the prosecutor's summation, it would consider the prosecutor's remarks to be,

*inter alia*, "harmless" (citing People v Crimmins, 36 NY2d 230, 241, 367 NYS2d 213 [1975]).

The summation itself will be discussed below under "Point V.D." Under this heading, Defendant

addresses only the issue of whether the doctrine of "harmless error" was applicable under the

facts of this case.

In Crimmins, this Court stated that "unless the proof of the defendant's guilt, without

reference to the error, is overwhelming, there is no occasion for consideration of any doctrine of

harmless error."(id., at 241).  This Court further stated that what is meant by "overwhelming

proof of guilt" is that "the quantum and nature of proof, excising the error, are so logically

compelling and therefore forceful in the particular case as to lead the appellate court to the

conclusion that 'a jury composed of honest, well-intentioned, and reasonable men and women'

on consideration of such evidence would almost certainly have convicted the defendant." (*id.*,

241-242).

In the present case, if the erroneously admitted proof is excised, the proof against the

Defendant is most certainly *not* "overwhelming." Rather, the evidence is overwhelming that the

murder was committed by prosecution witness, JOHN KANE.

### A.     THE PHYSICAL EVIDENCE

The indisputable physical evidence in this case had the greatest probative value, and it pointed to JOHN KANE as the murderer, not Paul Scrimo (DB113-115).

#### 1.   Fingerprints

No fingerprints were found in the victim's apartment that matched the Defendant, Paul Scrimo.  However, a fingerprint found on an Allman Brothers CD case in the apartment matched the known inked impression of JOHN KANE (DB31).  This was *conceded* by the People at trial (T.329:23-24; T.330:8;  T.1742:18; T.1743:14), and on appeal. (RB37, 52)

#### 2.   DNA Evidence

The Nassau County Police Department subjected a number of items to DNA analysis by transmitting them to Labcorp, a DNA testing laboratory in North Carolina (T.1008).  These items included clippings from the deceased victim's fingernails; cigarette butts from the victim's apartment and the second floor hallway; and the Q-tips that had been used to swab the mouth area of the drinking glass and the Budweiser beer bottle that were found on the victim's kitchen table (T.953-957, 977, 1021-1022, 1025, 1065).

Ms. Meghan Clement, the Technical Director of Labcorp's Forensic Identity Testing Department (T.1007-1008), testified that Labcorp "extracted" DNA from each of these items by wiping it with a swab dampened in distilled water and then placing half of the swab into a tube containing chemicals that allowed the DNA to be released (T.1027, lines 19-23;  T.1034, lines 10-15).

Labcorp was also provided with "reference samples" (blood or saliva) from the victim, Ruth Williams (T.1022, lines 5-6), the Defendant, Paul Scrimo (T.1025, lines 16-18; T.1045, line 25 - T.1046, line 1), and prosecution witness JOHN KANE (T.1025, lines 15-16; T.1045, lines 15-18; T.1074, lines 4-8).

Labcorp tested the nuclear DNA, using the polymerase chain reaction (PCR) method (T.1015, line 21 - T.1016, line 3; T.1078, lines 10-12). The results of its tests are set forth in three separate "Certificates of Analyses." They are dated May 9, 2000, June 23, 2000 and March 29, 2001, respectively (T.1040, lines 18-20). These three reports, along with all of the supporting data, were admitted, cumulatively, as People's 82 (T.1016-1018, 1040, line 16 - T.1041, line 1).

Ms. Clement explained that the "[t]he goal of forensic DNA testing is to develop a profile from a piece of evidence and compare it to a profile from a known sample to determine whether someone could have been a contributor or not." (T.1042, lines 8-11). The "profile" is composed of the characteristics (or "alleles") found at certain selected locations (or "loci") on the DNA strand (T.1066, lines 10-12, 14-15).

If test results show that a particular individual could have been a contributor to the DNA that was found on the victim or at the crime scene, it is said that the individual "is included" among the possible contributors or that he "cannot be excluded" as a possible source of the DNA. (T.1046, lines 7-20; 1049, line 20 - T.1050, line 9). Another way this is expressed is to say that the individual's DNA profile is "consistent" with (T.1046), or that it "matches" the profile of the DNA that was found (T.1045, line 18- T.1045, line 1; T.1049-1050). (In common usage, different shades of meaning might be attributed to some of these terms as compared to the others, but according to Clement, they all have the *identical* meaning in the context of forensic

-19-

DNA testing).

As a means of expressing how common or rare a particular DNA profile is, a statistical estimate is made of the probability of randomly selecting someone that would be a match. (T. 1042, lines 18-20; T.1044, lines 18-23). This statistical estimate is called a "random match probability." (T.1041:20-22). According to Clement, the purpose of such statistics is *not* to show the probability that the DNA came from a particular person. "No, the goal isn't to use a statistical estimate to show the probability that it is someone. The goal of statistical estimate is to help understand how common or rare that profile is in various populations." (T.1042, lines 17-20). (See also T.1047:6 - T.1048:2).

Clement did _not_ testify that Labcorp's tests had proved that any of the crime scene DNA had come from any particular person.

### *DNA on Cigarette butts*

It was the determination of Labcorp that none of the DNA that was found on any of the cigarette butts at the crime scene was consistent with the DNA of the Defendant, Paul Scrimo (DB31-32).

Ms. Clement testified that the profile of the DNA that was found on the "brown" cigarette butts at the crime scene was "consistent with" the DNA profile of JOHN KANE. (DB32; RB37). Labcorp calculated a statistical estimate for the profile of the DNA on those cigarette butts, called a "random match probability." (T.1041). It would match only 1 out of 18,100,000 persons in the

Caucasian population. (DB32).   On appeal, Defendant argued that the profile was "rare." [3]

In People v Rush, 242 AD2d 108, 110, 672 NYS2d 362 (2nd Dept 1998), the Appellate Division acknowledged that "DNA profiling 'consisting of *unique* genetic characteristics belonging to an *individual*, can provide strong evidence of a person's presence at and participation in a criminal act.'" (emphasis added).   Therefore, the jury in this case could have reasonably concluded that it was, in fact, KANE'S DNA on the "brown" cigarette butts.

However, the jury did not have to decide that issue, because the prosecutor *conceded* that the DNA on the brown cigarette butts came from KANE.  (T.329:16-23; T.330:2-9; T.1742:17) [opening and his closing statements].

### *DNA under the Victim's fingernail*

Under the murder victim's right index finger, a "mixture" of DNA was found, from two different individuals.   There was a "major" profile present and a "minor" profile. (T.1048:3-24). "What that means simply is that there's a greater concentration of one donor than another." (T.1048:24-25).

The Defendant, Paul Scrimo, was *excluded* as a possible donor. (DB31-32) (RB51-52).

The "minor" DNA profile in the mixture was consistent with Ruth Williams.

The "major" profile on this fingernail clipping matched the DNA profile of JOHN KANE.   It was estimated that the "major" profile would match only 1 in 2,600,000 in the

---

[3]      Clement described as "very rare" the random match probability of the DNA profile found on the Vantage brand cigarette butts that were consistent with the profile of Ruth Williams: 1 out of more than 6 Billion. (T.1023, 1044-1045).  She did not use such descriptions to characterize the rarity of any of the other DNA profiles.

Caucasian population. (DB32).  Under the circumstances of this case, it would not have been unreasonable for the jury to conclude that the "major" donor to the DNA mixture under the victim's fingernail was, in fact, JOHN KANE.  But, again, the jury did not have to decide that issue, because the prosecutor conceded that this DNA came from KANE. (T.329:16-22; T.330:2-7;  T.1742:17;  T.1743:13).  This was also conceded by the People on appeal. (RB38, 53).

In the Appellate Division, Defendant cited a Third Department murder case in which the prosecution's DNA expert had testified that it was *"extremely uncommon* to find blood or tissue from another individual in such [fingernail] scrapings" (emphasis and parenthetical matter added). (DB114).  In our case, the People did not disagree with that proposition, or with Defendant's argument and that such fingernail DNA evidence would constitute *compelling* evidence against the guilty party and exonerating the innocent (DB114).  They argued, however, that in this particular case, KANE'S DNA had gotten under the victim's fingernail as a result of physical contact while KANE was receiving oral sex from Ms. Williams (RB53).  (In response to a hypothetical question, Ms. Clement had testified that this was possible, assuming that Ms. Williams fingernail had come into contact with KANE'S skin). (T.1039-1040).

Clement also conceded, however, during cross-examination, that it was possible that the cellular the material under Williams' fingernail was from her attacker, and that it had gotten there while she was fighting him off and her fingernail came in contact with his skin. (T.1086-1087).

In direct contravention of this testimony, the People made the *new* argument on the appeal below that DNA could *not* have gotten under Williams' fingernail as a result of struggling with her attacker, since *no hemoglobin* had been found under the fingernail from which the DNA

-22-

had been recovered that matched KANE:

> ..Kane's DNA under Williams' fingernail not only failed to incriminate him, but also supported his account that he was merely a witness to defendant's fatal attack on Williams. *Because the material that contained Kane's DNA included no hemoglobin, it could not have lodged under Williams' fingernail through a scratch that drew blood, as would have been likely had Williams tried to fight off her killer.* Thus, the jury had every basis to conclude, reasonably, that Williams had gotten Kane's DNA under her fingernail through benign contact, i.e., the oral sex Kane described.

(RB53).

Of course, Respondent's assertion that a struggling victim is "likely" to scratch her attacker and draw blood is pure conjecture. No such argument was made in the prosecutor's summation. (T.1733-1784).

Moreover, the People's DNA expert testified that it was *not* necessary that there be a scratch in order for the attacker's DNA to become embedded under the victim's fingernail. As long as there is contact, the nail could pick up DNA contained in the attacker's *skin* cells (T.1075:11-15, 20-25;  T.1066:15 - T.1077:12;  T.1037:6-7, 17-25;  T.1086:19 - T.1088:3).

Assuming, however, that the victim did make a scratch on the murderer, which resulted in bleeding, it does not necessarily follow that any of her fingernails would have blood under them. The prosecutor did *not* establish this to be a fact during the testimony of either the People's DNA expert or their serologist.

In any event, only *one* (1) fingernail clipping out of a total of *ten* (10) was tested by the Police Department for hemoglobin. Furthermore, this occurred *after* that one clipping had been swabbed with distilled water at Labcorp so that it could be tested for DNA, and in the process,

50% of the material on it was removed. (T.961-963, 976, 992-993, 1003-1007, 1025-1026, 1026-1030, 1697-1699). The People's serologist, Det. McCarthy, conceded that one possible explanation for the negative result on the hemoglobin test was that, when Labcorp swabbed the clipping, it removed whatever hemoglobin may have been present. (T.984-987). Since the other 9 fingernail clippings were *not tested* for hemoglobin, McCarthy could *not* testify that he was certain that there was no traces of blood on any of them; nor did he do so. (T.950-1007).

The decision to test only the one particular clipping for hemoglobin was based upon a visual examination by Det. McCarthy who *saw* some "brownish" material on it under a microscope. (T.960:5 - T.961:1). However, Ms. Clement testified that DNA is only present in the nucleus of a cell, and that red blood cells do not have a nucleus. So, if DNA were to be found in blood, it would be found in a *white* blood cell. (T.1034:1-8; T.1074).

Also, McCarthy testified that the hemoglobin test was so sensitive that it could detect amounts that were infinitesimally small - 4 billionths of a gram (4 nanograms) - using as an illustration the powder in a one gram envelope of "Sweet and Low." (T.960 - T.964). This arguably suggests that blood could have been detected by the hemoglobin test although it was present in an amount so minute that it was *not visible*. Despite all of the foregoing, none of the other nine fingernail clippings were tested for hemoglobin.

Thus, the assertion that the People made *for the first time on appeal* cannot be fairly inferred from the record.

*The "mixed" DNA on the Budweiser bottle.*

Labcorp determined that the Budweiser bottle from the victim's kitchen table had mixed

-24-

DNA on it from at least two different individuals.  Labcorp could *not* exclude KANE, Williams or Scrimo as being a *possible* contributor to the "mixed" DNA -  along with one out of every 6,800 persons in the Caucasian population, 1 out of every 51,500 persons in the African American population, and 1 out of every 80,600 persons in the Hispanic population (DB33-35, 100).

<u>The People *conceded* at trial that JOHN KANE was the *major* contributor to this "mixed"</u> <u>DNA</u>.  The prosecutor did so, in both his opening statement and his summation. (T.332:15-24; T.1769:1-4). (RB37)

However, the prosecutor also improperly asserted, as if it were a *conclusively proven* fact, that the DNA of Paul Scrimo was present in this mixture. (T.332 - T.333;  T.1769:1-10) (RB1, 37, 47-49, 50, 92).  He purported to base this assertion on the testimony of the People's DNA expert, Meghan Clement:

> There is a mixture of DNA on that Budweiser bottle. Remember what Meghan Clement told you? There's a major contributor and a minor contributor; john Kane is a major contributor, Mr. Scrimo is a minor contributor.

(T.1769:1-5).

Then the prosecutor proceeded to tell the jury what this testimony by Ms. Clement "means":

> What does this mean? John Kane was drinking out of the bottle more than Mr. Scrimo was drinking out of the bottle. That's what that means. That's why there's a mixture of DNA on it ladies and gentleman. That's why there's a mixture of DNA.

(T.1769:6-10) (DB99-100).

In Appellant's initial Brief in the Appellate Division, it was shown that this assertion was a *deliberate misrepresentation* of the testimony of the People's own DNA expert, and that the prosecutor's remark constituted "unsworn testimony." (DB99-100). Ms. Clement had *not* testified that Mr. Scrimo was a minor contributor to the mixture of DNA on the Budweiser bottle. Nor had Ms. Clement testified that her tests had established that Mr. Scrimo had been drinking out of the Budweiser bottle.

Ms. Clement had actually testified that it was "*not* a matter of calculating whether somebody is actually found in [the] mixture" (emphasis supplied) (T.1044:2-3). As was true of the test results on the cigarette butts and the fingernail clipping, Labcorp had only come to a conclusion as to whether or not each of the persons in question could be excluded as a *possible* contributor to the mixed DNA on the Budweiser bottle.

Regarding Labcorp's *first* testing of the DNA on the Budweiser bottle, Clement testified that "[w]ithin the mixture of characteristics found, I cannot exclude John Kane and I cannot exclude Mr. Scrimo as being possible contributors." (T.1052:3-9).

With respect to Labcorp's *second* test on the DNA from the beer bottle, Clement testified that "[t]he conclusion from the test of the second half of the swab was that the major profile was consistent with John Kane, however, we could not exclude Ruth Williams or Paul Scrimo, as minor contributors." (T.1069:10-13). As noted at the outset, Clement also estimated the probability of randomly selecting an individual in the general population who could be a contributor to this mixture. (T.1069:16-20).

In the Appellate Division, the People did not take issue with the Defendant's argument that the number of possible contributors to the DNA mixture on the Budweiser bottle was

-26-

*relatively high,* and that it logically followed that its probative value was *relatively low.* (DB33-35, 100).

Furthermore, all DNA evidence is circumstantial. (People v Dolan, 2 AD3d 745, 768 NYS2d 654 [2d Dept 2003]; People v Horace,172 Misc.2d 270, 658 NYS2d 802 (Supreme Ct., Monroe County, 1997). The question of the inference to be drawn from circumstantial evidence is for the jury. (People v Sandgren, 277 AD 217, 98 NYS2d 371 [1st Dept 1950]). Whether the Defendant was, in fact, one of the contributors to the mixed DNA on the Budweiser bottle was an "ultimate issue of fact." The People's DNA expert could not have properly stated her opinion as to that "ultimate issue of fact." (Compare People v Abreau, 114 AD2d 853, 854 [2d Dept 1985]). That was the exclusive province of the jury. Nor did the expert do so. Yet, the prosecutor told the jury that Ms. Clement had.

In the Appellate Division, the fact that the prosecutor had *deliberately misrepresented* the testimony the People's DNA expert in his summation *and* that he had given unsworn testimony as to what it "meant" was pointed out in the Appellant's initial Brief, as an instance of prosecutorial misconduct. (DB99-100). The misrepresentation was of critical importance since the mixed DNA on the Budweiser bottle was *the only forensic evidence that the People had cited as alleged proof of the Defendant's presence in the victim's apartment.*

Incredibly, the Respondent's Brief repeated the same misrepresentation of the DNA testimony. Moreover, it did so *over and over again,* asserting no less than six (6) times that the DNA evidence "established" that the Defendant had drunk from the bottle and had been in the victim's apartment. (RB1, RB37, RB48-49, RB49 [fn.21], RB50 and RB92). The pages of the trial transcript that were cited did not in any way support the People's assertion.

-27-

This blatant misrepresentation was brought to the Second Department's attention and quoted in the Defendant's Reply Brief [hereafter "DRB"](see pp.1-2, 62). However, it appeared from the oral argument below that, by sheer force of the People's repetition of the same misrepresentation, the Appellate Division had accepted the proposition that the mixed DNA on the beer bottle "established" the Defendant's presence in the apartment at the time of the murder. Defendant respectfully requests that this Court decide this case on the basis of what is actually in the record, and not on the basis of the prosecution's deliberate misstatements.

Defendant also argued in the Appellate Division, on the basis of case law, that, even if it were assumed that Paul Scrimo's DNA was on this Budweiser bottle, *it did not logically follow that he had been in the apartment*, since the prosecution had not proved *where* the Budweiser bottle came from or *how* it got on Williams' kitchen table (DB103-104). The People did not respond to this argument, tacitly conceding the point.

According to KANE, Williams had *no beer* in her apartment (T.1431), and based upon the testimony of the clerk at the 7-eleven store, and a computer generated record of the purchase, the prosecutor had argued that Mr. Scrimo had come into the store that night and bought a 12-pack of *"Coors Light"* (T.1767) (not *Budweiser*). Thus, it was suggested in Appellant's initial Brief that KANE could have brought a bottle of *Budweiser* from the last bar at which he had been drinking ("Y.L. Child's"), and that because KANE and Scrimo had been standing next to each other at that bar, Scrimo may have drunk from the *Budweiser* bottle. (DB104). In Respondent's Brief, the People did not deny that this was a plausible scenario.

Since the submission of the Defendant's appeal below, the United States Supreme Court has had occasion to observe that, for many reasons, crime scene DNA evidence is often

-28-

*inconclusive,* especially when it is "mixed" DNA, and *as in this case,* more than 24 hours had

passed before it was recovered.  In his concurring opinion in  District Attorney's Office for Third

Judicial Dist. v. Osborne, 557 U. S. ____ (2009), at 6-8, Justice Alito wrote the following:

> As one scholar has observed:
>
> "[F]orensic DNA testing rarely occurs [under] idyllic conditions.
> Crime scene DNA samples do not come from a single source
> obtained in immaculate conditions; they are messy assortments of
> multiple unknown persons, often collected in the most difficult
> conditions. The samples can be of poor quality due to exposure to
> heat, light, moisture, or other degrading elements. They can be of
> minimal or insufficient quantity, especially as investigators push
> DNA testing to its limits and seek profiles from a few cells
> retrieved from cigarette butts, envelopes, or soda cans. *And most
> importantly, forensic samples often constitute a mixture of multiple
> persons, such that it is not clear whose profile is whose, or even
> how many profiles are in the sample at all.* All of these factors
> make DNA testing in the forensic context far more subjective than
> simply reporting test results . . . ." (citations). Such concerns apply
> with particular force where, as here, the sample is minuscule, *it
> may contain three or more persons' DNA, and it may have
> degraded significantly during the 24 or more hours it took police
> to recover it. (emphasis added).*

In the present case, Labcorp used "PCR DNA analysis that looks at STRs." (T.1015-

1016, 1078:10-12).  The defense had moved prior to trial to exclude the mixed DNA from the

Budweiser bottle, or in the alternative, that the defense's retained DNA expert, Howard Baum,

Ph.D, would be permitted  to rule out the possibility of *contamination* by re-testing the mixed

DNA that was on the Q-tip that had been used to swab the mouth of the Budweiser bottle.  Such

re-resting was not possible, however, because Labcorp had used up the remaining half of the

swab when it performed a *second* test at the request of the prosecution, without giving the

defense any notice.  Although Labcorp had retained some of the *extract* from the swab, Dr. Baum

-29-

had asserted that retesting the extract would not answer his concerns, because contamination

could have occurred during the extraction process. (DB35-36).

   In Oscborne, it was observed by the Supreme Court that (ironically), as DNA tests have

become more sensitive, allowing DNA to be detected in quantities so minute as to be invisible,

the possibility has increased that the crime scene DNA can become "contaminated" by other

DNA which is transferred to it inadvertently, and that this is most likely to happen during the

"extraction" process.

> [T]he risks associated with evidence contamination increase every time someone attempts to extract new DNA from a sample. According to Professor John Butler—who is said to have written "the canonical text on forensic DNA typing," Murphy, supra, at 493, n. 16—"[t]he extraction process is probably where the DNA sample is more susceptible to contamination in the laboratory than at any other time in the forensic DNA analysis process," J. Butler, Forensic DNA Typing 42 (2d ed. 2005).
>
>   Indeed, modern DNA testing technology is so powerful that it actually increases the risks associated with mishandling evidence. STR tests, for example, are so sensitive that they can detect DNA transferred from person X to a towel (with which he wipes his face), from the towel to Y (who subsequently wipes his face), and from Y's face to a murder weapon later wielded by Z (who can use STR technology to blame X for the murder). See Michaelis 62– 64; Thompson, Ford, Doom, Raymer, & Krane, Evaluating Forensic DNA Evidence: Essential Elements of a Competent Defense Review (Part 2), The Champion, May 2003, pp. 25–26. Any test that is sensitive enough to pick up such trace amounts of DNA will be able to detect even the slightest, unintentional mishandling of evidence. See Michaelis 63 (cautioning against mishandling evidence because "two research groups have already demonstrated the ability to obtain STR profiles from fingerprints on paper or evidence objects"). And that is to say nothing of the intentional DNA-evidence-tampering scandals that have surfaced in recent years. See, e.g., Murphy, The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence, 95 Calif. L. Rev. 721, 772–773 (2007) (collecting examples).

(*id.*, at 8-9).

### B.   TESTIMONIAL EVIDENCE

The following persons were key witnesses for the prosecution.  There was no defense case.

#### 1.   JOHN KANE

In the Appellate Division, the Respondent did not deny that prosecution witness JOHN KANE did not report the murder; that when he was questioned by the police on April 19, 2000, he *lied*, denying any direct knowledge; and not mentioning that he was with Paul Scrimo that night, drinking in the local bars. (DB115).  It was also not disputed that it was only after KANE was asked to give a DNA sample, and it appeared he was about to be charged with the murder, that he admitted he was with Ruth Williams that night at her apartment, and that she performed oral sex on him (DB115).

Respondent argued that Paul Scrimo also did not report the murder (RB53).  However, this was consistent with his having no direct knowledge of it - an assertion that never changed. In contrast, KANE *admitted* that his earlier exculpatory statements to police were *false*. (T.1492:19-24).

Only a few of the Defendant's statements that Respondent cites were arguably contradicted by independent evidence. (RB53-54).  Moreover, it was up to the jury - *not the Detectives or the prosecutor* - to determine if such contradictory evidence *proved* that a statement was *false*, and if so, whether it was evidence of consciousness of guilt, or there was some innocent explanation (DB87-88).  The jury, however, never received a "Consciousness of Guilt"

-31-

instruction. (DB86-90). Instead, they were erroneously given an instruction on "Confessions, Admissions and Statements" (DB90-91). Thus, they were misled as to the purpose for which the defendant's statements could be considered.

### 2. Francine Quinn

On the appeal, the People asserted that the testimony of Francine Quinn was "the most damaging to the defense" (RB79). Her testimony is discussed at length in Appellant's initial Brief (DB37-44). Allegedly, Ms. Quinn saw Paul Scrimo *kissing* Ruth Williams at "Y.L. Child's," and then later saw the two arguing behind the restaurant above which Williams' second floor apartment is located (RB48).

Presumably, if Ms. Quinn thought that her observations on the night of the murder were significant, she would have taken the initiative and spoken to the police right away. *She did not.* A full week passed before she gave a statement to Detective McHugh in the Command Bus - even though it was parked right behind the "Downtown" bar where Quinn worked (H.242-243).

The passage of time could not have helped Quinn's recollection. Her testimony that Ruth Williams was kissing Paul Scrimo at "Y.L. Child's" on April 12, 2000 was directly contradicted by the People's chief witness, JOHN KANE, who testified that *he* was the one making out with Ruth. (DB9, 19, 46).

Quinn did not identify the Defendant when she viewed the police line-up (DB41). It was not until Quinn saw Mr. Scrimo two days later in a photograph in Newsday, standing next to Detective McHugh, that she allegedly "recognized" him as the man she had seen at "Y.L.

-32-

Child's" with JOHN KANE and Ruth Williams. (DB41-42). It had come out at the suppression hearing that the photo in Newsday was next to an article stating that Mr. Scrimo had been arrested for the murder. (DB42). Of course, it was "suggestive in the extreme" that Quinn saw the Defendant in this context, and this seriously undermined the reliability of her "identification." (Compare, People v McCullers, 33 NY2d 806,807-809, 350 NYS2d 904 [1973]).

Quinn also testified that, that after she left "Y.L Child's," and walked a block to where her roommate's car was parked, she observed Ms. Williams, behind the restaurant above which her second floor apartment was located, and that Williams was arguing with a man who she believes was the same husky man with a shaved head that she had seen talking with Williams at the bar. (DB39-41). But for the reason noted above, and a myriad of other reasons, this testimony was not reliable (DB7, 19-20, 25, 37-42).

Furthermore, there was no evidentiary support for the prosecutor's assertion that the argument that Quinn allegedly observed occurred *shortly before* the murder. The prosecution had *not* proved the time of the murder *or* the time of the argument. (DB7, 19-20). Respondent's Brief merely repeated the prosecutor's assertion, without setting forth any supporting references to the record (RB48, 50), thus proving Defendant's point.

### 3.   Mohammed Houssain

Respondent cites the testimony of Mohamed Houssain, a clerk at the 7-Eleven store, that shortly after 4:00 A.M. on April 12, 2000, Mr. Scrimo came into the store and purchased beer, cigarettes for "the blonde" (RB48).

However, the records of the 7-Eleven store did *not* confirm that it was Mohammed

Houssain who was working as the clerk on the night in question - they indicated that the employee on duty at that time was a Mohammed *Shaheed* (T.1092-1093). Nor could the manager, Lisa Lawson, confirm who was actually working that night, because she was not there (T.1093:17-19).

The computer-generated record of the alleged purchase of "Coors Light" beer, "Vantage Ultra Light" cigarettes and "Marlboro box" cigarettes at 4:14 A.M. on April 12, 2000 actually states that the transaction was "aborted." (People's 84; T.1091-1093). According to the manager, this meant that no cash was received (T.1093-1094). Mr. Houssain could not explain this. (T.1344-1347).

According to Houssain, "the blonde lady" (Ruth Williams) was a regular customer at the 7-Eleven store, as was Mr. Scrimo (T.1313-1314). On Thursday, April 13, 2000, he saw police cars on Main Street, and learned that someone had been murdered (T.1314-1315, 1321, 1327-1328, 1339). On Friday, April 14, 2000, he became aware that the murder victim was Williams, when he saw her photo in a police poster and in the newspaper (T.1315-1316, 1331, 1340-1341, 1356). Yet, Houssain did *not* contact the police at that time, and tell them about Mr. Scrimo's alleged purchase on April 12 (T.1356). He told this story to the police for the first time more than *two weeks* later, in early May, after he had learned of the reward that was being offered (T.1332, 1343, 1357).

For all of the foregoing reasons, the evidence against the Defendant, Paul Scrimo, was *not* "overwhelming."

Notwithstanding Respondent's bare assertion to the contrary, the quality and the quantity of the proof adduced at trial provided "overwhelming" evidentiary support for the conviction of

-34-

<u>JOHN KANE</u>. (DB114-115).

The material that must be excised, which was not discussed above, was the erroneously admitted "tool mark" evidence," the extensive improper testimony concerning the Detectives interrogation of the Defendant, the erroneous instructions that were given to the jury, the prosecutor's improper remarks in summation, and the impact of defense counsel's ineffectiveness. These issues were argued in the Appellate Division under Points II and II. They were not properly preserved, however, and the Appellate Division did not consider them in the interests of justice. Accordingly, they are argued in this Memorandum as instances of defense counsel's ineffective assistance.

Point III.

IT WAS AN ABUSE OF DISCRETION FOR THE TRIAL COURT
TO EXCLUDE AS "COLLATERAL" TESTIMONY ABOUT AN
INCIDENT IN WHICH JOHN KANE HAD BEGUN CHOKING A
WOMAN DURING A DISPUTE OVER DRUGS HE HAD SOLD TO
HER, SINCE DEFENDANT HAD PROFFERED SUCH TESTIMONY
IN SUPPORT OF HIS DEFENSE THAT IT WAS KANE WHO
<u>STRANGLED WILLIAMS DURING A DISPUTE RELATED TO DRUGS</u>

<u>Appellate Division Disposition</u>

The above-entitled argument was disposed of in the Appellate Division by the last

sentence in its Decision that "[t]he defendant's remaining contentions are without merit."

<u>Reviewability</u>

This Court may review the Trial Court's decision not to permit the testimony of the

defense's three proposed witnesses to determine if it deprived the Defendant of his fundamental

right to present a defense and constituted an abuse of discretion as a matter of law. (See <u>People v</u>

<u>Primo</u>, 96 NY2d 351, 728 NYS2d 735 [2001]; <u>People v Carrol</u>, 95 NY2d 375, 385-387, 718

NYS2d 10 [2000]).

<u>Preservation</u>

In the Appellate Division, the People took the position that the above-entitled argument

was *not* preserved, contending that the reasons articulated in Defendant's appeal, as to why the

proposed testimony should have been allowed, had not been argued to the Trial Court: "At no

time did defendant ever propose any such *motive*, either expressly or implicitly, in the course of

his arguments to the jury, in his arguments to the court for the introduction of the evidence, or in

-36-

the course of his cross-examination of the witnesses." (emphasis added) (RB68).

In Defendant's Reply Brief, it was argued that while defense counsel's arguments were at times inartful, and he never used the word "motive," it was nevertheless apparent from the record as a whole that the aim of his cross-examination, as well as his reason for offering the testimony of Hartman, Ball, and Domaradsky, was to advance the theory that KANE strangled Williams during a dispute related to drugs. (DRB31-38).  Defendant supported this argument with extensive supporting references to the record.  For the convenience of this Court, copies of the cited pages are submitted herewith.

Additionally, the record makes reference to an untranscribed conference with the attorneys during which the Court apparently hashed out the permissible scope of defense counsel's cross-examination of KANE with respect to *drugs*, based upon the information that the defense's proposed witnesses had provided. (T.1446).  Only, if this was the case does the following colloquy and the Court's rulings make sense (T.1446-T.1557).  (Compare, People v Riback, 13 NY3d 416, 2009 WL 4250149, at 2, 2009 N.Y. Slip Op. 08856, at 2 [2009]).

The Appellate Division did *not* state in its Decision that it found this argument to be *unpreserved*

## Argument

The Court is respectfully referred to Point IV of the Defendant's Appellate Division Briefs.

Defense counsel argued at trial that it was JOHN KANE who strangled Ruth Williams, and that this may have occurred during a dispute related to *drugs*.  To lend plausibility to this

scenario, and to demonstrate the factual basis for this theory, defense counsel sought to introduce three witnesses who would testified about KANE'S drug dealing, Ms. Williams' drug use, and a violent episode during which KANE had choked another woman during a dispute over drugs that she had purchased from KANE.  (DB83-85).

In People v Primo, supra, 96 NY2d 351, involving a defense based upon third party culpability, this Court discussed a category of past cases in which there was no connection between the crime and the allegedly guilty third party, and the proposed evidence of third party culpability had been properly excluded.

However, in Primo itself, there *was* an evidentiary connection between the crime and the third party that the defense contended was the guilty party, and it was deemed to be error not to admit the additional evidence.

Primo stood trial for attempted murder, having allegedly shot a man inside a Brooklyn deli.  The defendant sought to prove that the shooter was actually a man named Maurice Booker, also known as "Moe."  Disagreeing with the Trial Court, this Court held that there was sufficient evidence in the record that Booker, was present at the doorway of the store at the time of the murder.  Thus, there was an *established connection* between Booker and the crime.  (96 NY2d 351, at 355-357).

The additional evidence that the defendant sought to introduce in Primo was a ballistics report from a subsequent robbery for which Booker had been apprehended, which would prove that the gun that Booker had used in that robbery was the same gun that was used in the shooting for which the defendant was standing trial:

> Here, the ballistics report is relevant evidence insofar as it links a
> third person--Moe Booker--to the gun used to shoot Cleland. *When*

-38-

> *coupled with proof that Moe Booker was at the scene of the shooting*, its probative value plainly outweighs the dangers of delay, prejudice and confusion. The trial court, however, improperly precluded the evidence. This constituted error as a matter of law. (Emphasis supplied).

(*id.*, at 357).

Significantly, this Court, in <u>Primo</u>, considered the probative value that the proffered evidence would have if it were to be "coupled with" the evidence that had already been admitted.

In the present case, a connection had already been established between JOHN KANE and the murder of Ruth Williams, before defense counsel had made his proffer, in that prosecutor had *conceded* in his opening statement that KANE was present in the victim's apartment at the time the murder occurred (T.322-325), that KANE'S fingerprint had been found on a CD case in Williams apartment, and that it was KANE'S DNA that was recovered from under the victim's fingernail and from two cigarette butts at the crime scene (T.329-330 ).

There was also evidence of KANE'S consciousness of guilt, as discussed above (DB112).

In the Appellate Division, the People did not disagree that if proposed witness Jennifer Hartman had been permitted to testify that JOHN KANE *choked* her during a dispute over drugs she had purchased from him (T.1453-1454) (DB84-85), the jury may have found it plausible that it was KANE who *strangled* Ruth Williams during a dispute over drugs. Thus, her testimony would have had a direct bearing on the issues of *guilt* and *innocence, and it was an abuse of discretion to exclude it.*.

-39-

Point IV.

IT WAS AN ABUSE OF DISCRETION FOR THE TRIAL TO ALLOW
THE PROSECUTION TO PRESENT THE TESTIMONY OF A
SECOND, UNDISCLOSED "TOOL MARK" EXPERT WHO GAVE
UNEXPECTED, INCRIMINATORY TESTIMONY, AND TO ALLOW HIM
<u>TO CONDUCT A SURPRISE, MISLEADING IN-COURT DEMONSTRATION</u>

<u>Appellate Division Disposition</u>

The above-entitled argument was disposed of in the Appellate Division by the last

sentence in its Decision that "[t]he defendant's remaining contentions are without merit."

<u>Reviewability</u>

This Court may review a Trial Court's decision to admit evidence if it finds that the Court

abused its discretion or exercised none at all. (<u>People v Riback</u>, 13 NY2d 416, 2009 WL

4250149, at 4;  <u>People v Cronin</u>, 60 NY2d 430, 433, 470 NYS2d 110 [1983];  <u>People v</u>

<u>Williams</u>, 56 NY2d 236, 239, 451 NYS2d 690 [1982];  <u>People v Lane</u>, 56 NY2d 1, 8, 451

NYS2d 6 [1982]).

<u>Preservation</u>

The Appellate Division's Decision did *not* find that the Defendant's arguments regarding

the "prosecution's "tool mark" evidence were *unpreserved*.  Rather, it reached the *merits*, by

stating in the last sentence of its Decision that "[t]he defendant's remaining contentions are

without merit."

The People had argued in the Appellate Division that the issues the Defendant was

arguing regarding the People's "tool mark" evidence were "largely unpreserved."

-40-

Defendant's trial counsel's objections and arguments clearly did preserve for review by this Court *some* of the issues regarding the People's "tool mark" evidence, while failing to preserve others. (Compare, <u>People v Riback</u>, 13 NY2d 416, 2009 WL 4250149, at 2).  Only the *preserved* issues are discussed under this heading.  (The *unpreserved* issues are discussed under Point V, as instances of defense counsel's *ineffectiveness*).

<u>Argument</u>

A.   IT WAS AN ABUSE OF DISCRETION FOR THE TRIAL TO
     ALLOW THE PROSECUTION  TO PRESENT THE TESTIMONY
     <u>OF  A  SECOND,  UNDISCLOSED  "TOOL  MARK"  EXPERT</u>

The fact that Detective Schiraldi may have been *qualified* to testify about the Leatherman tool (RB57) was irrelevant to the issue of whether his testimony came as an *unfair surprise*.

Respondent asserted in the Appellate Division that defense counsel "did not assert that he was surprised by Schiraldi's testimony about the Leatherman tool or by the in-court demonstrations Schiraldi used..," and that counsel's "complaint of surprise was confined to the introduction of the lineman dikes, ..wire cutters, and pocket knife" (RB55-59).  Actually, the defense *withdrew* its objections to the admission of photographs of the foregoing tools (T.820).  But, it is worth noting that one of his objections was that they "weren't provided with any prior knowledge" of the photos (T.816:11-12), and the Respondent recognized this to be a complaint of *surprise*.

The word "surprise" was also not used by defense counsel while he was objecting to Det. Schiraldi's testimony about the Leatherman tool, but it was manifest that *surprise* was the nature of his complaint.  Defense counsel stated  that he *had not been given any notice* that Schiraldi

-41-

might testify *about the Leatherman tool*:

> We were given Rosario material and discovery material that
> indicates his findings with respect to this cord [the ligature], not
> with respect to the [Leatherman] tool..
> [bracketed matter inserted]

(T.829:8-11) (DB50).

Defense counsel also complained at length that he was surprised by the *substance* of

Schiraldi's testimony, "which we have not gotten any prior notice of.." (T.835:15-18), i.e., it was

significantly *different* from what was stated in the reports turned over to the defense prior to trial

(T.829:4-5, 11-17, 23-25; T.330:3-6; T.831:13 - T.832:3; T.834:9-15; T.837:6-13; T.840:8-9).

Respondent pointed out that the People appended 16 pages of Det. Schiraldi's notes to

their Voluntary Disclosure Form (RB56). However, it does not deny that those notes pertained

only to Schiraldi's examination of the *ligature*, and his testing of the *hair* and *fiber* evidence, and

the *black, plastic-like speck* that had been found on the Leatherman (DB71-72).

Respondent noted that defense counsel did not request an adjournment to prepare for

Schiraldi's testimony about the Leatherman tool (RB57), but does not explain how doing so

would have ameliorated the prejudice. There was still no report from Schiraldi indicating his

analysis and conclusions about the tool or setting forth the details of the demonstration he would

conduct.

The testimony of Det. Schiraldi was not merely "cumulative" (RB59) of what F.B.I Agent

Rosati's testimony would be. Although they both concluded that the Leatherman was a "shearing

type" (scissor-like) tool, and that the cut mark on the ligature was made with a "shearing type"

tool, there were significant *differences*.

-42-

Agent Rosati concluded that the cut on the ligature could have been made with *any* "shearing type" (scissor-like) tool (T.932-933).

In contrast, Detective Schiraldi testified that the cut was made with a "shearing type" tool "that had that play in it to allow those multi-filaments to be flattened." (T.855:15-17).

Schiraldi had previously testified that this *flattening* was an indication that the tool that made the cut on the ligature had some "play" in its *jaws* (T.852:21-T.853:16). He had also testified that the Defendant's Leatherman tool had play in its jaws (T.828:2-21; T.842:24 - T.843:10; T.844:11-25). Thereafter, he testified that when he cut the ligature in the courtroom with the Leatherman, the filaments were *flattened* (T.845:1; T.853:12-16; T.854:8-11).

Schiraldi also testified that the *blades* of the Defendant's Leatherman tool had "unique" scratches and indentations, which would be reflected in the cuts it makes; and he demonstrated this using a *mono*-filament wire (T.827:2-16; 843:13-23). During colloquy, the trial Court expressly agreed with defense counsel, that Schiraldi's testimony implied that *only the Defendant's Leatherman tool could have cut the ligature* (T.837:8-15). [4] Thus, this was not merely "defendant's view," or a "newfound claim." (RB58).

The prejudicial effect of the testimony about the unique indentations and scratches on the blades of the Leatherman was *not* ameliorated by Schiraldi's testimony that these indentations and scratches would "*not* really leave an impression on *multiple* filament wire" such as that used to form the ligature (T.852:11-20; T.843:24 - T.844:2) (RB58). Since the testimony about the indentations and scratches on the blades was *irrelevant* and *misleading*, as was the use of the

---

[4]    In so doing, the Court implicitly rejected the prosecutor's argument to the contrary (T.830:8-11).

*mono*-filament wire in the demonstration, the Court should have *struck* the testimony *and* the demonstration and instructed the jury to disregard both.

As argued by Defendant in the Appellate Division, the Trial Court's statements during colloquy suggested that it believed that, since Schiraldi's report had been turned over prior to trial, there was no basis for precluding his testimony. The Court apparently did not realize that it had the *discretion* to preclude testimony *about the tool* on the basis of *unfair surprise*, on the ground that Schiraldi's reports did not state any findings about the tool. (DB71-72).

"The court failed to exercise its discretion because it erroneously perceived that it had no discretion to exercise. This was not a proper application of the test for expert testimony, and presents a legal issue for review by us. (*People v Williams*, 56 NY2d 236.)." (<u>People v Cronin</u>, 60 NY2d 430, 433, 470 NYS2d 110 [1983]).

B.      IT WAS AN ABUSE OF DISCRETION FOR THE COURT
        TO ALLOW DET. SCHIRALDI TO CONDUCT A SURPRISE,
        <u>FUNDAMENTALLY FLAWED, *IN-COURT DEMONSTRATION*</u>

(1)   <u>Unfair Surprise</u>

The People asserted *for the first time on appeal* that the defense was *not* surprised by Det. Schiraldi's demonstration (RB56). In the Court below, when defense counsel voiced his surprise at the demonstration and advised the Court that he had no idea what it would involve (T.821:8-12; T.822:14-16, 21-22; T.823:1-2) (DB74), the prosecutor's response was that he had no obligation to give the defense any advance notice (T.839:3-6).

Furthermore, after the Court allowed the demonstration to proceed, defense counsel voiced surprise over what the demonstration was purportedly showing, i.e., that the Leatherman

-44-

tool had certain "unique, individualizing" characteristics, which are reflected in the cuts it makes (T.828-840).

(2)     The Conditions Were Not Sufficiently
Similar To The Time In Question

As argued above under a separate Point heading, defense counsel did assert in the Trial Court that the conditions of Det. Schiraldi's demonstration were "not sufficiently similar to the time in question." (DB73). It was conceded, however, in the Appellate Division, that he failed to support that assertion with the correct arguments. (DB75). The failure to make the correct arguments is discussed below under Point V.A.

In Fields v City of New York, 4 NY2d 334, 339, 175 NYS2d 27 [1958], this Court deemed it appropriate to take into consideration the prejudicial effect of a serious error that was *not* preserved, in assessing the prejudicial effect of an error that *was* preserved. It concluded that, because of the seriousness of the unpreserved error, the preserved error was entitled to "greater stress":

> Somewhat greater stress may be placed upon this error because of the other more serious error previously mentioned to which no exception was taken. If a case is close or other circumstances have been liable to prejudice a party's case or defense, each reviewable error assumes greater significance because it is more likely to have affected the result.

While this Court is assessing the prejudicial effect of the above *preserved* errors regarding the "tool mark" evidence, it should also consider the serious unpreserved errors regarding the "tool mark" evidence which were not objected to because of defense counsel's ineffectiveness. (See Point "V.A." below).

-45-

Point V.

## DEFENDANT WAS DEPRIVED OF THE EFFECTIVE REPRESENTATION OF COUNSEL AS GUARANTEED BY THE CONSTITUTION OF THE STATE OF NEW YORK AND THE CONSTITUTION OF THE UNITED STATES

### Appellate Division Disposition

The Appellate Division disposed of the above-entitled argument by stating as follows:

"Viewing the totality of the evidence, the law, and the circumstances of the case, we find that the defendant's trial counsel provided meaningful representation (see *People v Benevento*, 91 NY2d 708, 712-713; *People v Baldi*, 54 NY2d 137, 147-148)."

### Reviewability

A claim of ineffective assistance of trial counsel, which was timely raised on direct appeal with an adequate record, it is properly reviewable by this Court. (See, e.g., People v Ennis, 11 NY3d 403,  872 NYS2d 364 [2008]; People v Caban, 5 NY3d 143, 800 NYS2d 70 [2005]; People v Benevento, 91 NY2d 708 [1998]; People v Hobot, 84 NY2d 1021 [1995]; People v Flores, 84 NY2d 184 [1994]; People v Rivera, 71 NY2d 705 [1988];  People v Baldi, 54 NY2d 137 [1981]).

### Preservation

The above-entitled argument was advanced in the Appellate Division in Point VII of the Appellant's Brief, which incorporated by reference arguments of ineffectiveness that appeared under previous point headings (DB107), as well as in Appellant's Statement of Facts (DRB51-52).

A.   DEFENSE COUNSEL WAS INEFFECTIVE IN REGARD TO THE
PEOPLE'S PRESENTATION OF EVIDENCE INTENDED TO SHOW
THAT A TOOL HE CARRIED ON HIS BELT WAS USED TO CUT
THE WIRE WITH WHICH THE MURDER VICTIM WAS STRANGLED

1.   Defense Counsel Should Have Moved *In Limine*
To Preclude the People's "Tool Mark" Evidence

In the Appellate Division, Respondent contended that, because the tool mark evidence

was "equivocal" and "not conclusive," it *could not have affected the verdict*, and therefore,

defense counsel was *not ineffective* for failing to move to preclude it. (RB83-84).

Prior to trial, the only tool mark reports that the defense received from the prosecution

were the reports by F.B.I. Agent Rosati, which were, in fact, inconclusive. (DB68-69).  It is

precisely because Rosati's testimony would have had such little probative value that it should be

have been excluded in view of the potential for prejudice. (DB69-70).  It is settled law that when

evidence is of slight value when compared to the possible prejudice to the accused that it must be

excluded. (People v Allweiss, 48 NY2d 40, 47, 421 NYS2d 341 [1979]).

In the Appellate Division, Respondent did not deny that jurors would naturally infer from

the admission of the expert's testimony and the Defendant's Leatherman tool that the tool *was*

somehow connected to the murder - even though it was not. (DB69).  Under such circumstances,

the Trial Court had the discretion to exclude it, and defense counsel should have asked that the

Court do so. (DB70).

2.   Defense Counsel Was Ineffective In Allowing
The Admission of the Defendant's *Leatherman Tool*

Respondent contended that it was a proper exercise of *discretion* for the court below to

-47-

admit the Defendant's Leatherman tool because its probative value outweighed any potential for prejudice (RB60, 62). But the trial Court never engaged in that weighing process, because defense counsel stated that he did not oppose the tool's admission (T.806:24-25). This was a grievous mistake. (DB70). Respondent does not disagree that, if the Leatherman had been excluded from evidence, there would have been no foundation for the lengthy tool mark testimony and demonstration that followed. (DB70).

The People asserted that there *was* a connection between the *tool* and the *Defendant,* because it was recovered from his person (RB62); but they did not argue that this made the tool admissible. They implicitly conceded that the tool had to be *connected* to the *crime,* and it was not. (DB68).

Respondent argued that "defendant overlooks that the tool was originally introduced into evidence in connection with Detective Schiraldi's recovery of a piece of plastic-like substance from it." (RB62). But since Schiraldi had determined that the speck found on the tool did *not* come from the ligature (T.806-808), there was no reason to even mention the speck *or* the tool, much less admit them.

The Defendant's Leatherman tool was *not* admitted as a mere "demonstrative aid" as was asserted by the People *for the first time on appeal.* (RB61-62). The jury was told that the Leatherman had been *recovered from Mr. Scrimo.* (T.1361, T.1759-1760). It was also manifest from the prosecutor's summation that the goal of Det. Schiraldi's demonstration was to have the jury conclude that the Leatherman was *the tool actually used to cut the ligature.* (T.1772-1774).

-48-

3.      Defense Counsel Was Ineffective in Failing to Make the Correct Arguments as to Why the Conditions of Detective Schiraldi's In-court Demonstration Were Not "Sufficiently Similar" to the "Time in Question"

As argued above under a separate Point heading, defense counsel did assert that the Trial Court that the conditions of Det. Schiraldi's demonstration were "not sufficiently similar to the time in question." (DB73). It was also conceded, however, that he failed to support that assertion with the correct arguments. (DB75).

This Court cannot hold that the Trial Court erred in permitting the demonstration, based upon the correct arguments that were made for the first time in the Appellate Division. (DB74-79). (See People v Person, 8 NY3d 973, 974, 836 NYS2d 531 [2007]). However, this Court can and should consider defense *counsel's failure to make the correct arguments* as an instance of ineffectiveness.

a.    The time in question

In the Appellate Division, the People tacitly conceded that, in a criminal case, "the time in question" is usually the time that the crime was committed; that the time in question in this case, based upon the Indictment, had to be April 12, 2000, when the murder was allegedly committed; and that it was incorrect for defense counsel to agree that the Court use the date of April 20, 2000, when the ligature was examined and photographed by Det. Schiraldi (DB75-76).

b.      The Condition Of The Leatherman Tool and the Cut End Of The Ligature

It also was shown in Appellant's initial Brief that Det. Schiraldi's conclusion that the ligature had been cut with a shearing-type (scissor-like) tool was based upon his observation that the *soft, tiny* strands of filament protruding from the cut end of the ligature were pushed or folded

over to one side  (T.815:9-12;  T.852:24-25)(DB76).  This is the result of the "shearing" effect, i.e., one blade passing alongside the other (T.815:9-12).

Det. Schiraldi's conclusion that the particular shearing tool that made the cut on the ligature had some "play" in its jaws was based upon the fact that some of the filaments, which are normally "round" (cylindrical), were "flattened" (DB76) (T.919:4-5;  T.853:12-16; T.855:15-17; T.854:8-11;  T.919:3-4).

In the Appellate Division, Respondent incorrectly stated that such "flattening" was a normal characteristic of a "shearing type" tool (DB38[fn.16]).  Only one of the pages that Respondent cited mentioned the flattening of the filament (T.919), and on that page, Schiraldi was explaining on re-direct why he considered a "shearing" cut to be "one directional"(T.918:3-T920:8).  Describing a "shearing" action generally, he stated that when the blade that does the cutting comes down, it tends to bend the wire over to one side (T.919:3-4).  In the midst of this general explanation, however, he made a specific reference to the Leatherman tool (People's 44) and to the 2 microscopic photos of the cut end of the ligature (Peoples 71-72):

> The slight play within that tool gives that flattening that those
> pictures depict.

(T.919:4-5).

In the Appellate Division, the People did not dispute that the prosecutor had failed to show that the appearance of the ligature had remained *unchanged* since it was cut, or that the filament protruding from the cut end was *not "capable of being...altered."* (DB77).  Respondent also failed to distinguish the cases holding that, under such circumstances, the evidence was *irrelevant* and *lacked probative value.* (DB76).  Defendant's Trial Counsel failed to make that

-50-

argument.

Respondent argued that even if there was a change in the condition of the tool or the ligature, this did not warrant exclusion of the *demonstration* because a "variation in circumstances affects the *weight* of the evidence, but is not a basis for its exclusion." (emphasis added) (RB60).  However, Respondent left out the previous sentence in <u>Mariner</u>, in which the threshold issue of *admissibility* was addressed:

> Demonstrative evidence is *admissible*, in the court's discretion, *provided* that the conditions under which the experiment are conducted are *similar* to those existing at the time of the incident at issue. (emphasis supplied).

(147 AD2d  659, at 660).

Assuming that the conditions of the demonstration are sufficiently similar to the time in question as to be admissible, the jury must assess its probative value "with a full awareness of any variations" (<u>Id</u>., at 660).  In this case, the jury was not made aware of the variations, or told how they might affect the results of the demonstration.  Defense counsel failed to accomplish this in his cross-examination of Schiraldi, or in his summation.

c.   <u>The Use of Dissimilar Wire</u>

In the Appellate Division, Respondent tacitly conceded that Schiraldi's use of *mono*-filament wire in his demonstration, to show the impression left by the "unique indentations and scratches" on the blades of the Leatherman tool, was *misleading and confusing*, because the blades would *not* have left such an impression on the *multi*-filament wire that was used as the ligature to strangle the murder victim. (DB77-78) (RB58, 60-61).  Defense counsel apparently

did not grasp the significance of this "variation," since he said nothing about it in his arguments

to the Court (for exclusion) or in his closing statement to the jury.

### d.   Other Prejudicial Aspects of the Demonstration

Respondent tacitly conceded Defendant's argument, that since there was no evidentiary

connection between the Defendant's Leatherman tool and *the murder*, it was prejudicial for

jurors to see wires being cut with it during Det. Schiraldi's in-court demonstration, especially

since the Leatherman tool was the only "shearing-type" (scissor-like) tool that was used. (DB79-

80).

Respondent disagreed that it was prejudicial that the Leatherman tool was *the only tool

admitted into evidence*, but did not explain why this was not unfairly suggestive (DB32)

(RB62[fn.23]).

### e.   Discretion

Respondent argued in the Appellate Division that it was a proper exercise of *discretion*

for the trial Court to allow Det. Schiraldi to conduct an in-court demonstration because the

probative value exceeded the potential for prejudice. (RB60-62).  However, there is no indication

in the record that the Court ever engaged in that weighing process.  Defense counsel failed to

argue that issue.

### 4.   Defense counsel Was Ineffective In Failing to Move To Strike Detective Schiraldi's Improper References to Tests Conducted By the Defense's "Tool Mark" Expert

Respondent asserted in the Appellate Division that Det. Schiraldi's re-direct testimony

"in no way established Petraco as an expert, tool-mark or otherwise, in the eyes of the jury."

(RB59).  However, Det. Schiraldi had expressly referred to Nicholas Petraco as an "expert."

(T.922:2-3).  Moreover, it was plain to the jury that Petraco was a "tool mark" expert, from

Schiraldi's testimony that Petraco had examined and tested the Leatherman tool, making cuts

with it and examining the cuts under the stereo microscope. (T.922:3, 16-25).

Schiraldi testified that Petraco was an "outside" expert who appeared at Police

Headquarters *with defense counsel*, Mr. Chamberlain (T.932), and one of the prosecutor's

questions referred to "[t]his examination *by* Mr. Petraco *and Mr. Chamberlain*." (T.923:8-9).

Thus, the jury heard that Mr. Petraco was working *for the defense*.  The prosecutor would also

make reference to the Defendant's "expert" (T.1773:1-5) while discussing the tool mark evidence

in his summation. (T.1772-1773):

> Think about something else that Detective Schiraldi told
> you, his expert, his expert [apparently pointing to Defendant], went
> to the Nassau County Police Department laboratory, took the tool
> and cut several of pieces of wire. Think about that. His own expert
> used that tool. [bracketed matter supplied]

(T.1773:1-7).

This remark could have had no other purpose but to suggest to the jury that Petraco was

not called as a witness because his testimony would not have helped the defense.

> It is, of course, absolutely improper for a prosecutor to suggest that
> a defendant has an obligation to call witnesses on his own behalf,
> or that he failed to call certain witnesses because their testimony
> would have been unfavorable.

(People v Grice, 100 AD2d 419, 422 [4th Dept 1984]).

Defense counsel objected to the above quoted remark in the prosecutor's summation, but

-53-

that objection was properly overruled the remark accurately recounted testimony in the record. When the testimony was given, defense counsel should have moved to strike it.

The <u>Davis</u> case cited by Respondent did *not* involve the *burden of proof.* (RB60). Also, the trial court in that case instructed jurors not to consider certain improper testimony that it *struck*, and the Court of Appeals agreed with the prosecution that the jury presumably followed this instruction. In our case, the improper re-direct testimony by Det. Schiraldi was *not struck*, and it was defense counsel's failure to request that it be struck that was the basis of Appellant's ineffectiveness argument, along with defense counsel's failure to dispel its prejudicial effect during re-cross. (DB81).

Respondent asserts that Schiraldi's testimony did *not* imply that if Petraco had testified, he would have described the same unique, individualizing features of the Leatherman tool that Schiraldi had. (RB59). But the jury would naturally have naturally drawn that inference from Schiraldi's testimony that he did not perform any of his own tests on the Leatherman (T.921:20-22), and that he first observed the "unique" characteristics of the Leatherman while observing the tests being conducted by Petraco.. (T.921:25 - T.922:4; T.922:21-23).

#### 5. Defense Counsel's Failure To Call The Defense's Tool Mark Expert

The People did not dispute that the defense planned to call its own tool mark expert, Nicholas Petraco. (DB51-52, 82). They argued, however, that defense counsel may have concluded that there was "no need" to do so because the People's tool mark evidence was "equivocal" (RB84). The record demonstrates the implausibility of this argument. Defense counsel's had strenuously argued that Schiraldi's testimony and demonstration implied that the

-54-

cut on the ligature *could only have been made with the Defendant's Leatherman tool*; and the Court had *agreed* with this view (T.837:8-15) and implicitly rejected the prosecutor' argument to the contrary (T.830:8-11)(DB72). The prosecutor had pointedly relied on the erroneously admitted "tool mark" evidence in the People's opening statement and summation, thus exacerbating its prejudicial impact. (DB25-26, 55). (Compare <u>People v Johnson</u>, 80 NY2d 798, 799, 587 NYS2d 278 [1992]).

 

B.    DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING
TO OBJECT TO IMPROPER TESTIMONY ABOUT THE
<u>DETECTIVES' INTERROGATION OF THE DEFENDANT</u>

In the Appellate Division, the People implicitly conceded Defendant's argument that he did *not* give the police a "confession," or make any "admissions" (DB58). They took the position that the statements were *false* and were admissible as evidence of "consciousness of guilt." (RB47, 49-52, 54, 82-83, 85, 92). In taking this position, the People tacitly conceded that Defendant's argument that the statements were *hearsay*, which could *not* properly have been admitted for their *truth*. (DB58).

Respondent did not disagree that, if defense counsel had objected to such testimony, and the prosecutor had stated that the purpose was to show "consciousness of guilt," the Court would have been required to give a limiting instruction based upon the standard "Consciousness of guilt" instruction (1 CJI [NY] 9.16). (DB58-59).

1.  Defense Counsel Was Ineffective in Failing
    to Move to  Strike the Detectives' Speculative
    Testimony as to the Operation of the Defendant's
    <u>Mind In Response to Being Asked Certain Questions</u>

The People asserted in the Appellate Division that defense counsel was not ineffective for

not moving to strike this testimony because the Detectives merely related their "observations" of

Defendant's "conduct." (RB80-81).  However, they did not deny that the Detectives *implied* what

they thought was going on inside Mr. Scrimo's mind, or that the prosecutor exploited this in his

closing argument, when he argued that each time the Detectives observed the Defendant *lower*

*his head*, he was *lying*. (DB80).

At other times, the Detectives *explicitly* stated what they believed the Defendant was

thinking or feeling, i.e., that he "couldn't" look at them (T.1288:6;  T.1292:15); and that he

appeared "nervous"(T.1153:2;  T.1281:23;  T.1288:5), "upset" (T.1284:3-4), "taken aback"

(T.1286:17), "agitated" (T.1291:10), "sullen," and "withdrawn" (T.1365:23).  Respondent did

not dispute that such testimony was rank speculation.  Furthermore, what was allegedly observed

was ambiguous, and therefore, it had no probative value.  Its only purpose was to prejudice the

Defendant, by having the jury draw an inference of guilt.

The prejudice was exacerbated when defense counsel had one of the Detectives *repeat* his

testimony during cross-examination, and then *reminded* jurors of it in his summation. (DB60).

The prosecution argued on appeal that defense counsel tried to use it to the Defendant's

"advantage," that the Detectives had described the Defendant as "nervous," when he suggested to

the jury, in summation, that these were "sophisticated homicide detectives who were expert at

getting admissions" (RB81).  But the Detectives had *not* gotten any admissions; and defense

counsel's remark may have caused jurors to think they had.  Also, the Detectives had testified

-56-

that the Defendant only got nervous over *certain* questions.  So, no "advantage" was gained.

The prejudice was further exacerbated when the jury was reminded of the testimony *again* during the summation of the prosecutor. (DB60).

> 2.   Defense Counsel Was Ineffective in Failing
>      to Move to Strike the Detectives' Testimony
>      That They *Knew* the Defendant Was *Lying*

Respondent did not dispute that it would be prejudicial and improper to ask a police witness whether he thought the Defendant was *lying*, or was *guilty*. (DB61-62).  But, here, the same improper *result* was achieved, through a *less direct approach*, i.e: "each Detective stated his opinion that the Defendant was lying *in the context of his narrative of the Defendant's interrogation.*" (DB61).

On appeal, the People did not deny that it would be natural for jurors to regard the Detectives' statements that the Defendant was lying as expressions of their actual opinions.  The prosecutor's summation shattered any illusion that such a result was not exactly what was intended.  The District Attorney urged jurors to

> "..reach the same conclusion as Detective Parpan and McHugh and
> that is that he was lying"

(T.1749:6-11) (DB61).

Yet, defense counsel had stood mute during this palpably improper testimony.

3.    Defense Counsel Was Ineffective in Failing to Move to Strike the Detectives' Testimony That After the Defendant's Arrest He (a) Declined to Answer Certain Questions; (b) Remained Silent When Accused of the Murder; And Finally (c) Declined <u>to Answer Any Further Questions and Requested an Attorney</u>

(a)

It was shown in Appellant's initial Brief that once it becomes apparent that testimony has been elicited for no other reason but to "develop that defendant had refused to answer damaging questions while he was in custody," it should be *struck*. (DB63). Respondent's Brief cited irrelevant cases which stand for the proposition that *when a defendant testifies at his trial*, he may be impeached by what he omitted from his pre-trial statements to police (RB82). Mr. Scrimo did *not* testify.

(b)

Respondent conceded that it was impermissible for Detective Parpan to testify that Paul Scrimo did not respond when he was implicitly accused of the murder. (DB64). It argued, however, that this could not have led the jury astray, because of the instructions given in the Court's charge (RB83). No legal support was cited for this argument, which ignores the cases cited by Appellant that suggest otherwise. (DB64). The Court needed to *strike* the testimony, and give a *prompt curative instruction*, e.g., that the Defendant's failure to respond to Det. Parpan's accusation "signified nothing." (<u>People v Travato</u>, 309 NY 382, at 386). Defense counsel failed to request such relief.

(c)

It was shown in Appellant's initial Brief, that the admission of testimony that Mr. Scrimo refused to answer any further questions and invoked his right to counsel, was prejudicial error

-58-

"which, quite by itself, requires reversal and a new trial" (DB64-66).  Respondent's assertion that the prejudice was ameliorated because the court's charge included the standard instruction on *right to counsel* (RB83), is unsupported and without merit.  The trial court needed to strike the testimony, and specifically "instruct jurors to draw no inference from defendant's declination to answer further police inquiries." (DB65).  Neither of these curative actions was requested due to defense counsel's ineffectiveness.

Respondent argued that any error was harmless, citing Hernandez (involving an isolated instance in case where the evidence was overwhelming) (RB83), but in our case, the jury *twice* heard testimony about Defendant's invocation of his right to counsel (DB65-66), *and* the evidence against him was *not overwhelming*.

C.   DEFENSE COUNSEL WAS INEFFECTIVE IN
     AGREEING TO THE COURT'S CHARGE ON
     "CONFESSIONS AND ADMISSIONS" AND IN FAILING TO
     REQUEST A CHARGE ON "CONSCIOUSNESS OF GUILT"

1.   Consciousness of Guilt (1 CJI [NY] 9.16)

The People argued *for the first time on appeal* that the Defendant's statements were evidence of "consciousness of guilt" (RB47, 49-52, 54, 82-83, 85, 92).  This was never stated by the prosecutor at trial.  Nor was the jury given a "consciousness of guilt" instruction.

(a)

The People argued in the Appellate Division that defense counsel's failure to request an instruction on  consciousness of guilt did not render his assistance ineffective, because such evidence was limited to defendant's statements, and it constituted a *minor* component of the

-59-

People's case (RB85-86).  This argument is belied by the trial record as well as the Respondent's Brief.

The prosecutor's opening statement suggested that the Defendant's "false" statements *outweighed* all of the physical evidence. (DB86, 89).  Defendant's  statements were then discussed in minute detail by 4 different police witnesses. (DB86).  In the prosecutor's closing, he argued that it was "important that when we look at this evidence, we *start with the statements that he gave to the police..*" (emphasis added); and, in no uncertain terms, he asserted that the reason why the Defendant gave the police "false," and "inconsistent" statements was that he was *guilty*. (DB89-90).

In Point III of Respondent's Brief, the "consciousness of guilt" evidence was described as "extensive" (RB47).  And throughout Respondent's Brief, the Defendant's statements were discussed. (RB4-5, 10-16, 23, 29-35, 45, 48-51, 53-54, 80-83, 86).  It is beyond serious dispute that Defendant's statements were a *major* part of the prosecution's case.


(b)

The People argued that it may have been a "strategic" choice on counsel's part not to request a "consciousness of guilt" instruction so as not to draw further attention to the "inconsistencies" in the Defendant's statements. (RB86).  But the statements were already the focus of attention, as a result of the relentless emphasis they had been given by the prosecutor. The instruction would have had a salutary effect in showing that "consciousness of guilt" is *not* demonstrated by mere "inconsistencies."

The standard instruction requires jurors to first determine (1) whether the statements

-60-

attributed to the Defendant had, in fact, been *made* by him; and if so, (2) whether the statements had been *proven* to be *false*. (DB87). The instruction requires the Court to identify the independent evidence by which the People have attempted to disprove it. (*Id.*)

(c)

Respondent argued that the jury was provided with sufficient guidance on how to evaluate *consciousness of guilt* evidence by the court's charge as a whole, which included instructions on how to assess the credibility of witnesses, a "two inference" charge, and instructions on the evaluation of defendant's statements to police personnel. (RB86 [incl. fn28]).

The Court's instructions on credibility and on "statements to police personnel" (RB86[fn.28]) were *inapplicable*, because they provided that, before the jury may consider the defendant's statements, they must find them to be *truthful* (T.1788-1806, T.1809-1816), whereas, "consciousness of guilt" evidence is *not* offered for its *truth.*

The cases cited by Respondent do not support the proposition that the Court's "two inference" charge regarding "circumstantial evidence" generally (T.1809:2-10), was an adequate substitute for the standard instruction on "consciousness of guilt," which has many other important elements (DB87). Nor was the jury instructed, in any event, that the Defendant's *statements* could be viewed as "circumstantial evidence."

Respondent's statement that the jury received "instructions on the evaluation of defendant's statements to police personnel," was presumably a reference to the instruction on "Confessions, Admissions and Statements" (1 CJI [NY] 11.01). As will be discussed below under subheading "2," the prosecutor *objected* to this instruction at the post-charge conference,

-61-

as being *inapplicable* to the facts of this case. (T.1825-1827). The People should not be permitted to take a position on appeal which is *inconsistent* with that which the prosecutor took below. (In the Matter of Sbuttoni, 16 AD3d 693, 694 [2d Dept 2005]).

In any event, the fact that the jury heard the instruction on "Confessions, Admissions and Statements" only *exacerbated* the prejudiced that flowed from the fact that it did *not* hear the instruction on "Consciousness of guilt." Under the circumstances of this case, the Court's failure to instruct the jury on "consciousness of guilt" was *not* harmless (DB89).


    2.   "Confessions, Admissions and Statements" (1 CJI [NY] 11.01)

At trial, the prosecutor argued that the Court's charge based on 1 CJI [NY] 11.01 "doesn't apply" to the facts of this case (T.1825-1827).

In the Appellate Division, Respondent asserted that "such instructions were in fact *necessary* because, due to counsel's *arguments* to the jury that the detectives had tried to coerce defendant into confessing (1679, 1709-11, 1713) there was a "'genuine question of fact as to the voluntariness of [his] statement.' People v White, 27 AD3d 884, 886 (3d Dept 2006) (citing People v Cefaro, 23 NY2d 283, 288-289 [1968])." (emphasis added) (RB86-87).

Once again, the People should not be permitted to take a position on appeal which is *inconsistent* with that which the prosecutor took below. (In the Matter of Sbuttoni, supra, 16 AD3d at 694).

Secondly, the argument that was made by the People for the first time on appeal has no merit. White actually held that "[s]uch an instruction is required only if the *evidence* presents a genuine question of fact as to the voluntariness of the statement.." (emphasis supplied) (*id.*, at

-62-

886). Similarly, <u>Cefaro</u> held that "[a] Trial Judge is required to charge on voluntariness only if an issue has been raised at the trial by a proper objection, and *evidence* sufficient to raise a factual dispute has been adduced either by direct or cross-examination" (emphasis supplied) (*id.*, at 288-289). Here, there was no *evidence* regarding coercion. Nor did the People purport to cite any in their Brief. (It may also be parenthetically noted that there was no *argument* on coercion either). The argument is totally contrived.

There is no way of concluding, short of speculation, that the jury did not rely on the erroneous instructions it received with regard to the Defendant's statements. (See discussion in <u>People v Martinez,</u> 83 NY2d 26, 37-38, 607 NYS2d 610 [1993]).

The Defendant was prejudiced by fact that the jury was instructed on "Confessions, Admissions and Statements," which was *not* applicable to the prosecution's use of his statements, *combined* with the fact that the jury was *not* instructed on "Consciousness of guilt," which *was* applicable. Respondent did not counter Appellant's arguments that defense counsel was ineffective in failing to request the correct charge (DB86-90), *and* in failing to object to the incorrect charge (DB90-91).

D.    DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING
TO OBJECT TO NUMEROUS PREJUDICIAL
<u>REMARKS IN THE PROSECUTOR'S SUMMATION</u>

<u>Appellate Division Disposition</u>

The Appellate Division disposed of the above-entitled argument by stating as follows:

> The defendant's contention that certain statements made by the prosecutor during summation deprived him of a fair trial is unpreserved for appellate review (see CPL 470.05[2]; People v

-63-

Dien, 77 NY2d 885, 885-886; People v Nuccie, 57 NY2d 818, 819; People v Medina, 53 NY2d 951, 953). In any event, the challenged comments constituted fair comment on the evidence (*see People v [\*2]Ashwal*, 39 NY2d 105, 109), were responsive to the arguments presented in defense counsel's summation (*see People v Galloway*, 54 NY2d 396, 400-401), or constituted harmless error (*see People v Crimmins*, 36 NY2d 230, 239).

Preservation

In the Appellate Division, the Defendant argued under Point VI of the Appellant's Briefs that "The Defendant Was Unfairly Prejudiced By the Prosecutor's Summation." (DB92-106; DRB44-49). It was conceded that *most* of the issues argued under that heading had *not* been preserved due to defense counsel's failure to object; and it was argued that they should be considered in the interests of justice *or as ineffective assistance*. (DB49). As shown below, the Appellate Division concluded that *none* of the arguments were preserved, and it did not exercise its interests of justice jurisdiction to consider them. Accordingly, in this Court, the prosecutor's remarks are discussed only in the context of Defendant's argument on *ineffective assistance*.

Reviewability

As shown above (p.46), a claim of ineffective assistance is reviewable by this Court.

ARGUMENT

It is respectfully submitted that the Appellate Division's conclusion, that the prosecutor's errors were either not improper, or were harmless, was erroneous, and that defense counsel was ineffective in not voicing appropriate objections.

-64-

Before addressing specific remarks and the specific objections that defense counsel should have made, a few comments will be made regarding the Appellate Division's Decision.

### "fair comment on the evidence"

As shown above, the Appellate Division held in this case that "the challenged comments constituted fair comment on the evidence," citing People v Ashwal, supra.. In Ashwal, however, the Second Department held that the prosecutor's remarks were *not* "fair comment," and on this basis, it granted the defendant a new trial. (39 NY2d 105, 109-111). Thus, Ashwal actually *supports* the position of the Defendant. It was cited several times in Defendant's Brief (DB92, 95-97), not just because of the result, but because of the application of the principles it enunciated.

### "were responsive to the arguments presented in defense counsel's summation"

Every prosecutor's summation is in some sense "responsive" to the summation of defense counsel, since the summation of defense counsel is always given first. The issue is whether the prosecutor's summation was "fairly" responsive, i.e.: Was there something said during defense counsel's summation that explains and somehow justifies a remark during the prosecutor's summation that would otherwise be considered improper? (See, e.g., People v Anthony, 24 NY2d 696, 703-704, 249 [1969]). Even where defense counsel's argument on summation "invited a strong response from the prosecutor, " it may still be held that the response that the prosecutor gave in his summation "exceeded the bounds of proper summation." (See People v Trinidad, 59 NY2d 820, 821, 464 NYS2d 740 [1983]) (court's refusal to grant defendant's request

-65-

for curative instructions constituted reversible error).

In our case, the Appellate Division supported its conclusion that the prosecutor's remarks were "responsive to the arguments presented in defense counsel's summation," with a citation to this Court's opinion in People v Galloway, 54 NY2d 396, 400-401.

In Galloway, however, this Court did *not* reject Defendant's appellate arguments concerning the prosecutor's summation on the ground that it was "responsive to the arguments presented in defense counsel's summation." Rather, on the pages cited by the Appellate Division in our case, this Court held that the prosecutor's "safe streets" argument, although condemnable, was "harmless error" because the facts of the case were "simple," and there was ample evidence of guilt. (*id.*, 400-401).

Earlier in the Galloway majority's opinion, there is a reference to the prosecutor's comments regarding the "defendant's contention"[5] the prosecution witness had a gun. It is not clear whether this was a reference to defense counsel's *summation*, or to the testimony of the two defense witnesses that they saw this individual with a gun. (*id.*, at 399, 404). Assuming that this was a reference to defense counsel's *summation*, this Court did *not* hold that defense counsel's summation justified the prosecutor's remarks. It stated only that the prosecutor's remarks "did not exceed the broad bounds of rhetorical comment permissible in closing argument." (*id.*, at 399). (The Galloway majority did state examples of how both attorneys had committed improprieties and had provoked one another, but defense counsel's summation was *not* mentioned among them).

---

[5]     The prosecutor characterized the defense's contention that the witness Cruz possessed a gun as a "smokescreen" or "a red herring" and cast aspersions on the credibility of the defendant's and the witness Taylor's testimony. (*id.*, at 399)

In any event, the summation of defense counsel at *this* Defendant's trial did *not*, by any

stretch of the imagination, justify the remarks in the prosecutor's summation that Defendant

complained of on appeal; and the prosecutor's closing argument *did* exceed the broad bounds of

permissible rhetorical comment.


<u>"or constituted harmless error"</u>

Finally, the Second Department held that the remarks made by the prosecutor during his

summation were "harmless" citing <u>People v Crimmins</u>, 36 NY2d 230, 239.  As discussed under

Point II above, the evidence against the Defendant in this case,  after excising the evidence that

had been erroneously admitted, was *not* "overwhelming," and thus the doctrine of harmless error

has no application.


       A.        The Prosecutor Denigrated the Defendant and His Attorney
                <u>and Vouched For  the  Credibility of Prosecution Witnesses</u>

It was argued in Appellant's initial Brief that the prosecution's denigration of the defense

by characterizing it as a "charade," as a  "sham," and as "swill," was patently improper. The

argument was supported by reported cases in which similarly denigrating terms had been

condemned.  (<u>People v Brown (Terrence)</u>, 26 AD3d 392, 393 [2d Dept 2006]("story ... load of

garbage"); <u>People v Torres</u>, 111 AD2d 885, 886-887 [2d Dept 1985] ("doomsday sham ...

smokescreen defense"); <u>People v Robinson</u>, 191 AD2d 595, 597 [2d Dept 1992] ( "con job" ...

attempt to "dupe" jurors); <u>People v Davis (Stancil)</u>, 53 AD2d 870 [2d Dept 1976] ("tries to pull

the wool over your eyes").

The People's Brief addressed none of these cases.  Instead, Respondent argued that it was

-67-

permissible for the prosecutor to make a "tempered challenge" to a *defendant's credibility*, when the credibility of the prosecution witnesses is attacked during defense counsel's summation (RB72). In each of the cases cited by Respondent, *the defendant testified* (People v Humphrey, 15 AD3d 683, 684, 686 [3d Dept 2005]; People v Overlee, 236 AD2d 133, 135 [1st Dept 1997]). They have no application, since Mr. Scrimo did *not* testify.

The People also asserted that defense counsel had "created a credibility contest" by "expressly urg[ing] the jury to credit *his account* over that of prosecution witnesses (T.1673-1732)"(emphasis added)(citing defense counsel's *entire* summation). (RB73-74). Respondent's failure to cite any particular pages is not an oversight. There is no page in defense counsel's summation where he asks jurors to credit the "account" of the Defendant over that of prosecution witnesses.

Nor was the People's response "tempered." Respondent did not disagree that the Courts of this State have universally condemned the type of denigrating remarks that were used in the prosecutor's summation about the Defendant and his attorney, i.e., characterizing the defense as a "charade," a "sham," and "swill;" stating that Defendant must have thought the police and the jury were stupid; that the defense was an insult to the intelligence of the jury; that the Defendant had "tailored" his statements to the police to fit whatever evidence he thought they had, and that his attorney had similarly "tailored" the defense. (DB92-95).

The People's only response was that these denigrating remarks were "almost exclusively" aimed at the Defendant (RB71), implicitly conceding that *some* of the improper remarks were also aimed at *defense counsel*. The fact the remarks were aimed at the defendant, moreover, does not excuse them.

-68-

Respondent argued that the prosecutor's comments on the Defendant's physical appearance at trial (DB95), were a proper response to defense counsel's attempts to discredit JOHN KANE (RB72). But only a few of the pages of the record that are cited by Respondent are from defense counsel's summation. (T.1682-1683, 1694, 1718-27), and defense counsel's arguments on those pages do *not* in any way justify the prosecutor's suggestion that the Defendant and his attorney were staging a performance for the jury by having Mr. Scrimo come to court wearing a suit, with his head no longer shaved. Respondent failed to distinguish or to even address the case of <u>People v Nunez</u>, 74 AD2d 805, 426 NYS2d 2 [2d Dept 1980] which was cited in Appellant's initial Brief (DB95).

> Finally, there was improper comment on the dress and physical characteristics of the defendant at trial. These errors may, it is assumed, be traced to the zeal of the prosecutor. However, in channeling such zeal, a prosecutor must be mindful not only of his duty to the People, but also of his duty to the defendant in insuring an untrammeled fair trial. When such zeal results in overstepping the bounds of fair and proper cross-examination and summation, it raises the spectre of lack of good faith and serves to undermine justice.

(74 AD2d 805, at 806).

In Appellant's initial Brief, it was argued that it was improper for the prosecutor to invite jurors to view the Detectives as "expert" witnesses, with 50 years combined experience in determining if homicide suspects are telling the truth (T.1742, 1746-1749), who were uniquely qualified to give an opinion on the defendant's *credibility*, and to urge jurors to *agree* with the Detectives that the Defendant was *lying* (DB95-96).

The prosecution argued on appeal that the prosecutor was only defending *the Detectives' credibility*, which had been attacked (RB72-73). However, the remarks in question had nothing

-69-

whatsoever to do with the Detectives' "credibility." They were about the Detectives' assessment of the "credibility" of the *non-testifying* Defendant.  Specifically, the prosecutor had improperly asked jurors to abdicate the responsibility to make their own credibility determinations, and to instead adopt the credibility determinations that had been made by the Detectives, because the Detectives were uniquely qualified to make such assessments by virtue of their experience and expertise. (DB95-96).

> B.     The Prosecutor Called Upon the Jury to Draw Conclusions
> Which Could Not Be Fairly Inferred from the Evidence

The District Attorney may not call upon jurors to draw conclusions which are not fairly inferrable from the evidence.  (People v Ashwal, 39 NY2d 105, 110, 383 NYS2d 204 [1976]; People v Conners, 149 AD2d 722, 723, 540 NYS2d 818 [2d Dept 1989]).

In response to Defendant's argument on appeal that the prosecutor in this case called upon the jury to draw conclusions which could not be fairly inferred from the evidence, the People failed to cite *any* record evidence from which *any* of the complained of arguments could have been fairly inferred. (DB96-106) (RB74).

"When an attorney in summation enlarges upon facts not in evidence or presses upon the jury subjects which its members have no right to consider, the required and proper practice for opposing counsel is to interrupt the summation for the purpose of objecting to the improper statements (*People v. Marcelin*, 23 A.D.2d 368, 370, 260 N.Y.S.2d 560, 562; 8 Carmody-Wait 2d, NY Prac. s 56:140) and the Trial Judge should respect the obligation of counsel to present such objections (American Bar Association Project on Standards for Criminal Justice, Function of the Trial Judge, s 5.7, pp. 70-71)." (People v DeJesus, 42 NY2d 519, 526, 399 NYS2d 196

-70-

[1977]).  This obligation was not fulfilled in the present case, in that defense counsel did not

interrupt the summation of the prosecutor for the purpose of objecting to his improper

statements.


1.     Misrepresenting the Testimony of the Medical Examiner

At the Appellate Division, Respondent tacitly conceded that the prosecutor's summation

*misrepresented* the testimony of the Medical Examiner. (DB97-99).

The prosecutor had argued that KANE (who was thinner and shorter than Scrimo) was

"too small" to have committed the murder.   In support of this argument he cited the fact that

there were no signs of a struggle in the apartment, which suggested that the victim had been

easily overcome. (DB97).  He also cited the Medical Examiner's testimony that the victim had a

fractured hyoid bone and larynx, asserting that "[i]t took a big and powerful man to crush her

throat and break the bones that were testified to by the Medical Examiner." (DB97-98).

Defendant argued on appeal that the Medical Examiner had only testified that these bones

were fractured as a result of manual strangulation. He had not testified that it took a "big and

powerful man" to do this or that KANE was physically incapable of it. (DB98).

The People, on appeal, *abandoned* the prosecutor's argument that the Medical

Examiner's testimony suggested that the attacker had to be *big and powerful* (DB97-98), and

instead argued that the attack must have been *quick* (RB51-52) - which was in no way probative

that the attacker was the Defendant, Paul Scrimo, rather than JOHN KANE.  Respondent also

acknowledged that Ms. Williams was "severely intoxicated" at the time (as shown by post-

mortem blood-alcohol tests) (RB36), and did not dispute Defendant's argument that this could

explain the lack of signs of a struggle. (DB97).

As discussed in Appellant's initial Brief, the prosecutor summation was also at variance with the Medical Examiner's testimony regarding the cause of death. The prosecutor *twice* made the assertion that Williams had quickly died during manual strangulation, and that the Defendant then strangled her with the ligature, to make sure that she "stayed dead." (DB98). Literally, he accused the Defendant of "overkill," which was highly inflammatory. (DB99). It was shown that this was contrary to the Medical Examiner's testimony that death had resulted from *both* the manual strangulation *and* the strangulation with the ligature. (DB98). If, as KANE testified, the manual strangulation came first, then it logically followed that Williams must have still been alive at the time of the strangulation with the ligature. (DB99).

On appeal, the People abandoned the prosecutor's argument that Williams had *died* during the *manual* strangulation, and prior to the strangulation with the *ligature*. Instead, they argued that during the manual strangulation, Williams was quickly "rendered ...unconscious" (RB52), and "looked dead" to KANE when her eyes rolled back in her head (RB25).

Lastly, in an attempt to suggest that the prosecutor's misconduct was really an innocent mistake, Respondent's asserted that the Defendant *did* not contend that the District Attorney's misstatement of the Medical Examiner's conclusions was in *bad faith*. (RB74[fn.25]). But, it was shown in Defendant's Reply Brief that it had been asserted in Appellant's initial Brief that the prosecutor's misstatement of the Medical Examiner's testimony was "a blatant attempt to mislead the jury." (DRB47)(DB99).

2.   Misrepresenting the DNA Evidence

It is a daunting task for the typical juror to digest and understand expert testimony on a complex scientific topic such as DNA.  Moreover, jurors cannot ask questions.  Thus, it can be critically important, especially after a long trial, for the Court and/or counsel to accurately recount the expert's testimony for the jury and to frame the issues that such testimony was intended to assist the jury to decide.  Given the increasingly prominent role that DNA has played in criminal cases, it would be a reasonable for jurors to expect the judge and the lawyers involved to be knowledgeable about DNA evidence and to be able to assist the jury in sorting it out.  Alas, the trial Judge in this case did not recount the testimony of the DNA expert in his charge, and it was misstated in the summations of *both* attorneys.

In People v Higgins, 5 NY2d 607, 186 NYS2d 623 [1959], where the trial court had recounted the testimony of a certain key expert, both in its charge and on occasions during the trial, this Court found that the trial court had *misstated* the conclusion that had been reached by the People's expert on a crucial issue, and that this "may well have tipped the balance against defendant." (*id*., at 628).  The erroneous statement by the trial court seriously undermined the probative force that the expert's opinion might well have had in the minds of the jury, and, viewed in that light, it was most damaging to defendant. (*id*., at 629).

Given the unique role of the prosecutor, he too can "tip the balance against a defendant" by *inaccurately* recounting the testimony a prosecution's expert.  Doing so intentionally is, of course, a violation of the responsibilities and the trust placed in him as a prosecutor.  (People v Vielman, 31 AD3d 674, 675, 818 NYS2d 291 [2d Dept 2006]).

"The [District Attorney] is the representative not of an ordinary party to a controversy,

-73-

but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (Berger v United States, 295 U.S. 78, 88 [1934]).

It is also impermissible for the prosecutor to go beyond what an expert actually said at trial and to offer his own "unsworn testimony" as to what the expert "meant." (People v Riback, 13 NY3d 416, 2009 WL 4250149, at 4 [2009].

While the prosecution's expert was on the stand in Riback, the prosecutor merely asked him to define the term "pedophile." The expert was apparently not asked if the defendant was a "pedophile," or to assume facts for the purpose of a hypothetical question from which that conclusion might be extrapolated. But the expert's definition of "pedophile" was used as "a springboard for the prosecutor to venture well beyond the evidence and the bounds of fair comment during his summation" in which he both implied and expressly asserted that the defendant was a pedophile. (id., at 2).

> As the dissenting Justice in the Appellate Division put it, these numerous "summation misstatements of fact and law ... when combined with the opinion by the prosecutor that defendant's acts were those of a pedophile ... rose to such a level that defendant was deprived of the fair trial to which he was entitled" ( People v. Riback, 57 AD3d 1209, 1220 [3d Dept 2008, Malone, J., dissenting] ). We recognize that County Court repeatedly sustained defense counsel's objections during the prosecutor's summation,

-74-

and instructed the jury to disregard parts of it. After a certain point,
though, the cumulative effect of a prosecutor's improper comments
during summation may overwhelm a defendant's right to a fair trial
( see People v. Calabria, 94 N.Y.2d 519, 523 [2000] ). Given the
inflammatory nature of the charges in this case, there was a
reasonable possibility that this prosecutorial misconduct
contributed to the verdict.

(id., at 4).

In the case at bar, the prosecutor committed both types of "fouls." First, he attributed a

statement to the People's DNA expert that she did *not* make, i.e.: that "Mr. Scrimo is a minor

contributor" to the "mixture of DNA on that Budweiser bottle." (T.1769:1-5). Then, he offered

the jury his own opinion as to what her *alleged* testimony "means," i.e.: that "John Kane was

drinking out of the bottle more than Mr. Scrimo was drinking out of the bottle." (T.1769:6-10).

(Please see discussion above under Point II, at pp. 25-28). As was noted under Point II, this

mixed DNA from the Budweiser was of critical importance because it was the only physical

evidence that was presented by the prosecution as being a link between Mr. Scrimo and the scene

of the murder. Thus, the prosecutor's deliberate distortion of the testimony of the DNA expert

was severely prejudicial, and it should have prompted a strenuous objection, and a request for a

curative instruction in which the Court informs the jury that Ms. Clement had *not* testified to

such conclusions.

### 3.   Lack of Evidence As Proof of Guilt

Appellant's initial Brief showed that neither logic nor the record evidence supported the

prosecutor's unconventional argument that the *presence* of physical evidence that KANE had

been in Williams' apartment and in contact with her body should be seen as proof that KANE

-75-

was *innocent*, whereas, the *absence* of physical evidence that Mr. Scrimo had been in the apartment should be viewed as proof that he was *guilty*. (DB100-104).  Respondent failed to address this point, tacitly conceding it.  (The District Attorney's Office elected to abandon the prosecutor's argument rather than attempt to defend it on appeal).

### 4.    Unsubstantiated Negative Inferences

It was argued in Appellant's initial Brief that the prosecutor sought to inflame the jury against the defendant by making statements about the defendant's behavior even though the prosecutor's characterization of that behavior was unsupported by the record. (DB105).  This argument also was implicitly conceded.

Respondent argued that no prejudice resulted from any of the remarks in the prosecutor's summation because of the overwhelming proof of guilt (referring to Respondent's Point II) and the instructions that the jury received in the Court's charge (RB75).  But Respondent cited no legal authority to support this argument.  Nor did it offer any explanation as to how the instructions it cited ameliorated the prejudice.

Respondent noted that most of the Appellant's arguments about the prosecutor's summation were not preserved (RB75), but tacitly conceded that they may be reviewed in the interest of justice, or as evidence of ineffectiveness (DB106).  Given the fact that the evidence in this case was *not* overwhelming, and turned primarily on the assessment of a single witness, the prosecutor's prejudicial comments cannot be deemed harmless, and the Defendant should be granted a new trial.

E.   DEFENSE COUNSEL WAS INEFFECTIVE
IN MANY ADDITIONAL RESPECTS

In the Appellate Division, the Defendant's Brief was structured in such a way that each Point dealt with a separate substantive issue, and in relation to each of those issues, there was a discussion of defense counsel's ineffectiveness.  Then, in a separate "Point VII," the issue of Ineffectiveness was separately addressed, and that Point incorporated by reference the discussions of ineffectiveness that had appeared earlier in the Brief. (DB107).

Contrary to Respondent's assertion (RB76[fn.26]), Appellant's initial Brief stated that Defendant's ineffectiveness of counsel argument was based upon *both* the Constitution of the State of New York *and* the Constitution of the United States. (DB107).

Respondent's Brief listed the actions that Defendant's trial attorney took which, in Respondent's opinion, were correct (RB79), but *Respondent failed to provide a single supporting reference to the record.*  Furthermore, most of the weaknesses in the People's case, which the People credited Defendant's trial counsel for bringing out, were actually conceded in the prosecutor's opening statement. (RB79;  T.329-330).

In reply to the People's argument on appeal that the Defendant's trial attorney *did not preserve* the arguments made in Point IV of the Defendant's Appellate Division Brief (RB68)(regarding the exclusion of three proposed defense witnesses), it was argued in Defendant's Reply Brief that, *if* that argument was deemed to be unpreserved, then it should be considered as another instance of ineffective assistance. (DRB38).  It was conceded in Point IV of the Defendant's Brief that trial counsel's argument was at times "inartful" He could certainly have stated more clearly and directly the legal basis on which he should have been permitted to present the testimony of Hartman, Domaradsky and Ball.  Defense counsel could have supported

-77-

his request with case law concerning the defendant's right to present evidence that the crime was committed by someone other than him, as was done by the defense counsel in <u>People v Rios</u>, 223 AD2d 390, 391-392, 636 NYS2d 753 [1st Dept 1996].

He also could have presented case law and articulated a cogent argument that was applicable to the specific purposes for which the testimony was being offered, as was done in Appellant's initial Brief:

> The testimony of the defense's proposed witnesses (T.1447-1448, 1453-1455, 1628) would have provided "necessary background information" about KANE (*People v Sibadan*, 240 AD2d 30 (1st Dept. 1998), helped to "explain the relationship" between KANE and Williams, to "place the events in question in a believable context," and to establish a motive for KANE to have strangled Williams. (*People v Garvin*, 37 AD3d 372 [1st Dept 2007]; *People v Archbold*, 40 AD3d 403 [1st Dept 2007]); *People v Corniel*, 258 AD2d 812, 814 [3d Dept 1999]; *People v Cabus*, 40 AD3d 540 [1st Dept 2007]).

(DB84).

Defense Counsel's Opening Statement

Appellant argued in his initial Brief that some of the remarks made during defense counsel's opening statement were "erroneous and ill advised"(DB107-108) (citing T.344:4-5; T.335:21-23; T.366:21-23).  The People argued that Appellant failed to specify what was wrong with these remarks (RB88).  Appellant's Reply Brief explained that Appellant had specified what was wrong with these remarks in his Statement of Facts. (DRB51) (DB27-29).[6]  Those passages from Appellant's Statement of Facts are quoted below:

---

[6]     An earlier, longer draft of Appellant's Brief repeated these portions of Appellant's Statement of Facts in the body of the argument on ineffective assistance, but the Brief had to be cut down in length.

Defense counsel misstated the issue regarding the Defendant's "Leatherman" tool, saying "they're trying to tie this tool into my defendant" (T.344:4-5). There was no question that Mr. Scrimo was the owner of this tool. The issue was whether it was this tool that cut the cord used as a ligature.

\*     \*     \*

However, some of defense counsel's remarks were better left unsaid. He suggested that the reasons why the Defendant might not have fully answered the detectives questions may have included "things that a man would not want his wife to know." (T.335:21-23). (The prosecutor had just told jurors that when Mr. Scrimo was asked by the 7-Eleven Clerk if he was going to see "the blonde lady," Mr. Scrimo said "Yea. Don't tell my wife.") (T.327).

Another ill-conceived remark was the following:

> But the issue isn't who did this. The
> real issue here is, after this case is
> over, have they proved that my
> defendant did this?

(T.336:21-23).

Jurors may have inferred that the defense was *not really disputing* the fact that the Defendant committed the murder, but only the prosecution's ability to *prove* it.

There was also a remark that may have been interpreted to mean the defense was *not really disputing* that Defendant was *inside* Williams' apartment:

> And it's not whether he was in the
> apartment or not, that's not the issue.
> Their whole -- everything they're
> going to try to point to, to show he
> was there. That's not the issue.

(T.341:3-6).

Mr. Scrimo had *denied* that he was inside Williams' apartment (T.1156, 1287, 1364-1365), and this was expected to be part of his defense (Minutes 9/27/00, p.7). If the defense was *conceding* that Scrimo was inside the apartment, then the lack of physical evidence of his presence would be immaterial, and the physical proof of KANE'S presence would not necessarily mean that he was the killer. Also, if the Defendant lied when he told Detectives he was never in the apartment, jurors could conclude that *everything* he said was a lie.

-79-

DB27-29).

It was argued in Appellant's initial Brief that defense counsel "failed to make appropriate objections" (DB108; citing T.347-365; T.501:20 - T.502:3; T.502:8-12; T.506:13-17; T.595; T.740, 742; T.1160:7 -T.1162:4; People's 1, 2, 43, 86). The People argued that Appellant failed to state the basis upon which an objection should have been made (RB88). In Appellant's Reply Brief, it was explained that the basis upon which each such objection should have been made was stated in the Appellant's Statement of Facts. (DRB51-52). It was noted there that defense counsel had failed to object when:

> - the witness was asked a *leading* question which prompted her in-court identification of the Defendant (DB38)(T.501:20 - T.502:3):

> - the People introduced a pre-trial photo identification by Francine Quinn *during their case in chief* (DB42-43)(People's 86)(T.595 and T.1160:7 -T.1162:4)

> - the prosecutor *led* Francine Quinn to *change* her testimony (DB38, DB40)(T.502:8-12 and T.506:13-17)

> - the ligature was admitted into evidence (People's 43) without any showing that there had been not been any change in the condition of the filament protruding from the cut end of it, or any limiting instruction (DB76-77) (T.740, and T.742) (also see, *supra*, Point III).

(DRB51-52).

The reasons why defense counsel should have objected to the admission of People's 1 and 2 [photos of the victim alive], as well as the testimony of the victim's brother and co-workers at pages [T.347-365], were set forth in Appellant's initial Brief (DB108). See also, People v LaValle, 3 NY3d 88, 112-114, 783 NYS2d 485 [2004].

Respondent argued that defense counsel was not ineffective in not objecting to this evidence because "the identification by Williams' brother of the two photographs were, of course, relevant to her identity, given the distortion of her features caused by the strangulation." (RB90).   However, there was nothing in the record which indicated that those who knew the victim had been unable to identify her dead body, or that they could not have identified her in court in the crime scene photos or the autopsy photos which would be going into evidence (see, e.g., People v Jones, 43 AD2d 1296, 1298 [4th Dept 2007]).   Just as importantly, the identity of the victim was never an issue in this case.   It was not raised at trial when it came to the admission of any of the photos of the deceased.   If identification had been an issue, the victim's brother's identification of her in a photo of her when she was alive would *not* have established that she was the same deceased individual person that was the subject of this murder case.

Also, Mr. Williams' testimony was not limited to his "identification" of his sister in the *live* photo of her, or to merely providing his sister's address, age and occupation, as the Respondent argued. (RB91).   He discussed his sister as a person, her life, education, personality, and their brother/sister relationship. (T.349-356).   He also discussed the rest of the family (who are depicted in the photo admitted as People's 1), and Ruth's relationship with them (T.348-354).   None of this information related to any of the facts to be proved at the trial.   It could only have been introduced to evoke sympathy.

Respondent argued that defense counsel would only have antagonized the jury and appeared callous to them, if he had objected to this testimony. (RB90-91).   But once defense counsel realized that the witness was a member of the victim's family, he could have requested a side bar, demanded that the prosecutor make an offer of proof outside the jury's hearing, and then

-81-

moved to preclude.  The prosecutor took such pre-emptive action with regard the defense's three

proposed fact witnesses. (T.1627).

Respondent argued that the testimony of the victim's co-workers was necessary to explain

the events leading up to the discovery of her body (RB9), but failed to explain how such events

were of any relevance.  It was sufficient for the jury to hear *when* and *where* the body was

discovered.  Officer Stark testified that she discovered Williams' dead body in her apartment at

9:15 P.M. on April 13, 2000. (T.1386-1389).

Respondent did not dispute that defense counsel elicited damaging testimony during his

cross-examination. (DB108).  (People v Zaborski, 59 NY2d 863, 865, 465 NYS2d 927

[1983]).  It argued that "in the course" of doing so, defense counsel *also* elicited information that

assisted the defense, but failed to show that any benefit was gained. (RB88-89).

It was shown in Appellant's initial Brief, with a small fraction of the examples that could

have been cited, that the trial Court had to repeatedly explain to the Defendant's attorney the

proper way that things should be done in a trial. (DB109-110).  Respondent suggests that defense

counsel may have been "trying to skirt the rules of evidence," in a zealous attempt to gain some

advantage. (RB91-92).  But the argument was purely hypothetical, and failed to address the

specific examples cited, which illustrate ineptness, not zeal. (DB109-110) (RB92).

Respondent argued that the Court's correction of defense counsel did not necessarily

"affect" his representation.  But Appellant's point was that the Court's corrections were an

*indicator* of such representation's deficiencies.  It is likely, however, that at the very least,

Court's numerous corrections of defense counsel did have a cumulative, adverse affect upon the

jury's view of the defense.  The People did not dispute that defense counsel's ineptness was

-82-

largely responsible for the trial running behind schedule. (DB110).  They only objected to

Appellant's speculation about what effect this may have had upon the jury, and upon defense

counsel's decision not to put on a defense. (DB110-111) (RB92).


<u>Defense counsel's Summation</u>

The Defendant's attorney began his inept summation by describing the People's case as

"a mountain of evidence, a mountain, a tremendous amount of evidence ..." (T.1675:25 -

T.1676:3) .. "you have mountains of evidence.." (T.1732:6) (DB52).

He inexplicably reminded jurors of the sympathetic testimony about the kind of person

Ruth Williams was when she was alive (T.1680:10-13) (DB52).

The Defendant's attorney also reminded jurors that three Detectives who interrogated Mr.

Scrimo after his arrest had testified that, in response to certain questions, the Defendant looked

down, could not look the Detective in the eye, and became sullen and withdrawn (T.1679:5-15;

T.1710:22 - T.1711:3;  T.1711:18-22).  He explained (as if it wasn't clear enough already), that

the Detectives wanted the jurors to draw conclusions as to what Mr. Scrimo's "internal thought

process was" (T.1712:17-19), i.e., that the Defendant was being "evasive" and was "lying"

(T.1679:10-12;  T.1711:15-16). (DB52-53)

Defense counsel failed to go through the many reasons why the testimony of Francine

Quinn was entitled to little, *if any*, weight (T.1685-1688).  Although he mentioned the drug

charges against Quinn, he failed to explain that the same Nassau County District Attorney's

office that was prosecuting Mr. Scrimo would also be deciding what disposition would be

offered in Quinn's case, and that this could be a motive for Quinn to curry favor with the

-83-

prosecutor. (T.1685). (DB53).

He *incorrectly* stated that, after Quinn had failed to recognize Scrimo in the May 3, 2000 line-up, she subsequently told the Detectives that she recognized Scrimo because of his *tattoos* (T.1687:19 - T.1687:3). (Quinn had allegedly recognized Scrimo in the May 5, 2000 Newsday photo, in which *no tattoos were visible*) (People's "86") (T.594-595, 1160-1161).(DB53).

When defense counsel mentioned the all-important DNA evidence, he failed to summarize it *accurately.* Notwithstanding Ms. Clement's testimony that Labcorp's test results did *not* establish that any of the crime scene DNA had come from a particular person, but only whether each of the persons in this case was or was not among the *possible* contributors, defense counsel erroneously told the jury that each item of crime scene DNA evidence *did* come from a particular person. (T.1677, 1693-1694, 1698-1699, 1702, 1705).

Most significantly, defense counsel stated that KANE was, in fact, (*not just possibly*) the "major" donor to the mixed DNA on the Budweiser bottle. (T.1677:11-13).   Jurors, hearing defense counsel interpret the DNA testimony in this manner, would infer, by parity of reasoning, that Paul Scrimo must, in fact, be one of the "minor" donors to the mixed DNA on the Budweiser bottle.  The prejudicial effect of defense counsel's *mistaken* restatement of the DNA testimony would subsequently be compounded by the prejudicial effect of the prosecutor's *intentional misrepresentation* of that testimony (T.1769:1-10).

Not only did defense counsel fail to remind jurors about the "scab"that Det. McHugh observed on KANE'S head several days after the murder was alleged to have occurred (T.1137:9-12); he stated that Det. McHugh did *not* see any "scratches" (T.1707:16-23).  As discussed above, cellular material had been found under the victim's fingernail which contained

-84-

DNA that matched the DNA profile of JOHN KANE. (DB32-33, 114).

Defense counsel's remarks concerning the People's "tool mark" evidence failed to minimize its significance. (T.1699-1701). He did not explain that there was no evidentiary connection between the Leatherman tool and the murder. He failed to explain why the in-court demonstration of the Leatherman tool by Det. Schiraldi was defective and misleading. He did not summarize the respects in which the testimony of Det. Schiraldi had been contradicted by the testimony of the People's other "tool mark" expert, F.B.I. Agent Rosati. (DB54).

Defense counsel *incorrectly* stated that, after Scrimo returned from buying beer and cigarettes, it was "about another ten minutes" before the murder occurred. In doing so, he appeared to fill in the only remaining gap in the time line leading up to the murder, thus making the prosecutor's subsequent argument that the murder occurred at *about* 4:30 A.M. appear plausible. This effectively eliminated one of the greatest weaknesses in the People's case. (DB111-112, DB54). None of this was disputed in Respondent's Brief.

Nor was it disputed that defense counsel made some remarks in his summation from which it could be inferred that the Defendant had, in fact, been *inside* Williams apartment, and had *direct knowledge* of the murder. (DB44-45, 112). As was observed above, in connection with similar remarks that defense counsel had made in his *opening* statement, Mr. Scrimo had *denied* that he was ever inside Williams' apartment (T.1156, 1287, 1364-1365), and this was expected to be part of his defense (Minutes 9/27/00, p.7). If the defense was *conceding* that Scrimo was inside the apartment, then the lack of physical evidence of his presence would become immaterial, and conversely, the physical proof of KANE'S presence would not necessarily mean that he was the killer.

-85-

A change in the theory of the defense during the course of a trial, without any

substantiation therefor, has been noted by this Court as an indicator of ineffectiveness. (People v

LaBree, 34 NY2d 257, 259, 357 NYS2d 412 [1974]).  It undoubtedly creates a negative

impression in the minds of the jurors and almost certainly dooms the defense to failure.

Thus, from the beginning of the Defendant's trial until the end, his defense was seriously

undermined by his own attorney.

The case at bar is a one-witness identification case that hinged on sharp issues of

credibility.   The recent opinion of the Second Department in People v Clarke, 66 AD3d 694,

698, 886 NYS2d 753 [2d Dept 2009] is "on all fours" with the case at bar:

> In conclusion, we do not find that any single example of
> deficient representation was sufficient to deprive the defendant of
> the effective representation of counsel ( *see People v. Dean*, 50
> A.D.3d at 1053, 856 N.Y.S.2d 649; *People v. Cyrus*, 48 A.D.3d at
> 160, 848 N.Y.S.2d 67; *People v. Cortez*, 296 A.D.2d at 466, 745
> N.Y.S.2d 467). Rather, we conclude that, given the totality of his
> counsel's deficient representation, the cumulative effect of these
> errors deprived the defendant of a meaningful representation and a
> fair trial ( *see People v. Ennis*, 11 N.Y.3d at 412, 872 N.Y.S.2d
> 364, 900 N.E.2d 915; *People v. Stultz*, 2 N.Y.3d at 283-284, 778
> N.Y.S.2d 431, 810 N.E.2d 883; *People v. Baldi*, 54 N.Y.2d at 147,
> 444 N.Y.S.2d 893, 429 N.E.2d 400). This is especially so where, as
> here, the determination of guilt in this one-witness identification
> case hinged on sharp issues of credibility ( *see People v. Robinson*,
> 260 A.D.2d 508, 510, 689 N.Y.S.2d 163; *People v. Walters*, 251
> A.D.2d 433, 435, 674 N.Y.S.2d 114).

## CONCLUSION

The November 190, 2009 Decision of the Appellate

Division, Second Department, should be reversed.

-86-

The County Court's June 18, 2002 Judgment of conviction and sentence should be vacated, and a new trial should be granted.

The County Court's April 5, 2001 Decision and Order should also be vacated, and suppression should be granted.


Dated: February 1, 2010


Respectfully submitted:


_____

CHARLES E. HOLSTER III, ESQ.
Attorney for *Defendant/Applicant*
100 East Old Country Road
Mineola, New York 11501
(516) 747-2330