RS

11|20

State of New York



# County Court, Nassau County

262 Old Country Road, Mineola, New York 11501
tel (516) 571-2800  fax (516) 571-1332

**Kathryn A. Cunningham, Esq.**
**Chief Clerk**

Date:     September 21ˢᵗ, 2010

Paul Scrimo
#2A3677
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Re:     Motion #:        C-778
        SCI / IND#:      1456N-2000
        FEL / DKT#;

Dear Sir/Madam:

    Your application received on 9/21/10, for a **Pro Se Motion to / for Vacate Judgment** is being placed on the County Court calendar on **October 20ᵗʰ, 2010** before the **Honorable David P. Sullivan**.

    Should you wish to submit any further documentation in support of this application, please do so by the above scheduled date, serving a copy on the Office of the District Attorney at the above address in addition to serving the Court.

                  Very truly yours,

                  CLERK'S OFFICE

cc:     Office of the District Attorney

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU                                        x

PEOPLE of the State of New York

                          Plaintiffs,

                                       **NOTICE OF MOTION**

    -against-                         **TO VACATE JUDGEMENT**

                                  Ind. No. 1456-00

PAUL SCRIMO,

                           Defendant.   x

     PLEASE TAKE NOTICE that upon the annexed affidavit of PAUL

SCRIMO, duly sworn to on the __9ᵗʰ__ day of September, 2010, (and documents

attached thereto) and upon the accusatory instrument and all proceedings

previously held herein, defendant will move this Court, at the Courthouse

located at 240 Old Country Road, Mineola, New York, on the 20th day of

October, 2010 at 10 a.m. or as soon thereafter as may be heard, for:

     An order pursuant to Criminal Procedure Law §440.10(h) vacating the

judgement entered against the above-named defendant on the 30th day of May,

2002, on the following grounds:

1. Defendant claims actual innocence and has not received a meaningful
   appeal to address/remedy the errors that occurred at trial.

2. Criminal Procedure Law §470.5(1) is unconstitutionally vague.

     Such other and further relief as the Court may deem just and proper.

Dated: September 9 , 2010

                                      Paul Scrimo, pro-se
                                    Defendant-Appellant
                                    Green Haven CF
                                    PO Box 4000
                                    Stormville, NY 12582

TO:  Nassau County District Attorney
     262 Old Country Road
     Mineola, NY 11501

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU _____ x

PEOPLE of the State of New York

Plaintiffs,    AFFIDAVIT IN SUPPORT
OF MOTION TO
-against-    VACATE JUDGEMENT

Ind. No. 1456-00

PAUL SCRIMO,

Defendant.  x
_____

State of New York  )
County of Dutchess  )ss:

Paul Scrimo, being duly sworn, deposes and says:

    1. I am the defendant in the above-titled proceeding. I make this affidavit in support of a motion, pursuant to CPL §440.10(h) to vacate the judgement of conviction herein, upon the grounds that the defendant's constitutional rights to due process were violated when the intermediate appellate court failed to render a meaningful appeal in an appeal as of right, and that CPL §470.25(1) is unconstitutionally vague.

    2. This information is based on information and belief, the source of that information being the trial record and all subsequent briefs, motions and decisions of the courts. As for those matters based upon belief; I believe them to be true.

    3. As a conviction is not final until the appellate courts affirm said conviction, a CPL §440 motion is the proper vehicle to challenge the conviction in it's entirety.

    4. I was indicted for murder in the second degree (PL §125.25). At

the arraignment I pled "not guilty" and posted bail in the amount of $100,000. (bond). I was tried in this court before Hon. Judge Jeffrey Brown and the jury rendered a verdict of guilty on May 21, 2002.

5. On June 18, 2002 I was sentenced to a term of 25 years to life.

6. The evidence adduced at my trial may be summarized as follows: I was convicted primarily on the testimony of John Kane, an individual who was taken into custody for the same crime and whose subsequent custodial statement resulted in my arrest. There was no physical evidence presented at trial connecting me to the crime or crime scene, despite the prosecutor's introduction of inconclusive testimony by expert witnesses.

7. After conviction in the New York Supreme Court (Ind. No. 1456-00), petitioner was entitled to an appeal as of right in accordance with CPL §450.10. He promptly filed a Notice of Appeal (AD No. 2002-06660) and an in forma pauperis application with the New York Supreme Court Appellate Division, Second Department. That application was approved and appellate counsel (Charles E. Holster III, Esq.) was appointed to pursue the appeal.

8. Six years after conviction, on August 7, 2008, defendant filed a claim in the New York Court of Claims against the State of New York and appellate counsel Holster for the purpose of enforcing a timely appeal. That claim was abandoned upon submission by Holster of defendant's appellate brief.

9. The Appellate Division affirmed the petitioner's conviction in a Decision dated November 10, 2009 (Exh. A). That Decision did not address all of the appellant's issues, instead citing "harmless error" or stating that "The defendant's remaining contentions are without merit." (People v Scrimo, 67 AD3d 85)

4

**10.** Petitioner filed a request for leave to appeal to the New York Court of Appeals and was denied (Hon. Susan Phillips Read, J.) on March 29, 2010 (Exh. B). A request for reconsideration was denied on July 30, 2010 (Exh. C).

**11.** Defendant filed a petition for a writ of habeas corpus in the Dutchess County Supreme Court using the same arguments presented in the instant motion, but was denied for having been an inappropriate vehicle to present issues which could have been presented in a direct appeal or a CPL Article 440 motion (Exh. D)

**12.** The conviction should be reversed for the following reasons:

**I)** The intermediate appellate court failed to render a meaningful appeal when it misapplied the *Crimmins* harmless error doctrine where there was no "overwhelming" evidence, and further abused their discretion in declaring that "The defendant's remaining contentions are without merit." .

**II)** Defendant claims actual innocence.

**III)** CPL §470.25(1) is unconstitutionally vague in that it allows the courts to circumvent the constitutional requirement that an appeal taken as of right be "meaningful".

**11.** The grounds for relief raised upon this motion have not been determined on the merits upon a prior motion or proceeding in a court of this state, or upon a prior motion or proceeding in a federal court. The same issues raised in the instant motion had been presented to the Dutchess County Supreme Court in a petition for a writ of habeas corpus, but that writ was denied on the grounds that a CPL Article 440 motion was appropriate, thus giving rise to the instant motion.

## POINT I

### THE FAILURE OF THE STATE TO GRANT A MEANINGFUL APPEAL IS A VIOLATION OF DUE PROCESS OF LAW.  NY CONST. ART. 1 §6, US CONSTITUTION AMENDS. 5, 14

Petitioner claims actual innocence, and for an innocent man to be wrongfully convicted in a court of law, mistakes must have occurred.  It is the appellant's task to point out those mistakes to the appellate courts and cite examples of how the courts have remedied similar errors in the past.  It is then the appellate courts' solemn duty to examine those mistakes, comparing the issues presented to those presented in the past in order to properly form a judicious opinion.  It has been held to be error for appellate courts to dispose of non-frivolous appellate claims without providing an explanation. (see Corcoran v Levenhagen, 558 US ___, 130 SCt 8 [2009])

In the instant case, the defendant was convicted solely on the word of John Kane, an individual who had been arrested for the crime and who had been told by detectives during questioning that he would be charged with murder.  At that point Kane told detectives that he was there, but that Paul Scrimo (petitioner) committed the crime, and he testified accordingly at petitioner's trial.  At trial, the prosecutor attempted to show that a mixed sample of DNA found on a beer bottle at the crime scene tied the defendant to the crime, but his own DNA expert, Meghan Clement, would not commit to such a claim.  A conviction based upon the word of an eyewitness without further (physical) evidence, particularly when that witness is also alleged to have committed that same crime, has long been held to be based upon 'weak' evidence. (see, e.g. Berger v

6

US, 295 US 78 [1935]) and because the evidence is not 'overwhelming' the *Crimmins* harmless error rule does not apply. (see People v Crimmins, 36 NY2d 230 [1975])  Because the jury was comprised of lay people who could not reasonably have been expected to understand the unreliability of uncorroborated eyewitness evidence, petitioner appealed in part on the weight of the evidence.

Appellate Assistant District Attorney Ilisa Fleischer (ADA), in an apparent attempt to bolster the weak eyewitness testimony, successfully 'created' more evidence than was adduced at trial when she stated not less than seven times in her Respondent's brief that there was conclusive DNA evidence linking the defendant to the crime scene, despite the testimony of the DNA expert who testified that she could not/did not calculate a statistical estimate (for the defendant in relation to the beer bottle) as it was generally not possible in a mixed sample.  Furthermore, even the trial prosecutor downplayed the DNA and fingerprint evidence that inculpated only his own eyewitness by telling the jury (Exh. E) to ignore the physical evidence and instead consider what was missing from the crime scene (and thus not in evidence)[1].  It is proof that the appellate court did not investigate the ADA's transcript citations (Exh. F) supporting her erroneous claim as she cited the very testimony that belies her claim.[2]

---

[1] This is a separate issue that may well be the subject of the "harmless error" ruling.  We cannot know and thus cannot argue the point as the appellate court did not explain the reasoning behind their finding of "harmless error".

[2] For the convenience of the Court,  these transcript pages have been provided with the Court's copy of this motion.

7

The intermediate appellate court failed to deliver a meaningful appeal in the following manner:

    1.  When declaring unspecified issues to be "without merit", the intermediate appellate court ignored the doctrine of 'stare decisis' and deprived appellant of due process of law.

    When a State grants a statutory right to appeal, due process compels States to make certain the defendant's rights are not forgone and that substantial legal and factual arguments are not inadvertently passed over. (see People v West, 100 NY2d 23, 28 [2003])  Thus, the State's procedure must afford "adequate and effective" appellate review, and a State's procedure provides such review so long as it reasonably ensures that an appeal will be resolved in a way that is related to the merit of that appeal. (see Smith v Robbins, 528 US 259, 276-277 [2000])

    2.  The application of the *Crimmins* harmless error standard was an abuse of discretion by the Court as there was no "overwhelming" evidence.

    As stated above, petitioner's conviction was based on the eyewitness testimony of John Kane, who had been arrested prior to the petitioner and whose DNA was found under the victim's fingernails and on cigarette butts and whose fingerprints were found at the scene of the crime.

    The trial District Attorney (DA) attempted to link the defendant to a mixture of DNA found on a beer bottle at the crime scene, but his own DNA expert, Meghan Clement (Clement) refused to commit to such an accusation. Clement testified that she had testified over 240 times in the past, so there was no question that if the DNA evidence could have inculpated the defendant, she would have testified to that effect.  The weak links, however, were the

unsophisticated jurors, who may have been unfamiliar with the doublespeak semantics used by Clement (i.e. "could not be excluded as a possible contributor"). It also possible that the appellate judges were confused by Clement's wordplay, though we can't know as they failed to explain their reasoning in their Decision.

The DA also introduced expert testimony regarding a Leatherman tool that was in the possession of the defendant at the time of his arrest. Defense counsel strenuously objected before and after the prolonged courtroom demonstration, thus preserving that issue for appeal. After the expert's demonstration, the judge agreed that it was confusing and should not be acceptable as evidence, but the DA successfully argued that the jury had already seen it and, in sum and substance, that bell could not be unrung. This issue is assumed to be one of those determined to be "without merit", though there is no explanation as to how that could be possible in view of all of the precedential caselaw cited.

In sum, it is an abuse of discretion to employ the *Crimmins* harmless error standard in a case where there is only uncorroborated eyewitness evidence.

## New York's Statutory Requirement

To further the claim of failure to grant a meaningful appeal, it remains to be established what comprises an appeal. Criminal Procedure Law (CPL) §470.25(1) states that "An order of an intermediate appellate court which affirms a judgement, sentence or order of a criminal court need only state such affirmance.". Peter Preiser, in his Practice Commentaries regarding CPL §470.25 points out that "This blanket statement is subject to an important exception where appellant has challenged the weight of the evidence. In such

9

case the court must fulfill appellant's entitlement to this review by carrying out that aspect of its responsibility and revealing its determination of the facts. *People v Romero, 2006, 7 NY3d 633, 636-644, 826 NYS2d 163, 859 NE2d 202; People v Danielson, 2007, 9 NY3d 342, 348-349, 849 NYS2d 480, 880 NE2d 1; People v Bleakley, 1987, 69 NY2d 490, 495-496, 515 NYS2d 761, 508 NE2d 672*; see also Practice Commentaries for CPL §470.15. Moreover, if in such case the intermediate appellate court's order fails to reveal or properly carry out its determination of the facts, the determination must be reversed and the case remitted for reconsideration of the facts. *People v Danielson, supra,* 9 NY3d at 349; *People v Bleakely, supra,* 69 NY2d at 495-496." (McKinney's Consolidated Laws of New York Annotated [West 2009])

In the instant case, the intermediate appellate court stated in their Decision that "Upon our independent review pursuant to CPL 470.15(5), we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero, 7 NY3d 633, 643-644*).". This determination, however, was not 'properly' carried out as it was based on an unsubstantiated misrepresentation of the DNA evidence, as outlined above, and the court failed to consider all of the relevant issues or explain why the doctrine of *stare decisis* was not required to determine that several of those issues were "without merit".

When an appellant presents issues that are backed by caselaw, the courts have an obligation to follow those precedents or explain the reason for their refusal to honor the decisions of past courts and the judges who preside over them. (see, <u>Payne v Tennessee</u>, 501 US 808, 827; "*Stare decisis* is the preferred course because it promotes the evenhanded, predictable and consistent development of legal principles, fosters reliance on judicial decisions, and

10

contributes to the actual and perceived integrity of the judicial process.")  By labeling certain issues as 'without merit', the court denigrates the attorney who prepared the appellate brief and shows a complete lack of respect for all of the courts and justices cited who considered those issues to have merit in the past. This failure to adjudicate issues meaningfully amounts to the Court paying lip service to the constitution as strict adherence to CPL §470.25(1) effectively allows the intermediate appellate courts to circumvent their constitutional obligations.

## POINT II

## DEFENDANT CLAIMS ACTUAL INNOCENCE

"[A] 'guilty'verdict only indicates that the government has proven beyond a reasonable doubt that the defendant committed each and every element of the crime, and not that the defendant actually committed the crime (*see People v Goetz*, 73 NY2d 751, 752, 536 NYS2d 45, 532 NE2d 1273)". (People v Cole, 1 Misc 3d 531, 765 NYS2d 477, 478 [2003]).

At a jury trial for a strangulation murder during which the prosecutor (DA) relied primarily on the alleged eyewitness testimony of John Kane, it was the defense counsel's miscalculation that because virtually all of the physical evidence inculpated the DA's eyewitness, there was no need to put on any defense witnesses at all.  That physical evidence consisted of Kane's fingerprints found at the scene of the crime, and Kane's DNA matching (as conceded by the DA) DNA found on cigarette butts and in a mixture of DNA from a beer bottle found at the crime scene, and matching DNA found *under the*

11

*fingernails of the victim* of a strangulation murder.  The DA adduced testimony from his expert DNA witness that the fingernail DNA could have come from casual contact, and because Kane claimed that he was in the room as the victim was strangled, the DA asserted that the presence of Kane's DNA under the victim's fingernails actually *supported* Kane's claim.  Combined with police testimony, however, that Kane had healed scratches on his face when he was taken into custody three weeks after the murder, this theory should not have held water for a reasonable jury.  If Kane's version of events was to be believed, the defendant was also in the room, in very close physical contact with the victim, and none of the defendant's DNA found its way under the victim's fingernails or anywhere else at the crime scene.  Again, under the mistaken assumption that this damning evidence of Kane's having committed the murder exculpated the defendant, defense counsel elected not to present any defense whatsoever.  While trial strategy cannot be second-guessed on appeal, it does give a reasonable explanation as to how an individual claiming actual innocence can get wrongfully convicted. (see *Cole*, supra)

Trial testimony revealed that Kane was an unemployed construction worker who frequented area bars and knew the victim intimately.  It was alleged during cross that he was a drug dealer and the murder was the result of a dispute with the victim (a woman) over drugs, but the Court would not allow questions regarding Kane's prior attempt to strangle a woman over a drug deal dispute, nor would the Court allow the defense to present testimony from the victim of that prior strangulation attempt.[3]

---

3.  The appellate court declared this issue meritless without explanation.

12

The DA asked the jury during summation why detectives would lie about Paul Scrimo and further told the jurors to think about how ridiculous it was that Scrimo would be framed[4]. It was never disclosed on the record, however, that prior to the murder Kane had bragged that he could not be arrested for dealing drugs as he had relatives "high up" in the police department. No hearing was requested or held to confirm Kane's relationship with (then) Nassau County Police Commissioner Donald Kane[5], or any member of the Nassau County Police Department. Exposing Kane's boast to the jury would certainly have negated those improper remarks by the DA in his closing argument.

Appellate counsel set forth the evidence showing Kane's guilt in his argument that the weight of the evidence was insufficient to convict the defendant. The appellate court did address this issue, albeit without explanation. The deciding factor may have been that, without any defense witness testimony to counter Kane's allegations, the jurors had only Kane's testimony on which to base their judgement. Or perhaps the appellate court believed the appellate ADA's misleading DNA evidence claims, and thus felt that there was in fact overwhelming evidence. Again, we cannot know as the court did not set forth the reasoning behind their blanket statement that "Upon our independent review pursuant to CPL 470.15(5), we are satisfied that the verdict of guilt was not against the weight of the evidence". In failing to articulate the reasoning behind its decision, the appellate court deprived the defendant of a fair opportunity to substantiate his actual innocence claim.

---

4. Another issue the appellate court declared "harmless error" without explanation.
5. Commissioner Kane announced his retirement two months after the defendant's arrest (though his retirement did not officially commence until a year later).

## POINT III

## CRIMINAL PROCEDURE LAW §470.25(1)
## IS UNCONSTITUTIONALLY VAGUE

It is a given that mistakes occur in the lower courts, including criminal courts. To address and remedy those mistakes is the primary reason for the existence of the appellate courts. A criminal defendant, however, differs from those of other courts in that he or she may have an appeal as of right, as authorized by CPL §450.10. This 'right' to an appeal is a right to a 'meaningful' appeal, and we are left to prove that CPL §470.25(1) does not apply to appeals by right as it is not a comprehensive statute, that its vagueness is subject to interpretation, and taken literally it deprives an appellant of a meaningful appeal and violates the right to due process.

Criminal Procedure Law §470.25(1) states the "An order of an intermediate appellate court which affirms a judgement, sentence or order of a criminal court need only state such affirmance.". Taken literally, CPL §470.25(1) would allow the intermediate appellate courts to arbitrarily decline to review any or all of the issues presented by an appellant, including those presented in an appeal as of right. This creates a paradox wherein the courts may legally deny an appellant an appeal despite the constitutional requirement that an appeal as of right be 'meaningful', and that inconsistency between State law and the constitution opens the door for the Supremacy Clause, as noted below.

The corresponding Federal requirement, Rule 52 of the Federal Rules of Civil Procedure, is clear and states that the courts must find facts specially and

state their conclusions of law separately.  In the absence of clear and comprehensive state law, preemption allows the Federal standard to supersede the inconsistent state law in deference to the Supremacy Clause.  As noted above, there is at least one important exception to the 'blanket statement', which serves to illustrate that, as written, CPL §470.25(1) is not all-encompassing. Another exception would be the failure by the intermediate appellate court to distinguish an appeal as of right from a discretionary appeal.  The United States Supreme Court has held that an appeal by right must be meaningful, and failure to so adjudicate is a due process error. (see, Evitts v Lucey, 469 US 387 [1985]). Due process is both a State and Federal Constitutional requirement, and all courts are bound by the due process clauses contained therein.

## DUE PROCESS

The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." (Matthews v Eldridge, 424 US 319, 333 [1976])

*Eldridge* states that identification of the specific dictates of due process generally requires consideration of three distinct factors:

1.  The private interest that will be affected by the official action;

2.  The risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;

3.  The Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

15

In the instant case, the first factor refers to the petitioner's right to a meaningful appeal of a wrongful conviction. As has been well stated in the past; Better nine guilty men go free than one innocent man remain unjustly imprisoned.

The second factor, the risk of error and the value of the remedy, in the instant case involves the incarceration of a wrongfully convicted citizen. The simplest remedy would be for the courts to properly adjudicate an appellant's claims so that a truly wrongful conviction would be thus exposed for the court's consideration, as only then could justice be fairly served. The value of a fair and proper judicial system to the citizens of this State and this Country is incalculable, as without strict adherence to a process based upon fundamental fairness there can be no confidence in the legitimacy of the decisions of the courts.

The third factor is the burden upon the Government should changes be required. In the instant case, that only requires that the intermediate appellate courts fully and fairly investigate the issues presented in an appeal as of right. The cost of the time involved is negligible compared to the moral cost of an error by the courts. This is not a hypothetical academic exercise- a citizen's liberty is at stake. It might be argued that the courts cannot handle the volume of appeals before them, and thus an expansion of the system is called for. If that proves to be the case, that then becomes an issue for legislators to consider in the future. For the purpose of this motion petitioner is arguing his own right to an appeal, and the cost of a meaningful appeal is a less demanding financial and administrative burden than prolonged post-conviction litigation.

16

The purpose of the due process clauses of the constitutions is to prevent the circumvention of the rights of citizens. If each court were allowed to operate on the "because we say so" doctrine instead of relying on the doctrine of *stare decisis,* each and every judge would have the potential to redefine previously accepted standards of law according to his or her own arbitrary and capricious whims.

## CONCLUSION

In conclusion, the New York Supreme Court, Appellate Division, Second Department arbitrarily disregarded several non-frivolous issues without explanation and abused its discretion when applying the *Crimmins* harmless error standard without the presence of overwhelming evidence, and the cumulative effect of these errors deprived petitioner of a fundamentally fair appeal of a wrongful conviction. It is not a function of the appellate court to act as an unwitting dupe for the ADA's disingenuous practices and the net result of those deceptions was a meaningless appeal, which thus violates petitioner's constitutional right to due process of law. Because an innocent man remains incarcerated due to a wrongful conviction, and because the appellate court failed in its obligation to render a meaningful appeal for said wrongful conviction, this court should uphold the constitutions by correcting the errors which occurred at trial and the meaningless appeal rendered by the intermediate appellate courts. Should this Court so direct, petitioner has every confidence that he will be vindicated in the event of a retrial.

17

WHEREFORE, based upon the due process violations shown above and in light of the defendant's meritorious claim of actual innocence, petitioner prays that this Court sees fit to vacate the judgement rendered at trial, and/or grant a de novo appeal based upon those same grounds, along with such other and further relief as this Court deems fit and proper.

Dated: September 9 , 2010
        Stormville, New York

                                    Respectfully submitted,


                                    _____
                                    Paul Scrimo 02A3677
                                    Defendant/Appellant pro se
                                    Green Haven C.F.
                                    PO Box 4000
                                    Stormville, NY 12582

Sworn to before me this

9 day of September, 2010

_____
NOTARY

RICHARD RYAN
Notary Public State of New York
ID # 01RY6050106
Qualified in Dutchess County
Commission Expires 10/30/ 10

18

# EXHIBITS

A) Appellate Division Decision
B) NY Court of Appeals Denial, 3/29/10
C) NY Court of Appeals Denial, 7/30/10
D) State Habeas Corpus Denial
E) DA Summation Transcript p.1770
F) Respondent's Brief p.37 w/beer bottle DNA citations


People v Scrimo  Ind. No. 1456-00

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

D24999
C/kmg

_____AD3d_____

Argued - October 22, 2009

A. GAIL PRUDENTI, P.J.
PETER B. SKELOS
JOSEPH COVELLO
LEONARD B. AUSTIN, JJ.

---

2002-06660

DECISION & ORDER

The People, etc., respondent,
v Paul Scrimo, appellant.

(Ind. No. 1456/00)

---

Charles E. Holster III, Mineola, N.Y., for appellant.

Kathleen M. Rice, District Attorney, Mineola, N.Y. (Douglas Noll and Ilisa T. Fleischer of counsel), for respondent.

Appeal by the defendant from a judgment of the County Court, Nassau County (Brown, J.), rendered June 18, 2002, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing (Ort, J.), of those branches of the defendant's omnibus motion which were to suppress physical evidence and his statements to law enforcement officials.

ORDERED that the judgment is affirmed.

Contrary to the defendant's contention, the County Court properly determined that the police had probable cause to arrest him (*see People v Thomas*, 231 AD2d 749, 750; *People v Crawford*, 221 AD2d 462). Accordingly, the County Court properly denied those branches of the defendant's omnibus motion which were to suppress physical evidence and his statements to law enforcement officials.

The defendant's contention that certain statements made by the prosecutor during summation deprived him of a fair trial is unpreserved for appellate review (*see* CPL 470.05[2]; *People v Dien*, 77 NY2d 885, 885-886; *People v Nuccie*, 57 NY2d 818, 819; *People v Medina*, 53

November 10, 2009

Page 1.

PEOPLE v SCRIMO, PAUL

A

NY2d 951, 953). In any event, the challenged comments constituted fair comment on the evidence (*see People v Ashwal*, 39 NY2d 105, 109), were responsive to the arguments presented in defense counsel's summation (*see People v Galloway*, 54 NY2d 396, 400-401), or constituted harmless error (*see People v Crimmins*, 36 NY2d 230, 239).

Upon our independent review pursuant to CPL 470.15(5), we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633, 643-644).

Viewing the totality of the evidence, the law, and the circumstances of the case, we find that the defendant's trial counsel provided meaningful representation (*see People v Benevento*, 91 NY2d 708, 712-713; *People v Baldi*, 54 NY2d 137, 147-148).

The defendant's remaining contentions are without merit.

PRUDENTI, P.J., SKELOS, COVELLO and AUSTIN, JJ., concur.

ENTER:

*James Edward Pelzer*

James Edward Pelzer
Clerk of the Court

November 10, 2009

PEOPLE v SCRIMO, PAUL

Page 2.

# State of New York
# Court of Appeals

BEFORE:  HON. SUSAN PHILLIPS READ,

Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

**CERTIFICATE DENYING LEAVE**

-against-

PAUL SCRIMO,

Indictment No. 1456/00

Appellant.

I, SUSAN PHILLIPS READ, Associate Judge of the Court of Appeals of the State of New York, do hereby certify that upon application timely made by the above-named appellant for a certificate pursuant to CPL 460.20 and upon the record and proceedings herein,* there is no question of law presented which ought to be reviewed by the Court of Appeals and permission is hereby denied.

Dated:  March 29, 2010
Albany, New York

*Susan Phillips Read*
Associate Judge

* ***Description of Order***:  Decision and Order of the Appellate Division, Second Department, entered November 10, 2009, affirming a judgment of County Court, Nassau County, rendered June 18, 2002.



# State of New York
# Court of Appeals

BEFORE: HON. SUSAN PHILLIPS READ,

_____
                                    Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

                -against-

PAUL SCRIMO,

_____
                                    Appellant.

**CERTIFICATE
DENYING
RECONSIDERATION**

     I, SUSAN PHILLIPS READ, Associate Judge of the Court of Appeals of the State of New York, certify that the application for reconsideration by the appellant of the application for a certificate to appeal pursuant to CPL § 460.20, denied by certificate dated March 29, 2010, be and the same hereby is denied.

Dated: July 30 , 2010
     Albany, New York

_____
     Associate Judge

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF DUTCHESS
------------------------------------------------------------------------X
PAUL SCRIMO,

                                 Petitioner,

          -against-

WILLIAM LEE, Superintendent of Green Haven
Correctional Facility,
                               Respondent.

------------------------------------------------------------------------X

**DECISION AND ORDER**

**Index No. 6362/2010**

SPROAT, C., SUPREME COURT JUSTICE

      Petitioner is currently incarcerated at Green Haven Correctional Facility upon his

conviction and sentence after a jury trial of murder in the second degree.

      Petitioner claims that he is being illegally detained and seeks to challenge his

entire conviction claiming he is an innocent man and is entitled to his immediate release.

      The petitioner appealed his original trial conviction to the Appellate Division.

Second Judicial Department which affirmed the judgment.  Thereafter the Court of

Appeals denied leave to appeal upon a finding that there was no question of law presented

and petitioner's application for reconsideration by the Court of Appeals was denied on

July 30, 2010.

      Since petitioner's claim concerning his 2002 conviction should have been more

appropriately addressed in his direct appeal or a motion pursuant to CPL Article 440, the

petition seeking a Writ of Habeas Corpus should be denied.  See *People ex rel. Baxter v.

Berbary*, 294 A.D.2d 932 (4th Dept. 2002) lv. den. 98 N.Y.2d 609.

Since the petitioner's application is not appropriate for consideration in the form of a Writ of Habeas Corpus to this Court, the Court declines the sign the Writ and dismisses the proceeding sua sponte. *People ex rel. Hickman v. Russi*, 257 A.D.2d 457 (1st Dept. 1999); *People ex rel. DeFlumer v. Strack*, 212 A.D.2d 555 (2nd Dept. 1995).

So Ordered.

Dated: August 27, 2010
      Poughkeepsie, New York

                                      HON. CHRISTINE A. SPROAT
                                        Supreme Court Justice

TO:    PAUL SCRIMO DIN 02A3677
        Petitioner, Pro Se
        Green Haven Correctional Facility
        P.O. Box 4000
        Stormville, NY 12582

Summation - People

1    he didn't care about the Budweiser bottle.  There

2    were no fingerprints on the Budweiser bottle, just

3    the cigarettes are gone and the Coors Light are gone.

4         Now, think about it.  I would take that, ladies

5    and gentlemen, over DNA and a fingerprint any day of

6    the week, because when the only items that are

7    missing from a crime scene can be shown to have been

8    purchased by this defendant, not only by independent

9    evidence but also by his own admission to Police

10   Officer Stark, and those are the only items that are

11   missing from a murder scene, that speaks volumes,

12   ladies and gentlemen, as much as any DNA or any

13   fingerprint.

14        Now, here is where it even gets more interesting

15   because you really have to think about the 7-Eleven

16   purchase and 7-Eleven clerk.  Down the road, he's got

17   a real problem.  He's got a real problem.  May 5th

18   the police department and detectives find that

19   7-Eleven clerk.  They find the 7-Eleven clerk and the

20   clerk remembers a sale about 4:00 a.m..  He remembers

21   the sale.  He made a sale to a regular customer.  He

22   made a sale to a regular customer, Mr. Scrimo.  He

23   makes a sale to a regular customer of particular

24   items and it was peculiar that Mr. Scrimo would be

25   buying a 12 pack of Coors Light and a package of



**Respondent's Brief**
ADA Ilisa Fleischer
(Heading added by appellant for clarity)

hours before her death (Catanese: 752, 758; Dr. THOMAS MANNING: 776, 778-83, 785, 787-89).

None of the latent prints found at the crime scene matched defendant's. The wineglass taken from Williams' kitchen table bore her fingerprint. A fingerprint on the CD case belonged to Kane. Two fingerprints found on the photo album and another fingerprint on a sheet of paper taken from the table could not be matched to anyone. No other identifiable fingerprints were recovered from any other surface in the apartment, including the ligature around Williams' neck (Detective CHARLES COSTELLO [Latent Fingerprint Section]: 707-15, 717-21; McHugh: 1190, 1209-10, 1261, 1266, 1271).

DNA testing established that the neck of the beer bottle on the kitchen table contained DNA from defendant, Kane, and Williams, with Kane the major contributor. DNA on the Vantage cigarette butts found under the ashtray on the kitchen table and under Williams' body were consistent with her profile, while the "major profile" of the DNA on the two brown cigarette butts was consistent with Kane's (Police serologist KEVIN MCCARTHY: 953-56, 960-61, 966-67, 977, 984, 998-99, 1004; MEGHAN CLEMENT [Laboratory Corporation of America]: 1021-31, 1043-55, 1057, 1064, 1069-70).

Microscopic examination of the ten fingernail clippings the medical examiner had taken from Williams during her autopsy revealed a mixture of a "brownish" substance and flecks of old nail polish

37



# APPENDIX

This appendix consists of a brief overview of the testimony of the People's expert DNA witness Meghan Clement, as well as all of the trial transcript pages attributed to Ms Clement and cited by appellate ADA Ilisa Fleischer in her Respondent's brief (p. 37, included as Exh. "F" with petitioner's brief). It is assumed that the Court will rely on the official trial transcript, to be provided by the trial court should this Court so request, and this appendix is provided solely for the convenience of the Court prior to any such request for the official transcript.

People v Scrimo  Ind. No. 1456-00

People v Scrimo Ind. No. 1456-00<br>AD No. 2002-06660

## ADA Fleischer's citations for Clement's expert DNA testimony
(from Respondent's brief, p.37)
(28 pages, T1021-31, 1043-55, 1057, 1064, 1069-70)

(All cites beginning with "A." are Clement's answers)

### Direct Examination

1021        (Reference to items received to be tested)

1022 12.    A. On the swab from the beer bottle the profile we
     13.    obtained indicated there was DNA for more than one
     14.    individual present. There was a mixture of DNA from at
     15.    least two individuals.

1023        (Cigarette butt/DNA testimony)

1024 20.    A.                A reference blood sample and
     21.    swab from the beer bottle are not included in this...

1025        (additional material to be tested)

1026        (paraphrase) Did you compare Scrimo/Kane DNA to
            beer bottle?  Yes.

1027  4.    A.           ... we could not exclude either John Kane or
      5.    Paul Scrimo as being possible contributors to the DNA on
      6.    that beer bottle.

1028        (Victim's fingernails/DNA)

1029        (Williams, Kane possible contributors to fingernail DNA)

1030 22.    A. However, the reference sample from John Kane and Paul
     23.    Scrimo are not included in this.

1031 19.    A. The results of the second portion of the swab from
     20.    the beer bottle was, again, there was a mixture of DNA
     21.    obtained from the second half of the swab and in that
     22.    mixture, again, we could not exclude Mr Kane or Mr Scrimo
     23.    or Ruth Williams as being possible contributors.

## Cross-Examination

1043   19. Q.  Did you come up with a determination with respect
       20. to the beer bottle? You indicated you found a mixture
       21. in the beer bottle?
       22. A.  We did find a mixture on the beer bottle and, no
       23. we did not calculate a statistical estimate.

1044   1. A. If we didn't calculate a statistical estimate
       2. it's not a matter of calculating whether somebody is
       3. actually found in a mixture.

1045   (received additional items for evaluation)

1046   (word clarification inre possible contributor/major profile)

1047   (Clement explains profile statistics [1 in 18,100,000])

1048   (end of profile statistic explanation)

1049   24. No, if you can't exclude someone, they are
       25. included. That's an automatic. If you can't exclude

1050   1. someone as a possible contributor, the are automatically
       2. included as a possible contributor.
       10. Q.  But you can't, with any scientific certainty,
       11. include him, right?
       12. A.  As I stated, if I can't exclude them, they are
       13. included as a possible contributor.
       14. Q.  As a possible?
       15. A.  Correct.

1051   (no question that Paul Scrimo's DNA is excluded from victim's fingernails)
       20. Q.                        ... the profile from the beer bottle
       21. was consistant with both John Kane and Paul Scrimo; is
       22. that correct?
       23. A.  No.

1052   7. A.     ...Within the mixture of characteristics found, I
       8. cannot exclude John Kane and I cannot exclude Paul Scrimo
       9. as being possible contributors. And that the one system
       10. where there's another characteristic which could not have
       11. come from either, Ruth Williams didn't possess that, so I
       12. couldn't exclude her as well.

1053   11. Q. Did you find a nine allele on the beer bottle
       12. at one loci, specifically D13S317, which could not be
       13. contributed by either John Kane or Paul Scrimo?
       14. A. Yes.

1054   20. A.                               ... we do identify a very weak
       21. nine allele or characteristic at one of the areas which
       22. couldn't have come from either Mr Scrimo or Mr Kane.

1055       (change of LabCorp report regarding Ruth Williams)

1057       (clarification regarding change of report)

1064       (only the beer bottle evidence was re-tested)

1069   12. A.                          ... we could not exclude Ruth Williams or
       13. Paul Scrimo as minor contributors.
       16. Q.                          ... The probality of randomly
       17. selecting an individual with a DNA profile that would be
       18. included as a contributor to the reportable mixture in
       19. item 22 is approximately, for the Caucasian population,
       20. what, 1 in 6,800?
       21. A. Correct.

1070   2. A. ... the probability of me randomly selecting someone who
       3. would not be excluded would be 1 in 6,800 for the
       4. Caucasian population. This calculation was on the
       5. mixture. It was't on a major profile. It was on the
       6. overall reportable mixture.
       18. Q. When you have a DNA profile, do you not -- do you
       19. provide statistical analysis for minor contributors?
       20. A. If you can differentiate a major profile and a
       21. minor profile, we would calculate a statistic strictly for
       22. minor contributor, however, generally, that's not possible
       23. to separate.

NOTE: While a review of the entire transcript will reveal more than is
contained herein, nowhere in Ms. Clement's testimony does she state that
Paul Scrimo's DNA profile matches the beer bottle (or any other) sample.
She only states that the defendant, along with every other Caucasian in the
world, has a 1 in 6,800 chance of possibly being a contributor to a mixed
DNA sample.

Proceedings

1    A    Yes, please.

2         (Whereupon, the witness resumed the witness

3    stand.)

4         THE CLERK:  Miss Clement, you are reminded you

5    are still under oath.  You may be seated.

6         THE WITNESS:  Yes.

7         MR. BIANCAVILLA:  May I continue, your Honor?

8         THE COURT:  Yes.

9         MR. BIANCAVILLA:  Thank you.

10   CONTINUED DIRECT

11   BY MR. BIANCAVILLA:

12   Q    Good afternoon, Miss Clement.

13   A    Good afternoon.

14   Q    Miss Clement, I am going to direct your attention

15   to April 19th of the year 2000.  Did you receive evidence

16   from the Nassau County Police Department with respect to

17   this case?

18   A    Yes, sir.

19   Q    Would you, please, describe to the jury what you

20   received from the Nassau County Police Department?

21   A    LabCorp received a sealed Federal Express

22   diagnostic specimen envelope which contained a bag which

23   contained a swab which was listed as from a beer bottle.

24   We received a bag containing a cigarette butt which was

25   listed as number seven from under the kitchen table

People - Clement - Direct

1    ashtray, a brown filter cigarette butt listed as number

2    eight from under the kitchen table ashtray, a cigarette

3    butt listed as number nine from the carpet near the

4    deceased, a cigarette butt listed at number 15 from the

5    hallway and a reference blood sample listed as from Ruth

6    Williams.

7        Q    Did you perform DNA analysis on those items?

8        A    Yes, sir.

9        Q    Would you explain to the jury what was the result

10   of DNA analysis that was performed on the swab from the

11   beer bottle?

12       A    On the swab from the beer bottle, the profile we

13   obtained indicated there was DNA for more than one

14   individual present.  There was a mixture of DNA from at

15   least two individuals.

16       Q    Now, with respect to crime scene item number seven

17   the Vantage cigarette that was found underneath the

18   ashtray?

19       A    That particular item yielded a single source

20   profile which matched the profile that was obtained from

21   the reference blood sample of Ruth Williams.

22           MR. CHAMBERLAIN:  May we have for the record a

23   reference to what the witness is reading from.  I know

24   but I would like the record to reflect it.

25           THE COURT:  She's testifying I believe -- are you

People - Clement - Direct

1    testifying from your own knowledge?

2         THE WITNESS:  Yes, also with referring to --

3         MR. BIANCAVILLA:  People's 83 in evidence.

4         THE COURT:  Yes, you can use that to refresh your

5    recollection.

6         THE WITNESS:  Thank you.

7         MR. BIANCAVILLA:  That document is also in

8    evidence, Judge.

9         THE COURT:  Yes.

10   Q    I'm sorry, the Vantage cigarette that was

11   underneath the ashtray on the kitchen table, what profile

12   was on that?

13   A    That was consistent with the profile of Ruth

14   Williams.

15   Q    With respect to crime scene number eight, the

16   brown filter that was found underneath the ashtray, at

17   that particular time when you analyzed that?

18   A    That profile was different than the profile of

19   Ruth Williams.

20   Q    And with respect to crime scene item number nine,

21   the Vantage cigarette that found underneath the body of

22   Ruth Williams?

23   A    That profile was consistent with the profile from

24   the known blood of Ruth Williams.

25   Q    And crime scene item number 15, the brown

People - Clement - Direct

1    cigarette filter obtained from the hallway?

2        A    That one was different than the profile of Ruth

3    Williams.

4        Q    The report regarding these initial items that

5    LabCorp analyzed, what was the date of that particular

6    report?

7        A    The day of that report was May 9th of 2000.

8        Q    After you analyzed these items, what did you do

9    with them?

10       A    The items were resealed in the original packaging

11   and they were returned to the Nassau County Police

12   Department SIB unit.

13       Q    I am going to show you what is People's 35 in

14   evidence and ask you do you recognize that?

15       A    Yes, I do.

16       Q    What do you recognize that to be?

17       A    This is the actual original packaging which

18   contained the cigarette butts from the original mailing as

19   well as the packaging that was returned back to the Nassau

20   County Police Department.  A reference blood sample and

21   swab from the beer bottle are not included in this but all

22   the cigarettes were from original mailing.

23       Q    Now, did there come a time when you received

24   additional evidence from the Nassau County Police

25   Department on May 26th of the year 2000?

People - Clement - Direct

1    A    Yes.

2    Q    Could you describe to the jury what was received

3    on that particular day?

4    A    Yes, that, again, was a sealed Federal Express

5    diagnostic specimen envelope which contained a bag

6    containing a swab which was listed as from a drinking

7    glass, a bag containing a swab listed as from a black wire

8    cord, material which was listed as from the fingernail of

9    the deceased and was designated R2 which was a single

10   piece of fingernail.

11        There was another bag containing fingernail

12   material listed as R3 and that contained three individual

13   pieces of fingernail.  Another bag containing fingernail

14   material which was designated as R5 and that had two

15   pieces of fingernail in it.  A bag containing four oral

16   swabs that were listed as from John Kane and a bag

17   containing a reference blood sample listed as from

18   Paul Scrimo.

19   Q    Will you explain to the jury what were the results

20   of your DNA analysis performed on Crime Scene item number

21   19, the swab from the wine glass from the kitchen table?

22   A    The swab from the wine glass revealed a single

23   source profile which was consistent with that of Ruth

24   Williams.

25   Q    With regard to the swab from the cord which you

People - Clement - Direct

1    received?

2         A    That profile also was consistent with the profile

3    of Ruth Williams.

4         Q    And the DNA analysis conducted on what had been

5    designated as fingernail R2?

6         A    That also was consistent with the profile of Ruth

7    Williams.

8         Q    The results of DNA analysis performed on the

9    fingernail designated as R3?

10        A    The fingernail designated as R3 yielded a mixture

11   of DNA so we knew there was DNA from more than one

12   individual in that particular sample.  The mixture -- we

13   could not exclude Ruth Williams as being a contributor to

14   the mixture, nor could we exclude Mr. Kane as being a

15   contributor to the mixture of the DNA on that fingernail.

16        Q    Now with respect to R5, another fingernail

17   cutting?

18        A    R5 was consistent solely with the profile of Ruth

19   Williams.

20        Q    Did there come a time when you compared the

21   reference standards of John Kane and Paul Scrimo to the

22   result of the DNA tests that you had done on Crime Scene

23   item 21, the beer bottle?

24        A    Yes.

25        Q    Please explain to the jury the result of that?

People - Clement - Direct

1    A    When we compared the profiles that were obtained

2    from the reference samples of John Kane and Paul Scrimo to

3    the mixture that was originally obtained on the beer

4    bottle, we could not exclude either John Kane or

5    Paul Scrimo as being possible contributors to the DNA on

6    that beer bottle.

7         There was also one additional characteristic that

8    was identified on the beer bottle at a single location

9    which could have come from Ruth Williams at that point.

10   Q    Now, let's go back to the fingernail cuttings, if

11   you would.  With respect to R2 --

12   A    Yes.

13   Q    -- could you tell jury how many cuttings were

14   received from the finger designated R2?

15   A    There was a single piece of fingernail material in

16   that.

17   Q    Now, would you explain to the jury how LabCorp

18   processed that one fingernail?

19   A    Yes.  LabCorp's policy is to only consume no more

20   than 50 percent of the sample.  What our technologists do

21   is actually take a swab, dampen it with distilled water,

22   and they will actually swab half of the fingernail which

23   is received.

24   Q    Now, the case file on this particular case, does

25   it indicate exactly what was done to fingernail R2?

People - Clement - Direct

1   A    Yes.

2   Q    Please read it to the jury?

3   A    It says, fingernail like material was stained over

4   80 percent with a light brown color swab, fifty percent of

5   stained area of fingernail like material.

6   Q    Once it is swabbed, what is then done with that

7   fingernail?

8   A    The fingernail is returned to it's original

9   packaging and its stored in the secured forensic locker

10  until the time when the analysis is completed.  At that

11  time it is returned back to Nassau County Police

12  Department.

13  Q    Now, that fingernail, R2, the result of that was

14  consistent with the DNA of Ruth Williams; correct?

15  A    That's correct.

16  Q    Let's go to fingernail cutting R3.  Could you tell

17  the jury how many cuttings were sent down to you regarding

18  fingernail designated R3?

19  A    There were three separate pieces which were

20  designated as part of R3.

21  Q    Would you describe for jury exactly how the

22  fingernail cutting from R3 was processed by LabCorp?

23  A    Yes.  There were two pieces which measured

24  approximately .5 by .1 centimeters and there was a third

25  piece which measured approximately 1 centimeter by .2

People - Clement - Direct

1    centimeters.

2           The piece of material -- of fingernail like

3    material, was measuring 1 centimeter by .2 centimeters.

4    Fifty percent of that was swabbed by the technologist.

5    The other two pieces were not touched.

6       Q    What happened to those three pieces?

7       A    Those three pieces, again, were returned to their

8    original packaging, and, upon completion of the analysis,

9    they were all sent back to Nassau County Police

10   Department.

11      Q    What were the DNA results of the swab from the

12   50 percent of that one fingernail regarding fingernail

13   number R3?

14      A    There was a mixture of DNA obtained which was

15   consistent -- or which we could not exclude Ruth Williams,

16   nor Mr. Kane as being possible contributors of.

17      Q    Now, with respect to fingernail designated as R5,

18   how many cuttings were obtained with respect to that

19   fingernail?

20      A    There were two.

21      Q    Could you describe exactly for the jury how those

22   particular fingernail cuttings were analyzed?

23      A    One piece was approximately .5 centimeters by .5

24   centimeters.  The second piece was 1 by .5 centimeters or

25   1 centimeter by .5 centimeters and the technologist

1030

People - Clement - Direct

1   swabbed 50 percent of the fingernail like material which

2   measured 1 centimeter by .5 centimeters.

3       Q    What was done with those three fingernails, the

4   evidence from those three fingernails after you were done

5   analyzing them?

6       A    There were only two pieces in R5.

7       Q    I'm sorry.  When you were done analyzing -- when

8   you analyzed R5, what were the results of that analysis?

9       A    The results of that analysis was that it was

10  consistent with Ruth Williams and the remaining portions

11  of those were returned back to the tubes and returned to

12  the Nassau County Police Department upon completion.

13      Q    I am going to show you People's 80 in evidence and

14  ask you if you recognize that?

15      A    Yes, I do.

16      Q    What do you recognize that to be?

17      A    This is the contents of the second mailing, the

18  three fingernail samples as well as swabs from the cord

19  and glass, again, the original packaging we received it

20  in, as well as the packaging that we returned it back to

21  the Nassau County Police Department in is included.

22  However, the reference sample from John Kane and Paul

23  Scrimo are not included in this.

24      Q    Thank you.  I am going to direct your attention to

25  March 9th of 2001.  Did you receive another mailing or

People - Clement - Direct

1   another submission from the Nassau County Police

2   Department?

3       A     Yes.

4       Q     What did you receive?

5       A     We received the remaining portion of the swab from

6   the beer bottle that was received in the original mailing

7   as well as the reference sample from Ruth Williams and we

8   also received the reference samples from Mr. Kane and

9   Mr. Scrimo in this mailing as well.

10      Q     Now, what, if any, analysis did you perform with

11  respect to these items?

12      A     The only analysis we performed on an item itself

13  was the second half of the swab we analyze that to

14  additional systems that we had developed over previous

15  amount of time since the original submission.  We also

16  performed additional tests on the extracts of the DNA

17  known samples which had previously occurred.

18      Q     What were the results?

19      A     The results on the second portion of the swab from

20  the beer bottle was, again, there was a mixture of DNA

21  obtained from the second half of the swab and in that

22  mixture, again, we could not exclude Mr. Kane, Mr. Scrimo

23  or Ruth Williams as being possible contributors.

24      Q     Now, could you tell the jury the difference

25  between the testing that was performed initially with

People - Clement - Cross

1   cigarette butt number seven which matched Ruth Williams.

2   We did not -- excuse me.  I'm sorry.  For cigarette butt

3   number nine which matched Ruth Williams.  We did not

4   calculate a statistic for number seven.  We calculated it

5   for nine because nine we had a larger profile.

6       Q    What statistical analysis did you provide for nine

7   then?

8       A    The probability of randomly selecting an unrelated

9   individual which would have a profile at the eight systems

10  that we obtained for cigarette number nine which matched

11  Ruth Williams would be approximately 1 in greater than

12  6 billion in the African-American population, 1 in greater

13  than 6 billion for the Caucasian population, and 1 in

14  4,450,000,000 for the Hispanic population.

15      Q    I am going to ask you further questions regarding

16  that but merely limit you are answers to the Caucasian

17  population?

18      A    Certainly.

19      Q    Did you come up with a determination with respect

20  to the beer bottle?  You indicated you had found a mixture

21  in the beer bottle?

22      A    We did find a mixture on the beer bottle and, no,

23  we did not calculate a statistical estimate.

24      Q    Did you calculate whether or not Ruth Williams

25  could have been included on the beer bottle?

People - Clement - Cross

1      A      If we didn't calculate a statistical estimate,

2    it's not a matter of calculating whether somebody is

3    actually found in a mixture.

4      Q      Let me rephrase that then, Miss Clement.

5             Did you conclude in your analysis that Ruth

6    Williams is excluded as a contributor for genetic material

7    in the sample found in the beer bottle?

8      A      Yes.   At this point, looking at the mixture and

9    only having Ruth Williams known sample, because we did not

10   see all the characteristics she possessed in the mixture,

11   we did exclude her.

12     Q      When you told the district attorney, with respect

13   to cigarette butt number nine, that Ruth Williams, the

14   victim, her DNA was consistent in the cigarette butt nine,

15   it wasn't really consistent, but it was consistent to a

16   statistical certainty or analysis of 1 in 6 billion; is

17   that correct?

18     A      The statistical analysis isn't a statistical

19   certainty.   What the statistical analysis does is that,

20   based on specific profile that we obtained on the

21   cigarette butt, the chances of me randomly selecting

22   someone that would also match would be 1 in greater than

23   6 billion.   Granted --

24     Q      It's --

25     A      It's a very rare profile that is found on the

People - Clement - Cross

1   cigarette butt which matched Ruth Williams.

2       Q    On May 26th you received profile -- you received

3   additional items for evaluation; is that correct?

4       A    That's correct.

5       Q    And at that time the -- your certificate of

6   analysis in evidence indicates the -- your certificate

7   dated June 23rd, indicated there was in addition to the

8   victim, Ruth Williams, two suspects, John Kane and

9   Paul Scrimo?

10      A    Correct.

11      Q    Were you aware whether either of those people had

12  been arrested at that time?

13      MR. BIANCAVILLA:  Objection.

14      THE COURT:  Sustained.

15      Q    Would you tell us what items you received from

16  John Kane, what items, as having come from John Kane, you

17  received?

18      A    We received four oral swabbings.

19      Q    Oral swabs.  Did you receive any oral swabs from

20  the victim?

21      A    No, sir.

22      Q    Did you receive any vaginal swabs from the victim?

23      A    No, sir.

24      Q    And you received a blood sample as having come

25  from Paul Scrimo?

People - Clement - Cross

1    A    That's correct.

2    Q    Now, based upon those swabs, you did an analysis

3    and you came up with certain conclusions; is that right.

4    A    Yes, sir.

5    Q    With respect to the cigarette butt number eight

6    and cigarette butt number 15, what was your conclusion?

7    A    The profile obtained from cigarette butt number

8    eight and cigarette butt number 15 was consistent with

9    originating -- or consistent with the profile which

10   originated from oral swabs of Mr. Kane.

11   Q    Do you use a different word there as a possible

12   contributor?  Do you call it something else in that

13   report?

14        MR. BIANCAVILLA:  Objection.

15        THE COURT:  I'll permit that.

16   A    Could you repeat the question?

17   Q    Do you use some other word in connection with that

18   profile for Mr. Kane?

19   A    That he cannot be excluded is how the report

20   reads.

21   Q    Does it not also read major DNA profile?

22   A    Yes, there also was some minor trace material

23   which didn't meet the reporting standards, so the major

24   profile from the cigarette butt was consistent with the

25   profile of Mr. Kane.

People - Clement - Cross

1    Q    Sticking to the Caucasian population,

2    Miss Clement, did you come up with a statistical analysis

3    for that profile?

4    A    Yes.

5    Q    What was that?

6    A    The probability of randomly selecting an unrelated

7    individual that would have a profile which matched the --

8    major profile of the cigarette butts which was consistent

9    with John Kane is approximately 1 in 18,100,000 in the

10   Caucasian population.

11   Q    What that means is the chances of picking somebody

12   else would be 1 in 18,100,000?

13   A    Not really --

14   Q    The chances of that sample having come from

15   somebody else would be 1 in 18,100,000?

16   A    No.

17   Q    Explain it to us.

18   A    What that means is that I wouldn't expect more

19   than one person in 18,100,000 to have that profile.  If I

20   were to randomly select an individual, that individual

21   would have a 1 chance in 18,100,000.  If I took a second

22   person, that person would still have a 1 in 18,100,000

23   chance, and so on.  Eventually I would expect, if I tested

24   18,100,000, that I would find one person that would match.

25   Q    But you would have to test that many to maybe find

People - Clement - Cross

1   one?

2       A    Statistically speaking, yes.

3       Q    Let me go on to fingernail number R3.  Did you

4   find that that was -- did you make a finding with respect

5   to that?

6       A    Yes.

7       Q    And it was not merely that it was consistent with

8   John Kane; right?

9       A    Well, no --

10      Q    It was a little more than just consistent with?

11      A    The profile on fingernail R3 --

12      Q    Let me withdraw that question.

13          MR. BIANCAVILLA:  Objection.  She was answering

14   the question.

15          THE COURT:  He can withdraw it if he wants.

16          Mr. Chamberlain, I don't mind if you withdraw a

17   question but once the witnesses starts to answer you

18   should let her complete her answer.

19          MR. CHAMBERLAIN:  Are you directing her to

20   finish?

21          THE COURT:  She was in the middle of it.

22      Q    Fine.  Go ahead.

23      A    The profile was a mixture.  There was a major

24   profile and a minor profile.  What that means is simply

25   there's a greater concentration of one donor than another.

People - Clement - Cross

1    In this particular mixture, Mr. Kane could not be excluded

2    as the major donor.

3        Q    When you say cannot be excluded, that would be

4    somebody who was a minor contributor you would also say

5    could not be excluded; right?

6        A    Correct.

7        Q    But there's a difference, is there not, when you

8    say he's the major contributor.  It's more than merely

9    consistent.  Is that not a fact?

10       A    No.  Any profile that's consistent with -- that's

11   consistent --

12       Q    On direct, Miss Clement, in answer to the district

13   attorney, I believe in every case, you said, it was

14   consistent with, you said that merely means --

15           MR. BIANCAVILLA:  Objection.  That's improper.

16           THE COURT:  Well, I haven't heard the whole

17       question.

18       Q    The word consistent --

19           THE COURT:  Rephrase.

20       Q    Let me rephrase it this way.  Your terminology,

21   consistent with, merely means somebody can't be excluded.

22   It doesn't mean you are including them with any

23   statistical certainty.  Is that correct?

24       A    No.  If you can't exclude someone, they are

25   included.  That's an automatic.  If you can't exclude

People - Clement - Cross

1    someone as a possible contributor, they are automatically

2    included as a possible contributor.  To say it's

3    consistent with means the characteristics possessed by

4    that individual are found.

5        Q    But you can't say with any degree of scientific

6    certainty that this person is included, can you, ma'am,

7    when you say that he can't be excluded?

8        A    I am saying with scientific certainty I can't

9    exclude them.

10        Q    But you can't, with any scientific certainty,

11    include him; right?

12        A    As I stated, if I can't exclude them, they are

13    included as a possible contributor.

14        Q    As a possible?

15        A    Correct.

16        Q    Let me go on to the fingernail R3.  What was the

17    probability of randomly selecting an unrelated individual

18    with that DNA profile other than Kane?

19        A    Again, the statistical estimate of a random match

20    probability, and we calculated for the major profile which

21    was consistent with Kane only, the probability of randomly

22    selecting another individual with a profile which matched

23    that on the fingernail is approximately 1 in 2,600,000 for

24    the Caucasian population.

25        Q    Does your report list that figure because mine

People - Clement - Cross

1    looks like it could be a typo?

2        A    It appears there's a zero missing.  There should

3    be an additional zero.

4        Q    With respect to that fingernail, there was a minor

5    contributor as well as; right?

6        A    That's correct.

7        Q    And that minor contributor was who?

8        A    It was consistent with Ruth Williams.

9        Q    Not Paul Scrimo?

10       A    No.

11       Q    So there's no question Paul Scrimo is excluded

12   from that?

13       A    That's correct.

14       Q    And to date we haven't had Paul Scrimo in this

15   report until we get to the beer bottle; is that right?

16            MR. BIANCAVILLA:  Objection.

17            THE COURT:  Sustained as to form.

18       Q    If we go to the beer bottle, Miss Clement, would

19   you tell us, was your -- you told the district attorney, I

20   believe, on direct, that the profile from the beer bottle

21   was consistent with both John Kane and Paul Scrimo; is

22   that correct?

23       A    No.

24       Q    That's what you told us on direct?

25            MR. BIANCAVILLA:  Objection, Judge.

People - Clement - Cross

1          THE COURT:  Sustained.

2      Q      Withdrawn.

3          Miss Clement, isn't it a fact that the major

4   contributor on the beer bottle was John Kane?

5      A    I can't answer that question because I never

6   said -- what I said is -- on the beer bottle, there's a

7   mixture.  Within the mixture of characteristics found, I

8   cannot exclude John Kane and I cannot exclude Mr. Scrimo

9   as being possible contributors.  And that the one system

10  where there's another characteristic which could not have

11  come from either, Ruth Williams doesn't possess that, so I

12  couldn't exclude her as well.

13     Q    That was your June 23rd report that said you

14  couldn't exclude her as well?

15     A    I'm not talking about the June 23rd report.  Yes,

16  the June 23rd report says that.

17     Q    Right now I'm talking about the June 23, 2000

18  report.  Does it say you cannot exclude the victim as well

19  from that mixture on the beer bottle?

20     A    No, it does not.

21     Q    So we still have your prior report from May 9th

22  that says the victim is excluded from the mixture on the

23  beer bottle?

24     A    Correct.

25     Q    Now, with respect to the beer bottle, did you also

People - Clement - Cross

1    find some other allele -- by the way, what is an allele?

2        A    Allele is the scientific name for characteristic.

3        Q    Characteristic found at a loci on a DNA sample; is

4    that right?

5        A    Yes.

6        Q    And your findings are based upon the alleles you

7    find at various loci in a particular sample or swab

8    submitted to you, right?

9        A    Our conclusions, yes, are based on the

10   characteristics or alleles identified.

11       Q    Did you also find a nine allele on the beer bottle

12   at one loci, specifically, D13S317, which could not be

13   contributed by either John Kane or Paul Scrimo?

14       A    Yes.

15       Q    At that time you indicated no statistical estimate

16   shall be calculated for that allele sample; correct?

17       A    Correct.

18       Q    Now, Miss Clement, if the victim was excluded and

19   there was something on that beer bottle that indicated

20   some other individual, that would mean there had to be,

21   assuming it was Kane and Scrimo, some third person there

22   other than the victim; is that right?

23            MR. BIANCAVILLA:  Objection.

24            THE COURT:  I'll permit that.

25       A    No.  The original report which excludes the victim

1054

People - Clement - Cross

1    was based solely on the victim's profile compared with the

2    mixture on the beer bottle.  When we compared only her

3    profile to the mixture on the beer bottle, there were a

4    couple of characteristics at various areas which were

5    possessed by the victim which weren't present in the

6    mixture.  At that point we excluded her as a source in the

7    mixture.

8        Q    And, Miss Clement, did you not exclude her --

9            MR. BIANCAVILLA:  Judge, objection.  I don't

10   believe she was done.

11           THE COURT:  Were you done with your answer,

12   Miss Clement?

13           THE WITNESS:  I was going to continue on.

14           THE COURT:  Then continue on.

15       Q    I am limiting the answer to June 23?

16           THE COURT:  I understand, and I think the witness

17   understands that.

18       A    Yes, I do.  As of -- upon receiving the profiles

19   or the reference samples from Scrimo and Kane and looking

20   at the mixture at that point, we do identify a very weak

21   nine allele or characteristic at one of the areas which

22   couldn't have come from either Mr. Scrimo or Mr. Kane.

23           However, at this point Ruth Williams does possess

24   a nine at that particular loci or genetic area.  Because

25   she possesses a nine which is an extremely weak

People - Clement - Cross

1    characteristic from a very minor contribution, we can't

2    exclude her from being the possible contributor of that at

3    this point.  So we can't exclude her from being a minor

4    contributor, but, as far as the bulk of the mixture,

5    there's not all of her characteristics being identified.

6        Q    So what you are saying is you changed your May 9th

7    certificate of analysis where you said she was excluded

8    from the beer bottle, by June 23rd you said she was not

9    excluded; is that right?

10       A    As the minor contributor.

11       Q    Would you read from your June 23rd report or

12   certificate of analysis and tell us where it says she

13   could have contributed?

14       A    It is not in the report.  It's designated that

15   there is a nine characteristic which could not come from

16   Mr. Scrimo or Mr. Kane but it does not designate

17   specifically.

18       Q    So you are telling us now that by June 23rd you

19   made that determination and you didn't put it in your

20   certificate of analysis?

21           MR. BIANCAVILLA:  Objection.

22           THE COURT:  Overruled.

23       A    I believe it was actually written in a letter at a

24   later date.

25       Q    Was that a letter written in response to a letter

People - Clement - Cross

1    A    Can you repeat the question?

2    Q    I said, ma'am, didn't that reflect a change in

3    your original report, the conclusion?

4    A    No, sir.  It was certainly -- the letter -- no, it

5    didn't reflect a change in the report.  It certainly was

6    based on additional information from the second submission

7    including interpretations using that as well.

8    Q    You know Doctor Baum, don't you?

9    A    Yes.

10   Q    He is the director of the forensic lab in the New

11   York City Examiners' Office?

12   A    Yes.

13   Q    Did you get -- your letter of November 25th refers

14   to a letter that you had received from the district

15   attorney from Doctor Baum, I have reviewed the letter

16   Doctor Baum wrote --

17        MR. BIANCAVILLA:  Objection?

18        THE COURT:  Don't read.

19   Q    Did you review a letter from Doctor Baum to come

20   to your conclusion in your November 25th letter?

21   A    No, sir.

22   Q    Could you -- do you have your November 25th letter

23   in front of you?

24   A    I do.

25   Q    Please look at the first sentence in there?

People - Clement - Cross

1       to appear to argue further on it.

2               THE COURT:  I'm denying it, overruling it.

3               I will sustain the objection.

4               You may inquire.

5       CONTINUED CROSS

6       BY MR. CHAMBERLAIN:

7           Q    Miss Clement, your third report here is dated

8       March 29th, 2001; is that correct?

9           A    Yes, sir.

10          Q    The reason for the resubmission to your lab of

11      this evidence was what, do you know?

12          A    Yes, we had developed additional systems which we

13      weren't originally testing with which could now be tested

14      to give more genetic information.

15          Q    And the additional systems would add information

16      to your previous report?

17          A    Potentially, yes.

18          Q    So the jury is clear about this, the only thing

19      resubmitted was the evidence surrounding the beer bottle;

20      is that right?

21          A    That's correct.

22          Q    This one beer bottle found on the table, do you

23      know where it was found?

24          A    No, I don't believe so.

25          Q    None of other evidence was submitted, fingernails,

People - Clement - Cross

1    THE COURT:  Did you understand the question?

2    THE WITNESS:  Yes.

3    THE COURT:  I'll permit it.

4    A    We didn't lose it.  It just did not --

5    Q    Did not show up?

6    A    That activity did not meet reporting standards.

7    Q    Now, you told the district attorney that both

8    John Kane and Paul Scrimo could not be excluded from the

9    beer bottle as a result of this last test; is that right?

10   A    The conclusion from the test of the second half of

11   the swab was that the major profile was consistent with

12   John Kane, however, we could not exclude Ruth Williams or

13   Paul Scrimo as minor contributors.

14   Q    Now, you provide a statistical analysis for a

15   contributor.  Will you read the last sentence with respect

16   to that in that report?  The probability of randomly

17   selecting an individual with a DNA profile that would be

18   included as a contributor to the reportable mixture in

19   item 22 is approximately, for the Caucasian population,

20   what, 1 in 6,800?

21   A    Correct.

22   Q    Are we talking about John Kane there?

23   MR. BIANCAVILLA:  Objection.

24   THE COURT:  I'll permit that.

25   A    No.  What we are saying is that, based on the

People - Clement - Cross

1  reportable mixture obtained in the second half of the swab

2  only, the probability of me randomly selecting someone who

3  would not be excluded would be 1 in 5,800 for the

4  Caucasian population.  This calculation was on the

5  mixture.  It wasn't on a major profile.  It was on the

6  overall reportable mixture.

7      Q    Didn't your report say John Kane cannot be

8  excluded as a major contributor to the genetic material in

9  this sample?

10     A    Yes, that's what the report said.

11     Q    Doesn't that analysis refer to the major

12  contributor who can be included?

13     A    No, it doesn't refer to the major contributor.  It

14  refers to the overall mixture of the reportable profile.

15     Q    Would it refer to a minor contributor, possible

16  minor contributor?

17     A    Yes, it would.

18     Q    When you have a DNA profile, do you not -- do you

19  provide statistical analysis for minor contributors?

20     A    If you can differentiate a major profile and a

21  minor profile, we would calculate a statistic strictly for

22  minor contributor, however, generally, that's not possible

23  to separate.  It's easy to identify a major profile

24  because it's more concentrated.

25     Q    In all your other reports you identified major

Paul Scrimo 02A3677                                    September 13, 2010
Green Haven Correctional Facility
PO Box 4000
Stormville, NY 125823

Supreme Court Clerk
Supreme Court Building
240 Old Country Rd.
Mineola, NY 11501

Dear Sir or Madam Clerk;

    Enclosed please find my motion to vacate judgement pursuant to CPL §440.10 along with exhibits and supporting paperwork. Additionally, for your convenience I have included with the Court's copy of this motion an appendix containing relevant trial transcript pages to help you form a preliminary opinion regarding the enclosed brief prior to your obtaining the official transcript from the trial court.

    It seems to me that a meaningful appeal does not require heroic efforts on the part of the appellate courts, but it should have required more than just a cursory glance and a rubber-stamp. It is my hope that this motion will achieve some measure of justice for my case and relief from the nightmare that my life has become.

    Please forward these documents to the appropriate party, and please advise me if there is anything else you need to help me in my quest to rectify my wrongful conviction.

    Thank you for your time and consideration in this matter.

Respectfully submitted,

Paul Scrimo

encl:   Motion pursuant to CPL §440.10 w/exhibits
       Appendix containing select transcript pages
       In forma pauperis application w/Authorization

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------------x
People of the State of New York,

                                        Plaintiffs,                          **AUTHORIZATION**

                                                                            Ind. No. 1456-00

                 -against-


PAUL SCRIMO,
                                        Defendant.
-------------------------------------------------------------------------x

    I, Paul Scrimo, inmate number 02A3677, request and authorize the agency holding me in custody to send to the Clerk of the Court of Nassau County Supreme Court certified copies of the correctional facility trust account statement (or the institutional equivalent) for the past six months.

    I further request and authorize the agency holding me in custody to calculate the amounts specified by CPLR §1101(f)(2), to deduct those amounts from my correctional facility trust fund account and to distribute those amounts as instructed by the Court.

    This authorization is furnished in connection with the above-entitled case and shall apply to any agency into whose custody I may be transferred.

    I understand that the entire filing fee as determined by the court will be paid in installments by automatic deductions from my correctional facility trust fund account even if my case is dismissed.

Dated: Stormville, New York
      September _13_, 2010

                                        Respectfully submitted,

                                        Paul Scrimo 02A3677
                                        Petitioner, pro se
                                        P.O. Box 4000
                                        Stormville, N.Y. 12582

6

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK   )
                    )ss:     <u>People v Scrimo</u>, Ind. No. 1456-00
COUNTY OF DUTCHESS )

     PAUL SCRIMO, being duly sworn, deposes and says:
I am the within mentioned petitioner and have served a copy of
the following papers:

          Notice of Motion to Vacate Judgement (CPL §440.10)
          Affidavit in Support of Motion to Vacate Judgement
          Exhibits

     Upon the parties listed below:

Nassau County District Attorney
262 Old Country Road
Mineola, NY 11501

by placing the above in a post-paid envelope and depositing it in a
United States Postal Service mailbox located at Green Haven
Correctional Facility, Stormville, NY 12582 on the _____ day of
September, 2010, as due and sufficient service.

                                   Paul Scrimo 02A3677
                                   petitioner, pro-se

Sworn to before me this
_____ day of September, 2010

*Richard Ryan*
NOTARY PUBLIC

RICHARD RYAN
Notary Public State of New York
ID # 01RY6050106
Qualified in Dutchess County
Commission Expires 10/30/ /0

Paul Scrimo  02A3677                                    September 10, 2010
Green Haven Correctional Facility
PO Box 4000
Stormville, NY 125823

Nassau County District Attorney
262 Old Country Rd.
Mineola, NY 11501


Dear Sir or Madam;

    Enclosed please find a copy of my motion pursuant to CPL §440.10  w/exhibits.  Please
forward these documents to the appropriate party.

    Thank you for your time and consideration in this matter.


Respectfully submitted,


Paul Scrimo


encl:  CPL §440.10 motion w/exhibits