*To Be Argued by:*
*Ilisa T. Fleischer*
*(15 minutes)*

# NEW YORK SUPREME COURT

### Appellate Division - Second Department

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

A.D. No. 2002-06660
Ind. No. 1456N/00

*- against -*

PAUL SCRIMO,

*Defendant-Appellant.*

# RESPONDENT'S BRIEF

**KATHLEEN M. RICE**
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Douglas Noll
Ilisa T. Fleischer
   Assistant District Attorneys
      *of Counsel*

TABLE OF CONTENTS

Page

Preliminary Statement . . . . . . . . . . . . . . . . .     i

Statement of Facts
        Introduction . . . . . . . . . . . . . . . . .      1
        The Suppression Hearing
                The People's Case . . . . . . . . . . . .   1
                The Defense Case . . . . . . . . . . . .   18
        The Court's Decision . . . . . . . . . . . .   18
        The Trial
                The People's Case . . . . . . . . . . . .  20
                        A.   In the early morning hours of
                             April 12, 2000, defendant
                             strangles Ruth Williams to death  . . .   20
                        B.   On April 13, 2000, Williams'
                             body is discovered  . . . . . . . .   26
                        C.   Detectives investigate Williams'
                             murder and arrest defendant . . . . . .   28
                        D.   Evidence is collected and
                             analyzed  . . . . . . . . . . .   36
                        E.   Months after his arrest,
                             defendant makes a statement
                             about the murder  . . . . . . . . .   39
        The Verdict and Sentence . . . . . . . . . . .   40

Point I
        The Hearing Court Properly Denied Defendant's
        Suppression Motion . . . . . . . . . . . . . . .   41

Point II
        The Jury's Verdict Was fully Supported by the
        Weight of the Evidence . . . . . . . . . . . . .   47

Point III
        Notwithstanding Defendant's Partly Unpreserved
        Claims to the Contrary, Detective Schiraldi's
        Testimony Was Entirely Proper, as Was the Intro-
        duction into Evidence of the Leatherman's Tool . . . .   55
                        A.   Defendant's claims are largely
                             unpreserved . . . . . . . . . . . . .   56
                        B.   Defendant's claims all lack merit . . . . . .   56

Point IV
    Contrary to Defendant's Mostly Unpreserved
    Claims, the Court Properly Denied Defendant's
    Request to Call Witnesses Who Proposed to
    Describe Kane as a Drug Dealer . . . . . . . . . . .   64

Point V
    Notwithstanding Defendant's Uniformly
    Unpreserved Claims, the Prosecutor's Summation
    Was Entirely Proper  . . . . . . . . . . . . . . . .   69

Point VI
    Defendant's Trial Counsel Provided Meaningful
    Representation . . . . . . . . . . . . . . . . . . .   76

Conclusion      . . . . . . . . . . . . . . . . . . .   94

Certificate of Compliance

# S T A T E M E N T   O F   F A C T S

## Introduction

On April 12, 2000, defendant used his hands and a ligature to strangle Ruth Williams to death in her apartment in Farmingdale, Nassau County, New York. An eyewitness to the crime identified defendant as the killer. Defendant's DNA was also found at the crime scene. In addition, both before and after his arrest, defendant made false statements to police about his actions on the night of the crime. Moreover, at the time of his arrest, defendant wore on his belt a Leatherman's tool, the blades of which could have made the marks left on the ligature used to strangle Williams.

## The Suppression Hearing[1]

### The People's Case

On the evening of April 13, 2000, Homicide Detective JOHN MCHUGH learned of the apparent homicide of Ruth Williams at her apartment in Farmingdale, Nassau County, New York. When McHugh arrived at the apartment a short time later, Williams lay dead on the bedroom floor, fully dressed. A ligature, which appeared to be a cord from a telephone answering machine, was wrapped around her

--------

[1]Parenthetical references preceded by "H" and "DB" are to the suppression hearing and to defendant's brief on appeal, respectively. Unless otherwise noted, all other parenthetical references are to the trial transcript.

1

neck.   The medical examiner subsequently determined that Williams
had been strangled to death (McHugh: H232-39, H349, H505-06).

While investigating Williams' final hours, McHugh obtained
information about John Kane.   Witnesses described Kane as a white
man in his thirties, five-feet-seven or eight-inches tall, with a
thin build, a ponytail, and a long beard.   On the morning of April
15, after a bartender gave Kane a message from the detectives, Kane
contacted them.    Later that day, McHugh and Detective JAMES
CEREGHINO interviewed Kane.   Kane said he had known Williams for
about a year and a half, primarily from the Falcon's Nest bar.
Kane had been at Williams' apartment two or three times; the last
time, three or four weeks before, she had given him oral sex, but
he did not consider himself her boyfriend and did not know about
any boyfriends she may have had.   Kane said he had learned of
Williams' death from "Ross."   Asked about a bald, heavily-tattooed
man who had been in Y.L. Child's bar on the night before Williams
died, Kane said he did not know anyone who met that description.
He did not recall having being in Child's that night; he had been
at another bar until 1:00 that morning, and then gone to a friend's
home (McHugh: H240-42, H355-58, H361-64, H366-68, H399-400, H425,
H434-37, H446).

2

# NEW YORK SUPREME COURT
## Appellate Division - Second Department

———··⋊·•·——

**THE PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

*- against -*

**PAUL SCRIMO,**

*Defendant-Appellant.*

———·—

# RESPONDENT'S BRIEF

———

## Preliminary Statement

Defendant appeals from a judgment of the County Court, Nassau County, rendered on June 18, 2002, convicting him, after a jury trial, of murder in the second degree (Penal Law § 125.25 [1]), and sentencing him to an indeterminate prison sentence of 25 years to life (Ort, J., at suppression hearing; Brown, J., at trial and sentence).

Defendant is incarcerated pursuant to the judgment of conviction. There were no co-defendants.

i

Between April 19 and 26, McHugh conducted separate interviews with Francine Quinn, Jennifer DeRenzis, Thomas Hardman, and Melissa Notarilcola, each of whom, in the early morning hours of April 12, had seen Williams at Child's with Kane and a stocky white man in his forties with a shaved head and tattoos. Notarilcola observed Williams dropping the straps on her overalls as she talked to the men, and Quinn saw Williams "making out" with the shaven-headed man. Quinn, DeRenzis, and Hardman also recalled that Williams had left the bar alone, and that ten to twenty minutes later, the two men left together (McHugh: H242-47, H266-72, H2925-97, H368-70, H399, H413-14, H416).[2]

A short time later, Quinn and her roommate left Child's and walked toward their car in the lot behind the Downtown Bar, above which Williams lived. As Quinn reached the car, she heard "loud raised voices" and saw Williams arguing with the shaven-headed man near the entrance to Williams' building; Quinn heard the man say "fuck." Only about 60 feet away, Quinn had a clear view of the couple. On April 13, McHugh himself had observed that the parking lot had "[e]xcellent" lighting (McHugh: H232-33, H247-49, H264, H369-70, H395-99, H402-03, H406, H408, H447, H478-80).

---

[2]DeRenzis remembered that Williams left Child's some time after 3:00 a.m., while Hardman recalled that she left at 4:00 a.m. (McHugh: H267, H271-72, H414, H416).

At about 4:00 p.m. on April 20, as McHugh and Detective Cole walked on Main Street in Farmingdale, they saw a man they later learned was defendant walking toward them.   About ten minutes later, defendant telephoned the Homicide Squad and left a message with Detective BRIAN PARPAN.   Defendant gave his name and said that he understood McHugh was looking for him because he was the "big bald headed guy" who "went to that bar."    Parpan gave McHugh defendant's telephone number and an account of the conversation. McHugh telephoned defendant, who agreed to meet McHugh in ten minutes at the command bus set up behind the crime scene.   When defendant arrived, McHugh noticed that his head was completely shaven and he wore a pouch on his belt.   Defendant said that he had heard that McHugh wanted to speak to a "big bald headed man who had been with Williams that Tuesday night at Child's," and acknowledged that he was that man (Parpan: H118, 140; McHugh: H272-77, H331, H353-54, H503).

Defendant recounted that, on April 11, he had played darts at the Falcon's Nest until midnight with his teammates, one of whom was a long-haired man whom he knew only as "John."    Afterward, defendant went to Granny's bar, and then to Child's.   At Child's, he saw Williams, and they spoke for about ten minutes.   Defendant could not remember their conversation because "he had been drinking"; however, he recalled that there were about eight people

4

in the bar, none of whom resembled him.  At about 3:00 a.m on April 12, defendant walked straight home.  Defendant added that if he had known that Williams was "going to go home and get herself killed, he would have remembered more or tried to help more."  At the end of the interview, McHugh showed defendant a photo of a black man named Jeff Johnson, whom defendant said he knew from "around town." Defendant said Johnson used to live over the Shamrock Bar, and may have been a drug dealer.  Later that afternoon, defendant called Parpan and told him that he now remembered that he saw Johnson every morning on Conklin and Secatogue Streets (Parpan: H119, H140; McHugh: H276-84, H425, H527).

On the evening of May 2, Detective Cereghino stopped Kane on the street, and Kane voluntarily[3] came to police headquarters for questioning.  Beginning at about 7:00 p.m., McHugh and Parpan interviewed Kane, who provided his pedigree information and criminal history.[4]  Kane stated that he had met Williams a couple

---

[3]While at police headquarters, Kane was not under arrest, was not given his constitutional rights, was not handcuffed, and was free to leave at any time but never asked to do so (Parpan: H156; McHugh: H288, H426-27, H443).

[4]Kane stated that he had been arrested at age 16 in Pennsylvania for a robbery or larceny involving a stolen car, and had served eight months in jail.  About ten years earlier, he had been convicted of petit larceny in Suffolk County.  A drug arrest upstate in 1999 involved a pipe containing residue of crack-cocaine.  Kane admitted that he was a heavy drinker but denied
(continued...)

5

of years before, and that she had given him oral sex a few times, most recently four to six weeks earlier.  He had seen her once or twice with a "big blond guy."  Kane again claimed to have learned about Williams' death from "Ross" (Cereghino: H73-74, H88; Parpan: H168; McHugh: H288-80, H425-27).

Kane said his relationship with defendant was limited to their Tuesday night darts team at the Falcon's Nest.  McHugh reminded Kane that, during their first interview, he had said he knew no big bald man with tattoos and pointed out that defendant fit that description.  Kane said he did not think of defendant as big and did not consider him bald because he had shaved his head only recently.  McHugh informed Kane that detectives believed that Kane might have more information than he had offered.  Asked if he had any involvement in the murder, Kane said he did not.  The detectives replied that he then had nothing to worry about and should just tell the truth.  Kane said he was "scared," "nervous," and "confused" (Parpan: H161, H170-72, H174-76, H219; McHugh: H290-92, H438-42).

McHugh told Kane that witnesses had seen him in Child's at the end of the night that Williams was killed.  Kane said that, two

---

[4](...continued)
using cocaine.  For two months, he had not worked steadily (Parpan: H165-66, H212-13; McHugh: H427-29, H432-34, H476-77).

weeks after the murder, defendant had told him not to worry and to keep his mouth shut because the police believed a black man had killed Williams.    (McHugh believed defendant had reached that conclusion because McHugh had shown him a photograph of a black man.)   Kane added, "[I]t wasn't me, I didn't do it, Scrimo did it" (Parpan: H192; McHugh: H442, H480-81).

Kane said that he had gone to the Falcon's Nest to play darts at about 8:00 p.m. on Tuesday, April 11, and that he and defendant drank while playing.   Afterward, the pair went to Granny O'Shea's and, soon thereafter, went to Child's, where Williams approached Kane.   As they stood by the bar, Williams danced and "dropp[ed] the straps on her overalls," and Williams and Kane kissed.   Defendant asked Williams, "[W]hat about me?" and she replied, "[N]o, you're married."   Five to 15 minutes after Williams left the bar, Kane and defendant left together (Parpan: H161, H166, H170-73, H177-79, H219; McHugh: H292-93, H401-02, H407, H434, H444, H446).

As they walked down Main Street, Kane suggested to defendant that they "continue the party" at Williams' apartment.   The men walked to Williams' building, went upstairs, and knocked on her door; she invited them in.   Williams had no beer, and defendant volunteered to buy beer and cigarettes at the nearby 7-Eleven. After defendant left, Kane put on some music and Williams performed oral sex on him; however, anticipating defendant's return, Kane

7

stopped Williams before he ejaculated. After ten to fifteen minutes, defendant returned with a 12-pack of Budweiser bottles, a package of Vantage Light 100 cigarettes for Williams, and a package of Marlboro cigarettes for Kane. Kane told defendant that Williams had "sucked his dick" while defendant was gone (Parpan: H178-84; McHugh: H293-94, H297, H400, H406-10, H444-58, H478).[5]

Defendant and Kane sat at the kitchen table, drinking beer. Then, as Kane listened to the music, defendant and Williams had a discussion that included a reference to defendant's wife. A short time later, defendant got up and said, "I'm out of here." As defendant headed toward the door, Kane asked him why he was leaving. Williams interjected, "[A]h, fuck him. Let him go home to his fat ugly wife." Defendant turned around and "charged" at Williams, who stood near the doorway between the kitchen and the bedroom. They both fell onto the bedroom floor, with defendant on top. Defendant choked Williams around the neck with both hands. Kane pulled on defendant's back and shoulders and yelled, "[W]hat the fuck are you doing? Stop." Despite his efforts, Kane could not stop defendant from choking Williams. As Kane stood in the kitchen, defendant got up and walked to the left side of the

---

[5] Kane did not believe Williams left the apartment while he was there but acknowledged that she was not in his view at all times. He was also unaware of any altercation outside the apartment (McHugh: H408-09, H467).

bedroom, from which Kane then heard what sounded like something being knocked over. Defendant returned with a "cord," which he wrapped around Williams' neck and used to choke her from behind for "about a minute." During and after the strangulation, Williams made no sounds or movements, and her eyes were "rolled up into her head" (Parpan: H179, H184-88; McHugh: H294-95, H297, H453-54).

Defendant yelled at Kane to turn off the music and to collect the empty beers; Kane complied and loaded all of the beer bottles into the carrying case. Meanwhile, defendant wiped down the kitchen table and doorknob with a napkin. As defendant walked Kane home, he admonished Kane, "[J]ust keep your mouth shut. It's only me and you in this, and if you keep your mouth shut we'll be okay" (Parpan: H188-91; McHugh: H294-96, H454-55).

That evening, McHugh informed Cereghino of Kane's statement and asked Cereghino to arrest defendant. McHugh described defendant and advised Cereghino that defendant played darts on Tuesday nights at the Falcon's Nest. Detectives Cereghino and Cole drove to Farmingdale and, at about 10:00 p.m., parked between the Falcon's Nest and defendant's home. Detectives ROBERT DEMPSEY and Warren Zimmerman parked nearby (Dempsey: H5-8, H21, H332-35; Cereghino: H40-44, H77-79, H85, H88-89, H91-93; McHugh: H301, H502-05).

9

Just after midnight, Cereghino saw a man matching defendant's description leave the Falcon's Nest and walk north on Main Street. After briefly losing sight of the man, Cereghino approached defendant and asked, "Paul Scrimo?" Defendant said, "[Y]es." Pointing his handgun at defendant, Cereghino identified himself as a police officer and told defendant to lie face-down on the ground and place his hands behind his head. Defendant complied (Dempsey: H8-9; Cereghino: H44-45, H80, H93, H97-99, H570).

Cereghino holstered his gun, handcuffed defendant, and frisked him. Cereghino then removed a tool from a pouch defendant wore on the right side of his belt. Cereghino considered the dark, metal tool a "possible weapon." Because there was a "distinct possibility" that defendant could reach the pouch with his hands cuffed, Cereghino confiscated the tool and pouch. Defendant said he had been drinking, but he did not appear to be intoxicated; he was rational, logical, responsive, compliant, and oriented as to time, place and circumstance (Dempsey: H9; Cereghino: H45-48, H97-99, H570-71).

Cereghino seated defendant next to Dempsey in the back seat of Dempsey and Zimmerman's car. En route to police headquarters, at about 12:15 a.m., defendant asked Dempsey, "What am I being arrested for?" Dempsey replied, "[F]or murder." Defendant said he could not have committed a murder because he had been in a bar

10

shooting darts all night. Dempsey responded, "You're being arrested for the murder of a woman that was found in her apartment a few weeks ago." Defendant stated, "I knew her from town, but I had nothing to do with it." At that point, Dempsey instructed defendant to "listen carefully" and advised him of his rights. After defendant assured Dempsey that he understood each of his rights, Dempsey asked if defendant was willing to talking to him without first speaking to a lawyer or having one present. Defendant replied, "I'll talk to you, but I had nothing to do with her murder. And I told you that I knew her from town" (Dempsey: H10-12, H14, H20, H27-31, H37-38; Cereghino: H46, H48, H97).

At about 12:40 a.m., Dempsey and Zimmerman escorted defendant into the homicide squad. Dempsey removed defendant's handcuffs and seated him in an interview room. Dempsey and Zimmerman informed McHugh and Parpan that defendant had waived his rights. Dempsey also described defendant's statements (Dempsey: H12-14; McHugh: H301-02, H508-11, H514-15).

At about 1:00 a.m., Parpan and McHugh entered the interview room. As McHugh introduced Parpan to defendant, defendant insisted, "[Y]ou have the wrong man, you made a mistake," and said he had nothing to hide. McHugh ascertained that defendant had been given his rights and would speak with McHugh without a lawyer. Defendant then repeated that the police had the wrong man (Parpan:

11

H120-22, H193-95, H201-03, H210-11; McHugh: H302-03, H515, H518-22, H525).

Asked what had happened "on the night in question," defendant replied that it was a Tuesday night, and he had played darts and drunk beer at the Falcon's Nest from 8:00 p.m. to midnight. Defendant then had a drink at Granny's before moving on to Child's, where he had two more drinks and spoke with Williams for five or ten minutes; however, he did not remember the topic of their conversation. He did not know when Williams left or where she went afterward. Defendant had known Williams for about six months and had seen her occasionally in bars. He sometimes talked to Williams, but there was nothing "going on" between them (Parpan: H122-24, H151-52, McHugh: H525-26).

Although "very vague" about time, defendant insisted that he had gone directly home from Child's. Reminded that stores often have surveillance videocameras, defendant became "obviously nervous." He put his head down and thought for a few seconds. Then, in a "different, excited type of voice," defendant said, "[Y]ou know, that's right, I did. I went to 7-Eleven. . . . I bought beer and cigarettes."[6]  Asked why he would buy cigarettes

_____

[6]On April 18, McHugh had reviewed videotape from the 7-Eleven, but the relevant time-frame had been taped over (McHugh: H485-87).

12

when he said he was a non-smoker, defendant claimed that he sometimes smoked. He explained his purchase of beer after a night of drinking as "what alcoholics do." Defendant refused to tell Parpan what brand of cigarettes and beer he had bought and dismissed these details as "not important" (Parpan: H124-26, H150, H153; McHugh: H278, H527-30).

After defendant conceded that he and his wife drank at home only rarely, Parpan again asked defendant why he had bought beer to take home. Defendant repeated that he was a "drunk" and an "alcoholic." When defendant questioned why he would be a suspect since he had done nothing more than see Williams shortly before her death, Parpan noted that witnesses from the bar had described "a little light sexual contact" between defendant and Williams. Defendant insisted that she had simply kissed him on the cheek, and Parpan replied that the witnesses had said that defendant and Williams had been "making out at the bar to [a point] where people took notice." Defendant again responded that he had been drunk. Parpan observed that he had a "very selective memory" and used his alcohol problem as an excuse not to answer certain questions. The detectives also told defendant that he was lying (Parpan: H127-30, H149-50, H153-55, H208-09; McHugh: H526-27, H530-35, H543).

Next, the detectives told defendant that the police knew that he had been inside Williams' apartment. Defendant denied this.

13

Parpan told defendant that nothing is secret if more than one person
knows about it.  Defendant asked what that meant, and the detectives
advised him that they had "spoken to everybody" (Parpan: H130-31;
McHugh: H535-36).

At that point, defendant stopped and looked away "for a while."
He then suggested that the detectives ask "John" where he had been
that night.  Parpan asked, "John?  John who?  Where did John come
from?"  Defendant asserted that he had always told the detectives
he had been with John.  Both detectives pointed out that defendant's
only previous reference to John was as a darts-team member, and that
defendant had never before claimed to have spoken with anyone other
than Williams that night.  Defendant nonetheless insisted that he
had previously mentioned John to the detectives (Parpan: H127-28,
H131-32; McHugh: H486-87, H537-38).

After a 45-minute break, the detectives told defendant that
John's last name was Kane.  Defendant stated that he had known Kane
for about a year as a darts-player and alcoholic.  Asked if John and
Williams had any type of a relationship, defendant said he would not
"talk about other people's business."  Defendant denied having gone
to Williams' apartment with Kane, even after the detectives said
they had evidence to prove he had done so.  Asked if Williams had
been murdered "because she made a remark," defendant "reacted a
little bit," but told the detectives, "We're on different sides of

14

the fence here.   I can't help you."   At about 5:10 a.m., the detectives left the room again (Parpan: H132-33, H196, H205; McHugh: H516-17, H543-48).

Cereghino then briefed McHugh about the arrest and gave him the Leatherman's tool and pouch he had recovered from defendant's belt. McHugh recalled having seen a similar pouch on defendant's person when he first met him on April 20 (Cereghino: H45-47, H49-50; McHugh: H304-05).

Cereghino and Cole then interviewed defendant.   Asked to go over the events of the night of the murder, defendant stated that he had been at the Falcon's Nest, playing darts and "drinking heavily."   He then walked down the block to Granny's and continued drinking.   Next, defendant walked to Child's, where he drank some more and saw Williams.   A short time later, defendant saw Williams leave; he remained in the bar until it closed.   He went home. Defendant made no mention of Kane or of having kissed Williams, and volunteered no information about any stops he made on the way home. However, when asked if he had stopped at the 7-Eleven, defendant again conceded that he might have (Cereghino: H51-54; Parpan: H134, H155; McHugh: H307).

Defendant again denied having been in Williams's apartment that night.   However, when Cereghino asked if defendant might have forgotten being there, defendant replied that it was possible.   He

15

added that he was a "heavy drinker" and had blackouts. Cereghino said the police knew defendant was in the apartment that night. Defendant became "sullen" and "withdrawn" and stopped talking. Eventually, however, defendant repeated his denial that he had been in the apartment. Cereghino then informed defendant that Kane had been with detectives for the last several hours, and that they knew what had "happened in the apartment that night." Defendant did not reply. Cereghino left the room and spoke with McHugh and Parpan (Cereghino: H33, H54-69, H81-84; McHugh: H552).

Five or ten minutes later, Parpan and McHugh re-entered the room. They told defendant it was obvious that he had been lying and using drinking as an excuse for a "selective memory." Defendant said, "[W]ell, you call them lies, I call them protection. My son trusted the police, and he's now in jail. And if I tell you my story, I might wind up in jail." The detectives told defendant he was under arrest and going to jail. They asked him to tell them what happened. Defendant said, "I can't tell you my story, I'm going to have the lawyer do it for me." At that time, about 7:15 a.m., the interview was terminated. Defendant telephoned his wife and told McHugh that she was going to contact an attorney (Parpan: H134-35, H142, H204; McHugh: H307-09, H517, H524, H532, H553-55).

16

At about 3:00 p.m. on May 3, 2000, defendant, with his attorney present, participated in a lineup. Child's patrons Quinn and DeRenzis separately viewed the lineup, but neither identified defendant. Then, at about 3:25 p.m., Child's bartender Hardman viewed the lineup for no more than 20 seconds, and identified defendant as the man he had seen on April 12 at Child's with Williams and Kane (Cereghino: H62-68, H70, H72-73; Detective JERALD MULLEN: H101-02, H108-12; Parpan: H136-37; McHugh: H312).

On May 5, McHugh interviewed Mohammed Hussain, the late-shift clerk at the 7-Eleven store near both Williams' and defendant's apartments. Hussain identified defendant as an almost daily customer. Hussain recalled that, at about 3:00 on the morning of the crime, defendant had come into the store and bought a 12-pack of Coors Light bottles, a pack of Marlboro cigarettes, and a pack of Vantage Light 100 cigarettes. The Vantage Lights were stocked specifically for Williams, who was the only customer who had bought them during the eight months Hussain had worked there. Hussain recalled asking defendant, "[A]re these for the girl?" and defendant's replying, "[Y]es, the blond, . . . but don't tell my wife." At that point, Hussain rang up the beer, cigarettes, and a package of condoms and wished defendant "a good time" (McHugh: H318-25, H330-31, H338, H457, H483, H489-92, H497, H512-13).

17

On May 9, 2000, McHugh re-interviewed Quinn, who explained that, at the lineup, she had been confused by the lighting, by all of the participants having bald or shaved heads, and by her inability to see the participants' body types because of the sheet covering their bodies. Quinn showed McHugh a photograph from the May 5 issue of <u>Newsday</u> that her roommate had shown her on the day it was published. After viewing the photo, Quinn had become "positive" that one of the men in the photo -- defendant -- was the man she had seen with Williams on the morning of her death, first at Child's and then arguing with Williams outside her building (McHugh: H313-17, H331-34, H374-76).

<u>The Defense Case</u>

Defendant presented no witnesses at the suppression hearing.

<u>The Court's Decision</u>

In a written decision filed on April 9, 2001, the court denied defendant's suppression motions in their entirety. First, the court found that Kane's account of the crime sufficiently reliable to provide probable cause for defendant's arrest because it was a "declaration against penal interest," in that it subjected him to criminal liability" as an "accessory after the fact" (Decision at 13). The court also credited Kane's statement that he and defendant had been with Williams shortly before her murder because it was corroborated by the testimony of various other witnesses, one of

18

whom had seen Williams arguing with a man who matched defendant's description just before she died (id.). Further, because "the detectives had confirmed significant details of John Kane's story," the court concluded that Kane was "reliable and that the information available to the detectives constituted probable cause to believe that [defendant] had committed the murder" (id. at 13-14). Accordingly, the court found that defendant's arrest was lawful and, as defendant's pouch and Leatherman's tool were recovered incident to that arrest, they were admissible at trial (id. at 14).

Next, the court denied defendant's motion to suppress his statements, concluding that he had been adequately advised of his constitutional rights and "knowingly and voluntarily waived them until the time that he reasserted his right to counsel and the interview was terminated" (id. at 14).

Finally, the court denied defendant's application to suppress identification testimony. The lineup procedure was not unduly suggestive. Moreover, because the Newsday photograph was in no way police-arranged, witnesses who identified defendant from that photograph would be permitted to identify him at trial (id. at 15).

19

The Trial

The People's Case

A.    In the early morning hours of April 12, 2000, defendant
strangles Ruth Williams to death.

From about 8:30 to midnight on April 11, 2000, the Falcon's

Nest bar on Main Street in Farmingdale, Nassau County, New York,

sponsored its Tuesday night dart team, which included bar owner

FRANK DEFALCO, 32-year-old JOHN KANE, and defendant.  Kane had long

brown hair, a long goatee, weighed about 150 pounds and was about

five-feet-six-inches tall; defendant, a stocky man about five-feet-

ten-inches tall, had a shaved head and tattooed arms (THOMAS HARDMAN

[Y.L. Child's bartender]: 386-88, 392-98, 401-02, 412, 414-15;

MELISSA NOTARNICOLA [off-duty Child's bartender]: 446-47; PENNY

SHOUSE [Granny O'Shea's bartender]: 449-50, 452, 477-78; DeFalco:

420-23, 425-26; FRANCINE QUINN[7] [Downtown's bartender]: 601;

Detective JOHN MCHUGH: 1138, 1203-04; Kane: 1425-28, 1507, 1521).

Forty-eight-year-old Ruth Williams was also out in Farmingdale

that night.  Williams came into the Downtown bar with a thin, dark-

haired white man of average height.  Quinn served Williams a Coors

_____

[7]On August 1, 2001, Quinn was arrested and charged with drug
sales and possession.  Pursuant to an agreement with the District
Attorney's Office, Quinn's testimony at defendant's trial would not
be used in the case against Quinn.  Quinn was represented by
counsel during her testimony at defendant's trial (Quinn: 496-97,
499-500, 527-28, 575-76, 579).

Light, and Williams remained at Downtown for a short time (JOHN MILLER WILLIAMS [Williams' brother]: 356; Quinn: 500-01, 516). At about midnight, Williams went to Granny's bar with a man who appeared to Shouse to have a "bad toupee." The pair sat at the bar for about 15 minutes, during which time Shouse served Williams a bottle of Coors Light (Shouse: 451, 453, 477).

After Williams left Granny's, Kane and defendant came in together and had a drink. Upon leaving at about 1:00 a.m., defendant and Kane walked to Child's, sat at the bar, and continued drinking. After a while, Williams approached them.[8] The trio was "hanging out," drinking and talking, and Williams was dancing and flirting with Kane. Notarnicola noticed that Williams was taking down the straps of her overalls as she danced "on top of" defendant. Kane recalled that he "made out" with Williams and, when defendant said, "[W]hat about me," Williams said, "[O]h, you're married." Notarnicola and Quinn, who had arrived at Child's at about 3:00 a.m., remembered Williams kissing defendant (Hardman: 388, 398-99; Notarnicola: 442-44; Shouse: 452-53, 477-78; Quinn: 502, 552; Kane: 1428-29).

---

[8]Hardman and Notarnicola recalled that Williams entered Child's with Kane and defendant (Hardman: 386-88, 392-98, 401, 412, 414-15; Notarnicola: 441-42, 446).

21

Right after "last call," Hardman missed his keys, including the bar keys.  At about 4:00 a.m., the bar owner locked everyone in the bar and searched for Hardman's keys.  Shortly thereafter, once a search revealed that she did not have the keys, Williams left the bar alone.  Some time later, Kane and defendant left together (Hardman: 380, 389-90, 402-07, 410-12, 444; Notarnicola: 444-45; Quinn: 503, 517, 553-57; Kane: 1430).[9]

As Kane and defendant walked down Main Street toward the Falcon's Nest, Kane said, "Why don't we go over to Ruthy's and have a drink."  Defendant agreed and they walked to 196 Main Street, where Williams lived in an apartment above Captain Andy's restaurant.  They entered the building's back door, went upstairs, and knocked on Williams' door.  She let them in.  Williams had no beer, so defendant volunteered to buy some.  Williams asked defendant to buy her a pack of cigarettes too (J.M. Williams: 351-52; SVEN BOST [building owner]: 604-06, 612-13; Kane: 1430-31, 1475, 1574-75).

At approximately 4:00 a.m., defendant entered the 7-Eleven store at 150 North Main Street in Farmingdale, where clerk MOHAMMED

---

[9]The only outgoing call made from Williams' home telephone on April 12, 2000, was placed at 4:00 a.m. to directory assistance (GERARD CONNELL [Verizon Communications]: 481-86, 488-80).

HUSSAIN[10] recognized him as an almost daily customer who lived across the street.  Defendant purchased a 12-pack of Coors light beer, a box of Marlboro Light cigarettes, and a box of Vantage 100 Light cigarettes.  Hussain asked defendant, "[Y]ou buy for the blonde lady. I know she is my only customer who buy those."[11] Defendant said, "[Y]es, . . . [b]ut don't tell my wife."  Hussain promised not to say anything and rang up defendant's cash purchase at 4:14 a.m.  He handed defendant a packet of condoms and said, "[Y]ou take condom too."  Smiling, defendant said, "[O]kay," and left (LISA LAWSON [store manager]: 1089, 1091-93; Hussain: 1314, 1318-20, 1340-41, 1344).[12]

Meanwhile, after defendant left the apartment, Kane sat at the kitchen table.  Kneeling between his legs, Williams performed oral sex on him, ran her fingers through his hair, and stroked his back, buttocks, and penis.  After several minutes, Kane asked Williams to stop because he knew defendant would be returning soon.  Kane got up, zipped his pants, and told Williams he was "going to put on some

---

[10]Hussain testified through an Urdu interpreter (Hussain: 1311, 1322).

[11]Williams was the only customer who bought Vantage Ultra Light cigarettes from Hussain, purchasing them two to three times a week (Hussain: 1313, 1318, 1331).

[12]The tapes in the store videocameras are taped over every 24 hours (Lawson: 1092).

23

tunes." While she remained in the kitchen, Kane walked through the bedroom into the living-room and put on an Allman Brothers CD (Kane: 1432-33, 1574-77, 1580-81, 1585, 1621).[13]

About 15 minutes after Williams had left the bar, Quinn and her roommate walked one block from Child's to her car, which was parked behind Williams' apartment building. Upon reaching her car, Quinn heard "loud, escalated voices" and the word "fuck." She turned to see what was happening. From about 50 feet away, Quinn had a clear view of Williams, who stood outside the back entrance to her building, arguing with a man. In the light from a "high intensity" flood-light above the back door, Quinn observed the man's shaved head and build. Although unable to see his face, she recognized defendant (Hardman: 403; Quinn: 502-10, 512, 522-25, 528-31, 535-36, 553-59, 562-66, 590-93, 598-600; Bost: 606).

By the time Kane walked back into the kitchen after attending to the music, defendant had returned with a 12-pack of beer.[14] The trio sat down at the kitchen table and each had a beer and listened to the music. After a while, Kane began "vegging out to the music,

---

[13]Kane did not see Williams leave the apartment at any time. However, he did not know her exact whereabouts at all times (Kane: 1572, 1577-79, 1581).

[14]Defendant had been gone about ten minutes. When defendant first returned, Kane was in the living-room and could not see defendant and Williams (Kane: 1575, 1577-78, 1587, 1622).

24

listening to the lyrics" while defendant and Williams talked.
Suddenly, defendant stood up and said, "I'm not going to take this.
I'm out of here." He began walking toward the door. Kane asked,
"What are you doing? We just got here. We just got some beers .
. . . [H]ang out." Williams interjected, "Fuck it. Let him go home
to his fat ugly wife" (Kane: 1434-35, 1441, 1475, 1578, 1585, 1587-
88, 1621-22).

At that point, defendant "snapped." He turned, pushed Kane
aside and went "right to Ruthy," who stood in the doorway between
the kitchen and the bedroom. Defendant grabbed Williams by the
shoulders and threw her down on the floor of the bedroom. Kane
looked over defendant's shoulder and saw Williams between
defendant's knees as he was "strangling" her. Her eyes were rolled
up in the back of her head, her mouth was "agape," and she did not
appear to be struggling. Kane ran to defendant, pulled on his
shoulder with both hands, and asked what he was doing. Defendant
was "like a rock," and Kane could not budge him (Kane: 1435-37,
1442-43, 1475, 1588-89, 1591-93, 1596, 1606, 1621-25).

Defendant strangled Williams for another "minute or two" and
then got up and walked into the bedroom, out of Kane's view. Kane
then heard a snapping sound, as if something had been "ripped out."
At that point, Williams, lying on the floor, "looked dead." Seconds
later, defendant returned, holding a cord in his hands. He stepped

25

behind Williams, wrapped the cord around her neck, and "yanked up" on it (Kane: 1437, 1441, 1592-94, 1596-99, 1623-25).

As Kane stood with his back against the kitchen counter, defendant screamed at him, "Get the fucking stereo." "[R]eluctantly," Kane stepped over Williams' legs, walked into the living-room, and shut off the music. When Kane returned to the kitchen, defendant was wiping down the table and chairs with a napkin and a rag. Defendant told Kane to "[g]et the fucking beers," so Kane grabbed the bottles from the table and replaced them in the case, which he carried down the hallway. Defendant followed immediately behind him, wiping off the handles on each door they passed through as they left the building (Kane: 1438-39, 1442-43, 1445-77, 1588, 1600-05).

As they walked toward Kane's home, defendant instructed Kane, "[D]on't say nothing. It's all taken care of. We are in this together. Just keep your mouth shut" (Kane: 1439, 1443-44, 1604).[15]

B.   On April 13, 2000, Williams' body is discovered.

On April 13, after Williams was unaccountably absent for a second day from her job as manager of a florist shop, co-worker CAROLINE DALY sent a delivery driver to her home. He reported that

---

[15]At the next Tuesday night's darts tournament, defendant repeated this admonition. At the darts competition the week after that, he added that Kane should not "worry" because the "cops were looking for a black guy" in connection with Williams' murder (Kane: 1439-40, 1443-44, 1479-80, 1520).

Williams' truck was in the parking lot. Prompted by Daly, landlord Bost telephoned Williams, knocked on her door, and called her name, but got no reply (Daly: 361-64; Bost: 607-08).

That evening, Bost called the police, and Police Officer PAMELA STARK responded to 196 Main Street at about 9:15 p.m. Bost and Stark knocked on and yelled at the door. Getting no response, Stark climbed onto the roof and looked through the windows into Williams' apartment; unable to see into all of the rooms, she had Bost unlock the apartment door (Bost: 608-11; Stark: 1387-91, 1396-97, 1412-13).

Looking from the kitchen toward the bedroom, Stark saw "two white socks." She walked to the doorway of the bedroom, where Williams lay fully dressed and slumped over on the floor. Her right hand lay palm up and her left palm down; all of the nails were intact. Obvious lividity demonstrated that Williams was dead. As Stark shone her flashlight on Williams' face, she noticed the cord around her neck (Bost: 610; Stark: 1392-1400).

Detective DENNIS DOWNES arrived at Williams' apartment at about 11:00 p.m. Dressed in overalls and a white shirt, Williams' body lay next to the bed. Knotted tightly around her neck was a black telephone cord. After Williams' body was removed by the medical examiner, Downes found a Vantage 100 cigarette and a burn mark on the carpet beneath where her leg had been (Downes: 618-19, 622, 627-29, 655-57, 680, 700; McHugh: 1115, 1168, 1170-71, 1186).

27

The apartment was generally neat, with only a few things in disarray. On the kitchen table lay various items, including a photo album, song lyrics on a piece of paper, an open bottle of Budweiser, a wineglass, and an ashtray with one brown and one white Vantage 100 cigarette butt underneath it. There were also some napkins on the floor at the threshold of the kitchen. On the bedroom floor lay a telephone/answering machine. In the otherwise orderly living-room, the phone jack had been ripped out of the wall, and an Allman Brothers CD lay next to the stereo (Stark: 1394-95, 1398-1400, 1410; Downes: 627-29, 654, 656-59, 674).

C.   Detectives investigate Williams' murder and arrest defendant.

On April 15, 2000, McHugh interviewed Kane at his home. Kane had no visible scratches, but bore an "old," scabbed-over injury on his forehead. McHugh asked Kane about a "male white who had a shaved head and tattoos that was in Y.L. Child's." Kane untruthfully said he did not know anyone of that description, and he omitted defendant when listing the names of those who had stayed at Child's until closing time on April 12. Kane also falsely told detectives that he had learned of Williams' death from "Ross" (McHugh: 1137, 1200-02, 1203, 1205-09; Kane: 1478, 1484, 1535-38).

Shortly after 4:00 p.m. on April 20, Detective BRIAN PARPAN received a telephone call from defendant. Defendant said that people at a bar he frequented had told him that McHugh was looking

for a "big bald guy," and that he met that description.  Parpan took defendant's telephone number, paged McHugh, and conveyed defendant's message (McHugh: 1137-38; Parpan: 1273-75).

McHugh telephoned defendant, who said, "I understand you are looking to speak to a big, bald-headed guy that was out at Y.L. Child's on Tuesday night."  Defendant agreed to come to the command bus behind the crime scene.  When defendant arrived there a short time later, McHugh noticed a black pouch attached to his belt. During their ensuing conversation, defendant acknowledged that he knew Williams, and that he had spoken to her briefly at Child's on the morning she died.  Defendant said he had left Child's at about 3:00 a.m. and walked straight home.  Shown a photograph of a black man named Jeff Johnson, defendant identified Johnson as a drug dealer who lived over the Shamrock Bar.  Defendant added that he sometimes saw Johnson on Route 109.  Later that afternoon, defendant called the Homicide Squad and told Parpan that he frequently saw Johnson when he ran errands on Secatogue Avenue and Conklin Street (McHugh: 1138-47, 1159; Parpan: 1276).

On the afternoon of May 2, Kane agreed to speak with McHugh again.  Kane said that he had met Williams in a bar, known her for two years, and received oral sex from her two or three times, most recently four to six weeks before the murder.  However, he was not Williams' boyfriend.  He also told McHugh he "didn't know anything"

29

about the crime.   Kane played on a Tuesday night darts team with defendant, but denied knowing a "big bald tattooed guy" (Cereghino: 1370, 1372-74; Kane: 1478, 1481-83, 1493-94, 1518-21, 1524-31, 1555-56).

After the detectives said they had evidence tying him to the crime scene, however, Kane finally told them "the full story."  He stated that, on the night of April 11, he had played darts and had some drinks with defendant.  They then went to Granny's and finally to Child's, where Williams was coming on to Kane and kissing him. After leaving Child's, Kane and defendant went to Williams' apartment.  There, after Kane had put on an Allman Brothers' CD, he found defendant in the kitchen after having purchased a 12-pack of Budweiser (McHugh: 1147, 1226-27, 1262; Parpan: 1299; Kane: 1560-62, 1564, 1571-72, 1578, 1587, 1591).

Later that evening, McHugh sent Detectives JAMES CEREGHINO, ROBERT DEMPSEY, Michael Cole, and Warren Zimmerman to Farmingdale to arrest defendant.  At about 10:00 p.m., Dempsey and Zimmerman parked in a lot facing defendant's apartment complex.  Cereghino and Cole parked between the Falcon's Nest and defendant's home (Dempsey: 1099-100, 1106-07, 1111-12; McHugh: 1227-28; Cereghino: 1358-59, 1362, 1369).

At about 12:10 a.m., Cereghino confronted defendant in a parking lot.  After defendant confirmed his identity, Cereghino

30

arrested and handcuffed him.   Cereghino frisked defendant and recovered a pouch containing a Leatherman's tool from the right side of his belt (Dempsey: 1101, 1111; Cereghino: 1360, 1362).

As Zimmerman drove defendant to police headquarters, defendant was seated in the back seat next to Dempsey.   After about five minutes, defendant asked why he was being arrested.   Dempsey replied, "You're being arrested for murder."   Defendant responded, "Well, I couldn't have done any murders tonight because I was in the bar shooting darts all night."   Informed that he was being arrested for "the murder of a woman who was found in her apartment about three weeks" before, defendant replied, "I knew her from town but I had nothing to do with it."   At that point, Dempsey gave defendant his constitutional rights; defendant said he understood and waived his rights and was willing to speak with Dempsey without an attorney.   However, defendant insisted, "I had nothing to do with her murder and I told you I knew her from town" (Dempsey: 1101-03, 1112-13; McHugh: 1242; Cereghino: 1361-63).

At about 12:40 a.m., Dempsey brought defendant to the Homicide Squad and left him seated and unhandcuffed in an interview room. There, at 1:00 a.m., McHugh and Parpan interviewed defendant. Defendant said he had been at the Falcon's Nest until midnight on the night of April 11.   He went on to Granny's, and then to Child's. At Child's, defendant spoke to Williams for five to ten minutes.

31

He did not know what time she left or where she went. He walked home at about 3:00 a.m. Defendant acknowledged that he had known Williams for about six months, and that both were "drinkers" (Dempsey: 1103-04; McHugh: 1148-49, 1216, 1238; Parpan: 1276-78, 1280, 1299).

Asked for more detail, defendant repeated that he had walked home down Main Street, arriving about 3:00 a.m., and insisted that he had made no stops. Defendant added that both he and Williams were alcoholics, and attributed his failure to remember many details of April 11-12 to his drinking (McHugh: 1150-51; Parpan: 1280-84, 1307).

After explaining to defendant that some businesses are equipped with videocameras, the detectives again asked defendant if he was sure he had not stopped somewhere on the way home on the night of the murder. Defendant "put his head down," sat there for "a couple of moments," "appeared to be getting nervous," and said, "I went to 7-Eleven for beer and cigarettes." Defendant, however, refused to specify what brand of products he had purchased. He dismissed these details as "not important." Asked why he bought cigarettes when he did not smoke, defendant now claimed that he sometimes smoked. Defendant said he was buying beer at that time of morning because he was an alcoholic (McHugh: 1152-53, Parpan: 1281-85).

32

The detectives also told defendant that witnesses at Child's had described "some light sexual contact" between him and Williams, but defendant insisted that she had merely kissed him on the cheek. The detectives said witnesses reported that defendant and Williams had kissed so passionately that they "drew the attention" of many people. Told that evidence placed defendant in Williams' apartment, defendant said, "No, that's wrong." Parpan said, "Paul, nothing is a secret when more than one person knows about it" (McHugh: 1153-54, 1223; Parpan: 1286-88).

Defendant again "dropped his head" and paused for a couple of minutes, appearing "very nervous." He said he had told them "everything" and suggested they speak to "John" to verify his statements. The detectives asked, "[W]ho is John?" and defendant insisted that he had told them about John. McHugh pointed out that defendant's only previous reference to "John" had been as his darts teammate, but defendant insisted that he had mentioned John as someone he had been out with that night. Defendant again urged them to talk to John, and claimed that he had left Child's with John. They had then separated, and defendant had gone "right home." Defendant then conceded that he had gone to 7-Eleven before going home (McHugh: 1154-55; Parpan: 1288-89, 1305).

After a 45-minute break, defendant said he knew John from darts and from the bar, and that John was an alcoholic. Asked about

33

John's relationship with Williams, defendant said, "I don't talk about other people." However, defendant denied having had a relationship with Williams. Parpan then asked, "Look, did this happen maybe because she made a remark, maybe she said something that set you off?" Defendant lowered his head, hesitated, and his voice sounded "upset" as he quickly said, "You know, I can't help you with this. We are on different sides here" (McHugh: 1155-56, Parpan: 1289-93, 1303-04).

At 5:10 a.m., McHugh and Parpan left room and spoke with Cole and Cereghino, who then questioned defendant. Defendant stated that he had been drinking "heavily" that night at the Falcon's Nest, and later that night went down the block to Granny's, and ultimately to Child's. While drinking there, he saw Williams and then saw her leave alone. When the bar closed, defendant walked home. In response to Cereghino's question, defendant admitted he might have stopped at the 7-Eleven. At that point, Cereghino told defendant, "We know that you had bought beer in the 7-Eleven that night," but defendant did not respond. He then denied having been in Williams' apartment that night. When defendant sought to excuse his spotty memory by claiming to have alcohol-induced "blackouts," Cereghino asked if he might have forgotten having been in Williams' apartment that night. Defendant conceded that was "possible." Cereghino said, "We know you were in the apartment that night." Defendant

34

said nothing.   Cereghino then told defendant that Kane had told detectives what had happened in the apartment that night.   Defendant again denied any involvement (McHugh: 1157, 1239; Parpan: 1293; Cereghino: 1363-65, 1374-77).

At about 7:00 a.m., McHugh and Parpan returned to the interview room and again urged defendant to "tell the truth."   Defendant said his son had told the police the truth and wound up in jail, so defendant "wanted his attorney to tell his side of the story."   The detectives immediately stopped questioning defendant, and shortly thereafter defendant called his wife (McHugh: 1157-58, 1238; Parpan: 1293-94).

On May 3, 2000, Hardman identified defendant from a lineup as one of the men he had seen with Williams in Child's in the early morning of April 12, 2000.   Quinn viewed the same lineup, but was unable to identify anyone because "[a]ll the people in the lineup looked the same" and had their bodies covered with a sheet; Quinn's inability to see the stature of the men in the lineup had affected her ability to make an identification (Hardman: 390-92, 404; Quinn: 512, 562-66, 593-95).

On May 4, 2000, Quinn saw a photograph in the newspaper that depicted McHugh and defendant.   Quinn told McHugh that the man in the newspaper photo was the same man she had seen with Williams at

35

Child's and at the back door of Williams' building on the morning
of the murder (Quinn: 595; McHugh: 1119-20, 1158, 1161-62, 1165-67).

D.     Evidence is collected and analyzed.

On April 14, 2000, Nassau County medical examiner Doctor GERARD
CATANESE conducted an autopsy on Williams.  A ligature was wrapped
three times and knotted tightly around Williams' neck.  Deep scalp
bruises on the front and left side of Williams' head, visible only
when the scalp was peeled back, were caused by two ante-mortem blunt
impacts.  Williams had also suffered bruising to her neck muscles,
fractures of her hyoid bone and thyroid cartilage, and bruising
behind her larynx, all of which indicated manual strangulation while
she was alive, as did a bruise on her tongue, a "frictional"
abrasion on her neck, and hemorrhages in her eyes and eyelids.
Based on these factors and "ligature abrasion furrows" on the skin
of Williams' neck, Catanese concluded that Williams had died of both
manual and ligature strangulation.  Catanese also observed that
Williams' hands and fingernails were uninjured (Catanese: 727-29,
743-58, 760-66).

Williams' blood alcohol was .26 percent at the time of her
death; that reading would have rendered her "severely intoxicated."
However, Williams had no toxicological indication of any kind of
drug abuse.  Williams definitely had not used cocaine in the 48

36

hours before her death (Catanese: 752, 758; Dr. THOMAS MANNING: 776, 778-83, 785, 787-89).

None of the latent prints found at the crime scene matched defendant's. The wineglass taken from Williams' kitchen table bore her fingerprint. A fingerprint on the CD case belonged to Kane. Two fingerprints found on the photo album and another fingerprint on a sheet of paper taken from the table could not be matched to anyone. No other identifiable fingerprints were recovered from any other surface in the apartment, including the ligature around Williams' neck (Detective CHARLES COSTELLO [Latent Fingerprint Section]: 707-15, 717-21; McHugh: 1190, 1209-10, 1261, 1266, 1271).

DNA testing established that the neck of the beer bottle on the kitchen table contained DNA from defendant, Kane, and Williams, with Kane the major contributor. DNA on the Vantage cigarette butts found under the ashtray on the kitchen table and under Williams' body were consistent with her profile, while the "major profile" of the DNA on the two brown cigarette butts was consistent with Kane's (Police serologist KEVIN MCCARTHY: 953-56, 960-61, 966-67, 977, 984, 998-99, 1004; MEGHAN CLEMENT [Laboratory Corporation of America]: 1021-31, 1043-55, 1057, 1064, 1069-70).

Microscopic examination of the ten fingernail clippings the medical examiner had taken from Williams during her autopsy revealed a mixture of a "brownish" substance and flecks of old nail polish

37

under the fingernails of the index, middle, and pinky fingers of the right hand.   The material under Williams' right index and pinky fingernails contained DNA consistent with Williams'.   Williams and Kane were the contributors to the mixture of DNA found under Williams' middle fingernail, with Kane the "major donor." Subsequent testing by the Suffolk County Crime Lab established that the index and pinky nail clippings contained no seminal fluid and that the middle fingernail clipping contained no human hemoglobin (Catanese: 751; McCarthy: 956-58, 960-63, 972, 975-77, 990, 997, 1004; Clement: 1025-27, 1029-30, 1045-51, 1069-70).

Detective VITO SCHIRALDI of the Police Department's Scientific Investigation Bureau described the ligature removed from Williams' neck as "similar to the power cord that would be used on a phone or answering type machine."   Based on their respective examinations, Schiraldi and FBI firearms and toolmark examiner CARLO ROSATI each concluded that the cord was cut with a "sharp implement" with a one-directional, "shearing type" of force.   Each found that the mark on the cord could have been made by "any type of shearing tool,"[16] including defendant's Leatherman's tool, the blades of which pass

---

[16]A shearing tool is one that has two blades that "pass alongside of each other" as they cut. When cutting wire, the bottom jaw holds the wire stable, while the "shearing jaw" cuts and creates a "flattening" of the wire (Schiraldi: 919-21, 925; Rosati: 933, 945).

38

"alongside of each other" as they cut through material.  Neither Rosati nor Schiraldi could conclude that defendant's Leatherman's tool definitively had made the original cut in the ligature. Moreover, a piece of black polymer-like material found on the Leatherman's tool did not come from the ligature (Schiraldi: 805-10, 815-28, 854-55, 900, 909-10, 915, 921; Rosati: 933-36, 939, 941, 943, 946).

E.   **Months after his arrest, defendant makes a statement about the murder.**

At 7:12 p.m. on October 18, 2000, Officer Stark received a call of a disturbance at 25 Elizabeth Street in Farmingdale, defendant's home, and responded to that location, where she saw defendant "pacing" inside the lobby.  Defendant came outside, and Stark asked his name.  Defendant immediately raised his hands in the air and said, "Paul Scrimo.  I didn't do it.  John Kane did.  I was never in that apartment."  Officer Wadsworth asked, "[T]hen why are we here tonight?"  Defendant described an "ongoing problem" he was having with an Hispanic man, but said that the man "wasn't there anymore" (Stark: 1400-01, 1406-08, 1414).

Defendant then resumed talking about Williams' murder.  He said that he, Kane, and Williams had been at Child's, and that Williams had kissed him, but only to whisper in his ear that "she wanted drugs from Kane," who, defendant explained, was a drug dealer and

39

did not give drugs away for free.  Defendant said that they all left
the bar and walked toward Williams' apartment, but that he went to
7-Eleven to buy beer and cigarettes while Williams and Kane went
directly to the apartment.  After completing his purchase, defendant
met Kane in an alleyway, gave him the beer and cigarettes, and said
he had to get home because his "old lady [was] going to be really
angry at [him]."  Defendant explained that, when the police picked
him up, he had never mentioned Kane "because of the drugs."
Finally, defendant said to Stark, "You're the officer who found
Ruthy . . . I'm really sorry.  I saw those pictures.  They looked
real terrible" (Stark: 1408-09, 1419).

<u>The Verdict and Sentence</u>

On May 21, 2002, the jury found defendant guilty of intentional
murder.  On June 18, 2002, defendant was sentenced to an
indeterminate state prison sentence of 25 years to life.

## POINT I

THE HEARING COURT PROPERLY DENIED DEFENDANT'S SUPPRESSION
MOTION (answering Defendant's Brief, Point I).

The police had abundant probable cause to arrest defendant:

a full sworn statement from murder eyewitness Kane. Contrary to

defendant's view (DB15-18), there was no need for the police to

verify this statement. Moreover, the statement's reliability was

enhanced because it was against Kane's penal interest and

corroborated by independent police investigation. Accordingly,

defendant errs in his claims that his own statements, the corporeal

and photographic identifications of him, and the Leatherman's tool

recovered from him should have been suppressed (DB15-22).[17]

It is well settled that probable cause for a warrantless arrest

"may be supplied, in whole or in part, through hearsay information."

People v. Bigelow, 66 N.Y.2d 417, 423 (1985). Of course, to rely

on such hearsay information, the People must establish, pursuant to

the Aguillar-Spinelli test, that the informant: (1) had a basis of

knowledge for the report transmitted; and (2) was reliable. People

v. Di Falco, 80 N.Y.2d 693, 696 (1993); People v. Bigelow, 66 N.Y.2d

at 423; People v. Johnson, 66 N.Y.2d 398, 402 (1985). Moreover, it

---

[17]Defendant's only suppression argument is a purported lack of
probable cause. Accordingly, the knowing and voluntary nature of
his statements to police and the propriety of the identification
procedures will not be discussed herein.

is "fundamental" that the ruling of the hearing court should not be disturbed unless it is clearly unsupported by the record.  People v. Glenn, 53 A.D.3d 622, 623 (2d Dept. 2008).  Here, defendant contests only the reliability prong.

In general, there is no one "sina qua non of reliability," but the reliability of an informant can be established where "a combination of factors, considered together," show "that an informant is worthy of belief."  People v. Rodriguez, 52 N.Y.2d 483, 489 (1981).  In essence, the reliability prong of the Aguillar-Spinelli test "requires a showing either that the informant is credible and the information supplied may, for that reason, be accepted as true or, in the absence of such showing, that the specific information given is reliable."  People v. DiFalco, 80 N.Y.2d at 697.

One "obvious" form of verification sufficient to establish reliability is an oath.  People v. Johnson, 66 N.Y.2d at 403.  Here, Kane's written statement virtually begins with Kane's acknowledgment that any false statements are punishable as a Class A misdemeanor; Penal Law § 210.45 is specifically cited.  That is sufficient to render the statement a sworn document.  See Penal Law § 210.00(1), (2).  Further, such a sworn statement satisfies the reliability prong of Aguillar-Spinelli.  Id.

42

Of course, here, Kane's statement was even more reliable because it was against his penal interest and was, in many respects, confirmed by independent information known to the police. Indeed, a statement against penal interest is sufficient to prove that an informant is worthy of belief. People v. Johnson, 66 N.Y.2d at 403; see People v. Parker, 256 A.D.2d 362, 362 (2d Dept. 1998).

Here, as the court below correctly determined, Kane's statement was an admission against his penal interest. Kane admitted that he was not only present when defendant murdered Williams, but that he had actively removed evidence -- the beer bottles -- from the crime scene, albeit at defendant's direction. Additionally, he acknowledged that he had failed to report the crime and had lied to the police when they initially questioned him. Contrary to defendant's view (DB15-17), these actions subjected Kane to liability for hindering prosecution and/or tampering with evidence. See People v. Williams, 20 A.D.3d 72, 80 (1st Dept. 2005); People v. Carney, 18 A.D.3d 242, 243 (1st Dept. 2005); People v. Barreiro, 149 A.D.2d 600, 600 (2d Dept. 1989); People v. Walker, 87 A.D.2d 725, 726 (3d Dept. 1983). Thus, it is evident that Kane's May 2 statement to police was a statement against penal interest and, for

43

that additional reason, reliable.[18]   See People v. Parker, 256

A.D.2d at 362.

In addition to relying on the sworn nature of Kane's statement,

and its against-penal-interest aspect, the People also established

that the specific information Kane gave was reliable.[19]   See People

v. DiFalco, 80 N.Y.2d at 697.   In this regard, independent sources

may corroborate details given by an informant and establish

reliability.   See id.   The independently verified details need not

be criminal in nature, so long as they are not "merely peripheral

to the reported criminal scheme," but instead "fit within the

---

[18]There was still another indication of Kane's reliability.
Because Kane provided the information directly to the police in a
face-to-face encounter, the police had an "opportunity to judge his
demeanor and evaluate his story." People v. DiFalco, 80 N.Y.2d at
700; see also People v. Kadan, 195 A.D.2d 174, 178 (1st Dept.
1994). Parpan specifically stated that he found Kane's statement
credible because he spoke "without any hesitation" and "there was
never a variation" through multiple repetitions (H206, H214-15).
Kane's facial expressions, demeanor, and reactions to questions
also contributed to Parpan's evaluation of Kane's believability
(H207, H214-15). Moreover, Parpan credited Kane's statement that
he had never before divulged the truth out of fear of defendant
(H206).

[19]Contrary to defendant's claim on appeal (DB17-18), because
Kane was an identified, not anonymous, informant, there was no
requirement that his information be corroborated; his sworn
statement against penal interest alone sufficed to establish the
Aguillar-Spinelli reliability prong. See People v. Calise, 256
A.D.2d 64, 65 (1st Dept. 1998); People v. Thomas, 231 A.D.2d 749,
750 (2d Dept. 1996); see also People v. DiFalco, 80 N.Y.2d at 697.
Nonetheless, Kane's statement identifying defendant as the murderer
was powerfully corroborated by several facts known to the police,
as detailed below.

44

informant's story of the contemplated crime as activities which are significant and essential to carrying it out."   Id. at 699.

Contrary to defendant's claim (DB18-20), the police did indeed corroborate several significant elements of Kane's statement.   As defendant acknowledges (DB18-20), numerous witnesses present at Child's on the morning of the murder verified that Kane and defendant were at Child's with Williams shortly before her death. Also significant was Kane's statement that, two weeks after the crime, defendant had told him not to worry and to keep quiet because the police believed a black man had killed Williams.   This, of course, was substantiated by McHugh's recollection that he had shown defendant a photograph of a black man.   Even more important, Kane's account of defendant's trip to the 7-Eleven was fully corroborated by the information provided by clerk Hussain.   These factors all contributed to establishing the reliability of Kane's information (H464-66, H470-76, H480-83, H566-67).

Defendant's quibbles with aspects of Kane's statement are of no moment.   Kane's failure to recall that Williams kissed defendant (as well as Kane himself) (DB19) in no way undercut Kane's statement.   Williams may have kissed both men, but Kane could simply have failed to see Williams and Kane embracing; given that Williams had an ongoing sexual relationship with Kane, she might well have attempted to shield from Kane her kissing of defendant.   Nor was the

45

reliability of Kane's statement weakened by his unawareness of defendant's argument with Williams (observed by Quinn) outside of Williams' apartment (DB20). Kane himself acknowledged that Williams was not within his view at all times (H408-09, H467). Thus, even if Kane's statement in this regard was not substantiated, it was not contradicted by, or inconsistent with, any of the other evidence.[20]

For the foregoing reasons, the hearing court correctly concluded that Kane was credible and his information was reliable. The sworn, against-penal-interest information Kane provided, the detectives' assessment of Kane's credibility, and the police corroboration of Kane's information all provided ample evidence of Kane's trustworthiness. Thus, the police had probable cause to arrest defendant, and all of the evidence that resulted from that arrest was lawfully obtained.

---

[20]Furthermore, defendant is wrong to argue that the hearing court's conclusion that Kane "appears to have been in police custody at the time he implicated [defendant]" (Decision at 13) undercut the statement's reliability (DB16-17). To the contrary, the Court of Appeals has reasoned that if an informant believes that his own penal prospects turn on his ability to provide truthful information to the police, he has an extremely compelling and immediate incentive to provide the best possible information. See People v. Comforto, 62 N.Y.2d 725, 727 (1984); People v. Rodriguez, 52 N.Y.2d 483, 490 (1981).

46

## POINT II

THE JURY'S VERDICT WAS FULLY SUPPORTED BY THE WEIGHT OF THE EVIDENCE (answering Defendant's Brief, Point VIII).

Despite an abundance of evidence -- including eyewitness testimony, DNA evidence, extensive consciousness-of-guilt proof, and additional circumstantial evidence -- defendant asserts that the jury's verdict was against the weight of the evidence because "[t]he evidence that Ruth Williams was murdered by JOHN KANE was *overwhelming*" (DB114) (*emphasis in original*). Defendant's claim is devoid of merit.

When reviewing the weight of the evidence on appeal, this Court must first determine whether a different verdict would have been unreasonable. If it finds that a different verdict would not have been unreasonable, it must "'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony.'" People v. Romero, 7 N.Y.3d 633, 643 (2007) (quoting People v. Bleakley, 69 N.Y.2d 490, 495 [1987]). If, after reviewing the record, this Court concludes that the jury failed to give the evidence the weight it should have, the Court may set aside the verdict. See id.; People v. Danielson, 9 N.Y.3d 342, 348 (2007). In conducting this analysis, "great deference" should be accorded the fact-finder's opportunity to view the witnesses, hear the testimony, and observe

47

demeanor.   People v. Romero, 7 N.Y.3d at 644; accord People v. Bleakley, 69 N.Y.2d at 495.   Based upon these principles, it is clear that defendant's attacks on the People's proof provide no basis for vacating his conviction.   A review of the evidence demonstrates that the jury evaluated the evidence appropriately.

Even without Kane's testimony, the evidence unquestionably established that defendant knew Williams, had two public encounters with her just before her murder (one of which was decidedly hostile), and was in her apartment at the time of her death. Various denizens of Child's saw defendant talking to Williams there, and some recalled seeing them kissing passionately.   A short time later, Child's patron Quinn saw defendant and Williams arguing loudly outside the entrance to Williams' apartment building, and heard defendant curse at Williams.   That defendant planned a rendezvous with Williams at her apartment just before her death was established by the testimony of 7-Eleven clerk Hussain, who, at about 4:00 a.m., sold defendant beer and cigarettes of a brand purchased only by Williams.   Hussain's detailed account made it plain that defendant not only intended to drink with Williams, but hoped to have a sexual encounter with her:   defendant purchased a package of condoms and asked Hussain not to tell his wife.   Of course, the discovery of defendant's DNA on the neck of a beer

bottle on Williams' kitchen table after her death demonstrates that defendant was drinking beer in Williams' apartment that night.[21]

Additionally, that Williams died only a short time after Hussain sold defendant the beer and cigarettes is established by the final phone call from her apartment at 4:00 that morning and by her being found dead in the same outfit she had been wearing at Child's. Further, when he was arrested, defendant possessed a cutting implement -- the Leatherman's tool -- that was capable of leaving the type of marks found on the ligature wrapped around the victim's neck.

While the People's evidence was strong and came from multiple sources, defendant's own statements provided the jury with ample basis for rejecting defendant's story. First and foremost, defendant's version of events was demonstrably false in many significant ways and directly contradicted by numerous pieces of independent evidence. For example, defendant initially insisted that he had had only a brief conversation with Williams at Child's, after which he had allegedly gone directly home. That version of events was contradicted not only by Kane's testimony, but also by

---

[21]Given the generally neat condition of the apartment, it is unlikely that the bottle would have been left on the table for any length of time. The presence of defendant's DNA on the neck of the bottle indicates: (1) that he drank from it; and (2) that he did not simply purchase the beer, as he had claimed in his statement to Officer Stark.

the testimony of various witnesses to defendant's necking session with Williams at Child's, Quinn's account of defendant's subsequent argument with Williams outside her building, and Hussain's testimony about his exchange with defendant at the 7-Eleven. As noted, defendant's claims were also belied by the DNA evidence establishing that defendant had been inside Williams' apartment just before she died.

Nor could the jury have failed to recognize defendant's convenient memory lapses and the myriad ways in which defendant's story evolved over time as he was confronted with the evidence against him. For instance, defendant's statement that he had gone directly home, arriving there by 3:00 a.m., changed when detectives informed defendant that they would check the videocameras of local businesses. After the mention of videocameras, defendant admitted that he had stopped at the 7-Eleven on his way home. He further conceded that he had arrived there far later than he had stated previously.

And while he insisted at first that the beer and cigarettes he purchased at the store were for his own consumption, this story eventually changed too. Months after his arrest, defendant summoned police to his home on an unrelated matter and suddenly blurted out that he had intended to bring the beer and cigarettes to Williams' home but, concerned about getting trouble with his wife, had passed

50

them off to Kane in an alleyway and never entered the apartment. Notably, too, during that statement defendant for the first time described Kane as a drug-dealer. That alleged -- but totally unproven -- status supposedly justified defendant's previous failure to divulge this information to police.

Defendant's statements changed in still another way. Only after his arrest, when defendant realized that his story had failed to convince the detectives, did he name Kane as his drinking companion that night. Indeed, when the police commented on Kane's sudden emergence, defendant falsely insisted he had previously mentioned Kane as an alibi. Plainly, then, the jury had every reason not only to reject defendant's demonstrably false and ever-varying statements, but to consider them as still more proof of his guilt. See People v. Ficarrota, 91 N.Y.2d 244, 249-50 (1997).

At the same time, the jury had every reason to credit Kane's account of the murder. First, unlike defendant's story, Kane's account was fully corroborated by the physical evidence. The condition of Williams' body bore out Kane's description of the crime in every respect. The bruising to her scalp, invisible to the naked eye, was consistent with her having been knocked to the floor by defendant. Further, precisely as Kane said, the medical evidence showed that she was strangled both manually and with the telephone cord. Additionally, the absence of defensive wounds and defendant's

51

DNA under Williams' fingernails was fully consistent with Kane's account of the blitz attack by defendant, which quickly rendered Williams unconscious.  The discovery of Williams' body on top of a Vantage cigarette that had burned the carpet, also indicated that she had been in the middle of smoking a cigarette when she was first assaulted.  Thus, just as Kane reported, the physical evidence showed that Williams had no opportunity to fend off defendant.

Ironically, the discovery of Kane's (but not defendant's) fingerprints at the crime scene actually substantiated Kane's statements that defendant killed Williams.  After all, as the killer, defendant obviously had a strong motive to remove any trace of physical evidence that he had been in Williams' apartment. In fact, he was careful to eradicate fingerprints from any surfaces he knew he had touched, an endeavor at which he was clearly successful. In striking contrast, the presence of Kane's fingerprint on the Allman Brother's CD strongly supported his assertion that, stunned after witnessing the grisly crime, he simply followed defendant's directive to collect the beer bottles.  Kane made no attempt to remove his own fingerprints from the scene because he knew he had played no part in the murder.  Accordingly, while the presence of Kane's fingerprint in Williams' apartment established that he had been in her apartment (DB114), it in no way indicated that he had

52

killed her. Rather, as noted, the fingerprint was fully consistent his assertion that he had simply witnessed the crime.

Although defendant argues otherwise (DB114), Kane's DNA under Williams' fingernail not only failed to incriminate him, but also supported his account that he was merely a witness to defendant's fatal attack on Williams. Because the material that contained Kane's DNA included no hemoglobin, it could not have lodged under Williams' fingernail through a scratch that drew blood, as would have been likely had Williams tried to fight off her killer. Thus, the jury had every basis to conclude, reasonably, that Williams had gotten Kane's DNA under her fingernail through benign contact, i.e., the oral sex Kane described.

Nonetheless, defendant insists that Kane betrayed "consciousness of guilt" by failing to report the murder and by initially denying any knowledge of the crime or contact with defendant on the night it occurred (DB114). However, as Kane credibly explained, after the crime, defendant repeatedly warned him to stay mum; having watched defendant choke Williams to death in front of him, Kane had every reason to fear him and the consequences of betraying his confidence. At the same time, defendant's claim ignores that he, too, failed to report the murder and that, as noted, his statements not only changed over time, but were replete with patently false and self-serving assertions and omissions.

Thus, it was entirely reasonable for the jury to infer consciousness of guilt from defendant's false and changing statements and omissions. <u>See</u> <u>People v. Ficarrota</u>, 91 N.Y.2d at 249-50; <u>People v. O'Donnell</u>, 26 A.D.3d 59, 64 (2d Dept. 2005); <u>People v. Bierenbaum</u>, 301 A.D.2d 119, 138 (1st Dept. 2002). When viewed within the context of all of the other evidence of defendant's guilt, the jury had every reason to conclude, as they did, that defendant -- not Kane -- killed Williams.

In sum, given the overwhelming eyewitness, medical, DNA, other scientific, and consciousness-of-guilt evidence establishing that defendant killed Williams, no verdict other than guilt would have been reasonable, and it cannot fairly be said that the jury did not give the evidence the weight it was due. Therefore, there is no basis for this Court to disturb the jury's verdict.

## POINT III

NOTWITHSTANDING DEFENDANT'S PARTLY UNPRESERVED CLAIMS TO THE CONTRARY, DETECTIVE SCHIRALDI'S TESTIMONY WAS ENTIRELY PROPER, AS WAS THE INTRODUCTION INTO EVIDENCE OF THE LEATHERMAN'S TOOL. (answering Defendant's Brief, Point III, §§ C-E).

Detective Vito Schiraldi of the Police Department's Scientific Investigation Bureau, an expert in criminalistics, properly gave expert testimony as to his examination of the Leatherman's tool seized from defendant, the ligature used to strangle Williams, and the ability of defendant's tool to make the marks found on the ligature.

Defendant now alleges that, based upon Schiraldi's pre-trial reports, defendant had expected Schiraldi to testify about only the ligature, the hair and fiber evidence, and the analysis of a plastic-like speck found on the tool,[22] not about the tool itself (DB71). Defendant further complains about the court's permitting in-court demonstrations illustrating Schiraldi's testimony about the tool (DB73-81), the introduction into evidence of the Leatherman's tool itself (DB79-80), and Schiraldi's reference to certain tests performed by defense expert Nicholas Petraco (DB81). Defendant's claims are largely unpreserved and entirely devoid of merit.

---

[22]Schiraldi concluded that the plastic-like speck did not come from the ligature used to strangle Williams (807-08).

55

A.  <u>Defendant's claims are largely unpreserved.</u>

At the outset, at trial, defendant never challenged the admission of the Leatherman's tool into evidence (806). And, as he acknowledges (DB81), he likewise made no complaint about Schiraldi's testimony about defense expert Petraco (921-22). Additionally, below, defendant's complaint of surprise was confined to the introduction of the photographs of the lineman dikes (large wirecutters), small wirecutters, and pocket-knife (815). Consequently, defendant's current grievances about the introduction of the Leatherman's tool and the testimony about Petraco are entirely unpreserved for appellate review, as is his claim that he was unfairly surprised by Schiraldi's tool-mark testimony as a whole. <u>See</u> C.P.L. § 470.05(2).

B.  <u>Defendant's claims all lack merit.</u>

In any event, defendant's claims are utterly meritless. First, at trial, defendant did not assert that he was surprised by Schiraldi's testimony about the Leatherman's tool or by the in-court demonstrations Schiraldi used to illustrate that testimony. Undoubtedly, he was not surprised. Along with Schiraldi's reports, the People appended 16 pages of Schiraldi's notes to their Voluntary Disclosure Form. Included was a notation that one end of the ligature had been cut with a sharp implement "not like wire cutters that sandwich a wire but more one directional force" (Schiraldi's

56

notes of April 20, 2000, p.8).  This statement plainly indicated that Schiraldi had the expertise necessary to recognize the types of cuts on the ligature and to compare them with marks left by different kinds of implements.  Defendant's knowledge of Schiraldi's expertise and practices was certainly particularly acute because defense counsel was aware that his own tool-mark expert had trained Schiraldi (821).

Notably, too, defendant's attorney requested no adjournment to prepare for cross-examination of Schiraldi; indeed, it is clear that none was needed, for counsel ably questioned Schiraldi regarding the tool-mark evidence (858-917, 924-27; see also DB74).

But even if this Court assumes, contrary to all indications, that trial counsel was actually surprised by Schiraldi's testimony in this regard, that hypothetical surprise was wholly unprejudicial.  As defendant acknowledges (DB68), he was aware that FBI agent Carlo Rosati would testify at trial about his examination of the Leatherman's tool and the cuts on the ligature.  Significantly, like Schiraldi, Rosati concluded that the cuts made with that tool were shearing-type marks similar to the one on the ligature, but that the cuts could have been made by any type of shearing tool, including scissors, but excluding wire-cutters, dikes, and knives (930-37, 939-47).  And just like Schiraldi, Rosati concluded that defendant's Leatherman's tool could have cut the ligature but could not say so

"definitively" (935, 939, 941, 943, 946). Plainly, then, defendant can hardly allege that he was blind-sided by Schiraldi's tool-mark testimony. He knew, and concedes that he knew, that virtually identical testimony was in the offing from Rosati.

Apparently recognizing as much, defendant insists that he was particularly prejudiced by Schiraldi's testimony about the Leatherman's tool because, unlike Rosati, Schiraldi testified that defendant's tool "had certain 'unique' features which would be reflected in the cuts it makes (DB72)" In defendant's view, this testimony implied that only that tool could have cut the ligature with which Williams was strangled (id.). This newfound claim misstates the evidence.

While Schiraldi did testify that wear and scratching on the jaws of defendant's tool gave it "unique individual characteristics," he went on to explain that these characteristics were not as obvious on a small multifilament type of wire like the ligature (827, 843-44, 852). And, as defendant ignores, Schiraldi further concluded that, while defendant's tool was "capable" of making the original cut shown in ligature, he was unable to determine that that particular tool, to "the exclusion of all others similar to it" (855), had made the cut on the ligature. As shown, this was entirely consistent with Rosati's testimony (935, 939, 941,

943, 946).  Thus, defendant plainly cannot assert that he was in any way prejudiced by Schiraldi's cumulative testimony in this regard.

Relatedly, defendant now argues that he was prejudiced by Schiraldi's unprotested testimony in the course of redirect examination that he reached his conclusions about the unique characteristics of the Leatherman tool while observing tests being conducted on the tool by the defense's supposed "'tool mark' expert, Nicholas Petraco" (DB81).  This claim, too, is belied by the record.

An accurate reading of the relevant testimony, rather than defendant's appellate rhetoric, reveals that Schiraldi stated nothing more than that, on April 18, 2000, Petraco and defense counsel came to a conference room of police headquarters; Petraco examined the Leatherman's tool and a Budweiser beer bottle, used a microscope to view the tool, and did test cuts with it on wire, which he photographed (922).  Plainly, then, that testimony in no way in no way established Petraco as an "expert," tool-mark or otherwise, in the eyes of the jury, as defendant inaccurately insists (DB81).  Moreover, Schiraldi's actual testimony obviously did not imply that, if called to testify, Petraco would necessarily have agreed with Schiraldi's conclusions, as defendant also urges (id.).  Further, even if Schiraldi's brief reference to Petraco could somehow have "placed an impermissible burden on the defense to call [him] as a witness" (DB81), any such misapprehension by the

59

jury was surely dispelled by the unequivocal instructions of the court, which the jury presumably followed (see People v. Davis, 58 N.Y.2d 1102, 1104 [1983]), that the People -- not defendant -- bore the burden of proof (see 1792-94, 1796-97).

Equally meritless is defendant's complaint that the court improperly permitted Schiraldi's tool-mark demonstrations (DB73).

"Demonstrative evidence is admissible, in the court's discretion, provided that the conditions under which the experiment are conducted are similar to those existing at the time of the incident at issue." People v. Mariner, 147 A.D.2d 659, 660 (2d Dept. 1989); see also Prince, Richardson on Evidence, § 199 (10th ed. 1973). Moreover, as defendant acknowledges (DB73), "tests and demonstrations in the courtroom are not lightly to be rejected when they would play a positive and helpful role in the ascertainment of truth . . . [T]he trial court itself must decide in the exercise of a sound discretion based on the nature of the proffered proof and the context in which it is offered, whether the value of the evidence outweighs its potential for prejudice." People v. Acevedo, 40 N.Y.2d 701, 704 (1976); accord People v. Caballero, 34 A.D.3d 690, 691-92 (2d Dept. 2006).

Viewed within this context, it is clear that the court's decision to permit Schiraldi's demonstration was an entirely provident exercise of its discretion. Without a demonstration, the

technical tool-mark evidence offered by Schiraldi had significant potential to confuse the jury. And even if there were any basis at all to defendant's speculative claim that the conditions of the cutting of the wire in court were not similar to the night of the murder because the condition of the cut end of the ligature and the condition of the tool might have changed since the crime (DB75-79), that possibility did not warrant preclusion of the demonstration, for a "variation in circumstances affects the weight of the evidence, but is not a basis for its exclusion." People v. Mariner, 147 A.D.2d at 660.

Defendant also argues that the Leatherman's tool itself was improperly admitted into evidence at trial because "there was no evidentiary connection between" it and the murder (DB79). This claim is both belated and baseless.

A court may allow the People to introduce a physical object into evidence as a demonstrative aid as long as the connection between the object and the defendant is "not so tenuous as to be improbable." People v. Mirenda, 23 N.Y.2d 439, 453 (1969). Further, foundational requirements for the admissibility of demonstrative evidence can be established through circumstantial evidence. Id., at 453-54; see People v. Lynes, 49 N.Y.2d 286, 291-92 (1980). For example, the People may properly introduce into evidence a weapon or instrument that resembles the one the defendant

61

used in the crime. <u>See</u> <u>People v. Del Vermo</u>, 192 N.Y. 470, 482-83 (1908); <u>People v. Lindsey</u>, 278 A.D.2d 133, 133 (1st Dept. 2000); <u>People v. Jackson</u>, 237 A.D.2d 620 (2d Dept. 1997). Here, the admission of the Leatherman's tool into evidence was proper.

The Leatherman's tool was clearly connected to defendant: it had been recovered from his person. Moreover, defendant overlooks that the tool was originally introduced into evidence in connection with Schiraldi's recovery of a piece of plastic-like substance from it. Schiraldi analyzed the plastic and concluded that it had not come from the ligature (806). And, as noted above, the tool also unquestionably helped the jury to understand the technical tool-mark testimony of both Schiraldi and Rosati. Significantly, the tool-mark testimony of both experts made it very clear to the jury that there was no conclusive evidence that the Leatherman's tool had been employed to cut the ligature used to strangle Williams. In short, the court properly admitted the Leatherman's tool since its probative value outweighed the minimal prejudice, if any, to defendant. <u>See</u> <u>People v. Lindsey</u>, 278 A.D.2d at 133.[23]

---

[23]Defendant's contention that the prejudice caused by admission of the tool was "compounded by the fact that the Leatherman also was *the only tool admitted into evidence*" (DB80) (*emphasis in original*) is also meritless.

Of course, even if the court improperly admitted any of the challenged evidence, defendant could not have been prejudiced as a result. First, as shown, Rosati's trial testimony about the Leatherman's tool and tool-mark evidence was virtually identical to Schiraldi's. Thus, even without the challenged testimony, the jury would still have heard the same conclusions. Moreover, as shown, Schiraldi's testimony had little, if any, adverse effect on defendant's case, for he freely admitted that he could not tie defendant conclusively to the ligature used to kill Williams. As defendant points out, this testimony left the jury free to conclude that the fact that defendant had not "disposed of the tool during the three weeks since the murder" supported an inference that his tool had not been used to cut the ligature (DB67). And, of course, given the strength of the other evidence that defendant was the killer (see Point II, supra), even if the evidence at issue was incorrectly admitted, it was surely harmless. See People v. Crimmins, 36 N.Y.2d 230, 240-42 (1975).

*   *   *

In sum, despite defendant's largely unpreserved claims to the contrary, the court acted within its discretion in admitting the complained-of evidence at trial, and any possible errors in its evidentiary rulings were entirely harmless.

63

## POINT IV

CONTRARY TO DEFENDANT'S MOSTLY UNPRESERVED CLAIMS, THE COURT PROPERLY DENIED DEFENDANT'S REQUEST TO CALL WITNESSES WHO PROPOSED TO DESCRIBE KANE AS A DRUG DEALER (answering Defendant's Brief, Point IV).

While giving defendant great latitude in attacking the credibility of eyewitness Kane,[24] the trial court properly precluded extrinsic evidence as to collateral matters: Kane's alleged drug sales to three individuals, and his purported relationship to them. After counsel made an offer of proof that Charles Ball, Stephanie Domaradzki, and Jennifer Hartman would testify that they had purchased cocaine from Kane, the court permitted counsel to cross-examine Kane at length as to these purported transactions. In addition, the court permitted cross-examination of Kane as to Hartman's allegation that, during a dispute with Kane related to a sale, Kane had begun to choke her and Domaradzki's assertion that she had once shared the cocaine she bought from Kane with Williams. However, Kane denied knowing either woman and any recollection of having choked Hartman. While Kane acknowledged that he knew Ball,

---

[24]In the course of his opening and closing arguments and his cross-examinations of the People's witnesses, counsel attempted to paint John Kane as a sporadically-employed, badly-groomed alcoholic, drug-dealer, and all-around low-life. The court gave counsel a good deal of latitude in this endeavor (see Opening Statement: 337-42; Hardman: 395, 401-02; DeFalco: 425-26; Notarnicola: 446-48; Quinn: 566, 589-90; McHugh: 1203-04, 1220-21; Parpan: 1306; Kane: 1465-68, 1468-72, 1474, 1521, 1611-13, 1616-20; Summation: 1682-83, 1694, 1718-27).

he stated that he had never sold drugs to him (1447-49, 1453-55, 1468-71).

Counsel then sought to call Ball, Domaradzki, and Hartman as defense witnesses because he was wished to introduce evidence that Kane was supplying drugs to Williams to show that Kane was "untruthful" (1548-59). The court denied counsel's application (1559). The next day, counsel renewed his request to call Ball to "testify to a drug purchase from Mr. Kane" (1628). After the court again denied defendant's motion, counsel insisted that the testimony of the three proposed witnesses would also be introduced to establish that Kane's relationship to Williams "involve[d] drug sales" (1630). The court once again rejected defendant's application because he sought to introduce extrinsic evidence on a collateral matter (1631).

When defendant asked if Ball could testify to Kane's "lack of veracity and his reputation in the community for . . . not being truthful," the court agreed, so long as Ball made no reference to drug sales (1632-34). However, although defendant argued that Hartman and Domaradzki should be permitted to testify about "the relationship" between Kane and Williams, the court adhered to its previous ruling (1636-38, 1642-43). Despite the court's willingness to hear reputation evidence from Ball, defendant called no witnesses at trial.

On appeal, defendant asserts that the court's ruling was erroneous because the proposed testimony "would have provided 'necessary background information' about KANE, . . . helped to 'explain the relationship between KANE and Williams,' to 'place the events in question in a believable context,' and to establish a motive for KANE to have strangled Williams" (DB84) (citations omitted). Defendant's claim is partly unpreserved and wholly baseless.

Initially, as shown, at trial, defendant sought to introduce the testimony of the three witnesses solely in order to show that Kane was lacking in veracity because he was a drug dealer and to show that drugs were supposedly involved in the relationship between Kane and Williams. Having failed to raise these claims below, defendant's current assertions about the importance of this testimony in providing background information about Kane, placing events in context, and establishing a supposed motive are unpreserved for appellate review. See C.P.L. § 470.05(2); People v. Innis, 83 N.Y.2d 653, 658 (1994). In any event, defendant's claims are entirely meritless.

Given the purposes for which defendant sought the introduction of this testimony at trial, the court's ruling was entirely proper, for this would have violated the long-standing prohibition against calling other witnesses to "contradict a witness' answers concerning

66

collateral matters solely for the purpose of impeaching that witness' credibility." People v. Pavao, 59 N.Y.2d 282, 288-90 (1983); accord People v. Alvino, 71 N.Y.2d 233, 247 (1987); People v. Chesson, 303 A.D.2d 418, 419 (2d Dept. 2003); People v. Diaz, 209 A.D.2d 632, 633 (2d Dept. 1994). After all, counsel's statements below made plain that his sole objective in having witnesses testify that Kane was a drug dealer was to impeach Kane's credibility. Thus, the court's denial of defendant's application was entirely correct and provides no basis for reversal of his conviction.

Nor would this testimony have been admissible for the reasons defendant now advances. Having witnesses testify that they had purchased drugs from Kane could hardly have explained the relationship between Kane and Williams, even if, as counsel promised, Domaradzki would testify that she had shared the drugs she bought with Williams. Defendant never alleged that the supposed sharing was done with Kane's knowledge, much less at his instigation. At the same time, defendant's assertions that this testimony was necessary to provide background information about Kane, place events in context, and explain Kane's relationship with Williams overlooks that he took full advantage of the wide latitude afforded him to explore all of these areas in the course of cross-examining Kane and the many prosecution witnesses who knew both Kane and Williams.

Defendant also errs in his newly-minted complaint that Hartman should have been permitted to describe an incident in which Kane had allegedly choked her during a dispute over a drug deal because it "lent plausibility to the defense theory that, it was during a dispute over drugs" that Kane strangled Williams (DB84). However, at no time did defendant ever propose any such motive, either expressly or implicitly, in the course of his arguments to the jury, in his arguments to the court for the introduction of this evidence, or in the course of his cross-examination of the witnesses.

Finally, any possible error was harmless, notwithstanding defendant's insistence to the contrary (DB85). As shown, supra (see Point II), the evidence of defendant's guilt was powerful. The excluded evidence did not touch on guilt or innocence, but on Kane's alleged drug-dealing, certainly an extrinsic matter. Thus, even if the court's ruling was improper, it was surely harmless. See People v. Gilmore, 66 N.Y.2d 863, 867 (1985); People v. Soto, 8 A.D.3d 683, 685 (2d Dept. 2004).

In sum, despite his largely unpreserved claims to the contrary, defendant has no cause to complain about the court's exclusion of extrinsic evidence as to collateral matters.

<u>POINT V</u>

NOTWITHSTANDING DEFENDANT'S UNIFORMLY UNPRESERVED CLAIMS, THE PROSECUTOR'S SUMMATION WAS ENTIRELY PROPER (answering Defendant's <u>Brief, Point VI).</u>

The prosecutor's summation was fair and a proper response to counsel's specific closing arguments. Nonetheless, on appeal, defendant accuses the prosecutor of prejudicing him in the course of numerous purported summation improprieties. In particular, defendant argues that the prosecutor denigrated him and his attorney, vouched for the credibility of prosecution witnesses, and called upon the jury to draw conclusions that could not be fairly inferred from the evidence (DB92-106). Defendant's claims are unpreserved and meritless.

As an initial matter, defendant's complaints about the prosecutor's summation are uniformly unpreserved. As defendant concedes (DB94, 106), his attorney objected to only a few of the remarks with which he now takes issue; significantly, <u>all</u> of those objections were entirely unelaborated. Three were sustained, after which defendant failed to request curative instructions or seek a mistrial (DB92-94, citing 1734-36, 1738, 1752-53, 1763, 1766, 1771-72, 1777). And, of course, defendant admittedly failed to object at all to most of the remarks that he now challenges (DB94-106, citing 1734-35, 1737, 1740-42, 1744, 1746-49, 1753, 1765-70, 1775, 1777-79, 1780-81, 1783). Consequently, defendant's appellate

69

complaints about the prosecutor's closing arguments are wholly unpreserved. See C.P.L. § 470.05(2); People v. Boyce, 54 A.D.3d 1052, 1052 (2d Dept. 2008). Nor is there any cause for this Court to review defendant's claims in the interests of justice, as defendant urges (DB106), as they are totally without merit.

Like any other advocate, a prosecutor is entitled to broad leeway in framing his arguments. See People v. Galloway, 54 N.Y.2d 396, 399 (1981); People v. Williams, 305 A.D.2d 703, 703 (2d Dept. 2003). Moreover, the prosecutor's summation must be examined in relation to the defense summation, as the prosecutor is entitled to respond to the defense arguments. See People v. Halm, 81 N.Y.2d 819, 821 (1993); People v. Boyce, 54 A.D.3d at 1052. In particular, "a prosecutor is entitled to respond vigorously to a defendant's assault upon the credibility of the People's witnesses . . . even when such comments might be deemed inappropriate under other circumstances." People v. Liang, 208 A.D.2d 401, 402 (1st Dept. 1994) (citations omitted).

The ultimate inquiry on appeal is whether the prosecutor's conduct was so egregious as to have substantially deprived the defendant of his right to a fair trial. See People v. Chin, 67 N.Y.2d 22, 29 (1986); People v. Galloway, 54 N.Y.2d at 401. Contrary to defendant's complaints, the People's summation fairly

70

characterized the issues and was a proper response to the defense and to defendant's specific comments in summation.

First, defendant alleges that the prosecutor denigrated defense counsel by contradicting defendant's summary of the testimony of the toxicologist, Dr. Manning (DB93). The prosecutor, however, was unquestionably entitled to argue his interpretation of Manning's testimony to the jury. See People v. Garcia, 27 A.D.3d 398, 399 (1st Dept. 2006). And to the extent the prosecutor disagreed with counsel's version of Manning's testimony, he hardly "ridicul[ed]" counsel (DB93), as defendant baselessly insists. Instead, the prosecutor properly responded to what appeared to be a deliberate effort by counsel to mislead the jury by implying that traces of cocaine could have been present in Williams when she died and dissipated before her autopsy (1696). In any case, the prosecutor's argument was nothing more than fair response to defense counsel's own.

Second, defendant takes issue with the prosecutor's use of the words "charade," "sham," and "swill" in the course of his summation and his arguments that defendant thought the police were "stupid" and that he had "tailored his statements to the police to fit whatever evidence he thought they had" (DB93-94). As defendant studiously ignores, these arguments were directed almost exclusively at defendant's patently false accounts of the night of the crime

71

(1734, 1737-38, 1744, 1752-53, 1757, 1765-66, 1771-72, 1783).   As such, they unquestionably "constituted fair comment on the issue of his credibility." <u>People v. Humphrey</u>, 15 A.D.3d 683, 686 (3d Dept. 2005); <u>see also</u> <u>People v. Overlee</u>, 236 A.D.2d 133, 144 (1st Dept. 1997) (prohibition against branding a defendant a liar or accusing him of lying "does not preclude the use of a more tempered challenge to a defendant's credibility").

Third, the prosecutor's reference to the changes in defendant's appearance between arrest and trial (DB95) was perfectly proper. The prosecutor made his initial reference to the change in defendant's appearance to explain why Hardman, who had identified defendant in a lineup the day after his arrest, was unable to identify him at trial (1734-35).   The prosecutor's second reference to the change in defendant's appearance since his arrest was obviously nothing more than a response to defendant's sustained efforts to discredit Kane by portraying him as an alcoholic, drug dealer, and general miscreant (Opening Statement: 337-42; Hardman: 402; DeFalco: 421, 425-26, 430-31; Notarnicola: 446-48; Quinn: 566, 589; McHugh: 1203-04; Parpan: 1306; Kane: 1468-71, 1507; Summation: 1682-83, 1694, 1718-27).   This, of course, was entirely proper. <u>See</u> <u>People v. Halm</u>, 81 N.Y.2d at 821.

Next, defendant alleges that the prosecutor improperly vouched for the credibility of Detectives McHugh and Parpan "by arguing

72

that, between them, they had 50 years of experience at determining if homicide suspects are telling the truth, and suggesting that jurors should accept the Detectives' conclusion that [defendant] *lied* to them" (DB95-96, citing 1742, 1746-49) (*emphasis in original*). Contrary to defendant's claim on appeal, such an argument does not constitute improper vouching.

Improper vouching occurs only when a prosecutor places his or her office's integrity behind arguments, or offers a personal opinion about a witness's credibility. See People v. Bailey, 58 N.Y.2d 272, 277 (1983); People v. Jackson, 7 N.Y.2d 142, 144-45 (1959). The prosecutor committed no such vice in the remarks defendant cites. Without question, the prosecutor defended the credibility of the People's witnesses, both of which had been the targets of repeated defense broadsides (see, e.g., 1679, 1707, 1709-10, 1713). As noted, the prosecutor was entitled to do so, and he kept his remarks well within acceptable bounds.

To the extent any of the complained-of arguments invited the jury to draw an inference about the witnesses' credibility different from that proposed by defendant, this was, of course, entirely proper. See People v. Humphrey, 15 A.D.3d at 686; People v. Duncan, 2 A.D.3d 455, 455 (2d Dept. 2003). Although he presented no evidence at trial, defendant nonetheless created a credibility contest by pitting his version of events -- and its veracity --

73

squarely against that of the People's witnesses. Beyond the defendant's vigorous cross-examination of the People's witnesses, throughout his summation defendant had expressly urged the jury to credit his account over that of the prosecution witnesses (1673-1732). Under these circumstances, it was particularly appropriate for the People to argue that the account of the People's witnesses was more credible than defendant's unsupported story.

Finally, citing a litany of examples (DB97-106), defendant insists that the prosecutor improperly "call[ed] upon the jury to draw conclusions which are not fairly inferrable from the evidence" (DB96). Even if these claims were preserved for appellate review -- and they are not -- they could not prevail. Despite defendant's insistence to the contrary, all of the arguments he faults simply drew fair inferences from the evidence. Since a prosecutor is accorded broad latitude in drawing such inferences in summation, the challenged remarks were unquestionably well within the bounds of permissible advocacy. See People v. Nieves, 2 A.D.3d 539, 540 (2d Dept. 2003).[25]

---

[25]Even if the prosecutor misrepresented the evidence in his arguments (DB98-106), which he did not, since defendant does not even contend that any of the purported errors were made in bad faith, they are not grounds for reversal of his conviction. See People v. Fonder, 211 A.D.2d 445, 446 (1st Dept. 1995).

74

Moreover, any potential harm posed by the prosecutor's closing arguments was surely ameliorated by the court's unequivocal instructions to the jury that the prosecution alone bore the burden of proof (1792-94), that the jury should not accord greater credibility to police testimony than to that of other witnesses (1804), that the arguments of counsel were not evidence (1786-87, 1790), that any "verbal exchanges" between the attorneys should be ignored (1790-91), that the jurors were the sole and exclusive judges of the facts (1788-89, 1803), and that they were to rely on their own recollection of the evidence (1736, 1773, 1787) and determine what weight to accord to it (1803-06). Since the jury presumably heeded these instructions, defendant could not have suffered any prejudice as a result of the prosecutor's closing arguments. This is especially true here, where, as shown (see Point II, supra), the People educed compelling evidence of defendant's guilt.

In sum, defendant's unpreserved challenges notwithstanding, the prosecutor's closing arguments were entirely proper.

POINT VI

**DEFENDANT'S TRIAL COUNSEL PROVIDED MEANINGFUL REPRESENTATION (answering Defendant's Brief, Points II; IIIA-B, F; V; VII).**

The representation provided by defendant's trial counsel, viewed as a whole, satisfied the state and federal constitutional standards of effective assistance of counsel. Trial counsel's performance was "meaningful" (People v. Benevento, 91 N.Y.2d 708, 712 [1998]) and reasonable within the wide range of acceptable professional behavior. Strickland v. Washington, 466 U.S. 668, 689 (1984).[26] Defendant has failed to carry his burden of overcoming the strong presumption of reasonable professional assistance. Id. Defendant has also failed to establish that the alleged substandard performance of counsel in any way undermined the reliability of the verdict. People v. Caban, 5 N.Y.3d 143, 155-56 (2005); People v. Ramirez, 22 A.D.3d 334, 337 (1st Dept. 2005). Faced with compelling evidence establishing defendant's guilt, trial counsel put forth a commendable effort, acting as a true advocate on defendant's behalf and ensuring a fair trial. Therefore, defendant's ineffectiveness claims should be rejected, and his conviction should be affirmed.

In ineffective-assistance-of-counsel claims, the defendant "bears the well-settled, high burden of demonstrating that he was

---

[26]Defendant does not specify whether his claim is brought pursuant to the federal or state constitution (DB, Points IIIA-B, F; V; VII).

deprived of a fair trial by less than meaningful representation." People v. Hobot, 84 N.Y.2d 1021, 1022 (1995). Moreover, "courts are properly skeptical when 'disappointed prisoners try their former lawyers on charges of incompetent representation.'" People v. Benevento, 91 N.Y.2d at 712 (quoting People v. Brown, 7 N.Y.2d 359, 361 [1960]).

Indeed, "a convicted defendant, with the benefit of hindsight, often can point out where he or she thinks trial counsel went awry." People v. Rivera, 71 N.Y.2d 705, 708 (1988); accord People v. Baldi, 54 N.Y.2d 137, 146 (1981). However, the Court of Appeals has emphasized that the "most critical concern in reviewing claims of ineffective assistance of counsel is to avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis." People v. Baldi, 54 N.Y.2d at 146.

Trial tactics do not constitute ineffectiveness merely because they fail. People v. Benevento, 91 N.Y.2d at 712; People v. Rivera, 71 N.Y.2d at 708; People v. Baldi, 54 N.Y.2d at 146-47. Indeed, trial tactics do not constitute ineffectiveness even when, retrospectively, they are "errors of judgment" (People v. DeMauro, 48 N.Y.2d 892, 894 [1979]), or the result of "poor judgment." People v. Jackson, 52 N.Y.2d 1027, 1029 (1981).

77

Instead, to establish ineffectiveness, "'it is incumbent on defendant to demonstrate the absence of strategic or other legitimate explanations' for counsel's alleged shortcomings." <u>People v. Benevento</u>, 91 N.Y.2d at 712 (quoting <u>People v. Rivera</u>, 71 N.Y.2d at 709). So long as counsel's alleged error "reflects a reasonable and legitimate strategy under the circumstances and evidence presented," counsel is not ineffective. <u>People v. Benevento</u>, 91 N.Y.2d at 712-13. Indeed, counsel's actual, subjective reasons for the challenged conduct or omission are "immaterial," if the record reveals "the existence of a trial strategy that might well have been pursued by a reasonably competent attorney." <u>People v. Satterfield</u>, 66 N.Y.2d 796, 799 (1985).

Further, the strategy need not be "the best trial strategy, or even a good one, so long as [the] defendant was afforded meaningful representation." <u>Id.</u> at 799-800. Unless a defendant demonstrates the absence of any such explanation for counsel's actions, "it will be presumed that counsel acted in a competent manner and exercised professional judgment." <u>People v. Rivera</u>, 71 N.Y.2d at 709.

Here, it is clear that defendant has failed to meet his burden of demonstrating constitutionally deficient representation. The record supports the conclusion that defendant's trial counsel was vigilant and aggressive in protecting defendant's rights and the result was a fair trial. For example, counsel pursued his only

78

viable defense: to try to pin the murder on Kane, who was admittedly present during the murder. To that end, he highlighted the weaknesses in the physical evidence, i.e., that Kane's DNA -- not defendant's -- was found under Williams' fingernail, that none of defendant's fingerprints was found in Williams' apartment, and the lack of unequivocal evidence linking defendant's Leatherman's tool to the ligature used to strangle Williams.

Counsel also lost no opportunity throughout the trial to attack the credibility of the prosecution witnesses, particularly Kane, Hussain, and Quinn, whose testimony was the most damaging to the defense. Additionally, he effectively emphasized that Quinn had been unable to see the face of the man who argued with Williams outside her building and that, in any event, Kane never saw Williams leave the apartment during that time-frame and was unaware of any argument between her and defendant. Further, counsel urged the jury to conclude that defendant's statements to police were involuntary because he was drunk when he made them and/or coerced into speaking to police. Additionally, counsel offered numerous objections and gave lengthy, effective opening and closing statements. Plainly, then, counsel provided exemplary representation.

Nonetheless, defendant attacks counsel's representation in myriad ways. These claims are based on twenty-twenty hindsight, as

79

well as misapprehensions of the law and/or the record, and should be rejected.

First, defendant complains that defense counsel should have moved to strike the detectives' descriptions of his "non-verbal reactions, such as the movements of his eyes and head, the pauses between his answers, and the change in the tone of his voice" because it was "offered as evidence of the operation of [his] mind" (DB59-60). Defendant argues that counsel exacerbated the situation by having one of the detectives repeat this testimony during cross-examination and by referring to it in summation (DB60). Defendant errs.

In describing their post-arrest conversation with defendant, Detectives McHugh and Parpan testified that they explained to defendant that they routinely examined businesses' security videotapes. They then asked if defendant was sure he had not stopped on his way home on the morning of the murder. Defendant "put his head down," sat there for "a couple of moments" and "appeared to be getting nervous" before he admitted having stopped at 7-Eleven (McHugh: 1152-53; Parpan: 1281-82).[27] As this testimony

_____

[27]Later in the conversation, after Parpan told defendant that "nothing is a secret when more than one person knows about it," the detectives recalled that defendant "dropped his head," paused briefly and appeared to be "very nervous" (McHugh: 1154-55; Parpan: 1288). Parpan also testified that, when asked if Williams had made
(continued...)

makes plain, the detectives were simply describing their observations of defendant's conduct during their questioning of him. This, of course, was entirely proper. Thus, as counsel obviously recognized, he had no cause to move to strike this testimony.

Defendant's related complaint that counsel erred in having Parpan repeat his description of defendant as appearing nervous during this interview and referring to this testimony in summation (DB60, citing 1306, 1679) misses the mark entirely. In fact, counsel deftly turned this evidence to defendant's advantage by urging the jury to conclude that defendant was nervous during questioning because "sophisticated homicide detectives who were expert at getting admissions" were trying to "put words into [his] mouth" (1679). Thus, far from demonstrating that counsel was ineffective, his use of this evidence showed his competence.

Defendant also faults counsel for failing to move to strike the detectives' testimony that "[t]hey [k]new [he] [w]as [l]ying" (DB61, citing 1150-51, 2253, 1155, 1293) (*emphasis in original*). This claim, too, misstates the testimony. In fact, the detectives were simply recounting their questioning of defendant, during which they either challenged his representations (1150-51, 1155) or told him

_____

[27](...continued)
a remark that had "set [him] off," defendant again lowered his head, hesitated, and his voice changed and sounded "upset" as he replied (Parpan: 1291-93).

that they knew he was lying (1153, 1293). This testimony was, of course, entirely proper. Indeed, defense counsel may have felt that the accusatory tone of a portion of the interrogation was important for the jury to hear. This reasonable strategic explanation renders defendant's current complaint mere second-guessing.

Next, defendant asserts that counsel was ineffective for failing to move to strike the detectives' testimony that, after his arrest, defendant "declined to answer *certain* questions," "did not respond when he was implicitly accused of the murder," and ultimately "declined to answer any further questions and invoked his right to counsel" (DB63-64) (*emphasis in original*). This claim must also be rejected.

Generally, a defendant may not be cross-examined or impeached with pretrial silence. People v. Conyers, 52 N.Y.2d 454, 457 (1987); People v. DeGeorge, 73 N.Y.2d 614, 618 (1989). However, this prohibition is simply inapplicable when the defendant does not remain silent before trial. See Anderson v. Charles, 447 U.S. 404, 408-09 (1980); People v. Savage, 50 N.Y.2d 673, 678, 681 (1980). Here, because defendant did not remain silent, it was proper for the prosecutor to point out to the jury what defendant, despite his three lengthy conversations with the police, did not say. This is particularly true, since this testimony was admissible as evidence

of defendant's consciousness of guilt.  See People v. Punter, 222 A.D.2d 242, 242 (1st Dept. 1995).

And although it is not ordinarily permissible for a prosecutor to elicit evidence of the fact that a defendant invoked his right to silence (see People v. Von Werne, 41 N.Y.2d 584, 587 [1977]), in light of the court's unequivocal instructions to the jury as to: 1) the quantum of evidence needed to prove guilt beyond a reasonable doubt (1792-95); 2) defendant's right to remain silent and his right to advice and assistance of counsel before answering questions or giving a statement to the police or the prosecutor (1812); and 3) the non-evidentiary status of the arguments of counsel (1790), instructions the jury presumably followed, this reference to defendant's silence could not possibly have led the jury astray. This is particularly true, given the powerful proof of defendant's guilt.  See People v. Hernandez, 248 A.D.2d 727, 728 (2d Dept. 1998).  Thus, contrary to defendant's insistence (DB65-66), counsel was not ineffective for failing to move to strike the brief references to defendant's invocation of his right to counsel. Indeed, that omission furthered counsel's effort to portray defendant as a helpless, isolated victim of police questioning.

Defendant also criticizes trial counsel for failing to move in limine to preclude admission into evidence of defendant's Leatherman's tool and anticipated tool-mark evidence from

83

prosecution witness Rosati, and for allowing admission of the tool into evidence (DB67-71). These claims are baseless.

As shown (see Point III, supra), both the tool-mark testimony and the tool itself were properly admitted into evidence. Trial counsel cannot be faulted for eschewing what would surely have been futile endeavors, for "[t]here can be no denial of effective assistance of trial counsel arising from counsel's failure to 'make a motion or argument that has little or no chance of success.'" People v. Caban, 5 N.Y.3d at 152 (quoting People v. Stultz, 2 N.Y.3d 277, 287 [2004]). But even if that were not the case, since the prosecution's tool-mark evidence as a whole failed to link defendant conclusively to the ligature used to strangle Williams, counsel was not ineffective because the verdict could not have been affected by the introduction of this evidence. See People v. Caban, 5 N.Y.3d at 155-56.

Relatedly, defendant argues that counsel was ineffective because he failed to call as defense witnesses tool-mark and DNA experts (DB81-82, 111). This claim, however, is unreviewable on direct appeal, because it involves matters dehors the record regarding the reasons for counsel's decisions not to call witnesses that defendant now simply assumes could have given favorable testimony. See People v. Rivera, 71 N.Y.2d at 709; People v. Morusma, 45 A.D.3d 253, 253 (1st Dept. 2007).

84

But even on the existing record, it is likely that counsel determined that, in light of the equivocal testimony from both the People's tool-mark and DNA experts, there was simply no need for counsel to call additional witnesses. Thus, since there appears to be a reasonable explanation for counsel's decision, it cannot be viewed as a sign of ineffectiveness. See People v. Benevento, 91 N.Y.2d at 712-13.

Defendant also accuses counsel of ineffectiveness because he did not request that the court charge the jury on consciousness of guilt and did not object when the court charged the jury on how to consider defendant's statements (DB86-91). These complaints cannot withstand scrutiny.

At the outset, while defendant's statements to police provided a sufficient evidentiary predicate for a consciousness-of-guilt instruction (see People v. Delacruz, 289 A.D.2d 254, 255 [2d Dept. 2001]), counsel's failure to request such a charge did not render his assistance ineffective. First, the consciousness-of-guilt evidence was limited to defendant's statements and constituted only a minor component of the People's case. See People v. Valtin, 284 A.D.2d 203, 203 (1st Dept. 2001) (court's refusal to give consciousness-of-guilt charge not reversible error because of minor nature of such evidence); People v. Johnson, 239 A.D.2d 123, 123

(1st Dept. 1997) (same).  Clearly, counsel could not be ineffective for not making a motion the trial court would have denied.

Further, particularly in light of the charge given (described below), counsel may have chosen not to have the court draw further attention to the numerous inconsistencies in defendant's statements to the police.  Again, such reasonable strategic choices should not be second-guessed.  <u>People v. Satterfield</u>, 66 N.Y.2d at 799.  Even without a discrete instruction in this regard, the court's charge to the jury "as a whole provided the jury with sufficient guidance on how to evaluate this evidence."  <u>People v. Valtin</u>, 284 A.D.2d at 203.[28]

Defendant also complains that counsel failed to object to the court's instructions as to how the jury should assess his statements to police (DB90-91).  But this claim ignores that such instructions were in fact necessary because, due to counsel's arguments to the jury that the detectives had tried to coerce defendant into confessing (1679, 1709-11, 1713), there was "a genuine question of fact as to the voluntariness of [his] statement."  <u>People v. White</u>,

---

[28]Indeed, the court gave the jury clear and unequivocal instructions on how to assess the credibility of witnesses in general (1788-1806), as well as a thorough "two inference" charge with respect to the assessment of defendant's own conduct (1809).  Additionally, and contrary to defendant's claims (DB91), the court's instructions on the evaluation of defendant's statements to police personnel (1809-16) provided the jury with still more guidance in this regard in a way that could only have been favorable to defendant.

27 A.D.3d 883, 884 (3d Dept. 2006) (citing People v. Cefaro, 23 N.Y.2d 283, 288-89 [1968]).   Thus, it is plain that counsel's assistance was not rendered ineffective because he did not object to the latter charge.  See People v. Ramkissoon, 36 A.D.3d 834, 835 (2d Dept. 2007).   Again, defendant is, with perfect hindsight, quibbling over trial tactics.

Defendant next levels a laundry-list of largely unspecified complaints at trial counsel's conduct of the trial in general, including his opening and closing statements, his failure to object to certain evidence, and his elicitation of other evidence (DB107-09, 111-12).   It is impossible to consider these claims fully because counsel's decisions and strategies cannot be evaluated on this record.  See People v. Rivera, 71 N.Y.2d at 709; People v. Morusma, 45 A.D.3d at 253.

In any case, defendant's grievances again amount to nothing more than dissatisfaction with trial tactics.   It is easy to review a cold record and assert that counsel should have done things differently, but, in deciding a claim of ineffective assistance of counsel, care should be taken to "avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis." People v. Baldi, 54 N.Y.2d at 146.  That is precisely what defendant urges here.

In many instances, defendant is unable to explain just how counsel erred. For example, while he points to "erroneous and ill-advised remarks" by counsel during his opening statement (DB107-08) and alleges that counsel also "failed to make appropriate objections" (DB108), he fails to specify what was wrong with counsel's arguments or on what basis he believes counsel should have objected. This omission is understandable, for an examination of the remarks and testimony defendant highlights reveals nothing at all objectionable. Therefore, defendant can do no more than speculate that counsel's errors "probably prejudiced" him (DB107-08); that speculation, of course, hardly suffices to demonstrate ineffective assistance of counsel.

Defendant also points to various occasions on which, he asserts, counsel "had witnesses repeat damaging testimony" (DB108). But a review of the record reveals that, in the course of the examples defendant now cites, counsel in fact elicited information that unquestionably assisted the defense.

For example, during counsel's cross-examination of Kane, counsel elicited that Kane had never observed defendant strike Williams in the head (1588, 1606). Notably, in summation, counsel took full advantage of this testimony to argue that Kane's account of the murder was incredible because it was inconsistent with the findings of the medical examiner that Williams had sustained blows

to her head (1694-95). Additionally, while having Kane recount the crime, counsel succeeded in obtaining Kane's repeated admissions that, apart from once pulling on defendant's shoulder, he took no action to stop defendant from strangling Williams, never called for help or tried to leave the apartment, and that he was uncertain about how long events had taken (1591-1600). Thus, far from demonstrating ineffective representation, the examples defendant cites in fact show counsel's competence.

Equally erroneous is defendant's insistence that counsel "brought out additional damaging testimony" (DB109). Again, the instances defendant cites actually demonstrate the effectiveness of counsel's cross-examination. For example, in the course of extended questioning of Kane about his sexual encounter with Williams just before she died, counsel not only cast Kane in a decidedly unflattering light but also elicited testimony to support counsel's summation argument that the physical evidence belied Kane's account of this encounter and supported a conclusion that Kane had killed Williams over a drug dispute (1575-77, 1692-94).

Additionally, and also favorable to the defense, counsel had Kane confirm that, to his knowledge, Williams had neither left the apartment nor been outside the building with defendant (1577-78). Contrary to defendant's claim (DB109), this testimony was neither belied nor weakened by Kane's statements during continued cross-

89

examination that he had not known Williams' location while he was looking through CDs in the living-room (1580), that he believed that Williams was in the kitchen when defendant came back from 7-Eleven (1587), and that defendant was already in the kitchen when Kane returned to the kitchen from the living-room (1585). Thus, it is clear that defendant's complaints in this regard confuse losing trial strategy with true ineffectiveness.

Counsel's decision not to move to preclude or strike the testimony of Williams's brother, employer, and a co-worker, and not to object to admission into evidence of two photographs of the victim while alive also did not constitute ineffectiveness (DB108). The identification by Williams' brother of the two photographs of her alive were, of course, relevant to her identity, given the distortion of her features caused by the strangulation. Moreover, the photographs were in no sense used to arouse the emotions of the jury. Accordingly, the photographs were properly admitted. See People v. Wood, 79 N.Y.2d 958, 959-60 (1992); People v. Chen, 253 A.D.2d 898, 898 (2d Dept. 1998). Thus, counsel was not ineffective for choosing not to make a meritless motion that could well have antagonized the court and the jury. Additionally, the brief testimony of her employer and co-worker was necessary to explain the events leading to the discovery of her body (see Nimmo: 358-60; Daly: 361-64).

90

Further, counsel undoubtedly had sound strategic reasons for choosing not to oppose introduction of the testimony of Williams' brother.   That testimony provided little more than Williams' occupation, age, and address (see 348-52, 356). And the jury might easily have held it against defendant had his attorney callously attempted to prevent the murder victim's brother from limning the bare outlines of his dead sister's brief life.  As defendant fails to apprehend (DB108), this valid consideration also accounts for counsel's well-advised sympathetic reference to this testimony in his summation (1680).

Finally, defendant alleges that counsel was deficient because "[t]he trial Court had to repeatedly explain to [him] the way that things should be done" with respect to various evidentiary matters (DB109-10).  Defendant is wrong.

Defendant fails to consider that counsel may have been deliberately trying to skirt the rules of evidence for strategic reasons.  For example, had the prosecutor failed to object, counsel might have succeeded in bringing various types of inadmissible but damaging evidence to the jury's attention.  Such tactics are, of course, far from unheard of and certainly do not establish ineffective assistance of counsel.  See People v. Coles, 27 A.D.3d 830, 832 (3d Dept. 2006); People v. Sullivan, 153 A.D.2d 223, 227 (2d Dept. 1990).  Moreover, defendant cannot point to any instances

91

in which counsel's alleged errors in this regard affected his representation. Notably, neither of the examples he cites supports his claim that "[a]t times, after the court sustained [the] prosecutor's objections, legitimate avenues of inquiry were abandoned" (DB110, citing 1208, 1587). And, of course, even if, as defendant insists, counsel's supposed "ineptness was largely responsible for the trial running behind schedule" (DB110), on this record, there is simply no basis for his speculation that "the patience of the jury was worn thin," much less that this supposed impatience affected the verdict (DB111). Thus, defendant cannot show that he was in any way prejudiced by counsel's purportedly overzealous actions.

In sum, counsel provided a coherent, strategically valid, and vigorous defense. Here, counsel's choice of strategy was limited by the veritable wall of evidence built by the prosecution. That evidence included the testimony of an eyewitness to the entire murder, DNA evidence establishing defendant's presence in the victim's apartment, evidence of a dispute between defendant and the victim shortly before the crime, defendant's possession of a tool capable of causing the type of marks found on the ligature, as well as statements from defendant's own mouth that demonstrated consciousness of guilt. When the actions of defendant's trial counsel are properly considered in the context of the trial as a

92

whole, it is clear that the fairness of the proceedings was not adversely affected by the now-challenged, largely strategic actions and inactions of counsel.  See People v. Baldi, 54 N.Y.2d at 147. Under the circumstances, defendant has failed to carry his burden of demonstrating "the absence of strategic or other legitimate explanations for counsel's alleged shortcomings."  People v. Benevento, 90 N.Y.2d at 712; accord People v. Finley, 27 A.D.3d 763, 763 (2d Dept. 2006).  And defendant has also failed to show that the actions of his attorney compromised the fairness of the trial. People v. Caban, 5 N.Y.3d at 155-56.  Therefore, his ineffective counsel claim should be rejected.

93

## CONCLUSION

<u>THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.</u>


Dated:      Mineola, New York
            January 13, 2009




                              Respectfully submitted,

                              Kathleen M. Rice
                              District Attorney, Nassau County
                              Attorney for Respondent
                              262 Old Country Road
                              Mineola, New York 11501
                              (516) 571-3800




Douglas Noll
Ilisa T. Fleischer
   Assistant District Attorneys
      Of Counsel


94

<u>CERTIFICATE OF COMPLIANCE WITH 22 NYCRR § 670.10.3(f)</u>

Ilisa T. Fleischer does hereby certify as follows: This brief was prepared by computer; the body of the brief is double-spaced and utilizes a mono-spaced typeface (Dark Courier) of 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used (Corel WordPerfect 12), the brief contains 20,490 words, exclusive of any pages containing the table of contents, table of citations, proof of service, certificate of compliance, and addenda.

Dated: Mineola, New York
       January 13, 2009

Ilisa T. Fleischer
Assistant District Attorney