```
 1   STATE OF NEW YORK : NASSAU COUNTY

 2   COUNTY COURT      : PART XIV
     ----------------------------------------:
 3   THE PEOPLE OF THE STATE OF NEW YORK,     :
                                              :
 4                    - against -            :  IND: 1456N-00
                                              :
 5   PAUL SCRIMO,                             :
                                              :  JURY TRIAL
 6                                            :
                            Defendant.        :
 7   ----------------------------------------x

 8                          May 3rd, 2002
                            262 Old Country Road
 9                          Mineola, New York

10

     B E F O R E:
11
               THE HONORABLE JEFFREY BROWN,
12             County Court Judge.

13

     A P P E A R A N C E S:
14

15        (As previously noted.)

16                   *      *      *

17             THE CLERK:  Case on trial.  All parties are

18        present.  The jurors are not present at this time,

19        except for juror number four, Mr. Schor.

20             People ready?

21             MR. BIANCAVILLA:  Ready.

22             THE CLERK:  Defense ready?

23             MR. CHAMBERLAIN:  Defendant ready.

24             THE COURT:  Counsel, I received this morning

25        a letter that was hand delivered to me through the
```

BB

Proceedings

```
 1    court officers which I have given each one of you an
 2    opportunity to read.  It's from the superintendent of
 3    schools for the Levittown public schools.  I'll read it
 4    into the record.
 5              Dear Honorable Judge Brown:  Doctor Schor is
 6    the principal of Abbey Lane Elementary School in the
 7    Levittown School District.  While there are times when
 8    a principal's service on jury duty can be accommodated
 9    at the school, such absence of a principal at this time
10    of year presents an extensive hardship on the school
11    district and students.  We are in State testing and the
12    end of the year programs where the principal's presence
13    is crucial and cannot be substituted.  For this reason,
14    I would hope you will consider postponing Doctor
15    Schor's jury duty at this time.
16              Doctor Schor, did you ask for an adjournment
17    prior to coming over here when you went to central jury
18    because of this time of year?
19              PROSPECTIVE JUROR:  I didn't.  My experience
20    with jury duty in the past, you're in for a day or two
21    and then you are sent out.  I didn't think there would
22    be a problem.
23              THE COURT:  We do try cases in the courts.
24    What happens if you are picked for a jury?
25              PROSPECTIVE JUROR:  Also the fact that my son
```

BB

Proceedings

1    is a prosecutor, I didn't feel it was likely I would be

2    called on to serve in a criminal case.

3              THE COURT:  As you see, it did happen.

4              PROSPECTIVE JUROR:  Yes, I do see that.

5              THE COURT:  Counsel, do you have any

6    objection?

7              MR. BIANCAVILLA:  Consent.

8              MR. CHAMBERLAIN:  Consent.

9              THE COURT:  Doctor Schor, we are going to let

10   you off this case.  Next time, I would suggest you make

11   an application at central jury.

12             PROSPECTIVE JUROR:  Thank you.

13             THE COURT:  Doctor Schor, I think you have to

14   go back to central jury.

15             (Whereupon, the prospective juror was

16   excused.)

17             MR. CHAMBERLAIN:  Judge, before the new panel

18   comes in, I have an application.  I was just handed a

19   supplementary fingerprint report on a print taken from

20   the victim's apartment, obviously, over two years ago

21   at this point.

22             This is something that was demanded as part

23   of discovery.  I would like to know if the district

24   attorney knows who Mr. Schwartz (phonetic) is.  I have

25   no idea at this point.  It's a person by the name of

BB

Proceedings

1    Steven Schwartz.  I asked him and he said he wouldn't

2    reveal at this time, that we would find out during the

3    trial.

4                I would ask the Court to advise him to tell

5    me who Mr. Schwartz is and what he knows about his

6    possible relationship to the victim.

7                Aside from that, Judge, the report indicates,

8    quote, there are latents remaining on this case, close

9    quote.

10               I don't want to be in the middle of trial and

11   find out there is a latent fingerprint that they are

12   first getting around to bringing up.  I would like some

13   explanation as to why there are latents that have not

14   been taken.

15               THE COURT:  May I see what you were handed,

16   Mr. Chamberlain?

17               Mr. Biancavilla, do you wish to be heard?

18               MR. BIANCAVILLA:  Judge, we turned over a

19   copy of this report.  This report was completed this

20   morning.  Just for Mr. Chamberlain's clarification,

21   every report he has gotten says there are latents

22   remaining on the case.

23               A latent fingerprint is a fingerprint

24   recovered from the crime scene that's not matched up to

25   someone.  There are fingerprints from that scene that

BB

Proceedings

1   were not matched up with someone.  This happened to be

2   one of those fingerprints.  This morning it was matched

3   up and I gave him a report as soon as I got it.  It's

4   dated May 3rd, 2002.

5           THE COURT:  This was not in your custody

6   until today?

7           MR. BIANCAVILLA:  No.  He's aware there are

8   latent fingerprints that remain in this case.  Every

9   time one gets matched, we provide documentation to it,

10  which is what we did this morning.

11          As to who the person is, I'm not required to

12  disclose to Mr. Chamberlain who the person is, nor what

13  the relationship to the victim was.

14          THE COURT:  What I would ask, is this person

15  going to be a witness during this trial?

16          MR. BIANCAVILLA:  We are not calling him, no.

17          MR. CHAMBERLAIN:  Judge, I'm a little curious

18  as to why latents are being matched two year after to

19  the crime.

20          MR. BIANCAVILLA:  That's police procedure.

21  You have open prints.  You try to match them to

22  someone.

23          THE COURT:  You're saying it took until this

24  date to match them up?

25          MR. BIANCAVILLA:  Exactly.  That's all.

Proceedings

1        THE COURT:  If a particular detective is

2    placed on the stand, you can examine him as to that

3    issue.

4        MR. BIANCAVILLA:  Detective Costello will be

5    testifying as to the prints on the case.  He has done

6    all the work.

7        THE COURT:  Mr. Biancavilla, as an officer of

8    the court, tells me that was just handed to him and

9    it's dated May 3rd.

10        I don't know what to tell you other than he

11    turned it over to you as soon as he got it which was

12    today.  Today is May 3rd.

13        MR. BIANCAVILLA:  As I walked in this

14    morning, the detective handed it to me.  I made a copy

15    of it and handed it to Mr. Chamberlain as soon as I

16    came in.

17        MR. CHAMBERLAIN:  Some information we had was

18    that there was a New York City narcotics officer in the

19    apartment with some relationship with the victim.  The

20    question of the relationship of these people with the

21    victim, I think, could be important during the trial of

22    this case.

23        I would like to know whether there's been any

24    information that they have concerning that or the

25    relationship with this person to the victim.  Even if

BB

Proceedings

```
 1    they are not going to call this person, I think we are
 2    entitled to know if they find latents there because
 3    this was a crime scene.
 4            Who might have been present at the crime
 5    scene are important factors and factors that we asked
 6    for in discovery two years ago.
 7            MR. BIANCAVILLA:  Detective McHugh will be
 8    testifying during the trial and Mr. Chamberlain can ask
 9    him who anybody is.
10            THE COURT:  As you are aware,
11    Mr. Chamberlain, discovery is controlled by the
12    Criminal Procedure Law.  I'm not sure this falls under
13    anything in particular that you would be entitled to at
14    this juncture.  I presume it's Rosario material with
15    respect to Detective McHugh.  I don't know --
16            MR. BIANCAVILLA:  Actually,
17    Detective Costello.
18            THE COURT:  Detective Costello.  I don't know
19    if he testified at any previous hearings or not and
20    even if he did --
21            MR. CHAMBERLAIN:  Costello did not.
22            THE COURT:  Then at this point the Rosario
23    material is, in essence, early, for lack of a better
24    word.
25            MR. BIANCAVILLA:  We provided it because it
```

BB

Proceedings

1      was a report that might be referred to during the

2      course of his testimony.  That's why we provided it.

3                  THE COURT:  You'll have ample opportunity to

4      cross-examine the detective with respect to this report

5      and to why it took two years for him to provide the

6      information to the district attorney.

7                  MR. CHAMBERLAIN:  Judge, my position is I

8      believe that report would be covered under, not

9      Rosario, but discovery material which we requested two

10     years ago.

11                 THE COURT:  What subdivision?

12                 MR. CHAMBERLAIN:  It's under the 240 section.

13                 THE COURT:  I understand, but which

14     subdivision?

15                 MR. CHAMBERLAIN:  I don't have my discovery

16     demand here but it would be under scientific reports.

17                 THE COURT:  240.21(c) says, I quote, Any

18     written report or document or portion thereof

19     concerning a physical or mental examination or

20     scientific test or experiment relating to the criminal

21     action or proceeding which was made at the request of

22     or direction of a public servant engaged in a law

23     enforcement activity or a person whom the prosecutor

24     intends to calls as a witness or the people intend to

25     produce at trial.

BB

Proceedings

1      I understand this may fall under that

2  category.  However, based on what Mr. Biancavilla tells

3  me, that he just received this from the police

4  department and turned it over to you on the same date,

5  I can't go beyond that at this juncture.  However, if

6  you find something out and you want to revisit this,

7  you can.

8      MR. CHAMBERLAIN:  Thank you, Judge.

9      A year or so after, we get fingerprint

10  reports they apparently had that they didn't turn over

11  when they turned over the first batch.  I'm curious why

12  they are doing testing on latents more than two years

13  after the incident.  There was a John Marks that had

14  been taken before and we just didn't get the report

15  even though it was a year old when we finally got it.

16      With that, I'll rest on that point, Judge.

17      (Whereupon, there was a brief recess taken.)

18      (Whereupon, the panel of prospective jurors

19         entered the courtroom.)

20      THE COURT:  Good morning, ladies and

21  gentlemen.  My name is Jeffrey Brown and I'm a County

22  Court judge and I'll be presiding over this trial.

23      At this time, now that you have all gotten

24  comfortable, I'm going to ask you to rise so the clerk

25  can swear you in.

Proceedings

1           (Whereupon, the panel of prospective jurors
2       was sworn by the clerk.)
3           THE COURT:  Again, good morning, ladies and
4       gentlemen.
5           At this point what I am going to do is we are
6       going to follow a certain procedure, but I want to give
7       you a little bit of information first.
8           We are looking -- at this point, we are
9       already in the process of voir dire and we need to pick
10      four more jurors and four alternates.
11          The charge in this case is murder but this is
12      not a capital case.  Additionally, let me tell you that
13      the allegations are that the murder occurred
14      April 12th, 2000, in the County of Nassau in the
15      community of Farmingdale, New York.
16          At this point what I am going to do is give
17      you -- oh, one other thing I want to tell you.  This
18      jury will not be sequestered.  That means you'll go
19      home each and every night, including during
20      deliberations, however, we never know what will happen
21      in the course of a trial.  But at this juncture, we
22      don't plan to sequester the jury which means you will
23      go home at night during deliberations.
24          Usually we work from 9:30 to quarter to 5:00
25      and you are off for lunch.

                                                    BB

Proceedings

1        At this point I am going to ask you to come

2    forward if you meet any of the three following

3    requirements.  I am going to read them to you now.

4        Those of you who have tickets to travel and

5    have the tickets with you and proof that you are going

6    on vacation within the next few weeks -- to let you

7    know, we expect this trial to take approximately two

8    weeks and we will be commencing the trial on Monday.

9        Now, if you have tickets and you have a

10   scheduled vacation or if you are going somewhere with

11   respect to a business trip and you actually have

12   tickets with you, get on line and come forward.

13       Another reason I'll permit you to come

14   forward at this point is if you are the sole parent or

15   guardian of a person who resides in the same household,

16   a child under 16 years of age, whose principal

17   responsibility is to actually personally engage in the

18   personal care and supervision of that child.

19       The other reason, if you are a sole business

20   owner without any employees, if you have a business

21   that must close as a result of you serving on jury

22   duty.

23       You can come forward, if you meet any of

24   those three requirements, and, if you don't, we'll just

25   ask you to sit back down again and you'll have to go

245

Proceedings

1  through the process. However, if you meet one of those

2  three requirements, you can stand up now and the court

3  officers will ask you to come forward one at a time.

4          (Whereupon, the following took place at the

5  bench outside the hearing of the prospective jurors and

6  the defendant.)

7          THE COURT:  What is your name?

8          PROSPECTIVE JUROR:  Andrew Extract.  I am the

9  sole proprietor of a business.  I do computer

10  consulting.  I have no employees.

11          THE COURT:  You work out of your house?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  If you do not show up, what would

14  happen?  Would no money come into the household?

15          PROSPECTIVE JUROR:  Right.  I worked on --

16  most of my clients are during the day.  I work with

17  businesses.

18          THE COURT:  Counsel?

19          MR. CHAMBERLAIN:  Consent.

20          MR. BIANCAVILLA:  Consent.

21          (Whereupon, the prospective juror returned to

22  his seat.)

23          THE COURT:  What is your name?

24          PROSPECTIVE JUROR:  John Volpe.  I have a

25  planned vacation on the 13th of May.  I don't know if

BB

Proceedings

1    that will interfere.  I wasn't prepared to bring

2    tickets or reservations but I can supply them later on

3    today.

4                THE COURT:  Do you work for the airlines?

5                PROSPECTIVE JUROR:  My wife does.

6                THE COURT:  Does she get free transportation?

7                PROSPECTIVE JUROR:  This is a driving

8    vacation.  I'm going to Maryland.

9                THE COURT:  Do you have hotel reservations?

10               PROSPECTIVE JUROR:  Yes.  I'm going for four

11   days, the 13th through Thursday.

12               THE COURT:  Counsel?

13               MR. BIANCAVILLA:  Consent.

14               MR. CHAMBERLAIN:  Consent.

15               (Whereupon, the prospective juror returned to

16   his seat.)

17               THE COURT:  Place your name on the record.

18               PROSPECTIVE JUROR:  Frank Caponia.

19               I am self-employed.  I don't have any

20   employees and I have to be there.  If I have to be here

21   two weeks --

22               THE COURT:  What is your business?

23               PROSPECTIVE JUROR:  New home building.

24               THE COURT:  You do it by yourself?

25               PROSPECTIVE JUROR:  Yes.

BB

Proceedings

1          THE COURT:  That's amazing.

2          PROSPECTIVE JUROR:  I don't do the work but I

3    supervise.  I'm the only guy there to supervise.

4          THE COURT:  Are you in the middle of a

5    project?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Questions?

8          MR. CHAMBERLAIN:  No questions.  Consent.

9          MR. BIANCAVILLA:  Consent.

10          (Whereupon, the prospective juror returned to

11    his seat.)

12          THE COURT:  Your name?

13          PROSPECTIVE JUROR:  Felice Menchel.

14          I am a self-employed physical therapist.

15          THE COURT:  Do you work out of an office or

16    go to people's homes?

17          PROSPECTIVE JUROR:  People's homes.

18          THE COURT:  Do you work for an agency?

19          PROSPECTIVE JUROR:  I subcontract early

20    intervention and geriatrics.

21          THE COURT:  Do you get paid if you are

22    sitting on jury duty?

23          PROSPECTIVE JUROR:  No.  And my patients

24    don't get seen.

25          THE COURT:  Questions?

BB

Proceedings

1          MR. BIANCAVILLA:   Consent.

2          MR. CHAMBERLAIN:   Consent.

3          THE COURT:   Just have a seat.

4          (Whereupon, the prospective juror returned to

5     his seat.)

6          Place your name on the record.

7          PROSPECTIVE JUROR:   Beverly Capparilla.

8          Good morning.

9          I have a bus trip, just one day, May 10th.

10          THE COURT:   Where are you going?

11          PROSPECTIVE JUROR:   New York City.  It's

12     already paid for.

13          THE COURT:   That would be in the middle of

14     the trial, that's true.

15          Where are you going in the City?

16          PROSPECTIVE JUROR:   Museums and then Little

17     Italy.

18          THE COURT:   Is this through a library or

19     something like that?

20          PROSPECTIVE JUROR:   Yes.

21          THE COURT:   How much money did you pay for

22     the trip?

23          PROSPECTIVE JUROR:   $59.

24          THE COURT:   Counsel?

25          MR. CHAMBERLAIN:   Consent.

Proceedings

1          MR. BIANCAVILLA:  Consent.

2          (Whereupon, the prospective juror returned to

3     her seat.)

4          THE COURT:  Put your name on the record.

5          PROSPECTIVE JUROR:  Deborah Wiseman.

6          I wasn't sure if I understood, but I have a

7     14 year old.  I work full time but I have full custody.

8          THE COURT:  Basically -- since you work full

9     time, it appears to me someone else watches your child

10    while you work.

11         PROSPECTIVE JUROR:  Well, he's 13.

12         (Whereupon, the prospective juror returned to

13    her seat.)

14         THE COURT:  Yes, sir, your name?

15         PROSPECTIVE JUROR:  Howard Joseph.

16         I have a small retail furniture store in

17    Brooklyn.  As we speak, my bookkeeper is the only one

18    in the place now.

19         THE COURT:  How is she at selling furniture?

20         PROSPECTIVE JUROR:  It's a burden.

21         MR. BIANCAVILLA:  No questions.

22         MR. CHAMBERLAIN:  No questions.  Consent.

23         THE COURT:  Have a seat.

24         (Whereupon, the prospective juror returned to

25    his seat.)

BB

Proceedings

1              State your name for the record.

2              PROSPECTIVE JUROR:  John Bartlett.

3              I have a vacation starting the 13th and a

4       doctor's appointment on the 13th.

5              THE COURT:  Where are you going?

6              PROSPECTIVE JUROR:  Hopefully, Atlantic city.

7              THE COURT:  This is vacation from?

8              PROSPECTIVE JUROR:  My regular job.

9              THE COURT:  Have you already taken the time

10      off.

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  You work for?

13             PROSPECTIVE JUROR:  Fleet Service, American

14      Airlines.

15             THE COURT:  You're locked in the time.

16             PROSPECTIVE JUROR:  Right.

17             THE COURT:  Could you switch that if you had

18      to?

19             PROSPECTIVE JUROR:  I would have to put in

20      and tell them I had to.

21             THE COURT:  And you have a doctor's

22      appointment?

23             PROSPECTIVE JUROR:  Yes, on the 13th.

24             THE COURT:  Can you switch it?

25             PROSPECTIVE JUROR:  I can switch it probably.

                                                          BB

Proceedings

1    It's no big deal, just call them up.

2            THE COURT:  I don't want you to switch if

3    it's something you've been waiting for.

4            PROSPECTIVE JUROR:  Three weeks, a month.

5            MR. BIANCAVILLA:  Consent.

6            MR. CHAMBERLAIN:  Consent, Judge.

7            (Whereupon, the prospective juror returned to

8    his seat.)

9            THE COURT:  Put your name on the record.

10           PROSPECTIVE JUROR:  My name is Corey Slipman.

11           THE COURT:  Yes, sir?

12           PROSPECTIVE JUROR:  I'm a practicing dentist

13   in solo practice.

14           THE COURT:  When you say you are a solo

15   practitioner, you have no other dentist working with

16   you?

17           PROSPECTIVE JUROR:  No.

18           THE COURT:  Is this something that you can

19   reschedule?  These people, can you see them at night?

20           PROSPECTIVE JUROR:  Well --

21           THE COURT:  It's not funny -- a lot of

22   dentists work at night -- to ask these questions.

23   You're saying if you sat on this trial you would not be

24   bringing money into the household?

25           PROSPECTIVE JUROR:  Basically that's it.

                                                          BB

Proceedings

1        MR. BIANCAVILLA:  Consent.

2        MR. CHAMBERLAIN:  Consent, Judge.

3        (Whereupon, the prospective juror returned to

4    his seat.)

5        THE COURT:  Your name?

6        PROSPECTIVE JUROR:  William Stasco.

7        I am self-employed.  I have a collision shop.

8    I just have my partner and a helper and I do the frame

9    work.  My partner doesn't do frame work and he doesn't

10   paint.

11       THE COURT:  Do you have a lot of cars in the

12   shop at the moment?

13       PROSPECTIVE JUROR:  We are a business shop.

14   Our employee just had a back operation.

15       THE COURT:  Counsel?

16       MR. BIANCAVILLA:  Consent.

17       MR. CHAMBERLAIN:  Consent.

18       (Whereupon, the prospective juror returned to

19          his seat and the following took place in open

20          court.)

21       THE CLERK:  The following jurors have been

22   excused from this panel with the thanks of the Court.

23   If I call your name, please gather all of your personal

24   belongings and step out and follow the instructions of

25   the court officers.  You will be returning to central

BB

Proceedings

1    jury, William Stasco, Corey Slipman, John Bartlett,

2    Howard Joseph, Beverly Capparilla, Felice Menchel,

3    Frank Caponia, John Volpe, Andrew Extract.

4            If you heard your name, you have been

5    excused.  If you have not, please remain seated.

6            (Whereupon, the excused prospective jurors

7        exited the courtroom.)

8            THE CLERK:  Jurors, if I call your name,

9    please gather your personal belongings, have your

10   questionnaires ready to hand to the court officers and

11   follow their instructions, and, at this time, I ask you

12   to separate your questionnaires into the individual

13   copies, please, to hand to the officers, Steven Adamo,

14   seat number one; Russel S. Davidson III, seat number

15   two; Patrick Enz, seat number three; Michelle White,

16   seat number four; Larry Williams Jr., seat number five;

17   Vincent A. Zucarelli, seat number six; Adam M. Wright,

18   seat number seven; Robert J. Froehlich, seat number

19   eight; Thomas P. Fulfaro Jr, seat number nine; Arnold

20   Gamberg, seat number ten; Mary George, seat number 11;

21   Barbara E. Gersten, seat number 12; Victoria Giambrone

22   seat number 13; Hector R. Henry, seat number 14.

23           THE COURT:  Again, good morning, ladies and

24   gentlemen.  My name is Jeffrey Brown.  I'm the County

25   Court judge who will be presiding over this trial.

Proceedings

1    At this time I intend to make a brief

2    statement to all of you and to ask you certain

3    questions.  I want you to know I'm directing my remarks

4    to all of the prospective jurors, both those in the box

5    and those on the other side of the rail.

6    Please pay close attention to all of the

7    questions I ask, particularly the general questions I

8    direct to the body as a whole.  The reason for this is,

9    if you are outside the rail and are asked be to seated

10   in the jury box, I will ask you in a general fashion

11   whether your answers to these questions will be yes or

12   no.

13   If you have any difficulty hearing these

14   questions put to the jurors, please make this known and

15   I will repeat myself.  The purpose of my inquiries is

16   to obtain twelve citizens to serve as fair and

17   impartial jurors.

18   Now, this case involves the trial of criminal

19   charges brought by the People of the State of New York

20   against the defendant, Paul Scrimo.

21   The defendant is represented by John

22   Chamberlain.

23   MR. CHAMBERLAIN:  Your Honor, ladies and

24   gentlemen, John Chamberlain from Garden City.

25   THE COURT:  And the District Attorney

BB

Proceedings

1      represents the People of the State of New York and is

2      represented by Assistant District Attorney Robert

3      Biancavilla.

4              MR. BIANCAVILLA:  Good morning.

5              THE COURT:  Now, the charges against the

6      defendant are contained in the indictment which alleges

7      that the defendant committed certain criminal acts.

8              As jurors, you are going to be called upon to

9      determine whether or not the evidence which you shall

10     hear and see in this case establishes the defendant's

11     guilt of the charges.

12             In order to do this, you will have to

13     evaluate all the evidence at the end of the trial to

14     determine whether what you have heard from the

15     witnesses and see as exhibits proves the charges beyond

16     a reasonable doubt.  This is called finding the facts

17     and that will be your function alone.  I will find no

18     facts at this trial.

19             Now, your ultimate decision is called a

20     verdict.  Your verdict as to each charge will either be

21     guilty or not guilty.  Evidence will be presented,

22     usually by calling witnesses, and the attorneys may

23     suggest that you draw certain conclusions from the

24     evidence.  But only you can decide what the evidence

25     proves and the verdict as to each count will remain

Proceedings

1   your decision alone. As judge, I will make no

2   determination of guilt or lack of guilt.

3          My role in this trial is to make sure you

4   reach a verdict in accordance with the law and I will

5   explain to you what the law is as to all of the issues

6   at this trial.

7          In order that the People and defendant

8   receive a fair trial, I may have to rule on questions

9   concerning the conduct of the trial.  Those rulings

10  have nothing to do with whether the defendant is guilty

11  or not guilty.  I may also rule on questions concerning

12  what evidence you may consider and for what purpose.

13         When I make a ruling concerning whether you

14  may hear some testimony or see some exhibit which is

15  offered as evidence, I will be ruling on whether or not

16  you are permitted to see it or hear it as a matter of

17  law.  Likewise, if I instruct you to disregard

18  something you might have heard, I will do so because

19  that is the law.

20         None of my rulings should be taken by you as

21  any indication at all of whether you should believe all

22  or part of what is offered as evidence or that the

23  defendant is guilty or not guilty.  That is solely your

24  job to determine.  But you must accept the law as I

25  give it to you if the defendant and the People are to

BB

Proceedings

1    have a fair trial to which they are entitled.

2              Now, the indictment is merely the way by

3    which the State of New York brings into court

4    individuals it claims to have violated the law.  It is

5    not any evidence whatsoever of the guilt of the

6    defendant and, indeed, the defendant, Paul Scrimo is

7    presumed to be innocent.  This presumption of innocence

8    continues throughout the trial unless and until the

9    jury, having considered all the evidence, shall find

10   that the defendant is guilty beyond a reasonable doubt

11   of the charges made against him.

12             Now, at the conclusion of the trial, it's my

13   province as the judge to instruct the jury as to the

14   law which is applicable to this case and the jury is

15   bound to follow my instructions on the law.

16             The jury, again, is the exclusive judge of

17   the facts and it alone determines whether the People

18   have proved the charges with respect to this defendant

19   beyond a reasonable doubt.

20             Now, in connection with the selection of the

21   jury, counsel for the respective parties have a right

22   to challenge a perspective juror for cause; that is,

23   either counsel may be of the opinion that a particular

24   prospective juror is not qualified or is disqualified

25   from service here because of some fact which affects

Proceedings

1      his or impartiality as a trial juror.

2                  In addition, counsel for the respective

3      parties have an absolute right to excuse a number of

4      jurors for arbitrary reasons without assigning any

5      grounds.  That is called a peremptory challenge.

6                  Should you be challenged, you are not

7      consider that as a reflection upon your integrity,

8      intelligence or capacity to serve as trial juror.

9                  Needless to say, prospective jurors may be

10     excused for a variety of reasons.  Do not be

11     embarrassed or concerned about such challenges.  In a

12     majority of the instances, you may often discover that

13     you will agree that a juror should be excused or, for

14     that matter, that you, yourself, should be excused from

15     service on the trial jury for valid and easily

16     discernible reasons.

17                 In any event, enter into the procedure of the

18     voir dire, that is, is questioning of each prospective

19     juror, with an open mind.  I am confident you will

20     answer all questions truthfully and in good spirit,

21     knowing full well that all of us, Court, jury and

22     counsel, are solely concerned with choosing from your

23     number 12 jurors who will be able to serve as a fair

24     and impartial jury.

25                 I now caution and admonish all of you, at any

BB

Proceedings

1  time the court is in recess, you are not to discuss

2  this case or any subject connected with this trial

3  among yourselves.  This simply means that you are not

4  to discuss this case with your fellow jurors or, for

5  that matter, with anyone; nor are you to permit others

6  to discuss it with you or in your presence.

7       If anyone tries to discuss this trial or any

8  subject connected with this trail with you despite the

9  fact you tell them not to do so, then report that fact

10  to the Court as soon as possible.  If it becomes

11  necessary for you to report such an incident to the

12  Court, let me further caution you, that you are not to

13  discuss such incident with your fellow jurors but

14  report the same to the Court and do so just as quickly

15  as possible.

16       I also charge and admonish you that under no

17  circumstances are you to read anything about this case

18  in a newspaper or magazine, or even to access it on

19  internet, if it should be there, nor are you to listen

20  to or view any radio or television reports concerning

21  this trial or this case.

22       In the event you are selected to serve as a

23  juror and during the course of the trial, if you see

24  the attorneys in the area of the courthouse and they do

25  not acknowledge you or talk to you, it is not that they

BB

Proceedings

1   do not recognize you but, rather, they are following

2   the Court's direction of having no contact with you.

3            Under no circumstances are you to view the

4   scene of the alleged crime or what you may believe to

5   be the scene of the alleged crime.

6            Finally, you are not to form, even in the

7   privacy of your own mind, nor are you to express, any

8   opinion as to the guilt or innocence of defendant until

9   such time as I submit the case to you for your

10  deliberation.

11           The reasons for these admonitions will be

12  readily apparent.  Should you serve as a trial juror,

13  you must decide the case wholly and solely on the

14  testimony and evidence you will hear and see during the

15  trial.  Obviously, it would not be fair to make a

16  decision on the basis of something you read or heard or

17  something someone else wrote or said outside of this

18  courtroom.

19           So, abide by these admonitions.  Then, if you

20  are sworn to serve as a juror, you will be able to

21  decide all issues with a free and unfettered mind.

22           Additionally, prior to discharge, you may not

23  request, accept, agree to accept or discuss with any

24  person receiving or accepting any payment or benefit in

25  consideration for supplying any information concerning

BB

Voir Dire - Court

1       the trial.

2               For your information, as I said before, we

3       expect this case to take approximately two weeks and

4       we'll be starting on Monday.

5               Now, ladies and gentlemen, we now turn to the

6       actual procedure of choosing of the trial jury.

7               Although my questions will be directed to the

8       prospective jurors seated in the jury box, again, I ask

9       that all of our remaining prospective jurors who are

10      seated in the courtroom, please, pay close attention to

11      my questions so that all of you will become familiar

12      with the functions and responsibilities of trial

13      jurors.

14              My first series of questions will concern

15      matters of general information.  These questions will

16      touch on the broad qualifications of trial jurors.

17      Questions that I ask and those that counsel will

18      subsequently ask are in no way intended to embarrass

19      anyone or to delve deeply into your private lives.

20              Basically, these questions can be answered

21      with yes or no answers.  For that reason, I will put

22      these general questions to all prospective jurors

23      seated in the jury box.  If any of you wish to respond

24      positively with a yes or even with a maybe, just raise

25      your hand.  If you do not understand the question, say

Voir Dire - Court

1   so.  If you do not raise your hand, I will, however,

2   assume that your answer is no.

3           Now, the district attorney and defendant's

4   attorney and the defendant have been introduced to you.

5   Do any of you know any of these people?

6           Are any of you acquainted with Denis Dillon,

7   the District Attorney of Nassau County or any members

8   of his staff or anyone who works in the District

9   Attorney's office?

10          Do any of you personally know the law

11   associates of the defendant's attorney or anyone who

12   works with him?

13          Is there anyone in the jury box at the

14   present time that has any business pending in the

15   District Attorney's office, police department or some

16   other law enforcement agency?

17          Is there anyone in the jury box or does

18   anyone close to you work for a lawyer or a group

19   principally concerned with the law either as a paid

20   employee or a volunteer or have you done such work in

21   the past?

22          Yes, ma'am.

23          PROSPECTIVE JUROR:  I work for the president

24   and in-house counsel of a real estate firm and they are

25   both attorneys.

BB

Voir Dire - Court

1        THE COURT:  In what capacity do you work

2    there?

3        PROSPECTIVE JUROR:  Executive assistant.

4        THE COURT:  Yes, sir?

5        PROSPECTIVE JUROR:  I am a lawyer.  I'm

6    self-employed.

7        THE COURT:  What is your practice?

8        PROSPECTIVE JUROR:  It's a general practice.

9    I do some criminal work sometimes.  I do immigration

10   work sometimes.  I do divorces sometimes.

11       THE COURT:  So you do a lot of different

12   types?

13       PROSPECTIVE JUROR:  Yes.

14       THE COURT:  I saw another hand.  Yes, sir?

15       PROSPECTIVE JUROR:  Myself or my family

16   member works for a lawyer?

17       THE COURT:  If there's someone close to you.

18       PROSPECTIVE JUROR:  My son works for Nassau

19   County, Emergency Managing office.

20       THE COURT:  Is he an attorney?

21       PROSPECTIVE JUROR:  No, he's a civilian

22   officer.

23       THE COURT:  I have to ask this question.  Is

24   everyone in the jury box at least 18 years of age?

25       Are you all residents of Nassau County and

BB

Voir Dire - Court

1    citizens of the United States?

2              Has anyone ever had a dispute with a police

3    officer or other law enforcement officer?

4              Now, the attorneys have advised me the

5    following people may be called as witnesses in this

6    case and I'll read them to you now:  Doctor Michael

7    DeMartino; Doctor Gerard Catanese, Doctor Thomas

8    Manning, Doctor Arlene Colon, each of them are employed

9    by the Nassau County Medical Examiner; Detective Jack

10   McHugh, Detective Brian Parpan, Detective Scott Kovar;

11   Detective Vito Shiraldi, Detective Kevin McCarthy,

12   Detective James Cerghino, Detective Dennis Downes,

13   Detective Jerl Mullen, Detective Warren Zimmerman,

14   Detective Robert Dempsey, Detective Charles Costello,

15   Detective Ron Brusseau, Police Officer Pamela Stark,

16   Police Officer Raymond Wadsworth, Sergeant Michael Cole

17   and Detective/Sergeant Neil Delargi.  Each one of them

18   are employed by the Nassau County Police Department.

19   Meghan Clement is employed by the Laboratory

20   Corporation of American.  Bruce Budowle and Carlo

21   Rossotti are employed by the Federal Bureau of

22   Investigation.  Additionally, Gerry Connell, Martin

23   Barten, John Williams, Lisa Lawson, John Kane, Francine

24   Quinn, Thomas Hardman, Bill DeLuso, Thomas Armour, Bill

25   Nimo, Robert Gunther, Penny Shouse, Mohammed Hussain,

Voir Dire - Court

1    Pat Buffalino, Sven Brost, Carolyn Daly, John Williams,

2    Robert White, Ross O'Boyle, Adam Stiglie, Frank

3    DeFalco, Melissa Notarnicola, Doug Leung, Ceron Smith,

4    Jennifer DeRenzis, Nicholas Patrako (phonetic), Ellen

5    Scrimo, Dee Freed (phonetic), Jay Hardman, Ed Morrison,

6    Sal Pacolla (phonetic), Tina Melacello (phonetic), Lee

7    Barrow (phonetic), Bob Hilina (phonetic), Linda Russo,

8    Chris Shinklestead (phonetic), Charles Ross, Keith

9    Wilson, S. Domeraski (phonetic), Mark Hecht (phonetic),

10   Mike Kolass (phonetic), Charles Ball, Doctor Howard

11   Baum from the New York City -- chief medical examiner

12   and Doctor Phillip Raffi (phonetic).

13              Is there anyone who knows any of these

14   people?

15              Does anyone in the jury box know anything

16   about this case?

17              Has anyone talked to you about this case?

18              Has anyone read anything about this case in

19   any newspapers, magazines or other publications?  Has

20   anyone heard or seen anything at all about this case

21   from radio or television programs?

22              Now, you've all previously heard my order and

23   admonitions that you are not to speak about this case

24   amongst yourselves, that you are not to permit anyone

25   to speak about it with you, that you are not to read

Voir Dire - Court

1    any newspapers, listen to any radio programs or follow

2    any television news programs or, perhaps, access the

3    internet with respect to this trial.

4         Will each of you promise me that you will

5    faithfully obey those admonishments of the Court if you

6    are chosen to serve as a trial juror?

7         Do any of you have an opinion as to the guilt

8    or innocence of this defendant as to any of the charges

9    contained in this indictment?

10        My next series of questions, ladies and

11   gentlemen, are specifically directed to your functions

12   and responsibilities should you be chosen to serve as a

13   trial juror.  In this regard, my questions will

14   especially concern your willingness to follow my

15   instructions on the law.

16        Now, of course, in order for you to be jurors

17   in the case, you don't have to know anything about the

18   law.  That's my function to explain the law to you.

19   It's your function to determine the facts from all of

20   the evidence and apply the law to those facts and

21   thereby render a fair and just verdict.

22        If you are selected as a trial juror, I will

23   explain the law in detail to you at the end of the

24   case, but, as you will appreciate, it's important to

25   know at this stage that you will follow and apply the

Voir Dire - Court

1    laws as I give them to you.

2            I will, therefore, describe some of the basic

3    and fundamental principles of the law in order to make

4    sure that you will be ready, willing and able to follow

5    and apply these laws in arriving at your ultimate

6    verdict.

7            For example, it is our law that an indictment

8    is not evidence.  The mere fact that the defendant has

9    been indicted is not evidence of anything.  In

10   particular, it is not evidence of the defendant's

11   guilt.

12           Should you be chosen to serve as a trial

13   juror, the law requires that you decide this case

14   wholly and solely upon all the evidence or lack of

15   evidence.  Therefore, since it is our rule of law that

16   the indictment is evidence of nothing, I now ask, will

17   you each promise me that you will follow that rule of

18   law?

19           It is our law that your final verdict or

20   verdicts must be unanimous.  Twelve jurors seldom agree

21   immediately and you will, therefore, at the end of the

22   trial, be called upon to deliberate together.

23           Will everyone on the jury promise me that at

24   the time your deliberation commences you will each

25   participate in those deliberations, express your own

BB

Voir Dire - Court

1    views, and reason together with your fellow jurors in

2    order to arrive at your final verdict or verdicts?

3            In other words, will you promise the

4    defendant and the People that you are willing

5    to participate in the deliberations, express your views

6    based on all the evidence in the case, keep an open

7    mind and listen to the views of your fellow jurors and

8    reason together until you arrive at your unanimous

9    final verdict or verdicts?

10           Now, under our law, every person accused of a

11   crime and brought to trial is presumed innocent unless

12   or until he is proved guilty beyond a reasonable doubt.

13   The defendant here is presumed innocent.  Put another

14   way, a defendant is never required to prove his or her

15   innocence.  On the contrary, the People, having accused

16   the defendant of the crimes charged, have the burden of

17   proving the defendant guilty beyond a reasonable doubt.

18           Further, this burden of proof never shifts.

19   It remains on the People and the presumption of

20   innocence remains with the defendant throughout the

21   trial.

22           Is there any one among you who cannot now in

23   their own mind grant to this defendant this presumption

24   of innocence?

25           Will you promise me that you will apply this

Voir Dire - Court

1    presumption of innocence throughout the trial and you

2    will wait until you have heard all of the evidence and

3    retired for your final deliberations before you decide

4    upon your final verdict or verdicts?

5         Stated otherwise, will you promise me that

6    you will apply the presumption of innocence unless and

7    until you are convinced of the defendant's guilt beyond

8    a reasonable doubt?

9         Now, before rendering its verdict, the jury

10   must hear all of the evidence.  This is another way of

11   saying that the jury must be patient, listen to the

12   evidence and wait until they have heard all of the

13   evidence before rendering their final verdict.

14        Will you all promise me that you will be

15   patient and wait until you have heard all the evidence,

16   wait until you have heard the summations of counsel and

17   my final instructions to you, and wait until you have

18   deliberated together in the jury room before rendering

19   your verdict or verdicts?

20        In a criminal case the burden of proof is

21   entirely on the People and remains on the People

22   throughout the trial.  The defendant is not required to

23   prove anything, nor is the defendant required to

24   disprove anything.  Again, the entire burden is on the

25   People and remains on the People throughout the trial.

BB

Voir Dire - Court

1        Is there anyone here that will have

2   difficulty following that rule of law and will you

3   promise me that you will follow that rule of law?

4        Since in a criminal case the defendant need

5   not prove anything, there is no requirement that a

6   defendant testify on his other her own behalf.  If

7   Paul Scrimo does not testify that fact is not a factor

8   from which any inference unfavorable to the defendant

9   may be drawn.

10        Does anyone have any difficulty following

11   that rule of law?

12        Now, the standard of proof required by law

13   for conviction in every criminal case is proof of guilt

14   beyond a reasonable doubt.  That standard, however,

15   does not require the People to prove the defendant's

16   guilt beyond all possibility of doubt or beyond a

17   shadow of a doubt.  It requires the People to establish

18   the defendant's guilt beyond a reasonable doubt.

19        Our law, therefore, requires that before this

20   jury may convict the defendant, each of you must be

21   satisfied that all of the credible evidence convinces

22   you beyond a reasonable doubt that the defendant is in

23   fact guilty.

24        The evidence must satisfy you beyond a

25   reasonable doubt that the defendant is in fact the

BB

Voir Dire - Court

1    person that committed the crimes charged.

2              The evidence must also establish beyond a

3    reasonable doubt each and every essential element of

4    the crimes charged, as I shall later define such

5    elements to you.

6              What does the law mean when it requires proof

7    of guilt beyond a reasonable doubt?  In other words,

8    when is a doubt of guilt reasonable under our law?

9              A doubt of the defendant's guilt, to be a

10   reasonable doubt, must be a doubt for which some reason

11   can be given.  The doubt, to be reasonable, must,

12   therefore, arise because of the nature and quality of

13   the evidence in the case or from the lack or

14   insufficiency of the evidence in the case.

15             For a doubt to be a reasonable doubt, it

16   should be a doubt which a reasonable person acting in a

17   matter of this importance would be likely to entertain

18   because of the evidence or because of the lack or

19   insufficiency of the evidence in the case.

20             A doubt of guilt is not reasonable, if,

21   instead of being based on the nature and quality of the

22   evidence or lack of the evidence, it is based upon some

23   a guess or whim or speculation unrelated to the

24   evidence in the case.

25             Also, a doubt of guilt is not a reasonable

                                                        BB

Voir Dire - Court

1   doubt if it is based merely on sympathy for the

2   defendant or from a mere desire by a juror to avoid a

3   disagreeable duty.

4       I repeat, a doubt of a defendant's guilt, to

5   be a reasonable doubt, must arise either from the

6   nature and quality of the evidence in the case or from

7   the lack or insufficiency of the evidence in the case.

8       Therefore, the first duty of each juror is to

9   consider and weigh all of the evidence in the case and

10  decide what evidence you believe is credible and worthy

11  of your consideration.

12      The next duty of each juror is to determine

13  whether the case has been proved beyond a reasonable

14  doubt of the defendant's guilt as that term is defined

15  in our law.

16      A reasonable doubt, our law says, is an

17  actual doubt, one which you are conscious of having in

18  your mind after you have considered all the evidence in

19  the case.  If, after doing so, you then feel uncertain

20  and not fully convinced of the defendant's guilt and

21  you are also satisfied that in entertaining such doubt

22  you are acting as a reasonable person should act in a

23  matter of this importance, then that is a reasonable

24  doubt of which the defendant is entitled to the

25  benefit.

Voir Dire - Court

1    I repeat, it is the duty of each juror to

2    carefully review, weigh and consider all the evidence

3    in the case.  If, after doing so, you find that the

4    People have not proved the defendant's guilt beyond a

5    reasonable doubt, as I have defined the term to you,

6    then you must find the defendant not guilty.

7    On the other hand, if you are satisfied the

8    People have proved the defendant's guilt beyond a

9    reasonable doubt, as have I defined that term to you,

10    you must then find the defendant guilty.

11    Will you now promise me that in your final

12    deliberations you will follow and apply the standard of

13    proof, that is, beyond a reasonable doubt, exactly as I

14    shall further explain and define that term to you in my

15    final charge?

16    Now, as you heard earlier, it is anticipated

17    that one or more police officers will testify in this

18    case.  Will you promise me that you will give the same

19    evenhanded scrutiny to the testimony of a police

20    officer as you give to that of any other witness?

21    This is another way of asking whether or not

22    you will evaluate the credibility of a police officer

23    just like any other witness.

24    Now, each witness' testimony must be weighed

25    upon its own merits.  Every defendant must be judged

BB

Voir Dire - Court

 1    solely upon the evidence.  All of us are aware we may

 2    have prejudices or sympathies.  Some of you may have

 3    had unpleasant experiences which may lead you to

 4    believe that members of certain groups are more honest

 5    or less honest or are more or less likely to commit a

 6    crime or are more or less likely to commit a particular

 7    crime or are more or less likely to be wrongly accused.

 8              It is our law that the trial jury must decide

 9    each case solely and wholly upon the evidence and upon

10    the evidence alone.  It is our law that the trial jury

11    must decide and render a verdict fairly and impartially

12    without reference to race, creed or color and without

13    fear, without favor and without sympathy.

14              Since neither bias nor prejudice nor sympathy

15    can be allowed to interfere with your deliberations in

16    the jury room, I ask you if there is any one here who

17    thinks that they might have such feelings, favorable or

18    unfavorable, about the defendant or about any other

19    witness or any other person involved in this trial?

20              If you have such feelings, you are bound by

21    your oath to say so.

22              Seeing no response, I will ask each one of

23    you, will you be able to decide this case solely on the

24    evidence without fear, favor or sympathy either for the

25    defendant or for the People?

BB

Voir Dire - Court

1    Will you bring in a verdict based solely on

2    the evidence and the evidence alone?

3    Now, our law requires that I advise you,

4    ladies and gentlemen of the prospective jury panel,

5    that you are not, and I repeat not, during your

6    deliberations to consider the subject of punishment.

7    Sentencing lies solely within the exclusive province of

8    the Court and the jury has no role to play.

9    You are not permitted to consider the

10   possibility of punishment or penalty in your

11   deliberations and you many not include any

12   recommendation as to sentence in your verdict.

13   Thus, you will see that as trial jurors you

14   are the sole and exclusive judges of the facts and the

15   facts alone.  The Court is the sole and exclusive judge

16   of the law and of any sentence, punishment or penalty

17   to be imposed following the rendering of your verdict.

18   Will you promise me that you will render your

19   verdict free from fear, favor or sympathy and without

20   considering any possibility of sentence or punishment?

21   Ladies and gentlemen, it is our law that you,

22   as trial jurors, you are the sole and exclusive judges

23   of the facts.  Thus, for example, nothing that the

24   lawyers will say during the trial is evidence.  As a

25   matter of fact, nothing that I say will be evidence.

BB

Voir Dire - Court

1   You and you alone will decide from all of the

2   evidence what the facts are in this case.  At the same

3   time, nothing that the lawyers say is the law.  It is

4   the responsibility of the Court to advise all concerned

5   as to the law that will be applicable in this case.

6   To put it another way, when you raise your

7   hands to take your oath as jurors and when I took my

8   oath as judge, we agree to follow, obey and apply the

9   law of the State of New York exactly as given to us by

10  the Legislature and as set forth in our Constitution.

11  This simply means that, whether you have any

12  ideas of your own of what the law is or what you think

13  it ought to be, you must now, under your oath, cast

14  aside your own ideas of the law.

15  Now, upon your oath as jurors, you must

16  accept the law as I explain it to you, whether you

17  agree with it or not, and apply that law to the facts

18  as you find the facts to be in this case.

19  Therefore, I ask you, will you accept the law

20  as given to you by me and will you apply the law to the

21  facts as you find the facts to be in this case?

22  Let me ask, will you be intimidated or

23  embarrassed in any way by the presence of spectators at

24  this trial?

25  Do each you now have a state of mind that

BB

Voir Dire - Court

1    will permit you to examine and assess the testimony

2    honestly, carefully, fairly, impartially and without

3    fear, favor or sympathy either to the People or to the

4    defendant?

5          Finally, do you know of any reason in your

6    own best conscience or good judgment why you could not

7    serve as a fair and impartial juror?

8          Yes, ma'am.

9          PROSPECTIVE JUROR:  With all due respect and

10   deference to the Court, Judge, I myself in the early

11   '80s was assaulted and went through the whole grand

12   jury thing.

13         THE COURT:  I understand.  I will be

14   questioning each of the jurors individually and we'll

15   take that up at that time.

16         PROSPECTIVE JUROR:  Thank you.

17         THE COURT:  We'll start with Steven Adamo.

18         How are you, sir?

19         PROSPECTIVE JUROR:  Fine.

20         THE COURT:  You have to keep your voice up,

21   everybody.

22         You have checked off that you have friends in

23   law enforcement or relatives.  Can you tell us about

24   that, please?

25         PROSPECTIVE JUROR:  My son who lives in

BB

Voir Dire - Court

1    Indiana works for a juvenile correctional facility.

2              THE COURT: You checked something off here.

3    Do you want to tell us from there --

4              PROSPECTIVE JUROR: That's fine.

5              THE COURT: -- about the convictions?

6              PROSPECTIVE JUROR: On my wife's side, a

7    nephew was convicted of drug abuse and drug peddling.

8              THE COURT: Where was that?

9              PROSPECTIVE JUROR: In Nassau County. I

10   think, in Freeport.

11             THE COURT: How long ago was that?

12             PROSPECTIVE JUROR: A good ten years, sir.

13             THE COURT: Do you understand that the same

14   district attorney's office that prosecuted your wife's

15   nephew is also prosecuting this case? Will that

16   present a problem to you?

17             PROSPECTIVE JUROR: No, sir.

18             THE COURT: Now, you've heard all the

19   questions. Can you be a fair and impartial juror in

20   this case?

21             PROSPECTIVE JUROR: Yes, I can.

22             THE COURT: Thank you, sir.

23             Russell Davidson?

24             PROSPECTIVE JUROR: Yes.

25             THE COURT: How are you today?

BB

Voir Dire - Court

1              PROSPECTIVE JUROR:  Fine.

2              THE COURT:  You also have friends in law

3      enforcement or relatives.  Tell us about that.

4              PROSPECTIVE JUROR:  My son works for Nassau

5      County Police, emergency management.

6              THE COURT:  Yes, you told us about him

7      before.  Anybody else?

8              PROSPECTIVE JUROR:  That's it.

9              THE COURT:  You checked off victim of a

10     crime.  Can you tell us about that?

11             PROSPECTIVE JUROR:  I was robbed at gunpoint

12     about five years ago.

13             THE COURT:  Was anybody caught as a result of

14     that?

15             PROSPECTIVE JUROR:  No.  The person is still

16     out there.

17             THE COURT:  You have heard all the questions

18     asked.  Can you be a fair and impartial juror in this

19     case?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Ladies and gentlemen, the

22     reporter has to take down what you say so you have to

23     keep your voices up.

24             PROSPECTIVE JUROR:  There's another victim.

25     My son who was a Nassau County auxiliary at the time,

BB

Voir Dire - Court

1     he was shot in a drive-by and is now blind in one eye

2     so he can't be on the force. That's why he works as a

3     civilian officer.

4               THE COURT: Was anybody caught as a result of

5     that?

6               PROSPECTIVE JUROR: No.

7               THE COURT: Are you, as a result of that

8     incident, upset that the police did not do their job

9     and catch this person? Does that upset you?

10              PROSPECTIVE JUROR: No. They did the best

11    they could.

12              THE COURT: So you could be a fair and

13    impartial juror in this case?

14              PROSPECTIVE JUROR: Yes.

15              THE COURT: Patrick Enz, how are you?

16              PROSPECTIVE JUROR: Good.

17              THE COURT: You checked off a lot of no

18    boxes. You left one blank about relatives in law

19    enforcement, friends?

20              PROSPECTIVE JUROR: I missed it.

21              THE COURT: Do you have any?

22              PROSPECTIVE JUROR: No.

23              THE COURT: Now, you've heard all the

24    questions. Can you be a fair and impartial juror in

25    this case?

Voir Dire - Court

1     PROSPECTIVE JUROR:  Yes.

2     THE COURT:  Thank you, sir.

3     Mitchell White.

4     PROSPECTIVE JUROR:  Yes.

5     THE COURT:  Hi.

6     PROSPECTIVE JUROR:  Hi.

7     THE COURT:  How are you?

8     PROSPECTIVE JUROR:  Fine.

9     THE COURT:  You are a physician's assistant?

10    PROSPECTIVE JUROR:  Yes.

11    THE COURT:  You work with physicians, I take

12    it, in your practice?

13    PROSPECTIVE JUROR:  Yes.

14    THE COURT:  There's going to be medical

15    testimony here and, obviously, you have been trained as

16    a physician's assistant.  If you are in the jury room

17    and they start to talk about the medical evidence and I

18    tell you the law is you cannot use your own expertise

19    with respect to -- you're only allowed to use your own

20    common sense but you can't use your specialized

21    knowledge with respect to jury deliberations, will you

22    be able to follow that law?

23    PROSPECTIVE JUROR:  Sure.

24    THE COURT:  You checked -- you have a lot of

25    nos.  Let me ask you this.  Can you be a fair and

BB

Voir Dire - Court

1    impartial juror in this case?

2                PROSPECTIVE JUROR:  Yes, I can.

3                THE COURT:  Thank you.

4                Larry Williams, how are you, sir?

5                PROSPECTIVE JUROR:  Okay.  Thank you.

6                THE COURT:  You checked -- you have a lot of

7    nos too.  You've heard all the questions asked?

8                PROSPECTIVE JUROR:  Yes.

9                THE COURT:  Can you be a fair and impartial

10   juror in this case?

11               PROSPECTIVE JUROR:  Possibly.

12               THE COURT:  Possibly?

13               PROSPECTIVE JUROR:  Yes.

14               THE COURT:  You have to be a little bit more

15   sure than that.  You can't be equivocal, as they say.

16               PROSPECTIVE JUROR:  Yes, I can be.

17               THE COURT:  This is the only time myself and

18   the jurors -- excuse me, attorneys, get to talk to you

19   about your qualifications as a juror and there are no

20   right or wrong answers.  It's just a matter of what

21   your feelings are so you have to express them to us.

22   Is there something that's bothering you?

23               PROSPECTIVE JUROR:  No.  I could be.

24               THE COURT:  You understood everything I said

25   with respect to the law?  Can you follow the law as I

BB

Voir Dire - Court

1    would charge it?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  And listen to the facts as they

4    come from the witness stand, look at the evidence and

5    exhibits placed into evidence?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  And you could sit with your

8    fellow jurors and reason with them and come to a well

9    reasoned verdict?

10             PROSPECTIVE JUROR:  I think so.

11             THE COURT:  I wasn't sure -- what was that

12   last answer?

13             PROSPECTIVE JUROR:  Yes.  Yes, I could.

14             THE COURT:  Okay.  Thank you.

15             Vincent, is it -- maybe you better say it?

16             PROSPECTIVE JUROR:  Zucarelli.

17             THE COURT:  The letters all come together

18   there.  How are you today?

19             PROSPECTIVE JUROR:  Good.

20             THE COURT:  Now, you checked off victim of a

21   crime.  Can you tell us about that?

22             PROSPECTIVE JUROR:  I had my car broken into.

23   I am sure there have been other things but that was

24   pretty recent.

25             THE COURT:  Anybody caught in that?

BB

Voir Dire - Court

1      PROSPECTIVE JUROR:  No.  I didn't even report
2   it.
3      THE COURT:  Also party to a civil case?
4      PROSPECTIVE JUROR:  I was involved in and
5   accident and it was settled through the insurance
6   companies.
7      THE COURT:  There's another box you checked
8   yes.  Can you tell us from there?  Do you recollect
9   what you checked off?
10     PROSPECTIVE JUROR:  No.
11     THE COURT:  Accused a crime?
12     PROSPECTIVE JUROR:  Yeah, I've been accused
13   of things before.
14     THE COURT:  If you can tell us from us there,
15   that's fine, or otherwise you can tell us at the bench
16   later.
17     PROSPECTIVE JUROR:  Over 20 years ago when I
18   was in high school I was accused of a drug charge.
19     THE COURT:  Did anything happen with respect
20   to that?
21     PROSPECTIVE JUROR:  It was sealed, thrown out
22   and everything.
23     THE COURT:  You've heard all the questions
24   that were asked of all the other jurors?
25     PROSPECTIVE JUROR:  Yes.

BB

Voir Dire - Court

1      THE COURT:  Can you be a fair and impartial

2  juror in this case?

3      PROSPECTIVE JUROR:  Sure.

4      THE COURT:  Thank you.

5      Adam Wright, how are you, sir?

6      PROSPECTIVE JUROR:  Fine.

7      THE COURT:  You are an attorney?

8      PROSPECTIVE JUROR:  Yes.

9      THE COURT:  You checked off victim of a

10  crime.  Can you tell us about that?

11      PROSPECTIVE JUROR:  I was in New Jersey last

12  year.  I was driving and my car was car jacked.  They

13  found it about two or three days later.

14      THE COURT:  Did they catch anybody with

15  respect to that crime?

16      PROSPECTIVE JUROR:  No, they did not.

17      THE COURT:  You also checked off party to a

18  civil case?

19      PROSPECTIVE JUROR:  Yes.  I have an

20  automobile action.  I had an accident in 1999.  It's

21  sill pending in Nassau.

22      THE COURT:  You checked -- you have a couple

23  of other boxes?

24      PROSPECTIVE JUROR:  I was on a jury case and

25  the clients had left town and the insurance company was

BB

Voir Dire - Court

1    pressing me for a release and I signed their names and

2    they claimed it was attempted forgery.  That was in

3    1995.  It happened in the course of my practice.

4              THE COURT:  So you were accused of something?

5              PROSPECTIVE JUROR:  Yes, of signing their

6    names without permission, the client's.

7              THE COURT:  Okay.  You have heard all the

8    questions that were asked of all the other jurors.  Can

9    you be a fair and impartial juror in this case?

10             PROSPECTIVE JUROR:  Yes, I can.  There are

11   other matters too.  I have a lot of cases coming up

12   next week.

13             THE COURT:  Are you a sole practitioner?

14             PROSPECTIVE JUROR:  Yes, I am.  There are

15   about ten or eleven of them coming up next week,

16   immigration appearances.  I haven't made any plans at

17   all for obtaining a substitute attorney to go in so I

18   am kind of concerned about that.  It's weighing heavily

19   on my mind.

20             THE COURT:  Thank you, sir.

21             Robert Froehlich, hello.

22             PROSPECTIVE JUROR:  Hello.

23             THE COURT:  How are you?

24             PROSPECTIVE JUROR:  Good.

25             THE COURT:  You checked off a lot of no boxes

BB

Voir Dire - Court

1    too.  You have heard all the questions asked?

2                PROSPECTIVE JUROR:  Yes.

3                THE COURT:  Can you be a fair and impartial

4    juror in this case?

5                PROSPECTIVE JUROR:  Yes.

6                THE COURT:  Thomas Fulfaro?

7                PROSPECTIVE JUROR:  Morning.

8                THE COURT:  How are you?

9                PROSPECTIVE JUROR:  Fine.  Thank you.

10               THE COURT:  You have friends in law

11   enforcement?

12               PROSPECTIVE JUROR:  Yes, a friend who is a

13   former New York City police officer, a friend who is a

14   New York State trooper and a friend on my father's

15   cousin -- on my father's side who is a New York City

16   police officer.

17               THE COURT:  Witness to a crime?

18               PROSPECTIVE JUROR:  Victim and witness.  When

19   I was in college, I worked for a movie theater and,

20   while doing a bank job at night, myself and coworker

21   were robbed.

22               THE COURT:  Was anybody caught in that case?

23               PROSPECTIVE JUROR:  I don't believe so.

24               THE COURT:  You have heard all the questions

25   asked.  Can you be a fair and impartial juror in this

                                                         BB

Voir Dire - Court

1    case?

2              PROSPECTIVE JUROR:  Yes, sir.

3              THE COURT:  Thank you.

4              Arnold Gamberg, how are you, sir?

5              PROSPECTIVE JUROR:  Good, sir.

6              THE COURT:  You checked off victim of a

7    crime.  Can you tell us about that?

8              PROSPECTIVE JUROR:  A family member.

9              THE COURT:  What happened?

10             PROSPECTIVE JUROR:  Murder.

11             THE COURT:  How long ago was that?

12             PROSPECTIVE JUROR:  1981.

13             THE COURT:  Now, you understand that the

14   allegations in the indictment here are murder.  Do you

15   think you could sit on a murder case?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  That won't bother you?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Can you be a fair and impartial

20   juror in this case?

21             PROSPECTIVE JUROR:  Yes, sir.

22             THE COURT:  Thank you.

23             Mary George?

24             PROSPECTIVE JUROR:  Hi.

25             THE COURT:  How are you?

BB

Voir Dire - Court

1      PROSPECTIVE JUROR:  I am fine.

2      THE COURT:  You too have checked off a lot of

3   no boxes.  There's nothing specific I have to ask you.

4   Generally, you have heard all the questions asked?

5      PROSPECTIVE JUROR:  Yes.

6      THE COURT:  Can you be a fair and impartial

7   juror in this case?

8      PROSPECTIVE JUROR:  I can, but one problem,

9   my brother is in ICU in New York City.  I don't know if

10   you can excuse me for that.

11      THE COURT:  He's in the intensive care unit?

12      PROSPECTIVE JUROR:  Yes.

13      THE COURT:  You're afraid you won't be able

14   to focus on the case because you're thinking about your

15   brother, is that true?

16      PROSPECTIVE JUROR:  Yes.

17      THE COURT:  I understand.  Thank you.

18      Barbara Gersten, how are you?

19      PROSPECTIVE JUROR:  Fine.

20      THE COURT:  You checked off victim of a

21   crime.  Tell us about that?

22      PROSPECTIVE JUROR:  My house was robbed.

23      THE COURT:  Do you mean burglarized?

24      PROSPECTIVE JUROR:  Burglarized.

25      THE COURT:  How long ago was that?

BB

Voir Dire - Court

1    PROSPECTIVE JUROR:  Four years ago.

2    THE COURT:  Anybody caught?

3    PROSPECTIVE JUROR:  They knew who they were

4    but they were young -- they were kids so nothing ever

5    happened with that.

6    THE COURT:  Did they go through the court

7    system?

8    PROSPECTIVE JUROR:  No.  The police suggested

9    that they don't.

10   THE COURT:  Were you upset with the police as

11   a result of that?

12   PROSPECTIVE JUROR:  I was upset with my house

13   being burglarized, but no.

14   THE COURT:  Now, you've heard all the

15   questions asked.  Can you be a fair and impartial juror

16   in this case?

17   PROSPECTIVE JUROR:  Yes.

18   THE COURT:  Victoria Grambrone?

19   PROSPECTIVE JUROR:  That's right.

20   THE COURT:  You wrote quite a few things on

21   here.  Let me see.  Let's work from the bottom up.  You

22   say you have no faith in the judicial system.  You have

23   sat as a juror before?

24   PROSPECTIVE JUROR:  No, I haven't.  Just from

25   what has happened with my assault and my niece who was

BB

Voir Dire - Court

1    assaulted and held up at gunpoint who identified the

2    guy and he got off on a technicality or dismissal.  She

3    was terrified.  She was in college.  It happened in her

4    apartment building in her garage.  She moved out of

5    state to Georgia and finished college there.  She

6    hasn't been the same.  Frankly, I have a bad taste in

7    my mouth.

8              THE COURT:  How long ago was this?

9              PROSPECTIVE JUROR:  Three years ago.

10             THE COURT:  As a result of that, you're upset

11   with the court system?

12             PROSPECTIVE JUROR:  That's right.

13             THE COURT:  Are you upset with the police

14   department?

15             PROSPECTIVE JUROR:  The whole thing,

16   attorneys as well.  You know, you say your side of the

17   story, you want your truth to be told and the other

18   side wants that the truth to be told and there's the

19   gray area of truth.  I don't know I can be impartial

20   because I don't really trust the system, frankly.

21   Sorry, but that's how I feel.

22             THE COURT:  That's okay.  That's why we have

23   the voir dire process.  Not every case is for every

24   person and not every person can sit on a criminal case

25   and I appreciate your input.  Thank you.

BB

Voir Dire - Court

1    Hector Henry, how are you, sir?

2    PROSPECTIVE JUROR:  Pretty good.

3    THE COURT:  Now, you checked off victim of a

4    crime.  Can you tell us about that?

5    PROSPECTIVE JUROR:  My sister was robbed

6    coming home from work one night.

7    THE COURT:  How long ago was that?

8    PROSPECTIVE JUROR:  Like ten years ago.

9    Someone snatched her pocket book and ran off.

10    THE COURT:  Anybody caught?

11    PROSPECTIVE JUROR:  No.

12    THE COURT:  You have heard all the questions

13    that were asked.  Can you be a fair and impartial juror

14    in this case?

15    PROSPECTIVE JUROR:  Yes.

16    THE COURT:  Thank you.

17    Counsel, approach the bench.

18    (Whereupon, the following took place at the

19    bench outside of the hearing of the prospective

20    jurors and defendant.)

21    THE COURT:  I understand, counsel, that you

22    each consent to excuse Victoria Grambrone?

23    MR. BIANCAVILLA:  Consent.

24    MR. CHAMBERLAIN:  Consent.

25    (Whereupon, the following took place in open

BB

Voir Dire - Court

1   court.)

2          THE CLERK:  Victoria Grambrone, step out and

3   follow the instructions of the officer.

4          (Whereupon, one prospective juror was excused

5   and exited the courtroom.)

6          THE CLERK:  If your name is called, please

7   bring your property with you.  Joan Defiglia, please

8   hand your paperwork up to the officer.

9          THE COURT:  Joan Defiglia, how are you today?

10          PROSPECTIVE JUROR:  I'm good, but you don't

11   remember me, do you.  I'm from your chiropractor's

12   office.

13          THE COURT:  It's been a long time.  I guess

14   you don't work for him anymore?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  That has to be eight years ago.

17   You work for a CPA.  You checked off that you swerved

18   on a trial before?

19          PROSPECTIVE JUROR:  It was, I guess, about

20   eight years ago.

21          THE COURT:  Was that here in Nassau County?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Did you get to deliberate?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  And did you reach a verdict?

BB

Voir Dire - Court

1    PROSPECTIVE JUROR:  Not guilty.

2    THE COURT:  We are not interested in the

3    verdict, just whether you reach a verdict.

4    PROSPECTIVE JUROR:  Yes.

5    THE COURT:  Was it a good jury experience for

6    you?

7    PROSPECTIVE JUROR:  Yes, it was.

8    THE COURT:  Now, you've heard all the

9    questions asked.  Can you be a fair and impartial juror

10   in this case?

11   PROSPECTIVE JUROR:  I'm not sure.

12   THE COURT:  Can you tell us why?  Is it the

13   type of case or is it something specific?

14   PROSPECTIVE JUROR:  It might be the

15   defendant.  It might be just -- since September 11th, I

16   have really not had real good feelings about too many

17   people.

18   THE COURT:  You're saying you can't sit on a

19   criminal case?

20   PROSPECTIVE JUROR:  I don't know if I could.

21   THE COURT:  You heard what I said with

22   respect to the law.  Could you follow the law as I

23   would charge it?

24   PROSPECTIVE JUROR:  I would try to the best

25   of my ability.

BB

Voir Dire - Court

1      THE COURT:  But you can't guarantee that you
2  would follow the law?
3      PROSPECTIVE JUROR:  No.  No, because I too
4  don't have too much faith in the judicial system.
5      THE COURT:  Okay.  Thank you.
6      Counsel, come forward, please.
7      (Whereupon, the following took place at the
8  bench outside of the hearing of the prospective jurors
9  and the defendant.)
10      THE COURT:  We have a consent?
11      MR. BIANCAVILLA:  Consent.
12      MR. CHAMBERLAIN:  Consent.
13      (Whereupon, the following took place in open
14      court.)
15      THE CLERK:  Joan Defiglia, you are excused
16  with the thanks of the court.  Step out and follow the
17  court officer's instructions.
18      (Whereupon, the prospective juror was excused
19  and exited the courtroom.)
20      THE CLERK:  Margaret Santoriello.
21      THE COURT:  Margaret Santoriello?
22      PROSPECTIVE JUROR:  Close enough.
23      THE COURT:  I try.  Let's see, you checked
24  off a whole bunch of no boxes.  Generally, let me ask
25  you, you've heard all the questions asked, can you be a

BB

Voir Dire - Court

1    fair and impartial juror in this case.

2              PROSPECTIVE JUROR:  Yes, I can.

3              THE COURT:   Thank you.

4              Ladies and gentlemen, we have been going a

5    while now so I'm going to take a break for lunch at

6    this point and ask you all to be back here a little

7    before two o'clock so we can start as close to two

8    o'clock as possible and then the attorneys will get to

9    speak to those who are in the box.

10             Again, ladies and gentlemen, I am directing,

11   and I will be admonishing you each and every time we

12   break, that you are not to discuss or converse amongst

13   yourselves or with anyone else upon any subject

14   connected with this trial.

15             You must not read or listen to any account or

16   discussion of this case in the event it is reported by

17   newspapers or in any other media and that includes the

18   internet.

19             You must not visit or view the premises or

20   place where the offenses charged were allegedly

21   committed or any other premise or place involved in

22   this case.

23             You must promptly report to the Court any

24   incident within your knowledge involving any attempt by

25   any person to improperly influence any member of the

BB

Voir Dire - Court

1    jury.

2              Do not visit any other courtroom in this

3    building or any other building.  Have a nice lunch and

4    we'll see you at two o'clock.

5              (Whereupon, the sworn jurors exited the

6         courtroom.)

7              THE COURT:  Counsel, see you at 2:00.

8              (Whereupon, a luncheon recess was taken.)

9              A F T E R N O O N   S E S S I O N

10             COURT OFFICER:  Jurors entering.

11             (Whereupon, the panel of prospective jurors

12        entered the courtroom and resumed their respective

13        seats.)

14             THE COURT:  Good afternoon, ladies and

15   gentlemen.  We are ready to continue with the voir dire

16   process.  We will commence now with Mr. Biancavilla.

17             (Whereupon, voir dire examination,

18   unrecorded, was conducted by the assistant district

19   attorney and defense counsel.)

20             (Whereupon, the following took place at the

21        bench.)

22             THE COURT:  Mr. Gamberg, you indicated you

23   wanted to approach the bench and say it outside the

24   hearing of the other jurors.

25             PROSPECTIVE JUROR:  Two things.  One is, when

                                                        BB

Voir Dire - Court

1    we first got selected this morning, I wasn't very

2    comfortable but I thought I would try.  I have a

3    brother murdered in 1981.  It was an older brother.

4              THE COURT:  Will that bring back bad memories

5    for you?

6              PROSPECTIVE JUROR:  It was horrible

7    situation.  I also just got a brand new position I just

8    started.  Between the two --

9              THE COURT:  Okay.  Sir, have a seat for a

10   moment.

11             MR. BIANCAVILLA:  Consent.

12             MR. CHAMBERLAIN:  Consent.

13             (Whereupon, the following took place in open

14      court.)

15             THE CLERK:  Mr. Gamberg, you are excused with

16   the thanks of the Court.

17             (Whereupon, the prospective juror was excused

18      and exited the courtroom.)

19             (Whereupon, voir dire examination, not

20   recorded, continued.)

21             (Whereupon, the following took place at the

22   bench.)

23             THE CLERK:  Do the People have any challenges

24   for cause, one through four?

25             MR. BIANCAVILLA:  No.

BB

Voir Dire - Court

1          THE CLERK:  Challenges for cause, one through

2     four, by defense counsel?

3          MR. CHAMBERLAIN:  Two.

4          THE COURT:  Granted.

5          THE CLERK:  Any further challenges for cause

6     by defense counsel, numbers one through four only?

7          MR. CHAMBERLAIN:  No.

8          THE CLERK:  Do the People wish to exercise a

9     peremptory on one, three or four.

10         MR. BIANCAVILLA:  No.

11         THE CLERK:  Defense counsel, do you wish to

12    exercise a peremptory challenge as to one, three or

13    four?

14         MR. CHAMBERLAIN:  Four.  No.  Wait.  Give me

15    a second.

16         THE COURT:  Sure.

17         MR. CHAMBERLAIN:  I'm going with four.

18         THE COURT:  Just four.  So we will swear one

19    and three.

20         THE CLERK:  Mr. Adamo will be juror number

21    four and Patrick Enz will be juror number 10.

22         People, challenges for cause as to number

23    five and six?

24         MR. CHAMBERLAIN:  Five.

25         THE CLERK:  Challenge for cause, number five?

BB

Voir Dire - Court

1    THE COURT:  Granted.

2           THE CLERK:  Defense counsel, do you have any

3    challenges for cause as to number six?

4           MR. CHAMBERLAIN:  No.

5           THE CLERK:  Do the people wish to exercise a

6    peremptory challenge as to number six?

7           MR. BIANCAVILLA:  No.

8           THE CLERK:  Defense counsel?

9           MR. CHAMBERLAIN:  No.

10          THE COURT:  Juror number six will be sworn as

11   juror number 11.

12          THE CLERK:  Do the People have any challenges

13   for cause as to juror number seven?

14          MR. BIANCAVILLA:  Yes.

15          THE COURT:  My notes, with respect to

16   Mr. Wright, was that he was a sole practitioner, an

17   attorney who has lots of cases on next week with

18   respect to immigration and naturalization.  I think his

19   mind may be elsewhere.

20          MR. CHAMBERLAIN:  No question, Judge.  He

21   doesn't want to be here, but you know the rules I

22   thought we were following.  He may have been able to

23   get excused.

24          THE COURT:  The test, Mr. Chamberlain, is

25   whether he can be a fair and impartial juror even

BB

Voir Dire - Court

1    though he has knowledge of those cases on and knowing

2    he would not be able to handle them.

3         MR. CHAMBERLAIN:  My notes indicate he could

4    be fair but has a number of cases next week.  I think

5    he repeated he could be fair to me and to your Honor.

6    I think he said he could be fair and follow the laws.

7         THE COURT:  I am granting that, cause.

8         THE CLERK:  People, challenge for cause as to

9    number eight?

10        MR. BIANCAVILLA:  No.

11        THE CLERK:  Defense counsel, challenge for

12   cause, number eight.

13        MR. CHAMBERLAIN:  I seriously doubt, Judge --

14   I will have a challenge for cause.  He told us he could

15   be fair and impartial.  But, on the other hand, I

16   question the ability of this juror to do both things.

17   I think he would have a hard time sitting here and

18   following the Court's instructions based on answers he

19   gave.  He's talking about going to school every night

20   for the next two weeks.

21        THE COURT:  First of all, he said he would be

22   going to school Wednesday and had to be there at

23   five o'clock and the second Wednesday, which would be a

24   week from this Wednesday, he said he had a test.

25   During Mr. Biancavilla's questioning, he said he was

Voir Dire - Court

1    sure he would be able to make the test.  He said he

2    didn't have a problem if he was late for class with

3    respect to this Monday so that not a reason.

4           The answers that Mr. Froehlich gave were that

5    he could be fair and impartial.  There is nothing that

6    he testified to that would convince me I should excuse

7    him for cause.

8           THE CLERK:  Do the People wish to exercise a

9    peremptory challenge as to number eight?

10          MR. BIANCAVILLA:  No.

11          THE CLERK:  Defense counsel?

12          MR. CHAMBERLAIN:  Yes.

13          THE CLERK:  People, challenges for cause as

14   to number nine?

15          MR. BIANCAVILLA:  No.

16          THE CLERK:  Defense, challenges for cause as

17   to number nine?

18          MR. CHAMBERLAIN:  No.

19          THE CLERK:  People, do you wish to exercise a

20   peremptory challenge as to juror number nine?

21          MR. BIANCAVILLA:  No.

22          THE CLERK:  Defense counsel, peremptory as to

23   nine?

24          MR. CHAMBERLAIN:  Yes.

25          THE CLERK:  Do the People have a challenge

BB

Voir Dire - Court

1 for cause as to juror number eleven?

2 MR. BIANCAVILLA: Yes.

3 MR. CHAMBERLAIN: Yes.

4 THE COURT: Yes, she said she would be

5 thinking about her brother who is in the hospital.

6 Granted on consent.

7 THE CLERK: People, challenge for cause as to

8 juror number twelve?

9 MR. BIANCAVILLA: No.

10 THE CLERK: Defense counsel, challenge for

11 cause as to juror number twelve?

12 MR. CHAMBERLAIN: No.

13 THE CLERK: Do the People wish to exercise --

14 MR. CHAMBERLAIN: Excuse me. Give me just

15 one second.

16 THE COURT: Of course, Mr. Chamberlain.

17 MR. CHAMBERLAIN: No.

18 THE COURT: Do the People wish to exercise a

19 peremptory challenge as to juror number twelve?

20 MR. BIANCAVILLA: No.

21 MR. CHAMBERLAIN: No.

22 THE COURT: Miss Gersten will be juror number

23 twelve.

24 Alternate number one, you each have two

25 challenges per seat.

BB

Voir Dire - Court

1          THE CLERK:  People, challenge for cause,

2     juror number thirteen?

3          MR. BIANCAVILLA:  No.

4          MR. CHAMBERLAIN:  No.

5          THE CLERK:  Do the People wish to exercise a

6     peremptory challenge as to number thirteen?

7          MR. BIANCAVILLA:  No.

8          MR. CHAMBERLAIN:  No.

9          THE COURT:  Alternate number one.

10          THE CLERK:  Do the People wish to exercise a

11     challenge for cause as to fourteen?

12          MR. BIANCAVILLA:  No.

13          THE CLERK:  Defense?

14          MR. CHAMBERLAIN:  No.

15          THE CLERK:  Do the People wish to exercise a

16     peremptory challenge as to fourteen?

17          MR. BIANCAVILLA:  Yes.

18          THE COURT:  Counsel, I understand that you

19     have both agreed that prospective juror number nine,

20     Thomas Fulfaro will be alternate two?

21          MR. CHAMBERLAIN:  Correct.  I'll withdraw my

22     peremptory and agree to have him as alternate two.

23          MR. BIANCAVILLA:  That is acceptable to the

24     People.

25          THE COURT:  We now have a jury and two

BB

Voir Dire - Court

1    alternates.

2              (Whereupon, the following took place in open

3         court.)

4              THE CLERK:  Jurors, may I have your attention

5    please?

6              The following jurors have been selected to

7    serve on this jury.  Steven Adamo will be juror number

8    four.  Patrick Enz will be juror number ten.  Vincent

9    Zucarelli will be juror number eleven.  Barbara Gersten

10   will be juror number twelve.  Margaret Santoriello will

11   be alternate one and Thomas Fulfaro will be alternate

12   number two.

13             If I did not call your name, gather your

14   belongings and step out of the box.  You are excused

15   from the jury panel with the thanks of the Court.

16             (Whereupon, the prospective jurors were

17   excused and exited the courtroom.)

18             THE CLERK:  Are the remaining jurors

19   satisfactory to the People?

20             MR. BIANCAVILLA:  Yes.

21             THE CLERK:  To the defense counsel?

22             MR. CHAMBERLAIN:  Yes.

23             THE CLERK:  Shall I swear them, Judge?

24             THE COURT:  Yes.

25             (Whereupon, the jurors were duly sworn by the

BB

Voir Dire - Court

1    clerk.)

2              THE COURT:  I am first going to talk to the

3    newly sworn jurors.  At this point, we are going to

4    excuse you and ask you to return here Monday morning at

5    9:30 when we will start the trial.  However, let me

6    give you some advice.  Parking is at a premium,

7    especially in the mornings.  So I would suggest you get

8    here at 9:00 or around that time and go for coffee or

9    something so you can be in the courthouse where the

10   court officers tell you to report, which they will do

11   before you leave here today.

12             I want to remind you that -- and I will be

13   admonishing you each time we break.  Do not discuss the

14   case amongst yourselves or with anyone else.  Keep an

15   open mind.  Do not form or express any opinions until

16   the entire case has been completed.

17             Do not read or listen to any accounts of the

18   case should they be reported in the media.  Do not

19   visit or view any place or premises that have been

20   mentioned.

21             You are not to permit any party to discuss

22   the case with you or attempt to influence you, and you

23   must promptly report to the Court any violation

24   thereof.

25             Have a nice weekend.  We will see you Monday

BB

Voir Dire - Court

1    morning at 9:30.

2              (Whereupon, the sworn jurors exited the

3         courtroom.)

4              THE COURT:  Now, let me address those of you

5    who never made it into the jury box.  I want to tell

6    you we appreciate you and would not have been able to

7    go forward with this voir dire process unless you were

8    here ready, willing and able to serve as jurors.  I

9    want to say we all thank you.

10             At this point, go back to central jury and

11   they'll tell you what to do from there.  See the court

12   officers and they will explain more to you.  Thank you

13   very much and have a nice weekend.

14             (Whereupon, the above matter was adjourned

15   until May 6th, 2002.)

16                  *       *       *

17

18

19

20

21

22

23

24

25

                                                      BB

```
1    STATE OF NEW YORK : NASSAU COUNTY

2         SUPREME COURT PART XII

3    ---------------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK       Ind. 1456-00

5              - against -

6    PAUL SCRIMO                                    Trial

7                   Defendant

8    ---------------------------------------------X

9                          May 6, 2002
                           262 Old Country Road
10                         Mineola, New York

11
     B E F O R E :
12
                    HON. JEFFREY S. BROWN,
13                       County Court Judge

14
     A P P E A R A N C E S :
15
             HON. DENIS DILLON
16              Nassau County District Attorney
                BY:  ROBERT BIANCAVILLA, Esq., of Counsel,
17                   Assistant District Attorney
                           For the People
18

19
             JOHN CHAMBERLAIN, Esq.
20              1001 Franklin Avenue
                Garden City, New York
21                      For the Defendant

22

23

                            KATHLEEN PLAIA
24                          OFFICIAL COURT REPORTER

25
```

Kathleen Plaia

1          THE CLERK:  This is indictment number 1456N

2     of 2000, People of the State of New York versus Paul

3     Scrimo.  On for trial.

4          All parties are present.  Jurors are not

5     present at this time.

6          Are the People ready to proceed?

7          MR. BIANCAVILLA:  Ready.

8          THE CLERK:  Defense counsel ready to proceed?

9          MR. CHAMBERLAIN:  Defendant ready.

10         THE COURT:  Counsel, I'm ready to bring the

11    jury up.  Anything you would like to place on the

12    record before I do that?

13         MR. BIANCAVILLA:  Judge, just for the record,

14    we turned over this morning to Mr. Chamberlain several

15    items of Rosario material, seventy-two exhibits in

16    total.  We would ask that he acknowledge receipt of

17    these exhibits.

18         In addition, we have given a copy of the

19    exhibit list to the Court.  And we would ask that the

20    Court mark it as a court exhibit.

21         THE COURT:  Mr. Chamberlain?

22         MR. CHAMBERLAIN:  Yes, Judge.  I have what

23    appears before me bound volumes, which I have not had a

24    chance to review.  The exhibit list does list

25    seventy-two exhibits.

Kathleen Plaia

1          THE COURT:  I thought you had an opportunity

2     to review some of the exhibit, Mr. Chamberlain.

3          MR. CHAMBERLAIN:  Most of them, Judge.

4          I have had a chance to exhibit -- review,

5     rather, I'm sorry, your Honor, Exhibit 19 briefly;

6     Exhibit 50, which was three pages; Exhibit 51, one

7     page; and Exhibit 63, seventeen pages.

8          THE COURT:  We'll mark the Rosario material

9     list as a court exhibit.

10         Counsel, I'm going to bring up the jury now.

11         MR. BIANCAVILLA:  Thank you, Judge.

12         THE CLERK:  This will be marked as Court

13    Exhibit II.

14         THE COURT:  Court Exhibit II.

15         MR. CHAMBERLAIN:  Judge, while we have a

16    minute --

17         THE COURT:  Yes, Mr. Chamberlain?

18         MR. CHAMBERLAIN:  I notice from the People's

19    Rosario material list that there are a number of

20    experts that are listed that I have yet to receive CVs

21    for.  And I will move to preclude any expert that I

22    have not received CV.

23         THE COURT:  Mr. Biancavilla.

24         MR. BIANCAVILLA:  Judge, I don't think a CV

25    is Rosario material.  We have turned over any notes or

1      memorandum or anything having to do with these

2      witnesses.  Curriculum vitae or CV is not rosario

3      material, nor anything that is required to be produced

4      during discovery.

5              MR. CHAMBERLAIN:  I would disagree with that,

6      Judge.

7              MR. BIANCAVILLA:  Okay.

8              THE COURT:  Well, I don't know have any case

9      law or statutory authority that requires the People to

10     provide you with a CV.  If you can point me to some,

11     Mr. Chamberlain, I will be glad to look at it.

12             MR. CHAMBERLAIN:  I have no authority at my

13     fingertips, Judge.  It's my understanding it was

14     required, and it was requested.  And we provided CVs

15     for all of our experts, at their request.

16             THE COURT:  Again, I reiterate,

17     Mr. Chamberlain, if you can point me in the direction

18     that requires the People to -- case law or statutory

19     authority, requires the People to provide you with

20     curriculum vitaes, again, I would be glad to look at

21     it.  But I know of none that will require the People to

22     provide it as Rosario material.

23             Counsel, also for the record, the material --

24     subpoenaed materials from Doctor Raffy I have reviewed

25     them.  And there is nothing that I see that should be

Proceedings                                            312

1     redacted.  So, whenever we take a break, Counsel can

2     review them at their leisure.

3                    MR. BIANCAVILLA:  Thank you, Judge.

4                    MR. CHAMBERLAIN:  Thank you.

5                    THE CLERK:  Ready for the jurors?

6                    THE COURT:  Yes.

7                    THE COURT OFFICER:  Jury entering.

8                    (Whereupon, the sworn jury and alternates

9     enter the courtroom).

10                   THE CLERK:  Both sides stipulate that all

11    sworn jurors are present and seated properly?

12                   MR. BIANCAVILLA:  So stipulated.

13                   MR. CHAMBERLAIN:  So stipulated.

14                   THE COURT:  Good morning, ladies and

15    gentlemen.

16                   JURORS:  Good morning.

17                   THE COURT:  I hope you had a nice weekend.

18    We're going to start the trial at this point.

19                   First I would like to precharge you with the

20    following:

21                   Members of the jury, at this point I'm

22    required by law to instruct you generally concerning

23    your basic functions, duty and conduct and to acquaint

24    you in a general way with the trial procedure and

25    certain rules which apply to every jury so that you

Kathleen Plaia

1    will better be able to assess and weigh the evidence as

2    it is presented and reach a proper verdict.

3              Now, the trial is commenced with the

4    selection of the jury.  The next step in the trial will

5    be an opening statement by the People, represented by

6    the district attorney.  During which he is required by

7    law to indicate to you what he intends to prove by way

8    of evidence to support the charges set forth against

9    the defendant.  Subsequent to that, defense counsel, if

10   he desires, may also make an opening statement.

11             What counsel for either party say in an

12   opening statement is not evidence.  You may consider

13   the opening statement as a preview of what each side

14   intends to prove by way of evidence in the case.

15             After the opening statement or statements,

16   the district attorney will present a witness or

17   witnesses who will be questioned by him.  This is

18   called direct examination.

19             After the district attorney completes his

20   questions, defense counsel will be given an opportunity

21   to question the witness.  This is called

22   cross-examination.

23             Now, after the People have concluded the

24   calling of their witnesses and the introduction of any

25   exhibits which are admissible into evidence, the

1    defendant may offer evidence in his defense.

2         After the defendant rests and the People

3    rest, the defendant may make a closing argument,

4    following which the People may make a closing argument.

5    Then I will charge you on law and you may retire for

6    the purpose of reaching your verdict.

7         This is the general outline of the trial

8    procedure.  For the most part, evidence consists of

9    testimony of witnesses under oath and exhibits which

10   are introduced into evidence.

11        Questions in and of themselves are not

12   evidence.  Therefore, you cannot infer any fact from

13   the mere asking of a question.  It's the answer coupled

14   with the question that constitutes evidence.  For

15   example, if a witness is asked a question, do you own

16   an automobile, and the witness answers no, you may not

17   infer from the mere asking of the question that the

18   witness does own an automobile.

19        Now, during the course of the trial either

20   attorney, the district attorney or defense counsel, may

21   object to a question or an answer on the ground that

22   somehow it's legally improper or inadmissible.  If I

23   sustain the objection, this means that I believe the

24   question or the answer was in some manner improper.

25        Therefore, in the first instance, the

1    question that may not be asked.  And in the second

2    instance, if an answer has been given, I will say,

3    strike it out, and, therefore, the answer is no longer

4    evidence in the case.

5           Now, if I overrule the objection, then it

6    means that the question is proper and I will permit it

7    to be answered, or if already answered, I will permit

8    the answer to stand as evidence in the case.

9           Please do not resent the fact that either

10   attorney makes objections.  This is their duty.  And do

11   not hold it against either attorney if I rule against

12   them.  Also, I will explain to you in detail in my

13   charge, as jurors in the case you are the sole judges

14   of the facts.  And I am the sole judge of the law.  You

15   must accept the law as I give it to you without

16   hesitation or reservation, even if you privately

17   disagree with me.

18          You must keep an open mind.  You must not

19   converse among yourselves or with anyone else upon any

20   subject connected with the trial.

21          You must neither offer nor express an opinion

22   as to the guilt or innocence of the defendant until I

23   finally give the case to you.

24          You must not read or listen to any account or

25   discussions in the case if reported in the newspapers

1        or other media.  You must not visit or view the

2        premises where the offenses charged were allegedly

3        committed or any other premises or place involved in

4        this case.

5                You must promptly report to the Court any

6        attempt within your knowledge involving an attempt by

7        any person to improperly influence any member of the

8        jury.

9                Ladies and gentlemen, I have also requested

10       that you refrain from taking notes during the course of

11       this trial.  Experience informs that by the taking of

12       notes by a juror during the course of a trial, it tends

13       to distract the attention of the juror from the trial.

14       It also tends during jury deliberations to confuse

15       those jurors who have not taken notes during the trial

16       and, therefore, prolongs deliberations.

17               Please bear in mind, any time during

18       deliberations you have a right to request testimony be

19       read back to you and any exhibit marked and received in

20       evidence be delivered to you.

21               We will now proceed with the next step of the

22       trial, which is the opening statement by the People.

23               Mr. Biancavilla.

24               MR. BIANCAVILLA:  Thank you, your Honor.

25               May it please the Court, Mr. Chamberlain,

1     members of the jury, good morning.

2              Okay.  We spent a lot of time picking a jury.

3     And this is the next stage, as the Judge told you.  It

4     is my opportunity to provide you with an opening

5     statement.  And what basically an opening statement is,

6     it is like the table of contents of a book, where I

7     will outline for you the evidence that we intend to

8     present during the course of this trial.  You, of

9     course, as the jury will write the final chapter in

10    this book.

11             Now, the first thing we have to start with in

12    an opening statement is what Mr. Scrimo is charged

13    with.  Because that's what we are required under the

14    law to prove.  So, with that in mind, let me read to

15    you the indictment.

16             It's entitled County Court, County of Nassau,

17    the People of the State of New York against Paul

18    Scrimo, defendant.

19             The grand jury of the County of Nassau by

20    this indictment accuses the defendant of the crime of

21    murder in the second degree, in violation of Section

22    125.25, subdivision 1, of the Penal Law of the State of

23    New York, committed as follows:

24             The defendant, Paul Scrimo, on or about the

25    12th day of April 2000, in the County of Nassau, State

1    of New York, with intent to cause the death have Ruth

2    Williams, caused the death of Ruth Williams.

3         Second count:  And the grand jury of the

4    County of Nassau by this indictment further accuses the

5    defendant of the crime of murder in the second degree,

6    in violation of Section 125.25, subdivision 2, of the

7    Penal Law of the State of New York, committed as

8    follows:

9         The defendant, Paul Scrimo, on or about the

10   12th day of April, 2000, in the County of Nassau, State

11   of New York, under circumstances evincing a depraved

12   indifference to human life, recklessly engaged in

13   conduct which created a grave risk of death to Ruth

14   Williams and thereby caused the death of Ruth Williams.

15        All of the actions and transactions alleged

16   in each of the several counts of this indictment are

17   connected together and from part of a common scheme and

18   plan.

19        It's dated July 6th, 2000, Mineola, New York,

20   it's signed by Denis Dillon, District Attorney of

21   Nassau County.

22        Putting the legalese aside, ladies and

23   gentlemen, what is this case all about?  Pure and

24   simple, this case is about anger.  Nothing more,

25   nothing less.  On April 12th, 2000, during the early

1    morning hours, three people were out drinking together

2    at a bar in the Village of Farmingdale called Y.L.

3    Childs.  Now, one is dead, one is on trial and the

4    other one is an eyewitness to the murder.

5         What the evidence will show, ladies and

6    gentlemen, is that Paul Scrimo is a stone-cold killer

7    that strangled to death a woman with his bare hands.

8    And that is what this case is all about.

9         Now, what are you going to hear about over

10   the next couple of weeks?  First of all, you're going

11   to hear about Paul Scrimo, the defendant in this case.

12   And you're also going to hear about an individual by

13   the name of John Kane, who was also with Mr. Scrimo,

14   and a witness to this murder.

15        And what you will hear is that John Kane and

16   Paul Scrimo had been friends for a couple of years.

17   They played together on a dart team at a bar in

18   Farmingdale called the Falcon's Nest.  They played

19   there every Tuesday night in dart tournaments from

20   eight o'clock until twelve o'clock.

21        You will also hear that Paul Scrimo is a

22   superintendent of an apartment building in Farmingdale

23   called Elizabeth Gardens.  He worked there for about

24   thirteen years.

25        John Kane is a carpenter who was living in

1   the Farmingdale Village with his sister and his

2   brother-in-law.

3            And they played darts together every Tuesday

4   night.  And on April 11th of the year 2000 that was no

5   different.  They played darts at the Falcon's Nest that

6   night.

7            Now, Ruth Williams also lived in the Village

8   of Farmingdale.  She had a little apartment on top of a

9   restaurant there on Main Street called Captain Andy's.

10   And Ruth Williams was born and raised in the Village of

11   Farmingdale.  Her family at one time owned the White

12   Funeral Home right off of Main street in the Village of

13   Farmingdale.  She was born there.  She was raised

14   there.  Ruth lived above Captain Andy's for a couple of

15   years and she managed the floral shop in Bethpage.

16            And on what was to be the last day of her

17   life, Ruth, forty-eight years old, was out and about in

18   the Village of Farmingdale, bouncing from bar to bar,

19   until the early morning hours of April 12th.  And you

20   will hear this was not unusual for Ruth.  Everybody on

21   Main Street knew Ruth.  Ruth was out looking for

22   companionship.  Ruth was out looking for affection.

23   Ruth had no idea that what she found that night would

24   end her life.

25            Sometime around two o'clock in the morning,

1    ladies and gentlemen, you're going to hear that Ruth

2    Williams, Paul Scrimo and John Kane all wound up

3    together in a bar on Conklin Avenue in Farmingdale,

4    right off of Main Street, called Y.L. Childs.  It's got

5    all the comforts and necessity of a good gin mill.

6    It's got a pool table.  It's got a dart board and it's

7    got music.  And at two o'clock in the morning, when

8    they were all there together, they were all having a

9    good time.  Everybody knew Ruth there.  Ruth had been

10   there before.  Everybody knew John Kane.  John Kane had

11   been there before.  Ruth knew John Kane because Ruth

12   had been intimate with John Kane on prior occasions.

13   And Ruth knew Mr. Scrimo as a local from the Village of

14   Farmingdale who had worked there for thirteen years.

15        Now, it was apparent to everybody at Y.L.

16   Childs that Ruth had more than her share to drink that

17   night.  She was loud, she was boisterous, she was

18   dancing seductively for both Kane and Scrimo at the

19   right side of the bar.  She was showing off her chest.

20   She was removing the straps of the overalls she was

21   wearing.  She was also seen passionately kissing

22   Mr. Scrimo at the bar during the course of the night.

23   And this all went on, ladies and gentlemen, for a

24   couple of hours.  And you will hear testimony that Ruth

25   left the bar alone at approximately 3:45 a.m. and went

1    home to her apartment above Captain Andy's on Main

2    Street.

3           You will also hear testimony that Ruth got

4    home around four a.m. and a short time later Scrimo and

5    Kane came knocking on the door.  John Kane will tell

6    you that they left the bar after Ruth they said let's

7    go up to Ruth's house and continue the party.  They

8    went there and they knocked on the door and she invited

9    had them in.  Mr. Kane had asked Ruth for a beer when

10   they got into the apartment and Ruth said that she

11   didn't have any beer.  So, Paul Scrimo volunteered to

12   go to the 7-Eleven right on the other side of the

13   railroad tracks from where the apartment was located

14   and buy some beer.  But before he left Ruth asked him

15   to buy her a pack of cigarettes.  Okay, a package of

16   Vantage Ultra Light 100s.

17          So, Scrimo left.  While he was gone, Ruth

18   attempted to perform an act of oral sex on Mr. Kane.

19   And this went on for a couple of minutes, and when Kane

20   was unable to ejaculate because he had been drinking

21   all night, they stopped.  Kane got up, went into the

22   living room to put on a CD.  While he was in, putting

23   on the CD, Ruth went downstairs to let Mr. Scrimo back

24   into the apartment.  When he got back up into the

25   apartment, Kane came walking out of the other room and

1       saw Scrimo there with a twelve pack of Coors Lites and

2       the cigarettes that she had asked for.  Kane was

3       listening to the music, Scrimo was talking to Ruth in

4       the kitchen area.  And Kane noticed during the course

5       of the conversation while he was at the other end of

6       the room that Scrimo and Ruth became involved in an

7       argument.  It wasn't a loud argument.  It was a

8       disagreement.  And at one point Scrimo gets up and

9       says, I've had enough of this shit, I'm out of here.

10      And he goes walking down the hallway.  Kane jumps up

11      and says, Paul, where are you going?  Come on, cool

12      off.  We just got here.  Sit down and have a couple of

13      beers.  With that, Ruth yells out, oh, let him go.  Let

14      him go home to his fat, ugly wife.  With that Scrimo

15      turns around, comes bounding back up the hallway,

16      pushes John Kane to the side and grabs Ruth Williams by

17      the throat, throws her down on the ground and in one

18      shot strangles her to death with his bare hands.  Kane

19      goes to grand grab him and tries to pull him off, and

20      Kane will tell you he was hard as a rock and he

21      couldn't even move him.  And John Kane will describe to

22      you as he looked over Paul Scrimo's shoulder how he

23      watched the life being strangled out of Ruth Williams.

24      How he saw her eyes roll up in to her head until the

25      point where she was dead.

1    At that point Scrimo yells to Kane, get the

2    CD, get the beers.  Kane starts to collect the beers

3    and turns off the CD.  While he's in the other room

4    doing that, he hears a ripping noise.  A sound that

5    appeared to be unusual to him.  And when he walked back

6    into the room, he saw Scrimo over Ruth Williams, tying

7    what appeared to be some type of a cord or a wire

8    around her neck.  At that point Scrimo jumped up,

9    grabbed some napkins and started wiping everything

10   down, wiping the table down, wiping the door knobs

11   down.  And as they were leaving, Scrimo cells to Kane,

12   don't worry about anything, it's all taken care of.  We

13   were in this together.

14        Well, ladies and gentlemen, that's what he

15   did.  And that's what happened at 196 Main Street on

16   the early morning hours of April 12th of 2000.  And

17   here's how we're going to prove it.  Please understand

18   something right from the beginning, this is a murder

19   case.  And you are very fortunate because you have an

20   eyewitness to a murder.  Most juries in murder cases ar

21   not as fortunate as you.  In most murder cases you have

22   to rely on other evidence to prove someone's guilt.

23   You have to rely on other evidence to reach a decision.

24   In this case you're going to have a person, a witness,

25   who is going to give you a moment by moment description

1       of what happened in that apartment.  You are going to

2       have a person who is going to give you a moment by

3       moment description of what led up to this attack on

4       Ruth Williams and what happened after the attack on

5       Ruth Williams.  And when you're done listening to this

6       witness, you will see that, based upon his testimony

7       alone, you will be convinced that Mr. Scrimo murdered

8       Ruth Williams.

9              But this case goes much deeper than that.  In

10      this case the depth of the evidence is far deeper than

11      just a witness to the murder.  First of all, you're

12      going to have the luxury of sitting back and listening

13      to the police tell you about the lie that Mr. Scrimo

14      told the police during the course of their

15      investigation.  How he lied to them about who he was

16      with that night, about what time he went home that

17      night, about what he did that night and about where he

18      was that night.  You're going to have the luxury of

19      listing to the lies that he told the police after he

20      was arrested about where he was, who he was with, what

21      happened during the night.  And you will also hear the

22      lame excuses that he gives the police for his faulty

23      memory about not remembering that information when he

24      was first interviewed.  You're going to have the luxury

25      of listing to his attempts to cover up his lies after

1    he posted bail and was released.

2         All of his lies, ladies and gentlemen, that

3    he told the police during the investigation after he

4    was arrested and after he was released on bail you will

5    see were his attempts to distance himself from the

6    murder scene, from John Kane, and from Ruth Williams.

7    They all were, I was alone that night.  I went straight

8    home after I drank.  I didn't stop anywhere on the way

9    home.

10        Well, you're going to hear testimony on how

11   he was caught.  Because, obviously, when he was out

12   that night, the police went out and they interviewed

13   other witnesses and they were able to determine that,

14   no, Mr. Scrimo was not alone that night, he was with

15   John Kane.  And they were able to place him with John

16   Kane.  The police found out he didn't go straight home

17   after he finished drinking.  And why?  Because there

18   were witnesses that will tell you, as they told the

19   police, what they saw.

20        He claimed that he didn't stop anywhere on

21   his way home.  And, again, there were witnesses who saw

22   exactly where he stopped.  And some of these glaring

23   inconsistencies are, number one, Mr. Scrimo claimed

24   that he went straight home alone, didn't see anybody,

25   didn't stop anywhere.  Well, unfortunately for

1     Mr. Scrimo, the 7-Eleven clerk remembered Mr. Scrimo

2     coming in that night.  And the 7-Eleven clerk will come

3     in and tell you how after four o'clock in the morning

4     Mr. Scrimo came into the 7-Eleven store and purchased a

5     twelve pack of beer and a package of Vantage Ultra

6     Light 100s.  And the 7-Eleven is going to tell you he

7     thought that was strange because he knew Mr. Scrimo,

8     and he never saw Mr. Scrimo in the 7-Eleven in four

9     o'clock in the morning.  And he also thought it was

10    strange because the only person that bought Vantage

11    Ultra Light 100s at that particular time in the morning

12    was Ruth Williams, the victim.  And you're going to

13    hear him tell you that's why they had those cigarettes

14    in the 7-Eleven store.  And he said to Mr. Scrimo, are

15    you going to see the blond lady?  And Mr. Scrimo

16    smiled at him and laughed and said, yeah, don't tell my

17    wife.  Because you will also hear that the 7-Eleven

18    clerk also knows Mrs. Scrimo.  And after Mr. Scrimo

19    said, yeah, don't tell my wife, the clerk said, take a

20    couple of condoms and put two condoms in Mr. Scrimo's

21    bag as he left.

22         The 7-Eleven clerk will also tell you, as he

23    watched Mr. Scrimo walk out of the 7-Eleven, he saw him

24    make a right, turn toward the direction of Ruth

25    Williams' apartment, instead of walking directly across

1    the street, which would have been the direction of

2    where Mr. Scrimo's apartment building was.

3            Mr. Scrimo also got caught in another lie

4    when he said he went straight home.  Francine Quinn,

5    who was a bartender in the Downtown Bar in Farmingdale,

6    when she got off of work, she decided to go up to Y.L.

7    Childs.  And she's going to tell that you she saw

8    Ruthie Williams up in Y.L. Childs with John Kane and

9    with a big bald guy with tattoos, never seen him

10   before.  But she's going to tell you that when she went

11   home, she had to walk back down Main Street and go back

12   behind the Downtown Bar.  Right next to where her car

13   was parked was the entrance to Ruth Williams'

14   apartment.  And she's going to tell you that at about

15   4:15, 4:20 in the morning, she saw Ruth Williams at her

16   back door, arguing with a big bald guy.  And it was the

17   same big bald guy with tattoos that she saw her with in

18   Y.L. Childs.

19           So, at that point he's already caught in two

20   lies, ladies and gentlemen.  But it gets even better

21   than that.  At some point after Mr. Scrimo is arrested

22   and he's confronted with these inconsistencies in his

23   stories, he has a discussion with another police

24   officer who he happens to call to the scene of his

25   apartment building when there's some kind of problem

1     with a vagrant.  And he starts talking about this whole

2     incident that he's been accused of.  And at that point,

3     at some point in the conversation, he says, and you

4     know what, I didn't tell those homicide detectives the

5     truth.  He said, you know, I went to 7-Eleven and I

6     bought the beer and the cigarettes and I brought it

7     back to them, but I never went up in the apartment.

8              And what is he attempting to do, ladies and

9     gentlemen?  He had already been caught in his lies.

10    Now he's trying to make excuses for those original lies

11    that he told the police.

12             These are the type of evidence, ladies and

13    gentlemen, you're going to hear during the course of

14    this trial.  That is in addition to, in addition to the

15    eyewitness testimony of John Kane.

16             Now, during the trial, make no mistake about

17    it, they're going to try to point the finger at John

18    Kane.  Because they're going to say, and they're going

19    to argue to you and you're going to see during the

20    course of the trial, that there was DNA obtained from

21    one of the fingernails of Ruth Williams that came back

22    to John Kane.  John Kane's DNA was found on cigarette

23    butts on the kitchen table in the apartment.  And John

24    Kane's fingerprint was found on the CD case.  And

25    they're going to say, look at John Kane, look at John

1    Kane.  He was up in that apartment.  He's the murderer.

2    Well, to be honest with you, ladies and gentlemen, if

3    the police were lazy and just wanted to point a finger

4    at somebody and just wanted to hang this murder on

5    somebody, it sure would have been easy to point the

6    finger and hang the murder on John Kane, make no

7    mistake about it.  There's DNA on her fingernail.  His

8    fingerprint is on the CD and there's cigarette butts on

9    the kitchen table.  And if the police just wanted to

10   judge a book by its cover, when you see John Kane,

11   you're going to see how easy it would have been to

12   point the finger at John Kane and hang this murder on

13   him.  But, they didn't want to judge a book by its

14   cover.  They listened to what Kane had to say.  They

15   compared it to the other evidence.  And guess what?

16   When you look at John Kane as a potential killer or

17   anyone else as a potential killer in this case, the

18   evidence is going to show you that it doesn't make

19   sense.  And we will prove to you during this trial that

20   Paul Scrimo is the murderer and that John Kane is not.

21   And here is how we're going to do it.

22        If John Kane killed Ruth Williams or someone

23   else killed Ruth Williams and Scrimo was not in the

24   apartment and not with him that night, then answer me

25   this question, why was he lying to the police about

1    where he was that night?   Why was he lying to the

2    police about who he was with that night?   Why did he

3    tell the police he went straight home?   Why didn't he

4    tell the police he went to the 7-Eleven and bought

5    cigarettes and Vantage Light 100s?   Why all the

6    deception?   Why all the lies?

7                You're also going to hear some interesting

8    testimony about that wire, that cord that strangled

9    Ruth Williams to death, or that was wrapped around her

10   neck.   And you're going to hear testimony that that

11   cord was cut, one end of it was cut.   And you're going

12   to hear testimony that that cord was a power cord to an

13   answering machine from Ruth Williams' apartment.   And

14   the heavy end, the end with the transformer on it had

15   been cut off.

16               But what's very interesting with the

17   testimony that you're going to hear is that that cord

18   was not cut with a knife.   It was cut with a scissor

19   type object or a scissor type tool whose blades were

20   not exactly in alignment.   And you're going to hear

21   expert testimony that that cord was cut with a tool

22   that was consistent with a tool that Mr. Scrimo wore on

23   his belt and was in his possession on the day he was

24   arrested.

25               I want you to think about that.   Because that

1    is very interesting.  If you are pointing the finger at

2    John Kane or pointing the finger at someone other than

3    Mr. Scrimo, what a coincidence that would be that

4    Mr. Scrimo just happened to have that particular type

5    of tool that cut that cord that was found wrapped

6    around Ruth Williams' neck, and the jaws of it were not

7    closing together properly and would have made a type of

8    cut.

9              Now, obviously they can argue, well, sure,

10   but that cut could have been made with any other type

11   of tool whose jaws didn't close correctly.  But what do

12   you think the odds would be when Mr. Scrimo just

13   happened to be wearing that tool on his waist when he

14   was arrested?

15             You're also going to hear about DNA evidence.

16   You're going to hear about fingerprint evidence.  On

17   the kitchen table there were several items that were

18   found.  There was a Budweiser bottle on the kitchen

19   table.  And there was DNA taken off of the mouth of

20   that Budweiser beer bottle.  And you will hear

21   testimony from experts saying there was a DNA mixture.

22   It wasn't just one person's DNA.  And you will hear

23   testimony that the major contributor on that beer

24   bottle was John Kane, but there was also a minor

25   contributor on that beer bottle, that was consistent

1    with Mr. Scrimo.

2                But another interesting factor about that

3    beer bottle is that there were no fingerprints on the

4    beer bottle.  There were fingerprints on the wine glass

5    on the table that came back to Ruth Williams.  There

6    were fingerprints on the photo album on the table that

7    came back to Ruth Williams and some unknowns.  There

8    was a fingerprint on a poem that was on the table.  But

9    the beer bottle didn't have any fingerprints on it.

10               You're going to have to think about that,

11   ladies and gentlemen.  And when you are thinking about

12   that, think about John Kane is talking to you about,

13   Mr. Scrimo wiping things down as he was leaving the

14   apartment.

15               Ladies and gentlemen, you will hear one

16   inconsistent after another inconsistency covering the

17   course of this trial.  I just highlighted the main ones

18   regarding the investigation of this case.  And let

19   there be no mistake about it, over the next two weeks

20   we are going to prove a case to you against Mr. Scrimo.

21   We are going to do it witness by witness, piece of

22   evidence by piece of evidence.  And make no mistake

23   about it, at the end of my case, I'm going to argue to

24   you that we have proven to you beyond a reasonable

25   doubt that Mr. Scrimo murdered Ruth Williams.  And I am

1    confident that when you hear the evidence, you listen

2    to the testimony of John Kane, and you listen to the

3    lies that Mr. Scrimo told during the course of this

4    investigation, you will reach the same conclusion.   And

5    that is that Paul Scrimo murdered Ruth Williams.

6              Thank you.

7              THE COURT:  Mr. Chamberlain.

8              MR. CHAMBERLAIN:   Thank you, Judge.

9              Ladies and gentlemen, we finally get to

10   discuss the evidence, what this case is all about.   And

11   as the Judge told you, what the DA told you is not

12   evidence.   What I'm about to tell you is not evidence.

13   If, in fact, you can try the case on what we said, he

14   would win because he's much more persuasive than I am.

15   If you listen to everything he said, if he were the

16   witness, you would believe him.   But I don't think

17   you're going to believe John Kane.   And I think I'm

18   going to be able to show you and give you a guideline

19   as to why you're not.

20             Let me say first, you heard the Court tell

21   you that he's required to open, and the defense may

22   open, I'm not.   And there are occasions when a defense

23   counsel will say to a jury, keep an open mind and let

24   it go at that.   Remember the Court's instructions, keep

25   an open mind, presumption of innocence and that sort of

1    stuff.  It's not stuff, those rulings.  But I'm going

2    to go further here, because I think some sort of a

3    guideline in listening to the evidence in this case

4    will be helpful to you as jurors.  And in doing so, I

5    want you to remember what we discussed as to how you

6    will evaluate witnesses and whether or not you give any

7    greater credence or whether or not you follow the

8    Court's instructions with respect to burden of proof.

9           What I'm about to say is not an assumption of

10   the burden of proof.  I'm not going to be trying here,

11   trying to prove that John Kane -- as the district

12   attorney said, they're going to prove he didn't do it.

13   I don't think there's a prayer of them doing that --

14    I'm not going to try to prove that he did it, because

15   I don't have the power, I don't have the tools and it's

16   not my job.  It's not my job.  So, I'm not assuming

17   that burden.

18           Now, number one, I want to tell you to keep

19   in mind the charge here is murder.  The charge is not

20   whether or not my client may or may not have told the

21   whole truth at all times to all detectives.  Some of

22   this involves things that a man would not want his wife

23   to know.  And that may be a ground, not saying so; but

24   there's no crime in not telling the whole truth,

25   assuming that's what you find.  Assuming that is what

1      you find.

2              I think when you're through with how this man

3      was picked up and when and what was said, you're going

4      to find you don't necessarily credit everything the

5      People claim as to what he said.  They don't have any

6      written statements.  They don't have any admissions to

7      any crime.  The whole thrust here is three weeks or so

8      after the murder, when he's picked up after a night of

9      drinking, that three weeks later, did he remember every

10     detail, or did he perhaps even fudging on some of the

11     details?

12             The crime is not whether or not somebody told

13     the full story.  It's a -- it's a felony to lie under

14     oath before a jury or under oath.  It's a misdemeanor

15     to sign a false statement knowing it to be false.  But

16     it's no crime at all to lie to the police.  And even if

17     it were, that's not the charge.  And they're going to

18     try to -- they're going to try to dissuade you from

19     what the charge is here.  The charge is murder, ladies

20     and gentlemen.  Horrible, terrible charge.  A horrible,

21     terrible murder.  But the issue isn't who did this.

22     The real issue here is, after this case is over, have

23     they proved that my defendant did this?

24             I think the evidence, after you have listened

25     to it, you will have a better belief that it's more

1    likely that John Kane did it than my defendant.  But

2    it's not my burden to prove that.

3            Now, you heard about Mr. Kane being a

4    carpenter; my client being a superintendent.  In a

5    sense both statements we'll find evidence of.  But my

6    client is a fully employed superintendent, with a wife

7    and two children he's supported.

8            Mr. Kane, you will find out, is not really a

9    carpenter.  He's a part-time hippy.  He's a thirty year

10   old hippy.  That's what you're going to have here.

11           Your case -- your -- this case is going to

12   depend upon whether or not you believe this thirty year

13   old hippy.  I don't know what he's going to look like

14   when he comes in here.  He disappeared.  The DA -- I

15   don't know where he is.  But he had, not long hair, it

16   went down by his shoulders, full beard all the way down

17   to here (indicating).  He looked a little bit like

18   Jesus Christ incarnate.  And he lived the style, a

19   dirty hippy lifestyle.  He didn't work.  You're going

20   to find out that maybe a couple of days every --

21   occasionally he would do some work.  I don't know if he

22   was being paid on the books or not.  We'll find out.

23   The chances are he wasn't getting paid.

24           How was he living?   He drank.  You're going

25   to hear from the district attorney evidence, he was out

1    all the time, all the time, every night.  He didn't

2    just go to one bar, he would go to a series of bars.

3    The question is why?  Why is he going from bar to bar?

4         I think you're going to find there is

5    evidence in this case that Mr. Kane was selling

6    cocaine, that's why he traveled from bar to bar to bar.

7    That is what supported his life style.  How do you

8    live, ladies and gentlemen, when you get to be thirty?

9    He didn't have any kids.  He didn't have a wife.  But

10   how do you support yourself, food, lodging, all the

11   things that it takes to live?  It's expensive, you

12   know.  How do you support yourself if you work every

13   now and then as a part-time carpenter?   Believe me, I

14   think it was more then than now.

15        So, lifestyle, in evaluating a witness, as we

16   discussed during jury selection, is important.

17        Background.  You're going to find out when he

18   was -- first of all, Mr. Biancavilla very cogently and

19   persuasively talked about, maybe my client didn't tell

20   the whole truth, maybe he lied when he was arrested.

21   He was arrested on May 3rd.  The night before he was

22   arrested Kane was picked up and brought in and

23   questioned.  Kane had previous -- this is three weeks

24   after the murder.  Kane had previously given a

25   statement, I think April 19th or 20th, a couple of

1       weeks before that, a week or so after the murder, he

2       had nothing to do with it.  Nothing.  They asked about

3       a bald fellow.  My client at the time wasn't bald, he

4       had his head shaved.  No, nothing to do with it.  When

5       he's picked up, he persists in lying.

6               So, you don't have an eyewitness to a murder.

7       Eyewitnesses to a murder, I agree with the district

8       attorney, are very rare.  But why do you have an

9       eyewitness to a murder?  Is it somebody that happened

10      to see it and immediately witnessed and told the

11      police, but had nothing to do with it?  Baloney.

12              His claim here that you heard is he invited

13      -- he wanted to go back up there.  Why?  To have oral

14      sex, which he said he had on previous occasions.  Why

15      is he inviting somebody else along with him?  Why does

16      he lie to the police?  Why does he clean up the scene?

17              You will hear he cleaned up fingerprints and

18      bottles and got evidence out of there.  That alone is a

19      felony, by the way, even if he didn't take part in the

20      murder.  He's not being prosecuted for that.  Why?

21      Why?  Why does he lie even after he's picked up three

22      weeks later, which he does.  You will hear it.  He

23      continues to lie.  Nothing to do with it.  Nothing to

24      do with it.  Then they say, we can tie you in here.  We

25      can tie you into this scene.  We can prove you were

1          there at that time.

2                  Ladies and gentlemen, you will hear the

3          evidence, it's very interesting they had a fingerprint

4          of Kane.  They already had there SIB, Scientific

5          Investigation Bureau, do tests and they had

6          fingerprints showing Kane was there.  So, they tied him

7          in.  They didn't have the DNA records yet.  So, Kane,

8          after a couple of hours, whatever it is, of being

9          questioned in homicide on the night of May 2nd, and

10         he's had time now, he's had three weeks to think about

11         it, he knows he might be a suspect.  He knows people

12         had seen him with this witness.  He knows that she was

13         coming on to him, she was after him.  Whether she was

14         after him for sex or for drugs is a question you're

15         going to have to ask yourselves.  And there may be

16         evidence about that.  But, the question is, what does

17         he do?  He's there.  They can prove he's there.  They

18         know he's got a prior relationship.  They already knew

19         that before they picked him up that night.  They knew

20         that.  So, what does he do?  He says, the only way out,

21         I'm going to lay it on Kane -- I'm going to lay it on

22         the defendant.

23                 And all the evidence, all the physical

24         evidence, there's things that they can't change here.

25         You're going to listen to the chain of the physical

1    evidence coming in.  You don't have any written

2    statements by my client.  You don't have any -- you

3    don't have any admissions.  And it's not whether he was

4    in the apartment or not, that's not the issue.  Their

5    whole -- everything they're going to try to point to,

6    to show he was there.  That's not the issue.  The issue

7    is, who killed this poor woman?  And there is only one

8    thing I can tell you about that, every piece of

9    evidence, scientific evidence, which you can't fudge,

10    points to Kane.

11         He claims he helped clean the apartment up.

12    His prints are there.  His DNA is all over the place.

13    They didn't get the DNA until after they charged my guy

14    and let Kane go.  They had already taken a position on

15    this case.  Strangely enough, they had let Kane go.

16    How they made that, why they made that, not my burden

17    to prove to you.

18         But, subsequent DNA tests showed it was

19    Kane's DNA that was found under, not on -- you heard it

20    was on the fingernail.  It wasn't on the victim's

21    fingernail.  It was scrapings from underneath her nail.

22    Where somebody being strangled would struggle and you

23    would get scrapings.  It was under her fingernail.

24    That's where they -- these tests show whose DNA it is.

25    Who was there?   Kane.  Whose fingerprints are in the

1    apartment?   Kane's.   Whose DNA is on all other

2    locations in the apartment?   Kane.   Who is the major

3    contributor to this beer bottle?   Kane.   Kane.   Kane.

4    Kane.   Kane.   Kane.

5           So, ladies and gentlemen, I think you're

6    going to have to be very careful about how you evaluate

7    this evidence.   But I think when you're through, you

8    will find that if there's proof beyond a reasonable

9    doubt, it's proof that Kane committed this murder, not

10   this defendant.   And you don't have to -- you don't

11   have to solve this case.   Maybe after -- after the case

12   is over you can try to talk about solving the case, as

13   to what really happened.   But you do have to follow the

14   Court's instructions.

15          There's no proof beyond a reasonable doubt.

16   It's -- in my opinion, there's very little proof,

17   unless you completely believe Kane.   If you believe

18   Kane, you can find my defendant guilty.   But you have

19   to believe him beyond a reasonable doubt.   And I think

20   there's plenty of evidence.   His own activity, his own

21   background, his -- and the scientific evidence -- to

22   say there's more than a doubt there.

23          Now, you have one other fact I want to bring

24   out.   You have my defendant arrested May 3rd, 2000.

25   Picked up.   Even though they knew where he was, they

1    waited for hours to arrest him on the street after he's

2    been drinking; presumably, so nobody can call his wife

3    and say, get a lawyer.  So, they picked him up and

4    questioned him.  He is -- there's a preliminary exam

5    and then there's an indictment.

6            I think the indictment is on or about the

7    first week of July.  I don't remember the exact date.

8    I think the presentation is July 6th or 7th.  There's

9    an indictment then.

10           You're going to find out that there is

11   evidence gathered -- normally, before they arrest

12   somebody, certainly before they present the case to the

13   jury, they have their evidence.  They say this --

14           MR. BIANCAVILLA:  Judge, I'm going to object

15   to what normally happens.

16           THE COURT:  Yes.

17           MR. CHAMBERLAIN:  I'll withdraw that.

18           THE COURT:  Yes.  It's sustained.

19           MR. CHAMBERLAIN:  In this case you're going

20   to hear about attempts to get further tests.  When the

21   DNA results came back, they all point to Kane.  So,

22   they resubmit later on, a year later.  You're going to

23   have tests in the year 2001, renewed DNA analysis.

24   Trying to bring my guy in.  Unsuccessful, in my

25   opinion.  But they're trying -- there are attempts.

1    There are tests on this tool you heard about, which is

2    sort of interesting.  You're going to have tests by the

3    SIB lab and it's sent later on to Washington for the

4    FBI, after the indictment.  You're going -- they're

5    trying to tie this tool into my defendant.

6         What you heard was the word consistent.  Be

7    very, very careful about the word consistent.

8    Consistent merely means it would have been, it could

9    have been that type of tool or any other type of

10   sheering type tool.  It didn't mean it was this

11   particular tool.

12        I think you're going to find when you listen

13   to the experts, including their experts, that they are

14   going to say they couldn't say it was this tool.

15        First of all, if somebody committed a murder,

16   would they go around and carry the tool they used weeks

17   later, if they had any sense?  They would have to be a

18   blithering idiot not to get rid of it, if they used the

19   tool.  But you're going to hear about something else;

20   that there was a piece of material on this tool.  They

21   tried to tie that to the cord.  And, again, no match.

22   No match.

23        So, don't be mislead or deceived by the use

24   of a sophisticated word like consistent.  Consistent

25   means that you can have somebody that spends years in

1      jail on something that is consistent, DNA evidence then

2      shows --

3              MR. BIANCAVILLA:  Judge, I'm going to -- I'm

4      going to object.

5              MR. CHAMBERLAIN:  Shows it's not he who did

6      it.

7              THE COURT:  Yes, sustained.

8              MR. CHAMBERLAIN:  Ladies and gentlemen,

9      finally, I want to tell to you keep an open mind.

10     Listen to the -- listen to the Court's instructions on

11     the law, apply the law, and at the end of the case

12     you're going to think and find that the only evidence

13     that the People have is the statements made by this

14     witness as to what he says happened after he was shown

15     that they had him tied in there.  And I don't think

16     you're going to find that carries much weight.

17             Thanks very much.

18             THE COURT:  Mr. Biancavilla, you can call

19     your first witness.

20             MR. BIANCAVILLA:  Can we approach?

21             THE COURT:  Yes, Counsel, come forward.

22             (Whereupon, there is a discussion held at the

23     Bench, off the record, between the Court and Counsel.)

24             THE COURT:  Ladies and gentlemen, we're going

25     to take a short break at this point.

1          Do not discuss the case among yourselves or

2     with anyone else.  Keep an open mind.  Do not form or

3     express any opinions until the entire case is

4     completed.  Do not read or listen to any account of

5     this case, should it be reported in the media.  Do not

6     visit or view any places mentioned.  You are not to

7     permit any party to discuss this case with you or

8     attempt to influence you.  You must promptly report to

9     the Court any violation thereof.

10         We will take a short break.  We'll be back in

11    ten minutes.

12              THE COURT OFFICER:  Okay, jurors.

13              (Whereupon, the sworn jurors and alternates

14    leave the courtroom.)

15              THE COURT:  Okay.

16              (Whereupon, there is a brief recess taken in

17    the proceedings)

18              (Whereupon, the following takes place in open

19    court)

20              MR. BIANCAVILLA:  Can I premark these

21    exhibits?

22              THE COURT:  Yes.  People's 1 and 2, photos.

23    Premarked People's 1 and 2 for identification.

24              THE COURT OFFICER:  Ready for the jury?

25              THE COURT:  Ready, Counsel?

1              MR. BIANCAVILLA:  Yes.

2              MR. CHAMBERLAIN:  Yes.

3              THE COURT:  Yes.

4              THE COURT OFFICER:  Jury entering.

5              (Whereupon, the sworn jury and alternates

6        enter the courtroom)

7              THE CLERK:  Both sides stipulate that all

8        sworn jurors are present and seated properly?

9              MR. CHAMBERLAIN:  So stipulate.

10             MR. Biancavilla:  Yes.

11             THE COURT:  Could you call your first

12        witness, Mr. Biancavilla?

13             MR. BIANCAVILLA:  John Williams, your Honor.

14    J O H N   M I L L E R   W I L L I A M S,  called as a

15        witness by and on behalf of the People, having been

16        first duly sworn, testified as follows:

17             THE COURT OFFICER:  In a loud voice would you

18        state your full name, spelling your last name and

19        county of residence.

20             THE WITNESS:  John Miller Williams, Wyoming

21        County, Pennsylvania.

22             MR. BIANCAVILLA:  May I inquiry, your Honor?

23             THE COURT:  Yes.

24    DIRECT EXAMINATION

25    BY MR. BIANCAVILLA:

Kathleen Plaia

1     Q    Mr. Williams, good morning.

2     A    Good morning.

3     Q    Thank you for being with us today.

4          Mr. Williams, can you tell the jury what your

5     relationship was to the victim in this case, Ruth Williams?

6     A    I am the victim's brother.

7     Q    And you live in Pennsylvania now?

8     A    Yes.

9     Q    Where -- who do you live with?

10    A    I live with my wife and two children.

11    Q    And what is your profession?

12    A    I'm a automotive and industrial mechanic.

13    Q    When did you move to Pennsylvania?

14    A    I moved to Pennsylvania with my family about

15    eight years ago.

16    Q    And where do your parents reside?

17    A    My parents reside in Nicholson, Pennsylvania.

18    Q    Now, was there a time when you lived in

19    Farmingdale?

20    A    Yes.  For most of the first thirty-six years of

21    my life I lived in Farmingdale.

22    Q    How about your parents?

23    A    They moved to Pennsylvania from Farmingdale in

24    1979.

25    Q    And prior to moving to Farmingdale -- prior to

Kathleen Plaia

Mr. Williams - People - Direct                        349

1    moving from Farmingdale, what was your father's profession?

2         A    My father was a funeral director.

3         Q    And in what funeral home?

4         A    In Arthur F. White funeral home in Farmingdale.

5    They had places in Farmingdale and Bethpage.

6         Q    Your sister Ruth, did she grow up in Farmingdale

7    also?

8         A    Yes, she did.

9         Q    Could you tell the jury what her educational

10   background was?

11        A    She graduated from Farmingdale high school in

12   1970.  And then she attended a secretarial school.  And

13   immediately afterward worked as a secretary, up until 1978,

14   at which point she got married.  And at that point she lived

15   in Farmingdale and also in Fort Myers, Florida.  And then

16   the marriage dissolved and she came back up.  And at that

17   point she went to the State University of New York at

18   Farmingdale for horticulture, full time.  And after that she

19   got out of school around 1982, '83.  At that point, until

20   the time of her death, she worked in the florist business.

21        Q    What type of positions did she hold in the

22   florist business?

23        A    She was a floral designer more than anything.

24        Q    At the time of her death, where did she work?

25        A    A florist in Bethpage, whose name I honestly

1    don't remember.

2        Q    Could you describe for the jury your sister's

3    stature; how tall was she?

4        A    Ruthie was, I'd say, between five foot seven and

5    five foot eight inches tall.

6        Q    And approximately what was her weight?

7        A    Her weight?   I would say, approximately a

8    hundred dollars and seventy pounds.

9        Q    And when was the last time you saw Ruth?

10       A    I saw Ruth for the last time, I would say, in the

11   winter of 2000.  I would say about January or February,

12   rather, of 2000.  I had come down to Long Island for the day

13   and I believe I had stopped in to where she worked and

14   visited, you know, for fifteen or twenty minutes and

15   chatted.

16       Q    How often would you see Ruth during the year?

17       A    Since I moved to Pennsylvania, I would probably

18   see her two or three times on Long Island.  And then usually

19   in September she would come up to Pennsylvania and stay at a

20   cottage we have on a lake for two to three weeks.

21            While in Pennsylvania, of course, I saw her just

22   about every day.

23       Q    How often would she see your parents?

24       A    She would see my parents -- when she was in

25   Pennsylvania, of course, for the two or three weeks on

1    vacation, she would see them just about every day.  Other

2    than that, my parents can't really travel anymore.  And, you

3    know, during the year she really didn't have the time to

4    come up.  Maybe she came up once a year.

5         Q    How old are your parents?

6         A    My dad is eighty-one years old, and my mom is

7    seventy-seven.

8         Q    Now, are there any other members of the family

9    here in the courtroom today?

10        A    Yes.  My cousin Rob is seated in the back.

11        Q    Okay.  Now --

12        A    I don't see anybody else.

13        Q    Okay, Mr. Williams.  Were you ever at Ruth's

14   apartment at 196 Main Street on -- in Farmingdale?

15        A    Yes.  Above Captain Andy's, sure.

16        Q    Could you describe for the jury the condition of

17   that apartment?

18        A    My sister was, to put it mildly, a neat freak.  I

19   mean, it used to be a running joke, where she would like me

20   to come over just so I could make a little bit after mess so

21   she could clean it up.  You know, so the place was really,

22   every time I was in it, the place was basically spotless.

23        Q    How often -- how many times were you in that

24   apartment?

25        A    When I lived on the Island I saw her quite often.

Mr. Williams - People - Direct                    352

1    You know, I don't know how to put a number on that.

2         Q    How long did she live above Captain Andy's?

3         A    Gee, I'm trying to think when she moved there.

4         Q    If you remember.

5         A    Actually, I don't remember when she moved.  She

6    lived on 130 Segatogue for a long time.  Then she moved to

7    Captain Andy's at one point.

8         Q    What is Captain Andy's?

9         A    I'm sorry, it's a restaurant.

10        Q    Where was her apartment located in relation to

11   Captain Andy's?

12        A    It was above it.

13        Q    I would ask the witness be shown what has been

14   marked as People's Exhibit 1 and 2 for identification.

15             THE COURT:  Okay.

16        Q    Mr. Williams, you have been shown what has been

17   marked as People's Exhibit 1 and People's Exhibit 2 for

18   identification.  Do you recognize those two photographs?

19        A    I recognize this one, number one.

20        Q    Do you recognize the person in -- one of the

21   people in People's Exhibit number 2?

22        A    Yes.

23        Q    Do both photographs fairly and accurately depict

24   your sister's stature at or about the time of her death?

25        A    Yes, I would say so.

1              MR. BIANCAVILLA:  We would offer them into

2      evidence, Judge.

3              THE COURT:  Please shown them to

4      Mr. Chamberlain.

5              MR. CHAMBERLAIN:  Very short voir dire,

6      Judge?

7              THE COURT:  Yes, Mr. Chamberlain.

8   VOIR DIRE EXAMINATION

9   BY MR. CHAMBERLAIN:

10     Q      Mr. Williams, do you have any idea when these

11  pictures were taken?

12     A      The larger photograph, number 1, was taken

13  sometime in the Fall of 1999.

14     Q      Okay.  Thank you.  And the other one, the small

15  one?

16     A      I have no idea.

17     Q      All right.

18              MR. CHAMBERLAIN:  I have no objection to the

19      introduction.

20              MR. CHAMBERLAIN:  Thank you, Mr. Williams.

21              THE COURT:  Mark them in evidence.

22              THE COURT OFFICER:  People's 1 and two

23      received.

24              MR. BIANCAVILLA:  Judge, may I DISPLAY them

25      for the jury?

Kathleen Plaia

1              THE COURT:  Yes, you can publish them.

2              (Whereupon, the referred to items are

3        displayed to the sworn jury and alternates.)

4    DIRECT EXAMINATION CONTINUED

5    BY MR. BIANCAVILLA

6         Q    Mr. Williams, I know you're familiar with

7    People's 1, which is the larger photograph.  Can you tell

8    the jury who is depicted in that photograph?

9              THE COURT OFFICER:  Can you see?

10             THE WITNESS:  Not really.

11             THE COURT:  Why don't you go down in the

12       well, Mr. Williams.

13             THE WITNESS:  Okay, sure.

14             (Whereupon, the witness leaves the witness

15       stand.)

16        Q    Could you tell the jury who is depicted in the

17   photograph, the individual on the left?

18        A    Certainly.  That's myself.

19        Q    The individual next to you?

20        A    That's my dad.  Next to him is my uncle, my

21   father's brother.  In addition to Uncle Ross is Ruthie.

22        Q    This photograph you said was taken when?

23        A    Fall of '99 sometime.

24        Q    Okay.  Displaying People's Exhibit 2, do you

25   recognize the people in that photograph?

Mr. Williams - People - Direct                355

1        A       Yes.   The woman on the left, I have no idea.

2        Q       How about the woman on the right?

3        A       The woman on the right is my sister.

4        Q       And you couldn't tell us when that photograph was

5    taken?

6        A       No, I couldn't.   You know, if you want me to make

7    an estimation.

8        Q       No, that's fine.

9        A       No, I don't know.

10       Q       Does that photograph fairly and accurately depict

11   your sister's size, her stature, at or about the time of her

12   death?

13       A       Yes, it does.

14       Q       Thank you, Mr. Williams.   You can be seated.

15               (Whereupon, the witness resumes his seat on

16       the witness stand.)

17       Q       Now, Mr. Williams, with respect to your sister's

18   personality, how would you describe that?

19       A       Where do you begin?   She was fun to be with.

20   She was very generous.   She loved animals.

21       Q       Were you older or younger than Ruth?

22       A       Ruth was three and-a-half years older than

23   myself.

24       Q       Was she protective of you?

25       A       Oh, yes.   Growing up, very.   Even when we both

Mr. Williams - People - Direct                    356

1    hit adulthood, at times, very.

2         Q    And under what circumstances was she protective

3    of you?

4         A    Well, growing up, just in the neighborhood, you

5    know, when kids would bother me or whatever.  Every now and

6    then it came up.  You know, she -- if she knew about it, she

7    would be right there.  She would -- she was --

8         Q    Was she an individual easily taken advantage of?

9         A    Not at all.

10        Q    How would you describe her reactions?

11        A    She, to put it bluntly, she didn't take crap from

12   anybody.

13        Q    That was even as she grew older?

14        A    Yes, definitely.

15        Q    Okay.  By the way, how old was your sister at the

16   time of her death?

17        A    Let's see.  It happened just after her -- just

18   after her forty-eighth birthday.

19        Q    When was her birthday?

20        A    April 6th, 1952.

21        Q    When were you notified of her death?

22        A    The morning of April 14th.

23        Q    Who notified you?

24        A    I got a phone call.  My cousin, Rob.

25             MR. BIANCAVILLA:  Thank you very much,

1          Mr. Williams.   I have no further questions.

2                      THE COURT:  Mr. Chamberlain?

3                      MR. CHAMBERLAIN:   No questions, your Honor.

4                      THE COURT:  Thank you, Mr. Williams.   You can

5     step down.

6                      THE WITNESS:  Okay.

7                      (WITNESS EXCUSED)

8                      THE COURT:  Counsel, approach the Bench,

9     please.

10                      MR. BIANCAVILLA:  Thank you, Judge.

11                      (Whereupon, there is a discussion held at the

12    Bench, off the record, between the Court and Counsel.)

13                      THE COURT:  Yes.

14                      MR. BIANCAVILLA:  The People call William

15    Nimmo.

16    W I L L I A M    N I M M O, called as a witness by and on

17    behalf of the People, having been first duly sworn,

18    testified as follows:

19                      THE CLERK:  You may be seated.

20                      THE COURT OFFICER:  Please be seated.

21                      In a loud voice, would you give your full

22    name, spelling your last name, and County of residence.

23                      THE WITNESS:  William Nimmo, N-I-M-M-O,

24    Nassau County.

25                      MR. BIANCAVILLA:  May I inquire, your Honor?

Kathleen Plaia

```
 1                  THE COURT:  You may.

 2   DIRECT EXAMINATION

 3   BY MR. BIANCAVILLA:

 4        Q      Good morning, Mr. Nimmo.

 5        A      Good morning.

 6        Q      Would you tell the jury what your profession is?

 7        A      I own a retail florist in Bethpage.

 8        Q      What is the name of your florist?

 9        A      Bethpage Bouquet.

10        Q      How long have you had that business?

11        A      I opened in 1984.

12        Q      Do you know Ruth Williams?

13        A      Yes.

14        Q      How long did you know Ruth Williams?

15        A      She came to work with me in December of '92 I

16   believe it was.

17        Q      And what was her position with your florist?

18        A      She started out as floral designer and she

19   quickly became my manager in the store.

20        Q      For how many years was she your manager?

21        A      I guess seven or eight years.

22        Q      How would you characterize Miss Williams as an

23   employee?

24        A      She was a very good employee.  She had a key to

25   my store.  She was in charge when I wasn't there.  A lot of
```

Mr. Nimmo - People - Direct                    359

1    duties she took care of for me.  Very well liked.  Lots of

2    friends.  Very good employee.

3         Q     And that was for the entire time she worked for

4    you?

5         A     Yes.

6         Q     And do you have another employee that works

7    there?

8         A     Yes, I do.

9         Q     Was Caroline Daly one of the employees that

10   worked there?

11        A     Yes.

12        Q     Did Ruth Williams supervise Caroline Daly while

13   she worked there?

14        A     Yes.

15        Q     Now, what exactly were the re -- Ruth Williams'

16   responsibility for you?

17        A     She did everything.  It's a florist.  She did

18   everything from, you know, bridal consultations, helping the

19   general public, funeral work.  You know, ordering flowers.

20   You know, just about everything you do in a florist.  Making

21   the arrangements, dictating to the younger employees what to

22   do.

23        Q     Did she set up schedules for employees?

24        A     Not usually, no.  I would take care of that.

25        Q     Was she a punctual employee?  Did you ever have

1    to worry about her showing up or not showing up?

2         A    She was there most of the time.  In a small shop

3    like that, with people, they get sick on and off.  But she

4    was usually very good.

5         Q    Thank you.  Did she also have control over cash

6    flow within the business in terms of accounts and taking

7    care of the money?

8         A    We're a computerized shop at that time.  The

9    computer does a lot of the stuff for us.  But she was fully

10   trusted.  She had keys.  She would take the money and put in

11   a safe at night.  All that kind of stuff.

12        Q    Thank you very much, Mr. Nimmo.  I have no

13   further questions.

14                  THE COURT:  Mr. Chamberlain, any questions?

15                  MR. CHAMBERLAIN:  No questions.  Thank you,

16        Judge.

17                  THE COURT:  Mr. Nimmo, thank you.  You may

18        step down.

19                  Mr. Biancavilla, call your next witness.

20                  MR. BIANCAVILLA:  Caroline Daly.

21   C A R O L I N E    D A L Y, called as a witness by and on

22        behalf of the People, having been first duly sworn,

23        testified as follows:

24                  THE COURT OFFICER:  In a loud voice, would

25        you give your full name, spelling your last name, and

1          county of residence.

2                     THE WITNESS:  Caroline Daly, D-A-L-Y.  I live

3          in Commack, Suffolk County.

4                     MR. BIANCAVILLA:  May I inquire, your Honor?

5                     THE COURT:  Yes.

6     DIRECT EXAMINATION

7     BY MR. BIANCAVILLA:

8          Q     Miss Daly, would you tell the jury -- first of

9     all, good morning.

10         A     Good morning.

11         Q     Would you tell the jury where you're employed?

12         A     Bethpage Bouquet.

13         Q     How long have you been employed there?

14         A     About since February -- oh, God.  1998 I would

15    say, very part-time.

16         Q     When you say you only work part-time --

17         A     Yes.

18         Q     How often are you there?

19         A     Then, back then I worked, I worked three days a

20    week from nine to three.

21         Q     What was your position there at the florist?

22         A     I was the counter-help person.

23         Q     Would you take orders and send out deliveries?

24         A     And I did floral design.

25         Q     You did floral design also?

1       A       Yes.

2       Q       Did you know Ruth Williams.

3       A       Yes.

4       Q       How long did you know Ruth Williams?

5       A       A year and-a-half.

6       Q       Ruth Williams was the manager of that florist?

7       A       She was the manager of the store.

8       Q       So, you would interact with her on a daily basis?

9       A       Yes, sir.

10      Q       Were you working at the florist in or about April

11  of 2000?

12      A       Yes.

13      Q       Were you there on April 12th of 2000?

14      A       What day of the week was that?

15      Q       That would be a Wednesday.

16      A       No, I do not work on Wednesdays.

17      Q       Were you there on April 13th?

18      A       Yes.

19      Q       Could you tell the jury what happened on April

20  13th when you got to work?

21      A       I came in and the girl had told me that Ruth

22  didn't come in yesterday and that they had been calling.

23  And I was worried, so I --

24      Q       Why were you worried?

25      A       Just because it's now her second day that she

Mr. Nimmo - People - Direct                    363

1    didn't come in.

2         Q    So, what did you do?

3         A    I sent one of the drivers over to see if her car

4    or truck was in the parking lot.  And then I called the

5    landlord, to see if he could check to see if the mail was

6    there.

7         Q    When you said you sent a driver over --

8         A    The delivery person.

9         Q    What happened when you sent the delivery person

10   over?

11        A    He came back and said her truck was there.

12        Q    Was where?

13        A    In the parking lot.

14        Q    And when he told you that the car was in the

15   parking lot, what did you do?

16        A    Then I started calling the landlord Sven.

17        Q    About what time did you send the driver over to

18   Ruth's apartment, do you remember?

19        A    Yes, around ten.

20        Q    And about what time did he report back to you?

21        A    10:30.

22        Q    And in was on Thursday, correct?

23        A    Yes.

24        Q    The 13th?

25        A    Uh huh.

Mr. Nimmo - People - Direct                              364

1        Q       And you started calling then, when?

2        A       I spoke to the wife at around, I think it was

3   around eleven or twelve.  And I spoke to his wife and I

4   asked if Sven could check the mail.

5        Q       Did he ever get back to you?

6        A       Yeah, we spoke that afternoon.

7        Q       What happened?

8        A       He asked me to come over.

9        Q       Did you do that?

10       A       No.  I picked up my daughter at three o'clock

11  after work and she was sick.

12       Q       So, on the afternoon of the 13th by that time had

13  you heard from Ruth Williams?

14       A       No.

15       Q       So, you left the florist at about three o'clock

16  and went up and picked up your daughter?

17       A       Uh-huh.

18       Q       And you went home at that point?

19       A       I picked her up at my mother's house and then I

20  went home.

21       Q       And you never spoke to Ruth Williams again after

22  that?

23       A       No.

24       Q       When was the last time you saw Ruth Williams

25  alive?

1          A      On Monday, at work.

2          Q      Okay.  That would have been Monday of that week?

3          A      Uh-huh.

4          Q      Thank you very much, Miss Daly.  I have no

5     further questions.

6                      THE COURT:  Mr. Chamberlain.

7                      MR. CHAMBERLAIN:   Thank you.

8     CROSS-EXAMINATION

9     BY MR. CHAMBERLAIN:

10         Q      Miss Daly --

11         A      Uh-huh.

12         Q      Did you -- you were friendly with her, you knew

13    something about her background at that time, right?

14         A      Uh huh, yes.

15         Q      And on the 14th of April, did you give -- were

16    you questioned by a detective about your knowledge of Ruth?

17         A      Yes.

18         Q      Is that Detective Cereghino, do you know?

19         A      I don't remember.

20         Q      Do you remember telling him that she used to go

21    to bars; she specifically said she didn't go to the

22    Downtown, do you recall that?

23         A      No.  That was the bars in town, yeah.

24         Q      The Downtown was a bar right below where she

25    lived?

1          A       Right.

2          Q       Was there any particular reason why she didn't go

3    to the Downtown, do you know?

4          A       She said it was a younger crowd.

5          Q       A what?

6          A       A younger crowd.

7          Q       Anything to do with drugs?

8          A       No.

9          Q       You told the detective that she had

10   ex-boyfriends, John, Mike, and dated them at the same time.

11   Did you know those persons last names?

12         A       No.

13         Q       Did she tell you -- did she complain about a

14   police officer stalking her and reporting him?

15                 MR. BIANCAVILLA:  Objection.

16                 THE COURT:  Sustained.  That's not the proper

17      way to question.

18         Q       Did you tell the detective that she advised you

19   about a police officer stalking her?

20                 MR. BIANCAVILLA:  Objection.

21                 THE COURT:  Sustained.

22         Q       Do you recall any complaints that Ruth told you

23   about that you related to Detective Cereghino about

24   completing -- police officer --

25                 MR. BIANCAVILLA:  Objection.

1          THE COURT:  What document are you using?

2          MR. CHAMBERLAIN:  I'm using Rosario

3    materially that I got this morning, which are notes of

4    Detective Cereghino.

5          THE COURT:  Okay.

6          MR. CHAMBERLAIN:  If you want to see it.

7          THE COURT:  Yes, I would like to see it.

8          MR. BIANCAVILLA:  What's the exhibit number

9    on the bottom?

10         THE COURT:  3.

11         THE COURT:  Overruled.

12         MR. BIANCAVILLA:  Did you say Exhibit 3?

13         THE COURT:  Page three.

14         MR. BIANCAVILLA:  There's no exhibit --

15         THE COURT:  I didn't see the exhibit.

16         MR. BIANCAVILLA:  What exhibit number is

17   that?

18         MR. CHAMBERLAIN:  I believe it's 50.

19         MR. BIANCAVILLA:  Five zero?  Okay.  I have

20   it, Judge.

21         MR. CHAMBERLAIN:  Could you repeat the

22   question back to the witness?

23         THE COURT:  Yes.

24         (Whereupon, the referred to question as read

25   back by the reporter as instructed.)

Kathleen Plaia

1      A      No.

2      Q      You don't recall that?

3      A      No.

4      Q      Do you recall her -- you telling Detective

5    Cereghino that Ruth had told you she reported this police

6    officer and he was a uniformed police officer?

7      A      No.

8      Q      Do you recall -- did you tell Cereghino that Ruth

9    liked biker-types?

10                MR. BIANCAVILLA:  Objection.

11                THE COURT:  I'm not sure what the relevancy

12          is.

13                MR. CHAMBERLAIN:  Background of Ruth, Judge.

14                THE COURT:  I'll permit you a little bit of

15          leeway, Mr. Chamberlain.

16                Overruled.

17     A      Yes.

18     Q      What was that?

19     A      Yes.

20     Q      Did she mention the Pagans at the time of that

21   discussion you had with Ruth about biker-types?

22                MR. BIANCAVILLA:  Objection.

23                THE COURT:  Sustained.  Sustained.

24                MR. CHAMBERLAIN:  Sustain?

25                THE COURT:  Yes.

Ms. Daly - People - Cross                    369

1          Q       Did you tell the Detective Cereghino about Ruth's

2     drinking habit?

3          A       I don't remember.  I think they asked me what --

4     did she drink beer or wine, or something like that.  What

5     kind of drink did she drink.

6          Q       Well, you mentioned that she went out -- she

7     frequented a lot of bars.  Did you tell the detective

8     anything about her having come in drunk on occasion?

9          A       No.

10         Q       Did you tell the detective anything about Ruth

11    taking various types of drugs?

12                     MR. BIANCAVILLA:  Objection.

13                     THE COURT:  I'll permit that.

14         A       No.

15         Q       Did you tell the detective when you asked Ruth

16    about pills, she said she didn't take that many; do you

17    recall that?

18         A       No.

19         Q       Did you ever tell the detective that Ruth showed

20    up late one day and she showed up drunk.  She was upset

21    because she had a guy she had put in jail had just got out;

22    do you recall that?

23                     MR. BIANCAVILLA:  Objection.

24                     THE COURT:  There's a time and place,

25         Mr. Chamberlain.

1          MR. CHAMBERLAIN:  Well, these are notes of

2     the detective, Judge.

3          MR. BIANCAVILLA:  Judge, I'm going to object

4     and ask to approach.

5          THE COURT:  Yes, come forward.

6          MR. BIANCAVILLA:  Please.

7          (Whereupon, the following takes place at the

8     Bench, between the Court and Counsel:)

9          MR. BIANCAVILLA:  Judge, this entire line of

10    questioning, all these questions, are improper

11    questions.  He's -- if he has questions he wants to ask

12    her and impeach her with answers from the notes of

13    Detective Cereghino, he can do so.  But just saying,

14    Did you ever tell Detective Cereghino, without first

15    asking her about dates, times and places --

16          THE COURT:  When this line of questioning

17    first started I said to you, Mr. Chamberlain, it was

18    the improper way to do it.  Mr. Biancavilla is right,

19    you should be questioning her, if she gives you an

20    answer which contradicts the notes of what she told the

21    detective, you can then go on to say, didn't you tell

22    detective whomever, on such and such a date, and then

23    you can read into the record what she told him.  That

24    is the proper way to do it.

25          MR. CHAMBERLAIN:  Judge, I had asked this

1        witness if she ever told the detective about Ruth being

2        drunk and she said no.  So --

3                  THE COURT:  The question is not that she ever

4        told the detective.

5                  MR. BIANCAVILLA:  The question would be, have

6        you ever seen Ruth Williams on such and -- first of

7        all, not have you ever seen.  But on a specific day did

8        Ruth Williams come in and was she intoxicated.  If she

9        says yes, there's no impeachment.  If she said no --

10                 THE COURT:  You have to lay the foundation.

11       Depending on her response, as to whether you can use

12       the detective's notes for cross-examination as to

13       credibility.

14                 MR. CHAMBERLAIN:  All right.  Thank you.

15                 MR. BIANCAVILLA:  And furthermore, my

16       objection would be, what difference does it make?

17       What's the relevancy of Ruth Williams coming to work

18       drunk?   That's my second objection.

19                 MR. CHAMBERLAIN:  He's brought out character,

20       unfortunately, the character of -- there is an issue

21       here.  He already brought it out.  He had witnesses

22       testify as to what she's like.  And it's her habits,

23       what she did.  What she was like is going to be an

24       issue in this trial.

25                 THE COURT:  I will permit you with respect to

1      that.

2                      MR. CHAMBERLAIN:  Thank you, Judge.

3                      (Whereupon, the following takes place in open

4      court:)

5                      THE COURT:  Okay, Mr. Chamberlain.

6      Q      Miss Daly, you knew the victim for approximately

7      a year, is that right?

8      A      About a year and four months maybe.

9      Q      And did -- during that period of time did Ruth at

10     any time show up drunk?

11     A      No.

12     Q      No?  Do you recall telling Detective Cereghino

13     in January 2000, while Bill, I guess -- I can't read the

14     last initial, probably is the owner, Bill something, on

15     vacation, Ruth was late for work one day, showed up drunk.

16     Do you recall that?

17     A      No.  She never showed up drunk.

18     Q      Does it refresh your recollection, if you told

19     the detective she was upset because a guy she had put in

20     jail just got out and had left a note on her car?

21     A      Yes.

22     Q      Do you recall who that guy was?  Did she tell you

23     who that guy was?

24                     MR. BIANCAVILLA:  Objection, relevancy,

25     Judge.

1                 THE COURT:  Well, I'm going to permit it.  If

2       she knows.

3       A     I don't know.

4       Q     Did you ever go out with Ruth in the evening to

5    any bars in Farmingdale?

6       A     No.

7       Q     Did you know any of the bars on Main Street?

8       A     Yes.

9       Q     Did you frequent any of the bars that were on

10   Main Street at that point in time in April of 2000?

11      A     No.

12      Q     When she said she liked bikers, did she say

13   anything about the places she was frequenting, any of those

14   bars?

15      A     No.  Not the Downtown, no.  That's the only one I

16   know she didn't go there.

17      Q     You didn't live anywhere near Farmingdale, do you

18   ma'am?

19      A     I grew up --

20                 MR. BIANCAVILLA:  Objection.

21      A     I grew up in Plainview.

22                 THE COURT:  It's kind of an awkward question,

23       I'll permit it.

24      A     I grew up in Plainview -- in Old Bethpage, which

25   is the town next to it, growing up.

Kathleen Plaia

1    Q     Did you know the Downtown bar?

2    A     I have been in it.

3    Q     Falcon's Nest?

4    A     I don't know, no.

5    Q     Y.L. Childs?

6    A     No.

7    Q     Did Ruth ever tell you that she had been in a --

8  had been in a bar, a local bar, and had a big fight with

9  John's brother, ever tell you anything about that?

10            MR. BIANCAVILLA:  Judge, objection.  Again,

11       it's vague.  There's no date, time or place.

12            THE COURT:  Yes.  I think if you could be a

13       little more specific, Mr. Chamberlain.

14    Q     A few months ago.

15            THE COURT:  A few months ago, in the year

16       2000?

17            MR. CHAMBERLAIN:  A few months prior to the

18       time she spoke to the detective.

19            THE COURT:  We were talking about the year

20       2000?

21            MR. CHAMBERLAIN:  That's right, Judge.

22    Q     Few months prior to the time you spoke to

23  Cereghino, the detective, did Ruth tell you that she had

24  been in a local bar and had a big fight with John's brother?

25    A     Yes.

Ms. Daly - People - Cross                    375

1      Q      No?

2      A      Yes.

3      Q      Did she tell you what the fight was about?

4      A      I really don't remember.

5      Q      Did she mention who John was?

6      A      That was somebody she dated.

7      Q      Someone she dated.  Did she describe this person

8  other than someone she dated?

9      A      No.

10            MR. CHAMBERLAIN:  Nothing further.  Thank

11  you, Judge.

12            THE COURT:  Redirect?

13            MR. BIANCAVILLA:  No, Judge.

14            THE COURT:  Thank you, Miss Daly.  You can

15  step down.

16            THE WITNESS:  Thank you.

17            (WITNESS EXCUSED)

18            THE COURT:  Counsel, approach the Bench

19  please.

20            (Whereupon, there is a discussion held at the

21  Bench, off the record, between the Court and Counsel.)

22            THE COURT:  Ladies and gentlemen, at this

23  time we were going to be excusing you for the day.

24  Sometimes scheduling is just the way things happen that

25  we won't be able to continue again until tomorrow

Kathleen Plaia

1        morning at 9:30.

2                Now, at this point, again, do not discuss the

3        case among yourselves or with anybody else.  Keep an

4        open mind.  Do not form or express any opinions until

5        the entire case is completed.  Do not read or listen to

6        any account of this case, should it be reported in the

7        media.  Do not visit or view any places mentioned.  You

8        are not to permit any party to discuss this case with

9        you or attempt to influence you.  You must promptly

10       report to the Court any violation thereof.

11               Have a nice day.  We will see you tomorrow

12       morning at 9:30.

13               (Whereupon, the sworn jury and alternates

14       leave the courtroom)

15               THE COURT:  Mr. Biancavilla, can you tell

16       Mr. Chamberlain what witnesses you have for tomorrow.

17               MR. BIANCAVILLA:  Yes.  Tomorrow's witnesses

18       will be Francine Quinn, Thomas Hardman, Bill DeLuso,

19       Sven's brother, Melissa Notarnicola, Frank DeFalco,

20       Penny Shouse.  I believe those are all the witnesses we

21       have scheduled for tomorrow, Judge.

22               MR. CHAMBERLAIN:  That's seven.

23               MR. BIANCAVILLA:  There are seven witnesses.

24               THE COURT:  Okay.  Anything further, Counsel?

25               MR. BIANCAVILLA:  Not unless you want me to

1     have more than seven witnesses, Judge.  They went

2     pretty fast today.  I think these will be more

3     involved.  I believe Mr. Chamberlain should have more

4     cross-examination for those witnesses.

5              Again, Judge, with these civilians, I'm

6     taking them out of work.  I would prefer not have to

7     them sit here all day and not put them on and have them

8     come back the next day.  I figured seven would be

9     sufficient for tomorrow.

10             THE COURT:  Is it possible we can have a

11    backup of a police witness, Mr. Biancavilla?

12             MR. BIANCAVILLA:  I'll do my best, Judge.

13             MR. CHAMBERLAIN:  Judge could we --

14             THE COURT:  Yes, Mr. Chamberlain?

15             MR. CHAMBERLAIN:  I'm sorry.  Could we

16    discuss a little bit on expert witnesses, because

17    lining those up is fairly difficult.

18             MR. BIANCAVILLA:  Sure.

19             MR. CHAMBERLAIN:  Because they're of a

20    nature --

21             MR. BIANCAVILLA:  I'm anticipating, if all

22    goes well, to start with my police witnesses on

23    Wednesday.  I anticipate Detective Shiraldi testifying

24    on Wednesday and then Mr. Rosati from the FBI

25    testifying on Thursday.

1          THE COURT:  You think they will take the

2     better part of the day?

3          MR. BIANCAVILLA:  It depends on how long

4     Mr. Chamberlain cross-examines them.  My DNA expert,

5     Megan Clement will be here and she's going on either

6     Thursday or Friday, depending upon how quickly we move

7     through the witnesses.  I expect to have my case in,

8     Judge, so you're aware, my case should be complete,

9     assuming everything goes as planned, by the end of the

10    day on Tuesday of next week.

11         THE COURT:  Okay.  I would ask that you have

12    a police witness available for tomorrow.

13         MR. BIANCAVILLA:  Again, I can only take

14    certain witnesses out of order, Judge.  I can't --

15    again, this case, the flow of the evidence is very

16    important.  I'll do the best I can.

17         THE COURT:  Okay.

18         Yes, Mr. Chamberlain?

19         MR. CHAMBERLAIN:  Shiraldi on Wednesday.

20    There are quite a few other police officers as

21    witnesses.  He mentioned FBI and DNA experts.  What

22    about the other police, are they on Wednesday?

23         MR. BIANCAVILLA:  No.

24         THE COURT:  Counsel, approach the bench.

25         (Whereupon, there is a discussion held at the

1    Bench, off the record, between the Court and Counsel.)

2              THE COURT:  Okay.

3              THE CLERK:  Mr. Scrimo, your case is being

4    adjourned until tomorrow, May 7th.  You must be here on

5    that date.  If you fail to appear, a warrant will be

6    issued for your arrest, any bail posted will be

7    forfeited, the case will proceed in your absence and

8    the assistant district attorney can charge with you an

9    additional charge of bail jumping.

10             THE DEFENDANT:  Thank you.

11             THE CLERK:  Be back tomorrow.  You may step

12   out.

13             (Whereupon, court stands in recess.  The

14   trial is adjourned to May 7th, 2002 at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

Kathleen Plaia