

1    STATE OF NEW YORK : NASSAU COUNTY

2         SUPREME COURT PART XII

3    ------------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK        Ind. 1456-00

5         - against -                           Trial

6    PAUL SCRIMO

7              Defendant

8    ------------------------------------------X

9                              May 7, 2002
                               262 Old Country Road
10                             Mineola, New York

11

12   B E F O R E :

13              HON. JEFFREY S. BROWN,
                     County Court Judge

14

15   A P P E A R A N C E S :

16        HON. DENIS DILLON
               Nassau County District Attorney
17        BY:   ROBERT BIANCAVILLA, Esq., of Counsel,
                Assistant District Attorney
18                         For the People

19

20        JOHN CHAMBERLAIN, Esq.
               1001 Franklin Avenue
21             Garden City, New York
                           For the Defendant

22

23

24                        KATHLEEN PLAIA
                          OFFICIAL COURT REPORTER

25

Kathleen Plaia

1          THE CLERK:  Case a trial continued,

2     indictment 1456N of 2000, People of the State of New

3     York versus Paul Scrimo.

4          All parties are present.  Jurors are not

5     present at this time.

6          People ready?

7          MR. BIANCAVILLA:  Ready.

8          THE CLERK:  Defendant ready?

9          MR. CHAMBERLAIN:  Defendant ready.

10         THE CLERK:  Ready for the jurors, Judge?

11         THE COURT:  Yes.

12         THE COURT OFFICER:  Jury entering.

13         (Whereupon, the sworn jury and alternates

14    enter the courtroom)

15         THE CLERK:  Both sides stipulate that all

16    sworn jurors are present and seated in the proper

17    order?

18         MR. BIANCAVILLA:  So stipulated.

19         MR. CHAMBERLAIN:  So stipulated.

20         THE COURT:  Good morning, ladies and

21    gentlemen.  I hope you had a nice evening.  Ready to

22    continue with the trial?

23         Mr. Biancavilla, will you call your next

24    witness, please.

25         MR. BIANCAVILLA:  The People call Thomas

1          Hardman.

2     T H O M A S    H A R D M A N,   called as a witness by and on

3          behalf of the People, having been first duly sworn,

4          testified as follows:

5                    THE COURT OFFICER:  In a loud voice, would

6          you give your full name, spelling your last name, and

7          your County of residence.

8                    THE WITNESS:  Okay.  Thomas Hardman, H-A-R-D,

9          as in David, M-A-N.  Nassau County.

10                    THE COURT OFFICER:  Thank you.

11                    MR. BIANCAVILLA:  May I inquire?

12                    THE COURT:  Yes.

13     DIRECT EXAMINATION

14     BY MR. BIANCAVILLA:

15          Q     Mr. Hardman, good morning.

16          A     Good morning.

17          Q     Mr. Hardman, would you tell the jury where you

18     are currently employed.

19          A     I'm the general manager of Penang Restaurant in

20     Syosset.

21          Q     How long have you worked there?

22          A     This location, a year.  I've been with the

23     company since September of 2001.

24          Q     What are your responsibilities?

25          A     I run the day-to-day operations of the

1   restaurant, payroll, scheduling, customer satisfaction.

2          Q     Now, in April of 2000 where were you employed?

3          A     Part-time, I worked as a bartender as Y.L.

4   Childs.

5          Q     Where is Y.L. Childs located?

6          A     Corner of Main Street and Conklin in Farmingdale.

7          Q     How long were you employed there?

8          A     Four months.

9          Q     And what were your responsibilities there?

10         A     I started out there as the day bartender, which

11  would be required, opening up the bar, serving, stocking,

12  doing some light ordering.

13         Q     And on April 11th of 2000, were you at Y.L.

14  Childs?

15         A     Yes.

16         Q     What were you doing there on that particular day?

17         A     I worked the day shift and then we had our dart

18  team later that evening.

19         Q     When you say later that evening, what time was

20  the dart team?

21         A     Eight o'clock the league started.

22         Q     And what went on at Y.L. Childs at eight o'clock?

23         A     I was -- my team had an away match.  We were at

24  Scooter's Pub.  We left.  I got -- my shift was over at

25  seven o'clock, so we left there approximately around 7:30 to

Kathleen Plaia

1    head to another local bar.

2          Q       Did there come a time when you came back to the

3    Village of Farmingdale?

4          A       Yes.

5          Q       Approximately what time did you come back?

6          A       About twelve, 12:30 that evening.

7          Q       Where did you go?

8          A       Went to Y.L. Childs from Scooters.

9          Q       And who was at Y.L. Childs when you got back

10   there about 12:30 in the morning?

11         A       Doug was the bartender.  I believe Melissa, his

12   girlfriend at the time, was there.  And I think their friend

13   Nickie or Nicole was there in the beginning of the shift.

14   Plus, then our dart team, which was Gina, Patty, one other

15   person who I don't remember his name, and myself.

16         Q       Now, did you leave Y.L. Childs at all during the

17   evening?

18         A       Yes.

19         Q       Where did you go?

20         A       I went down the block to Granny O'Shea's to see

21   some old friend that I knew that were working that I hadn't

22   seen in a while.

23         Q       Who was working at Granny O'Shea's?

24         A       Penny.

25         Q       Penny.  What is her last name?

Mr. Hardman - People - Direct                385

1      A      I don't know.

2      Q      And who else did you see at Granny O'Shea's?

3      A      When I saw -- when I walked in, Penny's boyfriend

4   at the time was Billy, at the corner, plus Chris.  Both of

5   those are the owners of Y.L. Childs.  And bartender/bouncer

6   Larry was at the end of the bar.

7      Q      How long were you at Granny O'Shea's?

8      A      Fifteen minutes.  We had one cocktail, said

9   hello, and then went back down.

10     Q      Now, other than the people you mentioned, was

11   Granny O'Shea's crowded, were there other customers in the

12   bar?

13     A      About three, four other people.

14     Q      Now, did there come a time when you left Granny

15   O'Shea's?

16     A      Yes, sir.

17     Q      Where did you go?

18     A      To Y.L. Childs.

19     Q      Approximately what time did you arrive back at

20   Y.L. Childs?

21     A      Quarter to one, one o'clock I would say.

22     Q      And who, if anyone, was there at that point?

23     A      Well, Larry came with us -- came with me from

24   Granny O'Shea's.  We met his girlfriend at the time,

25   Jennifer was down there.  I believe Fran and a couple of her

Kathleen Plaia

 1    friends were down there at the time.  Then we had a couple

 2    of other people later in the evening, other old friends and

 3    employees come down.

 4         Q    Now, Mr. Hardman, do you know Ruth Williams?

 5         A    Yes.

 6         Q    And how long had you known Ruth Williams?

 7         A    For, since about 1992, '93.

 8         Q    How did you meet Ruth Williams?

 9         A    I bartended at another bar in town called the

10    Shamrock Pub, she was a regular there.

11         Q    And how often would she come into the Shamrock?

12         A    Two, three nights a week maybe, possibly.

13         Q    Now, did you see Ruth Williams on that night,

14    on -- between the evening of April 11th and the early

15    morning hours of April 12th of 2000?

16         A    Yes, I did.

17         Q    Where did you see her?

18         A    She walked into Y.L. Childs and I was sitting --

19    it's a horseshoe bar.  I was sitting right in front of the

20    front door and she came in.

21         Q    Did you have a conversation with her at that

22    time?

23         A    Yes.

24         Q    Could you tell the jury what the conversation

25    was?

1        A      Basically, she was upset with me because she was

2    at Granny O'Shea's and I didn't recognize her and notice her

3    and say -- acknowledge her.  And I didn't realize she was

4    there.  There was other people there, I didn't notice.

5        Q      So, you didn't talk to her when she was at Granny

6    O'Shea's?

7        A      No.

8        Q      Now, when she came into Y.L. Childs and she had

9    this conversation with you, where did she go afterward?

10       A      She walked to the right hand corner of the bar,

11   and kept intermittently coming back to, you know, chastise

12   me a little bit for not acknowledging the friendship that we

13   had over the years.

14       Q      Okay.  Was they talking to anyone else while she

15   was at Y.L. Childs?

16       A      I know she talked with Billy a little bit, Larry.

17   She was with two gentlemen that she walked in with, sitting

18   in that corner where they were located.

19       Q      Could you describe for the jury the two gentlemen

20   you said she walked in with?

21       A      Sure.  One was John Kane, which I knew his name

22   as John at the time, who was a local of the town.

23       Q      Can you describe his appearance, please?

24       A      Sure.  About five-six, five-seven, shorter than I

25   am, long brown hair, goatee and beard.

Kathleen Plaia

1       Q       And the other individual?

2       A       Was about five-nine, bald head and I can remember

3   him because he had art work on his -- tattoos on both his

4   arms.

5       Q       And was his head was shaved completely bald?

6       A       Yes.

7       Q       And how would you describe his build?

8       A       Stocky, husky.

9       Q       Do you see that individual in the courtroom

10  today?

11      A       No.

12      Q       Now, on -- when you had saw Ruth Williams at the

13  bar, could you describe what she was doing with these two

14  individuals?

15      A       Chatting with, I assume, friends.  She was

16  dancing to the music and played some tunes on the jukebox.

17  To be honest with you, I really wasn't paying attention to

18  what was going on because I was in conversation with my own

19  friends.

20      Q       Okay.  Did you see her with these two individuals

21  at the bar?

22      A       Yes.

23      Q       Now, on May 3rd -- withdrawn.

24              During the course of that particular evening, did

25  something happen with your keys?

Mr. Hardman - People - Direct                    389

1        A       Yes.

2        Q       Please describe for the jury what happened with

3   your keys.

4        A       They went missing.

5        Q       What happened as a result of that?

6        A       Some people at the bar told me that they had seen

7   Ruth over where my belongings were.  And knowing she was

8   upset with me, I asked her, originally, did she have my

9   keys.  When she said no, I went to -- proceeded to tell

10  Billy that my keys were stolen.  We looked.  They had keys

11  to the bar on them, so he went down to get a padlock and it

12  delayed everyone kind of leaving because I wanted to find

13  the keys.  I was a little upset.

14       Q       Now, was Ruth still in the bar at the time?

15       A       Yes, she was.

16       Q       How about the bald headed individual with the

17  tattoos and John Kane, were they still in the bar?

18       A       Everybody was still in.  Because Billy wasn't

19  letting anybody leave because he didn't know who had, if

20  anyone had, the keys.

21       Q       Did you ever locate your keys?

22       A       No.

23       Q       Do you recall what time Ruth left the bar?

24       A       About four o'clock, a little after four.  Because

25  we were getting ready when I was noticed that my keys were

1    gone.  It was right about last call, so I was gearing up to

2    go home, and that's when we all noticed they were missing.

3        Q    Okay.  Now, did you notice when the bald headed

4    individual with the tattoos and John Kane left the bar?

5        A    Shortly after Ruth did.  About, maybe, ten,

6    fifteen minutes.

7        Q    Now, Mr. Hardman, do you remember appearing at

8    the Nassau County Police Department and viewing a lineup in

9    this particular case?

10       A    Yes, I do.

11       Q    All right.  And on May 3rd, when you viewed that

12   lineup, did you select someone out of that lineup?

13       A    Yes, I did.

14       Q    I'm going to show you what has been marked as

15   People's Exhibit 4 for identification.  Do you recognize

16   that photograph?

17       A    Yes, sir.

18       Q    Is that the lineup that you viewed on May 4th --

19   May 3rd of 2000?

20       A    Correct.

21       Q    Does that fairly and accurately depict that

22   lineup?

23       A    Yes.

24            MR. BIANCAVILLA:  We would offer that into

25       evidence at this time.

Kathleen Plaia

1             THE COURT:  Please show it to

2    Mr. Chamberlain.

3             MR. CHAMBERLAIN:  No objection.

4             THE COURT:  Mark it in evidence.

5             (Whereupon, the referred to item previously

6    marked for identification is received and marked

7    People's Exhibit 4 in evidence by the reporter as

8    instructed)

9             THE COURT OFFICER:  People's Exhibit 4

10   received in evidence.

11            MR. BIANCAVILLA:  Could you show it to the

12   witness, please?

13   Q     Now, Mr. Hardman, did you pick someone out of

14   that lineup?

15   A     Yes, I did.

16   Q     Which individual did you pick out of that lineup?

17   A     Number four.

18   Q     The individual that was seated in position number

19   four, was that the individual you saw with Ruth Williams at

20   Y.L. Childs on the morning of April 12th of 2000?

21   A     Yes, it was.

22            MR. BIANCAVILLA:  Judge, may I display that

23   for the jury?

24            THE COURT:  Yes, you can publish that.

25            (Whereupon, People's Exhibit 4 in evidence is

1    displayed on the viewer to the sworn jury.)

2       Q    Mr. Hardman, I believe you testified that the

3    individual that was with Miss Williams on the right side of

4    the bar was bald headed and he had tattoos.

5       A    Correct.

6              MR. BIANCAVILLA:  I ask that the witness be

7         shown what has been marked as People's Exhibit 3 for

8         identification.

9              THE COURT:  Okay.

10      Q    Do you recognize that photograph?

11      A    Yes.

12      Q    Does that photograph generally reflect the

13    appearance of the individual that you saw with Ruth Williams

14    on the early morning hours of April 12th?

15      A    For the most part, except the shirt he was

16    wearing, which is why I noticed the tattoos, was a muscle

17    tank, so it was sleeveless.

18      Q    So, in other words, the shirt he was wearing

19    displayed more of the tattoos on his arms?

20      A    Yes, sir.

21             MR. BIANCAVILLA:  We would offer that into

22        evidence.

23             THE COURT:  Show it to Mr. Chamberlain,

24        please.

25             MR. CHAMBERLAIN:  Voir dire, Judge?

Kathleen Plaia

1              THE COURT:  Yes.

2    VOIR DIRE EXAMINATION

3    BY  MR. CHAMBERLAIN:

4        Q     Mr. Hardman, you indicated the shirt he was

5    wearing was a muscle -- you called it a muscle shirt?

6        A     Yes, sir.

7        Q     No sleeves at all you indicated, up here?

8        A     Yes.  It was cut off on the sleeves from what I

9    recall.

10       Q     But this is the individual that you identified

11   at the --

12       A     Yes, sir.

13             MR. CHAMBERLAIN:  All right, no objection.

14             THE COURT:  Mark it in evidence.

15             (Whereupon, the referred to item previously

16   marked for identification is received and marked

17   People's Exhibit 3 in evidence by the reporter as

18   instructed)

19             THE COURT OFFICER:  People's 3 received in

20   evidence.

21             MR. BIANCAVILLA:  May I publish it for the

22   jury, Judge?

23             THE COURT:  Yes.

24             (Whereupon, People's Exhibit 3 is displayed

25   on the viewer to the sworn jury.)

1   DIRECT EXAMINATION CONTINUED

2   BY MR. BIANCAVILLA:

3       Q     Mr. Hardman, the jury is now being shown what is

4   People's 3 in evidence.  The photograph that they're seeing,

5   that's how the individual that was with Ruth Williams

6   appeared when he was with her at Y.L. Childs, at your

7   particular bar?

8       A     As I said, I don't know if it was the exact shirt

9   he was wearing, but, otherwise, the general appearance, yes.

10  That's him.

11      Q     Just please once more describe the shirt he was

12  wearing.

13      A     It was a muscle tank, where, I would assume,

14  cotton blend.  I wasn't that close to see what type.  Again,

15  it was sleeveless to show off more of the art work.

16      Q     So, in other words, the individual that you saw

17  had tattoos running up to the top of both arms?

18      A     Yes.  At least I know on the left arm because

19  that's what was facing, his side of the body, his profile,

20  that was facing me.

21      Q     Okay.  All right.  Thank you very much,

22  Mr. Hardman.

23              MR. BIANCAVILLA:  I have no further questions

24      of this witness.

25              THE COURT:  Mr. Chamberlain,

1      cross-examination.

2                  MR. CHAMBERLAIN:  Thank you, Judge.

3   CROSS-EXAMINATION.

4   BY  MR. CHAMBERLAIN:

5      Q     Mr. Hardman, you knew the person John as a

6   regular?

7      A     I didn't know him per se.  I know of him.  He was

8   a regular of the --

9      Q     Of the bar scene?

10     A     Of the bar scenes in town, yes.

11     Q     The person that you identified as the bald man

12  with the tattoos, you didn't know him, right?

13     A     No, not personally.

14     Q     So, it's fair to say, he wasn't a regular?

15     A     No.  The only time I recall seeing him was a

16  couple of weeks prior to, at an away dart match.

17     Q     He was a dart player?

18     A     Yes.

19     Q     All right.  Now, you indicated here that -- you

20  had at one point you said he had tattoos on both arms which

21  were shown in the photograph, right?

22     A     Yes.

23     Q     But you originally signed a statement that this

24  person had tattoos only on his left arm?

25     A     Left arm --

Mr. Hardman - People - Cross                    396

```
 1                    MR. BIANCAVILLA:  Objection.

 2                    THE COURT:  Sustained.

 3                    THE COURT:  You can ask another question,

 4      Mr. Chamberlain.

 5          Q     Let me ask you, did you ever identify this person

 6      as somebody with tattoos on one arm?

 7          A     Originally, yes, because that --

 8          Q     That was a mistake?

 9                    MR. BIANCAVILLA:  Objection.

10                    THE COURT:  Sustained.

11          Q     Did you at any time indicate what this person,

12      bald headed person, was drinking that night?

13          A     What appeared, what I saw, that he had drank,

14      yes.

15          Q     What was he drinking?

16          A     He was drinking an alcoholic beverage I know out

17      of a pint glass.  I know John was drinking something with

18      orange juice.

19          Q     And I'm talking about the bald headed person, was

20      he drinking something with Vodka?

21          A     I believe so.  That's what -- John used to drink

22      Vodka and orange juice.  They both were having the same

23      drink, from what I recall.

24          Q     Now, you indicated here that you saw Ruth walk in

25      when you were back in Y.L. Childs, is that correct?
```

Kathleen Plaia

1     A     Yes, sir.

2     Q     You saw her walk in with these two gentlemen?

3     A     Yes, sir.

4     Q     Do you recall testifying before the grand jury,

5  Mr. Hardman?

6     A     Yes, I do.

7             THE COURT:  Page and line number,

8  Mr. Chamberlain.

9             MR. CHAMBERLAIN:  Page 68, Judge.

10            MR. BIANCAVILLA:  One moment,

11  Mr. Chamberlain.

12            MR. CHAMBERLAIN:  Middle of the page,

13  Mr. Biancavilla.

14            MR. BIANCAVILLA:  Just the line number,

15  please, Mr. Chamberlain.

16            MR. CHAMBERLAIN:  Starting on line 12.

17            MR. BIANCAVILLA:  Page 68?

18            MR. CHAMBERLAIN:  I'm sorry.  I'm going

19  blind.  63.  I apologize.

20            MR. BIANCAVILLA:  That's okay.  Line 12?

21            MR. CHAMBERLAIN:  Yes, line 12.

22            MR. BIANCAVILLA:  Okay.

23            MR. CHAMBERLAIN:  "QUESTION:  When you got

24  into Y.L. Childs, did there come a time when you saw

25  Ruth Williams there?"

1        "ANSWER:  Yes.  I was sitting in the middle

2    of the bar.  I had a tap on my shoulder.  It was Ruth.

3    And she had gone, why -- she's like, why, like, were

4    you mad at me; why didn't you say hello to me at Granny

5    O'Shea's?  I told her I didn't realize she was there.

6    I haven't seen her since 1995.  So, it was, you know, a

7    good four years, that I just didn't recognize her."

8        "QUESTION:  Did you see her come into Y.L.

9    Childs?"

10        "ANSWER:  I didn't.  I didn't notice.  I was

11    sitting right in front of the front door.  I was -- I

12    assume, as soon as they walked in, that's when she

13    approached me."

14    Q     Does that refresh your recollection as to whether

15    you saw her coming in?

16    A     Yes.  That's what I would assume.  As I said, I

17    was in, right in front of the front door.  You come in, you

18    hear the door open.  We weren't crowded, so she tapped.

19    That's probably why I said I recall seeing her.  Because

20    they walked together as a group and that's when I got the

21    tap on the shoulder.

22    Q     Now, Mr. Hardman, did you see -- you saw these

23    people in -- you saw Ruth talking to some people in Y.L.

24    Childs, for what period of time would you say?

25    A     Throughout the whole -- throughout the whole

1    evening duration, probably about two hours.

2        Q    About two hours.  She interacted with a number of

3    different people there, is that correct?

4        A    Yes, sir.

5        Q    Did you see any activity between her and the this

6    bald headed person?

7        A    I saw them in some conversation.  She was dancing

8    near them in the area.  Also, I said, I really wasn't paying

9    that much attention.  I was in conversations with my own

10   friends.

11       Q    Do you recall being asked by a detective whether

12   you ever saw any kissing going on?

13       A    Yes.

14            MR. BIANCAVILLA:  Judge, I'm going to object.

15            THE COURT:  Yes.  Mr. Chamberlain, you have

16       to ask the questions in a proper way.

17            MR. CHAMBERLAIN:  All right, Judge.

18       Q    Did you ever see her kissing this bald headed

19   person?

20       A    No.

21       Q    You used to know Ruth as a regular at the

22   Shamrock?

23       A    Yes, sir.

24       Q    What was the Shamrock called in 2000, April of

25   2000?

1     A     I believe it was closed down at the time.

2     Q     What?

3     A     It was closed down at the time.  It actually -- I

4  don't recall the exact date.  But, actually, the building

5  burnt down.

6     Q     Let me go back to a few names here.  Melissa was

7  a girl who you saw earlier that night, was a girlfriend of

8  Doug, the bartender?

9     A     Yes, sir.

10    Q     Where did you see them?

11    A     Doug was my relief for the evening, because I was

12  the day bartender.  So, when I went to go to the dart match,

13  Doug was behind the bar.

14    Q     And what was Melissa's last name?

15    A     I don't know last names, sorry.

16    Q     And when you went to Granny O'Shea's, you saw

17  somebody by the name of Penny?

18    A     Yes, sir.

19    Q     And do you know Penny's last name?

20    A     No, I don't.  I'm sorry.  I remember what people

21  drink.  Remember their faces.  I can't remember last names.

22  Sorry.

23    Q     Do you remember anything else about Penny besides

24  what she may have had to drink or what she normally drank?

25    A     Sure --

Kathleen Plaia

1        MR. BIANCAVILLA:  Objection.

2        THE COURT:  It's sort of a compound question,

3    Mr. Chamberlain.  You can break it down if you wish.

4    Q    Do you know if Penny had any relationship with

5    anybody?

6        MR. BIANCAVILLA:  Objection, relevancy.

7        THE COURT:  I'll permit that.

8    A    From what I know, she was involved with Billy.

9    Q    With Billy?

10   A    The owner of one -- one of the owners of Y.L.

11   Childs.

12   Q    Do you know anything about whether or not -- you

13   knew the other man as John, who was the regular?

14   A    Yes.

15   Q    When you say regular, what do you mean, just a

16   regular at the bars?

17   A    He was a local patron.  You know, someone that

18   lived in the town.  So, it's --

19   Q    Do you know him by any other name, other than

20   John?

21   A    No.

22   Q    Had you ever heard the name John Doe or John D?

23   A    John D possibly.  Again --

24   Q    Referring to him?

25   A    Yes.

Mr. Hardman - People - Cross                    402

1      Q      And do you know why he went by the name John D?

2             MR. BIANCAVILLA:  Objection.

3      A      No, I don't.

4             THE COURT:  Yes, sustained.

5      Q      Would you describe this person you knew as John

6  or John D.; what did he look like?

7      A      About five-six, five-seven.  Shorter than me, and

8  I'm six foot.  Longer brown hair, brown mustache, goatee,

9  full beard.

10     Q      When you say longer, how long?

11     A      Mid-back.

12     Q      Mid-back.  And how long was this goatee?

13     A      Longer than -- it wasn't necessarily kept, that's

14  what I would say.  But it was longer.

15     Q      Okay.  Fine, Mr. Hardman.  Did he have any

16  tattoos on him?  You mentioned some tattoos.

17     A      I have no idea.

18     Q      You lost your keys that night?

19     A      Yes, sir.

20     Q      And when you lost your keys, the owner locked the

21  door to find -- not let anybody leave, is that correct?

22     A      Yes, sir.

23     Q      And Ruth then said she wanted to leave, is that

24  what happened?

25     A      Yes, sir.

Kathleen Plaia

1    Q    And was she searched before she left?

2    A    I believe Billy asked her to empty her pockets

3  and if he could look through her pocketbook.

4    Q    And did he?

5    A    I believe so, yes.

6    Q    And then she left?

7    A    Yes.  She didn't have the keys, so he had said

8  she could go.

9    Q    And do you know what time that was?

10    A    Approximately four, maybe a little after four.

11    Q    Okay.  And when she left, was anybody else left

12  in the bar?

13    A    The two guys that she was with and our group of

14  friends, which we were all proceeding because it was last

15  call, the bar was closing up to leave.

16    Q    Was there a Fran Quinn there?

17    A    Yes.

18    Q    Did she leave after Ruth left?

19    A    To be -- I believe she did.  I wasn't really

20  paying attention to when everyone was leaving.  I was still

21  looking for my keys.

22    Q    Did you had -- what about the two men with Ruth,

23  did they leave?

24    A    I noticed they were gone about ten, fifteen

25  minutes after Ruth had left.

1    Q    You didn't see them leave, you noticed they were

2    gone?

3    A    I didn't see them physically leave.  But they

4    did.  They were gone after Ruth left.  You know, they were

5    still in when Ruth was here.  The reason, because there was

6    this big production of putting the padlock on the front

7    door, so everyone was in.  I saw Ruth physically leave.  And

8    I didn't notice exactly when they left, but I would say

9    within ten or fifteen minutes, because that is when I left.

10    Q    Do you remember being asked before the grand

11    jury, did you know when John came --

12                    MR. BIANCAVILLA:  Objection.

13                    THE COURT:  Page and line number.

14                    MR. CHAMBERLAIN:  I'm sorry, Judge.  Page 70

15        and line 18.

16                    MR. BIANCAVILLA:  Okay.

17    Q    Withdrawn.

18         Let me ask you, did you sign a statement for the

19    police after the defendant's arrest, this defendant's

20    arrest?

21    A    I don't know when exactly he was arrested or when

22    I signed it.

23    Q    Did you sign a statement in the afternoon of May

24    3rd, 2000?

25    A    Yes, I did.

Mr. Hardman - People - Cross                    405

1    Q      And did you say --

2           MR. BIANCAVILLA:  Objection.

3           THE COURT:  No, I'll permit that.

4    Q      Did you say about ten to fifteen minutes later --

5           THE COURT:  First --  Counsel, come forward.

6           (Whereupon, the following takes place at the

7    Bench, between the Court and Counsel:)

8           THE COURT:  Mr. Chamberlain, when you ask

9    questions, you first have to get a response from the

10   defendant one way or the other.  Now, it depends upon

11   the response, whether you can go to a statement or to

12   knowledge or hearing testimony or whatever or something

13   else.

14          MR. CHAMBERLAIN:  This is an inconsistent

15   what he testified to.

16          MR. BIANCAVILLA:  I disagree with that.

17          THE COURT:  Could you read the last question

18   back for me please.

19          (whereupon, the referred to question was read

20   back by the reporter as instructed.)

21          THE COURT:  I don't see a question on the

22   floor, so to speak, that you have asked.

23          MR. CHAMBERLAIN:  Judge, on direct he

24   testified that these men left ten or fifteen minutes

25   after Ruth.  He then indicates that it was about then.

1       The statement clearly says not about then, or he didn't

2       say.  It says, about ten or fifteen minutes later

3       Scrimo and John left together.  This is referring to

4       after.

5               MR. BIANCAVILLA:  That's what he said on the

6       stand, Judge.  That was his testimony.

7               MR. CHAMBERLAIN:  But then his grand jury

8       testimony contradicts that.

9               THE COURT:  Okay.  With respect to the

10      statement that he made to the detective, apparently, at

11      least to me, it seems to be consistent --

12              MR. BIANCAVILLA:  Ruth --

13              THE COURT:  With the testimony he gave on

14      direct.

15              Now, the grand jury testimony which is

16      inconsistent, you certainly can use with respect to

17      cross-examination as to his credibility, you know.  But

18      you are not allowed to use a consistent statement,

19      because it's just not permissible.

20              MR. CHAMBERLAIN:  All right.  Okay.

21              (Whereupon, the following takes place in open

22      court:)

23              THE COURT:  Mr. Chamberlain, you may inquire.

24      Q       Mr. Hardman, you have told this jury here that

25      ten or fifteen minutes after Ruth left, John and this bald

1    headed man left, is that correct?

2        A    Yes.

3        Q    Were you asked these questions and did you give

4    this answer at the grand jury:

5                MR. CHAMBERLAIN:  Now we're on page 70, line

6        18.

7                "QUESTION:  Did you notice when John Kane

8        left the bar?"

9                "ANSWER:  No, I didn't."

10               "QUESTION:  Did you notice when the bald

11       headed man left the bar?"

12               "ANSWER:  No, I didn't."

13       Q    Did you give those answers?

14               MR. BIANCAVILLA:  Judge, that wasn't a

15       complete answer.

16               THE COURT:  Please read the full answer.

17               MR. CHAMBERLAIN:  I read the complete answer.

18               MR. BIANCAVILLA:  That's not the complete

19       answer, Judge.

20               THE COURT:  Counsel, come forward.

21               (Whereupon, the following takes place at the

22       Bench, between the Court and Counsel.)

23               THE COURT:  I don't want to get into

24       discussions in open court as to whether something is a

25       complete answer or not.  Obviously, I prefer --

1      MR. BIANCAVILLA:  Start at line 18.

2      THE COURT:  Line 18.

3      "Did you notice when John Kane left the bar?"

4      "ANSWER:  No, I didn't."

5      That is a complete answer.

6      MR. BIANCAVILLA:  No.

7      THE COURT:  "Did you notice when the bald

8  headed man left the bar?"

9      "No, I didn't.  I was a little bit distracted

10  and annoyed, trying to wonder" --

11      MR. BIANCAVILLA:  That's --

12      THE COURT:  When I talk, you don't talk.

13      MR. BIANCAVILLA:  I apologize.

14      THE COURT:  Please.

15      "ANSWER:  No, I didn't.  I was a little bit

16  distracted and annoyed, trying to wonder about my

17  keys."

18      That's the complete answer, Mr. Chamberlain.

19      MR. CHAMBERLAIN:  It doesn't change the

20  answer.  I'm reading the whole answer.  It didn't

21  change --

22      THE COURT:  I'm not saying THAT changes the

23  answer or not.

24      MR. CHAMBERLAIN:  Okay.

25      THE COURT:  If you're going to use grand jury

1        testimony, you should read the whole answer, the whole

2        response --

3                    MR. CHAMBERLAIN:  I will read the whole

4        answer.

5                    THE COURT:  The witness made at the time.

6                    (Whereupon, the following takes place in open

7        court.)

8                    THE COURT:  Mr. Chamberlain.

9                    MR. CHAMBERLAIN:  Thank you, Judge.

10       Q    I'm going to reread this and read another line,

11  Mr. Hardman, so we have a full context.

12                   MR. BIANCAVILLA:  Objection.

13                   THE COURT:  Mr. Chamberlain, no colloquy,

14       please.  Just read the question and answer.

15                   MR. CHAMBERLAIN:  Question, starting on line

16       18.

17                   "Did you notice when John Kane left the bar?"

18                   "ANSWER:  No, I didn't."

19                   "QUESTION:  Did you notice when the bald

20       headed man left the bar?"

21                   "ANSWER:  No, I didn't.  I was a little bit

22       distracted and annoyed trying to wonder about my keys."

23       Q    Is that correct?

24       A    Yes, sir.

25       Q    Now, which is correct, you saw them leave at ten

1    or fifteen minutes later, or that you didn't, for whatever

2    reason?

3                    MR. BIANCAVILLA:  Objection.

4        Q    Did you see them leave the bar, that's the

5    question?

6                    THE COURT:  Wait, wait.  We have an

7        objection.  Don't ask another question until I rule on

8        the objection.

9                    I'm going to overrule the objection.

10       A    Can you repeat the question, please?

11                   THE COURT:  Could you read the question back

12       to the witness, please.

13                   (Whereupon, the requested question was read

14       back by the reporter as instructed.)

15       A    If that's the way I testified at the grand jury,

16   I did not see them leave.  But, it's easy to infer when they

17   left, if -- the time period of when they left after Ruth,

18   which is probably what my intent was.

19       Q    You can't, as you sit here today, honestly tell

20   whether -- when they left?

21       A    No, I can't, sir.  I do not recall.

22       Q    Can you tell whether they left together?

23       A    I do not recall.

24       Q    Can you tell whether they left before or after

25   Fran Quinn?

Kathleen Plaia

1      A     I don't recall when Fran left.  All I know, I do

2  know at four o'clock everyone was still in the bar because

3  the door was closed.

4      Q     Thank you, Mr. Hardman.

5      A     You're welcome, sir.

6            THE COURT:  Redirect, Mr. Biancavilla?

7            MR. BIANCAVILLA:  Yes, please.

8  REDIRECT EXAMINATION

9  BY MR. BIANCAVILLA:

10     Q     Do you remember, Mr. Hardman, when Ruth was

11 trying to leave the bar?

12     A     Yes.

13     Q     What happened when Ruth was trying to leave the

14 bar?

15     A     Billy had stopped her.

16     Q     What drew your attention to that?

17     A     Because it was my keys that were involved.  And

18 because Billy was putting a padlock.

19     Q     Did you actually see Ruth walk out the door?

20     A     Yes.

21     Q     Okay.  When you saw Ruth walk out the door, did

22 anyone walk out the door with her at that point?

23     A     No, sir.

24     Q     Okay.  Was the bald headed guy and John Kane

25 still in the bar at that time?

1      A      Yes, sir.

2             MR. BIANCAVILLA:  Now, I would ask that this

3      be marked as grand jury -- People's Exhibit 5 for

4      identification.

5             THE COURT OFFICER:  People's 5 marked for

6      identification.

7      Q      Mr. Hardman, I ask you to please take a look at

8      grand jury Exhibit 5, do you recognize the individual in

9      this photograph?

10     A      Yes.

11     Q      Do you recognize what you call the art work in

12     that photo?

13     A      Yes.

14     Q      Does that photo fairly and accurately depict the

15     tattoos that you saw and the level of the tattoos you saw on

16     the arms of the bald headed guy in the early morning hours

17     of April 12th?

18     A      Yes, sir.

19            MR. BIANCAVILLA:  We offer that, Judge.

20            THE COURT:  Please show it to

21     Mr. Chamberlain.

22            MR. CHAMBERLAIN:  I'm going to object, Judge.

23     First of all, this is not proper redirect.  There was

24     nothing about tattoos or anything on cross.

25            THE COURT:  There was some questioning about

1      the shirt.

2                  MR. CHAMBERLAIN:  Let me show the photograph,

3      if I may.

4                  THE COURT:  Would you like a voir dire?

5                  MR. CHAMBERLAIN:  No.  I would like to show

6      the photograph to the Court.

7                  THE COURT:  I will look at the photograph.

8      Would you like a voir dire?

9                  MR. CHAMBERLAIN:  I would rather show the

10     Court the photograph.

11                 (Whereupon, the referred to document is

12     handed to the Court.)

13                 THE COURT:  Okay.

14                 MR. CHAMBERLAIN:  Voir voir, Judge?

15                 THE COURT:  Yes.

16     VOIR DIRE EXAMINATION

17     BY MR. CHAMBERLAIN:

18     Q      You never saw the person you have described as

19     the bald headed man without a shirt on, did you?

20                 MR. BIANCAVILLA:  Objection.

21                 THE COURT:  Overruled.

22                 MR. BIANCAVILLA:  It's voir dire on the

23     photograph, Judge.

24                 THE COURT:  That's actually that would be

25     cross-examination.  But, I will sustain it.

1    Q    Mr. Hardman, you recognize -- withdrawn.

2         MR. CHAMBERLAIN:  I object to the photograph,

3    Judge.  First of all, it's improper redirect.

4         Second of all, it's not -- it's not anything

5    that I think this witness can testify to with respect

6    to -- he's already got a photograph of somebody with

7    tattoos.

8         MR. BIANCAVILLA:  Judge, this witness

9    testified that the individual's tattoos went all the

10   way up his arms.  Mr. Chamberlain cross-examined him on

11   that issue.

12        THE COURT:  I have no problem with respect to

13   the introducing with respect to redirect.  The question

14   is to whether it's a fair and accurate representation.

15        MR. BIANCAVILLA:  That's what he said, that

16   that was the level of which the tattoos ended on the

17   individual's arms.

18        THE COURT:  Can I have the photo, please?

19        (Whereupon, the referred to document is

20   handed to the Court.)

21        THE COURT:  Mr. Hardman, is photograph a fair

22   and accurate representation of the art work, how the

23   bald headed man looked on the date of April 11th or

24   April 12th?

25        THE WITNESS:  Yes, it is.

Kathleen Plaia

1            MR. CHAMBERLAIN:  Could I interject, Judge?

2            THE COURT:  You can have a voir dire if you'd

3    like.

4    VOIR DIRE EXAMINATION

5    BY MR. CHAMBERLAIN:

6        Q    Mr. Hardman, did you ever see the tattoos that

7    are shown in this photograph that are not on the arms?

8        A    No, I haven't.

9        Q    So, you can't testify that this is a fair and

10   accurate representation of those tattoos, can you?

11       A    The ones on his arms I can.

12       Q    The ones on his arms?

13       A    That's the ones I saw.

14            MR. CHAMBERLAIN:  We already have a

15   photograph of that.

16            THE COURT:  Sustained.

17            MR. BIANCAVILLA:  Judge --

18            THE COURT:  Yes, Mr. Biancavilla.

19            MR. BIANCAVILLA:  Can we approach?

20            THE COURT:  Yes, Counsel.  Come forward.

21            (Whereupon, the following takes place at the

22   Bench, between the Court and Counsel:)

23            THE COURT:  The reason I sustained the

24   objection as to that, Mr. Biancavilla, is that the

25   witness testified during the voir dire by

1    Mr. Chamberlain that the two art work designs on the

2    bald headed man's chest, he did not see them.

3    Therefore, I sustained the objection because he cannot

4    testify that it was a fair and accurate representation

5    of how the bald headed man looked on April -- the early

6    morning of April the 12th.  He did say with respect to

7    the arms.

8              Now, if you wish to be heard you may.

9              MR. BIANCAVILLA:  Judge, I will offer it as a

10   fair and accurate representation of the art work he

11   observed on the individual's arms.

12             THE COURT:  I'll let you ask the questions

13   again, if he testifies as such --

14             MR. BIANCAVILLA:  He just did, to you.  He

15   just did, to you.

16             THE COURT:  I understand that.  No, he said

17   the whole thing was.  And that's not -- he's saying

18   that's not what he said to Mr. Chamberlain on voir

19   dire.  Therefore --

20             MR. BIANCAVILLA:  All right.

21             THE COURT:  I will permit --

22             MR. BIANCAVILLA:  Fine.

23             THE COURT:  If he does testify that the art

24   work on the arms is exactly how it's a fair and

25   accurate representation.

Kathleen Plaia

1              MR. BIANCAVILLA:  Fine.

2              THE COURT:  You will have to cover the rest.

3      I won't permit it.

4              MR. BIANCAVILLA:  Why do I have to cover it?

5      He's just saying I didn't see the chest so I can't tell

6      you that, but I did see the arm.  Like when we show a

7      photograph of the crime scene and it snowed.  We offer

8      it subject to the fact that there was no snow at the

9      time of the crime scene.

10             THE COURT:  Mr. Chamberlain.

11             MR. BIANCAVILLA:  That's all I'm saying.

12             MR. CHAMBERLAIN:  He already has a photograph

13     in evidence of the tattoos.

14             MR. BIANCAVILLA:  That's not true.  No, we

15     don't.  I don't believe you do, Mr. Chamberlain.  I

16     will permit the photograph to be placed into evidence.

17     However, I will have the two artistic art work on his

18     chest redacted.

19             MR. BIANCAVILLA:  Fine.

20             How do you want me to do that?

21             THE COURT:  Well --

22             MR. BIANCAVILLA:  Do you want me to cut them

23     out, I will do it right now.

24             THE COURT:  You want to publish this to the

25     jury?

1          MR. BIANCAVILLA:  Sure.

2          THE COURT:  What you do is, take a piece of

3    paper and cover it.  We will talk about it.

4          I don't want the jury to see the art work on

5    his chest.

6          MR. BIANCAVILLA:  Okay.

7          (Whereupon, the following takes place in open

8    court:)

9          MR. BIANCAVILLA:  Judge, can I show this to

10   the Court?

11         THE COURT:  Yes.

12         (Whereupon, the referred to document is

13   handed to the Court.)

14         THE COURT:  That's fine.

15         MR. BIANCAVILLA:  Okay.

16         THE COURT:  People's 5 is marked in evidence

17   subject to the redactions that were placed on the

18   record.

19         MR. BIANCAVILLA:  Judge, may I show this to

20   the jury?

21         THE COURT:  Yes, you may.

22         THE COURT OFFICER:  So marked.

23         (Whereupon, the referred to item is received

24   and marked People's Exhibit 5 in evidence by the

25   reporter as instructed.)

1          MR. BIANCAVILLA:  May I display it to the

2     jury?

3          THE COURT:  Yes, publish it to the jury.

4          MR. BIANCAVILLA:  Okay.  I have no further

5     questions, Judge.

6          THE COURT:  Cross-examination, or should I

7     say recross?

8  RECROSS EXAMINATION

9  BY MR. CHAMBERLAIN:

10     Q     Mr. Hardman, did you ever get your keys?

11     A     No, I haven't.

12          MR. CHAMBERLAIN:  Nothing further.

13          THE COURT:  Anything further,

14     Mr. Biancavilla?

15          MR. BIANCAVILLA:  No, Judge.

16          THE COURT:  Thank you, Mr. Hardman.  You may

17     step down.

18          (WITNESS EXCUSED)

19          THE COURT:  Mr. Biancavilla, can you call

20     your next witness, please?

21          MR. BIANCAVILLA:  Frank DeFalco.

22  F R A N K     D E F A L C O, called by and on behalf of the

23     People, having been first duly sworn, testified as

24     follows:

25          THE COURT OFFICER:  Please state your name,

1    spelling your last name, and the town in which you

2    reside.

3                THE WITNESS:  Frank DeFalco, D-E-F-A-L-C-O,

4    Rockville Center.

5                THE COURT:  You may inquire.

6                MR. BIANCAVILLA:  Thank you.

7                THE COURT:  Please try to keep your voice up,

8    Mr. DeFalco.

9                THE WITNESS:  Okay.

10                THE COURT:  If you can get as close to the

11    microphone as you can.

12                THE COURT:  You may inquire.

13    DIRECT EXAMINATION

14    BY MR. BIANCAVILLA:

15        Q    Good morning, Mr. DeFalco?

16        A    Could you tell the jury where you're employed?

17        A    Newsday.

18        Q    What's your position at Newsday?

19        A    PIC in the collating department.

20        Q    What is PIC?

21        A    I make the schedules.

22        Q    What is the collating department?

23        A    That's where the papers come out from.  And we

24    distribute them to the different trucks.

25        Q    Now, in April of 2000, were you the owner of or

Mr. DeFalco - People - Direct                    421

1    one of the owners of the Falcons Nest?

2         A     Yes.

3         Q     Where was the Falcons Nest located?

4         A     On Main Street in Farmingdale.

5         Q     How long were you the owner of the Falcons Nest?

6         A     Four years.

7         Q     And did you have a dart team at the Falcons Nest?

8         A     Yes, we did.

9         Q     What night was the dart team active?

10        A     Tuesdays.

11        Q     Now, who were the members of your dart team?

12        A     My personal team?

13        Q     Yes.

14        A     John, I don't know the last name.  John, Paul --

15   I forget the names.

16        Q     How many members were there on the dart time?

17        A     There were six.

18        Q     Do you remember all their names?

19        A     If I had them in front of me.  It's been a couple

20   of years.

21        Q     You said John, can you describe John for the jury

22   please, his appearance?

23        A     Long hair with the goatee, long goatee.

24        Q     And Paul, can you describe his appearance back in

25   April of 2000?

1    A      Shaved head.

2    Q      Do you see him in the courtroom today?

3    A      Yes.

4    Q      Where is he seated?

5    A      Right there.

6    Q      Could you point to him please and identify him by

7    an article of clothing he's wearing.

8    A      He's got the little pin on his lapel.

9    Q      Is he seated at the second table next to

10   Mr. Chamberlain, the attorney?

11   A      Yes.

12              MR. CHAMBERLAIN:

13              MR. BIANCAVILLA:  Judge, may the record

14   reflect the identification of the defendant?

15              THE COURT:  The record shall reflect the the

16   witness has identified the defendant.

17   Q      Now, I'm going to ask you to take a look at

18   People's Exhibit 3 in evidence.  Do you recognize the

19   individual in that photograph?

20   A      Yes.

21   Q      Does that photograph fairly and accurately depict

22   how Mr. Scrimo appeared in April of 2000?

23   A      Yes.

24   Q      Now, how often would Mr. Scrimo and John play

25   darts at the Falcons Nest?

1     A     At least once a week.

2     Q     What night was that?

3     A     On Tuesday.

4     Q     Now, could you describe for the grand jury what

5   happens at a dart tournament?

6     A     We all get together, play darts against another

7   bar, have a few drinks.

8     Q     On Tuesday night, April 11th of 2000, was there a

9   dart tournament at the Falcons Nest?

10    A     Yes.

11    Q     Were you there?

12    A     Yes.

13    Q     And was John Kane and Paul Scrimo also at that

14  dart tournament?

15    A     Yes.

16    Q     And what time did the dart tournament start?

17    A     Around 8:30, nine o'clock.

18    Q     What time did it end?

19    A     Around 11:30, twelve, I guess.

20    Q     And did you stay after the dart tournament?

21    A     No, I left.

22    Q     Where did you go?

23    A     Shopping, to the supermarket.

24    Q     When you left, was John Kane and Paul Scrimo

25  still at the Falcons Nest?

1    A      Yeah.

2    Q      Approximately what time was that?

3    A      I think around twenty to twelve.  I'm not sure

4  exactly what time it was, around there.

5    Q      And how long had Mr. Scrimo and John Kane been

6  playing darts for you at the Falcons Nest?

7    A      About three years.

8          MR. BIANCAVILLA:  Thank you.  I have no

9      further questions of this witness.

10          the court:  Mr. Chamberlain.

11  CROSS-EXAMINATION

12  BY MR. CHAMBERLAIN:

13    Q      Mr. DeFalco, you no longer have an interest in

14  the Falcons Nest?

15    A      No.

16    Q      When did you terminate your interest there?

17    A      January of last year.

18    Q      How long have you known the defendant, Paul

19  Scrimo?

20    A      About, I guess, a few months after we opened up

21  the place he started coming in.

22    Q      When was that?

23    A      I believe in '95.

24    Q      '95?

25    A      '95, '97, I'm not exactly sure.

Kathleen Plaia

1    Q     During the year that you know him, what did you

2    know about him?

3              MR. BIANCAVILLA:  Objection.

4              THE COURT:  Sustained.

5    Q     Your knowledge of him, would you explain what

6    that was, what did -- what was your socialization with him?

7              MR. BIANCAVILLA:  Objection.

8              THE COURT:  I'll permit you to ask him, you

9         know, where he knew him from, if that's the question.

10   Q     Where did you know him from?

11   A     From the bar, he would come in.  I didn't know

12   him beforehand.

13   Q     From the bar and from darts?

14   A     Right.

15   Q     And you, yourself, was on the dart team?

16   A     Correct.

17   Q     And you knew this person John?

18   A     Correct.

19   Q     Would you describe that person, please?

20   A     Physically?

21   Q     Physically.

22   A     Long hair with a long goatee.

23   Q     When you say long goatee, would you explain?

24   Describe how long.

25   A     Came down, I guess, about here (indicating).

1    Q    About here, indicating mid --

2    A    It wasn't full.  It was thin.

3    Q    Thin, but down to about --

4    A    Here (indicating).

5    Q    Indicating mid throat?

6    A    About five inches, four or five inches.

7    Q    Did he have any other distinguishing

8  characteristics that you recall?

9    A    A tattoo on his neck.

10    Q    A tattoo on his neck?

11    A    Yes.

12    Q    Do you recall what kind of a tattoo?

13    A    No.

14    Q    Was he known by any other name, other than John?

15    A    Not that I know of.

16    Q    Did you know him -- as a matter of fact, did you

17  know him as John Doe or if he was known as John Doe?

18         MR. BIANCAVILLA:  Objection.

19         THE COURT:  Overruled.

20    A    John Doe, yeah.

21    Q    Pardon me?

22    A    Yes.

23    Q    Yes.  And do you know why he went by the name

24  John Doe?

25         MR. BIANCAVILLA:  Objection.

1          THE COURT:  Sustained.

2     Q     You knew the victim, Ruth Williams, did you not,

3  sir?

4     A     Yes.

5     Q     How well did you know her?

6     A     When I first opened up the place, she came in a

7  few times.  That was about it.  She would come in maybe once

8  every three or four months after that.

9     Q     Do you know of any relationship between her and

10  John Doe?

11          MR. BIANCAVILLA:  Objection.

12          THE COURT:  If he knows.

13          MR. BIANCAVILLA:  Objection, may we approach?

14          THE COURT:  You may.

15          THE COURT:  Step down, sir.

16          (Whereupon, the following takes place at the

17  Bench, between the Court and Counsel:)

18          THE COURT:  I will permit the question if the

19  witness knows of anything from the relationship from

20  the bar itself.

21          MR. BIANCAVILLA:  My question is, I think the

22  question is broad, it's vague.  What type of a

23  relationship.  Did he cut her hair?  Did he do her

24  nails?  I mean, was it a personal relationship?  Was it

25  a physical relationship?  I think the question is

Case 2:11-cv-04171-AMD  Document 6-22  Filed 01/17/12  Page 49 of 132 PageID #: 1111

1    overbroad and it's vague, Judge.  The same thing as

2    saying what do you know about the person.  It's

3    objectionable.

4                THE COURT:  I know what Mr. Chamberlain is --

5                MR. BIANCAVILLA:  I don't think you do,

6    Judge.  I don't think you do know what Mr. Chamberlain

7    is getting at, which is why I'm asking him to be

8    more --

9                THE COURT:  Relationship of going out on a

10   date.

11               MR. BIANCAVILLA:  That's not what

12   Mr. Chamberlain is looking for, Judge.  That's why I'm

13   asking you to require him to be more specific.

14               THE COURT:  Would you like to be heard,

15   Mr. Chamberlain?

16               MR. CHAMBERLAIN:  It's a general question

17   that asks --

18               THE COURT:  I don't want a mistake to be

19   made.  I want you to ask a specific question for a

20   specific answer.

21               MR. CHAMBERLAIN:  Well, I think -- first of

22   all, I have to ask whether or not if he knows of any

23   relationship between Kane and --

24               THE COURT:  When you mean relationship, can

25   you be more specific.

1          MR. CHAMBERLAIN:  I will ask more specific

2     questions if your Honor directs me to.

3          THE COURT:  I do.

4          MR. CHAMBERLAIN:  All right.

5          THE COURT:  I believe the word relationship,

6     I do agree with Mr. Biancavilla, that can be very

7     general.  You know, apparently it doesn't have anything

8     to do with him going out.  So, I will want more

9     specifics.

10          MR. CHAMBERLAIN:  It may have something to do

11     with him going out, Judge.

12          THE COURT:  Then you ask that question.

13          (Whereupon, the following takes place in open

14     court:)

15          THE COURT:  For the record, the last

16     objection is sustained.

17     Q    Mr. DeFalco, do you know whether John Doe, the

18     person you knew as John Doe, had any business relationship

19     with the victim Ruth Kane -- Ruth Williams, I'm sorry.

20     A    No.

21     Q    Do you know whether he had a personal

22     relationship with her?

23     A    They talked once in a while.

24     Q    Do you know whether they were ever intimate?

25     A    That, I don't know.

1      Q      Pardon me?

2      A      No, I don't know.

3      Q      The -- how often did John Doe come into the

4  Falcons Nest during the time that you owned it?

5      A      Two or three times a week.

6      Q      Two or three times a week.  Did you have a drink

7  in the Falcons Nest known as a John Doe drink?

8      A      Yeah.

9      Q      Yes.  And why -- how did this drink come to be

10  known as the John Doe drink?

11            MR. BIANCAVILLA:  Objection.

12            THE COURT:  Sustained.

13      Q      Was it named after John Doe?

14      A      Yes.

15      Q      Yes?  I heard yes, if I'm not mistaken?

16      A      Yes.

17      Q      What was that drink?

18            MR. BIANCAVILLA:  Objection.

19            THE COURT:  I'll permit that.

20      A      Vodka with orange -- vodka with orange juice,

21  orange vodka with orange juice.

22      Q      And was there any particular reason you called

23  the drink after John Doe?

24            MR. BIANCAVILLA:  Objection.

25            THE COURT:  Sustained.

Kathleen Plaia

1      Q      Did John Doe -- was John Doe a heavy drinker at

2   the Falcons Nest, to your knowledge, during that period of

3   time?

4                  MR. BIANCAVILLA:   Objection.

5                  THE COURT:   Sustained as to the word heavy.

6                  You can ask the question more specifically,

7        Mr. Chamberlain.

8      Q      You had a drink at the bar named after him, he

9   was there?

10                 MR. BIANCAVILLA:   Objection.   There's been no

11       testimony of that -- to that, Judge.

12                 THE COURT:   Sustained.

13     Q      You had a drink named John Doe after John Doe the

14   person we have been describing, is that correct?

15                 MR. BIANCAVILLA:   Objection.

16                 THE COURT:   That, I will permit.

17     A      Can you repeat that one more time?   Repeat the

18   question one more time, please.

19     Q      You had a drink named John Doe after the John Doe

20   we have been describing, is that correct?

21     A      Yes.

22     Q      And how much -- I used the words heavy drinker.

23   Would you describe how much drinking John Doe did at the

24   Falcons Nest to your knowledge during the period just

25   shortly prior to April of 2000?

1          MR. BIANCAVILLA:  Objection as to relevancy.

2          THE COURT:  I don't understand the relevancy,

3     Mr. Chamberlain.  If he saw him the night before or

4     that night or something of that, that I would think is

5     relevant.

6          MR. CHAMBERLAIN:  I'm not talking about that.

7     I'm talking about general habits, Judge.

8          MR. BIANCAVILLA:  Again, I will object.

9          THE COURT:  With respect to general habits --

10         MR. CHAMBERLAIN:  Would you take it subject

11    to connection, Judge?  I would like to go into John

12    Doe's background.  I would like this witness --

13         THE COURT:  No, Mr. Chamberlain.  If you

14    would like to make a record, come forward.

15         Step down please.

16         (Whereupon, the following takes place at the

17    Bench, between the Court and Counsel:)

18         THE COURT:  Let me hear Mr. Chamberlain's

19    offer of proof.

20         MR. BIANCAVILLA:  Judge, can I make a

21    suggestion.  We have been going for about an hour now.

22    Why don't we do this in the back and give them five

23    minutes?

24         THE COURT:  Yes.  I think it's a good time to

25    give the jury a break.  Okay, we will do that.

Kathleen Plaia

1          THE COURT:  Ask the witness to come back in.

2          (Whereupon, the following takes place in open

3     court:)

4          THE COURT:  Ladies and gentlemen, we're going

5     to take a short break at this point.  Do not discuss

6     the case among yourselves or with anyone else.  Keep an

7     open mind.  Do not form or express any opinions until

8     the entire case has been completed.  Do not read or

9     listen to any accounts of this case, should it be

10    reported in the media.  Do not visit or view any

11    premises mentioned.  Do not permit any party to

12    influence you.  And any attempt to influence you, you

13    must promptly report to the Court any violation

14    thereof.

15          Please follow the court officer and we'll be

16    back shortly.

17          THE COURT OFFICER:  Follow me, please.

18          (Whereupon, the sworn jury and alternates

19    leave the courtroom)

20          THE COURT:  Mr. DeFalco, you may step down

21    now.

22          Counsel, join me in chambers, please.

23          (Whereupon, the witness leaves the courtroom)

24          MR. CHAMBERLAIN:  Can we have the clerk

25    admonish the witness not to discuss --

1          THE COURT:  Mr. Chamberlain, that's why I

2     brought him back in, expecting you to say that.  Now I

3     have let him go out.

4          MR. CHAMBERLAIN:  The clerk can go out and

5     tell him not to discuss it.

6          THE COURT:  Fine.  I'll ask the clerk.

7          Danielle, please go out and tell Mr. DeFalco

8     not to talk about this case with any of the other

9     witnesses and anybody else, for that matter.

10          THE CLERK:  Yes, Judge.

11          (Whereupon, the following takes place in the

12     Judge's chambers, between the Court and Counsel:)

13          THE COURT:  At this juncture,

14     Mr. Chamberlain, I'm not going to permit you to,

15     through habit, as you say, of being a, quote, unquote,

16     "heavy drinker," I'm not going to permit you to impeach

17     the witness who has not even been on the stand through

18     another witness.  I will permit it, of course,

19     depending upon what the response is from Mr. Kane, who

20     is -- whom we're talking about, and I will permit you

21     to on your case to impeach him and recall him.  And I

22     will direct the district attorney to provide you with

23     the address, so you can serve a subpoena if you need

24     to.

25          Anything else you want to say on the record?

1       MR. BIANCAVILLA:  Judge, my only point with

2   respect to this witness or any other witness, if he's

3   such a big drinker in the Village of Farmingdale, I'm

4   sure Mr. Chamberlain and his investigator will not have

5   any problem saying this witness is a big drinker, if,

6   in fact, he denies he's a big drinker.  I don't think

7   he's going to deny he's a big drinker.

8       MR. CHAMBERLAIN:  If he denies it, or you

9   don't think?

10      MR. BIANCAVILLA:  He's not going to deny he's

11  a big drinker.

12      THE COURT:  At this point I'm not going to

13  permit you to cross-examine this particular witness

14  with respect to that line of questioning.

15      You have a right to call him as your own

16  witness, if something comes out during the course of

17  Mr. Kane's testimony that would cause you to call him,

18  and that's up to you.

19      Anything else, Counsel?

20      (Whereupon, there is a brief recess taken in

21  the proceedings.)

22      THE CLERK:  Come to order.

23      THE CLERK:  Ready for the jurors, Judge?

24      THE COURT:  Yes.

25      THE COURT OFFICER:  Jury entering.

Kathleen Plaia

 1                    (Whereupon, the sworn jury and alternates

 2          enter the courtroom)

 3                    THE CLERK:  Sir, you're reminded you're still

 4          under oath.

 5                    THE COURT:  Mr. Chamberlain.

 6                    MR. CHAMBERLAIN:  Thank you, Judge.

 7     CROSS EXAMINATION CONTINUED

 8     BY MR. CHAMBERLAIN:

 9          Q    Mr. DeFalco, just a few more questions and we can

10     finish this up.

11                    Did you -- you indicated that you had known John

12     by a nickname of John Doe.  Did you know Ruth Williams by

13     any other name or nickname?

14          A    Yes.

15          Q    What was that?

16          A    Ruthless.

17          Q    Was she commonly known by that name in that area

18     at that time?

19          A    I don't know if it was common.  But, you know, I

20     knew her.

21          Q    Okay.  Were you questioned by the police on or

22     around the 20th of May 2000 after the defendant's arrest?

23          A    Around that time, yes.

24          Q    And were you asked about your relationship or

25     knowledge of the defendant?

1            MR. BIANCAVILLA:  Objection.

2            THE COURT:  Sustained.

3            THE COURT:  Mr. Chamberlain, you have to ask

4       it the proper way.

5       Q     Mr. DeFalco, would you tell -- would you tell us

6   what your -- during your association with the defendant over

7   the years you have related, did you ever have any problems

8   with him or know of any altercations involving him?

9            MR. BIANCAVILLA:  Objection.

10           THE COURT:  Sustained.  If you'd break it

11      down Mr. Chamberlain.

12      Q     Did you have any problem with him during the

13  time --

14           MR. BIANCAVILLA:  Objection.

15      Q     During the time he came to your bar?

16           THE COURT:  Excuse me.  Sustained.

17      Q     Did you know of any altercations involving

18  Mr. Scrimo?

19           MR. BIANCAVILLA:  Objection.  I'm going to

20      ask to approach.

21           THE COURT:  Yes, sustained.  I don't think

22      it's proper, Mr. Chamberlain.

23      Q     Were you asked by the police on May 20th whether

24  you had any prior problems with Mr. Kane?

25           MR. BIANCAVILLA:  Objection.

Mr. DeFalco - People - Cross                          438

1              THE COURT:  Sustained.  Come forward,

2      Counsel.

3              Please step down, sir.

4              (Whereupon, the following takes place at the

5      Bench, between the Counsel:)

6              THE COURT:  Mr. Chamberlain, there's certain

7      types of questions you just can't ask at all, which I

8      sustain.  And there's other questions that you can ask,

9      and if you ask the proper way, I will permit you to use

10     anything to cross-examine the witness, if there was

11     something that was inconsistent with how he responded

12     today in court.

13             But, with respect to Mr. Scrimo as having any

14     problem or altercations, I don't see the relevancy to

15     that at all.  Perhaps you can tell me what the

16     relevancy to that is as to some prior occasion if he

17     had an altercation in the bar.  Tell me what --

18             MR. CHAMBERLAIN:  Well, the background of

19     Mr. Scrimo as far as was gone into by the police.

20             THE COURT:  That may have well been.  It

21     doesn't mean it's admissible in court.

22             MR. CHAMBERLAIN:  Well, the background of

23     Mr. Kane and Mr. Scrimo is not admissible.

24             THE COURT:  When you have Mr. Kane on the

25     stand, you can go into anything you want with respect

Kathleen Plaia

1    to Mr. Kane.  And if there's some reason you want to

2    produce a witness on your case to refute something that

3    Mr. Kane said, you are more than welcome to do that.

4           However, at this point, I don't see this as

5    being a proper question.

6           Mr. Biancavilla, would you like to be heard?

7           MR. BIANCAVILLA:  No.  I think you said it

8    rather eloquently.

9           THE COURT:  Anything else you would like to

10   place on the record, Mr. Chamberlain?

11          MR. CHAMBERLAIN:  Nothing further, your

12   Honor.

13          THE COURT:  Okay.

14          THE COURT:  Please ask the witness to come

15   back in.

16          (Whereupon, the following takes place in open

17   court:)

18          MR. CHAMBERLAIN:  Nothing further, Judge.

19   Thank you.

20          THE COURT:  Redirect, Mr. Biancavilla?

21          MR. BIANCAVILLA:  No, Judge.  Thank you, sir.

22   You can step down.

23          THE WITNESS:  Okay.  Thanks.

24          (WITNESS EXCUSED)

25          THE COURT:  Mr. Biancavilla, call your next

1        witness, please.

2                    MR. BIANCAVILLA:  Melissa Notarnicola.

3    M E L I S S A    N O T A R N I C O L A,  called as a witness

4        by and on behalf of the People, having been first duly

5        sworn, testified as follows:

6                    THE CLERK:  You may be seated.

7                    THE COURT OFFICER:  In a loud voice, would

8        you give your full name, spelling your last name, and

9        your County of residence.

10                   THE WITNESS:  Melissa Notarnicola,

11       N-O-T-A-R-N-I-C-O-L-A.  Nassau County.

12                   THE COURT OFFICER:  Thank you.

13                   THE COURT:  You may inquire.

14                   MR. BIANCAVILLA:  Thank you.

15   DIRECT EXAMINATION

16   BY MR. BIANCAVILLA:

17       Q    Good morning, Miss Notarnicola.  How are you?

18       A    Good.  How are you?

19       Q    Okay.  Please tell the jury what type of work you

20   do.

21       A    Right now I work at Network Recovery Services,

22   it's a collection agency for New York Hospitals.

23       Q    What do you do for them?

24       A    Medical billing.

25       Q    I ask you to speak loudly so the court reporter

1    can get it all down.

2              How long have you been doing that type of work?

3        A    A little over a year.

4        Q    Now, was there a time when you were a bartender

5    at a bar called Y.L. Childs?

6        A    Yes.

7        Q    And when were you a bartender at Y.L. Childs?

8        A    Friday nights.

9        Q    And in April of 2000 were you working at Y.L.

10   Childs?

11       A    Yes.

12       Q    Now, when you weren't working, did you also

13   sometimes go down to Y.L. Childs?

14       A    Yes.

15       Q    Were you there on Tuesday night, April 11th --

16       A    Yes.

17       Q    2000?

18       A    Yes.

19       Q    Were you there into the early morning hours of

20   April 12th?

21       A    Yes.

22       Q    Now, do you know Ruth Williams?

23       A    I saw her there maybe once or twice before.

24       Q    And was she there as a customer?

25       A    Yes.

1        Q      Now, was she there in the early morning hours of

2   April 12 of 2000?

3        A      Yes.

4        Q      And when did you first notice that she was in the

5   bar?

6        A      She started dancing around and taking her straps

7   down, that's when I really noticed that she was there.

8        Q      What time had you arrived there?

9        A      I was there all night, probably like seven p.m..

10       Q      You were there from seven p.m..  Do you remember

11  about what time it was that you saw her there?

12       A      Early morning, maybe two, three a.m..

13       Q      All right.  And just describe for the jury her

14  behavior, what you observed?

15       A      She -- she was just -- she was dancing.  You

16  know, she was probably a little drunk.

17       Q      How would you know that?

18       A      She was acting a little wild, dancing around,

19  taking her suspender straps off.

20       Q      Was there anybody in the vicinity of where she

21  was dancing?

22       A      Yes.

23       Q      Can you describe who she was with?

24       A      She was with two other gentlemen.  One was --

25       Q      Do now either of them?

Ms. Notarnicola - People - Direct                443

```
 1        A      One.  One I knew.

 2        Q      Who did you know?

 3        A      John.  John.

 4        Q      John Kane?

 5        A      Yes.  I have seen him at the bar there a few

 6   times.

 7        Q      Who else was she with?

 8        A      Another gentleman, he was tall, bald, tattoos on

 9   him.

10        Q      Where did you see the tattoos on him?

11        A      God --

12        Q      If you remember?

13        A      They were just all over.

14        Q      And you said he was bald?

15        A      Yes.

16        Q      Was his head shaved bald?

17        A      Yes.

18        Q      Now, where were they seated, John and this big

19   bald guy?

20        A      When you walk into the bar, they were seated to

21   the right, in the corner.

22        Q      And where was Ruth dancing?

23        A      Right in front of the tall guy.  She was all over

24   him.

25        Q      When you say the tall guy, the bald guy?
```

1      A      Yes.

2      Q      When you say she was all over him, please

3   describe for the jury what you mean.

4      A      She was dancing all over him.  And she kissed

5   him.  She were kissing toward the end of the night.  She was

6   just, you know, dancing on top of him.

7      Q      And where was John while this was going on?

8      A      Right next to them.

9      Q      Do you remember an incident with Tom Hardman when

10  he lost his keys?

11     A      Yes.

12     Q      Tell the jury what happened.

13     A      He -- John -- Tom got a little crazy because he

14  lost his keys, because they were the keys to the bar.  And

15  we wouldn't let anybody leave until we found the keys.  We

16  couldn't find the keys.  You know, we were searching

17  everything.  Ruth, the one woman, was trying to leave.  And

18  she, you know, she was in a rush to leave.  We had to search

19  her first before she did.  Billy, who is the owner, had to

20  change the lock on the door.

21     Q      Do you remember if Ruth left with anybody?

22     A      I don't remember.

23     Q      But do you remember her leaving?

24     A      Yes.

25     Q      Do you remember when John and the big bald guy

Ms. Notarnicola - People - Cross                445

1   with tattoos, when they left?

2      A      No, I don't remember.  They left after the

3   incident with the keys.

4      Q      After the incident with the keys?

5      A      Yes.

6      Q      Do you remember if they left after Ruth?

7      A      I believe so.  I think she was -- she left first

8   and then them two.  She may -- I'm really not sure, but she

9   may have left with one of them.

10     Q      Okay, thank you.

11            MR. BIANCAVILLA:  I have nothing further for

12     this witness.

13            THE COURT:  Mr. Chamberlain.

14            MR. CHAMBERLAIN:  Thank you, Judge.

15   CROSS EXAMINATION

16   BY MR. CHAMBERLAIN:

17     Q      You weren't working that night?

18     A      No, I was not.

19     Q      Your normal night to work as a bartender was

20   Friday night?

21     A      Yes.

22     Q      Were you drinking that night?

23     A      Earlier.  I wasn't -- I had maybe one drink,

24   like, seven o'clock.  That was it.

25     Q      You had been there since seven p.m..  And it's

```
 1    fair to say you had no idea exactly when Ruth came in?

 2         A    No.

 3         Q    Or who she came in with?

 4         A    She came in with the two gentlemen.

 5         Q    She came in with the two gentlemen?

 6         A    Yes.

 7         Q    You sure of that?

 8         A    Yes.

 9         Q    Did you -- you were asked by the district

10    attorney if she was with John Kane.  Did you know him by

11    that name, John Kane?

12         A    Yes.  John, I know him by John.

13         Q    John?

14         A    Yes.

15         Q    Not Kane?

16         A    No.

17         Q    Would you describe John, what did he look like?

18         A    It's been two years.  He had long hair, facial

19    hair, he was short.

20         Q    What about his hair length, other than facial

21    hair?

22         A    He had long hair.

23         Q    How long?

24         A    I don't remember.

25         Q    Would you describe him as a biker type?
```

Kathleen Plaia

1              MR. BIANCAVILLA:  Objection.

2              THE COURT:  Sustained.

3       Q     Did you ever describe him as a biker type?

4              MR. BIANCAVILLA:  Objection.

5              THE COURT:  Sustained.

6       Q     Did you give the police a statement on April 20th

7  of that year, 2000?

8       A     Yes.

9       Q     Did you describe John as a biker type?

10             MR. BIANCAVILLA:  Objection.

11      Q     Biker looking?

12             THE COURT:  Sustained.

13             The question is, how would you describe John.

14      Q     How would you describe John?

15             MR. BIANCAVILLA:  Objection.

16             THE COURT:  Overruled.

17      A     I -- he looked -- he just had long hair.  He

18  looked like -- I don't know.  I don't know.

19      Q     Melissa, are you a resident of that area?

20             MR. BIANCAVILLA:  Objection.

21             THE COURT:  I'll permit that.

22      A     I'm a resident of Bethpage.

23      Q     Were you a friend of anybody at that particular

24  time?  Let's put it this way, were you a close friend of Tom

25  Hardman?

```
 1        A      Yes.

 2        Q      And did you ever hear the name John Doe,

 3   referring to the John you described as John?

 4        A      No.  Not John Doe.

 5        Q      Did you -- how well did you know John?

 6        A      He was a regular customer at Y.L. Childs.

 7        Q      He was a regular customer.  What do you mean by

 8   that?

 9        A      He was in there.  He was in there often.  He was

10   on the dart league.

11        Q      How many times a week, would you say?

12        A      That, I'm not sure, because I wasn't there every

13   night.  I was only there Friday nights and occasionally on

14   Tuesdays.

15               MR. CHAMBERLAIN:  Okay.  Nothing further.

16        Thank you, Judge.

17               THE COURT:  Any redirect, Mr. Biancavilla?

18               MR. BIANCAVILLA:  No.

19               THE COURT:  Thank you.  You may step down.

20               (WITNESS EXCUSED)

21               THE COURT:  Call your next witness, please.

22               MR. BIANCAVILLA:  Penny Shouse.

23

24

25
```

Ms. Shouse - People - Direct                    449

```
1    P E N N Y     S H O U S E,  called as a witness by and on

2         behalf of the People, having been first duly sworn,

3         testified as follows:

4                   THE CLERK:  You may be seated.

5                   THE COURT OFFICER:  In a loud voice, would

6         you give your full name, spelling your last name, and

7         your County of residence.

8                   THE WITNESS:  My name is Penny Lane Shouse,

9         S-H-O-U-S-E.  And I reside in Suffolk County.

10                  THE COURT:  Please get as close to the

11        microphone as you can.

12                  THE WITNESS:  Certainly.

13                  MR. BIANCAVILLA:  May I inquire?

14                  THE COURT:  Yes.

15   DIRECT EXAMINATION

16   BY MR. BIANCAVILLA:

17        Q    Good morning, Miss Shouse.

18        A    Good morning.

19        Q    Thank you for joining us today.

20        A    You're welcome.

21        Q    Miss Shouse, what type of work do you currently

22   do?

23        A    Currently I'm in computer sales.  I also have a

24   job as a bartender one night a week.

25        Q    Where do you tend bar?
```

Kathleen Plaia

1        A      I tend bar at Granny O'Shea's in Farmingdale.

2        Q      How long have you been tending bar at Granny

3    O'Shea's in Farmingdale?

4        A      Almost four years now.

5        Q      And what nights do you presently work at Granny

6    O'Shea's?

7        A      Wednesday evenings only.

8        Q      In April of 2000 were you a bartender at Granny

9    O'Shea's?

10       A      Yes, sir.

11       Q      How many night a week were you a bartender there?

12       A      Four.

13       Q      Did you work Tuesday night, April 11th?

14       A      Yes, I did.

15       Q      Now, do you know Ruth Williams?

16       A      I did, yes.

17       Q      And how long had you known Ruth Williams?

18       A      I had known her for about a year.  I had known

19   her for about a year.

20       Q      Where had you known her from?

21       A      From the bar.

22       Q      Was she a customer at Granny O'Shea's?

23       A      Yes, she was.

24       Q      How often would she come into Granny O'Shea's?

25       A      I would probably say once every three months.

Ms. Shouse - People - Direct                    451

1      Q       So, she wasn't there every night?

2      A       No.

3      Q       Do you remember her being there in the early

4   morning hours of April 12th?

5      A       Yes, I do.

6      Q       All right.  And approximately what time did she

7   come in?

8      A       11:30, midnight, around there.

9      Q       Around then.  Did she come in with anyone?

10     A       She walked in.  And there was a gentleman that

11  followed with her and they had talked, so I suppose, yes,

12  they did come in together.

13     Q       Can you describe him for the jury please?

14     A       Yes.  He was probably about five-seven, simply,

15  he seemed to wear a toupee, an evident toupee.

16     Q       Was it a bad toupee?

17     A       It was a bad toupee.

18     Q       It stood out?

19     A       It stood out, got my attention.

20     Q       How long were they at the bar together?

21     A       I would probably say about fifteen minutes.

22     Q       Did you serve her a drink?

23     A       Yes, I did.

24     Q       What did you serve her?

25     A       I served her a Coors Light, bottle.

1    Q    And did anybody else come into the bar that night

2    around the time when Ruth was there or before?

3    A    Sure.

4    Q    And do you know John Kane?

5    A    Yes, I do.

6    Q    And how long have you known John Kane?

7    A    I have known John from now about three years,

8    three or four years.

9    Q    Did you see him in Granny's that night?

10   A    Yes, I did.

11   Q    Did he come in with anyone or was he by himself?

12   A    He came in with a gentleman.

13   Q    Can you describe the individual you saw John Kane

14   come into Granny's with?

15   A    He was, I would say, about five-ten, maybe

16   five-eleven, wearing a tank top.

17   Q    How about his build?

18   A    Head shaved, stocky, thick, slightly muscular.

19   Q    And you said he had his head shaved?

20   A    Yes, did he.

21   Q    Anything else you notice about him?

22   A    Some tattoos on his arms.

23   Q    Where did you notice the tattoos?

24   A    On his arms.

25   Q    How long was John and this individual at Granny

1   O'Shea's?

2       A    Probably, in between twenty and thirty minutes.

3       Q    Did you see them talking to Ruth Williams at all?

4       A    She wasn't in the bar at the time.

5       Q    Did they come in before Ruth or after Ruth?

6       A    They came in after.

7       Q    And how long were they at Granny O'Shea's?

8       A    They were only there for about twenty or thirty

9   minutes.

10      Q    Were they drinking while they were at Granny

11  O'Shea's?

12      A    Yes, sir.

13      Q    Do you remember what you served them?

14      A    I'm positive I served John Kane a Budweiser.  And

15  almost positive I served the other gentleman an Absolute and

16  tonic.

17      Q    And do you recall about approximately Lee what

18  time they left?

19      A    I would say about one o'clock in the morning.

20      Q    Now, when Ruth left, did she leave with anyone or

21  did she leave by herself?

22      A    I didn't see her leave.  I just saw her Coors

23  Light halfway finished.

24      Q    That was it?

25      A    Yes.

1    Q      Was that the last time you saw Ruth alive?

2    A      Yes, it was.

3           MR. BIANCAVILLA:  Thank you.  I have no

4    further questions for this witness.

5           THE COURT:  Mr. Chamberlain.

6           MR. CHAMBERLAIN:  Thank you, Judge.

7    CROSS-EXAMINATION

8    BY  MR. CHAMBERLAIN:

9    Q      Miss Shouse --

10   A      Shouse.

11   Q      Shouse.  You're a close friend of Ruth's, weren't

12   you?

13   A      No, I wasn't.

14   Q      Well, you knew that Ruth used cocaine, didn't

15   you?

16          MR. BIANCAVILLA:  Objection.

17          THE COURT:  Sustained.

18   Q      Do you know that Ruth used cocaine?

19          MR. BIANCAVILLA:  Objection.

20          THE COURT:  Sustained.

21   Q      Did you use cocaine?

22          MR. BIANCAVILLA:  Objection.  In that period

23   of time.

24          THE COURT:  If we're talking about on that

25   date, I'll permit the question.

1      Q      Were you a cocaine user in and around April of

2   2000?

3                    MR. BIANCAVILLA:  Objection.

4                    THE COURT:  Counsel, come forward.

5                    (Whereupon, the following takes place at the

6   Bench, between the Court and Counsel:)

7                    THE COURT:  Mr. Chamberlain, I wish you would

8   have told me you were going to ask that question.  Now

9   I have to get an attorney for her.  If I knew this

10   before, I would have had an attorney waiting here.

11                    MR. CHAMBERLAIN:  Well, Judge, I don't know

12   who he's calling, whose he's calling in this order.

13                    MR. BIANCAVILLA:  Yes he does.  He has my

14   witness list.

15                    MR. CHAMBERLAIN:  They were not in order.

16                    THE COURT:  Counsel, you know, I wish would

17   you work with each other, because I would like to know

18   these things in advance.  I would like to know motions

19   in limine in advance. I would like to know if we have a

20   special problem.

21                    Obviously, she has constitutional rights here

22   and we need an attorney to represent her immediately.

23                    Is Tammy coming?

24                    THE CLERK:  I told her.

25                    THE CLERK:  Please get Tammy out here.

Kathleen Plaia

1              THE COURT:  We need and 18B attorney.

2              Yes, Mr. Biancavilla.

3              MR. BIANCAVILLA:  Judge, my only point is, if

4      you make inquiry outside the presence of the jury in

5      terms of how she intends to answer that question.

6              THE COURT:  She has a right to be advised by

7      an attorney before she answers the question.

8              MR. BIANCAVILLA:  Okay.  All right.

9              THE CLERK:  We have to break.

10             MS. ROBBINS:  I can't produce one right now.

11     The jury is sitting here.

12             THE COURT:  Let's take a break.

13             (Whereupon, the following takes place in open

14     court:)

15             THE COURT:  Ladies and gentlemen, at this

16     time we're go to break for lunch.  And I ask you to

17     come back here at two p.m..

18             Again, do not discuss the case among

19     yourselves or with anyone else.  Keep an open mind.  Do

20     not form or express any opinions until the entire case

21     is completed.  Do not read or listen to any account of

22     this case, should it be reported in the media.  Do not

23     visit or view any places mentioned.  You are not to

24     permit any party to discuss this case with you or

25     attempt to influence you.  You must promptly report to

Ms. Shouse - People - Cross                    457

1      the Court any violation thereof

2              Have a nice lunch.  We'll see you at two.

3              (Whereupon, the sworn jury and alternates

4      leave the courtroom)

5              THE COURT:  Ask the witness to come back in,

6      please.

7              (Whereupon, Ms. Shouse resumes the witness

8      stand.)

9              THE COURT:  Have a seat.

10             THE WITNESS:  Sure.

11             THE COURT:  Let the record reflect the jury

12     is no longer present.  At this point I'm going to

13     direct that you not talk to anybody about this case

14     until such time as you come back to the witness stand.

15     However, we're going to appoint an attorney to

16     represent you at this point --

17             THE WITNESS:  Okay.

18             THE COURT:  With respect to that last

19     question that was asked.

20             THE WITNESS:  Okay.  So, you're excused now.

21             THE WITNESS:  Certainly.

22             THE COURT:  Two o'clock.

23             THE WITNESS:  Two o'clock today?

24             THE COURT:  Yes.

25             THE WITNESS:  Thank you.

1            (Whereupon, the witness, Ms. Shouse, leaves

2      the courtroom)

3            MR. BIANCAVILLA:  Judge, just so the record

4      is clear and so the court is aware, we have another

5      witness that is going to be testifying this afternoon

6      that Mr. Chamberlain is aware of, had an arrest that

7      occurred during the course of the investigation here.

8      She will be appearing with her attorney this afternoon.

9            THE COURT:  Okay.

10           MR. CHAMBERLAIN:  Can I find out who that

11     attorney is, Judge?

12           THE COURT:  I don't know, Mr. Chamberlain.

13           MR. CHAMBERLAIN:  Does the DA know?

14           MR. BIANCAVILLA:  What relevance is it who

15     the attorney is?  He'll appear here with his attorney.

16           THE COURT:  He hasn't filed a notice of

17     appearance with me nor is he required to at this point.

18           MR. CHAMBERLAIN:  I understand, Judge.  Is

19     this Francine Quinn?

20           MR. BIANCAVILLA:  Yes.

21           THE COURT:  Counsel, see you at two o'clock.

22           MR. CHAMBERLAIN:  Thank you, Judge.

23           (Whereupon, court stands in recess.  There is

24     a luncheon recess taken in the proceedings.  The trial

25     is adjourned until two o'clock p.m.)

1              A F T E R N O O N    S E S S I O N

2          THE CLERK:  Come to order, please.  This is

3     case on trial continues.  All parties are present.

4     Jurors are not present at this time.

5          People ready?

6          MR. BIANCAVILLA:  Ready.

7          THE CLERK:  Defendant ready?

8          MR. CHAMBERLAIN:  Defendant ready.

9          THE COURT:  When we adjourned before lunch

10    there was a question that Mr. Chamberlain you made with

11    respect to the witness's, the witness's use of cocaine.

12    I at that point sustained the objection and said that I

13    would not permit you to testify.  Now, would you like

14    to make a record with respect to that?

15          First of all, let me preface it by saying, I

16    will permit you, and let me read something into the

17    record here.

18          MR. CHAMBERLAIN:  Fine, Judge.

19          THE COURT:  Now, in the case of People versus

20    Knatz, 76, AD2d, 889, the Appellate Division found this

21    was error to limit cross-examination under certain

22    limited reasons.

23          Now, what they said here was that it was a

24    further error concerning the decoy's -- the witness in

25    that case -- testimony, the Court's restriction of

1    defendant's cross-examination concerning the decoy's

2    use of heroin or other drugs on the morning of Flynn's

3    death and her use of heroin or methadone on the day in

4    which she testified at trial.  The decoy's drug use at

5    the specific times, which her ability to perceive and

6    recollect were most in question, was a relevant issue

7    and defense counsel should have been allowed to fully

8    explore.

9         It cites Court of Appeals case People versus

10   Freeland, 36, NY2d, 518 and 525.

11        Mr. Chamberlain, I will permit you, as I told

12   you in a conference with you and Mr. Biancavilla, that

13   I will permit you to specifically ask with respect to

14   those two areas as to today or the day before, and as

15   well as on the date in question, which was April 11th

16   and April 12th.

17        I will not permit you to ask questions with

18   respect to the defendant's (sic) use of cocaine at any

19   other time, date and place.

20        Now, I want to ask you at this time,

21   Mr. Chamberlain, do you have a good faith basis for

22   making such -- asking such a question?

23        MR. CHAMBERLAIN:  Yes, Judge.  Thank you.

24        As I indicated in chambers, I believe I have

25   a very good faith basis for these questions.  It's not

Kathleen Plaia

1   just this witness's credibility.  It's not just

2   Mr. Kane's credibility.  Although, certainly, that is

3   central to this case.  It is Mr. Kane -- this witness

4   was put on, who, among other things, and along with

5   other witnesses, to establish the relationship of the

6   various parties to each other.  And she indicated that

7   some evidence of that relationship, who knew who and

8   whatever.  I believe I should be allowed to inquire

9   into her knowledge of Kane being a drug dealer.

10          We have had -- and I have a good faith basis

11   for that.  There are two witnesses who testified

12   in-camera before Judge Honoroff, that Kane was a drug

13   pusher in that area at that time.  I have other

14   witnesses who have so indicated.  I have somebody that

15   has indicated this witness, if questioned, would claim

16   the Fifth.  I have evidence that this witness was a

17   party not only that got drugs from Kane, or John Doe as

18   he was known, but she partied, she used cocaine with

19   the victim who also got drugs from John Doe.

20          THE COURT:  What you're trying to do is to

21   impeach the credibility of a witness who hasn't

22   testified yet.  That I will not let you do until such

23   time as that witness has testified.  If that witness

24   has testified and, for example, will say, for argument

25   sake, I don't know what you're talking about, I never

1   possessed cocaine, I never sold cocaine, I never had

2   anything to do with cocaine.  Then, of course, you

3   certainly have ample fodder for cross-examination.

4   Plus, you certainly have an absolute right to bring in

5   any witness you want on your case.

6            MR. CHAMBERLAIN:  Well, Kane -- as I

7   indicated in chambers, Kane has already testified under

8   oath that he didn't sell cocaine.  So, I have a

9   credibility issue there.

10           But, it's just not credibility.  I'm entitled

11  through witnesses that have been produced by the People

12  to establish what they know about the relationship

13  between the victim and somebody who claims he was right

14  there and then cleaned up after an alleged murder that

15  he claims happened the way he claims it happened.

16           I'm entitled I think to bring out --

17           THE COURT:  Mr. Chamberlain, I'm not

18  preventing you from doing it, only, at the right time

19  is when you should do it.

20           MR. CHAMBERLAIN:  What you're saying, Judge,

21  I have to call this witness back to testify at some

22  future time as to the relationship between Kane and the

23  victim?

24           THE COURT:  You keep using the word

25  relationship.  What do you mean by the word

Proceedings                                       463

1          "relationship," Mr. Chamberlain?

2                    MR. CHAMBERLAIN:  I mean, drug relationship.

3                    First of all, Kane in his statement said he

4          had a prior sexual relationship with the victim.  He

5          had a sexual encounter that -- the night of the

6          victim's murder.  I believe there will be evidence that

7          there was a drug transaction going on that night.

8                    THE COURT:  You're now talking about two

9          different lines of questioning, Mr. Chamberlain.  One

10         line of questioning, I don't have a problem with, with

11         respect to the sexual relationship, as you put it.

12                   However, with respect to the drug relation, I

13         have a big problem.  And as I said before, I will

14         permit you to cross-examine her, as the case here said,

15         that I read into the record.  They find that to be very

16         relevant, I certainly do too.  I will permit you with

17         respect to questions with respect to prior to today or

18         even this morning or any -- or at any time within the

19         last day or so.  I will also permit you any time within

20         a day or so of April the 11th and April 12th of 2000.

21                   However, the balance of the questions I think

22         are not relevant at this point and I will not permit

23         you.

24                   Mr. Biancavilla, anything you wish to say?

25                   MR. BIANCAVILLA:  Judge, I would just like to

Kathleen Plaia

1    know, based on the parameters of the limits of your

2    ruling, if Mr. Favalle could set forth on the record

3    what his intention is going to be with respect to those

4    specific questions.

5         THE COURT:  All right.  I will do that.

6    First thing I must do, I'm going to appoint Michael

7    Favalle pursuant to County Law 18B to represent the

8    witness here, Penny Shouse.

9         Mr. Favalle.

10        MR. FAVALLE:  Yes, your Honor.

11        THE COURT:  Now, could you tell us at this

12   point if your client should be asked the question as to

13   whether on May the 6th or May the 7th she used cocaine,

14   how --

15        MR. BIANCAVILLA:  Of 2002.

16        THE COURT:  Yes, of 2002, how she would

17   respond to that question?

18        MR. CHAMBERLAIN:  Judge, I'm going to ask

19   that be done on the record.

20        MR. BIANCAVILLA:  It is on the record.

21        MR. CHAMBERLAIN:  No, I don't mean -- I mean

22   in front of the jury, with the witness, not in this

23   fashion.

24        MR. BIANCAVILLA:  Judge, I'm waiting to see

25   what the response is, I will fashion my response --

1        MR. CHAMBERLAIN:  I know you're waiting.  But

2    I don't think this is a proper way to do it.

3        THE COURT:  I'm not saying it shouldn't be

4    done on the record, Mr. Chamberlain.  I'm asking

5    Mr. Favalle at this point, so we will know what will

6    happen, so we are not acting in the dark here.

7        MR. FAVALLE:  If your question, your Honor,

8    will be --

9        THE COURT:  It will be Mr. Chamberlain's

10   question.

11       MR. FAVALLE:  I understand that.  Your

12   question to me, do I know what her answer would be to

13   that?

14       THE COURT:  Yes.

15       MR. FAVALLE:  I do know what her answer will

16   be.  Again, if you want me to tell you what the answer

17   will be, I can do that.

18       MR. BIANCAVILLA:  My question will be, will

19   he be advising her to invoke her Fifth Amendment right

20   with respect to that specific question?

21       MR. FAVALLE:  To cocaine use today or

22   yesterday, she would not.

23       THE COURT:  With respect to April the 11th

24   and April 12th of 2000, would she be invoking her

25   constitutional rights?

Kathleen Plaia



1          MR. FAVALLE:  I would need to hear the exact

2    question.

3          THE COURT:  All right then, we'll have to do

4    it.

5          MR. BIANCAVILLA:  No.  That's what I'm trying

6    to avoid.

7          MR. CHAMBERLAIN:  For the record, I

8    respectfully except to the Court's ruling.  I would

9    like to go ahead and ask the question.

10         MR. BIANCAVILLA:  Judge --

11         THE COURT:  Yes, Mr. Biancavilla.

12         MR. BIANCAVILLA:  What I will do at this

13   point, I will set forth on the record that the People

14   will not use for any purposes whatsoever the testimony

15   or information derived from Penny Shouse with respect

16   to the question of whether or not she used cocaine on

17   April 11th or April 12th of 2000.

18         THE COURT:  So, you're offering her immunity?

19         MR. BIANCAVILLA:  I'm saying, we will not use

20   her testimony for whatever purpose whatsoever for her

21   cocaine use, if, in fact, she did use any, on April

22   11th, April 12th.  If she says, I don't recall, I don't

23   recall.  If that's what her answer is going to be, then

24   the People will not use any -- use the testimony

25   against her; nor, if she says, yes, I did, we will not

1   use that testimony, for any purposes whatsoever.

2            THE COURT:  So, at this point, Counsel, what

3   I'm going to do is, I'm going to have the witness come

4   back in and I will ask Mr. Chamberlain to ask those

5   questions and we'll see what her response is.  We don't

6   know what question Mr. Chamberlain, as Mr. Favalle

7   said, he would have to hear the question.

8            MR. CHAMBERLAIN:  We're going to do this in

9   front of the jury, Judge?  Because I'm not --

10            THE COURT:  Yes, will do it in front of the

11   jury.

12            MR. FAVALLE:  If I may, based on the

13   Assistant District Attorney's statement on the record

14   now, I would need a moment to speak to my client.

15            THE COURT:  Yes.

16            MR. CHAMBERLAIN:  Judge, I would -- I would

17   respectfully suggest that even if she claims that she's

18   given immunity, I have a right to have that brought

19   out.

20            MR. BIANCAVILLA:  You can ask her.  You can

21   put it on the record that I just said we won't use

22   anything she says regarding her drug use, that's fine.

23            THE COURT:  You can do that.

24            MR. BIANCAVILLA:  That's fine.  I have no

25   problem with that.  I will ask her --

1      THE COURT:  Mr. Favalle, do you want a

2  moment?

3      MR. FAVALLE:  Yes, please.

4      (Whereupon, there is a brief pause in the

5  proceedings)

6      THE COURT:  Mr. Favalle.

7      MR. FAVALLE:  Yes, your Honor.

8      THE COURT:  Have you had an opportunity to

9  speak to your client?

10     MR. FAVALLE:  I have, your Honor.

11     THE COURT:  And based on what you have heard

12  on the record, what is your -- do you wish to tell me

13  at this point?

14     MR. CHAMBERLAIN:  I would appreciate if we

15  could have the witness brought in, in front of the jury

16  and not go back and forth as to all of these.  I don't

17  think -- I object to this.

18     THE COURT:  Mr. Chamberlain, this is done

19  outside the jury -- it depends on my ruling -- at this

20  point.

21     MR. CHAMBERLAIN:  You already ruled, Judge.

22     THE COURT:  No.  Based upon the -- for lack

23  of a better word -- immunity, as Mr. Biancavilla said,

24  he would not use it against Miss Shouse if she should

25  testify that she used cocaine on that date or within a



1    day or two before, I asked Mr. Favalle to go outside

2    and speak to his client, which he has, and he's back

3    there to respond.

4                    Mr. Favalle.

5                    MR. FAVALLE:   I have advised my client that,

6    again, depending on the precise question, she should

7    testify truthfully as to any cocaine unsage on the two

8    dates in question.

9                    MR. BIANCAVILLA:   That's fine, Judge.

10                   THE COURT:   We'll give her immunity for those

11   two dates.

12                   Okay.  And, certainly, Mr. Chamberlain, you

13   can cross-examine her with respect to the People giving

14   immunity to Miss Shouse.

15                   MR. CHAMBERLAIN:   Respectfully except, your

16   Honor.

17                   THE COURT:   You have an exception.

18                   (Whereupon, the witness, Penny Shouse,

19   resumes the stand to continue cross-examination

20   testimony as follows, having been previously duly sworn

21   by the Clerk of the Court.)

22                   (Whereupon, Mr. Michael Favalle is standing

23   next to the witness, Ms. Shouse, at the witness stand.)

24                   THE COURT OFFICER:   Jury entering.

25                   (Whereupon, the sworn jury and alternates

```
1        enter the courtroom)

2              THE CLERK:  Both sides stipulate that all

3    sworn jurors are present and seated properly?

4              MR. BIANCAVILLA:  So stipulated.

5              MR. CHAMBERLAIN:  So stipulated.

6              THE CLERK:  Miss Shouse, you're reminded

7    you're still under oath.

8              THE COURT:  Good afternoon, ladies and

9    gentlemen.  I'm sorry for the delay, but there were

10   some arguments we could not have done in your presence.

11   But we're ready to proceed now.

12              Also, ladies and gentlemen, the gentleman

13   standing next to the witness is Mr. Michael Favalle who

14   is the attorney for the witness.

15              Mr. Chamberlain.

16   CROSS EXAMINATION CONTINUED

17   BY MR. CHAMBERLAIN:

18        Q    Miss Shouse, when we broke before, you recall

19   there was a question I had asked you about prior drug use.

20   Do you recall the question?

21        A    Could you repeat it, please.

22        Q    Do you recall the question when we broke?

23        A    That's what I'm asking.  Could you repeat the

24   question, please?

25        Q    I'm going to --
```

Ms. Shouse - People - Cross                    471

```
 1              THE COURT:  Mr. Chamberlain, I think the

 2      witness doesn't recall.  She asked you to repeat the

 3      question.

 4      Q       I'm sorry.  Let me limit the question to this,

 5   Miss Shouse.

 6              Directing your attention to the period of on or

 7   about April 11th or 12th, about the time of the murder of

 8   Ruth Williams, were you in possession or did you use any

 9   cocaine in that period of time?

10      A       I do not recall.

11      Q       And you realize that you have now been given

12   immunity by the district attorney whether or not you answer

13   yes or no?

14      A       Yes, I do realize that.

15      Q       You have just been so advised.  And not

16   withstanding that advise, you cannot tell us whether you did

17   or did not?

18      A       I cannot recall that.

19      Q       During that period of time, that approximate

20   period of time, did you get any -- was John, the person you

21   described as John, now known to you as John Kane, did he

22   supply cocaine to you?

23              MR. BIANCAVILLA:  Objection.

24              THE COURT:  Sustained.

25      Q       On or about April 11th or April 12th, did John
```

1    Kane supply cocaine to you?

2              MR. BIANCAVILLA:  Objection.

3              THE COURT:  Sustained.

4              THE COURT:  Come forward.

5              Please, step down.

6              (Whereupon, the following takes place at the

7    Bench, between the Court and Counsel.)

8              THE COURT:  With respect to Miss Shouse

9    herself, I permitted you to ask the question with

10   respect to on or about April 11th and 12th of 2000,

11   and, of course, with respect to May 6th and 7th of

12   2002.

13             Now, with respect to -- with respect to the

14   witness who has not testified yet, Mr. Kane, I

15   specifically said that you should not go into that and

16   wait until he testifies.

17             MR. CHAMBERLAIN:  This is, as I said, Judge,

18   I thought I was limited to that area.  But it's a

19   question of the relationship between her and the

20   witness and also the relationship between her and the

21   victim.  And based on that, I thought I was limited to

22   that area, but just as to those items.

23             THE COURT:  I specifically told you,

24   Mr. Chamberlain, that you would be able to

25   cross-examine Mr. Kane at the time when he's placed on

1    the witness stand by the People.  And depending on, of

2    course, what type of responses he gives you, you

3    certainly could cross-examine him with respect to that

4    information.  If he denies it, you have an absolute

5    right to bring this witness back and ask those

6    questions.

7           MR. CHAMBERLAIN:  So I don't do this again,

8    Judge, and come up here again, I intend to ask this

9    person whether at the about that time, those dates, she

10   partied with or used cocaine with Ruth Williams, who is

11   not going to testify.

12          THE COURT:  Mr. Biancavilla?

13          MR. BIANCAVILLA:  What's the relevancy of

14   that?

15          THE COURT:  I'm not sure there is relevancy

16   either.

17          MR. BIANCAVILLA:  I'm going to object.

18          MR. CHAMBERLAIN:  Well, the relationship

19   between her and Ruth Williams or she knew that Ruth

20   Williams got cocaine from John Kane in that time frame,

21   and her -- the relationship between the victim and Kane

22   is crucial.

23          MR. BIANCAVILLA:  It's irrelevant.

24          THE COURT:  Ruth Williams.

25          MR. CHAMBERLAIN:  Ruth Williams isn't the

 1    witness here.  It's not her credibility.  It's a

 2    question of the relationship.

 3                    THE COURT:  Mr. Biancavilla.

 4                    MR. BIANCAVILLA:  It's irrelevant.

 5                    MR. CHAMBERLAIN:  It's not irrelevant.

 6                    MR. BIANCAVILLA:  Whether or not she partied

 7    with Ruth Williams is irrelevant --

 8                    THE COURT:  It's --

 9                    MR. BIANCAVILLA:  To the issues in this case.

10                    THE COURT:  I agree with you, with respect to

11    that, it's irrelevant.  Especially with respect to Ruth

12    Williams, the decedent in this case.  I don't see the

13    relevance there at all.  It has nothing -- I see plenty

14    of relevance, I told you, at the proper time you can

15    ask questions with respect to it, with respect to

16    Mr. Kane.  And I'm sure you will.

17                    MR. CHAMBERLAIN:  There is testimony about

18    Ruth Williams' background, her activities, her

19    relationship with Kane already in this case.  For me --

20    and this person has given statements.  She had already

21    testified that she knew Ruth well and she also knew

22    Kane -- she knew John since she started working at the

23    bar for a number of years.

24                    THE COURT:  Okay.

25                    MR. CHAMBERLAIN:  There's already testimony

Kathleen Plaia

1   in the case about the relationship.  I think I should

2   be able to go into that relationship.

3                    THE COURT:  I see no relevance.

4                    MR. CHAMBERLAIN:  She knows these people.

5                    THE COURT:  I do not see any relevance

6   whatsoever with respect to whether Ruth Williams

7   partied -- as you put it -- with this witness.  I don't

8   see the relevancy.  The question is, it's totally

9   relevant, as I placed on the record and I permitted you

10  to cross-examine those two time periods, it's totally

11  relevant with respect to the witness's ability to

12  perceive what was going on those two dates or being

13  able to testify at this point, now, as to whether she

14  was under the influence of some sort of drug or not

15  today.  I permitted you to do that.

16                   MR. CHAMBERLAIN:  Isn't it relevant as to

17  what the victim was doing on April 11th or April 12th?

18  It's relevant as to what the victim's condition,

19  whether she was intoxicated or whatever.

20                   MR. BIANCAVILLA:  He can ask her that.  He

21  can ask her that.

22                   MR. CHAMBERLAIN:  No.  Well, I'm going to ask

23  her.  You're limiting it to those two dates.  I'm

24  entitled to ask her whether she knows the victim had

25  cocaine on April 11th or 12th.

Kathleen Plaia

Ms. Shouse - People - Cross                    476

1          THE COURT:  If she observed her.

2          MR. CHAMBERLAIN:  Fine.

3          THE COURT:  Not if she had it.  You have to

4     phrase your question properly and I'll permit the

5     question to be asked.

6          MR. BIANCAVILLA:  That's all.

7          (Whereupon, the following takes place in open

8     court:)

9          THE COURT:  Mr. Chamberlain.

10          MR. CHAMBERLAIN:  Thank you, Judge.

11  CROSS-EXAMINATION CONTINUED

12  BY MR. CHAMBERLAIN:

13     Q    Miss Shouse, I'm directing your attention back to

14  the limited period of April 11th and April 12th.  At that

15  period of time you had known John, the person you described

16  here, since, for how long?

17     A    About a year and-a-half.

18     Q    Was that since you started working at Granny's?

19     A    Approximately.

20     Q    And what about Ruth, you knew Ruth Williams, the

21  victim?

22     A    I knew of her about, probably about a year

23  and-a-half also.

24     Q    Now, directing your attention to the period of

25  April 11th or April 12th, did you, as you sit -- did you at

Kathleen Plaia

Ms. Shouse - People - Cross                477

1    any time observe Ruth Williams possess or use cocaine on

2    those evenings, if you can recall?

3         A     No, I cannot.  No, I did not.  No, I did not.  I

4    can recall, I did not ever see her use.

5         Q     On those occasions?

6         A     Never.

7         Q     You indicated before that you were at Granny's

8    and you saw some people come in?

9         A     Was that a question, I'm sorry?

10        Q     Yes, ma'am.  Did Ruth come in to Granny's

11   sometime that evening?

12        A     Yes, she did.

13        Q     Was that about midnight?

14        A     It was just around midnight, yes.

15        Q     Was she with a male white?

16        A     I saw them come in together, following each

17   other.  I don't know if, I -- I assume they were together.

18        Q     Did you see them leave?

19        A     I didn't see Ruth leave.

20        Q     The male white you saw with her there was not

21   this defendant, is that right?

22        A     No.

23        Q     Now, did you see the man you described as John

24   come into Granny's that night?

25        A     Yes.

Kathleen Plaia

1    Q    Was that before or after ruth left?

2    A    That was after Ruth left.

3    Q    And you saw the person sitting here in front of

4    you come in also?

5    A    Yes, I did.

6    Q    And did you serve him a drink?

7    A    Yes, I did.

8    Q    And what did you serve him?

9    A    If I recall correctly, it was an Absolute and

10   tonic.

11   Q    Not beer?

12   A    Not beer.

13   Q    And, Miss Shouse, were you engaged to Bill DeLuso

14   at that point in time?

15   A    No, we were not engaged at that time.

16   Q    Are you engaged now?

17        MR. BIANCAVILLA:  Objection.

18        THE COURT:  I'm not sure what the relevancy

19   of that is.

20        MR. CHAMBERLAIN:  He's another witness here,

21   Judge.  I'm just asking.

22        THE COURT:  You can ask --

23        MR. CHAMBERLAIN:  All right, withdrawn.

24   Q    Did you drive Mr. DeLuso from Granny's to Y.L.

25   Childs?

1    A      Yes, I did.

2    Q      Did you go in Y.L. Childs?

3    A      No, I did not.

4    Q      Do you know of a gentleman by the name of

5    Christian, a bouncer at the Downtown at that time?

6             MR. BIANCAVILLA:  Objection.

7             THE COURT:  Overruled.

8    Q      Do you know a Christian, a bouncer at the

9    Downtown?

10   A      I knew of him.

11   Q      Fellow by the name of Charles Bald, do you know

12   him?

13   A      I do now.  I didn't at the time.

14            MR. CHAMBERLAIN:  Thank you, Miss Shouse.

15            THE COURT:  Redirect, Mr. Biancavilla?

16            MR. BIANCAVILLA:  None, Judge.

17            THE COURT:  Thank you, Miss Shouse.  You may

18       step down.

19            THE WITNESS:  Thank you.

20            THE COURT:  Thank you Mr. Favalle.

21            MR. FAVALLE:  You're welcome.

22            (WITNESS EXCUSED

23            THE COURT:  Please call your next witness.

24            MR. BIANCAVILLA:  Gerry Connell.

25

Kathleen Plaia

```
 1    G E R A R D    C O N N E L L,  called as a witness by and on

 2         behalf of the People, having been first duly

 3         sworn, testified as follows:

 4                   THE CLERK:  Please be seated.

 5                   THE COURT OFFICER:  Please state your name,

 6         spelling your last name and the town in which you

 7         reside.

 8                   THE WITNESS:  Certainly.  Gerard Connell.

 9         C-O-N-N-E-L-L, kings County.

10                   MR. CHAMBERLAIN:  May we approach, Judge?

11                   THE COURT:  Yes.

12                   THE COURT:  Can you step down?

13                   (Whereupon, the following takes place at the

14         Bench, between the Court and Counsel:)

15                   THE COURT:  Yes, Mr. Chamberlain.

16                   MR. CHAMBERLAIN:  He's on the People's

17         witness list that we got at the beginning of the trial.

18         He's not on the list for today.  I had no idea.  I'm

19         not prepared on this witness because --

20                   MR. BIANCAVILLA:  He works for the phone

21         company.

22                   MR. CHAMBERLAIN:  Pardon me?

23                   MR. BIANCAVILLA:  He works for the phone

24         company.  He's going to put phone records in.

25                   MR. CHAMBERLAIN:  Okay.
```

1              MR. BIANCAVILLA:   I wouldn't do that to you,

2      John.

3              (Whereupon, the following takes place in open

4      court:)

5              THE COURT:   You may inquire.

6              MR. BIANCAVILLA:   Thank you.

7   DIRECT EXAMINATION

8   BY MR. BIANCAVILLA:

9      Q     Good afternoon, Mr. Connell.

10     A     Good afternoon, sir.

11     Q     Would you tell the jury where you're employed?

12     A     Verizon Communications, formerly Bell Atlantic.

13     Q     What is your position?

14     A     Staff Director, Corporate Security, Custodian of

15   the Records.

16     Q     And what are your responsibilities in that

17   position?

18     A     As custodian of the records, I testify in court

19   as to the authenticity of subpoenaed Verizon, Bell Atlantic

20   records, and to assist in their interpretation.

21             MR. BIANCAVILLA:   I'm going to ask that these

22     two documents be marked as People's 6 and People's 7

23     for identification.

24             (Whereupon, the referred to item is received

25     and marked People's Exhibits 6 and 7 for identification

1     evidence by the reporter as instructed)

2               THE COURT OFFICER:  People's 6 and 7 marked

3     for identification.

4               MR. BIANCAVILLA:  Please show them to the

5     witness.

6     Q     Mr. Connell, you're being shown what has been

7     marked as People's 6 and 7 for identification.  Do you

8     recognize those documents?

9     A     Yes, sir, I do.

10    Q     What do you recognize those documents to be?

11    A     The first document, Exhibit 6 is subscriber

12    records for a particular customer.  And the second exhibit,

13    Exhibit 7, is what is known as LUDS, local usage details,

14    records of calls made from this customer to a particular

15    number.

16    Q     Now, is information contained in those documents

17    kept in the regular course of business of Verizon

18    Communications?

19    A     Yes, they are.

20    Q     Is it the regular course of business of Verizon

21    Communications to keep such records?

22    A     Yes, it is.

23    Q     Is the information contained within those records

24    placed in those records at or about the time that the

25    incident occurs?

Mr. Connell - People - Direct                483

1      A       Yes, it is.

2              MR. BIANCAVILLA:  We would offer those two

3      documents at this time.

4              THE COURT:  Please show them to

5      Mr. Chamberlain.

6              MR. CHAMBERLAIN:  Short voir dire, Judge.

7              THE COURT:  Certainly.

8   VOIR DIRE EXAMINATION

9   BY MR. CHAMBERLAIN:

10     Q       Mr. Connell, I take People's 6 is a record of the

11     subscriber's account, is that correct?

12     A       Yes, sir, the customer.

13     Q       Is it one page, that record?

14     A       Yes, sir.

15     Q       Could you -- there are a lot of symbols on here

16     that I presumably are unique to the telephone company record

17     keeping system.  Could you explain what this document would

18     purport to show in general?

19             MR. BIANCAVILLA:  Objection.

20             THE COURT:  Actually that's more apt for

21         cross-examination, Mr. Chamberlain, those questions.

22     Q       Does this indicate a billing record, bill, for

23     that account?

24     A       What this indicates, sir, is who has that

25     account, the telephone number, the name, and the address

Kathleen Plaia

Mr. Connell - People - Direct                    484

1    where service is located.

2         Q    I see.  That's People's 6?

3         A    Yes, sir.

4         Q    People's 7 is what?

5         A    What People's 7 is, is a copy of the LUDS, the

6    LUDS, local usage details for that particular account, which

7    would indicate any calls that were made from that Exhibit

8    6's number, outgoing, that were made, completed and billed.

9         Q    Would it indicate the dates?

10        A    Yes, it does.  The date and the time, sir, and

11   what number was called.

12                  MR. CHAMBERLAIN:  Okay, no objection.

13                  THE COURT:  Mark them in evidence, please.

14                  THE COURT OFFICER:  So marked.

15   DIRECT EXAMINATION CONTINUED

16   BY MR. BIANCAVILLA:

17        Q    Now, Mr. Connell, referring to People's Exhibit

18   6 --

19        A    Yes, sir.

20        Q    Could you tell the jury what phone number is

21   indicated in People's Exhibit 6?

22        A    Area code is 516-753-1170.

23        Q    And the subscriber information indicated in that

24   record for that particular phone?

25        A    Certainly.  The customer's name is Ruth Williams.

Kathleen Plaia

Mr. Connell - People - Direct                485

1    W-I-L-L-I-A-M-S.   The location is 196 Main Street,

2    Farmingdale, New York, 11735-2618.

3        Q    Now, Mr. Connell, with respect to People's

4    Exhibit 7, could you just briefly, again, explain to the

5    jury what is contained in that document?

6        A    What this document is, this is the LUDS, the

7    local usage detailed.  What it shows is what calls were

8    made, outgoing, from 516-753-1170, that were made, completed

9    and billed on a specific date, at a specific time.

10       Q    Now, that particular record, People's Exhibit 7,

11   is that particular record for a particular date?

12       A    Yes, sir, it is.

13       Q    What is the particular date?

14       A    It's April 12th of the year 2000.

15       Q    Now, were there any phone calls from that

16   particular phone number on April 12th of 2000?

17       A    Yes, sir.

18       Q    And what time was the phone call?

19       A    The phone call was made at four a.m. on the 12th.

20       Q    And where was the phone call made to?

21       A    It was made to directory assistance,

22   516-555-1212.

23       Q    That was at four a.m.?

24       A    Yes, sir.

25       Q    And was the call completed?

Mr. Connell - People - Cross                    486

1    A     Yes, sir.

2    Q     Now, is there an indication in that particular

3 record what information was being requested?

4    A     No, sir.

5    Q     There is not.  Was there any other phone calls

6 made from the telephone of Ruth Williams on April 12th of

7 the year 2000?

8    A     No, sir.

9    Q     The only one phone call at four a.m.?

10    A     Yes, sir.

11          MR. BIANCAVILLA:  Thank you very much.  I

12 have no further questions.

13          THE COURT:  Mr. Chamberlain,

14 cross-examination?

15          MR. CHAMBERLAIN:  Just a second, Judge.  If I

16 may.

17          THE COURT:  Of course.  Take your time.

18          MR. CHAMBERLAIN:  May I see People's, 7.

19 Please.

20          THE COURT:  Yes.

21 CROSS-EXAMINATION

22 BY MR. CHAMBERLAIN:

23    Q     Mr. Connell, I'm going to show you some other

24 records that appear to be computer records from the

25 telephone company and ask you if I'm correct about that.

Kathleen Plaia

1          THE COURT:  Would you like those marked,

2     Mr. Chamberlain?

3          MR. CHAMBERLAIN:  If you would, yes, Judge.

4     I would like to have pages 16 through 18 marked, of

5     this.

6          THE COURT:  As one exhibit?

7          MR. CHAMBERLAIN:  As one exhibit.

8          THE COURT:  All right.

9          MR. BIANCAVILLA:  If I could ask

10    Mr. Chamberlain what he's referring to so I can pull

11    the exhibit.

12         THE COURT:  Yes, Mr. Chamberlain.

13         MR. CHAMBERLAIN:  The record we supplied as

14    Rosario material.

15         THE COURT:  There's a page number.

16         MR. BIANCAVILLA:  There should be an exhibit

17    number.

18         MR. CHAMBERLAIN:  Pages 16, 17 and 18.

19         MR. BIANCAVILLA:  There should be an exhibit

20    number.

21         MR. CHAMBERLAIN:  At the beginning of that

22    there would be an exhibit number.  It's part of the

23    middle exhibit.

24         (Whereupon, the referred to item is received

25    and marked for identification as Defendant's Exhibit A

Mr. Connell - People - Cross                    488

1    for Identification by the reporter as instructed)

2              THE COURT OFFICER:  Defendant's A marked for

3    identification.

4              THE COURT:  Mr. Chamberlain, do you have a

5    question?

6              MR. CHAMBERLAIN:  I think he's still reading

7    the record, Judge.

8              THE COURT:  Well --

9    Q    Mr. Connell, are you ready?

10   A    Yes, sir.

11   Q    Can you identify what those pages refer to?

12   A    No, sir, I cannot.  I'm not familiar with this

13   format at all.

14   Q    They are telephone company records, but you're

15   not familiar with them?

16             MR. BIANCAVILLA:  Objection, that wasn't his

17   answer.

18             THE COURT:  That's a compound question.  You

19   can ask the --

20   Q    Are they telephone company records?

21   A    There's telephone numbers.  But I can't verify

22   whether it's an official document.

23   Q    Exhibit 7 seems to indicate phone calls that were

24   made from the apartment, is that correct?

25   A    Yes.  That's the one that you have, right.  Fine,

Kathleen Plaia

1    yes.  That's the one where a call was made from that 516

2    number on April 12th, 2000, at four a.m., to directory

3    assistance.

4          Q     Information?

5          A     Yes.

6          Q     You wouldn't have any records as to whether that

7    phone call was completed or whose request it was made, there

8    wouldn't be any records, would there?

9          A     The phone call was complete, otherwise it

10   wouldn't be appearing on the LUDS.  It's a billable call.

11   As far as the records are concerned, no.  As to what

12   information was given out, no.

13         Q     Aren't the records I have just showed you records

14   of phone calls made into the apartment after this time?

15         A     Into the apartment?

16         Q     Yes?

17         A     I -- those are strictly outgoing that you're

18   looking at, that one.

19         Q     This is outgoing?

20         A     Outgoing.

21         Q     I understand.

22         A     This particular -- I can't say one way or the

23   other, sir.  I'm not familiar with this format.

24               MR. CHAMBERLAIN:  Rosario material, Judge,

25         indicates that they were telephone company records.

1          MR. BIANCAVILLA:  They're not telephone

2     company records, Judge.

3          MR. CHAMBERLAIN:  Pardon me?

4          MR. BIANCAVILLA:  Judge, may we approach?

5          THE COURT:  Yes, come forward.

6          You can step down.

7          THE WITNESS:  Certainly, your Honor.

8          (Whereupon, the following takes place at the

9     Bench, between the Court and Counsel:)

10          THE COURT:  Yes, Counsel?

11          MR. CHAMBERLAIN:  Exhibit 32 appears to be

12     phone track records.

13          MR. BIANCAVILLA:  What does it say on the

14     right side, John?

15          THE COURT:  By Detective Sacks.

16          MR. BIANCAVILLA:  What does it say on the

17     right side of the exhibit list?

18          MR. BIANCAVILLA:  For Rosario use material

19     Exhibit 32.

20          THE COURT:  Homicide Squad.

21          MR. BIANCAVILLA:  Thank you.

22          MR. CHAMBERLAIN:  It says Ruth Williams.

23          MR. BIANCAVILLA:  Look at number 32.  32 is

24     what he's referring to.  That is a computer software

25     program that the homicide squad uses.  It's not a phone

1      company record.

2                  THE COURT:  It should explain why the witness

3      doesn't recognize the document.

4                  MR. CHAMBERLAIN:  I guess so.  They appear to

5      be telephone records.

6                  THE COURT:  I agree with you, it's got

7      telephone numbers on.  It doesn't make them telephone

8      records.

9                  MR. CHAMBERLAIN:  You know if the witness

10     doesn't recognize them, he doesn't recognize them.

11                 THE COURT:  Anything further, Counsel?

12                 MR. CHAMBERLAIN:  No.  Not with this witness.

13                 (Whereupon, the following takes place in open

14     court:)

15                 THE COURT:  Mr. Chamberlain.

16                 MR. CHAMBERLAIN:  Nothing further.

17                 THE COURT:  Any redirect, Mr. Biancavilla?

18                 MR. BIANCAVILLA:  No, Judge.

19                 THE COURT:  Thank you, Mr. Connell.

20                 THE WITNESS:  Thank you, your Honor.

21                 MR. CHAMBERLAIN:  Judge, if I may.  Just to

22     clear the record.

23                 THE COURT:  One moment.

24                 MR. CHAMBERLAIN:  May I ask the witness --

25                 THE COURT:  You need to -- you have another

1          question of the witness?

2                    MR. CHAMBERLAIN:  Yes.

3                    THE COURT:  Okay.  Have a seat again, sir.

4                    (Whereupon, the witness, Gerard Connell,

5          resumes the stand to continue cross-examination

6          testimony as follows:)

7                    THE WITNESS:  Yes, your Honor.

8                    THE COURT:  Yes, Mr. Chamberlain?

9    CROSS-EXAMINATION CONTINUED

10   BY MR. CHAMBERLAIN:

11        Q     The telephone, can you -- the records I showed

12   you are not telephone company records, is that correct, as

13   far as you know?

14        A     As far as I know, yes.

15        Q     You know of a computer track that can be kept by

16   the police department of in or outgoing calls, of telephone

17   calls?

18                    MR. BIANCAVILLA:  Judge, I'm going to object

19        to that question.

20                    THE COURT:  Well, if he knows.

21                    I'll overrule it.

22        A     I understand that there is a program available,

23   yes.

24        Q     Is that what those records appear to be, as far

25   as you know?

Proceedings                                    493

1          A      I don't really get involved with derivative

2     records.

3                      MR. CHAMBERLAIN:  Nothing further.

4                      Thank you, Mr. Connell.

5                      THE COURT:  Anything further,

6     Mr. Biancavilla?

7                      MR. BIANCAVILLA:  No, Judge.

8                      THE COURT:  Thank you, Mr. Connell.  You can

9     step down.

10                     (WITNESS EXCUSED)

11                     THE COURT:  Mr. Biancavilla, call your next

12    witness.

13                     MR. BIANCAVILLA:  Judge, I'm going to need to

14    approach with Mr. Chamberlain prior to the next

15    witness.

16                     (Whereupon, the following takes place at the

17    Bench, between the Court and Counsel)

18                     THE COURT:  Yes, Mr. Biancavilla.

19                     MR. BIANCAVILLA:  I just wanted to provide

20    you and Mr. Chamberlain with a copy of a stipulation

21    that we have entered into with the attorney of our next

22    witness.

23                     (Whereupon, the referred to document is

24    handed to the Court.)

25                     THE COURT:  So, you are saying,

Kathleen Plaia

1      Mr. Biancavilla, you're not calling the witness?

2                  MR. BIANCAVILLA:  We are calling the witness.

3      We are calling the witness.  This is a stipulation

4      between Francine Quinn and the Office of the District

5      Attorney that she can be cross-examined regarding her

6      pending criminal case.

7                  In other words, after she provided

8      information to the police department, she was arrested

9      while she was a bartender.  Mr. Chamberlain was aware

10     of this during the course of this case.  In fact, he

11     was the one that advised Mr. Dempsey she was arrested

12     for selling drugs at --

13                 THE COURT:  So, it's actually immunity?

14                 MR. BIANCAVILLA:  No, it's not immunity.  We

15     will not use any of her statement.  She is still being

16     prosecuted for the crimes.  We were not taking a

17     position on that prosecution.

18                 Our only stipulation to her is that we will

19     not use anything she says in this particular trial

20     against her in that prosecution.

21                 THE COURT:  Okay.

22                 MR. BIANCAVILLA:  That's what it says, Judge.

23                 MR. CHAMBERLAIN:  That's not exactly what it

24     says.

25                 MR. BIANCAVILLA:  It's exactly what it says.

Kathleen Plaia

1          It is hereby stipulated by and between Dennis Dilon,

2     District Attorney of Nassau County, and Joshua Ketover,

3     Esquire, attorney for the defendant, Francine Quinn,

4     that the People shall not use for any purpose

5     whatsoever the testimony or information derived from

6     Francine Quinn in the trial of People v. Paul Scrimo.

7               THE COURT:  This is in the caption, People

8     versus Francine Quinn, in this case.  The People should

9     not use for any purpose whatsoever the testimony or

10    information derived from Francine Quinn in the trial of

11    People versus Paul Scrimo.  And it's dated May 7th,

12    2002.

13              MR. CHAMBERLAIN:  Judge, I think I'm entitled

14    to know as part of my Rosario any material, anything

15    that led up to this stipulation, any negotiations.

16              MR. BIANCAVILLA:  There is none.  I'm telling

17    him there are no deals.

18              MR. CHAMBERLAIN:  The stipulation is, you're

19    not using the testimony?

20              MR. BIANCAVILLA:  This is the only thing.

21    This is it.  Complete.

22              THE COURT:  You can certainly cross-examine

23    her with respect to that.

24              MR. BIANCAVILLA:  Absolutely.

25              THE COURT:  Based on the People's

Kathleen Plaia

1    representation that there's no -- nothing else.  Then I

2    will just have this marked.

3              MR. BIANCAVILLA:  That's all I'm asking,

4    Judge.

5              THE COURT:  Mark this as a Court Exhibit.

6              MR. CHAMBERLAIN:  Judge, while we're up here.

7              THE COURT:  Yes?

8              MR. CHAMBERLAIN:  Is Miss Quinn going to be

9    the last witness today?

10             THE COURT:  Yes.

11             MR. BIANCAVILLA:  Yes, that's it for today.

12             THE COURT:  We'll discuss tomorrow's

13   witnesses later.

14             MR. BIANCAVILLA:  Fine.

15             (Whereupon, the following takes place in open

16   court:)

17             THE COURT:  Call your next witness,

18   Mr. Biancavilla.

19             MR. BIANCAVILLA:  Francine Quinn.

20             THE COURT OFFICER:  Miss Quinn, remain

21   standing, raise your right hand.

22   F R A N C I N E    Q U I N N,  called as a witness by and on

23        behalf of the People, having been first duly sworn,

24        testified as follows:

25             (Whereupon, Joshua Ketover, Esq., is present

Kathleen Plaia

Ms. Quinn - People - Direct                497

```
 1          in attendance to assist Ms. Quinn during her

 2     questioning.)

 3               THE COURT OFFICER:  Please state your name,

 4     spelling your last name and the town in which you

 5     reside.

 6               THE WITNESS:  Francine Quinn, Q-U-I-N-N,

 7     Lindenhurst.

 8               THE COURT:  Ladies and gentlemen of the jury,

 9     the gentleman standing next to the witness is

10     Mr. Joshua Ketover, who is counsel for the witness.

11               You may inquire, Mr. Biancavilla.

12               MR. BIANCAVILLA:  Thank you, Judge.

13     DIRECT EXAMINATION

14     BY MR. BIANCAVILLA:

15          Q     Good afternoon, Miss Quinn.

16          A     Good afternoon.

17          Q     Thank you for joining us.  Where would you tell

18     the jury where you're currently employed?

19          A     I'm currently employed at MRI Imaging.

20          Q     What do you do there?

21          A     Front desk receptionist.

22          Q     How long have you been working there?

23          A     Working there about eight and-a-half months.

24          Q     And did you ever work as a bartender in the

25     Village of Farmingdale?
```

1    A    Yes, I did.

2    Q    Where do you work?

3    A    I worked at the Downtown Bar and Grill.

4    Q    Where is the Downtown Bar and Grill located?

5    A    On Main Street.

6    Q    Is it next to Captain Andy's?

7    A    Yes, it is.

8    Q    Did you know Ruth Williams, the victim in it

9    case?

10   A    Yes, I did.

11   Q    How often would you see Ruth Williams?

12   A    Very infrequently.  Probably about, maybe, like

13   once a week.

14   Q    And what would she do?  She would come into the

15   Downtown?

16   A    Yeah.

17   Q    And you were a bartender?

18   A    Yes, I was.

19   Q    How many nights a week did you work as a

20   bartender?

21   A    Five nights a week.

22   Q    And what were your hours?

23   A    Seven to closing.

24   Q    And on April 11th of 2000, were you working that

25   night?

Ms. Quinn - People - Direct                                    499

```
1      A      Yes, I was.

2      Q      Were you working into the early hours of

3  April 12?

4      A      Yes.

5      Q      And when did you stop working at the Downtown?

6      A      I stopped working about 2:30, quarter to three.

7      Q      When did you actually stop being employed by the

8  Downtown?

9      A      Oh, probably, like, end of July.

10      Q      End of July?

11      A      Yeah.

12      Q      Of what year?

13      A      2001.

14      Q      Okay.  Now, during the course of -- after you

15  were fired -- after you left the Downtown, what was the

16  reason why you left the Downtown?

17      A      I left the Downtown 'cause I was moving on to a

18  better job.

19      Q      Where did you move on to then?

20      A      Garden City MRI.

21      Q      So, you went to work at Garden City MRI after you

22  left the Downtown?

23      A      Correct.

24      Q      Now, did there come a time after you had left the

25  Downtown when you were arrested?
```

Kathleen Plaia

1      A      Yes.

2      Q      Was -- did that arrest involve you selling drugs

3   while you were working at the Downtown?

4      A      Yes.

5      Q      Oh, all right.  Now, have you basically entered

6   into an agreement with the Office of the District Attorney,

7   my office, that we will not use any of your testimony here

8   today regarding those incidents against you?

9      A      Correct.

10      Q      All right.  That agreement was reached between

11   your attorney, Mr. Ketover, and myself?

12      A      Yes.

13      Q      Now, on April 11th of 2000, when you were working

14   at the Downtown, do you remember Ruth Williams coming in?

15      A      Yes.

16      Q      Did she come in with anybody?

17      A      Yeah, she came in with a white male.

18      Q      Can you describe him?

19      A      He was just a white male, just, probably about

20   normal height.

21      Q      Okay.  Did he have hair, did he not have hair?

22      A      Yeah, he had hair, dark hair.

23      Q      All right.  And did they have a drink at your

24   bar?

25      A      Yes, they did.

Ms. Quinn - People - Direct            501

1     Q     And do you remember what you served Ruth Williams

2   at the time?

3     A     I served her a Coors Light.

4     Q     And about how long was she there at your bar that

5   night?

6     A     Um, short period of time.  I mean, I served her

7   the beer and then, you know, next thing you know she was

8   gone.

9     Q     And what time did you stay at the Downtown until

10  that night?

11    A     We closed up about two-thirty, quarter to three.

12    Q     Where did you go?

13    A     I went down the block.

14    Q     Where did you go down the block?

15    A     To Y.L. Childs.

16    Q     How did you get there?

17    A     My co-worker gave me a ride.

18    Q     And about what time did you get to Y.L. Childs?

19    A     About three.

20    Q     And when you went into Y.L. Childs do you

21  remember who was there?

22    A     Yeah.  Ruth was there and so was the defendant.

23    Q     Do you see somebody else in the courtroom today

24  that was there?  You said the defendant --

25    A     Yeah.

Kathleen Plaia

1      Q      Did you see this gentleman seated at the second

2    table in Y.L. Childs that night?

3      A      Yes.

4      Q      Could you tell the jury how -- give them a

5    description of how he appeared that night.

6      A      Um, he just had a buzzed short hair and he had

7    tattoos and, you know, that's about it.

8      Q      When you say he had a buzzed short hair, could

9    you describe that?

10      A      Like, shaved.  Like, shaved, really short hair.

11      Q      His head was bald?

12      A      Yeah, like, really.

13      Q      What did you see him doing while he was at Y.L.

14    Childs?

15      A      He was talking with Ruth and he was also -- I saw

16    him later on kissing her.

17      Q      Now, when you saw him kissing her, where were

18    they?

19      A      Up on the right side of the bar when you first

20    walk in.

21      Q      We're talking about Y.L. Childs?

22      A      Y.L. Childs.

23      Q      And do you remember what time you left Y.L.

24    Childs?

25      A      I left there about four.

Ms. Quinn - People - Direct                           503

1    Q    Four o'clock in the morning?

2    A    Yes.

3    Q    Now, had Ruth left before you?

4    A    Yes.

5    Q    Now, had the defendant in this case left the bar

6  before you left the bar?

7    A    I don't recall.

8    Q    Now, was he with anybody?

9    A    Yeah.  He was with Ruth.

10   Q    And who else?

11   A    And John Kane.

12   Q    Do you know John Kane?

13   A    Yeah, I know him.

14   Q    How long have you known John Kane?

15   A    I just know him from, I was employed at the

16  Downtown for three years.  So, just from working there about

17  three years.

18   Q    Was he a customer at the Downtown?

19   A    Yes.

20   Q    Now, when you left the Downtown -- I'm sorry,

21  when you left Y.L. Childs, approximately what time did you

22  leave there?

23   A    I left there around four a.m..

24   Q    And did you leave with someone?

25   A    I left with my roommate.

Ms. Quinn - People - Direct                504

1      Q      Who is your roommate?

2      A      James Grella.

3      Q      Where did you go?

4      A      We were walking down back towards the Downtown to

5   get in his car and go home.

6      Q      Where was his car parked?

7      A      Behind the Downtown, parking lot.

8      Q      Now, how did you walk back to where his car was

9   parked?  Describe the streets you walked on.

10     A      We came out of Y.L. Childs, and made a right down

11  Conklin{}.  And then we made another right down, walked down

12  Main Street, down through town.  And then made a left turn

13  around, past the Downtown, down Front Street, down toward

14  the parking lot.

15     Q      When you walked through the parking lot what

16  happened?

17     A      I walked up ahead of my roommate and walked up to

18  his car.  And I heard voices when I got to the car.  So, I

19  just, like -- like, loud, escalated voices.  I turned to

20  look to see, you know, what was going on.

21     Q      What did you see?

22     A      I saw Ruth arguing with somebody with a, you

23  know, a man, which I thought was the same guy that I saw

24  with her in the bar.

25     Q      When you say the same guy you saw with her in the

Ms. Quinn - People - Direct                505

1  bar, can you describe that person?

2      A      He was just, like, a stocky, like, you know, full

3  chested, you know, about five-ten, same shaved head.

4      Q      Was it the same person you had seen her with at

5  the bar?

6      A      I believed it to be.

7      Q      And what did you do at that point?

8      A      I just got in my car and picked up my roommate

9  around the corner and drove home.

10      Q      What time did you get home?

11      A      About 4:30, twenty after four.

12      Q      Now, how far were you from these two people when

13  you heard the voices?

14      A      Um, about fifty feet.

15      Q      And were they standing in a particular place?

16      A      Well, the entrance to Ruth's apartment is back

17  there behind the restaurant.  She lives above the

18  restaurant.  So, right by where that entrance is.

19      Q      That's where you saw these two -- Ruth standing?

20      A      Yes.

21              MR. BIANCAVILLA:  Judge, I would ask this

22      photograph be marked as People's Exhibit 8 for

23      identification.

24              (Whereupon, the referred to item is received

25      and marked People's Exhibit 8 for identification by the

Kathleen Plaia

1          reporter as instructed.)

2                    THE COURT OFFICER:  People's 8 marked for

3          identification.

4                    MR. BIANCAVILLA:  Please show it to the

5          witness.

6          Q      Miss Quinn, you're being shown what has been

7     marked as People's 8 for identification; do you recognize

8     that?

9          A      Yes.

10         Q      What do you recognize that to be?

11         A      This is the area that's the entrance to Ruth's

12    apartment, the area behind Captain Andy's.

13         Q      Does that photograph fairly and accurately

14    represent the area where you saw Ruth with the bald headed

15    individual with tattoos on the morning -- early morning

16    hours of April 12th?

17         A      Yes.

18                    MR. BIANCAVILLA:  We offer that into

19         evidence, Judge.

20                    THE COURT:  Please show it to

21         Mr. Chamberlain.

22                    MR. CHAMBERLAIN:  Voir dire, Judge?

23                    THE COURT:  Yes.

24    VOIR DIRE EXAMINATION

25    BY MR. CHAMBERLAIN:

```
 1        Q     Does this picture accurately represent where you

 2   were located when you viewed those people?  Does this show

 3   where you were located?

 4        A     Where I was located?

 5        Q     Yes.

 6        A     No.

 7        Q     This is just a close-up of the door where you say

 8   you saw them standing, is that right?

 9        A     Yes.

10        Q     Not the location that you were in when you viewed

11   them, correct?

12        A     No.  I wasn't standing in that location.  No.

13        Q     Was this location adjacent to the back of the

14   Downtown that you worked in?

15        A     Yes.

16        Q     Were you -- was the Downtown to the right of this

17   picture?

18        A     Yes.

19        Q     And were you standing to the right -- was that

20   car parked to the right?

21        A     No.  It was like in front of it.

22              MR. CHAMBERLAIN:  Mr. Biancavilla, do we have

23        a photograph of where --

24              MR. BIANCAVILLA:  Judge, this is voir dire.

25              MR. CHAMBERLAIN:  I object to the picture
```

1        because I don't think this accurately shows the

2        location from the viewpoint that this witness had,

3        which is, I think --

4                    MR. BIANCAVILLA:  Judge, that wasn't my

5        question.

6                    THE COURT:  The question was, was it a fair

7        and accurate representation of where she saw the victim

8        and the bald headed man.

9                    MR. CHAMBERLAIN:  I respectfully submit, she

10       could not see this location from where she was located.

11                   MR. BIANCAVILLA:  Judge, I don't believe that

12       was what she said.

13       Q      Is that correct, you could not?

14                   THE COURT:  Answer that question.

15       Q      Could you have an unobstructed view of this

16       location from where you were at your car?

17       A      That's the location I was looking at, yes.

18       Q      That's what you were looking at.  But from where

19       you were looking?

20       A      I wasn't standing that close.  I mean, that's a

21       close-up.  I wasn't standing right there.

22                   MR. BIANCAVILLA:  Mr. Chamberlain, you're

23       voir diring on that picture.

24                   MR. CHAMBERLAIN:  I object to the picture.

25       It does not show the location that she was in, and it's

1    misleading.

2              THE COURT:  May I see the photo, please?

3              Miss Quinn, from the area where you were

4    standing, can you see this area depicted in this

5    photograph?

6              THE WITNESS:  Yes.  I can see the whole door.

7              THE COURT:  Was it obstructed in any way?

8              THE WITNESS:  The door -- like, the where,

9    where they were standing?  I was standing, like,

10   right here looking at it.  I saw this area.

11             THE COURT:  So, is that a fair and accurate

12   representation of the area where the two people were

13   standing?

14             THE WITNESS:  Yes.

15             THE COURT:  And you had an unobstructed view

16   at that time, is that correct?

17             THE WITNESS:  Yes.

18             MR. CHAMBERLAIN:  Voir dire, Judge?

19             THE COURT:  Continued voir dire?

20             MR. CHAMBERLAIN:  Yes.

21             THE COURT:  Okay.

22   Q    Did you testify that, at the grand jury, that

23   the --

24             MR. BIANCAVILLA:  Objection.

25             THE COURT:  Mr. Chamberlain -- sustained.

Ms. Quinn - People - Direct                    510

1        This is not cross-examination.

2   Q        Where was the car parked?

3                MR. BIANCAVILLA:  Objection.

4   Q        The location --

5                THE COURT:  Mr. Chamberlain, this is only a

6    voir dire with respect to this photograph which the

7    People want to place into evidence.  You have ample

8    opportunity to cross-examine, to go into all those

9    areas.

10                MR. CHAMBERLAIN:  Withdrawn.

11                THE COURT:  You withdraw your objection?

12                MR. CHAMBERLAIN:  I withdraw the question.

13                THE COURT:  Oh, your objection is overruled.

14         And the photograph, People's 8, is marked

15    into evidence.

16                (Whereupon, the referred to item previously

17    marked for identification is received and marked

18    People's Exhibit 8 in evidence by the reporter as

19    instructed)

20                THE COURT OFFICER:  So marked.

21                MR. BIANCAVILLA:  May I display that for the

22    jury, Judge?

23                THE COURT:  Yes.

24                MR. BIANCAVILLA:  Thank you.

25                (Whereupon, People's Exhibit 8 is placed on

Kathleen Plaia

Ms. Quinn - People - Direct                 511

1          the viewer for the sworn jury to observe.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25