DIRECT EXAMINATION CONTINUED

BY MR. BIANCAVILLA:

Q Now, Miss Quinn, could you describe the lighting conditions in that particular area when you walked by that night?

A Well, there's a big, like, a lamp, like, a FLOOD light back there, displayed.

Q Was the big flood light on?

A Yes.

Q Okay. Now, Miss Quinn on May 3rd of 2000 were you taken to the Nassau County Police Department and did you view a lineup?

A Yes, I did.

Q And were you able to pick anybody out of that lineup?

A No, I was not.

Q And why not?

A They all looked the same. All the people in the lineup looked the same.

Q I'm going to show you People's Exhibit 4 in evidence; do you recognize that?

A Yes.

Q Is that the lineup that you viewed?

A Yes.

MR. BIANCAVILLA: Thank you.

I have no further questions of this witness.

THE COURT: Mr. Chamberlain, cross-examination.

MR. CHAMBERLAIN: Mr. Biancavilla, could I have the other photographs of the back of the Downtown?

THE COURT: You want people's 8 in evidence.

MR. CHAMBERLAIN: No, I want the other police photographs.

MR. BIANCAVILLA: Judge, can we approach?

THE COURT: Yes, you can approach.

Step down a minute, Miss Quinn.

(Whereupon, the following takes place at the Bench, between the Court and Counsel.)

MR. BIANCAVILLA: We asked Mr. Chamberlain that he could have anything he wanted duplicated. I have a use for those exhibits. I'm not turning them over to him.

MR. CHAMBERLAIN: If he doesn't want to show them to the jury, these were records --

THE COURT: I understand that. Discovery is different than what the People intend to use at trial.

Now, as long as Mr. Biancavilla gave you an opportunity to make copies of whatever photographs you want, is that true? He did give you an opportunity to duplicate?

MR. CHAMBERLAIN: Yes.

THE COURT: Did you not take advantage of it?

MR. CHAMBERLAIN: We did take advantage of it. I will take a short break and look through my file. I have to dig out some photographs.

THE COURT: You do have copies?

MR. CHAMBERLAIN: I have some, yes. I have some other photographs. It would have been faster to use the ones --

MR. BIANCAVILLA: I have a use for those. Those are my photographs.

THE COURT: I would agree, it would be faster, otherwise --

MR. CHAMBERLAIN: I'll use mine, Judge.

THE COURT: You want to take a moment?

MR. CHAMBERLAIN: I would like to take a five minute break.

THE COURT: Yes, we can do that.

MR. CHAMBERLAIN: Thank you.

(Whereupon, the following takes place in open court:)

THE COURT: Ladies and gentlemen, we're going to take a short break at this point. Do not discuss the case among yourselves or with anyone else. Keep an open mind. Do not form or express any opinions until

the entire case has been completed. Do not read or listen to any accounts of this case, should it be reported in the media. Do not visit or view any places or premises mentioned. You are to promptly report to the Court any attempt by anyone to improperly influence any member of the jury, or any violation thereof.

Be back in a moment. Please follow the court officers.

THE COURT OFFICER: Follow me, please.

(Whereupon, the sworn jury and alternates leave the courtroom)

(Whereupon, there is a five minute recess taken in the proceedings)

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom).

(Whereupon, the People's witness, Francine Quinn, resumes the stand, having been previously duly sworn by the Clerk of the Court to commence cross-examination testimony as follows:)

CROSS-EXAMINATION

BY MR. CHAMBERLAIN:

Q Miss Quinn, I'm going to start back at the beginning here.

You were working at the Downtown in April of

19 -- of 2000?

A Right.

Q And would you tell us, on April 11th you saw Ruth with a man in the Downtown, a male white?

A I didn't hear what you said.

Q Could you tell us, did you tell us a little while ago that you saw Ruth in the Downtown that evening with a male white?

A Correct.

Q What did that person look like?

A Um --

Q That was not the defendant?

A No.

Q What did that person look like?

A He was about average height, thin, white male.

Q Do you recall testifying before the grand jury?

A Yes.

MR. CHAMBERLAIN: Page 29. Do you recall being asked, line 9 -- line 12.

"QUESTION: Do you remember anything else about him as you sit here today?"

"ANSWER: Yes. He had, like, tattoos on his arms and you know he was a little stocky. He had a big chest, big arms."

"QUESTION: We are talking about the man you

saw with Ruth at the Downtown?"

"ANSWER: Yes."

Q Do you recall those questions and answers?

A No. I recall the questions.

Q You say that after the Downtown you saw Ruth again at Y.L. Childs, is that right?

A Yes.

Q You were friendly with Ruth, were you not?

A No.

Q No. Well, you were interacting with her, let's say, at the Y.L. Childs, were you not, talking to her?

A No. No.

Q No? You were asked if Ruth left before you, and you said yes, is that right?

A Yes, she did.

Q And about how long after Ruth left did you leave?

A Probably about fifteen minutes.

Q About fifteen minutes. You were asked if the defendant and John D. left before you, do you recall that?

A Yes.

Q And you indicated you don't recall?

A Right.

Q Do you recall being asked that in the grand jury in July of 2000?

MR. BIANCAVILLA: Judge, I'm going to object

to that question.

A I don't recall.

MR. CHAMBERLAIN: "Would you tell the grand jury" --

THE COURT: Excuse me, Mr. Chamberlain. You can certainly ask the question, but just give us the line and page number.

MR. CHAMBERLAIN: Page 40 and 41, Judge. I will have the line in a minute.

THE COURT: Okay.

"QUESTION: And did you become aware at sometime after that, that John Kane and the bald headed man were no longer at Y.L. Childs?"

"ANSWER: No, I wasn't. I wasn't really aware. I didn't pay attention to whether they had left the bar or not before I left the bar."

Q Is that what you told the grand jury?

MR. BIANCAVILLA: Objection.

THE COURT: I'm going to let it stand. Overruled.

Q At that point you recall that you don't know whether they left, you've forgotten it?

MR. BIANCAVILLA: I object.

THE COURT: Yes.

Q I said you don't recall here.

THE COURT: When there's an objection on the floor, please let me rule on it before you ask another question.

I'm going to sustain that objection.

You certainly can go into that area of questioning, Mr. Chamberlain.

Q Is it correct that you don't now recall whether they left before or after you, or is it correct that you do not know whether they left before you?

MR. BIANCAVILLA: Judge, I'm going to object.

THE COURT: Counsel, please approach the bench.

(Whereupon, the following takes place at the Bench, between the Court and Counsel:)

THE COURT: Yes, Mr. Biancavilla.

MR. BIANCAVILLA: Judge, my objection, Judge, how is that inconsistent?

MR. CHAMBERLAIN: The difference.

MR. BIANCAVILLA: There's no --

MR. CHAMBERLAIN: Not recognizing.

THE COURT: Wait, excuse me.

MR. BIANCAVILLA: There is no inconsistency there at all, Judge. She said the exact same thing here as she did in the grand jury. She may have used a different word, but she said the same thing.

THE COURT: There is a difference between --

MR. BIANCAVILLA: Recalling and remembering.

THE COURT: And knowing.

Could you read the back the question to me.

(Whereupon, the requested question was read back by the reporter as instructed)

MR. BIANCAVILLA: She said in the grand jury she wasn't aware. That's the same thing she said here, Judge. She wasn't aware.

MR. CHAMBERLAIN: It's not the same thing. She said she didn't recall.

MR. BIANCAVILLA: That's not what she said.

MR. CHAMBERLAIN: There's been two years, there is a difference.

THE COURT: There is a difference. I will permit you to ask the question.

MR. CHAMBERLAIN: Thank you, Judge.

(Whereupon, the following takes place in open court:)

THE COURT: Read back the last question.

(Whereupon, the requested question was read back by the reporter as instructed.)

THE COURT: Do you understand the question?

THE WITNESS: Not really.

THE COURT: Would you rephrase the question?

MR. CHAMBERLAIN: Let me see if I can rephrase it.

Q You told this jury here that you just don't recall whether they left before you.

Do you recall what you told the grand jury, did you tell the grand jury that?

MR. BIANCAVILLA: Objection.

THE COURT: That's not proper, sustained.

Q Does it refresh your recollection that you told the grand jury:

"QUESTION:"

MR. CHAMBERLAIN: Line 21, page 40:

"Did you become aware at some time after that John Kane and the bald headed man were no longer at Y.L. Childs?"

"ANSWER: No, I wasn't. I really wasn't -- I wasn't really aware. I didn't pay attention to whether they the left the bar or not before I left the bar."

Question by the district attorney.

"I'm not asking if you actually saw them walking out the door."

Interrupted.

"ANSWER: No."

"QUESTION: But did there come a time when you were aware of the fact that they were no longer

present at the bar?"

"ANSWER: No."

"QUESTION: No recollection?"

"ANSWER: No."

"QUESTION: So, you didn't actually see them leave the bar, is that correct?"

"ANSWER: No."

Q Do those questions and answers refresh your recollection as to whether you saw the defendant and John Kane leave Y.L. Childs before you did?

A I don't recall.

Q Okay. You were asked -- you testified here about walking after you left, walking to where your car was parked, is that right?

A Right.

Q And you walked down Main Street, around the Downtown, which your car was parked somewhere behind the Downtown, is that correct?

A Yes.

Q Did you tell this jury, would you tell this jury, did you walk slowly or fast?

A Normal. I just walked.

Q Do you recall whether it was cold out that night, would it refresh your recollection if it was cold out?

A Yeah, it was chilly.

Q Did you previously sign a statement that you walked fast because it was cold out?

MR. BIANCAVILLA: Objection, Judge.

Q Does that refresh your recollection?

THE COURT: Well, I'll let it stand. Overruled.

A I walked ahead of my roommate because I was cold.

Q Okay. Now, you told the district attorney and this jury here that you saw this man, this defendant, and Ruth, whom you knew, arguing outside the back door to her apartment, is that right?

A Yes.

Q Were you asked about that previously in the grand jury?

MR. BIANCAVILLA: Objection.

THE COURT: Sustained.

Q If you recall?

THE COURT: Sustained.

Q Were you asked this question and given this answer to the grand jury, question by the district attorney --

MR. BIANCAVILLA: Page?

MR. CHAMBERLAIN: I'm sorry, page 44, line 18.

"QUESTION" --

MR. BIANCAVILLA: One second, Mr. Chamberlain.

MR. BIANCAVILLA: Okay.

MR. CHAMBERLAIN: "QUESTION: I take it, you did not get a good observation of the face of the woman or the face of the man?"

"ANSWER: No."

Q Does that refresh your recollection as to whether or not you could identify these people who you say you saw arguing?

MR. BIANCAVILLA: Objection.

THE COURT: No, overruled.

A Could you repeat the question?

Q Question by the District Attorney:

"I take it, you did not get a good observation of the face of the woman or the face of the man?"

"ANSWER: No."

MR. BIANCAVILLA: Judge, he's taking that questions out of context with respect to the rest of the testimony in the grand jury. The very next sentence clarifies that question.

THE COURT: I'll permit you on redirect to clarify it, Mr. Biancavilla, as long as Mr. Chamberlain is reading a complete question and answer.

Q Is that correct, does that refresh your recollection? You couldn't tell the faces of these people, right?

A I couldn't see the face.

Q You saw a build, is that right, and that's it?

A I saw a build of a man and a shaved head, just as I saw in the bar ten minutes before that.

Q Were you wearing a coat that night, you said it was cold?

A I don't remember.

Q Well, was this man that you saw wearing a coat outside?

A No.

Q Did you -- could you tell us where -- you walked behind Captain Andy's. Would you tell us where your car was parked?

A It was parked in the second row in the parking lot.

Q How many rows were there?

A It was the second row from the curb, from the sidewalk.

Q Were there more than two rows, were there more than two rows?

A Yes.

Q How many rows were there?

A I don't -- I don't know.

Q Francine, you have discussed this matter a number of times with the district attorney, have you not?

A Yes.

Q And you have discussed -- you have testified before the grand jury, right?

A Right.

Q You have also given statements to detectives, right?

A Yes.

Q You, through your attorney, you have arranged some agreement with respect to your testimony here?

A Could you explain?

MR. BIANCAVILLA: Objection, Judge. He knows there's no agreement.

THE COURT: Well, you are presupposing something.

MR. CHAMBERLAIN: He indicated he had an agreement with her attorney, Judge.

MR. BIANCAVILLA: Judge, that's not --

MR. CHAMBERLAIN: On the record there is such an agreement.

THE COURT: Excuse me, Mr. Chamberlain. Come forward, Counsel.

(Whereupon, the following takes place at the

Bench, between the Court and Counsel:)

THE COURT: First of all, what was indicated by the district attorney was a stipulation which was outside the hearing of the jury.

MR. CHAMBERLAIN: No, Judge. Respectfully, when he first started questioning her, he spoke about an agreement he had reached with her attorney and he named the attorney. That was his language -- not mine -- his. It was on the record.

THE COURT: Mr. Biancavilla?

MR. BIANCAVILLA: I believe I used the word stipulation. We would not use her testimony if she should be questioned regarding the drug sales.

THE COURT: For argument sake, that is an agreement. A stipulation is an agreement between counsel for witnesses as well as the assistant district attorney.

I'll permit you to go into that area.

MR. CHAMBERLAIN: Thank you, Judge.

(Whereupon, the following takes place in open court:).

Q And you then not only discussed it with detectives, the former district attorney that handled this case, but you also had your attorney discuss your testimony in connection with this case in accordance with an agreement

he has with the district attorney, is that correct?

An agreement was made with respect to your testimony, is that correct?

A Yes.

Q Now, Miss Quinn, do you recall the location -- the location of your car, do you recall you said the second row? Is that what you testified -- if you were to testify to a different location before, would that refresh your recollection now?

MR. BIANCAVILLA: Objection.

THE COURT: Sustained.

Q Was your car parked more behind the Downtown or Captain Andy's?

A It was parked in the middle.

Q In the middle?

A Yeah.

Q I ask if these questions and answers before the grand jury in July of 2000 refresh your recollection.

MR. BIANCAVILLA: Objection.

THE COURT: Mr. Chamberlain, if you want to attempt to refresh the recollection of a witness, you first have to ask her if there's a document that would refresh her recollection. If so, hand her the document to look at.

Q I'm going to show you grand jury testimony, Miss

Quinn. Before -- starting at bottom of page 42, as to where your car was parked, going on to the top of page 43.

(Whereupon, the referred to document is handed to the witness.)

Q Having read that testimony, does that refresh your recollection as to where your car was parked?

A Yes.

Q Where was your car parked?

A It was parked in the third row.

Q Not the second?

A Right.

Q Was it lined more behind Captain Andy's or more behind the Downtown?

A It was more behind the Downtown.

Q I'm going to show you a photograph and ask you if you recognize it?

THE COURT: Defendant's B for identification.

(Whereupon, the referred to item is received and marked Defendant's Exhibit B for identification by the reporter as instructed.)

THE COURT OFFICER: Defendant's B for identification so marked, your Honor.

Q Does that photograph accurately represent the back of the Downtown and Captain Andy's and the parking lot in which your car was parked?

A Yes.

Q Would you please mark on that photograph exactly where in the third row your car was parked behind the Downtown?

A Over here.

(Whereupon, the witness complies with request.)

Q Miss Quinn, you have indicated a marking here that would appear to be more behind Captain Andy's than the Downtown, is that correct?

A Where that car is.

MR. BIANCAVILLA: Objection, the photograph speaks for itself.

THE COURT: The photograph is not in evidence yet.

MR. BIANCAVILLA: It's not in evidence.

MR. CHAMBERLAIN: I will offer it.

THE COURT: You will move it into evidence?

MR. CHAMBERLAIN: I will move it into evidence.

MR. BIANCAVILLA: Can I see it, Judge?

THE COURT: Yes.

Please show it to Mr. Biancavilla.

MR. BIANCAVILLA: No objection.

THE COURT: Mark it in evidence.

(Whereupon, the referred to item previously marked for identification is received and marked Defendant's Exhibit B in evidence by the reporter as instructed)

THE COURT OFFICER: Defendant's B marked in evidence, your Honor.

THE COURT: Show it to the witness.

Mr. Chamberlain, do you want the photograph shown back to the witness?

MR. CHAMBERLAIN: Yes, I would.

THE COURT: Okay.

Q The location of the marking, would that location be more behind Captain Andy's or the Downtown?

MR. BIANCAVILLA: Objection. The picture is in evidence and it speaks for itself.

MR. CHAMBERLAIN: I'm asking --

THE COURT: I'll permit that question.

A I guess it's -- it's, like, right in the middle.

Q I'm going to show you another photograph, Miss Quinn, and ask you if that actually represents the back of --

THE COURT: Excuse me, do you want that marked, Mr. Chamberlain?

MR. CHAMBERLAIN: Yes, I do, Judge. Thank you.

THE COURT: Defendant's C for identification

(Whereupon, the referred to item is received and marked Defendant's Exhibit C for identification by the reporter as instructed.)

THE COURT OFFICER: Defendant's C marked for identification, your Honor.

Q Does that photograph accurately represent the back of the Downtown and the back of Captain Andy's and, specifically, the position right in the middle between the two?

A Yes.

MR. CHAMBERLAIN: I'm going to offer that photograph.

THE COURT: Show it to Mr. Biancavilla please.

MR. BIANCAVILLA: Can I just have a voir dire?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. BIANCAVILLA:

Q The direction that this photograph was taken of the back of Captain Andy's, is this the view that you had when you observed the defendant and Miss Ruth Williams?

MR. CHAMBERLAIN: That's improper voir dire, Judge. The question on voir dire was whether this

represents --

THE COURT: I will allow the question with respect to the direction itself, as the direction was north, south, east or west.

MR. BIANCAVILLA: I'm asking her if this was the view she was observing the Downtown.

THE COURT: I'll permit you to ask with respect to north, south, east and west. I wouldn't ask whether it's the actual view.

MR. BIANCAVILLA: What's the relevancy --

THE COURT: I don't know.

MR. BIANCAVILLA: If it's not the actual view?

MR. CHAMBERLAIN: Objection, Judge.

THE COURT: Let's not have colloquy. I'm the ultimate arbiter as to what's relevant at this point.

You have a voir dire, Mr. Biancavilla.

MR. CHAMBERLAIN: I ask that his remarks be stricken and they be directed --

THE COURT: His remarks shall be stricken. All colloquy should be disregarded by the ladies and gentlemen of the jury.

Q With respect to this particular photograph, is this the position in which you were standing when you would be observing?

A No.

MR. CHAMBERLAIN: Objection, improper voir dire.

MR. BIANCAVILLA: Okay, objection.

THE COURT: Overruled.

Marked in evidence.

(Whereupon, the referred to item previously marked for identification is received and marked Defendant's Exhibit C in evidence by the reporter as instructed)

THE COURT OFFICER: Defendant's C marked in evidence, your Honor.

CROSS-EXAMINATION CONTINUED

BY MR. CHAMBERLAIN:

Q Can you, Miss Quinn, can you show us -- withdrawn.

Defendant's C is actually taken from a position closer than you were that night, is that not correct?

MR. BIANCAVILLA: Objection.

MR. CHAMBERLAIN: Were you --

THE COURT: I'm not sure that it can be answered that way because of the use of different types of lenses on cameras.

So, I'm going to sustain objection.

Q Let me go back to Defendant's B and ask you, if

you put an X here on the edge of this photograph, is that where you were standing that night?

A That's where my car was parked.

Q Where were you standing with relation to your car?

A On the driver's side.

Q I see. And the location you indicated here was that more behind Captain Andy's or more behind the Downtown?

MR. BIANCAVILLA: Judge, I'm going to object. It has been asked and answered three times.

THE COURT: I'll permit it.

Overruled.

Last time, Mr. Chamberlain.

A It's in the middle.

Q In the middle between the two?

THE COURT: Do you understand that question?

THE WITNESS: Yes.

A It's in the middle.

MR. CHAMBERLAIN: Can I have these shown to the jury, please.

THE COURT: Counsel, can I see you at the bench?

(Whereupon, there is a discussion held at the Bench, off the record between the Court and Counsel)

THE COURT: We'll put them on the machine.

Mr. Chamberlain, you can publish the photographs if you'd like.

MR. CHAMBERLAIN: If you would.

(Whereupon, the referred to items are published to the sworn jury and alternates.)

MR. CHAMBERLAIN: Can we do this one more time.

(Whereupon, the referred to items are placed on the viewer to be viewed by the sworn jury and alternates.)

MR. CHAMBERLAIN: One last question.

THE COURT: Yes, Mr. Chamberlain.

Q While it's up they're, Miss Quinn, the third row would be the location where that X is; in other words, it would be a row by the curb?

THE COURT: Can you see that from here?

THE WITNESS: No.

THE COURT: Would you like to go into the well and take a look?

THE WITNESS: No, it's all right.

A Yes.

Q The third row would be the location where that X is, is that correct?

A Yes.

THE COURT: All right, ladies and gentlemen,

at this point we're going to break for the day. It's been a long day. So, I think it's a good POINT to break at this time.

Again, do not discuss the case among yourselves or with anyone else. Keep an open mind. Do not form or express any opinions until the entire case has been completed. Do not read or listen to any accounts of this case should it be reported in the media. Do not visit or view any place or premises that have been mentioned. You are not to permit any party to discuss this case or an attempt to influence you. You must promptly report to the Court any violation thereof.

Ladies and gentlemen, we're going to start at ten o'clock. So, not at 9:30, but at 10:00 a.m. the Court has other court business.

At this point, have a very nice evening. And we'll see you tomorrow.

THE COURT OFFICER: Jurors, follow me, please.

(Whereupon, the sworn jurors and alternates leave the courtroom.)

THE COURT: Miss Quinn, you're not to discuss this case with anybody, you understand that, with any other witness or any other person?

THE WITNESS: Yes.

(Whereupon, the witness leaves the witness stand and exits the courtroom with counsel, Mr. Ketover.)

THE COURT: We'll see you tomorrow morning at ten a.m..

(Whereupon, court stands in recess. The trial is adjourned to May 8th, 2001, at ten a.m.)

STATE OF NEW YORK : NASSAU COUNTY

COUNTY COURT PART XIV

-----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK trial

- against -

PAUL SCRIMO,

Defendant.

-----------------------------------------X

May 8th, 2002
262 Old Country Road
Mineola, New York

B E F O R E :

HON. JEFFREY S. BROWN,
County Court Judge

A P P E A R A N C E S:

HON. DENIS DILLON
Nassau County District Attorney
BY: ROBERT BIANCAVILLA, Esq., of Counsel,
Assistant District Attorney
For the People

JOHN CHAMBERLAIN, ESQ.
1001 Franklin Avenue
Garden City, NY
For the Defendant

KATHLEEN PLAIA
OFFICIAL COURT REPORTER

(Whereupon, the following takes place on the record, in open court, in the presence of the Court, Assistant District Attorney Biancavilla, Mr. Chamberlain, the defendant, and Joshua Ketover, attorney for People's witness Quinn, outside the presence of the sworn jury and witness:)

THE CLERK: You may be seated.

This is case on trial, continued, People of the State of New York versus Paul Scrimo.

All parties are present. Jurors are not present at this time.

Are the People ready?

MR. BIANCAVILLA: Ready your Honor.

THE COURT: Defense ready?

MR. CHAMBERLAIN: Defendant ready.

THE COURT: Are we ready to proceed, Counsel?

MR. BIANCAVILLA: Judge, I believe there is something for the record.

THE COURT: Yes, Mr. Biancavilla.

MR. BIANCAVILLA: Well, Judge, I think Mr. Ketover is best to advise the Court or inform the Court of what transpired yesterday after we broke.

THE COURT: Yes, sir, Mr. Ketover?

MR. CHAMBERLAIN: Judge, could we have a conference off the record about this?

THE COURT: No, Mr. Chamberlain.

MR. BIANCAVILLA: I would like this on the record, please.

MR. KETOVER: To make the record clear, I'm not an advocate in any way in this matter.

THE COURT: You represent the witness.

MR. KETOVER: I represent the witness, and that witness is Francine Quinn.

I received a phone call last night from counsel for the defense in this matter, asking questions about my client, which I had no problem with. There was, as I understood it to be, a request to speak with my client, which I said I couldn't do.

I was then informed immediately, when I told Mr. Chamberlain that that can't happen, he said, well, that's not what I meant. I said, maybe I misunderstood.

And that was the full extent of the conversation. There wasn't any real attempt to contact my client by the defense. There wasn't anyone going to speak to my client by the defense. It was a phone call to my office, to make sure we're clear on both sides.

I just wanted to make sure I made a record so if anything ever happened, there's no misunderstanding, and putting my client in jeopardy as far as not obeying

the Court's order and not speaking with anybody.

THE COURT: As all Counsel are aware, before we left this courtroom I admonished the witness not to speak to anybody with respect to this case.

MR. BIANCAVILLA: Judge, I would ask that Mr. Ketover set forth on the record what exactly the subject matter of that conversation was and what information Mr. Chamberlain was looking for, which was specifically relayed to me by Mr. Ketover yesterday afternoon in the conversation when he notified me of Mr. Chamberlain's --

THE COURT: You said Mr. Ketover was more detailed to you, Mr. Biancavilla?

MR. BIANCAVILLA: Yes.

THE COURT: Mr. Ketover, could you be more detailed?

MR. KETOVER: The question -- the subject that I think defense counsel was trying to get into was, what, if any, contact my client had with, I believe, a John Kane with alleged drug sale activity. That was the sum and substance of what I think was the attempt to get information on.

As I told Mr. Chamberlain then, if he had an investigator that wanted to speak with my client before the trial, in my presence, I would have been more than

happy to cooperate. But pursuant to this Court's order, at this time that can't happen.

That was pretty much how I ended the conversation. It was a short conversation. I don't think it lasted -- lasted more than maybe eight or nine minutes.

Again, I wanted to make sure all parties are aware that there was not an ex-parte communication, so the Court would be aware of it, since my client is here at her own peril, since she has other charges pending against her, and is not hung out to dry.

THE COURT: Mr. Chamberlain?

MR. CHAMBERLAIN: I very openly gave this gentleman my card in front of other witnesses, told him I would calling him yesterday afternoon as we left the courtroom. I did call him. And I at no time suggested I wanted to talk to his client. And at the end of the conversation he said something about wanting to talk to my client. I said, I didn't say that, I'm not asking to talk to your client.

The conversation involved what her status was with -- I was, in fact, trying to garnish some information as to what he knew about this, as well as her present charges, whether she was under indictment.

I -- at one point I did say, you have an

investigator. We have had an investigator try to speak to Miss Quinn, both shortly after this happened and approximately a week ago. She refuses to talk to our investigator.

So, I had in no way attempted to talk to the witness. I was trying to find out what he knew about it.

And as far as the implication that I was trying to have a conversation with his client, that is completely erroneous. As a matter of fact, I made sure I cleared that up at the end of the conversation.

MR. KETOVER: I can confirm that. At the end of the conversation he did say, that's not what I meant. I can confirm that.

MR. CHAMBERLAIN: I never said anything like that, Judge. And I wouldn't say anything like that.

THE COURT: Now, what I'm concerned about, if -- of course, attorneys are permitted to talk to each other. There's no prohibition for attorneys to speak to each other.

However, I'm concerned that there was in any shape or form, that, Mr. Chamberlain, you attempted to contact this witness through Mr. Ketover.

I ask you, Mr. Ketover, was there any indication to you that Mr. Chamberlain was attempting

to contact this witness?

MR. KETOVER: My understanding -- that's why I phrased it that way -- what I believe to have been asked of me, was whether or not he could have a conversation with my client.

MR. CHAMBERLAIN: Judge, absolutely --

MR. KETOVER: I phrased it as, that is my understanding. Could my understanding be erroneous? Anything is possible, which is why I phrased it that way. I did not articulate a position in any way or form.

My understanding was, at the beginning of the conversation, that you would like to maybe speak to my client before court regarding these alleged drug sales. I said, I can't do that for you, it's in the middle of cross-examination, which immediately you did say, that's not -- I'm not asking to speak with your client directly. My response was, and I said, maybe I misunderstood you. That was the --

MR. CHAMBERLAIN: You said something about, you wanted to have a conversation. I said, no, I'm not asking that. I never asked that. I wouldn't ask that, Judge.

THE COURT: I'm even concerned that you asked Mr. Ketover to ask his client something.

Now, Mr. Chamberlain, we all are quite clear as to what my direction was with respect to this witness, that nobody was to speak to her and she was to speak to nobody.

Now, as I said before, I have no problem with attorneys speaking to each other, because that's permitted.

However, you know, at this point, let me ask you, Mr. Ketover, at any point did Mr. Chamberlain speak to your client?

MR. KETOVER: Absolutely not. There has been no communications whatsoever between the defense or any of his staff members and my client, that I'm aware of, at all.

MR. CHAMBERLAIN: The only communication was two years ago, shortly after this incident, which she worked in the bar, which she refused to say anything.

And from what I understand -- it wasn't me personally, it was the investigator -- approximately a week ago, when I believe she told him she was told not to discuss this with him or words to that effect.

THE COURT: I would just say, I'm very disappointed with this indication. Because right now we have an issue as to whether -- and Mr. Chamberlain is denying it, Mr. Ketover is saying it's possible it

happened -- that there was a question he -- that Mr. Chamberlain wanted to speak to Mr. Ketover's client. At this point I have no evidence that, from what Mr. Ketover told me, that you did not speak to -- that you spoke to Miss Quinn.

Now, I'm going to make myself very clear here, I don't want any conversation whatever with Miss Quinn or any other witness who should appear on this stand.

Do we understand each other, Mr. Chamberlain?

MR. CHAMBERLAIN: Judge, I do.

One of the things that, with respect to this witness and the prior witness, Miss Shouse --

THE COURT: Yes.

MR. CHAMBERLAIN: You have limited me to some questions as to what they know about.

THE COURT: I made an evidentiary ruling, that's correct.

MR. CHAMBERLAIN: Right. And you have limited me to saying, to asking them whether or not they had cocaine on those particular days, the 11th and 12th of April.

THE COURT: And May 5th and 6th and 7th, which was the day she testified, which was yesterday, which was May 7th.

MR. CHAMBERLAIN: Aside from that, Judge, the questions I would ask those witnesses, you said for me to -- after Mr. Kane testifies, I could bring those witnesses back.

THE COURT: As I made very clear to you on the record, depending on how the responses are from Mr. Kane. If Mr. Kane denies it, you certainly could bring them in. I even said to you, you subpoena them and these witnesses do not attend, you can certainly go forward with material witness orders and we will proceed that way.

MR. CHAMBERLAIN: Are you directing me not to try to talk to these witnesses after I subpoena them with respect to this case?

THE COURT: No. I directed you not to speak to this witness while she's on cross-examination. She's in the middle of cross-examination.

MR. CHAMBERLAIN: I didn't try to speak to this witness, believe me.

THE COURT: Not according to Mr. Ketover.

Obviously, he was concerned enough that he brought this to the attention of the Assistant District Attorney and now to the attention of the Court.

I don't know if he's mistaken or not, Mr. Chamberlain. I'm not going to get into this at

this point. He says he may have been mistaken. I want it perfectly clear, I'm ready to go forward with the trial now.

However, I want it perfectly clear, when somebody is on the stand and we're in the middle of testimony, either direct or cross, and I usually at the end I will make a direction that the witness not speak to anybody during any break, I'm going to ask the same thing; I don't want counsel speaking to them. That goes, of course, for the assistant district attorney, defense and defense counsel or anybody who might be an investigator thereof.

MR. KETOVER: Judge, if I may, as a member of the Defense Bar, I want to make a clear record. It's not my intention, as I said, to take any position. But, again, my client is here at her own peril. We do have an agreement which specifically states nothing she testifies to will be used against her. But there's nothing else for her to be here on. So, I'm trying to make sure that everything is crystal clear.

My understanding was, that was the question asked. Immediately after I said that it can't be done, Mr. Chamberlain then said, that's not what I was asking of you. It was that quick of an exchange. It wasn't delay. So, just so we're clear.

MR. CHAMBERLAIN: Can I ask you who first suggested talking to your client? Was it -- didn't you bring that up in the conversation, that you want to have a conversation with my client beforehand? And I said, no. Isn't that the way it transpired? Didn't you bring it up in the first place?

MR. KETOVER: My memory of the event is this: You asked about her current charges. You then asked about whether or not she had any experience with Mr. Kane. You then asked me whether --

MR. CHAMBERLAIN: I --

THE COURT: Let Mr. Ketover finish.

MR. KETOVER: You then asked me -- this is my memory of it -- if you can speak with her before court. Maybe the term was "get together." I don't really recall specifically. I then said, it's the middle of cross-examination, that's improper. And then immediately after I said that is when you corrected me and said, I wasn't asking to speak with your client.

That was the full extent of the conversation, which, like I said, lasted maybe five to seven minutes. As far as I know, at this point no one from the defense team has spoken to my client.

MR. CHAMBERLAIN: And I did not suggest -- I'll say it categorically -- "getting together" with

his client at any time. I suggested, if you want to have -- are you suggesting that, and I said, I'm not suggesting it. He brought it up, I didn't. I was asking --

MR. KETOVER: I have no ax to grind here. I want to make sure we're crystal clear.

THE COURT: The record is quite clear as to what my directions are right now.

MR. CHAMBERLAIN: Fine, Judge.

THE COURT: Let's not have this come up again.

Anything you want to add Mr. Biancavilla?

MR. BIANCAVILLA: No, Judge.

THE COURT: Bring the witness in.

THE COURT: Counsel, are you ready to proceed?

MR. BIANCAVILLA: Ready, Judge.

MR. CHAMBERLAIN: Ready, your Honor.

F R A N C I N E Q U I N N, Recalled as a witness, having been previously duly sworn, resumed the stand to continue cross-examination testimony as follows:

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE CLERK: Both sides stipulate all sworn

jurors are present and seated properly?

MR. BIANCAVILLA: So stipulated, your Honor.

MR. CHAMBERLAIN: So stipulated.

THE COURT: Good morning, ladies and gentlemen. I'm sorry for the delay. With all best intentions we aim to start at the time I tell you we're going to start, but sometimes something comes up, things that have to be out of your hearing or other court business. So, I want to let you know, it's not that we're not thinking about you, it's just that we have to do other things.

But we're ready to proceed now.

Mr. Chamberlain.

THE CLERK: Miss Quinn, you're reminded your still under oath.

THE WITNESS: Yes.

CROSS-EXAMINATION CONTINUED.

BY MR. CHAMBERLAIN:

Q Miss Quinn, you and I have never spoken before we first spoke yesterday when you were on the stand, is that correct?

A Yes.

Q Were you contacted by an investigator from my office? Were you contacted by an investigator concerning this matter?

A Yes.

Q When was that?

A On several occasions.

Q And when was the last occasion?

A Last week.

Q And what, if anything, did you tell that investigator?

MR. BIANCAVILLA: Objection.

A Nothing.

THE COURT: Sustained.

Q Did you refuse to discuss this case: Did you tell him you have been told not to discuss this case?

MR. BIANCAVILLA: Objection.

THE COURT: I'm not sure what the relevancy is, Mr. Chamberlain.

Q Did you discuss this case with that investigator?

A No.

Q Now, Miss Quinn, I want to direct your attention back to the Y.L. Childs when you were there. Were you in conversation with Ruth during that evening?

A No.

Q You testified that you saw Ruth kiss the defendant, is that correct?

A Yes.

Q Did you see her kiss anybody else?

A No.

Q And when you saw her leave, about what time was that?

A Probably about a little before four o'clock.

Q A little before four. And shortly after you left, right, about ten, fifteen minutes, right?

A Before I left.

Q Shortly after she left, ten or fifteen minutes you left?

A Yes.

Q When she left, how many people were left in the bar shortly before four?

A I don't recall.

Q Approximately -- it was almost closing, right?

A Yeah.

Q Well, about how many people?

A Approximately, maybe, ten people.

Q Possibly ten people. Okay. And when you left, how many people were left?

A Same people were there.

Q Same people. Now, it's correct that some of the people that were there when she left were John Kane, whom you knew, and the defendant, right?

A I'm sorry, could you repeat the question?

Q When she left Y.L. Childs, John Kane, whom you

knew, and the defendant were still there, right?

A I don't recall.

Q Do you -- I'm going to show you a page from -- your testimony before the grand jury and see if it refreshes your recollection.

MR. CHAMBERLAIN: Page 50, Mr. Biancavilla, starting with top -- starting with line 5.

Question by a juror, line 5.

MR. BIANCAVILLA: Page 50?

MR. CHAMBERLAIN: It's 50 or 56.

THE COURT: Mr. Chamberlain, do you want that marked?

MR. CHAMBERLAIN: Yes.

THE COURT OFFICER: Defendant's D marked for identification.

(Whereupon, the referred to item is received and marked Defendant's Exhibit D for identification by the reporter as instructed.)

THE COURT: Mr. Chamberlain.

MR. CHAMBERLAIN: Thank you.

Q Does that refresh your recollection as to the number of people left?

A Yes.

Q At the time you left?

A Yes.

Q Pardon me?

A Yes.

Q What is it, what did you indicate?

A I said about ten people.

Q Had you told the grand jury -- a juror of the grand jury about five? You mentioned five that worked there?

MR. BIANCAVILLA: Objection.

THE COURT: Well, I'm not exactly sure what the total statement was in the grand jury. I'm going to overrule it for now.

MR. CHAMBERLAIN: Let me withdraw it, Judge.

Q You indicated -- you mentioned five and then there were five or six more, is that a fair statement?

MR. BIANCAVILLA: Objection.

Q Would it be possibly eleven people?

MR. BIANCAVILLA: Objection.

THE COURT: I'll overrule it.

A I said, you know, about ten people. I said I wasn't sure exactly how many people were there.

Q Did you tell a juror, did you indicate to a juror, five people specifically?

MR. BIANCAVILLA: Objection.

THE COURT: You know, Mr. Chamberlain, you have to read the question and answer into the record if

you're going to use the grand jury testimony.

MR. CHAMBERLAIN: Question by a juror, line 5, page 56: .

"Actually, I have another question. I have another question.

When you were leaving the bar, when you were a guest in the bar, not where you were working, how many people were actually left in the bar when they said last call, aside from the five you mentioned?"

"Probably, like, five or six more."

MR. BIANCAVILLA: I'm going to object, Judge. It's not inconsistent.

THE COURT: Apparently it is not.

Sustained.

Q Well, does that refresh your recollection as to your mentioning five specific people?

MR. BIANCAVILLA: Objection.

THE COURT: Well, refreshing your recollection is a different story.

Miss Quinn, after reviewing the grand jury testimony, is your recollection refreshed as to the amount of people that were in the bar at closing?

THE WITNESS: Is it refreshed? I don't really understand what you're asking me. I don't really --

THE COURT: You responded you did not recall. Therefore, I asked you if your grand jury testimony refreshed your recollection as to how many people were in the bar after closing, after reviewing that segment of the grand jury testimony.

THE WITNESS: Yes.

THE COURT: Ask the question, Mr. Chamberlain.

Q All right. Miss Quinn, essentially, there were the same ten or so people there that were there when Ruth left, is that correct? The number was the same, is that right?

A Yes.

Q Nobody had come in during the period of time after Ruth left, had they?

A No.

Q Now, directing your attention -- withdrawn.

It is your testimony that you walked quickly when you left from that location around the Downtown to your car, is that right?

A Yes.

Q Approximately how long did that walk take?

A Probably, about five minutes.

Q Five minutes. It was a block long, wasn't it?

MR. BIANCAVILLA: Objection.

THE COURT: I'll permit that.

Q How long a distance was it from Y.L. Childs to the Downtown?

A I don't really know.

Q Isn't that one block?

A Yeah, it's one block.

Q Okay. When -- you indicated he -- when you got to your car you were about to get in the driver's side -- driver's door and you saw some people arguing outside the back entrance to captain Andy's, is that right?

MR. BIANCAVILLA: Judge, I object. We went through this yesterday on several occasions.

THE COURT: Overruled. I'll permit it.

A I heard noises.

Q You heard noises?

A I heard voices.

Q Could you tell -- could you tell what the people were saying?

A I heard escalated voices. I heard the word fuck and it caused me to draw my attention that way.

Q Now, you told us -- withdrawn.

You could not tell what -- you indicated that there was an argument, you couldn't tell what the argument was about, is that your testimony?

A Yes.

Q You indicated to the district attorney that you were approximately fifty feet away from where these people were standing.

MR. BIANCAVILLA: Objection.

THE COURT: Overruled.

MR. BIANCAVILLA: Judge, I don't think anywhere in the testimony did I ask was she fifty feet away.

MR. CHAMBERLAIN: I think he did.

THE COURT: Let's do it this way. I will sustain that. Just ask the question of the witness.

Q Do you remember being -- well. Did you -- how far away were you when you were -- from where you were standing where these people were?

A Probably, maybe, about fifty feet.

Q It's your testimony that it was about fifty feet from -- withdrawn.

They were standing right outside the door, the double door that you referred to, is that correct?

A They were standing in that area, by the door.

Q Were they standing any distance away from it?

A I'm not -- I'm not really sure. It was in that area. It was where the door to her apartment is.

Q Well, were they right adjacent to the door? Were they five or ten feet away? Can you tell us that or not

tell us that?

A The area where they were standing was the entrance to where her apartment is.

Q Were the doors opened or closed?

A The door was closed.

Q Closed. Are you sure of that, Miss Quinn?

MR. BIANCAVILLA: Objection.

THE COURT: Overruled.

A Yes.

MR. CHAMBERLAIN: Page 49, starting with line 3.

Q Miss Quinn, do you recall these questions and answers before the grand jury:

Question by the district attorney. "Were they a couple of feet away from the doors? Were they relatively in close proximity? Can you give us some idea?"

"ANSWER: They were kind of like in the middle of the entrance of the doors. They weren't right in front of the door. But --"

"QUESTION: Do you have a recollection when both of these doors were -- withdrawn.

Do you have a recollection of whether the right hand door was open or closed?"

"ANSWER: No."

"You don't have a recollection."

"ANSWER: No."

Q Do you recall those questions and answers?

A Yes.

Q Now, the right hand door was the door that led up to the victim's apartment, is that right?

A Yes.

Q And could you tell this jury what if anything has refreshed your recollection over your recollection before the grand jury on July of 2000 as to the door -- as to the doors?

MR. BIANCAVILLA: Objection.

THE COURT: Yes, sustained as to form, Mr. Chamberlain.

Q Have you discussed this case with anybody else since then?

A No.

Q Never. You haven't discussed what you were going to testify to? Didn't you discuss it with the district attorney?

A Well, with the district attorney.

Q Yes, with the district attorney?

A Yes.

Q And Mr. Dempsey, another district attorney before him?

A Yes.

Q As you sit here, testimony what is your testimony as to whether the doors were open or closed?

MR. BIANCAVILLA: Objection.

THE COURT: Last time I'll permit this.

A I don't remember it being opened.

Q Now, Miss Quinn, you testified that these people you saw arguing or the person you knew as Ruth and this defendant, is that correct?

A Yes.

Q When you testified before the grand jury two years ago you were not certain as to whether it was these people, is that correct?

MR. BIANCAVILLA: Objection.

Q Miss Quinn, you appeared at a lineup shortly after this man was arrested, were you not?

A Yes.

Q And did you view this lineup from a few feet away from the individuals you were viewing, approximately five or seven feet; do you know how far away the people were? You were standing in front of a one way glass, right, where they couldn't see you, you could see them?

A Yes.

Q Approximately how far away were these individuals?

A I don't know, about maybe five, six feet.

Q Okay. And this is the way the individual that you looked on that occasion back two years ago on May 3rd when you viewed that lineup, right?

A I'm sorry, I didn't understand the question.

Q In other words, -- withdrawn.

You were unable to identify Mr. Scrimo from five or seven feet away on May 3rd, is that correct, May 3rd, 2000?

A Yes.

Q And on the night in question you were standing, as you said in People's B, alongside a car parked in the third row. Would you tell me your estimate of the distance of the third row from where the back door is that you were referring to and where those people were?

MR. BIANCAVILLA: Objection.

THE COURT: Can you do that, Miss Quinn?

THE WITNESS: Can I --

THE COURT OFFICER: Looking at People's B in evidence.

THE COURT: Look at People's B. Can you look at People's B and tell us how many feet? Does that refresh your recollection? I presume that's the question you want to ask.

MR. BIANCAVILLA: Judge, there's no testimony

that that's the view she was observing them from.

MR. CHAMBERLAIN: There was testimony. They marked an X, Judge.

THE COURT: Based on that objection, I'm going to sustain it.

I'm going to let Mr. Chamberlain ask that.

Q From where you marked the X on that photograph, can you estimate the distance from that place to the location where the two people were standing?

MR. BIANCAVILLA: Objection.

THE COURT: Well, you are presupposing something.

Miss Quinn, you marked an X on that photograph. People's B in evidence -- Defendant's B in evidence, is that correct?

THE WITNESS: Yes.

THE COURT: That's the place you were standing when you observed the two people near the back of Captain Andy's.

THE WITNESS: No.

Q What does the X signify?

A That's where the car was parked.

Q The car was parked. And what part of the car would the X signify? That row that the X -- that row of cars points away from Captain Andy's, does it not?

MR. BIANCAVILLA: Judge, I'm going to object.

THE COURT: Yes, I'm confused. Wait, Mr. Chamberlain. I'm confused by that question.

I'm going to sustain it in that form.

MR. CHAMBERLAIN: I will withdraw it, if I may.

Q Was your car parked facing diagonally away from Captain Andy's at that time?

A Yeah.

Q And so, the X would mark the back of where your car was parked, would it not?

A Yes.

Q And so, you were actually a little further away, around the side of the path of the driver's side of the car, about to get in, is that correct?

A No. I was on the driver's side of it. The car was parked diagonally. I was walking around to the driver's side.

Q Miss Quinn, did you see the people after you heard this argument? Did you see whether they were in or out or left or anything?

A No. I got in my car and left.

Q And is there no question that this conversation we're talking about was taking place outside this doorway, not inside, right?

A Yes.

Q Have you been to the victim's apartment, do you know?

A No.

Q Let me direct your attention to Downtown when you saw this other -- this male white that you described previously at the Downtown earlier that evening, the evening of April 11th and 12th. Was John Kane there?

A At the Downtown?

Q Yes.

A No.

Q Was John Kane -- you knew John Kane fairly well at that time, didn't you?

A He was a frequent customer of the Downtown.

Q Was he -- had he ever been barred from the Downtown for selling drugs?

MR. BIANCAVILLA: Objection.

Q Do you know?

MR. BIANCAVILLA: Objection.

THE COURT: Sustained.

Q Who was the owner of the Downtown?

MR. BIANCAVILLA: Objection.

THE COURT: I'll permit that.

Q Who was the owner of the Downtown?

A Scott Morano.

Q And his son -- was Scott the owner or the father, Tony?

A Scott's the owner.

Q Father is Tony Morano?

A Yes.

Q Was there a bouncer/doorman by the name of Chris Killstat at the Downtown?

A Past employee, yes.

Q Past employee. I'm talking about --

THE COURT: Are you referring to April 11th and 12th?

MR. CHAMBERLAIN: Yes.

A Yes, he was.

Q Now, were you present when there was an incident involving a woman who grabbed money from John Kane claiming that he had shorted her on a drug sale?

MR. BIANCAVILLA: Judge, I'm going to object.

THE COURT: Sustained.

MR. BIANCAVILLA: Judge, I want to approach on this.

THE COURT: Yes, Counsel, come forward.

Could you step down please.

(Whereupon, the following takes place at the Bench, between the Court and Counsel:)

THE COURT: Mr. Biancavilla.

MR. BIANCAVILLA: Judge, I want you to direct Mr. Chamberlain to stop this or I want him sanctioned.

You have spent two days telling him not to elicit this type of testimony. You have made a record clearer than any other record I ever heard and he continues to defy your Court order, and I think the only way you will --

MR. CHAMBERLAIN: I want --

MR. BIANCAVILLA: Is to sanction him.

THE COURT: Mr. Chamberlain.

MR. CHAMBERLAIN: I would like this outside the presence of the jury, because I want --

THE COURT: Let's go in chambers.

MR. CHAMBERLAIN: I've got some --

THE COURT: That's it. Let's go into chambers.

MR. CHAMBERLAIN: I have some material I would like to bring in.

THE COURT: Ladies and gentlemen, we're going to take a short break at this point. Do not discuss the case among yourselves or with anyone else. Keep and open mind. Do not form or express any opinions until the entire case is completed. Do not read or listen to any accounts of this case, should it be reported in the media. Do not visit any place or

placed mentioned. Finally, you are not to permit any party to discuss this case with you or attempt to influence you. You are to promptly report to the Court any violation thereof.

We'll be back with you shortly. Please follow the court officers.

THE COURT OFFICER: Please follow me.

(Whereupon, the sworn jury and alternates leave the courtroom.)

THE COURT: Counsel, join me in chambers, please.

(Whereupon, the following takes place in chambers, between the Court and Counsel, Mr. Ketover is also present.)

THE COURT: Mr. Chamberlain, you heard my admonitions with respect to cross-examination. I don't understand why you keep asking those questions. You can certainly ask Mr. Kane on the specific dates with respect to any cocaine transaction you want. If he denies it, I said you can bring in anybody you want under subpoena or bring them in.

Now, I don't understand why you keep asking those questions when I asked you not to do this yesterday.

MR. CHAMBERLAIN: My understanding, Judge,

was that I was supposed to defer asking this witness questions about her involvement or anything about that.

THE COURT: No, I said --

MR. CHAMBERLAIN: With respect to that. I have a good faith basis for asking these questions. I have statements from other people that will support them, which I will show to the court, in-camera, if the Court were so inclined.

MR. BIANCAVILLA: If I could briefly interrupt you. I have Appellate Division cases from every Department in this state that basically say, set forth the proposition that Mr. Chamberlain cannot do what he's trying to do at this trial. Let me read the citations into the record.

People v Barnhill, 180 AD2d, 884, Third Department from 1992; People v. Walton, 170, AD2d, 349, First Department, 1991; People v. Bugman, 254, AD2d, 796, Fourth Department from 1998; People v. Alvino, 71 NY2d 233, 1987; People v. Umbarro, 128 AD2d, 712, Second Department, 1987; People v. Diaz, 209 AD2d, 633, Second Department 1994.

Judge, I will leave these cases with your law secretary. But, basically, they clearly set forth, you cannot collaterally -- this all has to do with the introduction of collateral evidence, Judge. And

they're very clear, from the Court of Appeals right down through all the Departments, you cannot collaterally try to impeach a witness with the type of evidence that he's trying to do.

MR. CHAMBERLAIN: Judge, I understand -- I know the law on collateral, on estoppel of collateral evidence.

MR. BIANCAVILLA: There are many cases.

MR. CHAMBERLAIN: Let me finish, please.

THE COURT: Let Mr. Chamberlain speak.

Yes, Mr. Chamberlain.

MR. CHAMBERLAIN: There are many cases on collateral attack, Judge. There's no question about that. I do not consider this a collateral attack. Because the question here is not Mr. Kane's credibility. It certainly is not solely Mr. Kane's credibility. It's more than that. It's Mr. Kane's relationship to this witness or to other witnesses, to the victim and who had a relationship. It's not a question of his credibility, although that will be involved. It's a question of relationship, which has been brought out by the People in connection with --

MR. BIANCAVILLA: At this point --

MR. CHAMBERLAIN: Part of these witnesses are testifying as to the relationship between who they knew

and how they knew them. I'm entitled to go into that, I think, on cross-examination. I'm entitled to bring out information I have. And I have a good faith basis for all of these questions. I truly believe --

THE COURT: You're attacking collaterally through another witness. You're attacking Mr. Kane's credibility through Miss Quinn. That is not permissible.

MR. CHAMBERLAIN: I'm not attacking.

THE COURT: Obviously by asking the questions with respect to cocaine transactions of Mr. Kane, you're attacking -- because if she's going to acknowledge, yes, he did, you're attacking Mr. Kane's credibility through Miss Quinn.

MR. CHAMBERLAIN: But I'm not attacking his credibility here. I'm a talking about his lifestyle. I'm talking about who he is.

THE COURT: His lifestyle?

MR. CHAMBERLAIN: I'm bringing forth, Judge, the relationship between -- of Kane to the victim, to this young lady, and to other people, based upon information I have that she is -- that he was a drug supplier, and there are witnesses who have testified here he was a drug supplier. And I believe I should have an opportunity to bring that out. I think it's

part and parcel of this entire case. Why the police did not arrest Kane or did not investigate his drug involvement, I don't know. But you're going to find out they didn't.

THE COURT: One moment, Mr. Chamberlain.

MR. CHAMBERLAIN: Judge, I have --

THE COURT: I'm reading, Mr. Chamberlain.

MR. CHAMBERLAIN: Fine.

(Whereupon, there is a brief pause.)

THE COURT: Mr. Chamberlain, it's quite clear to me that my ruling is correct.

MR. CHAMBERLAIN: Can I be heard one further second, Judge?

THE COURT: Yes.

MR. CHAMBERLAIN: This witness has claimed Kane, who she knew well, was a regular visitor at the Downtown.

THE COURT: Yes.

MR. CHAMBERLAIN: I think I have a right to attack her credibility or ask her questions if based upon the information I have that Kane had been barred from the Downtown for selling drugs there, if she was aware of that. I have a right -- I have a basis for those questions. I have signed statements to that effect, that kane had been barred by the fellow she

mentioned, this Scott Morano, from going -- because he was selling drugs there.

THE COURT: That is a collateral matter, Mr. Chamberlain. It's collateral. If you would like to, as I explained to you, this is the last time I'm going to explain it to you, you will have ample opportunity to cross-examine Mr. Kane on all these items. I'm sure you will.

Now, of course if he should testify differently to what your other information is, you will have an opportunity at that point on your case to cross-examine or else produce witness, if that's the case. But at this juncture you are cross-examining on collateral matters that -- I will not permit it.

This is the last time I'm going to put it on. I don't want to have to get involved with sanctions. I want this perfectly clear, okay? I don't want to keep coming in here and have these conferences in chambers, going over the same thing we went over yesterday and the day before. Okay?

You have an exception.

MR. CHAMBERLAIN: All right, Judge.

(Whereupon, the following takes place in open court:)

MR. CHAMBERLAIN: I will be allowed one area

that you allowed with respect to Miss Shouse with respect to use on that night?

THE COURT: Yes. I made that ruling. And also with respect to within the last couple of days.

MR. CHAMBERLAIN: Would you explain to the jury -- all right.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: Mr. Chamberlain.

CROSS-EXAMINATION CONTINUED

BY MR. CHAMBERLAIN:

Q Miss Quinn, on the night on or about April 11th or April 12th, during that period of time, were you -- did you use any cocaine during that period of time, the year 2000?

A No.

Q You indicated to the district attorney, in answer to his questions, that you were charged with six counts of sale and six counts of possession of cocaine, is that correct?

MR. BIANCAVILLA: Objection.

MR. CHAMBERLAIN: I think it was placed on the record.

MR. BIANCAVILLA: It wasn't.

THE COURT: That's not what the district attorney said, Mr. Chamberlain. If you want to ask a question --

Q Were you so charged?

A Yes.

Q And you were asked --

MR. BIANCAVILLA: Judge, I'm going to object.

THE COURT: Well, I haven't heard the next question.

Q You were asked when you left the Downtown; you said the last day of July 2001, is that correct?

A I said the end of July.

Q The end of July. All right. And you indicated that was to better yourself, to get a better position?

A Yes.

Q Isn't it a fact, you were arrested on August 1st, 2001 for sale and possession of cocaine?

A Yes.

MR. KETOVER: If I might interject, he's mischaracterizing.

MR. CHAMBERLAIN: I object to the counsel interjecting.

MR. BIANCAVILLA: He is mischaracterizing the charges and everything else.

MR. CHAMBERLAIN: I'm not, I object.

THE COURT: Excuse me. Excuse me. Everybody. I'm in charge of the courtroom, okay. When I talk, nobody else does.

Now, I think perhaps, Mr. Chamberlain, you could be more specific as to the allegations and dates.

THE COURT: Come forward, Counsel.

(Whereupon, the following takes place at the Bench, between the Court and Counsel:)

MR. KETOVER: If I might just make it easier. I'm not playing games here. She wasn't charged with sale of cocaine on -- possession of cocaine. I think there might have been Ectasy. So, clearly what she was charged with --

THE COURT: That what I'm --

MR. KETOVER: She's answering, yes, I was charged.

THE COURT: There were certain dates these things happened alleged in the indictment. Those are the dates you're supposed to use. You say such and such a day.

MR. KETOVER: As well as different controlled substances. There wasn't cocaine.

THE COURT: Be specific.

MR. CHAMBERLAIN: The date is correct. And I'll ask the date for the charge.

MR. BIANCAVILLA: That's why I was objecting, so you know.

MR. CHAMBERLAIN: I have a letter from Bill Dempsey saying she was arrested on August 1st.

THE COURT: Excuse me. She may have been arrested on August 1st. I don't know the dates of the alleged sales.

MR. BIANCAVILLA: Exactly.

MR. CHAMBERLAIN: I haven't asked those questions.

THE COURT: That's the important dates. I can understand, you can ask her if she was arrested on such and such a date. When you make reference to the actual sales, you have to be specific as to the date that allegedly those sales took place.

MR. BIANCAVILLA: And what sales.

THE COURT: And what the sales are for.

MR. KETOVER: Yes. Again, my client isn't looking to sidestep anything.

MR. CHAMBERLAIN: If he wants to bring out what the sales were for --

THE COURT: You have an absolute right. I'm not denying you.

MR. CHAMBERLAIN: Thank you.

(Whereupon, the following takes place in open

court:)

THE COURT: Mr. Chamberlain.

CROSS-EXAMINATION CONTINUED

BY MR. CHAMBERLAIN:

Q Miss Quinn, you were, in fact, arrested on August 1st, 2001 and charged with drug sales, were you not?

A Yes.

Q And the dates of these drug sales, when were they; can you tell us that?

A I don't remember the exact dates.

Q Well, they, according to your answer to the district attorney, they were all at the Downtown Bar, is that correct?

A Yes.

Q And were they to -- withdrawn.

Can you tell me the range of dates, approximate range of dates?

MR. BIANCAVILLA: Objection.

THE COURT: Well, that's kind of a nebulous question, Mr. Chamberlain. Perhaps you could be more specific.

Q Well, we're talking about a period -- your arrest was August 1st, 2001. How long prior to that period did these sales take place?

A I think it was, like, six months. I'm not sure.

Q After your arrest did you enter into a consent or an agreement with the District Attorney's Office for cooperation?

A Yes.

MR. BIANCAVILLA: Objection.

THE COURT: Well, overruled.

MR. CHAMBERLAIN: Pardon me?

MR. BIANCAVILLA: Judge, I'm going to object. He's mischaracterizing.

MR. CHAMBERLAIN: I'm going to object.

THE COURT: Excuse me, I rule on objections. I don't want arguments in front of the jury.

Now, I permitted the answer to stand.

Mr. Biancavilla, on redirect you can ask her whatever questions you feel are appropriate.

MR. CHAMBERLAIN: Thank you, Judge. I didn't hear the answer, I heard Mr. Biancavilla.

THE COURT: Excuse me?

MR. CHAMBERLAIN: Can I hear the answer. I didn't hear her answer.

THE COURT: Did the witness answer?

The answer was, yes, Mr. Chamberlain.

Read it back, please.

(Whereupon, the requested answer was read back by the reporter.)

Q And you understand the purpose of that agreement you entered into?

MR. BIANCAVILLA: Objection.

THE COURT: Well, if she understands the agreement, I'll permit that.

MR. BIANCAVILLA: That wasn't the question, Judge.

THE COURT: Well, the word "purpose" is kind of a nebulous --

Q Let me withdraw the word "purpose."

Do you understand the agreement?

A Yes.

Q What's in it for you?

MR. BIANCAVILLA: Objection.

THE COURT: Overruled. Overruled.

A I don't understand what you are asking me.

Q You're cooperating with the district attorney, what are you going to get for that cooperation?

MR. BIANCAVILLA: Objection. He's assuming facts.

THE COURT: Actually, Mr. Chamberlain, you're presupposing something. You have to ask her the question first.

MR. KETOVER: Why don't we read the agreement?

Q You signed a cooperation agreement, did you not, ma'am, did you?

A I don't --

MR. KETOVER: Judge, at this point I have to interject. That's not what she signed, Judge.

MR. CHAMBERLAIN: I object to his making --

THE COURT: Counsel --

MR. CHAMBERLAIN: In front of this jury.

THE COURT: Let me --

MR. CHAMBERLAIN: It's inappropriate.

THE COURT: Miss Quinn, do you understand the question?

THE WITNESS: I don't really know --

THE COURT: That's okay. If you don't understand the question, all you have to do is say so and I'll have Mr. Chamberlain rephrase it.

MR. CHAMBERLAIN: If she wants time, Judge, to consult with her counsel outside the presence of the jury and then answer the question --

THE COURT: Mr. Chamberlain, please.

MR. BIANCAVILLA: It's a mischaracterization. We did this on the record.

MR. CHAMBERLAIN: I object to these comments in front of this jury, Judge.

THE COURT: Counsel, come forward again,

please.

(Whereupon, the following takes place at the Bench, between the Court and Counsel:)

THE COURT: Yes, Mr. Biancavilla.

MR. BIANCAVILLA: So the record is clear, I gave you a copy yesterday of the stipulation or the proposed agreement.

THE COURT: Is that the only agreement?

MR. BIANCAVILLA: That is it. There's no cooperation agreement. She didn't sign any.

MR. CHAMBERLAIN: I object to this.

THE COURT: This is -- excuse me.

THE COURT: Mr. Chamberlain, how can you object to what the district attorney is telling us outside the hearing of the jury?

MR. CHAMBERLAIN: Because the jury can hear it.

THE COURT: The jury can not hear it, only if you raise your voice.

MR. CHAMBERLAIN: I think they hear it.

THE COURT: Do not raise your voice.

Yes, Mr. Biancavilla?

MR. BIANCAVILLA: Mr. Chamberlain is well aware, we made him well aware yesterday, that that is the entire agreement. If he wants to question her

whether or not we promised her anything or anything of that nature, I don't care. But for him to just say what's in it for you, and you signed a cooperation agreement, that's nonsense because there's no good faith basis for asking that. He, again, is just speculating.

MR. KETOVER: More to the point, Judge. In my communication with Mr. Chamberlain yesterday when he called me, we specifically discussed this. And I specifically told him she's not getting out of it, that there's no promises whatsoever.

THE COURT: Okay.

MR. KETOVER: No promises whatsoever. That's the only agreement.

THE COURT: I understand that. What Mr. Ketover tells you, you certainly don't have to take as gospel.

MR. CHAMBERLAIN: As a matter of fact, I have reason --

THE COURT: I'm not preventing you from asking these questions. As a matter of fact, you should ask these questions. You're entitled to.

MR. CHAMBERLAIN: Thank you, Judge. He didn't want to tell me --

THE COURT: Excuse me, I'm talking. Remember

the rule, when I talk, you don't.

Now, I'm suggesting to you, ask your questions in a proper manner. You have heard the representation from the district attorney, that that was the agreement. You can ask her if there was another agreement, but that's it.

MR. CHAMBERLAIN: Judge, to start with, your response to this gentleman's statement, I couldn't even -- I had trouble getting out that she was under indictment. He clearly did not want to provide any information.

Now, with respect to Mr. Biancavilla's statement, I don't know that that is the only agreement. That's the agreement with respect to her testifying here today. When somebody is arrested on drug charges, it is common for them to enter into a cooperation agreement with narcotics bureau of the district attorney, which is what I asked her, and she said yes. I'm entitled to probe that. I think -- and the questions asked were directed toward that -- if it wasn't a signed agreement, all she has to do is say no.

THE COURT: You can make it more specific and ask her.

MR. CHAMBERLAIN: First of all --

THE COURT: She didn't understand the

question.

MR. BIANCAVILLA: That's exactly what I am concerned about.

MR. CHAMBERLAIN: I think she did.

THE COURT: I'll let you ask it again. You heard me explain it to her. If she doesn't understand it, she will tell me.

MR. BIANCAVILLA: I'm not finished, Judge.

First of all, if there was a cooperation agreement, I would be required to disclose it under the law. He has no good faith basis to asking those questions because I am required under the discovery sections of the Criminal Procedure Law to disclose it. He has no good face basis for asking that, and he's impermissibly going into area. That's my point. The CPL says I have to disclose if one is in existence, and I'm saying it's not in existence.

MR. CHAMBERLAIN: Well, I think Mr. -- I think he would like to testify. All I know is, yesterday I was handed a short stipulation, nothing about anything else. Common practice indicates -- common practice indicates that drug defendants enter into cooperation agreements. I asked her that. And I think I have a right to ask her that.

THE COURT: I did not stop you from asking

that. You know, I didn't think she understood the question. I'm asking you to rephrase the question.

MR. CHAMBERLAIN: Can we her answer read back? I think she understood the question. My understanding --

THE COURT: I'm going to let you ask it again at this point. Let's go forward.

MR. KETOVER: I'll bring her in, Judge.

(Whereupon, the following takes place in open court:)

THE COURT: Mr. Chamberlain.

CROSS-EXAMINATION CONTINUED

BY MR. CHAMBERLAIN:

Q Miss Quinn, I asked you about a cooperation agreement with the District Attorney's Office, that would be the Narcotics Bureau. You're charged with sale of narcotics, do you understand that?

MR. BIANCAVILLA: Objection to the form of the question.

Q Do you understand the question I asked you before?

MR. BIANCAVILLA: Objection.

THE COURT: Excuse me.

MR. CHAMBERLAIN: All right I'll withdraw it.

THE COURT: Sustained.

Q Miss Quinn, did you have an agreement with the District Attorney's Office to cooperate in connection with drug investigations after your arrest, yes or no?

A No.

Q So, when you answered yes before, you didn't understand the question, is that correct?

A I was confused as to what you meant.

Q Were any of the people that were involved in the matters that you were involved in regular customers of the Downtown?

MR. BIANCAVILLA: Objection.

THE COURT: I'll permit that.

A No.

Q Either by customers, informants, targets of an investigation, in any way involved?

THE COURT: How would she know that?

MR. BIANCAVILLA: I'm going to object.

MR. CHAMBERLAIN: If she knows.

MR. BIANCAVILLA: Judge, I object.

THE COURT: Well, ask another question. I'm sustaining it as to form.

Q Miss Quinn, and shortly after this incident -- you were aware of where John Kane lived, were you not?

A Yes.

Q After this incident, and according to you, he was a regular frequenter of the bars in that area, right?

A Yes.

Q Right after the murder did Mr. Kane leave the scene?

MR. BIANCAVILLA: Objection.

THE COURT: Sustained.

Q After May of 2000 did you see Mr. Kane in the neighborhood anymore?

MR. BIANCAVILLA: Objection.

MR. BIANCAVILLA: As to relevancy.

THE COURT: I'm not sure. Unless you can tell me this is relevant, Mr. Chamberlain.

MR. CHAMBERLAIN: Think it will be connected up.

THE COURT: I'll give you a little bit of leeway.

MR. CHAMBERLAIN: Thank you.

THE COURT: Overruled.

A Can you repeat the question?

Q After May of 2000 was Mr. Kane still around in that Farmingdale area?

MR. BIANCAVILLA: Objection.

THE COURT: This one is sustained. Read the last one back.

(Whereupon, the last question was read back by the reporter as instructed)

THE COURT: I'll permit that.

A No, I don't remember seeing him around.

Q Have you been in contact with him since that period of time?

A No.

Q Do you have any idea where he went?

MR. BIANCAVILLA: Objection.

THE COURT: Sustained.

MR. CHAMBERLAIN: Nothing further. Thank you, Judge.

THE COURT: Redirect, Mr. Biancavilla?

MR. BIANCAVILLA: Yes, please. Just briefly, Judge.

REDIRECT EXAMINATION

BY MR. BIANCAVILLA:

Q Miss Quinn, I'm going to show you what has been offered into evidence as People's Exhibit number 8. I'm going to ask you to please take one of these red dots and place it in the approximate area where you saw Ruth Williams and the defendant standing when you heard that argument, please.

(Whereupon, witness complies with request)

Q Thank you.

MR. BIANCAVILLA: May I display that for the jury, Judge?

THE COURT: Yes.

THE COURT: Show it to Mr. Chamberlain first.

MR. BIANCAVILLA: Now displaying People's Exhibit 8 for the jury.

Q Miss Quinn, my question is, is that the view that you had of that little alcove from where you were standing at your car?

A Do you mean the angle?

Q Yes. Is that the view that you had?

A Yeah.

Q Okay. Now, Defense Exhibit C. Take a look at Defense Exhibit C. Is that the view that you had from where you were standing when you observed Miss Williams and the defendant?

A No.

Q Okay. Take a look at Exhibit B, Defense Exhibit B. Is that the view that you had when you observed Miss Williams and the defendant?

A No.

MR. BIANCAVILLA: Okay. Thank you.

Q Now, Mr. Chamberlain asked you a question yesterday or read a question to you out of your grand jury testimony on page 44. And he read you one question out of a

series of questions.

MR. CHAMBERLAIN: I'm going to object to this, Judge. That's not proper.

THE COURT: I haven't heard a question yet.

MR. CHAMBERLAIN: I object to the preamble. Let's hear the question.

Q Yesterday Mr. Chamberlain asked -- read to you this question and read your answer. That was a question on page 44 at line 18.

"QUESTION: I take it you did not get a good observation of the face of the woman or the face of the man?"

"ANSWER: No."

Q Do you remember him asking you that question?

A Yes.

Q Okay. Now, do you remember being asked these questions and giving these answers on page 44 of your grand jury testimony, starting on page 43 at line 23:

"QUESTION: Did you hear the man use the F word?"

"ANSWER: Yes."

"QUESTION: The man that you saw, was he bald headed man?"

"ANSWER: Yes."

"QUESTION: What can you tell us about the

stature?"

"ANSWER: He had the same stocky build of the man that I saw with her earlier in the bar. Like, he had, you know, big arms and, you know, I could tell he had a shaved head."

"QUESTION: What can you tell us about the woman?"

"I could see her hair. The blonde hair.".

"QUESTION: Was the blonde hair consistent with Ruth's hair?"

"ANSWER: Yes."

"Did it look like Ruth's hair?

"ANSWER: Yes."

"I take it you could not get a good observation of the face of the woman or the face of the man?"

"ANSWER: No."

"QUESTION: But the build of the man that you observed, was it consistent with the man that you had previously observed in Y.L. Childs?"

"Answer: Yes."

Q Do you remember being asked those questions and giving those answers in the grand jury?

A Yes.

Q Okay. Now, you said on May 3rd that you viewed a

lineup, correct?

A Yes.

Q And take a look at People's Exhibit 4 in evidence. Tell the jury, is that the lineup that you viewed?

A Yes.

MR. BIANCAVILLA: Okay. May I display that for the jury, please?

THE COURT: Yes.

(Whereupon, People's Exhibit 4 is placed on the viewer and published to the sworn jury and alternates.)

Q Now, is it fair to say that when you viewed this lineup, the individuals in that lineup were in a seated position?

A Yes.

Q You weren't able to see their bodies?

A Yes.

Q All you were able to see was basically five heads popping out from on top of a white sheets?

A Yes.

Q So, you weren't able to see the stature of the individual in addition to the heads, correct?

A Yes.

Q Did that affect your ability to identify the

subject?

A Yes.

Q Do you recall the next day you seeing a newspaper?

A Yes.

Q And in that newspaper did you see a photograph of Detective McHugh?

A Yes.

Q And did you -- did you see another individual with Mr. McHugh in that photograph?

A Yes, I did.

Q And did you recognize that individual in that photograph?

A Yes, I did.

Q And who did you recognize that individual to be? Was that the same individual you saw at Y.L. Childs with Ruth Williams?

A Yes.

MR. BIANCAVILLA: Thank you. I have no further questions.

THE COURT: Mr. Chamberlain, any recross?

RECROSS-EXAMINATION

BY MR. CHAMBERLAIN:

Q You just heard a series of questions you were asked in the grand jury regarding the description of the man

you saw outside of Captain Andy's, is that correct?

A Yes.

Q Was there anywhere that you indicated to the grand jury that you -- when you were asked about it, did you ever say you saw a man with tattoos?

A Yes.

MR. BIANCAVILLA: Objection.

THE COURT: I'll permit that.

MR. BIANCAVILLA: Fine, withdrawn.

Q Question:

MR. CHAMBERLAIN: "The man" -- top of page 44:

"QUESTION: The man that you saw was a bald man?"

MR. BIANCAVILLA: One moment, Mr. Chamberlain.

MR. CHAMBERLAIN: Page 44, top of the page.

THE COURT: Line number?

MR. CHAMBERLAIN: Line 3, Judge.

THE COURT: Thank you.

MR. CHAMBERLAIN: "The man that you saw was a bald headed man?"

"ANSWER: Yes."

"What can you tell us about the stature?"

"He had the same stocky build of the man I

saw with her earlier in the bar. Like, he had, you know, big arms, you know. And, you know, I could tell he had a shaved head."

"What could you tell us about the woman?"

Q Was there anything in that description where you gave tattoos --

A No.

Q To the grand jury? Were you -- you were wearing a coat that night. You said it was cold, right?

MR. BIANCAVILLA: Objection. Beyond the scope of my redirect.

THE COURT: Beyond the scope, but I'll permit it.

Overruled.

Q You didn't -- basically, what you told the grand jury was, you saw somebody with a certain build that was consistent with what you had seen before?

MR. BIANCAVILLA: Objection.

THE COURT: That is sustained.

Q "Question" -- were you asked this question and GAVE this answer.

"But the build" --

MR. BIANCAVILLA: What page, Mr. Chamberlain?

MR. CHAMBERLAIN: Same page, bottom of page 22.

"But the build of the man that you observed, was it consistent with the man that you had previously observed at Y.L. Childs?"

"Answer: Yes."

Q Now, in effect, you told the grand jury you couldn't positively identify those persons, isn't that a fact?

MR. BIANCAVILLA: Objection.

THE COURT: Sustained.

Q These questions by the District Attorney, Mr. Dempsey, in the grand jury, were after you had failed to identify him at a lineup, isn't that a fact?

MR. BIANCAVILLA: Objection.

THE COURT: I'll permit that.

A Yes.

Q So, they were an attempt to explain --

MR. BIANCAVILLA: Oh, come on.

Q To the grand jury why you hadn't been able to identify this man at a line?

MR. BIANCAVILLA: Objection.

THE COURT: Sustained.

Q Miss Quinn --

MR. CHAMBERLAIN: Can I have People's 8, the photograph, she identified the view.

Would you put that on, please?

MR. BIANCAVILLA: Sure.

(Whereupon, People's Exhibit 8 is placed on the viewer.)

Q Now, you say this is the view you had in this photograph, is that right?

THE COURT: Miss Quinn, can you see it?

THE WITNESS: Yes.

THE COURT: Miss Quinn, it might be easier if you'd go into the well.

MR. BIANCAVILLA: Why don't we show her the photograph?

THE COURT: Let the court officer show you the photograph.

Then you can display it, Mr. Chamberlain.

(Whereupon, People's Exhibit 8 is handed to the witness.)

(Whereupon, People's Exhibit 8 is placed on the viewer.)

Q That photograph has no relationship to where you were standing when you had this view, is that correct?

A Yes.

Q And your testimony is that you were standing somewhere between Captain Andy's and the Downtown, is that correct?

A Yes.

Q And closer to the down -- the back of the Downtown?

A Well, I said I was, like, in the middle.

Q Like in the middle. At the grand jury you said closer to Downtown?

MR. BIANCAVILLA: Objection.

THE COURT: Sustained.

It's not proper questioning, Mr. Chamberlain.

Q The X -- can I show you Defendant's B for identification.

MR. CHAMBERLAIN: Put that on. Show it to her first.

(Whereupon, the referred to exhibit is handed to the witness and then placed on the viewer.)

Q And the X you put there is approximately where the car that you were standing alongside was parked, right?

A Yes.

Q And that X shows the rear of that vehicle. And you were alongside, by the driver's door, is that right?

A Yes.

MR. CHAMBERLAIN: Can you put that up on the screen?

(Whereupon, the referred to exhibit is placed on the viewer.)

Q And would that photograph represent the

approximate view you had from that position of what you claim you saw outside Captain Andy's?

A No.

Q Approximately how far away from Captain Andy's and these people were you --

MR. BIANCAVILLA: Judge, I'm going to object. We have been through this already. It's improper redirect.

THE COURT: Mr. Chamberlain, you are addressing areas that were not covered on redirect.

MR. CHAMBERLAIN: Well, I think it was inferentially covered, Judge. I will let it go.

THE COURT: I did not stop you. When you say you're finished, I will ask Mr. Biancavilla if there's anything further.

MR. BIANCAVILLA: I have one final question for you, Miss Quinn.

REDIRECT EXAMINATION

BY MR. BIANCAVILLA:

Q Were there any other big bald headed men with tattoos in Y.L. Childs that morning when you were there?

A No.

MR. BIANCAVILLA: Thank you.

THE COURT: Anything further, Mr. Chamberlain?

RECROSS EXAMINATION

BY MR. CHAMBERLAIN:

Q If I tell you that a measurement --

THE COURT: Mr. Chamberlain, you see you can only address the areas that were immediately addressed by the prosecutor.

MR. CHAMBERLAIN: He addressed the view area.

THE COURT: He said he asked one question. He asked if there are any other bald headed men in Y.L. Childs that evening.

MR. CHAMBERLAIN: Nothing further. Thank you.

THE COURT: Anything further, Mr. Biancavilla?

MR. CHAMBERLAIN: No, Judge.

MR. BIANCAVILLA: No, Judge.

THE COURT: You may step down. Thank you.

(WITNESS EXCUSED)

THE COURT: Counsel, approach the bench please.

(Whereupon, the following takes place at the Bench, off the record, between the Court and Counsel)

THE COURT: Mr. Biancavilla, call your next witness please.

MR. BIANCAVILLA: Sven Bost.

S V E N B O S T, called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE COURT OFFICER: In a loud voice would you give your full name, spelling your last name and County of residence.

THE WITNESS: Sven Bost, B-O-S-T. In Nassau County.

THE COURT OFFICER: Thank you.

THE WITNESS: I'm hard of hearing today.

MR. BIANCAVILLA: May I inquire, your Honor?

THE COURT: Yes, you may.

DIRECT EXAMINATION

BY MR. BIANCAVILLA:

Q Mr. Bost, good afternoon.

A Good afternoon.

Q I know we're right on the cusp, good morning. Thank you for being with us today. Thank you for being so patient.

You are the owner and landlord of the building in which Captain Andy's is located in?

A Right.

Q And how long have you been owner of that building?

A November was forty years.

Q And what is Captain Andy's?
A It's a seafood continental restaurant.
Q How long have you had that restaurant?
A Forty years in November.
Q You're the owner and chef?
A Right.
Q And is there an apartment on top of Captain Andy's?
A Right.
Q How long has the apartment been there?
A So long as I have been there actually.
Q Okay. Do you know the victim in this case, Ruth Williams?
A Right.
Q Do you know her?
A Yes.
Q And how long did you know Ruth Williams?
A Probably about ten, eleven years, I guess.
Q And where did you know Ruth Williams from?
A She used to work for a florist in town that I did business with.
Q And did there come a time when Miss Williams rented the apartment above Captain Andy's?
A Yes.
Q Could you tell the jury when she first became a

tenant?

A It must have been 1992. I'm not sure what month though, you know.

Q Now, would you characterize Miss Williams as a good tenant?

A I can't hear.

Q Would you characterize Miss Williams as a good tenant?

A Yes.

MR. CHAMBERLAIN: Objection, Judge.

Q Did she pay her rent on time?

MR. CHAMBERLAIN: Objection.

A She was very punctual actually.

THE COURT: That's all right, overruled. You can answer that.

A Very punctual. Actually, a few days ahead of time. Very nice and neat.

Q Okay. Now, Mr. Bost, I'm going to show you what is in evidence as grand jury --

THE COURT: People's --

MR. BIANCAVILLA: I'm sorry.

Q People's Exhibit 8. Take a look at that photograph. Do you recognize that photograph?

A That's the rear entrance to the apartment and to the kitchen area.

Q Of your restaurant?

A Right.

Q Okay. Now, there's a flood light above that rear door there?

A Right.

Q Could you describe what type of flood light that is to the jury please?

A It's like a high intensity light. It's no longer working. We had a light put up in the light pole, it comes on with sensor light.

Q Was it working on April 11th of 2000?

A I believe so, yes.

Q And would it light up that back area?

A Right. It was working in conjunction with the light on top then. It was -- it has since been disconnected.

Q Thank you. May I have that photograph back?

The open door in this particular photograph, would that have been the entrance to the apartment above Captain Andy's?

A Yes. Yes.

Q That was the apartment that was rented by Ruth Williams?

A Yes.

Q Okay. Now, on Thursday, April 13th, did there

come a time when you called the Nassau County Police Department?

A Yes.

Q What was the purpose of your telephone call?

A They had -- my wife had gotten a phone call from Bethpage Florist where Miss Williams worked. And they were concerned she hadn't shown up for work. And they wanted us to go up and see if she was sick or something, you know.

Q And did there come a time when you called the police?

A Yes. I said I didn't want to pry into anybody's business. I was back and forth to my house that particular day. And my daughter was working. She said, why don't you go up and see if she had a stroke or something. So --

Q Did you go up to the apartment?

A I went down and I called on the telephone first. And there was no answer. So, my daughter kept on saying, why don't you go up.

Q When you say there was no answer, did an answering machine pick up or was there no answer?

A There was no answer. Maybe I didn't let it ring long enough, you know.

Q What did you do then?

A My daughter kept on harping, I should go up, you know. So, I went up and I knocked on the door and I

screamed in, hey, Ruthie.

Q Did you get any response?

A There was no answer. So, I went down again. And so she said, why don't you go in the apartment, you have the key. No, I said, it's none of my business I said. So, she was on the phone with my son-in-law. And he used to work for the legislature. I said, why don't you ask my son-in-law what to do.

Q What did you ultimately wind up doing, Mr. Bost?

A He said call the police and let them decide.

Q Did you do that?

A That's what I did at that point.

Q Did there come a time when a police officer came to Captain Andy's?

A Yes.

Q Do you remember the police officer's name?

A It was a lady officer. I don't recall the name. I don't think I got the name actually.

Q Do you remember what time she got there?

A Must have been in the evening, maybe six, seven o'clock, something like that.

Q Was it before or after you closed the restaurant?

A It was before we closed.

Q Okay. What did you do?

A She said -- I told her the story behind it. So,

she said, we have to go up and see. So, I tried to open the door. I haven't been up there for years. Like, you know, she took care of the apartment, painted it.

Q Which doors were locked?

A Well, the entrance door downstairs was locked. So, I opened that.

Q That's the door that is shown in the picture?

A Right.

Q That was locked?

A That was locked. So, I opened that. When we come upstairs I am looking for a key. I have about maybe twenty keys on the key thing. So, I didn't know which key. So, I tried one key, it fitted a dead bolt. And it seemed like the dead bolt was open, you know. Then I have to find the key for the lower part on the door handle. And I tried all the keys, and it was kind of dark.

Q What did you do then?

A I couldn't find the key. So, we couldn't open the door. I told the officer, why don't we go out on the roof. It's a long hallway. There's a door leading to the roof. So, I said, why don't we go on the roof and take a look through the kitchen window.

Q Did you do that?

A That's what we did. And the light was on and a jacket was hanging on the chair and her two cats were on the

floor. I told the officer to call us on the parking lot, I said, maybe she went out for a moment or whatever.

Q What happened?

A The officer said, well, we have to get in there. So, at that point we went back to the door again. And the officer put the flashlight on the lock and I looked in the flashlight and I found the right key. And we went in and the officer went in first. And the cats were still in the kitchen there. And so --

Q What room did you walk into?

A Into the kitchen area. And the officer went in to the middle room, which is the bedroom. Oh, my God, she said. Ruth was laying on the floor there. She's a goner she says. So, at that point she asked me if I had a cell phone. No, I don't have a cell phone. So, she said, could you go downstairs, there's an officer coming on Main Street and ask him to bring a cell phone up.

Q Did you do that?

A That's what I proceeded to do. And then I heard -- I was halfway in the hallway, I heard the officer saying something. So, I went back in again, and then said she noticed something else. She was -- she had gone into the bedroom. And --

Q What did you do at that point?

A I peeked behind her. You know, she was sort of

standing half in the doorway and half in the bedroom.

Q What did you see?

A I saw Ruth laying on the floor next to the bed. And so I peeked around and I saw it was, like, a cord around her neck and it was blood coming from the nose and from the mouth. I could see her face.

Q What did you do then?

A The officer told me to go down again and get the cell phone. So, I proceeded, I went down and I met the officer on the street and I asked him if he had a cell phone, to bring it up. So, I went up with the officer. But that's all I -- they sort of wanted to get rid of me at that point, so I went back down again. And that was then there.

MR. BIANCAVILLA: Thank you very much. I have nothing further for Mr. Bost.

THE COURT: Mr. Chamberlain.

CROSS-EXAMINATION.

BY MR. CHAMBERLAIN:

Q Mr. Bost, just a couple of questions.

The door upstairs was -- there are two locks, one was locked, one wasn't you said?

A Right. The dead bot lock wasn't locked. But the lock on the knob, you know, was locked.

Q Could you describe --

MR. CHAMBERLAIN: Thank very much.

Q Can you describe for me and the jury the path from the entrance door to the apartment in the back and how you get from there to the -- to the back door of the apartment?

A It's a long hallway that leads from the picture that was shown.

Q So, first you go -- let say you are going --

A You go up a staircase. It's about -- I used to live there, seven, eight years -- it was eighteen or twenty steps.

Q Okay. Then you get to the top of the steps and you turn right?

A Then it's a long hallway. At the end of the hallway is a doorway that goes up to the roof area.

Q Okay. Would you say a long hallway --

A It's about, well, it's the length of the kitchen area. It's about, I would, say twenty feet.

Q And that's at a bend. As you get to the top of the stairs you turn right?

A No. You go straight.

Q You go straight. You go to the top of the stairs and go straight?

A Long, right.

Q To the apartment?

A It's a four foot hallway. Long hallway.

MR. CHAMBERLAIN: Thank you very much, Mr. Bost. I have no nothing further.

THE COURT: Mr. Biancavilla?

MR. BIANCAVILLA: Nothing further.

THE COURT: Thank you, Mr. Bost. You are excused.

(WITNESS EXCUSED)

THE COURT: Ladies and gentlemen, we'll adjourn at this point. Be back at two o'clock. Do not discuss the case among yourselves or with anyone else. Do not form or express any opinions until the entire case is completed. Do not read or listen to accounts of the case, should there be any ed in the media. Do not visit or view any premise or premises mentioned. You are not to permit any party to discuss this case with you. You are promptly to report to the Court any violation thereof.

Have a nice lunch we'll see you at two.

(Whereupon, the sworn jury and alternates leave the courtroom)

THE COURT: Counsel, see you at two o'clock.

MR. BIANCAVILLA: Thanks, Judge.

MR. CHAMBERLAIN: We have four police witnesses this afternoon and we will be finished?

THE COURT: Speak to Mr. Biancavilla. I



don't know.

(Whereupon, there is a luncheon recess taken in the proceedings. The trial is adjourned until 2:00 p.m.)

A F T E R N O O N S E S S I O N

THE COURT OFFICER: Jury entering.

THE COURT: One moment, please.

MR. CHAMBERLAIN: I understand we are --

THE CLERK: Case on trial continues. All parties are present. Jury is not present at this time.

Are the People ready?

MR. BIANCAVILLA: Ready.

THE CLERK: The defendant ready?

MR. CHAMBERLAIN: Defendant ready.

THE COURT: Yes, Mr. Chamberlain.

MR. CHAMBERLAIN: Judge, I understand we were starting with Detective Downes who is from the crime detection.

THE COURT: Yes.

MR. CHAMBERLAIN: There are certain photographs, quite a few exhibits in the grand jury that we got a transcript, we don't have the exhibits. I'm going to ask for exhibits, 3 through 8 now so --

MR. BIANCAVILLA: You were shown all the photographs.

MR. CHAMBERLAIN: I would like to know which are 3 through 8.

MR. BIANCAVILLA: Mr. Chamberlain -- Judge --

MR. CHAMBERLAIN: Show me the photographs.

MR. BIANCAVILLA: We're past the grand jury stage at this point.

THE COURT: Between direct and cross I will give you an opportunity to look at the photographs if they're not put in evidence now.

MR. BIANCAVILLA: I will put a lot of photographs into evidence. He's already looked at the crime scene photographs three times already, so you're aware of it.

THE COURT: Did you give Mr. Chamberlain an opportunity to make copies?

MR. BIANCAVILLA: Absolutely. I had him go through the book twice. In fact, we did produce certain copies for him.

MR. CHAMBERLAIN: I'm trying to identify the photographs. I just have gotten the Rosario material. The grand jury testimony refers to certain numbered photographs. The one I saw did not indicate -- there was no way I could identify.

THE COURT: What you should have done is tell me at 12:30, I could have asked you and Mr. Biancavilla to get together over lunch.

However, at this juncture what I'm going to do, on our next break I will ask Mr. Biancavilla to show you which photographs are --

MR. BIANCAVILLA: To be perfectly honest with you, I have no idea. I don't have them here. I am working off of another set of photographs I had duplicated.

MR. CHAMBERLAIN: That's the problem.

MR. BIANCAVILLA: He's had two years.

MR. CHAMBERLAIN: Don't interrupt.

MR. BIANCAVILLA: He's viewed all of the exhibits, okay. This is nonsense.

MR. CHAMBERLAIN: This is --

THE COURT: Mr. Chamberlain.

MR. CHAMBERLAIN: Completely inaccurate. We just got photographs a week or two ago after requesting them two years ago.

MR. BIANCAVILLA: Please, it's nonsense.

MR. CHAMBERLAIN: The point is, they didn't have numbers. I'm trying to identify the photographs that were referred to as exhibits in the grand jury testimony on the Rosario material I got just a few days ago. So, what I'm asking for is approximately six photographs.

MR. BIANCAVILLA: I don't know what those photographs are, Judge. I don't have the grand jury exhibits here.

THE COURT: I will ask -- at the break I will

ask Mr. Biancavilla just to show you the photographs. At that point if there's additional applications you can make them.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE CLERK: Both sides stipulate that all jurors are present and seated properly?

MR. BIANCAVILLA: Yes.

MR. CHAMBERLAIN: Yes.

THE COURT: Good afternoon, ladies and gentlemen. We're ready to continue with the trial now.

Mr. Biancavilla, will you call your next witness.

MR. BIANCAVILLA: Detective Dennis Downes.

D E N N I S D O W N E S, Detective, called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE CLERK: Thank you. Be seated.

THE COURT OFFICER: In a loud voice would you give your full name, spelling your last name, shield number and present command.

THE WITNESS: Detective Dennis Downes, D-O-W-N-E-S. Shield number is 349. I'm a Detective assigned to the Crime Scene Search Section of the

Nassau County Police Department.

THE COURT: You may inquire, Mr. Biancavilla.

MR. BIANCAVILLA: Thank you, Judge.

DIRECT EXAMINATION

BY MR. BIANCAVILLA:

Q Good afternoon, Detective.

A Good afternoon.

Q Could you tell the jury how long you have been a member of the Nassau County Police Department?

A I've been a member of the police department for fifteen years.

Q And would you explain to them your duties and responsibilities as a member of the Crime Scene Search Section of the Nassau County Police Department?

A Yes. I have been assigned to the Crime Scene Search Section for eleven years.

As a detective assigned to Crime Scene, my duties and responsibilities include responding to major crime scenes throughout Nassau County to photograph, collect, and document physical evidence at the Crime Scene.

Q Now, were you working on Thursday, April 13th, 2000?

A Yes, I was.

Q And did there come a time when you were asked to respond to an apartment located at 196 Main Street in

Farmingdale?

A Yes, I was.

Q And when was it that you received that assignment?

A I received that assignment at approximately ten p.m. at night.

Q What time did you arrive at the location?

A I arrived at that location an hour later, at approximately eleven p.m..

MR. BIANCAVILLA: Judge, I would ask that be marked as People's Exhibit 9 for identification.

THE COURT: Okay.

(Whereupon, the referred to item is received and marked People's Exhibit 9 for identification as instructed.)

MR. BIANCAVILLA: Show it to the witness, please.

Q Detective, you're being shown what is marked as People's 9 for identification. Do you recognize that?

A Yes, I do.

Q What do you recognize that to be?

A This is a digital photograph taken from a satellite light and the picture shows the general area of where I responded to that night.

Q 196 Main Street in Farmingdale?

A That's correct.

Q And is that digital satellite generated photograph fairly and accurately depict that particular area as it existed on April 13th of the year 2000?

A Yes, it does.

MR. BIANCAVILLA: Judge, we would offer that at this time.

THE COURT: Please show it to Mr. Chamberlain.

MR. CHAMBERLAIN: No objection, your Honor.

THE COURT: Mark it in evidence.

(Whereupon, the referred to item previously marked for identification is received and marked People's Exhibit 9 in evidence by the reporter as instructed)

MR. BIANCAVILLA: Judge, with the Court's permission, I ask it be set up on the easel and displayed for the jury?

THE COURT: Yes, we'll do that.

(Whereupon, People's Exhibit 9 is placed on the easel for the jury's viewing)

Q Now, Detective, I'm going to ask that you take these stickers and please take a yellow one and just write the address 196 Main Street. And then we'll have you walk over to the map and put the location you responded to.

Could you please write on the map the location where 196 is located?

(Whereupon, witness leaves the witness stand.)

A This is Main Street, which is a road that runs north and south. The brown shaded area represents buildings, commercial buildings, in that location. The yellow sticker will represent 196, the front of 196 Main Street.

Q When you responded to that location, you were directed to respond to an apartment at 196 Main Street?

A Yes, I was.

Q Where was the entrance to that apartment?

A The entrance to that apartment was on the rear of 196 Main Street, where there's offset boxes. This was a door leading up to an apartment that was above a restaurant called Captain Andy's.

Q Would you take that yellow arrow and point it toward where that door is.

A That little offset box there in the brown shaded area would represent the entrance to that apartment.

Q You could be seated again. Thank you, Detective.

(Whereupon, witness resumes his seat in the witness stand.)

Q Now, Detective, when you arrived at this

particular crime scene, what was the first thing that you did?

A When I arrived to the crime scene with my police van full of equipment. I was dressed in a police uniform. And the first thing I did was meet with other detectives that were at that scene and other police officers that responded to that scene to speak with them and get a general overview of what the scene represented and what was upstairs in the apartment.

Q And after you had that conversation what did you do?

A What I did was, I first walked into the apartment just to look over the apartment and I observed a deceased woman in a bedroom at that location in her late forties. I looked around carefully for evidence, potential evidence, that I was going to videotape, photograph and later on collect.

After I looked around the apartment carefully, not contaminating any evidence, I went back to the crime scene van, got a video camera together and with the assistance of another detective from crime scene I went on to videotape the apartment, the areas in the apartment, and specifically the general area where the deceased woman, Ruth Williams, now known to me, was lying.

MR. BIANCAVILLA: Judge, I ask this be marked

as People's Exhibit 10 for identification.

(Whereupon, the referred to item is received and marked People's Exhibit 10 for identification by the reporter as instructed.)

THE COURT OFFICER: People's 10 for identification.

Q Detective, you are being shown what has been marked as People's 10 for identification. Do you recognize that?

A Yes, I do.

Q What do you recognize that to be?

A This is the case that holds the video that I took that night at 196 Main Street.

Q Is that the original video you used?

A Yes, it is. The box on the outside contains my crime scene evidence label with my initials, the evidence item number 36, the date and the homicide number attached to it.

Q And since April 13th of 2000, have you viewed that video?

A Yes, I have.

Q When was the last time you viewed it?

A I viewed this video on May 3rd, 2002 at 1:30 p.m. in the afternoon.

Q Is that video fairly and accurately depict the

crime scene as it existed when you arrived at 196 Main Street on April 13th of 2000?

A Yes, it does.

MR. BIANCAVILLA: We would offer that.

THE COURT: Any objection, Mr. Chamberlain?

MR. CHAMBERLAIN: May I just look at it, Judge?

THE COURT: Of course.

VOIR DIRE EXAMINATION

BY MR. CHAMBERLAIN:

Q Has this tape been out of your possession?

A Yes. That tape was submitted as evidence and out of my possession, yes.

Q It was out of your possession?

A Yes.

Q Do you know where it was during that period of time?

A It was over in the Homicide Squad.

Q Was it sealed at that time?

A Yes, it was. The evidence tape is on there.

Q The evidence tape is on here. But that is not a sealing tape, is that right?

A No, it's not.

Q So, what I'm asking, was this tape container sealed?

A I have to look at it again. No, this portion was not sealed.

Q Detective, did you view that tape at the time it was taken?

A After I -- after I took the video, that night I did view it so that I knew for sure that the video actually did come out.

Q And you viewed it again you said on May 3rd, 2000, just a few days ago?

A Yes, I did.

Q And as far as -- as the best you can tell, that was the same tape you viewed back then? Is there any changes, identical tape?

A It's identical tape.

MR. CHAMBERLAIN: I have no further objection -- no questions. No objection.

THE COURT: Mark it in evidence.

THE COURT OFFICER: People's 10 received in evidence.

(Whereupon, the referred to item previously marked for identification is received and marked People's Exhibit 10 in evidence by the reporter as instructed)

MR. BIANCAVILLA: Judge, at this time I would like to display that for the jury and have Detective

Downes describe to the jury what they're observing.

THE COURT: Yes. Detective, you can step down to the well.

We'll have the lights turned off so the jury can see it.

(Whereupon, the witness leaves the witness stand.)

A This is just the cover sheet that shows the date, where I am, and the case number that is assigned.

This is a video of the rear of 196. That's the back entrance to the restaurant of Captain Andy's. This is a metal door leading to the apartment above Captain Andy's. I'm showing you the video that the lock is intact on the door knob. That there was no forced entry.

This is along the five stairs that leads up to a hallway that leads up to the door of the apartment. So, I'm now walking up the flight of stairs.

I'm now in a hallway, a very narrow hallway, that will lead to the entrance door to the apartment at 196. I'm showing some windows in the hallway. None of the windows had any signs of forced entry. In the hallway there was some cat transporting boxes and some charcoal and there was another door on the north side of that hallway that led to a rooftop where there was a jacuzzi.

Now, here is the door to the actual apartment at

196, Ruth Williams' apartment. And I'm showing some papers on the ground. There's a small table in the kitchen. A small eat-in kitchen. There's a dungaree jacket. There's a photo album. There is a Budweiser bottle of open beer. There was also a wine glass, assorted papers on the counter. The kitchen was intact. There appeared to be no sort of ransacking of the kitchen or any area of the apartment.

These are items on the kitchen table. There was a candle, a glass with some wine, an ashtray. There was a song on a piece of paper and a photo album on top of the kitchen table. I'm just taking a close-up of the song and some of the words on that song. The Budweiser bottle of beer.

Ruth Williams lying on the floor next to her bed in her living room. She is in overalls, a long T-shirt. The beads to her bedroom. Everything was intact. Her bed was still intact, it wasn't a mess. Everything seemed like it was in order.

This is Ruth Williams. Her hand had a lot of discoloring. Her face had a lot of redness and discoloring. There was blood coming out of her nose. Around the neck of Ruth Williams was a black telephone type cord. Here's her hand. There were no injuries on her hand. No signs of any sort of defensive wounds. There was a lot of discoloring to her skin in her legs, face and hand. Here in the video I'm

getting a better close-up of blood around her face. The black cord is tied tightly around her neck with a knot also. She had her jewelry on. The cord goes on the back of her hair, not underneath her hair.

This is her bedroom. Pillow kisses intact. Comforter intact and clothes hanging from the canopy on her bed. Hall in order, nothing knocked down. Her little cat box house. Some of the furnishings in the bedroom. There's a window in her bedroom. There is also a desk with a computer. Still, the cover on. On the floor here is a telephone receiver and answering machine, one piece. That is on the floor in the bedroom of Ruth Williams. These are some of the wires attached to the telephone answering machine that had been pulled out of the wall just on the other side of the telephone answering machine, just on the other side of this wall. Those are wires attached to the computer. Those wires are all still attached to their corresponding jacks, nothing was pulled out. This is a close-up of the end of the wires on that answering machine. Again, I'm showing the wires to the computer, that all those wires are all intact, that they haven't been ripped out of the wall.

I have now walked through the bedroom, now in the living room of the apartment. And just on the other side of the wall I'm videotaping a phone jack that has some damage

to it. And this table appeared to be the table where the answering machine was on, and that it had been ripped out of the wall. There is damage to the telephone jack. There are wires that have become disconnected. There's some fracturing of the plastic. I'm now panning around the living room of the apartment, showing that pillows are still in order. There's a jacket on the couch. Behind the couch there was some candy wrappers. A Hershey's box where some of the candy came from. This is a window in the apartment. Vertical blinds are hall in place. And if you were looking out that window, you would be looking on to Main Street. And this is the entertainment section in the living room. And here there are some tapes and CDs. Everything seemed to be in order. There was no ransacking. There were no drawers pulled out. There was no clothes or jewelry boxes thrown about the apartment.

Again, the video shows the answering machine on the floor with the attached wires. The canopy bed. No drawers pulled out. Everything in order. Ruth Williams lying on the side of her bed. Her arm is twisted.

I'm walking back now into the kitchen. There's an ashtray, wine glass, Budweiser bottle, photo album, keys, papers on the floor, papers and a bill on the counter, paper with some writing on the counter. This is the cabinet above the stove. Those doors were open.

This is the hallway leading to the end of the apartment. This is the bathroom. Just showing the lock on the interior portion of the door to the apartment, that there was no trauma to it. The bathroom. The toilet seat in the upright position. Everything seemed to be in order in the bathroom. There are clothes still hanging. There's a window in the bathroom, also that there was no forced entry to. Toilet seat in the upright position. Again, no damage to the door knob or the lock.

That's looking westbound from the entrance of the apartment. The long narrow hallway. Some items in the apartment, in the hallway apartment, which is the cat transporter. The door to the roof op, no forced entry. There's a jacuzzi out on the rooftop. That's the rooftop to the bar called the Downtown. These are the exterior windows. There's an attic in the apartment also that there was no forced entry to in the window or the door.

This is a general overview of the rooftop and the Downtown Bar, which is just north of the apartment. A jacuzzi on the rooftop. The exterior to the door leading to the hallway, no forced entry to the door, the frame, the handle.

I'm walking now back toward the front entrance of the entire apartment, the long narrow staircase leading to the door which is being secured by police officers.

That's it.

(Whereupon, the witness resumes his seat on the witness stand.)

Q Now, Detective, after you videotaped the crime scene that the jury just saw, what's the next thing you did in terms of processing that scene?

A Shortly after the video, I then took still photographs of the exterior and interior apartment.

MR. BIANCAVILLA: Judge, could we have these photographs marked for identification? There are several of them.

THE COURT: We'll mark them sequentially.

(Whereupon, the referred to items are received and marked People's Exhibits 11 through 30 for identification by the reporter as instructed.)

THE COURT: People's 11 through 30 marked for identification.

Q Detective, I show what you has been marked as People's 11 through 30 for identification, can you quickly those?

A Yes, sir. These are the photographs that I took that night.

Q Do they fairly and accurately depict the areas which you photographed and which you collected evidence from?

A Yes, they do.

MR. BIANCAVILLA: We will offer those, Judge.

THE COURT: Please show them to Mr. Chamberlain.

MR. CHAMBERLAIN: Short voir dire, Judge, and I would like to approach.

THE COURT: Do you want a voir dire first?

MR. CHAMBERLAIN: I would like the voir dire first.

THE COURT: Go right ahead.

VOIR DIRE EXAMINATION

BY MR. CHAMBERLAIN:

Q Detective, you indicated these are the photographs -- crime scene photographs you took that night. They're not the only photographs, are they?

A No, they're not.

Q As a matter of fact, you took literally dozens, maybe hundreds, right?

MR. BIANCAVILLA: Objection.

THE COURT: I'm not sure what the relevancy of that is, Mr. Chamberlain.

MR. CHAMBERLAIN: Well, the relevancy, Judge, is Rosario material I have that identifies certain photographs. I might ask this Detective, your Honor --

MR. BIANCAVILLA: Judge, this is a voir dire on those photographs.

THE COURT: As to whether this photograph fairly and accurately represents the area that the detective took the photographs of.

MR. CHAMBERLAIN: Well, it represents various things. I don't -- I object to the mass introduction, to start with. A lot of them are not of the apartment.

THE COURT: I understand that. But each one of those represents something that the People wish to put into evidence in their case.

MR. CHAMBERLAIN: I would like to know, so I can tie these photographs into the crime scene reports that we got, which indicate distance from the subject, direction.

MR. BIANCAVILLA: Judge, that's beyond --

THE COURT: You will have an opportunity for cross-examination, Mr. Chamberlain. If you want, there are certain voir dire questions you can ask now. Take your time. But, there are certain questions better reserved for cross-examination.

MR. CHAMBERLAIN: Well, there are concerns, which those photographs represent in connection with his prior testimony before the grand jury.

THE COURT: That is not more subject for a

voir dire, with respect to these photographs.

MR. CHAMBERLAIN: All right, Judge. May we approach then with respect to these?

THE COURT: You may.

Step down, Detective.

(Whereupon, the following takes place at the Bench, between the Court and Counsel:)

MR. CHAMBERLAIN: We have a number of photographs of the victim.

THE COURT: Yes.

MR. CHAMBERLAIN: Basically, she's face down.

THE COURT: Yes.

MR. CHAMBERLAIN: I have no objection to those, body, and so forth.

THE COURT: Why don't you tell me which one you have objection to.

MR. CHAMBERLAIN: I think it's unnecessarily gory. And, obviously, she was turned over to take the photograph. I don't think it's --

THE COURT: You wish to be heard, Mr. Biancavilla?

People's number 24 for identification.

MR. BIANCAVILLA: The reason why she's turned over, what is being displayed is the position of the ligature around her neck as it existed within the

apartment.

MR. CHAMBERLAIN: There are other photographs.

THE COURT: With respect to People's 24, I'm going to admit that into evidence.

Your exception is noted.

Which other ones?

MR. CHAMBERLAIN: That's it.

THE COURT: Just that one?

MR. CHAMBERLAIN: Yes.

THE COURT: The others you agree?

MR. CHAMBERLAIN: The others I have no objection.

THE COURT: You have no objection.

Okay.

(Whereupon, the following takes place in open court:)

THE COURT: With respect to People's number 11, 12, 13, 14 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29 and 30, I understand you have no objection to those.

MR. CHAMBERLAIN: That's correct.

THE COURT: With respect to People's number 24, I understand you object to that one.

MR. CHAMBERLAIN: That is also correct,

Judge.

THE COURT: All right, I'm going to overrule your objection and all will be marked into evidence.

(Whereupon, the referred to items previously marked for identification are received and marked People's Exhibits 11 through 30 in evidence by the reporter as instructed.)

THE COURT OFFICER: 11 through 30 marked into evidence.

MR. BIANCAVILLA: Thank you.

DIRECT EXAMINATION CONTINUED

BY MR. BIANCAVILLA:

Q I ask the witness be shown People's 31 for identification.

Detective, you're being shown what is marked as People's Exhibit 31 for identification, do you recognize that?

A Yes, I do.

Q What do you recognize these to be?

A This is a computer generated sketch that was drawn by another detective in the crime scene unit based upon measurements that I took that night of the apartment.

Q Does that sketch fairly and accurately depict the layout of that apartment as it existed on April 13th of 2000 when you examined it?

A Yes, it does.

MR. BIANCAVILLA: We would offer that into evidence, Judge.

THE COURT: Please show it to Mr. Chamberlain.

MR. CHAMBERLAIN: No objection.

THE COURT: Mark it in evidence.

(Whereupon, the referred to document previously marked for identification is received and marked People's Exhibit 31 in evidence by the reporter as instructed.)

THE COURT OFFICER: So marked.

MR. BIANCAVILLA: Judge, could we display that for the jury please on the easel?

Could we have the Detective step down, Judge.

THE COURT: Yes.

Step down, Detective.

(Whereupon, the witness leaves the witness stand.)

Q Detective Downes, could you describe for the jury what they're viewing in People's Exhibit 31?

A This is a computer generated sketch of measurements and dimensions of the apartment that I took that night.

These would be the stairs coming up from the

bottom of the entrance. The long narrow hallway. The door that is swung open to the rooftop that had the jacuzzi. Here would be the door to the actual apartment. Just to the left of that door is a bathroom with another door. Another short hallway. This would be the kitchen and dining area. Then leaving the kitchen, the bedroom, and then the living room. And this is a window looking out on Main Street.

Q Now, Detective, I'm going to display People's Exhibits 11 in evidence. I'm going to ask you to take a look at that and just tell the jury what they're viewing there?

A This is a photograph that I took from Main Street. I'm standing on Main Street, looking westbound. And it shows the restaurant, Captain Andy's. There's an automobile on Main Street. This is the restaurant. These set of three windows represent the windows to the apartment looking out on Main Street. Also, above the apartment there was an attic with another window that was used for storage. But this is the front of Captain Andy's with the picture of the apartment living room windows.

Q Could you take this photograph and pin it up on that diagram where the front of Captain Andy's would be. If you need to put it below it.

Now, the front windows depicted in that photograph would be where?

A These sets of three windows would be this window here, in the living room.

Q Okay. Displaying Exhibit number 12, tell the jury what they're looking at there?

A This was -- this is a photograph that I took eastbound. This shows a cement patio area and a glass block wall that separated a cement patio that was just on the outside of the entrance to that apartment. There's a sidewalk there. And just on the other side of this glass box window would be the entrance to the apartment and also the rear entrance to Captain Andy's.

Q Could you place that up their also. And displaying number -- People's Exhibit 13, what are they viewing there?

A This is a photograph that I took westbound from the front entrance door leading up the stairway into the apartment. And here it shows the cement patio. There's a overhang, an open overhang. There's some firewood there. This is a picture that I took standing directly in front of the door leading up to the apartment.

Q Please post that. Displaying Exhibit number 14?

A It's a photograph that I took from only several feet away. It shows the metal door leading up the flight of stairs to the apartment. And it shows that the door lock and the handle are intact and there doesn't appear to be any

sort of forced entry to that metal door.

Q Please post that. Displaying Exhibit 15?

A This is a photograph that I took showing the long flight of stairs that leads up to the narrow hallway that lead to the door into the apartment itself.

Q Please post that. Displaying Exhibit 16?

A I now walking up the flight of stairs. I'm taking a picture eastbound. It shows the narrow hallway leading to the entrance of the apartment and in the hallway there's some charcoal and some cat transporter boxes in the hallway.

Q Please post that. Displaying Exhibit 21.

A This is a photograph that I took. I now walked into the kitchen of the apartment. It's a general scene photograph of ruth Williams lying on the carpet, from her feet, towards her head, laying next to the bed, and in overalls, a white shirt and her arm is twisted and discolored.

Q Post that in the room where that was taken. Displaying Exhibit 18?

A This is a photograph that I took eastbound as soon as I opened up the entrance to her -- Ruth Williams' apartment door. It's a photograph of the eat-in kitchen, the table, contents on top of the table.

Q Please post that. Displaying Exhibit number 29,

where was that location?

A This is a photograph in the living room. This is the end table and the damaged telephone jack that I observed that night, that had the wires torn out of it and the plastic broken.

Q Please place that.

MR. BIANCAVILLA: Okay, Judge, may we approach a moment?

THE COURT: Yes.

(Whereupon, there is a discussion that takes place at the Bench, off the record, between the Court and Counsel)

THE COURT: Ladies and gentlemen, as you realize, it's very hot in this courtroom. And it's probably getting very uncomfortable. I don't think at this point the air conditioning is working. So, what I'm going to do is adjourn for the day at this point, because I would rather have you excused than be uncomfortable.

I will ask you to come back and we will start tomorrow at 9:30. Again, as you remember, get here a little earlier than that due to the parking problem.

Again, do not discuss this case among yourselves or with anyone else. Keep an open mind. Do not form or express any opinions until the entire case

is completed. Do not read or listen to any account of this case, should it be reported in the media. Do not visit or view any premises or place. Finally, do not permit any party to or attempt to influence you. You must promptly report to the Court any violation thereof.

Have a very nice evening. We'll see you tomorrow morning at 9:30.

(Whereupon, the sworn jury and alternates leave the courtroom)

THE COURT: Counsel, we'll see you tomorrow at 9:30.

MR. BIANCAVILLA: Thank you, Judge.

THE COURT: Detective, we'll see you tomorrow at 9:30. Please do not talk to anybody about this case.

THE WITNESS: Thank you, your Honor.

MR. CHAMBERLAIN: Could we get a schedule on witnesses?

THE COURT: Yes, come forward.

(Whereupon, court stands in recess. The trial is adjourned to May 9, 2002 at 9:30 a.m.)