642 A



1   STATE OF NEW YORK : NASSAU COUNTY

2       COUNTY COURT PART XIV

3   -------------------------------------------X

4   THE PEOPLE OF THE STATE OF NEW YORK        Ind. 1456N-00

5           - against -                            Trial

6   PAUL SCRIMO,

7                   Defendant.

8   -------------------------------------------X

9                           May 9th, 2002
                            262 Old Country Road
10                          Mineola, New York

11

12  B E F O R E :

13              HON. JEFFREY S. BROWN,
                    County Court Judge
14

15

16  A P P E A R A N C E S :

17      HON. DENIS DILLON
            Nassau County District Attorney
18          BY:  ROBERT BIANCAVILLA, Esq., of Counsel,
                Assistant District Attorney
19                      For the People

20

21      JOHN CHAMBERLAIN
        1001 Franklin Avenue
22      Garden City, NY
                        For the Defendant

23

24                      KATHLEEN PLAIA
                        OFFICIAL COURT REPORTER
25

                    Kathleen Plaia

1          (Whereupon, the following takes place in open

2     court, in the presence of the Court, Assistant District

3     Attorney Biancavilla, Mr. Chamberlain and the

4     defendant, outside the presence of the sworn jury.)

5          THE CLERK:  Part XIV of the County Court,

6     County of Nassau, is now in session.  Honorable

7     Jeffrey S. Brown presiding.  You may be seated.

8          This is case on trial continued.  All parties

9     are present.  Jurors are not present at this time.

10          Are the People ready to proceed?

11          MR. BIANCAVILLA:  People are ready, Judge.

12          THE CLERK:  Defense ready to proceed?

13          MR. CHAMBERLAIN:  The defense would like an

14     application, Judge.

15          THE COURT:  I want to put something on the

16     record first, Mr. Chamberlain, before you make any

17     applications.

18          MR. CHAMBERLAIN:  Okay.  Fine, Judge.

19          THE COURT:  I'm very distressed with

20     something I heard from my law secretary this morning.

21     That at approximately 7:30 last night, you went over to

22     her house, ex-parte, to talk to her.

23          Excuse me.  That is simply not permitted.

24     There is absolutely no reason you should have to go to

25     my law secretary's home and speak to her.  If there's

Kathleen Plaia

```
 1    anything you have to speak to her about with respect to

 2    this trial, you wait until 9:30 in the morning.

 3            I will ask my law secretary to put some

 4    information on the record with respect to what

 5    happened.

 6            MS. ROBBINS:  As your Honor stated,

 7    Mr. Chamberlain came to my house at 7:30 with

 8    information that he had about one of the witnesses on

 9    his list who had been -- I'm sure he will go on the

10    record with it -- had been taken into custody allegedly

11    in Brooklyn, and was being transported back to Nassau

12    County on some warrant that may or may not exist.  And

13    without going into the situation, I listened to what he

14    had to say, I didn't take any action.  And I don't know

15    whether the Court wants to inquire as to the

16    underpinnings of the conversation.  But --

17            THE COURT:  I'm sure Mr. Chamberlain had a

18    good reason for -- perhaps he can enlighten me why he

19    had to come over to my law secretary's house at 7:30

20    last night, why such application, or whatever you had

21    to say, couldn't be made today at 9:30.

22            MR. CHAMBERLAIN:  Judge, the purpose of my

23    going to her house was to get a call to you.

24            And the purpose of that was, the witness who

25    was picked up in the city, called me yesterday after
```

Kathleen Plaia

1      leaving court, somewhere around four p.m..  This is a

2      witness, one of the witnesses, who testified before

3      Judge Honoroff previously, to the effect that she had

4      purchased cocaine from John Kane, the People's chief

5      witness.  This witness also told me that she knew that

6      the victim used cocaine and got it from John Kane.

7              This was one of the witnesses that I

8      originally did not want to put on the witness list, but

9      did after colloquy with the Court about the Court

10     advising the jury about witnesses.

11             This witness told me that she was picked up

12     standing outside a store, not doing anything, charged

13     with loitering.  That was finished, and there was a

14     warrant lodged from Nassau as of last year, I believe

15     it was July.

16             I immediately checked with Legal Aid who I

17     thought had represented her, and they did a computer

18     run and indicated there were no outstanding warrants

19     for that person.

20             I called the court and was advised there were

21     no outstanding warrants for that person.

22             I was also told, on a failure to appear, on a

23     minor charge -- which is what the warrant was

24     supposedly about -- often times they would not even

25     bother to pick the person up.  If they did want to pick

Kathleen Plaia

1   them up, they would transfer them to Riker's, and not

2   go in late at night.

3          I then found out there was a detective going

4   in late at night to bring her over to Headquarters.  I

5   did not -- from the information I had, I did not

6   believe that this was an appropriate procedure, a

7   normal procedure.

8          For that reason I wanted -- based upon my

9   information, there was no warrant outstanding, which is

10  the information I got from the court, I wanted to call

11  you.

12          THE COURT:  There's still no reason why this

13  couldn't have waited until 9:30 this morning.

14          MR. CHAMBERLAIN:  Yes, Judge.  I think it

15  would have been inappropriate for her to be brought

16  over for questioning by the district attorney, if, in

17  fact, that was the purpose.

18          THE COURT:  Are you finished?

19          Mr. Biancavilla, do you wish to respond in

20  any way?

21          MR. BIANCAVILLA:  Judge, I have no knowledge

22  of anything he is talking about.

23          I think the appropriate sanctions should be

24  imposed.  And I think the matter should be referred to

25  the Disciplinary Committee.

1          This is not the first time, this is the

2     second time he's attempted something like this, Judge,

3     two days in a row.

4          MR. CHAMBERLAIN:  I object to that, Judge.

5     "Something like this" is completely inappropriate.

6          The prior instance involved a phone call with

7     an attorney that I believe probably had set that up and

8     said, I have nothing to gain here.  I think probably he

9     was taping the phone call and trying to put words in my

10    mouth.  And, obviously, the district attorney knew of

11    that phone call before I did.

12         MR. BIANCAVILLA:  Judge, I was called after

13    Mr. Chamberlain made that phone call to Mr. Ketover.

14    Mr. Ketover advised me what had transpired.  I never --

15    I had no knowledge of that phone call until after it

16    occurred.

17         THE COURT:  Mr. Chamberlain, I'm just going

18    to say this very succinctly.  I do not want any

19    ex-parte communications whatsoever with my law

20    secretary or with myself; any attempt to speak.  When

21    you speak to my law secretary, you're attempting to

22    speak to me; I do not want that.

23         Do we understand each other?

24         MR. CHAMBERLAIN:  I understand that, Judge.

25         MR. BIANCAVILLA:  Judge, I'm requesting on

Kathleen Plaia

1          the record a copy of today's transcript and also a copy

2          of yesterday's transcript so we can make the

3          appropriate --

4                    THE COURT:  Any other applications?

5                    MR. BIANCAVILLA:  Yes, Judge.  This morning I

6          turned over to Mr. Chamberlain two additional pieces of

7          Rosario material that I came upon.

8                    One involved Detective Kevin McCarthy, who

9          has not testified as of yet.  That we have marked as

10         Rosario Exhibit number 73.

11                   And Rosario Exhibit number 74 would be

12         four -- five pages of written notes of Detective

13         Downes.  These are just notes of the measurements he

14         took at the crime scene, Judge.  I became aware of them

15         this morning.  I immediately turned them over.

16                   THE COURT:  All right.  We'll append them to

17         the court exhibit, previously marked as a court

18         exhibit.

19                   Mr. Chamberlain, did you have an application

20         you need to make?

21                   MR. CHAMBERLAIN:  Judge, I would like an

22         opportunity -- these exhibits are coming in the middle

23         of the trial, I think while we're on the examination of

24         this witness.  I would like an opportunity to review

25         them.

Kathleen Plaia

1           THE COURT:  I'll give you an opportunity

2   right before your cross-examination.

3           MR. CHAMBERLAIN:  I also, Judge, would like

4   an opportunity to have a recess until two o'clock to

5   check on the witness we just spoke about, who I

6   understand is being brought in this morning.

7           THE COURT:  There's no need to do that,

8   Mr. Chamberlain.  You have time over lunch to do that.

9           Bring the jury in.

10          MR. BIANCAVILLA:  Judge, I thought you were

11  going to let me mark these exhibits.

12          THE COURT:  You want to premark exhibits?

13          MR. BIANCAVILLA:  Yes, please.

14          THE COURT:  Go right ahead.

15          MR. BIANCAVILLA:  Thank you, Judge.

16          (Whereupon, the referred to exhibits are

17  premarked People's 32 through 44 for identification,

18  outside the presence of the sworn jury and alternates)

19          THE COURT OFFICER:  Whereupon premarked

20  exhibits 32 through 44 for identification.

21          THE COURT OFFICER:  Jury entering.

22          (Whereupon, the sworn jury and alternates

23  enter the courtroom)

24          THE CLERK:  Both sides stipulate that all

25  sworn jurors are present and seated properly?

Kathleen Plaia

1          MR. BIANCAVILLA:  Yes, your Honor.

2          MR. CHAMBERLAIN:  Defendant ready.

3          THE COURT:  Do you stipulate,

4     Mr. Chamberlain, that the jurors are seated properly?

5          MR. CHAMBERLAIN:  Yes, I do, Judge.

6          THE COURT:  Good morning, ladies and

7     gentlemen.  I'm sorry for the delay.  We had some other

8     court business that had to be taken care of, but we're

9     ready to proceed at this point.

10          Have the detective come back in, please.

11    D E N N I S    D O W N E S,  Detective, recalled as a

12       witness, having been previously duly sworn, resumed

13       the stand to continue testimony as follows:

14          THE CLERK:  Detective Downes, you're reminded

15    you're still under oath.  You may have a seat.

16          MR. BIANCAVILLA:  Judge, can we display

17    People's 3 for the jury?

18          THE COURT:  Yes, of course.

19    DIRECT EXAMINATION CONTINUED

20    BY  MR. BIANCAVILLA:

21    Q    Detective, I'm going to ask that you be shown

22    what has been marked as People's 32 for identification.  Do

23    you recognize that photograph?

24    A    Yes, I do.

25    Q    What do you recognize that photograph to be?

Kathleen Plaia

1        A        This is a photograph of the living room of the

2    apartment at 196 Main Street.  The pictures shows a couch, a

3    wall unit with a stereo and CD player.

4        Q        Does that fairly and accurately depict how that

5    area looked when you photographed it and when you were at

6    the crime scene on April 13th of 2000?

7        A        Yes, it does.

8                    MR. BIANCAVILLA:  We would offer that, Judge.

9                    THE COURT:  Show it to Mr. Chamberlain,

10    please.

11                    MR. CHAMBERLAIN:  No objection.

12                    THE COURT:  Mark it in evidence.

13                    (Whereupon, the referred to item previously

14    marked for identification is received and marked

15    People's Exhibit 32 in evidence by the reporter as

16    instructed)

17                    THE COURT OFFICER:  People's 32 received in

18    evidence.

19                    MR. BIANCAVILLA:  Judge, can I display that?

20                    THE COURT:  Yes.

21                    (Whereupon, People's Exhibit 32 in evidence

22    is displayed to the sworn jury and alternates.)

23        Q        Now, Detective --

24                    MR. BIANCAVILLA:  Could I have him step off

25    the witness stand?

1          THE COURT:  Yes, Detective.  Step into the

2      well.

3          Q      Detective, would you place this photograph please

4      with this pin just above the room that you are referring to.

5              Now, giving that that is People's 32, would you

6      take that blue sticker that says 32 on it and put it below

7      that photograph?

8              Now, Detectives, People's 29 is a photograph I

9      believe where you said where the telephone answering machine

10     was.

11         A      Yes.

12         Q      Were both those areas in the same photograph --

13     in the same room?

14         A      Yes.  This was also in the living room just on

15     the north side of the living room.  And this wall unit is on

16     the south side.

17         Q      Okay, thank you.  Detective, I'm going to refer

18     you to People's 8 located on Exhibit number 31.  Could you

19     tell the jury how far away from the rear entrance door you

20     were when you took that photograph?

21         A      Yes.  I would have to refer to my notes.

22              MR. BIANCAVILLA:  May he refers to his notes?

23              THE COURT:  Yes.  You may refresh your

24     recollection.

25         A      This photograph here we're talking about?

1    Q    Yes.  People's Exhibit number 8.

2    A    It's twenty-five feet.

3    Q    Now, would you please refer to photograph,

4  People's Exhibit number 11, which would be your photograph

5  F-1.

6         Could you tell the jury how far you were standing

7  when you photographed that photograph?

8    A    This is the front of Captain Andy's and that was

9  fifty feet that I took that photograph.

10        MR. BIANCAVILLA:  Thank you very much.

11   Please be seated.

12        (Whereupon, the witness resumes his seat on

13   the witness stand.)

14   Q    Detective, can you see the monitor from over

15  there?

16   A    No.

17        MR. BIANCAVILLA:  Then, Judge, we have to

18   keep him out of the seat.

19        THE COURT:  Detective, stand in the well.

20        THE WITNESS:  Okay.

21        (Whereupon, the witness leaves the witness

22   stand.)

23   Q    Detective, I'm going to display for you what is

24  in evidence as People's Exhibit 19.  Could you just describe

25  for the jury what they're viewing in People's Exhibit 19?

1      A      This is a photograph that I took of the -- I'm in

2   the kitchen at 196 Main Street, the apartment.  These are

3   items that are on the kitchen table and it depicts a bottle

4   of Budweiser, glass that had some, what appeared to be, wine

5   in it, an ashtray, a photo album, piece of paper with words

6   from a song, there was a candle, keys, and a little tray

7   with some ceramic items.

8      Q      Now, Detective, did you remove those items from

9   that table and take them as evidence?

10     A      Yes, I did.

11     Q      When you removed those items and took them as

12   evidence what, if anything, else did you see on that table?

13     A      When I moved the dark ashtray I observed a brown

14   and white cigarette, but that was underneath the ashtray.

15     Q      Was it one cigarettes butt or two?

16     A      There were two.

17     Q      One was brown and one was white?

18     A      That's correct.

19     Q      I will display People's Exhibit 20 to the jury,

20   and ask you to describe what you're viewing there.

21     A      When I lifted up the ashtray which had no

22   cigarette butts in it at the time, I then observed two

23   cigarette butts, a brown one and a white Vantage 100

24   cigarette butt.

25     Q      Now, the victim depicted in People's Exhibit 21,

1    which is displayed on People's Exhibit 31, that was the

2    position where she was observed when you found her?

3        A    Yes, it was.

4        Q    Okay.  Now by her right leg there appears to be

5    some type of a little ball in that photograph, could you

6    point that out to the jury please.

7             (Whereupon, the witness complies)

8        Q    What was that, Detective?

9        A    That was a ball that a cat would play with.

10       Q    Now, I'm going to display for the jury People's

11   Exhibit 22, and just explain to the jury what they're

12   viewing there.

13       A    This is a photograph that I took from only

14   several feet away of Ruth Williams, lying next to her bed,

15   overalls, white sweater.  Her arm was twisted and the

16   photograph shows the discoloration of her hand and face.

17       Q    Now, did there come a time, Detective, when the

18   body of Ruth Williams was removed by the Medical Examiner's

19   Office?

20       A    Yes, there was.

21       Q    Okay.  Did you make certain observations of the

22   area where Ruth Williams had been lying?

23       A    Yes, I did.

24       Q    I'm going to display for the jury People's

25   Exhibit 26.  Could you explain to the jury what they're

1   viewing there.

2        A     After Ruth Williams was removed by the Medical

3   Examiner and transported over to Nassau County Medical

4   Center, I then took a photograph -- I made some notations on

5   the carpet as to where Ruth Williams' feet and legs were and

6   head.  And then took a photograph of the carpet where Ruth

7   Williams was laying.  And here you see the ball that appears

8   in the other picture where her leg was.  And then also

9   underneath her body, near her leg, was another white

10  cigarette Vantage 100 butt.  And then up top there was also

11  blood on the carpet and a burn mark that I took a photograph

12  of.

13       Q     I'm going to show you what has been marked as

14  People's 27 in evidence.  Please tell the jury what they're

15  viewing now?

16       A     That was a burn mark in the carpet where the

17  white cigarette Vantage 100 was underneath her leg.

18       Q     Displaying for the jury People's Exhibit 28.

19  Please explain to the jury what that is.

20       A     That's a photograph on the far end of Ruth

21  Williams' bedroom on the floor.  This is a photograph of

22  only several feet away.  It shows the telephone/answering

23  machine, the telephone receiver and some of the wires that

24  were torn out of the telephone jack that was just on the

25  other side of the wall.

Kathleen Plaia

1      Q       Displaying People's Exhibit 30.

2      A       This is a photograph of that same

3   telephone/answering machine device.  It just shows the front

4   key board and the tape that was inside the

5   telephone/answering machine and the wire that was torn out.

6      Q       Displaying People's Exhibit number 23.

7      A       This is a photograph I took several feet away

8   from Ruth Williams.  Specifically, the photograph shows the

9   blank telephone cord tied tightly around her neck and on the

10  outside of her hair.  It also shows the discoloration of her

11  face and there was some blood on the carpet.

12     Q       Displaying People's Exhibit 25.

13     A       This is another close-up photograph of the black

14  telephone cord tied around her neck on the outside of her

15  hair and tightly against the skin.

16     Q       Displaying People's Exhibit 24.  Please describe

17  that.

18     A       This is a close-up photograph of the face of Ruth

19  Williams.  The cord -- telephone cord is around her neck,

20  black cord, tightly around the front of her neck.  And

21  there's a lot of blood coming from the nose, mouth.  There's

22  some bruising around her eye and a lot of discoloration in

23  the face.

24     Q       You can be seated now, Detective.  Thank you.

25             (Whereupon, the witness resumes his seat on

Kathleen Plaia

Det. Downes - People - Direct                 658

1        the witness stand.)

2        Q     Detective, when you removed the items from the

3   kitchen table, other than, in addition to finding those two

4   cigarette butts under the ashtray, when you removed the

5   photo album from the ashtray did you make any observations

6   about what was underneath the photo album?

7        A     Yes.  After I photographed and collected the

8   photo album on the kitchen table, I observed a button

9   underneath the photo album that I photographed and

10  collected.

11       Q     All right.  Now, with respect to the telephone

12  that was found at the scene, did you collect that telephone

13  as evidence?

14       A     Yes.

15       Q     And could you describe for the jury how you

16  collected that telephone?

17       A     I had pair of latex rubber gloves on.  And after

18  the telephone was photographed, I then collected, carefully

19  collected, the entire receiver and the answering machine,

20  placed it in a brown paper bag, labeled it with a marker.  I

21  later put my evidence tag on that brown paper bag, sealed it

22  with evidence tape and transported it over to police

23  headquarters for evaluation by the Latent Fingerprint

24  Section.

25       Q     I'm going to ask that you be shown People's

Kathleen Plaia

Det. Downes - People - Direct                 659

1    Exhibit 33 for identification.  Do you recognize that?

2        A    Yes, I do.

3        Q    What do you recognize that to be?

4        A    This is the telephone base and the receiver with

5    the damaged cord that I collected from Ruth Williams'

6    bedroom that night.

7        Q    How do you recognize it to be that one?

8        A    The in -- inside this plastic bag there's the

9    brown paper bag that I put the telephone inside of that

10   night.  And it contains my writing and also my crime scene

11   evidence label with the date and the homicide number

12   attached to this case.

13            MR. BIANCAVILLA:   Thank you.

14       Q    Now, did there come a time during the course of

15   your examination of that apartment when you looked at the

16   entertainment center that you have discussed in People's

17   Exhibit number 32?

18       A    Yes, I did.

19       Q    What observations did you make regarding that

20   entertainment center?

21       A    I noticed that the power to the Cd player was on.

22   That there was no CD inside the CD player.  And I observed

23   right next to the CD player, on a shelf, a plastic CD,

24   Allman Brothers.  I also observed a cassette that was also

25   on the lower shelf.

Kathleen Plaia

1      Q      And what, if anything, did do you with the CD

2    case, did you examine it?

3      A      Yes, I examined it.  I applied -- I lightly

4    applies some fingerprint powder to that CD, plastic CD

5    holder case.  I observed some latent fingerprints.  Then I

6    packaged the item in brown paper bag for it to be

7    transported to the Latent Fingerprint Section for further

8    evaluation.

9      Q      I'm going to ask you be shown what has been

10   marked as People's 34 for identification.  Do you recognize

11   that, Detective?

12     A      Yes, I do.

13     Q      What do you recognize that to be?

14     A      This is the CD holder that I collected that night

15   from Ruth Williams' apartment from the shelf of that

16   entertainment center.  It has the brown paper bag with my

17   writing on it and it also has my crime scene evidence label

18   with the item number, the date, my initials and the homicide

19   number attached to this case.

20     Q      Thank you.  Now, with respect to the cigarettes

21   that you had discussed with the jury, the two cigarettes you

22   found on the kitchen table, could you describe to the jury

23   what you did with them?

24     A      With the pair of latex rubber gloves on, I

25   carefully collected each individual cigarette butt, placed

Det. Downes - People - Direct                    661

1    it in a plastic hinge box that we have in the crime scene

2    truck.  I attached a number to it, and put a label and

3    evidence tape on each box.

4         Q    The one -- what about the one you found under the

5    body?

6         A    I also did the same thing.  I carefully collected

7    that with latex rubber gloves, placed it in a plastic hinged

8    box, labeled it and later transported it to police

9    headquarters to be evaluated had by the lab.

10        Q    Do you find any other cigarette butts during the

11   course of the investigation that night, either inside the

12   apartment or in the hallway?

13        A    Yes, I did.

14        Q    Where did you locate that?

15        A    I observed in the long narrow hallway, just on

16   the top -- just above the top step, I observed a brown

17   cigarette butt that I also photographed and collected with

18   latex gloves, put in a plastic hinged box, labeled and sent

19   over to the lab for analysis.

20             MR. BIANCAVILLA:  I'm going to ask that the

21        witness be shown People's 35 for identification.

22        Q    You are being shown what is marked as People's 35

23   for identification, Detective.  Do you recognize that?

24        A    Yes, I do.

25        Q    What do you recognize that to be?

Kathleen Plaia

1    A    Inside this plastic are the four separate

2  individual plastic hinged boxes that I put each of the four

3  cigarette butts inside of that night.  Each hinged box has

4  my writing on it and my crime scene evidence label with

5  initials and the corresponding homicide number attached to

6  this case.

7    Q    Okay.  Now, Detective, with respect to the photo

8  album that was located on that table, what did you do with

9  that?

10    A    The entire photo album I collected with latex

11  rubber gloves, placed the entire album inside a brown paper

12  bag and then transported that over to police headquarters to

13  be processed for Latent Fingerprint Section.

14        MR. BIANCAVILLA:  I ask that the witness be

15      shown what has been marked as People's 37 for

16      identification.

17    Q    Do you recognize that, Detective?

18    A    Yes, I do.

19    Q    What do you recognize that to be?

20    A    This was the photo album that was on the kitchen

21  table in Ruth Williams' apartment.  The photo album was

22  placed in a brown paper bag.  It has my writing and name on

23  it.  Also on the bag is my crime scene label with the item

24  number, the date, my initials and the corresponding homicide

25  number attached to the case.

1      Q     Was there also a glass that you took from that

2  table, wasn't there?

3      A     Yes, there was.

4      Q     What did you do with that glass?

5      A     I took a sample of the contents from the glass.

6  And then I took the glass itself and then placed it in a

7  brown paper bag and transported it over to police

8  headquarters to be processed for latent fingerprints.

9      Q     I show you what has been marked as People's 38

10  for identification.  Do you recognize that, Detective?

11      A     Yes, I do.

12      Q     What do you recognize that to be?

13      A     This is the glass from the kitchen table at Ruth

14  Williams' apartment that contained some wine.  It has my

15  label on it and the brown paper bag that I placed it in that

16  night.

17      Q     Now, is that glass in the same condition as it

18  was when you placed it in the paper bag that night?

19      A     No, it isn't.

20      Q     What is different about it?

21      A     A small piece of the glass base has broken off

22  the glass.

23      Q     But the glass was intact when you submitted it

24  for identification?

25      A     Yes, it was.

1      Q   Okay.  Detective, you also mentioned that there

2   was some type of a song on the kitchen end table?

3      A   Yes.

4      Q   I will show you what has been marked as People's

5   36 for identification.  Do you recognize that?

6      A   Yes, I do.

7      Q   What do you recognize that to be?

8      A   This is -- this is the song on the piece of paper

9   that appeared on that table next to the photo album that

10  night.

11     Q   How do you recognize it to be that, sir?

12     A   This has the crime scene item number and the

13  homicide number attached to this case.

14     Q   Now, Detective, were there additional items that

15  you also collected when you processed that scene?

16     A   Yes, there were.

17     Q   Okay.

18         MR. BIANCAVILLA:  I'm going to ask that the

19     witness be shown People's 42 for identification.

20             You can put that down for one second,

21     Officer.  I missed one piece.  The beer bottle.

22         THE WITNESS:  Yes.

23     Q   Did you collect the beer bottle that night?

24     A   Yes, I did.

25     Q   What did you do with the beer bottle?

Kathleen Plaia

1        A        I removed a liquid sample from the Budweiser beer

2    bottle.   I then with latex rubber gloves placed the beer

3    bottle in a brown paper bag, sealed it and transported it

4    over to police headquarters for evaluation.

5        Q        Please take a look at what has been marked as

6    People's 39 for identification and tell us if you recognize

7    it?

8        A        This is the Budweiser bottle.   It was placed in

9    the brown paper bag.   And has my label attached to the

10    bottle that has my initials, the date and the corresponding

11    case number.

12        Q        Okay.   Thank you very much.   Now, with respect to

13    People's exhibit 41 for identification --

14                THE COURT OFFICER:   42.

15        Q        42.   Do you recognize the chart which you were

16    just shown?

17        A        Yes, I do.

18        Q        What do you recognize that to be?

19        A        This is a computer generated diagram of the

20    layout of the apartment, with the corresponding numbers

21    attached to evidence items that I collected that night.   I

22    took measurements of the room, located the evidence items.

23    Then with the assistance of another detective at the Crime

24    Scene Unit a diagram was prepared.

25        Q        Does that fairly and accurately depict the

1    apartment and where in fact you recovered the various items

2    of evidence from?

3          A      Yes, it does.

4                  MR. BIANCAVILLA:   Judge, we would offer that

5    at this time.

6                  THE COURT:   Please show that to

7    Mr. Chamberlain.

8                  MR. CHAMBERLAIN:   No objection, your Honor.

9                  THE COURT:   Mark it in evidence.

10                 (Whereupon, the referred to item previously

11   marked for identification is received and marked

12   People's Exhibit 42 in evidence by the reporter as

13   instructed)

14                 THE COURT OFFICER:   Received in evidence.

15                 MR. BIANCAVILLA:   Judge, can we display that

16   for the jury, please?

17                 THE COURT:   Yes.

18                 MR. BIANCAVILLA:   May we have the detective

19   step down also, Judge?

20                 THE COURT:   Yes.  You may step down,

21   Detective.

22                 (Whereupon, the witness leaves the witness

23   stand.)

24                 (Whereupon, People's Exhibit 42 is displayed

25   to the sworn jury and alternates.)

Det. Downes - People - Direct                667

1      Q      Detective, can you please explain to the jury

2    generally what they're viewing there in terms of the layout

3    and the red numbers they're looking at?

4      A      This is the apartment above Captain Andy's.  This

5    is the long set of staircase that you come up through the

6    back door.  You go through the narrow hallway.  Then there's

7    a door here that leads to the apartment of Ruth Williams.

8    Inside that door is another narrow hallway.  There's a

9    bathroom on the north side.  As soon as you walk in, the

10   kitchen.

11            All of these red numbered items are evidence

12   items that I collected and appear below at the legend.

13            Here's the kitchen, the.  Table with various

14   evidence items that I collected.  There's the bedroom.  The

15   position of Ruth Williams.  Some evidence items collected.

16   The bedding.

17            Also, here's the walls that separate the bedroom

18   from the living room.  Some evidence items I collected.  The

19   living room with some furnishings.  The t.v. cabinet and

20   entertainment section with evidence items numbers attached.

21   And this over here would be the window facing Main Street.

22      Q      Now, in the key at the bottom there are some

23   dimensions next to each item that was recovered.  Could you

24   explain to the jury what that means and what the reference

25   point would be?

Kathleen Plaia

1     A     To locate evidence in each room I would take a

2     corner of the room, use it as a reference point, and then

3     locate evidence items north, west, perhaps east or south.

4             The reference point in the kitchen would be this

5     corner here and it's noted by the letters RP.  And also in

6     the bedroom, the reference point would be this corner, noted

7     by RP.  And then in the living room the reference point was

8     this corner, noted by RP.

9             So, all the evidence items could be located off a

10    reference point.

11    Q     Now, did you process that crime scene for

12    fingerprints?

13    A     Yes, I did.

14    Q     Would you please explain to the jury how you went

15    about processing that crime scene for fingerprints?

16    A     After I photographed the scene, collected

17    evidence items that were in plain view and packaged them, I

18    then began to apply fingerprint powder, black powder and

19    gray powder, to various items throughout the bathroom,

20    kitchen, bedroom and living room.

21    Q     Let me stop you there.  Explain to the jury the

22    difference between black powder and gray powder just so they

23    understand the process you're talking about.

24    A     I would use black powder on light colored objects

25    and I would use the gray powder on dark colored objects and

Kathleen Plaia

1    glass.

2        Q       Please go through with the jury each area that

3    you processed for fingerprints and what the results were.

4    If you need to refer to your notes, please do so.

5                THE WITNESS:   Your Honor, I need to refer --

6                THE COURT:   Yes.   You need to refresh your

7        recollection?

8                THE WITNESS:   Yes.

9        A      I applied fingerprint powder in the living room

10   to the windows, the interior and exterior windows, the

11   glass, the frame, the window sill.   I applied fingerprint

12   powder to the entertainment section, the wall unit, the

13   glass doors, the shelving, the CD player shelf, some of the

14   mica doors and handle, the CD player.

15               Also, in the living room, the wood frame opening

16   on each side I applied fingerprint powder to, and the wall

17   and table around where that answering machine was in the

18   living room.

19               Also, in the bedroom I applied fingerprint powder

20   to the exterior of the dresser, the wood frame opening that

21   separated the kitchen from the bedroom, the computer

22   desk-top, the window, the interior and exterior, the glass,

23   the frame, the sill.

24               In the kitchen I applied fingerprint powder to

25   the refrigerator door, it's side, two plastic drinking

1    containers, the table cover, the windows.  There were two

2    windows here that I applied fingerprint powder to.  The

3    glass frame and the sill.

4            In the bathroom I applied fingerprint powder to

5    the bathroom door, it's frame, it's handle, the medicine

6    cabinet glass door, the toilet, toilet seat, the two windows

7    that are inside the bathroom.

8            Also, in the hallway I applied fingerprint powder

9    to the entrance door, the frame, the storm door, to the

10   roof, the interior and exterior glass of the storm door, the

11   window in the hallway.

12           Also applied fingerprint powder to areas in the

13   attic.  There was a pulldown stairway.  And also, two

14   windows, the glass and the frame.  The lower entrance door

15   at the bottom of the stairs there was a metal door that I

16   applied fingerprint powder to, both on the inside and

17   outside.

18       Q    When you say you processed the doors, how do you

19   process the doors?

20       A    What I would do is, based on the color of the

21   door -- in this case they were both light colored -- I would

22   apply black fingerprint powder to almost completely the door

23   area, from top to bottom.

24       Q    Door knobs?

25       A    Door nobody.

Det. Downes - People - Direct                    671

1        Q       Now, what were the results of your fingerprint

2    processing of that apartment?

3        A       Just the fingerprint processing itself?

4        Q       Yes.

5        A       I observed -- after I applied fingerprint powder,

6    I observed fingerprints item number 34, which is on the wall

7    that separates the living room from the bedroom.  I

8    photographed and collected and lifted a fingerprint at item

9    number 34.  I then also collected a fingerprint on the

10   exterior surface of the dresser that I photographed and

11   collected and lifted, and then on the t.v. cabinet.

12           I had applied a light coat of gray powder to the

13   exterior of the CD holder.  I observed some fingerprints on

14   that CD case and then submitted it.  Other items I just --

15   other items that I felt were conducive to fingerprints I

16   just submitted to the latent fingerprint section without

17   applying fingerprint powder to them.

18       Q       But you referred to crime scene items number 34

19   and 35, those were actual lifts that you performed?

20       A       Yes.

21       Q       Describe for the jury how you did that.

22       A       What I did was, after I applied fingerprint

23   powder, I observed what appeared to be a fingerprint or

24   partial fingerprint and then with an advanced camera that

25   takes a one-to-one shot of the photograph, I took a picture

Kathleen Plaia

1    of that print.  I then took an in -- adhesive lift that we

2    use to lift the fingerprints off the surface and I did that

3    to both the areas of 34 and 35.  Took a picture of the

4    prints, then lifted the prints with the adhesive lifts that

5    we have.

6         Q    Now, I'm going to show you what has been marked

7    as People's 40 and 41 for identification.  Could do you

8    recognize those?

9         A    Yes, I do.

10        Q    What do you recognize those to be?

11        A    These are the actual fingerprint lifts that I

12   took that night.  One is item number 34 and one is at 35.

13             MR. BIANCAVILLA:  You can be seated, again,

14   Detective.  Thank you.

15             (Whereupon, the witness resumes his seat on

16   the witness stand.)

17        Q    Now, Detective, after you collect all the

18   evidence what do you do with it?

19        A    After all the evidence is collected, it's placed

20   in the crime scene van.  Then I drive back to my office in

21   North Bellmore.  Paperwork is prepared, typed up.  Evidence

22   items I properly packaged and sealed.  And then later on

23   it's transported over to police headquarters for further

24   evaluation by the Latent Fingerprint section or to the lab.

25        Q    So, you don't perform any analysis on the

1    evidence that you collect at the crime scene?

2         A     No, I don't.

3               MR. BIANCAVILLA:  Judge, at this time the

4    People would offer what has been marked for

5    identification as from 33 on, Judge, we offer that into

6    evidence.

7               THE COURT:  33 through through 41.

8               MR. BIANCAVILLA:  Yes.

9               THE COURT:  Show them to Mr. Chamberlain,

10   please.

11              MR. CHAMBERLAIN:  Just a very short voir

12   dire, Judge.

13              MR. BIANCAVILLA:  I'm finished.  I have no

14   further questions.

15              THE COURT:  Okay, Mr. Biancavilla.

16              Would you like a voir dire with respect to

17   which ones, Mr. Chamberlain?

18              MR. CHAMBERLAIN:  With respect to the

19   location of these in relation to the diagram.

20              THE COURT:  Sure.

21   VOIR DIRE EXAMINATION

22   BY MR. CHAMBERLAIN:

23        Q     Detective, the diagram you got up here on the

24   board, I think it's 42.  Is that DRAWN to scale as far as

25   the apartment goes?

1      A      No.   That's for illustration purposes only.

2      Q      It's not to scale?

3      A      That's correct.

4      Q      And obviously the hallway that looks quite short

5   is a lot longer than what it shows on that picture?

6      A      That's correct.

7      Q      It's a lot narrower, right?  The diagram does not

8   reflect exactly where these things were located on a scale

9   dimension?

10     A      That's correct.

11     Q      And with respect to the, I think it's 38, the

12  glass that is broken.

13     A      The broken glass.

14     Q      The broken glass.

15     A      That was on the table.

16     Q      That glass was broken after you collected it, is

17  that it?  Was it broken at the time you collected it?

18     A      No.

19     Q      It was not?

20     A      No.

21     Q      Is there any significance on the break as far as

22  evidentiary character?

23             MR. BIANCAVILLA:   Objection.

24             THE COURT:   I'm not sure what that means,

25     Mr. Chamberlain.

```
 1              Sustained as to form.
 2      Q     Other than -- does a break -- was there anything
 3  about where the break occurred that you collected evidence
 4  from?
 5              MR. BIANCAVILLA:  Objection.
 6              THE COURT:  I think I understand the
 7  question.  Were you collecting -- well, perhaps you can
 8  rephrase your question.
 9              But, do you understand the question,
10  Detective?
11              THE WITNESS:  Well, when I collected the
12  glass, the base of the glass was intact.  Somewhere in
13  transport over at Police Headquarters a small portion
14  of that base was chipped off.
15      Q     You said you took -- did you take a print from
16  this glass?
17      A     The entire glass was submitted to the Latent
18  Fingerprint Section for processing.
19      Q     And do you know whether they lifted any prints?
20              MR. BIANCAVILLA:  Objection, hearsay.
21              THE COURT:  Yes, sustained.
22      Q     You indicated you took a sample from the glass?
23      A     Yes, I took a liquid sample.
24      Q     That was from the contents inside?
25      A     Yes.
```

Kathleen Plaia

1          MR. CHAMBERLAIN:  All right.  I have no

2     objection to the introductory evidence.

3          THE COURT:  All right.  People's 33, 34, 35,

4     36, 37, 38, 39, 40, and 41 are marked into evidence.

5          (Whereupon, the referred to items previously

6     marked for identification are received and marked

7     People's 33, 34, 35, 36, 37, 38, 39, 40 and 41 in

8     evidence by the reporter as instructed)

9          THE COURT OFFICER:  People's 33 through 41

10    are received in evidence.

11         MR. BIANCAVILLA:  One more question.

12         THE COURT:  One more question,

13    Mr. Biancavilla.

14         MR. BIANCAVILLA:  Could we have the Detective

15    stand up.

16         THE COURT:  Yes.

17    DIRECT EXAMINATION CONTINUED

18    BY MR. BIANCAVILLA:

19    Q     You just testified that this Exhibit 42 is not

20    drawn to scale, is that correct?

21    A     Yes.

22    Q     Could you remove that from the board, let the

23    jury see the one behind it?

24          Is that a scale drawing of the apartment layout?

25    A     Yes, it is.

1        Q        Does that fairly and accurately represent the

2    actual layout of the apartment?

3        A        Yes.

4        Q        Okay.    Thank you.

5                 THE COURT:    All right.

6                 MR. CHAMBERLAIN:    Based on that last point,

7    Judge?

8                 THE COURT:    Counsel, come forward a minute.

9                 MR. CHAMBERLAIN:    Sure.

10                (Whereupon, there is an off the record

11   discussion held at the Bench between the Court and

12   Counsel.)

13                THE COURT:    Ladies and gentlemen, at this

14   point we're going to take a very short break.    Do not

15   discuss the case among yourselves or with anyone else.

16   Keep an open mind.    Do not form or express any opinions

17   until the entire case is completed.    Do not read or

18   listen to any accounts of this case, should it be

19   reported in the media.    Do not visit or view any place

20   or premises that have been mentioned.    You're not to

21   permit any party to discuss this case with you or

22   attempt to influence you.    And you must promptly report

23   to the Court any violation thereof.

24                Please follow the court officers.    We'll be

25   back very shortly.

Kathleen Plaia

```
 1                    (Whereupon, the sworn jury and alternates

 2       leave the courtroom)

 3                    [THE] COURT:  Detective, you may step down.

 4                    THE WITNESS:  Thank you, sir.

 5                    (Whereupon, the witness leaves the witness

 6       stand)

 7                    (Whereupon, there is a brief recess taken in

 8       the proceedings.)

 9                    (Whereupon, the following takes place in open

10       court, after a brief recess in the proceedings.)

11                    THE CLERK:  Case on trial continues.  All

12       parties are present.  Jurors are not present at this

13       time.

14                    People ready?

15                    MR. BIANCAVILLA:  Ready.

16                    THE CLERK:  Defense ready?

17                    MR. CHAMBERLAIN:  Defendant ready.

18                    THE CLERK:  Ready for the jurors?

19                    THE COURT OFFICER:  Jury entering.

20                    (Whereupon, the sworn jury and alternates

21       enter the courtroom)

22                    THE CLERK:  Both sides stipulate that all

23       sworn jurors are present and seated properly?

24                    MR. CHAMBERLAIN:  So stipulated.

25                    MR. BIANCAVILLA:  So stipulated, your Honor.
```

1          THE COURT:  All right.  Ask Detective Downes

2     to come in please.

3               (Whereupon, Detective Downes resumes the

4     stand, having been previously duly sworn, to commence

5     cross-examination testimony as follows:)

6               THE CLERK:  Detective, you're reminded you're

7     still under oath.

8               Please have a seat.

9               THE COURT:  Cross-examination,

10    Mr. Chamberlain.

11              MR. CHAMBERLAIN:  Thank you, your Honor.

12    CROSS-EXAMINATION

13    BY MR. CHAMBERLAIN:

14         Q    Good morning, Detective.

15         A    Good morning, sir.

16         Q    You identified a number of photographs in

17    connection with this crime scene.  They were not the only

18    photographs.  There are many, many more, right?

19         A    There are a little over sixty photographs.

20         Q    And I'll get back to this after.

21              But, in addition to the photographs, you also

22    collect fingerprints which you already testified to?

23         A    That's correct.

24         Q    And other evidence which we haven't gone into

25    yet, is that right?

1    A    That's correct.

2    Q    And it's your job, Detective, as I understand it,

3    to collect evidence, not to analyze or evaluate it.  There

4    are other experts that who do that?

5    A    Yes.

6    Q    Okay.  You indicated when you got down there that

7    night, the night of the 13th of April, there were already

8    some detectives there?

9    A    Yes.

10   Q    One of them Detective McHugh?

11   A    Yes.

12   Q    Is Detective McHugh the investigating detective

13   on this homicide?

14   A    Yes, he is.

15   Q    So, he was directing the activities in connection

16   with the investigation?

17            MR. BIANCAVILLA:  Objection.

18            THE COURT:  If he knows.

19   A    Each detective has their own assignment to do.

20   Detective McHugh is assigned to the Homicide Squad and he

21   was the investigating officer.

22   Q    As investigating officer, what would her duties

23   be?  Wouldn't that be to collect all the evidence?

24            MR. BIANCAVILLA:  Judge, I'm going to object.

25   It calls for the operation of someone else's mind.

```
 1              THE COURT:  Well, if Detective Downes knows

 2      what the investigating detective does with respect to a

 3      homicide case, he certainly can respond to that

 4      question.

 5      A      The investigating officer -- Detective McHugh in

 6      this case -- is responsible for the overall, entire

 7      investigation.

 8      Q      Okay.  Thank you, Detective.  Now, with respect

 9      to evaluation, the collection of evidence here, did you

10      collect any evidence after the -- your visit to the crime

11      scene after the 13th?

12              MR. BIANCAVILLA:  Judge, I'm going to object.

13              THE COURT:  No.  You mean --

14              MR. BIANCAVILLA:  With respect to what case,

15      Judge.

16              MR. CHAMBERLAIN:  In this case.

17              THE COURT:  With respect to this case, I

18      presume.  Is that what we're talking about?

19              MR. CHAMBERLAIN:  I'm not talking about

20      anything else, Judge.

21              Yes, this case.

22              THE COURT:  I'll permit that.

23      A      No.  No.

24      Q      Nothing after the 13th?

25      A      Did I?
```

1        Q       You.

2        A       No.

3        Q       There were some swabs obtained from the suspect

4    on or about, report says, March 21st, 2000, that would have

5    to be a mistake?

6                        MR. BIANCAVILLA:  Judge, I'm going to object.

7                        THE COURT:  Sustained.

8        Q       You didn't collect any --

9                        THE COURT:  The jury should disregard that

10   last statement.  The jury should disregard the last

11   statement made by Counsel.

12                       MR. CHAMBERLAIN:  I withdraw that question,

13   Judge.

14       Q       Let me show you --

15                       THE COURT:  Would you like that marked,

16   Mr. Chamberlain?

17                       MR. CHAMBERLAIN:  Yes, I would, your Honor.

18                       THE COURT:  Show it to the witness.

19                       MR. BIANCAVILLA:  Can I see it after he shows

20   it to the witness.

21                       THE COURT:  You can see it.  Show it to

22   Mr. Biancavilla.

23                       (Whereupon, the referred to item is received

24   and marked Defendant's E for identification by the

25   reporter as instructed.)

1    THE COURT OFFICER: Defendant's E is marked

2    for identification.

3         Counsel, come up, please.

4         Detective, step down a moment.

5         (Whereupon, the following takes place at the

6    Bench, between the Court and Counsel:)

7         THE COURT: Mr. Biancavilla?

8         MR. BIANCAVILLA: Judge, that is a report

9    from Scientific Investigation Bureau regarding a sample

10   taken from someone after the 13th of April. He just

11   asked this detective if he collected evidence after the

12   13th of April. He gave him that answer, he said no, I

13   didn't. What is the relevancy of showing him that

14   document?

15        THE COURT: Perhaps Mr. Chamberlain can tell

16   us.

17        MR. CHAMBERLAIN: First of all, Judge, this

18   is a report I was just handed this morning. It says

19   March 21st.

20        MR. BIANCAVILLA: Excuse me, that refers

21   to -- Judge, I turned it over, I specifically said,

22   those are Detective McCarthy's notes, okay, regarding

23   serology.

24        THE COURT: It has nothing to do with

25   Detective Downes.

1          MR. CHAMBERLAIN:  I can ask him that.

2          MR. BIANCAVILLA:  It has nothing to do with

3    serology.  He collected, and you will hear this, he

4    collected material for serology.

5          THE COURT:  Can I suggest something to you,

6    Mr. Chamberlain?  I don't see the relevancy here with

7    respect to Detective Downes who just testified no more

8    than a couple of minutes ago that he did not take any

9    samples subsequent to that date.  Now, this was

10   received by Detective Bazowitz.

11         MR. BIANCAVILLA:  That's Basillowitz.

12         THE COURT:  You know, and Mr. Biancavilla

13   told you it was notes with respect to Detective

14   McCarthy.  They're the ones who you would cross-examine

15   with respect to this.  He just said he had nothing to

16   do with subsequent to that date.  If you want to ask --

17   well, you know, first of all, it says March 21st, 2000.

18   The alleged incident here occurred on April 12th, 2000.

19         MR. CHAMBERLAIN:  That's right.

20         THE COURT:  So, this is relevant to nothing.

21         MR. BIANCAVILLA:  It's relevant to nothing.

22   What's the point?

23         MR. CHAMBERLAIN:  It's a report that I was

24   just handed as Rosario material, Judge.

25         THE COURT:  I understand that.

Kathleen Plaia

1          MR. CHAMBERLAIN:   The other reports we have

2     been given indicate he collected material -- he

3     collected photographs, he collected fingerprints, he

4     collected swabs, he collected materials for DNA.   He

5     collected materials.

6          MR. BIANCAVILLA:   I never said any of that.

7          MR. CHAMBERLAIN:   It's all in the record.

8          THE COURT:   I understand.

9          MR. BIANCAVILLA:   He collected material for

10    serology.

11         THE COURT:   But this is saliva swabs,

12    Mr. Chamberlain.   There is no indication whatsoever

13    that he collected -- first of all --

14         MR. CHAMBERLAIN:   I asked him what he

15    collected.

16         MR. BIANCAVILLA:   No.

17         THE COURT:   Mr. Chamberlain, the date of --

18         MR. CHAMBERLAIN:   What if I just do this,

19    Judge.   What if I hand him this and say, did you

20    collect the material listed on this report?

21         MR. BIANCAVILLA:   Judge, it has nothing to do

22    with him.   It has absolutely nothing to do --

23         MR. CHAMBERLAIN:   I think I'm entitled to ask

24    the witness.

25         MR. BIANCAVILLA:   He's not, Judge.   All he's

1      doing --

2                    THE COURT:  I understand.  I'll tell you what

3      I will do.  You have already marked it.  I will let him

4      show him the document and ask him if he --

5                    MR. BIANCAVILLA:  If you -- let him ask him,

6      first of all, if he recognizes the document.  If he

7      says no, then that's the end of the story.

8                    MR. CHAMBERLAIN:  Maybe he wants to conduct

9      my examination for me.

10                   MR. BIANCAVILLA:  Just ask admissible

11     questions, Mr. Chamberlain.

12                   THE COURT:  Counsel, come on, no colloquy.  I

13     will let Mr. Chamberlain show him the document and ask

14     him if he recognizes and if he does --

15                   MR. CHAMBERLAIN:  You're directing me to say

16     does he recognize it?

17                   MR. BIANCAVILLA:  It's a proper question,

18     Judge.  Anything other than that is not proper.

19                   THE COURT:  You are showing him a document.

20     If he doesn't recognize it or had nothing to do with

21     it, what relevance does it have?   It's obvious to me

22     it was performed by another detective.  However, you

23     can certainly ask him the question.

24                   MR. CHAMBERLAIN:  I'm not asking him about

25     the performance.  I'm asking him if he collected the

1    swabs that were referred to.

2              MR. BIANCAVILLA:  He knows he didn't, Judge.

3    The document says it doesn't refer to him.

4              THE COURT:  Mr. Chamberlain, you have -- show

5    him the document and ask him the question as to whether

6    he recognizes it.

7              (Whereupon, the following takes place in open

8    court:)

9              MR. CHAMBERLAIN:  I ask the witness be shown

10   this document.

11             THE COURT:  Yes.

12   Q     Detective, do you recognize that document, what

13   it is?

14   A     It's a Police Department Scientific Investigation

15   Bureau Receipt Report.

16             MR. BIANCAVILLA:  Judge, I'm going to object.

17   Reading from something not in evidence.

18             THE COURT:  Detective, did you have anything

19   to do with the preparation of that document?

20             THE WITNESS:  No, I did not.

21   Q     Did you have anything to do with the collection

22   of the evidence that is referred to in that document?

23             MR. BIANCAVILLA:  Objection.

24             THE COURT:  I'll permit that.

25   A     No, I did not.

1    Q    All right.  Thank you, Detective.

2         Now, Detective, I think it's People's 8 refers --

3              MR. CHAMBERLAIN:  Can we have the photograph

4    put back up there?

5              THE COURT:  You would like People's 8.

6              MR. CHAMBERLAIN:  It's all on the board.

7              THE COURT:  Could you place the board up on

8    the easel for Mr. Chamberlain?

9         Do you want it on the easel?

10             MR. CHAMBERLAIN:  Are you looking for

11   People's 8?

12             MR. BIANCAVILLA:  That's People's 3.

13   People's 8 is mounted on.

14             MR. CHAMBERLAIN:  That's correct.

15             MR. BIANCAVILLA:  It was mounted on, People's

16   31.

17             MR. CHAMBERLAIN:  Perhaps if I can have the

18   district attorney put on the viewer.

19             MR. BIANCAVILLA:  The photographs are

20   mounted, Judge.

21             THE COURT:  They're mounted at the time.  If

22   you want a particular one, you can take it off the pin

23   if you want.

24             MR. BIANCAVILLA:  It's not pinned anymore.

25   They were falling off.

1          THE COURT:  Okay.

2     Q     Do you recall People's 8, Detective?

3     A     Yes, I do.

4     Q     Is that the one of all the photographs mounted on

5  that board that has a red dot as well as blue dot?

6          THE COURT:  Detective Downes, perhaps if you

7     got down into the well, it might be easier so you can

8     look at it simultaneously with Mr. Chamberlain's

9     questions.

10    A     Okay.

11          (Whereupon, the witness leaves the witness

12    stand.)

13    A     I recognize that photo, yes.

14    Q     And you indicated on direct that you took that

15  from approximately twenty-five feet away?

16    A     Approximately, yes.

17    Q     Did you -- the photograph next to it is People's

18  what, the number right on the --

19          MR. BIANCAVILLA:  There's a number right on

20    the blue dot.

21    Q     Number of the blue dot, Detective?

22    A     This one here?    This one here is 13.

23    Q     13.  That was a picture taken from the vicinity

24  of the doorway, looking out toward the parking lot, is that

25  correct?

Kathleen Plaia

1          A      Yes, it is.

2          Q      Did you take any photographs from the parking lot

3    looking in toward that doorway?

4          A      This photograph here, People's 20, is taken from

5    the general vicinity of that sidewalk, that would show this

6    opening.  This photograph would show this opening.  This is

7    a photograph westbound.  This is a photograph eastbound.

8          Q      Is that People's 20, the first one?

9          A      12.

10         Q      That was taken from the position approximately

11   between the dividing line between the Downtown and Captain

12   Andy's?

13         A      That's correct.

14         Q      And approximately how far away were you when that

15   photograph was taken?

16         A      I have to refer to my paperwork.  Do we know what

17   photograph number that is?

18                MR. BIANCAVILLA:  Just flip it up.

19         A      That's approximately thirty feet.

20         Q      Thirty feet?

21         A      Yes.

22         Q      Okay.  And I'm going to show you Defendant's C in

23   evidence, Detective, and ask you if that photograph also

24   shows the dividing line between Captain Andy's and the

25   Downtown?

Kathleen Plaia

1          MR. BIANCAVILLA:  Objection.  The photographs

2     speak for themselves, Judge.

3          THE COURT:  Can I see the photo?

4          I'm not sure what you mean, Mr. Chamberlain,

5     by dividing line.  Are you talking about property

6     lines?

7          MR. CHAMBERLAIN:  It shows where one building

8     ends and the other property starts.

9          MR. BIANCAVILLA:  I'm going to object, Judge.

10    The photo speaks for itself.

11         THE COURT:  Well, I'll let the Detective

12    answer the question.

13    A     What's the question, sir?

14    Q     Does that photograph accurately represent the

15    line between Captain Andy's and Downtown taken from

16    approximately the same position that you were in when you

17    took People's 12?

18    A     Yes, it does.

19    Q     All right.  Thank you, Detective.

20         I'm going to show you Defendant's B in evidence.

21    And I ask you to look at that photograph.  Does that

22    photograph accurately represent the view of the back of the

23    Downtown and Captain Andy's from the parking lot?

24    A     Yes, it does.

25    Q     And if a person were standing in a position

1    either where this X is marked on that photograph or further

2    out alongside a car where that X was planted, in the third

3    row of that parking lot, would this picture accurately

4    represent the back of that -- the view of the back of

5    Captain Andy's?

6                        MR. BIANCAVILLA:  Objection.

7                        THE COURT:  Sustained.  No foundation,

8         Mr. Chamberlain.

9         Q      Detective, did you take any picture -- did you

10   take any picture from the third row of the parking lot

11   viewing Captain Andy's?

12        A      No, I did not.

13        Q      Would be able to -- did you ever measure the

14   distance from the third row or approximately that area to

15   the back of Captain Andy's?

16        A      No, I didn't.

17        Q      Can you, as you stand here today, estimate that

18   distance, looking at that photograph?

19        A      No, I could not.

20                        MR. CHAMBERLAIN:  Thank you.

21                        (Whereupon, the detective resumes his seat on

22        the witness stand.)

23        Q      It's certainly more than the twenty-five feet

24   from where you took that photograph, right?

25                        MR. BIANCAVILLA:  Objection.

 1              THE COURT:  Sustained.

 2      Q      Now, in addition to these photographs, did you

 3  also take photographs of the victim's vehicle?

 4      A      Yes, I did.

 5      Q      And did you also do a crime scene analysis of the

 6  contents of that vehicle?

 7              MR. BIANCAVILLA:  Objection.

 8              THE COURT:  I'll permit that.

 9      A      I'm not the detective that did that analysis.

10      Q      Not the analysis.  But, did you collect the

11  evidence that was used for that analysis?

12      A      No, I did not.

13      Q      Do you know who did that, Detective?

14      A      Detective -- I believe it was Detective Smith.

15      Q      I'm going to show you a page -- I'm going to show

16  you a document and ask you if you recognize it.

17      A      Yes, I do recognize this.

18      Q      Is that -- would you tell the Court and jury what

19  that document is?

20              MR. BIANCAVILLA:  Objection.

21              THE COURT:  You can't read from a document

22      not in evidence.

23      Q      What does it represent?

24              MR. BIANCAVILLA:  Objection.

25      Q      Is it a document kept in the regular course of

1    business by the police department?

2         A     Yes.

3         Q     Is it a report of the analysis -- the contents

4    collected from the victim's car?

5                    MR. BIANCAVILLA:  Objection.

6                    THE COURT:  Sustained.  That's not the proper

7         way, Mr. Chamberlain.

8         Q     That is a document kept in the regular course of

9    business of the police department?

10        A     Yes, it is.

11        Q     And it was a document kept in the regular course

12   of business in connection with the investigation of this

13   particular homicide, is that correct?

14        A     Yes, it was.

15                   MR. CHAMBERLAIN:  I offer that in evidence.

16                   MR. BIANCAVILLA:  Objection.

17                   THE COURT:  You left out one of the

18        questions.

19                   Sustained.

20        Q     Are you familiar with the evidence collected by

21   Detective smith and referred to in that document?

22        A     Yes, I am.

23        Q     And is that accurately reflected evidence that

24   was collected by him to your knowledge?

25                   MR. BIANCAVILLA:  Objection.

Kathleen Plaia

1              THE COURT:  Sustained.

2              MR. CHAMBERLAIN:  If he knows.

3              THE COURT:  Counsel, come forward.

4              (Whereupon, the following takes place at the

5      Bench, between the Court and Counsel:)

6              THE COURT:  Mr. Chamberlain, in order to get

7      a business ruling in, there's three questions.

8              MR. BIANCAVILLA:  I object beyond that.

9      First of all, it's not a business record.

10             THE COURT:  I'm not up to that yet.  I don't

11     even know, we haven't gotten that far.

12             MR. BIANCAVILLA:  Thank you.

13             MR. CHAMBERLAIN:  What are the three

14     questions, Judge?

15             THE COURT:  Would you like to borrow my

16     Richardson's?

17             MR. CHAMBERLAIN:  No, not right now.

18             MR. BIANCAVILLA:  Well, let's move along,

19     Judge.

20             THE COURT:  Now, I don't have to practice law

21     for you.  There is a proper procedure in order to get

22     something into evidence by a business record rule.

23             MR. BIANCAVILLA:  When it's a business record

24     rule.

25             THE COURT:  I don't know, we haven't gotten

1          that far.

2                    MR. CHAMBERLAIN:  Okay.

3                    THE COURT:  It depends on what the answers

4          from the detective are, as to what he answers, as to

5          whether this is admitted pursuant to a business record

6          rule.

7                    Now, if you would like to borrow my

8          Richardson, you're more than welcome.  Otherwise, let's

9          move on.

10                   MR. CHAMBERLAIN:  All right.

11                   (Whereupon, the following takes place in open

12         court:)

13         Q     Detective, you indicated that you took latents

14    from various locations in this apartment?

15         A     Yes.

16         Q     I'm going to show you a document and ask you if

17    you recognize this document?

18                   THE COURT:  Defendant's F, we'll mark it.

19                   MR. CHAMBERLAIN:  Mark it, please.

20                   MR. CHAMBERLAIN:  I'm going to ask that that

21         succeeding document, I will give you the number of

22         pages.

23                   THE COURT:  How many pages would you like to

24         be marked?

25                   MR. CHAMBERLAIN:  A total of five pages,

1      Judge.

2                  (Whereupon, the referred to item is received

3      and marked Defendant's Exhibit F for identification by

4      the reporter as instructed.)

5                  THE COURT OFFICER:  Defendant's F marked for

6      identification.

7      Q     Do you recognize those documents?

8      A     Yes, I do.

9      Q     And the first document, is that signed by you?

10     A     Yes, it is.

11     Q     And is that a record of the fingerprints, places

12     from where you took the fingerprints?

13                  MR. BIANCAVILLA:  Objection.

14                  THE COURT:  You can't read from a document

15     that is not in evidence.

16                  MR. CHAMBERLAIN:  I'm not asking him to read.

17                  MR. BIANCAVILLA:  He's telling him what it

18     is.

19                  THE COURT:  In essence, you're telling

20     everybody here what is in that document.

21                  MR. CHAMBERLAIN:  He already testified to it.

22                  THE COURT:  We run by rules of evidence,

23     Mr. Chamberlain.

24     Q     Detective, go on to the next page, if you will.

25     Is that a record kept in the regular course of business by

Kathleen Plaia

```
 1   the police department?

 2        A     Yes, it is.

 3        Q     Is that a record of the evidence you collected?

 4              MR. BIANCAVILLA:  Objection.

 5              THE COURT:  Sustained, as to that question.

 6        Q     Detective, in addition -- you testified to

 7   various -- you testified to the collection of fingerprints

 8   at various locations; did you also collects hairs?

 9        A     No, I did not.

10        Q     You didn't -- was there a different person

11   collecting hairs from the location, from the crime scene?

12        A     Not to my knowledge, no.

13        Q     Were there any -- to your knowledge, there were

14   no hairs collected for submission for evaluation by other --

15              MR. CHAMBERLAIN:  Withdrawn.

16              MR. BIANCAVILLA:  Objection.

17              MR. CHAMBERLAIN:  Let me rephrase.

18        Q     There were no hairs collected from the crime

19   scene to your knowledge, is that your testimony?

20              MR. BIANCAVILLA:  Objection.

21              THE COURT:  I'll permit that question.  But

22        I'm going to sustain as to form.

23        Q     Were there any hairs collected at the crime scene

24   to your knowledge?

25              MR. BIANCAVILLA:  Objection.
```

1          THE COURT:  Overruled.

2     A     No, there was not.

3     Q     Were there any fibers collected from the crime

4  scene, do you know?

5     A     There was evidence submitted to be evaluated for

6  hairs and fibers.

7     Q     Do you recall what that evidence was?

8     A     Yes.

9          THE WITNESS:  If I may, I will refer to my

10  evidence sheets.

11          THE COURT:  Yes, you may refresh your

12  recollection.

13    A     From the bedroom of Ruth Williams' apartment

14  there were four brown pillowcases from the bed that I

15  submitted to the lab to be evaluated for the presence of any

16  serology evidence and hairs and fibers.  I also submitted a

17  blanket from the bed in the bedroom of Ruth Williams.  That

18  bed also was to be evaluated for any serology or hairs and

19  fibers at the lab.  I also submitted the top sheet from the

20  bed of Ruth Williams to be tested and analyzed for any

21  serology, hairs and fibers.  I also submitted the bottom

22  sheet from that bed to also be tested at the lab for

23  serology, hairs and fibers.

24    Q     What about the ligature cord around the victim's

25  neck, was that submitted by you or tested by the --

Det. Downes - People - Cross                700

1   submitted by you for testing by you or by anybody else to

2   your knowledge?

3       A      That went with the body to the morgue.

4       Q      Did you do anything with respect to taking

5   evidence from the ligature cord, collecting evidence from

6   that cord at the scene before the body was taken?

7       A      No, I just took photographs of that ligature

8   cord.

9       Q      Detective, after your collection of evidence on

10  the 13th of April, you collected no other evidence in this

11  case, is that correct?

12      A      That's correct.

13      Q      And you had nothing to do with the evaluation of

14  any of this evidence?

15      A      No, I did not.

16      Q      The two fingerprints that you lifted, you turned

17  over to the Fingerprint Section of the Scientific

18  Investigation Bureau?

19      A      Yes, I did.

20      Q      And the other latent you observed that you

21  already referred to, you also turned over that information?

22      A      That's correct.

23      Q      In your professional opinion, as an expert in the

24  crime scene unit in connection with collection of this, you

25  did a thorough job in collection of any evidence you find

Kathleen Plaia

1    with respect to this homicide?

2                    MR. BIANCAVILLA:  Objection.

3                    THE COURT:  Sustained.

4                    THE COURT:  You haven't laid a foundation,

5         Mr. Chamberlain.

6         Q     Did you collect all the evidence you thought was

7    available, if possible, in that capacity?

8                    MR. BIANCAVILLA:  Judge, I'm going to object.

9                    THE COURT:  Sustained.

10        Q     After your collection of the evidence, you were

11   never asked to go back and get any further evidence, were

12   you, by Detective McHugh or anybody?

13        A     No, I was not.

14                   MR. CHAMBERLAIN:  All right.  Thank you.

15                   Nothing further.

16                   THE COURT:  Any redirect, Mr. Biancavilla.

17                   MR. BIANCAVILLA:  No, Judge.

18                   THE COURT:  Thank you, Detective Downes.  You

19        can step down.

20                   (WITNESS EXCUSED)

21                   THE COURT:  Mr. Biancavilla, call your next

22        witness, please.

23                   MR. BIANCAVILLA:  Detective Costello.

24   C H A R L E S   C O S T E L L O, Detective, called as a

25        witness by and on behalf of the People, having been

1          first duly sworn, testified as follows:

2                    THE COURT OFFICER:  Please state your name,

3     spell your last name, shield number and command.

4                    THE WITNESS:  Detective Charles E. Costello,

5     Junior.  Shield number 682.  Last name is

6     C-O-S-T-E-L-L-O.  Nassau County Police Department

7     Latent FINGERPRINT Section.

8                    MR. BIANCAVILLA:  May I inquire, your Honor?

9                    THE COURT:  Yes.

10    DIRECT EXAMINATION

11    BY MR. BIANCAVILLA:

12         Q     Detective Costello, how long have you been a

13    member of the Nassau County Police Department?

14         A     Twenty-nine years.

15         Q     How long have you been a member of the Latent

16    Fingerprint Section?

17         A     Eighteen years in July.

18         Q     Can you explain to the jury what training you

19    have had in your area of expertise?

20         A     My first assignment to the Latent Fingerprint

21    Section, I was give training by members already assigned to

22    the unit in the receiving, safeguarding, processing

23    evaluation and identification of fingerprint evidence.

24              I have attended a one week basic classification

25    school sponsored by the FBI.  I have attended an advanced

1    one week latent fingerprint school sponsored by the FBI.  I

2    attended a three week administrative advanced latent

3    fingerprint school sponsored by the FBI at the FBI Academy

4    in Quantico, Virginia.  I attended an advanced palm

5    identification school sponsored by the New York State

6    Department of Criminal Justice Services in Albany, New York.

7    I have attended various computerized fingerprint schools

8    sponsored by the Printrak Corp, P-R-I-N-T-R-A-K.  I have

9    attended additional computerized schools sponsored by the

10   Morpho Corporation.

11          I'm a New York State qualified latent fingerprint

12   examiner.  I'm a member of the International Association for

13   Identification.  I'm a member of the New York State Division

14   of the International Association for Identification.  I am a

15   New York State Certified Bureau of Municipal Police, Police

16   Instructor.  In that capacity I teach fingerprints,

17   instruct, give demonstrations --

18          MR. CHAMBERLAIN:  I will concede the

19       Detective's expertise in the fingerprint --

20          MR. BIANCAVILLA:  Judge, Mr. Chamberlain is

21       interrupting.

22          THE COURT:  Mr. Biancavilla has a right to

23       elicit the information.

24   Q    Please continue.

25   A    I teach, instruct, give demonstrations to new

1    recruits, police officers, detectives, investigators, other

2    individuals as instructed or requested by my department.

3            I have a Bachelor of Science Degree from the

4    State University of New York.  I have additional five

5    college credits in the science of fingerprints from the

6    University of Virginia.  I have read books, magazine

7    articles, journals, newspaper articles brought to my

8    attention relative to the science of fingerprints.  I have

9    previously testified relative to my fingerprint work in

10   grand jury, district court, county court and federal court.

11       Q    And approximately how many fingerprints have you

12   analyzed over your career with the Nassau County Police

13   Department?

14       A    Excess of a million.

15       Q    Now, could you explain to the jury what is a

16   fingerprint?

17       A    Ink fingerprint or --

18       Q    Break it down.

19       A    Okay.  The underside of your hand, underside of

20   your fingers, the soles of your feet contain friction skin.

21   The friction skin is what we deal with as latent fingerprint

22   examiners.

23            An ink fingerprint is an intentional recording of

24   an area of friction skin you wish to catalog or keep for

25   future reference, examination, comparison.  It's normally

1  achieved by applying a transfer agent, such as printer's

2  ink, to the area of friction skin you wish to record.  It's

3  done by applying that ink, or ink preferably, to the

4  friction skin and rolling or placing that area on a

5  preferably a white piece of cardboard or white paper for

6  pertinent recording.

7      Q      What is a latent fingerprint?

8      A      A latent fingerprint is an unintentional or

9  chance recording of an area friction skin that is left on an

10 item through transfer when you touch the item.

11     Q      How is it left?

12     A      Generally, it can be a sweat print, perspiration

13 in the area of friction skin I have described.  Your sweat

14 pores are in the ridges, which are the high areas of the

15 skin.  And that's what exudes out or excretes itself out on

16 to the ridges.  And that perspiration will be left or could

17 be left on the item as you touch it.  You could eat a

18 sandwich, a greasy sandwich for lunch.  The grease, the oil

19 from the sandwich, butter type of substance, could adhere to

20 your skin.  You could transfer that when you touch an item,

21 paint, cork, any sort of substance.  Touch your face in the

22 right area where the oils are, that could adhere to the

23 skin, that would possibly transfer when you touch an item.

24     Q      And what factors affect whether or not an

25 individual will leave a fingerprint?

1          A        Conditions outside.   Today it's a humid day.

2     Possibly, you would have a higher collection of moisture on

3     the area of your skin, which could be good or bad.   If

4     there's too much, it would leave deposits which would look

5     like dots, almost like rain on a window when it's touched.

6     Because of the excess ridges of moisture on the ridges, it

7     would be difficult to identify, if identifiable at all.

8                You could also have too little or no moisture or

9     transfer agent on the tool, thereby the hand or the skin

10    would be dry when it touches the item, you would have

11    nothing to transfer.

12         Q        What about surfaces, Detective?

13         A        Surfaces, generally, we say clear, hard surfaces

14    are good.  But we have success with other items as well.

15    You don't always leave identifiable prints on items.

16                Aside from what I started saying about the

17    perspiration and the sweat, if I was to pick up this

18    microphone, you would see that only a small portion of that

19    friction skin I described to you, my fingers, touched that

20    microphone.  Because of that the microphone having weight to

21    it, when I pick it up, I'm compressing the friction skin,

22    thereby pushing the ridges into what we call the furrows,

23    the low area of the skin, which would obliterate or possibly

24    obliterate the detail that would be transferred to the item.

25                I could touch it in a sliding motion, which would

Det. Costello - People - Direct          707

1    cause it to smear or smudge.  Again, eradicating the detail

2    that may have been left had a clean touch been made.

3          I could be wearing gloves, thin gloves, heavy

4    gloves.  Items could be dirty, too dirty to leave or for the

5    perpetration or for the transfer agent to get through them.

6    You could wipe off an area that you have touched, if you

7    know you have touched it.

8          A great many reasons as to why you would not

9    leave identifiable prints.

10   Q     If connection with this case, Detective, did you

11   examine and evaluate various pieces of evidence?

12   A     Yes, I did.

13   Q     I'm going to show you People's Exhibit 38 in

14   evidence.  Do you recognize that?

15   A     It's the drinking glass on the table at the

16   scene.

17   Q     Did you perform a fingerprint analysis of that

18   drinking glass?

19   A     Yes, I did.

20   Q     Just briefly explain to the jury how you

21   performed that fingerprint analysis?

22   A     I applied powders to the glass as a processing

23   technique.  I recovered one identifiable fingerprint on the

24   glass, subsequently compared and identified the print on the

25   glass to the deceased in this case.  It was her print.

1        Q       Thank you.  That would be the print of Ruth

2    Williams on that glass?

3        A       Yes.

4        Q       I ask that the witness be shown People's 36 in

5    evidence.

6                You're being shown what is in evidence as

7    People's 36.  Do you recognize that?

8        A       Yes, I do.

9        Q       What do you recognize that to be?

10       A       It's a piece of paper that was located on the

11   kitchen table at the scene of the crime.

12       Q       And could you briefly describe for the jury the

13   analysis you performed on that?

14       A       I used a chemical substance that we use to

15   recover latent impressions on paper called ninhydrant.  I

16   dipped or sprayed the paper item, this piece of paper, with

17   that chemical.  And what happens is, the -- if it reacts

18   with the amino acid present in the sweat on the hand at the

19   time you touched something, that reaction causes a

20   coloration which I then look at to see if any identifiable

21   prints have been made.

22       Q       And were you able to find any identifiable prints

23   on that paper?

24       A       Yes.

25       Q       Were you able to match them with anyone?

Kathleen Plaia

1      A      No, I have not.

2      Q      Thank you.

3             MR. BIANCAVILLA:  I ask that the witness be

4      shown People's 37 in evidence.

5      Q      Do you recognize that?

6      A      Yes, I do.

7      Q      What do you recognize that to be?

8      A      It's the photo album that was located on the

9      kitchen table.

10     Q      And did you process that photo album?

11     A      Yes, I did.

12     Q      Explain to the JURY how you processed the photo

13     album?

14     A      With the photo album I used a process we use

15     which is super glue.  basically, I call it in layman's terms

16     super glue.  That you commonly use in your own home.  What

17     we do or what I do, I put it in a pot with a little dish,

18     heat it up.  It fumes.  The palmerization that takes place,

19     the fogging, so to speak, adheres to material substances

20     that could be on the items that I am processing at that

21     time.  I put the photo album and the pages into the chamber

22     in order to identify -- develops identifiable prints.  I was

23     successful in recovering identifiable prints on four pages

24     from the photo album.

25     Q      Were you able to match them up?

Kathleen Plaia

Det. Costello - People - Direct                    710

1      A      Two have been identified, two remain open.

2      Q      And the two that were identified?

3      A      One belongs to John Marks, the other belongs to

4  Steven Schwartz.

5             MR. BIANCAVILLA:  I ask the witness be shown

6      People's 34 in evidence.

7      Q      Do you recognize that?

8      A      Yes, I do.

9      Q      What do you recognize that to be?

10     A      The CD case recovered from the scene.

11     Q      And did you analyze that?

12     A      Yes, I did.

13     Q      What type of analysis did you perform on the CD

14  case?

15     A      Again, I used super glue and some gray powder on

16  the item.  I recovered one identifiable fingerprint on that

17  CD case.

18     Q      And who was that identifiable fingerprint of?

19     A      Compared identified to the known inked

20  impressions of John Kane.

21             MR. BIANCAVILLA:  Finally, I ask that the

22      witness be shown People's 39 in evidence.

23     Q      Do you recognize that?

24     A      Yes, I do.

25     Q      What do you recognize that to be?

Kathleen Plaia

1          A       It's the bottle from the kitchen table recovered

2    from the scene.

3          Q       And did you process that bottle?

4          A       Yes, I did.

5          Q       How did you process that bottle?

6          A       With powders.

7          Q       And were you able to recover anything from that

8    bottle?

9          A       Nothing.

10         Q       Excuse me?

11         A       I recovered no identifiable prints on the bottle.

12         Q       Can you describe for the jury glass as a surface

13   to obtain fingerprints and is it a good surface, is it not a

14   good surface?

15         A       As I said, generally, a clean hard surface,

16   smooth, would be good for prints.  It depends on how it is

17   touched, as I said also, whether you would leave

18   identifiable prints on it or what was done after it was

19   touched.

20         Q       What things would affect whether or not there

21   were prints on the bottle?

22         A       If the bottle had been cold and it was a warm

23   day, you could have condensation on the bottle, on the

24   bottle.  It would almost have the same effect as having too

25   much moisture on your hands.  You would be putting your

1    hands into that moisture and leaving a smudge.  You could

2    wipe off the bottle if you had touched it.  You could have

3    possibly been gripping it too hard.

4        Q       And you found no evidence of any fingerprints on

5    it?

6        A       No.

7            MR. BIANCAVILLA:  And I ask that the witness

8        be shown People's 40 and 41 in evidence.

9        Q       Do you recognize People's 40 and 41, Detective?

10       A       They're the lifts recovered from the scene in

11   this case.

12       Q       Okay.  And could you describe briefly to the jury

13   how you examined those lifts?

14       A       The lifts are taken from the scene and

15   photographed by crime scene members.  When they're brought

16   to my office, what I do is, under magnification and good

17   lighting I evaluate, which means, I look at the impressions

18   that are in the photo and the lifts to see if there are

19   identifiable impression on either one.  In this case, either

20   one.  And there were no identifiable impressions on the

21   items, on the lifts.

22       Q       On those lifts, correct, on People's 40 and 41?

23       A       No, nothing identifiable.

24       Q       Okay.  You examined other evidence in this case

25   for fingerprint evidence, Detective?

Kathleen Plaia

1     A     Yes, I did.

2     Q     What other items did you examine?

3     A     Numerous.

4     Q     Do you have your notes?

5     A     Yes.

6     Q     Could you refer for your notes, please?

7     A     Some of the evidence that I examined, or the

8  other evidence I examined, were telephone base receiver, and

9  there was mini cassette inside that telephone base;

10  telephone jack and wires; Hershey metal can; a cassette tape

11  and box; CD case that was indicated, the case already

12  mentioned; there was a brown button; a paper with writing on

13  it; one other pieces of paper, you have already seen today;

14  another piece of paper with writing on it; an Allstate bill;

15  a cardboard Prodigy CD; photo album with four film envelopes

16  inside it; one memorial card; and the photo album had

17  fifty-two pages inside of it; black ceramic ashtray; a

18  candle with glass holder; a drinking glass; Budweiser

19  bottle, you have seen; wine -- two wine bottles and a black

20  telephone receiver.

21           I also examined seven greeting cards.  One Macy's

22  gift note.  One small white envelope.  One handprinted note.

23  One yellow ball.  One shopping bag.  One plug in smiley

24  face.  One Macy's gift card.  Two wizard gift boxes.  Four

25  Newsday pages, pages out of the Newsday newspaper.  One

Kathleen Plaia

1    beanie bag with tag.  And one black plastic bag.

2         Q     That's all the evidence you examined in the case?

3         A     Yes.

4               MR. BIANCAVILLA:  Okay, thank you.  I have no

5         further questions of this witness.

6               THE COURT:  Mr. Chamberlain.

7               MR. CHAMBERLAIN:  Thank you, Judge.

8    CROSS-EXAMINATION

9    BY MR. CHAMBERLAIN:

10        Q     Detective, 40 and 41 that you just referred to a

11   few minutes ago, what were they?

12        A     Are they the lifts?

13        Q     They were the ones, the prints, lifted at the

14   scene, correct?

15        A     Those were the lifts, correct.

16        Q     What were they lifted from?

17        A     Again, I will refer to my notes.

18               One of the lifts was from the wooden door frame,

19   wooden frame doorway, opening, at the living room.

20        Q     Between the living room and the bedroom?

21        A     I'm going from what is written here, the item is

22   from a mica closet door in the bedroom.

23        Q     Now, all the items you just mentioned, you

24   couldn't get any lifts from at all, is that correct?  The

25   ones you just mentioned at the tail end of your direct

Kathleen Plaia

Det. Costello - People - Cross                    715

1   examination?

2       A    I also included the items that I did get lifts.

3       Q    Yeah.  But, I mean, the other items you referred

4   to in one question, you read out a list.  You got no prints

5   from them at all?

6       A    No.  Other than what was previously mentioned.

7       Q    You went back to the beer bottle.  You indicated

8   that there are no identifiable prints, and you indicated

9   there are various reasons why there wouldn't be.

10          MR. BIANCAVILLA:  Judge, I object.  He did

11   not say there were no unidentifiable prints.

12          MR. CHAMBERLAIN:  He did not say no

13   unidentifiable prints?

14          THE COURT:  Let's ask the Detective.

15      Q    Is that correct, there were no unidentifiable

16   prints?  Is that a correct statement?

17      A    There was nothing identifiable on there.

18      Q    Can you tell the difference between when

19   something is wiped off and when something is identified?

20      A    Sometimes.

21      Q    In evaluating this bottle, did it appear to have

22   been wiped off?

23      A    I don't recall.

24      Q    You don't recall.  Okay.  The bottle was open?

25      A    Yes, I believe.

Kathleen Plaia

1      Q      Do you know if there was any liquid in it?

2      A      I don't think I had any liquid in it.  I don't

3   know about when it was found.

4      Q      Would it have made a difference to you in

5   evaluating how prints would have been left or whether they

6   had been deliberately removed whether there had been liquid

7   in it?

8      A      Would a substance being in the bottle make any

9   difference to me?

10     Q      You indicated if the bottle was cold something

11  might happen.  I believe that would -- I said, you indicated

12  before that if the bottle were cold, that would affect

13  prints.  I would take it, that would be from a cold liquid

14  inside?

15     A      Again, maybe I can clarify what I meant by that.

16  If it's warm, just think about in your own home.  If you

17  take something out of the freezer or out of your

18  refrigerator on a hot day, the cooling of the can or the

19  bottle, in this case, you could possibly get that

20  condensation on the outside of the item that is cold and now

21  brought out to the hot, to the heat.

22     Q      All right.  You have mentioned that you were able

23  to identify prints from two other persons, John Marks and

24  Stefan Schwartz.  Who is John Marks?

25               MR. BIANCAVILLA:  Objection.

1          THE COURT:  Only if he knows.

2              MR. BIANCAVILLA:  Judge, it's hearsay.

3          THE COURT:  Actually, I'm going to sustain

4      that

5      Q    You were the police expert identifying

6  fingerprints, latents, taken at the scene in this case, is

7  that correct?

8      A    I processed and developed prints, yes.

9      Q    You were looking for certain fingerprints, I take

10  it?

11      A    I was looking for any identifiable prints.

12      Q    How do you identify a print that you pick as

13  matching a particular individual?

14      A    I do a comparison with known inked impressions

15  and with the unknown latent impression from the item I'm

16  examining.

17      Q    And did you do that with respect to this person

18  by the name of Marks?

19      A    Yes.

20      Q    And?

21      A    He's one of the people identified.

22      Q    And what -- who did you identify?  What did you

23  identify him as?

24              MR. BIANCAVILLA:  Objection.

25              THE COURT:  I'll permit the question with

Det. Costello - People - Cross                    718

1      respect to, as to what the detective used as to

2      identify.

3          Q      What did you use to identify?

4          A      I used a known fingerprint of John Marks.

5          Q      From where?

6                 MR. BIANCAVILLA:  Objection.

7                 THE COURT:  Sustained.

8          Q      When did you identify John Marks as a person who

9      had left prints in the apartment?

10         A      I believe it was April 15th.

11         Q      Okay?

12         A      April 15th.

13         Q      Did you have anything further to do with the

14     investigation of John Marks yourself?

15         A      No.

16         Q      Who was the detective that that investigation was

17     turned over to?

18         A      Should have been Detective McHugh.

19         Q      Jack McHugh.  What about Stefan Schwartz.  How

20     did you identify his fingerprints?

21         A      Again, the known inked impressions of Stefan

22     Schwartz were compared with the unknown latent impression I

23     was comparing at the time.  It was identified to Stefan

24     Schwartz.

25         Q      And do you now know who Stefan Schwartz is?

1           MR. BIANCAVILLA:  Objection.

2      Q    All right.  Did you identify that at the same

3  time or at some subsequent time?

4      A    Subsequent.

5      Q    Could you tell us when?

6      A    May 3rd this year.

7      Q    May 3rd, 2002?

8      A    Yes.

9      Q    Did that come from some prior record that was

10  already on file on May 3rd?

11          MR. BIANCAVILLA:  Objection.

12          THE COURT:  Sustained.

13      Q    Can you tell us how you became aware of John --

14  I'm sorry, Stefan Schwartz's latent fingerprint record on

15  May 3rd of this year?

16          MR. BIANCAVILLA:  Objection.

17          THE COURT:  Sustained.

18      Q    Detective, when you are checking for latents to

19  compare them with known prints, you review prints that are

20  already on file with your department, is that correct?

21          MR. BIANCAVILLA:  Objection.

22          THE COURT:  Sustained.

23      Q    How did you become aware of a particular type of

24  a print without getting into --

25          MR. BIANCAVILLA:  Judge, I'm going to object.

Kathleen Plaia

1              MR. CHAMBERLAIN:  All right.

2              THE COURT:  How he became aware is not

3      relevant, Mr. Chamberlain.

4              Sustained.

5      Q      In any event, Detective, you turned that

6      information over to Detective McHugh also, I take it?

7      A      Yes, I did.

8      Q      So, you had nothing to do with investigating this

9      case over and above the information you relayed here to this

10     Judge and jury about the prints you collected at the scene?

11     A      No.  Whatever I did on the case, I advised them,

12     and that was it.

13     Q      You mentioned a whole list of things, Detective.

14     Was there a ligature cord -- was there an attempt to lift

15     prints from a ligature cord to your knowledge?

16     A      I don't -- I got a telephone cord, as I

17     described.  I don't know if it's the cord you're

18     questioning.

19     Q      I think the telephone cord, we have the cord in

20     evidence.

21              MR. CHAMBERLAIN:  Do we have the cord in

22     evidence?

23              MR. BIANCAVILLA:  No.

24     Q      Okay, the -- assuming the telephone -- withdrawn.

25              The telephone cord you got, was there an attempt

1   to lift prints from that?

2        A      Yes.

3        Q      Okay.  Who did that?

4        A      I did.

5        Q      And when was that done?

6        A      April 14th, 2000.

7        Q      And what was the result of that?

8        A      There was negative for identifiable prints.  You

9   have the plastic cord, thin plastic cord.  You know, even

10  something similar to this, I believe it was flat and gray.

11  There's not a lot of area for which you can touch the item.

12  Again, depending on how you are grabbing it, you could

13  slide, you could have too much pressure on it.

14       Q      Can you tell us when you attempted to get the

15  print from the cord, what date, do you have any record of

16  that?

17       A      April 14th.

18       Q      After you finished with the cord did you do

19  something with it?

20       A      The cord would have been given to Detective

21  McHugh.

22       Q      You don't know of other tests that may or may not

23  have been performed on that?

24       A      No, I don't.

25              MR. CHAMBERLAIN:  Nothing further.

Kathleen Plaia

1              Thank you very much, Detective.

2         THE COURT:  You're welcome.

3         THE COURT:  Mr. Biancavilla, any redirect?

4         MR. BIANCAVILLA:  No redirect.

5         THE COURT:  Thank you very much, Detective.

6    You may step down.

7         (WITNESS EXCUSED)

8         THE COURT:  Ladies and gentlemen, at this

9    point we're going to stop for lunch and ask you to be

10   back here at two o'clock.

11             Again, don't discuss the case among

12   yourselves or with anyone else.  Keep open minds.  Do

13   not form or express any opinions until the entire case

14   has been completed.  Do not read or listen to any

15   account, should it be recorded in the media.  Do not

16   visit or view any places or premises mentioned.  You're

17   not to permit any party to discuss this case with you

18   or attempt to influence you.  You must promptly report

19   to the Court any violation thereof.

20             Have a nice lunch.  We'll see you at two.

21         THE COURT OFFICER:  Jurors, follow me.

22             (Whereupon, the sworn jurors and alternates

23   leave the courtroom.)

24         THE COURT:  Counsel, see you at two.

25         MR. BIANCAVILLA:  Thank you, Judge.

Proceedings                                                          723

1            (Whereupon, there is a luncheon recess taken

2       in the proceedings.   The trial is adjourned until 2:00

3       p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kathleen Plaia

```
 1            A F T E R N O O N    S E S S I O N

 2            THE CLERK:  Case on trial continued.  All

 3    parties are present.  Jurors are not present at this

 4    time.

 5            People ready to proceed?

 6            MR. BIANCAVILLA:  Ready.

 7            THE CLERK:  Defendant ready?

 8            MR. CHAMBERLAIN:  Defendant ready.

 9            THE COURT:  Mr. Biancavilla, who is your next

10    witness?

11            MR. BIANCAVILLA:  Doctor Catanese, Judge.

12            THE COURT:  Will you bring the jury in,

13    please?

14            THE CLERK:  They're on their way up.

15            THE COURT OFFICER:  Jury entering.

16            THE CLERK:  Both sides stipulate all sworn

17    jurors are present and seated properly?

18            MR. BIANCAVILLA:  Yes.

19            THE COURT:  Mr. Chamberlain?

20            MR. CHAMBERLAIN:  I'm sorry, Yes.  So

21    stipulated.

22            THE COURT:  Mr. Biancavilla, call your next

23    witness, please.

24            MR. BIANCAVILLA:  Doctor Gerard Catanese.

25
```

```
 1   G E R A R D    C A T A N E S E,  Doctor, called as a witness

 2        by and on behalf of the People, having been first duly

 3        sworn, testified as follows:

 4                   THE CLERK:  Be seated.

 5                   THE COURT OFFICER:  In a loud voice, would

 6        you give your full name, spelling your last name, and

 7        your County of residence.

 8                   THE WITNESS:  Sure.  My name is Gerard

 9        Catanese.  Last name is C-A-T-A-N-E-S-E.  My County of

10        residence is Nassau.

11                   THE COURT OFFICER:  Thank you.

12                   THE COURT:  You may inquire.

13                   MR. BIANCAVILLA:  Thank you.

14   DIRECT EXAMINATION

15   BY MR. BIANCAVILLA:

16        Q     Doctor Catanese, good afternoon.

17        A     Good afternoon.

18        Q     Doctor, would you tell the jury where you're

19   employed?

20        A     I'm employed at the Nassau County Medical

21   Examiner's Office.

22        Q     And are you a physician duly licensed to practice

23   medicine within the State of New York?

24        A     Yes, I am.

25        Q     How long have you be licensed to practice your
```

1  profession?

2       A      Since 1988.

3       Q      And in what field do you practice?

4       A      I practice in the field of forensic pathology.

5       Q      Would you tell the jury what your educational

6  background is please?

7       A      Sure.  I have a BS in biology from St. John's

8  University in Queens.  I have a Doctor of Medicine from SUNY

9  Health Science Center in Brooklyn.  I have a two year

10 residency in anatomic pathology from SUNY Health Science

11 Center in Brooklyn.  I have a one year internship in

12 pediatrics from Winthrop University Hospital in Mineola.  I

13 have a two year residency in laboratory medicine from Kings

14 County Hospital in Brooklyn.  I have one year of specialized

15 Fellowship training in forensic pathology from the New York

16 City Medical Examiner's Office.

17      Q      And would you just briefly explain to the jury,

18 what does the field of pathology involve?

19      A      A pathologist is a doctor who specializes in

20 making diagnoses by examining body tissues an fluids.

21      Q      How does forensic pathology relate to that?

22      A      Well, forensic pathology is a subspecialty of the

23 specialty of pathology.  Forensic pathologist specializes in

24 examining injuries and wound patterns and drawing

25 conclusions about them.  A forensic pathologist certifies

1    cause and manners of individuals deaths.

2         Q    Would you explain your responsibility at the

3    Nassau County Medical Examiner's Office?

4         A    As a Deputy Medical Examiner, I perform autopsies

5    and I certify the cause and manners of individuals deaths.

6         Q    And would you explain what an autopsy consists

7    of?

8         A    An autopsy is a complete examination of the body.

9    It starts with an examination of the external surface of the

10   body, involves opening of the body cavities, examining all

11   of the organs in their normal anatomic position.   It

12   involves removing each organ and examining it individually.

13        Q    In your professional career, how many autopsies

14   have you completed yourself or been present for?

15        A    With my own two hands I have performed more than

16   two thousand autopsies.  And I have witnessed several

17   thousand others.

18        Q    Have you on prior occasions testified in courts

19   of law as to an expert in the field of forensic pathology?

20        A    Yes, I have.

21        Q    In that testimony have you rendered opinions as

22   to the cause of death?

23        A    Yes, I have.

24        Q    Approximately how many times?

25        A    More than fifty times.

Dr. Catanese - People - Direct                    727

1    Q      Now, did there come a time, Doctor, on April 14th

2  of 2000 that you performed an autopsy on the remains of Miss

3  Williams?

4    A      Yes, I did.

5    Q      Were photographs taken of that autopsy?

6    A      Yes, they were.

7    Q      Now.  Could you tell the jury what Miss Williams

8  height was?

9    A      The body measured five foot eight inches.

10   Q      And what was Miss Williams weight?

11   A      One hundred sixty-five pounds.

12   Q      And what injuries were noted to Miss Williams

13  during the external examination of the body?

14   A      During the external examination of the body I

15  noticed that there was a ligature or an electric wire tied

16  around her neck.  This was tied tightly.  In addition to the

17  wire being tied around her neck, there was a noticeable

18  bruise to her tongue and there were hemorrhages in her eyes

19  an eyelids.

20   Q      Now, did you perform an internal examination of

21  that particular area?

22   A      Yes, I did.

23   Q      Please describe that for the jury.

24   A      Certainly.  On internal examination I found

25  bruising to -- actually, on external examination there also

Kathleen Plaia

1    was an abrasion to her right neck that I failed to mention.

2            On internal examination there was a bruise to the

3    muscles of the deep neck.  Then there was fractures of the

4    bones of the neck.  By bones I mean, the hyoid bone which is

5    a small bone which sits up above the thyroid cartilage, high

6    up in the neck.  There were fractures of the thyroid

7    cartilage, which is what makes up the larynx, the Adam's

8    Apple.  There is also bruising to these areas of fracture.

9    There is bruising present behind the larynx.  So, behind the

10   area.  Okay.  And let's see, there were some bruises to her

11   scalp that were deep, to the front of her left head, to the

12   side of her left head.

13        Q    Thank you.  Doctor, I'm going to ask that you

14   review please what have been marked as People's Exhibits 45

15   through 64 for identification.  Please keep them in the same

16   order.

17            Doctor, do those photographs fairly and

18   accurately depicted the victim and the extent of the

19   victim's injuries at the time you performed the autopsy?

20        A    Yes, they do.

21        Q    Doctor, I'm going to ask that the witness be

22   shown People's 43 for identification.

23            Doctor, do you recognize that?

24        A    Yes, I do.

25        Q    What do you recognize that to be?

1       A       This is the ligature that I removed from the

2   deceased at the time of autopsy.

3               MR. BIANCAVILLA:  Judge, at this time we

4   would offer People's 43 through 64 into evidence.

5               THE COURT:  Please show them to

6   Mr. Chamberlain.

7               (Whereupon, there is a brief pause in the

8   proceedings)

9               MR. CHAMBERLAIN:  May we approach, your

10  Honor?

11              THE COURT:  Yes.

12              (Whereupon, the following takes place at the

13  Bench, between the Court and Counsel:)

14              THE COURT:  Yes, Mr. Chamberlain?

15              MR. CHAMBERLAIN:  Judge, I have an objection

16  to a substantial number of these.  I would not object

17  to any that showed the victim's hand.  I believe there

18  was some scrapes and fingernails, that may be relevant.

19  I have no idea what the relevance of this photograph

20  is.

21              THE COURT:  May I see that?

22              MR. CHAMBERLAIN:  Or this one.  Or this one.

23              THE COURT:  Mr. Biancavilla, could you tell

24  us the relevance?

25              MR. BIANCAVILLA:  Sure.  If you give me those

1        three I will explain to you what the relevance is.

2                   With respect to photographs number --

3        People's 62 for identification, People's 61 for

4        identification, people's 60 for identification.   Doctor

5        Catanese is going to testify to what these photograph

6        demonstrate, that the victim did not die from the

7        ligature strangulation; the victim died from a manual

8        strangulation.   In fact, her throat was compressed and

9        broken with a hand before the ligature was applied.

10       That is what these photographs show, the broken

11       cartilage and the injury to the internal portions.

12                   THE COURT:  Are these the cartilege in the

13       neck?

14                   MR. BIANCAVILLA:  Within the throat itself.

15       These are portions of the throat itself.   And these are

16       the throat reflected, that shows the injuries to that

17       throat from manual strangulation.

18                   This, again, shows that the victim's tongue

19       was bitten.   And that is consistent with a manual

20       strangulation because when you strangle someone, you

21       push their tongue and their tongue protrudes and they

22       bite down on it.

23                   THE COURT:  That is what the doctor will

24       testify?

25                   MR. BIANCAVILLA:  Absolutely.   That is what

1       is significant about that.

2                   THE COURT:  Yes, Mr. Chamberlain.

3                   MR. CHAMBERLAIN:  My recollection of both the

4       autopsy record and the doctor's testimony before the

5       grand jury did not indicate that at all.  So, this is

6       something completely knew.  The autopsy report

7       indicates the strangulation.  It doesn't indicate it

8       was caused by one or the other.  And the testimony in

9       the grand jury would so indicate also.

10                  MR. BIANCAVILLA:  You can cross-examine him

11      on whatever you want, John.

12                  MR. CHAMBERLAIN:  I can cross-examine after

13      those things are in.

14                  MR. BIANCAVILLA:  Right.

15                  MR. CHAMBERLAIN:  They're unnecessary to this

16      case.  It's not --

17                  MR. BIANCAVILLA:  Judge, they clearly

18      demonstrate the cause and manner of death, which is

19      extremely important for this particular case.  That she

20      was a manual strangulation before the ligature was

21      applied.

22                  MR. CHAMBERLAIN:  That's not the report that

23      we have, Judge.

24                  THE COURT:  With respect to the photographs

25      themselves -- I'm going to be reading to you from

1    Richardson -- principles -- excuse me, withdrawn.

2              But there is seemingly liberality in the

3    admission of inflammatory real evidence, especially

4    photographs, at criminal trials.  Photographs are

5    admissible, if relevant, to illustrate and corroborate

6    or disprove other evidence.  Graphic evidence should be

7    excluded only if its sole purpose is to arouse the

8    emotions of the jury and to prejudice the defendant.

9              In this case, according to the offer of proof

10   that will be testified to by the Doctor, is given to us

11   by the assistant district attorney.  They are going to

12   prove the manner of death in this particular case.  And

13   they are not solely here for the purpose of just being

14   inflammatory.

15             For that reason, I will admit it into

16   evidence.

17             You have an exception.

18             MR. CHAMBERLAIN:  Judge, before you rule

19   finally, let me say, if I may --

20             THE COURT:  Yes.

21             MR. CHAMBERLAIN:  That I would like to be

22   heard.  If that is the causality, I would like to bring

23   the autopsy report up in the grand jury.  Because this

24   is the first time there's been any notice of any

25   scientific evidence that there is death by manual

1    strangulation.  That was not his testimony, as far as I

2    recall it.  And I would request, either let me do that

3    now or let these pictures be held.

4              MR. BIANCAVILLA:  No.  He has to use them,

5    Judge.

6              MR. CHAMBERLAIN:  And I think probably it

7    would be best to let me do it now.  Let me --

8              THE COURT:  I'll let you show me the autopsy

9    report.

10              MR. BIANCAVILLA:  Judge, can I just, for a

11    moment, before we break here, what's the significance

12    of that?

13              THE COURT:  I don't know.

14              MR. BIANCAVILLA:  My point is, if in the

15    autopsy report it says strangulation, he can

16    cross-examine him on that.

17              THE COURT:  Let me see what it says.

18              MR. BIANCAVILLA:  It makes no difference.  It

19    doesn't affect the admissibility of these photographs.

20              MR. CHAMBERLAIN:  Obviously it makes a

21    difference --

22              MR. BIANCAVILLA:  John, let's -- John, let me

23    have those.

24              MR. CHAMBERLAIN:  I have it.

25              (Whereupon, there is a brief pause in the

1       proceedings.)

2                   MR. BIANCAVILLA:  Is there a specific part

3       there you want to direct him to, John?

4                   MR. CHAMBERLAIN:  Well, as soon as I have a

5       chance to read it myself.

6                   MR. CHAMBERLAIN:  Here's the toxilogical

7       report.

8                   THE COURT:  I now have had an opportunity to

9       review the certificate of death and report of autopsy.

10      Now, the cause under immediate cause is strangulation.

11      It isn't limited to by ligature or manual.  And as we

12      look at the conclusion in the report of autopsy, cause

13      of death is strangulation.  Again, it's not limited to

14      any particular type.

15                  So, based on what is being shown to me, it

16      seems not to be the same as what you just told me

17      previously on the record that you were going to show

18      me.

19                  MR. CHAMBERLAIN:  Judge, let me -- give me a

20      second here, if I may.

21                  Unless Mr. Biancavilla can point out some

22      section that I'm missing --

23                  THE COURT:  Let me tell you this,

24      Mr. Chamberlain.  No matter what the grand jury

25      testimony says, if it says something different than

1    strangulation, you certainly can use that with respect

2    to cross-examination.  Because that may show an

3    inconsistency.

4                    MR. CHAMBERLAIN:  I understand that, Judge.

5                    THE COURT:  However, as I said before, the

6    autopsy report, as well as the certificate of death,

7    say strangulation.

8                    MR. CHAMBERLAIN:  So does the grand jury

9    strangulation.  There's no indication that it was

10   manual.  As a matter of fact, there was testimony as to

11   both forms of strangulation.  There's no indication,

12   previous to this point, previous to the statement that

13   they're going to limit it to one form, that she died as

14   a result of one, rather than the other.

15                   THE COURT:  You certainly have an opportunity

16   to cross-examine the Doctor.

17                   MR. BIANCAVILLA:  As a matter of fact, he may

18   have never even been asked the question.

19                   With respect to this photograph.  If you want

20   me to continue, I will explain the significance of

21   that.

22                   THE COURT:  Are there any others you object

23   to?

24                   MR. CHAMBERLAIN:  Yes, Judge.

25                   THE COURT:  Finish them now.

                              Kathleen Plaia

Proceedings                                                736

1           MR. CHAMBERLAIN:  I don't think this is -- I

2    think it's gory.  I will have no objection to any

3    photographs of the neck.

4           MR. BIANCAVILLA:  Can I address this one,

5    Judge?

6           THE COURT:  Yes.

7           MR. BIANCAVILLA:

8           MR. CHAMBERLAIN:  Let me finish with respect

9    to my position.

10          MR. BIANCAVILLA:  There are different ones.

11          THE COURT:  He wants to keep them in order.

12          MR. CHAMBERLAIN:  I will keep them in order,

13   Judge.

14          I will refer to the fact that there are

15   numerous photographs of the injuries that have been

16   testified to.  Injuries to the neck and side of the

17   head.  That's what he testified to.  But the report

18   says, and what the grand jury testimony is, I have no

19   objection to that.  Other photographs tend to inflamme.

20          THE COURT:  Which ones?

21          MR. CHAMBERLAIN:  The ones you're handling

22   for one.

23          THE COURT:  People's 58 for identification.

24          MR. BIANCAVILLA:  Can I address that?

25          THE COURT:  Yes.

Kathleen Plaia

1          MR. BIANCAVILLA:  Part of manual

2     strangulation is, a major way to determine whether an

3     individual has been strangled manually, okay, is what

4     is called hemorrhaging and petechial hemorrhaging in

5     the eyes, which is why the doctor basically pulls the

6     eyelids up.  What the doctor is going to testify is,

7     with regarding all this hemorrhaging in the eyes, was

8     caused by --

9          THE COURT:  The doctor will say it would be a

10    direct result of manual strangulation.

11         MR. BIANCAVILLA:  Absolutely.

12         THE COURT:  Based on that offer of proof,

13    Mr. Chamberlain?

14         MR. CHAMBERLAIN:  Then I will amend my

15    request here, Judge.

16         THE COURT:  Yes.

17         MR. CHAMBERLAIN:  And request that this

18    testimony regarding one form of strangulation versus

19    another be precluded.  Because I have no prior notice

20    that this was a manual strangulation, as distinguished

21    from --

22         THE COURT:  Why are you requiring notice of a

23    particular type of strangulation?

24         MR. CHAMBERLAIN:  We're requiring notice of

25    scientific tests and evidence they we, had were given

1    some, and there was no evidence it was one form or the

2    other.

3              MR. BIANCAVILLA:  He was given the entire

4    autopsy report and he was given an opportunity to view

5    all the autopsy photographs.

6              MR. CHAMBERLAIN:  Maybe you can point out

7    something in the autopsy report or the grand jury

8    testimony that says it was manual rather than --

9              MR. BIANCAVILLA:  If he wasn't asked to.

10             MR. CHAMBERLAIN:  Can I finish a sentence?

11             THE COURT:  Let Mr. Chamberlain finish.

12             MR. BIANCAVILLA:  All right.  Go ahead.

13             THE COURT:  Go ahead, Mr. Chamberlain.

14             MR CHAMBERLAIN:  Maybe he can point out a

15   place in the autopsy report, the grand jury testimony,

16   anything, where it was given before this minute that

17   indicates it was manual rather than the elements that

18   he testified to before, which was both.

19             THE COURT:  Mr. Biancavilla, do you want to

20   reply?

21             MR. BIANCAVILLA:  Judge, no.  There's no

22   point to reply.  He was provided with the autopsy

23   report.  The autopsy report is very clear.  And he

24   was -- he could have had his expert examine the autopsy

25   report.  He could have examined all the photographs.

1    He chose not to.  At this point it's not my problem he

2    didn't do his homework.

3              THE COURT:  Apparently, the People have

4    complied with Criminal Procedure Law 240.20 with

5    respect to discovery.

6              You know, as far as I'm concerned,

7    Mr. Chamberlain, I'm going to admit those photographs.

8    You have an exception.

9              MR. CHAMBERLAIN:  Respectfully except to

10   those.

11             THE COURT:  Yes, you have an exception.

12             MR. CHAMBERLAIN:  Thank you.

13             MR. CHAMBERLAIN:  I also move for preclusion

14   and you're denying that?

15             THE COURT:  Yes.

16             MR. CHAMBERLAIN:  And I except that.

17             MR. BIANCAVILLA:  Judge, you have to give me

18   a minute.  They're all out of order now.

19             Okay, Judge.

20             (Whereupon, the following takes place in open

21   court:)

22             MR. BIANCAVILLA:  Judge, I'm going to ask

23   that Doctor Catanese be permitted to step out of the

24   box and could we have the lights turned out in the

25   courtroom?

Kathleen Plaia

1              We offer People's 45 through 64, and in

2      addition People's 43.

3              THE COURT:  May I have the photo for a

4      moment, please.

5              MR. BIANCAVILLA:  Yes.

6              THE COURT:  Mr. Chamberlain, do you have any

7      objection to the admission of People's 45 through 57

8      and 63 and 64?  When you come forward -- take a look.

9              MR. CHAMBERLAIN:  Thank you, Judge.

10             (Whereupon, there is a brief pause in the

11     proceedings.)

12             MR. CHAMBERLAIN:  I have no objection to

13     those.  No objection to these.

14             THE COURT:  Okay.

15             MR. CHAMBERLAIN:  No, I do have, as we

16     discussed, Judge.

17             THE COURT:  They're separate.

18             Mr. Biancavilla, can you come forward,

19     please?

20             (Whereupon, the following takes place at the

21     Bench, between the Court and Counsel:)

22             THE COURT:  Mr. Chamberlain, I thought those

23     were the only ones you were objecting to.

24             MR. CHAMBERLAIN:  No, Judge.  I said I

25     objected to -- I had no objection to the ones --

Kathleen Plaia

1                    THE COURT:  Perhaps you should specifically

2          tell me what you object to.

3                    MR. CHAMBERLAIN:  I'm looking through them,

4          Judge.

5                    MR. CHAMBERLAIN:  I object to number 45.  I

6          did not object to any of the -- I do not object to 53,

7          54, 55, 56, and 57, which show the ligature around the

8          deceased's neck.

9                    I object to 58, 59, 60, 61, 62.  Based on no

10         prior notice of the claim with respect to what they are

11         intended to show at this time.  And, alternatively, I

12         move for preclusion from any testimony with respect to

13         them.

14                   THE COURT:  Anything additional you want to

15         say, Mr. Biancavilla?

16                   MR. BIANCAVILLA:  Judge, they reflect the

17         victim as she was autopsied and accurately reflect all

18         her injuries.

19                   THE COURT:  And Mr. Chamberlain had an

20         opportunity to see all those photographs in discovery?

21                   MR. BIANCAVILLA:  Absolutely.

22                   THE COURT:  Your objection is overruled,

23         Mr. Chamberlain.

24                   Mark them in evidence.

25                   (Whereupon, the referred to exhibits,

Kathleen Plaia

1          previously marked for identification are received and

2          marked People's Exhibits 45, 46, 47, 48, 49, 50, 51,

3          52, 53, 54, 55, 56, 57, 58, 59, 50, 61, 62, 63, in

4          evidence by the reporter as instructed.)

5                    (Whereupon, the following takes place in open

6          court:)

7                    THE COURT:  People's 45 through 64 are to be

8          marked in evidence.

9                    THE COURT:  Additionally, People's 43 is to

10         be marked into evidence.  Any objection to that,

11         Mr. Chamberlain?

12                   MR. CHAMBERLAIN:  I have no objection to

13         that, Judge.

14                   THE COURT:  Okay.  Mark it in evidence.

15                   (Whereupon, the referred to item is received

16         and marked People's Exhibit 43 in evidence by the

17         reporter as instructed.)

18                   THE COURT:  Doctor, would you step into the

19         well, please.

20                   THE WITNESS:  Sure.

21                   (Whereupon, Doctor Catanese leaves the

22         witness stand.)

23                   MR. BIANCAVILLA:  Judge, may we put the

24         lights down?

25                   Displaying People's exhibit 45.

1       Q       Doctor, could you please explain what the jury is

2    viewing in People's Exhibit 45?

3       A       This is a photograph of the deceased prior to

4    performing the autopsy.

5               THE JUROR:  He's blocking some of the jurors.

6               THE COURT:  Is that better?

7               THE JUROR:  Yes.

8       A       This is a photograph of the deceased as received

9    prior to performing the autopsy.  You can see that there's a

10   wire tied around her neck.

11      Q       Displaying Exhibit 46.

12      A       This is another photograph, again, prior to

13   performing the autopsy.  It just shows the different view of

14   the ligature which is tied tightly around the deceased's

15   neck.

16      Q       Is there something intertwined with that

17   ligature, Doctor?

18      A       Hair is intertwined with the ligature there.  The

19   deceased was wearing a metal-like change which is hanging on

20   the ligature as well.

21      Q       Displaying Exhibit number 47.

22      A       Here we have a closer view of the ligature around

23   the deceased's neck.  Noting the knot in the corner here,

24   the hair interwound with the ligature.  And here

25   demonstrating it is wrapped multiple times -- three times in

1    actuality -- and tied tightly.

2         Q    Displaying Exhibit number 48.

3         A    This is a view, again, prior to performing the

4    autopsy.  This is a view of the other side of the neck

5    essentially.  It's showing the ligature.

6         Q    Exhibit number 49.

7         A    Here we have a closer view of the ligature tied

8    tightly around the deceased's neck.

9         Q    Exhibit number 50.  If you can, explain to the

10   jury, Doctor, how you removed the ligature from the neck.

11        A    Sure.  This actually is the ligature that was

12   present on the deceased's neck.  In order to remove the

13   ligature, I went to an area where there were no knots, where

14   it wasn't wrapped around itself.  I cut those areas and I

15   tied them together with white string in order to preserve

16   them.  Then I removed the ligature.  Some of the hair was

17   trapped in the ligature, and I layed it out for

18   photographic.

19        Q    Displaying Exhibit number 51.

20        A    Here, again, the same ligature.  We're getting a

21   closer view of the knot.

22        Q    Exhibit number 52.

23        A    Here, again, same ligature.  Part of the ligature

24   was looped and that shows the loop.  There would be the

25   knot.

1        Q       Displaying Exhibit number 53.

2        A       This is a photograph of the deceased's neck after

3   the ligature has been removed.   If you look, there is marks

4   on the neck.   These horizontal type marks, these are called

5   ligature abrasion furrows.   There are marks on the skin of

6   the neck where the ligature was tied.

7        Q       Displaying Grand jury Exhibit number 54 --

8   People's Exhibit 54, sorry.

9        A       This is just a view of the other side of the

10  neck, showing the marks on the neck from the ligature.

11       Q       People's 55.

12       A       This is showing the back of the neck with the

13  ligature marks.

14       Q       People's 56?

15       A       This is a view of the front of the neck with the

16  chin being pulled upward.   We see the ligature marks.   We

17  also see an abrasion to the area of the neck here.

18               An abrasion is a type of frictional injury where

19  the surface epithelia or outer layer skin is actually rubbed

20  off.

21               This injury here would not be consistent with a

22  ligature strangulation, but would be consistent with manual

23  strangulation.

24       Q       Manual strangulation, what would cause that

25  injury?

Kathleen Plaia

1        A       The actual fingers rubbing against the neck.

2        Q       Displaying Exhibit number 57.

3        A       This is another view of the neck, with the chin

4    being pulled up.  It shows the abrasion that I just

5    described.  Then it shows the ligature abrasion furrows.

6        Q       Now, Doctor, in determining whether a person has

7    been strangled or has died as a result of strangulation, is

8    there a particular point in time when you were to examine

9    the eyes of the individual?

10       A       Sure.  One would examine the eyes early on in the

11   examination and one would be looking for hemorrhages in the

12   eyes and eyelids.

13       Q       What is the point of that?

14       A       When someone is manually strangled, there's a

15   compression of the neck and compression of the circulation.

16   But it's usually an incomplete compression of the

17   circulation.  So, there's a back-up of blood.  And the blood

18   vessels in the eyes and eyelids being very weak, they tend

19   to bleed from this.

20               Where, if someone were just strangled with a

21   ligature tied tightly around their neck, there should be a

22   complete cut off of circulation.  There should be no back-up

23   of blood.  There should been no hemorrhages in the eyes and

24   eyelids.

25               The fact there there is hemorrhages in the eyes

1   and eyelids says there's more than a ligature tied around

2   the person's neck.  That there was a manual component to the

3   strangulation.

4        Q    I'm going to display for the jury People's 58.

5   Please describe for the jury what they're viewing?

6        A    We're looking at a photograph of the deceased's

7   face.  The eyelids are being held up.  And we see the

8   hemorrhage in the eyes and eyelids.  This hemorrhage is

9   caused by the strangulation.

10       Q    When you say "the strangulation," is that

11  hemorrhage caused by a manual strangulation or caused by a

12  ligature strangulation?

13       A    Manual strangulation.

14       Q    Now, Doctor, could you describe for the jury what

15  occurs to the anatomy or the mouth and tongue of an

16  individual as a result of a manual strangulation?

17       A    In a manual strangulation, where there's a

18  pushing up of the larynx, the tongue would protrude, so

19  that's something that one would expect.  So, an injury of a

20  protruding tongue would be a fairly common finding.

21       Q    What is an injury of a protruding tongue?

22       A    Its tongue would be -- when one pushes up on the

23  larynx, the tongue can be pushed out of the mouth and then

24  because of the teeth and the pushing of the neck, the tongue

25  could then be injured.

 1          Q       I will display for the jury People's Exhibit

 2     number 59.

 3              Please explain to them what they're observing?

 4          A       This photograph, I'm holding the deceased's mouth

 5     open and we see there is an injury to the tongue.  We see

 6     the tongue is partially protruding from the mouth.  I didn't

 7     put the tongue in that position, that's the position that it

 8     was received.

 9          Q       And that is consistent with a manual

10     strangulation?

11          A       Yes.

12          Q       Now, Doctor, could you describe for the jury the

13     injuries to the throat or the neck during the manual

14     strangulation?

15          A       Sure.  When examining any strangulation, when one

16     dissects the neck, one dissects the neck layer by layer,

17     looking for evidence of injury.

18              In a manual strangulation versus a ligature

19     strangulation, one would expect to see focal type of

20     injuries, bruises or contusion.  What I mean by bruises or

21     contusions is, blunt trauma, squeezing that disrupts blood

22     vessels and causes hemorrhage.  One would expect to see some

23     contusions of the musculature of the neck.  Also, the neck

24     bones.

25              In a manual strangulation, because of the

1    squeezing, one would expect there to be fractures of the

2    neck bones, which we had in this case.  We have fractures of

3    the thyroid cartilage and the hyoid bone.  The bone that

4    sits up in the neck.

5          So, in a ligature strangulation, with a simple

6    wire ligature, you wouldn't find fractures that require

7    squeezing.

8          What is very, very important as well is --

9    Q      Let me display People's Exhibit 60 and explain to

10   the jury, in the context of what you were just saying, what

11   you they are viewing.

12   A      What we are viewing here is the skin of the neck

13   dissected up and the layers -- the muscular layers of the

14   neck stripped off and dissected individually.

15         And what we see here is a contusion or abrasion

16   of one of the neck muscles on the left side of the neck.

17              THE COURT:  Doctor, could you move back?

18   Q      Thank you, Doctor.  Go ahead, Doctor.

19   A      So, in this area, here is the bruise, that was in

20   the muscle of the neck.

21   Q      Doctor, so the people there can see what you're

22   talking about, this area up here would be the bruising?

23   A      Yes.  That's a neck muscle and that is reflected

24   back and it's dissected.

25   Q      That's also consistent with a manual type of

1    strangulation?

2         A     Yes.   Squeezing.

3         Q     Okay.   Displaying number 61 in evidence.   Please

4    explain to the jury what they're viewing there.

5         A     This is a photograph of the hyoid bone.   The

6    hyoid bone is a bone that sits up in the neck.   On the hyoid

7    bone, we see that this part of it is fractured or broken.

8    And that there is hemorrhage or contusion in the site of

9    fracture.   This shows that this bone was broken by squeezing

10   the neck while the individual was alive, consistent with

11   manual strangulation.

12        Q     Displaying People's Exhibit 62.

13        A     This is a photograph of the larynx, the Adam's

14   Apple, if you must.   We're looking at the back of the larynx

15   here, we were not looking at the front.   We're looking at

16   the part that rides against the neck.   The bony part of the

17   neck in the back.   We see a fracture of the this part of the

18   larynx here with hemorrhage into it.   Again, consistent with

19   the manual strangulation.   Consistent with squeezing.   The

20   hemorrhage indicating it happened while the deceased was

21   alive.

22             We also see a bruise here in the back of the

23   larynx or a contusion.   In order to reach the back of the

24   larynx, one would have to actually squeeze into the neck to

25   do it.   You can't reach in by pushing on the outer surface.

Proceedings                                    751

1    This is consistent with a manual strangulation.

2         Q      Now, Doctor, did you also examine the hands of

3    the individual?

4         A      Yes, I did.

5         Q      Please explain to the jury your examination of

6    the hands and what you did?

7         A      Certainly.  I examined the hands prior to

8    performing the autopsy.  Then I took a clipping of the

9    fingernails, which would be routine.

10        Q      Were there any injuries to the fingernails or to

11   the fingers?

12        A      No.  No injuries to the hand or fingernails.

13        Q      We will display People's Exhibit number 63.

14   Explain to the jury what they're viewing.

15        A      This is a photograph of the back of the

16   deceased's hand.

17        Q      That would be the right hand?

18        A      Yes.

19        Q      And photograph number 64?

20        A      Photograph of the back of the back of the left

21   hand, showing no injuries.

22        Q      Okay.  Thank you, Doctor.

23               MR. BIANCAVILLA:  You can be seated again.

24               (Whereupon, Doctor Catanese resumes his seat

25        on the witness stand.)

Kathleen Plaia

1        Q        Now, Doctor, as part of the autopsy that you

2    performed, were tissue samples from the deceased submitted

3    for analysis to the toxicology department?

4        A        Yes, they were.

5        Q        Were tissue samples also examined

6    microscopically?

7        A        Yes, they were.

8        Q        Did either the toxicological or microscopic

9    examinations yield anything of significance?

10       A        The deceased's blood alcohol was 0.26 percent.

11       Q        Now, with respect to the cause of death, was

12   there anything significant about the toxicology or the

13   microscopic examination?

14       A        No.

15       Q        Now, have you an opinion within a reasonable

16   degree of medical certainty as to the cause of death?

17       A        Yes, I do.

18       Q        And could you tell us what your opinion is?

19       A        Strangulation is the cause of death.

20       Q        What do you base that opinion on, Doctor?

21       A        I base my opinion on my autopsy examination.

22       Q        Now, with respect to strangulation, you removed

23   the ligature from the deceased's neck?

24       A        That is correct.

25       Q        Could you tell the jury whether or not the

1    strangulation or the death occurred from a manual

2    strangulation or from the ligature itself?

3         A    My opinion was that both contributed.  I couldn't

4    separate them.

5         Q    But, is it your opinion that she was manually

6    strangled before the ligature was placed around her neck?

7         A    It could have happened at the same time.  It's

8    hard to know.  But both of them did occur.

9         Q    Now, do you have an opinion point within a

10   reasonable degree of medical certainty as to whether Miss

11   Williams could have survived these injuries had she received

12   prompt medical attention?

13        A    No, she wouldn't have been able to survive them.

14        Q    Thank you very much, Doctor.

15             MR. BIANCAVILLA:  I have nothing further for

16        this witness.

17             THE COURT:  Mr. Chamberlain.

18   CROSS-EXAMINATION.

19   BY MR. CHAMBERLAIN:

20        Q    Doctor, you indicated that there was a manual

21   strangulation and a ligature, is that correct?

22        A    Yes.

23        Q    So, your testimony is not that the cause of death

24   was manual strangulation by itself, is that correct?

25        A    My opinion is, the cause of death is

1    strangulation, which includes both.

2         Q    Including both?

3         A    Yes.

4         Q    As you sit here, Doctor, there's no way you can

5    tell whether the injuries that caused death were caused by

6    just manual strangulation?

7         A    They were caused by both, in my opinion.

8         Q    Right.  Okay.  Doctor, you said there were

9    bruises to the side of the face of the victim?

10        A    They were deep.  There was a deep bruising to the

11   muscle --

12        Q    You're misreading my question.  I said, to the

13   side of the face.  You're pointing to your neck.

14        A    There were deep hemorrhages to the scalp of the

15   victim.

16        Q    And you reported those in your autopsy report as

17   blunt impact --

18        A    Yes.

19        Q    Injuries?

20             THE WITNESS:  I will open the report to

21   refresh my memory.

22             THE COURT:  Yes.  Refresh your recollection.

23        A    Yes.

24        Q    And, just, again, that report, by the way, did

25   not indicate that the strangulation is caused by either type

1   of -- either the manual or the ligature, just that it was

2   strangulation, is that correct?

3        A    As to the cause of death, yes.

4        Q    Were these blunt impacts to the side of the head

5   in at least -- withdrawn.

6             Does your report indicate it was at in at least

7   two locations?

8        A    Yes.

9        Q    Were they --

10            MR. CHAMBERLAIN:  Can I see the exhibits that

11   were just introduced into evidence?

12            THE COURT:  Yes, of course.

13       Q    Were they to the right side of the victim's head,

14   Doctor?

15       A    The left side.

16       Q    The left side?

17       A    Yes.

18       Q    I'm going to show you -- I'm going to show you

19   three exhibits here which show the side of the head, and ask

20   you if the blunt impact injuries are shown on the exhibit,

21   photograph, Doctor.

22            MR. CHAMBERLAIN:  They are, for the record,

23       People's 45, 46 and 48.

24       A    The injuries are described in my report as

25   sub-scalp contusions.  So, they're not actually readily

```
 1   evident looking at the photographs.  They're only after the
 2   scalp is peeled back and dissected and examined.
 3        Q    So, they're not readily available in that -- in
 4   those photographs?
 5        A    They're described as sub-scalp contusions.
 6   They're below the surface of the scalp.
 7        Q    Did you take any other photographs of the side of
 8   the head showing those injuries that you recall?
 9        A    Yes.  There are photographs of them.
10        Q    Do you recall which ones they are?
11        A    There should be a photograph of the scalp peeled
12   back and the two contusions or bruises that I described.
13             MR. CHAMBERLAIN:  Do I have --
14             MR. BIANCAVILLA:  Here, Mr. Chamberlain.
15             THE COURT:  Counsel, no conversation, please.
16        Q    Are there any photographs without the scalp
17   peeled back that show the contusions that you're referring
18   to?
19        A    These are sub-scalp contusions.  So, you wouldn't
20   see them unless you pulled the scalp back.
21        Q    Do you have a -- do you have an opinion --
22             MR. CHAMBERLAIN:  I'm not going to offer
23        those.  Withdrawn.
24        Q    The photographs that show the scalp peeled back
25   would be nothing a layman could identify as an injury, is
```

1      that correct?

2                      MR. BIANCAVILLA:   Objection.

3                      THE COURT:   Actually, I'll let the Doctor

4          answer it if he can.

5          A      I don't know what a layman would be able to

6      identify.

7          Q      Are there any photographs, other than that,

8      showing the contusions to the side of the scalp without the

9      scalp peeled back?

10         A      No.  They're not visible without the scalp being

11     peeled back, you see.

12         Q      Okay.  In any event, Doctor, these injuries to

13     the side of the head, the injuries we're talking about to

14     the side of the head, these blunt impact injuries, would not

15     have been caused by the manual strangulation, is that

16     correct?

17         A      They would be caused by a blunt impact.  So, not

18     from squeezing the throat, no.

19         Q      Not by the ligature either?

20         A      Not by the ligature in the throat, no.

21         Q      And there were at least two of those?

22         A      There were two injuries identified, yes.

23         Q      As you sit here, Doctor, do you have a

24     reasonable -- an opinion with a reasonable degree of medical

25     certainty as to what might have caused those blunt impact

1    injuries to the side of the head?

2        A    These injuries are contusions or bruises.  A

3    bruise or contusion is a type of blunt injury produced by

4    disrupted blood vessels under the skin.  Any type of impact

5    with a non-sharp instrument could have caused them.  It's

6    impossible to say what.

7        Q    If the victim were shoved down on her back to be

8    strangled, that act would not cause injury to the side?

9        A    Unless she banged the side of her head.

10       Q    But if she banged it, would that cause multiple

11   injuries here?

12       A    She had two of them.  She had one to the frontal

13   area and one to the side.  So, you're probably talking about

14   two impacts.  Because they're kind of separated.  But,

15   exactly, how they happened, I couldn't tell you.

16       Q    No.  I understand that.  You mentioned the

17   toxicological report, you didn't do that?

18       A    I just gathered the specimens.  No.

19       Q    The analysis is was done by a separate expert

20   who -- an expert in toxicology?

21       A    The analysis was done by a toxicologist, yes.

22       Q    And he's the gentleman waiting outside?

23            MR. BIANCAVILLA:  Objection.

24            THE COURT:  Sustained.

25       Q    You indicated that the toxicological report did

Kathleen Plaia

1    not indicate any evidence that would be relevant to this

2    case, is that correct?

3                    MR. BIANCAVILLA:  Objection, that's not what

4         he said.

5                    THE COURT:  Sustained as to relevancy.

6         Q    The toxicologist outside would be the proper

7    person to ask about the analysis of the toxicological

8    report, is that correct?

9                    MR. BIANCAVILLA:  Objection.

10                   THE COURT:  Sustained as to form.

11        Q    You did sign that report yourself?

12        A    I signed the report, which I'll pull now to show

13   that I reviewed it, yes.

14        Q    But you're not a toxicologist?

15        A    I'm not a toxicologist, no.

16        Q    I have no further questions.  Thank you.

17                   THE COURT:  Any redirect?

18                   MR. BIANCAVILLA:  Yes.

19                   I'm going to ask that these be marked as

20        People's 65 and 66 for identification.

21                   THE COURT:  Yes.

22                   (Whereupon, the referred to items are

23        received and marked People's Exhibit 65 and 66 for

24        identification by the reporter as instructed.)

25                   THE COURT OFFICER:  65 and 66 marked for

Kathleen Plaia

1          identification.

2                    MR. BIANCAVILLA:   Can we show them to the

3          witness, please.

4                    THE COURT:   Yes.

5    REDIRECT EXAMINATION

6    BY MR. BIANCAVILLA:

7          Q     Doctor Catanese, do you recognize those two

8    photographs?

9          A     Yes, I do.

10         Q     Do they fairly and accurate reflect the reflected

11   scalp of the victim in this particular case?

12         A     Yes, they do.

13         Q     And do they fairly and accurately represent the

14   two injuries that you were just discussing with

15   Mr. Chamberlain?

16         A     Yes, they do.

17                    MR. BIANCAVILLA:   Judge, I offer those into

18         evidence.

19                    THE COURT:   Show them to Mr. Chamberlain.

20                    MR. CHAMBERLAIN:   I would have the same

21         objection that I had before.   I think they're unduly

22         gory.

23                    Other than that, I have no objection.

24                    I don't think they're probative either.

25                    THE COURT:   Overruled.

1          Mark them in evidence.

2          MR. BIANCAVILLA:  Judge, could we display

3     them for the jury and could I have Doctor Catanese back

4     down here, please.

5          THE COURT:  Yes.

6          (Whereupon, the referred to items previously

7     marked for identification are received and marked

8     People's Exhibit 65 and 66 in evidence by the reporter

9     as instructed)

10          (Whereupon, Doctor Catanese leaves the

11     witness stand.)

12     Q     Doctor Catanese, I'm going to display for the

13     jury People's exhibit 65.  If you could just explain to them

14     what they're viewing, as it relates to the two blunt force

15     injuries we you were discussing.

16     A     We're looking at a photograph of the top of the

17     deceased's head.  The scalp has been cut.  Half of the scalp

18     has been pulled forward.  The other half has been peeled

19     back.  The left side of the head, front area, there is a

20     contusion, a sub-scalp contusion or bruise.

21          By sub-scalp I mean, one below the scalp.  A

22     contusion or a bruise, as I said earlier, is a type of blunt

23     trauma that disrupts blood vessels and causes hemorrhage.

24          We have one here present on the frontal area.  We

25     have one here present on the side of the head, the temporal

1    area.  We have two injury sites itself.

2        Q    So it's clear for the jury, would they be visible

3    from outside of the body?

4        A    These were not visible.

5        Q    Why not, Doctor?

6        A    She probably died after receiving them.  Had she

7    lived longer, they might have been visible.  I described

8    them as sub-scalp contusions because I couldn't see them on

9    the surface, only after I reflected the scalp back.

10       Q    I'm going to display Exhibit 66.  What is that?

11       A    This is a view of the deceased from the left side

12   of the head, body being in that direction.  The same view,

13   except it's to the side.  The scalp peeled forward.  The

14   scalp peeled back.  One injury, two injuries.  We see the

15   two injuries to the head, but we see them from the left

16   side.

17       Q    Now, Doctor, please explain for the jury what

18   causes blunt force trauma.

19       A    Blunt force trauma is -- are injuries produced by

20   impacts with non-sharp instruments.  So, what could cause

21   this, anything that isn't sharp impacting the head; a fist,

22   a floor, anything.

23       Q    Anything that she would bang her head against?

24       A    Exactly.

25       Q    Let me show you a picture, Doctor, People's

1    Exhibit number 22.

2          I'm going to ask you, hypothetically speaking,

3    there's a picture of where the victim was found.  Okay.

4    Now, hypothetically speaking, if this is a metal bed frame

5    and while the victim is being strangled and pushed on the

6    ground and her head is banged up on the left side aside that

7    metal bed frame, would that cause blunt force trauma injury?

8          A     All you need is an impact with something that

9    isn't sharp.  So, yeah, sure, that could cause it.

10         Q     Thank you, Doctor.  I have nothing further.

11               THE COURT:  Anything further,

12    Mr. Chamberlain?

13               MR. CHAMBERLAIN:  Yes, Judge.

14               (Whereupon, Doctor Catanese resumes his seat

15     on the witness stand.)

16   RECROSS-EXAMINATION

17   BY MR. CHAMBERLAIN:

18         Q     Doctor, you testified that the blunt force

19   injuries were probably caused before the victim died.

20   There's no question they were caused before the victim died,

21   right?  There's no evidence they were caused after the

22   victim died?

23         A     They would have to be caused before she died.  We

24   would have had a blood pressure or heart rate at the time.

25   I don't remember saying probably.

Kathleen Plaia

1    Q    Doctor, you responded in response to a

2  hypothetical question.  She could have -- she hit her head,

3  that could be responsible, is that right?

4    A    All we need is an impact with a blunt surface.

5    Q    Right.  That would have been one hit, right, if

6  she had hit her head, in that hypothetical as she was going

7  down?

8              MR. BIANCAVILLA:  Objection.

9              THE COURT:  That's speculative,

10  Mr. Chamberlain.  Sustained.

11    Q    Well, hypothetically, if you had a victim being

12  pushed down or shoved down to be strangled, that is left in

13  the condition that this photograph shows, she hits her head,

14  that would be one impact, is that correct?

15    A    My understanding was, metal rail on the bed.  So,

16  I could imagine -- and this is just speculation --

17  hypothetically --

18              THE COURT:  Please don't speculate.

19              THE WITNESS:  She was a hypothetical

20      situation.

21    A    In a hypothetical situation, someone could bang

22  their head on the metal rail of the bed and then bang their

23  head on the floor.  So, I could imagine two impacts, I

24  guess.  But I really don't know what happened.

25              MR. CHAMBERLAIN:  One minute, Judge.  If I

1     may.

2                    THE COURT:  Certainly, Mr. Chamberlain.

3          Q     You testified before that these blunt impact

4    injuries you were talking about would have been caused by a

5    fist or something not hard, is that correct?

6          A     No.  I said anything hard.  I said, any type of

7    blunt trauma.

8                    We're talking about a bruise.  Everyone has had a

9    bruise from time to time.  You need an impact with something

10   that isn't sharp, but something hard enough to disrupt blood

11   vessels.

12         Q     But you're hypothetically concluding the side

13   rail of -- metal rail of a bed?

14         A     That was a question asked to me.  In fact, I

15   don't know how these injuries happened.

16         Q     I understand you.  I don't either.  And the

17   question is, you gave an example of the deceased to this

18   jury.  You gave an example of the deceased hitting her head

19   against a metal rail, which is, as I understand it, is not

20   consistent with your definition of a blunt force impact?

21                    MR. BIANCAVILLA:  Judge, I'm going to object

22        to that.

23                    THE COURT:  Sustained.

24         Q     Would a sharp metal rail be the type of object

25   that would cause a blunt force impact you described?

1          A      A sharp -- I don't understand sharp.

2          Q      Well, a metal --

3                 THE COURT:  Ask another question,

4      Mr. Chamberlain.

5          Q      The metal rail -- Doctor, so we make it clear,

6      you're hypothetically including a metal rail on the bed?

7          A      I didn't actually see the metal rail.  But, yes

8      okay.  It is sharp you're saying?

9          Q      No, I'm not saying sharp.

10                MR. BIANCAVILLA:  Judge, I showed the Doctor

11     this photograph, and asked him if he --

12                THE COURT:  You asked a hypothetical

13     question.

14                MR. BIANCAVILLA:  Exactly.  Based upon the

15     photograph.

16                MR. CHAMBERLAIN:  May I see the photograph?

17                MR. BIANCAVILLA:  Sure.

18     Q      I'm going to show you --

19                MR. CHAMBERLAIN:  Can we put it up?  Let me

20     show it to the Doctor first.

21                (Whereupon, the referred to item is handed to

22     the witness and then handed back to Mr. Chamberlain)

23                MR. CHAMBERLAIN:  Now put it up there.

24     Q      Doctor, you hypothetically --.

25                THE COURT:  Can you see?

1           THE WITNESS:  No, I can't see.

2           THE COURT:  Doctor, go down.

3           THE WITNESS:  Okay.

4           (Whereupon, Doctor Catanese leaves the

5    witness stand.)

6      Q    Doctor Catanese, do you see any metal rail there

7    that could have been hypothetically the cause of the blunt

8    impact that you referred to?

9           MR. BIANCAVILLA:  Judge, I'm going to object.

10          THE COURT:  Yes, sustained.  It's a

11   hypothetical question, Mr. Chamberlain.

12          MR. CHAMBERLAIN:  He put before this jury

13   that it might have been the blunt rail.  I would like

14   to know what rail he's talking about.  I didn't put it

15   before the jury, he did.

16          MR. BIANCAVILLA:  It was a hypothetical based

17   upon the photograph.

18          THE COURT:  He asked hypothetical questions.

19          MR. CHAMBERLAIN:  It has to be based on

20   evidence.  There's no evidence.

21          THE COURT:  Mr. Chamberlain, please.  Ask a

22   question.

23     Q    Is there any rail that you see in that picture?

24          MR. BIANCAVILLA:  Objection.

25          THE COURT:  Sustained.

```
 1                    THE COURT:  It's a hypothetical question.

 2                    MR. CHAMBERLAIN:  I respectfully suggest,

 3       Judge, that hypotheticals are supposed to be based upon

 4       evidence in the case, not on something that he's just

 5       thinking up.

 6                    MR. BIANCAVILLA:  Judge, I'm going object.

 7                    MR. CHAMBERLAIN:  I respectfully except.

 8                    No further questions.

 9                    THE COURT:  Sustained.

10                    Any further questions, Mr. Biancavilla?

11                    MR. BIANCAVILLA:  No, Judge.

12                    THE COURT:  Thank you, Doctor.  You may step

13       down.

14                    (WITNESS EXCUSED)

15                    THE COURT:  Ladies and gentlemen, we're going

16       to take a short break at this point.  Do not discuss

17       the case among yourselves or with anyone else.  Keep an

18       open mind.  Do not form or express any opinions until

19       the entire case has been completed.  Do not read or

20       listen to any accounts of the case, should it be

21       reported in the media.  Do not visit or view any place

22       or premises that have been mentioned.  You're not to

23       permit any party to discuss this case with you or

24       attempt to influence you.  You must promptly report to

25       the Court any violation thereof.
```

1           Please follow the court officers, we'll be

2    back shortly.

3           (Whereupon, the sworn jury and alternates

4    leave the courtroom.)

5           MR. CHAMBERLAIN:  Judge, I have an

6    application, if I may.

7           THE COURT:  Yes, Mr. Chamberlain.

8           MR. CHAMBERLAIN:  I'm going to move to

9    preclude the doctor's testimony in its entirety.  And

10   the basis of that is that the district attorney at the

11   start of this examination offered a series of

12   photographs, which I believe were unduly gory and

13   unnecessary, including parts of the body taken from

14   inside the neck.  Those photographs were offered and

15   accepted by the Court on his representation that this

16   doctor was going to testify that the cause of death was

17   manual strangulation.  I advised the Court at that time

18   that he had never so indicated before.  And I will read

19   from the grand jury.  Page 16, Volume 3,

20   Mr. Biancavilla, page 16, line 5.

21           "QUESTION:  What is your opinion" --

22           Let me go back a question, Judge.  Bottom of

23   page 52, line 25.

24           "Therefore, Doctor, do you have an opinion

25   with a reasonable degree of medical certainty as to the

1      cause of Miss Williams' -- cause of Miss Williams'

2      question?"

3                      I'm sure he meant death.

4                      "ANSWER:  Yes, I do."

5                      "What is your opinion and what is the basis

6      for your opinion?"

7                      "ANSWER:  Miss Williams' cause of death is

8      strangulation.  The basis of my opinion is the

9      evidence, namely, the trauma noted to her neck and

10     larynx, as well as the ligature present on her neck."

11                     Now that was the only evidence we were ever

12     provided.  He offered, and it was based upon his

13     statement that he was going to elicit testimony, it was

14     a -- cause of death was manual strangulation.  That's

15     not what this Doctor testified to and --

16                     THE COURT:  Is that it, Mr. Chamberlain?

17                     MR. CHAMBERLAIN:  That's it, Judge.

18                     THE COURT:  Mr. Biancavilla?

19                     MR. BIANCAVILLA:  I have to nothing to add,

20     Judge.

21                     THE COURT:  Mr. Biancavilla, you complied

22     completely with CPL 240.20?

23                     MR. BIANCAVILLA:  Yes, we have.

24                     THE COURT:  You turned over scientific

25     reports prepared by the medical examiner?

1          MR. BIANCAVILLA:  Judge, we have given

2    everything that he has requested.

3          MR. CHAMBERLAIN:  That's what I'm saying,

4    Judge.  If he's going to introduce pictures on certain

5    representations, they should be based upon some basis.

6    I assume --

7          THE COURT:  He gave me an offer of proof as

8    to what the Doctor was going to testify to.  And the

9    doctor did testify to that.

10         Now, you have to understand, Mr. Chamberlain,

11   as I have said to you before when we were up at the

12   bench, with respect to photographs, if the photograph

13   corroborates the evidence that was testified to, it's

14   admissible.  The sole reason you would keep out a

15   photograph, if it's sole purpose is to arouse the

16   emotions of the jury and prejudice the defendant.

17         The doctor testified he relied upon each one

18   of these photographs.  And each one of these

19   photographs demonstrated something with respect to his

20   reaching his final diagnosis.

21         MR. CHAMBERLAIN:  In the opening of this

22   case, Judge, he opened to the jury, there was no

23   question that this poor lady was strangled to death.

24   There's no issue here, unless it's raised by him.  And

25   I'm submitting that putting in body parts is not

1      probative of anything, other than inflamming the jury.

2              THE COURT:  Mr. Biancavilla.

3              MR. BIANCAVILLA:  I have nothing to add,

4      Judge.

5              THE COURT:  Mr. Chamberlain, as I told you,

6      the only reason you would leave out a photograph, if it

7      arouses the emotion of the jury and prejudices the

8      defendant.  The sole purpose is to arouse the emotions

9      of the jury.  As I said before, this is the third time

10     I'm saying it, the sole purpose was not that.

11              The doctor used it to corroborate his

12     testimony as he was testifying as to what was injured,

13     what parts of the body.  He was demonstrating to us

14     where certain things, certain colors or certain

15     fractures were, or where certain abrasions were.

16              Now, I don't know what else to tell you,

17     Mr. Chamberlain.  But, as I said before at the bench,

18     I'm overruling your objection.  You have an exception.

19              MR. CHAMBERLAIN:  Thank you.

20              THE Court:  Counsel, five minutes.

21              MR. BIANCAVILLA:  Thank you, Judge.

22              (Whereupon, there is a brief recess taken in

23     the proceedings.)

24              THE COURT OFFICER:  Jury entering.

25              (Whereupon, the sworn jury and alternates

1          enter the courtroom).

2                    THE CLERK:  Both sides stipulate that all

3          sworn jurors are present and seated properly?

4                    MR. CHAMBERLAIN:  So stipulated.

5                    MR. BIANCAVILLA:  Yes.

6                    MR. CHAMBERLAIN:  Yes.

7                    THE COURT:  Ladies and gentlemen, we're ready

8          to continue with the trial.

9                    Mr. Biancavilla, call your next witness,

10         please.

11                   MR. BIANCAVILLA:  Doctor Thomas Manning.

12                   Witness sworn.

13                   THE CLERK:

14                   THE COURT OFFICER:  Please state your name,

15         spell your last name, please.

16                   THE WITNESS:  Name is Thomas Manning,

17         M-A-N-N-I-N-G.

18                   THE COURT OFFICER:  Town in which you reside?

19                   THE COURT:  County.

20                   THE WITNESS:  Nassau County.

21                   THE COURT:  You may inquire, Mr. Biancavilla.

22                   MR. BIANCAVILLA:  Thank you.

23    DIRECT EXAMINATION

24    BY MR. BIANCAVILLA:

25         Q    Good afternoon, Doctor Manning.

1      A     Good afternoon.

2      Q     Thank you for joining us.

3            Doctor Manning, would you tell the jury where

4  you're employed?

5      A     I'm employed in the Nassau County Medical

6  Examiner's Office, where I'm the Chief Toxicologist.

7      Q     How long have you been with the Nassau County

8  Medical Examiner's Office?

9      A     For just over thirty years.

10     Q     And how long have you been Chief of Toxicology?

11     A     I think twenty-four -- twenty-four years.

12     Q     Could you please explain to the jury your

13  credentials and background?

14     A     Yes.  I have a Bachelor's Degree from Manhattan

15  College.  A Master's Degree in physiology from Adelphi

16  University.  And a PHD in pharmacology, toxicology from St.

17  John's University.  I'm Board Certified in forensic

18  toxicology.  And I am licensed as a laboratory director by

19  the New York State Health Department.

20            I'm a member of a number of professional

21  organizations, the American Academy of forensic Sciences.

22  The American Association of Crime Lab Directors.  And the

23  Society of forensic Toxicology, to which I was on the board

24  of directors.

25            I serve as a con -- I teach a course in

Kathleen Plaia

1    toxicology at CW Post on alternate years with Adelphi

2    University.

3              I am a consultant to South Oaks Hospital, which

4    is an alcohol rehabilitation hospital in Amityville.  I am

5    also a consultant to the Drug and Alcohol Commission for the

6    US Army and whole military.  We have the contract for the

7    whole military; that is, the Air Force, Navy and the Army as

8    well.

9              I have a number of publications, some fifteen

10   publications, in the area of toxicology.

11       Q    Doctor, what is forensic toxicology?

12       A    Forensic toxicology, toxicology in its broader

13   sense is the study of poisons and their effect on the body.

14            In our particular area, forensic toxicology, is

15   one where we specialize in the forensic aspect, that is, the

16   court presentation of these findings in the court of law.

17       Q    What are your responsibilities as Chief of

18   Toxicology at the Nassau County Medical Examiner's Office?

19       A    I supervise a laboratory of some eight analysts

20   who analyze tissues for the presence of drugs and chemicals

21   or anything which could cause or contribute to the death of

22   an individual.  It is my job to review the data and then

23   finalize a report.

24       Q    Now, Doctor, during the course of your

25   professional career, have you testified in courts of law as

Dr. Manning - People - Direct                    776

1    an expert in the field of toxicology?

2         A    Yes, probably at least a hundred times.

3         Q    And have you rendered opinions regarding the

4    field of toxicology?

5         A    Yes.

6         Q    In what type of courts?

7         A    In federal court, just about every county court

8    around in Nassau, Suffolk, Westchester, all the state

9    courts.

10        Q    Okay.  Doctor, I'm going to ask that you take a

11   look at what has been marked as People's 67 for

12   identification.

13        A    Yes.

14        Q    Now, is that document kept in the regular course

15   of business of the Nassau County Medical Examiner's Office?

16        A    Yes, it is.

17        Q    Is it the regular course of business for the

18   Nassau County Medical Examiner's Office to keep that

19   document?

20        A    Yes, it is.

21        Q    Is the information contained therein placed in

22   that record at or about the time of the tests performed?

23        A    Yes.

24             MR. BIANCAVILLA:  We offer that into

25        evidence.

Kathleen Plaia

1          THE COURT:  Show it to Mr. Chamberlain,

2     please.

3          MR. CHAMBERLAIN:  I have a copy, Judge.

4     Toxicological report.

5          No objection.

6          (Whereupon, the referred to item previously

7     marked for identification is received and marked

8     People's Exhibit 67 in evidence by the reporter as

9     instructed)

10         THE COURT OFFICER:  So marked.

11    Q     Doctor Manning, could you describe for the jury

12    what alcohol is and its actual effects?

13    A     Yes.  Alcohol -- and I'm assuming we're talking

14    about drinking alcohol which people consume.

15    Q     Yes, drinking alcohol.

16    A     It is a compound found in, I guess you might want

17    to call it, food.  But it is a compound which when taken is

18    absorbed into the bloodstream and then has a depressing

19    effect on the central nervous system.  That is, it makes the

20    central nervous system, the brain and all of the peripheral

21    nerves sluggish.  It's sort of like working with a dead

22    battery.  The higher the alcohol concentration gets, the

23    effect of the depressing effect becomes more pronounced and

24    the impulses that are generated in the body become

25    diminished, so that you do not get the same -- you get a

1    euphoric effect first.  But then, in addition to that, you

2    get this depressing effect which, again, makes the body

3    sluggish?

4         Q    Doctor, does the effect of alcohol differ

5    depending upon the size of an individual?

6         A    Not in the way we measure it.  We measure it as

7    far as a certain concentration in the blood.  That

8    concentration, not taking tolerance into account, but in

9    general has the same physiological effects on everybody.

10        Q    Now, the victim in this case, Ruth Williams, to

11   which that is a toxicology report you have, is five feet and

12   is one hundred and fifty-five pounds.  the jury has heard

13   she has had a blood alcohol level of a .26.

14        A    Yes.

15        Q    Could you describe to the jury the effect of .26

16   of alcohol on the victim in this case?

17        A    Yes.  She would be severely intoxicated.  And by

18   this I mean, first her mental capacities would be

19   diminished.  By this we call it mental cloudiness.  Things

20   that you have learned over your lifetime you tend to ignore.

21   You tend to do things which are not -- you wouldn't normally

22   do.

23             The second effect, and certainly at this level we

24   would see these kind of things, your judgment being

25   impaired. you can't judge distance, speed a whole host of

1    things.

2           The third effect is on reaction time.  And the

3    main thing here with reaction time is it becomes

4    diminished -- I mean, increased.  That is, if you take your

5    hand and you put it on a hot plate, it takes a long time for

6    you, certain -- certain amount of time for you to realize

7    it's hot and you pull your hand away.

8           Well, with alcohol, this becomes diminished.  So

9    that the reaction time becomes increased, it takes you

10   longer to react to that situation, so you leave your hand

11   there.  You don't realize that it's hot, it takes longer to

12   make that recognition and then takes longer for you to

13   respond to that.

14          The next effect is uncoordination.  Since all of

15   your senses are controlled by nerves, by making them dull,

16   your ability to feel things becomes greatly diminished,

17   again, along with the inability to react once you do feel

18   it.  Even though you feel it, so what.

19          And then the final effect and major effect is

20   another effect is on vision.  You certainly, with a person

21   with a .26 alcohol, would have tunnel vision, which really

22   is not that important in this case.  But, certainly would

23   have blurred and probably double vision in this particular

24   case.

25          Q    Now, in terms of reaching a level of .26, how

1    much alcoholic beverages would have to be consumed?

2        A    Again.  She's one hundred and sixty-five pounds,

3    and she's a female, she would have to consume at least --

4    tohave in her body at the time she died, would have at least

5    ten drinks in her, probably more like fifteen, depending on

6    what the drink may be.

7        Q    I'm sorry, Doctor, I didn't hear that.

8        A    Depending on what the drink may be.  When I say

9    ten standard drinks, I'm talking about one and a quarter

10   ounces of hard liquor, twelve ounces of standard beer, a can

11   of beer -- beer does vary in alcohol concentration, so it

12   may be a little more if she's drinking light beer rather

13   than regular beer -- or four ounce of wine.  That's pretty

14   much what we use as a standard because the alcohol

15   concentration in four ounces of wine equals the same alcohol

16   concentration in twelve ounce of beer and one and-a-quarter

17   ounces of a hard liquor.

18       Q    Now, Doctor, the toxicological report that was

19   generated by your staff in this particular case, you

20   performed several tests in that case, correct?

21       A    Well, the laboratory did, yes.

22       Q    The laboratory did.  Yes.  Can you tell the jury

23   what tests were performed?

24       A    We did test for gases.  And the main one is

25   carbon monoxide.  We do this routinely.  On all of our cases

1    we do a certain amount of tests that cover about ninety

2    percent of the poisons that are out there.  There are some

3    poisons that, or substances, that we do not normally look

4    for because they just are exotic poisons that you don't

5    normally see, something like curare.  We would do curare if

6    we knew it was there.  But in most cases we go for ninety

7    percent of the compounds.

8            We did this in this case and we divided this into

9    category.  The first gas, variety of gases, poisons and

10   carbon monoxide is the one we look for there.  And that was

11   within the normal rage.  We look for acid and basic

12   compounds, these would be drugs like barbiturates, asprin

13   and the like.  There was none of those compounds found.

14        Q    What are barbiturates, Doctor?

15        A    Barbiturates are compounds used in sleeping

16   preparations and also used as anticonvulsants.  Somebody who

17   has convulsions very often will be put on phenobarbital,

18   which is one of the barbiturates.  Other barbiturates are

19   usually sleeping preparations such as secobarbitol, Seconal

20   and the like.

21        Q    Was there anything present in this?

22        A    No.

23        Q    What's the next category?

24        A    Basic compounds.  This is the vast majority of

25   the drugs that are out there.  We screen for, as I say,

1    probably in the order of a thousand compounds.  And none of

2    them were detected.

3         Q     So, I'm not going to ask you to list them all.

4         A     No, I couldn't if you do.

5         Q     How about opiates?

6         A     In addition, we do specific tests for compounds

7    that are, quote, "drugs of abuse."  And we did all of them.

8    And I can list them for you.

9         Q     Please.

10        A     Methadone, amphetamines, phencyclidine, which is

11   PCP, Benzoylecgonine --

12        Q     Excuse me, I think you have to spell that.

13        A     B-E-N-Z-O-Y-L-E-C-G-O-N-I-N-E.  Benzodiazepine,

14   which are Valium type compounds, and opiates, which would be

15   morphine and heroin and the like.  And none of these were

16   present.

17        Q     Okay.  Cocaine, Doctor, Manning, what is that a

18   derivative of?

19        A     Cocaine is an extract from a plant.  And it

20   produces a euphoric use, and it's a stimulant to the central

21   nervous system.  We tested for -- we tested for breakdown

22   product, which is Benzoylecgonine, and that was negative.

23        Q     If a person -- hypothetically speaking, Doctor,

24   if a person was a user of cocaine --

25        A     Yes.

Dr. Manning - People - Direct                    783

1      Q      Is there a particular time that cocaine would

2  stay within the individual's system?

3      A      Certainly we would see it within forty-eight

4  hours of use.

5      Q      Now, if --

6      A      In some cases it could even last longer than

7  that.  There was nothing here, so she certainly didn't use

8  it forty-eight hours prior to her death.

9      Q      When you say drugs that -- you tested for drugs

10  of abuse, was there any indication of any type of

11  toxicological finding with respect to any type of drug

12  abuse?

13      A      No.  We did a specific test for a compound called

14  gamma-hydroxybuteric acid, which is gamma.  I think most

15  people are familiar with a compound called the date rape

16  drug.  And this is it.  We do this on cases where we might

17  suspect that somebody was drugged in order to seduce a

18  person.  We tested for that.  And although we did find some,

19  it's probably from a breakdown product in the body.  The

20  body makes this compound.  And we did see some very low

21  levels, but they're not significant.  So --

22      Q      But you saw no indication of cocaine use or

23  cocaine abuse?

24      A      No.

25                   MR. BIANCAVILLA:  Thank you, Doctor Manning.

Kathleen Plaia

1        I have no further questions.

2                    THE COURT:  Mr. Chamberlain.

3                    MR. CHAMBERLAIN:  Thank you, Judge.

4    CROSS EXAMINATION

5    BY MR. CHAMBERLAIN:

6        Q        Doctor Manning --

7        A        Good morning -- good afternoon.

8        Q        Now, the last thing you spoke of, the

9    gamma-hydroxibutyric acid, did I pronounce that right?

10       A        Yes.

11       Q        That is commonly known as a date rate drug?

12       A        Yes.

13       Q        It's also a recreational drug that some people

14   take?

15       A        Yes.

16       Q        And you found, according to the report, 2.6

17   milligrams/L, per liter, I suppose?

18       A        Right.

19       Q        Exactly what is -- what dose is that?

20       A        Well, the compound you normally produce this

21   compound gamma-butyric acid in your body.  So, if I tested

22   anybody, especially after they died, they build it up, you

23   will get certain levels.  Anything over five milligrams per

24   deciliter we would consider to be significant.  We tested.

25   It was 2.6.  So, there's no significant finding in that

1    gamma.

2         Q    When you say no significant, you -- no

3    significant finding, you can't testify with any reasonable

4    degree of medical certainty that that finding of that drug

5    in her system was not something she had -- she had taken?

6    In other words, you can't testify, certainly, that it was

7    just normal?

8         A    Yes, I can.

9         Q    You can?

10        A    Yes.  We see that in everybody.

11        Q    Doctor, you indicated that you found her severely

12   intoxicated based upon the blood alcohol contents .26, is

13   that right?

14        A    That's correct.

15        Q    And you testified what that would do to a normal

16   person, right?

17        A    Yes.

18        Q    As far as affecting impairment, judgment,

19   reaction time, coordination and so forth, right?

20        A    That's correct.

21        Q    Is it not a fact, Doctor, that certain people who

22   are drink heavily can accustom themselves to the alcohol and

23   act in a manner that is less -- has less effect where it

24   doesn't show up?

25        A    They would appear that, yes.  But that doesn't

1    mean they don't have the physiological effects of alcohol.

2         Q    They certainly could appear they could handle it?

3         A    She could appear that she is sober as a judge.

4              THE COURT:  Excuse me?

5              THE WITNESS:  Excuse me, your Honor.

6              MR. CHAMBERLAIN:  You mean the Judge in this

7    case.

8         A    She could appear very sober.  But that doesn't

9    mean the physiological effects of alcohol are not there.

10        Q    So, what you're saying, some guy who is a

11   confirmed alcoholic could walk down the street and look

12   perfectly normal and still have effects?

13        A    He would still have the effects of the alcohol,

14   yes.

15        Q    Some of these people could wake up at .20, can't

16   they?

17              MR. BIANCAVILLA:  Objection.

18              THE COURT:  I ask that you read it back.

19              (Whereupon, the requested question was read

20   back by the reporter as instructed.)

21              THE COURT:  Sustained.

22        Q    Referring to severe alcoholics, have you had --

23   do you have knowledge in your study of toxicology of people

24   who have a high level of blood alcohol at all times?

25        A    At all times?

1          Q     Well, even when they wake up in the morning?  How

2     about a severe alcoholic, you have any experience with that?

3          A     A severe alcoholic would eventually burn it off.

4     The idea is that if you didn't burn alcohol off, you would

5     take a drink and stay drunk forever.  That doesn't happen.

6     Everybody knows that.  It does wear off.  It breaks down,

7     alcohol.  It brakes down at a fairly consistent rate, by the

8     way, even in an alcoholic.

9          Q     Right.  If the person has this high level and

10     takes some more, they could keep the level up, right?

11          A     Yes.

12          Q     In any event, the tests -- you didn't perform any

13     tests as to the -- any tests specific for cocaine, did you,

14     Doctor?

15          A     We test -- in the body cocaine is immediately or

16     broken down to a compound called Benzoylecgonine.  So,

17     laboratories don't test specifically for cocaine.  They test

18     for -- specifically for the Benzoylecgonine.  If the

19     Benzoylecgonine is there, we go further with it, with

20     confirmation tests and so on.  That's what we did in this

21     particular case.  There was no Benzoylecgonine.

22          Q     You didn't detect any, is that what your report

23     says?

24          A     Right.

25          Q     And isn't it possible that a signal amount of

1    cocaine could have been there and that more specific tests

2    to determine that or its breakdown components could have

3    been performed?

4         A    No.  With -- the cut off levels that we use are

5    at such extremely low concentration, their level -- below

6    that level would be no significant finding.

7         Q    Would you say no significant finding, if somebody

8    had taken a dose -- snorted a dose of -- a small dose of

9    cocaine two days before, two or three days before that,

10   wouldn't show up in the test, isn't that correct?

11        A    That's correct.  That's what I said.  Forty-eight

12   hours is pretty much the outset.  Sometimes you can pick it

13   up a little longer.  But chronic people, sometimes you can

14   pick it up five or six days even.  But, in general, general

15   population, a person who uses cocaine, you wouldn't see it

16   in his urine after forty-eight hours.

17        Q    Is there a test for, called mass spectroscopy?

18        A    Yes.

19        Q    Is that a more specific test for smaller doses?

20        A    No.  It's more specific -- it's not always as

21   sensitive as some of the other tests we ran in this case.

22             You use the mass spectroscopy.  Once you find a

23   preliminary finding by the screen test, which we did, you

24   will use mass spectroscopy as a way of making a very

25   positive identification.  Mass spectroscopy is a fingerprint

1    of chemistry.  And when you use mass spectroscopy, you use

2    an identification to an absolute certainty.  The thing is

3    relatively complicated.  You use the screen first to

4    determine whether the material is there.  And if it's there,

5    then we go to mass spectroscopy to do the confirmation test.

6              There was mass spectroscopy done in this case, by

7    the way, just to rule out any of the other drugs.  And there

8    was nothing there.  We do it on every case.

9         Q    Okay.  So, as you sit here, you can't tell us --

10   withdrawn.

11              MR. CHAMBERLAIN:  I have nothing further.

12              Thank you very much, Doctor.

13              THE COURT:  Mr. Biancavilla?

14              MR. BIANCAVILLA:  Absolutely nothing else.

15              THE COURT:  Thank you, Doctor.

16              THE WITNESS:  Thank you, your Honor.  I

17   didn't mean to say sober as a judge.

18              THE COURT:  Not a problem.

19              (WITNESS EXCUSED)

20              THE COURT:  Counsel, approach the bench,

21   please.

22              (Whereupon, there is a discussion held at the

23   Bench, off the record between the Court and Counsel.)

24              THE COURT:  Ladies and gentlemen, we're going

25   to excuse you for the day and ask you to be back

1         tomorrow morning at 9:30.

2                    Okay.  Do not discuss the case among

3         yourselves or with anyone else.  Keep an open mind.  Do

4         not form or express any opinions until the entire case

5         has been completed.  Do not read or listen to any

6         accounts of the case, should it be reported in the

7         media.  Do not visit or view any premises mentioned.

8         Finally, do not permit any party to discuss this case

9         or an attempt to influence you.  You must promptly

10        report to the Court any violation thereof.

11                    Have a nice evening.  See you tomorrow

12        morning at 9:30.

13                    (Whereupon, the sworn jury and alternates

14        leave the courtroom)

15                    THE COURT:  Counsel, come forward, please.

16                    (Whereupon, there is a discussion held at the

17        Bench, off the record, between the Court and Counsel.)

18                    (Whereupon, Court stands in recess for the

19        day.  The trial is adjourned to May 10th, 2002 at

20        9:30 am)

21

22

23

24

25

Kathleen Plaia