

1   COUNTY COURT OF THE STATE OF NEW YORK
    COUNTY OF NASSAU : CRIMINAL PART   XII
2   ------------------------------------------------X

3   THE PEOPLE OF THE STATE OF NEW YORK,

4                                                   Indictment No.
                    -against-                       1456N-2000
5

6   PAUL SCRIMO,

7                                       Defendant.

8   ------------------------------------------------X
                                        Mineola, New York
9                                       May 10, 2002

10

11  B E F O R E:     HONORABLE JEFFREY S. BROWN
                     County Court Judge
12


13
    A P P E A R A N C E S:
14

15          HON. DENIS DILLON
                District Attorney of Nassau County
16              BY:  ROBERT BIANCAVILLA, ESQ.
                Assistant District Attorney for the People
17

18          JOHN CHAMBERLAIN, ESQ.
                Attorney for Defendant
19              1001 Franklin Avenue
                Garden City, NY  11530
20

21

22              M I N U T E S   O F   T R I A L

23

24
                                        Edward Dong
25                                      Official Court Reporter

People v. Scrimo                                    792

1        THE CLERK:  Case on trial continued, Indictment

2    number 1456N of 2000, People of the State of New York

3    versus Paul Scrimo.  All parties are present.  Jurors

4    are not present at this time.  Are the People ready?

5             MR. BIANCAVILLA:  Ready.

6             THE CLERK:  Defense ready?

7             MR. CHAMBERLAIN:  Defendant ready.

8             THE COURT:  Let's bring in the jury.

9             THE COURT OFFICER:  Jury entering.

10    (Whereupon, the jury was properly seated in the courtroom.)

11             THE CLERK:  Both sides stipulate that all sworn

12    jurors are present and seated properly?

13             MR. BIANCAVILLA:  Yes.

14             MR. CHAMBERLAIN:  So stipulated.

15             THE COURT:  Good morning, ladies and

16    gentlemen.  I hope everybody's well today, had a nice

17    evening.  We're ready to continue with the trial.  Mr.

18    Biancavilla, will you call your next witness, please.

19             MR. BIANCAVILLA:  Detective Vito Schiraldi.

20    D E T.   V I T O   P.   S C H I R A L D I, having been called

21    as a witness by the People and after having been first duly

22    sworn by the Clerk of the Court, testified upon his oath as

23    follows:

24             THE COURT OFFICER:  In a loud voice would you

25    give your full name, spelling your last name, shield

1        number and present command?

2                    THE WITNESS:  Vito P. Schiraldi.  I'm a

3        detective with the Nassau County Police Department.  My

4        shield number is 724, and I am assigned to the

5        Scientific Investigation Bureau, the laboratory of the

6        police department.  S-C-H-I-R-A-L-D-I.

7                    THE COURT:  You may inquire.

8                    MR. BIANCAVILLA:  Thank you, Judge.

9    DIRECT EXAMINATION

10   BY MR. BIANCAVILLA:

11       Q.    Detective Schiraldi, would you tell the jury,

12   please, how long you've been a member of the Nassau County

13   Police Department?

14       A.    Just short of 16 years.

15       Q.    And where are you currently assigned?

16       A.    To the Scientific Investigation Bureau.

17       Q.    And how long have you been a detective?

18       A.    10 years, nine years.

19       Q.    Now, what are your responsibilities at the

20   Scientific Investigation Bureau?

21       A.    I'm responsible for the handling of the analysis of

22   trace evidence with an emphasis on hairs, fibers, small minute

23   materials such as wires, paint chips, glass, physical

24   reconstruction such as hit and runs and things of that nature.

25       Q.    Now, that would be your -- withdrawn.

Case 2:11-cv-04171-AMD   Document 6-25   Filed 01/17/12   Page 4 of 99 PageID #: 1481

1              Is it fair to say that your official title is you're

2      a criminalist?

3          A.    That's correct, yes.

4          Q.    Tell the jury what a criminalist is.

5          A.    A criminalist examines items that really don't fall

6      into a true category.  Such as serology has blood and bodily

7      fluids; toxicology does liver samples, tissue, what not.  It's

8      anything that needs the microscope, anything that needs the

9      microscope, any type of physical impression, anything, again,

10     that doesn't fit into a true category, footprint, tire track,

11     hair, fibers, paint chips, glass and what not.

12         Q.    And do you specialize in microscopy?

13         A.    Yes, I do.

14         Q.    Explain to the jury what exactly is the specialty of

15     microscopy?

16         A.    Microscopy is the use of a microscope, light

17     microscope, stereo light microscope, polarized light

18     microscope, comparison light microscope, electron microscopy,

19     to use the microscope in its forensic application to examine

20     trace evidence.

21         Q.    And what is your educational background?

22         A.    I have a bachelor's of science in forensic science

23     from John Jay College of Criminal Justice in Manhattan.

24         Q.    And in addition to your educational background what,

25     if any, other training have you received with respect to

1   criminalistics?

2        A.   I've taken numerous courses through the FBI academy

3   in Quantico, Virginia, in hair and fibers analysis, taken

4   numerous courses with the Northeastern Association of Forensic

5   Scientists, which I am a member, through the state police

6   academy in Albany.  And I've taken numerous courses with the

7   New York Microscopical Society, which is a microscope society

8   that is run out of the Natural History Museum in New York.

9        Q.   Are you a member of any scientific investigation

10  organizations or societies?

11       A.   Yes, I'm a member of the Northeastern Association of

12  Forensic Scientists and a member of the New York State

13  Microscopical Society.

14       Q.   Have you testified as an expert in criminalistics

15  before?

16       A.   Yes, I have.

17       Q.   Approximately how many times?

18       A.   Over four dozen times.

19       Q.   And how many times have you been qualified as an

20  expert in criminalistics in New York State?

21       A.   Over four dozen times.

22       Q.   And in what courts?

23       A.   Nassau County District Court, County Court and in

24  Nassau County Supreme Court.

25       Q.   Now, have you ever not been qualified as an expert

1   in any court?

2        A.   No, I have not.

3        Q.   Now, how many years have you spent in the Scientific

4   Investigation Bureau as a criminalist?

5        A.   Just short of 15.

6        Q.   And how many cases have you done in your 15 years of

7   experience?

8        A.   In the hundreds.

9        Q.   Now, with respect to this particular case, is it

10  fair to say that you examined various pieces of evidence

11  during the course of this investigation?

12       A.   Yes, I did.

13            MR. BIANCAVILLA:   I'm going to ask that the

14       witness be shown what has been marked as People's 68

15       for identification.

16       Q.   Do you recognize that, Detective?

17       A.   Yes, I do.

18       Q.   What do you recognize that to be?

19       A.   These are the clothes I was asked to examine removed

20  from the deceased.  And the package, it bears my initials, VS,

21  all over.

22       Q.   I'm going to ask you when you're speaking to face

23  the jury.

24       A.   These are the clothes that I examined that were

25  removed from the deceased at autopsy.  I removed hairs and

1   fibers from them.  They're mounted on glass slides.  The

2   slides are in this cardboard slide holder.  It's packaged by

3   myself, double sealed as I usually do, with my VS initials

4   going through each of the double seals.

5              MR. BIANCAVILLA:  Judge, we would offer that

6       into evidence at this time.

7              THE COURT:  Show that to Mr. Chamberlain,

8       please.

9   VOIR DIRE BY

10  MR. CHAMBERLAIN:

11      Q.   Detective, has that been opened since you examined

12  it?

13      A.   No, it has not.

14      Q.   Have you had custody of it the whole time?

15      A.   It was in property bureau.

16      Q.   You personally haven't had it in custody?

17      A.   No, I have not.

18              MR. CHAMBERLAIN:  I'll consent, Judge.

19              THE COURT:  Mark it in evidence please.

20      (Whereupon, People's Exhibit 68 was marked in evidence.)

21              THE COURT OFFICER:  People's 68 received in

22       evidence.

23              MR. BIANCAVILLA:  Thank you.

24  CONT'D DIRECT EXAMINATION

25  BY MR. BIANCAVILLA:

1      Q.    Now, Detective, you stated you examined that

2  clothing for hair and fibers?

3      A.    That's correct, yes.

4      Q.    Now, with respect to that particular clothing, did

5  you remove various hairs from that clothing?

6      A.    Yes, I did.

7      Q.    Now, in terms of explaining to the jury how you

8  performed the examination of a hair, did you bring something

9  with you to court today that would assist you in your

10  explanation to the jury?

11      A.    Yes, I did.

12              MR. BIANCAVILLA:  I'm going to ask that the

13        witness be shown People's 69 for identification.

14      Q.    Detective, you're being shown what's been marked

15  as People's 69 for identification.  Does that fairly and

16  accurately -- is that a fair and accurate copy of the master

17  that you're going to use in front of the jury that's just a

18  photocopy?

19      A.    It is, yes.

20              MR. BIANCAVILLA:  Judge, we would offer that

21        into evidence.

22              THE COURT:  Please show it to Mr.

23        Chamberlain.

24              MR. CHAMBERLAIN:  Short voir dire, Judge?

25              THE COURT:  Yes.

1   VOIR DIRE BY

2   MR. CHAMBERLAIN:

3       Q.    Detective, when was this prepared?

4       A.    That picture there, this morning.

5       Q.    This morning.  Basically this is prepared for

6   presentation at trial, not as part of your normal duties in

7   the examination of evidence?

8       A.    I have a larger one that I always use when I

9   testify.

10      Q.    You have another larger one than this?

11      A.    I have the one that I use when I testify that I

12  produced in 1989, and I've used it on several occasions since

13  1989.

14      Q.    What you're saying, this will help you explain what

15  you did in connection with your examination; is that correct?

16      A.    That's correct, yes.

17              MR. CHAMBERLAIN:  I have no objection.

18              THE COURT:  Mark it in evidence.

19      (Whereupon, People's Exhibit 69 was marked in evidence.)

20              THE COURT OFFICER:  People's 69 received in

21      evidence.

22              MR. BIANCAVILLA:  Thank you.

23  CONT'D DIRECT EXAMINATION

24  BY MR. BIANCAVILLA:

25      Q.    Now, Detective, could you explain to the jury what

1    you're holding up there in your hand?

2        A.   This is a small section of a generic hair.  A human

3    hair is cylindrical for the most part.  It's like a three --

4    there's three anatomical regions.  There are three anatomical

5    regions of a hair.  The outestmost [sic] portion being called

6    the cuticle, that keeps the moisture in your hair, keeps it

7    supple.  Dirt and what not gets underneath the cuticle,

8    scales, producing dry or brittle hair.  The exterior portion

9    is called the cortex.  The small dots depict the pigment.  The

10   pigmentation that is in hair, the pigmentation is also a good

11   indication and characteristic of the origin of that person, if

12   he's black, white, Asian.

13        The central air canal, this medulla, is a black line

14   running through some hairs.  It's an air tube inside with air,

15   animals have it, two-thirds of the width of the hair, they

16   surmise, because of insulation, as animals still use their

17   hair for insulation.  As people evolve, the medulla is going

18   slowly out of people's hair.  I don't have a medulla in my

19   hair.  I've looked at my hair every day for 10 and a half

20   years.  Every day I mount my hair and look.  Some people have

21   a continuous medulla.  Other people are fragmented and what

22   not.  A good generic hair.

23        Q.   Now, when you are examining hair, explain to the

24   jury what you're looking for.

25        A.   The first thing I do with a hair if it's found on a

1   garment, I will just drop it.  I'll sketch its natural

2   contour, then I'll measure it.  I'll mount it on a glass

3   slide.  I'll examine that with a stereo light microscope.  For

4   all intents and purposes, it's a magnifying glass, if you

5   will.  Mount it on a glass side in a mounting medium called

6   Puremount and put it under a compound light microscope and

7   look at the microscopical characteristics.  I measure the

8   width of the hair, the distribution and the way this pigment

9   is laid out within the hair.  These other anatomical features

10  are called ovoid bodies.  This is a characteristic prevalent

11  in bovine hairs, on cows.  Humans have them.  These air sacs

12  are called cortical fusi.

13         Distribution and juxtaposition of these or the

14  positioning of these characteristics within that hair shaft

15  with a range of standard from an individual, I can say that

16  person's hair looks like this.  This question hair, does that

17  fit within that range of characteristics?  And if it does, I

18  say it's consistent and could have come from.  At that point

19  it is said to be consistent microscopically.

20         Q.  Now, with respect -- you can put that down now.

21  With respect to this particular case did you examine the

22  various items of clothing that were depicted in People's 68?

23         A.  Yes, I did.

24         Q.  Could you tell the jury what the results of your

25  examination were?  What was the first item you looked at?

```
 1              THE WITNESS:  Judge, may I refer to my notes?

 2              THE COURT:  Yes, of course, to refresh your

 3         recollection.

 4              MR. CHAMBERLAIN:  May I ask the witness to

 5         let me look at his notes so I can compare them with

 6         mine?

 7              MR. BIANCAVILLA:  Judge, I'm going to object.

 8         Judge, he's interrupting this witness's testimony.  He

 9         has all the notes that were provided to him prior to

10         commencement of this trial.

11              THE COURT:  Counsel, actually, Mr.

12         Chamberlain does have a right to compare the original

13         notes with the copy.  Just take a moment, Mr.

14         Chamberlain.

15              MR. CHAMBERLAIN:  Thank you, Judge.

16                   (Brief pause.)

17              MR. CHAMBERLAIN:  Thank you, Judge.

18         Q.   Detective Schiraldi, what was the first item that

19    you examined?

20         A.   A gray bra.

21         Q.   What was -- did you find anything on the gray bra?

22         A.   Let me refer to my notes, please.  Yes, I did.

23         Q.   What did you find?

24         A.   A hair.

25         Q.   Would you describe the hair for the jury?
```

```
 1          A.    It was a hair of animal origin.

 2          Q.    What was the next item you examined?

 3          A.    Socks.

 4          Q.    Did you find anything on the socks?

 5          A.    Yes, an animal hair also.

 6          Q.    What was the next item you examined?

 7          A.    A pair of blue panties.

 8          Q.    Did you find anything from the blue panties?

 9          A.    Yes, hair of animal original and a chemically

10    treated scalp hair of human origin, Caucasian human origin.

11          Q.    Did you compare that chemically treated scalp hair

12    to the hair standards you received from the deceased in this

13    case?

14          A.    Yes, I did.

15          Q.    Just briefly describe to the jury what a hair

16    standard is.

17          A.    Again, a hair standard, as I have some gray hairs on

18    the side of my head, what I want to do when I look at a

19    person's hair standard, I want to get a good representative of

20    what that person's hair looks like.  I want to see the gray

21    hairs.  I want to see the darker hairs.  I want to see maybe

22    some of the thinner hairs that might be -- like on myself I'm

23    losing a little hair back here, so it might be a little

24    thinner.  All these range of characteristics are set forth

25    from that person.
```

```
 1              Then I look at the fiber regions of the head, the
 2    right, the left, the front, the back, the vertex and the nape
 3    of the neck.  I look at all those and get a range of
 4    characteristics.  If the question hair that I look at fits
 5    within that range, it's consistent with and could have come
 6    from.
 7         Q.   Could you tell the jury with respect to the hair,
 8    the Caucasian hair from the panties, within a reasonable
 9    degree of scientific certainty as to the origin of that hair?
10         A.   Yes, I could.  It originated from the deceased.
11         Q.   Now, did you examine another item?
12         A.   Yes, I did, a blouse.
13         Q.   What did you find on the blouse?
14         A.   On the blouse also animal hairs and chemically
15    treated scalp hairs of Caucasian origin.
16         Q.   Did you determine the origin of the chemically
17    treated Caucasian hairs that you found?
18         A.   Yes, I did.
19         Q.   Could you tell the jury within a reasonable degree
20    of scientific certainty the source of that hair?
21         A.   Again, they originated from the scalp of the
22    deceased.
23         Q.   Now, did you examine another piece of evidence in
24    this particular case?
25         A.   Yes, I did.
```

1      Q.    What was that?

2      A.    Pair of overall pants and a black dual copper wire.

3      Q.    Now, the overall pants, was anything recovered from

4    that?

5      A.    No, there were not.

6      Q.    How about the copper wire?

7      A.    Yes, there was a number of hairs left in a knot that

8    I left intact.  I sampled some of those hairs, most of those.

9    I left a few because I did not want to remove the knot and

10   disturb the wire cord in any way.

11     Q.    I'm going to show you People's 43 in evidence.  I

12   ask you to take a look at that.  Is that what you examined?

13     A.    Yes, it is.

14     Q.    Could you tell the jury with a reasonable degree of

15   scientific certainty as to the source of the hairs in that,

16   that you examined from there?

17     A.    Again, they originated from the scalp of the

18   deceased.

19     Q.    Thank you, Detective.  Were there any other hairs

20   recovered from the body, Detective?

21     A.    No, there were not.

22     Q.    Not body.  From the clothing that you examined?

23     A.    No, there were not.  The bra, the socks, the

24   panties, the blouse and the cord.

25     Q.    You're going to have to speak up.

Det. Schiraldi - Direct/Biancavilla                806

1       A.    The bra, the socks, the panties, the blouse and the

2    knotted cord, those are the only hairs that were recovered.

3       Q.    Now, Detective, what was the next item -- withdrawn.

4             Did you examine a piece of black plastic --

5       A.    Yes.

6       Q.    -- during the course of your examination?

7       A.    Yes, I did.

8       Q.    I'm going to show you People's 44 for

9    identification.  Do you recognize that, Detective?

10      A.    Yes, I do.

11      Q.    What do you recognize that to be?

12      A.    This is a Leatherman tool, the Leatherman tool

13   sheath or belt holster and a small sample box that has a small

14   black piece of fragment of luminous black, like, plastic that

15   was removed from the interior handle of the Leatherman type

16   tool.

17      Q.    Did you examine both that black piece of plastic and

18   the tool?

19      A.    Yes, I did.

20            MR. BIANCAVILLA:  We would offer that into

21      evidence at this time.

22            THE COURT:  Please show it to Mr.

23      Chamberlain.

24            MR. CHAMBERLAIN:  I have no objection, Judge.

25      I've seen it.  Thank you.

1          THE COURT:  Mark it in evidence.

2     (Whereupon, People's Exhibit 44 was marked in evidence.)

3          THE COURT OFFICER:  People's 44 received in

4     evidence.

5     Q.    Could you explain to the jury what exactly you did

6     with that piece of black plastic?

7     A.    The piece of black plastic that was removed from the

8     Leatherman type tool's blade -- that's a multi-tool -- was

9     subjected to Fourier transformation infrared spectroscopy.  I

10     also made a small -- out of this small piece of plastic I took

11     thin layers and I put it into an IR spectroscopy, which is an

12     IR beam passing through the sample which is a small piece of

13     plastic.

14          Depending on the molecular structure, what the

15     chemical structure of that plastic or any polymer substance

16     may be, it causes different energy vibrations.  These energy

17     vibrations are absorbed or not absorbed depending upon if it's

18     CO, like a molecule of carbon, oxygen or hydrogen and these

19     things tend to absorb energies at a different level.

20     Depending on what that substance may be, the energies are

21     absorbed and it gives you a spectrum or spectroscopy of what

22     that sample is.  I also did the same with the sample of the

23     cord and I found that these two items were dissimilar.

24     Q.    So the piece of black plastic inside the Leatherman

25     tool did not come from the phone wire?

1      A.    That's correct.

2      Q.    It came from some other source?

3      A.    That's correct.

4      Q.    With respect to the Leatherman tool that's also in

5  People's 44, what did you do with the Leatherman tool?

6      A.    I examined the jaws on it and at that time I didn't

7  do any further analysis of that tool at that time.

8      Q.    Now --

9              MR. CHAMBERLAIN:  What time, Judge?

10             THE COURT:  Excuse me?

11             MR. CHAMBERLAIN:  I'm not sure what time he's

12      talking about.

13             THE COURT:  When did you do this examination,

14      Detective?

15             THE WITNESS:  On the Leatherman tool?

16             THE COURT:  Yes.

17             THE WITNESS:  When I first received that.

18     Q.    What was the date of that, Detective?

19     A.    On 11/8/00.

20     Q.    Now, what did you do with it on that particular day?

21     A.    I just examined the cord and the Leatherman tool and

22  the sheath.

23     Q.    What observations did you make about the Leatherman

24  tool itself on that particular day?

25     A.    That it was -- the jaws and the lock and the cutting

```
 1    part of it were well used, and the tool was used quite often

 2    and it had a little play in it.  And it also was a functioning

 3    tool.

 4         Q.   What did you do with respect to the cord?

 5         A.   At that time when I first received the cord on the

 6    other date -- may I refer to that date?

 7         Q.   Yes.

 8         A.   As I do with most of my evidence, I sketch it.  I

 9    examine it and sometimes if there's something pertinent on it

10    I usually photograph something that's unique.

11         Q.   Just so it's clear, what date did you receive the

12    cord?

13         A.   On April 20, the year 2000 at 1213 hours.

14         Q.   What date did you receive the Leatherman tool?

15         A.   November 8 of 2000.

16         Q.   Now, what did you do with the cord when you first

17    looked at it?

18         A.   I sketched it, as I have in my notes, and I

19    photographed an end that was, I assumed, was cut or torn in

20    some manner, from the edge.

21         Q.   Now, during the course of your investigation did you

22    determine what type of cord that was?

23         A.   Yes, I did.

24         Q.   Tell the jury what type of cord it was.

25         A.   It's similar to the power cord that would be used on
```

1   a phone or answering type machine.

2        Q.   Were you able to determine what this power cord

3   looked like completed without the cut end?

4        A.   Yes.

5        Q.   How did you do that?

6        A.   I did a search, because I know it was a Phonemate

7   phone.  I did a search of the computer to find out what type

8   of phones, a Phonemate type phone, what type of cords they

9   had.  And just from visually examining that cord I can

10  interpolate what the cord intact would look like.

11               MR. BIANCAVILLA:  I'm going to ask that the

12       witness be shown People's 70 for identification.

13               THE COURT:  Okay.

14       Q.   Detective, is that -- does that photograph fairly

15  and accurately depict the complete Phonemate power cord that

16  you're referring to?

17       A.   Yes, it would.  It also has the black and white

18  lines that it also has.

19       Q.   In other words, the photograph in that picture would

20  be the complete Phonemate cord.  This is a Phonemate cord that

21  has been cut?

22       A.   Yes, it's minus a transformer that you plug into a

23  wall.

24               MR. BIANCAVILLA:  We offer that into evidence,

25       Judge.

Det. Schiraldi - Direct/Biancavilla          811

1                    THE COURT:  Please show that to Mr.

2          Chamberlain.

3                    MR. CHAMBERLAIN:  Short voir dire, Judge?

4                    THE COURT:  Yes.

5                    MR. CHAMBERLAIN:  Thank you.

6    VOIR DIRE BY

7    MR. CHAMBERLAIN:

8          Q.    You received this from the manufacturer, this

9    exhibit?

10         A.    No, from the computer.  I just downloaded it from

11   the computer.

12         Q.    You downloaded it.  It's a download of a web site

13   from the manufacturer?

14         A.    It's Ebay.

15         Q.    Ebay, okay.  Ebay sells this particular item, I see.

16         A.    Ebay sells many items.  That's one of the items that

17   they may sell.

18         Q.    And when did you receive this, Detective?

19         A.    I think it was about two weeks ago, maybe right

20   about this time.

21         Q.    Two weeks ago?

22         A.    Yes.

23         Q.    So this again was not prepared as part of your

24   normal process of investigation of a crime.  This was prepared

25   for trial; is that correct?

1          MR. BIANCAVILLA:  Objection.

2          THE COURT:  Well, that's certainly not a voir

3     dire question, Mr. Chamberlain.

4     Q.   Did you make any notation in your record,

5  Detective, concerning the type of cord or where this cord came

6  from in your notes that you keep in the regular course of your

7  business?

8          MR. BIANCAVILLA:  Objection.

9          THE COURT:  That's not a voir dire question

10     either, Mr. Chamberlain.

11     Q.   Just one more question:  Detective, you received

12  the cord, I think you said, on a date in April 2000.

13     A.   Yes.

14          MR. BIANCAVILLA:  Objection.

15          THE COURT:  I haven't heard the question.

16          MR. BIANCAVILLA:  He just asked it, Judge.

17          MR. CHAMBERLAIN:  It's the date he received

18     it.

19          MR. BIANCAVILLA:  It's voir dire on a

20     picture, not when he received the cord.

21          THE COURT:  The last response from the

22     witness should be struck.

23          MR. CHAMBERLAIN:  No further questions.  No

24     objection.

25          THE COURT:  Mark it in evidence.

1    (Whereupon, People's Exhibit 70 was marked in evidence.)

2              THE COURT OFFICER:  People's 70 received in

3        evidence.

4              MR. BIANCAVILLA:  Can you give that to the

5        witness, please.

6    CONT'D DIRECT EXAMINATION

7    BY MR. BIANCAVILLA:

8        Q.   Detective, would you just put that yellow arrow and

9    point to the power cord we're referring to in the photo?

10       A.   (Indicating.)

11             MR. BIANCAVILLA:  I ask if we can just pass

12       that to the jury, because that won't display well on

13       the presenter.

14             THE COURT:  Yes, we can publish it to the

15       jury.

16             MR. BIANCAVILLA:  Thank you.

17    (Whereupon, People's Exhibit 70 was published to the jury.)

18             MR. BIANCAVILLA:  I ask that the witness be

19       shown People's 71 and 72 for identification.

20       Q.   Detective, you're being shown what has been marked

21    as People's 71 and 72 for identification.  Do you recognize

22    those photographs?

23       A.   Yes, I do.

24       Q.   What do you recognize those photographs to be?

25       A.   These are photographs I took on the afternoon of

1   4/20 of the year 2000.

2       Q.   Don't show them to the jury yet.  Do they fairly and

3   accurately depict the cut ends of the wire that you

4   photographed on that particular date?

5       A.   They depict it very well, yes.

6               MR. BIANCAVILLA:  We offer those into evidence,

7       Judge.

8               MR. CHAMBERLAIN:  No objection, Judge.

9               THE COURT:  Mark them in evidence.

10  (Whereupon, People's Exhibits 71 and 72 were marked in

11                          evidence.)

12              THE COURT OFFICER:  People's 71 and 72 received

13      in evidence.

14      Q.   Now, Detective Schiraldi, when as a criminalist

15  you were comparing items or areas that have been cut, are

16  there different ways that cuts occur?

17      A.   Yes, there are several dynamics that happen within

18  fibers, wire, rope, steel, when it is cut or forced to break.

19      Q.   Could you slowly explain to the jury the various

20  dynamics that take place when something is cut?

21      A.   It's all dependent on which type of implement is

22  being used.  If a metal -- corded metal like a strap or like a

23  crane line is corded, if it breaks, the ends tend to ball.

24  The steel stretches physically to the point -- it's called

25  tensile strength -- and it snaps, the ends ball.

1        The forces of a knife blade against a hard

2   substance, you'll see a grating towards where it hits the hard

3   substance.  If something is folded and cut with a knife you'll

4   see a curvature and a slice.  If something is cut or pinched

5   with a wire cutter, the jaws meet at a 90-degree angle or in

6   the same plane, so you'll see an apex or pinch cut is what I

7   call it, because the jaws come together and the little portion

8   of the wire or item that sticks up is left.

9        If it's cut with a lopping type action or shearing

10  type action such as a scissor, it turns to one direction

11  because it lies on the bottom of the scissor and the knife

12  blade comes across the top and tends to fold that over.

13  Q.   Now, Detective, did you bring various items with you

14  to court today to assist you in explaining to the jury these

15  various principles of cutting?

16  A.   Yes, I did.

17             MR. BIANCAVILLA:  I ask that the witness be

18  shown People's 73, 74, 75, 76 and 77 for

19  identification.

20             THE COURT:  Okay.

21             MR. CHAMBERLAIN:  Judge, could I see the

22  exhibits before they're shown to the witness?

23             THE COURT:  Sure.

24             MR. CHAMBERLAIN:  May we approach, your

25  Honor?

1           THE COURT:  Yes.  Could you step down a

2      moment, Detective.

3           (Whereupon, the witness exited the courtroom.)

4      (Whereupon, the following colloquy was held at the bench.)

5           MR. CHAMBERLAIN:  Judge, these are more items

6      that were assembled for preparation for trial, not

7      anything provided previously to the defense, and I feel

8      the introduction of this type of material to this jury

9      might well confuse them.  And I object to the

10     procedures whereby they're offering pictures of tools

11     that aren't in evidence here and the fact that we

12     weren't provided with any prior knowledge.  Now, you

13     have the telephone cord, but this is getting to a

14     fairly material area regarding the cuts.  There are

15     pictures of the tool --

16          THE COURT:  I gather the People are using

17     this as a demonstrative tool in order to show different

18     methodologies of cutting a wire.

19          MR. CHAMBERLAIN:  That's my understanding,

20     Judge.  All I'm saying is I think they could

21     demonstrate it without offering pictures.

22          THE COURT:  How else are they going to do it?

23     Are you actually demonstrating it in court?

24          MR. BIANCAVILLA:  That's what we're going to

25     do.  The only reason I've had those marked is so there

1    is a record of what we used in the courtroom.

2    Detective Schiraldi is going to take those items out of

3    his bag and we were actually going to cut various items

4    in front of this jury and then put them up on the

5    presenter so that the jury can see the different cuts.

6    I'm then going to have Detective Schiraldi open up the

7    evidence, take out the Leatherman cord and actually cut

8    the ligature with the Leatherman tool in front of this

9    jury and then display for the jury the result of that

10   cut with the Leatherman.

11            MR. CHAMBERLAIN:  I'm going to object to that

12   last part, Judge.

13            MR. BIANCAVILLA:  I'll show you Richardson's,

14   Judge.  There is absolutely nothing wrong with doing a

15   demonstration in front of the jury with evidence,

16   because it's very important that the jury understand

17   the various types of cuts that could be produced using

18   various types of tools.

19            THE COURT:  Section 4-

20            MR. CHAMBERLAIN:  Judge, I'm not going to

21   have an objection to the demonstration of the tools.

22            THE COURT:  You don't or you do?

23            MR. CHAMBERLAIN:  I don't.  I'm not objecting

24   to that.  I'm objecting to the tools -- if he wants to

25   show the various types of tools, I have no objection.

```
 1              THE COURT:  Let me ask Mr. Biancavilla, what

 2    is the purposes of the photographs?

 3              MR. BIANCAVILLA:  Because we are not going to

 4    leave the tools.  He's going to use the tools to make

 5    those cuts of those two types of wires.  I'm making a

 6    record of the tools that were used and the wires that

 7    were cut.  In other words, Judge, I'm offering these

 8    the same way I offered a photocopy of the big chart.

 9    We're not leaving the big chart here.  We've got a

10    photocopy of it.  I've made a photocopy of these.

11              THE COURT:  Because we don't want the jury to

12    have these in the jury room.

13              MR. BIANCAVILLA:  Exactly, because we don't

14    want to leave the tools here.

15              MR. CHAMBERLAIN:  I don't think the tools

16    that are used for demonstration should be given to the

17    jury and I'm not certain about the pictures.

18              THE COURT:  We are not going to do that.

19    That's why I said that.

20              MR. BIANCAVILLA:  This is for the appellate

21    record, Judge.

22              THE COURT:  Mr. Biancavilla, this is just for

23    the appellate record so they have a photograph.  I

24    guess it's a photograph.

25              MR. CHAMBERLAIN:  He's not offering them in
```

1      evidence?

2                    MR. BIANCAVILLA:  I have to.

3                    THE COURT:  For the purpose of making an

4      appellate record if there's a conviction.

5                    MR. CHAMBERLAIN:  He can mark them for I.D.

6      for the appellate record, Judge.

7                    MR. BIANCAVILLA:  I don't believe so.  They

8      have to be in evidence, Judge.

9                    MR. CHAMBERLAIN:  I don't think so.

10                   THE COURT:  Do we agree we don't show these

11     photographs to the jury?

12                   MR. BIANCAVILLA:  I don't care.  They don't

13     have to see it.

14                   THE COURT:  Mr. Chamberlain, you have no

15     objection to placing People's 75, 76, 77, 73 and 74

16     into evidence solely for the purpose of an appellate

17     record without showing these to the jury?

18                   MR. CHAMBERLAIN:  Absolutely.

19                   MR. BIANCAVILLA:  That's fine.

20                   THE COURT:  Okay.  With respect to the

21     demonstration do you have any objection, Mr.

22     Chamberlain?

23                   MR. CHAMBERLAIN:  With respect to the

24     demonstration on the actual evidence?

25                   MR. BIANCAVILLA:  Absolutely.  When he gets

1    done demonstrating these wires, when he's done with

2    that demonstration, he's going to use People's Exhibit

3    44 which is the Leatherman tool, this here.  He's going

4    to open up People's Exhibit 43, remove the ligature and

5    actually cut the ligature in front of the jury and

6    display to the jury the cut end on the presenter.

7              MR. CHAMBERLAIN:  I feel this would create a

8    circus atmosphere.

9              THE COURT:  I don't think it's a circus

10   atmosphere.  Let me tell you what the law is, Mr.

11   Chamberlain.  I had an opportunity to research this

12   issue, because I'm looking at what Richardson's says,

13   Section 4-219:  The result of an experiment or test is

14   admissible on trial to show the nature, quality or

15   tendency of an object, provided that the trial judge is

16   satisfied that the conditions under which the

17   experiment or test was conducted were sufficiently

18   similar to those existing at the time in question to

19   make the result achieved by the test relevant to the

20   issue.  If the conditions are similar, the evidence

21   should be admitted.  Any difference in circumstances

22   affect the weight of the evidence but is not a basis

23   for its exclusion.  But if the test conditions are not

24   shown to have been sufficiently similar, the results of

25   the test is inadmissible.

Det. Schiraldi - Direct/Biancavilla                821

1        Now, basically what's going to happen here is

2    the detective is going to be cutting a wire and it's

3    going to show you, I suppose, different angles of how

4    the cutting tool cut a particular wire.

5        MR. CHAMBERLAIN:  I have retained an expert.

6    We've gone over, looked at the wire, looked at the

7    material in preparation for this.  I've got an expert

8    who actually trained this detective, and I had no

9    opportunity of reviewing what type of cuts there were.

10   And I think a cut on a ligature cord itself is really

11   at this point something I can't analyze and I can't

12   properly be prepared for.  And it would create a

13   dramatic effect in front of this jury.

14       MR. BIANCAVILLA:  Judge, if I could add

15   something.  His expert actually went to the Nassau

16   County Police Department laboratory, examined this

17   evidence, examined the Leatherman tool, made cuts with

18   the Leatherman tool on various pieces of wire, and he's

19   not doing anything more today than what Detective

20   Schiraldi is going to do in front of this jury.

21       THE COURT:  That was my concern.  Mr.

22   Chamberlain, your expert had an opportunity to do

23   exactly what the detective is going to be doing in

24   front of this jury.  Is that true, he had that

25   opportunity?  That's what Mr. Biancavilla said.

Det. Schiraldi - Direct/Biancavilla                822

```
 1              MR. CHAMBERLAIN:  The opportunity was part of

 2       an investigative process.

 3              THE COURT:  Yes, but, Mr. Chamberlain, all

 4       he's doing is cutting a wire.  Is that what happened at

 5       the time?

 6              MR. BIANCAVILLA:  Yeah.

 7              THE COURT:  We're talking about cutting.

 8              MR. CHAMBERLAIN:  He did more.

 9              THE COURT:  All this can be done.

10              MR. CHAMBERLAIN:  There was microscopic

11       examination.

12              THE COURT:  And there's testimony as to that.

13              MR. CHAMBERLAIN:  Photographs and so forth.

14       I understand that.  I'm only concerned about the

15       demonstration Detective Schiraldi is going to do in

16       front of this jury.

17              THE COURT:  I'm told your experts had an

18       opportunity to do exactly what Detective Schiraldi is

19       going to demonstrate to us and the jury right here in

20       the court, so based on that --

21              MR. CHAMBERLAIN:  I don't know exactly what

22       he's going to demonstrate.  As far as I can tell --

23              THE COURT:  Mr. Biancavilla told me he's

24       going to cut a wire.

25              MR. BIANCAVILLA:  Exactly.
```

 1            MR. CHAMBERLAIN:  It's not scientific

 2       investigation that was done previously.  In any event,

 3       Judge, as far as these pictures, they will not go to

 4       the jury?

 5            THE COURT:  That's absolutely correct.

 6            MR. CHAMBERLAIN:  Okay.

 7            THE COURT:  With respect to the

 8       demonstration.

 9            MR. CHAMBERLAIN:  I would still, for the

10       record, continue my objection.  I don't think it's

11       appropriate, but I've heard your Honor's ruling.

12            THE COURT:  As long as the proper foundation

13       is laid by the detective that it's a similar situation,

14       similar to the one existing at the time I will permit

15       it to be done in the courtroom.

16       (Whereupon, the proceedings continued in open court.)

17       (Whereupon, People's Exhibit 73 though 77 were marked in

18                          evidence.)

19            THE COURT OFFICER:  People's 73 through 77

20       received in evidence.

21            MR. BIANCAVILLA:  Thank you.  Judge could we

22       ask permission to have the witness step in front of the

23       jury with the various tools that he has so he could

24       stand and work off the board?

25            THE COURT:  Yes.

1      Q.    Now, Detective, could you please display to the

2    jury what you've brought with you today to demonstrate the

3    various types of cuts that can be produced?

4      A.    Single pocket knife.

5      Q.    That would be People's 74.

6      A.    Pair of small wire cutters.

7      Q.    That would be People's 75.

8      A.    Pair of large lineman dikes, pair of wire cutters

9    also.

10     Q.    People's 73.

11     A.    Section of Romex.  This is what you have in your

12   house, electrical wire that goes to your house.

13          MR. CHAMBERLAIN:  Detective, would you repeat

14     that?

15     A.    Romex, regular household -- this is the wire that

16   is in your wall, goes to the receptacles.  And a small piece

17   of multistrand, multifilament wire.

18     Q.    People's 76.

19     A.    And a small piece of multifilament wire.

20     Q.    People's 77.  The only thing I'll ask you,

21   Detective, is to speak up.  Would you please explain to the

22   jury the type of cut that is produced with a knife?

23     A.    With a knife there are two types of dynamics that go

24   along with the knife.  Again, you have a hard rigid substance;

25   you lay a cylindrical tube over it; and this is the wire and

1    you cut down with the force this way.  What will happen will

2    be, if it's a slight angle on a copper wire you'll see

3    something of this nature (indicating.)  What you're doing here

4    is you're plowing the soft copper wire down at an angle and

5    it's being deposited in a small type of ridge right there.

6    That's just the wire itself.

7         Q.    Could you please demonstrate a cut on the Romex

8    cable, on the Romex wire, with a knife and explain it on the

9    presenter?

10        A.    I'll cut it on this (indicating.)

11               MR. BIANCAVILLA:  Judge, can we have the lights

12        shut off, please?

13               THE COURT:  Yes.

14        A.    The direction you see is depicted here.  See that

15   filing down there, that small ridge?  The force was applied

16   this way.  The soft copper wire was lying; I pushed it all

17   down.  It lies upon the hard substrate of the surface and then

18   it broke.  We're clear on that?  Do you understand what I'm

19   saying?

20              The other dynamics, I can't do it with this one.

21   I'll draw it and I'll show you with this one.  It won't be as

22   pronounced, but a small or thinner wire that you're going to

23   cut with a knife, in most occasions you'll have to cut it like

24   this, put the knife blade in and pull out.  So in this type of

25   scenario you'll have a wire come up like this and you'll see

1    that force come through it.  Now, this is a -- I'll try it

2    again but I've been trying with this particular wire to cut it

3    with this dull knife.  Now, you see that hooking effect and

4    that push, that force?  So you'll see the cylinder, if you

5    will, slightly turned where I have to move it to put my knife

6    in it.  The force goes out.  Again, you see that same dynamic

7    that you're seeing here but you're seeing this angulation or

8    this hooking curvature when I go through it.

9         With a pair of wire cutting tools or dikes, what

10   you're going to see is the cylinder will be here; this is the

11   wire, if you will; the jaws will come in.  They're slightly

12   curved like this.  They'll come in; they'll squeeze the wire

13   until -- they'll squeeze the wire until you see something like

14   this (indicating.)  That's the two jaws are coming in with

15   enough tensile strength where the wire breaks, the apex or

16   zenith type cut, the highest point on the plane.  You see

17   that?  It comes from one side, the other side, either end pops

18   up.

19        The other is a shearing type effect.  May I use the

20   Leatherman tool?

21        Q.   Yes.

22             MR. BIANCAVILLA:  Judge, let the record

23        reflect, please, that People's Exhibit number 44 is

24        being opened in front of jury and the Leatherman tool

25        is being removed by Detective Schiraldi.

1          THE COURT:  The record should reflect that.

2      A.   Leatherman type tool.  There's two jaws in here

3  like a scissor.  They're very small.  They're shearing

4  together such as a scissor.  Can you all see that?  The

5  shearing goes in there like a scissor.

6      Q.   Could you describe for the jury the wear on that

7  tool?

8      A.   The jaws on this tool have been used to the point to

9  where they should be flat like scissor type jaws like this,

10  they wear over the years from multiple cutting.  These sharp

11  edges were planed together and milled together so they sliced

12  as a shear.  There are small indentations and scratches from

13  the hardness of the wire they once were cutting or whatever

14  they cut, whatever they tried to cut.  They're scored and

15  used.  These are physical impressions.  These are unique

16  individual characteristics to this tool.

17          A plane blade is a class characteristic.  Every tool

18  manufactured by Leatherman, this tool, has a flat blade that's

19  a class characteristic, as scissors or lopping shears that you

20  use on hedges or what not.  Class characteristics; small

21  individualizing characteristics.  What we have here is we have

22  a blade, and as you can see it's milled in such a fashion that

23  it's given strength on this side, and this is your sharpened

24  edge and just the opposite on the bottom.

25      Q.   Detective, I'm going to ask you to speak slower

1    please so the reporter can get it all down.

2         A.    On the inside of the Leatherman tool you have the

3    same type of configuration, sharpened edge, sharpened edge,

4    and they squeeze together as a scissor, a scissor or shear

5    together.  These meet causing the cut.  What you'll see in

6    most cases like this, when the monofilament wire, that thick

7    wire, is cut, you'll see something like this.  It's almost

8    very similar to that force that you saw with the knife but

9    you'll see it a little bit more sharper and this will be less

10   pronounced shearing.  And in some cases this will turn, this

11   last little bit will turn and flatten as it's going through

12   the shear, scissoring action.  Depending on how sloppy the

13   tool is, it will cause the monofilament to bend and twist and

14   leave a heavier deposit on this.

15        Q.    When you say sloppy, what does that mean?

16        A.    Sloppy being the wear on the width.  You've got a

17   scissor.  It's got this little screw there.  And you cut the

18   paper and the paper bends.  You've got to get your screw

19   driver out and tighten that up.  When you go the next time it

20   slices tightly.  The scissor is getting worn.  Wear and tear,

21   it's causing these jaws to open up.

22              MR. CHAMBERLAIN:  Judge, I have a strenuous

23        objection to all of this.  We were told --

24              MR. BIANCAVILLA:  Judge, I'm going to object

25        to any comments while this witness is testifying.

Det. Schiraldi - Direct/Biancavilla                829

```
 1              THE COURT:  Let's do it at the bench, please.
 2     (Whereupon, the following colloquy was held at the bench.)
 3              THE COURT:  Yes, Mr. Chamberlain.
 4              MR. CHAMBERLAIN:  This contradicts what we
 5        were told.  First of all we were told that we were
 6        going to have a demonstration of other tools that were
 7        put in, common tools that were not part of this case.
 8        We were given Rosario material and discovery material
 9        that indicates his findings and the basis for his
10        findings with respect to this cord, with respect to the
11        tool.  We have FBI reports with respect to the tool,
12        all of which is contradicted by what he's testifying
13        to.  This is completely misleading and it's on a
14        crucial point of evidence.  We have evidence that his
15        initial report of the examination of the cut wire was a
16        one direction force, a knife force.  That's what we're
17        getting here.
18              THE COURT:  If you have that evidence you can
19        certainly cross-examine him on it.
20              MR. CHAMBERLAIN:  This is completely
21        misleading.  I will cross-examine him on it.
22              THE COURT:  Of course.
23              MR. CHAMBERLAIN:  Why is he being allowed to
24        put in all this business about this being unique and
25        there's absolutely nothing on that?
```

1          MR. BIANCAVILLA:  Judge, he can cross-examine

2     him on it.

3          MR. CHAMBERLAIN:  What we have contradicts

4     that.  We have the FBI report that says there's no way

5     they can tell this is the same tool.  There's nothing

6     in it.  They can't distinguish it.

7          THE COURT:  I believe you.

8          MR. BIANCAVILLA:  Nobody is going to say this

9     is the same tool.  I don't know what he's talking

10     about.  He's not going to say anything contradictory to

11     what's in his report.

12          MR. CHAMBERLAIN:  He's already said it.

13          MR. BIANCAVILLA:  So he'll cross-examine him

14     on it.

15          MR. CHAMBERLAIN:  I will.

16          MR. BIANCAVILLA:  Judge, can we give the jury

17     a break?  They've been here over an hour already.

18          THE COURT:  Ladies and gentlemen, at this

19     time we're taking a short break.  Again, do not discuss

20     this case among yourselves or with anyone else.  Keep

21     an open mind.  Don't form or express any opinions until

22     the entire case has been completed.  Do not read or

23     listen to any account of this case that is reported in

24     the media.  Don't visit or view any premises that have

25     been mentioned.  You are not to permit any party to

1      discuss this case with you.  If anyone attempts to do

2      so, you must promptly report to the Court any violation

3      thereof.  Please follow the court officer.

4            (Whereupon, the jury exited the courtroom.)

5            (Whereupon, the witness exited the courtroom.)

6            THE COURT:  Counsel, we'll take a very short

7      break, then I'll hear arguments with respect to your

8      objection, Mr. Chamberlain.

9                  (Brief recess.)

10           THE COURT:  Let the record reflect that the

11     jury is not present but all counsel and defendant are

12     present.  Mr. Chamberlain.

13           MR. CHAMBERLAIN:  Yes, Judge.  We had started

14     this on the record at the bench and just to follow up

15     on that, the FBI report concludes that, first of all,

16     that the Q1 exhibit, that was the Leatherman tool that

17     they were examining, shearing type -- I'm sorry.  Q1 is

18     the cord.  Q1 exhibits shearing type tool marks like

19     those produced by the -- like those produced on the

20     multitool.  However, it could not be determined whether

21     or not these were produced by the one multitool to the

22     exclusion of all other shearing type tools.  The

23     preliminary examination of the tool by this expert was

24     different from theirs with respect to the type of cuts

25     but there's nowhere in any material we've been provided

1    by way of discovery or even Rosario that indicates that

2    there's anything unique about this tool reflecting a

3    unique cut, which is what he's trying to show here.

4                MR. BIANCAVILLA:  No, he's not, Judge.  He's

5    not trying to show that at all.  He hasn't even got it.

6                MR. CHAMBERLAIN:  First of all, Mr.

7    Biancavilla, I'd appreciate it if you wouldn't

8    interrupt me.

9                MR. BIANCAVILLA:  Mr. Chamberlain, you're

10   wasting time.

11               THE COURT:  Counsel, I don't -- please, no

12   argument, no arguments.  I want to hear legal argument,

13   not arguments.

14               MR. CHAMBERLAIN:  That's fine with me, Judge.

15               THE COURT:  Now, what is the nature of your

16   objection?  What actually are you objecting to, Mr.

17   Chamberlain, so I can get at that?

18               MR. CHAMBERLAIN:  What he's doing here in

19   talking about the type of cuts and uniqueness of this

20   thing is confusing and misleading this jury.

21               THE COURT:  You're talking about the

22   demonstration?

23               MR. CHAMBERLAIN:  I'm talking about the

24   demonstration.

25               THE COURT:  Just so the record is clear, the

1    different tools that the detective brought with him,

2    the knife and he called it the dike, and there were

3    different tools that made different types of cuts, is

4    that what you're referring to?

5              MR. CHAMBERLAIN:  No, Judge.

6              THE COURT:  You have no objection to that

7    then?

8              MR. CHAMBERLAIN:  As I indicated before --

9              THE COURT:  I'm a little confused about what

10   your objection is.

11             MR. CHAMBERLAIN:  I'm trying to explain that,

12   Judge.  I had no objection to that.  I thought what was

13   going to be done was a demonstration of the different

14   types of cuts.  He's --

15             THE COURT:  That's what he's been doing up

16   until now.

17             MR. CHAMBERLAIN:  I disagree, Judge.  When he

18   takes the Leatherman tool and he starts talking about

19   the uniqueness of the blades and three or four times

20   Mr. Biancavilla has brought out how sloppy it is and

21   this and that, referring to cuts, that's not talking

22   about different types of cuts of different tools in

23   general, which is what I thought.  There's no

24   similarity between this procedure and what they do in

25   the laboratory or what was done here.  There's been no

1    showing of that.

2              I have no objection -- I don't care if they

3    don't show it's the same type of blade, the same type,

4    the same force, the same dullness or not.  All of those

5    would affect this.  If they're just demonstrating a one

6    dimensional cut versus a shearing type cut, a pincer

7    type cut, I have no objection to demonstrating for the

8    purposes of explaining to the jury those different

9    types of cuts.  When you get into the particular

10   evidence which we have been studying which I have had

11   an expert on and he starts misleading the jury about

12   this thing has certain unique characteristics and he's

13   going to show the cut, we have nothing in the record

14   with regard to that.  What we have in the record

15   contradicts that.

16             THE COURT:  Then you certainly have fertile

17   cross-examination material, Mr. Chamberlain.

18             MR. CHAMBERLAIN:  I understand that.  There's

19   so much material that goes into this case, Judge, and

20   at the end of the day, at the end of two weeks, this

21   jury is going to be completely confused and I don't

22   know what they're going to remember.

23             THE COURT:  Mr. Chamberlain, if you're

24   telling me that the detective is testifying in

25   contravention as to the reports that were received by

1    you as part of your discovery and Rosario, then you

2    certainly have cross-examine materials that you can

3    amply cover in your cross-examination of Detective

4    Schiraldi.

5              MR. CHAMBERLAIN:  I'm not only saying that.

6    I don't think this detective should be allowed to get

7    up and talk about things --

8              THE COURT:  He's been qualified as an expert.

9              MR. CHAMBERLAIN:  I understand, Judge, but

10   he's talking about the particular evidence.  It's not

11   expertise here.  He's talking about --

12             THE COURT:  He's talking about cutting tools.

13   He's an expert in SIB.

14             MR. CHAMBERLAIN:  I have no problem with his

15   talking about cutting tools.  I have a problem with his

16   talking about this particular cutting tool in the

17   manner in which he's doing it, which we have not gotten

18   any prior notice of, which in my opinion is confusing

19   to the jury and should not be allowed.

20             THE COURT:  Mr. Biancavilla --

21             MR. CHAMBERLAIN:  I think it's important

22   because this case is dependent upon -- there's no other

23   evidence of my defendant even being at the scene unless

24   there's some question about a beer bottle, but I didn't

25   think that's going to show it.  So this is a very

1    crucial piece of evidence, and to allow misleading

2    evidence to the jury on this --

3              THE COURT:  If you think something is

4    misleading, at that point I would expect you to stand

5    up and object and I'll make a ruling on that

6    immediately.

7              MR. CHAMBERLAIN:  I did, Judge.

8              THE COURT:  At this point you made a

9    ruling -- excuse me, made an objection and now we're

10   having argument.

11             MR. CHAMBERLAIN:  I would say some of the

12   other prior testimony was misleading but on the other

13   tools it didn't really matter that much.

14             THE COURT:  Correct me if I'm wrong, but

15   apparently you had no objection to this demonstration.

16   Am I incorrect now?

17             MR. CHAMBERLAIN:  You're incorrect, yes,

18   Judge.

19             THE COURT:  Tell me at what point I'm

20   incorrect.

21             MR. CHAMBERLAIN:  As to the tool involved I

22   object.

23             THE COURT:  Just so the record is clear, you

24   had no objection when he was making the cuts with the

25   other tools.

1          MR. CHAMBERLAIN:  That's right.

2          THE COURT:  Now he's making the cut with the

3     Leatherman tool.

4          MR. CHAMBERLAIN:  Yes, Judge, but he's not

5     just making a cut with it.  He's demonstrating; he's

6     talking about it.  He's talking about certain

7     characteristics of it, none of which is in the

8     material.  And it implies to the jury that this cut --

9     what he's trying to say is that this particular cut on

10    this particular cord was made by this particular tool.

11    That's the uniqueness that he's trying to get to.  It's

12    sloppy.  They're going to try to show that this cut,

13    the implication was this cut was made by this tool.

14         THE COURT:  That is what the People's witness

15    is testifying to.

16         MR. CHAMBERLAIN:  But that is not what his

17    report says, Judge.

18         THE COURT:  You keep repeating that, Mr.

19    Chamberlain.  You have ample opportunity for

20    cross-examination.  I would think that would be your

21    first area you're going to cover in cross.  Mr.

22    Biancavilla.

23         MR. BIANCAVILLA:  Judge, just so the record

24    is clear with respect to the evidence that we're

25    talking about here and Mr. Chamberlain's opportunity to

1      view all the evidence, first of all, Mr. Chamberlain

2      was given the opportunity to view the ligature.  He was

3      given an opportunity to view the Leatherman tool.  He

4      hired an expert, Nicholas Patrico [phonetic], whom

5      Detective Schiraldi knows him very well, to examine the

6      ligature, to examine the Leatherman tool.  Nicholas

7      Patrico was permitted in the Nassau County Police

8      Department laboratory to perform various tests with the

9      Leatherman tool and also examine the ligature.  I might

10     add I've never even received a report from Nicholas

11     Patrico with respect to the examination and

12     observations that he made regarding the cuts and the

13     tools and the condition of the tools.  And I can tell

14     you Detective Schiraldi has advised me that Mr. Patrico

15     made several cuts with the Leatherman tool on several

16     different types of surfaces.  So he was given a full

17     and fair opportunity to test the Leatherman tool, test

18     the wire, make any cuts he wanted.

19              In addition, your Honor required me the day

20     before to also provide Mr. Chamberlain with a list of

21     witnesses who were going to testify.  Mr. Chamberlain

22     knew that Detective Schiraldi was going to testify

23     first thing in the morning.  He had every opportunity

24     if he was concerned about Detective Schiraldi's

25     testimony to have Mr. Patrico here to observe the

Case 2:11-cv-04171-AMD Document 6-25 Filed 01/17/12 Page 49 of 99 PageID #: 1526

```
 1          testimony, and the People never object when one expert

 2          wants to listen to the testimony of another expert.

 3                   Furthermore, we are under no obligation to

 4          give defendants a notice of any demonstration that the

 5          police are going to do, that the People are going to do

 6          during a trial.  We are well within the parameters of

 7          what Richardson's has set forth on demonstrations in

 8          the court.  If Mr. Chamberlain believes that Detective

 9          Schiraldi is testifying to anything contrary to his

10          report that has been generated, then Mr. Chamberlain

11          can cross-examine him on those particular issues, and

12          the People are submitting to this Court that this is

13          just more delay being caused by Mr. Chamberlain.

14                   He's been provided with full discovery, was

15          given an ample opportunity to have his expert here, and

16          the People would request that we be permitted to

17          continue with the testimony of Detective Schiraldi at

18          this time.

19                   MR. CHAMBERLAIN:  There's a lot in that thing

20          that has absolutely nothing to do with what this

21          witness has just testified to.  I repeat, Judge, the

22          prior examination we had was based upon the

23          examinations we were given, the discovery material we

24          were given.  We were given discovery material that

25          indicated that this cut was made a certain way.  We
```

1    were given material that indicated what the FBI found.

2    We were given pictures of it.  We did make some tests,

3    but none of this indicates there was anything unique

4    about this tool in relation to this wire and that there

5    was any way you could distinguish this cut from any

6    other shearing type tool.

7                THE COURT:  That, Mr. Chamberlain --

8                MR. CHAMBERLAIN:  The implication given to

9    the jury now is just to the contrary.

10                THE COURT:  Mr. Chamberlain, that is

11    something you're going to cover on cross-examination, I

12    presume.

13                MR. CHAMBERLAIN:  Yes, Judge, I am.

14                THE COURT:  So any differences, as I said

15    before, with respect to his testimony today versus what

16    you were provided in Rosario material and discovery is

17    certainly fertile area and you're going to certainly, I

18    presume, go into it in cross-examination.  Therefore,

19    at this point I see no reason to sustain your

20    objection, which I'm not exactly sure of other than you

21    don't want him to talk about the tool itself.

22                Now, as I explained at the bench,

23    experimentations and demonstrations are permitted, and

24    I said if the conditions are similar, the evidence

25    should be submitted.  Any differences in circumstances

1     affect only the weight of the evidence and is not a

2     basis for exclusion, and I'm reading from Richardson's

3     on evidence, Section 4-219.  Now, you're going to have

4     an ample opportunity to cross-examine, and as I

5     understand, you have an expert.  He certainly could

6     have been here if he wanted to listen to the testimony.

7     That was up to you.  Now, at this point --

8               MR. CHAMBERLAIN:  Unfortunately --

9               THE COURT:  I'm sorry?

10              MR. CHAMBERLAIN:  Unfortunately, it turns out

11    his son is graduating from college and he couldn't be

12    here in any event.  I would have liked to have him

13    here.  I did not know that the People would not object.

14              THE COURT:  You certainly could have talked

15    to Mr. Biancavilla, and if there were any problems you

16    could have made an application to me.  You should have

17    asked him three or four days ago if he had any

18    objection, and if he did, you could have made your

19    application to me at that time.

20              MR. CHAMBERLAIN:  I don't think he would have

21    rescheduled his expert to suit my expert's time.  He

22    had to be out of state, from what he told me.

23              THE COURT:  I understand that.  At this time

24    I'm going to overrule your objection and let's proceed.

25    Ready for the jury.

```
 1              THE COURT OFFICER:  Jury entering.

 2              THE COURT:  Ask Detective Schiraldi to come

 3      back in.

 4          (Whereupon, the witness resumed the stand.)

 5      (Whereupon, the jury was properly seated in the courtroom.)

 6              THE CLERK:  Both sides stipulate that all

 7      jurors are present and seated properly?

 8              MR. BIANCAVILLA:  Yes.  May I continue,

 9      Judge?

10              THE COURT:  Mr. Chamberlain?

11              MR. CHAMBERLAIN:  Yes.

12              THE COURT:  Yes, you may.

13  CONT'D DIRECT EXAMINATION

14  BY MR. BIANCAVILLA:

15      Q.   Detective, if you could step up in front of the jury

16  again, please.  Detective, before we continue with the manner

17  in which the Leatherman tool cuts, is the Leatherman tool that

18  you received, was it -- did it come with a pouch?

19      A.   Yes.

20      Q.   Could you display for the jury the manner in which

21  that Leatherman tool was stored so they understand?

22      A.    There's a belt loop here so you can wear it on your

23  belt.

24      Q.   Now, before we broke we were talking about -- you

25  were talking about the sloppiness of that tool.  Could you
```

```
 1   please get into that again and talk about the condition of

 2   that tool?

 3        A.   Again, when I say sloppy I mean in a way of usage.

 4   As I depicted with a pair of scissors, if they come apart a

 5   bit, they don't cut very well.  You have to tighten that up so

 6   that this blade coincides with this blade and goes against the

 7   blade so it cuts the paper.  In this tool or implement there's

 8   a little bit of play in there so those jaws don't meet

 9   actually at an exact plane.  There's a little bit of wear and

10   tear in there.

11        Q.   You also testified that there are individual

12   characteristics on that Leatherman tool?

13        A.   Yes, as I depicted, there are these small

14   individualizing characteristics that are present on this

15   implement or the jaws of this implement from usage.  On a

16   thick monofilament wire such as this, those individualizing

17   characteristics can be very critical for the simple reason if

18   there is a hesitation cut where those slight -- just before I

19   do the actual cutting I pressed lightly and then I moved to

20   cut the wire, you would see those hesitation cuts.  And they

21   would be good unique individualizing characteristics on which

22   to base a comparison to individualizing this tool on cutting

23   something, individualizing.  Going back to class

24   characteristics, flat, well-machined or milled jaws.  These

25   individualizing characteristics are not as apparent or
```

1    noticeable on a multistrand filament type of wire such as

2    this.

3        Q.   Why is that, Detective?

4        A.   The small copper filament, you won't see those

5    hesitation cuts.  In most cases small monofilament wire has

6    insulation wrapped around it, so you won't see that hesitation

7    type cut.

8             Now, we just depicted what the --

9        Q.   The wire cutter, have you made the cut with the wire

10   cutter?

11       A.   I made the cut.  Now I'm going to cut this

12   monofilament copper wire with the Leatherman tool.  You'll see

13   this very square cut pushing, because of the play.  You will

14   see a little tail end coming up.  If it was a pure shearing

15   flat cut with no play, there would probably be just

16   directional force cross the plane.  You might see a small

17   deposit.  With this play you might see more of a deposit.

18            MR. CHAMBERLAIN:  Objection to probably and

19        might be and all that.

20            THE COURT:  Sustained.  The jury should

21        disregard that.

22       A.   I'm going to cut the monofilament wire.  You see a

23   flat cut, a flat cut with that small tail because of the play

24   inherent in that used tool.  Are we clear on that?  Do you

25   understand what I'm talking about?  Flat with a small tail.

Case 2:11-cv-04171-AMD   Document 6-25   Filed 01/17/12   Page 55 of 99 PageID #: 1532

1    Now, if I could use the cord, which I have never cut before.

2                    MR. BIANCAVILLA:  Judge, we're going to open up

3        People's 43 in evidence.

4                    THE COURT:  Okay.  Mr. Biancavilla, what

5        exhibit is that?

6                    MR. BIANCAVILLA:  I'm displaying Exhibit

7        number 71.

8                    MR. CHAMBERLAIN:  Judge, for the record,

9        Judge, I would object to this on the basis of what I've

10       already indicated, also on the basis that this would be

11       confusing to the jury.

12                    MR. BIANCAVILLA:  Judge, I'm going to object

13       to this being on the record.

14                    MR. CHAMBERLAIN:  I'd like to voir dire on

15       what he's about to do.

16                    THE COURT:  This is not a voir dire

17       situation.  This is already in evidence.

18                    MR. CHAMBERLAIN:  He's about to do a

19       demonstration, Judge.

20                    THE COURT:  Yes, he is.  If there's something

21       you want to say, say it outside the hearing of the

22       jury.  Come forward.

23       (Whereupon, the following colloquy was held at the bench.)

24                    THE COURT:  Yes, Mr. Chamberlain.

25                    MR. CHAMBERLAIN:  Based upon our discussion,

1    Judge, it's my understanding that your Honor is

2    inclined to let this demonstration in, if it was done

3    under circumstances --

4              THE COURT:  Similar, similar circumstances.

5    I read to you what the law is.

6              MR. CHAMBERLAIN:  I want to voir dire this

7    witness as to whether this is in any way similar to the

8    microscopic examination of the Leatherman tool and the

9    photographing microscopically.

10             THE COURT:  I think we're talking about

11   apples and oranges, Mr. Chamberlain.  I'm not sure what

12   you're talking about.  All we're talking about now is

13   the actual cutting of the wire by the Leatherman tool

14   and if it's -- I will, if you want, I will ask the

15   detective outside the hearing of the jury as to whether

16   when he cuts the wire here today is it similar to what

17   would have been cut back on April 12, 2000.

18             MR. BIANCAVILLA:  Judge, I'm going to object

19   to that.  He can do this on cross-examination.  And

20   unless we wrap that cord around somebody's neck and

21   strangle them to death with the wire, Judge, that's the

22   only thing that is dissimilar.  I think any further

23   delay in this is being obstructionist.  He's delaying

24   this detective's testimony and every time he interrupts

25   I'm going to start from the beginning.  This is meant

1    to flow naturally.  Every time we get to this same

2    part, Judge, he objects.  He did it the last time.  Now

3    he's doing it again.

4              MR. CHAMBERLAIN:  I object to those remarks,

5    Judge.  I will say this:  He is now putting up the

6    picture of a wire.

7              THE COURT:  Yes, it's in evidence.

8              MR. CHAMBERLAIN:  I understand that.  It was

9    microscopically examined, blown up for that purpose,

10   and then examined, and they did scientific

11   investigation tests and they issued reports on that.

12   He is now going to presumably put up a picture of a new

13   cut, let the jury try to make this comparison --

14             MR. BIANCAVILLA:  Absolutely.

15             MR. CHAMBERLAIN:   -- here in court, which is

16   completely improper.

17             MR. BIANCAVILLA:  It's not.

18             MR. CHAMBERLAIN:  At least you are -- if it

19   was done under similar conditions.

20             THE COURT:  He can testify as an expert as to

21   a similarity.  The jury can't do that.  I won't permit

22   that without the expert testimony.  I don't know what

23   Mr. Biancavilla is going to ask.

24             MR. BIANCAVILLA:  The jury can either accept

25   or reject his opinion.

1            THE COURT:  That's right.

2            MR. BIANCAVILLA:  It's up to them.

3            THE COURT:  Without the expert opinion, I

4    would strike it.  However, if he's going to testify, I

5    presume -- can I have an offer of proof?

6            MR. BIANCAVILLA:  He's going to testify that

7    this particular cut was made with a shearing type tool.

8    And I'm going to say, With a reasonable degree of

9    scientific certainty?  No, I can't.

10           MR. CHAMBERLAIN:  With a shearing type tool

11   is consistent.  That is not what he's going in to.

12           MR. BIANCAVILLA:  That's exactly what I'm

13   going in to, Mr. Chamberlain.  You're wasting time and

14   you're being an obstructionist.

15           MR. CHAMBERLAIN:  I'm not an obstructionist.

16   That is not what he's going to be testifying to.  It's

17   not a shearing type tool.  That's what the report says,

18   but that's not what he's testifying to.

19           THE COURT:  I'm not interested in what the

20   report says.  I'm interested in the testimony from the

21   witness's mouth.

22           MR. CHAMBERLAIN:  The demonstration he's

23   doing is not under similar conditions.

24           MR. BIANCAVILLA:  Similar conditions as to

25   what?

1          MR. CHAMBERLAIN:  It would be perjury if you

2      ask him.

3          MR. BIANCAVILLA:  Similar conditions as to

4      what, as to the night of the strangulation?

5          THE COURT:  No, that he cannot do.

6          MR. BIANCAVILLA:  He never cut that cord

7      before.  The photographs that were up there are the

8      photographs as the cord existed when he examined it.

9      He has never cut that cord before, so there is no

10     similar condition to compare it to.

11         THE COURT:  Is he going to make a comparison?

12         MR. BIANCAVILLA:  He's going to put the cut

13     end up there that he did in the courtroom and compare

14     it to the photograph that he took of the cut end when

15     he examined the cord.  And there's nothing improper

16     about that.

17         THE COURT:  I don't see there's anything

18     improper about that either.  I agree with you, Mr.

19     Biancavilla.  I'm going to permit the test.  You have

20     made your record, Mr. Chamberlain.  I've heard your

21     objection.  I'm going to overrule your objection.

22     (Whereupon, the proceedings continued in open court.)

23     Q.   Please explain to the jury what they're viewing on

24  the monitor.

25     A.   This is, as you saw in that other photograph of the

1    Phonemate, the transformer end of that wire cord that was in

2    that picture, taken in that picture.  We have the power plug

3    end that's plugged in the phone unit or answering type

4    machine, this portion here.  This was the ligature as cut from

5    the deceased at the time of autopsy.  The medical examiner

6    banded that together.  These are not pertinent to our

7    conversation at this time.  This is the power cord.  This is

8    the power unit that plugs in the phone.  This is where the

9    transformer section, the large piece like this, that is

10   plugged into the wall once was adhered to.  That was cut from

11   this wire.

12          From my scientific examination of this, my feeling

13   is it was a lopping type shear from dynamics that this

14   displayed on what I explained to you before.

15       Q.    Detective, that end of the wire that you're holding

16   in your hand, the photograph that is depicted on the screen,

17   is that photograph what you photographed at that end of the

18   wire?

19       A.    This photograph, I took these pictures on the

20   afternoon of April 20, the year 2000, of this end.  Since then

21   it has been repackaged, examined by outside experts and

22   repackaged in this bag.

23       Q.    Did you use some type of microscopic device to

24   photograph that end of the wire?

25       A.    This is a stereo light microscope.  As I said

1   before, this is a magnifying glass -- it allows you to see 3D,

2   good depth perception -- with a photographic unit on it, 35

3   millimeter film.  Now, see, the picture themselves, I have a

4   millimeter scale.  All good forensic photography is done with

5   a scale.  You assume it is one to one.  You can juxtaposition

6   the ruler to the actual item that you are photographing so you

7   know the scale is there.  If I held up a millimeter ruler and

8   you blew up it, I could tell you the exact dimensions.  That

9   one is about four millimeters.  Every forensic photo should

10  have a scale.

11             THE COURT:  Detective, what exhibit are you

12      showing the jury?

13             THE WITNESS:  Exhibit 71, People's Exhibit

14      71.

15      Q.   Can you just briefly describe for the jury what

16  type of wire they're viewing on the TV and the type of wire

17  you're holding in your hand?

18      A.   This is a dual wire.  It has a polarized side.

19  That's the white and the black.  It's a polarized wire,

20  showing the conductivity, how the electricity flows through

21  the wire.  This is a power type wire.  Then I took that off

22  the computer.  I know from looking at this wire it is similar

23  to that Phonemate phone that we had in that picture.  This is

24  that type of wire used with those type of transformers.

25  Again, the transformer is not present.  I don't know where the

1    transformer is.  I never saw the transformer.  But I did

2    document exactly what I saw on this end, pertinent end,

3    because that was cut by the medical examiner, and I

4    photographed it at that time.

5        Q.    Now, that wire has multiple braids?

6        A.    Well, there are two -- there's multiple filaments

7    inside each of the lobes of this wire.  As you can see here

8    there's multiple filaments inside each of the lobes, polarized

9    lobes, one black, one white, multiple filaments of wire in

10   multiple lobes, two lobes.

11       Q.    Now, is multiple filament wire conducive to

12   observing individual characteristics of a particular type of

13   tool?

14       A.    In this case, no.  Most cases not.  Because single

15   filaments -- they give way between one another and push among

16   themselves, those thin or that type of jaw wear is not

17   really -- does not really leave an impression on multifilament

18   wire.  On single filament, that monofilament large wire, it

19   leaves an impression if there's hesitation.

20       Q.    Okay.

21       A.    So what this picture depicts is, again, that

22   shearing force, that angulation that I depicted in my sketches

23   and what I did an example of on those other items.  You see

24   there's one blade laying here.  The shearing effects pushed

25   the rest of the filaments over to one side.  It's hard to

1   visualize it.  Could I pass this amongst the jury?

2                    THE COURT:  You want to publish that

3        photograph, Mr. Biancavilla?

4                    MR. BIANCAVILLA:  That would be photograph

5        number 72.  Could he just display this to the jury?

6                    THE COURT:  If you like.  While we publish it

7        you can't testify, Detective.

8                    THE WITNESS:  I'm just going to hold it up.

9                    THE COURT:  You're going to hold it up instead.

10                   THE WITNESS:  I'm going to hold it up so they

11       can all see.

12       A.    There is a little bit of flattening on some of the

13       filaments.  They're round filaments but several of them on

14       different lobes are flattened.  Can you see that?  On this top

15       one they're very, very prominent.  Round copper wire flattened

16       slightly on the top, multifilament.  We understand that?

17                   Again, now, I will remove a section of this wire.

18       The rest is no longer needed.  I will cut it first with a pair

19       of lineman dikes.  There's that apex type cut.  You see a

20       small raised ridge in the middle of that, the meeting jaws at

21       a 90-degree angle or 180-degree angle.  Squeeze the wire,

22       small apex type cut.

23                   Same piece of wire, I'm going to loop it with a

24       knife blade, the dynamics of me putting a loop in it with the

25       force of the knife.  You see that, the looping of the wire

1    with a slice through it?  Okay?

2                 THE WITNESS:  I'm going to mark your court up

3         again, Judge.

4         A.    One directional force against a very hard

5    substrate such as the wood, very flat.  There's no hesitation

6    here because it's just a soft multifilament wire, much softer

7    than the single filament wire.  No apex, no curvature.

8                 And last, the Leatherman tool.  Place it in the

9    jaws, and I have to pull because it's not cutting.  We have

10   that curvature.  We have slight flattening of the multi copper

11   filaments similar to what is depicted here.  You'll see

12   another dynamic that is prevalent in this cut and in this

13   photograph opposed to the other cuts that I made with the wire

14   cutter and the knife:  There's that force not only when you're

15   squeezing and cutting wire, but I have to wiggle the wire out.

16   Hence, with the other cuts with the knife and the wire cutter

17   it was very flat.  You saw mostly insulation and very little

18   bit of the apex when I cut with the wire cutter and almost

19   none when I cut it with the knife.  The dynamic of me having

20   to pull pulled the insulation back, extruded the copper wire

21   forward.

22                 Again, this knife is capable of making the cut

23   depicted.  This Leatherman is capable of making the cut that

24   was depicted in the original way that I found the cord.

25        Q.    You can be seated, Detective, and bring your tools

1   back up there with you.  You know, leave them there for now.

2           Now, Detective, just so it's clear to the jury, this

3   Leatherman tool that you just demonstrated to them, is that

4   the only type of tool that could have made that shearing type

5   cut on that particular wire?

6           A.   The only type tool?  Shearing type effect tool.

7           Q.   Shearing type tool?

8           A.   Not individually that tool.

9           Q.   You can't tell this jury that particular tool made

10  that particular cut?

11          A.   Not to the exclusion of all others similar to it.

12          Q.   So in other words, you're talking about the type of

13  cut, the shearing action of the cut?

14          A.   That's correct.

15          Q.   It was made with that type of shearing action?

16          A.   That's correct.  Something that had that play in it

17  to allow those multifilaments to be flattened.

18          Q.   Can you tell this jury within a reasonable degree of

19  scientific certainty that that cord was not cut with a knife?

20          A.   Definitely not.

21          Q.   That that cord was not cut with dikes?

22          A.   Definitely not.

23          Q.   That that cord was not cut with wire cutters?

24          A.   Definitely not.

25          Q.   And that that cord was not cut with a scissor?

1    A.    That's correct.

2              MR. BIANCAVILLA:  I have nothing further for

3    Detective Schiraldi, other than -- let me just check to

4    make sure I've offered everything into evidence.

5              I believe I've offered everything.  I have no

6    further questions for Detective Schiraldi.

7              THE COURT:  Mr. Chamberlain.

8              MR. CHAMBERLAIN:  Thank you, Judge.

9              MR. BIANCAVILLA:  Excuse me, Judge, before

10   Mr. Chamberlain starts, we marked these two drawings,

11   People's Exhibit 78 and People's Exhibit 79 for

12   identification.  We would offer those too.

13             THE COURT:  Any objection?

14             MR. CHAMBERLAIN:  Yes, Judge.  I think

15   they're confusing and improper based on my prior

16   objection.

17             THE COURT:  Can I see them, please.

18             I'm going to sustain the objection.

19             MR. BIANCAVILLA:  Judge, can we approach

20   briefly, please.

21             THE COURT:  Yes.

22   (Whereupon, the following colloquy was held at the bench.)

23             MR. BIANCAVILLA:  My question is for Mr.

24   Chamberlain.  What's the basis for the objection?

25             MR. CHAMBERLAIN:  I already stated it, Judge.

1          THE COURT:  Well, now we're up here, Mr.

2     Chamberlain.

3          MR. CHAMBERLAIN:  I said I thought it was

4     based upon my prior objection and also it's confusing

5     to the jury.  Your Honor just sustained it, I thought.

6          THE COURT:  I did and I did find it confusing

7     to the jury.

8          MR. BIANCAVILLA:  Judge, what I'm saying is

9     that if -- first of all, the jury has already seen it.

10    It's been viewed.  It is actually something that the

11    detective used during the course of his presentation in

12    front of the jury.  If they have any questions

13    regarding the drawings, his testimony will be read back

14    and my problem is that how can you exclude something

15    that they've seen during the course of this detective's

16    testimony?

17         THE COURT:  That's true.  I didn't think of

18    it in that light.

19         MR. CHAMBERLAIN:  If it's confusing, it's

20    confusing.

21         THE COURT:  It may be confusing to us as lay

22    people.  What can be done is the jury can ask for the

23    detective's testimony be read back with respect to any

24    particular segment of the drawing itself.  Now, as you

25    look at in a vacuum, I agree with you it is confusing.

1    However, we've heard the testimony of the detective as

2    he was drawing the particular diagrams on these two

3    pages that are up there.  What I'm going to do is I'm

4    going to overrule it.

5              MR. BIANCAVILLA:  Thank you, Judge.

6              THE COURT:  You have an exception, Mr.

7    Chamberlain.

8    (Whereupon, the proceedings continued in open court.)

9              THE COURT:  The objection is overruled.

10   Cross-examination.

11   (Whereupon, People's Exhibits 78 and 79 were marked in

12                     evidence.)

13             MR. BIANCAVILLA:  Judge, I just asked the

14   detective to put the evidence away.

15             THE COURT:  Yes, we'll take a moment to do

16   that.

17   CROSS-EXAMINATION

18   BY MR. CHAMBERLAIN:

19       Q.   Detective, how are you this morning?

20       A.   Good morning.  Very well.

21       Q.   What's left of it.  First of all, your duties here

22   in the Scientific Investigation Bureau in the manner you've

23   already described, you made these -- you made an

24   investigation.  You made a report to whom?

25       A.   A report?

1      Q.    Of your investigation.

2      A.    To the investigating detective.

3      Q.    And who was that?

4      A.    Jack McHugh.

5      Q.    And the procedure, as far as how you conduct

6   yourself scientifically, you make investigations of materials

7   that are submitted to you?

8           MR. BIANCAVILLA:  Objection.

9      A.    Yes.

10          THE COURT:  I'll permit him to ask.

11          MR. BIANCAVILLA:  Judge, I'm going to ask to

12      approach then.

13          THE COURT:  If he's laying a little bit of a

14      foundation.

15          MR. BIANCAVILLA:  Procedure is not the

16      subject of cross-examination, Judge.

17          MR. CHAMBERLAIN:  He went into this on direct

18      at the beginning of his direct, Judge.  I don't

19      understand why it's not proper.

20          THE COURT:  I'll allow you, Mr. Chamberlain,

21      to ask a couple of questions with respect to

22      foundation.

23          MR. CHAMBERLAIN:  That's all I need, Judge.

24      A.    Could you rephrase the question?

25          MR. CHAMBERLAIN:  Would you read the question

1      back?

2                (Whereupon, the record was read back.)

3      A.   Yes, all the time.

4      Q.   And as part of that examination you take photographs

5  sometimes?

6      A.   Yes, most cases, yes, but not all.

7      Q.   You look at the evidence in microscopes?

8      A.   That's correct.

9      Q.   And sometimes you take photographs through the

10  microscope or blowups?

11      A.   That's correct, yes.

12      Q.   You use different types of microscopes?

13      A.   Yes.

14      Q.   And do you record your findings as you go along?  Is

15  that part of the scientific protocol, that you make immediate

16  recordings of what your findings are?

17      A.   Most certainly.

18      Q.   Is that most certainly?

19      A.   Yes, most certainly.

20      Q.   And the reason for that would be so you don't forget

21  it and confuse it with some other matter; is that correct?

22      A.   That's correct, yes.

23      Q.   And we already started -- we started talking about

24  your notes here, Detective.  There were many other things that

25  you did other than what you testified to this morning; is that

1   correct?

2              MR. BIANCAVILLA:  Objection.

3              THE COURT:  That's kind of a nebulous

4       question.  Perhaps you can get more specific, Mr.

5       Chamberlain.

6       Q.   Over and above the examination of the hairs and

7   fibers, did you do anything else in this case?

8              MR. BIANCAVILLA:  Objection.

9              THE COURT:  Are we talking about other

10      scientific tests, Mr. Chamberlain?

11             MR. CHAMBERLAIN:  Absolutely.

12             THE COURT:  I'll permit that.

13      A.   I don't really understand how I could understand

14  that in its context.  Please rephrase or repeat it for me,

15  please.

16      Q.   Well, the hairs, in your examination of the hairs

17  that you referred to, did you make notes as to their length,

18  their diameter and so forth?

19      A.   Oh, yes, that's all in my notes.

20      Q.   So you examined them microscopically?

21      A.   Yes, again, with a stereo light microscope, then a

22  compound light microscope, polarized light microscope that

23  allows you to see thickness and differences, and a comparison

24  light microscope to, again, to compare these hairs to the

25  known standard of the deceased.  It is a system of microscopes

1   that allows you to look in one set of oculars and see a split

2   screen, if you will, of two fields of view.  The known

3   inquiry, the known sample to the right I use as my convention,

4   and the question always being on the left, that's how I do

5   mine.

6        Q.   Those were examined on what day, could you tell me?

7        A.   Yes, sure.  4/26 subsequent to the time of 1320,

8   which is 1:20 in the afternoon.

9        Q.   I want to direct your attention to your notes back

10  to 4/20.  Did you examine the wire, the copper wire, that you

11  have exhibited to the jury, the ligature wire in this case?

12       A.   In the lower right there will be a number, it'll be

13  10 of 20 or 10 of 80.  What page are you looking at?

14       Q.   I believe it's eight, Detective, lower in the right.

15       A.   Yes, that's depicted right there, yes.

16       Q.   Would you read your notes with respect to that

17  examination of that wire, please.

18       A.   4/20 --

19            MR. BIANCAVILLA:  Objection.

20            THE COURT:  Sustained.

21       Q.   What did your examination of the wire on that day

22  show, Detective?

23            THE WITNESS:  Could I read from my notes,

24       Judge?

25            THE COURT:  You can use your notes to refresh

Det. Schiraldi - Cross/Chamberlain                863

1      your recollection, Detective.  You can't read from

2      them.

3      A.   Okay.  A cursory look under the stereo light

4   microscope led me to believe that it was cut with a sharp

5   implement, not like wire cutters that sandwich or apex the

6   wire, but with directional force.

7      Q.   Well, Detective, your notes don't indicate anything

8   about a cursory look there, do they?

9              MR. BIANCAVILLA:  Objection.

10             THE COURT:  No, I'll permit that.

11     Q.   Did you make a finding on that day that the cord,

12  ligature cord, cut was made with a sharp instrument not like

13  wire cutters that sandwich the wire but more one directional

14  force, yes or no?

15     A.   He read from my notes.  Yes.

16     Q.   Now, that was your only note concerning that wire

17  cord at that time; is that correct?

18     A.   That's correct, yes.

19     Q.   Now, after that was that wire cord sent out by your

20  laboratory anyplace?

21     A.   Yes, it was.

22     Q.   And where was it sent?

23     A.   At the time I was very busy with other homicides and

24  rapes.  It was told -- I was told that because of my workload

25  it was being sent to the FBI in Washington D.C.

1     Q.    I didn't ask you why it was sent.  Because you were

2   too busy, is that it?

3     A.    I was working other cases.

4     Q.    You were fully competent to check the wire yourself

5   as an expert on tools?

6     A.    Yes, that's correct.

7     Q.    But because you were busy it was sent to the FBI?

8     A.    That's correct.

9     Q.    When was it sent to the FBI?

10              THE WITNESS:  I have to look at my notes,

11        Judge.

12              THE COURT:  Sure, you can refresh your

13        recollection.

14    A.    It was sent out Federal Express on 6/29 of the

15   year 2000.

16    Q.    6/29?

17    A.    That's correct.

18    Q.    Was there a transmittal letter dated May 29 from the

19   SIB to the FBI?

20    A.    I do know there was a letter.

21    Q.    Maybe I can save you some time here, Detective.

22              MR. BIANCAVILLA:  Which document are you

23        referring, to Mr. Chamberlain?  Give me a number.

24              MR. CHAMBERLAIN:  I have a page out of the

25        Rosario material.  I don't know.

1          MR. BIANCAVILLA:  What exhibit was the

2     Rosario material?

3          MR. CHAMBERLAIN:  I don't know.  It was part

4     of the Rosario material that was provided.

5     Q.   Let me show this to you.

6          THE COURT:  You want that marked, Mr.

7     Chamberlain?

8          MR. CHAMBERLAIN:  Yes.

9        (Whereupon, Defendant's Exhibit G was marked for

10                       identification.)

11          MR. BIANCAVILLA:  Can I see the document?

12          THE COURT:  You may.

13          MR. CHAMBERLAIN:  Let me hold my question on

14     that.  I want to establish a little bit of a time line

15     here.

16     Q.   Detective, when you examined the power cord on, I

17     think you said it was 4/20?

18     A.   That's correct, yes.

19     Q.   You examined it microscopically and took these

20     pictures?

21     A.   That's correct.

22     Q.   Of the cut end.  At that time this defendant had not

23     been arrested yet; is that correct?

24          MR. BIANCAVILLA:  Objection.

25          THE COURT:  Sustained.

Case 2:11-cv-04171-AMD   Document 6-25   Filed 01/17/12   Page 76 of 99 PageID #: 1553

1      Q.   Do you know if this defendant had been arrested?

2                MR. BIANCAVILLA:  Objection.

3                THE COURT:  Sustained.

4      A.   No, I do not.

5      Q.   Detective, you indicated on direct that you first

6  got the power -- the Leatherman tool in April.  I'm sorry.  In

7  November.  What date?

8      A.   November 8.

9      Q.   November 8 you received the tool.  Isn't it a fact

10 that that tool had been received shortly after the defendant's

11 arrest on May 3, 2000?

12               MR. BIANCAVILLA:  Objection.

13               THE COURT:  Sustained.

14     Q.   Was not that tool sent with the cord to the FBI on

15 either May 29 or June 29?

16               MR. BIANCAVILLA:  Objection.

17               THE COURT:  I'll permit that.  Overruled.

18     A.   I wrote a letter.  I contacted the FBI laboratory

19 and I was on vacation.  That's why me myself I did not send it

20 out, but we did contact them.  We were in the midst of finding

21 out who was going to examine this item.

22               MR. CHAMBERLAIN:  May I have that letter,

23        please.

24               MR. BIANCAVILLA:  Sure.

25     Q.   You say you wrote a letter.  Is that the

1    transmittal letter?

2         A.   This is the letter, yes.

3         Q.   Would you tell the Judge and the jury what was sent

4    on that date with that transmittal letter?

5         A.   There are the wire and the Leatherman type tool.

6         Q.   And the tool?

7         A.   That's correct.

8         Q.   What was the request made of the FBI?

9              MR. BIANCAVILLA:  Objection.

10             THE COURT:  Sustained.

11        Q.   What was the request to the FBI?

12             MR. BIANCAVILLA:  Objection.

13             THE COURT:  Sustained.

14        Q.   It was sent for what purpose?

15             MR. BIANCAVILLA:  Objection.

16             THE COURT:  Sustained.

17        Q.   Was there --

18             MR. CHAMBERLAIN:  May I have the purpose of the

19        objection, Judge?  I'm not sure I understand it.

20             THE COURT:  Mr. Chamberlain, I don't have to

21        give you a reason for my -- I'm sustaining the

22        objection.  It's not a proper question.  I'm sustaining

23        it for form, Mr. Chamberlain.

24        Q.   Was the FBI informed of the reason for the request

25    for their examination of this tool and that cord?

1          MR. BIANCAVILLA:  Objection.

2          THE COURT:  Mr. Chamberlain, it's not a

3     proper question.  Sustained.  There's another way to

4     get it in.

5     Q.   Was it common for you to refer items for

6     examination, you meaning the Scientific Investigation Bureau,

7     to other agencies?

8          MR. BIANCAVILLA:  Objection.

9          THE COURT:  I'll permit that.

10          MR. BIANCAVILLA:  Judge, I'm going to ask to

11     approach, please.

12          THE COURT:  Come forward.  Step down,

13     Detective.

14       (Whereupon, the witness exited the courtroom.)

15    (Whereupon, the following colloquy was held at the bench.)

16          THE COURT:  Yes, Mr. Biancavilla.

17          MR. BIANCAVILLA:  Judge, what is common, what

18     is not common, what is procedure, what is not

19     procedure, is irrelevant.  The only thing that's

20     relevant during the criminal trial is what was done in

21     a particular case.  What is common is not relevant and

22     is objectionable, and all we're having here is what is

23     common, what's not common, what your purpose is, what

24     your procedure is.  It's all irrelevant, Judge.  What

25     was done in another case and another time is not

```
 1    relevant to this trial.  That is my point of my

 2    objection.  That's why I objected when he was asking

 3    questions about procedure, and that's why I'm objecting

 4    at this point when he's asking questions about what's

 5    common and what's not common.

 6              THE COURT:  Mr. Chamberlain.

 7              MR. CHAMBERLAIN:  Foundation questions,

 8    Judge, as to the procedures normally followed.

 9              THE COURT:  I overruled the objection with

10    respect to the procedures.  Now we're concerned about

11    what is common for the detective to do.  On reflection,

12    it's an improper question.  However, if you want to ask

13    in this particular case what did he do is certainly a

14    legitimate question and area that you can go into.

15    What he did on other occasions has no relevance to what

16    he did, because it could have been completely

17    different.  It could have been the same.  Who knows?

18              MR. CHAMBERLAIN:  It's a foundation question

19    for other questions.

20              THE COURT:  But it's not a proper foundation

21    question.

22              MR. CHAMBERLAIN:  Fine, Judge.

23    (Whereupon, the proceedings continued in open court.)

24    Q.    In this case, this material, the Leatherman tool and

25    the power cord were transmitted to the FBI at the end of May
```

1    or in June of 2000; is that correct?

2         A.    That's correct.

3         Q.    And in the normal course of business of the police

4    department during when such a transmission is made or such a

5    transmittal is made, a cover letter or some request as to what

6    is required is provided; is that correct?

7              MR. BIANCAVILLA:  Objection.

8              THE COURT:  Normal course is not a legitimate

9         question.  What was done in this situation would be a

10        legitimate question.

11        Q.    Was it done in this case?

12        A.    Was there a cover letter sent with the item?

13        Q.    Yes.

14        A.    There was, yes.

15        Q.    And that cover, was that cover letter a record made

16   in the regular course of business of the police department?

17        A.    Well, I called them and I informed them --

18             MR. BIANCAVILLA:  Objection, not responsive.

19             THE COURT:  Yeah, you have to respond to the

20        question, Detective.

21        Q.    Was it in the regular course of business that that

22   cover letter was made?

23        A.    Yeah.

24        Q.    And was it the regular course of business to make

25   such a record?

1      A.   It's not a regular course of business that we --

2              MR. BIANCAVILLA:  Judge, he's answered the

3      question.

4              MR. CHAMBERLAIN:  No, he hasn't.  He was in

5      the middle of his sentence.

6              THE COURT:  Have you finished your response?

7              THE WITNESS:  No.

8              THE COURT:  Go ahead.

9      A.   It's not the regular course of business that I

10     send things to the FBI.

11     Q.   But when you do, is it the regular course of

12     business of the police department to make a record of that

13     transmittal?

14     A.   Well, if we ask an individual to do something, as we

15     are --

16             MR. BIANCAVILLA:  Judge, I'm going to object.

17     It's not responsive to the question.

18             THE COURT:  I think you have to respond with

19     a yes or no, Detective.

20     A.   I can't answer that with a yes or no.

21     Q.   Well, when you send material to the FBI on the

22     occasions when you do, is it the regular course of business of

23     the police department to send -- to make a record and send a

24     request along with that?

25             MR. BIANCAVILLA:  Objection.

Det. Schiraldi - Cross/Chamberlain                872

1        A.   Yes.

2                THE COURT:  I'll let the answer stand.

3        Q.   And was the -- that letter, letter of transmittal

4    made, that record made, at or about the time of the event or

5    within a reasonable time thereafter?

6                MR. BIANCAVILLA:  Objection.

7                THE COURT:  No, overruled.

8        Q.   Was the letter sent with the material at the same

9    time?

10       A.   Well, we had to contact the FBI.

11               MR. BIANCAVILLA:  Objection, not responsive.

12               THE COURT:  Sustained.

13       A.   We get a 301 and 106 that asks you what you're

14   submitting this piece of evidence for.  So I called the FBI

15   telling them that I was busy with other things and we were

16   thinking about sending this to the FBI.

17       Q.   Then the record, the letter of transmittal, was sent

18   at the time you sent the material; is that right?

19       A.   No.  I called up and we sent the letter at that time

20   and we spoke to the FBI on the phone at the time, May 29 or

21   thereabouts and said they could do it.  We formulated the

22   letter and then we sent the evidence.

23       Q.   Within a reasonable period of time?

24       A.   That's correct.

25               MR. CHAMBERLAIN:  I offer that in evidence.

1          THE COURT:  Any objection, Mr. Biancavilla?

2          MR. BIANCAVILLA:  Yes, Judge, and I'll ask to

3      approach.

4          THE COURT:  Come forward.

5      (Whereupon, the following colloquy was held at the bench.)

6          THE COURT:  Mr. Chamberlain, I understand from

7      your questioning that you're attempting to lay a

8      foundation to submit a business record.  Now we have

9      Mr. Biancavilla.

10          MR. BIANCAVILLA:  Objection.  A letter is not

11      a business record.  The proper foundation for a

12      business record is is that record kept in the regular

13      course of business of the Nassau County Police

14      Department?  Is it the regular course of business of

15      the Nassau County Police Department to keep such

16      records?  Was the information placed therein at or

17      about the time when the events depicted therein were

18      completed?

19          THE COURT:  Can I see the letter, please.

20          MR. BIANCAVILLA:  That is a business record.

21      This is a request to do something.  That is not a

22      business record.

23          MR. CHAMBERLAIN:  Mr. Biancavilla --

24          THE COURT:  I'd like to read the letter.

25          MR. CHAMBERLAIN:  Mr. Biancavilla, Judge, is

1    contradicting what his witness just testified to.  He

2    testified that it is a regular course of business when

3    they transmit evidence to another agency, to the FBI,

4    to send a letter.

5              THE COURT:  Let me read to you what the

6    requirements are for a business record:  CPLR 4518(a)

7    requires the following factual foundation:  First, that

8    the record be made in the regular course of business,

9    essentially, that it reflect a routine, regularly

10   conducted business activity and that it be needed and

11   relied on in the performance of functions of the

12   business.  Secondly, that it be the regular course of

13   such business to make the record, a double requirement

14   of regularity, essentially, that the record be made

15   pursuant to established procedure for the routine,

16   habitual, systematic making of such a record.  And,

17   third, that the record be made at or about the time of

18   the event being recorded, essentially, that

19   recollection be fairly accurate and the habit or

20   routine of making the entries assured.

21              This isn't an 85A or 79, Mr. Chamberlain --

22              MR. CHAMBERLAIN:  I'm aware of that, Judge.

23              THE COURT:   -- where the police department

24   made records.  This is a correspondence that may or may

25   not be used to send information to another agency.  As

Case 2:11-cv-04171-AMD   Document 6-25   Filed 01/17/12   Page 85 of 99 PageID #: 1562

1    a matter of fact, the detective says that he even

2    called the FBI.  I don't even know if the letter was

3    made contemporaneously with the sending.  You're all

4    over the place here.

5            MR. CHAMBERLAIN:  I understand what your

6    Honor is saying, but I think that even if he called

7    before, if in fact it's a regular -- there are records

8    and records; some are routine all the time and others

9    are less frequent but are there whenever they do

10   certain things.  This would be a transmittal letter.

11           THE COURT:  There was no testimony from the

12   detective that it was a regular routine that they

13   always sent a cover letter every time they sent

14   something to the FBI or another agency.  Apparently

15   they call people; sometimes they don't.  As a matter of

16   fact, there is -- correct me if I'm wrong, I didn't

17   hear anything in the record.

18           MR. CHAMBERLAIN:  I thought he did.  I'll go

19   into that if you want.

20           MR. BIANCAVILLA:  I would just like to add --

21           MR. CHAMBERLAIN:  I don't think it has to be

22   all the time, so long as it's done whenever they do

23   something.

24           THE COURT:  Mr. Chamberlain, the foundation

25   has to be met pursuant to the CPLR, pursuant to

1    Richardson's, which is 8-305.  There is a foundational

2    requirement.  Now, this is not a record that's made in

3    the regular course of its business.

4              MR. BIANCAVILLA:  It's a letter, Judge.

5              THE COURT:  This is a letter.

6              MR. BIANCAVILLA:  We might as well try this

7    case on paper.  If you're going to let that in, you

8    might as well let in every piece of paper that comes in

9    the courtroom.

10             THE COURT:  I don't agree with you, Mr.

11   Chamberlain.  That is not a record that's made in the

12   regular course of business.  This is a letter sent by

13   Detective Ryan, who isn't even this detective, to the

14   director of the FBI.

15             MR. CHAMBERLAIN:  I think he said he prepared

16   the letter.  Ryan is --

17             THE COURT:  I'll read it.  It says sincerely

18   Detective Sergeant Dennis Ryan.  He is not Detective

19   Sergeant Ryan.

20             MR. CHAMBERLAIN:  I think he testified he

21   prepared the letter and apparently it was signed by his

22   chief Ryan, that's all.

23             THE COURT:  There's other ways you can get in

24   the information.  I'm not going to tell you how to try

25   your case but that's not a business record, not

1      encompassed within the business record rule.

2                  MR. CHAMBERLAIN:  Respectfully except.

3                  THE COURT:  You have an exception.

4                  MR. CHAMBERLAIN:  You want me to desist on

5      trying to lay a foundation for this at this point?

6                  MR. BIANCAVILLA:  Judge, I'm tired of

7      objecting.

8                  THE COURT:  I'm not going to tell you to do

9      anything.  I'm telling you the letter is not a proper

10     record as encompassed by a business record rule.

11     (Whereupon, the proceedings continued in open court.)

12     Q.    Detective, are you aware -- you indicated there were

13     telephone conversations between you and the FBI at about the

14     time this letter was sent?

15     A.    I called them.

16     Q.    Did you advise them that the evidence being sent had

17     not been examined by anyone previously?

18     A.    Did I advise them of that?  I said at that time I

19     wouldn't be able to get to it and I'm sending it down to you.

20     I opened it, I examined it, photographed it and I packaged it

21     to be sent down there, yes.

22     Q.    The question was, Detective, did you advise them

23     that the evidence that was being sent to them for testing had

24     not been examined by anyone prior to that?

25     A.    I just said that after I photographed it, I told

 1   them that no one examined it and I packaged it and sent it to

 2   them.

 3        Q.   Had you examined it on May 20?  Had you not only

 4   examined it microscopically, taken pictures, but come to a

 5   finding as to the one directional force?

 6        A.   I came to that decision on April 20.

 7        Q.   April 20.  Did you tell that to the FBI?

 8        A.   That was just in my notes.  I didn't do any further

 9   testing at that time.  I didn't do any test cuts or anything

10   of that nature.  This is an observation looking under the

11   stereo microscope, seeing force, knowing the dynamics of cuts,

12   and in the course of my job I made quick cursory notes and

13   examined that without doing any test cuts.

14        Q.   What other tests would you do, Detective, other than

15   examine it with a microscope, blow up the pictures, examine

16   them?  Isn't that what you normally do in the microscopic

17   examination of a cut cord?

18             MR. BIANCAVILLA:  Objection.

19             THE COURT:  No, in this case.

20        Q.   Detective?

21             THE COURT:  One moment.  In this case, as long

22        as it's with respect to this case I will permit the

23        question to be asked.

24        A.   Could you read that back to me, please.

25             (Whereupon, the record was read back.)

1              MR. CHAMBERLAIN:  I'll withdraw the question.

2       Let me go on here.

3       Q.   Detective, you say you came to the conclusion that

4    it was a one dimensional force cut?

5       A.   I never said one dimension.

6       Q.   You said one direction?

7       A.   Direction.

8       Q.   Thank you.  That would be a cut you exhibited to the

9    jury with a straight knife; is that correct?

10      A.   A straight knife or something moving while the wire

11   is stationary, moving across that wire.

12      Q.   At an angle?

13      A.   At an angle, perpendicular, any type of one

14   directional force where the wire remains stationary and

15   something is pushing or cutting into it.

16              MR. BIANCAVILLA:  Displaying People's Exhibit

17       72.

18              MR. CHAMBERLAIN:  Thank you.

19      Q.   Now, that's a blowup of the microscopic

20   examination you had of that cord on May 20; is that right?

21              THE COURT:  Detective, can you see it from

22       here?

23              THE WITNESS:  May I get up?

24              THE COURT:  Yes, of course.

25      A.   When I opened the bag this is how the wire looked,

1    and I photographed it on April 20 subsequent to 1300 hours or

2    1 o'clock in the afternoon.

3        Q.   That's a blowup of it?

4        A.   That's correct.

5        Q.   When you viewed that blowup you came to the

6    conclusion at that time that that cord was cut with a one

7    directional force or a knife?

8        A.   One directional force.

9        Q.   Which would be a knife?

10       A.   I said a sharp implement.  I didn't say a knife.  A

11   knife has one blade.

12       Q.   Go ahead, Detective.  I didn't mean to interrupt.

13       A.   A one directional force, something, again, pushed.

14   There was a substrate or another bar there or a flat surface.

15   That direction or force was pushed into that wire.  That's

16   what I say in my notes.

17       Q.   Would that be cutting against something like a wood

18   surface?

19       A.   Something needs to be a substrate or fulcrum where

20   it has to be leaned against to be pushed in to be cut.

21       Q.   So when that was sent to the FBI did you tell them

22   of that conclusion?

23       A.   No, I did not.

24       Q.   Do you recall who you discussed this with at the

25   FBI?

1      A.    I spoke to the department chief, and they were

2   deciding who it was going to be sent to, because they have a

3   large caseload down there themselves.

4      Q.    Thank you.  You can return.  And from that time

5   until you got the FBI report, did you come to any other

6   conclusion about that cut cord?

7      A.    Again, the one directional force that I described in

8   my notes on April 20.  I have it in my notes.  That's the only

9   comment I made about that wire at that time.

10     Q.    And from that time until you got the FBI report did

11  you at any time change that conclusion?

12     A.    No, I did not.

13     Q.    Let us go on to the FBI report.  Can you tell me

14  when you got that?

15              MR. BIANCAVILLA:  Objection.

16              THE COURT:  Well, we're presupposing he did,

17       Mr. Chamberlain, first of all.

18     Q.    Did you receive an FBI report?

19     A.    I have a copy of it in my notes, yes.

20     Q.    Can you tell us when you got it?

21     A.    Subsequent to October 17 of 2000.

22     Q.    And did the report indicate what type of a cut was

23  made in the opinion of the FBI on that cord?

24              MR. BIANCAVILLA:  Objection.

25              THE COURT:  Sustained.  He can't read from

Case 2:11-cv-04171-AMD  Document 6-25  Filed 01/17/12  Page 92 of 99 PageID #: 1569

1      the report, Mr. Chamberlain.  It's not in evidence.

2          Q.   Were you in contact with the FBI at any time prior

3      to receiving that written report?

4          A.   Subsequent to April 20?

5          Q.   Yes, between April 20 and the date you got the

6      report.

7          A.   I spoke to them April 20, told them I was sending it

8      down.  They sent me back the evidence and a report.  I never

9      had any conversations with any of the analysts or any other

10     personnel down there subsequent to the initial contact on or

11     about -- subsequent to April 20 and speaking to them between

12     that date and May 29.

13         Q.   Now, in addition to the request for the type of cut

14     when you sent that to the FBI, you were requesting some

15     information about a little black dot that you found on the

16     power tool -- taken from the Leatherman tool taken from the

17     defendant when he was arrested?

18                   MR. BIANCAVILLA:  Objection.

19                   THE COURT:  I'll permit that.  Overruled.

20         A.   There was, yes.  Since I was sending the cord down

21     there with the Leatherman tool -- I didn't touch the

22     Leatherman tool at that time.  I sent it down to the FBI

23     packaged with the cord.

24         Q.   But you specifically asked the FBI to examine a

25     little piece of black material that you had found on that

1   tool, did you not?

2        A.    Not that I found, no.

3        Q.    No?

4        A.    Somebody examined it and opened it and it was there

5   to the naked eye.

6        Q.    Did you ask that the black polymer-like material on

7   the tool be compared with the black wire covering of the cord?

8        A.    Yes, any foreign substance adhering to a metal

9   object, I would inquire to what that would be.

10        Q.    So you were asking not only for the tool mark

11   comparison on the tool that may have cut that wire but you

12   were also asking for a comparison of that little black dot

13   found on the Leatherman tool taken from the defendant?

14        A.    That's correct.

15        Q.    With the cord?

16        A.    Yes, to the cord.

17        Q.    Prior to that time did you make any comparison

18   between the two?

19        A.    No, I did not.

20        Q.    So that you did examine the cut end but you did not

21   make an examination before material was sent down to the FBI

22   of a black dot versus the cord, the black dot taken from the

23   tool obtained from the defendant on his arrest and the cord?

24        A.    No.

25        Q.    Were you fully capable of doing that in your

```
 1   laboratory, Detective?

 2              MR. BIANCAVILLA:  Objection.

 3              THE COURT:  Overruled.

 4      A.   Of doing the comparative work?

 5      Q.   Yes.

 6      A.   Yes, on the black dot.

 7      Q.   Was there any reason why your office didn't do that,

 8   SIB didn't do that?

 9      A.   The reason, again, as I stated, I was involved with

10   other homicides and rapes, and this needed to be done in a

11   timely fashion.  And there was other cases that needed to be

12   done prior to this one and I was working on those.  It was a

13   decision from the homicide detective that we send it out to

14   get it done forthwith.

15      Q.   And at no time, Detective -- withdrawn.

16           Just to make this certain, when the material was

17   sent to the FBI on May 29, 2000, was your name given and phone

18   number given for contact for the FBI, do you know?

19              MR. BIANCAVILLA:  Objection.

20              THE COURT:  Sustained.

21      Q.   Do you know if -- you're certain, however, there

22   was no contact between now and the FBI between the time of the

23   transmittal of this material and the time you received the

24   written report from the FBI?

25      A.   Certain as to?
```

Case 2:11-cv-04171-AMD   Document 6-25   Filed 01/17/12   Page 95 of 99 PageID #: 1572

```
 1        Q.    Any contact, your calling back and forth, what about

 2   this, I found a one directional, it might be a shearing, a

 3   different type cut or anything like that?

 4        A.    When I first called them up?

 5        Q.    Between April 20 --

 6        A.    When I first called up to get the FBI, advise them

 7   of what I was sending down, I might have mentioned that in my

 8   notes there was a shearing type effect that I feel -- or one

 9   directional force.  That's all I said.  I never -- at that

10   time I never did any test cuts or any type of comparative

11   work.

12        Q.    Detective, that's not what I asked you.  I'm not

13   asking you what might have been.  I'm asking you was there any

14   contact after that material was sent down?

15        A.    I can't remember exactly.

16        Q.    You've already testified that when it was sent down

17   they were told no, the evidence had not been examined by

18   anyone.

19                   MR. BIANCAVILLA:  Objection.

20                   THE COURT:  First of all, there's a proper

21            way to do that, Mr. Chamberlain.  Are you reading from

22            a document?

23                   MR. CHAMBERLAIN:  No, Judge, I'm not.  I'm

24            paraphrasing but not reading from the document.

25                   THE COURT:  That's not the proper way to do
```

1       it.

2       Q.   Didn't you testify just a little while ago that

3   when the evidence was sent down the FBI was told it had not

4   been examined by anyone?

5                MR. BIANCAVILLA:  Objection.

6       A.   That is not what I said.

7                MR. BIANCAVILLA:  I'll withdraw the objection,

8       Judge.

9       Q.   I'm going to show you this document, Defendant's

10   G, and ask you if it refreshes your recollection as to what

11   the FBI was told as to any prior examination of the evidence.

12                MR. BIANCAVILLA:  Judge, again, I'm going to

13       object.  I need to approach on that.

14                THE COURT:  All right, wait.  Ladies and

15       gentlemen, at this point we're going to break for

16       lunch.  I'll ask you to be back here at 2:30.  We have

17       some other court business to take care of.  Do not

18       discuss this case among yourselves or with anyone else.

19       Keep an open mind.  Do not form or express any opinions

20       until the entire case has been completed.  Do not read

21       or listen to any accounts of this case should it be

22       reported in the media.  Don't visit or view any place

23       or premises that may have been mentioned, and do not

24       permit any party to discuss this case with you.  If

25       anyone attempts to do so, you must promptly report to

Det. Schiraldi - Cross/Chamberlain                887

1    the Court any violation thereof.  Have a nice lunch.

2    We will see you at 2:30.

3        (Whereupon, the jury exited the courtroom.)

4            THE COURT:  Detective, can you step down,

5    please.

6        (Whereupon, the witness exited the courtroom.)

7            THE COURT:  Mr. Biancavilla.

8            MR. BIANCAVILLA:  Judge, it's that same

9    letter.  That is not even written by Detective

10   Schiraldi.  It's written by Detective Sergeant Ryan.

11           THE COURT:  I will permit it only with

12   respect to refreshing his recollection.  Let me finish,

13   Mr. Biancavilla.  You can refresh your recollection

14   with a piece of paper, with a bologna sandwich, with

15   anything.  If it doesn't refresh his recollection,

16   that's fine.

17           MR. BIANCAVILLA:  But that is not the

18   question he asked.

19           THE COURT:  What was the question, Mr.

20   Chamberlain?

21           MR. CHAMBERLAIN:  You can read it back but

22   that was the question I thought I asked.

23           THE COURT:  Let me ask the court reporter to

24   read it back to me.

25       (Whereupon, the record was read back.)

1     MR. BIANCAVILLA: I'm going to still maintain

2     my objection for the following reasons: First of all,

3     what the FBI was told on a prior occasion is an

4     improper question. If that refreshes his recollection

5     as to what he told the FBI, that I understand.

6          THE COURT: That's correct.

7          MR. BIANCAVILLA: Does that refresh your

8     recollection as to what the FBI was told by the man on

9     the moon?

10         THE COURT: If you're more specific, Mr.

11    Chamberlain, I will permit you to refresh his

12    recollection but it has to do with whether or not it

13    refreshes his recollection.

14         MR. BIANCAVILLA: As to something he told

15    them.

16         THE COURT: As we know, that letter is signed

17    by Detective Sergeant Ryan, who is not --

18         MR. CHAMBERLAIN: I know that, but it could

19    refresh his recollection.

20         THE COURT: As to what he told, yes, ask that

21    question.

22         MR. BIANCAVILLA: My objection was that

23    wasn't what his question was.

24         THE COURT: I will sustain the objection with

25    respect to the question but I will allow Mr.

1    Chamberlain to rephrase the question when we come back

2    from lunch.  Anything else, Counsel?

3              MR. BIANCAVILLA:  Not from me, Judge.

4              THE COURT:  Mr. Chamberlain?  2 o'clock.  I'm

5    sorry, 2:30, Counsel.

6                        (Luncheon recess.)

7                   *         *         *

8              C E R T I F I C A T I O N

9

10    I hereby certify the within to be a true and accurate

11   transcription of my stenographic notes in the above

12   proceeding.

13

14

15                        _____

                          Edward Dong

16

17

18

19

20

21

22

23

24

25