Proceedings                                             890

```
 1              A F T E R N O O N    S E S S I O N

 2              THE CLERK:  Come to order, please.  This is

 3     case on trial continues.

 4              All parties are present.  Jurors are not

 5     present at this time.

 6              Are the People ready?

 7              MR. BIANCAVILLA:  Ready.

 8              THE CLERK:  The defendant ready?

 9              MR. CHAMBERLAIN:  Ready.

10              THE CLERK:  Ready for the jurors.

11              THE COURT:  Yes.

12              THE CLERK:  Jury entering.

13              THE COURT OFFICER:  Jury entering.

14              (Whereupon, the sworn jury and alternates

15     enter the courtroom)

16              THE CLERK:  Both sides stipulate that all

17     sworn jurors are present and seated properly?

18              MR. BIANCAVILLA:  Yes.

19              MR. CHAMBERLAIN:  So stipulated.

20              THE COURT:  Ask the Detective back in please.

21     V I T O    S H I R A L D I,  Detective, recalled as a

22         witness, having been previously duly sworn, resumed

23         the stand to continue testimony as follows:

24              THE CLERK:  Detective Shiraldi, you're

25     reminded you're actually under oath.
```

Kathleen Plaia

1          Be seated.

2          THE COURT:  Good afternoon, ladies and

3     gentlemen.  We're ready to continue with the trial.

4          Mr. Chamberlain.

5          MR. CHAMBERLAIN:  Thank you, Judge.

6  CROSS-EXAMINATION CONTINUED

7  BY MR. CHAMBERLAIN:

8     Q    Detective, I'm going to show you a document and

9  ask if you can identify it.

10         MR. CHAMBERLAIN:  Can I have it marked for

11    identification?

12         THE COURT:  Defendants H.

13         (Whereupon, the referred to item is received

14    and marked Defendant's Exhibit H for identification by

15    the reporter as instructed.)

16         THE COURT OFFICER:  Defendant's H for

17    identification so marked.

18         THE COURT:  Would you like it shown to the

19    witness.

20         MR. CHAMBERLAIN:  Yes, please, Judge.

21    Q    Detective, is that a record kept in the regular

22  course of business of Nassau County Police Department?

23    A    Yes.

24    Q    And is it the regular course of business of the

25  Nassau County Police Department to keep such records?

Kathleen Plaia

1        A        Yes.

2        Q        And is that report made at or about the time or

3    within a reasonable time thereafter of events related

4    thereon?

5        A        I didn't make this document.

6        Q        Can you tell looking at that whether or not that

7    was made at or about the time?

8        A        It says 4/14 2000.  I'm assuming that's the date.

9                 THE COURT:  You can't assume.

10       A        That is the date on there.  I didn't make this

11   document.

12       Q        I understand that.  We're certainly referring to

13   SIB for evaluation or analysis?

14                MR. BIANCAVILLA:  Judge, I'm going to object.

15       He's going to be reading from something not in

16       evidence.

17                MR. CHAMBERLAIN:  I'm not asking him to read.

18       I'm asking if -- read it to himself.

19                THE COURT:  He certainly can look at the

20       document.  He can't read out loud.

21                I will allow it.

22                MR. CHAMBERLAIN:  That's fine.

23       A        There is one item that says, go to SIB.

24                MR. BIANCAVILLA:  Objection.

25                THE COURT:  Detective, don't tell us what it

Det. Shiraldi - People - Cross          893

1    says.

2                    THE WITNESS:  Okay.

3    A     Yes.

4    Q     Were, to your knowledge, a Ziplock bag taken from

5    the deceased's car with buds and stems submitted to SIB for

6    analysis?

7                    MR. BIANCAVILLA:  Objection.

8                    THE COURT:  Sustained.

9                    MR. CHAMBERLAIN:  I'm asking if he knows

10   whether that was done, Judge.

11                   THE COURT:  Well, you -- the question you

12   asked is not a proper question.  Perhaps, if you leave

13   out half the question, you will be able to ask the

14   question.

15   Q     Was a Ziplock bag with stems and buds submitted

16   to SIB for analysis in connection with this case?

17   A     I don't know.

18   Q     You don't know?

19   A     I have no knowledge of that.

20   Q     Would you review the document again, Detective,

21   and see if the internal information confirms that the

22   document was submitted at or about the time it relates as to

23   crime scene evidence submitted to the crime -- by crime

24   scene to SIB.

25                   MR. BIANCAVILLA:  Objection, Judge.

Kathleen Plaia

Det. Shiraldi - People - Cross                 894

1                THE COURT:  Sustained.

2                MR. CHAMBERLAIN:  I'm going to ask that two

3        other documents be marked for identification.

4                THE COURT:  Defendant's I.

5                (Whereupon, the referred to item is received

6        and marked Defendant's Exhibit I for identification by

7        the reporter as directed.)

8                THE COURT OFFICER:  Defendants I for

9        identification.

10               Show it to the witness?   Would you like it

11       shown to the witness?

12               MR. CHAMBERLAIN:  Defendant's I for

13       identification is a document, two pages?

14               THE COURT OFFICER:  Yes.

15               MR. CHAMBERLAIN:  Would you show it to the

16       witness.

17       Q    Are those documents, records, kept in the regular

18       course of business of Nassau County Police Department?

19       A    Yes.

20       Q    And is it the in the regular course of business

21       of the police department to keep such documents --

22       A    Yes.

23       Q    Make such record?  Were they made at or about the

24       same time as the events related therein?

25       A    One was made on April 20th.

1              MR. BIANCAVILLA:  Objection, not responsive.

2              THE COURT:  No.  Sustained.

3              You can't read from the document, Detective.

4              THE WITNESS:  I can't answer it.

5       Q      The documents relate to certain information.

6  Were the documents made at or about the same time or

7  reasonably close thereto?

8       A      To what?

9       Q      To the events related in the documents?

10      A      One of the pages is my notes and one --

11             MR. BIANCAVILLA:  Objection.

12             THE COURT:  Don't tell us what it says.

13             THE WITNESS:  No.

14      Q      Your notes -- withdrawn.

15             Page one --

16             MR. BIANCAVILLA:  Judge, I'm going to object.

17  Can we approach, please?

18             THE COURT:  Come forward, Counsel.

19             Step down.

20             (Whereupon, the following takes place at the

21  Bench, between the Court and Counsel:)

22             MR. BIANCAVILLA:  My objection is, Judge,

23  this is not a business record, nor is this a business

24  record.  This is nothing more than hearsay.  The

25  detective is on the stand testifying.  If he testifies

1        something inconsistent, he can be impeached with this,

2        and only if he denies --

3                    THE COURT:  These are the detective's notes.

4                    MR. BIANCAVILLA:  I understand that.

5                    THE COURT:  I think we're on the same page on

6        that.  It's not a record, I agree with you.

7                    MR. BIANCAVILLA:  It's not a record.

8        Moreover, this, even though it appears to be some type

9        of a report, is not a business record either.  Because

10       the detective has testified to that.  If there is

11       something in there that is different from what he is

12       testifying, then he can be impeached with that.  But

13       that is not a business record.

14                   THE COURT:  Mr. Chamberlain.

15                   MR. CHAMBERLAIN:  Yes.  The -- this is a

16       business record, certainly.  It's a report made in the

17       regular course of business of the Nassau County Police

18       Department.  And regardless of what the district

19       attorney says, the witness has so identified it as a

20       business record.  He's identified both of them as

21       business records kept in the regular course.  It's the

22       regular business of the Nassau County Police Department

23       to keep such records.  Previously he testified that as

24       part of the scientific procedure and protocol they make

25       records immediately of whatever they're examining.

1          THE COURT:  So far you are having difficulty

2     getting this into evidence.  I'm not disagreeing with

3     you, this is a business record.  This may have well

4     been a business record.  To me it is a document filled

5     out by the Scientific Investigation Bureau of the

6     Police Department.  It says on top, Police Department,

7     County of Nassau, New York, Scientific Investigation

8     Bureau Receipt/Report.

9          MR. BIANCAVILLA:  My point, just because it

10    says it is a report, Judge, does that mean it is a

11    business record?  Here's my point, Detective Shiraldi

12    testified as to his conclusions.  If there is nothing

13    in there that is inconsistent with his conclusions and

14    that he has denied, then it is not admissible.

15    Otherwise --

16          THE COURT:  That is a different story,

17    Mr. Biancavilla.

18          MR. BIANCAVILLA:  Otherwise, I can come up

19    here with every single report and offer it into

20    evidence as a business record.

21          THE COURT:  I'm not disagreeing with you.  I

22    haven't read what is in the document.

23          MR. BIANCAVILLA:  All right.

24          THE COURT:  Okay.  The question is, one, is

25    it a business record?  I'm looking at the two

1     documents.  Detectives notes is not a business record.

2                Is this is a business record, on two?  It is

3     inconsistent with the way the detective testifies.

4                At this point you have, Mr. Chamberlain, you

5     have to then question with respect to this report.  And

6     if there is an inconsistency as a business record, I

7     will permit it into evidence.  But so far you haven't

8     met that test.

9                MR. CHAMBERLAIN:  Well, I didn't understand

10    the objection.  I thought the objection was based upon

11    the fact that the witness wasn't sure of the thrust of

12    the question.

13                MR. BIANCAVILLA:  No.

14                THE COURT:  Mr. Chamberlain, you may be

15    right.  I don't think he understood your question with

16    respect to being made contemporaneously with the events

17    thereof.  But you can clarify that.

18                MR. CHAMBERLAIN:  I think I'm entitled to --

19                THE COURT:  This is notes.  This is not a

20    business record.

21                MR. CHAMBERLAIN:  He's indicated as part of

22    the standard procedure in the scientific investigation

23    bureau, they make notations right away of exactly what

24    their findings are.  The language in here is language.

25    He hasn't fully testified.

1        THE COURT:  Even if I agree with you that

2    it's a business record, which I don't, even if he

3    agrees with you, it has to be inconsistent with the

4    manner in which the detective has testified.  If it's

5    inconsistent, then you can get it into evidence first

6    by questioning him and then, obviously, it will be an

7    exhibit that you can show.  Then I would permit it into

8    evidence and the jury will be able to see it, it was

9    inconsistent.

10        MR. CHAMBERLAIN:  This page, Judge.

11        THE COURT:  You still have to do the same

12   thing.  You still have to show it's inconsistent.  Just

13   because it's consistent -- I don't know, question him,

14   we'll find out if it's inconsistent or not.  As I said

15   before, I haven't read the document.

16        MR. CHAMBERLAIN:  It's a matter of

17   phraseology.  The only way I can do it is to refer to

18   the phraseology.

19        THE COURT:  Why don't you ask him the

20   question, if he ade a finding on such and such a date.

21   If it's inconsistent -- you have to phrase the

22   questions.  You know, I only make rulings on the

23   evidence.

24        MR. CHAMBERLAIN:  If this is a record, a

25   business record, I think I should be allowed to get it

Kathleen Plaia

1    in.

2              THE COURT:  It is a business record.  But

3    there's another ground for the objection, which I agree

4    with the assistant district attorney.  In order to get

5    the document into evidence, you first have to show it's

6    inconsistent with how he testified.

7              MR. CHAMBERLAIN:  All right, Judge.

8              (Whereupon, the following takes place in open

9    court:)

10   CROSS-EXAMINATION CONTINUED

11   BY MR. CHAMBERLAIN

12       Q    On April 20th OF 2000 you made a microscopic

13   examination of the ligature that had been submitted to SIB,

14   is that right?

15       A    That's correct.

16       Q    And did you on that indicate a particular type of

17   ligature as a result of your examination?

18       A    I just called it a ligature.  I didn't specify

19   any type.

20       Q    Did you specify any uniqueness about the

21   ligature?

22              THE WITNESS:  May I refer to my notes, Judge?

23              THE COURT:  Yes, you may refresh your

24   recollection.

25       A    I call it a black wire -- black power type wire.

1      Q      Did you not say ligature, unique?

2      A      I write that in my notes.  Yes, I do.

3      Q      Did you not say that power adapter, but the other

4   end was cut with a sharp implement not --

5                  MR. BIANCAVILLA:  I object.  He's not reading

6         from -- he's reading from something not in evidence.

7                  THE COURT:  Mr. Chamberlain, please don't

8         read from the document.

9      Q      Would you please characterize the exact language

10  you used?  Withdrawn.

11             Detective, you indicated in the beginning of

12  cross that for scientific review of your examinations it's

13  important for you to immediately record your findings, is

14  that correct?

15     A      Yes.

16     Q      And what did you record after examining that

17  ligature with the microscope?

18                  MR. BIANCAVILLA:  Objection.

19                  THE COURT:  You're asking him to read from

20        the document, Mr. Chamberlain.

21                  MR. CHAMBERLAIN:  I'm asking him to review

22        his notes, not read from the document.

23                  THE COURT:  That's different.

24     Q      Would you review your notes and give me --

25                  THE COURT:  No.  He doesn't say he needs his

1      memory refreshed.  You have to just ask him the

2      question.  And then if he needs his memory refreshed,

3      he will say so and I'll direct -- give him permission

4      to look at his notes.

5      Q      Would you do that?

6      A      Look at my notes?

7             THE COURT:  Mr. Chamberlain, ask a question.

8      Q      Would you review your notes and give me your best

9      recollection after so doing of your findings as to the other

10     end of the -- what cut the other end of the cord?

11             MR. BIANCAVILLA:  Objection.

12             THE COURT:  Sustained.

13     Q      Did you indicate here, Detective, that --

14     withdrawn.

15             After examining that cord with a microscope, did

16     you not only find that it was cut with one directional

17     force, but that it was a sharp implement?

18     A      Yes.

19     Q      Not like wire cutter, but something like a knife?

20     A      I don't say like a knife.  I say one directional

21     force, different than wire cutters.

22     Q      It's different.  Would that be the knife that you

23     displayed in front of this jury?

24     A      No.  I think I displayed that it was not a knife.

25     Q      Well, wouldn't a one directional force be a cut

Kathleen Plaia

Case 2:11-cv-04171-AMD   Document 6-26   Filed 01/17/12   Page 14 of 122 PageID #: 1590

1   made with a knife?

2        A     One directional force could be cut with a knife,

3   yes.

4        Q     Now, you indicated that you made a -- withdrawn.

5            After you sent that -- you did not, did you, make

6   an evaluation of the little black dot that was found on the

7   tool before it sent to the FBI?

8        A     No, I did not.

9        Q     And did you request that that evaluation be made

10  by the FBI?

11       A     Yes.

12       Q     And at the time that that request was sent out,

13  you were in charge of the tool mark section of SIB, were you

14  not?

15       A     No, I was not.

16       Q     Who was in charge?

17       A     Detective-Sergeant Ryan.

18       Q     Was Detective Ryan's expertise in tool markings

19  or in handwriting?

20            MR. BIANCAVILLA:  Objection.  What's the

21       relevancy of that?

22            THE COURT:  There doesn't appear to be any

23       relevancy.

24            I'll permit him to answer it.  If he knows.

25       A     He's my immediate supervisor.  He's not a

1    scientific -- you know, he's not a criminalist.

2         Q    He's not a criminalist.  Does that mean he does

3    not examine tools microscopically, the way you do?

4              MR. BIANCAVILLA:  I object.

5         Q    What does that mean, he's not a criminalist?

6              THE COURT:  Sustained.

7         Q    Would you explain to the jury what type of --

8    withdrawn.

9              Was there anybody else in SIB that was doing tool

10   examinations at that time?

11             MR. BIANCAVILLA:  Objection, as to relevancy.

12             THE COURT:  Mr. Chamberlain, I don't see the

13        relevancy to that question.  Perhaps you can tell me.

14             MR. CHAMBERLAIN:  Let me go on, Judge.

15        Q    You showed this jury a number of different types

16   of tools; was one of those the scissors?

17        A    No.

18        Q    You cut one of the packages that the cord was in

19   with a pair of scissors, did you not?

20        A    That's correct.

21        Q    You didn't make any use of that scissor in your

22   demonstration, right?

23        A    That's correct.

24        Q    And a scissor is a sheering-type tool, right?

25        A    That's correct.

Det. Shiraldi - People - Cross                    905

1      Q      Not the type tool that would result in a one

2  directional force cut, right?

3      A      That's incorrect.

4      Q      Scissors come in different shapes, some blunter,

5  some wider than others, right?

6      A      That's correct.

7      Q      And some looser than others.  Did you make any

8  tests of this cord with a scissor?

9      A      No.

10      Q      Now, the cord which was used here was examined by

11  you on April 20th?

12      A      Yes.

13      Q      And the -- I think it's your testimony that you

14  made no examination of the cord or a tool until after it was

15  received back from the FBI?

16      A      That's incorrect.

17      Q      I see.  What is correct then?

18      A      I examined the cord on April 20th.  I

19  photographed --

20              MR. BIANCAVILLA:  I'm sorry, I can't hear the

21      Detective.  Would you speak up.

22      A      I examined the cord on April 20th.  I

23  photographed the cord on April 20th.  I never examined the

24  leatherman tool until November 8th of 2000.

25      Q      You have already testified that you sent the tool

Kathleen Plaia

1    along with the cord to the FBI to have a little dot on the

2    tool examined by the FBI.

3         A    That's correct.

4         Q    So, you saw the tool and you must have examined

5    it sufficiently to know there was a little black dot on it,

6    right?

7              MR. BIANCAVILLA:  Objection.  That wasn't his

8         testimony.

9              MR. CHAMBERLAIN:  That was --

10             THE COURT:  I'll sustain it as to form.

11        Q    You examined the tool to determine whether there

12   was any material on it?

13        A    No, I did not.

14        Q    Detective, the transmittal to the FBI was when,

15   do your notes indicate that?

16        A    When was it sent or was it?  When was the letter

17   written?

18        Q    Pardon me.

19        A    When was the actual item sent?

20        Q    When was it sent?

21             THE WITNESS:  Can I refer to my notes, Judge?

22             THE COURT:  Of course.  If your notes will

23        refresh your recollection.

24             THE WITNESS:  Yes, they will.

25        A    On 6/29 2000.

1      Q      I'm going to show you Defendant's G for

2      identification again and ask you if you were aware of that

3      document at the end of May 2000?

4      A      Yes, I was.

5      Q      And can you explain any reason -- withdrawn.

6             The tool was sent to Washington, the tool and the

7      cord were sent to Washington, because you were busy with

8      other matters?

9      A      That's correct.

10     Q      And this was at the direction of the Homicide

11     Detective, John -- Jack McHugh?

12     A      Yes.

13     Q      And presumably he wanted this thing done quickly,

14     right?

15             MR. BIANCAVILLA:  Objection.

16             THE COURT:  Sustained.

17     Q      Was there any reason why it couldn't wait?

18             MR. BIANCAVILLA:  Objection.

19             THE COURT:  Sustained.

20     Q      The letter indicates --

21             MR. BIANCAVILLA:  Objection.

22     Q      Withdrawn.

23             THE COURT:  Sustained.

24     Q      Do you have any reason for the delay between that

25     document dated --

Kathleen Plaia

1              MR. BIANCAVILLA:  Objection.

2      Q      The end of May?

3              MR. BIANCAVILLA:  Reading from something not

4      in evidence.

5              THE COURT:  Yes, sustained.

6              Mr. Chamberlain.

7      Q      Detective, do you have any notes regarding

8  your -- your notes regarding any examination of the cord or

9  the tool, other than the pages that I have already exhibited

10 to you?

11     A      No.

12     Q      Do you have any notes concerning the tool being

13 worn?

14     A      No.

15     Q      Do you have any notes concerning the tool having

16 play in it?

17     A      No.

18     Q      Do you have any notes concerning the tool being

19 difficult to cut?

20     A      No.

21     Q      Being dull or requiring strength to cut the cord?

22     A      No, I do not.

23     Q      Do you have any notes indicating that the tool

24 will leave a cut with a flat end with a small tail?

25     A      No.

1        MR. BIANCAVILLA:  Objection.

2        THE COURT:  I'll permit it.

3    Q       And until you received the tool and the cord back

4    in late October of 2000, you had no communications with the

5    FBI concerning their evaluation of the cord?

6    A       Prior to November 8th?

7    Q       Received it back November 8th?

8    A       That's correct.

9    Q       Prior to November 8th, 2000?

10   A       No, I did not.

11   Q       Was there anybody else in SIB who was working on

12   this case and this evaluation of that tool or that cord

13   besides yourself?  Anybody else at SIB besides yourself

14   working on that cord and that tool?

15   A       No.

16   Q       After you received the cord back November 8th,

17   did you make any further examination of that cord or that

18   tool in connection with your testimony here today?

19   A       The cord, yes.  The tool, no.

20   Q       The cord, when?

21   A       When I sampled a small, thin piece, as I

22   described, in the Fourier transformation infrared

23   spectroscopy.  So, sample that in comparison to the small

24   black fleck of plastic that was removed by the FBI and put

25   in the sample container.

```
 1        Q        That was a stereo microscopical examination of

 2   the material, the cord and the little black dot taken from

 3   the tool?

 4        A        Ever forensic examination should start, and it

 5   started, with a stereo microscopic examination.

 6        Q        And would you tell the jury exactly what you did

 7   with that?

 8        A        I examined that under a stereo light microscope.

 9        Q        Anything else?

10        A        Then I did Fourier transformation infrared

11   spectroscopy on both samples.

12        Q        Did you use any other material in that fashion?

13        A        Other than the two samples, the small black flex

14   and the wire?

15        Q        No.

16        A        No.

17        Q        May I see you document -- withdrawn.

18             Was that on or about November 14th of 2000?

19                 THE COURT OFFICER:  Defendant's I for

20        identification.

21                 (Whereupon, the referred to item is handed to

22        the witness)

23        A        I finished my report on 11/14 2000, yes.

24        Q        Was that report kept in the regular -- made in

25   the regular course of business of Nassau County Police
```

1    Department?

2         A     Yes.

3         Q     Was it the regular course of business of the

4    Nassau County Police Department to make such records?

5         A     I write a report when I finish a case.

6         Q     Was that report made at or about the time the

7    examination referred to therein?

8         A     Yes.

9                    MR. CHAMBERLAIN:  I offer that in evidence.

10                   MR. BIANCAVILLA:  Same objection as before,

11   Judge.

12                   MR. CHAMBERLAIN:  It has --

13                   THE COURT:  Counsel, come forward.

14                   (Whereupon, the following takes place at the

15   Bench, between the Court and Counsel:)

16                   THE COURT:  Mr. Chamberlain, where was it

17   contradictory, the testimony, to what Detective

18   Shiraldi said on direct.

19                   MR. CHAMBERLAIN:  Right here it starts,

20   Judge.  He used a piece of wood in connection with that

21   examination.

22                   MR. BIANCAVILLA:  He didn't ask him about it.

23                   THE COURT:  That was my next --

24                   MR. BIANCAVILLA:  Thank you.

25                   THE COURT:  You didn't ask him that.

1          MR. CHAMBERLAIN:  I asked --

2          THE COURT:  Let me explain, Mr. Chamberlain.

3   Mr. Chamberlain.  Mr. Chamberlain, in a criminal

4   case -- and I shouldn't have to be doing this.

5          MR. CHAMBERLAIN:  I would like --

6          THE COURT:  You -- he has his direct

7   testimony.  He gives his testimony.  You listen to it.

8   Then you look at the record and see if there's

9   something contradictory there.  Then you cross him,

10  didn't you do X or didn't you do Y or didn't you do Z?

11  And then now, there is where the contradiction is, he

12  says, I did J or K or L.

13         MR. CHAMBERLAIN:  I asked him if he used any

14  other material.

15         MR. BIANCAVILLA:  You had better go back to

16  law school.

17         MR. CHAMBERLAIN:  He used any other material

18  back in connection with that.  That was the question I

19  asked him.

20         THE COURT:  Why didn't you ask him if he used

21  a piece of wood?

22         MR. CHAMBERLAIN:  You know, Judge --

23         THE COURT:  Mr. Chamberlain, we follow the

24  rules of evidence.

25         MR. CHAMBERLAIN:  I am following the rules.

1          THE COURT:  No, you're not.

2          MR. BIANCAVILLA:  No, you're not, John.

3          MR. CHAMBERLAIN:  I respectfully except.  I

4    would like --

5          THE COURT:  You have an exception on the

6    record.

7          MR. CHAMBERLAIN:  All of this is in front of

8    the jury and this witness.

9          THE COURT:  Nobody -- if you don't raise your

10   voice, nobody is hearing this.  And you haven't, yet.

11   That's why we're up at the Bench.  I won't do it in

12   front of the jury.

13          I'm trying to explain to you, if you want to

14   try to get a contradiction in, you have to ask him

15   about the contradiction.  Didn't you say in your report

16   that you used wood?  There's -- it has to be a direct

17   contradiction in order to get it into evidence.  Then,

18   that part, well, we redacted that part of it, will get

19   into evidence.

20          MR. BIANCAVILLA:  He has to deny it first

21   before you can put that into evidence.

22          THE COURT:  You have to ask him the question.

23          MR. CHAMBERLAIN:  I did ask him a question.

24          MR. BIANCAVILLA:  No, he didn't.

25          THE COURT:  You didn't ask you him about the

1      wood.

2                  MR. CHAMBERLAIN:  I asked him if he used any

3      other substance.  I mean, that would include anything.

4      I said, was anything, other than those two items --

5                  MR. BIANCAVILLA:  You give it to him and say,

6      does this refresh your recollection as to some other

7      substance.  And if denies it --

8                  MR. CHAMBERLAIN:  He had it in front of him

9      to refresh his recollection.

10                  THE COURT:  Mr. Chamberlain, there are

11     certain procedures.  Now, I don't want do keep doing

12     this at the Bench.  You have to follow the rules of

13     evidence.  You have to ask a correct question, a proper

14     question.

15                  MR. CHAMBERLAIN:  Fine, Judge.  You're not

16     allowing this in?

17                  THE COURT:  I'm sorry?

18                  MR. CHAMBERLAIN:  It's not allowed in?

19                  THE COURT:  You haven't done it properly.

20                  MR. CHAMBERLAIN:  It's not allowed, Judge?

21                  MR. BIANCAVILLA:  Judge, can we move on.  I

22     have another witness.

23                  THE COURT:  You have an objection?

24                  MR. BIANCAVILLA:  Yeah, I have an objection.

25                  THE COURT:  Sustained.

1              MR. CHAMBERLAIN:  Okay.

2              (Whereupon, the following takes place in open

3      court:)

4      Q      Detective, in connection with that evaluation of

5  that material, you indicated you didn't use any other

6  substance.  Does a piece of toothpick-like wood used in

7  connection with that evaluation refresh your recollection?

8      A      I know it's there.  I didn't use that in my

9  evaluation, no.

10     Q      You indicated it was stereo microscopical.  Was

11 there not a chemical method used in that evaluation as well?

12     A      The Fourier transformation infrared spectroscopy

13 is an instrument, technique, that uses the infrared energy

14 to pass through the sample, samples, dictates the absorbancy

15 of that and gives you a spectrum, as I indicated before.

16     Q      Those tests indicated that the material was not

17 only dissimilar, but, quote, could not have originated from

18 the cord?

19     A      That's correct.

20     Q      Other than that test, did you perform any other

21 tests on either the cord or the tool before testifying here

22 today?

23     A      No, I did not.

24     Q      After you got the FBI report that indicated a

25 different type of cut --

```
 1              MR. BIANCAVILLA:  Objection, Judge.

 2              THE COURT:  Sustained.

 3     Q     Did the FBI report come back with a different

 4   type of cut?

 5              MR. BIANCAVILLA:  Objection.

 6              THE COURT:  Sustained.

 7              THE COURT:  It's not in evidence,

 8   Mr. Chamberlain.

 9              MR. CHAMBERLAIN:  Pardon me?

10              THE COURT:  It's not in evidence.

11              MR. CHAMBERLAIN:  I think I got -- I would

12   like to ask this witness if he knows of what the

13   results were.

14              MR. BIANCAVILLA:  Judge --

15              MR. CHAMBERLAIN:  I think --

16              THE COURT:  No, Mr. Chamberlain.

17              Sustained.

18     Q     In any event, have you discussed your findings

19   with the FBI agent outside the courtroom here today?

20              MR. BIANCAVILLA:  Objection.

21              THE COURT:  I'll permit that.

22     A     I met him this morning for the first time.

23     Q     I understand that.  Have you discussed your

24   findings with him today?

25     A     No, I did not.  I read his report and I had -- I
```

1    said, okay, that's it.  I didn't discuss anything with him.

2        Q     And did you not discuss your findings with him

3    before coming here today?

4        A     No, I did not.  First time I met him was this

5    morning.

6        Q     Did you change your opinion from the time you --

7    the findings reported in your notes from your testimony here

8    today as to the type of cut?

9                   MR. BIANCAVILLA:  Objection.

10                  THE COURT:  I'm going to sustain as to form.

11       Mr. Chamberlain.

12       Q     Well, on the prior examination, microscopic

13   examination, of this cord, you made a finding that it was a

14   one directional cut, is that right?

15       A     That's correct.

16       Q     You have changed that opinion now?

17       A     No, I have not.

18       Q     You have not?

19       A     I have not changed that opinion.

20                  MR. CHAMBERLAIN:  Nothing further, Detective.

21       Thank you.

22                  THE COURT:  Any redirect, Mr. Biancavilla?

23                  MR. BIANCAVILLA:  Yes, Judge.

24

25

Kathleen Plaia

1    REDIRECT EXAMINATION

2    BY MR. BIANCAVILLA:

3        Q      Detective Shiraldi, with respect to the one

4    directional cut or one directional force, okay, could you

5    open up your bag of tools in front of you, please.

6                    THE WITNESS:  May I stand up, Judge?

7                    THE COURT:  Yes.

8                    MR. BIANCAVILLA:  Judge, could we have

9    Detective Shiraldi stand in front of the jury, please.

10                   THE COURT:  Yes.

11                   You can go to the well, Detective.

12                   (Whereupon, the witness leaves the witness

13   stand.)

14       Q      Would you please explain to the jury what is a

15   one directional force?

16       A      One directional force --

17       Q      Please speak up.

18       A      One directional force is, any time that there is,

19   just as you see, one curvature or one sign of direction or

20   field pushing of the object.  That is done by --

21                   THE COURT:  You have to keep your voice up.

22       A      When I say one directional force, what I'm saying

23   is, that the wire is put between these two jaws, and one is

24   stationary.  One pushes through one direction.  The wire is

25   held by one side.  This, acting as a fulcrum in the middle

Kathleen Plaia

1   of a see-saw, stopping there.  And the other jaw is pushing

2   against it, creating the wire to remain stable in one

3   aspect.  And the top, where the sheering jaw comes from,

4   tends to bend that over.  The slight play within that tool

5   gives that flattening that those pictures depict.

6        Q    Now, does a pair of wire cutters --

7             MR. CHAMBERLAIN:  I move to strike that last

8        part which was not responsive to the answer, Judge.

9             MR. BIANCAVILLA:  This is an explanation of

10       one directional force.

11            THE COURT:  It appears to me he was telling

12       us what a one directional force was.

13            I'm going to deny it, Mr. Chamberlain.

14       Q    Does a pair of scissors apply a one directional

15   force?

16       A    Yes, it does.

17       Q    Okay.  Explain how that works.

18       A    Is there a pair of scissors around?

19       Q    I don't believe so.

20       A    If you put your hand in scissors, usually the

21   bottom blade stays stationary.  Your thumb --

22            (Whereupon, the witness is handed a pair of

23       scissors.)

24       A    The bottom, if you watch the blade, the bottom

25   blade stays stationary.  The top blade does the cutting.

1    That's one directional force, pushing the paper down against

2    the fulcrum.  This blade, creating the cut, pushing it down.

3    If we can blow this up on spectroscopy, this will be pushed

4    over, the paper will be pushed over.

5        Q    That one directional force which you just

6    displayed with the scissors, is the same type of one

7    directional force used by the leatherman tool?

8        A    Sheering top.  Looping, sheering action, yes.

9        Q    A pair of wire cutters, does that provide a one

10   directional force?

11       A    No, it does not.  As I depicted on my sketch --

12   as crude as that may be -- these meet together, creating the

13   apex.  You will see the both portions pull in the wire, the

14   apex where it rips apart.  Two directional.  Both sides of

15   that wire you see creating then the break.  Two directions,

16   both sides of this wire.

17       Q    How about the larger, I believe you called

18   them --

19       A    These are lineman dikes.  Same thing, basically,

20   the same jaw.  This has a pair of pliers in the front.  But,

21   the same type of jaw.  These jaws meet together.  You will

22   see that same pinching of the wire, the break, the apex of

23   the wire sticking out.

24       Q    What about the knife?

25       A    The knife has a one directional force.

1      Q      But --

2      A      However, as I push down here (indicating), this

3  was your fulcrum.  As I cut the wire, before I pushed down,

4  this was the fulcrum.  When I looped it around, before that

5  one directional force, you saw there was another

6  characteristic there, there was that looping that I drew

7  out.  There's that looping section.  You would see this in

8  the wire.  Then that one directional force would be pulled

9  out, where you might see some little actions here or here.

10        But, again, you're using a fulcrum, one

11  directional force.  Scissors and that leatherman type tool,

12  one directional force.  The opposite jaw being the

13  stationary position, where the other piece is the looping or

14  sheering effect giving that one direction.

15     Q      Now, with respect to the examination of the

16  leatherman tool.

17            You can sit down again, Detective.

18                    (Whereupon, the witness resumes the witness

19     stand.)

20     Q      When was the first time you performed any test

21  cuts with that leatherman tool?

22     A      Today, as I was standing here.

23     Q      In front of the jury?

24     A      In front of the jury.

25     Q      When was the first time you actually observed the

1   individual characteristics of that leatherman tool?

2       A     On April 18th when an outside expert,

3   Mr. Petraco, and Mr. Chamberlain came to examine that tool

4   in my presence in police headquarters.

5       Q     Okay.  And do you have notes of that meeting?

6       A     Yes, I do.

7       Q     Do you recall what occurred at your laboratory on

8   April 18th?

9       A     It was in the conference room of police

10  headquarters.

11      Q     Who appeared in the conference room at police

12  headquarters?

13      A     Mr. Chamberlain and Mr. Petraco.

14      Q     Do you know Nicholas Petraco?

15      A     Yes, I do.

16      Q     Did you observe an examination of both the

17  leatherman tool and the ligature by Mr. Petraco?

18      A     Yes, I did.

19      Q     Please describe for the jury what your

20  observations were.

21      A     He used our stereo light microscope.  He did some

22  test cuts with the leatherman type tool, viewed it under the

23  stereo light microscope.  Cut some aluminum wire, some

24  monofilament wire and documented that by digital

25  photography.  He also examined a Budweiser beer bottle.

Det. Shiraldi - People - Redirect          923

1        Q      With respect to cutting an aluminum-type wire

2    with a -- with the leatherman tool, what's the purpose of

3    cutting an aluminum wire, and what's the difference from

4    cutting aluminum and copper?

5        A      Aluminum is a very, sort of, soft, light

6    material.  You could see some individualized

7    characteristics.  You could --

8        Q      This examination by Mr. Petraco and

9    Mr. Chamberlain took place on what date?

10             THE WITNESS:  May I refer to my notes, Judge?

11             THE COURT:  Yes.  You can refresh your

12        recollection.

13        A     April 18th at 1210 hours.

14             THE COURT:  What year was that, sir?

15        A     Year 2002.

16        Q     Now, on November 8th of 2000 did you -- had you

17    performed any test cuts with that wire?

18        A     No, I did not.  With the wire?

19        Q     No, I'm sorry.  With the leatherman tool.

20        A     No, I did not.

21        Q     Okay.  Thank you.

22             MR. BIANCAVILLA:  I have nothing further.

23             THE COURT:  Anything further,

24        Mr. Chamberlain?

25

Kathleen Plaia

1    RECROSS EXAMINATION

2    BY MR. CHAMBERLAIN:

3        Q    Detective, you say you know Mr. Petraco, where do

4    you know him from?

5                    MR. BIANCAVILLA:  Objection.

6                    MR. CHAMBERLAIN:  He brought it out.

7                    MR. BIANCAVILLA:  Relevancy?

8                    MR. CHAMBERLAIN:  Why did he bring it out he

9        knows him?

10                   MR. BIANCAVILLA:  I didn't ask him if he knew

11       him.  I said, did he appear at his laboratory.

12                   MR. CHAMBERLAIN:  You asked him, do you know

13       Mr. Petraco.

14                   THE COURT:  Actually, I think you did.

15                   MR. BIANCAVILLA:  Okay.

16                   THE COURT:  You can answer the question.

17       A    Yes, I do know him.

18       Q    Where did you know him from?

19                   MR. BIANCAVILLA:  Objection.

20                   MR. CHAMBERLAIN:  Same question, Judge.

21                   THE COURT:  I'll permit the answer.

22       A    He was my -- a detective when I was employed at

23   the New York City Police Laboratory as a civilian chemist.

24       Q    Was he also a professor of yours?

25       A    He was a professor at John Jay College also, yes.

```
 1        Q      And this testimony here about scissors being a

 2   one directional force tool, is that your testimony?

 3        A      That's how it appeared, yes.  Any substance cut

 4   with a sheering-type would be a one directional force.  The

 5   bottom jaw or blade acts as the fulcrum, the other blade

 6   does the direction, and the force cuts.

 7        Q      Wasn't your testimony this morning that a knife

 8   would be a one directional force, where it cuts through

 9   whatever you're cutting?

10                MR. BIANCAVILLA:  I object.  This was

11          explained three times.

12                THE COURT:  I'll permit him, since you

13          brought this area up on redirect.

14                MR. CHAMBERLAIN:  I'm going to object to the

15          district attorney making comments.

16                THE COURT:  Mr. Chamberlain, he made the

17          objection.  I ruled upon it.  I prefer that both of you

18          not argue your objections in front of the jury.

19        A      Can you repeat the question?

20                THE COURT:  Read back the question to the

21          Detective.

22                (Whereupon, the requested question was read

23          back by the reporter as instructed.)

24        A      Again, as I explained, a knife does have a one

25   directional force.  But it has a different dynamic than a
```

1    one directional force, which that acts as a looping,

2    sheering-type action.

3              As I told you with these pictures, that's your

4    one directional force with the knife.  But you see these

5    little telltale signs, these other dynamics that involved in

6    the cutting with the one directional force with the simple

7    blade.

8         Q    Wasn't it your testimony this morning that the

9    sheering-type cut would be two blades going against each

10   other, sheering?

11        A    That's a sheering-type action, yes.

12        Q    That was to distinguish an opposite really of a

13   one directional cut, was it not?

14              MR. BIANCAVILLA:  Objection.

15        Q    Wasn't that your testimony?

16              THE COURT:  I will have to sustain it for

17   form, Mr. Chamberlain.

18        Q    Did you discuss your opinion on a one directional

19   force being made by a scissor with the agent outside?

20              MR. BIANCAVILLA:  Objection.

21              THE COURT:  I don't think that was covered on

22   redirect.

23              MR. CHAMBERLAIN:  Well, this business about

24   one directional force has just come up.

25              THE COURT:  I will let you ask the question

Det. Shiraldi - People - Recross                      927

1       again.

2                       MR. BIANCAVILLA:  It didn't come up.

3                       MR. CHAMBERLAIN:  His definition did.

4                       THE COURT:  Overruled.  Ask the question.

5       Q       Did you discuss that with the detective out --

6       with the agent outside?

7       A       No, I did not.

8       Q       You didn't discuss anything about your findings

9       or his findings at the time you have been sitting outside

10      with him?

11      A       No, I did not.

12                      MR. CHAMBERLAIN:  Nothing further.

13                      THE COURT:  Anything further,

14      Mr. Biancavilla?

15                      MR. BIANCAVILLA:  No, Judge.

16                      THE COURT:  Thank you, Detective.  You can

17      step down.

18                      (WITNESS EXCUSED)

19                      THE COURT:  Mr. Biancavilla, will you call

20      your next witness, please?

21                      MR. BIANCAVILLA:  Carlo Rosati.

22      C A R L O   R O S A T I,  called as a witness by and on

23          behalf of the People, having been first duly sworn,

24          testified as follows:

25                      THE CLERK:  Thank you.  Be seated.

1          THE COURT OFFICER:  In a loud voice, would

2     you give your full name, spelling your last name, and

3     your County of residence.

4          THE WITNESS:  Carlo Rosati, R-O-S-A-T-I.   I

5     live in Loughton County, Virginia.

6          THE COURT OFFICER:  Thank you.  You may

7     inquire.

8          MR. BIANCAVILLA:  Thank you, Judge.

9  DIRECT EXAMINATION

10 BY MR. BIANCAVILLA:

11     Q     Good afternoon, Mr. Rosati.

12     A     Good afternoon, sir.

13     Q     Mr. Rosati, where are you employed?

14     A     I'm employed by the Federal Bureau of

15 Investigation in Washington, DC, also known as the FBI.

16     Q     And what is your position with the FBI?

17     A     I am a firearms and tool marks examiner.

18     Q     And how long have you been examining firearms and

19 tool marks?

20     A     With the FBI Laboratory for the last seven

21 and-a-half years.

22     Q     And prior to the FBI?

23     A     I started my employment with the FBI in 1977 as a

24 fingerprint examiner.  I became a technician with them in

25 1979 through 1990.  1990 through 1994 I was a firearm and

1   tool mark examiner with the Bureau of Alcohol and Firearms

2   laboratory in Rockville, Maryland.

3       Q    And what training have you had in that area?

4       A    The majority of my training has been on-the-job

5   training by other examiners.  But I have attended

6   specialized courses in the discipline of firearms and tool

7   marks.  I have also traveled to various factories to observe

8   their manufacturing process, as well as to read different

9   articles that are published in the Association of Firearms

10  and Tool Mark Examiners Journals, of which I am also a

11  member and attend their training seminars whenever possible.

12      Q    With respect to tool marks and tool marks

13  impressions, approximately how many examinations have you

14  performed over your career, if you can give us a number?

15      A    Thousands of examinations.  Because, firearm

16  evidence is also tool mark evidence.

17      Q    And have you been qualified as an expert in this

18  particular area?

19      A    Yes, I have.

20      Q    All right.  And have you testified in courts as

21  an expert in tool mark examination?

22      A    Yes, I have.

23      Q    Now, are all tool mark examiners also firearms

24  examiners?

25      A    No.  They are not.

Mr. Rosati - People - Direct                    930

1          Q       So, different agencies have different -- split up

2    their disciplines differently?

3          A       Yes, sir, they do.

4          Q       With the FBI, they do tool mark and firearms?

5          A       That's correct.

6          Q       Other agencies may do tool mark and hair

7    microscopy?

8          A       Yes.

9          Q       Because they all involve the use of microscopes?

10         A       Yes. it depends upon their protocols.

11         Q       You examine certain pieces of evidence which were

12   sent to you in this case?

13         A       Yes, sir, I did.

14         Q       Was one of them a, what's been referred to as, a

15   leatherman tool?

16         A       Yes, sir.

17         Q       Was another item a ligature?

18                 I'm going to show you what is in evidence as

19   People's 43 and People's 44.

20                 These have been involved in front of the jury, so

21   you may have to move them around to see your identification

22   marks.

23                 Do you recognize the leatherman tool?

24         A       Yes, I do.  My identification marks are on the

25   packaging.  My identification marks are also on the

1    packaging of the wires which were submitted, which I believe

2    you called the ligature.

3        Q    And I could you tell the jury when you received

4    those items?

5        A    These items were received in the FBI Laboratory

6    on June 30th of 2000.  I signed for the evidence from our

7    evidence control center, July 5th of 2000.

8        Q    Could you briefly explain to the jury what you

9    did with those items?

10       A    With these particular items, I followed the

11   normal laboratory procedures of examination of evidence.

12            I initially started my paperwork and then

13   examined the items on an initial examination of normal

14   viewing, starting to create notes for me to be able to

15   recall this information for you today.

16            I then proceeded to look at the items of evidence

17   under a stereo microscope, which allows me to look at

18   evidence up to four times normal vision.  And upon

19   completion of the initial examinations under the microscope,

20   I proceeded to determine what I would have to do to make

21   appropriate test cuts for me to make comparisons from the

22   multi tool, the leatherman multi tool, to have specimens

23   that are available for me to look at under comparison

24   microscope.

25            Comparison microscope is one microscope that has

Mr. Rosati - People - Direct                    932

1  two sets of optics that allows me to look at two things at

2  the same time.

3          Upon completion of all of my initial

4  examinations, I had reached a conclusion for this evidence.

5      Q    Okay.  And the examinations that you made, when

6  you said test cuts, please explain what you did regarding

7  the test cuts.

8      A    Well, from looking at -- what is classified as

9  People's Exhibit 43, looking at the end of the wires, I

10  could determine the type of tool mark that was present.

11          From my training and from my experience in former

12  employment, I spoke of my employment with the FBI and with

13  ATF, and, of course, I had recognition of various types of

14  tools marks in working for them.  But I also worked

15  throughout high school and college in a machine shop, and I

16  have a pretty extensive knowledge of kinds and types of tool

17  markings they will create.

18          So, upon looking at, again, People's Exhibit 43,

19  I could determine that there was a sheering-type of tool

20  mark at the end of this evidence.

21      Q    What type of tools produce a sheering-type tool

22  mark?

23          MR. CHAMBERLAIN:  Can we get a date, when

24      this was done?

25          MR. BIANCAVILLA:  He gave a date, Judge.

1           THE COURT:  Could you tell us when this was

2     done?

3           THE WITNESS:  Yes, your Honor.  May I refer

4     to my notes?

5           It was in October.

6           THE COURT:  You can refresh your

7     recollection.

8           THE WITNESS:  October 17th of 2000.

9     Q    What type of tools produced the type of

10    observations you made on that wire?

11    A    Well, any type of sheering tool.  A sheering tool

12    is a type of tool which will have two blades, which, as they

13    impress against the items that they are cutting, they will

14    actually pass alongside of each other.  One blade works as

15    an anvil, the other blade will work as the cutter.  In

16    cutting through this particular evidence. And the evidence

17    itself will actually have drawing marks toward a action

18    through the item of evidence, which will have tool marks on.

19    Q    Let me ask you a question, I'm going to show you

20    a pair of scissors.

21    A    Yes, sir.

22    Q    Does this pair of scissors produce that kind of

23    effect?

24    A    Yes, they do.

25    Q    How about a pair of dikes like this?

1      A      Not normally.   These would be pinching-type of

2   tools.

3      Q      Pinching-type tools.   Okay.   How about a pair of

4   wire cutters?

5      A      Those are diagonal cutters, pinching-type tools

6   also.

7      Q      How about the leatherman tool in front of you?

8      A      The leatherman tool that is in front of me, first

9   observation would appear to be a pinching-type of tool.

10  However, on this particular one, it actually is a

11  sheering-type tool.   The two blades pass alongside of each

12  other.   They start to impress, but then they will pass

13  alongside of each other as they're cutting through the

14  material.

15     Q      Why does that particular tool operate in the

16  fashion you just testified?

17     A      Well, it appears to be the design of this

18  particular tool.

19            Again, this one here is different from the one I

20  have, which is made by a different company.   The one I have

21  is a pinching-type tool, where the two jaws come and meet

22  each other.

23            This particular type tool is either made that way

24  or has been forced out of alignment and is a sheering-type

25  tool.

1    Q    Could that be from wear?

2    A    Yes, it could.

3    Q    Now, did you have an opinion with respect to the

4  comparison in comparing the test cuts you made with that

5  leatherman tool and your observations of the cut end of the

6  ligature with respect to that tool?

7    A    Yes, sir.

8    Q    Okay.  Could you please tell us what your opinion

9  is?

10   A    My opinion is that the leatherman multi purpose

11  tool could have cut those wires, but I cannot say

12  definitively.

13   Q    Thank you.

14        MR. BIANCAVILLA:  I have no further

15   questions.

16        THE COURT:  Mr. Chamberlain.

17  CROSS-EXAMINATION

18  BY MR. CHAMBERLAIN:

19   Q    Your definition of a sheering-type tool includes

20  scissors, two blades cutting across each other, is that

21  right?

22   A    Yes, sir.

23   Q    Would it include a knife?

24   A    No, sir.  That would be a single blade tool.

25  That could be in a sheering-type motion, but it is -- you

1  have to preface it as a single blade tool.  Is tis a way to

2  define that and observe that on the item that is used to

3  cut.

4       Q     And would a knife be a one directional-type tool?

5       A     Yes, sir.

6       Q.    Okay.  As distinguished from the sheering-type

7  that you found?

8       A     Yes, sir.

9       Q     All right, Agent.  And you indicated that this

10 particular tool could have been forced out of being a

11 pinching-type tool by wear?

12      A     Either by wear or abuse.  I'm unable to determine

13 that.  Or it may have been manufactured that way.  I'm

14 unable to determine that.

15      Q     Excuse me, I didn't mean to interrupt.  It may

16 have been manufactured that way?  You're just speculating

17 here, you can't tell us with any reasonable degree of

18 certainty that it was converted from a pinching-type tool to

19 a sheering-type tool by either abuse or wear?

20      A     That's correct.

21      Q     Now, Agent, you indicated that you got -- the FBI

22 got this tool on June 30th, you signed for this on July 5th

23 and you conducted the experiments or investigation of it on

24 October 17th.  Are those dates correct?

25      A     That's correct.

1       Q       Anything between July 5th and October 17th?

2       A       No, sir.

3       Q       Aside from -- aside from the investigation into

4    the type of tool and whether it was a sheering-type tool and

5    the cuts on the cord, were you -- was anything else being

6    done by the FBI with respect to these exhibits that were

7    sent to you?

8       A       A request was made for a chemistry-type

9    examination, to determine if any foreign material on the

10   tool could be compared to People's Exhibit 43's wires.

11      Q       And was that done?

12      A       No, it was not.

13      Q       Do you know how that request was made?  Was it

14   made in writing?

15      A       Yes, sir, it was.

16      Q       Do you write back to say, no, or how did you

17   communicate that fact to the requesting authority?

18      A       I called the phone number which was supplied to

19   me on -- I have to refer to my notes again.

20      Q       Was it on October 12th?

21      A       Yes, sir.

22      Q       And did you talk to the detective who was in SIB

23   who was handling this investigation for the Nassau County

24   investigation on this tool in this court?

25      A       I spoke to a detective.  I don't remember exactly

1   which one it was.  My notes only refer to as called

2   detective.

3       Q      You spoke to a detective Shiraldi outside a

4   little bit, I take it?

5       A      Yes, sir.

6       Q      Was he the person you spoke to?

7       A      I don't recall.  All I know is that I called and

8   informed them that I could not perform those examinations

9   that were requested.

10      Q      Was that all?

11      A      Yes, sir.

12      Q      Don't your notes indicate that that detective had

13  some questions?

14      A      No, sir, I don't, on my phone call log.  No, sir.

15  Just what I -- I had questions concerning tool marks and

16  chemistry exams.  And my reason for my call was to inform

17  him that the FBI laboratory at that point in time could not

18  perform the chemistry exam.

19      Q      Did you ask that detective as to whether or not

20  they had made any previous examination of these items?

21      A      No, sir.

22      Q      When this was sent to you, were you told there

23  were no previous examinations of these items?

24      A      The letter I believe indicates that, sir.

25      Q      And, so, you didn't discuss whether this was a

Kathleen Plaia

1   one directional force cut or sheering-type cut?

2        A     No, sir.

3        Q     Clearly, there's a significant difference between

4   those two type cuttings?

5        A     Yes, sir.

6        Q     And your finding, Agent Rosati, is that the

7   results of your tests were inconclusive, is that right?

8        A     Yes, sir, that's correct.

9        Q     And in addition to examining that

10  microscopically, did you do anything else, didn't you make

11  some cuts?

12       A     Yes, sir, I did.

13       Q     And how many cuts did you make?

14       A     I made several different cuts.

15       Q     Okay.  And did you, Detective -- I'm sorry,

16  Agent, I take it that, you agree, that in forensic science

17  it's extremely important to note down your findings

18  immediately upon doing that so that you don't forget them or

19  confuse them with some other evaluation?

20       A     That's correct, sir.

21       Q     Did you make notes of your findings at the time

22  of those tests?

23       A     Yes, sir, I did.

24       Q     On the 17th of October?

25       A     Yes, sir, I did.

1   Q      I'm sorry, was it on the 12th?

2   A      No, sir, it was the 17th.

3   Q      Would you check the tool mark?

4   A      Yes, sir.  I stand with the 17th as being the

5   date which my examinations were being conducted.  The notes

6   were written on the 12th.  But the conclusions are written

7   on the 17th.

8   Q      Oh, the test was done on the 12th?

9   A      The note sheets were written on the 12th.

10  Q      Well, wouldn't the note sheets be done -- they

11  wouldn't be done before you did the test?

12  A      Yes, sir, they would.

13  Q      They would?

14  A      Yes, sir.  I stand corrected if earlier I said

15  they were all done on the 17th.  I believe I looked at the

16  date of the 17th as my conclusions as being the date I wrote

17  them all.

18  Q      Thank you.  And your notes indicate that you had

19  seven sheering-type tool marks, is that right?

20  A      Several.

21  Q      Several?

22  A      Yes, sir.

23  Q      Isn't there a number seven there?

24         MR. BIANCAVILLA:  Judge, I'm going to object.

25  I let this go --

1              THE COURT:  Yes, Mr. Chamberlain.  Don't ask

2       the witness to testify as to the contents of the

3       document.

4       Q      Having reviewed your notes, would you tell us if

5   there was a specific number that you recall?

6       A      Yes, sir.  Seven sheering-type tool marks.  No

7   conclusion.  Several test cuts from K-1.

8       Q      Thank you.  Now, in addition to no conclusion,

9   were your findings that it could not be determined whether

10  or not K-1 cut Q-1?

11      A      I'm sorry, sir.  Could you repeat that for me?

12      Q      Your tests indicated that it could not be

13  determined whether or not K-1 cut Q-1?

14      A      Yes, sir, that's correct.

15      Q      And would you explain to the jury the K-1 and Q-1

16  designation?

17      A      K-1 would be the multi tool, Q-1 would be all of

18  the tool marks from the wires which were submitted.

19      Q      I'm going to show you a couple of documents and

20  ask you --

21              MR. CHAMBERLAIN:  I ask these be marked.

22              THE COURT:  Do you want them marked together?

23              MR. CHAMBERLAIN:  Yes, if you will, Judge.

24              THE COURT:  Okay.

25              (Whereupon, the referred to item is received

1      and marked Defendant's Exhibit J for identification by

2      the reporter as instructed.)

3              THE COURT OFFICER:  Defendant's J for

4      identification.

5              THE WITNESS:  Thank you.

6      A      Yes, sir.

7      Q      Now, you indicated, Agent Rosati, that you have a

8   leatherman's tool yourself?

9      A      No, sir.  I have a Gerber.

10     Q      You have a Gerber.  There are, in fact, quite a

11  few different styles and types of leatherman tools, are

12  there not?

13     A      Yes, sir, there are.

14     Q      Do you know, Agent, whether or not those tools

15  all have sheering-type cutting edges in addition to a knife

16  which is separate and apart from that?

17     A      No, sir.  I would have to examine all the

18  different models because they probably have different

19  appliabilities.

20     Q      Do those documents assist you in that

21  examination?

22     A      No, sir, they don't.  Because in most general

23  circumstances they don't describe the part of the work that

24  I do to describe something as whether it's a pinching-type

25  tool or sheering-type tool.  If I'm missing it, sir, I would

Mr. Rosati - People - Cross                    943

1    appreciate if you could point it out to me.

2         Q    I thought you might know more about leatherman

3    tools than general knowledge.

4         A    I have an above knowledge than most individuals.

5    But when it gets down to manufacturers' individuality, they

6    mark particular things for use.  And there is quite a few

7    numbers of different manufacturers that produce such tools

8    as this.

9         Q    So, your final conclusions of the FBI was that

10   this tool could not be determined -- could not be determined

11   that this tool cut this cord, right?

12        A    That's correct.

13        Q    And any of a number of other type sheering-type

14   tools could have cut it, is that correct?

15        A    That's correct.

16        Q    How many other types of sheering tools are there?

17        A    Quite a few number, sir.  I couldn't even start

18   to guess.

19        Q    That's numbers of types?

20        A    Yes, sir.

21        Q    So, if there are a number of types, there are

22   thousands, perhaps, of tools --

23        A    I don't know that.

24        Q    In common?  Sheering-type tools in common use.

25        A    I don't know, sir, if it's tens, hundreds or

1    thousands.

2         Q    Hundred of thousands.

3              MR. CHAMBERLAIN:  Thanks very much, I

4         appreciate it.

5              THE COURT:  Redirect?

6              MR. BIANCAVILLA:  Sure.

7    REDIRECT EXAMINATION

8    BY  MR. BIANCAVILLA:

9         Q    Mr. Rosati --

10        A    Yes, sir.

11        Q    The leatherman tool that is in evidence, I

12   believe it's People's 43?

13        A    44.

14        Q    You made the test cuts with that leatherman tool.

15   Did it produce cuts similar to the one you observed --

16        A    Yes, sir.

17        Q    On the ligature?

18        A    Yes, sir.

19        Q    Now, the one directional force that

20   Mr. Chamberlain was asking you about, does a scissor

21   provide -- is a scissor an example of a one directional

22   force type of cut?  Can you explain how that works in

23   terms --

24              MR. CHAMBERLAIN:  I would like to have one

25        question answered, not two or three.

Mr. Rosati - People - Redirect                          945

1              THE COURT:  Excuse me, if you have an

2        objection --

3              MR. CHAMBERLAIN:  I object to multiple

4        questions, Judge.

5              MR. BIANCAVILLA:  Let me withdraw that.

6              THE COURT:  Okay, go ahead.

7        Q      You described before about a cutting and a

8   focrum, I believe you called it, or what was the term you

9   used?

10       A      An anvil.

11       Q      Anvil.  Could you explain that concept, please?

12       A      Yes, sir.  Even though one blade is producing the

13  cutting, the second blade is impressing into the opposite

14  side of the test material.

15              So, in a sheering-type action you have motion

16  going through the cutting product, but there's also force

17  being exerted against the opposite side and it's observable

18  under microscopic examination.

19       Q      Okay.  When you say sheering-type action, you

20  observed that sheering-type action on that ligature,

21  correct?

22       A      Yes, sir.

23       Q      And that's the same sheering-type action that you

24  observed from that leatherman tool when you made your test

25  cuts, correct?

Kathleen Plaia

1        A       Yes, sir.

2                MR. BIANCAVILLA:  Okay, I have nothing

3        further.

4                THE COURT:  Mr. Chamberlain, anything

5        further?

6    RECROSS-EXAMINATION

7    BY MR. CHAMBERLAIN:

8        Q       When you say it's the same type, in no way can

9    you say that that tool made the cuts you found on that cord

10   is that right?

11       A       That's correct, sir.

12               THE COURT:  Anything further?

13       Q       The cut, the sheering-type tool, scissor-type, as

14   distinguished from the knife which is generally one

15   directional, is that correct?

16       A       That's correct.

17               THE COURT:  Mr. Biancavilla.

18   REDIRECT EXAMINATION

19   BY MR. BIANCAVILLA:

20       Q       Could you describe whether that cord was cut with

21   a knife?

22       A       Yes, I would.

23       Q       What would you observe if that cord had been cut

24   with a knife?

25       A       I would observe one directional flow.  I would

1    observe -- these particular wires are multi strand wires.

2    And I would have observed the continuing flow only in one

3    direction instead of having any force from the other side

4    embedded into them.

5         Q    So, you could definitely say that that cord was

6    not cut with -- cut with a knife?

7         A    Yes, sir.

8              MR. BIANCAVILLA:  Nothing further.

9              THE COURT:  Mr. Chamberlain, recross?

10   RECROSS EXAMINATION

11   BY MR. CHAMBERLAIN:

12        Q    Or a one directional force?

13        A    I'm sorry, I don't follow your question.

14             MR. CHAMBERLAIN:  Withdrawn.

15             Nothing further, Judge.

16             MR. BIANCAVILLA:  Thank you, Judge.  Nothing

17   further.

18             THE COURT:  Thank you, sir.  You can step

19   down.

20             THE WITNESS:  Thank you, your Honor.

21             (WITNESS EXCUSED)

22             THE COURT:  Can I see counsel at the Bench,

23   please.

24             (Whereupon, there is a discussion held at the

25   Bench, off the record, between the Court and Counsel.)

Kathleen Plaia

Proceedings                                              948

1           THE COURT:  Ladies and gentlemen, at this

2      time we're going to excuse you for the day, and ask you

3      to come back at 9:30 Monday morning.

4           Have a nice weekend.  I'm going to remind

5      you, like I do each and every time, do not discuss the

6      case among yourselves or with anyone else.  Keep an

7      open mind.  Do not form or express any opinions until

8      the entire case has been completed.  Do not read or

9      listen to any accounts of the case, should it be

10     reported in the media.  Do not visit or view any

11     premises mentioned.  Finally, do not permit any party

12     to discuss this case or an attempt to influence you.

13     You must promptly report to the Court any violation

14     thereof.

15          Have a good weekend.  See you Monday morning.

16          THE COURT OFFICER:  Follow me, please.

17          (Whereupon, the sworn jury and alternates

18     leave the courtroom)

19          THE COURT:  Counsel, come forward.

20          (Whereupon, court stands in recess.  The

21     trial is adjourned to Monday, May 13th, 2002 at

22     9:30 a.m.)

23

24

25

Kathleen Plaia

Proceedings

I - N - D - E - X

W I T N E S S E S

| | DX | CX | RDX | RCX |
|---|---|---|---|---|
| FOR THE PEOPLE: | | | | |
| John Miller Williams | 348 | | | |
| William Nimmo | 358 | | | |
| Caroline Daly | 365 | | | |
| Thomas Hardman | 382 | 395 | 419 | |
| Frank DeFalco | 420 | 424 | | |
| Melissa Notarnicola | 440 | 445 | | |
| Penny Shouse | 449 | 454 | | |
| Gerard Connell | 481 | 486 | | |
| Francine Quinn | 497 | 515 | 590 | 595 |
| Sven Bost | 603 | 611 | | |
| Det. Dennis Downes | 618 | 679 | | |
| Det. Charles Costello | 702 | 714 | | |
| Dr.Gerard Catanese | 724 | 753 | 760 | 763 |
| Doctor Thomas Manning | 773 | 784 | | |
| Det. Vito Shiraldi | 918 | 924 | | |
| Carlo Rosati | 928 | 935 | 944 | 946 |

CONTINUED EXHIBITS

### E X H I B I T S

|  | | ID | EVID |
|---|---|---|---|
| FOR THE PEOPLE: | | | |
| 1. Family photo | | 346 | 353 |
| 2.  Photo (victim/bar) | | 346 | 353 |
| 3. Photo of defendant | | | 393 |
| 4.  Photo of lineup | | | 391 |
| 5. Photo defendant (waist) | | 412 | 418 |
| 6. Phone records | | 481 | 484 |
| 7. Phone records | | 481 | 484 |
| 8.  Photo back door | | 505 | 510 |
| 9. Digital Photo (blowup) | | 619 | 620 |
| 10.  Video | | 623 | 625 |
| 11.  Crime Scene Photo | | 631 | 635 |
| 12.  Crime Scene Photo | | 631 | 635 |
| 13.  Crime Scene Photo | | 631 | 635 |
| 14.  Crime Scene Photo | | 631 | 635 |
| 15.  Crime Scene Photo | | 631 | 635 |
| 16.  Crime Scene Photo | | 631 | 635 |
| 17.  Crime Scene Photo | | 631 | 635 |
| 18.  Crime Scene Photo | | 631 | 635 |
| 19.  Crime Scene Photo | | 631 | 635 |
| 20.  Crime Scene Photo | | 631 | 635 |
| 21.  Crime Scene Photo | | 631 | 635 |
| 22.  Crime Scene Photo | | 631 | 635 |

CONTINUED EXHIBITS

| | | | |
|---|---|---|---|
| 23. | Crime Scene Photo | 631 | 635 |
| 24. | Crime Scene Photo | 631 | 635 |
| 25. | Crime Scene Photo | 631 | 635 |
| 26. | Crime Scene Photo | 631 | 635 |
| 27. | Crime Scene Photo | 631 | 635 |
| 28. | Crime Scene Photo | 631 | 635 |
| 29. | Crime Scene Photo | 631 | 635 |
| 30. | Crime Scene Photo | 631 | 635 |
| 31. | Diagram apt. (blowup) | | 651 |
| 32. | Photo | 649 | 651 |
| 33. | Answering machine | 649 | 676 |
| 34. | CD | 649 | 676 |
| 35. | Cigarette butts | 649 | 676 |
| 36. | Lyrics to song | 649 | 676 |
| 37. | Photo album | 649 | 676 |
| 38. | Goblet | 649 | 676 |
| 39. | Beer bottle | 649 | 676 |
| 40. | Fingerprints | 649 | 676 |
| 41. | Fingerprints | 649 | 676 |
| 42. | Apartment layout | 649 | 666 |
| 43. | Ligature | 649 | 742 |
| 44. | Leatherman tool | 649 | 729 |
| 45. | Autopsy Photo | | 742 |
| 46. | Autopsy Photo | | 742 |
| 47. | Autospy Photo | | 742 |

CONTINUED EXHIBITS

| | | | |
|---|---|---|---|
| 48. | Autopsy Photo | | 742 |
| 49. | Autopsy Photo | | 742 |
| 50. | Autopsy Photo | | 742 |
| 51. | Autopsy Photo | | 742 |
| 52. | Autopsy Photo | | 742 |
| 53. | Autopsy Photo | | 742 |
| 54. | Autopsy Photo | | 742 |
| 55. | Autopsy Photo | | 742 |
| 56. | Autopsy Photo | | 742 |
| 57. | Autopsy Photo | | 742 |
| 58. | Autopsy Photo | | 742 |
| 59. | Autopsy Photo | | 742 |
| 60. | Autopsy Photo | | 742 |
| 61. | Autopsy Photo | | 742 |
| 62. | Autopsy Photo | | 742 |
| 63. | Autopsy Photo | | 742 |
| 64. | Autopsy Photo | | 742 |
| 65. | Photo of scalp | 759 | 761 |
| 66. | Photo of scalp | 759 | 761 |
| 67. | Toxicology report | | 777 |

CONTINUED EXHIBITS

FOR THE DEFENDANT:

A.  Phone records (Rosario)      488

B.  Photo (parking lot)          529      531

C.  Photo (parking lot)          532      534

D.  GJ test. Quinnn pg 56        554

E.  Papers                       682

F.  5 pages in book              697

G.  Transmittal letter

H.  Scene report                 891

I.  2 pg document                894

J.  Document (expert opinion)    942

```
 1   STATE OF NEW YORK : NASSAU COUNTY
     COUNTY COURT     : PART XIV
 2   -----------------------------------------:
     THE PEOPLE OF THE STATE OF NEW YORK,     :
 3                                            :
                     - against -             : IND: 1456N-00
 4                                            :
     PAUL SCRIMO,                             :   CONTINUED
 5                                            :     TRIAL
                           Defendant.         :
 6   -----------------------------------------x
                           May 13, 2002
 7                         262 Old Country Road
                           Mineola, New York
 8
     B E F O R E:
 9
                 THE HONORABLE JEFFREY BROWN,
10               County Court Judge.

11   A P P E A R A N C E S:

12           (As previously noted.)

13                    *      *      *      *

14           THE CLERK:  Case on trial continues, the People

15       of the State of New York versus Paul Scrimo,

16       Indictment 1456N of 2000.

17           All parties are present.  The jurors are not

18       present at this time.

19           Are the People ready?

20           MR.  BIANCAVILLA:  Ready.

21           THE CLERK:  Defendant ready?

22           MR. CHAMBERLAIN:  Ready.

23           COURT OFFICER:  Jury entering.

24               (Whereupon, the sworn jurors entered the

25           courtroom and resumed their respective seats.)
```

People v. Scrimo

1          THE CLERK:  Do both sides stipulate that all

2     sworn jurors are present and seated properly?

3          MR.  BIANCAVILLA:  Yes.

4          MR. CHAMBERLAIN:  So stipulated.

5          THE COURT:  Good morning, ladies and gentlemen.

6     I hope you had a nice weekend.  We are ready to

7     continue with the trial.

8          Call your next witness, Mr. Biancavilla.

9          MR.  BIANCAVILLA:  Detective Kevin McCarthy.

10    D E T E C T I V E   K E V I N   M C C A R T Y, a witness

11    called on behalf of the People, having been duly sworn,

12    testified as follows:

13         COURT OFFICER:  In a loud, clear voice, give your

14    full name, spelling your last name, shield number and

15    present command.

16         THE WITNESS:  Detective Kevin McCarthy,

17    M-C-C-A-R-T-H-Y, shield 707.  My command is the

18    Scientific Investigation Bureau.

19         THE COURT:  You may inquire.

20         MR.  BIANCAVILLA:  Thank you, Judge.

21    DIRECT EXAMINATION

22    BY MR. BIANCAVILLA:

23         Q    Good morning.

24         A    Good morning.

25         Q    Detective McCarthy, will you tell the jury how

People - Det. McCarthy - Direct

1  long you have been a detective?

2     A     I have been a detective approximately 11 years.

3     Q     And how long have you been a police officer?

4     A     I have been a police officer for approximately 16

5  years.

6     Q     And how long have you been a member of the

7  Scientific Investigation Bureau?

8     A     I have been a member of the Scientific

9  Investigation Bureau for approximately 14 years.

10     Q     Do you specialize in a particular area at the

11  Scientific Investigation Bureau?

12     A     Yes, I am a serologist.

13     Q     Please, briefly describe for the jury what a

14  serologist does?

15     A     A serologist studies and identifies blood and body

16  fluids.

17     Q     What are your particular responsibilities at the

18  Scientific Investigation Bureau?

19     A     My duties are to examine evidence, do some

20  preliminary testing, and we contract out further testing,

21  DNA testing with a company.

22     Q     Could you, please, give the jury your educational

23  background?

24     A     I have an associates degree from SUNY Farmingdale.

25  I have a bachelor of science degree from SUNY/Stonybrook;

People - Det. McCarthy - Direct

1   and I have 12 graduate credits, three from CW Post

2   University in biochemistry at graduate level and nine

3   courses I took at Quantico, Virginia, the FBI Academy.  I

4   got the credits through the University of Virginia.

5       Q     In addition to your educational background, what,

6   if any, training have you received with respect to

7   serology?

8       A     I worked in the New York Institute of Technology

9   on a microbiology teaching lab.  I worked in the

10  pharmacology department at SUNY/Stonybrook in a research

11  lab.  One doing research on antiviral drugs and one doing

12  research on anticoagulants.

13      Q     Are you a member of any scientific investigation

14  organizations or societies?

15      A     I am not a member at this time.

16      Q     Have you testified as an expert in serology?

17      A     Yes, I have.

18      Q     How many times?

19      A     Approximately 45 times.

20      Q     In how many states?

21      A     Just in New York State.

22      Q     How many times have you been qualified as an

23  expert in serology in New York State?

24      A     Again, approximately 45 times.

25      Q     Have you ever not been qualified as an expert in

People - Det. McCarthy - Direct

1    any court?

2        A    No, I have not.

3        Q    Did there come a time when you sent out various

4    items of evidence from this case for DNA analysis?

5        A    Yes, I did.

6        Q    I am going to direct your attention to April 18th

7    of the year 2000.  Did you send out material with regard

8    to this case?

9        A    Yes, I did.

10       Q    Where were the samples sent?

11       A    The samples were sent to LabCorp, Laboratory

12   Corporation of American.

13       Q    And how were they sent?

14       A    They were sent via FedEx.

15       Q    Please tell the jury, what is Laboratory

16   Corporation of America?

17       A    Laboratory Corporation of American is a large

18   laboratory.  Among other testing, they do, they do DNA

19   testing for us.  It's a contract laboratory.  We have a

20   contract with them.

21       Q    Could you describe for the jury what was sent?

22       A    On the first mailing?

23       Q    That would be the mailing on April 18th of 2000.

24       A    Right.  On April 18th, I sent the morgue blood of

25   Ruth Williams in relation to this case.  I sent four crime

People - Det. McCarthy - Direct

1    scene samples which were cigarette butts.  I sent a swab

2    from -- another crime scene item which was a Budweiser

3    bottle.

4        Q    With respect to the four crime scene items, the

5    cigarette butts, could you tell us what the crime scene

6    item number was of the four cigarette butts you sent out?

7        A    May I refer to my notes?

8             MR.  BIANCAVILLA:  May he, Judge?

9             THE COURT:  Yes, you can do that to refresh your

10   recollection.

11       A    Crime Scene items were 7, 8, 9 and 15.

12            MR. CHAMBERLAIN:  May I have what page of that

13   Crime Scene report we are referring to?

14            THE COURT:  Yes.

15            THE WITNESS:  I'm referring to the LabCorp

16   mailing form that I filled out.

17       Q    Crime scene number seven was what?

18       A    Crime scene item seven was a cigarette butt.

19       Q    What type of cigarette butt?

20       A    I would have to refer to the crime scene sheet

21   now.

22       Q    Please do.

23       A    It was a Vantage cigarette butt.

24       Q    Crime scene item number eight?

25       A    Number eight was a brown filtered cigarette butt.

People - Det. McCarthy - Direct

Q    And Crime scene number nine?

A    Nine was, again, another Vantage cigarette.

Q    And crime scene number 15?

A    Crime scene 15 was a brown cigarette butt.

Q    Now, you said you took a swab from a beer bottle. What is the crime scene number on the beer bottle that you swabbed?

A    The crime scene item on the beer bottle is item number 21.

Q    Would you, please, describe for the jury what you did with that beer bottle in the serology unit of the Scientific Investigation Bureau?

A    Yes.  I took the beer bottle.  I took a moistened Q-tip swab and I swabbed the exterior edge of the bottle where your mouth would go on to drink the beer.

Q    What did you do with the swab then?

A    The swab was allowed to air dry and it was sent to Lab Corp for DNA analysis.

Q    That was along with the four cigarette butts together with the morgue blood of Ruth Williams?

A    That's correct.

Q    And that was on April 18th of 2000?

A    That's correct.

MR.  BIANCAVILLA:  I would ask the witness be shown People's 39 in evidence and People's 35 in

People - Det. McCarthy - Direct

1    evidence.

2        Q    Detective, do you recognize those two items that

3    you are being shown?

4        A    Yes, this is the beer bottle that I swabbed around

5    the mouth area, the Budweiser bottle, crime scene item

6    number 21.  These are the crime scene items, the cigarette

7    butts that I referred to.

8        Q    How were those items sent to LabCorp?

9        A    The beer bottle, the swab, was sent to Lab Corp.

10   It was a Q-tip swabbed.  It was sampled around the neck of

11   the bottle.  It's placed in a Ziplock bag and

12   appropriately labeled.

13       Q    How did the items get to LabCorp?

14       A    FedEx.

15            MR.  BIANCAVILLA:  Thank you.  You can take those

16       back from the officer.

17       Q    Detective, I'm going to direct your attention to

18   May 25th of 2000.  Did you send additional items to

19   LabCorp for DNA analysis?

20       A    Yes, I did.

21       Q    Please describe for the jury what items were sent

22   on May 25th of 2000?

23       A    The -- there were three fingernail samples from

24   the deceased, Ruth Williams, that were sent out, R2, R3

25   and R5.

People - Det. McCarthy - Direct

1      Q    What else?

2      A    And there were oral swabs that were obtained from

3    John Kane.  Those were oral swabs taken by a detective

4    from inside of his mouth for a standard and a blood

5    standard card of Paul Scrimo.

6      Q    What else?

7      A    Can I refer to my notes?

8      Q    Sure.

9      A    There was a swab from a drinking glass, crime

10   scene item number 19.

11          MR. CHAMBERLAIN:  May we have the portion of the

12       record the detective is referring to right now?

13          THE WITNESS:  Yes, it's my LabCorp mailing form.

14          MR. CHAMBERLAIN:  A separate form?

15          THE WITNESS:  It's a different form for a

16       different mailing on another day.

17          MR. CHAMBERLAIN:  Thank you.

18     A    Okay.  And swabbings from a black wire cord.

19     Q    They were all sent to LabCorp on May 25th of 2000?

20     A    That's correct.

21     Q    Now, prior to sending the fingernail scrapings or

22   fingernail cuttings to LabCorp Corp, did you examine the

23   fingernail cuttings that you received from the Nassau

24   County Medical Examiner's Office?

25     A    Yes, I did.

People - Det. McCarthy - Direct

1    Q    What did you find when you examined the fingernail

2    cuttings from the Nassau County Medical Examiners' Office?

3    A    I examined them with a stereomicroscope and the

4    samples R2, R3, and R5 had some material under the

5    fingernail.

6         MR. CHAMBERLAIN:  I would object to this, Judge.

7    This was not --

8         MR. BIANCAVILLA:  Judge, I object to this in

9    front of the jury.

10        THE COURT:  First of all, I'll overrule the

11   objection with respect to this question.

12        If there's something you want to make a record

13   about, you could do that.

14        Come forward.

15        Step down, Detective.

16             (Whereupon, the following took place at the

17        bench outside of the hearing of the defendant and

18        jury.)

19        THE COURT:  Gentlemen?

20        MR. CHAMBERLAIN:  Judge, we were provided with

21   material in response to our discovery demands, Rosario

22   material, with respect to what findings the various

23   units of the SIB and the serology department, the ME's

24   office, found and so forth.  There was no reference to

25   this finding.

People - Det. McCarthy - Direct

1      THE COURT:  Which finding?

2      MR. CHAMBERLAIN:  The finding he made --

3      THE COURT:  He made an observation of the

4  fingernail scrapings.

5      MR. CHAMBERLAIN:  Microscopic examination.

6  There's no notation of that in the record whatsoever.

7      MR. BIANCAVILLA:  So you can cross-examine on

8  it.

9      MR. CHAMBERLAIN:  I think it's improper to bring

10  it up at this point.

11      MR. BIANCAVILLA:  You can cross-examine him on

12  it.

13      THE COURT:  Mr. Chamberlain, you know as long as

14  the People have complied with all the discovery rules

15  with respect to Criminal Procedure Law 240 as well as

16  Rosario rules of all documents the detective filled

17  out at the time that he handled these materials and

18  made any observations, they have complied.

19      As far as anything else, you certainly have a

20  right to cross-examine the witness with respect to

21  any, as you say, alleged failure of documenting his

22  observations.

23      Your objection is overruled.

24          (Whereupon, the following took place in open

25      court.)

People - Det. McCarthy - Direct

1          MR.  BIANCAVILLA:  May I continue, your Honor?

2          THE COURT:  Yes.

3    CONTINUED DIRECT

4    BY MR. BIANCAVILLA:

5          Q    Detective, how many fingernail cuttings did you

6    examine at your lab?

7          A    There were ten.

8          Q    You used what type of instrument to examine these

9    fingernails?

10         A    Stereo microscope.

11         Q    With respect to what you referred to as R2, R3 and

12   R5, just briefly describe to the jury what were R2, R3 and

13   R5?

14         A    R2, R3 and R5 is a designation by the medical

15   examiners for the right hand, the thumb being number one,

16   the next finger two, three, four and five.

17         Q    Please describe for the jury what, if anything,

18   you observed on fingernail cuttings R2, R3 and R5?

19         A    On those cuttings there were some material,

20   visible material underneath of it.  It was brownish in

21   color, but I also noticed that there was some old nail

22   polish, small minute pieces of nail polish.  So it was a

23   mixture of materials.

24         Q    Those three cuttings, those are the cuttings you

25   referred to when you said you sent them to Laboratory

People - Det. McCarthy - Direct

1    Corporation of America for DNA analysis; correct?

2       A    Yes.

3          MR.   BIANCAVILLA:   I would ask the witness be

4       shown what has been marked for identification as

5       People's 80.

6       Q    Detective, you have been shown what has been

7    marked for identification as People's Exhibit 80.  Do you

8    recognize that?

9       A    Yes.

10      Q    What do you recognize that to be?

11      A    This is the tubes that contain the three

12   fingernail clippings and these are the swabs from the

13   black cord and the drinking glass.

14      Q    Now -- okay.  You can put those down.

15         Did there come a time, Detective, when you

16   received the fingernail cuttings back from LabCorp after

17   they had been analyzed?

18      A    Yes, I did.

19      Q    Did you perform further examination on those

20   particular fingernail cuttings?

21      A    I observed further testing being done on them at

22   the Suffolk County Crime Lab.

23      Q    With respect to Crime Scene items R2 and R5, what

24   type of testing was done on R2 and R5?

25      A    May I refer to my notes?

People - Det. McCarthy - Direct

1    Q    Yes.

2         MR. CHAMBERLAIN:  May we have a representation as

3    to what notes?

4         THE WITNESS:  It's my report, page two.

5         MR. CHAMBERLAIN:  May I see it, Detective?

6         THE COURT:  Show it to Mr. Chamberlain.

7    Q    What tests were performed on fingernail cutting R2

8    and R5?

9    A    R2 and R5 were tested for the presence of seminal

10   fluid.

11   Q    Is there a particular name for that test?

12   A    It's a P30 Abacard test.  That's a company name,

13   A-B-A-C-A-R-D.

14   Q    Please describe for the jury what a P30 Abacard

15   test is?

16   A    It's a test.  It's similar to a pregnancy test kit

17   where you take a sample and you put it in the loading well

18   of this plastic container and the sample runs up the

19   container.  In this instance, it's got monoclonal

20   antibodies in it for the antigen P30 that's present in the

21   male prostate and it's also an indicator for seminal

22   fluid.  If it's positive, it would have two lines on it.

23   If it's negative, it would just have one control line on

24   it.

25   Q    What were the results of the tests on fingernail

People - Det. McCarthy - Direct

1   scrapings R2 and R5?

2       A     They were negative.

3       Q     With respect to fingernail cutting R3, did you --

4   was a particular type of test performed on fingernail

5   cutting R3?

6       A     Yes.  R3 was the fingernail cutting --

7       Q     Just tell us what you did to R3?

8       A     That was the test I observed for the presence of

9   human hemoglobin.

10      Q     Was there a particular type of test done on it?

11      A     Yes.

12      Q     What is the name of that?

13      A     Antihuman globulin test that's on -- that's also

14  made on these cards.

15      Q     What is the card called?

16      A     It's called hematrace.

17      Q     What is hemoglobin?

18      A     It's the oxygen carrying molecule present in the

19  red blood cells.

20      Q     Were you looking for on that fingernail cutting R3

21  when you performed that test?

22      A     We were looking for the presence of human blood.

23      Q     What were the results of that test?

24      A     It was negative.

25      Q     Now, the test that you performed on R2 and R5, the

People - Det. McCarthy - Direct

1    P30 test, could you tell the jury what the level of

2    sensitivity is of that test in terms of how much of the

3    antigen that you spoke of would have to be present in

4    order to get a result on that test?

5        A    Yes, it's a very minute amount of P30 antigen,

6    four nanograms per million.

7        Q    Four nanograms?

8        A    Yes.

9        Q    With respect to the amount of hemoglobin that

10   would be necessary in order to obtain a result on your

11   hematrace card, how much hemoglobin would need to be

12   present?

13       A    Fifty nanograms per mill.

14           MR.  BIANCAVILLA:  I am going to ask this be

15       marked as People's 83.

16               (Whereupon, the above-mentioned item was

17           marked as People's Exhibit 83 for identification

18           only.)

19       Q    Detective, do you recognize that?

20       A    Yes, it's a pack of Sweet and Low.

21       Q    Will that assist you in explaining to the jury the

22   sensitivity of the P30 test and hematrace test conducted

23   on these?

24       A    Yes, it would.

25           MR.  BIANCAVILLA:  We would offer that, Judge?

People - Det. McCarthy - Direct

1        THE COURT:  Show it to Mr. Chamberlain, please.

2        MR. CHAMBERLAIN:  Voir dire?

3        THE COURT:  Yes.

4   VOIR DIRE EXAMINATION

5   BY MR. CHAMBERLAIN:

6        Q    This has nothing to do with the evidence in the

7   case, it's just for demonstration purposes here?

8        A    Correct.

9        MR. CHAMBERLAIN:  No objection.

10       THE COURT:  Mark it in evidence.

11            (Whereupon, People's Exhibit 83, previously

12            marked for identification only, was marked and

13            received in evidence as People's Exhibit 83.)

14       COURT OFFICER:  People's 83 received in evidence.

15       MR.  BIANCAVILLA:  Please hand it to the

16   detective.

17  CONTINUED DIRECT

18  BY MR. BIANCAVILLA:

19       Q    Please hold that up for the jury.

20            Detective, could you tell the jury how much

21  substance is contained in a Sweet and Low packet?

22       A    One gram.

23       Q    In order to obtain one nanogram of a substance,

24  what would we divide that Sweet and Low packet by?

25       A    One billion.

People - Det. McCarthy - Direct

1   Q    In order to -- so, in other words, with respect to

2   the P30 test --

3   A    Yes.

4   Q    -- how many nanograms of the antigen would be

5   required --

6   A    Four.

7   Q    That would be four billionths of a gram?

8   A    That's correct.

9   Q    With respect to a result on a hematrace card when

10  you are looking for blood, how much would be required for

11  that?

12  A    Fifty.

13  Q    So that would be 50 billionths of a gram; correct?

14  A    That's correct.

15  Q    Is it fair to say both of those tests are

16  extremely sensitive?

17  A    Yes, they are.

18  Q    Detective, I'm going to direct your attention to

19  March 8th of 2000.  Did you make another submission to

20  LabCorp?

21  A    Yes, I did.

22  Q    What did you submit to LabCorp on March 8th?

23       MR. CHAMBERLAIN:  Judge, March 8th, 2000 was

24       before the date of the crime, I believe.  I think

25       there's a mistake.

People - Det. McCarthy - Direct

1    Q    I'm sorry.  March 8th of 2001?

2    A    2001, yes.  Yes, I resubmitted the standards of

3  Paul Scrimo, John Kane and the deceased, Ruth Williams,

4  along with the remainder of the swab from the beer bottle.

5    Q    That was submitted to where?

6    A    Again, LabCorp.

7    Q    After the testing was done then, were those items

8  returned to you?

9    A    Yes, they were.

10        MR.   BIANCAVILLA:  I would ask the witness be

11     shown what's been marked as People's 81 for

12     identification.

13        THE COURT:  Okay.

14    A    Yes, this is the items that were in the third

15  mailing.

16    Q    Excuse me?

17    A    These are the items mailed out in the third

18  mailing.

19    Q    Which were what again?

20    A    It's the remainder of the swab from the beer

21  bottle.  The oral swabs from John Kane.  The blood

22  standard of Paul Scrimo and the blood standard from the

23  deceased, Ruth Williams.

24    Q    Who directed you to re-submit those items to

25  LabCorp?

People - Det. McCarthy - Direct

1     A    This was a request by the then assistant district

2    attorney in this case to get additional testing on the

3    swabbing from the beer bottle.

4     Q    Who authorized the use of the remainder of that

5    swab to be sent to LabCorp?

6     A    I did.

7     Q    Thank you, Detective.

8          MR.  BIANCAVILLA:  Judge, at this time the People

9    would offer what has been marked for identification as

10   People's Exhibits 80 and 81 in evidence.

11        THE COURT:  Please show them to Mr. Chamberlain.

12        MR. CHAMBERLAIN:  Short voir dire on 80, your

13   Honor?

14        THE COURT:  Yes.

15 VOIR DIRE EXAMINATION

16 BY MR. CHAMBERLAIN:

17     Q    The tubes in People's 80, can you see the

18   fingernails in there?

19     A    There are no longer any fingernails in there.

20     Q    So these are just the tubes?

21     A    That's correct.

22        MR. CHAMBERLAIN:  I would object based on

23   relevancy of sending tubes -- putting additional

24   evidence before this jury.  I don't think they are

25   particularly relevant here.

People - Det. McCarthy - Direct

1     THE COURT:  Overruled.

2     MR. CHAMBERLAIN:  No other objection.

3     THE COURT:  Mark them both in evidence.

4        (Whereupon, People's Exhibits 80 and 81,

5     previously marked for identification only, were

6     marked and received in evidence as People's

7     Exhibits 80 and 81.)

8     COURT OFFICER:  People's 80 and 81 received in

9  evidence.

10     MR.  BIANCAVILLA:  Thank you.

11     I have no further questions of this witness.

12     THE COURT:  Mr. Chamberlain, cross-examination.

13     MR. CHAMBERLAIN:  Thank you.

14  CROSS-EXAMINATION

15  BY MR. CHAMBERLAIN:

16    Q   Detective, you referred to some notes, page two of

17  a report that you filled out.  Is that your serology

18  report?

19    A   Yes, it is.

20    Q   How many pages was that report?

21    A   Eight.

22    Q   May I see the full eight pages that you are

23  referring to?

24    A   Yes.

25    Q   These eight pages summarize the entire work you

People - Det. McCarthy - Cross

1    did in connection with this murder investigation?

2       A    Yes, they do.

3            MR. CHAMBERLAIN:  I am going to -- withdrawn.

4       Q    Detective, are -- is this report a report kept in

5    the regular course of business of the Nassau County Police

6    Department?

7            Is it the regular business --

8            THE COURT:  Mr. Chamberlain, you have no answer

9       to the first question yet.

10      Q    It was combined.  Answer the first question.

11      A    Yes.

12      Q    Is it the business of the Nassau County Police

13   Department to keep such records?

14      A    Yes, it is.

15      Q    Were these records made contemporaneously or

16   approximately contemporaneously with the evidence reported

17   herein, the events?

18      A    Yes.

19           MR. CHAMBERLAIN:  I would offer these.

20           MR. BIANCAVILLA:  Objection.

21           THE COURT:  You haven't shown any inconsistency,

22      as we have gone over on the record many times before.

23           MR. BIANCAVILLA:  Judge, may we do this at the

24      bench?

25           THE COURT:  Come forward.

People - Det. McCarthy - Cross

1      (Whereupon, the following took place at the

2      bench outside of the hearing of the defendant and

3      jury.)

4          THE COURT:  Mr. Chamberlain, we went through this

5      at length Friday and Thursday, that in order to get a

6      document in evidence, first you must cross-examine the

7      detective as to an alleged inconsistency that may or

8      may not exist and you have to give him an opportunity

9      to acknowledge the inconsistency or not, as the case

10     may be.  Then you move it into evidence.

11         MR. CHAMBERLAIN:  Judge, it's not a matter of

12     inconsistency.  It's a matter of completeness and it's

13     a matter of this jury being able to recall details at

14     the end of a complex case.

15         I think, if there were records kept that

16     explained the evidence collected -- sum total of the

17     evidence collected, it is a fact in this case.

18         THE COURT:  We have the detective's testimony.

19     If the jury would like anything read back, they can

20     have that done.  They can send us a note, if they have

21     any questions at all.

22         We run by rules of evidence, Mr. Chamberlain,

23     and the rules of evidence are such that this cannot

24     come into evidence.  You have not demonstrated the

25     ground work to place this document in evidence.

People - Det. McCarthy - Cross

1        MR. CHAMBERLAIN:  I'll let it go at that.

2        THE COURT:  Anything further, Mr. Biancavilla?

3        MR. BIANCAVILLA:  No.

4            (Whereupon, the following took place in open

5        court.)

6  CONTINUED CROSS

7  BY MR. CHAMBERLAIN:

8        Q    Detective, you also analyzed some swabs obtained

9    from another suspect in this case?

10        A    I didn't, no.

11        Q    Were they analyzed by serology?

12        A    They were obtained by serology.

13        Q    And they were not analyzed?

14        A    No, they were not.

15        Q    Do you have any reason -- do you know of any

16    reason why they were not?

17        MR. BIANCAVILLA:  Objection.

18        THE COURT:  Sustained.

19        Q    Can you give us the name of that other suspect?

20        MR. BIANCAVILLA:  Objection.

21        THE COURT:  Sustained.

22        Q    Detective, you indicated that you had some

23    fingernail clippings that you obtained -- that were

24    obtained from the ME; is that correct?

25        A    Yes, that's correct.

People - Det. McCarthy - Cross

1    Q   Do you know if those fingernail clippings were

2   analyzed by the serology department of the ME's office.

3         MR.  BIANCAVILLA:  Objection.

4         THE COURT:  You are presupposing there is a

5    serology department.

6    Q   Is there a toxicological department at the ME's

7   office that does serological work?

8    A   I'm not sure.

9         MR.  BIANCAVILLA:  Objection.

10        THE COURT:  If he knows.

11    A   I'm not sure, in the time-frame of this case, if

12   the serology section was in operation at the time.

13    Q   Do you know whether the fingernails were analyzed

14   by the ME's office, yes or no?

15    A   I don't know if they were analyzed or not, no.

16    Q   Do you know Doctor Colon at the ME's office?

17    A   Yes, she's currently assigned in our laboratory.

18    Q   She's what?

19    A   She's currently assigned in our laboratory.

20    Q   At the time of this incident, was she part of the

21   forensic scientific division of the serology department of

22   the ME's office?

23         MR.  BIANCAVILLA:  Objection.

24        MR. CHAMBERLAIN:  If he knows.

25        MR.  BIANCAVILLA:  Judge?

People - Det. McCarthy - Cross

1    THE COURT:  I'm not sure of the relevancy of

2    that.  Sustained.

3    Q    Detective, I'm going to show you a serology report

4    and ask you if this refreshes your recollection as to an

5    analysis of the, of serology in the ME's office?

6         MR.  BIANCAVILLA:  Objection, Judge.

7         THE COURT:  If it refreshes his recollection.

8         MR.  BIANCAVILLA:  I don't believe there was a

9    question on the floor that requires refreshing his

10   recollection.

11   Q    Was Doctor Colon at the time a serologist with the

12   ME's office at the time of this incident?

13   A    She was over in the ME's office.  As to her status

14   at the time, I don't know.

15   Q    Does that report reflect her status or refresh

16   your recollection as to that?

17        MR.  BIANCAVILLA:  Objection.

18        THE COURT:  Sustained.

19   Q    Does it refresh your recollection as to her status

20   at that time?

21        MR.  BIANCAVILLA:  Objection.

22        THE COURT:  Sustained.

23   A    Yes.

24        THE COURT:  Disregard that, ladies and gentlemen.

25   Q    Does that report refresh your recollection as to

People - Det. McCarthy - Cross

1    whether or not the fingernails were examined for blood

2    serology at the ME's office before transferring over to

3    you?

4        A    It doesn't reflect in that way.   It says -- it

5    says none submitted for examination.

6        Q    When you say none, none of what?

7        A    It says fingernail clippings.  Underneath, it says

8    none submitted for examination.  And it says why not next

9    to it with a question mark.

10       Q    Detective, in forensic serology, which you are an

11   expert in, wouldn't it be appropriate to examine for blood

12   before transmitting fingernails for DNA analysis?

13           MR.  BIANCAVILLA:  Objection.

14           THE COURT:  I'll permit that.

15       A    No.

16       Q    You indicated on direct that you saw a light

17   reddish brown stain?

18       A    I believe I said brownish.

19       Q    Pardon me.

20       A    Brownish.

21       Q    Brownish.  Did that brownish stain indicate to you

22   there was a possible presence of blood?

23           MR.  BIANCAVILLA:  Objection.

24           THE COURT:  I'll sustain it as to form,

25       Mr. Chamberlain.

People - Det. McCarthy - Cross

1    Q    Detective, did you make a notation -- you examined

2    those fingernails at that time, before you sent them to

3    LabCorp, under a microscope; is that correct?

4    A    That's correct.

5    Q    Did you make any notation of that examination?

6    A    No, I did not.

7    Q    Isn't it appropriate and proper scientific

8    procedure to make a notation of any findings at the time

9    you make them?

10        MR.  BIANCAVILLA:  Objection.

11        THE COURT:  Overruled.

12        MR.  BIANCAVILLA:  Judge, my same objection from

13   the other day.

14        THE COURT:  Overruled.

15   A    No.  That was the selection process that I was

16   using, visual examination of the items prior to selecting

17   them for further testing.

18   Q    When did you first make any reference to that

19   light brown stain?

20   A    I didn't because I couldn't determine what it was.

21   There were numerous materials under there, some that I

22   felt might have been nail polish.

23   Q    But you are testifying here that that light brown

24   stain was significant; is that correct?

25   A    I am just describing why I picked those

People - Det. McCarthy - Cross

1    fingernails to be sent for DNA testing because they had

2    some material under them.

3        Q    When did you first make any reference to that

4    light brown stain?

5        A    Written reference, I haven't.

6        Q    You don't have any?

7        A    No.

8        Q    When you -- do you recall testifying before the

9    grand jury in this case.

10           You don't?

11       A    I am trying to remember.

12       Q    If I give you the date of -- I believe it was

13   July 5th, 2000, a few months after the incident, does that

14   refresh your recollection?

15       A    I really don't remember testifying at this time.

16       Q    Detective, when you swabbed that beer bottle, what

17   did you use, a little Q-tip?

18       A    Yes.

19       Q    Did it have anything on it?

20       A    Distilled water.

21       Q    Distilled water.

22           What about LabCorp, do you know what they do when

23   you send fingernails up to them, do they swab them?

24           MR. BIANCAVILLA:  Objection.

25           THE COURT:  Sustained.

People - Det. McCarthy - Cross

1      Q    Do you know what they do in their analysis?

2           MR.  BIANCAVILLA:  Objection.

3           THE COURT:  Sustained.  It's what they did this

4      time.

5           MR.  BIANCAVILLA:  Judge, my objection is beyond

6      that.

7           THE COURT:  I am sustaining the objection.

8      Q    Detective, when you got these fingernail clippings

9      back -- withdrawn.

10          First of all, let me ask you, the fingernail

11     clippings, approximately what size were they?

12     A    Some of them had two or three fingernail clippings

13     in it.

14     Q    In the tube?

15     A    In the tube, but they originated from the same

16     finger.

17     Q    And approximately what size were each of them?

18     A    I don't have any measurements to assign to them.

19     Q    Do you have any recollection as to what they were?

20     A    They were small.  They weren't large long grown

21     fingernails.

22     Q    They were from a person with closely clipped

23     nails?

24          MR.  BIANCAVILLA:  Objection.

25          THE COURT:  Sustained.

People - Det. McCarthy - Cross

1    Q    When you say small, what do you mean by that,

2    Detective?

3    A    They were typical nail clippings, not, you know,

4    like a real long nail that would have a...

5    Q    When you received those fingernails back from

6    LabCorp, they had already been examined by whatever

7    process DNA evaluation took with respect to whether there

8    was any DNA on them; is that correct?

9         MR. BIANCAVILLA:  Objection.

10   Q    Do you understand the question, Detective?

11        THE COURT:  Mr. Chamberlain, I don't understand

12        it.

13   Q    Whatever LabCorp does --

14        THE COURT:  Mr. Chamberlain, excuse me.  If I

15        don't understand the question, I'm sustaining as to

16        form.  Therefore, I'm going to ask you to let me

17        finish, then you can ask another question.

18        MR. CHAMBERLAIN:  I was about to do that.

19        THE COURT:  Okay.

20   Q    Would not -- withdrawn.

21        Were you aware of what LabCorp did to these

22   fingernails in their processing of the fingernails to

23   determine where the DNA under the fingernails came from?

24        MR. BIANCAVILLA:  Objection.

25        THE COURT:  I'll let him answer.

People - Det. McCarthy - Cross

1    MR.  BIANCAVILLA:  May we approach?

2    THE COURT:  Come forward.

3    Step down, Detective.

4    (Whereupon, the following took place at the

5    bench outside of the hearing of the defendant and

6    jury.)

7    THE COURT:  Yes.

8    MR.  BIANCAVILLA:  Judge, that is the most

9    flagrant and blatant type of hearsay anyone can ask,

10   whether or not someone knows something.  He doesn't

11   work for LabCorp, wasn't present when tests were

12   performed, doesn't know which of the cuttings were

13   examined by LabCorp.  This clearly calls for a hearsay

14   response and that is inadmissible.

15   THE COURT:  Mr. Chamberlain?

16   MR. CHAMBERLAIN:  He's an expert in serology.

17   THE COURT:  That may be.  What does that have to

18   do with it?  Is he like a mind reader so he'll know

19   what they did at LabCorp which is hundreds of miles

20   away from Nassau County?

21   MR. CHAMBERLAIN:  As an expert, I think I should

22   be able to ask him whether or not it's proper

23   procedure.

24   MR.  BIANCAVILLA:  Proper procedure or improper

25   procedure is not the subject matter of this trial.

People - Det. McCarthy - Cross

1    This is not an admissibility hearing.  He has no

2    knowledge of LabCorp.  He has -- even if he has

3    knowledge, it's obtained through hearsay.  Based upon

4    the rules of evidence, hearsay is inadmissible and

5    there is no exception here to that rule.

6        THE COURT:  Mr. Chamberlain, asking those

7    questions -- I agree with Mr. Biancavilla this is not

8    proper.  When the LabCorp representative gets on the

9    stand, you have the right to ask them as to what he or

10   she did at the time of the tests.

11       What Detective McCarthy did is of no moment

12   because he wasn't there.  Anything that was done was

13   in the report or was told by another person over the

14   telephone or some other way.

15       MR. CHAMBERLAIN:  Judge, since he's testifying to

16   what he did afterward, I would like to be able to ask

17   the question subject to connection.

18       THE COURT:  What?

19       MR. CHAMBERLAIN:  I want to ask if LabCorp

20   swabbed those fingernails to do their analysis, would

21   that not -- could that not have removed blood.

22       THE COURT:  You can ask hypothetical questions.

23   That's a different story.

24       MR. CHAMBERLAIN:  That's where I am going.

25       MR.  BIANCAVILLA:  My point is how is that

People - Det. McCarthy - Cross

1    relevant here?

2         MR. CHAMBERLAIN:  I think it's relevant.

3         MR. BIANCAVILLA:  Excuse me.  He's not an expert

4    in DNA analysis.  How would he know what the results

5    would be?

6         THE COURT:  Mr. Chamberlain, I'm not sure what

7    you want to ask this man who is an expert in serology.

8         MR. CHAMBERLAIN:  He's putting this man in as

9    proof.  He's presenting him to prove that R3, the

10   fingernails with scrapings of John Kane, did not

11   contain blood.  That's a finding he's presenting for

12   some reason.

13        MR. BIANCAVILLA:  Exactly.

14        MR. CHAMBERLAIN:  So I have a right to ask this

15   witness who is an expert witness whether or not

16   swabbing would remove blood --

17        THE COURT:  Which swabbing, his swab?

18        MR. CHAMBERLAIN:  No.

19        THE COURT:  Which swabbing are you talking about,

20   Mr. Chamberlain?

21        MR. CHAMBERLAIN:  I'm sure during the DNA

22   analysis they swabbed those fingernails.

23        THE COURT:  So ask the DNA person from LabCorp

24   those questions.

25        MR. CHAMBERLAIN:  I will.  I am asking that I be

People - Det. McCarthy - Cross

1    allowed to ask this witness a hypothetical based upon

2    that set of facts subject to connection.

3         MR.  BIANCAVILLA:  It's my position, Judge,

4    that's clearly -- what was done to those fingernails

5    once they are beyond the Nassau County Police

6    Department laboratory is subject matter for the DNA

7    person.

8         THE COURT:  Mr. Chamberlain, before you can ask

9    questions of this witness, you have to qualify him as

10   an expert in that field.  He may not be able to answer

11   your questions.

12        MR. CHAMBERLAIN:  I'm asking serology, Judge.

13        THE COURT:  He may be an expert in A but not

14   necessarily B.

15        MR. CHAMBERLAIN:  I agree.  What I am asking is,

16   really, is serology based upon what LabCorp may have

17   done.  I'm asking you take it subject to connection.

18   He's being presented as an expert in serology.

19        THE COURT:  I will permit you to ask questions of

20   the witness if you can qualify him -- that he would

21   know what happens to the swabs.

22        MR.  BIANCAVILLA:  First, we are assuming it was

23   swabbed.  There's no evidence that LabCorp swabbed

24   anything, Judge.

25        THE COURT:  That may be.

People - Det. McCarthy - Cross

1          Now, first, if you can ask him the question and

2     you can qualify that he would know that, I will

3     permit you to ask the question, however, if he

4     doesn't know that, it would be like asking him

5     something he has no expertise on.

6          MR. CHAMBERLAIN:  I'm going to ask him a

7     hypothetical, assuming, as your Honor suggested --

8          THE COURT:  I told you that you would have to ask

9     him if he would know something.  He has to be

10     qualified as someone who knows.  Then you can ask your

11     hypothetical question.

12          MR. CHAMBERLAIN:  All right.

13               (Whereupon, the following took place in open

14          court.)

15  CONTINUED CROSS

16  BY MR. CHAMBERLAIN:

17     Q    Detective, you are an expert in serology; is that

18  correct?

19     A    Yes.

20     Q    And that's the analysis of blood, bodily fluids

21  and blood; is that correct?

22     A    That's correct.

23     Q    Would swabbing of a sample prior to your

24  examination of that sample possibly affect what was on it?

25     A    Yes.

People - Det. McCarthy - Cross

1    THE COURT:  We're talking about the blood,

2    Mr. Chamberlain.

3    Q    With respect to analysis of blood?

4    A    Yes, it would lower the sample size.

5    Q    So that swabbing and swabbing with distilled water

6    or alcohol would affect it; is that right?

7    A    Yes.

8        MR.  BIANCAVILLA:  Objection.  Where did alcohol

9    come from?

10       MR. CHAMBERLAIN:  I asked about it,

11   Mr. Biancavilla.

12       THE COURT:  Excuse me.  Excuse me.  We have an

13   objection on the floor.

14       MR. CHAMBERLAIN:  I object to --

15       THE COURT:  I don't want to hear colloquy.

16   Sustained as to form.  You are assuming something not

17   in evidence, Mr. Chamberlain.

18   Q    So it's possible, Detective, that swabbing,

19   regardless of whatever was on the swab, would remove some

20   of the material that you would be testing for serology

21   substances; is that correct?

22   A    Yes, if you remove some material from it, that's

23   less material that would remain to work with.

24   Q    So, for you to tell us -- withdrawn.

25       Now, I am going to ask you, assuming this

People - Det. McCarthy - Cross

1   hypothetical, assuming that after you sent these

2   fingernails to LabCorp in North Carolina for testing,

3   assuming that they were swabbed in connection with that

4   process for DNA testing, before they were returned to you,

5   would that possibly have effected the results that you

6   testified to as to, first, two and five, with respect to

7   seminal fluid?

8       A    It would depend on if all the potential material

9   was removed by that swabbing.

10      Q    You have no way of knowing whether it was or not?

11      A    I spoke with the analyst at the time.

12      Q    You spoke with the analyst at the time?

13      A    Yes, that's correct.

14      Q    You have no way of personally knowing what was

15  removed or not; is that correct?

16      A    Personally I don't, no.

17      Q    Did you make any report anywhere of that

18  conversation you had with the analyst at that time?

19      A    No, I don't, but LabCorp does.

20      Q    Where you can, answer my questions with a yes or

21  no, Detective.

22          MR.  BIANCAVILLA:  Judge, he answered the

23      question he was asked.

24          THE COURT:  Mr. Chamberlain has the right to

25      phrase his cross-examination as he sees fit.

People - Det. McCarthy - Cross

1    Q    Detective, with respect to R3, the fingernail

2    known as R3, would a prior swabbing have possibly removed

3    the blood that you were looking for?

4    A    Again, if you remove all the material, then you

5    can test it.  If you remove part of the material, you can

6    test what is remaining.  It depends on what material is

7    removed.

8    Q    As you sit here, you have no way of knowing how

9    much material was removed; is that right?

10   A    Just from phone conversations.

11   Q    I said you have no way of knowing, other than what

12   you may or may not have been told; is that right?

13         MR.  BIANCAVILLA:  Objection.

14         THE COURT:  Sustained.

15         He just answered that, Mr. Chamberlain.

16   Q    Now, Detective, couldn't you have tested these

17   fingernails before you sent them for serology -- before

18   you sent them to DNA?

19   A    I made a decision to send them for DNA first

20   because of the small amount of material present.  I would

21   prefer to find out whose DNA it was before I do testing as

22   to the source of the DNA; otherwise, I could have done a

23   test on human blood or seminal fluid and would have said

24   human blood or seminal fluid not knowing whose it was.  So

25   I made that choice as a serologist.

People - Det. McCarthy - Cross

1    Q    Before you found out, for whatever reason, no

2    serology tests for blood were made by the medical

3    examiner; is that correct?

4         MR.  BIANCAVILLA:  Objection.

5         THE COURT:  Sustained.

6    Q    You were concerned about the possibility of your

7    swabbing removing material that would effect the DNA test,

8    is that your testimony?

9         MR.  BIANCAVILLA:  Objection.

10        THE COURT:  I'll permit that.

11        MR.  BIANCAVILLA:  Swabbing of what, Judge?  He

12        sent down several items.

13        MR. CHAMBERLAIN:  I would object to this

14        commentary.

15        THE COURT:  I don't want colloquy between

16        counsel.

17        Mr. Chamberlain, I suggest you make it more

18        specific which swabbing you are referring to.

19   Q    You indicated you made a decision not to test for

20   serology before you sent these fingernail to LabCorp, is

21   that correct, yes or no?

22   A    I didn't do any basic serology testing on it prior

23   to going to LabCorp.

24   Q    And that was your decision?

25   A    That's correct.

People - Det. McCarthy - Cross

1    Q    And the reason for that decision was that you were

2    concerned about removing material; is that correct?

3    A    Using material, yes.

4    Q    Using material.  Using material under the

5    fingernails, is that correct, that's the material we are

6    talking about?

7    A    That's correct.

8    Q    How would you use that material?

9         MR.  BIANCAVILLA:  Objection.

10        THE COURT:  Sustained.

11   Q    Physically, what would cause that material to be

12   used in your process?

13        MR.  BIANCAVILLA:  Objection.

14        THE COURT:  Sustained as to form,

15     Mr. Chamberlain.

16   Q    How would you perform a serology test before

17   sending these fingernails to LabCorp?

18        MR.  BIANCAVILLA:  Objection.

19        THE COURT:  There was no test.  Sustained.

20   Q    Would you have performed the same tests before

21   that you performed afterwards?

22        MR.  BIANCAVILLA:  Objection.

23        THE COURT:  I'm not sure what you mean.

24     Sustained.

25        MR. CHAMBERLAIN:  Judge, he performed tests

People - Det. McCarthy - Cross

1     afterwards.

2          THE COURT:  Mr. Chamberlain, if I don't

3     understand a question, I will tell you and I will

4     sustain as to form.  I'm not saying it can't be asked

5     but it has to be in proper form.

6          MR. CHAMBERLAIN:  Thank you, Judge.

7     Q     Detective, you performed certain tests you

8     testified to here on these fingernails after they came

9     back from LabCorp; is that correct?

10    A     Yes.

11    Q     And you performed different tests on R2 and R5

12    from the one you performed on R3; is that right?

13    A     That's correct.

14    Q     Would you have performed the same tests that you

15    performed on those fingernails before you sent them to

16    LabCorp to determine serology?

17         MR.  BIANCAVILLA:  Objection.

18         THE COURT:  Do you understand the question,

19    Detective?  If you don't, tell me.

20         THE WITNESS:  Not exactly.  I understand where he

21    is going but --

22         THE COURT:  I want you to completely understand

23    the question.  If you don't, just tell me.

24    A     The way I did the tests after I received them, I

25    wouldn't have done it the same exact way prior to.  I

People - Det. McCarthy - Cross

1    would have had to try to modify it and remove a small

2    percentage of the sample and try to retain some sample for

3    DNA testing.  But I preferred to find out if there was DNA

4    there, whose it was, prior to identifying what it was.

5        Q    Now, Detective, if you had fingernail scrapings

6    from three different fingernails that were sent to

7    LabCorp --

8             MR. BIANCAVILLA:  Objection.

9             MR. CHAMBERLAIN:  It's preliminary.  I'm not

10       finished.

11            MR. BIANCAVILLA:  Judge, they were cuttings.

12            THE COURT:  Sustained.  You have to use what he

13       did.  They were cuttings.

14       Q    Before you performed the test after the

15   fingernails were sent back from LabCorp, were you aware of

16   LabCorp's findings with respect to these fingernails?

17            MR. BIANCAVILLA:  Objection.

18            THE COURT:  I'll permit that.

19       A    Yes, I was.

20       Q    And you were aware that Paul Scrimo had been

21   arrested for the murder; is that right?

22            MR. BIANCAVILLA:  Objection.

23            THE COURT:  Sustained.

24       Q    You say you were aware of the findings.  You were

25   aware that there was a difference in their findings with

People - Det. McCarthy - Cross

1   respect to fingernails R2 and R5 as contrasted with their

2   findings as to R3; is that correct?

3        MR.  BIANCAVILLA:  Objection.

4        THE COURT:  Sustained.  You are introducing

5     hearsay, Mr. Chamberlain.

6    Q   Detective, there was -- you were aware that

7   John Kane had been identified, his DNA had been identified

8   only under R3; is that correct?

9        MR.  BIANCAVILLA:  Objection.  You know what,

10     I'll withdraw the objection, Judge.

11       THE COURT:  You can answer, Detective.

12   A   May I refer to my notes.

13       THE COURT:  Yes, you can refresh your

14     recollection.

15       THE WITNESS:  May I have my report back?

16       THE COURT:  Yes, Mr. Chamberlain, the detective's

17     report.

18       MR. CHAMBERLAIN:  Oh, I'm sorry.

19       THE WITNESS:  Could you repeat the question?

20   Q   Could you read the question back?

21       THE COURT:  Read it back.

22           (Whereupon, the requested question was read

23           back by the court reporter.)

24   A   Only under R3, as referring to the fingernail

25   clippings?

People - Det. McCarthy - Cross

1    Q    R3 being the fingernail, R3?

2    A    Yes.

3    Q    You indicated R3 was the one you tested for human

4    blood?

5    A    That's correct.

6    Q    An that was the only one you tested for human

7    blood?

8    A    That's correct.

9    Q    Now, who asked you to make that additional test

10   which had not been made previously?

11        MR.  BIANCAVILLA:  Objection.

12        THE COURT:  Sustained.  That's not relevant.

13   Q    DNA, Detective, is present in the nuclei of cells,

14   is it not?

15        MR.  BIANCAVILLA:  Objection.

16        THE COURT:  Sustained.

17        MR. CHAMBERLAIN:  He's testifying as an expert in

18     serology.

19        THE COURT:  This is DNA, Mr. Chamberlain.  You

20     have to qualify him as such.

21   Q    Does your expertise include the study of DNA in

22   human cells, Detective?

23   A    No.  Currently we are contracting our DNA work out

24   to LabCorp.

25   Q    But you have no training or expertise in that

People - Det. McCarthy - Cross

1     field?

2     A     I have some.  I can answer basic questions, but if

3     it gets into the actual testing --

4     Q     Is it basic that DNA is only contained in the

5     nuclei of the cell?

6           MR.  BIANCAVILLA:  Objection.

7           THE COURT:  You can testify to that.

8     Q     What is the answer to that question?

9     A     Yes.

10          MR.  BIANCAVILLA:  Objection.  I'll ask to

11    approach.

12          THE COURT:  Come forward.

13          MR. CHAMBERLAIN:  I'll withdraw the question.

14          MR.  BIANCAVILLA:  I would ask the answer be

15    stricken.

16          THE COURT:  Ladies and gentlemen, the last

17    response by the detective, as well as the question by

18    Mr. Chamberlain, is stricken and you should disregard

19    it.

20    Q     Does your expertise in the analysis of DNA include

21    information as to whether DNA is contained in cells other

22    than blood cells?

23          MR.  BIANCAVILLA:  Objection.

24          THE COURT:  Mr. Chamberlain, he just said he

25    could only give basic information.  Sustained.

People - Det. McCarthy - Cross

1    Q   Can you tell what type of cells DNA is contained

2  in?

3       MR.  BIANCAVILLA:  Objection.

4       THE COURT:  Counsel, come up, please.  Approach

5  the bench.

6       Detective, step down.

7          (Whereupon, the following took place at the

8          bench outside of the hearing of the defendant and

9          jury.)

10      THE COURT:  Mr. Chamberlain, these questions you

11  are asking are best for a LabCorp representative.  He

12  told you he's not an expert in DNA and you're asking

13  DNA questions which I will keep sustaining.  He says

14  he can only give you basic information.

15      MR.  BIANCAVILLA:  Basic information is not the

16  subject matter of testimony in a trial unless the

17  person is qualified as an expert.

18      THE COURT:  He hasn't been qualified as an expert

19  with respect to DNA.

20      MR. CHAMBERLAIN:  If I may be heard, I think I'm

21  entitled to ask these questions.  This information is

22  put forth by the district attorney that there's no --

23  he tested for blood after these items were returned,

24  after R3, the fingernail with John Kane's DNA was

25  returned.

People - Det. McCarthy - Cross

1    The significance of that, I think he has

2    sufficient knowledge and I would like to know the

3    significance of that.  Part of the significance will

4    depend -- the reason for that is to try to undercut

5    the DNA findings and I think he can testify that the

6    impression being left with this jury that there's no

7    blood there is not a proper impression.

8        I think I can get that from this witness.  If I

9    can't, I can't, but I should be able to ask him.

10   He's an expert based upon his qualification in

11   serology which includes blood.  It includes the

12   significance of no blood being in that DNA.

13       THE COURT:  DNA is a specialty much more specific

14   than serology, Mr. Chamberlain.  I am not going to

15   permit you to ask him questions where he has not been

16   qualified as an expert.  He answered that he could

17   answer limited questions with respect to DNA.

18       He has been qualified as an expert with respect

19   to serology, not DNA.  You can ask any question you

20   want about serology and blood.

21       It's your job, when the LabCorp representative

22   is here, you can ask any DNA questions you want and

23   tie it together however you want in your summation,

24   but I'm not going to permit you to question someone

25   who is not an expert.

People - Det. McCarthy - Cross

1      MR. BIANCAVILLA: Can we move on? I have a

2    witness with a two o'clock flight. We are going to

3    spend more time at the bench -- this was a 15 minute

4    witness.

5      MR. CHAMBERLAIN: Who is your next witness?

6      MR. BIANCAVILLA: May we move on?

7      THE COURT: Yes. Your objection is sustained.

8      MR. BIANCAVILLA: Thank you.

9        (Whereupon, the following took place in open

10       court.)

11      THE COURT: Mr. Chamberlain.

12  CONTINUED CROSS

13  BY MR. CHAMBERLAIN:

14    Q    Detective, you indicated that your tests,

15  subsequent to the return of those fingernails on

16  fingernail scrapings from R3 --

17      MR. BIANCAVILLA: Objection. It wasn't a

18    scraping, Judge.

19      THE COURT: It was a cutting.

20    Q    On fingernail R3, the material on fingernail R3,

21  indicated that it did not contain hemoglobin, is that your

22  testimony here?

23    A    Yes, human hemoglobin.

24    Q    What is the significance of that here?

25      MR. BIANCAVILLA: Objection.

People - Det. McCarthy - Cross

1        THE COURT:  Sustained as to significance.

2    Q    Detective, you indicated that you would -- in the

3    year 2001, on March 8th, you resubmitted material to

4    LabCorp for re-examination that included John Kane's DNA,

5    swabs, Paul Scrimo's DNA sample, the beer bottle, and the

6    DNA taken from the victim; is that correct?

7    A    That's correct.

8    Q    Who asked you to resubmit that?

9    A    That request was made through the assistant

10   district attorney.

11   Q    Did he indicate why that was being resubmitted for

12   re-evaluation?

13       MR. BIANCAVILLA:  Objection.

14       THE COURT:  Sustained.

15   Q    Were you aware or that DNA -- the DNA report prior

16   to that with respect to that beer bottle?

17       MR. BIANCAVILLA:  Objection.

18       THE COURT:  I will permit him to answer that.

19   A    Yes, I believe I was.

20   Q    The resubmission was to do what?  Do you know why

21   you were resubmitting?

22       MR. BIANCAVILLA:  Objection.

23       THE COURT:  Sustained.

24   Q    After -- withdrawn.

25       Was there a change in the DNA analysis after that

                    People - Det. McCarthy - Cross

1   resubmission?

2              MR.  BIANCAVILLA:  Objection.

3              THE COURT:  Sustained as to form.

4      Q    You indicated that you authorized the using up of

5   the DNA sample on that swab, is that correct, on that

6   resubmission?

7              MR.  BIANCAVILLA:  Objection.  There were several

8       swabs.

9              THE COURT:  Which one, Mr. Chamberlain?

10     Q    I'm talking about the swab from the bottle.

11     A    I authorized them to use additional material that

12  they found necessary to do the second typing that we

13  requested.

14     Q    When you say additional material, you authorized

15  them to use all the DNA so that it could not be tested by

16  the defense?

17             MR.  BIANCAVILLA:  Objection.

18             THE COURT:  Sustained.

19     Q    Did you authorize the using -- when you said

20  additional material, was all that material used up?

21             MR.  BIANCAVILLA:  Objection.

22             THE COURT:  Sustained.

23     Q    What do you mean by the word additional material?

24             MR.  BIANCAVILLA:  Objection?

25             THE COURT:  Sustained, Mr. Chamberlain.

People - Det. McCarthy - Cross

1    Come forward, please, counsel.

2              (Whereupon, the following took place at the

3        bench outside of the hearing of the defendant and

4        jury.)

5        THE COURT:  You are asking the wrong person the

6    questions about what they did at LabCorp.  That's the

7    person you would have these questions for as to

8    whether they used all the materials or was there

9    anything left.  He just authorized the use.

10       MR. CHAMBERLAIN:  That's not correct.  What is

11   correct here is, number one, that it was brought out

12   on direct that he authorized the using of the

13   material.  That means all of the material.

14       MR.  BIANCAVILLA:  That's not what he said.

15       THE COURT:  On direct he indicated he authorized

16   it to be sent back for a second typing.

17       MR. CHAMBERLAIN:  I heard using up, Judge, and

18   there's a history here.

19       MR.  BIANCAVILLA:  There's always a history.

20       THE COURT:  Let me hear Mr. Chamberlain.

21       MR. CHAMBERLAIN:  We had motion practice on this

22   at length.

23       MR.  BIANCAVILLA:  Judge, I have to interrupt.

24   This is merely another stall tactic.

25       MR. CHAMBERLAIN:  Please, stop.

People - Det. McCarthy - Cross

1    THE COURT:  The way we are going, I don't think

2    they'll make it.

3        MR.  BIANCAVILLA:  We spend more time at this

4    bench than asking questions.  You have the right to

5    say sustained and let's move on.

6        THE COURT:  What I'm trying to do is explain to

7    Mr. Chamberlain that I don't want this area --

8        MR.  BIANCAVILLA:  Just say sustained, Judge.

9        THE COURT:  Make your record and move on,

10   because, as far as I'm concerned, with the motion

11   practice that's fine.  It's been done.  There's a

12   decision of this court, a county court judge, who made

13   a decision with respect to these issues you are

14   telling me about in motion practice.  I'm not

15   interested in that.  I am interested in questions.

16       MR. CHAMBERLAIN:  I understand, but the point is,

17   in that motion, the issue was brought out regarding

18   who authorized the using up of the entire sample.  I

19   am entitled, I believe.

20       THE COURT:  Why don't you ask the person --

21       MR. CHAMBERLAIN:  He's testified he authorized

22   it.

23       THE COURT:  The person from LabCorp, ask him or

24   her as to whether the substance was completely used up

25   with the second typing.

People - Det. McCarthy - Cross

1    MR. CHAMBERLAIN:  It was.  I know that.

2    THE COURT:  Then ask that person, not this

3    person.  Sustained.

4    MR. CHAMBERLAIN:  It's a question of who

5    authorized it.

6    THE COURT:  You have it on the record.  He

7    authorized the sending out of a second typing.  You

8    can ask the question of the proper person who is the

9    person from LabCorp, not this person.

10   MR. CHAMBERLAIN:  Judge, this person

11   authorized -- LabCorp doesn't authorize using up the

12   entire sample.

13   THE COURT:  You are talking about apples and

14   oranges.  Detective McCarthy indicated he authorized a

15   second typing.  You ask the person from LabCorp how

16   much of the material was used.

17   MR. BIANCAVILLA:  One other thing, Judge.  I

18   understand you are breaking early.  I would ask we

19   take a short break and that we continue on to 12:30 in

20   order to complete these witnesses.  There's no reason

21   to break early.

22   MR. CHAMBERLAIN:  Who is the next witness?

23   MR. BIANCAVILLA:  Meghan Clement.

24   I think we should work to 12:30.  The earlier

25   she gets done --

People - Det. McCarthy - Redirect

1        MR. CHAMBERLAIN:  You know he can't expect to

2    bring a witness in --

3        THE COURT:  I don't want to get involved in that.

4    I am doing the best I can with respect to scheduling.

5        MR. CHAMBERLAIN:  I will finish up here, Judge.

6            (Whereupon, the following took place in open

7        court.)

8        MR. CHAMBERLAIN:  Nothing further.

9        THE COURT:  Redirect, Mr. Biancavilla?

10       MR.  BIANCAVILLA:  Briefly.

11   REDIRECT EXAMINATION

12   BY MR. BIANCAVILLA:

13       Q    Detective, McCarthy, will you, please, review your

14   notes in this particular case regarding any indications

15   you made of the examination of the fingernails

16   scrapings -- cuttings?

17       A    Yes.

18       Q    Did you make notes regarding the examination of

19   the fingernail clippings and submitting those fingernail

20   cuttings to LabCorp?

21       A    Yes, I did.

22       Q    Detective McCarthy, when you received those items

23   back, I believe you testified that there were a number of

24   clippings from the fingernails that were sent to LabCorp;

25   correct?

People - Det. McCarthy - Redirect

1    A    Yes.

2    Q    Do you know how many clippings were sent regarding

3    each fingernail?

4    A    No.  I believe R3 had three.  And R2 and R5, one

5    of them had two but I'm not sure which.

6    Q    So do you know for a fact that when you got those

7    fingernail clippings back that you analyzed the clipping

8    that was used for the DNA analysis or clippings that had

9    been not been used for the DNA analysis?

10        MR. CHAMBERLAIN:  Objection.  I don't understand.

11        THE COURT:  Do you understand the question,

12    Detective?

13        THE WITNESS:  Yes, I do.

14   A    I analyzed clippings that had been used for the

15   DNA analysis.

16   Q    But with respect to how many clippings were used

17   for the DNA analysis, do you know how many of the

18   clippings were used for DNA analysis?

19   A    I thought it was a percentage of each.

20   Q    But not the entire clipping?

21   A    That's correct.

22        MR.  BIANCAVILLA:  Thank you.  Nothing further.

23        THE COURT:  Mr. Chamberlain.

24

25

People - Det. McCarthy - Recross

1    RECROSS EXAMINATION

2    BY MR. CHAMBERLAIN:

3       Q    Were they examining the clippings or materials on

4    the clippings?

5            MR.  BIANCAVILLA:  Objection.

6            THE COURT:  I'll permit that.

7            MR.  BIANCAVILLA:  How would he know what LabCorp

8       was examining?

9            THE COURT:  Technically, that's true.  I'll

10      sustain that.  All right.

11      Q    Detective, didn't you just testify that they only

12   used up a portion of the clippings?

13      A    That's correct.

14      Q    How did you know that?

15           MR.  BIANCAVILLA:  Objection.

16           THE COURT:  You just asked two questions,

17      Mr. Chamberlain.

18      Q    You just testified for Mr. Biancavilla they used

19   up only a portion of the clippings.  How did you know

20   that?

21      A    With phone conversations.

22      Q    And when you say to Mr. Biancavilla a portion of

23   the clippings, are you talking about the clippings or the

24   material that was on the clippings?

25           MR.  BIANCAVILLA:  Objection.

People - Det. McCarthy - Recross

1    THE COURT:  Sustained.

2    Q    When you said the clippings to Mr. Biancavilla, in

3    answer to that question, what were you referring to,

4    Detective?

5    A    I was referring to the material under the

6    clippings.

7    Q    Thank you.

8         And is it not a fact, from your phone

9    conversations, you realized they had done DNA analysis on

10   the material on all those fingernail clippings?

11        MR.  BIANCAVILLA:  Objection.

12        THE COURT:  Sustained as to form.  Just to form,

13   Mr. Chamberlain.

14   Q    You were certainly aware that the material under

15   the fingernails -- the three pieces designated as R3,

16   fingernail R3, had they found John Kane's DNA; right?

17        MR.  BIANCAVILLA:  Objection.  Beyond the scope

18   of redirect, Judge.

19        MR. CHAMBERLAIN:  It's the only material thing

20   here.

21        MR.  BIANCAVILLA:  Beyond the scope.

22        THE COURT:  It's beyond the scope but I will let

23   him answer.  Let's not get into colloquy.

24        Could you repeat that again?

25   Q    You are aware that they found John Kane's DNA