People - Clement - Direct

1    under the material on R3?

2         A    Yes, that's correct.

3              MR. CHAMBERLAIN:  Nothing further.

4              THE COURT:  Mr. Biancavilla?

5              MR.  BIANCAVILLA:  Nothing, Judge.

6                   (Whereupon, the witness was excused from the

7              witness stand.)

8              THE COURT:  Mr. Biancavilla, call your next

9         witnesses, please.

10             MR.  BIANCAVILLA:  Meghan Clement.

11   M E G H A N    C L E M E N T, having been duly sworn, a

12   witness called on behalf of the People, testified as

13   follows:

14             COURT OFFICER:  In a loud voice, state your full

15        name, spelling your last name, and county of

16        residence.

17             THE WITNESS:  My name is Meghan Clement.  The

18        last name is spelled C-L-E-M-E-N-T.  My county of

19        residence is Wake County, North Carolina.

20             THE COURT:  You may inquire.

21             MR.  BIANCAVILLA:  Thank you, Judge.

22   DIRECT EXAMINATION

23   BY MR. BIANCAVILLA:

24        Q    Good morning.

25        A    Good morning.

People - Clement - Direct

1    Q      Thank you for joining us today.

2           Miss Clement, tell the jury where you are

3    employed?

4    A      I'm employed at a company called LabCorp in the

5    Research Triangle Park, in the Raleigh Durham area.

6    Q      For how long have you been employed there?

7    A      Since November of 1994.

8    Q      And in what capacity are you employed?

9    A      I am a technical director in the forensic identity

10   testing department.

11   Q      Please tell the jury what your responsibilities at

12   LabCorp are as technical director?

13   A      My responsibilities include directing

14   technologists who perform the majority of hands-on

15   analysis as well as participating in the analysis of

16   samples that are submitted to our laboratory for DNA

17   testing.  We analyze these samples for not only criminal

18   cases but also some civil situations.

19   Q      What is your educational background?

20   A      I have a bachelor's of science in biology from

21   Westfield State College in Massachusetts and a masters' of

22   science in forensic sciences from the University of New

23   Haven in Connecticut.

24          I have also attended graduate level courses at

25     the University of New Mexico in Albuquerque as well

People - Clement - Direct

1   as as obtained graduate level credits through the

2   University of Virginia for courses which I actually

3   took at the FBI academy in Quantico, Virginia.

4   Q    Where have you employed following receiving your

5   masters degree?

6   A    Originally in Albuquerque, New Mexico at the City

7   Police Department Crime laboratory.  I was employed there

8   from 1985 through 1991 working in their biology section.

9   From there I moved to Fort Worth, Texas where I was

10  employed at the Terrant County Medical Examiner's office

11  in their forensic biology department and I was there from

12  1991 until November of 1994 when I moved to North Carolina

13  to take my current job.

14  Q    What, if any, other training have you had with

15  respect to DNA analysis?

16  A    I have had a class, a one-month class at the FBI

17  academy in Qauntico dealing specifically with DNA.  I had

18  a two-week advanced DNA course at the FBI academy, a

19  seven-week course dealing with PCR analysis in California

20  at a company called Applied Biosystems.

21       I have attended numerous workshops and symposiums

22  as well as tending annual meetings dealing specifically

23  with DNA analysis.

24  Q    Have you made presentations at forensic

25  conferences?

People - Clement - Direct

1      A    Yes, I have.

2      Q    What did they involve?

3      A    I have presented papers at the American Academy of

4    Forensic Sciences and the Symposium on Human

5    Identification which dealt with validation of various DNA

6    procedures we use in our laboratory.

7      Q    Are you a member of any scientific organizations

8    or societies?

9      A    I am.

10     Q    Please, which ones?

11     A    I am an associate member of the Northeastern

12   Association of Forensic Scientists, a member of the

13   Southwestern Association of Forensic Scientists and also a

14   member of the American Academy of Forensic Scientists.

15     Q    Is LabCorp an accredited laboratory?

16     A    Yes, it is.

17     Q    What does that mean when a laboratory is

18   accredited?

19     A    To become accredited, a laboratory must apply for

20   accreditation.  When they are considering your

21   application, you must send all of your procedure manuals,

22   your safety manuals, quality control manuals, and they

23   will inspect all of these.

24          Once they have deemed that you have met the

25   minimum qualifications as far as your procedures and

People - Clement - Direct

1   controls, they will actually send an inspection team down
2   to interview employees and to inspect your laboratory to
3   be sure that you are following the procedures which you
4   have outlined.  They will randomly pull case files to make
5   sure that you are maintaining the proper documentation for
6   another expert to review the file and obtain the same
7   conclusion or results.
8        Once they determine that you are, indeed,
9   following all of your manuals and that you have met the
10  minimum qualifications, they will accredit your
11  laboratory.
12  Q    Does LabCorp participate in proficiency testing
13  programs?
14  A    Yes, that's one of the aspects that you must
15  participate in a proficiency testing program.  LabCorp
16  actually participated in two different proficiency testing
17  programs as well as one of our accreditations is through
18  the New York State Department of Health and they also send
19  a proficiency test twice a year.
20  Q    What is a proficiency test?
21  A    A proficiency test is when an organization will
22  submit samples that simulate a case and they will ask you
23  to analyze them and send them the results just like you
24  would in a normal case.  They then determine whether you
25  have obtained the correct result or not.

People - Clement - Direct

1   Q    Have you testified as an expert in DNA analysis?

2   A    Yes, I have.

3   Q    Approximately how many times?

4   A    Approximately 245 to 250.

5   Q    In how many states?

6   A    I believe 27 or 28 different states.

7   Q    How many times have you been qualified as an

8   expert in DNA analysis in New York State.

9   A    In New York, I would probably say at least 60 to

10  70 times.

11  Q    And in what courts?

12  A    I have been qualified in Erie County, Oneonta

13  County, Kings County, Queens County, in the Federal Court

14  in Brooklyn.  I have been qualified in Manhattan, in

15  Niagara County, Suffolk County.  I couldn't name them all

16  but those are some.

17  Q    In addition to the Nassau County District

18  Attorney's Office, what other district attorney's offices

19  does LabCorp perform forensic DNA analysis for?

20  A    We accept cases from all over the country, so

21  various district attorney's offices.

22  Q    What about locally?

23  A    Locally, we have done work for Kings County,

24  Queens County, Manhattan.  We have done work that's been

25  submitted by the medical examiner's office in New York

People - Clement - Direct

1    City.

2        Q    When you say the medical examiner's office, are

3    you talking about the Office of the Chief Medical Examiner

4    of New York?

5        A    Yes.

6        Q    Have you testified as an expert in DNA analysis of

7    cases which were referred to LabCorp by the Office of the

8    Chief Medical Examiner of the City of New York?

9        A    Yes.

10       Q    Approximately how many times?

11       A    I believe I have testified in about 17 or 18

12   different cases.

13       Q    And these were cases specifically for the Office

14   of the Chief Medical Examiner of the City of New York?

15       A    They were cases that fell under their jurisdiction

16   that got forwarded to us, yes.

17       Q    Have you ever not been qualified as an expert in

18   forensic DNA analysis by any court?

19       A    No, sir.

20       Q    Could you explain to the jury what is DNA?

21       A    DNA stands for deoxyribonucleic acid.  It's the

22   blueprint of life.  It is the code for every physical

23   characteristic we possess as well as every chemical

24   reaction that takes place in our body that allows us to

25   exist.

People - Clement - Direct

1   Q    Where can DNA be found?

2   A    DNA is found in every cell in our body which

3   contains a nucleus and the majority of our cells do.

4   Cells that are in our skin that line all of our internal

5   organs, white blood cells.  Really, red blood cells are

6   one of the only cells that do not contain a nucleus so

7   when we get DNA from blood it's from a white cell, not

8   red.  Virtually most other cells in our body have DNA.

9   Q    Does DNA vary from person to person?

10  A    Yes, it does.

11  Q    How does it vary?

12  A    About 99 percent of our DNA is the same in

13  everyone.  If you look to the person next to you and make

14  a list of the similarities, it would be very long, two

15  arms, two eyes, heart, liver, etcetera.

16       Within one percent of our DNA where there are

17  differences is where we get all of our individualized

18  characteristics such as hair color, eye color, and those

19  are characteristics we can see but there are other

20  characteristics which we possess that you can't see when

21  you look at someone such as our blood type.

22       Most of us are familiar that there are four blood

23  types found in the population, type A, type B, type AB and

24  type O, but you can't look at someone and know what blood

25  type they are.  We have to perform a chemical test.

People - Clement - Direct

1    That's what we are doing when we analyze DNA.

2         We have identified specific areas where there are

3    differences in the population.  We can't look at someone

4    and know what the difference is so we have to perform

5    chemical tests at the specific areas to find out what

6    difference an individual possesses.

7         We can run those same tests on evidentiary samples

8    and compare the characteristics found in a known blood

9    sample or oral sample to the characteristics found in a

10   sample from a crime scene, let's say, and determine

11   whether there are similarities or differences.

12   Q    Are there different forms of DNA analysis?

13   A    Yes, there are.

14   Q    Can you briefly describe the forms of DNA

15   analysis?

16   A    There are two methodologies to analyze DNA.  The

17   first one, an older methodology, is referred to as RFLP

18   and that stands for restriction fragment length

19   polymorphism.  That particular type of DNA requires a lot

20   of DNA.  It is a very long drawn out procedure.

21        The second more commonly used methodology today is

22   referred to as PCR.  That stands for polymerase chain

23   reaction, and it is used in virtually all facets of

24   science in analyzing DNA.

25   Q    And the test that was done with respect to the

People - Clement - Direct

1    material in this particular case, what type of testing --

2    form of DNA testing was it?

3        A    PCR was used.

4            MR.  BIANCAVILLA:  I am going to ask the witness

5        be shown People's 82 for identification.

6        Q    Miss Clement, you have been shown what's marked as

7    People's 82 for identification.  Do you recognize that

8    document?

9        A    Yes, I do.

10       Q    What do you recognize that document to be?

11       A    It's a photocopy of the case file outlining all of

12   the documentation of the analysis LabCorp performed on

13   evidence submitted in this particular case.

14       Q    Is that document kept in the regular course of

15   business of the Laboratory Corporation of American?

16       A    Yes, it is.

17       Q    Is it the regular course of business of LabCorp

18   Corporation to keep such a document?

19       A    Yes.

20       Q    All of the entries regarding the analysis that was

21   were performed that are contained in that document, were

22   they placed in that document at or about the time the

23   analysis was in fact performed?

24       A    Yes.

25           MR.  BIANCAVILLA:  Judge, we would offer that.

1017

People - Clement - Direct

1      THE COURT:  Show it to Mr. Chamberlain, please.

2      MR. CHAMBERLAIN:  May we approach?

3      THE COURT:  Certainly.

4      Step down, Miss Clement.

5           (Whereupon, the following took place at the

6      bench outside the hearing of the sworn jurors and

7      the defendant.)

8      THE COURT:  Mr. Chamberlain?

9      MR. CHAMBERLAIN:  Judge, I have no objection to

10     the conclusionary part of these reports.  What bothers

11     me is including charts and things is just going to

12     be -- it's going to bury the substance.

13          There are a lot of diagrams and things of charts

14     with blips, Federal Express slips, all kinds of

15     things that are immaterial.  They will just bury this

16     thing.

17          What I am looking for is something I can

18     meaningfully absorb, with all the evidence the People

19     have put in this here, and not bury conclusions that

20     are insignificant to this case in a lot of other

21     material.

22     MR.  BIANCAVILLA:  Judge, I'm sure this is not

23     Mr. Chamberlain's first DNA case but these documents

24     are routinely put in evidence.  The Appellate Division

25     has, on hundreds of occasions, approved them because

People - Clement - Direct

1    the actual analysis to which this witness will be

2    testifying is contained in those documents and the

3    results of everything, including how the evidence was

4    handled, exactly what evidence was examined, was not,

5    what was received and sent back, is all contained in

6    that document and that's why the Appellate Division

7    has said the entire case file of the laboratory is

8    admissible as a business record in this case.

9         MR. CHAMBERLAIN:  I have been offering business

10   records of the police department.

11        THE COURT:  That's a little different.

12        MR.  BIANCAVILLA:  A lot different.

13        THE COURT:  Mr. Chamberlain, if the Appellate

14   Division has found this is the proper procedure to

15   use, far be it from me in the County Court to say it's

16   not.

17        MR. CHAMBERLAIN:  My problem, Judge, is the

18   volume and the type of material.  This looks like

19   hundreds and hundreds of pages.

20        THE COURT:  Mr. Chamberlain, that's no reason to

21   take anything out of it.  I'm just here to let you

22   make your record.

23        MR. CHAMBERLAIN:  I don't think any of this is

24   related.

25        THE COURT:  You have the right to cross-examine

Proceedings

1   with respect to any part of this document and I'm sure

2   you will.

3        MR. CHAMBERLAIN:  Respectfully except.

4        THE COURT:  At this point, if we are going to

5   break, I would ask you do it now.  We will be going

6   into a whole new area.  I would ask it not be

7   interrupted.

8        MR. CHAMBERLAIN:  This would be a good time.

9        THE COURT:  Yes, I will do that.

10            (Whereupon, the following took place in open

11       court.)

12            (Whereupon, People's Exhibit 82, previously

13       marked for identification only, was marked and

14       received in evidence as People's Exhibit 82.)

15       COURT OFFICER:  People's 82 received in evidence.

16       THE COURT:  Ladies and gentlemen, at this time we

17   are going to break for lunch.  I would ask you to be

18   back here at two o'clock.

19       Do not discuss the case amongst yourselves or

20   with anyone else.  Keep an open mind.  Do not form or

21   express any opinions until the entire case has been

22   completed.

23       Do not read or listen to any accounts of the

24   case should they be reported in the media.  Do not

25   visit or view any place or premises that have been

Proceedings

1    mentioned.

2         You are not to permit any party to discuss the

3    case with you or attempt to influence you, and you

4    must promptly report to the Court any violation

5    thereof.

6         Have a nice lunch and we'll see you at two.

7         THE COURT:  Miss Clement, see you here at

8    two o'clock.

9              (Whereupon, a luncheon recess was taken.)

10            A F T E R N O O N   S E S S I O N

11        THE CLERK:  Case on trial continued.  All parties

12   present.

13        People ready?

14        MR. BIANCAVILLA:  Yes.

15        THE CLERK:  Defendant ready?

16        MR. CHAMBERLAIN:  Yes.

17        THE COURT:  Bring the jury in.

18        COURT OFFICER:  Jury entering.

19             (Whereupon, the sworn jurors entered the

20        courtroom and resumed their respective seats.)

21        THE COURT:  Both sides stipulate that all sworn

22   jurors are present and seated properly.

23        MR. BIANCAVILLA:  Yes your Honor.

24        MR. CHAMBERLAIN:  So stipulated.

25        THE CLERK:  Bring the witness in?

Proceedings

1    A    Yes, please.

2         (Whereupon, the witness resumed the witness

3    stand.)

4         THE CLERK:  Miss Clement, you are reminded you

5    are still under oath.  You may be seated.

6         THE WITNESS:  Yes.

7         MR. BIANCAVILLA:  May I continue, your Honor?

8         THE COURT:  Yes.

9         MR. BIANCAVILLA:  Thank you.

10   CONTINUED DIRECT

11   BY MR. BIANCAVILLA:

12   Q    Good afternoon, Miss Clement.

13   A    Good afternoon.

14   Q    Miss Clement, I am going to direct your attention

15   to April 19th of the year 2000.  Did you receive evidence

16   from the Nassau County Police Department with respect to

17   this case?

18   A    Yes, sir.

19   Q    Would you, please, describe to the jury what you

20   received from the Nassau County Police Department?

21   A    LabCorp received a sealed Federal Express

22   diagnostic specimen envelope which contained a bag which

23   contained a swab which was listed as from a beer bottle.

24   We received a bag containing a cigarette butt which was

25   listed as number seven from under the kitchen table

People - Clement - Direct

1   ashtray, a brown filter cigarette butt listed as number

2   eight from under the kitchen table ashtray, a cigarette

3   butt listed as number nine from the carpet near the

4   deceased, a cigarette butt listed at number 15 from the

5   hallway and a reference blood sample listed as from Ruth

6   Williams.

7       Q    Did you perform DNA analysis on those items?

8       A    Yes, sir.

9       Q    Would you explain to the jury what was the result

10  of DNA analysis that was performed on the swab from the

11  beer bottle?

12      A    On the swab from the beer bottle, the profile we

13  obtained indicated there was DNA for more than one

14  individual present.  There was a mixture of DNA from at

15  least two individuals.

16      Q    Now, with respect to crime scene item number seven

17  the Vantage cigarette that was found underneath the

18  ashtray?

19      A    That particular item yielded a single source

20  profile which matched the profile that was obtained from

21  the reference blood sample of Ruth Williams.

22          MR. CHAMBERLAIN:  May we have for the record a

23      reference to what the witness is reading from.  I know

24      but I would like the record to reflect it.

25          THE COURT:  She's testifying I believe -- are you

People - Clement - Direct

1    testifying from your own knowledge?

2            THE WITNESS:  Yes, also with referring to --

3            MR. BIANCAVILLA:  People's 83 in evidence.

4            THE COURT:  Yes, you can use that to refresh your

5    recollection.

6            THE WITNESS:  Thank you.

7            MR. BIANCAVILLA:  That document is also in

8    evidence, Judge.

9            THE COURT:  Yes.

10   Q    I'm sorry, the Vantage cigarette that was

11   underneath the ashtray on the kitchen table, what profile

12   was on that?

13   A .  That was consistent with the profile of Ruth

14   Williams.

15   Q    With respect to crime scene number eight, the

16   brown filter that was found underneath the ashtray, at

17   that particular time when you analyzed that?

18   A    That profile was different than the profile of

19   Ruth Williams.

20   Q    And with respect to crime scene item number nine,

21   the Vantage cigarette that found underneath the body of

22   Ruth Williams?

23   A    That profile was consistent with the profile from

24   the known blood of Ruth Williams.

25   Q    And crime scene item number 15, the brown

People - Clement - Direct

1    cigarette filter obtained from the hallway?

2        A    That one was different than the profile of Ruth

3    Williams.

4        Q    The report regarding these initial items that

5    LabCorp analyzed, what was the date of that particular

6    report?

7        A    The day of that report was May 9th of 2000.

8        Q    After you analyzed these items, what did you do

9    with them?

10       A    The items were resealed in the original packaging

11   and they were returned to the Nassau County Police

12   Department SIB unit.

13       Q    I am going to show you what is People's 35 in

14   evidence and ask you do you recognize that?

15       A    Yes, I do.

16       Q    What do you recognize that to be?

17       A    This is the actual original packaging which

18   contained the cigarette butts from the original mailing as

19   well as the packaging that was returned back to the Nassau

20   County Police Department.  A reference blood sample and

21   swab from the beer bottle are not included in this but all

22   the cigarettes were from original mailing.

23       Q    Now, did there come a time when you received

24   additional evidence from the Nassau County Police

25   Department on May 26th of the year 2000?

People - Clement - Direct

1    A    Yes.

2    Q    Could you describe to the jury what was received

3  on that particular day?

4    A    Yes, that, again, was a sealed Federal Express

5  diagnostic specimen envelope which contained a bag

6  containing a swab which was listed as from a drinking

7  glass, a bag containing a swab listed as from a black wire

8  cord, material which was listed as from the fingernail of

9  the deceased and was designated R2 which was a single

10  piece of fingernail.

11       There was another bag containing fingernail

12  material listed as R3 and that contained three individual

13  pieces of fingernail.  Another bag containing fingernail

14  material which was designated as R5 and that had two

15  pieces of fingernail in it.  A bag containing four oral

16  swabs that were listed as from John Kane and a bag

17  containing a reference blood sample listed as from

18  Paul Scrimo.

19    Q    Will you explain to the jury what were the results

20  of your DNA analysis performed on Crime Scene item number

21  19, the swab from the wine glass from the kitchen table?

22    A    The swab from the wine glass revealed a single

23  source profile which was consistent with that of Ruth

24  Williams.

25    Q    With regard to the swab from the cord which you

People - Clement - Direct

1    received?

2        A    That profile also was consistent with the profile

3    of Ruth Williams.

4        Q    And the DNA analysis conducted on what had been

5    designated as fingernail R2?

6        A    That also was consistent with the profile of Ruth

7    Williams.

8        Q    The results of DNA analysis performed on the

9    fingernail designated as R3?

10       A    The fingernail designated as R3 yielded a mixture

11   of DNA so we knew there was DNA from more than one

12   individual in that particular sample.  The mixture -- we

13   could not exclude Ruth Williams as being a contributor to

14   the mixture, nor could we exclude Mr. Kane as being a

15   contributor to the mixture of the DNA on that fingernail.

16       Q    Now with respect to R5, another fingernail

17   cutting?

18       A    R5 was consistent solely with the profile of Ruth

19   Williams.

20       Q    Did there come a time when you compared the

21   reference standards of John Kane and Paul Scrimo to the

22   result of the DNA tests that you had done on Crime Scene

23   item 21, the beer bottle?

24       A    Yes.

25       Q    Please explain to the jury the result of that?

People - Clement - Direct

1    A    When we compared the profiles that were obtained

2    from the reference samples of John Kane and Paul Scrimo to

3    the mixture that was originally obtained on the beer

4    bottle, we could not exclude either John Kane or

5    Paul Scrimo as being possible contributors to the DNA on

6    that beer bottle.

7         There was also one additional characteristic that

8    was identified on the beer bottle at a single location

9    which could have come from Ruth Williams at that point.

10   Q    Now, let's go back to the fingernail cuttings, if

11   you would.  With respect to R2 --

12   A    Yes.

13   Q    -- could you tell jury how many cuttings were

14   received from the finger designated R2?

15   A    There was a single piece of fingernail material in

16   that.

17   Q    Now, would you explain to the jury how LabCorp

18   processed that one fingernail?

19   A    Yes.  LabCorp's policy is to only consume no more

20   than 50 percent of the sample.  What our technologists do

21   is actually take a swab, dampen it with distilled water,

22   and they will actually swab half of the fingernail which

23   is received.

24   Q    Now, the case file on this particular case, does

25   it indicate exactly what was done to fingernail R2?

People - Clement - Direct

1   A     Yes.

2   Q     Please read it to the jury?

3   A     It says, fingernail like material was stained over

4   80 percent with a light brown color swab, fifty percent of

5   stained area of fingernail like material.

6   Q     Once it is swabbed, what is then done with that

7   fingernail?

8   A     The fingernail is returned to it's original

9   packaging and its stored in the secured forensic locker

10  until the time when the analysis is completed.  At that

11  time it is returned back to Nassau County Police

12  Department.

13  Q     Now, that fingernail, R2, the result of that was

14  consistent with the DNA of Ruth Williams; correct?

15  A     That's correct.

16  Q     Let's go to fingernail cutting R3.  Could you tell

17  the jury how many cuttings were sent down to you regarding

18  fingernail designated R3?

19  A     There were three separate pieces which were

20  designated as part of R3.

21  Q     Would you describe for jury exactly how the

22  fingernail cutting from R3 was processed by LabCorp?

23  A     Yes.  There were two pieces which measured

24  approximately .5 by .1 centimeters and there was a third

25  piece which measured approximately 1 centimeter by .2

People - Clement - Direct

1    centimeters.

2           The piece of material -- of fingernail like

3    material, was measuring 1 centimeter by .2 centimeters.

4    Fifty percent of that was swabbed by the technologist.

5    The other two pieces were not touched.

6       Q    What happened to those three pieces?

7       A    Those three pieces, again, were returned to their

8    original packaging, and, upon completion of the analysis,

9    they were all sent back to Nassau County Police

10   Department.

11      Q    What were the DNA results of the swab from the

12   50 percent of that one fingernail regarding fingernail

13   number R3?

14      A    There was a mixture of DNA obtained which was

15   consistent -- or which we could not exclude Ruth Williams,

16   nor Mr. Kane as being possible contributors of.

17      Q    Now, with respect to fingernail designated as R5,

18   how many cuttings were obtained with respect to that

19   fingernail?

20      A    There were two.

21      Q    Could you describe exactly for the jury how those

22   particular fingernail cuttings were analyzed?

23      A    One piece was approximately .5 centimeters by .5

24   centimeters.  The second piece was 1 by .5 centimeters or

25   1 centimeter by .5 centimeters and the technologist

                    People - Clement - Direct

1   swabbed 50 percent of the fingernail like material which

2   measured 1 centimeter by .5 centimeters.

3       Q    What was done with those three fingernails, the

4   evidence from those three fingernails after you were done

5   analyzing them?

6       A    There were only two pieces in R5.

7       Q    I'm sorry.  When you were done analyzing -- when

8   you analyzed R5, what were the results of that analysis?

9       A    The results of that analysis was that it was

10  consistent with Ruth Williams and the remaining portions

11  of those were returned back to the tubes and returned to

12  the Nassau County Police Department upon completion.

13      Q    I am going to show you People's 80 in evidence and

14  ask you if you recognize that?

15      A    Yes, I do.

16      Q    What do you recognize that to be?

17      A    This is the contents of the second mailing, the

18  three fingernail samples as well as swabs from the cord

19  and glass, again, the original packaging we received it

20  in, as well as the packaging that we returned it back to

21  the Nassau County Police Department in is included.

22  However, the reference sample from John Kane and Paul

23  Scrimo are not included in this.

24      Q    Thank you.  I am going to direct your attention to

25  March 9th of 2001.  Did you receive another mailing or

People - Clement - Direct

1   another submission from the Nassau County Police

2   Department?

3       A    Yes.

4       Q    What did you receive?

5       A    We received the remaining portion of the swab from

6   the beer bottle that was received in the original mailing

7   as well as the reference sample from Ruth Williams and we

8   also received the reference samples from Mr. Kane and

9   Mr. Scrimo in this mailing as well.

10      Q    Now, what, if any, analysis did you perform with

11  respect to these items?

12      A    The only analysis we performed on an item itself

13  was the second half of the swab we analyze that to

14  additional systems that we had developed over previous

15  amount of time since the original submission.  We also

16  performed additional tests on the extracts of the DNA

17  known samples which had previously occurred.

18      Q    What were the results?

19      A    The results on the second portion of the swab from

20  the beer bottle was, again, there was a mixture of DNA

21  obtained from the second half of the swab and in that

22  mixture, again, we could not exclude Mr. Kane, Mr. Scrimo

23  or Ruth Williams as being possible contributors.

24      Q    Now, could you tell the jury the difference

25  between the testing that was performed initially with

People - Clement - Direct

1    respect to that beer bottle swab and the testing that was

2    performed on that second submission with respect to the

3    beer bottle swab?

4        A    When the first samples were submitted to our

5    laboratory, we had eight different areas of DNA that we

6    were currently looking at, that we had validated and

7    developed protocols for.

8        Q    Explain to the jury what it means had been

9    validated and protocol?

10       A    Prior to being able to perform any analysis on

11   case work, you have to run various validation tests, new

12   procedures to show that the procedure is reliable, to show

13   that you can obtain the correct result, that it's

14   reproducible, that in different technologist's hands you

15   will get the same answer from the same sample.

16            Basically what you are doing is running tests to

17   optimize the conditions under which you run the test.  You

18   want to run different samples from the same individual to

19   show that you are going to get the same type, whether it

20   is a saliva sample, blood sample or hair root.  You want

21   to show that over the course of time the DNA isn't going

22   to change from one type to another.

23            These are all standard validation tests which are

24   performed to show that you can use this procedure

25   routinely to obtain a proper answer.

People - Clement - Direct

1    Q    And you had done that with respect to eight

2    systems on the initial testing; correct?

3    A    That's correct.

4    Q    Now, over the course of period of time that passed

5    while this case was pending, were you then requested or

6    did you then validate and obtain protocols for additional

7    systems for DNA analysis?

8    A    Yes, that's correct.

9    Q    How many additional systems were there?

10   A    The additional systems -- actually, there were --

11   there were seven additional systems which we had

12   validated -- a new protocol, actually, to validate 13

13   systems instead of eight, but some of those 13 weren't

14   included in the original eight.  That's why there were

15   more than 13 minus eight.

16   Q    Did there come a time when the District Attorney's

17   office asked you to analyze the DNA in this case with

18   respect to the latest systems that were currently being

19   used?

20   A    The request, actually, came from the Nassau County

21   Police Department.  There were conversations with the

22   District Attorney's office as to whether our validation

23   had been completed on the new systems and we had informed

24   them that, yes, we were currently performing analysis on

25   case work samples, that we had completed the validation.

People - Clement - Direct

1  The request came from the Nassau County Police Department

2  to analyze that.

3      Q    Just briefly, when you receive a swab for

4  analysis, with respect to that particular beer bottle,

5  what did you do with the first swab you received from the

6  Nassau County Police Department?

7      A    The first swab we would cut in half and we would

8  take half of the swab and extract DNA from it and then run

9  it through the systems to develop a profile.

10     Q    When you say you extract DNA from the first half

11  of the swab, just explain to the jury what that means?

12     A    What means is you literally take the cotton fabric

13  from the swab and you put it in a tube and you add

14  chemicals to break down the cells to allow the DNA to be

15  released.

16          Once you have released the DNA from the cells that

17  were on the swab, you then run it through a procedure to

18  detect the various areas that we are looking at on the DNA

19  where there are differences in the population.

20     Q    The first swab, the first cutting from the swab,

21  you extracted a particular amount of DNA from that portion

22  of the swab?

23     A    Yes.

24     Q    How much was extracted?

25     A    I need to refer to my notes.  There were

People - Clement - Direct

1     approximately 11 nanograms that were extracted from the

2     first half of that swab.

3         Q     How many was used during the first sequence that

4     was performed?

5         A     Approximately 25 percent of that, so approximately

6     5 nanograms or so.

7         Q     So there was 75 percent of that first extract left

8     over; correct?

9         A     Correct.

10        Q     And LabCorp to this days, does it still maintain

11    75 percent of that DNA that was extracted from that swab?

12        A     Yes.

13        Q     With respect to the second portion of that

14    particular swab from that beer bottle --

15        A     Yes.

16        Q     -- how much was extracted from the second portion

17    of that swab?

18        A     From the second swab there was not a quantitatible

19    amount in the small amount we attempted to quantitate.  So

20    it did not give us a specific reading.  There were very,

21    very small amounts of DNA from that.

22        Q     From the second swab?

23        A     Correct.

24        Q     How much of that was used in the second testing?

25        A     In the second testing all of what was extracted

People - Clement - Direct

1    from the second half was consumed.

2        Q    But there is still 75 percent from the first

3    extraction that's still in the possession of LabCorp?

4        A    Correct.

5        Q    Did anyone ever request that you provide that

6    extract from the first testing for further DNA analysis?

7        A    No.

8            MR. BIANCAVILLA:  I would ask the witness be

9        shown People's 81 in evidence.

10       Q    Do you recognize that?

11       A    Yes, I do.

12       Q    What do you recognize that to be?

13       A    This is the swab from the beer bottle as well as

14   the reference samples for Ruth Williams, Paul Scrimo and

15   Mr. Kane which was the third mailing and all of original

16   packaging as well as the packaging for returning to the

17   Nassau County Police Department.

18           Excuse me.  I think I misspoke.  Actually there

19   is, I think, a very small amount of the second extract

20   remaining.  I believe there is but it's not quantitatible

21   so I'm not sure how much is remaining.

22       Q    Can you tell the jury what type of substances you

23   can obtain DNA from?

24       A    Any type of biological, human biological fluid,

25   generally, will contain cellular material which we can

People - Clement - Direct

1   extract DNA from; saliva samples which contain cells from

2   the inner cheek and gum which we can obtain it from;

3   vaginal secretions, the cells from the vaginal vault we

4   can obtain DNA from; spermatozoa; blood samples, white

5   blood cells we obtain DNA from; skin we can obtain DNA

6   from.

7       Q       Perspiration?

8       A       Perspiration will contain cell material that you

9   can obtain DNA from.

10      Q       Have there been some studies that have determined

11  DNA can even be obtained from dandruff?

12      A       Yes, that would be skin that would be -- would

13  have cells that you can extract DNA from.

14      Q       So DNA doesn't necessarily have to come from

15  blood?

16      A       No.  No, it doesn't.

17      Q       Hypothetically speaking, Miss Clement, can you

18  transfer DNA from one individual to another by merely

19  touching the other individual?

20      A       It's possible, yes.

21      Q       And what, in fact, is being transferred by the

22  touching?

23      A       By the touching, it would be the potential of

24  transferring cellular material from one individual to

25  another.

1038

People - Clement - Direct

1    Q    Is it possible to transfer DNA from running one's

2    hand through another individual's hair?

3    A    Yes, in that instance you could pick up cells from

4    the scalp.

5    Q    Is it possible from touching another individual's

6    bodily organ that you would transfer DNA?

7    A    Yes.

8    Q    What would be transferred at that particular time?

9    Assume for a fact that two people are engaged in an act of

10   oral sex or fellatio, can you envision a scenario by which

11   another individual's DNA would wind up upon another

12   individual's hand?

13        MR. CHAMBERLAIN:  Objection.

14        THE COURT:  Sustained.

15        MR. BIANCAVILLA:  It's a hypothetical, Judge.

16        THE COURT:  Counsel, come forward.

17        Step down.

18            (Whereupon, the following took place at the

19        bench.)

20        THE COURT:  Mr. Chamberlain.

21        MR. CHAMBERLAIN:  The objection is, to start

22   with, it's not based on any evidence in this case,

23   number one.  Number two, it's not --

24        THE COURT:  That's true.

25        MR. CHAMBERLAIN:  The way it's phrased, it's not

People - Clement - Direct

1    a proper question.

2         MR. BIANCAVILLA:  A Hypothetical, as pointed out

3    yesterday, does not have to be based upon evidence

4    within the case.  All we have to do is set forth

5    certain facts, but I will submit it subject to

6    connection because there will be testimony that

7    Mr. Kane did obtain what Mr. Kane termed a blow job

8    from Ruth Williams in the apartment and I would offer

9    this subject to connection.

10        THE COURT:  I'll permit it subject to connection.

11        MR. CHAMBERLAIN:  Will you put it on the record

12   for the jury that it's subject to connection?

13        THE COURT:  Yes, of course.

14             (Whereupon, the following took place in open

15        court.)

16        THE COURT:  The objection is overruled subject to

17   connection.

18        MR. BIANCAVILLA:  Thank you, Judge.

19   CONTINUED DIRECT

20   BY MR. BIANCAVILLA:

21   Q    Let me rephrase the question.  I am going to ask

22   you to assume a certain set of facts.  A man and woman are

23   engaged in sexual activity which consists of a woman

24   performing oral sex on the man.  Assume for a moment that

25   the woman is fondling or holding the man's penis in her

People - Clement - Direct

1  hand.  Is it fair to say that DNA from the man, from his

2  penis, or another part of his body which she is touching,

3  could become embedded under a fingernail?

4       A    Yes, that's possible.

5       Q    What type of material from the male would be --

6  what type of material from the man could cause evidence of

7  DNA to become embedded under the fingernail?

8       A    In that scenario it would most likely be skin.

9       Q    Thank you, Miss Clement.

10          MR. BIANCAVILLA:  I have no further questions for

11      this witness.

12          THE COURT:  Mr. Chamberlain.

13          MR. CHAMBERLAIN:  Thank you, Judge.

14 CROSS-EXAMINATION

15 BY MR. CHAMBERLAIN:

16      Q    Miss Clement, may I have the exhibit of the

17  findings of Lab Corp?

18          Would it be fair to say that the conclusions are

19  contained in the certificate of analysis dated May 9th,

20  June 23rd, 2000, and March 29th, 2001 in this exhibit?

21      A    Yes.

22      Q    And the rest of the exhibit concerns the actual

23  technical tests that were performed; is that correct?

24      A    Yes, that's correct, the documentation of not only

25  what tests were performed, what the results were, and that

1041

People - Clement - Cross

1    is what was used to base the conclusions on.

2       Q    Without explanation, a jury would have some

3    difficulty understanding this exhibit?

4            MR. BIANCAVILLA:  Objection.

5            THE COURT:  Sustained.

6       Q    Let me hand this back to you, if I may.

7            With respect to the conclusions, the first set of

8    swabs you got you received on the 19th of April, 2000; is

9    that correct?

10      A    That's correct.

11      Q    You made certain findings -- withdrawn.

12           You made certain findings with respect to those

13   swabs; is that right?

14      A    Yes, sir.

15      Q    And you found not only that the -- for example,

16   with respect to the cigarette butt number seven and number

17   nine, not only that Ruth Williams could not be excluded

18   but that the chance or statistical probability of her

19   being the person with respect to those items, did you not?

20      A    We calculated a statistical estimate for the

21   profile on one of the cigarette butts which is called a

22   random match probability.

23      Q    So that the goal of forensic DNA testing is not

24   merely to say somebody cannot be excluded but to attempt

25   to calculate statistical analysis as to whether they could

People - Clement - Cross

1    be included; is not that a fact?

2         MR. BIANCAVILLA:  Objection.

3         THE COURT:  I will sustained the word goal.

4    Q    Can you tell me what is the purpose of forensic

5    DNA testing?

6         MR. BIANCAVILLA:  Objection.

7         THE COURT:  I'll permit that.

8    A    The goal of forensic DNA testing is to develop a

9    profile from a piece of evidence and compare it to a

10   profile from a known sample to determine whether someone

11   could have been a contributor or not.

12   Q    And that goal includes an attempt to determine

13   with statistical certainty whether somebody could be

14   included, does it not?

15        MR. BIANCAVILLA:  Objection.

16        THE COURT:  I'll permit it.

17   A    No, the goal isn't to use a statistical estimate

18   to show the probability that it is someone.  The goal of

19   statistical estimate is to help understand how common or

20   rare that profile is in various populations.

21   Q    Let me ask you to go to your report certificate of

22   analysis dated May 9th.  Did you provide a statistical

23   analysis with respect to the cigarette butt number seven

24   and number nine?

25   A    No.  We provided a statistical estimate for the

People - Clement - Cross

1   cigarette butt number seven which matched Ruth Williams.

2   We did not -- excuse me.  I'm sorry.  For cigarette butt

3   number nine which matched Ruth Williams.  We did not

4   calculate a statistic for number seven.  We calculated it

5   for nine because nine we had a larger profile.

6       Q    What statistical analysis did you provide for nine

7   then?

8       A    The probability of randomly selecting an unrelated

9   individual which would have a profile at the eight systems

10  that we obtained for cigarette number nine which matched

11  Ruth Williams would be approximately 1 in greater than

12  6 billion in the African-American population, 1 in greater

13  than 6 billion for the Caucasian population, and 1 in

14  4,450,000,000 for the Hispanic population.

15      Q    I am going to ask you further questions regarding

16  that but merely limit you are answers to the Caucasian

17  population?

18      A    Certainly.

19      Q    Did you come up with a determination with respect

20  to the beer bottle?  You indicated you had found a mixture

21  in the beer bottle?

22      A    We did find a mixture on the beer bottle and, no,

23  we did not calculate a statistical estimate.

24      Q    Did you calculate whether or not Ruth Williams

25  could have been included on the beer bottle?

People - Clement - Cross

1    A    If we didn't calculate a statistical estimate,

2    it's not a matter of calculating whether somebody is

3    actually found in a mixture.

4    Q    Let me rephrase that then, Miss Clement.

5         Did you conclude in your analysis that Ruth

6    Williams is excluded as a contributor for genetic material

7    in the sample found in the beer bottle?

8    A    Yes.  At this point, looking at the mixture and

9    only having Ruth Williams known sample, because we did not

10   see all the characteristics she possessed in the mixture,

11   we did exclude her.

12   Q    When you told the district attorney, with respect

13   to cigarette butt number nine, that Ruth Williams, the

14   victim, her DNA was consistent in the cigarette butt nine,

15   it wasn't really consistent, but it was consistent to a

16   statistical certainty or analysis of 1 in 6 billion; is

17   that correct?

18   A    The statistical analysis isn't a statistical

19   certainty.  What the statistical analysis does is that,

20   based on specific profile that we obtained on the

21   cigarette butt, the chances of me randomly selecting

22   someone that would also match would be 1 in greater than

23   6 billion.  Granted --

24   Q    It's --

25   A    It's a very rare profile that is found on the

People - Clement - Cross

1    cigarette butt which matched Ruth Williams.

2        Q    On May 26th you received profile -- you received

3    additional items for evaluation; is that correct?

4        A    That's correct.

5        Q    And at that time the -- your certificate of

6    analysis in evidence indicates the -- your certificate

7    dated June 23rd, indicated there was, in addition to the

8    victim, Ruth Williams, two suspects, John Kane and

9    Paul Scrimo?

10       A    Correct.

11       Q    Were you aware whether either of those people had

12   been arrested at that time?

13            MR. BIANCAVILLA:   Objection.

14            THE COURT:   Sustained.

15       Q    Would you tell us what items you received from

16   John Kane, what items, as having come from John Kane, you

17   received?

18       A    We received four oral swabbings.

19       Q    Oral swabs.  Did you receive any oral swabs from

20   the victim?

21       A    No, sir.

22       Q    Did you receive any vaginal swabs from the victim?

23       A    No, sir.

24       Q    And you received a blood sample as having come

25   from Paul Scrimo?

People - Clement - Cross

1    A    That's correct.

2    Q    Now, based upon those swabs, you did an analysis

3    and you came up with certain conclusions; is that right.

4    A    Yes, sir.

5    Q    With respect to the cigarette butt number eight

6    and cigarette butt number 15, what was your conclusion?

7    A    The profile obtained from cigarette butt number

8    eight and cigarette butt number 15 was consistent with

9    originating -- or consistent with the profile which

10   originated from oral swabs of Mr. Kane.

11   Q    Do you use a different word there as a possible

12   contributor?  Do you call it something else in that

13   report?

14        MR. BIANCAVILLA:  Objection.

15        THE COURT:  I'll permit that.

16   A    Could you repeat the question?

17   Q    Do you use some other word in connection with that

18   profile for Mr. Kane?

19   A    That he cannot be excluded is how the report

20   reads.

21   Q    Does it not also read major DNA profile?

22   A    Yes, there also was some minor trace material

23   which didn't meet the reporting standards, so the major

24   profile from the cigarette butt was consistent with the

25   profile of Mr. Kane.

People - Clement - Cross

1    Q    Sticking to the Caucasian population,

2   Miss Clement, did you come up with a statistical analysis

3   for that profile?

4    A    Yes.

5    Q    What was that?

6    A    The probability of randomly selecting an unrelated

7   individual that would have a profile which matched the --

8   major profile of the cigarette butts which was consistent

9   with John Kane is approximately 1 in 18,100,000 in the

10   Caucasian population.

11    Q    What that means is the chances of picking somebody

12   else would be 1 in 18,100,000?

13    A    Not really --

14    Q    The chances of that sample having come from

15   somebody else would be 1 in 18,100,000?

16    A    No.

17    Q    Explain it to us.

18    A    What that means is that I wouldn't expect more

19   than one person in 18,100,000 to have that profile.  If I

20   were to randomly select an individual, that individual

21   would have a 1 chance in 18,100,000.  If I took a second

22   person, that person would still have a 1 in 18,100,000

23   chance, and so on.  Eventually I would expect, if I tested

24   18,100,000, that I would find one person that would match.

25    Q    But you would have to test that many to maybe find

People - Clement - Cross

1    one?

2        A    Statistically speaking, yes.

3        Q    Let me go on to fingernail number R3.  Did you

4    find that that was -- did you make a finding with respect

5    to that?

6        A    Yes.

7        Q    And it was not merely that it was consistent with

8    John Kane; right?

9        A    Well, no --

10       Q    It was a little more than just consistent with?

11       A    The profile on fingernail R3 --

12       Q    Let me withdraw that question.

13           MR. BIANCAVILLA:  Objection.  She was answering

14       the question.

15           THE COURT:  He can withdraw it if he wants.

16           Mr. Chamberlain, I don't mind if you withdraw a

17       question but once the witnesses starts to answer you

18       should let her complete her answer.

19           MR. CHAMBERLAIN:  Are you directing her to

20       finish?

21           THE COURT:  She was in the middle of it.

22       Q    Fine.  Go ahead.

23       A    The profile was a mixture.  There was a major

24    profile and a minor profile.  What that means is simply

25    there's a greater concentration of one donor than another.

People - Clement - Cross

1    In this particular mixture, Mr. Kane could not be excluded

2    as the major donor.

3        Q    When you say cannot be excluded, that would be

4    somebody who was a minor contributor you would also say

5    could not be excluded; right?

6        A    Correct.

7        Q    But there's a difference, is there not, when you

8    say he's the major contributor.  It's more than merely

9    consistent.  Is that not a fact?

10       A    No.  Any profile that's consistent with -- that's

11   consistent --

12       Q    On direct, Miss Clement, in answer to the district

13   attorney, I believe in every case, you said, it was

14   consistent with, you said that merely means --

15           MR. BIANCAVILLA:  Objection.  That's improper.

16           THE COURT:  Well, I haven't heard the whole

17       question.

18       Q    The word consistent --

19           THE COURT:  Rephrase.

20       Q    Let me rephrase it this way.  Your terminology,

21   consistent with, merely means somebody can't be excluded.

22   It doesn't mean you are including them with any

23   statistical certainty.  Is that correct?

24       A    No.  If you can't exclude someone, they are

25   included.  That's an automatic.  If you can't exclude

People - Clement - Cross

1    someone as a possible contributor, they are automatically

2    included as a possible contributor.  To say it's

3    consistent with means the characteristics possessed by

4    that individual are found.

5        Q    But you can't say with any degree of scientific

6    certainty that this person is included, can you, ma'am,

7    when you say that he can't be excluded?

8        A    I am saying with scientific certainty I can't

9    exclude them.

10       Q    But you can't, with any scientific certainty,

11   include him; right?

12       A    As I stated, if I can't exclude them, they are

13   included as a possible contributor.

14       Q    As a possible?

15       A    Correct.

16       Q    Let me go on to the fingernail R3.  What was the

17   probability of randomly selecting an unrelated individual

18   with that DNA profile other than Kane?

19       A    Again, the statistical estimate of a random match

20   probability, and we calculated for the major profile which

21   was consistent with Kane only, the probability of randomly

22   selecting another individual with a profile which matched

23   that on the fingernail is approximately 1 in 2,600,000 for

24   the Caucasian population.

25       Q    Does your report list that figure because mine

People - Clement - Cross

1   looks like it could be a typo?

2       A    It appears there's a zero missing.  There should

3   be an additional zero.

4       Q    With respect to that fingernail, there was a minor

5   contributor as well as; right?

6       A    That's correct.

7       Q    And that minor contributor was who?

8       A    It was consistent with Ruth Williams.

9       Q    Not Paul Scrimo?

10      A    No.

11      Q    So there's no question Paul Scrimo is excluded

12  from that?

13      A    That's correct.

14      Q    And to date we haven't had Paul Scrimo in this

15  report until we get to the beer bottle; is that right?

16           MR. BIANCAVILLA:  Objection.

17           THE COURT:  Sustained as to form.

18      Q    If we go to the beer bottle, Miss Clement, would

19  you tell us, was your -- you told the district attorney, I

20  believe, on direct, that the profile from the beer bottle

21  was consistent with both John Kane and Paul Scrimo; is

22  that correct?

23      A    No.

24      Q    That's what you told us on direct?

25           MR. BIANCAVILLA:  Objection, Judge.

People - Clement - Cross

1    THE COURT:  Sustained.

2    Q    Withdrawn.

3    Miss Clement, isn't it a fact that the major

4    contributor on the beer bottle was John Kane?

5    A    I can't answer that question because I never

6    said -- what I said is -- on the beer bottle, there's a

7    mixture.  Within the mixture of characteristics found, I

8    cannot exclude John Kane and I cannot exclude Mr. Scrimo

9    as being possible contributors.  And that the one system

10   where there's another characteristic which could not have

11   come from either, Ruth Williams doesn't possess that, so I

12   couldn't exclude her as well.

13   Q    That was your June 23rd report that said you

14   couldn't exclude her as well?

15   A    I'm not talking about the June 23rd report.  Yes,

16   the June 23rd report says that.

17   Q    Right now I'm talking about the June 23, 2000

18   report.  Does it say you cannot exclude the victim as well

19   from that mixture on the beer bottle?

20   A    No, it does not.

21   Q    So we still have your prior report from May 9th

22   that says the victim is excluded from the mixture on the

23   beer bottle?

24   A    Correct.

25   Q    Now, with respect to the beer bottle, did you also

People - Clement - Cross

1    find some other allele -- by the way, what is an allele?

2         A    Allele is the scientific name for characteristic.

3         Q    Characteristic found at a loci on a DNA sample; is

4    that right?

5         A    Yes.

6         Q    And your findings are based upon the alleles you

7    find at various loci in a particular sample or swab

8    submitted to you, right?

9         A    Our conclusions, yes, are based on the

10   characteristics or alleles identified.

11        Q    Did you also find a nine allele on the beer bottle

12   at one loci, specifically, D13S317, which could not be

13   contributed by either John Kane or Paul Scrimo?

14        A    Yes.

15        Q    At that time you indicated no statistical estimate

16   shall be calculated for that allele sample; correct?

17        A    Correct.

18        Q    Now, Miss Clement, if the victim was excluded and

19   there was something on that beer bottle that indicated

20   some other individual, that would mean there had to be,

21   assuming it was Kane and Scrimo, some third person there

22   other than the victim; is that right?

23             MR. BIANCAVILLA:  Objection.

24             THE COURT:  I'll permit that.

25        A    No.  The original report which excludes the victim

People - Clement - Cross

1   was based solely on the victim's profile compared with the

2   mixture on the beer bottle.  When we compared only her

3   profile to the mixture on the beer bottle, there were a

4   couple of characteristics at various areas which were

5   possessed by the victim which weren't present in the

6   mixture.  At that point we excluded her as a source in the

7   mixture.

8       Q    And, Miss Clement, did you not exclude her --

9            MR. BIANCAVILLA:  Judge, objection.  I don't

10  believe she was done.

11           THE COURT:  Were you done with your answer,

12  Miss Clement?

13           THE WITNESS:  I was going to continue on.

14           THE COURT:  Then continue on.

15      Q    I am limiting the answer to June 23?

16           THE COURT:  I understand, and I think the witness

17  understands that.

18      A    Yes, I do.  As of -- upon receiving the profiles

19  or the reference samples from Scrimo and Kane and looking

20  at the mixture at that point, we do identify a very weak

21  nine allele or characteristic at one of the areas which

22  couldn't have come from either Mr. Scrimo or Mr. Kane.

23           However, at this point Ruth Williams does possess

24  a nine at that particular loci or genetic area.  Because

25  she possesses a nine which is an extremely weak

People - Clement - Cross

characteristic from a very minor contribution, we can't

exclude her from being the possible contributor of that at

this point.  So we can't exclude her from being a minor

contributor, but, as far as the bulk of the mixture,

there's not all of her characteristics being identified.

Q    So what you are saying is you changed your May 9th

certificate of analysis where you said she was excluded

from the beer bottle, by June 23rd you said she was not

excluded; is that right?

A    As the minor contributor.

Q    Would you read from your June 23rd report or

certificate of analysis and tell us where it says she

could have contributed?

A    It is not in the report.  It's designated that

there is a nine characteristic which could not come from

Mr. Scrimo or Mr. Kane but it does not designate

specifically.

Q    So you are telling us now that by June 23rd you

made that determination and you didn't put it in your

certificate of analysis?

MR. BIANCAVILLA:  Objection.

THE COURT:  Overruled.

A    I believe it was actually written in a letter at a

later date.

Q    Was that a letter written in response to a letter

People - Clement - Cross

1   that you would have obtained from the district attorney

2   from -- that had come from the defense's expert, Doctor

3   Baum?

4           MR. BIANCAVILLA:  Objection.

5           THE COURT:  Sustained.

6       Q    You mentioned a letter?

7           MR. BIANCAVILLA:  Objection.

8       Q    When was the letter?

9           THE COURT:  Overruled.

10      Q    The letter that corrected the exclusion of Ruth

11  Williams from the beer bottle sample, when was that

12  letter?

13      A    First I have to clarify.  It wasn't a correction.

14  It was information or -- it was a letter discussing the

15  results once the additional information of the additional

16  known samples were supplied.  Let me refer to --

17  November 25th of 2000.

18      Q    And you said it was -- and you already had that

19  information in June but it wasn't in your June report is

20  that what you are saying?

21      A    That's correct.

22      Q    Didn't that letter of November 25th represent a

23  change in your original conclusion phrased in your report?

24          MR. BIANCAVILLA:  Objection.

25          THE COURT:  Overruled.

People - Clement - Cross

1     A    Can you repeat the question?

2     Q    I said, ma'am, didn't that reflect a change in

3     your original report, the conclusion?

4     A    No, sir.  It was certainly -- the letter -- no, it

5     didn't reflect a change in the report.  It certainly was

6     based on additional information from the second submission

7     including interpretations using that as well.

8     Q    You know Doctor Baum, don't you?

9     A    Yes.

10    Q    He is the director of the forensic lab in the New

11    York City Examiners' Office?

12    A    Yes.

13    Q    Did you get -- your letter of November 25th refers

14    to a letter that you had received from the district        .

15    attorney from Doctor Baum, I have reviewed the letter

16    Doctor Baum wrote --

17            MR. BIANCAVILLA:  Objection?

18            THE COURT:  Don't read.

19    Q    Did you review a letter from Doctor Baum to come

20    to your conclusion in your November 25th letter?

21    A    No, sir.

22    Q    Could you -- do you have your November 25th letter

23    in front of you?

24    A    I do.

25    Q    Please look at the first sentence in there?

1058

People - Clement - Cross

1      A      Yes.

2      Q      Had you reviewed the letter from Doctor Baum?

3      A      Oh, I had reviewed a letter but reviewing the

4    letter didn't make me change my conclusion.  My conclusion

5    had never changed.

6      Q      Well, you were aware of the significance of

7    somebody else being present if the People's version of

8    this crime indicated it was just Scrimo, Kane and the

9    victim in that apartment, were you not?

10             MR. BIANCAVILLA:  Objection.

11             THE COURT:  Sustained as to form -- wait.

12     Q      Withdrawn.

13             THE COURT:  Mr. Chamberlain, when there's an

14     objection, give me a chance to rule and then you can

15     ask another question or perhaps the question will

16     stand.

17             MR. CHAMBERLAIN:  I withdrew.

18             THE COURT:  Okay.

19     Q      Do you have the letter that you reviewed from

20   Doctor Baum there, Miss Clement?

21     A      I have to look.

22     Q      Let me save some time, Miss Clement.  Do you have

23   it yet?  Are you reading?

24     A      I'm not sure which letter.

25     Q      October 2nd, a letter, 2000, a letter from

People - Clement - Cross

1   Doctor Baum?

2       A    Yes, I have that.

3       Q    In that letter he indicated --

4            MR. BIANCAVILLA:  Objection.

5            THE COURT:  Don't read from the letter.

6       Q    Were you responding to that letter in your

7   November 25th letter, Miss Clement?

8       A    Yes.

9       Q    And in your November 20 -- withdrawn.

10           You certainly did not, in your June 23rd report,

11  in any way indicate that the victim could be excluded from

12  the beer bottle; is that correct?

13      A    That's correct, there's nothing excluding her from

14  the beer bottle in the June 2000 report.

15      Q    And in fact, your first report of a change in the

16  conclusion reached, starting with your May 9th certificate

17  of analysis was that letter of November 25th; is that

18  correct?

19           I'm not asking what you told the district

20  attorney.  I'm saying what you put in writing in any

21  report.

22           MR. BIANCAVILLA:  Objection.

23           THE COURT:  Well, I am going to sustain it as to

24      form at this point.  You added a little too much

25      information, Mr. Chamberlain.

People - Clement - Cross

1   Q    Your first report of a change in your certificate

2   of analysis as to the victim being excluded was in your

3   November 25th letter; is that right?

4           MR. BIANCAVILLA:  Objection.  She testified it

5       wasn't a change.

6           THE COURT:  I will sustain just as to the word

7       change.

8   Q    It was a difference in your conclusion, was it

9   not?

10  A    The first time there was written documentation

11  that we do not exclude Ruth Williams is in the letter.

12  Q    I'm not asking if it's in the letter.  The first

13  time you do not exclude her is in the letter and you

14  indicate in the letter that this was a different

15  conclusion; right?

16          MR. BIANCAVILLA:  Objection.

17          THE COURT:  I'll permit that.

18  A    No.

19  Q    Would you read the letter, please, the paragraph?

20          MR. BIANCAVILLA:  The next to last paragraph.

21          THE COURT:  Excuse me -- wait.  Wait

22      Mr. Chamberlain, you have like three questions on the

23      floor here.  You asked the witness to read the letter.

24      Is there a purpose for that at this point?

25          MR. CHAMBERLAIN:  I want her to read the next to

People - Clement - Cross

1    last paragraph as to whether or not that was a

2    different conclusion from the original certificate.

3         THE COURT:  Have you read it?

4         THE WITNESS:  Oh, I'm sorry.

5         Okay, I read the letter.

6    Q    Can you answer the question?

7         THE COURT:  Could you repeat the question?

8    Q    I'll withdraw.

9         I'm not asking why you may have come to a

10   different conclusion, but that was the first time --

11        THE COURT:  No.  Sustained.  Just ask a question.

12   Q    Was not that the first time you expressed a

13   different conclusion from the ones certified on May 8th

14   and again on June 23rd, 2000?

15   A    The letter is the first time that conclusion was

16   documented.

17        MR. CHAMBERLAIN:  I will now offer the -- ask

18   these documents be marked for identification?

19        THE COURT:  Yes.

20             (Whereupon, the above-mentioned items were

21        marked as Defendant's Exhibits K and L for

22        identification only.)

23        COURT OFFICER:  Defendant's K and L marked for

24   identification.

25        MR. CHAMBERLAIN:  I would offer them in evidence.

People - Clement - Cross

1    MR. BIANCAVILLA:  Objection.

2    THE COURT:  Step down.

3    Counsel, come forward please.

4         (Whereupon, the following took place at the

5    bench.)

6    THE COURT:  Yes, Mr. Biancavilla.

7    MR. BIANCAVILLA:  What is the basis of them being

8    admitted in evidence.  It's purely hearsay.

9    THE COURT:  This is a letter from a Doctor Baum.

10   MR. BIANCAVILLA:  If he would like to come in and

11   testify, I would be more than happy for him to take

12   the seat.  It's complete hearsay.

13   MR. CHAMBERLAIN:  No.

14   MR. BIANCAVILLA:  Excuse me.  Thank you.  With

15   respect to the letter, which I believe is the letter

16   of --

17   THE COURT:  One, October 2nd is signed by

18   Doctor Baum; November 25th is signed by Miss Clement.

19   MR. BIANCAVILLA:  I don't think there's anything

20   inconsistent in the letter that she just testified to

21   from the witness stand.

22   MR. CHAMBERLAIN:  Judge, with respect to the

23   letter that she testified to, there's sufficient

24   confusion --

25   THE COURT:  Confusion is not the method of making

People - Clement - Cross

 1    the determination whether something goes in evidence.

 2    You have confronted her with her letter and she has

 3    agreed with you that there was a, for the lack of a

 4    better word, a difference from what she previously

 5    stated in her previous report that was issued earlier.

 6         If she did not agree that -- if there was an

 7    inconsistency, then, of course, you could have placed

 8    this in evidence.  But at this point she agreed with

 9    the conclusion you are trying to bring out.

10         MR. CHAMBERLAIN:  It's inconsistent in there.

11    She's quibbling, Judge.  I think I have a right to put

12    that before the jury.

13         MR. BIANCAVILLA:  Mr. Chamberlain is trying to

14    bring in Baum's testimony without putting him on the

15    stand.  I would be happy to cross him when he hits the

16    stand, Judge.  I think that's the only purpose of

17    that, Judge.

18         THE COURT:  Mr. Chamberlain, you can continue to

19    cross-examine her --

20         MR. CHAMBERLAIN:  That's enough, Judge.  I'll let

21    it go.

22         THE COURT:  Okay.

23         MR. CHAMBERLAIN:  I respectfully except.

24         THE COURT:  That different from letting it go.

25         MR. CHAMBERLAIN:  When I say that, I don't want

1064

People - Clement - Cross

1    to appear to argue further on it.

2         THE COURT:  I'm denying it, overruling it.

3         I will sustain the objection.

4         You may inquire.

5    CONTINUED CROSS

6    BY MR. CHAMBERLAIN:

7    Q    Miss Clement, your third report here is dated

8    March 29th, 2001; is that correct?

9    A    Yes, sir.

10   Q    The reason for the resubmission to your lab of

11   this evidence was what, do you know?

12   A    Yes, we had developed additional systems which we

13   weren't originally testing with which could now be tested

14   to give more genetic information.

15   Q    And the additional systems would add information

16   to your previous report?

17   A    Potentially, yes.

18   Q    So the jury is clear about this, the only thing

19   resubmitted was the evidence surrounding the beer bottle;

20   is that right?

21   A    That's correct.

22   Q    This one beer bottle found on the table, do you

23   know where it was found?

24   A    No, I don't believe so.

25   Q    None of other evidence was submitted, fingernails,

People - Clement - Cross

1   cigarette butts, other swabs, none of the other evidence

2   was submitted, right?

3       A    No, other than the reference samples.

4       Q    Did you tell the district attorney when you had

5   new materials or new systems or did he request that you

6   re-examine this evidence regarding the beer bottle?

7           MR. BIANCAVILLA:  Objection.

8           THE COURT:  I'll permit it.

9       A    Honestly, I don't know that the initial

10  conversations were with the district attorney.  I think it

11  may have been with the Nassau County Police Department

12  because they are the ones who traditionally submit the

13  evidence.  We had recently validated the new systems and

14  they were aware of the new systems being validated so I

15  think the original conversations were with the police

16  department.

17      Q    Who initiated those conversations with the police

18  department?

19          MR. BIANCAVILLA:  Objection as to relevancy.

20          THE COURT:  Sustained.

21      Q    Were the additional systems that you have spoken

22  of -- I think you said you went from eight to 13; is that

23  right?

24      A    Correct.  We were originally analyzing eight.  In

25  the new testing there were kits that allowed us to analyze

People - Clement - Cross

1  13.

2      Q    Would they add alleles to the various loci?

3      A    Well, they didn't add alleles to the loci.

4  Basically, what they did is was add loci.  Loci is simply

5  the name for location of DNA or an area of DNA.  So they

6  added the numbers of areas of DNA that we could test.

7      Q    The loci are the various locations on a particular

8  swab or piece of evidence that give the various DNA

9  locations; is that right?

10     A    No.  Loci are the locations on DNA strand that we

11  are looking at to develop a profile from.

12     Q    And the profile is developed from the alleles on

13  that loci; is that correct?

14     A    The profile is a combination of all the alleles at

15  the various locations.

16     Q    You are -- you made a report of what you received

17  on March 9th on March 29th; is that right?

18     A    March 29th, 2001, yes.

19     Q    And that's, again, included in the People's

20  Exhibit of your lab report there?

21     A    People's Exhibit 82.

22     Q    Will the allele detected in that -- do they

23  includes all the alleles detected before plus new alleles;

24  is that correct?

25     A    No.

People - Clement - Cross

1    Q     No?

2    A     No.

3    Q     What do they do?

4    A     They include only the results of the analysis on

5    the second half of the swabbing from the beer bottle that

6    was performed with this particular submission.

7    Q     Well, if you repeat the loci, they should include

8    the same alleles plus perhaps more; is that a fair

9    statement?

10         MR. BIANCAVILLA:  Objection.

11         THE COURT:  I'll permit that.

12   Q     In other words --

13         THE COURT:  Wait.  There's a question there,

14   Mr. Chamberlain.

15         MR. CHAMBERLAIN:  She looks confused.

16         THE COURT:  Do you understand the question?

17         THE WITNESS:  I don't think I do.

18         MR. BIANCAVILLA:  Which is why I objected.

19   Q     In your March 2001 analysis, did you include the

20   same loci that you did in June and May of 19 -- of 2000?

21   A     Some of them were the same because some of the

22   systems that we were already analyzing are included in the

23   new kits that look at 13, but many of them are not the

24   same.  There are some that overlapped but there were many

25   differences.

People - Clement - Cross

1    Q    Will you go to D3S1317, your March 2001 analysis,

2    what was -- what were the alleles on the beer bottle?

3    A    Actually, it's genetic systems D13S317 and the

4    only reportable characteristic or allele we saw was a 12,

5    but there was also additional activity which didn't meet

6    the threshold level for reporting.

7    Q    So at the conclusion, at the conclusion of that

8    analysis, was that the only allele at that loci was 12?

9    A    The only reportable one, yes.

10   Q    Is there an explanation for the change from the

11   June 23rd analysis at that loci?

12   A    Certainly.

13   Q    What is it?

14   A    The systems -- first of all, we got more DNA from

15   the first half of the analysis of the beer bottle swab so

16   we were able to get more genetic information from it.

17   Those items were a little more sensitive than using these

18   kits with 13.  So where we may have picked up additional

19   activity or additional information in the first test

20   because it was more DNA there, we didn't see all of the

21   activity in the second test with less DNA.

22   Q    So for that loci, you lost eight, nine and 11 of

23   the prior alleles that you had shown in your June 23rd

24   report?

25            MR. BIANCAVILLA:  Objection to the terminology.

People - Clement - Cross

1    THE COURT:  Did you understand the question?

2    THE WITNESS:  Yes.

3    THE COURT:  I'll permit it.

4    A    We didn't lose it.  It just did not --

5    Q    Did not show up?

6    A    That activity did not meet reporting standards.

7    Q    Now, you told the district attorney that both

8  John Kane and Paul Scrimo could not be excluded from the

9  beer bottle as a result of this last test; is that right?

10   A    The conclusion from the test of the second half of

11  the swab was that the major profile was consistent with

12  John Kane, however, we could not exclude Ruth Williams or

13  Paul Scrimo as minor contributors.

14   Q    Now, you provide a statistical analysis for a

15  contributor.  Will you read the last sentence with respect

16  to that in that report?  The probability of randomly

17  selecting an individual with a DNA profile that would be

18  included as a contributor to the reportable mixture in

19  item 22 is approximately, for the Caucasian population,

20  what, 1 in 6,800?

21   A    Correct.

22   Q    Are we talking about John Kane there?

23   MR. BIANCAVILLA:  Objection.

24   THE COURT:  I'll permit that.

25   A    No.  What we are saying is that, based on the

People - Clement - Cross

1    reportable mixture obtained in the second half of the swab

2    only, the probability of me randomly selecting someone who

3    would not be excluded would be 1 in 6,800 for the

4    Caucasian population.  This calculation was on the

5    mixture.  It wasn't on a major profile.  It was on the

6    overall reportable mixture.

7         Q    Didn't your report say John Kane cannot be

8    excluded as a major contributor to the genetic material in

9    this sample?

10        A    Yes, that's what the report said.

11        Q    Doesn't that analysis refer to the major

12   contributor who can be included?

13        A    No, it doesn't refer to the major contributor.  It

14   refers to the overall mixture of the reportable profile.

15        Q    Would it refer to a minor contributor, possible

16   minor contributor?

17        A    Yes, it would.

18        Q    When you have a DNA profile, do you not -- do you

19   provide statistical analysis for minor contributors?

20        A    If you can differentiate a major profile and a

21   minor profile, we would calculate a statistic strictly for

22   minor contributor, however, generally, that's not possible

23   to separate.  It's easy to identify a major profile

24   because it's more concentrated.

25        Q    In all your other reports you identified major

People - Clement - Cross

1    contributor and provide a statistical analysis in the

2    millions; is that right?

3             MR. BIANCAVILLA:  Objection.

4             THE COURT:  Sustained.

5    Q     In large numbers?

6             THE COURT:  Sustained.

7    Q     What would be the statistical analysis that

8    John Kane is included in that mixtures as a major

9    contributor to that beer bottle?

10   A     For which swab, the second one?  The second half?

11   Q     Yes.

12   A     We didn't calculate a major profile statistic.  We

13   calculated an overall mixture profile statistic.

14   Q     You're saying there's no difference between one

15   and the other?

16   A     There can be, certainly.

17   Q     There can be.

18           Did you testify before the grand jury,

19   Miss Clement?

20   A     I did, yes.

21   Q     Do you recall Page 52, top of page, Line 2 -- do

22   you recall this question and this answer:

23           "QUESTION:  Now, Lab Corp did not undertake a

24       statistical analysis with respect to the swabbings

25       from the Budweiser beer bottle; is that correct?

People - Clement - Cross

1    "ANSWER:  That's correct.  You have a mixture of

2    DNA for more than one individual.  It's not a unique

3    profile which matches an individual so we do not

4    calculate statistics on mixtures."

5         Was that your testimony then?

6    A    Yes.

7    Q    Of course this preceded this March report, right?

8    A    Yes.

9    Q    But, nevertheless, your testimony was you do not

10   calculate statistics on mixtures; is that right?

11   A    That's correct, at that time we did not.

12   Q    Your highest degree was a master of science?

13   A    Yes, sir.

14   Q    Where was that ma'am?

15   A    The University of New Haven in West Haven,

16   Connecticut.

17   Q    You answered some hypothetical questions for the

18   district attorney here.  Have you had any -- you don't

19   have any expertise in collecting evidence at crime scenes

20   personally, do you?

21   A    Yes, I do.

22   Q    Personally?

23   A    Yes, sir.  I spent two years as a -- in

24   Albuquerque working crime scenes, homicide scenes.  And,

25   also, my job in Texas, I responded to scenes and collected

People - Clement - Cross

1   evidence.

2       Q    Do you have any expertise in sexual practices or

3   techniques or anything along the lines referred to --

4            MR. BIANCAVILLA:  Objection, Judge.

5            THE COURT:  Sustained.

6       Q    In forensic work?

7            THE COURT:  Sustained.  Sustained.

8       Q    Ma'am, you indicated DNA could be obtain by

9   stroking somebody, running your hand over somebody; is

10  that your testimony?

11      A    It's possible.

12      Q    Can you state with any reasonable degree of

13  scientific certainty that somebody could get DNA on their

14  fingernails if they were just stroking somebody?

15      A    Given that hypothetical, no, because their

16  fingernails wouldn't come into contact with the skin.

17  Unless the fingernails came in contact with the skin, you

18  wouldn't expect any transfer to the fingernails.

19      Q    And the district attorney asked you about DNA

20  being collected from such things as dandruff?

21      A    Yes.

22      Q    Would that be an ascertainable amount as the type

23  of swabs as you had in this case?

24      A    It depends.  It depends on the activity.  If you

25  are scratching your head, yes, potentially.  If it's just

People - Clement - Cross

1    on a shoulder that you then touch, then possibly not.

2        Q    DNA can come from blood, can it not?

3        A    Yes.

4        Q    And normally it would have to come from the nuclei

5    of a cell and not from any other part, right?

6        A    Nuclear DNA would come from the nuclei of a sell.

7        Q    What type of DNA are we talking about here?

8        A    Here we are talking about nuclear DNA.

9        Q    It could also come from -- if you had fingernails,

10   it could come from a scratch of skin; is that right?

11       A    That's possible, yes.

12       Q    If you -- to get DNA, you're not going to get it

13   just by running your hand over somebody's body, are you?

14            MR. BIANCAVILLA:  Objection.

15            THE COURT:  I'll permit that.

16       A    It's possible.  There are any number of factors

17   that could play into that.

18       Q    You might get it, but it's unlikely, is it not?

19            MR. BIANCAVILLA:  Objection.

20            THE COURT:  Sustained.

21       Q    Would it be more likely, Miss Clement, for

22   somebody to get DNA -- you can get DNA from skin; is that

23   right?

24       A    Yes.

25       Q    Would it be more likely that somebody would get

1075

People - Clement - Cross

1    DNA under their fingernails in connection with a scratch

2    or some struggle?

3         MR. BIANCAVILLA:  Objection.

4         THE COURT:  Sustained.

5    Q    Could you get -- would you -- to get a good DNA

6    sample, do you need to just -- do you need just surface

7    skin or do you need some indentation so that you go below

8    the surface?

9         MR. BIANCAVILLA:  Objection.

10        THE COURT:  Sustained.

11   Q    Do you need to have a scratch?  Would it be likely

12   to get DNA without there being a -- DNA from skin without

13   there being a scratch?

14   A    It's possible to get sufficient quantities of DNA

15   without there being a scratch.

16   Q    The sexual activity that was referred to here, if

17   somebody were -- which included holding with one hand on

18   to a penis, would that likely cause a collection of DNA

19   under fingernails without a scratch?

20   A    The fingertips -- fingernails would have to come

21   into contact with the skin, but it doesn't necessarily

22   have to cause a scratch for there to be cells deposited

23   under nails.  I can itch my arm and not leave a scratch

24   and certainly transfer plenty of DNA to my fingernails to

25   get a profile.

People - Clement - Cross

1    Q    But if you are getting material under fingernails,

2    would it not be likely there would be some pain involved

3    if somebody were digging fingernails into an organ?

4              MR. BIANCAVILLA:  Objection.

5              THE COURT:  Sustained.

6    Q    You indicated it was possible.  Could you tell me

7    under what scenario that DNA material would get under

8    fingernails in connection with that activity?

9              MR. BIANCAVILLA:  Objection.

10             THE COURT:  Do you understand the question?

11             THE WITNESS:  I'm not sure.

12             THE COURT:  Rephrase, Mr. Chamberlain.

13   Q    You were asked by the assistant district attorney

14   could DNA be transferred during the course of somebody

15   holding on to a penis.  Is it not more likely that in

16   order to get DNA under fingernails there would have to be

17   some scratching or digging in of those fingernails in the

18   penis?

19   A    Not necessarily, no.

20   Q    You think it would be obtainable just by holding,

21   without fingernails touching the penis?

22             MR. BIANCAVILLA:  Objection.  That wasn't the

23        entire hypothetical.

24             THE COURT:  I'll let her answer.

25             Answer this assuming the hypothetical the People

People - Clement - Cross

1    put on the record.

2       A    Assuming that hypothetical, when you have skin

3    which is wet, the cells are transferred much more easily

4    so there doesn't necessarily have to be a force to remove

5    them.  They are carried off much easier.

6           I don't know if you have ever scratched somebody's

7    back who has been sweating, who has been mowing their

8    lawn, you'll have tons of skin under your fingernails.

9    Any time something is wet, it transfers more easily.

10          In a hypothetical situation, there doesn't have to

11   be a scratch, but the fingernails certainly need to be in

12   contact with whatever body part, whether -- whatever.

13      Q    Your assumption of something being wet indicated,

14   we are talking about oral sex here, being some possibility

15   of the organ being wet because of oral sex; is that your

16   testimony?

17      A    That was the hypothetical.

18      Q    Wouldn't an oral swab from the victim be more

19   indicative of DNA -- a likelihood of showing the DNA?

20          MR. BIANCAVILLA:  Objection.

21          THE COURT:  Sustained.

22          MR. BIANCAVILLA:  Could you show the witness

23      People's 83?

24          THE COURT:  Okay.

25

People - Clement - Redirect

1  REDIRECT EXAMINATION

2  BY MR. BIANCAVILLA:

3      Q    Miss Clement, you're being shown People's 83 in

4  evidence.  Do you recognize that?  It's a Sweet and Low

5  packet, isn't it?

6      A    Yes, it is.

7      Q    How much substance is contained in a Sweet and Low

8  packet?

9      A    Approximately 1 gram.

10     Q    Now, the type of DNA analysis that was performed

11  in this case is called what?

12     A    PCR DNA analysis that looks at STRs.

13     Q    Using PCR technology or PCR DNA analysis, would

14  you tell this jury how much DNA would be required in order

15  for you to begin the PCR process and produce a result?

16     A    Our protocols recommend a template of

17  approximately one half of a nanogram to 1 nanogram of DNA.

18     Q    Let me stop you there.  A half a nanogram?

19     A    Yes.

20     Q    Hypothetically speaking, if there was a half of

21  nanogram of DNA underneath a fingernail and you subjected

22  that substance to PCR process, you would be able to

23  generate a profile from that DNA?

24     A    Yes.

25     Q    Now, that contains 1 gram of substance; correct?

People - Clement - Redirect

1    A    Yes.

2    Q    In order to produce 1 nanogram, how much would you

3    divide that by?

4    A    You would divide that by 1 billion.

5    Q    In order to produce a half a nanogram, how much

6    would you divide that by?

7    A    Take the one billionth and cut it in half.

8    Q    Now, when you said LabCorp did not begin

9    calculating statistics on mixtures when you first produced

10   the report regarding the beer bottle --

11   A    Yes.

12   Q    -- when did LabCorp begin calculating statistics

13   on mixtures?

14   A    At the end of 2000.  I believe it was either late

15   October or November of 2000 that we started calculating

16   statistics on mixtures.

17   Q    Could you explain to the jury how it came about

18   that LabCorp began calculating mixtures, calculating

19   statistical mixtures in the year 2000?

20   A    Yes.  There were various peer reviewed articles

21   which discussed the various mixture calculations that were

22   generated in early 2000 which became -- were disseminated

23   in the forensic community and became acceptable to be used

24   in mixtures situations.

25   Q    So prior to 2000, the forensic community hadn't

People - Clement - Redirect

1   validated the mixture calculations; correct?

2       A    Correct.

3       Q    What exactly is a mixture calculation?

4       A    A mixture calculation takes into consideration all

5   of the characteristics that are found in the mixture and

6   the various combinations of characteristics from a

7   particular individual which can be a contributor.

8           For instance, if you have three characteristics,

9   and let's call them 9, 10 and 11, at any particular DNA

10  site, a person who is a 9-9 could be considered part of

11  that mixture, a person who is a 9-10 could be part of that

12  mixture, 9-11 could be part of that, a 10-10, a 10-11, an

13  11-11.  So you actually calculate the frequency of all of

14  those combinations and add them together to determine at

15  that particular location this percentage of the population

16  could be included as a potential contributor of this.

17          You'll then look at the next genetic systems and

18  do that for all the combinations of characteristics there.

19  Basically, you have to take into consideration every

20  potential combination of profiles that could be joined to

21  that mixture.

22      Q    You did that with respect to your report dated

23  March 29th of 2001; correct?

24      A    That's correct.

25      Q    And that was after these mixture calculations had

People - Clement - Redirect

1    been validated and approved by the forensic community?

2        A    Correct.

3        Q    Now, with respect to the mixture calculation which

4    you did on this result involving the profile of Ruth

5    Williams, Paul Scrimo and John Kane, you obtained a result

6    in that calculation; correct?

7        A    Yes.

8        Q    What was the result of that calculation with

9    respect to the three areas which you perform these

10   statistical calculations for?

11       A    The probability of randomly selecting an

12   individual that would have a profile that would be

13   included in the mixture that we obtained on the second

14   portion of the beer bottle stain would be approximately 1

15   in 51,500 for the African-American population, 1 in 6,800

16   for the Caucasian population, and 1 in 80,600 for Hispanic

17   population.

18       Q    Why are those numbers different?

19       A    Those numbers are difference simply because

20   different characteristics are found in different ethnic

21   groups with difference frequency.  We find that in all of

22   genetics.  For instance, our A, B, O blood type, although

23   every ethnicity has the potential of having A, type B is

24   found, let's say, 20 percent in African-Americans but only

25   11 percent in Caucasians.  So it's not spread out equally

People - Clement - Redirect

1   across the various ethnicities.

2       Q    With respect to the mixture involving Ruth

3   Williams, Paul Scrimo and John Kane, what is the

4   significance of 1 in 51,500 for the African-American

5   population?  What does that mean?

6       A    What that means is, if I were to randomly select

7   an African-American and test them, the probability that

8   they would be included in -- could be included as part of

9   this mixture would be 1 in 51,500.

10      Q    And with respect to 1 in 6800 for the Caucasian

11  population?

12      A    Again, if I were to randomly select a Caucasian

13  and test them, the chances that they would not -- or the

14  probability that they would be included would be 1 in

15  6,800.

16      Q    And with respect to the Hispanic population?

17      A    Again, if I took a Hispanic and tested them, the

18  probability they would be included is 1 in 80,600.

19      Q    Now -- with respect to --

20           THE COURT:  Mr. Biancavilla, are you going to be

21      much longer?

22           MR. BIANCAVILLA:  Just one more question.

23           THE COURT:  Because I think it's time to take a

24      break.

25      Q    When obtaining a reference standard from an

People - Clement - Redirect

1    individual, does it make a difference whether you are

2    using an oral swab or blood sample?

3    A      No.

4           MR. BIANCAVILLA:  Nothing further.

5           THE COURT:  Ladies and gentlemen, we are going to

6      take a break at this point.

7           Do not discuss the case amongst yourselves or

8      with anyone else.  Keep an open mind.  Do not form or

9      express any opinions until the entire case has been

10     completed.

11          Do not read or listen to any accounts of the

12     case should they be reported in the media.  Do not

13     visit or view any place or premises that have been

14     mentioned.

15          You are not to permit any party to discuss the

16     case with you or attempt to influence you, and you

17     must promptly report to the Court any violation

18     thereof.

19               (Whereupon, the sworn jurors exited the

20          courtroom.)

21               (Whereupon, a brief recess was taken.)

22          COURT OFFICER:  Jury entering.

23               (Whereupon, the sworn jurors entered the

24          courtroom and resumed their respective seats.)

25          THE COURT:  Mr. Chamberlain?

People - Clement - Recross

1        THE CLERK:  Both side stipulate all sworn jurors

2     are present and seated properly?

3        MR. BIANCAVILLA:  So stipulated, your Honor.

4        THE COURT:  Mr. Chamberlain.

5        MR. CHAMBERLAIN:  Yes, sir?

6        THE COURT:  Do you stipulate the jurors are

7     seated properly?

8        MR. CHAMBERLAIN:  So stipulated.

9        THE COURT:  You may recross.

10        MR. CHAMBERLAIN:  Thank you.

11   RECROSS EXAMINATION

12   BY MR. CHAMBERLAIN:

13     Q    May we have the witness make a correction.  She

14   testified that her June 23rd report had a typo in one of

15   the numbers.  Could we have her correct that before it

16   goes to the jury?

17        THE COURT:  Do you object Mr. Biancavilla?

18        MR. BIANCAVILLA:  No, of course not.

19     A    Okay.

20     Q    Now, the fingernails referred to here are -- do

21   you know what hand they are from?  Does it indicate what

22   hand they are from?

23        MR. BIANCAVILLA:  Objection.  That's beyond my

24     redirect.

25        THE COURT:  Limit yourself, Mr. Chamberlain, to

People - Clement - Recross

1    what the assistant district attorney covered on

2    redirect.

3    Q    With respect to the new report in March of 2001,

4    that only referred to the beer bottle; is that correct?

5    A    That's correct.

6    Q    None of the other evidence you analyzed with

7    respect to fingernails, ligature cord, glasses, anything

8    else, there was no change in any of that other evidence?

9            MR. BIANCAVILLA:  Beyond the scope of redirect.

10           THE COURT:  It is but I'll let her answer the

11       question.

12   A    There was no additional analysis performed on

13   those.

14   Q    You were asked a series of questions about

15   hypotheticals.  If -- let me ask you this, Miss Clement.

16   If there was testimony that the victim was knocked to the

17   ground, choked, struggled, do you have a professional

18   opinion that you could state with a reasonable degree of

19   scientific certainty as to whether or not it would be

20   likely that the person choking her, that their DNA would

21   get under that victim's fingernails as she was trying to

22   prevent being choked?

23           MR. BIANCAVILLA:  Objection, beyond the scope of

24       redirect.

25           THE COURT:  Sustained.

People - Clement - Recross

1    Q    Don't you think it's a lot more likely that would

2    occur than during an act of fellatio?

3            MR. BIANCAVILLA:  Objection.

4            THE COURT:  Sustained.

5            MR. CHAMBERLAIN:  Is that on the basis of

6       improper redirect?  I would ask to reopen my cross for

7       that one question.

8            THE COURT:  Fine, one question, Mr. Chamberlain,

9       with respect to that.

10   Q    The question posed before with respect to the

11   likelihood of a person being -- fighting for her life and

12   being strangled, choked, and the likelihood of DNA getting

13   under the fingernails nails of that victim --

14           MR. BIANCAVILLA:  Judge --

15           MR. CHAMBERLAIN:  Would you read the previous

16      question, please?

17           THE COURT:  Ask me if you would like a question

18      read back.  Ask another question.

19   Q    Miss Clement, you testified that you thought it

20   was possible that the victim's fingernails contained --

21   got DNA under their fingernails during an act of fellatio.

22   I am asking you, if that victim were knocked to the

23   ground, being choked, struggling and strangled, would it

24   be likely that that victim's fingernails would contain

25   some DNA of the person choking her?

People - Clement - Recross

1    A    Only if she made physical contact with the person

2  choking her.

3    Q    I gave you a hypothetical where she's grabbed by

4  the throat, knocked to the ground, being choked and

5  strangled to death.  That includes physical contact.

6         MR. BIANCAVILLA:  Objection.  Is that a question?

7         THE COURT:  So far I haven't gotten a question

8    yet.

9    Q    With that physical contact included.

10         MR. BIANCAVILLA:  Again, objection, Judge.

11         THE COURT:  Where is the question?

12         MR. CHAMBERLAIN:  She answered the previous

13    question only if there's physical contact.

14         THE COURT:  Ask questions, Mr. Chamberlain, and

15    ask them in proper form.

16    Q    With the physical contact I just described in that

17  hypothetical, would you answer the question?

18    A    Given your hypothetical, I guess I'm not clear

19  about the physical contact.  If somebody is choking,

20  hypothetically, if someone is choking another individual

21  and they are clawing at their hand to get them off,

22  certainly there's a potential of getting DNA transferred

23  underneath there nails.  As far as whether one is more

24  likely than the other, there's nothing scientific one

25  could --

People - Clement - Recross

1      Q      They are both equally likely?

2      A      Given physical contact, either, yes, I think would

3    be possible.

4             MR. CHAMBERLAIN:  Nothing further, Judge.

5             THE COURT:  Mr. Biancavilla?

6             MR. BIANCAVILLA:  Nothing, Judge.

7             THE COURT:  Thank you.  You may step down.

8                 (Whereupon, the witness was excused from the

9             witness stand.)

10            THE COURT:  Call your next witness.

11            MR. BIANCAVILLA:  Lisa Lawson.

12   L I S A    L A W S O N, a witness called on behalf of the

13   People, having been duly sworn, testified as follows:

14            COURT OFFICER:  In a loud voice, give your full

15        name, spelling your last name, and county of

16        residence.

17            THE WITNESS:  Lisa Lawson, L-A-W-S-O-N, Suffolk

18        County.

19   DIRECT EXAMINATION

20   BY MR. BIANCAVILLA:

21       Q      Miss Lawson, would you tell the jury where you are

22     employed?

23       A      I work for 7-Eleven, Incorporated.

24       Q      Do you manage a particular 7-Eleven?

25       A      Yes.

People - Lawson - Direct

1    Q    Is there a 7-Eleven -- first of all, how many

2    7-Elevens are located in Farmingdale?

3    A    Five.

4    Q    How many do you manage?

5    A    Two.

6    Q    Is one of the 7-Elevens you manage located by the

7    train station or by the train crossing on Main Street in

8    the Village of Farmingdale?

9    A    Yes.

10   Q    How long have you been employed by 7-Eleven?

11   A    Nine years.

12   Q    What you are specific duties with respect to your

13   employment at 7-Eleven?

14   A    I am a manager.

15   Q    What does that involve?

16   A    Everything from payroll, hiring, firing, banking,

17   keeping records.

18   Q    Okay.  I'm going to show you what's been marked as

19   People's 84 and 85 for identification.

20        Do you recognize those two documents?

21   A    Yes.

22   Q    People's 84 and People's 85, are those two

23   documents kept in the regular course of business of the

24   7-Eleven Corporation?

25   A    Yes.

People - Lawson - Direct

1    Q    Is it the regular course of business of the

2    7-Eleven Corporation to keep those records?

3    A    Yes.

4    Q    With respect to People's 84, is the information

5    contained in that report placed in that record at or about

6    the time of the occurrence?

7    A    Yes.

8    Q    And with respect to People's 85, is the

9    information contained in People's 85 placed in there at or

10   about the time of the information depicted there in?

11   A    It would be placed in when they were given this

12   information.

13          MR. BIANCAVILLA:  We would offer those two

14   documents into evidence.

15          THE COURT:  Show them to Mr. Chamberlain, please.

16          MR. CHAMBERLAIN:  No objection.

17          THE COURT:  Mark them in evidence.

18            (Whereupon, People's Exhibits 84 and 85,

19          previously marked for identification only, were

20          marked and received in evidence as People's

21          Exhibit 84 and 85.)

22          COURT OFFICER:  People's 84 and 85 received in

23   evidence.

24          MR. BIANCAVILLA:  Please show them to the

25   witness.

People - Lawson - Direct

1    Q    Miss Lawson, on April 11 or April of the year

2    2000, did you have an employee by the name of Mohammed

3    Hussain?

4    A    Yes.

5    Q    At what store was he employed?

6    A    He was employed at the 150 North Main Street store

7    which is the gas station store by the railroad tracks in

8    Farmingdale.

9    Q    What were his hours?

10   A    Mostly he worked the 11:00 to 7:00 shift.  That's

11   the over night shift.

12   Q    That is 11:00 at night to 7:00 in the morning?

13   A    Yes.

14   Q    Was he working to your knowledge on the evening of

15   April 11th into the morning of April 12th?

16   A    Yes, he was.

17   Q    With respect to People's 84, was there a

18   transaction recorded at that store at approximately

19   4:14 a.m.?

20   A    Yes.

21   Q    What was that transaction according to that

22   record?

23   A    It was for a 12 pack of Coors Light bottles, a

24   pack of Vantage Ultra Light cigarettes and a pack of

25   Marlboro box king size cigarettes.

People - Lawson - Direct

1    Q    Now, with respect to the transaction, there is

2    name on the transaction of -- a different Mohammed;

3    correct?

4    A    Yes.

5    Q    How is that distinguished during the course of a

6    transaction?

7    A    Each employee has to sign in and out of the shift.

8    If the employee before didn't sign out of his shift and

9    the next employee didn't sign into his shift, it would

10   carry over and he would keep working under the other

11   person's code number.

12   Q    Is there a videotape surveillance system within

13   that 7-Eleven?

14   A    Yes.

15   Q    Where are the cameras located?

16   A    The cameras are behind the register.  One is down

17   the first aisle.

18   Q    How often were those tapes used?

19   A    Every day.

20   Q    They are taped over every 24-hour period?

21   A    Yes.

22        MR. BIANCAVILLA:  Thank you, very much.

23        THE COURT:  Mr. Chamberlain?

24        MR. CHAMBERLAIN:  Thank you, Judge.

25

People - Lawson - Cross

1   CROSS-EXAMINATION

2   BY MR. CHAMBERLAIN:

3       Q    Just a few questions.  Miss Lawson, is it?

4       A    Yes.

5       Q    I take it from your prior answer that there are

6   two Mohammeds here, one is Shaheed(phonetic)and one is

7   Hussain?

8       A    Yes.

9       Q    The record that says Mohammed Shaheed reflects

10  that, as far as you know because he was a prior employee,

11  had the prior shift?

12      A    He would have had the prior shift, yes.

13      Q    Do you know that of your own knowledge?

14      A    I checked payroll records.

15      Q    You keep payroll records?

16      A    Yes.

17      Q    But you don't know exactly who was there that

18  night?

19      A    No, I wasn't there.

20      Q    I think it's People's 84 has the word aborted on

21  that; right?

22      A    Yes.

23      Q    Does that mean, that that transaction was

24  canceled?

25      A    It means there was no cash taken on that

1094

People - Lawson - Cross

1    particular sale.

2        Q    No cash.  So the next transaction shows that there

3    was no sale; is that right?

4        A    Yes.

5        Q    By the way, going back to the start of -- how much

6    would -- how much would you pay Mohammed Hussain during a

7    normal shift per hour?

8        A    Depends on his experience, but usually they start

9    at $6.50 to $7 an hour.

10       Q    I am going to ask you to review some records of

11   transactions that evening and ask you if my total of about

12   $3 hour of being earned is correct?

13           MR. BIANCAVILLA:  Objection.

14           THE COURT:  Are you referring to the revenue

15       taken in buy the store?

16           MR. CHAMBERLAIN:  Can you tell --

17           THE COURT:  Sustained.

18       Q    Would your records indicate how much income is

19   being taken in per hour?

20           MR. BIANCAVILLA:  Objection.

21           THE COURT:  I'm looking for the relevancy.

22       Sustained.

23           MR. CHAMBERLAIN:  It may have something to do

24       with credibility.

25           MR. BIANCAVILLA:  May have is not admissible.

People - Lawson - Redirect

1    This is a fishing expedition.  I object again, Judge.

2         THE COURT:  Sustained.

3         MR. CHAMBERLAIN:  Nothing further.

4         MR. BIANCAVILLA:  Brief redirect.

5  REDIRECT EXAMINATION

6  BY MR. BIANCAVILLA:

7    Q    Miss Lawson, that computer generated record of

8  that sale, where is that record maintained?

9    A    In an electronic journal of our computer.

10   Q    Who has access to that?

11   A    Myself, the manager and franchisee.

12   Q    Employees have no access to that journal?

13   A    No.

14        THE COURT:  Anything further, Mr. Chamberlain?

15        MR. CHAMBERLAIN:  No.

16        THE COURT:  Thank you, Miss Lawson.  You may step

17  down.

18             (Whereupon, the witness was excused from the

19        witness stand.)

20        THE COURT:  Ladies and gentlemen, we are going to

21  break at this point.  I'm asking you to be here

22  tomorrow at 9:45 a.m.

23        Do not discuss the case amongst yourselves or

24  with anyone else.  Keep an open mind.  Do not form or

25  express any opinions until the entire case has been

Proceedings

1    completed.

2         Do not read or listen to any accounts of the

3    case should they be reported in the media.  Do not

4    visit or view any place or premises that have been

5    mentioned.

6         You are not to permit any party to discuss the

7    case with you or attempt to influence you, and you

8    must promptly report to the Court any violation

9    thereof.

10            (Whereupon, the sworn jurors exited the

11        courtroom.)

12        THE COURT:  Mr. Biancavilla, are there any

13    witnesses tomorrow that I need to appoint attorneys

14    for?

15        MR. BIANCAVILLA:  Not unless you need to appoint

16    them for four detectives.

17        THE COURT:  Come forward, Counsel.

18                  *       *       *

19        (Whereupon, the above matter was adjourned to

20    May 14th, 2002.)

21

22

23

24

25