1097

```
 1   STATE OF NEW YORK : NASSAU COUNTY

 2   COUNTY COURT      : PART XIV
     ----------------------------------------:
 3   THE PEOPLE OF THE STATE OF NEW YORK,    :
                                             :
 4                  - against -             :  IND: 1456N-00
                                             :
 5   PAUL SCRIMO,                            :
                                             :   JURY TRIAL
 6                                           :
                              Defendant.    :
 7   ----------------------------------------x

 8                           May 14, 2002
                             262 Old Country Road
 9                           Mineola, New York

10   B E F O R E:

11           THE HONORABLE JEFFREY BROWN,
12           County Court Judge.

13   A P P E A R A N C E S:
14

15           (As previously noted.)

16                    *      *      *

17           THE CLERK:  Indictment 1456N of 2000, People

18   versus Paul Scrimo.

19           Case on trial continued.  All parties are

20   present.

21           People ready?

22           MR. BIANCAVILLA:  Ready.

23           THE CLERK:  Defendant ready?

24           MR. CHAMBERLAIN:  Yes.

25           COURT OFFICER:  Jury entering.
```

Proceedings

1          (Whereupon, the sworn jurors entered the

2       courtroom and resumed their respective seats.)

3          THE CLERK:  Do both sides stipulate all jurors

4       are present and seated properly?

5          MR. BIANCAVILLA:  Yes.

6          MR. CHAMBERLAIN:  Yes.

7          THE COURT:  Good morning, ladies and gentlemen.

8       We are read to continue with the trial.

9          Mr. Biancavilla, call your next witness please.

10         MR. BIANCAVILLA:  Detective Dempsey.

11   D E T E C T I V E   R O B E R T   D E M P S E Y, a witness

12   called on behalf of the People, having been duly sworn,

13   testified as follows:

14         COURT OFFICER:  In a loud, clear voice, state

15      your full name, spelling your last name, shield number

16      and present command.

17         THE WITNESS:  My name is retired Detective Robert

18      Dempsey, D-E-M-P-S-E-Y.  I'm retired from the Nassau

19      County Police Department where I was employed as a

20      detective with the Homicide Squad.

21         THE COURT:  You may inquire.

22   DIRECT EXAMINATION

23   BY MR:  BIANCAVILLA:

24      Q    Detective, prior to retiring, how many years did

25      you have with the Nassau County Police Department?

People - Det. Dempsey - Direct

1    A    Just shy of 39 years, sir.

2    Q    How many years were you assigned to the Homicide

3  Squad?

4    A    A little over 22 years, sir.

5    Q    Now, I am going to direct your attention to the

6  evening of May 2nd of the year 2000 into the early morning

7  hours of May 3rd of 2000.  Were you working that day?

8    A    Yes, sir.

9    Q    Were you working -- or were you involved in the

10  investigation of the death of Ruth Williams?

11    A    Yes, sir.

12    Q    On May 2nd, the evening of May 2nd, what did you

13  do?

14    A    It was some time around 9:50, 9:30 when I was

15  directed by my commanding officer, Lieutenant Frank

16  Guidice, to assist Detectives Cole and Cereghino and

17  Zimmerman in a surveillance stakeout and possibly the

18  arrest of a person who I see in the courtroom today,

19  Paul Scrimo.

20    Q    What time did you leave the Homicide Squad?

21    A    I believe it was around 9:30.

22    Q    Did you travel to the Farmingdale area?

23    A    Yes, sir.

24    Q    Who did you travel out there with?

25    A    I was a passenger in car 1062.  I was with

People - Det. Dempsey - Direct

1    Detective Warren Zimmerman, a detective also assigned to

2    the Homicide Squad.

3        Q    Was that a marked car or unmarked car?

4        A    Unmarked car.

5        Q    Did there come a time when you arrived in the

6    vicinity of the Village of Farmingdale?

7        A    Yes.

8        Q    Where did you guys park?

9        A    We parked in a dark parking field which was

10   located north of the railroad tracks in Farmingdale.

11       Q    Did any other detectives also go out to the

12   Farmingdale area that evening?

13       A    Yes, Detectives Cereghino, James Cereghino, and

14   Michael Cole.

15       Q    What type of vehicle did they go out in?

16       A    I believe they were in an unmarked van.

17       Q    Did you have any communication with them while you

18   were out in the Farmingdale area?

19       A    Yes.

20       Q    Without telling us what was said, could you tell

21   the jury what transpired?

22       A    Well, I was parked in a very dark parking lot with

23   Detective Zimmerman and we were facing towards an

24   apartment complex called the Elizabeth Gardens, I believe.

25   It was some time -- it was about ten minutes after

People - Det. Dempsey - Direct

1   midnight on the 3rd of May when I saw Detective Cereghino

2   come running past the front of our car towards the back of

3   our car.

4        Detective Zimmerman and myself jumped out of our

5   car and at that time I saw Detective Cereghino confronting

6   Mr. Scrimo in the parking lot behind our vehicle and he

7   ordered Mr. Scrimo to lie face down on the roadway, that

8   he was under arrest.

9        At that time I saw Detective Cereghino place

10   handcuffs on Mr. Scrimo.  Mr. Scrimo was then righted to

11   his feet.  Detective Cereghino then directed

12   Detective Zimmerman and I to place him in our vehicle and

13   take him directly to police headquarters in Mineola where

14   the Homicide Squad is located.

15        Q    Where was Mr. Scrimo placed in your vehicle?

16        A    He was placed in the right rear passenger seat.  I

17   was in the left rear passenger seat and Detective

18   Zimmerman drove the vehicle.

19        Q    Please explain to the jury what transpired en

20   route to have Homicide Squad?

21        A    It was only about five minimum after we started to

22   leave the Farmingdale area, we were on, I believe, Conklin

23   Street, when Mr. Scrimo said to me, What am I being

24   arrested for?  And I said, You're being arrested for

25   murder.  He said to me, Well, I couldn't have done any

People - Det. Dempsey - Direct

1    murders tonight because I was in the bar shooting darts

2    all night.  I said, You are being arrested for the murder

3    of a woman who was found in her apartment about three

4    weeks ago.

5            At this point Mr. Scrimo says to me, I knew her

6    from town but I had nothing to do with it.  At that point

7    I decided to give Mr. Scrimo his constitutional rights.

8        Q    Please describe for the jury exactly how you did

9    that?

10       A    I told him orally, I said, I want you to listen

11   carefully to me, Mr. Scrimo, because I'm going to give you

12   your constitutional rights.

13           I advised him that you have the right to remain

14   silent, that anything you do say can be used against you

15   in court.  Do you understand that?  He told me that he

16   did.

17           I also advised him that he had a right to talk to

18   a lawyer before answering any questions and have a lawyer

19   appointed for him free of charge if he could not afford to

20   hire one.  I asked him if he understood that and he told

21   me that he did.

22           I also advised him that he had a right to remain

23   silent until he had a chance to talk to a lawyer.  I asked

24   him if he understood that.  He told me he did.

25           I then asked Mr. Scrimo, I says, Are you willing

People - Det. Dempsey - Direct

1   to speak to me now without talking to a lawyer first.  And
2   he told me, I'll talk to you but I had nothing to do with
3   her murder and I told you I knew her from town.
4         At that point there was no further conversation
5   between myself and Mr. Scrimo and there was never any
6   conversation between Detective Zimmerman and Mr. Scrimo or
7   myself.
8         At about 20 minutes to 1:00 in the morning, we
9   pulled into the parking lot at police headquarters in
10  Mineola.  We exited the vehicle and we went to the second
11  floor room 242 where the Homicide Squad is located.
12        After entering the Homicide Squad, I was directed
13  by Detective Parpan to take Mr. Scrimo to a rear interview
14  room which is located at the rear of the main squad room.
15  I did so.  At that time Detective Parpan also told me to
16  take the handcuffs off of Mr. Scrimo.  I removed the
17  handcuffs from him.
18        I then placed Mr. Scrimo in a chair alongside a
19  desk in the rear interview room.  I then left that room
20  and I met with Detectives Parpan and McHugh.  At that time
21  I advised them --
22        MR. CHAMBERLAIN:  Objection to the narrative,
23     Judge.  I would like questions and answers rather than
24     a narrative here.
25        THE COURT:  All right.  Ask another question.

People - Det. Dempsey - Direct

1    Q    After you placed him in the interview room, what

2    happened?

3    A    I left him alone.  I closed the door.  I then

4    entered the main squad room where I had a conversation

5    with Detectives Parpan and McHugh.

6    Q    After that conversation what happened?

7    A    After that conversation, I prepared notes to what

8    had transpired between me and Mr. Scrimo in the police

9    car, and after I prepared my notes, I later signed off

10   duty and went home.

11   Q    Did you have any other contact with Mr. Scrimo

12   that night?

13   A    No, sir.

14        MR. BIANCAVILLA:  I have nothing further for this

15      witness.

16        THE COURT:  Mr. Chamberlain.

17   CROSS-EXAMINATION

18   BY MR. CHAMBERLAIN:

19   Q    Detective, you have been retired how long?

20   A    Since March of 2001.

21   Q    Keeping busy?

22        MR. BIANCAVILLA:  Objection.

23        THE COURT:  Sustained.

24   Q    Are you enjoying your requirement?

25        MR. BIANCAVILLA:  Objection.

People - Det. Dempsey - Cross

1      THE COURT:  Sustained.

2      Q     You were on the force for 39 years?

3      A     Yes, sir.

4      Q     How many years in homicide?

5      A     Little over 22, sir.

6      Q     Would it be fair to say you have interrogated

7   many, many suspects during that 22-year period?

8      A     I would say I have interviewed many people, not

9   interrogated.

10     Q     Interviewed, and you've given them their rights,

11  right, before you interviewed them?

12     A     Many times, sir.

13     Q     Now, Detective, in this case when you gave Scrimo

14  his rights, was there any discussion concerning a recent

15  decision that indicated you were no longer required to

16  give him his rights?

17     A     No, I knew nothing about this recent decision, to

18  be very frank with you, sir.

19     Q     There was such a decision but you knew nothing

20  about it; is that your testimony?

21        MR. BIANCAVILLA:  Objection.

22        THE COURT:  Sustained.

23     Q     If I tell you, Detective, that as soon as you left

24  Mr. Scrimo, when he was interviewed by other detectives,

25  he said something about I understand I no longer have to

People - Det. Dempsey - Cross

1    be given rights, would that refresh your recollection as

2    to whether there was any discussion between you and him

3    concerning that matter?

4         MR. BIANCAVILLA:  Objection.

5         THE COURT:  You said after, Mr. Chamberlain?  Did

6      you say after Detective Dempsey left?

7         MR. CHAMBERLAIN:  Yes.

8         THE COURT:  Sustained.

9    Q    You indicated that you went out -- you were

10   assigned by Lieutenant Guidice to go out to a surveillance

11   and possibly arrest.  Was that your testimony?

12   A    Yes.

13   Q    Was there any question about the fact that you

14   were going out to arrest Mr. Scrimo?

15        MR. BIANCAVILLA:  Objection.

16        THE COURT:  Overruled.

17   A    Well, I was part of a surveillance team.  I didn't

18   know beforehand whether or not we were going to arrest him

19   or not.

20   Q    You didn't?  You weren't told to go to arrest him?

21   A    We were going to arrest him if we found him, yes.

22   Q    And when you say if you found him, you knew where

23   he lived; right?

24   A    Yes.

25   Q    And you knew at that time where he would be on

People - Det. Dempsey - Cross

1    that particular Tuesday night, did you not?

2       A    I didn't know that, sir.

3       Q    Well, hadn't you been told where he would he would

4    be at that Falcons Nest bar right alongside the parking

5    lot where you and other detectives were parked?

6       A    I was told he frequented that bar but I didn't

7    know he was in that bar.

8       Q    Is it your testimony that none of the detectives

9    going out to arrest Scrimo knew that he was at that bar

10   that particular night?

11           MR. BIANCAVILLA:  Objection.

12           THE COURT:  Sustained as to what the other

13      detectives knew.

14      Q    You had been out there -- you left about 9:30.

15   Did you get out there about 9:45, Detective?

16      A    I would say it was near ten o'clock.  Yeah, ten

17   o'clock, sir.

18      Q    Was there some prior testimony -- withdrawn.

19           He wasn't arrested until he had exited the Falcons

20   Nest at about ten after 12:00; is that correct.

21           MR. BIANCAVILLA:  Objection.

22      A    I don't know where he exited from.

23           THE COURT:  I'll permit it.  The answer will

24      stand.

25      Q    You don't know where he exited from?

People - Det. Dempsey - Cross

1      A    No.

2      Q    Were you in communication -- there were four

3  police officers out there; right?

4      A    Three other detectives besides myself.

5      Q    All homicide?

6      A    Well, three homicide.  One temporarily assigned to

7  homicide, yes.

8      Q    Who was that?

9      A    That was Detective Michael Cole.

10     Q    All of you experienced, long term detectives;

11  right?

12     A    I believe so.

13     Q    Twenty-five or so years most of them; right?

14         MR. BIANCAVILLA:  Objection.

15         MR. CHAMBERLAIN:  Withdrawn.

16     Q    Didn't you people communicate as to where you were

17  going to -- where Scrimo was and where he would be

18  arrested?

19         MR. BIANCAVILLA:  Objection.

20         THE COURT:  I'll permit the question as to

21     whether they had communication.

22     Q    Did you have any communications?

23     A    Yes.

24     Q    Did they concern where Scrimo was?

25     A    I don't recall any radio communication notifying

People - Det. Dempsey - Cross

1    us where he was located, no.

2        Q      Between yourselves?

3        A      I don't understand your question.

4        Q      Did you communicate between yourselves as to where

5    Scrimo was?  Why were you parked at that location?

6              MR. BIANCAVILLA:  Objection.

7              THE COURT:  Sustained.  That's two questions.

8        Q      Did you communicate between yourselves, the four

9    detectives who had been sent to arrest Scrimo, as to where

10   he was, where he was located?

11             MR. BIANCAVILLA:  Objection.  There are three

12       questions there.

13             THE COURT:  Sustained.

14       Q      Did you have any other communication between 9:45

15   or 10:00 p.m. and 12:10 when he was arrested?

16             THE COURT:  With whom?

17       Q      With the other detectives.

18             THE COURT:  Okay.

19       A      Yes, we had communication as far as where our

20   location was.

21       Q      What about where the defendant, the suspect, was

22   at that point?

23       A      I don't recall any communication about where he

24   was.

25       Q      If I tell you that another detective testified

People - Det. Dempsey - Cross

1    previously that you all knew where --

2         MR. BIANCAVILLA:  Objection.  No other detective

3    has testified yet.

4         MR. CHAMBERLAIN:  At a previous hearing.

5         THE COURT:  No.  No.  Sustained.

6         Ladies and gentlemen, disregard that testimony.

7    Strike it from your minds.

8    Q    Do you of your own knowledge have any information

9    as to what Scrimo had been doing that evening up until the

10   time he was arrested?

11        MR. BIANCAVILLA:  Objection.  It is hearsay and

12   calls for speculation, Judge.

13        THE COURT:  Sustained.

14   Q    To your knowledge, did any of you four detectives

15   confirm where Scrimo was up until 12:10 p.m.?

16        MR. BIANCAVILLA:  Objection.

17        THE COURT:  Sustained, Mr. Chamberlain.

18   Q    Detective, you were sitting in a parking lot for

19   over two hours.  Were you just waiting for Scrimo to walk

20   by?  Do you know why you were sitting in that parking lot?

21        MR. BIANCAVILLA:  Objection.  There was a

22   statement and two questions.

23        THE COURT:  Mr. Chamberlain, please, ask

24   questions.  You have a habit of making compound

25   questions out of information.

People - Det. Dempsey - Cross

1    Q    You were sitting in a parking lot for over two

2  hours that evening; is that correct?

3    A    Yes.

4    Q    You had been sent to arrest Mr. Scrimo; is that

5  correct?

6    A    Yes.

7    Q    Did you -- were you told why you were supposed to

8  wait in that particular location?

9         MR. BIANCAVILLA:  Objection.

10         THE COURT:  I'll permit that.

11    A    We were told to take a position north of the

12  railroad tracks.

13    Q    Were you told why?

14    A    They told us in case he came along.  I don't know.

15    Q    In case he came along?

16    A    Yeah.

17    Q    Did Lieutenant Guidice tell you why Scrimo was

18  being arrested?

19    A    No.

20         MR. BIANCAVILLA:  Objection.

21         THE COURT:  Sustained.  Sustained.

22    Q    When you left police headquarters in Mineola it

23  was to go out there to Farmingdale to arrest Scrimo; is

24  that right?

25         MR. BIANCAVILLA:  Judge, asked and answered four

People - Det. Dempsey - Cross

1    times.

2         THE COURT:  This is the last time,

3    Mr. Chamberlain.

4    Q    The question is you left from police headquarters?

5    A    In Mineola, yes, sir.

6    Q    Were you aware of John Kane being in police

7    headquarters at that time?

8         MR. BIANCAVILLA:  Objection.

9         THE COURT:  Sustained.

10   Q    Now, when you told Scrimo he was being arrested

11   for murder, that was before any rights; is that correct?

12   A    Yes.

13   Q    What was his answer?

14   A    He said to me, I knew her from town but I had

15   nothing to do with it.

16   Q    I thought you told this jury that, I couldn't have

17   committed any murder, I have been drinking here in this

18   bar all night?

19        MR. BIANCAVILLA:  Objection.  That wasn't an

20        accurate reflection of the testimony.  He said nothing

21        about drinking in a bar all night.

22        THE COURT:  I'll let the detective testify.

23   Q    What did he say when you say you're being arrested

24   for murder?

25   A    He said, I couldn't have done any murders because

1113

People - Det. Dempsey - Cross

1   I have been in the bar shooting darts all night.

2       Q    He didn't say anything about her at that point,

3   right, I knew her from town?

4       A    Well, the next conversation he had with me he said

5   that.

6       Q    But when you say the next conversation, that was

7   after you told him about a murder that had occurred some

8   three week prior; is that correct?

9       A    What I said to him, sir, was that you're being

10  arrested for the murder of a woman who was found in her

11  apartment a few weeks ago.  I never mentioned where it

12  was, Farmingdale, or anything else.

13      Q    And after you advised him of his rights, nothing

14  further was said as to that case?

15      A    Oh, yes.

16      Q    After he said, I'll talk to you, nothing further

17  was said?

18      A    He said to me, I'll talk to you but I had nothing

19  to do with the murder, and I told you that I knew her from

20  town.

21      Q    Anything else?

22      A    No.

23           MR. CHAMBERLAIN:  Nothing further.

24           THE COURT:  Any redirect?

25           MR. BIANCAVILLA:  No, Judge.

People - Det. Dempsey - Cross

1       THE COURT:  Thank you, Detective Dempsey.

2       THE WITNESS:  Thank you, your Honor.

3            (Whereupon, the witness was excused from the

4       witness stand.)

5       THE COURT:  Call your next witness,

6    Mr. Biancavilla?

7       MR. BIANCAVILLA:  May we approach, please?

8       THE COURT:  Yes.

9            (Whereupon, off-the-record discussion took

10       place at the bench.)

11       THE COURT:  Call your next witness.

12       MR. BIANCAVILLA:  Detective McHugh.

13  D E T E C T I V E   J O H N   M C H U G H, a witness called

14  on behalf of the People, having been duly sworn, testified

15  as follows:

16            COURT OFFICER:  State your name, spelling your

17       last name, shield number and command.

18       THE WITNESS:  Detective John McHugh, M-C capital

19       H, H-U-G-H, shield 624, Homicide Squad, Nassau County

20       Police.

21       THE COURT:  You may inquire.

22  DIRECT EXAMINATION

23  BY MR. BIANCAVILLA:

24       Q    Detective McHugh, good morning.

25       A    Good morning.

People - Det. McHugh - Direct

1    Q    Detective --

2         MR. BIANCAVILLA:  Judge, I'm looking for the

3    easel.  It's behind the board there.

4    Q    Detective, how long have you been a police

5    officer?

6    A    It will be 27 years next month.

7    Q    How long have you been assigned to the Homicide

8    Squad?

9    A    Five years.

10   Q    Detective, were you involved in the investigation

11   of the death of Ruth Williams?

12   A    Yes, I was.

13   Q    As a result of that investigation, did you travel

14   to the Farmingdale area?

15   A    Yes.

16   Q    Did you familiarize yourself with the Farmingdale

17   area?

18   A    Yes.

19        MR. BIANCAVILLA:  May we post People's Exhibit 9

20   in evidence, Judge?

21        THE COURT:  Yes.

22   Q    Officer --

23        THE COURT:  Detective, you may want to step into

24   the well.

25   Q    Detective, I'm handing you a group of colored

People - Det. McHugh - Direct

1    stickers.  Detective, could you please indicate for the

2    jury where the 7-Eleven is located?

3        A    7-Eleven is located right here.

4        Q    Would you, please, place a yellow sticker on that

5    location?

6        A    (Witness complying.)

7        Q    Could you, please, indicate for the jury where the

8    apartment building that Paul Scrimo was the superintendent

9    at was located and where he resided?

10       A    This building here.

11       Q    Please place a sticker on that.  Use a red

12   sticker.

13       A    (Witness complying.)

14       Q    The Downtown Bar, could you point for the jury and

15   show them where the Downtown Bar is?

16       A    Right here.

17       Q    That would be the rear of the Downtown Bar?

18       A    That would be the rear.

19       Q    Place the sticker in the front.  The entrance

20   is -- there's an entrance on Main Street?

21       A    Yes.

22       Q    How about the Falcon's Nest?

23       A    On the corner here.

24       Q    And the bar, Granny O'Shea's?

25            THE COURT:  Mr. Biancavilla, you should be

People - Det. McHugh - Direct

1    telling us which sticker you put on each item.

2        MR. BIANCAVILLA:  They are yellow.

3        THE COURT:  You're not putting it in the record.

4        MR. BIANCAVILLA:  The detective is placing a

5    sticker entitled Granny O'Shea's on Granny O'Shea's.

6        Q    Now, will you place a sticker depicting Y.L.

7    Childs on the location of Y.L. Childs?

8        A    (Witness complying.)

9        Q    Detective, during the course of your

10   investigation, did the Nassau County Police Department set

11   up what's commonly referred to as a command bus at that

12   location?

13       A    Yes, we did.

14       Q    Just show the jury where the command bus was

15   located?

16       A    Right here.

17       Q    Please put a blue sticker where the command bus

18   was located?

19       A    (Witness complying.)

20       Q    During the course of the investigation, did you

21   also determine where John Kane was living?

22       A    Yes, I did.

23       Q    Please put a sticker where John Kane was living?

24       A    (Witness complying.)

25       Q    Detective, did there come a time during the course

People - Det. McHugh - Direct

1  of your investigation when you walked from Y.L. Childs to

2  the apartment of Ruth Williams?

3      A    Yes, I did.

4      Q    Could you, please, indicate for the jury the route

5  that you took from Y.L. Childs to the apartment of Ruth

6  Williams?

7      A    From Y.L. Childs going west on Conklin Avenue,

8  making a right, going south -- I'm sorry, going north on

9  Main Street, a left just before the railroad tracks which

10  would be South Front Street, around to the back parking

11  lot to the entrance to the apartment.

12     Q    Did you time yourself when you walked that?

13     A    Yes, I did.

14     Q    Could you tell jury how long it took you to walk

15  that?

16     A    Between three and three and a half minutes.

17     Q    Also during the course of your investigation did

18  there come a time when you walked from the 7-Eleven store

19  to the apartment of Ruth Williams?

20     A    Yes.

21     Q    Could you describe for the jury the route that you

22  took to walk from 7-Eleven to the apartment of

23  Ruth Williams?

24     A    Came out of 7-Eleven, went south on Main Street,

25  over the tracks, made a right on Front Street and around

People - Det. McHugh - Direct

1   to the back entrance of the apartment.

2       Q     How long did it take you to do that?

3       A     Minute and a half.

4       Q     You may be seated now.

5             Detective, I am going to show you what's in

6   evidence as People's Exhibit 4, the lineup photograph.

7             Do you recognize that photograph?

8       A     Yes, I do.

9       Q     Could you just tell the jury who is seated in

10  position number four of that lineup photograph?

11      A     The defendant, Paul Scrimo.

12            MR. BIANCAVILLA:   I would ask that this be

13  marked, I believe, as People's 86 for identification.

14            (Whereupon, the above-mentioned item was

15            marked as People's Exhibit 86 for identification

16            only.)

17            COURT OFFICER:   People's 86 marked for

18      identification.

19            MR. BIANCAVILLA:   Please show it to the

20      detective.

21      Q     Detective McHugh, you're being shown what's marked

22  as People's 86 for identification.   Do you recognize that?

23      A     Yes.

24      Q     What do you recognize that to be?

25      A     It's a photograph that appeared in Newsday of

People - Det. McHugh - Direct

1   myself standing next to the defendant at the rear of

2   police headquarters.

3       Q    When was that photograph published?

4       A    Friday, May 5th, 2000.

5       Q    Detective, on April 19th, did you interview

6   Francine Quinn?

7       A    Yes, I did.

8       Q    As a result of your interview, or as part of your

9   interview with Francine Quinn, did you go to a particular

10  location in the Village of Farmingdale?

11      A    Yes, I went to the rear parking lot behind Captain

12  Andy's Restaurant and the place of occurrence.

13      Q    Where -- what particular location did you go to in

14  this parking lot?

15      A    The parking lot which would be the third row west

16  of the place of occurrence where the first set of cars are

17  parked facing each other.

18      Q    Did you make an observation from that particular

19  location?

20      A    Yes, I did.

21          MR. BIANCAVILLA:  Judge, could we display

22      People's 31?

23          THE COURT:  Yes.

24          MR. BIANCAVILLA:  May I have Defense Exhibits A,

25      B and C, please?

People - Det. McHugh - Direct

1    Q    Detective, your location within that parking lot

2    and the view you were observing, was that result of the

3    conversation that you had with Francine Quinn?

4    A    Yes.

5    Q    Will you, please, step out of the witness box once

6    more.   I am going to ask you to take a look at a

7    photograph depicted as People's Exhibit 8.

8         Do you see that photograph?

9    A    Yes, I do.

10   Q    Does that fairly and accurately depict the view

11   that you had from standing at the position where you were

12   standing as a result of your conversation with

13   Francine Quinn?

14        MR. CHAMBERLAIN:   Objection.

15        THE COURT:   What's the nature of your objection?

16        MR. CHAMBERLAIN:   Bolstering, Judge.   We had

17   Miss Quinn testify here as to what her position was.

18        THE COURT:   Overruled.

19        MR. CHAMBERLAIN:   What she may have told the

20   detective --

21        THE COURT:   Overruled.

22   Q    Detective, the view that you observed from the

23   position where you were standing after your conversation

24   with Francine Quinn, does that photograph fairly and

25   accurately depict that view?

People - Det. McHugh - Direct

1    A    Yes.

2    Q    I am going to show you Defense Exhibit A -- I'm

3    sorry, Defense Exhibit B in evidence, and I'm going to ask

4    you to take a look at that photograph.

5        Does that photograph fairly and accurately depict

6    the view of the rear of those buildings from the position

7    that you were standing as a result of your conversation

8    with Francine Quinn?

9    A    No, it does not.

10   Q    Now, I'm going to show you Defense Exhibit C?

11       MR. CHAMBERLAIN:  I object to this.  This is

12   contradicted by the witness' testimony --

13       MR. BIANCAVILLA:  Excuse me, Judge.

14       THE COURT:  I don't want any colloquy, on the

15   record, Mr. Chamberlain.  Just object and I will rule.

16       MR. CHAMBERLAIN:  May we have a conference at the

17   bench?

18       THE COURT:  Come forward.

19           (Whereupon, the following took place at the

20       bench.)

21       THE COURT:  What is the nature of your objection,

22   Mr. Chamberlain?

23       MR. CHAMBERLAIN:  The position she was in was

24   indicated on this photograph.  She marked that.  What

25   he is doing is attacking the credibility of his own

People - Det. McHugh - Direct

1    witness by a statement she made after the fact through

2    the detective and it's really -- first of all, it's

3    attacking her prior statement.  People's 8 in evidence

4    is from 25 feet away.  It's not from three rows away.

5    He is attacking her credibility and the prior

6    testimony and this is not a proper way to do it.

7        MR. BIANCAVILLA:  I am not attacking her

8    credibility.  She said those photographs didn't depict

9    the view either.  I have not asked this detective a

10   word about what she told him.  All I said was, based

11   on the conversation that you had with her, did you go

12   to a particular location and I'm asking him to tell

13   the jury what his observations were and what he is

14   saying -- don't touch that.

15        THE COURT:  Bring the exhibit over.

16        MR. BIANCAVILLA:  Could you ask the jury to leave

17   the room.  I'm done.

18        (Whereupon, the following took place in open

19   court.)

20        THE COURT:  Ladies and gentlemen, we are going to

21   take a short break at this point.

22        Do not discuss the case amongst yourselves or

23   with anyone else.  Keep an open mind.  Do not form or

24   express any opinions until the entire case has been

25   completed.

People - Det. McHugh - Direct

1   Do not read or listen to any accounts of the

2   case should they be reported in the media.  Do not

3   visit or view any place or premises that have been

4   mentioned.

5       You are not to permit any party to discuss the

6   case with you or attempt to influence you, and you

7   must promptly report to the Court any violation

8   thereof.

9           (Whereupon, the sworn jurors exited the

10          courtroom.)

11      THE COURT:  Mr. Chamberlain, what is the nature

12  of your objection?

13      MR. CHAMBERLAIN:  Judge, the nature of the

14  objection is that he is either attacking his own

15  witness' credibility, because she testified not that

16  People's 8 -- I apologize for knocking over your water

17  pitcher, Judge -- but People's 8 shows a view of the

18  back door 25 feet away from that door.  That's not

19  where she was, according to her testimony here and

20  before.

21      Her testimony was that she was parked in the

22  third row.  In the grand jury she said the last row

23  you would park in.  That was shown and she pointed

24  that position out in the -- Defendant's Exhibit B.

25  It's a significant difference away from where

People - Det. McHugh - Direct

1    People's 8 is shown.  In any event, Judge, it's

2    improper for him to attempt to bring out --

3        THE COURT:  Are you arguing he is impugning the

4    integrity of his own witness.

5        MR. CHAMBERLAIN:  I am and I am arguing he can't

6    bring out what Miss Quinn showed -- was seeing,

7    rather.

8        THE COURT:  He hasn't done that.  He just said

9    based on a conversation with her, and he asked the

10   question after that.

11       MR. CHAMBERLAIN:  The question was is that the

12   view she said she was sitting in.

13       MR. BIANCAVILLA:  That's not what I said, Judge.

14   I asked this detective if he had a conversation with

15   Francine Quinn.  He said yes.  Based upon that

16   conversation did you go to a particular location in

17   that parking lot and look in a particular direction?

18   He said yes.  Then I showed him a picture.  Does this

19   fairly and accurately reflect the view that you

20   observed from standing at that particular location and

21   his answer was yes.  Then I showed him

22   Mr. Chamberlain's exhibits and asked him the same

23   question and he answered no.  I haven't said nothing

24   about Francine Quinn.

25       Mr. Chamberlain's objection has nothing to do

People - Det. McHugh - Direct

1   with what Francine Quinn may or may not have said.

2   It has nothing to do with it.  If I might add,

3   Francine Quinn answered those questions in the same

4   way this detective has answered these questions, that

5   Defendant's B and C does not accurately reflect the

6   view of what she saw and that People's 8 does reflect

7   the view of what she was seeing, and she said she

8   observed that view from 50 feet away.

9           I don't understand the basis for the objection,

10  Judge.  I don't.  There is no legal basis for the

11  objection.

12          MR. CHAMBERLAIN:  The purpose of the question is

13  obvious.  It's what Francine Quinn saw.

14          MR. BIANCAVILLA:  It's not.

15          MR. CHAMBERLAIN:  Don't interrupt me.

16          MR. BIANCAVILLA:  It's what the detective saw.

17          THE COURT:  Excuse me.  Excuse me.  The detective

18  is a different person than Francine Quinn, shorter,

19  taller.

20          MR. BIANCAVILLA:  That's right.  He can cross him

21  on that.  We are wasting more time at this trial with

22  these nonsense arguments of Mr. Chamberlain's.  We

23  have been six days through trial and we spend more

24  time listening to Mr. Chamberlain's arguments that

25  have no basis in fact or law.  We are going to be here

People - Det. McHugh - Direct

1    for a month if we don't just move --

2        THE DEFENDANT:  You're talking 20 years for me,

3    pal.

4        THE COURT:  Mr. Scrimo, please don't say

5    anything.

6        MR. CHAMBERLAIN:  I resent the last remark.  The

7    reason we are having nonsense in this trial, as

8    Mr. Biancavilla puts it, is he is trying to put a

9    detective on to say what Miss Quinn saw.  He is trying

10   to establish a position that she did not testify to

11   before.

12       If you look at these exhibits, while she may

13   have claimed to have seen what was in People's 8, her

14   position, the position she was standing in, was

15   considerably different and that was not the position

16   she was standing in.

17       This is merely trying to either change what she

18   has testified to or discredit what she has testified

19   to or attack it.  It's not clear from her testimony

20   that she was standing where that picture of People's

21   8 was taken and that was her view.  That's not clear.

22       I respectfully submit that the problem here is

23   that what he is trying to do is putting this type of

24   evidence in, not with the objections.

25       THE COURT:  The problem I have here is that it

People - Det. McHugh - Direct

1   appears to me, Mr. Biancavilla, you are placing a

2   witness on the stand and asking him to make -- to take

3   testimony based upon the information given to him by

4   Francine Quinn.

5         MR. BIANCAVILLA:  Judge, he's standing in a

6   specific position in a parking lot.  There's nothing

7   wrong with that.  He's standing in a particular

8   position.  I didn't ask him what the witness told him.

9   He went to a particular location.  He made an

10  observation.  He's testifying as to his personal

11  observation.  There's absolutely nothing improper with

12  that.

13        MR. CHAMBERLAIN:  Why is he standing in that

14  position if that's not what the witness told him?

15        MR. BIANCAVILLA:  You can ask him is that.

16        MR. CHAMBERLAIN:  That's what you are offering

17  here.

18        MR. BIANCAVILLA:  There's nothing wrong with

19  that.  That's like test firing a firearm.  If I handed

20  a person in SIB a firearm and he test fires it --

21        THE COURT:  Miss Quinn was the one who was

22  actually standing in the parking lot.  The detective

23  wasn't there.  The conditions aren't the same.  We

24  don't know if the cars are the same.

25        MR. BIANCAVILLA:  That's all subject matter to

People - Det. McHugh - Direct

1    cross-examination.

2         THE COURT:  I disagree.

3         MR. BIANCAVILLA:  Fine.  I'll lay a better

4    foundation, that's all, and -- that is wrong, Judge.

5         THE COURT:  You have an exception.

6         (Whereupon, a brief recess was taken.)

7         THE COURT:  Yes, Mr. Biancavilla?

8         MR. BIANCAVILLA:  My only point with respect to

9    Detective McHugh's testimony, Judge, is the same as if

10   we were offering a photograph in evidence.  It's no

11   different.  He's just talking about his personal

12   observation of it.

13        When we put a photograph in evidence, all we say

14   is does that fairly and accurately depict something.

15   All I'm asking him is does that fairly and accurately

16   depict a view he observed from a particular location.

17   It's no different than offering a photograph into

18   evidence.

19        The fact as to how he got to the location is

20   irrelevant.  I asked him, based upon a conversation,

21   did you go to a particular location and he went to

22   that particular location.  If he took a photograph

23   and I offered the photograph into evidence and said

24   does that fairly and accurately depict the view, it

25   would be admissible.

People - Det. McHugh - Direct

1    If Mr. Chamberlain wanted to cross-examine him

2    regarding the day or time, how many cars were in the

3    parking lot, things of that nature, it doesn't go to

4    the admissibility; it just goes to the weight.

5    That's my only argument, Judge.  Any of these

6    additional things just go to the weight.

7         I apologize for being rude before, if I was,

8    which I probably was, but that's my only point, that

9    it goes to the weight the jury should give the

10    evidence, not the admissibility of it.

11         THE COURT:  Anything further?

12         MR. CHAMBERLAIN:  You want more argument?

13         THE COURT:  With respect to that.  All

14    Mr. Biancavilla is doing is asking if a photograph

15    fairly and accurately depicts a particular view.

16         MR. CHAMBERLAIN:  Judge, he is not the witness as

17    to what was seen from that view.  The witness who

18    has -- had something to say about that view has

19    already testified.

20         The purpose of this is not just introducing a

21    photograph, this is establishing what a particular

22    witness said about that view and the purpose of this

23    testimony is to try to clarify, bolster or impeach

24    that witness and that witness has testified.

25         THE COURT:  Just so the record is clear, what did

People - Det. McHugh - Direct

1   Miss Quinn testify to with respect to the photographs,

2   with respect to People's 8 and Defendant's B and C?

3        MR. CHAMBERLAIN:  She indicated a number of

4   different things.  It may be that the jury is

5   uncertain about what her testimony was but it should

6   be based upon her testimony.

7        Her testimony was first, on direct, that

8   People's 8 was the view.  But subsequent testimony,

9   based upon cross-examination and her prior testimony

10  before the grand jury, her car, she was alongside the

11  driver side door of her car which was parked in the

12  third row, the furthest from that door, and the

13  photograph that we put in shows that location.

14       It's improper for him to try to correct, change,

15  add to, detract from, impeach her testimony as to

16  what she saw.  The question is what did she see on

17  the night in question, April 11th.

18       MR. BIANCAVILLA:  So the record is clear, she

19  looked at both of those exhibits and said with respect

20  to both of those exhibits that they do not fairly and

21  accurately reflect the view that she had.

22       The only thing she said about one of those

23  photographs is that in a particular corner was where

24  a particular part of her car was.

25       When she was asked by me and Mr. Chamberlain,

People - Det. McHugh - Direct

1    she said that is not the view that she had.  She

2    looked at People's 8 and said, People's 8 is the view

3    that I had except I was standing 50 feet away.

4         Actually, a crime scene detective said that this

5    photograph was taken from 25 feet away.  That's what

6    the testimony is, Judge.

7         MR. CHAMBERLAIN:  And the testimony is also that

8    she marked Defendant's C and then she said the place

9    where she marked it, which is where her car was --

10        MR. BIANCAVILLA:  Right.

11        MR. CHAMBERLAIN:  Don't interrupt, please.

12        She marked an X as to where her car was, but

13   then she said she was further away because she was

14   alongside the driver's side.  She also testified,

15   Judge, confirming what she had told the grand jury,

16   it was more behind the Downtown --

17        THE COURT:  What she told the grand jury is not

18   of importance.

19        MR. CHAMBERLAIN:  But she testified here.

20        THE COURT:  What came out of the witness' mouth

21   is important.

22        MR. CHAMBERLAIN:  She testified here the car was

23   parked more behind the Downtown than Captain Andy's.

24        That photograph and another one -- that B and C,

25   shows the line between the two and after saying it was

People - Det. McHugh - Direct

1    more behind the Downtown, she then said it was in

2    middle.

3         THE COURT:  Part of the problem I have is I'm not

4    sure where the detective was standing in the parking

5    lot based on his conversation with Miss Quinn.  I'm

6    not sure if Miss Quinn took --

7         MR. BIANCAVILLA:  Judge, he testified where he

8    was standing.  He said he went to the third row.

9         THE COURT:  That's a long row.

10        MR. BIANCAVILLA:  He said a particular spot and

11   Mr. Chamberlain was agreeing with his testimony while

12   he was saying it, that he was going to the third row

13   to a particular spot and he made observation of the

14   back of the bars.

15        I didn't ask him because I don't want him to

16   testify as to hearsay.  I have been preventing any

17   hearsay testimony.

18        All he said, which is completely legally proper,

19   based upon that conversation, he walked to the third

20   row of the parking field and stood in a particular

21   location behind those bars and he viewed the back of

22   the restaurants.  Then all I asked him was --

23        THE COURT:  I think you have to lay a better

24   foundation.  At this point I'll sustain the objection.

25        Bring the jury in.

People - Det. McHugh - Direct

1    MR. CHAMBERLAIN:  In addition to the foundation,

2    my objection remains.  I disagree with what the

3    detective said, but, regardless of foundation, I would

4    object to his testifying as to what Francine Quinn

5    said her view was.

6        She has testified here.  That is an attempt to

7    change, bolster, modify, clarify, whatever, her

8    testimony.  That's improper.  That's the basis of my

9    objection.

10       THE COURT:  I understand your bolstering

11   argument, Mr. Chamberlain.  At this point I'm not

12   saying one way or the other.  I want to see what type

13   of foundation Mr. Biancavilla lays.  I may agree with

14   you after the foundation is laid.

15       Bring the jury in.

16       COURT OFFICER:  Jury entering.

17           (Whereupon, the sworn jurors entered the

18       courtroom and resumed their respective seats.)

19       THE CLERK:  Do both sides stipulate all sworn

20   jurors are present and seated properly?

21       MR. BIANCAVILLA:  Yes.

22       MR. CHAMBERLAIN:  Yes.

23       THE COURT:  Ask the detective to come back in,

24   please.

25           (Whereupon, the witness resumed the witness

People - Det. McHugh - Direct

1          stand.)

2              MR. BIANCAVILLA:  Thank you, Judge.

3              May we have the Court's ruling on the record

4          please?

5              THE COURT:  The objection is sustained.

6      CONTINUED DIRECT

7      BY MR. BIANCAVILLA:

8          Q     Detective McHugh, when you went to the parking lot

9      with Francine Quinn, what time of the day was it, or

10     evening?

11         A     Say 9:00 p.m.

12         Q     Could you tell the jury what type of -- what were

13     the lighting conditions?

14         A     Lighting conditions were very good.

15         Q     Was it dark out, light out, where you were

16     standing?

17         A     It was dark out.  There is lighting in the parking

18     lot and the area at the rear of the restaurant is

19     extremely well lit.

20         Q     Now, where you were standing, could you give -- as

21     close as you can get to exactly, tell the jury where you

22     were standing in that parking lot by -- in terms of how

23     many rows back you were?

24         A     I was in the first row where cars are parked

25     facing each other.

People - Det. McHugh - Direct

1    Q    But how far -- how many rows into the parking lot

2    were you?

3    A    That would be the second row of the parking lot.

4    Q    How many -- positioning yourself between the

5    buildings, approximately where were you between the two

6    buildings?

7    A    Between what two buildings?

8    Q    The restaurant, the Downtown and Captain Andy's,

9    where were you standing?

10   A    Directly across from between the two of them.

11   Q    From between the two of them?

12   A    Correct.

13   Q    Approximately how many feet away were you standing

14   in that particular location?

15   A    Sixty feet.

16        MR. CHAMBERLAIN:   Judge, 60 feet away from what?

17        THE COURT:   Yes.

18   A    From the building.

19        MR. BIANCAVILLA:   That's it on foundation, Judge.

20        THE COURT:   Objection, Mr. Chamberlain?

21        MR. CHAMBERLAIN:   Same objection.

22        THE COURT:   I'll sustain the objection.

23        Ladies and gentlemen, you should disregard the

24   testimony you previously heard with respect to the

25   two questions prior to when we broke.

People - Det. McHugh - Direct

1   Q    Detective McHugh, on April 15th, did there come a
2   time when you interviewed John Kane?
3   A    Yes.
4   Q    Where did that interview occur?
5   A    At his home on Melville Road in Farmingdale.
6   Q    Could you describe for the jury exactly how he was
7   dressed at the time of that particular interview?
8   A    He was wearing a pair of shorts and a T shirt.
9   Q    Did you observe any injuries on John Kane at that
10  interview on April 15th?
11  A    He had an old injury to his head that was scabbed
12  over.
13  Q    Could you tell the jury when it was that you first
14  interviewed Paul Scrimo?
15  A    On the 20th of April, 2000.
16  Q    Were you working -- obviously you were working
17  that day.  What time did you come into work that day on
18  the 20th?
19  A    I believe it was 8:00 a.m.
20  Q    Around four o'clock in the afternoon, where were
21  you?
22  A    I was on the corner of Front Street and Main
23  Street in Farmingdale walking south on Main Street.
24  Q    Who were you with?
25  A    Detective Cole from the Eighth Squad.

People - Det. McHugh - Direct

1    Q    Tell the jury what happened at that particular
2    time?

3    A    As we were walking south across the street, also
4    on Main Street walking north, we saw the defendant.

5    Q    Could you describe how he appeared at that time?

6    A    He was a large, bald-headed, full-sized male in
7    his late 30s.

8    Q    Did you make eye contact?

9    A    Yes, I did.

10   Q    Did you know who he was at the time?

11   A    No, I did not.

12   Q    What did you do at that point?

13   A    We continued south on Main Street and we went to
14   Y.L. Childs Bar to conduct an interview.

15   Q    While you were at Y.L. Childs Bar, did something
16   happen?

17   A    I was paged to my office.

18   Q    Did you call your office?

19   A    Called my office.

20   Q    Based upon that telephone call to your office,
21   what did you do?

22   A    I called a Mr. Scrimo at the telephone number that
23   he had left in my office.

24   Q    Now, where were you when you made that telephone
25   call?

People - Det. McHugh - Direct

1    A    I was in the command bus behind the place of

2    occurrence.

3    Q    That telephone call, please describe to the jury

4    that conversation?

5    A    I dialed the number that had been provided.  A

6    male answered.  I identified myself.  I said, I'm

7    Detective McHugh from the Nassau County Police, Someone

8    just called my office indicating they wanted to speak to

9    me.  I asked for Mr. Scrimo.

10        The gentleman that answered the phone said, I'm

11   Mr. Scrimo.  I said, What can I do for you?  He said, I

12   understand you are looking to speak to a big, bald-headed

13   guy that was out at Y.L. Childs on Tuesday night.

14        I said, Yes, I am.  I said, Would it be possible

15   for us to speak to you, I'm not really familiar with where

16   you live could we come by and speak to you?

17        He said, I really don't have anything to add but I

18   really don't want you to come by either, my wife is

19   getting home from work, my kids are coming home.

20        I said, Would it be possible for you to come to

21   the command bus behind Captain Andy's?

22   Q    What did he say?

23   A    He said he would come over.  He said he would be

24   over in about ten minutes.

25   Q    Did there come a time that he arrived at the

People - Det. McHugh - Direct

1    command bus behind Captain Andy's?

2        A    Yes.

3        Q    Approximately what time was that?

4        A    About 5:15 p.m.

5        Q    When he arrived at the command bus -- by the way,

6    describe to the jury how the command bus is set up, what's

7    inside the bus?

8        A    Inside the command bus are benches.  There is a

9    table you can use as a desk.  There's are police

10   department computers.  It's about 30 feet long and we use

11   it to conduct interviews.

12       Q    When he arrived at the command bus, did you invite

13   him in?

14       A    Yes.

15       Q    Who else was present in the command bus at that

16   time?

17       A    Also Detective Cole.

18       Q    Now, could you tell the jury how Mr. Scrimo was

19   attired at the time?

20       A    At that time he was wearing black jeans, a long

21   sleeved gray T shirt, black boots.  He had a belt on.  On

22   the belt he had a chain with some keys and he also had a

23   black pouch that contained something.  I couldn't see what

24   it was.

25       Q    I am going to show you People's Exhibit 44 and ask

People - Det. McHugh - Direct

1   you if you recognize that pouch?

2       A    It appears to be the type of pouch I saw, yes.

3       Q    That was on April 20th?

4       A    That's correct.

5       Q    What was the first part of the conversation that

6   you had with Mr. Scrimo at that time?  Explain it to the

7   jury.

8       A    I took the spelling of his name, correct spelling

9   of his name, his address.  I asked him his age.  Prior to

10  that I introduced myself and Detective Cole.  I indicated

11  to him that I was the detective he had spoken to on the

12  phone and we sat down.

13      Q    Then what happened?

14      A    He told me that he had understood that we were

15  looking to speak to a big, bald-headed guy that was in

16  Y.L. Childs on Tuesday night.

17          I said to him, Well, we are talking about a week

18  ago Tuesday night; correct?  He said, Yes, a week ago

19  Tuesday night.  He said he had stayed out a little bit

20  late that night.  His wife was just getting over him

21  having been out that late.

22          I asked him if he knew Ruth.  He said, Yes, I knew

23  Ruth.  He knew her for between one to two years from the

24  bars.  He described her as a drinker and he was a drinker

25  and that's how they knew each other.

People - Det. McHugh - Direct

1    Q    Did he call her by a particular name?

2    A    She was also known to him as Ruthless.  He had

3    started speaking to her about six months prior.

4    Q    Did he make any comment to you about her

5    appearance?

6    A    He thought she was younger than she appeared.  He

7    also thought she was good looking.  He told me she was the

8    kind of woman you had to be careful with though.  If you

9    were in a bar having a drink with your wife, she could

10   just come up to you and say, hey, Paul, you want to see my

11   tits.  So he thought she was a little bit of a liability

12   in that regard.

13   Q    What happened next?

14   A    I asked him about that Tuesday night.  He told me

15   he had gone to -- I'm sorry.  He had gone to Falcons Nest

16   some time between 8:00 and 8:30 to shoot darts on a

17   Tuesday night league.  Darts is over about midnight.  He

18   then went down to Granny O'Shea's which is right down the

19   street.  I asked him why he did that.  He just described

20   it as just another place to go after darts.

21   Q    Did you ask him what he was drinking that night?

22   A    I asked him what he was drinking during darts.  He

23   indicated to me that he was on the Atkins diet so he was

24   drinking vodka and seltzer.  We had a discussion about the

25   diet.  I commented that it's a good thing to lose a couple

People - Det. McHugh - Direct

1    of pounds.  It's healthy.

2         I asked him if he smoked and he told me he did not

3    smoke.  I asked him if he knew anybody or recognized

4    anyone while he was at Granny O'Shea's.  He said no.  I

5    think he said he stayed there for one drink and then he

6    went to Y.L. Childs arriving there some time around

7    2:00 a.m.

8         When he was at Y.L. Childs, there were about eight

9    or ten people in the bar.  I asked him if he knew anybody

10   in the bar.  He said, yes, he saw Ruth there.  He spoke to

11   her for five or ten minutes.  I asked him about what.  He

12   said he didn't remember because he had been drinking.  The

13   only other person that he remembered in that bar, in Y.L.

14   Childs was a -- he called her a tomato who had a spike

15   through her chin.

16        He said he shot some darts and left about three

17   o'clock.  I asked him if there was anyone else in the bar

18   at that time that resembled his appearance, perhaps they

19   have you confused with someone else.  He said, no, he was

20   the only big, bald-headed guy in the bar at that time.

21        Left about three o'clock, walked home down Main

22   Street.  I asked him if he had seen anybody, you know, any

23   cars, any suspicion people, anybody on the street, were

24   any of the bars open as he went past, any of the stores.

25   He said, no, he didn't see anything out of ordinary and he

People - Det. McHugh - Direct

1    went right home.

2        Q    Did you ask him if he stopped anywhere on the way

3    home?

4        A    I asked him if he had stopped in any bars or

5    stores.  He said he walked straight home.

6        Q    Then what happened?

7        A    He said to me, You know, Detective, I wish I could

8    help or remember more, but who knew that she was going to

9    go home and get herself killed.

10       I then asked him about the bars in Farmingdale in

11   general, who he knew from the bars.  He said he knew Ross,

12   the bartender from Falcon's Nest.  At Granny O'Shea's, the

13   bar was run by the owner's daughters.  He really didn't

14   say anything about the Downtown or Y.L. Childs.

15       I asked him about the dart league, the Tuesday

16   night dart team at the Falcon's Nest.  He told me the

17   names of the people on the team, Frank DeFalco, who is one

18   of the owners of the Falcon's Nest; a woman named Irene; a

19   guy named John, he didn't know his last name, a long

20   haired guy; a guy named Jerry Hannon who he had just found

21   out recently was the stepson of Ruth; and a girl named

22   Denise.  I believe he hadn't seen Jerry Hannon for about a

23   month or so.

24       He told me that a friend of his by the name of

25   Keith Wilson who was a corrections officer had been up in

People - Det. McHugh - Direct

1    Ruth's apartment at one time and that Keith Wilson told

2    him that Ruth was into witchcraft, the Pagans, and that

3    she turned tricks.

4         At that point he pointed out the window of the

5    command bus to a nursery school which was just outside the

6    door and said, Detective, see that nursery school there --

7    I didn't even know that Ruth lived up there -- I used to

8    take my kid to that school every day.  He told me he last

9    spoke to Ruth about six months ago.  That's about it for

10   our discussion then.

11        Q    Did he mention anything about her being a relative

12   of White Funeral Home?

13        A    Right, she had told him -- he believed she had

14   told him that she was White's daughter and that she lived

15   over the funeral home.  That was about a year ago.

16        At that point we were done talking.  I told him,

17   you know, if anything else comes up, if you remember

18   anything else or anything else, you know, please give me a

19   call.

20        I was done speaking to him.  I did not want him at

21   that time to think that he was a suspect, so before he

22   left I had the case file in the trailer, on top of the

23   case file --

24        MR. CHAMBERLAIN:  I object to the statement that

25        I did not want him --

People - Det. McHugh - Direct

1      THE COURT:  Sustained.  The jury should disregard

2    the last statement by the detective.

3    Q    Just tell us what you did.

4    A    I took some files from the box.  On top of the

5    files was a picture of a gentleman by the name of Jeff

6    Johnson, a male black from the Farmingdale area.

7          I told Mr. Scrimo, I want you to take a look at

8    this picture.  I'm not saying this gentlemen is involved,

9    this investigation is still in it's early stages, we would

10   just like to see if you know this guy.

11         I showed him the picture of Jeff Johnson and he

12   told me, Yes, I know him, He used to live over the

13   Shamrock Bar, He's a drug dealer and I see him sometimes

14   down on Route 109.

15        MR. BIANCAVILLA:  May we have this marked?

16        THE COURT:  Yes, 87, I believe.

17        MR. BIANCAVILLA:  Yes.

18          (Whereupon, the above-mentioned item was

19          marked as People's Exhibit 87 for identification

20          only.)

21        COURT OFFICER:  People's 87 for identification.

22        Would you like it shown to the witness?

23        MR. BIANCAVILLA:  Please.

24   Q    Detective, you're being shown what has been marked

25   as People's 87 for identification.  Do you recognize that?

People - Det. McHugh - Direct

1    A    Yes, I do.

2    Q    What you recognize that to be?

3    A    It's the photograph of Jeffrey Johnson that I

4    showed to Mr. Scrimo.

5    Q    After you showed him the photograph of Jeffrey

6    Johnson, what did he say to you?

7    A    That he knew him, he recognized him, that he used

8    to live over the Shamrock Bar, that he was a drug dealer

9    and that he used to see him down on Route 109.

10    Q    How did you leave off with Mr. Scrimo at that

11    point?

12    A    I again asked him if anything else came up, if he

13    heard anything, you know, to give us a call, and we said

14    good bye.

15    Q    Now, did there come a time when you again

16    interviewed John Kane?

17    A    Yes.

18    Q    On what date did that occur?

19    A    That's on May 2nd, 2000.

20    Q    Where did that interview occur?

21    A    At police headquarters in Mineola.

22    Q    As part of that interview did John Kane provide

23    you with a DNA sample?

24    A    Yes, he did.

25    Q    Did there come a time when Mr. Scrimo was

People - Det. McHugh - Direct

1    arrested?

2        A    Yes.

3        Q    And he was transported to the Nassau County

4    Homicide Squad?

5        A    Yes, he was.

6        Q    Were you part of the team that went out to arrest

7    him?

8        A    No, I was not.

9        Q    When was the first time you came into contact with

10   Mr. Scrimo after he was arrested?

11       A    When he arrived at my office at 12:40 a.m. on May

12   3rd.

13       Q    Did you interview Mr. Scrimo at that time?

14       A    I interviewed him at 1:00 a.m.

15       Q    Please describe to the jury what transpired at

16   1:00 a.m. in the Homicide Squad?

17       A    I introduced myself again.  He remembered having

18   met me the week prior.  I introduced Detective Parpan who

19   was also in the room with me.  I told him that -- he said,

20   You got the wrong guy, it's a mistake.

21            I said, Before we talk, I understand you were

22   given your rights, Do you understand your rights, Are you

23   willing to speak to me without an attorney?  He said, Yes.

24   He said, But I know you don't have to give me my rights

25   there was some court decision.  I said, That's not true,

People - Det. McHugh - Direct

1  don't believe what you read in the newspaper.

2      He said, I've -- I already spoke to you once, I

3  told you what happened that Tuesday night.

4  Detective Parpan asked him, Well, please tell me what

5  happened Tuesday night.

6      He told us that he had gone to darts, darts is

7  between 8:00 and 12:00 at the Falcon's Nest.  He then went

8  to Granny O'Shea's.  He then went to Y.L. Childs.  He saw

9  Ruth at Y.L. Childs, spoke to her for five to ten minutes,

10  once again, he couldn't recall about what, and that he

11  walked home at about 3:00 a.m.

12      We asked him, Please go into a little more detail,

13  Let's go through the evening's events from bar to bar.  He

14  described, once again, going to darts at Falcon's Nest.

15  He described the people that were on the team, Frank

16  DeFalco; Irene; John, a long haired guy; I don't think he

17  mentioned Jerry Hannon at that time.  He had shot darts.

18  He then went down to Granny O'Shea's, another place, for

19  just a change of scenery.  He had one drink there.

20      We asked him, Did you see anybody there that you

21  recognized or were familiar with?  No, he did not.  He

22  then went to Y.L. Childs.  At Y.L. Childs, he saw Ruth,

23  spoke to her, once again, he didn't recall about what and

24  said that was the only person that he knew in the bar.

25      I reminded him that the first time I had spoke to

People - Det. McHugh - Direct

1    him he mentioned the girl with the spike through her face.

2    He said, Oh, yes, she was there.

3            He had then walked home, believing he got home

4    about 3:00 a.m., also down Main Street.  Once again I

5    asked him, Did you see anybody, Did you make any stops,

6    Were any stores open, bars open.  No, went straight home.

7        Q    What happened then?

8        A    He said, I -- I helped you guys.  I came to you,

9    you know, to speak to you.

10           Detective Parpan said, You didn't come to us, You

11   knew that we were looking to speak to you, It's been a

12   week since we first started investigating this case, A

13   week later, you call us, That's not helping, That's not

14   you coming to us, You knew we were going to look to speak

15   to you as the big, bald-headed guy.

16           He said, No, that's not true, I wanted to help.

17           We had some discussions about Ruth.  He said that

18   Ruth was an alcoholic.  He was an alcoholic.  He didn't

19   remember a lot of the details of that night because he had

20   been drinking.

21           We asked him how much he had been drinking that

22   night while we were speaking to him.  He said he had

23   six pints and we asked him, Well, how much did you have on

24   the Tuesday night a week prior.  He said he probably had

25   about three more that night.

People - Det. McHugh - Direct

1    We said, Well, you don't seem drunk or intoxicated

2    to us, You are responsive to our questions, You have no

3    problem understanding what we are asking of you and

4    speaking about.

5         He said, Well, I'm scared sober, I had, you know,

6    a gun pointed in my face.

7    Q    What happened then?

8    A    I would like to review Detective Parpan's notes.

9         MR. BIANCAVILLA:  Sure.

10   Q    By the way, when this interview was being

11   conducted, were you taking notes or was Detective Parpan?

12   A    Detective Parpan was.

13        MR. CHAMBERLAIN:  May we have a time line

14   established?

15        THE COURT:  Time of day?

16        MR. CHAMBERLAIN:  No.  This interview started at

17   1:00 a.m. from what I heard.  The question is how far

18   along were they.

19        THE COURT:  You'll have an opportunity on

20   cross-examination to address that point,

21   Mr. Chamberlain.

22   Q    Have you reviewed the notes, Detective?

23   A    Not yet.

24   Q    Okay.

25   A    Detective Parpan indicated to Mr. Scrimo that he

People - Det. McHugh - Direct

1    had received, meaning Parpan, had received the two

2    telephone calls from Mr. Scrimo when he had called the

3    office back on the 20th.

4         MR. CHAMBERLAIN:  Detective, could I ask you --

5         MR. BIANCAVILLA:  Judge, I object to this.

6         MR. CHAMBERLAIN:  I want to know where he's at in

7    the notes.

8         THE COURT:  Excuse me.  Excuse me.  The detective

9    is entitled to refresh his recollection by looking at

10   notes, if they do refresh his recollection.  Where he

11   is, is of no moment at this point.  You'll certainly

12   have an opportunity to go through it completely on

13   cross-examination.

14   Q    Please continue, Detective.

15   A    Detective Parpan and I explained to Mr. Scrimo

16   that, you know, we have been working on this case for a

17   period of time now and we have spoken to a lot of people

18   in the Farmingdale area.  We have done an extensive

19   canvass.  Some of these businesses have cameras in them 24

20   hours a day for security reasons.  Those cameras are

21   equipped with clocks, you know, so we look at these things

22   during the course of our investigation.  Now, is it

23   possible that on your way home that night you may have

24   stopped some place?

25   Q    How did he respond to that?

People - Det. McHugh - Direct

1     A    He put his head down.  He sat there for a couple

2     of moments, appeared to be getting nervous, and he said, I

3     went to 7-Eleven for beer and cigarettes.

4         We said, What kind of beer?  He said, That's not

5     important.  What kind of cigarettes?  He said, That's not

6     important.

7         We said, You don't smoke, Why would you need

8     cigarettes?  He said, Sometimes I smoke.

9         What are you going to do with beer at five o'clock

10    in the morning?  I was going to take to home.

11         What are you going to do with beer at five o'clock

12    in the morning?  I'm an alcoholic, That's what alcoholics

13    do.  I don't remember a lot of things because I drink.

14    Q    What happened next?

15    A    We told him that he was lying, that many of the

16    things that we had discussed now in the early stages of

17    our second interview were obviously not true.  We just

18    asked him to speak the truth.

19         He said, I am speaking the truth, I am trying to

20    help you, I called you.

21         We told him again, You didn't call us, You knew we

22    were looking to speak to you, That's not why you called.

23    You are a suspect in this case, we told him, We

24    interviewed the people at Y.L. Childs, We know what was

25    going on between you and Ruth.

People - Det. McHugh - Direct

1          He said, All right, I kissed her.  We said, It was

2    lot more than a kiss, It was described to us as

3    mouth-to-mouth, tongue-to-tongue, You never mentioned any

4    of that to us, You are a suspect.

5          I would like to look at the notes again.

6    Q    Sure.

7          What happened at that point, Detective?

8    A    We told him, When an issue is raised that you are

9    unable to answer or you won't answer, you use your

10   alcoholism as a crutch.  You have selective memory.

11         He said -- we told him we have evidence at this

12   point in this investigation that puts you at that

13   apartment.

14         He said, No, that's wrong.  He says, Christian, a

15   fellow he knew who is a bouncer at the Downtown, told him

16   that Fran and Ruth left the downtown that night and that

17   Fran had seen Ruth arguing with a big, bald-headed guy.

18   Both Christian and Fran know him, Mr. Scrimo, so it

19   couldn't be him.

20         We told him that story is wrong.  You don't have

21   your details and facts correct on that.

22         Detective Parpan then said to him, Paul, nothing

23   is a secret when more than one person knows about it.

24         He again dropped his head, thought about that for

25   a couple of minutes, couple of moments, and said, John,

People - Det. McHugh - Direct

1    you should speak to John.

2         We said who is John?  He said, John, the guy I

3    told you about.  I said, The only time you mentioned

4    anyone named John is from the dart's team at Falcon's

5    Nest.  We asked you who were you out with that night and

6    you never mentioned John.  He said, Yes, I did.  We said,

7    No, you didn't.  And we went back over the details as he

8    had described them of the stops at the different bars.

9         He said, John is a guy you should talk to.  We

10   said, Well, we will be.  He said, I walked home with John.

11   We split up.  Then we said you went to 7-Eleven?  He said,

12   Maybe I went to 7-Eleven.  Well, where did John go?  I

13   don't know where John went.  At that point we took a

14   break.

15       Q    About what time is it at that point in the

16   interview?

17       A    3:35 in the morning.

18       Q    How long was the break for?

19       A    About 45 minutes.

20       Q    During the course of this conversation, did

21   Mr. Scrimo have anything to eat or did he drink anything?

22       A    He had water.  He was offered coffee, however, he

23   declined, and he was taken to the bathroom at that point.

24       Q    Then what happened after the break?

25       A    We resumed the interview at about 4:20 a.m.  When

People - Det. McHugh - Direct

1    we went back in, we asked him about John.  We told him

2    John's last name was Kane.  He said he was a guy that he

3    knew from darts and from the bar, Kane, John, was also an

4    alcoholic.

5         We asked him what John's relationship was with

6    Ruth and he said, I don't talk about other people.  We

7    asked him, well, do you have a relationship with Ruth?  He

8    said, No, I don't.

9         We asked him some more questions about John, if he

10   knew where John lived.  I don't believe he said he knew

11   where John lived.  We asked him what John, you know, did

12   for a living.  He thought he was some type of carpenter's

13   helper.  What kind of guy was he?  He said he was just a

14   guy he knew from the bar that was an alcoholic.

15        We told him we knew that he and John had gone to

16   Ruth's apartment that night, that we had evidence along

17   those lines, and he indicated to us, no, that was not

18   true, he had not.

19        We went over that story with Christian the bouncer

20   having seen him -- him saying that he had seen him that

21   evening.  We told him we knew that wasn't true.  We -- you

22   know, we had spoken to the witnesses.  We knew what

23   happened relative to the back of the Downtown.  We told

24   him he was facing a murder charge and that he could get 25

25   to life for that and the truth was the best way to go and

People - Det. McHugh - Direct

1  he should answer our questions truthfully.

2      Q    What did he say at that point?

3      A    At that point he said, I have been truthful, I

4  helped you, you know, sometimes I don't remember things

5  because of my drinking.  At that time we took another

6  break.

7      Q    How long was that break for?

8      A    That break was at 5:10, so we were in there for 50

9  minutes.  We came out at 5:10.  Other detectives went in

10  and spoke to him for a period of time.

11      Q    Who are those other detectives that went in?

12      A    Detective Cole and Detective Cereghino.

13      Q    Prior to them going in, did you have conversation

14  with them?

15      A    Yes.

16      Q    Without telling us what the conversation was, did

17  there come a time that Detective Cole and

18  Detective Cereghino came out?

19      A    Yes.

20      Q    Did you and Parpan go back in?

21      A    Yes.

22      Q    Tell the jury what happened then?

23      A    Went back in about 7:00 a.m., once again, asked

24  him to tell the truth.  He said that his son had spoken to

25  the police and had told them the truth and his son wound

                     People - Det. McHugh - Direct

1    up in jail.  He wanted his attorney to tell his side of

2    the story.  At that point we stopped our questioning and

3    shortly after that I believe he called his wife.

4         Q    About what time did you finish with that

5    interview?

6         A    About 7:15 in the morning.

7              MR. BIANCAVILLA:  Thank you, Detective.

8              Judge, at this point we would offer what has

9         been marked for identification as People's 86 and 87

10        into evidence.

11             THE COURT:  Please show it to Mr. Chamberlain.

12             MR. CHAMBERLAIN:  Voir dire?

13             THE COURT:  Yes, Mr. Chamberlain.

14   VOIR DIRE EXAMINATION

15   BY MR. CHAMBERLAIN:

16        Q    Detective, with respect to People's 86, it's not a

17   police department shot, a mug shot, it's a Newsday shot;

18   is that correct?

19        A    It's a Newsday shot.

20        Q    Were you aware that this was being taken?

21             MR. BIANCAVILLA:  Objection.

22        Q    At the time it was taken?

23             MR. BIANCAVILLA:  Objection.

24             THE COURT:  I'm not sure of the relevancy.

25        Sustained.

People - Det. McHugh - Direct

1    MR. CHAMBERLAIN:  I'm not sure what the relevancy

2    of the picture is, Judge, at this point.

3    THE COURT:  Is that the nature of an objection;

4    is that what you are saying?

5    MR. CHAMBERLAIN:  I'm trying to find out whether

6    this photograph was by pre-arrangement.

7    MR. BIANCAVILLA:  Objection.

8    THE COURT:  Sustained.

9    Just ask questions, Mr. Chamberlain.

10   Q    The question is, were you aware this photograph

11   was going to be taken?

12   MR. BIANCAVILLA:  Objection.

13   THE COURT:  I'll permit it.

14   MR. BIANCAVILLA:  Judge, it's voir dire on the

15   photograph.

16   THE COURT:  I know.

17   A    The question is was I aware that the photograph

18   was going to be taken?  No.

19   Q    The mug shot, was this photograph taken from an

20   active file in the Farmingdale command post?

21   MR. BIANCAVILLA:  Objection.

22   THE COURT:  Sustained.

23   This is a voir dire with respect to the

24   photograph, Mr. Chamberlain.

25   Q    Was this the photograph that you showed to the

People - Det. McHugh - Direct

1   defendant that day?

2       A    The photo of Jeff Johnson, yes.

3       Q    Where did this come from?

4           MR. BIANCAVILLA:  Objection.

5           THE COURT:  Sustained.

6           MR. CHAMBERLAIN:  I have no objection to the

7   Johnson photograph.  I would object on the basis of

8   relevancy to the Newsday photograph, unless I have

9   some offer of proof.

10          MR. BIANCAVILLA:  I will do it at the bench, if

11  you would like.

12          THE COURT:  Come forward, Counsel.

13          Step down, Detective.

14              (Whereupon, the following took place at the

15          bench outside of the hearing of the jurors and

16          defendant.)

17          THE COURT:  Mr. Biancavilla?

18          MR. BIANCAVILLA:  Yes, Judge, if you recall the

19  testimony of Francine Quinn, after she said that she

20  did not pick him out in the lineup two days later on

21  the 5th, she saw a Newsday article depicting a

22  photograph of detective --

23          THE COURT:  Yes, I recall the testimony.

24          MR. BIANCAVILLA:  This is the photograph that was

25  published in Newsday on that day.  That's the

People - Det. McHugh - Direct

1     relevancy of it.  That's why I was offering it.

2          THE COURT:  Anything further?

3          MR. CHAMBERLAIN:  Nothing further.

4          THE COURT:  All right.  Your objection is

5     overruled.

6          MR. CHAMBERLAIN:  That objection is withdrawn

7     based upon that statement.

8          THE COURT:  We'll mark them both in evidence

9     without opposition.

10              (Whereupon, the following took place in open

11         court.)

12              (Whereupon, People's Exhibits 86 and 87,

13         previously marked for identification, were marked

14         and received in evidence.)

15         COURT OFFICER:  People's 86 and 87 received in

16     evidence.

17              (Whereupon, the witness resumed the witness

18         stand.)

19         MR. BIANCAVILLA:  Judge, may I display that for

20     the jury?

21              THE COURT:  Yes.

22 CONTINUED DIRECT

23 BY MR. BIANCAVILLA:

24     Q    Detective, I am going to display People's 86 for

25     the jury.

People - Det. McHugh - Cross

1     Does that photograph fairly and accurately depict

2   the appearance of the defendant at the time of his arrest,

3   at the time of his interview?

4     A     Yes.

5     Q     And with respect to People's 87, is that the

6   photograph of Jeff Johnson that you showed to the

7   defendant while you were interviewing him on April 20th?

8     A     Yes.

9         MR. BIANCAVILLA:  Thank you.  I have no further

10    questions for Detective McHugh.

11        THE COURT:  Mr. Chamberlain?

12  CROSS-EXAMINATION

13  BY MR. CHAMBERLAIN:

14    Q     Detective, with respect to the photograph of Jeff

15  Johnson that was just exhibited, you didn't -- did that

16  photograph come from an active file of an investigation in

17  that area?

18        MR. BIANCAVILLA:  Objection.

19        THE COURT:  Sustained.

20    Q     Did you tell the defendant that that was an active

21  investigation of a suspect in that area?

22        MR. BIANCAVILLA:  Objection.

23        THE COURT:  Sustained.

24    Q     What did you tell the defendant with respect to

25  that photograph?

People - Det. McHugh - Cross

1    A    That I am not saying this gentlemen is involved in

2    anything, that the investigation is still in it's early

3    stages and I would like to see if you recognize him.

4    Q    But you indicated he was a suspect, did you not?

5         MR. BIANCAVILLA:  Objection.

6         THE COURT:  I'll permit that.

7    A    No.

8    Q    Well, you indicated he was somebody you were

9    interested in, in connection with the investigation;

10   right?

11        MR. BIANCAVILLA:  Objection.

12        THE COURT:  I'll permit that.

13   A    Could I hear the question again, please.

14        THE COURT:  Read back the question.

15        (Whereupon, the court reporter read back the

16        requested question.)

17   A    No.

18   Q    You were asking this person, the defendant, if he

19   knew Mr. Johnson; is that correct?

20   A    If he recognized the photo, yes.

21   Q    Did you explain why you were asking if he

22   recognized the photograph?

23   A    No.

24   Q    You're showing him a mug shot, you're asking him

25   if he recognized a man, and no further explanation; is

                    People - Det. McHugh - Cross

1    that what you are telling us?

2        A    That's correct.

3        Q    Where did you get that mug shot from, Detective?

4             MR. BIANCAVILLA:  Objection.

5             THE COURT:  Sustained.

6        Q    Now, Detective, with respect to the Newsday

7    photograph --

8             MR. CHAMBERLAIN:  May I have that,

9        Mr. Biancavilla?

10            Can I put that on the screen, please?

11            MR. BIANCAVILLA:  Sure.

12            THE COURT:  Mr. Chamberlain, would you like the

13       detective to come down to the well?  I don't think he

14       can see.

15       Q    Do you recall the photograph, Detective?

16            Come on down.

17       A    Can I go?

18            THE COURT:  Yes.

19       A    Yes, I do.

20       Q    It's correct that when this photograph was taken

21   the defendant was wearing a jacket; is that correct?

22       A    He has a jacket on, yes.

23       Q    So it would be impossible to identify this

24   defendant by tattoos on his arms because his arms were

25   covered; is that right?

People - Det. McHugh - Cross

1   MR. BIANCAVILLA:  Objection.

2   THE COURT:  Sustained.

3   Q    Is this the photograph that Miss Quinn said she

4   identified the defendant from; is that your testimony?

5   MR. BIANCAVILLA:  Objection.

6   THE COURT:  Sustained.

7   Q    Did you have a conversation with Francine Quinn

8   concerning this photograph?

9   MR. BIANCAVILLA:  Objection.

10   THE COURT:  I'll permit that.

11   A    Yes.

12   Q    And did she tell you -- was that after she had

13   appeared at a lineup?

14   A    Yes.

15   Q    And at the lineup she was unable to identify the

16   defendant from five people sitting -- seven or so people

17   in front of her; is that right?

18   MR. BIANCAVILLA:  Objection.

19   THE COURT:  Sustained as to form.

20   Q    Was Miss Quinn able to identify the defendant at

21   the lineup?

22   A    She identified no one.

23   Q    Was she able to pick the defendant out?

24   MR. BIANCAVILLA:  Objection.  Asked and answered.

25   THE COURT:  Last time.

People - Det. McHugh - Cross

1    Q    Was she asked to identify --

2         THE COURT:  Wait, Mr. Chamberlain, you asked a

3    question.

4         MR. CHAMBERLAIN:  I'll withdraw the question,

5    Judge.

6         THE COURT:  Okay.

7    Q    Do you know what she was asked at the lineup?

8    A    Yes.

9    Q    What was she asked at the lineup?

10   A    To view the lineup and let us know if she

11   recognized anyone and if she recognized anyone to let us

12   know what number.

13   Q    Wasn't she asked if she could recognize a person

14   she said she saw outside the back entrance to Captain

15   Andy's on the early morning hours of April 12th, 2000?

16   A    I don't know if I spoke to her during the lineup

17   in regards to that background information.

18   Q    Well, you subsequently had a conversation with her

19   about this photograph that appeared in Newsday?

20   A    Yes.

21   Q    Did she tell you she could now identify him

22   because she saw a tattoo?

23   A    No.

24   Q    What did she tell you with respect to identifying

25   him from this photograph?

People - Det. McHugh - Cross

1    A    That the gentleman in that photograph was the same

2  man that she had seen at the back door of Ruth's apartment

3  and he was the same man that had just left in the company

4  of Ruth from Y.L. Childs on the night of occurrence.

5    Q    After she saw the photograph did she tell you how

6  she identified him from the photograph when she couldn't

7  identify him from the lineup?

8            MR. BIANCAVILLA:  Objection.

9            THE COURT:  Sustained.

10   Q    Did she tell you what in the photograph enabled

11 her to identify the defendant that she could not identify

12 from the lineup.

13           MR. BIANCAVILLA:  Same objection.

14           THE COURT:  You were fine until you added the

15    extra part.  You can't use compound questions.

16           Sustained.

17   Q    Did she tell you what in this photograph enabled

18 her to identify the defendant?

19   A    Seeing him again.

20   Q    Just seeing him again?

21   A    Seeing him again in that photograph.

22   Q    Seeing his face?

23   A    Yes.

24   Q    That's it?

25   A    Yes.

People - Det. McHugh - Cross

1    Q    Detective, you were the investigating detective on
2    this homicide, were you not?

3    A    Yes, I was.

4    Q    In connection with that, did you have the crime
5    scene secured and then evidence collected?

6    A    Yes, I did.

7    Q    Do you recall how many items of evidence were
8    collected from the crime scene?

9    A    No, I do not.

10   Q    Do you have a record of that anywhere?

11   A    The records would be in the crime scene work
12   sheets, yes.

13   Q    If I tell you the records indicate 36 items, would
14   that refresh your recollection?

15   A    I don't know.

16   Q    After the items, whatever the number was, were
17   collected, what was done with them?

18   A    Some of the items would have been forwarded to the
19   Scientific Investigation Bureau.

20   Q    For what purpose?

21   A    Evidentiary purposes, forensics, latent
22   fingerprints.

23   Q    Anything else?

24   A    I would have to know what the specific item is
25   that you are talking about.

People - Det. McHugh - Cross

1    Q    Well, your crime scene report indicates a whole

2    series of examinations for forensics, do they not?

3        MR. BIANCAVILLA:  Objection.

4        THE COURT:  Sustained.

5        Don't read from something not in evidence,

6    Mr. Chamberlain.

7        MR. CHAMBERLAIN:  I'm not reading.

8        THE COURT:  You can ask the question but don't

9    make reference to something not in evidence.

10   Q    What other examinations were done with respect to

11   the evidence besides latents?

12   A    DNA, hair, fibers, other things, depending on the

13   type of evidence.

14   Q    Tool marks?

15   A    Tool marks.

16   Q    Let's stick with tool marks for a minute.  Were

17   any tools submitted for evaluation?

18       MR. BIANCAVILLA:  Objection.

19       THE COURT:  If he knows.

20   A    Yes.

21   Q    What was submitted for evaluation?

22   A    A leatherman tool.

23   Q    That was the tool taken from the defendant on his

24   arrest on May 3rd, three week later?

25   A    Yes.

People - Det. McHugh - Cross

1    Q    What about the apartment that the victim was found

2    in, were any tools collected in that apartment?

3    A    No.

4    Q    Were there scissors, were there any scissors,

5    knives or tools in that apartment to your knowledge?

6    A    Knives, I would think.  Tools and scissors, I

7    don't have any knowledge of.

8    Q    Did you direct any of your crime scene detectives

9    to collect any tools from that apartment for evaluation?

10   A    Evaluation for?

11   Q    For examination, any forensic evidence, tool

12   marks?

13        Detective, you had a ligature cord --

14        MR. BIANCAVILLA:  Objection.

15        THE COURT:  That was a question, Mr. Chamberlain.

16        Do you understand the question?

17        THE WITNESS:  Could I have it read back?

18        THE COURT:  Yes.

19            (Whereupon, the court reporter read back the

20            requested question.)

21        THE COURT:  Sustained.

22        Ask another question.

23   Q    Detective, there was a ligature around the

24   victim's neck when she was found; is that correct?

25   A    That's correct.

People - Det. McHugh - Cross

1    Q    And that ligature was a cut cord of some type;

2    right?

3    A    Yes.

4    Q    Did you direct the collection of any tools from

5    the crime scene that may have caused that cut?

6         MR. BIANCAVILLA:  Objection.

7         THE COURT:  Sustained as to form.

8    Q    Other than the tool taken from the defendant three

9    weeks later, were any other tools submitted to tool

10   mark -- the tool mark section of SIB, the Scientific

11   Investigation Bureau for examination?

12        MR. BIANCAVILLA:  Objection, as to form.

13        THE COURT:  I am going to overrule it.

14   A    No.

15   Q    Now, in connection with your examination, did you

16   have occasion to speak to a coworker of the defendant --

17   coworker of the victim -- I'm sorry -- by the name of

18   Carolyn Daly?

19   A    I have spoken to Carolyn Daly, yes.

20   Q    Did Carolyn Daly tell you in sum and substance

21   that the victim had complained about being stalked by a

22   police officer?

23        MR. BIANCAVILLA:  Objection.

24        THE COURT:  Sustained.

25   Q    What did Carolyn Daly tell you with respect to

People - Det. McHugh - Cross

1     your investigation of this homicide?

2          MR. BIANCAVILLA:  Objection.

3          THE COURT:  It's hearsay.

4          MR. CHAMBERLAIN:  It's part of his investigation.

5          MR. BIANCAVILLA:  It's all hearsay.

6          MR. CHAMBERLAIN:  What, if anything, he did with

7     respect to this investigation --

8          THE COURT:  Mr. Chamberlain --

9          MR. BIANCAVILLA:  Can we do this at the bench?

10          THE COURT:  There's no need to.

11          Sustained.

12          MR. BIANCAVILLA:  Thank you.

13          MR. CHAMBERLAIN:  Your Honor, at this time --

14          THE COURT:  Would you like to break at this

15     point?

16          MR. CHAMBERLAIN:  I would, yes.

17          THE COURT:  Ladies and gentlemen, at this point

18     we are going to break for lunch.

19          Again, do not discuss the case amongst

20     yourselves or with anyone else.  Keep an open mind.

21     Do not form or express any opinions until the entire

22     case has been completed.

23          Do not read or listen to any accounts of the

24     case should they be reported in the media.  Do not

25     visit or view any place or premises that have been

People - Det. McHugh - Cross

1    mentioned.

2         You are not to permit any party to discuss the

3    case with you or attempt to influence you, and you

4    must promptly report to the Court any violation

5    thereof.

6         Have a nice lunch.  We'll see you at two

7    o'clock.

8              (Whereupon, the sworn jurors exited the

9         courtroom.)

10        THE COURT:  Detective, do not talk to anybody

11   about the evidence or your testimony in this case.

12        THE WITNESS:  Yes, sir.

13        THE COURT:  See you at two o'clock.

14             (Whereupon, the witness was excused from the

15        witness stand.)

16        THE COURT:  Counsel, we'll see you at two

17   o'clock.  This may be a good time to go see

18   Judge Honorof.

19        MR. CHAMBERLAIN:  Yes, Judge.

20             (Whereupon, a luncheon recess was taken.)

21          A F T E R N O O N   S E S S I O N

22        THE CLERK:  Case on trial continues.

23        All parties present.  The jurors are not present

24   at this point.

25             People ready?

People - Det. McHugh - Cross

1    MR. BIANCAVILLA:  Ready.

2    THE CLERK:  Defendant ready?

3    MR. CHAMBERLAIN:  Ready.

4    MR. BIANCAVILLA:  Judge, I have something to set

5    forth on the record.  I guess I shouldn't be surprised

6    by this, but at 12:00 Mr. Chamberlain and I went

7    downstairs.  I say I shouldn't be surprise by this

8    given the history of this case and what has transpired

9    during the course of this trial.

10       When we went downstairs to Judge Honorof

11   regarding the transcript of testimony which Judge

12   Honorof took, or supposedly had taken, during his

13   interview of two witnesses provided to him during the

14   defense of a bail reduction hearing.

15       I was surprised to learn that, although Judge

16   Honorof said he did conduct such a hearing in

17   chambers, that he did not have a court reporter

18   present when he took testimony from these two

19   individuals.

20       Now, I spoke to District Attorney Bill Dempsey

21   during lunch and it was Assistant District Attorney

22   Dempsey's understanding that when this procedure was

23   going to be conducted by Judge Honorof that there was

24   going to be a court reporter present and there was

25   going to be a transcript of what was transpiring

Proceedings

1    because, according to Assistant District Attorney

2    Dempsey, he was expressly precluded from, number one,

3    being present during the time these individuals were

4    interviewed by Judge Honorof and questioned by Judge

5    Honorof, and, number two, was not even advised when

6    these witnesses were going to be presented to Judge

7    Honorof.

8        Clearly that creates a problem for the People and

9    puts the People at a disadvantage during the course of

10   this trial should this Court permit whoever those

11   witnesses are to be called to testify regarding

12   whatever it is they are going to testify for.

13       First of all, we are not even conceding their

14   testimony, if they are called, would be admissible at

15   this particular trial.

16       I just want the record to reflect that, number

17   one, the proceeding was conducted before Judge

18   Honorof and that Judge Honorof did not have a court

19   reporter present when he questioned these individuals

20   and then came out on the record and reduced bail in a

21   murder case.

22       THE COURT:  Mr. Chamberlain, is there anything

23   you wish to add?

24       DEFENSE ATTORNEY:  Judge, Mr. Dempsey was not

25   present and I was not present.  The procedure, as I

Proceedings

1   understood it, was that he would do this either in

2   camera or -- I believed it would be on the record.  I

3   didn't know until just now, along with

4   Mr. Biancavilla, that it was not, but he did indicate

5   that he spoke with these witnesses in camera in

6   chambers and a recording was not made, but I don't see

7   how that effects anything here as far as the testimony

8   of these witnesses or should effect them.

9        MR. BIANCAVILLA:  Judge, again, I'm not looking

10  for a ruling from the Court now.  I'm just bringing

11  this to the Court's attention.

12       My appeals bureau is basically investigating

13  right now, number one, whether or not we have

14  standing to ask that the Court preclude their

15  testimony because of that, and, number two, whether

16  or not there are grounds to make a bail application

17  at this time.  I'll know by the end of the day where

18  we stand legally on that ground.

19       THE COURT:  Counsel, we are missing two jurors.

20  We'll have to wait a few minutes.

21       MR. BIANCAVILLA:  Fine.  Thank you.

22            (Whereupon, there was a brief pause in the

23       proceedings.)

24            (Whereupon, the following took place in

25       chambers outside of the hearing of the jury and

1177

Proceedings

1    defendant.)

2    THE COURT:  Mr. Biancavilla, after you made your

3    record with respect to the sealed proceeding, I spoke

4    to Judge Honorof and Judge Honorof has indicated to me

5    that, actually, it was in the courtroom and it wasn't

6    in chambers, therefore, he had no recollection at that

7    point.  He sealed the courtroom and what he did was at

8    that point he sealed the record too.

9    MR. BIANCAVILLA:  My question is was there a

10   transcript.

11   JUSTICE HONOROF:  I have just read it, of the

12   proceeding.  It was unsealed, for whatever purpose you

13   care to use, other than a criminal prosecution of the

14   witnesses who gave this testimony.

15   MR. CHAMBERLAIN:  Judge, it was my request to

16   have it unsealed.  These are my witnesses.

17   JUSTICE HONOROF:  Then certainly your application

18   is granted.

19   MR. CHAMBERLAIN:  I want that to prepare my

20   witnesses for examination and that -- if, and as of

21   when, I put those witnesses on the stand.

22   JUSTICE HONOROF:  There was one.

23   MR. BIANCAVILLA:  My point is, now that it's

24   unsealed, it's a public record and we are entitled to

25   it.

Proceedings

1    THE COURT:  That's correct, Mr. Biancavilla.

2    MR. CHAMBERLAIN:  But I'm asking it remain sealed

3    until I decide to put those witnesses on the stand and

4    at that time I will present it as standard Rosario

5    material.

6    THE COURT:  Mr. Chamberlain, you are not making

7    application at this point to unseal the record; is

8    that what you are telling me?

9    MR. CHAMBERLAIN:  I am making application -- I

10   don't know whether Judge Honorof intended to seal it

11   from myself as the presenting --

12   JUSTICE HONOROF:  So that my purposes are clear,

13   I intended to seal it so as to protect the

14   constitutional rights of the witness against criminal

15   prosecution while making what I needed to, in terms of

16   a thorough -- thorough examination of the strengths

17   and weaknesses of the People's case in order to be

18   fully informed for the purpose of granting a bail

19   application.

20   MR. BIANCAVILLA:  I understand.

21   MR. CHAMBERLAIN:  Judge, for that limited

22   purpose, so it would be sealed as to the People?

23   MR. BIANCAVILLA:  My point is once it's unsealed,

24   it becomes a public record and I am entitled to a copy

25   of that transcript.

Proceedings

1     MR. CHAMBERLAIN:  I am going to request that

2    sealing remain.

3     JUSTICE HONOROF:  Here is what I am going to do.

4    I don't want to insert myself into Judge Brown's case.

5    I have made my record for sealing the case clear

6    today.  I am turning the sealed records over to Judge

7    Brown for whatever use he cares to make of them.

8     MR. CHAMBERLAIN:  May I ask one question here?

9    It was my recollection there were two witnesses

10   presented.

11    JUSTICE HONOROF:  There only appears to be one

12   witness in this transcript.  If there were --

13    MR. CHAMBERLAIN:  My recollection is there were

14   two.  I just got a phone call, by the way, that

15   indicated one of those witnesses thought there was a

16   transcript.

17    JUSTICE HONOROF:  There's a transcript of one of

18   the witnesses.

19    MR. BIANCAVILLA:  Judge, my only other question

20   to you, most respectfully, did you make notes during

21   that testimony?

22    JUSTICE HONOROF:  That I did not.

23    MR. BIANCAVILLA:  Thank you.

24    JUSTICE HONOROF:  If it turns out there's another

25   transcript, it's Judge Brown's to do with what he

Proceedings

1    wishes.  I didn't recall this one, frankly.

2         MR. CHAMBERLAIN:  I think they would have been

3    the same afternoon.

4         JUSTICE HONOROF:  Then it's probably the same

5    reporter.  Just check with the reporter, but it's now

6    Judge Brown's.  Gentlemen, good luck, both of you.

7         MR. BIANCAVILLA:  Thank you.

8         MR. CHAMBERLAIN:  I appreciate it.

9         THE COURT:  So at this point I have a sealed

10   record that was delivered to me by Judge Honorof and

11   let's proceed.

12        MR. BIANCAVILLA:  I withdraw my prior comments

13   and ask they be stricken from the record.

14        THE COURT:  Do you object to that,

15   Mr. Chamberlain?

16        DEFENSE ATTORNEY:  Yes, I have no objection is

17   the answer to that.

18        THE COURT:  To Mr. Biancavilla striking those

19   remarks.

20        MR. BIANCAVILLA:  Everything that was said out on

21   the bench prior to us coming back here.

22        THE COURT:  We will strike that from the record.

23        MR. CHAMBERLAIN:  Judge, as I understood his

24   ruling, they were sealed for the purpose of protecting

25   the witnesses from any prosecution.  Since those are

Proceedings

1  my witnesses, I would like to be able to have that to

2  prepare my witnesses for direct on my case, if I put

3  them on.

4      MR. BIANCAVILLA:   Judge, my only argument is that

5  once that record is unsealed, it becomes a public

6  record and both the People, if I want it, may pay for

7  that transcript.   I'm entitled to a copy of that

8  transcripts as a public record.   It can't be unsealed

9  for one party only.

10     Whether or not the witnesses are protected from

11  criminal prosecution is an issue that's not before

12  this Court and will be an issue that can be raised by

13  those witnesses if and when any criminal prosecution

14  occurs in terms of Judge Honorof's authority to give

15  them whatever immunity he claimed to have authority

16  to give them.

17     MR. CHAMBERLAIN:   I would respectfully disagree

18  with that last statement.   You can seal -- under the

19  applicable provisions, either party can move for a

20  sealing order.   In this case the district attorney

21  moved for a sealing order and got it, not only who the

22  witnesses were but what they said.

23     MR. BIANCAVILLA:   We did not.

24     MR. CHAMBERLAIN:   You moved for a sealing order

25  with respect to the two witnesses at the jail who in

Proceedings

1    the year 2000 --

2         THE COURT:  That has nothing to do with this.

3    That's apples and oranges at this point.  I am just

4    interested in the facts before us now.

5         MR. CHAMBERLAIN:  I'm just arguing he said if

6    it's unsealed --

7         THE COURT:  That's pursuant to a Criminal

8    Procedure Law statute.

9         Mr. Chamberlain, as you are aware, under 240.45

10   sub 2 of the Criminal Procedure Law, if you intend to

11   call a witness, you have to provide any written or

12   recorded statement made by any person other than the

13   defendant whom the defendant intends to call as a

14   witness at the trial, and which relates to the

15   subject matter of the witnesses' testimony.

16        MR. CHAMBERLAIN:  Yes, I do, Judge.  As a matter

17   of fact, not only do I understand that, but your

18   Honor, at conference, indicated you wanted me to

19   provide specificity as to what the witness will --

20        THE COURT:  You'll have to make an application at

21   some point when you indicate you want to make an

22   application to unseal.  But at that point, it's a

23   public record and you have to provide it pursuant to

24   the Criminal Procedure Law, to the assistant district

25   attorney.

Proceedings

1       MR. BIANCAVILLA:  I think it's beyond that.  I

2    don't have to wait for him to give it to me and call

3    his witnesses.  Once this Court enters an unsealing

4    order, it becomes an independent record and I can get

5    it independently of Mr. Chamberlain.

6       THE COURT:  Is that correct?

7       MR. BIANCAVILLA:  The day you unseal that, I will

8    ask the court reporter, whoever it may be, to provide

9    me with a copy of that transcript, once you unseal it.

10   I don't have to wait for Mr. Chamberlain.

11      MR. CHAMBERLAIN:  I think the problem here is

12   terminology.  Judge Honorof, loud and clear, said that

13   record was only sealed for the purposes of preventing

14   prosecution.

15      THE COURT:  But it's sealed, nevertheless, and

16   there's no application before me to unseal at this

17   point.  Judge Honorof resealed the record and that's

18   where it stands, Mr. Chamberlain.  If you are making

19   an application, that's fine.  I'll be glad to hear it

20   and give the People an opportunity to be heard.

21      MR. CHAMBERLAIN:  My application is that these

22   are witnesses that were presented for the purpose of

23   testifying to the issue of the People's chief witness

24   being a drug seller, a pusher.  Those statements were

25   taken in camera without my being present.  At this

Proceedings

1      point I'm asking it be unsealed.

2              THE COURT:  Mr. Biancavilla?

3              MR. BIANCAVILLA:  As long as I get a copy, he can

4      unseal it.

5              THE COURT:  Based upon your application,

6      Mr. Chamberlain, and, apparently, no opposition by the

7      People, I will unseal the record.

8              MR. CHAMBERLAIN:  All right.

9              THE COURT:  Let's proceed, Counsel.

10             MR. BIANCAVILLA:  I would like to know the name

11     of the court reporter and the witness in the record,

12     Judge.

13             THE CLERK:  Eileen Hyland, September 27, 2000.

14             MR. BIANCAVILLA:  The name of the witness?

15             THE COURT:  I'm not sure.  I haven't read it yet.

16     Charles Ball, B-A-L-L, Nassau County.

17     Counsel, are we ready to proceed?

18             MR. BIANCAVILLA:  Yes.

19             MR. CHAMBERLAIN:  May I see the transcript?

20             THE COURT:  You have to order it.  I am not

21     permitted to give you the transcript, Mr. Chamberlain.

22             MR. CHAMBERLAIN:  Judge, we are in the middle of

23     the trial.  I'm trying to prepare witnesses.

24             THE COURT:  Mr. Chamberlain, that is the rule.  I

25     have unsealed the record.  Right now this record has

Proceedings

1    been sealed.  It's like any other record.  You are

2    required to order it from a court reporter like

3    Mr. Biancavilla is about to do.  That's why I put on

4    the record the date of September 27th, 2000, the court

5    reporter and the witness, and you can get a copy of

6    the transcript just like Mr. Biancavilla.

7         MR. CHAMBERLAIN:  May I have the court reporter's

8    name?

9         THE COURT:  Eileen Hyland.  The court clerk will

10   provide it to you.

11        (Whereupon, the following took place in open

12        court.)

13        COURT OFFICER:  Jury entering.

14        (Whereupon, the sworn jurors entered the

15        courtroom and resumed their respective seats.)

16        THE CLERK:  Do both sides stipulate that all

17   sworn jurors are present and seated properly?

18        MR. BIANCAVILLA:  Yes.

19        MR. CHAMBERLAIN:  Yes.

20        THE COURT:  Good afternoon, ladies and gentlemen.

21   We are ready to continue.

22        Bring the detective back in.

23        (Whereupon, the witness resumed the witness

24        stand.)

25        THE CLERK:  Detective, you are reminded you are

Proceedings

1        still under oath.

2                THE WITNESS:  Yes, ma'am.

3                THE COURT:  You may inquire, Mr. Chamberlain.

4                MR. CHAMBERLAIN:  Thank you.

5     CONTINUED CROSS

6     BY MR. CHAMBERLAIN:

7        Q     Detective, you were the investigating detective in

8     this case; is that right?

9        A     Yes, I was.

10       Q     The first thing you did in connection with your

11    investigation was to have the crime scene evidence

12    collected; is that right?

13       A     I guess you could call it one of the first things.

14       Q     Did you have photographs of the crime scene taken?

15       A     Yes.

16       Q     Do you recall how many?

17       A     No, I do not.

18       Q     I'll show you some records here and ask you if

19    these records refresh your recollection.

20                THE COURT:  Mark them.

21                    (Whereupon, the above-mentioned item was

22                marked as Defendant's Exhibit M for identification

23                only.)

24                COURT OFFICER:  Defendant's M for identification.

25                Would you like it shown to the witness?

People - Det. McHugh - Cross

1        MR. CHAMBERLAIN:  Would you please.

2    Q    Do they refresh your recollection as to the

3    photographs taken?

4    A    This record indicates that 63 photographs were

5    taken.

6    Q    Now, I want to show you Defendant's N for

7    identification?

8        THE COURT:  We'll mark it.

9            (Whereupon, the above-mentioned item was

10           marked as Defendant's Exhibit N for identification

11           only.)

12           COURT OFFICER:  Defendant's N for identification.

13           Would you like it shown to the witness, Counsel?

14           MR. CHAMBERLAIN:  Please.

15    Q    Could you tell us what Defendant's N represents,

16    Detective?

17           MR. BIANCAVILLA:  Objection.

18           THE COURT:  Sustained.

19           MR. CHAMBERLAIN:  I'm not asking for the details

20    on it, just what type of records are those.

21           MR. BIANCAVILLA:  Objection.

22           THE COURT:  That is actually reading from the

23    document, Mr. Chamberlain.

24    Q    Are those records of the collection of evidence,

25    Detective?

People - Det. McHugh - Cross

1    MR. BIANCAVILLA:  Objection.

2    THE COURT:  Are you asking the detective if it

3    refreshes his recollection as to something?

4    Q    Detective, do you recall how many items were

5    seized without reviewing that item, that document?

6    A    No, I do not.

7    Q    Does that refresh your recollection?

8    MR. BIANCAVILLA:  Judge, I am going to object.

9    Items of what?

10    MR. CHAMBERLAIN:  Items of evidence.

11    THE COURT:  Items of evidence collected; is that

12    the question?

13    MR. CHAMBERLAIN:  Yes.

14    A    I would have to review the forms.

15    THE COURT:  Certainly, you can look at them,

16    Defendant's N.

17    A    There's 36 items on that list.

18    Q    After the evidence was collected it was sent to

19    various departments for analysis; is that correct?

20    A    That would be the procedure.

21    Q    I am going to show you what I ask to be marked as

22    Defendant's O for identification?

23    THE COURT:  O.

24            (Whereupon, the above-mentioned item was

25            marked as Defendant's Exhibit O for identification

People - Det. McHugh - Cross

1     only.)

2          COURT OFFICER:  Defendant's O for identification.

3          THE COURT:  Mr. Chamberlain, I understand you

4     want to mark three additional documents.  Do you want

5     to mark them Defendant's P, Q and R.

6          MR. CHAMBERLAIN:  Correct, Judge.

7               (Whereupon, the above-mentioned items were

8               marked as Defendant's Exhibits P, Q and R for

9               identification only.)

10         COURT OFFICER:  Defendant's P, Q and R, marked

11    for identification.

12         MR. CHAMBERLAIN:  May I have them?

13    Q    Defendant's P, do you recognize this document?

14         COURT OFFICER:  This is O.

15    Q    Defendant's O, Detective, do you recognize this

16    document?

17    A    It's a scene examination --

18         MR. BIANCAVILLA:  Objection.  Not responsive.

19         THE COURT:  Just a yes or no.

20    Q    Do you recognize it, Detective?

21    A    No.

22    Q    You don't?

23    A    No.

24    Q    Were latent fingerprints taken from the scene at

25    your direction?

People - Det. McHugh - Cross

1    A    Latent fingerprints were recovered from the scene,

2    yes.

3    Q    As you sit here, do you recall where those

4    fingerprints were taken from?

5    A    Some of them, yes.

6    Q    Do you recall all of them?

7    A    I'm not certain if I recall all of them, no.

8    Q    Will you look at Defendant's O and tell us if that

9    document refreshes your recollection as to where the

10   latent fingerprints were taken?

11   A    I can tell you where some of them were recovered

12   without looking and then, if you want me to look, I can

13   look at it.

14   Q    You can't tell us about all of them?

15   A    I may be telling you about all of them but I

16   wouldn't know until I reviewed the document.

17   Q    Tell us what you can recall first?

18   A    Some latent fingerprints were recovered from a

19   photo album that was on the kitchen table at the scene and

20   I believe some latents were recovered from the wall in the

21   living room.  Also a latent fingerprint was recovered from

22   a CD case in a stereo cabinet in the living room.

23   Q    In addition to the ones recovered, there were

24   other areas of the apartment that were dusted for prints,

25   were there not?

People - Det. McHugh - Cross

1       MR. BIANCAVILLA:  Objection.  He has no personal

2   knowledge of that, and, if he knows, it's hearsay.

3       THE COURT:  He could, theoretically, have been

4   present.

5       Detective, were you present when the area was

6   dusted for fingerprints?

7       THE WITNESS:  No, I was not.

8   Q   Did you direct the taking of evidence from that

9 apartment as the investigating detective in this case?

10 Did you not direct all evidence to be collected in this

11 case?

12       MR. BIANCAVILLA:  Judge, he wasn't present.  He

13   just said that.

14       MR. CHAMBERLAIN:  He didn't have to be.

15       THE COURT:  Overruled.

16       That question, you can answer.

17   A   I don't direct the recovery of evidence.

18   Q   Whatever they recovered is what you get, is that

19 it?

20   A   The scene is processed by Crime Scene people

21 trained to do that, yes.

22   Q   So you had no knowledge of where they were going

23 to look for prints or what prints -- what areas they were

24 going to dust; is that right?

25   A   They are the experts in that area and they process

People - Det. McHugh - Cross

1    the scene accordingly.

2    Q    Will you tell us what areas they dusted?

3         MR. BIANCAVILLA:  Objection.

4         THE COURT:  Sustained.

5    Q    Do you recall?

6         THE COURT:  He just answered that question for

7    you, Mr. Chamberlain.

8         MR. CHAMBERLAIN:  He said he didn't direct them,

9    Judge.  I'm asking what areas were --

10        THE COURT:  I asked him if he was present and he

11   wasn't present.

12   Q    Did you receive a record as the investigating

13   detective of what areas were dusted?

14        MR. BIANCAVILLA:  Again, objection, Judge.

15        THE COURT:  Sustained.

16        MR. CHAMBERLAIN:  Judge, the completeness of this

17   investigation is an issue here.

18        MR. BIANCAVILLA:  I would ask this not be before

19   the jury.

20        THE COURT:  Objections are made.  Rulings are

21   made.  You have to ask a proper question,

22   Mr. Chamberlain.  I'm not saying you can't ask these

23   questions.  I don't want colloquy.

24   Q    As you sit here, would that record in front of

25   you, Defendant's O, indicate the areas of the apartment

                    People - Det. McHugh - Cross

1    that were dusted for prints?

2              MR. BIANCAVILLA:  Objection.

3              THE COURT:  Sustained.  You would have to read

4        from the record, Mr. Chamberlain, from the document.

5        Q    As the investigating, were you not interested in

6    where prints were sought in this apartment?

7              MR. BIANCAVILLA:  Objection.

8              THE COURT:  Sustained.

9        Q    I will show you Defendant's P for identification.

10             Have you had a chance to read that?

11       A    Yes.

12       Q    Did you direct a soda can used by the defendant be

13   examined for DNA evidence?

14             MR. BIANCAVILLA:  Objection.

15             THE COURT:  I will permit the detective to answer

16       that question.  Overruled.

17       A    Yes, I did.

18       Q    And do you have the results of that examination?

19       A    Do I, no.

20       Q    Did you ever receive them?

21       A    Did I ever receive a report on DNA results on that

22   soda can?

23       Q    Yes.

24       A    No.

25       Q    Do you recall where the soda can -- the soda can,

People - Det. McHugh - Cross

1    do you know where the soda can came from?

2        A    Yes.

3        Q    Where would that be?

4            MR. BIANCAVILLA:  Objection.

5            THE COURT:  I'll permit that.

6            MR. BIANCAVILLA:  Judge, unless he was present

7        for its recovery --

8            THE COURT:  He says he knows.

9            MR. BIANCAVILLA:  It could be subject to hearsay,

10       Judge.

11           THE COURT:  Detective, did you -- you were at the

12       scene; is that correct?

13           THE WITNESS:  Yes, your Honor.

14           THE COURT:  When you were at the scene, did you

15       observe a soda can there?

16           THE WITNESS:  No, I did not

17       Q    Detective, was there any soda can on the list of

18    evidence collected from the scene?

19           MR. BIANCAVILLA:  Objection.

20           THE COURT:  Sustained.

21       Q    I show you Defendant's R for identification.

22           Detective, did you, in addition to ordering or

23    directing a collection of evidence at the victim's

24    apartment, direct a collection of evidence from her

25    vehicle -- the vehicle belonging to the victim?

People - Det. McHugh - Cross

1       MR. BIANCAVILLA:  Objection.

2       THE COURT:  I'll permit that.

3   A  Yes, I did.

4   Q  Did that -- did you -- did you receive a report

5 back from the collection of that evidence?

6   A  Yes, I did.

7   Q  Do you recall all the items collected?

8   A  No, I do not.

9   Q  Is that document -- was that the only item

10 collected?

11      MR. BIANCAVILLA:  Objection.

12     THE COURT:  Sustained.

13   Q  After reading that, does that refresh your

14 recollection of the items collected?

15     MR. BIANCAVILLA:  Objection.  There's no item he

16   collected.

17     THE COURT:  You have to lay a foundation.

18     MR. CHAMBERLAIN:  He said he received a report.

19     THE COURT:  Ask the detective if he went to the

20   automobile.

21   Q  Detective, as the investigating detective, you

22 assign other people to do jobs and you get the material

23 back for analysis or review in connection with your

24 investigation; is that not a fact?

25     MR. BIANCAVILLA:  Objection, Judge.

People - Det. McHugh - Cross

1         THE COURT:  I'll permit that.

2    A    I have other detectives that assist me and I do

3    assign them to tasks.

4    Q    And you ask for a crime scene evaluation of

5    articles in the victim's vehicle; is that correct?

6    A    That's correct.

7    Q    And you received a report back of those articles;

8    is that correct?

9    A    That's correct.

10   Q    And do you recall all the items that were

11   collected?

12   A    No, I do not.

13   Q    Does that document refresh your recollection?

14   A    Can I review it?

15   Q    Yes.

16   A    I reviewed it.  I see about 50 items on that list.

17   Q    Was one of the items a zip-lock bag with stems and

18   buds?

19        MR. BIANCAVILLA:  Objection.

20        THE COURT:  Sustained.

21   Q    Did you receive back a report of an item of a

22   zip-lock bag of stems and buds?

23        MR. BIANCAVILLA:  Objection.

24        THE COURT:  Sustained.  Hearsay.

25   Q    Did you -- did you -- did you cause a bag of -- a

People - Det. McHugh - Cross

1  Ziploc bag of stems and buds to be sent to SIB for

2  analysis?

3      A    No.

4      Q    Would you review the document, please, item 20?

5           MR. BIANCAVILLA:  Objection.

6           THE COURT:  Overruled.

7      Q    Does that indicate --

8           MR. BIANCAVILLA:  Judge, I object.

9           THE COURT:  Sustained.

10     Q    Does that refresh your recollection as to whether

11 or not that bag was sent to SIB for analysis?

12     A    Yes.

13     Q    And was it sent to SIB for analysis now that your

14 recollection is refreshed?

15     A    Yes.

16     Q    And did you get back an analysis as to that item?

17     A    No.

18     Q    When you did not get it back, did you follow up to

19 find out why you did not get it back?

20          MR. BIANCAVILLA:  Objection.

21          THE COURT:  Sustained.

22     Q    Detective, are there any other crime -- other than

23 the documents that you have just been shown, any other

24 police department records concerning collection of

25 evidence in this case?

People - Det. McHugh - Cross

1    A    I'm sure there would be.

2    Q    Do you recall any other evidence that was

3  collected?

4    A    No, I do not.

5    Q    What about the ligature cord found around the

6  victim's throat?

7         MR. BIANCAVILLA:  Is that a question.

8    Q    Do you recall that item of evidence?

9    A    Yes, I do.

10   Q    That's not one of the 36 on the crime scene

11  collection report --

12        MR. BIANCAVILLA:  Objection.

13        THE COURT:  Sustained.  Sustained.

14   Q    What, if anything, did you do with that item,

15  Detective?

16        MR. BIANCAVILLA:  Objection.

17   Q    Did you direct anything --

18        THE COURT:  First of all -- excuse me.  You have

19    to wait for a ruling.

20        Sustained.

21   Q    Did you direct anything be done with the wire

22  cord, Detective?

23   A    At the scene?

24   Q    At any time.

25        MR. BIANCAVILLA:  Judge, objection.

People - Det. McHugh - Cross

1        THE COURT:  At any time is sustained.

2        Q    All right.  At the scene, Detective did you direct

3    that anything be done with respect to the wire cord at the

4    scene?

5        A    The cord was left on the victim.  It was removed

6    from the scene on the victim to the morgue and it was

7    processed in accordance with procedures from there.

8        Q    Did you direct any swabbing of the cord at the

9    scene?

10       A    No.

11       Q    Did you direct any oral swabs of the victim at the

12   scene before the body was removed to the morgue?

13       A    No.

14       Q    Did you direct any swabbing of the area around the

15   victim's neck where the cord was located?

16       A    At the scene, we are talking about?

17       Q    At the scene.

18       A    No, I did not.

19       Q    Now, Detective, after collection of evidence at

20   the scene, did you proceed in your investigation to

21   determine any people that had seen the victim shortly

22   prior to her death?

23       MR. BIANCAVILLA:  Objection.

24       THE COURT:  Sustained as to form.

25       Q    After collection of that evidence at the scene,

People - Det. McHugh - Cross

1    what did you do next in connection with your

2    investigation?

3            MR. BIANCAVILLA:  Objection.  The detective

4        testified he didn't collect evidence at the scene.

5            THE COURT:  Sustained as to form.

6    Q    After you supervised or directed or saw to the

7    collection of evidence at the scene, what, if anything,

8    did you do after that?

9            MR. BIANCAVILLA:  Same objection, Judge.  He

10       didn't do any of those three, according to his

11       testimony.

12           THE COURT:  Overruled.  I'll permit that.

13           MR. CHAMBERLAIN:  Thank you.

14   A    What did I do after the crime scene people

15   processed the scene, is that the question?

16   Q    Yes.

17   A    I met with the detectives that were assisting me

18   with the case, organized the canvass and started

19   interviewing witnesses.

20   Q    And you testified here that you saw somebody by

21   the name of John Kane approximately three days later on

22   the 15th of April; is that correct?

23   A    April 15, correct.

24   Q    That was at his house?

25   A    That was where he lived, yes.

People - Det. McHugh - Cross

1   Q    Before you went see him, did you obtain any
2   information about John Kane prior to your going to see
3   him?

4   A    I don't believe so, no.

5   Q    Well, did you ascertain that he had been with the
6   victim the night prior to her death?

7        MR. BIANCAVILLA:  Judge, I'm going to object.
8   It's hearsay.

9        THE COURT:  Sustained.

10  Q    What in your investigation led you to go to
11  John Kane's house on April 15th?

12       MR. BIANCAVILLA:  Same objection, Judge.

13       THE COURT:  As a result of information, you went
14   to John Kane's house?

15       THE WITNESS:  Yes, your Honor.

16       THE COURT:  Go on from there, Mr. Chamberlain.

17  Q    Did that information include the fact that he was
18  known -- his name on the street?

19       MR. BIANCAVILLA:  Objection.

20       THE COURT:  I am going to sustain it as to form.

21  Q    What had you found out about John Kane in relation
22  to the victim prior to seeing him on April 15th?

23       MR. BIANCAVILLA:  Objection.

24       THE COURT:  That's hearsay.  You have to ask the
25   question properly.

People - Det. McHugh - Cross

1    Q    You say you had obtained information about

2  John Kane prior to going to see him.  Did that information

3  relate to contacts between Kane and the victim?

4         MR. BIANCAVILLA:  Objection.  Same basis, Judge,

5     for my objection.

6         THE COURT:  Sustained.

7    Q    When you went to see Kane, did he give you -- did

8  he -- did you ask him about the victim, Ruth Williams?

9    A    I asked him if he knew her, yes.

10   Q    What did he tell you?

11        MR. BIANCAVILLA:  Objection.

12        THE COURT:  Sustained.  Classic hearsay.

13   Q    You say you asked him if he knew her.  Did you ask

14  him anything else?

15   A    I asked him how long he knew her.

16   Q    Did you ask him anything else?

17   A    I asked him where he knew her from.

18   Q    And did you ask him when he had last seen her?

19   A    Yes, I did.

20   Q    What was advice did you get on that answer?

21        MR. BIANCAVILLA:  Objection.

22   Q    Did you get an answer --

23        THE COURT:  Wait.  Wait.  Read the last question

24     back to he.

25        (Whereupon, the requested question was read back

People - Det. McHugh - Cross

1    by the court reporter.)

2         THE COURT:  Sustained.  I don't know what that

3    question means.

4    Q    What answer did you get as to when John Kane had

5    last seen the victim?

6         MR. BIANCAVILLA:  Objection.

7         THE COURT:  Hearsay.

8    Q    Detective, you indicated that John Kane was

9    wearing certain items of clothing on that day, the 15th of

10   April, 2000?

11   A    Yes.

12   Q    You didn't see any scratches on him; is that

13   right?

14   A    No scratches.

15   Q    Did you examine him for scratches specifically?

16   A    Only as I was sitting across from him.

17   Q    So if he haded scratches on some part of his body

18   under his clothing, you would not have been able to see

19   it; is that a fair statement?

20   A    That's a fair statement.

21   Q    Will you describe what he looked like aside from

22   the clothing that he had on that day?

23   A    His physical appearance?

24   Q    Yes.

25   A    He's about 5 foot 8, about 150 pounds.  His hair

People - Det. McHugh - Cross

1    was long, I believe it was in the pony tail, and he had a

2    full beard.

3        Q    When you say long hair, will you describe how long

4    it was?

5        A    Pony tail that was just down below the shoulders.

6        Q    How long was the beard?

7        A    Maybe about 4 inches.

8        Q    Was it a full beard including the upper lip as

9    well as lower lip?

10       A    I don't recall whether he had a moustache or not.

11   I know he had a beard.

12       Q    As a result of that conversation with Mr. Kane,

13   what, if anything, did you do next?

14       A    Continued following leads, interviewing witnesses,

15   reviewing telephone records, gathering information,

16   processing that information as it was brought to my

17   attention.

18       Q    Did you get any information as to John Kane?

19       A    Yes.

20       Q    Did he have any other name on the street besides

21   the name Kane?

22            MR. BIANCAVILLA:  Objection.

23            THE COURT:  Sustained.

24            You're presupposing where it came from by asking

25       the question that way.

People - Det. McHugh - Cross

1      MR. CHAMBERLAIN:  It was part of the

2   investigation, Judge.

3          THE COURT:  I understand that.

4          MR. BIANCAVILLA:  That doesn't make it

5   admissible.

6   Q    Did you ascertain whether Mr. Kane was employed or

7   unemployed?

8          MR. BIANCAVILLA:  Objection.

9          THE COURT:  Sustained.

10  Q    Was one of the witnesses you spoke to a person by

11  name of Jennifer DeRenzis?

12  A    Yes.

13  Q    Did she -- did you ask her about the person,

14  John Kane?

15  A    I would have to review my notes concerning that

16  interview.

17  Q    Do you have your notes with you?

18  A    No, I do not.

19         THE COURT:  Do you want that marked,

20  Mr. Chamberlain?

21         MR. CHAMBERLAIN:  Yes.

22         THE COURT:  That he will be Defendant's S.

23             (Whereupon, the above-mentioned item was

24         marked as Defendant's Exhibit S for identification

25         only.)

People - Det. McHugh - Cross

1        COURT OFFICER:  Defendant's S for identification.

2    Would you like it shown to the witness?

3        MR. CHAMBERLAIN:  Please.

4    A    I reviewed that.

5    Q    Are those the notes of your interview of her,

6    Jennifer DeRenzis on April 14th, the day before you saw

7    John Kane.

8    A    It appears that my notes on that interview are

9    dated the 20th of April.

10        THE COURT:  Mr. Chamberlain?

11        MR. CHAMBERLAIN:  Yes, Judge.

12        THE COURT:  Do you need a moment?

13        MR. CHAMBERLAIN:  Yes, Judge.

14        THE COURT:  Okay.

15    Q    Did you also interview her on the 14th, Detective?

16    A    Looks like the 16th.

17    Q    The 16th of April?

18    A    The 16th of April may have been when her

19    information was brought to my attention.

20    Q    Did you testify before the grand jury about your

21    interview of Miss DeRenzis?

22    A    I would have to review my testimony.

23    Q    Whatever day it was, you say your notes indicate

24    you got the information -- you recorded the information on

25    the 16th received from some prior day; is that correct?

People - Det. McHugh - Cross

1    A    I closed out the lead on the 20th.  I received the

2  information on the 16th.

3    Q    Detective, did Miss DeRenzis describe John Kane?

4         MR. BIANCAVILLA:  Objection.

5    Q    If you recall?

6         MR. BIANCAVILLA:  Judge, same objection.  Classic

7    hearsay.

8         THE COURT:  If it can be responded to with a yes

9    or no, I'll permit it.

10   A    The question, again?

11   Q    Did she describe him to me?

12   A    She described someone do me.

13   Q    Did she use the name Kane or did she use the name

14  John D?

15        MR. BIANCAVILLA:  Objection.

16        THE COURT:  Sustained.

17   Q    What name did she use in describing the person?

18        MR. BIANCAVILLA:  Same objection.

19        THE COURT:  Hearsay.  Sustained.

20   Q    The 4/20 you refer to on your notes, the notation

21  at the top of the page --

22   A    I would have to see them.

23        MR. BIANCAVILLA:  Objection.

24        THE COURT:  You should not be reading from a

25    document that is not in evidence, Mr. Chamberlain.

People - Det. McHugh - Cross

1    Q    Is there anything in this note that indicates this

2    was on 4/20?

3         MR. BIANCAVILLA:  Objection.

4         THE COURT:  Sustained.

5    Q    Detective, you said you received -- you just said

6    you received, a minute ago, the information on the 20th of

7    April?

8         MR. BIANCAVILLA:  Objection.  That wasn't his

9     testimony.  Please.

10        THE COURT:  Ask the detective again.

11   Q    I am going to show you the -- I'm going to tell

12   you to disregard the note at the top which is my

13   handwriting, Detective, and ask you if the lead sheet

14   tells you when you received that note on Miss DeRenzis?

15        THE COURT:  You can ask if it refreshes his

16    recollection.

17   Q    Does that refresh your recollection, Detective?

18   A    Yes, it does.

19   Q    And what was the date now that it's refreshed?

20   A    April 16th.

21   Q    Is that a 15th or 16th?

22        MR. BIANCAVILLA:  Judge.

23        THE COURT:  Don't read from the document please.

24        Sustained.

25   Q    Detective, did you also interview somebody by the

People - Det. McHugh - Cross

1   name of Tom Hartman?

2       A     Yes, I interviewed Mr. Hartman.

3       Q     Did he describe a person he knew by the name of

4   John?

5             THE COURT:  Again, that's hearsay,

6       Mr. Chamberlain.

7             Sustained.

8             You cannot elicit from this witness what someone

9       else told him.

10            MR. CHAMBERLAIN:  Judge, this witness was the

11      investigating detective.

12            THE COURT:  I understand exactly what he was,

13      Mr. Chamberlain, but the rules of evidence including

14      hearsay still apply.

15      Q     Did you receive back latent fingerprints from the

16  collection of evidence at the crime scene, Detective?

17      A     Yes, I did.

18      Q     Will you tell us what prints were lifted from the

19  crime scene?

20      A     You want a list of the fingerprints that were

21  lifted from the crime scene or do you want to know the

22  ones that were identified.

23      Q     I want to know the ones that were identified first

24  and then --

25      A     On the CD case in the stereo cabinet, the latent

People - Det. McHugh - Cross

1    of John Kane was identified off a CD case.  In the photo

2    album, a latent fingerprint was identified belonging to a

3    John Marks, and, also in that same book, a latent

4    fingerprint was identified as belonging to a Steven

5    Schwartz(phonetic).

6        Q    Did you identify who Marks and Schwartz were as

7    part of your investigation?

8             MR. BIANCAVILLA:  Objection.

9             THE COURT:  Sustained as to form.

10       Q    Did you determine -- did you investigate how

11   Steven Schwartz' fingerprints got into the decedents

12   apartment?

13       A    Yes, I did.

14       Q    Will you tell us what that determination was?

15            MR. BIANCAVILLA:  Objection. Same objection,

16       Judge.

17            THE COURT:  Sustained.

18       Q    When did you find out that Steven Schwartz'

19   fingerprints were in the deceased's apartment?

20       A    The first week of the investigation, I was

21   notified there was a latent there.  The identification of

22   that latent was just come accomplished prior to the start

23   of this trial.

24       Q    What did you determine -- withdrawn.

25            The reason for the delay between the latent that

People - Det. McHugh - Cross

1    was developed on April 13th or 14th of 2000 --

2           MR. BIANCAVILLA:  Judge, objection.

3           THE COURT:  The reason for the delay is not

4    relevant, Mr. Chamberlain.

5    Q     When did you first get Mr. Schwartz' fingerprints

6    on file in the Nassau County Police Department?

7    A     I don't know.

8    Q     If I tell you that -- was Mr. Schwartz --

9           MR. CHAMBERLAIN:  I would like to have this

10   marked as Defendant's Exhibit T for identification.

11               (Whereupon, the above-mentioned item was

12           marked as Defendant's Exhibit T for identification

13           only.)

14           COURT OFFICER:  So marked Defendant's Exhibit T

15   for identification.

16           MR. CHAMBERLAIN:  Please show it to the witness.

17   Q     Does that document refresh your recollection as to

18   when those fingerprints were on file with the Nassau

19   County Police Department?

20   A     Yes.

21   Q     What was the date?

22           MR. BIANCAVILLA:  Objection.

23           THE COURT:  It would be reading from a document.

24   Sustained.

25   Q     After your recollection is refreshed, can you tell

People - Det. McHugh - Cross

1    us the approximate date when the Nassau County Police

2    Department got Mr. Schwartz' fingerprints?

3            MR. BIANCAVILLA:  Objection.

4            THE COURT:  I'll permit it.

5    A     The fingerprint card is dated November of 2000.

6    Q     Was Mr. Schwartz arrested for drug sales on that

7    date?

8            THE COURT:  Sustained.

9            MR. BIANCAVILLA:  Thank you, Judge.

10           THE COURT:  Sustained.

11   Q     Part of your investigation, Detective, did you

12   investigate the background of both Mr. Kane and the

13   victim?

14           MR. BIANCAVILLA:  Objection.

15   Q     And the defendant?

16           THE COURT:  I'll permit that.

17   A     What do you mean by background?

18   Q     Well, what they did, whether they were employed,

19   what names they were known by, what their reputation was

20   in the community, whether they had any visible means of

21   support, whether they were married, had children, whether

22   they went to work every day, whether they spent a lot of

23   money in bars every night, whether they were known to be

24   drug users or sellers, that's what I mean?

25           MR. BIANCAVILLA:  Judge, I counted 10 questions

People - Det. McHugh - Cross

1    there.

2        THE COURT:  That was quite a compound question.

3    Sustained.

4        MR. CHAMBERLAIN:  He asked me what I meant.

5        THE COURT:  I understand but you can, with

6    specificity, tell him what you mean without asking 10

7    questions.

8        Ladies and gentlemen, we are going to take a

9    brief recess.

10       Do not discuss the case amongst yourselves or

11   with anyone else.  Keep an open mind.  Do not form or

12   express any opinions until the entire case has been

13   completed.

14       Do not read or listen to any accounts of the

15   case should they be reported in the media.  Do not

16   visit or view any place or premises that have been

17   mentioned.

18       You are not to permit any party to discuss the

19   case with you or attempt to influence you, and you

20   must promptly report to the Court any violation

21   thereof.

22            (Whereupon, the sworn jurors exited the

23       courtroom.)

24            (Whereupon, a brief recess was taken.)

25       COURT OFFICER:  Jury entering.

People - Det. McHugh - Cross

1          (Whereupon, the sworn jurors entered the

2     courtroom and resumed their respective seats.)

3          THE CLERK:  Both sides stipulate that all sworn

4     jurors are present and are seated properly?

5          MR. CHAMBERLAIN:  So stipulated.

6          MR. BIANCAVILLA:  Yes.

7          THE COURT:  Bring the detective back in.

8          (Whereupon, the witness resumed the witness

9     stand.)

10         THE COURT:  Mr. Chamberlain?

11         MR. CHAMBERLAIN:  Thank you.

12    CONTINUED CROSS

13    BY MR. CHAMBERLAIN:

14         Q    Detective, after you interviewed Kane on the 15th

15    you again interviewed him on the 2nd of May; is that

16    correct?

17         A    That's correct.

18         Q    And that interview took place at Nassau County

19    headquarters?

20         A    Yes.

21         Q    Homicide Squad?

22         A    Yes.

23         Q    Was he picked up and brought into Homicide on that

24    day?

25         A    He came into the Homicide Squad with us, yes.

People - Det. McHugh - Cross

1    Q    Was that interview conducted -- withdrawn.

2         Would you tell us approximately what time he

3    arrived at Homicide?

4    A    I believe it was a little after 7:00 p.m.

5    Q    Detective, do you have any notes as to when that

6    actually started that would refresh your recollection as

7    to the exact time?

8    A    Of Mr. Kane's interview?

9    Q    When he was brought in?

10        MR. BIANCAVILLA:  Judge, he didn't say he needed

11       his recollection refreshed.

12        THE COURT:  Detective, do you know the exact time

13       that you started this interview.

14        THE WITNESS:  I believe it was 7:10 p.m.

15   Q    Detective, that interview of Kane took place with

16   you an Detective Parpan; right?

17   A    Yes.

18   Q    And Detective Parpan was the one taking notes?

19   A    Yes.

20   Q    And you reviewed those notes to refresh your

21   recollection before testifying here?

22        MR. BIANCAVILLA:  Which interview, Judge?

23   Q    The interview of Kane.

24   A    John Kane's interview on May 2nd, we are talking

25   about?

People - Det. McHugh - Cross

1    Q    That's correct.

2    A    With Detective Parpan, yes.

3    Q    Now, you indicated that early the next morning you

4    started about 1:00 a.m., you started an interview of the

5    defendant, Scrimo, in Homicide; is that correct?

6    A    That's correct.

7    Q    Would it be fair to say that your interview of

8    Scrimo was based upon the information you obtained from

9    Kane?

10   A    There were other things involved that that

11   interview was based on.

12   Q    Your determination to go out and arrest Scrimo was

13   based upon what Kane had just told you, was it not?

14   A    Not solely, no.

15   Q    Do you remember testifying that that was the basis

16   for probable cause?

17        MR. BIANCAVILLA:  Objection.

18        THE COURT:  Sustained.

19   Q    What other information did you have other than

20   Kane -- what Kane had just told you?

21        MR. BIANCAVILLA:  Objection.

22        THE COURT:  Sustained.

23        You are calling for hearsay.

24        MR. CHAMBERLAIN:  He said there was other

25     information.

People - Det. McHugh - Cross

1    THE COURT:  Yes.

2    Q    What other evidence or information did your

3    investigation produce concerning Mr. Scrimo other than

4    what Mr. Kane had told you?

5          MR. BIANCAVILLA:  Objection.  Same basis, Judge.

6          THE COURT:  Sustained.

7    Q    Up until the time that Kane made certain

8    statements on the evening of May 2nd, you had conducted, I

9    take it, an interview, an examination of the victim's

10   relationship with whomever she had been seen with that

11   night; is that correct?

12         MR. BIANCAVILLA:  Objection.

13         THE COURT:  Sustained as to form.

14         I don't think I understand the question.

15         Do you under the question, Detective?

16         THE WITNESS:  No.

17   Q    Your investigation concerned, of this homicide,

18   concerned who the victim had been with shortly prior to

19   her death; is that right?

20         MR. BIANCAVILLA:  Judge, I am going to object to

21      that question.

22         THE COURT:  I'll permit that.

23   Q    Go ahead and answer that question.

24   A    Part of my investigation had to deal with who she

25   was with just prior to her death, yes.

People - Det. McHugh - Cross

1    Q    And that investigation indicated, among other

2    people, Kane, or a person fitting his description and the

3    defendant; is that correct?

4         MR. BIANCAVILLA:  Objection, Judge.  Again, it

5       calls for hearsay.

6         THE COURT:  Sustained.

7    Q    Did your investigation concern any relationship

8    between Scrimo and the victim?

9         MR. BIANCAVILLA:  Objection.

10        THE COURT:  Sustained.

11   Q    There were a number of bars in the vicinity of

12   Main Street in Farmingdale that were involved in this

13   investigation; is that correct?

14   A    That's correct.

15   Q    Would you name those bars please?

16   A    Downtown, Falcons's Nest, Granny O'Shea's, Y.L.

17   Childs.

18   Q    They are all in close proximity to each other?

19   A    Yes.

20   Q    Did you have any prior information about those

21   bars in connection with any arrests in 1998 for a

22   motorcycle gang called the Pagans?

23        MR. BIANCAVILLA:  Objection.

24        THE COURT:  Sustained.

25   Q    Did you investigate whether there was any history

People - Det. McHugh - Cross

1    of any of those bars in connection with drug

2    investigations and particularly cocaine?

3          MR. BIANCAVILLA:  Objection.

4          THE COURT:  Sustained.

5    Q    Prior to picking Kane up on May 2nd --

6          MR. BIANCAVILLA:  Objection to the

7    characterization.

8          THE COURT:  Sustained as to the characterization.

9    Q    Was Kane --

10         THE COURT:  The testimony was that he was brought

11   in.

12   Q    Was Kane picked up by homicide detectives and

13   brought into the Homicide Squad in Mineola?

14         MR. BIANCAVILLA:  Again, objection.

15         THE COURT:  Please don't characterize the

16   testimony.

17   Q    How did Kane get into police headquarters from his

18   home in Farmingdale?

19   A    We asked him --

20         MR. BIANCAVILLA:  Objection.  There's no

21   testimony he picked him up at his home.

22         THE COURT:  Sustained as to his home.

23         Ask the question -- are you withdrawing the

24   question?

25         MR. CHAMBERLAIN:  Yes, Judge, I am.

People - Det. McHugh - Cross

1        THE COURT:  If you ask it properly, you can ask

2    it, Mr. Chamberlain.

3       Q    Prior to Kane being in Nassau County Headquarters

4    on the evening of May 12th, had you investigated his

5    employment background?

6       A    I had some information relative to his employment,

7    yes.

8       Q    And what was that information?

9       MR. BIANCAVILLA:  Objection.

10       THE COURT:  Sustained.

11       Hearsay, Mr. Chamberlain.

12       Q    Can you tell this jury whether he was -- whether

13    he was employed in or about April of 2000?

14       MR. BIANCAVILLA:  Objection.

15       THE COURT:  The only way to get it is through

16    hearsay?

17       MR. CHAMBERLAIN:  We have an investigating

18    detective in charge of a homicide.

19       MR. BIANCAVILLA:  It's not an exception to the

20    hearsay rule, Judge, being a detective in a homicide

21    case.  I've gone through Richardson.  It's not there.

22       THE COURT:  It's sustained, Mr. Chamberlain.

23       Q    Independently of what Kane told you, did you make

24    any investigation as to where he might have been employed?

25    Did you make any other investigation?

People - Det. McHugh - Cross

1       MR. BIANCAVILLA:  Objection.

2       THE COURT:  I'll let him answer that question.

3    A    Is the question --

4       THE COURT:  Did you make an investigation as to

5    where Mr. Kane was employed?

6    A    Yes.

7    Q    Did you check for any payroll records?

8       MR. BIANCAVILLA:  Judge, I am going to object.

9       THE COURT:  I'll permit this.

10   A    I don't believe any payroll records existed.

11   Q    Could you tell the jury of your investigation how

12   many days Kane had worked between let's say January 1st

13   2000 and April 12th, 2000?

14      MR. BIANCAVILLA:  Objection.

15      THE COURT:  Sustained.

16   Q    Did you investigate his drinking background at

17   that point?

18      MR. BIANCAVILLA:  Objection, Judge.

19      THE COURT:  I will let this question be asked.

20   A    He was known in the bars.

21   Q    He was known in the bars as what?

22      MR. BIANCAVILLA:  Objection.

23      THE COURT:  Sustained.

24   Q    When you say he was known in the bars would you,

25   please, elaborate on that?

People - Det. McHugh - Cross

1      MR. BIANCAVILLA:  Objection.

2      THE COURT:  Sustained.

3          Mr. Chamberlain, hearsay, the only way the

4      detective can get the information is from somebody

5      else telling him.  Unless it's an exception to the

6      hearsay rule, it's hearsay.

7      Q     Did you investigate whether Kane had a prior

8  sexual relationship with the victim prior to April 12th,

9  2000?

10     A     Yes.

11     Q     What did that investigation reveal?

12         MR. BIANCAVILLA:  Judge --

13         THE COURT:  That is hearsay.

14     Q     Did you investigate any other relationship between

15 Kane and the victim?

16     A     No.

17     Q     Did you ever ask him -- determine whether he

18 shared cocaine with her?

19         MR. BIANCAVILLA:  Objection.

20         THE COURT:  Sustained.

21     Q     Did you make any determination as to when the last

22 time he had seen her prior to April 11th 2000 --

23         MR. BIANCAVILLA:  Objection.

24         THE COURT:  Sustained.  Form.

25     Q     Did you determine whether they had any financial

People - Det. McHugh - Cross

1    dealings, Kane and the victim?

2              MR. BIANCAVILLA:  Objection, Judge.

3              THE COURT:  Sustained.

4      Q    You mentioned, Detective, that you heard the name

5    Ruthless in questioning the defendant in the early morning

6    hours of May 3rd; is that correct?

7      A    Correct.

8      Q    Had you heard that name before?

9              MR. BIANCAVILLA:  Objection.

10             THE COURT:  I'll permit that.

11     A    Yes, I had.

12     Q    Where had you heard that name before?

13     A    From people in the bars in Farmingdale.

14     Q    What about the night before from John Kane?

15             MR. BIANCAVILLA:  Objection.

16             THE COURT:  Sustained.

17     Q    You asked the defendant, according to your

18   testimony on direct, in the early morning hours of

19   May 3rd, about whether he had been kissing Ruth in the bar

20   the night before she was murdered; is that correct?

21     A    That's correct.

22     Q    Had you asked -- did you have any information from

23   Kane as to who had been kissing who the night before?

24             MR. BIANCAVILLA:  Objection.

25             THE COURT:  Sustained.

People - Det. McHugh - Cross

1        MR. CHAMBERLAIN:  Withdrawn.

2    Q    Were there any questions posed to Kane as to who

3    was kissing who the evening of May 2nd when you and Parpan

4    were questioning Kane?

5        MR. BIANCAVILLA:  Objection again, Judge.

6        THE COURT:  I'll let him answer if there's a

7    question posed.

8    Q    Was there a question posed?

9    A    A specific question posed about kissing?

10   Q    Yes.

11   A    No.

12   Q    Do you want to review your notes -- Parpan's notes

13   is what you used to refresh your recollection as to that

14   interview?

15       MR. BIANCAVILLA:  Objection.

16       THE COURT:  That's not the proper way to ask a

17   witness if he would like his recollection refreshed.

18       MR. CHAMBERLAIN:  Withdrawn.

19   Q    Do you have Parpan's notes in front of you,

20   Detective, from that interview, the Kane interview?

21       MR. BIANCAVILLA:  Judge, he's talking about the

22   Kane interview.  That's hearsay.

23       THE COURT:  I will permit him to ask if he asked

24   a particular question of Kane but not the response

25   that came from it.  If you want him to refresh his

People - Det. McHugh - Cross

1      recollection show him a document.

2      Q      Do you have Parpan's notes?

3      A      No.

4             THE COURT:  Has that been marked?

5             MR. CHAMBERLAIN:  No.

6             THE COURT:  Defendant's U.

7                    (Whereupon, the above-mentioned item was

8             marked as Defendant's Exhibit U for identification

9             only.)

10            COURT OFFICER:  Defendant's U marked for

11     identification.

12            Show it to the witness, Counsel?

13     Q      I think it's about page seven, Detective.

14            MR. BIANCAVILLA:  Objection.

15            MR. CHAMBERLAIN:  There is --

16            THE COURT:  All right.  All right.  Overruled.

17     Q      Does that refresh your recollection as to whether

18     there was any question about kissing?

19     A      Yes, it does.

20     Q      With your recollection refreshed, what is your

21     answer now?

22     A      My recollection is that the question we asked him

23     was what was going on at the corner of the bar when you

24     were there.

25     Q      And what was the answer?

People - Det. McHugh - Cross

1       THE COURT:  Sustained.

2    Q    What was going on, is that about kissing?

3       MR. BIANCAVILLA:  Objection.

4       THE COURT:  Sustained.

5    Q    When you say your recollection -- the question

6    was, was there anything discussed about kissing?

7       MR. BIANCAVILLA:  That wasn't the question,

8    Judge.  Objection.

9       THE COURT:  Actually, I believe that was the

10   question of Mr. Chamberlain.  Overruled.

11   A    My recollection, and the reason why I answered the

12   question that way, was that we had asked what was going on

13   in the corner of the bar while you were there.

14   Q    Was that about kissing?  Did you get a response --

15      MR. BIANCAVILLA:  Objection.

16      THE COURT:  Mr. Chamberlain, one at a time.

17      DEFENSE ATTORNEY:  All right, Judge.

18   Q    When you asked -- you asked Kane what was going

19   on, that's when you got a response -- there was a response

20   about kissing; is that right?

21      MR. BIANCAVILLA:  Objection.

22      THE COURT:  That is the hearsay.  Sustained.

23   Q    How long was Kane in that interview room?

24   A    Mr. Kane was interviewed for approximately two

25   hours.

People - Det. McHugh - Cross

1    Q    And -- without telling us anything that Kane said

2    specifically in that two-hour period, would it be fair to

3    say that he denied any involvement in this for the first

4    hour and a half of that two hours?

5         MR. BIANCAVILLA:  Objection.

6         THE COURT:  That would be hearsay,

7    Mr. Chamberlain.

8    Q    As a result of Kane's statement and some other

9    evidence, you decided to make an arrest of the defendant;

10   is that correct?

11   A    That's correct.

12   Q    And you sent out four -- what is it, Homicide sent

13   out four homicide detectives to make that arrest?

14   A    That's correct.

15   Q    And did they have information from Kane as to

16   where the defendant would be that particular Tuesday

17   night, the night of May 2nd into the early morning hours

18   of May 3rd?

19        MR. BIANCAVILLA:  Objection.

20        THE COURT:  Sustained.

21        That's hearsay, what Mr. Kane told them.

22   Q    Did you direct these detectives where to go to

23   make this arrest?

24   A    Yes.

25   Q    Where was that, Detective?

People - Det. McHugh - Cross

1   A   Farmingdale area, specifically the area of the

2   Falcon's Nest bar.

3   Q   You had information then from whatever source that

4   the defendant would be at the Falcon's Nest that

5   particular Tuesday night; right?

6           MR. BIANCAVILLA:  Objection.

7           MR. CHAMBERLAIN:  Withdrawn.

8   Q   Detective, did you tell the detectives to wait

9   until the defendant was alone outside, walking home, or

10  did you tell them to go into the bar, the Falcon's Nest

11  and make the arrest?

12  A   I didn't tell them how or where to effect the

13  arrest.

14  Q   Well, you know if they had gone into the bar to

15  make the arrest, someone might have called relatives and

16  an attorney might have shown up; right?

17          MR. BIANCAVILLA:  Objection, Judge.

18          THE COURT:  Sustained.

19  Q   When you sent these detectives out to arrest

20  Scrimo, was Kane still in police headquarters?

21  A   Yes, he was.

22  Q   He had come with the homicide detectives earlier

23  that evening?

24  A   Yes, he did.

25  Q   Did he say I would like to stay overnight?

People - Det. McHugh - Cross

1    MR. BIANCAVILLA:  Objection.

2    THE COURT:  Sustained.

3    Q    Was he there voluntarily, Detective?

4    A    Yes, he was.

5    Q    And he was -- was he an overnight guest

6    voluntarily?

7    MR. BIANCAVILLA:  Objection.

8    THE COURT:  Sustained.

9    Q    How long did he stay there, Detective?

10   A    I believe he stayed until the next morning.

11   Q    What time the next morning?

12   A    I don't know the exact time that he left.

13   Q    Might it be about eleven o'clock?

14   A    Sometime in the morning.  Eleven o'clock, could

15   be.

16   Q    Detective, at that point you had certain

17   statements, without going into detail, from Kane that

18   indicated his claim that --

19   MR. BIANCAVILLA:  Judge, objection.  Again, this

20   is hearsay.

21   THE COURT:  Mr. Chamberlain, please stay away

22   from the hearsay.

23   Sustained.

24   Q    Without going into the detail as to what

25   information you had, did you have information

People - Det. McHugh - Cross

1    concerning --

2         MR. BIANCAVILLA:  Judge, I am going to object

3    again.  Just because it's not detailed doesn't make it

4    any less hearsay.

5         THE COURT:  The objection is sustained as to

6    form.

7    Q    Had Mr. Kane -- I'm not asking what he told you --

8    but he had told you that he had taken part -- or been --

9    either been involved in certain activity; is that correct?

10        MR. BIANCAVILLA:  Objection.

11        THE COURT:  Read that back to me.

12        (Whereupon, the requested question was read back

13   by the court reporter.)

14        THE COURT:  That question makes no sense,

15   Mr. Chamberlain.

16        Sustained.

17   Q    Did you make a determination at that time to let

18   Mr. Kane go?

19        MR. BIANCAVILLA:  Objection.

20        THE COURT:  Sustained.

21   Q    Did you tell Mr. Scrimo that Mr. Kane had told you

22   that he was involved -- that Kane had invited Scrimo up to

23   the apartment and that after a confrontation with the

24   victim, a verbal confrontation, Scrimo started to leave

25   and then Kane said stay and then Scrimo turned and

People - Det. McHugh - Cross

1    after -- went straight for the victim and strangled her,

2    did you tell Scrimo words to that effect?

3            MR. BIANCAVILLA:  I don't understand the

4        question.

5            THE COURT:  Wait.  Mr. Chamberlain.  You can ask

6        the question but I'm going to sustain as to form.

7        It's just not in proper form.

8    Q    What did you tell Scrimo that Kane had told you?

9            MR. BIANCAVILLA:  Judge, I'm going to object.  I

10       don't believe there was any testimony that this

11       detective told Mr. Scrimo anything about what Kane

12       told him.

13           THE COURT:  You can ask the question,

14       Mr. Chamberlain.

15   Q    Detective, did you not tell us that you had, at

16   the end of that interview, that you had information from

17   his buddy, Kane, did you tell that to Scrimo?

18   A    Information from his buddy, Kane, about what?

19   Q    About what happened in the apartment?

20   A    I don't believe that's my testimony, no.

21   Q    Did that happen?

22           MR. BIANCAVILLA:  Objection.

23           THE COURT:  Sustained as to form.

24           You can ask the question, Mr. Chamberlain.

25   Q    What, if anything, did you tell Scrimo about Kane

People - Det. McHugh - Cross

1   when you were interviewing Scrimo in the early morning

2   hours of May 3rd?

3       A    He was told that John Kane was in the Homicide

4   Squad and that John Kane had been interviewed.

5       Q    Just been interviewed.  You didn't tell him

6   anything else?

7       A    Interviewed, and Kane had told us what had

8   happened up in the apartment, yes.

9       Q    What did you tell him Kane had told you had

10  happened?

11      A    I don't believe I went into the specifics.

12      Q    Detective, did you make a determination to provide

13  immunity for John Kane in connection with this

14  investigation?

15          MR. BIANCAVILLA:  Objection.

16          THE COURT:  Sustained.

17      Q    Kane was released or Kane went home on May 3rd,

18  2000?

19          MR. BIANCAVILLA:  I am objecting to the

20      characterization of release.

21          MR. CHAMBERLAIN:  I withdraw the release.

22      Q    Kane went home on May 3rd, 2000.

23      A    He left our office.  I don't know if he went to

24  work or home.  He left our office.

25      Q    Was he working at that time?

People - Det. McHugh - Cross

1    A    I said I didn't know if he went to work.

2    Q    You know he wasn't working, don't you?

3         MR. BIANCAVILLA:  Objection.

4         THE COURT:  Sustained.

5    Q    Did you interview him again after that, Kane?

6    A    After what?

7    Q    After May 3rd?

8    A    Yes, I have spoken to him.

9    Q    When was that?

10   A    On several occasions.  I don't know the exact

11   dates.

12   Q    Were you present when he -- you testified before

13   the grand jury on -- withdrawn.

14        Were you present when he testified at a

15   preliminary examination on or about May 25th, 2000 in

16   district court?

17   A    Was I present for his testimony?

18   Q    Were you present?  Did you bring him in?  Did you

19   see him?  Were you there?

20        MR. BIANCAVILLA:  That's four questions.

21        THE COURT:  One at a time, Mr. Chamberlain.

22   Q    Detective, you understand I am asking do you

23   recall that date when he came in for a preliminary

24   examination in district court?

25   A    Are you referring to a felony exam?

---

People - Det. McHugh - Cross

1    Q    Yes?

2    A    I recall there being a felony exam he was involved

3    in but I don't know the exact date.

4    Q    I understand, but were you there?

5    A    I think I was, yes.

6    Q    Now, were you, as the investigating detective on

7    this homicide, consulted as to whether or not he would be

8    given immunity?

9         MR. BIANCAVILLA:  Objection.

10        THE COURT:  Sustained.

11   Q    Were there any discussions to your knowledge with

12   Kane concerning his testimony on that date?

13        MR. BIANCAVILLA:  Objection.

14        THE COURT:  I'll allow you to ask him if you

15   spoke to him on that date.

16   Q    Did you speak to him on that date?

17   A    On the day of the felony exam?

18   Q    Yes.

19   A    Yes.

20   Q    Were there any discussions concerning his

21   action -- his testifying for the people under -- for the

22   People as a witness without waiving any immunity?

23        MR. BIANCAVILLA:  Objection.

24        THE COURT:  Sustained.

25   Q    Were you present when he testified before the

People - Det. McHugh - Cross

1    grand jury on July 7th, 2000?

2        MR. BIANCAVILLA:  Objection.

3        THE COURT:  Sustained.

4        Come forward.

5        Detective, step out for a moment.

6        (Whereupon, the following took place at the

7    bench outside of the hearing of the jurors and

8    defendant.)

9        THE COURT:  Mr. Chamberlain, these questions,

10   first, have to be asked of Mr. Kane during your

11   cross-examination.

12       MR. BIANCAVILLA:  Not only that, Judge,

13   Mr. Chamberlain, as an officer of the court, knows

14   that the grand jury is a secret proceeding and

15   Detective McHugh would not be present while Mr. Kane

16   was testifying before the grand jury.  I think that

17   comment is disingenuous.

18       DEFENSE ATTORNEY:  There's nothing disingenuous

19   about it.  I'm asking if he was present before --

20       MR. BIANCAVILLA:  That wasn't your question.

21       THE COURT:  I allowed you to ask if he spoke to

22   him on that date, but if you are getting into the

23   granting of immunity -- first of all, do you know who

24   grants immunity?

25       MR. CHAMBERLAIN:  I know the DA, but I'm not

People - Det. McHugh - Cross

1    going to have the DA on the stand here.  This is the

2    investigating detective on a homicide case.

3         THE COURT:  Why don't you ask Mr. Kane?

4         MR. BIANCAVILLA:  No.  Call Assistant District

5    Attorney Dempsey.

6         THE COURT:  Call Mr. Dempsey who handled the

7    case.  You can call who you want, but there's certain

8    ways you're not going to get it in and this is one of

9    the ways.

10        MR. CHAMBERLAIN:  If, in fact, this detective

11   took part in any discussions concerning this witness,

12   Mr. Kane, getting immunity, I think I am entitled.

13   It's his case --

14        THE COURT:  Why is that relevant?

15        MR. CHAMBERLAIN:  Why?

16        THE COURT:  Yes, why is it relevant whether the

17   detective is involved or not?

18        MR. CHAMBERLAIN:  Whether the detective is

19   involved --

20        THE COURT:  Why?

21        MR. CHAMBERLAIN:  It may be relevant to his

22   testimony.  I have a right to ask why he took certain

23   steps.

24        THE COURT:  I permitted you to question him with

25   respect to certain conversations, but I'm going to

People - Det. McHugh - Cross

1    limit it and I don't want you to keep going into it.

2            Anything further Mr. Biancavilla?

3            MR. BIANCAVILLA:  No.

4            MR. CHAMBERLAIN:  I respectfully except.

5                    (Whereupon, the following took place in open

6            court.)

7                    (Whereupon, the witness resumed the witness

8            stand.)

9    CONTINUING CROSS

10   BY MR. CHAMBERLAIN:

11       Q    Detective McHugh, did you ever ask -- did you ever

12   make any determination as to whether or not Kane sold

13   cocaine?

14           MR. BIANCAVILLA:  Objection.

15           THE COURT:  Sustained.

16       Q    Did you make an investigation as to whether there

17   was any money owed by the victim to Kane?

18           MR. BIANCAVILLA:  Objection.

19           THE COURT:  He can answer that question.

20       A    I am unaware of anything like that.

21       Q    Did he make any investigation as to that?

22       A    I was unaware of it so I couldn't make an

23   investigation.

24       Q    Did you have any information or did you make any

25   investigation concerning money that Kane owed Ruth

                    People - Det. McHugh - Cross
1    Williams?

2              MR. BIANCAVILLA:  Objection, Judge.

3              THE COURT:  Sustained.

4       Q    Detective, you've indicated here, with respect to

5    the statements you took from the defendant, that you had

6    certain information that was inconsistent with what he

7    told you; is that correct?

8       A    What he told us that evening, yes.

9       Q    When you say that evening, we are talking about

10   May 3rd, early morning hours of May 3rd?

11      A    Right, yes.

12      Q    Was there any videotape made of that session, that

13   interview of Mr. Scrimo?

14      A    No.

15      Q    And he was being interviewed, I think you said,

16   from 1:00 a.m. until he was brought in -- withdrawn.

17             He was brought in at 12:10 -- withdrawn.

18             He was being interviewed from 1:00 a.m. until

19   seven something in the morning?

20      A    1:00 a.m. until about 7:15 with some breaks in

21   between, yes.

22      Q    One of those breaks, you and Parpan went out

23   and --

24             MR. BIANCAVILLA:  Judge, I object to him calling

25       Detective Parpan by his last name.

People - Det. McHugh - Cross

1    THE COURT:  You should use the proper title.

2    Q    You and Detective Parpan -- is that what he

3    wants -- you and Detective Parpan went out and Detective

4    Cereghino and Cole went in and continued questioning the

5    defendant; right?

6    A    Yes.

7    Q    There was no videotape.  Was there any audio tape

8    made of any of that?

9    A    No.

10   Q    Did you ever reduce any of that to writing and

11   have him sign it?

12   A    No.

13   Q    Did you -- so, basically, these -- what you are

14   testifying to is based upon your recollection after being

15   refreshed by Parpan's notes; is that right?

16   A    My recollection of the events and the interview,

17   yes, and the notes.

18   Q    And the interview was, a number up to four,

19   homicide detectives asking questions and getting -- and

20   getting certain answers that you testified to here; right?

21   MR. BIANCAVILLA:  Objection.  Form.

22   THE COURT:  Sustained as to form,

23   Mr. Chamberlain.

24   Q    There's nothing -- the form -- the actual

25   language, who was phrasing what, we don't have any of

1240

People - Det. McHugh - Cross

1    that.  We only have your recollection based on Parpan's

2    notes; is that right?

3            MR. BIANCAVILLA:  Objection.

4            THE COURT:  Detective, did you understand that

5        question?

6            THE WITNESS:  No.

7    Q    You can't tell us verbatim --

8            THE COURT:  Excuse me.

9            MR. CHAMBERLAIN:  I'll withdraw.

10           THE COURT:  Rephrase it.

11   Q    You can't tell us verbatim what you said that

12   night to Mr. Scrimo, can you, Detective?

13   A    Not on all of it, no.

14   Q    And you can't tell us what Parpan said, can you?

15   A    Verbatim?

16   Q    Verbatim.

17   A    No.

18   Q    And you can't tell us verbatim what the defendant

19   answered to whatever was said?

20   A    Not to all the questions, no.

21   Q    You certainly had the capability of audio taping

22   that night, did you not?

23           MR. BIANCAVILLA:  Objection.

24           THE COURT:  Overruled.

25   A    During that interview?

1241

People - Det. McHugh - Cross

1       Q       Yes.

2       A       That's not our procedure.

3       Q       I didn't ask you that, Detective.   I said did you

4       have the capability?

5       A       You mean is there equipment that would be used to

6       do that.

7       Q       Yes.

8       A       Yes.

9       Q       And you also have the capability to videotape

10      statements, did you not?

11              MR. BIANCAVILLA:   Objection.

12              THE COURT:   Overruled.

13      A       Yes, there is equipment for that also.

14      Q       Was there any discussion concerning a recent

15      decision, a court decision that indicated that you don't

16      have to give rights anymore?   Yes or no, was there any

17      discussion concerning that during your interview of

18      Mr. Scrimo in the early morning hours of May 3rd?

19      A       Yes.

20      Q       By the way, you didn't read him his rights, did

21      you?

22      A       No, I did not.

23      Q       And Detective Parpan didn't, did he?

24      A       No, he didn't.

25      Q       And to your knowledge, neither did Detectives Cole

People - Det. McHugh - Cross

1    or Cereghino read him rights?

2        A    No, they did not.

3        Q    So, as far as you know, his rights were read to

4    him only by Detective Dempsey, or so you were told by

5    Dempsey when he came in; is that right?

6        A    His rights were given to him by Detective Dempsey,

7    yes.

8        Q    The business about a recent court decision --

9            MR. BIANCAVILLA:   Objection to the

10   characterization.

11           THE COURT:   Business of recent court decision,

12   Mr. Chamberlain?

13           MR. CHAMBERLAIN:   He indicated the subject came

14   up.

15           THE COURT:   Your characterization, the business

16   of, that's no way to ask a question.

17           MR. CHAMBERLAIN:   Thank you, Judge.

18       Q    The discussion concerning a recent court decision,

19   did you bring that up?

20       A    No, I did not.

21       Q    Did Mr. Scrimo bring that up?

22       A    Yes, he did.

23       Q    Did he say where he had gotten it from?

24       A    I believe he said the newspaper.

25       Q    Are you testifying from memory now.

People - Det. McHugh - Cross

1      MR. BIANCAVILLA:  Judge, I object to that.

2      THE COURT:  I don't think we have a question.

3      MR. CHAMBERLAIN:  The question was where he got

4  it from, Judge?

5      MR. BIANCAVILLA:  He said the newspaper.

6      MR. CHAMBERLAIN:  No.  He said I believe, that's

7  what he said.

8      THE COURT:  Let's not have colloquy, Counsel.

9      Q    As you are sitting here, you are testifying that

10  he said the newspaper, or you're not sure?

11     A    To the best of my recollection, he said the

12  newspaper.

13     Q    Did you or Parpan say anything to correct that at

14  that point?

15     MR. BIANCAVILLA:  Correct what, Judge?

16  Objection.

17     THE COURT:  I'm not sure I understand,

18  Mr. Chamberlain.

19     Q    He brought it up and he said, I understand from a

20  recent court decision you don't have to read me my rights

21  anymore; is that right?

22     A    Yes.

23     Q    And you believe he said he got it from the

24  newspaper.  Did you correct that at that point?

25     A    Yes, I said, That's not true and don't believe

Case 2:11-cv-04171-AMD   Document 6-28   Filed 01/17/12   Page 148 of 150 PageID #: 1936
1244

People - Det. McHugh - Cross

1    what you read in the newspaper.

2        Q    Do you recall Parpan saying we didn't comment on

3    that?

4        A    I'm sorry.

5        Q    Was Parpan with you the entire time that this

6    conversation about the -- the conversation about rights

7    was ongoing?

8        A    Parpan was in the room with me, yes.

9        Q    And Parpan said we didn't comment on this

10   statement about rights, would that refresh your

11   recollection as to whether there was any comment about the

12   newspaper or anything?

13           MR. BIANCAVILLA:  Objection.

14           THE COURT:  Sustained.

15       Q    A few more questions, Detective.  You were present

16   later on on May 3rd when there was a lineup.

17       A    Yes.

18       Q    And you viewed that lineup?

19           MR. BIANCAVILLA:  Objection.

20           THE COURT:  What was the question?

21               (Whereupon, the court reporter read back the

22           requested question.)

23           MR. CHAMBERLAIN:  Withdrawn.

24       Q    Is it a fact, Detective, that you testified

25   previously under oath that you were not present at that

People - Det. McHugh - Cross

1    lineup.

2          MR. BIANCAVILLA:  Objection.

3    Q    Yes or no, Detective?

4          THE COURT:  Sustained.

5    Q    Were you present at the lineup, Detective?

6    A    Yes.

7          THE COURT:  Mr. Chamberlain?

8          MR. CHAMBERLAIN:  I'm sorry, your Honor.  I am

9    unable to find a particular part of the transcript at

10   this moment.

11         THE COURT:  This maybe a good time to break.

12         We are going to break at this point now and I'll

13   ask you to be back here tomorrow morning at 9:30.

14         Do not discuss the case amongst yourselves or

15   with anyone else.  Keep an open mind.  Do not form or

16   express any opinions until the entire case has been

17   completed.

18         Do not read or listen to any accounts of the

19   case should they be reported in the media.  Do not

20   visit or view any place or premises that have been

21   mentioned.

22         You are not to permit any party to discuss the

23   case with you or attempt to influence you, and you

24   must promptly report to the Court any violation

25   thereof.

Case 2:11-cv-04171-AMD   Document 6-28   Filed 01/17/12   Page 150 of 150 PageID #: 1938

Proceedings

1        Have a nice evening.  We will see you tomorrow

2    at 9:30.

3        (Whereupon, the sworn jurors exited the

4    courtroom.)

5        THE COURT:  Detective, please do not discuss the

6    case with anybody.  We'll see you tomorrow morning at

7    9:30.

8        THE WITNESS:  Thank you.

9        (Whereupon, the witness was excused from the

10   witness stand.)

11       THE COURT:  Counsel, 9:30 tomorrow.

12       MR. BIANCAVILLA:  Whatever you say.

13       (Whereupon, the above matter was adjourned to

14   May 15, 2002.)

15                    *        *        *

16

17

18

19

20

21

22

23

24

25