1  STATE OF NEW YORK : NASSAU COUNTY

2  COUNTY COURT      : PART XIV
   ----------------------------------------:
3  THE PEOPLE OF THE STATE OF NEW YORK,    :
                                           :
4                   - against -           : IND: 1456N-00
                                           :
5  PAUL SCRIMO,                            :
                                           :   JURY TRIAL
6                                          :
                   Defendant.   :
7  ----------------------------------------x

8                        May 15, 2002
                         262 Old Country Road
9                        Mineola, New York

10

   B E F O R E:
11
              THE HONORABLE JEFFREY BROWN,
12            County Court Judge.

13
   A P P E A R A N C E S:
14

15        (As previously noted.)

16               *      *      *

17        THE CLERK:  Case on trial continued, People

18     versus Paul Scrimo.  All parties present.  The jurors

19     are not present at this time.

20        People ready?

21        MR. BIANCAVILLA:  Ready.

22        THE CLERK:  Defendant ready?

23        MR. CHAMBERLAIN:  Ready.

24        COURT OFFICER:  Jury entering.

25             (Whereupon, the sworn jurors entered the

People - Det. McHugh - Cross

1          courtroom and resumed their respective seats.)

2          THE CLERK:  Do both sides stipulate that all

3     sworn jurors are present and seated properly?

4          MR. BIANCAVILLA:  Yes.

5          MR. CHAMBERLAIN:  So stipulated.

6          THE COURT:  Good morning, ladies and gentlemen.

7     I hope you had a nice evening.  We are ready to

8     continue with the trial.

9          Bring in Detective McHugh, please.

10          THE CLERK:  Detective, you are reminded you are

11     under oath.

12          THE WITNESS:  Yes, ma'am.

13  CONTINUED CROSS

14  BY MR. CHAMBERLAIN:

15          MR. CHAMBERLAIN:  May we have the last question

16     and answer read back?

17          THE COURT:  I'm sorry, the reporter doesn't have

18     the notes.

19          THE WITNESS:  I think I can help.

20          THE COURT:  Just ask another question.

21     Q     The question was were you present during the

22     lineup of the defendant on May 3rd?

23     A     Yes, I was.

24     Q     Do you recall testifying previously regarding this

25     lineup before the grand jury?

                          People - Det. McHugh - Cross

1     A     Yes.

2     Q     Do you recall being asked these questions,

3     Detective, and giving these answers?

4           MR. BIANCAVILLA:  Page, please?

5           MR. CHAMBERLAIN:  Page 16, starting at line 15,

6     Mr. Biancavilla.

7     Q           "QUESTION:  I am not going to ask you at this

8                 time about your interview with Mr. Scrimo, but

9                 I would like to ask you this.  During the

10                afternoon of May 3rd in the year 2000, did you

11                help to conduct a lineup of Mr. Scrimo in

12                connection with this case?

13                    "ANSWER:  Yes, I did.

14                    "QUESTION:   For that purpose did you

15                help to assemble four police officers with

16                shaved heads to be fillers in this lineup?

17                    "ANSWER:   Yes."

18          MR. BIANCAVILLA:  Judge, I am going to object at

19    this point.

20          THE COURT:  Mr. Chamberlain, where is the

21    inconsistency?

22          MR. BIANCAVILLA:  May we approach, Judge?

23          THE COURT:  Yes, come forward.

24          Detective, step out.

25                    (Whereupon, the following took place at the

People - Det. McHugh - Cross

1   bench outside of the hearing of the jurors and

2   defendant.)

3   THE COURT:  Mr. Chamberlain, as you are aware,

4   the first thing you have to do is ask a question.  If

5   the detective should testify to something that is

6   inconsistent with what's in the grand jury minutes,

7   you are certainly entitled to read into the record the

8   grand jury transcript where it is inconsistent.

9   However, at this juncture, we don't have any

10   inconsistency.

11   MR. CHAMBERLAIN:  Not at this juncture, but this

12   is one of a series of questions that I will show

13   inconsistency.

14   THE COURT:  You have to ask questions before the

15   prior testimony.  Ask him whatever you would like and

16   then once you feel that you want to use the grand jury

17   testimony, if there's any inconsistency, I will permit

18   it.  If he testifies consistently with the grand jury

19   testimony, you won't be able to place it in the

20   record.

21   MR. BIANCAVILLA:  Judge, he asked him was he

22   present when the lineup was conducted.  He answered

23   that yes, he was.  Everything in the grand jury is him

24   describing what occurred at the lineup that he was

25   present for.  I don't understand how any of that is

People - Det. McHugh - Cross

1   inconsistent with what he said.

2         THE COURT:  You're right so far.

3         MR. BIANCAVILLA:  I don't think Mr. Chamberlain

4   should be permitted to go through that entire

5   testimony, if there's one question he was asked, were

6   you present at a lineup that was conducted, and he

7   says no, then that's the question he should be asking

8   or else we might as well as read the whole entire

9   grand jury testimony.

10        MR. CHAMBERLAIN:  The testimony is in support of

11  a series of questions concerning his presence at the

12  lineup he subsequently contradicted at a subsequent

13  hearing.  I cannot bring this out without showing he

14  said yes and then no.

15        THE COURT:  If he was inconsistent at a hearing,

16  you can use hearing minutes but not grand jury

17  testimony which is apparently consistent.

18        MR. CHAMBERLAIN:  Judge, as far as credibility, I

19  feel I am entitled to show a flip flop from one

20  position to another.

21        THE COURT:  You are allowed to show the

22  inconsistency at the, I presume, Wade hearing.  And if

23  you are alleging it's inconsistent, that's fine.

24  However, from what I hear now, the grand jury

25  testimony is consistent with how the witness is

People - Det. McHugh - Cross

```
 1        testifying and you cannot introduce that testimony

 2        into evidence.

 3            Objection sustained.

 4            (Whereupon, the following took place in open

 5        court.)

 6            THE COURT:  Mr. Chamberlain, you may continue.

 7   CONTINUED CROSS

 8   BY MR. CHAMBERLAIN:

 9        Q    Detective, after testifying at the grand jury that

10        you conducted a lineup --

11            MR. BIANCAVILLA:  Objection.

12            THE COURT:  Sustained.

13        Q    Did you testify at the grand jury that you

14        conducted a lineup?

15            MR. BIANCAVILLA:  Objection.

16            THE COURT:  Sustained.

17        Q    Did you testify subsequently in January of 2001

18        before Judge Ort at preliminary hearings in this case?

19        A    Yes, I did.

20        Q    Were you asked whether you were present at the

21        lineup?

22            MR. BIANCAVILLA:  Objection.  If he wants to

23        refer to a specific page --

24            MR. CHAMBERLAIN:  Page 421 of the hearing

25        transcript, line 20.
```

People - Det. McHugh - Cross

1      MR. BIANCAVILLA:  Page 421?

2      MR. CHAMBERLAIN:  Right.

3      MR. BIANCAVILLA:  I am going to object.  I want

4  to approach.

5      THE COURT:  Come forward.

6      Step out, Detective

7          (Whereupon, the following took place at the

8          bench outside of the hearing of the jurors and

9          defendant.)

10     MR. BIANCAVILLA:  Showing you that page and those

11  questions, how is that inconsistent with what he just

12  testified to, Judge?

13     MR. CHAMBERLAIN:  It's obviously inconsistent,

14  Judge.  He says he wasn't there.

15     THE COURT:  The question in the hearing,

16  Detective, you testified here that you didn't take

17  part in a lineup; is that correct?  I wasn't

18  physically in the room when the lineup was conducted,

19  no?

20     MR. BIANCAVILLA:  How is that inconsistent.

21     MR. CHAMBERLAIN:  This is why I wanted -- the

22  grand jury --

23     THE COURT:  I am not interested in the grand jury

24  testimony.  I am interested in his testimony today.

25     MR. CHAMBERLAIN:  Here is the testimony he

People - Det. McHugh - Cross

1    originally gave.

2         THE COURT:  Today, Mr. Chamberlain?

3         MR. CHAMBERLAIN:  Today he said he was present

4    during the lineup.

5         THE COURT:  Please read that answer back.

6         (Whereupon, the court reporter read back the

7    requested testimony.)

8         MR. BIANCAVILLA:  How is that inconsistent?

9         THE COURT:  Apparently the detective testified

10   that he was present at the lineup that took place on

11   May 3rd.

12        Now, the question here says, and I'm reading

13   from the minutes of the hearing before Judge Ort

14   Detective, you testified here that you weren't -- you

15   didn't take part in the lineup; is that correct?  I

16   wasn't physically in the room when the lineup was

17   conducted.

18        MR. CHAMBERLAIN:  And before the grand jury --

19        THE COURT:  I am not interested in the grand

20   jury.

21        MR. CHAMBERLAIN:  I would like to make a complete

22   record and read this, Judge.

23        THE COURT:  Go ahead.

24        MR. CHAMBERLAIN:  "QUESTION:  When you conducted

25        a lineup, did you have all the participants sit

People - Det. McHugh - Cross

1      down?

2             "ANSWER:  Yes, and then detective --"

3             THE COURT:  Theoretically, he might have set it

4      up.  You have to ask these questions.  He could have

5      set it up and then left the room.  You have to ask

6      those question first before you can bring in the

7      inconsistencies.

8             MR. CHAMBERLAIN:  Judge, the inconsistency is in

9      the prior testimony before the grand jury.

10            THE COURT:  You have not set a foundation for the

11     use of grand jury testimony or for the use of the

12     hearing testimony.  You must set a foundation.

13            Ask the defendant questions and then you can use

14     whatever inconsistencies that are different in the

15     grand jury testimony or the hearing testimony, if

16     there are any.

17            MR. BIANCAVILLA:  Thank you, judge.

18            (Whereupon, the following took place in open

19     court.)

20  CONTINUED CROSS

21  BY MR. CHAMBERLAIN:

22     Q    Detective, you testified you were present during

23   the lineup of Mr. Scrimo.  Did you conduct that lineup?

24     A    No, I did not.

25     Q    Grand jury testimony page --

People - Det. McHugh - Cross

1    MR. BIANCAVILLA:  I object for the same reason

2    that we were just at the bench for.

3    MR. CHAMBERLAIN:  This is different, Judge.

4    THE COURT:  Do you have an extra copy of the

5    grand jury testimony so we don't have to keep coming

6    up to the bench?  Hand me the grand jury testimony.

7    MR. BIANCAVILLA:  Judge, I can give you mine.

8    MR. CHAMBERLAIN:  He hasn't even heard the

9    question.

10   THE COURT:  Excuse me.  Page and line,

11   Mr. Chamberlain.

12   MR. CHAMBERLAIN:  The top of page 17, your Honor,

13   line 18.

14   MR. BIANCAVILLA:  I'm sorry.  Page 17?

15   THE COURT:  Which page?

16   MR. CHAMBERLAIN:  Starting at page 16, line 18.

17   THE COURT:  Page 16, line 18, Mr. Chamberlain?

18   MR. CHAMBERLAIN:  Line 18.  I'll read the whole

19   thing.

20   THE COURT:  Let me read it first.

21   MR. CHAMBERLAIN:  All the way up to the top of

22   page 17, your Honor.

23   THE COURT:  Would you, please, read the last

24   question back to me again.

25        (Whereupon, the court reporter read back the

People - Det. McHugh - Cross

1        requested testimony.)

2        THE COURT:  I'll permit you to ask the question.

3        MR. CHAMBERLAIN:  Thank you.

4        Q    Do you recall being asked this question by

5    Mr. Dempsey at the grand jury:

6            "QUESTION:  I'm not going to ask you at this

7            particular time about your interview with

8            Mr. Scrimo, but I would like to ask you this.

9            During the afternoon of May 3rd in the year

10           2000, did you help to conduct a lineup with

11           Mr. Scrimo in connection with this case?

12           "ANSWER:  Yes, I did."

13       MR. BIANCAVILLA:  Judge, I object for same

14       reason.

15       MR. CHAMBERLAIN:  I am objecting to constant

16       interruptions.

17       THE COURT:  Overruled.

18       MR. CHAMBERLAIN:  His objection is overruled?

19       THE COURT:  Go ahead, Mr. Chamberlain.

20           "QUESTION:  Did you --"

21       THE COURT:  Stop there, Mr. Chamberlain.

22       MR. CHAMBERLAIN:  You want me to stop there?

23       THE COURT:  Yes.

24       MR. CHAMBERLAIN:  I would like to go to the top

25    of the next page.

People - Det. McHugh - Cross

1    THE COURT:  You haven't laid a foundation to go

2    into that question.

3    MR. CHAMBERLAIN:  He just testified on direct --

4    THE COURT:  You have my ruling on the record now.

5    You can ask additional questions now.

6    Q    Did -- were you present when Francine Quinn viewed

7    the lineup?

8    A    Was I present in the room when she viewed the

9    lineup?

10   Q    No.  Were you present during the lineup when she

11   viewed the lineup?

12   MR. BIANCAVILLA:  Objection.

13   Q    Were you present in the room --

14   THE COURT:  Excuse me.  When there is an

15   objection on the floor, please stop so I can rule on

16   it.  I don't want you talking over the other attorney.

17   The objection is sustained.

18   Q    Did you not -- do you understand the question?

19   Were you present during the lineup when Francine Quinn was

20   viewing the lineup?

21   MR. BIANCAVILLA:  Again, I am objecting.

22   THE COURT:  Objection is sustained as to form.

23   Q    Did you have a view as Miss Quinn was viewing the

24   lineup of her view of that lineup?

25   MR. BIANCAVILLA:  Objection.

People - Det. McHugh - Cross

1      THE COURT:  Compound question, Mr. Chamberlain.

2      Q     Did you see Francine Quinn view the lineup?

3      A     No.

4      Q     Question -- bottom of page 17, your Honor, line

5      20, last question.

6          "QUESTION:    -- bottom of page 17, your Honor,

7      last question.

8          THE COURT:  Go ahead.

9      Q     Detective McHugh, if I showed you Grand Jury

10     Exhibit 27 marked for identification, is that a fair and

11     accurate representation of the lineup that you conducted

12     on that particular day?  Answer, Yes, I did.

13         THE COURT:  No.  It says yes, it is.  Excuse me.

14     It says yes, it is.

15         MR. CHAMBERLAIN:  I am sorry.

16     Q         "ANSWER:  Yes, it is.

17             "QUESTION:  Did Francine Quinn view this

18         lineup, simply yes or no?

19             "ANSWER:  Yes.

20             "QUESTION:  Don't tell us anything she may

21         have said.  Is that the way that the lineup

22         looked at the time that she viewed it?

23             "ANSWER:  Yes."

24         Does that refresh your recollection as to

25     whether or not you were present when Francine Quinn

People - Det. McHugh - Cross

1     was viewing that lineup?

2             MR. BIANCAVILLA:  Judge, I am going to object.

3             THE COURT:  I'll permit it.

4     A     I answered that no, I couldn't see her when she

5     viewed the lineup.

6     Q     Is that what you answered?

7     A     I believe that's what I answered, yes, just now.

8     Q     But not before the grand jury?

9             MR. BIANCAVILLA:  Objection.  It was a different

10    question.

11            THE COURT:  Mr. Chamberlain, ask another

12    question.

13            Sustained.

14    Q     When you told the grand jury that that was the way

15    the lineup looked at the time she viewed it, was that an

16    honest and accurate answer?

17            MR. BIANCAVILLA:  Objection.  That's ridiculous.

18            THE COURT:  Sustained as to honest and accurate.

19    Q     Was it an accurate answer?

20            MR. BIANCAVILLA:  Objection.

21            THE COURT:  There's another way to ask,

22    Mr. Chamberlain.

23            Sustained as to form.

24    Q     When you told this jury here today that you were

25    present during the lineup, was that an honest answer?

People - Det. McHugh - Cross

1      MR. BIANCAVILLA:  Objection.

2      THE COURT:  Sustained as to honest.

3   Q    Was that a correct answer?

4      MR. BIANCAVILLA:  Objection.

5      THE COURT:  Sustained.

6   Q    Detective, you testified that various prints were

7   lifted from the scene; is that correct?

8   A    Yes, you asked me some questions about latent

9   fingerprints.

10  Q    One of those prints matched John Kane; right?

11  A    Yes.

12  Q    None matched the defendant, Scrimo, right?

13  A    No.

14  Q    None matched?

15  A    None matched.

16  Q    You testified earlier that your basis for arrest,

17  probable cause for arrest of Mr. Scrimo on May 3rd was

18  partly the statement you received from John Kane?

19     MR. BIANCAVILLA:  Judge, I am going to object.

20     THE COURT:  Sustained.

21  Q    What else, other than Kane's statement --

22     MR. BIANCAVILLA:  Judge, I object.  These

23  questions were gone through and sustained yesterday.

24     MR. CHAMBERLAIN:  He said something else.

25     THE COURT:  Let me hear your question.

People - Det. McHugh - Cross

1    Q    What other information did you have to give you

2    probable cause for the arrest of Paul Scrimo on May 3rd?

3              MR. BIANCAVILLA:  Objection.

4              THE COURT:  Sustained as to probable cause.

5    Q    To the extent you based your arrest -- your

6    decision to arrest Paul Scrimo on Kane's statement, what

7    basis did you have for crediting Kane's statement?

8              MR. BIANCAVILLA:  Objection.

9              THE COURT:  For form, sustained.

10   Q    Had Kane given conflicting statements prior --

11   withdrawn.

12             Did you get a signed statement from John Kane on

13   the night of May 2nd, 2000?

14   A    Yes, I did.

15   Q    Did you do a time line with respect to when this

16   murder may have occurred?

17             MR. BIANCAVILLA:  Objection.

18             THE COURT:  I'll permit that.

19   A    During the case or in regards to Mr. Kane?

20   Q    At the time you arrested Scrimo?

21   A    At the time that I arrested Mr. Scrimo, I had

22   indications of the time of occurrence, yes.

23   Q    And you also had a statement from Francine Quinn;

24   is that right?

25   A    I had a statement from her, yes.

People - Det. McHugh - Cross

1    Q    Was Quinn's statement consistent as to the time

2    line with Kane's statement?

3            MR. BIANCAVILLA:  Objection.

4            THE COURT:  Sustained.

5    Q    The statement you had from Quinn indicated that

6    she had left the bar ten or 15 minutes after --

7            MR. BIANCAVILLA:  Objection.  Same reasons.

8            THE COURT:  Hearsay, Mr. Chamberlain.

9            MR. CHAMBERLAIN:  I have nothing further, Judge.

10           THE COURT:  Redirect, Mr. Biancavilla?

11           MR. BIANCAVILLA:  Yes, redirect.

12   REDIRECT EXAMINATION

13   BY MR. BIANCAVILLA:

14   Q    Detective McHugh, on May 3rd a lineup was

15   conducted in this case?

16   A    Yes.

17   Q    Were you present in the offices of the Homicide

18   Squad when that lineup was conducted?

19   A    Yes.

20   Q    How many rooms are there in the Homicide Squad?

21   A    Five.  Six, sorry.

22   Q    Is the lineup conducted in a particular room?

23   A    Yes, it is.

24   Q    What room is that lineup conducted in?

25   A    It's a room we have set up to the left side of our

People - Det. McHugh - Redirect

1    office.  It's equipped to hold the lineup in.

2        Q    Were you one of the detectives that prepared the

3    lineup?

4            MR. CHAMBERLAIN:  I am objecting to leading.

5            THE COURT:  Sustained.

6        Q    Tell the jury what you did with respect to your

7    involvement in the lineup?

8        A    I contacted the witnesses.  I had other detectives

9    assist me in obtaining fillers.

10       Q    What's a filler?

11       A    Fillers are people we put in the lineup that

12   resemble -- we try to get to resemble the same physical

13   characteristics of the individual sitting in the lineup.

14   We usually try to get five.  In this case we used four.

15           I also made arrangements for the witnesses to be

16   brought into police headquarters, to be separated to

17   maintain the integrity of the lineup.  I assisted in

18   arranging and setting up the lineup room.

19       Q    When you say you assisted in arranging the lineup

20   room, what did you do?

21       A    We have to move desks around, get chairs, obtain

22   the numbers that are used in the identification process,

23   things of that nature.

24       Q    Now, on that particular day, was Mr. Scrimo there?

25       A    Yes, he was.

People - Det. McHugh - Redirect

1    Q    Was Mr. Chamberlain there?

2    A    Yes, he was.

3    Q    Did you see Mr. Chamberlain that day?

4    A    Yes.

5    Q    Did he see you that day?

6    A    Yes.

7    Q    Did you have conversation with Mr. Chamberlain?

8    A    I believe so, yes.

9    Q    Was that prior to the lineup?

10   A    Yes.

11   Q    When it came time to position Mr. Scrimo in the

12   lineup, did you have a conversation with Mr. Chamberlain?

13   A    I don't believe I did, no.

14   Q    Did one of the other detectives have a

15   conversation with Mr. Chamberlain?

16        MR. CHAMBERLAIN:  Objection.  Hearsay.

17        MR. BIANCAVILLA:  I am not asking what the

18   conference was, Judge.

19        THE COURT:  Excuse me.  Excuse me.

20        If he observed another detective having a

21   conversation with Mr. Chamberlain, he can testify as

22   to that, but not as to what the detective and

23   Mr. Chamberlain said.

24   Q    Did you observe another detective having a

25   conversation with Mr. Chamberlain?

People - Det. McHugh - Redirect

1    A    No, I did not.

2    Q    Did there come a time when you viewed the lineup

3    prior to the witnesses seeing the lineup?

4    A    Yes.

5    Q    The photograph that you identified that was taken

6    of that lineup, is that what you viewed prior to the

7    witnesses seeing the lineup?

8    A    Yes.

9    Q    So you weren't present in the Homicide Squad with

10   Mr. Chamberlain and Mr. Scrimo on the day of the lineup?

11        MR. CHAMBERLAIN:  Objection.  Leading.

12        THE COURT:  Sustained.

13        MR. BIANCAVILLA:  Okay.  I think I made my point.

14        MR. CHAMBERLAIN:  Objection.

15        THE COURT:  No extra comments, please.

16   Q    Detective, I believe you said you testified that

17   two latent fingerprints were recovered from the photo

18   album that was found from the desk -- I'm sorry, on the

19   kitchen table?

20   A    Yes.

21   Q    And I believe you testified yesterday that one of

22   those fingerprints came back to a gentleman by the name of

23   Steven Schwartz?

24   A    That's correct.

25   Q    Did you interview Steven Schwartz?

People - Det. McHugh - Redirect

1    A    Yes, I did.

2    Q    When did you interview Steven Schwartz?

3    A    April 15th of 2000.

4    Q    Where did you interview Steven Schwartz?

5    A    At his place of employment.

6    Q    Where was that?

7    A    At the Downtown Bar, Farmingdale.

8    Q    Would you give the jury a description of Steven

9    Schwartz, please?

10   A    He's a male white, very thin, about 5 foot 7, dark

11   bushy hair.

12   Q    Now, another one of the latent fingerprints which

13   you spoke about yesterday came back to an individual by

14   the name of John Marks?

15   A    Yes, it did.

16   Q    Did you interview John Marks?

17   A    Yes, I did.

18   Q    On what day did you interview John Marks?

19   A    I believe that was May 20th.

20   Q    Where did that interview take place?

21   A    At his home.

22   Q    Could you tell us -- just tell the jury and give

23   them a description of his appearance?

24   A    He's a male white, 20 years old, about 6 feet,

25   thin build, dirty blonde, regular length hair.

People - Det. McHugh - Recross

1     MR. BIANCAVILLA:  Thank you.  Nothing further.

2          THE COURT:  Mr. Chamberlain, any recross?

3          MR. CHAMBERLAIN:  Shortly, Judge.

4   RECROSS EXAMINATION

5   BY MR. CHAMBERLAIN:

6     Q    Detective, when you testified before the grand

7   jury, did you tell the jury that you were not present but

8   had merely --

9          MR. BIANCAVILLA:  Judge --

10         THE COURT:  Sustained.  Sustained.

11    Q    Is it a fact that -- withdrawn.

12         Steven Schwartz, you interviewed him, you say, on

13  the 15th, approximately three days after the murder?

14    A    I interviewed him on the 15th.

15    Q    Do you have any notes from that interview?

16    A    Yes.

17    Q    May I see them, Detective?

18    A    I don't have them with me.

19    Q    Would you tell us what that interview consisted

20  of?

21         MR. BIANCAVILLA:  Objection.

22         MR. CHAMBERLAIN:  It was brought out.

23         THE COURT:  But it's hearsay.

24    Q    Mr. Schwartz worked at the Downtown?

25    A    Yes.

People - Det. McHugh - Recross

1    Q    Mr. Schwartz, was he working the Downtown at the

2    same time that Francine Quinn was working the Downtown?

3         MR. BIANCAVILLA:  Objection.  Calls for hearsay,

4    Judge.

5         THE COURT:  Sustained.

6    Q    Did you have Mr. Schwartz's fingerprints on file

7    on the 15th of April, 2000?

8    A    I don't know.

9    Q    Well, how did you get to Mr. Schwartz with respect

10   to his latent fingerprints?

11        MR. BIANCAVILLA:  Objection.

12        THE COURT:  Sustained.

13        MR. CHAMBERLAIN:  Withdrawn.

14   Q    Did you testify yesterday that Mr. Schwartz's

15   fingerprints came from a November 2000 incident?

16   A    You showed me a fingerprint card that had that

17   date on it, yes.

18   Q    As a result of an arrest for selling --

19        MR. BIANCAVILLA:  Objection.

20        THE COURT:  Sustained.  Sustained.

21   Q    What was that card from, Detective?

22        MR. BIANCAVILLA:  Objection.

23        THE COURT:  Sustained.

24   Q    Did you have his fingerprints on April 15th?

25   A    I don't know.

People - Det. McHugh - Recross

1    Q    Well, I thought you testified that you interviewed

2    Mr. Schwartz because of the latent fingerprint that you

3    found --

4           MR. BIANCAVILLA:  Judge, objection.  That wasn't

5       his testimony.

6           MR. CHAMBERLAIN:  That was the testimony, Judge.

7           MR. BIANCAVILLA:  No, it wasn't.

8           THE COURT:  I'll let him ask the detective and he

9       can correct Mr. Chamberlain if it's incorrect.

10   Q    Did you ask Mr. Schwartz, what you asked him now,

11   anything about whether he knew John Doe that dealt in

12   drugs when you spoke to him on April 15th?

13          MR. BIANCAVILLA:  Objection.  Assuming facts not

14      in evidence.

15          THE COURT:  Mr. Chamberlain, sustained.

16   Q    Mr. Schwartz was part of this investigation;

17   right.

18          MR. BIANCAVILLA:  Objection.

19          THE COURT:  I'll let him ask that.

20          Overruled.

21   A    He was interviewed during the course of this

22   investigation.

23   Q    And did you make any inquiry as to whether or not

24   Francine Quinn used drugs, whether or not John Doe sold

25   drugs, whether or not the victim used drugs?

People - Det. McHugh - Recross

1      MR. BIANCAVILLA:  Objection.

2      THE COURT:  Sustained.

3      Q    Did you interview John Marks in connection with

4    this case?

5      A    Yes, I did.

6      Q    When did you interview him?

7      A    I believe it was May 20th, 2000.

8      Q    What was the -- what did you ask Mr. Marks?

9      THE COURT:  Sustained as to form.

10     Q    Did you have -- you say you interviewed him.  What

11   was the subject of that interview?

12     A    Whether he knew the victim.

13     Q    And he's one of the persons whose fingerprints

14   were found in the victim's apartment?

15     A    Yes.

16     Q    What did he say?

17     MR. BIANCAVILLA:  Objection.

18     THE COURT:  Sustained.

19     Q    Did you ask him anything -- where did you

20   interview Mr. Marks?

21     A    At his home, 42 Motor Parkway, Farmingdale.

22     Q    Do you have notes of that interview?

23     A    Yes, I do.

24     Q    Are they with you here?

25     A    No, they are not.

People - Det. McHugh - Recross

1    Q    As a result of that interview, did you determine

2    that Marks knew the victim?

3         MR. BIANCAVILLA:  Objection.

4         THE COURT:  Sustained.

5    Q    Were there any other persons whose fingerprints

6    were found in that apartment other than the two people we

7    mentioned and the victim and Kane's?

8    A    Those are the only four latents that were

9    identified.

10        MR. CHAMBERLAIN:  Nothing further.  Thank you,

11   Judge.

12        THE COURT:  Mr. Biancavilla, anything further?

13        MR. BIANCAVILLA:  No, Judge.

14        THE COURT:  Thank you, Detective.

15        THE WITNESS:  Thank you.

16        (Whereupon, the witness was excused from the

17   witness stand.)

18        THE COURT:  Call your next witness, please.

19        MR. BIANCAVILLA:  Detective Parpan.

20   D E T E C T I V E   B R I A N   P A R P A N, a witness called

21   on behalf of the People, having been duly sworn, testified

22   as follows:

23        COURT OFFICER:  Please state your name, spelling

24   your last name, shield number and command.

25        THE WITNESS:  Brian Parpan, P-A-R-P-A-N, shield

People - Det. Parpan - Direct

1   270.   I'm a detective with the Nassau County Homicide

2   Squad.

3        THE COURT:  You may inquire.

4        MR. BIANCAVILLA:  Thank you.

5   DIRECT EXAMINATION

6   BY MR. BIANCAVILLA:

7        Q     Good morning, Detective Parpan.

8        A     Good morning, sir.

9        Q     Will you tell the jury how long you have been a

10  police officer?

11       A     I am in my 29th year.

12       Q     How long have you been a detective.

13       A     Twenty-five.

14       Q     How long have you been a member of the Nassau

15  County Homicide Squad?

16       A     I'm in my 15th year.

17       Q     Detective Parpan, I am going to direct your

18  attention to April 20th of the year 2000.  Were you

19  working that day?

20       A     I was, yes, sir.

21       Q     What tour of duty were you working?

22       A     I believe I was working from three in the

23  afternoon until midnight.

24       Q     Were you in the offices of the Nassau County

25  Homicide Squad on the afternoon of April 20th?

1274

People - Det. Parpan - Direct

1    A    I was.

2    Q    Around four o'clock in the afternoon?

3    A    Yes, sir.

4    Q    Please tell the jury what occurred approximately

5    at that time?

6    A    Shortly after 4:00, about 4:10, I answered the

7    phone and a gentleman on the end of the phone identified

8    himself as Paul Scrimo and said, you know, I'm

9    Paul Scrimo, I understand the police are looking for me.

10         I said, That's nice of you to call.  who are you?

11   He said, Well, I was at a bar and the people at the bar

12   told me that Detective McHugh at this particular number

13   was looking for a big bald guy.  And he said, I'm a big

14   bald guy.  I said, So am I but what is it about?

15         He said, Well, I go to that bar.  Detective McHugh

16   wanted to speak with me.  So I said, All right, Give me

17   something, I'll contact Detective McHugh.  I said, He's

18   not in the office right now but let me know how he can

19   reach you.

20         He gave me a phone number, 694-9451, and said he

21   would be available there.  But then he said, I have

22   nothing to add.  I didn't know if he had already spoken

23   with someone.  I didn't know what he meant by that.  I

24   told him I would contact Detective McHugh.

25         When we hung up, I paged Detective McHugh

1275

People - Det. Parpan - Direct

1    immediately and a short time later Detective McHugh got

2    back to me.  I gave him the message and the contact for

3    Mr. Scrimo.

4        Q    Now, later on that afternoon, did you receive

5    another telephone call?

6        A    I did, yes.

7        Q    Who was that call from?

8        A    Again, a gentleman identified himself as

9    Paul Scrimo.

10       Q    Approximately what time was that phone call?

11       A    That was 5:50 in the afternoon.

12       Q    Please tell the jury what the substance of that

13   conversation was?

14       A    Again, he identified himself as Paul Scrimo.  He

15   asked me, Are you the detective I just spoke with?  I

16   said, I think you just spoke with Detective McHugh but I'm

17   the detective you spoke to on the phone.

18           He said, All right, Listen, I want to get a

19   message to Detective McHugh.  He said, That individual

20   that we were discussing when I met with him, now that I

21   think about it, I see that person every day, he must be on

22   a regular schedule.

23           I asked him who.  I said, What are you talking

24   about?  He said, Well, while I was there, they showed me a

25   picture of a male black.  I see that person almost every

People - Det. Parpan - Direct

1    day at the same time, about nine o'clock in the morning,

2    and he's usually on Secatogue -- I had to ask him how to

3    spell that -- Avenue and Conklin Street in Farmingdale

4    about nine o'clock every morning.

5         He said, I know the time because I drop my son off

6    and I'm usually going to Home Depot.  So, if he is looking

7    for that person, he's there on a regular schedule and

8    that's where he would be.

9         I thanked him for the information and said I would

10   get the message to Detective McHugh.  Again, as soon as I

11   hung up, I paged Detective McHugh.  He got back to me and

12   I gave him the information.

13   Q    Detective, I am going to direct your attention to

14   May 3rd of 2000.

15   A    I was -- I was working from the 2nd into the 3rd,

16   sir.

17   Q    Did there come a time in the early morning hours

18   of May 3rd when you and Detective McHugh conducted an

19   interview of the defendant in this case, Paul Scrimo?

20   A    Yes, sir.

21   Q    By the way, do you see Mr. Scrimo in the courtroom

22   today?

23   A    I do.

24   Q    Please point to him and identify an article of his

25   clothing?

People - Det. Parpan - Direct

1    A     The gentleman sitting next to Mr. Chamberlain

2    wearing a greenish jacket and tie.

3    Q     Approximately what time did you meet Mr. Scrimo on

4    the morning of May 3rd?

5    A     I think he came into our office about a quarter to

6    one.  I didn't go into the interview room with him until

7    1:00 a.m.

8    Q     Had you ever met Mr. Scrimo before?

9    A     I had not met him personally, no.

10   Q     Tell the jury what occurred when you went into the

11   interview room?

12   A     We entered the interview room around one o'clock.

13   Detective McHugh introduced me to Mr. Scrimo, and

14   Mr. Scrimo said, You know, you are making a mistake.  You

15   know, you got the wrong man.

16         Detective McHugh said, I just want to talk to you

17   about your rights first.  I want to ask you if you got

18   your rights in the car.  He said he did.

19         Detective McHugh was involved in refreshing him

20   about the rights when Mr. Scrimo said, Well, I know, based

21   on a recent court decision, you don't have to give me my

22   rights anymore.

23         Detective McHugh continued to ask him if he had

24   gotten his rights and he said yes.  He asked him if he

25   understood his rights.  He said yes, and he asked him if

People - Det. Parpan - Direct

1    he was willing to speak to us without an attorney, all of

2    which he said yes to.

3           He said, You have the wrong man.  I have nothing

4    to hide.  He then indicated to Detective McHugh, You know,

5    I called you, I told you what happened that night.

6           So I said, Tell me.  You know, explain to me what

7    happened that night.  He looked at me and he said, I

8    played darts.  It was a Tuesday night.  I play darts at

9    the Falcon's Nest, usually lasts about eight to twelve.

10          I asked him about drinking.  He said he drinks

11   Guinness.  He said after darts, and I'm not sure time it

12   was, he said he left.  I went to Granny's and had one

13   drink.  I left Granny's and went to Y.L. Childs where I

14   had two drinks.  I met Ruth and I went home.  I was home

15   by three o'clock.

16          I stopped him and I said, That's somewhat vague.

17   I said, I'm interested in who you were with, who did you

18   deal with that night, who did you speak with.  Tell us the

19   people that you spent time with so we can verify all these

20   things.  I said, Just start at the beginning please.

21          He said, All right, darts, again, Tuesday night at

22   the Falcon's Nest.  The team members are, he believed, was

23   the owner of the Falcon's Nest, a person by the name of

24   Frank, he said Irene, John, Kevin, another person by the

25   name of Paul and himself.  That's the dart team.

People - Det. Parpan - Direct

1    Again, he reiterated that darts run from eight to

2  twelve and the time can vary.  At the end of darts, and he

3  wasn't sure of the time, he said he left.  I asked him

4  where did he go.  He said, I went to Granny's.  I said,

5  Why?  Why are you leaving, going from one place to

6  another?  Just a change of scenery.  I went to Granny's.

7  Who was there?  Only a few people, I didn't know anyone.

8    Did you know anyone there?  Nope.  I had one drink

9  and I left.  Then where did you go?  He said then he went

10  to Y.L. Childs.  Again I said, Why?  Change of scenery,

11  that's a bar that's open the latest and it's usually more

12  crowded.  I said, Who was there?  He said the only person

13  I knew by name there was Ruth.

14    MR. CHAMBERLAIN:  Judge, I object to the

15    narrative form unless the testimony is that this is

16    the exact verbatim sequence.  Otherwise, I would like

17    questions and answers.

18    THE COURT:  We'll have the questions done in a

19    different way.

20    MR. CHAMBERLAIN:  Thank you.

21  Q    What did he say next?

22  A    He said that the only person I knew there was

23  Ruth.  That was the only person that I knew in Y.L.

24  Childs.  Detective McHugh --

25    MR. CHAMBERLAIN:  Objection.

People - Det. Parpan - Direct

1        THE COURT:   Sustained.

2        Q     What did he say next?

3        A     Detective McHugh then interrupted him and said,

4    Wasn't there a girl with a spike in her chin?

5        Q     Then what was said?

6        A     He said, Yes, that's right, I played a game of

7    darts with that girl.

8        Q     What happened next?

9        A     Then he indicated that he spoke with Ruth for

10   about five to ten minutes.  He didn't know where she went

11   or what time she left but he said he left and he was home

12   by 3:00 a.m.

13       Q     Then what did he say?

14       A     Well, we asked him to tell us a little bit about

15   Ruth, what he knew about Ruth.

16       Q     What did he tell you?

17       A     He said that he knew her for about six months.  He

18   knew her through the bars.  He said he's a drinker, an

19   alcoholic, and she's a drinker, so he would see her

20   occasionally in the bars.  That was all he knew about her.

21       Q     Then what did you say?

22       A     He had indicated -- he said, You know, I called

23   you with this information.  I called you with this.  I

24   told him, Well, no, you didn't.  I'm the detective you

25   spoke to on the phone.  You called and gave me information

People - Det. Parpan - Direct

1    about a black man and where he was.  You never said

2    anything about this.  His reply was, Well, I'm a drinker

3    and I don't remember a lot.

4        Q    Then what happened?

5        A    We indicated that he was doing very well.  We said

6    do you remember what happened that evening?  He said yes.

7    We questioned him about when he left Y.L. Childs, tell us

8    what you did?

9        Q    What did he tell you?

10       A    He said that I went right home.  He said, I was

11   home at 3:00 a.m.

12       Q    What did you say to him?

13       A    We asked him, Are you sure you didn't stop

14   anywhere?  Are you sure you went right home from Y.L.

15   Childs?

16       Q    What was his response?

17       A    He said yes.

18       Q    What did you say?

19       A    I said, You know, stores that are open at that

20   time of night, stores that are 24-hour stores, have video

21   cameras for security purposes.

22       Q    What was his reaction to that?

23       A    Mr. Scrimo got very nervous.  His head went down.

24   He didn't answer us.  He didn't look at us.  He finally

25   looked up and in a very quick response said, Well, you

People - Det. Parpan - Direct

1    know, I -- I went to 7-Eleven.  I went to 7-Eleven and

2    bought beer and cigarettes.

3       Q    What did you say to him at that point?

4       A    Well, first we spoke to him about now you went to

5    7-Eleven.  How could you forget that?  And he talked about

6    drinking.  Then we indicated you don't smoke, do you?  He

7    said no.  Why are you buying cigarettes?  He said, Well,

8    sometimes I smoke.

9       Q    What did you say to him?

10      A    We just kept speaking to him about the smoking.

11   You don't smoke.  You're on your way home, three o'clock

12   in the morning, why are you buying cigarettes?  He said,

13   Sometimes I smoke and I was drunk.

14      Q    What did you say to him at that point?

15      A    Well, we said, now you're telling us you are

16   drunk.  Still it's three o'clock in the morning and now

17   you're buying beer to take home.

18      Q    What was his response?

19      A    He said, Well, I'm an alcoholic and that's what

20   alcoholics do.  We continued on this for a period of time

21   about the -- why he would do it and then I asked him, I

22   said, Well, what kind of beer did you buy?  He said,

23   That's not important.

24      Q    What did you ask him next?

25      A    I felt it was important --

People - Det. Parpan - Direct

1    Q    What did you say?

2    A    I said, You're not telling us that you don't

3    recall.  Tell me what kind of beer you bought.  He said,

4    That's not important.  I said, How about cigarettes, what

5    kind of cigarettes did you buy?  He just said, It's not

6    important.  We asked him numerous times.  We indicated it

7    was important, that we wanted to corroborate everything he

8    told us.  What kind of cigarettes?  Well, it's not

9    important.

10   Q    What happened next?

11   A    At that time I indicated to him that the same

12   cameras often are dated and timed.  I said, Are you sure

13   that you were home at 3:00 a.m?

14   Q    What was his response?

15   A    He immediately backed right off that and said, No,

16   It was probably much later.  I asked the time and he

17   didn't know but he said it was much later.

18   Q    Then what happened?

19   A    He indicated -- several times to us he had been

20   indicating that he was drunk.  So I asked him, I said,

21   Well, that evening what did you drink?  He told us that he

22   drank six pints of Guinness and then he had three

23   additional drinks, one at Granny's and two at Y.L. Childs.

24        I thought it was good that he would remember that.

25   I said, How much did you drink tonight now that we are

People - Det. Parpan - Direct

1    talking to you? He said, Well, about same. I said, You

2    look fine to me, Mr. Scrimo. You're not drunk. You are

3    answering every question I ask you. You obviously get

4    upset when you have trouble with a question.

5          MR. CHAMBERLAIN: We are back to narrative,

6       Judge.

7          MR. BIANCAVILLA: Judge, he's responding to a

8       question I asked.

9          THE COURT: I'll sustain the objection.

10   Q    What happened next in the interview?

11   A    I indicated to him that as far as I was concerned

12   he was not drunk.

13   Q    What happened then?

14   A    And I told him that you are answering every

15   question I have. You are very attentive to what is going

16   on. There's no indication to me that you are drunk.

17   Q    Then what happened?

18   A    He said, Well, actually, I was drunk but I'm

19   scared sober because when the guy arrested me he had his

20   gun out.

21   Q    What did you say to him?

22   A    I said, It doesn't work that way. If you are

23   drunk, you are drunk. You don't get scared sober or drink

24   coffee to get sober. If you are drunk, you are drunk, and

25   as far as I can see, you are not drunk.

People - Det. Parpan - Direct

1    Q    What happened then?

2    A    I asked him then about his drinking and if he

3    drinks at home.

4    Q    What was his response?

5    A    His answer was no.  Then he said, Well, rarely I

6    drink at home.

7    Q    Then what did you ask him?

8    A    I said, What about your wife, does your wife drink

9    at home?  He shook his head but said rarely.

10   Q    What happened then?

11   A    I said to him, Please explain to me why at this

12   hour in the morning, when you claim to have been drinking

13   all night and neither of you drink much at home, you found

14   it necessary to stop at the 7-Eleven and buy beer, at this

15   hour in the morning.

16   Q    What was his response?

17   A    His answer was, I am an alcoholic.  It's what

18   alcoholics do.

19   Q    What happened next?

20   A    I told him that, basically, that was just a

21   crutch, that he was using that as a crutch.  Any time he

22   didn't want to answer a question, he would tell us he was

23   a drunk or he was an alcoholic.

24   Q    What happened at that point?

25   A    Then he stopped and said, You know, I called you.

People - Det. Parpan - Direct

1    I called you people to try to help you.  I called.

2        Q    What was your response?

3        A    It was that you didn't call to try to help us.

4    You called because you knew Detective McHugh was looking

5    for you and you certainly had to assume that you were

6    going to be a suspect in this.  You were in the bar.

7        Q    What did he say to that?

8        A    He didn't understand why he would be a suspect.

9    He said, I only talked to her a few minutes in the bar.

10   Why would I be a suspect?

11       Q    What did you say to him at that point?

12       A    I said, Aren't you leaving something out, Paul?

13   Aren't you leaving something out?  He said no.  What?

14       Q    What did you say?

15       A    How about some light sexual contact maybe?

16       Q    And his response was?

17       A    Again, he got a little taken aback and he said,

18   You know what, she kissed me on the cheek, that's all she

19   did.

20       Q    What did you say to him?

21       A    I said, No, this was mouth-to-mouth making out in

22   the bar where it drew the attention of quite a few people,

23   people we have spoken with.

24       Q    What did he say?

25       A    Again, he said the fact that he was drunk.  He

People - Det. Parpan - Direct

1    said, I was drunk, I don't remember.

2           I said, All you have here is a selective memory

3    and you try to use drunkenness to cover up things you

4    can't get out of.  I said, There's no doubt in my mind

5    that you are lying.  We believe you were lying and we

6    believe you were in the apartment that night.

7    Q     What did he say at that point?

8    A     He denied it.  He said he was not in the

9    apartment.  He said, As a matter of fact, you can ask

10   Christian.  And he then described this person Christian to

11   us.

12          He said, Christian is the bouncer at the Downtown,

13   and that Ruth lives directly behind the Downtown.  He

14   indicated that through a conversation he had with

15   Christian, that Ruth came home with Fran and that Fran

16   observed Ruth having an argument with a bald-headed guy

17   and because Fran knew him, it certainly couldn't be him so

18   we were wrong.

19   Q     What happened at that point?

20   A     Well, we told him that wasn't the entire story.

21   We told him only a portion of that was true and that, in

22   fact, was not the way the story, as we knew it, took

23   place.

24   Q     Then what happened?

25   A     I told him, I said, Paul, let me tell you

People - Det. Parpan - Direct

1    something.  It's not a secret when more than one person

2    knows.  When more than one person knows something, it's no

3    longer a secret.  We are talking about everybody.

4        Q    What happened then?

5        A    Again, he portrayed being very nervous.  His head

6    went down.  He couldn't look at us and then he said, Well,

7    you know, I told you everything.  I told you everything.

8    Ask John, he'll tell you.

9        Q    What did you say then?

10       A    I said, John?  Who is John?  Where did John come

11   from?

12       Q    What was his response?

13       A    He said, I was with John all night.  I told you I

14   was with John.

15            Adamantly, I said, You never said you went

16   anywhere with John.  We were very specific about who you

17   were with, who did you talk to in these places.  You never

18   mentioned John.  There's a reason for that.  Why are you

19   separating yourself?

20            Detective McHugh indicated you didn't mention John

21   the first time he spoke with you.

22       Q    What happened then?

23       A    He indicated -- he said, Well, I did.  I'm sure I

24   did.  I was with John and we were together at the bars.

25   As a matter of fact, we left Y.L. Childs together, and

People - Det. Parpan - Direct

1  when we left, we separated and I went right home.

2     Q    Then what happened?

3     A    I said, Are you sure of that?  He said yes.  I

4  said, What happened to 7-Eleven?  Oh, yeah, that's right,

5  I stopped at 7-Eleven then I went home.

6     Q    What did you ask him next?

7     A    Well, it was about 3:35 in the morning at this

8  time.  We decided to take a break.

9     Q    How long did you break for?

10    A    We broke for about 45 minutes.

11    Q    Okay.  Then what happened next?

12    A    When we came back in it was 4:20 and we started

13 right where we left off.  We asked him about John.  Tell

14 us about John?  He said, I don't know his last name.  We

15 said could it be Kane?  He said, I have no idea.  I don't

16 know his last name.

17    Q    What happened then?

18    A    We asked him where he knew him from.  He said that

19 they play on the dart team together so he knows him for a

20 year or so but strictly through darts and he described

21 John as an alcoholic.

22    Q    What did you ask him then?

23    A    We asked him if there was any relationship or

24 anything that he was aware of between John and Ruth.

25    Q    How did he respond to that?

People - Det. Parpan - Direct

1    A    He said, I'm not going to talk about anybody else.

2    Q    What did you say then?

3    A    We asked him again, tell us a little bit about

4    John.  Tell us if he and Ruth are friendly.  He said, I'm

5    not going to talk about other people.  I just won't talk

6    about other people.

7    Q    What happened then?

8    A    We accused him at that time, again, of lying and

9    we told him that we believed both he and John had gone up

10   to the apartment, that they were there, that based on

11   crime scene and evidence and interviews, we felt that he

12   was not being truthful.

13   Q    What happened at that point?

14   A    He again tried to bring up the story of the

15   Downtown situation with Christian, the fact that Fran saw

16   somebody, and, had it been him, Fran knows him well enough

17   that it would have been him -- that she would have known

18   it was him instead of saying I saw a bald man.

19        Again, we told him that particular story was only

20   partially true and it wasn't influencing our thoughts.

21   Q    What happened at that point?

22   A    We told him the severity of what we are dealing

23   with.  We told him that this was murder.  We told him we

24   were facing a very strong possible of 25 years to life in

25   jail.  We were interested in why this happened, why did

People - Det. Parpan - Direct

1    something like this happen.  He gave us no answer.

2        Q    What happened then?

3        A    We asked him several times.  Something snapped,

4    sometimes something happens and causes these things to

5    happen.  Tell us.  Tell us what happened.  Again, he

6    refused to answer.

7        Q    What happened next?

8        A    I finally said to him, I said, Look, did this

9    happen maybe because she made a remark, maybe she said

10   something that set you off?  He got a little agitated.  He

11   said, You know, I can't help you with this.  We are on

12   different sides here.

13           MR. CHAMBERLAIN:  Objection to he got agitated

14       and ask it be stricken.

15           THE COURT:  Sustained as to agitated.

16       Q    Describe to the jury his appearance in response to

17   that?

18       A    It was similar to what it had been several times.

19   Every time he appeared to be backed into a corner where he

20   wouldn't look you in the eye --

21           MR. CHAMBERLAIN:  Objection.

22           THE COURT:  Sustained as to backed into a corner.

23       Q    Describe the bodily movements that you observed

24   him display?

25       A    When he was relaying certain things, he would look

People - Det. Parpan - Direct

1    you right in the eye and talk to you.  When you asked him

2    other things, his head would go down.  He couldn't look at

3    us.  He would try to answer.  His voice changed an octave.

4            MR. CHAMBERLAIN:  Objection to the general

5        description of what occurred.

6            THE COURT:  The detective can testify as to what

7        he observed.

8            MR. CHAMBERLAIN:  His testimony is comparing his

9        testimony of the entire -- his questioning of the

10        entire evening.

11            THE COURT:  I'll sustain the comment to the

12        extent the detective can testify as to what he

13        observed.

14    Q    Continue describing what you observed, Detective.

15    A    In those instances, he was unable to look at us.

16            MR. CHAMBERLAIN:  In those instances --

17            THE COURT:  Sustained.

18    Q    The last instance.

19    A    The last instance, he was unable to look at us.

20    His head was down.

21            MR. CHAMBERLAIN:  Objection to the conclusion he

22        was unable to look at us.

23            THE COURT:  Sustained.

24    A    He didn't look at us.  He looked down at the

25    ground.  He waited before he answered.  When he did

People - Det. Parpan - Direct

1    answer --

2        Q    What did he say?

3        A    His voice was quicker.  He sounded upset and he

4    said, I can't help you with this.  We are on different

5    sides here.  I can't help you.

6             This was about five o'clock in the morning and,

7    again, we took a short break at that point.

8        Q    Now, at the end of that particular break, what

9    happened?

10       A    We returned back to speak to Mr. Scrimo at

11   seven o'clock in the morning, both Detective McHugh and I.

12       Q    In between that, did two other detectives go in

13   and speak to Mr. Scrimo?

14       A    Detective Cereghino and Detective Cole.

15   Detective Cereghino is from our office and Detective Cole

16   is from the Eighth Squad, I believe.

17       Q    You went back in with Detective McHugh at seven

18   o'clock?

19       A    Correct, yes.

20       Q    Tell the jury what happened at seven o'clock?

21       A    We went in and told him you have a lot of problems

22   here.  You've been lying about numerous things.  You keep

23   changing your story.  When you are caught in lies, you

24   have some major problems.

25       Q    What was his response?

People - Det. Parpan - Direct

1    A    He said, Well, you know, you call them lies.  To

2    me, I call it self-protection.  He said, My son trusted

3    the police once and now he's in jail.  If I tell you my

4    side, I may wind up in jail.

5    Q    What did you say then?

6    A    I told him that's where you are going.  You are

7    under arrest.  Don't you understand you are under arrest

8    here?  You are going to jail.  Tell us your side.  At that

9    point he indicated that he would like his attorney to tell

10   us his side and he requested an attorney.

11        MR. BIANCAVILLA:  Thank you.  I have no further

12        questions.

13        THE COURT:  I think we'll take a break at this

14        time.  Ladies and gentlemen, we'll take a short break.

15        Do not discuss the case amongst yourselves or

16        with anyone else.  Keep an open mind.  Do not form or

17        express any opinions until the entire case has been

18        completed.

19        Do not read or listen to any accounts of the

20        case should they be reported in the media.  Do not

21        visit or view any place or premises that have been

22        mentioned.

23        You are not to permit any party to discuss the

24        case with you or attempt to influence you, and you

25        must promptly report to the Court any violation

Proceedings

1  thereof.

2      (Whereupon, the sworn jurors exited the

3  courtroom.)

4      THE COURT: Detective, please don't discuss your

5  testimony with anybody.

6      THE WITNESS: No, sir.

7          (Whereupon, a brief recess was taken.)

8      THE CLERK: Case on trial continues. All parties

9  are present. The jurors are not present at this time.

10     Are the People ready?

11     MR. BIANCAVILLA: Ready.

12     MR. CHAMBERLAIN: Defendant ready.

13     THE COURT: Counsel, I received a note from the

14  jury. I am going to read it to you.

15     MR. BIANCAVILLA: A note already?

16     THE COURT: The note is dated today. Honorable

17  Judge Brown, this jury respectfully requests if the

18  trial is going according to schedule? If not, can you

19  give us an approximate estimate of the duration of the

20  trial? Thank you for your understanding in this

21  matter. Respectfully, the Jury.

22     Mr. Biancavilla, when do you think you'll

23  complete your case?

24     MR. BIANCAVILLA: I should be finished by

25  tomorrow, Judge.

Proceedings

1     THE COURT: Mr. Chamberlain, I understand at this

2     point you don't have to tell us but what I could do is

3     tell the jury we think we are going according to

4     schedule.  Do you think it would be fair to tell the

5     jury that perhaps we will be summing up Monday?

6     MR. CHAMBERLAIN:  Judge, I really doubt it, based

7     on what I'm hearing.  We are working Friday, I take

8     it?

9     THE COURT:  Yes, we are.

10     MR. CHAMBERLAIN:  One of my expert witnesses

11     indicated that Friday is a Jewish holiday, minor, but

12     he won't be available.

13     THE COURT:  Can you have him here Thursday?  I'll

14     take him out of turn.

15     MR. CHAMBERLAIN:  The People's case --

16     THE COURT:  No, the People said they would be

17     done tomorrow.

18     Right?

19     MR. BIANCAVILLA:  Yes.

20     MR. CHAMBERLAIN:  The question is when they will

21     be done tomorrow.

22     THE COURT:  Counsel, approach the bench.  Come

23     forward.

24          (Whereupon, off-the-record discussion took

25          place at the bench.)

Proceedings

```
 1          THE COURT:  Bring the jury in, please.

 2          COURT OFFICER:  Jury entering.

 3              (Whereupon, the sworn jurors entered the

 4          courtroom and resumed their respective seats.)

 5          THE CLERK:  Both side stipulate that all sworn

 6      jurors are present and seated properly?

 7          MR. BIANCAVILLA:  Yes.

 8          MR. CHAMBERLAIN:  So stipulated.

 9          THE COURT:  Ladies and gentlemen, I received your

10      note with respect to the duration of the trial.  I

11      have also had a conversation with counsel.  We expect

12      the trial to be over -- we are a little slower than we

13      expected -- but we expect the trial to be in your

14      hands early to mid next week, so sometime Tuesday or

15      Wednesday.  We are guessing.

16              Are we ready for the detective?

17              (Whereupon, the witness resumed the witness

18          stand.)

19  CROSS-EXAMINATION

20  BY MR. CHAMBERLAIN:

21      Q    Detective Parpan, you have been a police officer

22      for 29 years?

23      A    Correct, yes, sir.

24      Q    How many times have you testified?

25      A    Very rarely as a police officer, numerous times as
```

People - Det. Parpan - Cross

1    a detective.

2        Q    Your power of recall for events two years ago

3    seems very good, Detective, from what I heard here this

4    morning.

5            MR. BIANCAVILLA:  Objection.

6            THE COURT:  Is that a question?

7            MR. CHAMBERLAIN:  Just a comment, Judge.

8            THE COURT:  No comments.  Just questions.

9        Q    Detective, did you take notes of these events you

10   testified to?

11       A    I did, yes, sir.

12       Q    Did you review those notes in connection with

13   preparation of your testimony here today?

14       A    Yes, I did.

15       Q    And your notes of the interview of the defendant

16   were about five page?

17       A    I believe they were five pages, yes, sir.  There

18   are two additional pages referencing the phone calls.

19       Q    The phone calls on the 20th of April?

20       A    That's correct, yes.

21       Q    Prior to this, did you interview a suspect by the

22   name of John Kane?

23       A    I was involved in that interview, yes, sir.

24       Q    And that interview took place on May 2nd?

25       A    The night of May 2nd.  Yes, evening hours `of

People - Det. Parpan - Cross

1   May 2nd.

2       Q    And you were the person who took notes of that

3   interview?

4       A    Correct.

5       Q    And in both cases you and Detective McHugh were

6   together, the interview of Kane and then the interview of

7   Scrimo?

8       A    That's correct, yes.

9       Q    In both cases it was your notes that were -- you

10  were the one that took notes?

11      A    That's correct, yes.

12      Q    Detective, the notes of the interview of John Kane

13  were nine pages?

14      A    I don't know, sir.  I have not reviewed them.

15      Q    How long did that interview take?

16      A    It was relatively brief.  In fact, I think the

17  entire interview was, maybe, two hours, but that included

18  a written statement.

19      Q    And the interview of Scrimo lasted from one until

20  a little after seven with the breaks you described?

21      A    A couple of breaks, yes, sir.

22      Q    Now, let me start at the beginning of the

23  interview of Scrimo, Detective.  You indicated that you

24  told him -- you asked him if he had already been given his

25  rights; is that correct?

People - Det. Parpan - Cross

1    A    Detective McHugh did, yes.

2    Q    At that point did either you or Detective McHugh

3    give him his rights?

4    A    Detective McHugh asked him the waivers, if he

5    understood, and if he was willing to speak to us.  But he

6    didn't recite the rights, if that's what you mean.

7    Q    Did either of you show him a rights card?

8    A    We did not, no, sir.

9    Q    To your knowledge, did anyone give him his rights

10   during the period he was being interviewed from 1:00 a.m.

11   to a little after seven?

12   A    He was reminded of them as we started the

13   interview at 1:00 a.m. and he acknowledged that he had

14   already been given them.

15   Q    Did he also say that he had been told or that he

16   understood -- withdrawn.

17        He also said that he understood that you no longer

18   had to give him his rights?

19   A    That's correct, yes, sir.

20   Q    That's all he said about that, not -- did he say

21   anything else other than that?

22   A    About what?  You're losing me.

23   Q    About his rights.

24   A    He acknowledged that he had been given his rights

25   in the car.

People - Det. Parpan - Cross

1    Q    And he understood that you no longer had to give

2    him his rights.

3    A    He said, I know that you don't have to give them

4    to me based on a new ruling.  Detective McHugh continued.

5    Q    Did you comment on that?

6    A    I did not.

7    Q    Did Detective McHugh comment on that?

8    A    Not to my recollection.

9    Q    Would your prior testimony before -- at a hearing,

10   does it refresh your recollection that Detective McHugh

11   did not comment?

12   A    I believe I testified that we didn't comment on

13   it, that's correct.

14   Q    Detective, you have capabilities in homicide to

15   use audio tape in an interview of a suspect; right?

16   A    We have tape recorders, yes.

17   Q    And you -- videotaping capabilities to videotape

18   an interview of a suspect; right?

19   A    No, we do not.

20   Q    No?

21   A    Not in police headquarters, no.

22   Q    Did you audio tape any part of this interview of

23   the defendant?

24   A    We did not.

25   Q    Did you have anything to do with the decision to

People - Det. Parpan - Cross

1    have the defendant arrested that night?

2              MR. BIANCAVILLA:  Objection, Judge.

3              THE COURT:  Sustained.

4         Q    You were aware that he had been already arrested

5    that night for the murder of Ruth Williams?

6         A    I was aware that when Mr. Scrimo was brought in,

7    he was under arrest, yes.

8         Q    For that murder?

9         A    Yes.

10        Q    The story you related about what was said to him

11   occurred over --

12             MR. BIANCAVILLA:  Judge, objection to the

13        characterization.

14             THE COURT:  Just use the actual testimony of the

15        witness.

16        Q    What you recall occurred over that six-plus-hour

17   period is based upon your recollection from that event

18   from two years ago; is that right?

19        A    From my notes and from my notes helping me recall,

20   yes.

21        Q    One of the things you brought out with the

22   defendant was that he hadn't told you everything about who

23   he was with that night, is that correct, the night of

24   April 11th?

25        A    Absolutely, yes in the latter stages, yes.

People - Det. Parpan - Cross

1    Q    In the latter stages.

2         Had he told you in the earlier stages that he was

3    with certain people?

4    A    He told us who he played darts with that evening,

5    yes, he did.

6    Q    And one of those people was a person by the name

7    of John?

8    A    That's correct.

9    Q    And did he describe John?

10   A    He did not.

11   Q    Did he describe John, I don't know his name, a

12   long haired guy, does that refresh your recollection?

13   A    No.  At which stage are you at?

14   Q    At the beginning of this interview when you first

15   say who were you are with?

16   A    No, not the all.

17   Q    He mentioned -- he said he was with a number of

18   people at the Falcons Nest; right?

19   A    He mentioned the people on the dart team he played

20   darts with.

21   Q    And one was John?

22   A    That's correct.

23   Q    And did he remember his last name?

24   A    Much later in the interview he told us I don't

25   remember his last name, when he brought up John, and

People - Det. Parpan - Cross

1    someone he had been with all night.

2        Q    Well, hadn't he already told that to McHugh

3    earlier on the 20th of April that he was with John that

4    night on the dart team, a long haired guy?

5            MR. BIANCAVILLA:  Objection.

6            THE COURT:  Sustained.

7        Q    Have you discussed with Detective McHugh what

8    information he had prior to commencing that interview on

9    May 3rd of the defendant?

10       A    I had an idea what Detective McHugh knew, yes.

11       Q    I'm going to show you a document --

12           THE COURT:  Would you like that marked?

13           MR. CHAMBERLAIN:  Yes, sir.

14               (Whereupon, the above-mentioned item was

15           marked as Defendant's Exhibit V for identification

16           only.)

17           COURT OFFICER:  Defendant's V marked for

18       identification.

19       Q    Detective, you would recognize Detective McHugh's

20   notes, would you not?

21           MR. BIANCAVILLA:  Objection.

22           THE COURT:  I'll permit that.

23       A    They have Detective McHugh's name in the upper

24   right-hand corner, yes.

25       Q    And you would recognize his handwriting, wouldn't

People - Det. Parpan - Cross

1    you?

2       A    Well, I have never seen this before, but it has

3    his name on it.

4       Q    Would that -- would those notes refresh your

5    recollection as to what information Detective McHugh

6    already had from the defendant on April 20th as to the

7    appearance of this person named John?

8            MR. BIANCAVILLA:  Objection.

9            THE COURT:  Sustained, Mr. Chamberlain.  You are

10       attempting to refresh the detective's recollection to

11       something the detective had nothing to do with.

12      Q    Detective, you already indicated you conferred

13   with McHugh as to what was already known about this

14   defendant before conducting this interview; right?

15      A    I conferred with Detective McHugh about certain

16   aspects of the case.

17      Q    You have indicated here, Detective, that one of

18   the reasons you suspected that the defendant was lying was

19   that he hadn't told you anything about being with

20   John Kane that night; is that correct?

21      A    Absolutely.

22      Q    And isn't it a fact that he told you at the outset

23   that he was with John that night at the Falcon's Nest?

24      A    That's completely out of context from what we were

25   asking him, sir.  He played darts with John.  He also

                    People - Det. Parpan - Cross

1   mentioned Irene, Kevin and Paul.

2       Q    But that was the night, April 11th --

3       A    That's correct, yes, sir.  That's not the night we

4   were interested in.

5       Q    When he told you he was with John that night, were

6   you not aware of what John he was talking about?

7       A    I was not, no, sir.

8       Q    You weren't?

9       A    Excuse me.  I thought you meant prior.  I was

10  aware who he played darts with, yes.  I was aware that was

11  in fact John Kane.

12      Q    And you were also aware because you had just

13  finished an interview with John Kane, hadn't you?

14      A    Yes.

15      Q    What did John Kane look like when you had that

16  interview?

17           MR. BIANCAVILLA:  Objection.  Relevancy.

18           THE COURT:  I'll permit it.

19      A    He had long hair and a beard.

20      Q    Detective, you told us that, at a number of places

21  during the course of this early morning interview, the

22  defendant appeared nervous; would that be correct?

23      A    That would be correct, yes, sir.

24      Q    He would look down; is that correct?

25      A    His whole demeanor would change, yes, sir.

People - Det. Parpan - Cross

1    Q    During the period of time that he was being

2    interviewed, did he have anything to eat that evening?

3    A    He didn't have anything to eat.  At the end, I

4    believe, but certainly not from one o'clock on until after

5    seven.

6    Q    Until after seven?

7    A    That's right.

8    Q    I'm only referring to the period up until seven or

9    7:15.

10        Did he have anything to drink other than water?

11   A    He refused anything else.  He did have water.

12   Q    He had water?

13   A    He had water, yes, sir.

14   Q    Had he -- do you know where he had been for the

15   evening before he was arrested?

16   A    I was aware and he told us also that he had been

17   playing darts.

18   Q    And he had been drinking?

19   A    He indicated he was, yes.

20   Q    And have you, Detective, in your experience, ever

21   been questioned after being out drinking at night by a

22   group of sophisticated homicide detectives for a period of

23   six or more hours?

24   A    That doesn't include my wife, does it?

25   Q    Your wife --

People - Det. Parpan - Cross

1    THE COURT:  That's sustained.

2    Q    You have never been in a circumstances, have

3    you --

4    MR. BIANCAVILLA:   Judge --

5    THE COURT:  Sustained.  Sustained.

6    Q    Was Mr. Scrimo asked to sign any statement that

7    night?

8    A    No statement was taken, sir.

9    Q    Other than your rendition of how he may have

10   looked or how he may have appeared to answer certain

11   questions, he made no admissions; is that right?

12   MR. BIANCAVILLA:   Objection.

13   THE COURT:  Sustained.

14   Q    Did he make any admissions concerning the crime

15   that he was charged with?

16   MR. BIANCAVILLA:   Objection.

17   THE COURT:   Sustained as to the word admissions.

18   Q    Detective, did you -- were you responsible for

19   John Kane being brought into the homicide headquarters on

20   May 2nd, 2000?

21   A    I was not.

22   Q    Was he there voluntarily, to your knowledge?

23   MR. BIANCAVILLA:   Objection.

24   THE COURT:  Sustained.

25   Q    During the period of time that you were

1309

                    People - Det. Parpan - Cross

1   interviewing the defendant, do you know where Kane was?

2       A    I believe he was sleeping in the other interview

3   room in our office.

4       Q    Do you have sleeping facilities in the interview

5   room?

6           MR. BIANCAVILLA:  Objection.

7           THE COURT:  Sustained.

8       Q    Did you have anything to do with a decision

9   concerning cutting Kane lose and not arresting him?

10          MR. BIANCAVILLA:  Objection.

11          THE COURT:  Sustained.

12      Q    During your interview of Kane, did he make any

13  admissions concerning this homicide?

14          MR. BIANCAVILLA:  Objection.

15          THE COURT:  Sustained.

16      Q    Are you away of any agreements to give Kane

17  immunity for his testimony?

18          MR. BIANCAVILLA:  Objection.

19          THE COURT:  Sustained.

20      Q    Other than this interview of the defendant you

21  have testified to here and the two prior telephone

22  conversations that you had with him, did you have any

23  other activity in this case?

24      A    No, I did not, sir.

25          MR. CHAMBERLAIN:  Nothing further.  Thank you,

People - Det. Parpan - Cross

1     Judge.

2          THE COURT:  Mr. Biancavilla?

3          MR. BIANCAVILLA:  No redirect, Judge.

4          THE COURT:  Thank you, Detective.

5          THE WITNESS:  Thank you, your Honor.

6               (Whereupon, the witness was excused from the

7          witness stand.)

8          THE COURT:  Counsel, approach the bench, please.

9     Counsel, come forward for a second.

10              (Whereupon, there was an off-the-record

11         discussion at the bench.)

12              (Whereupon, the following took place in open

13         court.)

14         THE COURT:  Mr. Biancavilla, call your next

15    witness, please.

16         MR. BIANCAVILLA:  Mohammed Hussain.

17         THE CLERK:  Will the Urdu interpreter state your

18    name for the record, please?

19         THE INTERPRETER:  M-A-S-U-M-A, Masuma, last name,

20    C-H-A-G-A-N-A, Chagana.

21         MR. BIANCAVILLA:  Judge, may we approach?

22         THE COURT:  Yes.

23              (Whereupon, there was an off-the-record

24         discussion at the bench.)

25    M O H A M M E D    H U S S A I N, a witness called on behalf

People - Hussain - Direct

1  of the People, having been duly sworn, testified as follows:

2          COURT OFFICER:  State your name, spelling your

3      last name, slowly, and give your county of residence.

4          THE WITNESS:  (In English) My last name is

5      Hussain, H-U-S-S-A-I-N.

6          THE CLERK:  Spell your first name.

7          THE WITNESS:  (In English) M-O-H-A-M-M-E-D.

8          THE COURT:  Mr. Hussain, get as close to the

9      microphone as you can.

10         THE CLERK:  What county do you reside in, please?

11         THE WITNESS:  (In English) I live in Farmingdale.

12 DIRECT EXAMINATION

13 BY MR. BIANCAVILLA:

14     Q    Mr. Hussain, do you speak English?

15     A    Yes, sir, I speak.

16     Q    We have the interpreter here for you today in case

17   you don't understand any of my questions or questions by

18   Mr. Chamberlain.  Okay?

19     A    Okay, sir.

20     Q    What language do you speak?

21     A    I speak Urdu language, sir.

22     Q    Where are you from?

23     A    I from Pakistan.

24     Q    When did you come to this country?

25     A    I come almost seven years before 1995, December.

People - Hussain - Direct

1   Q    The blonde haired lady in the photograph,

2   Mr. Hussain, where do you know her from?

3   A    She is my regular customer.  She comes to 7-Eleven

4   almost two, three times a weekly.

5   Q    When she came to 7-Eleven, she came two or three

6   times a week?

7   A    Yes, sir.

8   Q    What would she buy when she came to 7-Eleven?

9   A    Coors Light beer and Budweiser beer and Vantage

10  Ultra Light 100 cigarettes.

11  Q    The Vantage Ultra Light 100 cigarettes, did she

12  always by those cigarettes?

13  A    Yes, my shift that lady with blonde hair, she's

14  only customer that shift.

15  Q    That bought those cigarettes?

16  A    Yes, sir.

17  Q    This man seated at the second table here, do you

18  recognize him?

19  A    Yes, sir.

20  Q    Where do you recognize him from?

21  A    I work, he come in, in the morning time, buy

22  newspaper almost six, four, six days every week.

23  Q    About what time would he normally come in the

24  morning?

25  A    He comes in six, seven o'clock in the morning

People - Hussain - Direct

1    time.

2        Q    What would he buy?

3        A    He buy a newspaper and some times he buy a

4    Marlboro Light box cigarette.

5        Q    Do you know this man's wife?

6        A    Yes.  She drive the school bus.  They came, two,

7    three time together, tell me this is my wife and I know

8    her.  She buy coffee and she drove the small school bus.

9        Q    How often would she come into the store?

10       A    She come only for coffee and sometimes she buy the

11   cigarette, Marlboro light box, maybe twice time, one time,

12   two times weekly.

13            THE COURT:  Madam, interpreter, only if the

14       witness has a problem understanding something should

15       you interpret.

16       Q    Do you know where Mr. Scrimo lives?

17       A    He live in -- I don't exactly, what house number,

18   but he lives opposite my store, across the street, other

19   side.

20       Q    Now, on Thursday April 13th, 2000, were you

21   working that day?

22       A    Yes, sir.

23       Q    What time did you get to work that night?

24       A    11:00 p.m.

25       Q    And at about 10:00 p.m. that night, do you

People - Hussain - Direct

1    remember seeing something?

2        A    Yes, I see the Main Street, that after Main Street

3    part of the train track, I saw the police and one

4    ambulance over there.

5        Q    And a couple of days later, did you see a poster

6    in the window of the 7-Eleven?

7            MR. CHAMBERLAIN:  Objection to the leading.

8            THE COURT:  Yes.

9            MR. BIANCAVILLA:  I am just giving a specific

10       time.

11           THE COURT:  Lead with respect to the date but

12       not --

13           MR. BIANCAVILLA:  I'm sorry.

14           May I have this shown to the witness, please?

15           Judge, could I have this marked as People's 87

16       for identification?

17           THE COURT:  Yes.

18               (Whereupon, the above-mentioned item was

19           marked as People's Exhibit 87 for identification

20           only.)

21           MR. BIANCAVILLA:  Please show it to the witness.

22       Q    Do you recognize that?

23       A    Yes, sir.

24       Q    What do you recognize that to be?

25       A    I see the -- after the two day, that is on my

People - Hussain - Direct

```
 1    window, the window of 7-Eleven.  Outside I see the poster.

 2        Q    Speak slower.

 3             You saw this on the window of 7-Eleven?

 4        A    Yes, on the main door outside that poster is.

 5    When I came 11:00 o'clock, I saw this poster.

 6        Q    What did you see in the window?

 7        A    I see this poster.

 8        Q    Put it down.

 9             Now, did there come a time when Detective McHugh

10    showed you that poster?

11        A    No.

12             MR. CHAMBERLAIN:  Objection to the leading?

13        A    The detective came after --

14             THE COURT:  Wait.  Wait.  When there is an

15    objection, you have to wait because I have to rule.

16        Q    My question is --

17             MR. CHAMBERLAIN:  The question was what the

18    question was and there was an objection to it.

19             THE COURT:  Try not to lead.

20             MR. BIANCAVILLA:  Did there come a time --

21             THE COURT:  Just try not to lead.

22        Q    Did there come a time after you saw the poster in

23    the window that Detective McHugh showed you that poster?

24             MR. CHAMBERLAIN:  Objection.

25             THE COURT:  That's overruled.
```

People - Hussain - Direct

1    Q    What is your answer?

2    A    Excuse me.  Explain.

3         THE COURT:  Mr. Hussain, when you don't

4    understand something, tell me, and I'll have the

5    interpreter translate.

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Miss Interpreter, please translate

8    the last question for the witness.

9    Q    Did there come a time after he saw the poster in

10   the window that Detective McHugh showed him that poster?

11        (Whereupon, the Urdu interpreter interpreted the

12   question as requested.)

13   A    He never say -- he never show me this.

14   Q    Look on the back of that poster.  Do you recognize

15   your signature?

16   A    Yes, sir, but that is signature --

17        THE COURT:  Just answer Mr. Biancavilla's

18   question.

19   Q    Is that your signature on the back?

20   A    No, not my signature on the back.  No.

21   Q    Fine.  Thank you.

22        Now, after you saw -- withdrawn.

23        Directing your attention to the day before,

24   Wednesday, April 12th of 2000, do you remember working

25   that day?

People - Hussain - Direct

1   A   Yes, sir.

2   Q   At around 4:00 a.m., did you see the man sitting

3   in this courtroom?

4   A   Yes, sir.

5   Q   Tell the jury what happened?

6   A   This guy came in the store.  I was in the counter

7   side and this guy came in the store and he's make a left.

8   He's going over to the fridge, beers.

9   Q   Let me stop you there.  You were standing behind

10  the counter.

11  A   Yes, sir.

12  Q   And he went over to the left side of the store?

13  A   Then he entered, make a left and go -- that's

14  beers over there.  There are three refrigerators there.

15  Q   There are three refrigerators in the store?

16  A   Yes.

17  Q   What did you see him do?

18  A   He went over, picked up the beer, Coors Light, 12

19  pack, and brought it to the counter.

20  Q   When what happened, he came to the counter?

21  A   He said, I need cigarettes, Marlboro light box.  I

22  remember he smoke it sometimes and his wife smoke it.

23  After he say I need Vantage 100 Light box.  I say you buy

24  for the blonde lady.  I know she is my only customer who

25  buy those.  He say yes.

People - Hussain - Direct

1    Q    What did he say then?

2    A    But don't tell my wife.  I said don't worry, my

3    friend, I never say anything.

4    Q    What happened then?

5    A    After he gave me cash money, I rang the money in

6    the register.  The drawer open.  And after I say him, I

7    say, you want to take condom too?  He say okay, give me

8    condom too.

9    Q    What happened next?

10   A    I give him one condom, a light blue packet, I

11   remember.  I give him condom and he left.

12        THE COURT:  I don't think I understand the last

13       part of that answer.  Repeat it, please.

14   A    I say him, I say you take condom too.  He say

15   okay.  I give him condom and he smiling.

16        THE COURT:  Smelling?

17   A    Smiling.

18        And after he left, he's gone outside and then he's

19   gone out.  I remember he go every day walking, coming in

20   the store, he's going to the home, but that day he's going

21   out his -- he face, like, Main Street side, but, after, I

22   don't know where he's going.

23   Q    When he walked out of the store, what direction

24   did he go?

25   A    He's on my right side.  My face is on the door

People - Hussain - Direct

1    side and he's going on right side.

2        Q    He went to the right?

3        A    Yes, sir.

4        Q    Do you remember meeting with Detective McHugh

5    after this?

6        A    Yes, sir.

7            MR. BIANCAVILLA:  I would ask this be marked as

8    People's 89 for identification.

9            MR. CHAMBERLAIN:  May I see it, please?

10           MR. BIANCAVILLA:  As soon as it's marked.

11           THE COURT:  One moment.

12               (Whereupon, the above-mentioned item was

13           marked as People's Exhibit 89 for identification

14           only.)

15           COURT OFFICER:  People's 89 for identification.

16           THE COURT:  Mr. Chamberlain, would you like to

17       look at it?

18           MR. CHAMBERLAIN:  Yes, please.

19           MR. BIANCAVILLA:  Will you show it to the

20       witness, please?

21       Q    Do you recognize that photograph, Mr. Hussain?

22       A    Yes.

23       Q    Is that the photograph that Detective McHugh

24   showed you when he met with you?

25       A    Yes.  He came my home and then he showed me this.

People - Hussain - Direct

1    Q    Is this the poster that you saw in the window of

2    7-Eleven?

3    A    Yes, sir.

4         MR. BIANCAVILLA:  Judge, at this time I will

5    offer both of these in evidence.

6         THE COURT:  Mr. Chamberlain, would you like to

7    see them again?

8         MR. CHAMBERLAIN:  May I have voir dire, Judge?

9         THE COURT:  Yes, of course.

10   VOIR DIRE EXAMINATION

11   BY MR. CHAMBERLAIN:

12   Q    You have already indicated you didn't sign this

13   poster; is that correct?

14   A    I did not sign this one.

15   Q    And the poster you're saying you saw in the

16   window, can you tell us when you saw that in the window?

17   A    After two days.  Then I saw the police Thursday

18   night, 13 April.  And then I saw the 15th, Friday night I

19   saw this one.

20   Q    The 15th of April?

21   A    Yes, but not sure Friday night.  I remember after

22   two days.

23   Q    After two days?

24   A    Yes, sir.

25   Q    When did you see Detective McHugh?

People - Hussain - Direct

1    A    He came after two week, my home.

2         MR. CHAMBERLAIN:  No objection.

3         THE COURT:  Mark them both in evidence.

4              (Whereupon, People's Exhibits 88 and 89,

5         previously marked for identification only, were

6         marked and received in evidence as People's

7         Exhibits 88 and 89.)

8         MR. BIANCAVILLA:  May I display this to the jury,

9    Judge?

10        THE COURT:  Yes.

11             (Whereupon, the above-mentioned exhibits were

12        published to the jury.)

13        MR. BIANCAVILLA:  I have nothing further, Judge.

14        THE COURT:  Mr. Chamberlain?

15   CROSS-EXAMINATION

16   BY MR. CHAMBERLAIN:

17   Q    Mr. Hussain, you are a citizen of what country?

18   A    Citizen of Pakistan.

19   Q    Are you a legal resident alien here in the United

20   States?

21   A    Yes, sir.

22   Q    When did you get that status?

23   A    Two day before I get my new card, my card, I give

24   them that and my new card is valid 12 of May to 2003 of

25   May.  It's one year valid.

People - Hussain - Cross

1    Q    Two days before today, is that what you are

2    saying?

3    A    I get -- it's the 13th May.  I got to immigration

4    office in Manhattan.  I get a new card.  My expired card,

5    I give them.

6    Q    When did you first get legal status?

7    A    That is 1995 I came this country.  I get my first

8    authorization in 1997.  1997 I get a permit.

9    Q    Were you -- was your status effected by the fact

10   you married an American citizen?

11        MR. BIANCAVILLA:  Objection.

12        THE COURT:  Sustained.

13   Q    Do you recall being questioned previously by an

14   investigator for the defense, Mr. Newman(phonetic)?

15   A    I no understand that, sir.

16        THE COURT:  Will the interpreter please translate

17        for the witness.

18        Repeat the question.

19        (Whereupon, the Urdu interpreter interpreted the

20        question as requested.

21   Q    Do you recall being questioned by an investigator

22   for the defense, a Mr. Newman?

23        MR. BIANCAVILLA:  Objection.  May I approach?

24        THE COURT:  Come forward, counsel.

25             (Whereupon, the following took place at the

People - Hussain - Cross

1   bench outside of the hearing of the defendant and

2   jury.)

3   MR. BIANCAVILLA:  Judge, if he has notes or any

4   type of statement obtained from this witness by his

5   investigator, the People are entitled to it.

6   THE COURT:  Mr. Chamberlain?

7   MR. BIANCAVILLA:  We have not been provided with

8   any of those notes and we are entitled to them.

9   MR. CHAMBERLAIN:  I have voluminous notes.

10  MR. BIANCAVILLA:  I want a copy before

11  cross-examination.

12  THE COURT:  You should turn them over to the

13  People.  Why don't I break at this point and give you

14  an opportunity to make copies?

15  MR. BIANCAVILLA:  Thank you, Judge.

16  THE COURT:  We'll break until two o'clock.

17  MR. CHAMBERLAIN:  Okay.

18  (Whereupon, the following took place in open

19  court.)

20  THE COURT:  Ladies and gentlemen, we are going to

21  break at this point for lunch.

22  Do not discuss the case amongst yourselves or

23  with anyone else.  Keep an open mind.  Do not form or

24  express any opinions until the entire case has been

25  completed.

People - Hussain - Cross

1    Do not read or listen to any accounts of the

2    case should they be reported in the media.  Do not

3    visit or view any place or premises that have been

4    mentioned.

5        You are not to permit any party to discuss the

6    case with you or attempt to influence you, and you

7    must promptly report to the Court any violation

8    thereof.

9        Have a good lunch and we'll see you at 2:00 p.m.

10       Mr. Hussain, we'll see you at 2:00 p.m.  Do not

11   discuss this case with anyone.

12       THE WITNESS:  Okay, sir.

13       THE COURT:  You may step down.

14           (Whereupon, a luncheon recess was taken.)

15       A F T E R N O O N   S E S S I O N

16       THE CLERK:  Case on trial continued.  All parties

17   present.  The jurors are not present at this time.

18       People ready?

19       MR. BIANCAVILLA:  Ready.

20       THE CLERK:  Defendant?

21       MR. CHAMBERLAIN:  Ready.

22       MR. BIANCAVILLA:  Briefly, I want to make sure

23   there are no potential witnesses present in the

24   courtroom while we are going through the trial.

25       The second thing, Mr. Chamberlain handed me

1526

Proceedings

1    several pages of notes and he told me later on this

2    is a transcript of a taped conversation.  The People

3    do not have a copy of the tape recording this was

4    made from.

5        I don't want to hold up the cross-examination of

6    this witness, but after reviewing the tape, if

7    something comes up, I want to be permitted to recall

8    the witness, if necessary.

9        THE COURT:  Mr. Chamberlain, are there any

10   witnesses in the courtroom?

11       MR. CHAMBERLAIN:  To my knowledge, none, except

12   possibly character witnesses.

13       MR. BIANCAVILLA:  I have no problem with the wife

14   in the courtroom, but I would ask any others be

15   excluded.

16       MR. CHAMBERLAIN:  I didn't move to have --

17       MR. BIANCAVILLA:  Your Honor, I believe you, in

18   the beginning of the trial, asked us if any witnesses

19   were present in the courtroom and I assured you there

20   were no witnesses present.

21       MR. CHAMBERLAIN:  I never heard anything about

22   witnesses.

23       THE COURT:  You have no recollection at this

24   point?

25       MR. BIANCAVILLA:  I'm not trying to make an issue

Proceedings

1   out of it.  I'm just asking, if a potential witness is

2   in the courtroom, they be excluded at this time.

3           THE COURT:  Other than the defendant's wife?

4           MR. BIANCAVILLA:  Right.

5           THE COURT:  Mr. Chamberlain?

6           MR. CHAMBERLAIN:  Other than the defendant's

7   wife, the answer is there will be no other witnesses.

8   There are no other witnesses.

9           THE COURT:  With respect to the tape, you'll

10  provide it to Mr. Biancavilla?

11          MR. CHAMBERLAIN:  Yes, Judge.

12          THE COURT:  You'll give him an opportunity to

13  listen to it, provide him a copy.

14          MR. CHAMBERLAIN:  Absolutely.

15          MR. BIANCAVILLA:  If he brings it tomorrow, I can

16  review it.

17          MR. CHAMBERLAIN:  I believe I can do that.

18          THE COURT:  Fine.

19          Anything else?

20          MR. BIANCAVILLA:  No, Judge.

21          THE COURT:  Bring the jury in.

22          COURT OFFICER:  Jury entering.

23              (Whereupon, the sworn jurors entered the

24          courtroom and resumed their respective seats.)

25          THE CLERK:  Do both sides stipulate that all

Proceedings

1      sworn jurors are present and properly seated?

2              MR. BIANCAVILLA:  Yes.

3              MR. CHAMBERLAIN:  So stipulated.

4              THE COURT:  Ladies and gentlemen, I just want to

5      apologize for our late start this afternoon.  I had

6      other court business to take care of.  From time to

7      time that will happen.  I just wanted to let you know

8      we were thinking of you but sometimes things are

9      beyond our control.

10             At this point we are ready to proceed.  Ask the

11     witness to come back in

12                  (Whereupon, the witness resumed the witness

13             stand.)

14             MR. CHAMBERLAIN:  Mr. Biancavilla, may I have

15     People's 85 and 88?

16             THE CLERK:  Sir, you are reminded your still

17     under oath.

18             MR. CHAMBERLAIN:  I think 85 would be the

19     employee record and 88 would be the poster.

20             THE COURT:  You may inquire, Mr. Chamberlain.

21  CROSS-EXAMINATION

22  BY MR. CHAMBERLAIN:

23     Q     Mr. Hussain, you indicated that -- withdrawn.

24             Let me show you People's 88.

25             Is that the poster you say you saw on Friday after

People - Hussain - Cross

1    the murder?

2        A    Yes.

3        Q    And you heard about the murder Thursday night when

4    you saw the police car?

5        A    Yes, sir.

6        Q    And you knew Thursday night that the murder

7    involved a woman you knew who was a customer of yours?

8        A    Yes, customer.

9        Q    Sir, would you look at the top of that poster and

10    tell me when it was issued?

11        Do you read English?

12        A    Yes, sir.

13        Q    Will you tell me when it was issued?

14        A    Information wanted, all call --

15        Q    At the top, very top, issued what date?

16        A    Date of issue, April 13th, 2000.

17        Q    Mr. Hussain --

18        MR. CHAMBERLAIN:  I am going to ask the Court

19    take judicial notice that Friday was April 14th, the

20    Friday you are referring to was April 14th.

21        THE COURT:  Show me a copy of a calendar, please.

22        You want me to take judicial notice that April

23    13th, 2000, was a Thursday?

24        MR. CHAMBERLAIN:  Actually, that Friday was

25    April 14th.

People - Hussain - Cross

1    THE COURT:  Yes, I'll take judicial notice of

2    that.

3        MR. CHAMBERLAIN:  Thank you.

4    Q    You are telling us you saw this poster before it

5    was issued?

6        MR. BIANCAVILLA:  Objection.

7        THE COURT:  I'll permit that.

8        MR. BIANCAVILLA:  Judge, it's an improper

9    question.

10       MR. CHAMBERLAIN:  I object to that comment.

11       THE COURT:  I'll let the witness answer.

12   A    Yes.

13       THE COURT:  Do you understand the question?

14       THE WITNESS:  No.  Say again, sir.

15       MR. CHAMBERLAIN:  May we have the question read

16   back?

17       THE COURT:  Yes, read it back.

18           (Whereupon, the court reporter read back the

19           requested question.)

20       MR. BIANCAVILLA:  Judge, I object.  It's

21   argumentative.

22       MR. CHAMBERLAIN:  Since we have --

23       THE COURT:  Excuse me.  I will let you ask the

24   question.

25   A    Actually, this poster I see outside.  I tell you

People - Hussain - Cross

1    Friday before, but, actually, this one is after, and I see

2    the poster after that.  I am not sure what date but that

3    is after, two days, that I see the poster on the window.

4        Q    Mr. Hussain, you told this jury that you knew the

5    woman?

6        A    Blonde hair lady.

7        Q    Blonde hair, as a regular customer, and you know

8    the person you had sold these articles to was a regular

9    customer; is that correct?

10       A    Yes, she is a regular customer.

11       Q    And on Thursday, the day after the -- withdrawn.

12            On Thursday, April 13th --

13       A    Yes.

14       Q    -- you were aware that she had been murdered?

15       A    I was in the shop.

16       Q    In the shop?

17       A    In the store, nighttime.

18       Q    But you knew at that point that this blonde woman

19   you knew as a regular customer had been murdered?

20            MR. BIANCAVILLA:  Objection.  I object.

21            THE COURT:  I'm not sure I understand the

22       question, Mr. Chamberlain.

23            Sustained as to form?

24       A    But --

25            THE COURT:  No.  When I sustain an objection, you

People - Hussain - Cross

1    don't have to answer.

2            THE WITNESS:  Okay, sir.

3    Q    When did you first become aware of the fact there

4    had been a murder near your 7-Eleven?

5    A    7-Eleven -- I'm sorry, sir, I need --

6            THE COURT:  Please, madam interpreter, did you

7        hear the question?

8            THE INTERPRETER:  Yes.

9            THE COURT:  Will you translate for the witness,

10       please?

11           (Whereupon, the Urdu interpreter interpreted the

12       requested question.)

13   A    Then I remember then detective came my home and he

14   show me this picture, that Friday.  Then I remember she

15   is -- I mean, I someone killing dead woman.

16   Q    After the detective came to your home -- when was

17   that?

18   A    It was after two week that he came my home,

19   detective.

20   Q    Well, did you sign a statement on the date the

21   detective came to your home?

22   A    After two week that is, I mean, I saw the picture,

23   and after two week, he came my home.

24   Q    Did you sign a statement on that day?

25   A    Date, two day before I leave vacation is 5th of

People - Hussain - Cross

1    May and the detective came the 3rd of May.

2            THE COURT:  Did you understand the question?  Did

3        you sign a statement on that date?

4            THE WITNESS:  Yes, I sign.  I don't remember what

5        date, sir, but I sign before I go on vacation, two,

6        three, days, that I remember.

7        Q    Before you went on vacation?

8        A    I go on vacation.

9        Q    When did you go on vacation?

10       A    I go back country.

11       Q    What?

12       A    I go to Pakistan.

13           THE COURT:  When did you go to Pakistan?

14       Q    When?

15       A    The 5 of May.

16       Q    May 5th?

17       A    Yes, sir.

18       Q    Of 2000?

19       A    Yes.

20       Q    When did you sign the statement?

21       A    It almost two or three day before, but I not sure

22   what date, but I remember it two, three days before I

23   sign.

24       Q    Are you sure you went to Pakistan on May 5th,

25   Mr. Hussain?

People - Hussain - Cross

1     Are you sure you went to Pakistan on May 5th?

2     A     Yeah, May 5th I leave.  This is the 5 of May.

3     Q     It was a number of days before that when you

4     signed the statement.  Are you sure of that?

5           MR. BIANCAVILLA:  Objection.  That wasn't his

6           testimony, Judge.

7           THE COURT:  Sustained.

8     Q     With reference to the date you went to Pakistan,

9     which you are sure was May 5th, how long before that date

10    did you sign the statement?

11          MR. BIANCAVILLA:  Objection.  Form.

12          THE COURT:  Sustained as to form.

13    Q     With reference to the date you went to Pakistan,

14    can you tell us when you signed the statement?

15          MR. BIANCAVILLA:  Same objection, Judge.

16          THE COURT:  I'll let that stand.

17    A     Two, three days before I told you on the 5 of May

18    I leave.  And two, three days before I sign, but I'm not

19    sure what the date was.

20    Q     And that was the first time that you remembered

21    that the woman you knew as a regular customer had been

22    murdered?

23          MR. BIANCAVILLA:  Objection.

24    A     No, that is I saw --

25          THE COURT:  Wait.

People - Hussain - Cross

1    Q    Did the detective tell you that there had been a
2    woman murdered when he saw you and you signed the
3    statement?
4          MR. BIANCAVILLA:  I object.
5    A    Then I see --
6          THE COURT:  You have to wait until I rule on the
7       objection.
8          THE WITNESS:  I'm sorry.
9          THE COURT:  I'll permit that.  You can answer
10      that.
11         THE WITNESS:  No answer?
12         THE COURT:  You can, yes.
13   A    This time I see this poster.  Then I remember that
14   is the lady that is my regular customer for the Vantage
15   Light 100 cigarettes.  Then I remember because she's dead.
16   This time I remember.  This time I see the poster on the
17   front window.
18   Q    If I tell you, sir, that a statement purportedly
19   signed by you is dated May 5th, would that refresh your
20   recollection?
21   A    May 5, I not was here.  May 5, eight o'clock, nine
22   o'clock, my flight is take off.  May 5, I not here.
23   Q    You're sure about that?
24   A    Yes.  Evening time, 8:30, nine o'clock, I leave.
25   But I go inside seven o'clock.  I already got my boarding

People - Hussain - Cross

1    card.  Already I get it, two hours before, 5 of May.

2              MR. CHAMBERLAIN:  I would like to have this

3        document marked.

4                    (Whereupon, the above-mentioned item was

5              marked as Defendant's Exhibit W for identification

6              only.)

7              COURT OFFICER:  Defendant's W marked for

8        identification.

9        Q    Will you look at that document?  Look at the

10   front.

11       A    That date is 5.  That is actually I was not here

12   on May 5.  May 5, evening time, I leave.  I have boarding

13   card for my ticket.

14       Q    Look at the bottom of that page.  Is that your

15   signature?

16       A    Yes, my signature.

17       Q    But there was no date of May 5 when you signed

18   that; is that your testimony?

19             MR. BIANCAVILLA:  Objection.

20             THE COURT:  Sustained.

21             MR. BIANCAVILLA:  Judge, we can put that in

22       evidence, if you would like.

23             MR. CHAMBERLAIN:  I object to those completely

24       gratuitous remarks.

25             THE COURT:  Mr. Chamberlain and Mr. Biancavilla,

People - Hussain - Cross

1    please.

2         MR. CHAMBERLAIN:  I would ask the jury be

3    instructed to disregard that.

4         THE COURT:  The jury should disregard the

5    colloquy between counsel and the Court.  It is not

6    evidence and you should not consider it.

7    Q    Is that the statement that you signed?

8    A    Yes, sir.  I read this statement.  I signed.

9    Q    But you are telling me it was not signed on the

10   date it's dated?

11   A    The date I never write in.  I signed this

12   statement.

13   Q    Mr. Hussain, did you tell this jury that you then

14   remembered after the detective visited you about the woman

15   who was murdered?

16        MR. BIANCAVILLA:  Judge, objection.

17   Q    Is that correct?

18        MR. BIANCAVILLA:  Object to the form.

19        THE COURT:  Sustained.

20   Q    Let me put it this way.  You told us, did you not,

21   that you, on Thursday night after -- the Thursday night

22   you saw ambulances and police vehicles near your 7-Eleven;

23   is that correct?

24   A    What date, sir, 13 April, 2000?

25        THE COURT:  No.  Thursday night.

People - Hussain - Cross

1    Q    April --

2    A    Yes, April 13, 2000.

3    Q    Was that about a month before you signed the

4    statement?

5         MR. BIANCAVILLA:  Objection.

6    A    No.

7         THE COURT:  Sustained.

8    Q    Did you tell the detective that it was about a

9    month before on a Thursday night when you saw these

10   vehicles?

11   A    I saw the police car and ambulance.

12        MR. BIANCAVILLA:  Objection.

13        THE COURT:  Overruled.

14   A    But not detective.  I never write the statement

15   this date.

16   Q    Let me show you Defendant's W again, for

17   identification.

18        Does that refresh your recollection as to whether

19   you told the detective it was about a month before, that

20   Thursday night, when you saw police vehicles outside?

21   A    Not before.  I said after one month, sir.  I say

22   after one month.  That is statement.  Then I saw this

23   picture after two weeks.  The detective came my home.

24   This day, nighttime, I write the statement.

25   Q    Did you write the statement?

People - Hussain - Cross

1      A    No, he write it.  But just I did it and after I

2   sign, not I write it.  Just I read this one.  After he

3   read this one, I reading.  He say you certify this whole

4   story?  I say yes and after I sign.

5      Q    Mr. Hussain, is it a fact that it was possibly a

6   month before you signed that statement that you saw police

7   vehicles after Thursday night near 7-Eleven involved in a

8   woman's body being found?

9           MR. BIANCAVILLA:  Objection.

10          THE COURT:  Stop.

11          MR. BIANCAVILLA:  Form of the question.

12          THE COURT:  Sustained as to the form.

13          You don't have to answer.

14     Q    The Thursday night that you are referring to in

15  April, was that April 13th?

16     A    April 13.

17     Q    And did you find out on April 13th who that woman

18  was?

19          MR. BIANCAVILLA:  Objection.

20          THE COURT:  I'll permit that.

21     Q    Did you find out on April 13th who that woman was?

22     A    No.  I asked the customer.  Customer say somebody

23  dead in the bar but I don't know who.  Then I find -- I

24  saw the picture of this one.  Thursday night, I don't know

25  who is dead.  I don't know.

People - Hussain - Cross

1    Q    When did you see the picture?

2    A    I see the picture after two day on my window on

3    the outside in the door, that 7-Eleven main door.  Outside

4    I see this one.

5    Q    When?

6    A    After Thursday.

7    Q    After Thursday?

8    A    Yeah.

9    Q    What day is after Thursday?

10    A    Friday night.  That is when my shift start, Friday

11    night, but I off Saturday morning.  I think it is Friday

12    night.

13    Q    That would be Friday the 14th of April?

14    A    No.  No.  Friday.  14 is Friday.  I off.  Thursday

15    night I came, that is 14 morning I go.  This is on my

16    shift, night shift.  I came 11:00 p.m. Thursday night and

17    the 14, April, is a Friday.  Seven o'clock I go.

18    Q    Did you tell the detective when you spoke to him

19    and signed the statement that the day after that Thursday

20    night, in the newspaper, I saw the story about the woman

21    who had been murdered?

22    A    Yes, sir, I see that newspaper.

23    Q    That would be Friday the 14th of April, right?

24    A    That is morning, Friday.

25    Q    Did you tell him I saw the picture, you saw a

People - Hussain - Cross

1  picture you recognized as the woman who was a steady

2  customer, the blonde?

3      A    Yeah, this lady.  I remember this one, blonde

4  lady, blonde hair lady.

5      Q    Mr. Hussain --

6      A    Yes, sir.

7      Q    At that point you were already aware that you

8  had -- the purchase you have testified to here by another

9  regular customer, two nights before, is that right?

10     A    Two night before who customer?  Oh, yes.  Yeah,

11 he's a regular customer too.

12     Q    When you saw her picture in the paper, you knew

13 that she was the person that had been murdered right

14 there; right?

15     A    Yes.

16     Q    And you knew that whatever you put in this

17 statement to the detective sometime in May, you already

18 knew that, that Friday night, did you not?

19          MR. BIANCAVILLA:  Objection to the form.

20          THE COURT:  Sustained as to the form.

21     Q    The information that you put in this statement

22 about what you claim Mr. Scrimo purchased, you already

23 knew on Friday the 14th of April; right?

24          MR. BIANCAVILLA:  Objection.

25          THE COURT:  Sustained.  Form.

1912

People - Hussain - Cross

1    Q    Before you saw any poster involving a reward, did

2    you tell anybody about what you claim -- what you have

3    testified to here today?

4         MR. BIANCAVILLA:  Objection.

5         THE COURT:  Sustained.

6    Q    When, Mr. Hussain, was the first time you told

7    anybody about your sale to Mr. Scrimo on -- in the early

8    morning hours of April 12th, 2000?

9    A    Then is detective that came my home and I write

10   the statement that night.  I tell that guy, came

11   Tuesday -- Wednesday morning, my shift is Tuesday night.

12   It start, but Wednesday morning I tell the detective I saw

13   him.  He came over my store.  I sold the beer and Marlboro

14   Lights box and Vantage Light box and one condom.

15   Q    Mr. Hussain, did you make any notation of that

16   sale at the time it was made?  Did you write anything down

17   about that sale?

18   A    I'm sorry?

19   Q    Did you make --

20        THE COURT:  Did you hear the question, madam,

21        interpreter?

22        THE INTERPRETER:  Yes.

23        THE COURT:  Please interpret for the witness.

24        (Whereupon, the Urdu interpreter interpreted the

25        requested question.)

People - Hussain - Cross

1    A    I rang Marlboro light box and Coors Light 12 pack,

2    bottle, and Vantage Light 100.  Then I saw him and after

3    he said don't tell my wife, then he asked me about Vantage

4    Light 100.  I say you buy for blonde lady.  He said yes.

5    And after I asked him, he pay me.  My drawer is open and I

6    put in money in the drawer.  My drawer is open after I

7    said to him you take some condom too.  He say okay.  I

8    give him condom.  I never ring this one.

9         MR. CHAMBERLAIN:  Move to strike all this.

10        THE COURT:  The jury should disregard the

11        unresponsive part.

12   Q    Did you make any notation of that sale yourself,

13   did you write anything down?

14   A    No.  I just put in the computer.

15   Q    The computer shows sales that are registered and

16   for which you collect money; right?

17   A    Yes, I collect money.  Yes.

18   Q    I am going to show you People's 84 and ask you if

19   you recognize that document?

20   A    Yes, three item, that one is toilet paper, bottle,

21   Coors Light and Vantage --

22        THE COURT:  Mr. Hussain, you have to slow down

23        because the reporter has to take everything you say

24        down on that.

25   A    I gave him three items I sold him.  Number one is

1344

People - Hussain - Cross

1    Coors Light, 12 pack.   Number two is Marlboro box, light,

2    and number three is Vantage Ultra Light 100, box.   Then I

3    sold him -- he pay this one and this time he opened out of

4    the drawer, that is my drawer is opened same time I tell

5    him, I say, take the condom too.   He say okay.   I give him

6    condom but that item I never ring in the register.   I put

7    in money just in the drawer and the drawer closed.   Then

8    his condom, it never shows on the sheet.

9         Q     You have answered more than I asked, Mr. Hussain,

10   but that's fine.

11              Mr. Hussain, that sheet also shows no sale, does

12   it not?

13        A     No sale?

14        Q     No sale, N O sale?   Do you understand no sale?

15        A     No have anything here that is understand, no sale.

16        Q     Does it say aborted?

17        A     Then I don't know what it means.   This one, my

18   boss maybe know, but I don't know what it mean.

19        Q     What about next transaction right under that, the

20   same time, no sale?

21        A     No sale mean that I opened the no sale drawer for

22   charge for something.   But when I count money at the

23   change of shift and I have to count money, I put in bank

24   money inside, and the rest money I have to deposit.   Then

25   I use no sale.

People - Hussain - Cross

1  Q    I am going to ask you to take a look at

2  Defendant's --

3            THE COURT:  You want to mark something?

4            MR. CHAMBERLAIN:  Yes.

5            THE COURT:  That'll be X.

6  Q    Defendant's X which will be a series --

7            THE COURT:  First of all, Mr. Chamberlain, we

8  have to mark it before we do anything else.

9            MR. CHAMBERLAIN:  I'm trying to figure out how

10  many pages, Judge.

11           THE COURT:  For what purpose are you showing this

12  to him?

13           MR. CHAMBERLAIN:  For questions I want to ask

14  him.

15           The exhibit would be all of the page in this

16  book from that page on.

17               (Whereupon, the above-mentioned item was

18           marked as Defendant's Exhibit X for identification

19           only.)

20           COURT OFFICER:  Defendant's X marked for

21  identification.

22           THE COURT:  Go ahead.

23  Q    Please review those for a second, Mr. Hussain.

24  Run through those pages there, please, and see if you

25  recognize them?

People - Hussain - Cross

1    A    The page?

2         THE COURT:  There are multiple pages there.

3    That's more than one page, Mr. Hussain.  I think he

4    wants you to look at all the pages that have been

5    marked for identification from that point on.

6         THE WITNESS:  That is page --

7         THE COURT:  No.  Just review them and when you

8    are ready let us know.

9         THE WITNESS:  Okay.

10   Q    Would you tell us when each one of those pages,

11   sales transactions, took place?

12        Are those records of sales transactions during

13   your shift?

14   A    Yes, sir.

15   Q    Are there any that indicate -- they all are normal

16   sales, are they not?

17        MR. BIANCAVILLA:  Objection.

18        THE COURT:  Sustained as to form.

19   Q    Well, they all indicate normal sales, do they not?

20        MR. BIANCAVILLA:  Objection.

21        THE COURT:  Sustained.

22        MR. CHAMBERLAIN:  Withdrawn.

23   Q    Do any of those other sales transactions indicate

24   that they were aborted?

25        MR. BIANCAVILLA:  Objection.

People - Hussain - Cross

1    THE COURT:  Sustained as to relevancy.

2    Q    Mr. Hussain, as you sit here, do you have any idea

3    why the sale that you refer to was aborted?

4    MR. BIANCAVILLA:  Objection.

5    A    I don't remember, sir.

6    THE COURT:  We are talking about the specific

7    sale on this particular evening?

8    MR. CHAMBERLAIN:  That's correct, Judge.

9    THE COURT:  I'll let him answer.

10   A    I don't know what it means but that is a -- this

11   is printing that I remember, but other one, that is

12   A-B-O-R-T-E-D.  I don't know what it means.  Maybe my boss

13   would know, but I don't know what it means.

14   Q    But you were visited, were you not, by an

15   investigator from the defense, Mr. Hussain?

16   A    I need help.

17   THE COURT:  Did the interpreter here the

18   question?

19   Could you repeat the question, Mr. Chamberlain.

20   Q    You were visited by an investigator for the

21   defense?

22   (Whereupon, the Urdu interpreter interpreted the

23   question as requested.

24   A    Yes, detectives came my home.  Nobody else came,

25   just detectives and other guy with him.  Two guys came my

People - Hussain - Cross

1    home.

2          Q    What about your gas station?

3          A    No.  Gas station, nobody came.  Gas station, I

4    never work.  I work for 7-Eleven but after 7-Eleven then I

5    finish.  I came back from vacation after three months, 5

6    of August I came back, and after is when the detective I

7    see again.

8          Q    Do you recall being asked whether you had obtained

9    permanent legal status and saying yes, you got it by being

10   married?  Does that refresh your recollection?

11         MR. BIANCAVILLA:  Objection.

12         THE COURT:  Wait.  Wait.

13         MR. BIANCAVILLA:  First, there's no proper

14   foundation for the question and, second, it is

15   irrelevant.

16         MR. CHAMBERLAIN:  It's not irrelevant.  I object

17   to the comments.

18         THE COURT:  They are not comments.

19         Sustained.

20         MR. CHAMBERLAIN:  May we be heard with respect to

21   this?

22         THE COURT:  Come forward.

23              (Whereupon, the following took place at the

24         bench outside of the hearing of the jurors and

25         defendant.)

People - Hussain - Cross

1      THE COURT:  Mr. Chamberlain, what do you want to

2  ask the witness?

3      MR. CHAMBERLAIN:  I want to ask the witness about

4  conflicting answers.

5      THE COURT:  Tell me.

6      MR. CHAMBERLAIN:  I am trying to.

7      THE COURT:  I understand you are alleging

8  conflicts.  Tell me what you want to ask him.

9      MR. CHAMBERLAIN:  I want to ask him when he was

10  married because the answers he's given previously are

11  conflicting and there's a basis for asking whether a

12  person is here on fraudulent grounds.  I think I have

13  the right to ask.

14      THE COURT:  The man said he was a resident alien.

15  Let me ask you this.  Is there something different in

16  here?  Did he tell your investigator something other

17  than that?

18      MR. CHAMBERLAIN:  He said do you have permit,

19  legal residence, and he said, yes, I married here then

20  he --

21      THE COURT:  But that's not conflicting.  He's

22  still a permit resident.

23      MR. CHAMBERLAIN:  He said he came in 1995.  Then

24  he was asked -- and how long have you been married.  I

25  got married in 1970.  The second marriage -- when was

People - Hussain - Cross

1    the second marriage?  October 2001.  Now, that's

2    conflicting because he got his legal status when he

3    first came here in 1995.

4        THE COURT:  What's that got to do with being

5    remarried?  People do that all the time.

6        MR. CHAMBERLAIN:  He got married, apparently, a

7    third time because he divorced that woman who he said

8    he met in the gas station, he divorced that woman and

9    apparently married someone else.

10        THE COURT:  Okay.

11        MR. CHAMBERLAIN:  I think I have a right to probe

12    him on whether he's here -- got here on fraudulent

13    grounds.  That's what I am asking.

14        THE COURT:  Mr. Biancavilla?

15        MR. BIANCAVILLA:  I don't think it's relevant to

16    anything, first of all.  Second of all, the proper

17    foundation hasn't been laid for asking those

18    questions.

19        I am not about to start explaining the proper

20    foundation on that, but, with respect to the

21    relevancy, he questioned him about his legal status,

22    the fact that he has a resident alien card.  I think

23    that further inquiry is just...

24        THE COURT:  The reason why he is a resident alien

25    is of no moment.  If he got it because he married a

People - Hussain - Cross

1    woman, that's fine.

2         MR. CHAMBERLAIN:  Except, Judge, if that was a

3    fraudulent marriage.  If he married the woman for the

4    purpose of getting status here and then divorced her

5    and he had no basis for that, that would be a proper

6    line of inquiry.

7         MR. BIANCAVILLA:  It's not, Judge.

8         MR. CHAMBERLAIN:  Any time I ask a question with

9    respect to this --

10        THE COURT:  When did that marriage take place,

11   Mr. Chamberlain?

12        MR. CHAMBERLAIN:  I don't know.

13        THE COURT:  Tell me you have it.

14        MR. CHAMBERLAIN:  I have gotten conflicting

15   answers.

16        THE COURT:  You haven't gotten any conflicting

17   answer as of yet.

18        MR. CHAMBERLAIN:  Previously the questions were

19   asked and we got conflicting answers.

20        THE COURT:  I see no relevancy whatsoever.  He

21   says that he's a resident alien.  There's nothing here

22   that indicates he wasn't.  All you have told me is

23   that he was a resident alien because he married a

24   woman.  You are alleging he married this woman for

25   some collateral reason.  There's no evidence to that.

People - Hussain - Cross

1      That's totally collateral.  I won't permit you to go

2         into that.

3            MR. BIANCAVILLA:  Thank you, Judge.

4                (Whereupon, the following took place in open

5                court.)

6                (Whereupon, the witness resumed the witness

7                stand.)

8    CONTINUING CROSS

9    BY MR. CHAMBERLAIN:

10      Q    Were you not visited by an investigator and myself

11    in connection with this case in April of 2002?

12      A    2002?

13      Q    Yes.

14      A    Yes, somebody came, detectives came.  One time you

15    came.  One time his lawyer, the other guy came.

16      Q    Did the district attorney come?

17      A    No, not to my home.  He never came over.

18      Q    Do you remember being asked in April of 2002 about

19    a prior statement you had given to an investigator?

20            MR. BIANCAVILLA:  Objection.

21            THE COURT:  Sustained.

22      Q    The detective that came, do you remember his name?

23      A    His name is -- first name is John.  I have a card.

24    But the name, I calling him John.  John what he's actually

25    named but I call him John Mickel(phonetic).

People - Hussain - Cross

1   Q   Did anybody tell you in those visits about

2   answering questions of anybody else?

3   A   No.

4   Q   Do you remember answering questions that asked

5   whether anybody had been there and answering that the

6   detectives and district attorney came --

7   MR. BIANCAVILLA:  Objection.

8   Q   -- and told me not to answer any question of

9   anybody else?

10   MR. BIANCAVILLA:  Objection.

11   THE COURT:  Sustained.

12   Q   Do you remember my being there, Mr. Hussain?

13   A   I'm sorry?

14   Q   Do you remember my being there?

15   A   You came to my station.

16   Q   Before I came, had you been visited by anybody --

17   it was a gas station, wasn't it?

18   A   Yeah, his lawyer came.  He said I am the lawyer

19   and he came over there and he asked me some questions.  He

20   say I am talking about that murder case.

21   Q   Who is he?

22   A   I don't know what his name was but he's a tall

23   guy.  I just remember his face.

24   Q   From the district attorney's office?

25   A   No.  No.  That guy.

1354

People - Hussain - Cross

1    Q    Mr. Hussain, do you recall being asked why you

2    waited for a number of weeks after you knew this girl was

3    dead to tell the police what you knew?

4              MR. BIANCAVILLA:  Objection.

5              THE COURT:  I'll let him ask.

6              MR. BIANCAVILLA:  There's no foundation for this

7         as to the date, the time, or where.  There's no

8         foundation for this question.

9    Q    Do you remember the date?

10             THE COURT:  Put a little more specificity into

11        it, Mr. Chamberlain, please.

12   Q    You were visited in April of 2000 by myself and an

13   investigator; right?

14   A    You came a couple weeks before.  Two weeks before

15   you came over.

16   Q    With another man?

17   A    Yes, you came together.  You say I see you in

18   court again.  That was your last word.  You say anybody

19   give -- that I remember the story that you were talking

20   about with me.

21             THE COURT:  Mr. Hussain, slow down.

22             THE WITNESS:  Sorry, sir.

23             MR. BIANCAVILLA:  I'm not sure of that answer,

24        Judge?

25             THE WITNESS:  Sorry.

People - Hussain - Cross

1    Q    Mr. Hussain, do you recall being asked a question

2    as to why you didn't report this earlier?

3              MR. BIANCAVILLA:  Same objection.

4              THE COURT:  When was that, Mr. Chamberlain?

5              MR. CHAMBERLAIN:  April 19th, 2002.

6              MR. BIANCAVILLA:  What page of the transcript.

7              MR. CHAMBERLAIN:  Page 10.

8    Q    Do you recall being asked, Mohammed, why did you

9    wait for two or three weeks?

10             MR. BIANCAVILLA:  What line, Mr. Chamberlain?

11             MR. CHAMBERLAIN:  Bottom of page.

12             MR. BIANCAVILLA:  One moment, please.

13             Page 10?

14             MR. CHAMBERLAIN:  Page 10, April 19th, 2002.

15   Q    When you found out --

16             MR. BIANCAVILLA:  Mr. Chamberlain, you gave me

17   that -- one moment -- okay.  I see it now.

18             THE COURT:  Go ahead, Mr. Chamberlain.

19   Q    Let me withdraw the question.

20             I'll put it this way.  Let me just ask you,

21   Mr. Hussain, Thursday, April 13th, you knew that there was

22   a person killed?

23             MR. BIANCAVILLA:  Objection.

24             THE COURT:  I will permit that.

25   Q    Right?

People - Hussain - Cross

1    A    No.  Somebody told me there's somebody dead in the

2    bar but I don't know who.  Nobody tell me who is dead.

3    Q    Friday, the next day, you saw the person's picture

4    in the newspaper?

5    A    After two days.  Not same day, next day.  After

6    two days I saw that poster.  I see that one.  That one I

7    see.  Then I recognized this is my customer.  Lady is

8    dead.  This time I don't remember.

9    Q    And you recognized that picture in the newspaper

10    as your customer?

11    A    Yes, sir.

12    Q    The customer you referred to in your testimony

13    here, your regular customer?

14    A    Yeah, regular.

15          MR. BIANCAVILLA:  Objection to the form of the

16    question.

17          THE COURT:  Overruled.

18    Q    And you -- did you tell anybody that you had made

19    a sale in the early morning hours of April -- withdrawn.

20          When you found out she was dead, did you find out

21    when they thought she had been killed?

22          MR. BIANCAVILLA:  Objection.

23    Q    Did the store --

24          THE COURT:  Stop.

25          Sustained.

People - Hussain - Cross

1    Q    Did you tell anybody about the transaction you

2   testified to here at that time?

3    A    No.

4    Q    Why not?

5         MR. BIANCAVILLA:  Objection.

6         THE COURT:  Sustained.

7         MR. CHAMBERLAIN:  Let me withdraw the question,

8   Judge.

9    Q    Did you know about the reward at that point?

10   A    Sir, I no want --

11   Q    Did you know about the reward, yes or no?

12   A    No, I never get it.  I know there was a reward but

13  I never call anybody, but I don't know.

14        MR. CHAMBERLAIN:  Nothing further.

15        THE COURT:  Mr. Biancavilla?

16        MR. BIANCAVILLA:  Nothing.

17        THE COURT:  You may step down.

18             (Whereupon, the witness was excused from the

19             witness stand.)

20        THE COURT:  Call your next witness please.

21        MR. BIANCAVILLA:  Detective Cereghino.

22  D E T E C T I V E   J A M E S   C E R E G H I N O, a witness

23  called on behalf of the People, having been duly sworn,

24  testified as follows:

25             COURT OFFICER:  Please state your name, spelling

                   People - Det. Cereghino - Direct

1        your last name, shield number and command.

2               THE WITNESS:  James C-E-R-E-G-H-I-N-O.  Shield

3        561.  I am a detective assigned to the Homicide Squad

4        of the Nassau County Police Department.

5               MR. BIANCAVILLA:  May I inquire?

6               THE COURT:  Yes.

7               MR. BIANCAVILLA:  Thank you.

8    DIRECT EXAMINATION

9    BY MR. BIANCAVILLA:

10       Q    Detective Cereghino, good afternoon.

11       A    Afternoon.

12       Q    Detective, will you tell the jury how long you

13   have been a police officer?

14       A    Twenty-seven years.

15       Q    How long have you been a detective?

16       A    Fifteen.

17       Q    How long have you been assigned to the Homicide

18   Squad?

19       A    A little over four years.

20       Q    Detective, were you involved in the arrest of

21   Paul Scrimo on the -- in the early morning hours of

22   May 3rd or the evening of May 2nd of 2000?

23       A    Yes, sir.

24       Q    Did there come a time when you and other

25   detectives went to the Village of Farmingdale?

People - Det. Cereghino - Direct

1    A    Yes, we did.

2    Q    Who did you go there with?

3    A    Detective Michael Cole from the Eighth Squad;

4    Detective Robert Dempsey and Detective Warren Zimmerman

5    from the Homicide Squad.

6    Q    Did you go in a particular vehicle?

7    A    Cole and I went in an unmarked van and

8    Detective Dempsey and Zimmerman went out there in a

9    Homicide unmarked car.

10   Q    When you went out there, where did you position

11   yourselves?

12   A    Detective Cole and I parked on a deadend block

13   approximately one block east of Main Street on the north

14   side of the railroad tracks basically between a bar called

15   Falcon's Nest and 25 Elizabeth Street where we knew the

16   defendant to live.

17   Q    Do you remember approximately what time you got

18   there?

19   A    I believe it was approximately 10:00 p.m.

20   Q    Tell the jury what happened?

21   A    We were looking to arrest Paul Scrimo.  We

22   believed that he played darts on Tuesday nights at the

23   Falcon's Nest so we set up observation on the bar.  At

24   around midnight, maybe a little after, we see a gentleman

25   exit the bar and start walking north on Main Street who

People - Det. Cereghino - Direct

1   fit the general description of the defendant.

2       Q    So what did you do?

3       A    We were approximately 150 feet away.  At the time

4   I exited the van with Detective Cole.  We lost sight of

5   him for a short period of time when there were buildings

6   between Main Street and where we were and we met up in a

7   driveway parking lot as he was heading basically east

8   toward where he lived.

9       Q    What did you do?

10      A    As I approached him I asked him if he was

11  Paul Scrimo.  He stated that he was.  At that time I

12  pointed my service weapon at him.  I told him I was the

13  police and I told him to get on the ground, lie face down

14  on the ground.

15      Q    What happened?

16      A    He did and I told him to put his hands behind his

17  head.  He did, and at that time I handed my flashlight to

18  Detective Cole.  I holstered my weapon and I came up

19  behind the defendant and handcuffed him with his hands

20  behind his back.

21      Q    What happened at that point?

22      A    At that time I stood him up.  I frisked him and on

23  the right side attached to his belt there was a letter

24  pouch or sheath.  I wasn't certain what was in there but I

25  considered it to be a possible weapon so I took the item

People - Det. Cereghino - Direct

1    out of there and I secured it on my person.

2        Q    What did you do at that point?

3        A    Upon completing frisking the defendant, the auto

4    that Detectives Dempsey and Zimmerman was closer, and it

5    being a car, I put the defendant in the rear of that car.

6        Q    What did you do at that point?

7        A    At that time Detective Cole and I returned to our

8    van.  We responded over to the command post which was

9    right outside the place of occurrence where the victim had

10   lived.  We secured the command post and at that time we

11   responded to the Homicide Squad.

12       Q    I am going to show you what's in evidence as

13   People's 44.

14            Do you recognize that?

15       A    Yes.

16       Q    What do you recognize that to be?

17       A    I believe this is the tool that I took from the

18   defendant on the night I arrested him.

19       Q    Thank you.

20            MR. BIANCAVILLA:  May we have the easel set up,

21       Judge?

22            THE COURT:  Yes.

23            MR. BIANCAVILLA:  Could we have People's 9 in

24       evidence displayed for the jury, please?

25            THE COURT:  Okay.

People - Det. Cereghino - Direct

1      MR. BIANCAVILLA:  Could we have the witness step

2      out of the witness box.

3      THE COURT:  Yes, you can step down.

4      Q      Please approach People's 9, the map of

5      Farmingdale.

6      Detective, could you just point for the jury and

7      show them where you were positioned when you first

8      observed Mr. Scrimo?

9      A      We had the van backed into here because we

10     believed that the defendant lived over here in this

11     apartment complex and here is the Falcon's Nest where we

12     had a view of whoever came out of there and if he was

13     heading home we would see him.  When he exited the bar, he

14     headed north here.  At that time we exited the van.

15     Detectives Dempsey and Zimmerman were parked over here.  I

16     intercepted the defendant right about here and that's

17     where I arrested him.

18     Q      So that would be in the parking lot between Main

19     Street and the apartment building?

20     A      Main Street and Division Street, yes, sir.

21     Q      Which is right across the street from the 7-Eleven

22     store?

23     A      Yes, sir.

24     Q      Thank you.  You may be seated.

25     Detective Cerenghino, after you placed Mr. Scrimo

People - Det. Cereghino - Direct

1    in the back of Detective Dempsey's vehicle, when was the

2    next time you had any contact with him?

3        A    Approximately 5:25 in the morning.

4        Q    Where was that?

5        A    That was in the Homicide Squad.

6        Q    And where did you have contact with him?

7        A    In the main interview room.

8        Q    Did there come a time when you went into the

9    interview room where Mr. Scrimo was located?

10       A    Yes, I did.

11       Q    Who was with you?

12       A    Detective Cole.

13       Q    Tell the jury what happened?

14       A    Detective McHugh had asked me to go in and

15   interview the defendant.  I entered with Detective Cole.

16   I introduced myself and Detective Cole to him.  I

17   apologized for pointing a gun in his face earlier in the

18   evening, that I was the arresting officer, and that I

19   wanted to speak to him about the night of occurrence, the

20   night Ruthy died.

21           He was willing to speak to me and he told me the

22   night we were talking about he had been in the Falcon's

23   Nest, that he had been drinking heavily in there, that at

24   some point in the evening he had left there and gone down

25   the block to a bar named Granny's.

People - Det. Cereghino - Direct

1    He said that at a later time someone had told him

2    that he had been introduced to Penny, the barmaid, but

3    that he didn't recall that.  He stated that at a later

4    point in the evening he continued further down the block

5    and right around the corner there to another bar by the

6    name of Y.L. Childs.

7        He stated that he went in there and while he was

8    drinking he saw Ruth in there and at some point he saw her

9    leave alone.  He stated that when the bar closed, he left

10   and he walked home.

11       I asked him if he had stopped at the 7-Eleven and

12   he stated that it was possible that he had stopped at the

13   7-Eleven.

14       At that point, rather friendly, I said to him, We

15   know about the beer run.  We know that you had bought beer

16   in the 7-Eleven that night.  For that he gave no response.

17       At that time I asked him, Were you in Ruth's

18   apartment that night?  He said no.  He denied that he had

19   been in that apartment.

20       So at that time I reviewed what he had told me,

21   basically, what he remembered and didn't remember.  He

22   remembered playing darts at Falcon's Nest.  He remembered

23   drinking heavily.  He remembered being in Granny's.  He

24   didn't remember being introduced to Penny.  He remembered

25   being in Y.L. Childs.  He remembered seeing Ruth in there.

People - Det. Cereghino - Direct

1   He remembered seeing her leave alone.  He remembered

2   walking home.  He can't remember going into the 7-Eleven.

3        I said, Why is it that you remember certain things

4   and you don't remember other things?  At that time he

5   said, I am a heavy drinker.  I have blackouts.  At that

6   time -- at that time I said to him, Well, is it possible

7   that you were in Ruthy's apartment that night and you

8   didn't remember?  He said, yeah, that it was possible.

9        At this time I said to him, We know you were in

10  the apartment that the night.  At that point he denied it.

11  Q    What did he say?

12  A    He just sat back.  He started to withdraw and he

13  wouldn't say anything to me.  I said, We know you were in

14  the apartment that night.  And when he wouldn't answer me,

15  that's when I said to him, Was anyone missing from darts

16  tonight?  He wouldn't answer me.  I said, Was John Kane

17  missing from darts tonight?  No response.  I said, Any

18  idea where John Kane's been for last several hours?  He's

19  been with us.  We know what happened in the apartment that

20  the night.

21       No response.  He wouldn't admit he was there,

22  denied he was there, wouldn't say anything.  He just

23  became more sullen and more withdrawn.

24  Q    What happened at that point?

25  A    At that time I concluded the interview.

People - Det. Cereghino - Cross

1    Q    And you left the room with Detective Cole?

2    A    Yes, sir.

3    Q    Thank you.

4         MR. BIANCAVILLA:  I have no further questions.

5         THE COURT:  Mr. Chamberlain?

6         MR. CHAMBERLAIN:  Thank you, Judge.

7  CROSS-EXAMINATION

8  BY MR. CHAMBERLAIN:

9    Q    Detective, you have been a detective for quite a

10   few years.  How many times have you testified.

11   A    Many times.

12   Q    And your recollection of this event -- withdrawn.

13        You've had quite a few cases between April 2000

14   and the present, have you not?

15   A    Quite a few, several, yes.

16   Q    Is there anything about this case that refreshes

17   your recollection as to exactly what was said that night?

18   A    Yes, sir, I took notes that night.

19   Q    You took notes?

20   A    Yes, sir.

21   Q    Other than the notes, anything else?

22   A    I reviewed my grand jury testimony and the

23   hearing.

24   Q    Have you discussed this with other detectives

25   concerning what you recall and they recall?

People - Det. Cereghino - Cross

1     A    No, sir.

2     Q    You discussed it with the district attorney?

3     A    I reviewed the case with the district attorney but

4    not my testimony.

5     Q    Not your testimony?

6     A    No, sir.

7     Q    Before you testified at the grand jury, did you

8    discuss your testimony with any other detective?

9     A    No, sir.

10    Q    Did you discuss it with the district attorney at

11   that time, your testimony?

12    A    No, sir.  I referred --

13    Q    Just -- whatever you are going to say, you said on

14   the stand.

15         MR. BIANCAVILLA:  Objection.

16         THE COURT:  I'll permit it.

17         No.  Sustained.

18         No comments, Mr. Chamberlain.

19         MR. CHAMBERLAIN:  They are not comments, Judge.

20    They are questions.

21         THE COURT:  That's not a question.  That was a

22    comment.

23    Q    Did you just go in without discussing it with the

24   district attorney when you testified before the grand

25   jury?  You didn't discuss anything about your testimony?

People - Det. Cereghino - Cross

1    MR. BIANCAVILLA:  Objection.

2    THE COURT:  Overruled.

3    A    I discussed the fact pattern of the case.  The

4    district attorney at the time told me the questions he was

5    going to be asking me.

6    Q    And you told him what you were going to answer?

7    A    Yes.

8    Q    So did you discuss it with him?

9    A    Yes, sir.

10   Q    When you are sitting around the hallway and you

11   are testifying, didn't you discuss it with other

12   detectives?

13   A    No, sir.

14   Q    What about during the hearing before Judge Ort,

15   did you discuss anything with other detectives?

16   A    No, sir.

17   Q    What about the district attorney at that point,

18   did you discuss it again with him?

19   A    As I said, he would supply me with the questions

20   he was going to ask me.

21   Q    And you told him what the answers were going to

22   be?

23   A    Yes, sir.

24   Q    What about here, did you discuss it with this

25   district attorney?

People - Det. Cereghino - Cross

1    A    Yes, sir.

2    Q    So you did discuss what you are going to testify

3    to with this district attorney?

4    A    Yes, sir.

5    Q    Now, Detective, you said you went out to arrest

6    this defendant on the evening of May 2nd, 2000; is that

7    right?

8    A    Yes, sir.  Before that, earlier that day.

9    Q    You already picked up a suspect.  A person by the

10   name of John Kane.

11        MR. BIANCAVILLA:  Objection to the

12        characterization again.

13        THE COURT:  Do not use the word suspect.  Picked

14        up Mr. Kane.

15        MR. BIANCAVILLA:  I said --

16        THE COURT:  I understand.  Please.

17   Q    Did you pick up a person by the name of --

18        THE COURT:  Picked up also.  I don't know how

19        else, actually, you're going to say it.  I'll permit

20        that.  Go ahead.

21   Q    Did you come into contact with a person by the

22   name of John Kane?

23   A    Yes, I did.

24   Q    What did you do with that person when you came

25   into contact with him?

People - Det. Cereghino - Cross

1    A    I saw John Kane.  I stopped to speak to him.  I

2  told him Detective McHugh would like to speak with him

3  further.  He agreed to speak with Detective McHugh and

4  Detective McHugh came by and took him into Homicide.

5    Q    So you didn't just talk to him there, you took him

6  to the Homicide Squad?

7    A    I believe Detective McHugh brought him in.

8    Q    He was going -- he said it was voluntary, he was

9  going in voluntarily?

10         MR. BIANCAVILLA:  Objection.

11         THE COURT:  Sustained.

12    Q    Did you advise -- withdrawn.

13         Did you advise Kane of his rights at that time?

14    A    No, sir.

15    Q    Nothing about rights?

16    A    No, sir.

17    Q    When you say no, the answer is no there was

18  nothing about rights?

19         MR. BIANCAVILLA:  Objection.

20         THE COURT:  Overruled.  Go ahead.

21    A    When I asked him if he would come in with us to

22  speak to Detective McHugh, did I give him rights then?

23    Q    Yes.

24    A    No.

25    Q    Did anybody?

People - Det. Cereghino - Cross

1    MR. BIANCAVILLA:  Objection.

2    Q    In your presence?

3    THE COURT:  I'll permit that.

4    A    No, sir.

5    Q    Did you have any knowledge he had been advised of

6    his rights at any time with respect to this?

7    MR. BIANCAVILLA:  Objection.

8    THE COURT:  Sustained.

9    Q    You testified before the -- Judge Ort at a hearing

10   in January 2001; is that right?

11   MR. BIANCAVILLA:  Objection.

12   MR. CHAMBERLAIN:  Preliminary question.

13   MR. BIANCAVILLA:  For what purpose, Judge?

14   MR. CHAMBERLAIN:  For this purpose.  Let me

15   finish my question.

16   THE COURT:  I'll hear the question.

17   Q    Were you asked this question --

18   MR. BIANCAVILLA:  Judge, I object.  There's no

19   foundation laid for it.

20   THE COURT:  Come forward.

21   Step down.

22   MR. CHAMBERLAIN:  I'll withdraw it.  I would

23   rather just move on here.

24   THE COURT:  Fine.  Whatever you say.

25   Q    Did you take any -- did you have any role in

                    People - Det. Cereghino - Cross

1    questioning of Kane at Homicide?

2        A    No, sir.

3        Q    Approximately what time did you come into contact

4    with Mr. Kane in Farmingdale?

5        A    On May 2nd?

6        Q    Yes.

7        A    It was late afternoon.  It was around five

8    o'clock, maybe a little later.

9        Q    Do you recall testifying before that it was around

10   three or four?  I'm sorry.  Let me change that.

11            Do you recall being asked this question.

12            MR. BIANCAVILLA:  May I have a page?

13            THE COURT:  Page and line number.

14            MR. BIANCAVILLA:  He has to ask him, Judge.  He

15        has to ask him first.

16            THE COURT:  It would help if I had a copy too.

17            MR. CHAMBERLAIN:  I don't have a copy, Judge.

18            THE COURT:  Go ahead.

19            MR. CHAMBERLAIN:  Maybe the district attorney has

20        one.

21            THE COURT:  Go ahead.

22        Q    Page 74, line --

23            MR. BIANCAVILLA:  I need to know grand jury or

24        pretrial hearing.

25            MR. CHAMBERLAIN:  Hearing testimony.

People - Det. Cereghino - Cross

1       MR. BIANCAVILLA:  Page, please?

2       MR. CHAMBERLAIN:  Page 74, line 10.

3   Q   Let me just show it to you, Detective, instead of

4  reading it and see if it refreshes your recollection.

5   A   Line?

6   Q   Line 10, Detective.

7   A   Line 10.  Yes, sir?

8   Q   Might it have been earlier than five o'clock

9  Detective?

10   A   No, I don't believe so.

11   Q   Is your memory better now than it was in January

12  of 2001?

13       MR. BIANCAVILLA:  Objection.

14       THE COURT:  Overruled.

15   A   I recall --

16       MR. BIANCAVILLA:  Judge, argumentative.

17       THE COURT:  I'll permit it.

18   A   One of the things I do recall was that when we --

19  when we ran into him that day, I believe he was on his way

20  to get something for dinner which, as I recall now, it

21  would have been towards the later part of the afternoon,

22  early part of the evening.

23   Q   So your saying you recall something now better

24  than what you recalled in January of 2001?

25       MR. BIANCAVILLA:  Objection.  Argumentative.

People - Det. Cereghino - Cross

1    THE COURT:  Last time, Mr. Chamberlain.

2    You can answer.

3    A    That is the way that I recall it, sir.

4    Q    It certainly wasn't seven o'clock; right?

5    A    No, sir.

6    Q    Now, do you know what time it is that you went in

7    to conduct an interview of this defendant on May 3rd?

8    A    Morning of May 3rd, approximately 5:25 a.m.

9    Q    Did you have any conversation with anybody before

10   you went in there?

11   A    Yes, sir, I spoke with Detectives McHugh and

12   Parpan.

13   Q    You mentioned John to this defendant, is that

14   right, during that interview?

15   A    Yes, I did.

16   Q    Did Detective Parpan or McHugh tell you that they

17   had mentioned John to this defendant before?

18   A    I don't believe they had.

19       MR. BIANCAVILLA:  Objection.  It calls for

20       hearsay.

21       THE COURT:  I'll let it stand.

22   Q    You testified that when you first asked the

23   defendant whether he visited 7-Eleven, he denied it; is

24   that right?

25   A    What -- if he had responded to the 7-Eleven?

People - Det. Cereghino - Cross

1    Q    Yes.

2    A    He said it was possible.

3    Q    The first time you asked him, he said it was

4    possible?

5    A    Yes, it was.

6    Q    During the time that you were with him, did you

7    advise him of any rights?

8    A    No, sir.

9    Q    Did anybody in your presence?

10   A    No, sir.

11   Q    Did you offer him anything to eat?

12   A    When I first walked in, I asked him if he would

13   like any water and he refused it.

14   Q    Just water?

15   A    Yes, sir.

16   Q    When did you leave there, Detective, that evening?

17   How long did that take?

18   A    I was in there from 5:25 in the morning, about an

19   hour and a half.  I left the room about 7:00 a.m.

20   Q    What time?

21   A    About 7:00 a.m.

22   Q    Other than being nonresponsive to a number of

23   questions, Detective, did this defendant make any

24   admissions to you?

25            MR. BIANCAVILLA:  Objection.

1976

                    People - Det. Cereghino - Cross

1        THE COURT:  Sustained.

2     Q   Did he make any admissions --

3        MR. BIANCAVILLA:  Objection.

4        THE COURT:  Sustained as to admissions.

5     Q   Did he make any statements admitting his

6     participation in the crime of murder?

7        MR. BIANCAVILLA:  Objection.

8        THE COURT:  Sustained.

9     Q   Other than asking about where he had been the

10    night before, as to who he had been with, did you ask him

11    anything about what had occurred in the apartment in

12    the -- in the apartment of the victim?

13        MR. BIANCAVILLA:  Objection to the form.

14        THE COURT:  Do you understand the question?

15        THE WITNESS:  I believe so.

16        THE COURT:  Overruled.

17    A   Initially he stated he had not been in the

18    apartment.  As the interview went on, he considered the

19    possibility he had been in the apartment.

20    Q   I'm asking, you must have misunderstood the

21    question, did you ask him anything about what occurred in

22    the apartment?

23    A   No.

24    Q   Did you tell him anything about what John Kane may

25    or may not have said about what he claimed occurred in the

1377

People - Det. Cereghino - Cross

1   apartment?

2        A    Yes.

3             MR. BIANCAVILLA:  Objection.

4             Forget it.  I withdraw the objection, Judge.

5        Q    What did you tell him about that?

6        A    That John Kane said he had been in the apartment

7   and that's when he denied it.

8        Q    Other than being in it, did you tell him anything

9   else John Kane claimed?

10       A    No, sir.

11            MR. CHAMBERLAIN:  Nothing further.  Thank you.

12            THE COURT:  Anything further, Mr. Biancavilla?

13            MR. BIANCAVILLA:  No.  Thank you.

14            THE COURT:  You're excused, Detective.

15            MR. BIANCAVILLA:  Before we do that, we have to

16       approach.

17            THE COURT:  Come forward.

18                 (Whereupon, the following took place at the

19            bench outside of the hearing of the jurors and

20            defendant.)

21            THE COURT:  Yes, Mr. Biancavilla?

22            MR. BIANCAVILLA:  Judge, this is a copy, and

23       Mr. Chamberlain has a copy of this, of certain

24       statements that were made to Police Officer Stark by

25       Paul Scrimo when they responded to a call at his

People - Det. Cereghino - Cross

1    apartment building on April 18th.

2        Now, it was a conversation that encompassed many

3    other relevant areas.  I would like to be permitted

4    to lead this witness to specific portions of the

5    conversation so that we don't get into areas that are

6    irrelevant.  The areas that in red, I have

7    highlighted, are the areas I wish to get into.  The

8    areas in yellow, I do not want to get into.

9        MR. CHAMBERLAIN:  May I have a copy of that for a

10   moment to reflect on it?

11           (Whereupon, the following took place in open

12           court.)

13       THE COURT:  Ladies and gentlemen, we are going to

14   take a short break.

15       Do not discuss the case amongst yourselves or

16   with anyone else.  Keep an open mind.  Do not form or

17   express any opinions until the entire case has been

18   completed.

19       Do not read or listen to any accounts of the

20   case should they be reported in the media.  Do not

21   visit or view any place or premises that have been

22   mentioned.

23       You are not to permit any party to discuss the

24   case with you or attempt to influence you, and you

25   must promptly report to the Court any violation

People - Det. Cereghino - Cross

1    thereof.

2                (Whereupon, a brief recess was taken.)

3        COURT OFFICER:  Jury entering.

4        THE CLERK:  Do both sides stipulate that all

5    sworn jurors are present and properly seated?

6        MR. BIANCAVILLA:  Yes.

7        MR. CHAMBERLAIN:  So stipulated.

8        THE COURT:  Ladies and gentlemen, it's been a

9    long day.  At this point we are going to let you go

10   home and ask you to be back here tomorrow at 9:30.  We

11   hope to start on time.

12       Do not discuss the case amongst yourselves or

13   with anyone else.  Keep an open mind.  Do not form or

14   express any opinions until the entire case has been

15   completed.

16       Do not read or listen to any accounts of the

17   case should they be reported in the media.  Do not

18   visit or view any place or premises that have been

19   mentioned.

20       You are not to permit any party to discuss the

21   case with you or attempt to influence you, and you

22   must promptly report to the Court any violation

23   thereof.

24       Have a nice evening and we'll see you tomorrow.

25       (Whereupon, the jury exited the courtroom.)

People - Det. Cereghino - Cross

1    THE COURT:  Mr. Biancavilla?

2    MR. BIANCAVILLA:  Judge, with respect to the

3    testimony of Police Officer Stark, apparently on

4    Wednesday, October 18th, Police Officer Stark

5    responded to a call at Elizabeth Gardens and had a

6    conversation with Mr. Scrimo.  Her conversation was

7    reduced to writing in notes which have been provided

8    to defense counsel.

9    During her testimony tomorrow, the People would

10   like to elicit from her various parts of this

11   conversation, but not all of the conversation.  The

12   majority of the conversation is self-serving and is,

13   therefore, hearsay, and not an exception to the

14   hearsay rule.

15   The People only seek to introduce those portions

16   of the conversation which are an exception to the

17   hearsay rule and that would be various admissions

18   from the defendant.  It would begin on page one.

19   I'll read into the record what I wish to elicit.

20   On Wednesday, October 18th, 2000 RMP 810

21   responded to a disturbance call, vagrant, on going

22   problem.  At 1912 hours, incident 2997, 25 Elizabeth

23   Street, Farmingdale, complainant, super, with PO

24   Wadsworth, RMP 814.

25   At the front door of the apartment complex, a

Proceedings

1   male while met us.  I asked his name and he said

2   Paul Scrimo, holding his hands above his head, I

3   didn't do it, you know who did it, John Kane.  All

4   the DNA comes back to him.  I have never been in that

5   apartment.

6       He then answered some questions regarding the

7   call we were called for.  The vagrant was gone before

8   we arrived.

9       She would just briefly go into the details of

10  the vagrant part of the call.  Then we would skip to

11  page two and direct her to the conversation that she

12  had with him regarding the murder investigation.

13      Regards to April 13th, he said Ruthy was kissing

14  him at the bar, Y.L. Childs, but only to whisper she

15  wanted drugs from Kane.  He stated Kane deals drugs

16  and doesn't give any away for free.  How they walked

17  back towards her apartment.  He went to by cigarettes

18  and beer at 7-Eleven and Ruthy and John went up to

19  her apartment.  He then met Kane in an alleyway and

20  gave him the cigarettes and beer saying his old lady

21  would be angry with him if he stayed any longer.

22  Paul said he got in trouble as it was, being out as

23  late as he did.

24      Then I want to skip to the last page where it

25  says when they picked me up I didn't mention Kane

Proceedings

1   because of the drugs.

2       The only other portion is, when Paul Scrimo

3   realized I was the police officer who found Ruth, he

4   said I'm sorry, I saw those pictures of her,

5   something to that effect, of how terrible it was.

6       That's the only portion of that statement that I

7   wish to elicit through this police officer, Judge.

8   Everything else, it is the People's position, is

9   self-serving and, therefore, not an exception to the

10  hearsay rule.

11      THE COURT:  Mr. Chamberlain, basically

12  Mr. Biancavilla is asking to be permitted to lead the

13  witness through certain areas with respect to the

14  testimony.  Do you object to that?

15      MR. CHAMBERLAIN:  I do, Judge.  I respectfully

16  suggest that anything that occurs in this case, other

17  than any reference to what his attorney told him,

18  investigators and such, regarding the defense, should

19  be fair game here.  It's cumulative.  If he's bringing

20  in this statement, which I believe is basically -- I

21  think he has to take the wheat with the chaff.

22      THE COURT:  I don't think it's cumulative.  If

23  you don't consent to him leading the witness,

24  Mr. Biancavilla will have to do it very carefully.

25      MR. BIANCAVILLA:  Judge, you can overrule and

Proceedings

1    permit me --

2         THE COURT:  I'll see where this goes.  I can make

3    a decision at that point.

4         At this point, I am not going to permit you to

5    lead.

6         MR. BIANCAVILLA:  Fine.

7         THE COURT:  Mr. Chamberlain, anything else?

8         MR. CHAMBERLAIN:  Nothing further, Judge, other

9    than a list of witnesses for tomorrow.

10        MR. BIANCAVILLA:  Ross O'Boyle, Bill DeLuso, Doug

11   Leung, Bill Nimo, Sergeant Michael Cole.

12        THE COURT:  Counsel, we'll see you tomorrow at

13   9:30.

14        MR. CHAMBERLAIN:  Thank you, Judge.

15        MR. BIANCAVILLA:  Thank you.

16                    *       *       *

17             (Whereupon, the above matter was adjourned to

18        May 16th, 2002.)

19

20

21

22

23

24

25