1  STATE OF NEW YORK : NASSAU COUNTY

2  COUNTY COURT      : PART XIV
   ----------------------------------------:
3  THE PEOPLE OF THE STATE OF NEW YORK,    :

4                  - against -            :  IND: 1456N-00
                                          :
5  PAUL SCRIMO,                           :
                                          :    JURY TRIAL
6                                         :
                           Defendant.     :
7  ----------------------------------------x

8                        May 16, 2002
                         262 Old Country Road
9                        Mineola, New York

10

   B E F O R E:

11
              THE HONORABLE JEFFREY BROWN,
12            County Court Judge.

13

   A P P E A R A N C E S:

14

15         (As previously noted.)

16              *       *       *

17              THE CLERK:  Case on trial.  All parties are

18      present.  The jurors are not present.

19              People ready?

20              MR. BIANCAVILLA:  Ready.

21              THE CLERK:  Defense ready?

22              MR. CHAMBERLAIN:  Morning, Judge.

23              Defense ready.

24              COURT OFFICER:  Jury entering.

25              (Whereupon, the sworn jurors entered the

People - P.O. Stark - Direct

1  courtroom and resumed their respective seats.)

2  THE CLERK:  Both sides stipulate all jurors

3  are present and seated properly.

4  MR. BIANCAVILLA:  Yes.

5  MR. CHAMBERLAIN:  So stipulated.

6  THE COURT:  Good morning, ladies and

7  gentlemen.  We are ready to continue with the trial.

8  Call your next witness, Mr. Biancavilla.

9  MR. BIANCAVILLA:  Police Officer Pamela

10  Stark.

11  P O L I C E   O F F I C E R   P A M E L A   S T A R K, a

12  witness called on behalf of the People, having been duly

13  sworn, testified as follows:

14  COURT OFFICER:  In a loud, clear voice, give

15  your full name, spelling your last name, shield number

16  and present command.

17  THE WITNESS:  Pamela F. Stark.  Shield 2626,

18  command is court liaison.

19  THE COURT:  You may inquire.

20  DIRECT EXAMINATION

21  BY MR. BIANCAVILLA:

22  Q  Good morning, Officer Stark.

23  A  Good morning.

24  Q  Officer Stark, prior to being assigned to court

25  liaison, where were you assigned?

People - P.O. Stark - Direct

1    A    The Eighth Precinct.

2    Q    Were you working in the Eighth Precinct on

3 Thursday, April 13th, 2000?

4    A    Yes.

5    Q    How long have you been a police officer?

6    A    I'm in my fifth year.

7    Q    On Thursday, April 13th, of 2000, how long had you

8 been a police officer?

9    A    I believe I was in my third year.

10    Q    What were your duties as a police officer assigned

11 to the Eighth Precinct?

12    A    I had RMP -- that's radio more patrol car -- 810

13 Farmingdale, nights, 1900 hours to 0700 hours.

14    Q    Was that a steady shift that you worked?

15    A    Yes, I worked three on, four off, two on, three

16 off.

17    Q    On Thursday, April 13th, 2000, were you working on

18 that day?

19         MR. CHAMBERLAIN:  With all due respect, I

20    believe Thursday was April 14th, just so the record is

21    clear.

22         THE COURT:  I don't have a calendar in front

23    of me.  You can cross her on that fact.

24         MR. CHAMBERLAIN:  Fine.

25    Q    What tour of duty were you working?

People - P.O. Stark - Direct

1    A    Can I check?

2    Q    Sure.

3    A    I have Thursday, April 13th, in my memo.

4    Q    What tour of duty were you working?

5    A    1900 hours to 0700 hours.

6    Q    So that was 1900 hours --

7    A    On the 13th.

8    Q    Seven o'clock at night?

9    A    On Thursday, until 7:00 a.m.

10   Q    What date?

11   A    The 14th.

12   Q    Which would have been?

13   A    Friday.  I have Friday because I was working

14   Friday the 14th.  Saturday is the 15th.

15   Q    That was a tour of duty that you were working?

16   A    Yes.

17   Q    Did there come a time when you were directed to

18   respond to 196 Main Street?

19   A    Yes.

20   Q    Approximately what time were you directed to

21   respond to 196 Main Street?

22   A    2112 the call came over, it was dispatched.

23   Q    What is 2112?

24   A    9:12 at night.

25   Q    Did you respond to the scene?

People - P.O. Stark - Direct

1    A    Yes, I did.

2    Q    Approximately what time did you respond to the

3  scene?

4    A    I arrived at 2115.

5    Q    That would be 9:15 in the evening?

6    A    Yes.

7    Q    Why were you directed to that scene?

8    A    It was a well check call.

9    Q    What is a well check?

10    A    We receive well check calls when family members,

11  friends, anybody is trying to get in touch with somebody and

12  they haven't been able to.  We respond and hopefully find

13  the person.

14    Q    Is that what you did that night?

15    A    Yes.

16    Q    When you got to 196 Main Street at approximately

17  9:15, tell the jury what you did?

18    A    I entered through Main Street, which was Captain

19  Andy's.  I asked for what showed on my computer, the

20  complainant, Sven.  I asked to meet with him.

21    Q    Did you have conversation with him?

22    A    Yes.  I asked numerous questions as to why I was

23  there on the call.

24    Q    As a result of that conversation, what did you do?

25    A    The information that I received, that I was there

People - P.O. Stark - Direct

1    because he had received a call from his wife at about three

2    o'clock that his tenant of approximately eight years who was

3    a punctual woman had not shown for work and there was no

4    answer at her door.  She lived by herself and he had known

5    her for quite sometime and it was totally out of character.

6        Q    So what did you do?

7        A    I walked through the restaurant with him heading

8    to the back of the restaurant, walked out the door.  I then

9    asked him if he seen her car, is her car parked around here,

10   and he showed me her vehicle which I think was a blue and

11   white Blazer parked in the back.

12            He then escorted me to a door that was just north

13   of the outside of his restaurant.  It was two metal white

14   doors.  He unlocked the door.  There was no glass or

15   anything.  He unlocked the door and then we entered up a

16   very narrow stair that came to the top to a platform.

17            At the top of platform there was an outside storm

18   door to the left and then there was one apartment door right

19   in front where I saw shoes.  There was a door mat.  We

20   knocked on the door.  I kept on saying, police, open up,

21   police, open up.  He was yelling because he was familiar

22   with her, Ruthy, Ruthy, open the door, open the door.

23            At that point in time he had a large amount of

24   keys with him and I said, you know, maybe -- where does that

25   door lead to, is there another entrance?

People - P.O. Stark - Direct

1    Q    When you asked him what did that door lead to --

2    A    I meant the storm door on the top of the landing.

3    Q    Let me stop you.  Let me ask the questions so the

4   court reporter can take it down and then you can answer the

5   question?

6    A    Sorry.

7    Q    Which door are you referring to?

8    A    I was referring to the storm door that was at the

9   top of the landing at the top of the stairs.

10   Q    Then what happened?

11   A    He said that that led out to the roof.

12   Q    What did you do?

13   A    I went out on the roof and he showed me the

14  windows and where they were in proximity of the apartment.

15   Q    Explain to the jury how you checked that?

16   A    I checked to make sure if they were secure, if

17  there was any entry.  I went first to the bathroom window,

18  which he told me.  I couldn't see in because it was dark but

19  everything was secure.

20        Then I went around and I walked up to what was the

21  kitchen and there was a light on above the table.  There was

22  two -- two drink glasses, a beer bottle to the right and a

23  greenish wine glass to the left.  I saw nothing else out of

24  place.  I saw a black cat.  Those windows were also secure.

25  There was nothing out of place, nothing in the apartment.

People - P.O. Stark - Direct

1    Q    What is the next window you went to?

2    A    The bedroom window was just a single window.

3  Blinds were shut in an upright position.  I couldn't see

4  much.  I was using my magazine light but I couldn't see

5  much.

6    Q    What is a magazine light?

7    A    Our flashlights we have.  I then asked help

8  again --

9             MR. CHAMBERLAIN:  Objection to the continuing

10       I did this and that.  I would like questions and

11       answers.

12             THE COURT:  Yes.

13    Q    What did you do then?

14    A    I asked him when was it that you received the

15  phone call from her.  He said, Three o'clock.  He said --

16    Q    Phone call from who?

17    A    From his wife saying that she received a call from

18  her job.  He said, Three o'clock.  And I said, Nobody had

19  heard from her from work?  No.  Then he said to me, She

20  hasn't been seen for two days.  With that I said, Let's open

21  the door.

22    Q    What did you do at that point?

23    A    He got the key.  He opened the door.  I asked him

24  to stand out on the landing.  I walked in --

25             MR. CHAMBERLAIN:  Objection to the continuing

People - P.O. Stark - Direct

1    what did you do then.

2                    MR. BIANCAVILLA:  Judge, it's a question.

3                    THE COURT:  It is a question,

4    Mr. Chamberlain.

5                    MR. CHAMBERLAIN:  I understand, but it's

6    narrative form.

7                    THE COURT:  If it goes on too long, you can

8    object.

9                    Continue officer.

10   Q    So after you observed the door, describe what

11   happened?

12   A    I asked him to wait out on the landing.  I went

13   inside.  To the left was my first door to secure.  It was a

14   bathroom.  Everything looked fine.

15   Q    When you looked into the bathroom, what did you

16   see?

17   A    Everything looked intact.  Nothing, I saw nothing

18   out of the ordinary.

19   Q    What did you do then?

20   A    Walked back into the small little hallway.

21   Q    What did you do after you went in the small little

22   hallway?

23   A    I walked into what is the kitchen.

24   Q    What observations did you make when you went into

25   the kitchen?

People - P.O. Stark - Direct

1     A    I immediately saw two white socks.

2     Q    What did you do when you saw two white socks?

3     A    I walked to that doorway.

4     Q    Explain to the jury what you observed?

5     A    I saw a female slumped over to the left.  I saw

6  one hand with the palm facing up, one hand with the palm

7  facing down and lividity throughout the hand.  I knew then

8  the person was deceased.

9     Q    What did you do then?

10    A    I yelled to him, I'm sorry, she's deceased. Please

11 wait downstairs.  I'm going to call for back up.  They need

12 to know where I am.

13    Q    What did you do then.

14    A    I called for back up and an ambulance for 1072.

15 That's a pronouncement.

16    Q    What happened then?

17    A    I went back.  The phone was ringing nonstop.

18 Where her face was was behind where the light could shine on

19 her.  I flashed my magazine light.  Then all of a sudden I

20 saw the cord and I yelled, Oh, shit.

21    Q    Then what happened?

22    A    I immediately took out my gun and went through

23 every other room making sure that it was secure.

24    Q    Could you describe each room that you went through

25 and the appearance of each room that you went through?

People - P.O. Stark - Direct

1   A    The bathroom seemed very dry.  I immediately

2   looked into the shower and sink.  There was no water or

3   anything like that.  I then walked into the kitchen.  When I

4   was walking in, I did see napkins on the floor right before

5   the kitchen started.  I saw, as I said before, there was a

6   beer bottle, a brown glass beer bottle.  There was a

7   greenish wine glass on the table.  There was a printed up

8   docket of like a ballad that was on the table and that hand

9   printed one was on the counter.

10          The sink and everything looked in place, neat and

11  clean, but I did notice on the table cloth it looked like

12  there had been ashes scattered and somebody had mushed them

13  into the table cloth.  There was a ash tray and a couple of

14  chips in the ash tray.

15               MR. CHAMBERLAIN:  Objection to the operation

16          of her mind as to what it looked like.

17               THE COURT:  Sustained.

18               MR. BIANCAVILLA:  Judge --

19               THE COURT:  Whatever you observed, you can

20          describe.

21  A    I observed ashes into the table cloth.  I then --

22  I also saw something else.  There was a vacuum cleaner out

23  in the kitchen and there was a calendar right on the side of

24  the refrigerator.

25  Q    What did you observe about the calendar?

People - P.O. Stark - Direct

1    A    I observed that the last date -- she crossed out

2   every date, or somebody had.  The last date that was crossed

3   out was the 10th of April which was a Monday.

4    Q    What did you do at that point?

5    A    Other observations, the other observation was in

6   her bedroom.  I saw what was either a telephone or an

7   answering machine pulled from the wall on the floor and in

8   the living roomy heard a hum from a stereo like music had

9   been over.  I saw a black leather coat that was on the

10  couch.  I also saw a jean jacket on the chair in the

11  kitchen.

12   Q    After you made those observations, what did you

13  do?

14   A    I saw those observations as I made my search with

15  my gun.  Then I immediately got in touch with my command and

16  I requested the detectives be notified and for a sergeant to

17  be at the scene immediately.

18           MR. BIANCAVILLA:  Judge, may we have the

19      easel set up?

20           THE COURT:  Yes, of course.

21           MR. BIANCAVILLA:  I would ask People's 31 be

22      displayed on the easel?

23           May we have the witness step down?

24           THE COURT:  Step into the well, please.

25           THE WITNESS:  Sure.

People - P.O. Stark - Direct

1     Q   Now, Officer Stark, would you just point out to

2  the jury, when you arrived at that location and came up the

3  back stairs with Sven, can you point out to the jury how you

4  went on People's 31?

5     A   Came up the hallway here.

6     Q   Speak up.

7     A   We came up the hallway here.  We were at this

8  door.  I then asked about this door that I had seen the

9  outside screen of the door.  This is the roof.  We then went

10  out and I looked into these two windows which were the

11  bathroom.  He told me they were the bathroom but I couldn't

12  see in.  I then walked up to the kitchen area which I could

13  see there was half a curtain and there was a light on above

14  the kitchen table.

15     Q   What did you observe when you looked in the window

16  at that particular location?

17     A   At that particular location I saw a beer bottle,

18  brown glass, and on the side I saw a green -- like a wine

19  glass on the table.  To the right was a beer bottle.  To the

20  left was the green glass and I saw a black cat.

21     Q   Then what's the next thing that you did?

22     A   I went to this bedroom window and the bedroom

23  window blinds were shut in an upper condition.  I was

24  shining my magazine light to try and see inside and saw

25  nothing.

People - P.O. Stark - Direct

1   Q    What did you do at that point?

2   A    That's when I told him we had to open the door.

3   Q    How did you get back into the hallway?

4   A    We went right through there.  Came in here and he

5   opened up the door.

6   Q    When you walked into the door there, show the jury

7   what you did?

8   A    I walked into this bathroom and secured it, made

9   sure -- my training is to secure as you move and I saw that

10  nothing was out of the normal in this room.  I saw the

11  closet.  I saw everything.  I believe there was a cat litter

12  bag in there.  Everything was fine.  Then I walked right in

13  here.  As soon as I made entrance into here, I could see the

14  feet.

15  Q    Point for the jury where you saw the feet?

16  A    Right here.

17  Q    Now, look at the photograph that's depicted -- I

18  think that's People's 21, is that how the body was

19  positioned when you saw the body?

20  A    Yes.

21  Q    Describe to the jury what you did next?

22  A    At that point I shined -- I walked over.  I saw

23  the lividity in that left hand.  I also noticed that none of

24  the nails had been broken on the hand.

25        I then yelled to Sven who was the landlord, Please

People - P.O. Stark - Direct

1    wait outside.  Please go downstairs.  I'm sorry, she's

2    deceased.  I need to call for back up.  I need to tell them

3    where I am, because it wasn't a known location for me.  I

4    had been there for a year and never knew there was an

5    apartment there.

6        Q    What did you then do?

7        A    I called for back up and then I went back in and

8    shined my flashlight in here because it was around the

9    corner and there was no light.  As soon as I saw the cord on

10   the neck, I yelled, Oh, shit, and then I drew my weapon,

11   walked over here, secured this area and then secured the

12   living room.  This is the living room here.

13       Q    Show us on the floor plan what you did?

14       A    I walked through here, secured everything here,

15   then walked into the living room and secured it.

16       Q    After you made sure everything was secured, what

17   you do?

18       A    I called my command over my radio and requested

19   that a sergeant and detectives be notified immediately that

20   I had a homicide.

21       Q    Look at those photographs and tell the jury, do

22   each of those photographs fairly and accurately represent

23   how the apartment appeared when you arrived there?

24       A    Yes, they all -- they all represent.

25                 MR. CHAMBERLAIN:  May we have some

People - P.O. Stark - Direct

1     clarification as to which photographs he's referring

2     to?

3          Q     Read the number below each one?

4                THE COURT:   Read off the People's exhibits

5     and tell us if it fairly and accurately represents.

6          A     Twelve looks like the back to me.  I was on this

7     side.  I was over here, Captain Andy's.  I was on the

8     opposite side here where I made entrance.

9                This looks like coming out of the restaurant, and

10    then going over here the entrance into the apartment.

11    That's number eight.

12               Number 13, yes, I walked over here and I did see

13    her car parked over here.  Looks accurate to me.

14         Q     What number is that?

15         A     Number 13.

16               Number 29, I believe this is the living room here

17    or going into the living room.  This is where the answering

18    machine, I believe, was pulled out, or the telephone.  I

19    just looked at it on the floor.  It was all mangled up.

20    That was the only thing out of order in the apartment.  That

21    was it.

22               Thirty-two was the living room.  This is what I

23    believe the stereo -- where the music -- a hum was coming

24    out of the speakers.  On this side of the living room wall

25    was the brick.

People - P.O. Stark - Direct

1    This is the kitchen, number 21, and this is her

2  bedroom and slightly -- the bed was totally made.  She was

3  totally dressed.

4    Eighteen is the kitchen.  The kitchen looks

5  actually perfect except that there were napkins on the floor

6  here that I had seen.  I don't know if it's further up.

7    Q    Okay.

8    A    Sixteen is the hallway.  She had stenciling on the

9  wall.  It looks -- home sweet home, she had.

10    Here are the stairs, 15, that I entered.

11    Number 14, I'm not sure what number 14 is.

12    Q    Okay.

13    A    And this is Captain Andy's and that's number 11.

14    Q    You can be seated.  Thank you, officer.

15    Officer, I am going to direct your attention to

16  Wednesday, October 18th of 2000.  Do you remember that day?

17    A    Yes, I do.

18    Q    Were you working that day?

19    A    Yes.

20    Q    What tour of duty were you working?

21    A    1900 hours to 0700 hours.

22    Q    And that would be from 7:00 at night to 7:00 in

23  the morning?

24    A    Yes.

25    Q    Now, I'm going to direct your attention --

People - P.O. Stark - Direct

1   withdrawn.

2           Did there come a time when you responded to --

3               THE COURT:  Mr. Chamberlain?

4               MR. CHAMBERLAIN:  I am waiting for the end of

5       the question.  I would like to approach.

6               THE COURT:  I haven't heard the question.

7               MR. CHAMBERLAIN:  I'm waiting for the end of

8       the question.

9               MR. BIANCAVILLA:  Please be seated until I

10      finish.

11              MR. CHAMBERLAIN:  Please.

12              THE COURT:  Finish your question.

13      Q    Did there come a time when you responded to 25

14  Elizabeth Street in Farmingdale?

15      A    Yes.

16              MR. CHAMBERLAIN:  May we approach, your

17      Honor?

18              THE COURT:  I don't see any -- I'll overrule

19      your objection with respect to this question.

20              MR. CHAMBERLAIN:  I would like to approach.

21              THE COURT:  You can come forward.

22              (Whereupon, the following took place at the

23          bench outside of the hearing of the jurors and the

24          defendant.)

25              THE COURT:  Yes, Mr. Chamberlain?

People - P.O. Stark - Direct

1    MR. CHAMBERLAIN:  Your Honor, we are getting

2    into the statement that we discussed yesterday.  I'm

3    not a hundred percent sure whether our colloquy

4    yesterday was fully on the record but I would like to

5    place on the record my objection to the introduction of

6    any part of this statement for these reasons.

7         There are no admissions here so there's no

8    basis for an exception to the hearsay rule.  This

9    entire statement would be hearsay.  So for that reason,

10   I would object to the entire statement.  There's

11   also -- if the Court overrules that objection, then I

12   would like to go further with respect to the portion

13   Mr. Biancavilla wants to redact from this statement.

14        THE COURT:  All right.  Let's talk generally,

15   Mr. Biancavilla.

16        MR. BIANCAVILLA:  I will rely on my

17   representations to the court yesterday, Judge.

18        THE COURT:  Mr. Chamberlain, I see no --

19   nothing objectionable about the statement.  Let's put

20   it this way.  She will testify and you will make

21   objections.  If I feel there's a reason to sustain the

22   objection, I will, and if it's an answered responded

23   to, I will strike it and tell the jury to disregard it.

24        At this juncture I am not about to make a

25   determination because I don't know what the witness is

1403

People - P.O. Stark - Direct

1   testifying to.  All I have in front of me are these

2   notes.

3          MR. CHAMBERLAIN:  Perhaps these noted --

4   bracketed, perhaps we should mark them as a court

5   exhibit at this point.

6          MR. BIANCAVILLA:  I read it in the record

7   yesterday so there's a record of what I am going to be

8   asking.

9          THE COURT:  Is that correct?

10          MR. CHAMBERLAIN:  With respect to that, there

11   are statements in here that are not admissions.

12          THE COURT:  There are many.  It doesn't mean

13   it's an admission per se that somebody committed the

14   murder.  It may be admission to certain elements of the

15   crime that the People have to prove.

16          MR. CHAMBERLAIN:  I do not see anything in

17   here.

18          THE COURT:  That's a question of fact for the

19   jury.  I will make determinations as to evidentiary

20   rulings as to whether I feel it's appropriate for the

21   jury to hear.  Now, if you feel something is

22   objectionable, stand, object and I'll rule at that

23   point.

24          MR. CHAMBERLAIN:  The other part of my

25   objection is, above the entire statement, there are

People - P.O. Stark - Direct

1    portions he wants to put in that concern an operation

2    of the defendant's mind.  He said, for example, he

3    said, when they picked me up, I didn't mention Kane

4    because of the drugs.

5         Now, the only way you can understand that --

6    if you allow that in, the other questions that concern

7    the operation of his mind as to what he believes

8    happened and so forth should be allowed in.  If he

9    elicits that and I object in front of the jury, it will

10   be out there.

11        THE COURT:  It's like any statement someone

12   makes.  I am not going to prevent the People from

13   eliciting the testimony.  I will make rulings with

14   respect to evidentiary rulings with respect to

15   objections you may make.

16        Now, we have already redacted a large part of

17   it based on the People's representations.  You objected

18   yesterday to allowing Mr. Biancavilla to lead which

19   might have alleviated some of the problems that you are

20   probably concerned about that you may say something

21   outside the area the People agreed -- the portions of

22   the testimony they can elicit into evidence.

23        Now, at this juncture I am not going to

24   prevent the People.  I will rule on objections and --

25        MR. CHAMBERLAIN:  Judge, as far as leading,

People - P.O. Stark - Direct

1    it's my understanding we have a police officer, that he

2    prepares his witnesses --

3           THE COURT:  Mr. Biancavilla?

4           MR. CHAMBERLAIN:  No.  I mean the witness.

5    He's preparing her to limit her answer to these

6    specific questions, but what I am saying is some of

7    these things cannot be exclude without allowing it in.

8    The redacted portions are hearsay in any event.

9           THE COURT:  The redacted portions aren't

10    going into evidence.  That's what redaction means.

11           MR. CHAMBERLAIN:  I don't mean that.  I mean

12    the portions that are not redacted.

13           THE COURT:  First of all, this is a

14    statement, not testimony.  This is a statement.  I

15    don't know what comes out of the witness' mouth.  I

16    have to listen, hear, and make determinations on a

17    question-by-question basis and that I will do.

18         Do you have anything more to add,

19    Mr. Biancavilla?

20           MR. BIANCAVILLA:  No, Judge.

21         (Whereupon, the following took place in open

22      court.)

23           THE COURT:  Bring the witness back in.

24         (Whereupon, the witness resumed the witness

25    stand.)

People - P.O. Stark - Direct

1        MR. BIANCAVILLA:   May I, your Honor?

2    CONTINUED DIRECT

3    BY MR. BIANCAVILLA:

4        Q    Officer Stark, directing your attention to

5    Wednesday, October 18th, 2000, were you working that day?

6        A    Yes.

7        Q    What tour of duty were you working.

8        A    1900 hours to 0700 hours.

9        Q    Did there come a time when you were directed to

10   respond to 25 Elizabeth Street?

11       A    Yes.

12       Q    What time were you directed to respond to 25

13   Elizabeth Street?

14       A    1912 hours which would be 7:12 in the evening.

15       Q    What was the purpose of that call?

16       A    A disturbance call.

17       Q    How long did it take you to respond to that

18   location?

19       A    Maybe four minutes.

20       Q    When you got to the location, did you see anyone?

21       A    Yes, I did.

22       Q    Please describe the individual that you saw and

23   where you saw them?

24       A    I parked my car out front and as I walked to the

25   location -- there's a glass lobby door in the apartments.  I

People - P.O. Stark - Direct

1     saw a middle aged man pacing inside the lobby.

2          Q     Do you see him in the courtroom today?

3          A     Yes, I do.

4          Q     Please point to him and identify him by an article

5     of clothing that he's wearing?

6          A     Green suit.

7          Q     At the second table?

8          A     Second table.

9               MR. BIANCAVILLA:  May the record reflect the

10          identification of the defendant?

11               THE COURT:  Yes, the record should reflect

12          that.

13          Q     Describe for the jury what happened at that time?

14          A     As I approached the building, I was with another

15     officer, 814, P.O. Wadsworth.  We walked up and he exited

16     the front door and I said -- I asked him his name.

17               With that, he raised his hands in the air and he

18     said, Paul Scrimo.  I didn't do it.  John Kane did.  I was

19     never in that apartment.

20          Q     What happened then?

21          A     P.O. Wadsworth asked him then why are we here

22     tonight.

23          Q     What did Mr. Scrimo say?

24          A     He said there was a male Hispanic in the rear of

25     his apartment building.  It's been an ongoing problem and

People - P.O. Stark - Direct

1    that he was trying to stay in the basement and that he had

2    confronted him in the parking lot because the male Hispanic

3    said, I think, something rude to his wife.

4            He said the male Hispanic did not say anything to

5    him, stared at him and flicked a cigarette, then walked off

6    toward Main Street.  The male Hispanic was about five-seven,

7    150 pounds, white pants.  Then he said he wasn't there

8    anymore.

9        Q    What happened at that point?

10       A    He then went on to talk again about what he was

11   initially bringing up.

12       Q    And was that regarding the murder of Ruth

13   Williams?

14       A    Yes.

15       Q    Could you tell the jury what he said with respect

16   to that?

17       A    He said that they were all out at Y.L. Childs,

18   Kane, Ruthy and himself, and that Ruthy was kissing on him

19   but only to whisper in his ears that she wanted drugs from

20   Kane.  He told me that Kane is a drug dealer.  He doesn't

21   give away drugs for free.

22           He said then they all left the bar and walked

23   toward Ruthy's apartment.  He said that Kane and Ruthy went

24   up to the apartment while he went across to 7-Eleven to buy

25   beer and cigarettes and when he finished buying beer and

People - P.O. Stark - Direct

1   cigarettes, he met Kane in an alleyway, gave him the beer

2   and cigarettes and said, I got to get home because my old

3   lady is going to be really angry at me.  And he said as it

4   was, the time he got home, he got in trouble.

5        Q    Now, did there come a time during the course of

6   that conversation that he mentioned anything about his

7   arrest?

8        A    Yes, he said, When they picked me up, I -- I never

9   mentioned Kane because of the drugs.  And then he said to

10  me, You're the officer who found Ruthy.  He said, I'm really

11  sorry.  I saw those pictures.  They looked real terrible.

12       Q    Thank you, Officer.

13            MR. BIANCAVILLA:  I have nothing further for

14       this witness.

15            THE COURT:  Mr. Chamberlain,

16       cross-examination?

17            MR. CHAMBERLAIN:  Yes, Judge.

18  CROSS-EXAMINATION

19  BY MR. CHAMBERLAIN:

20       Q    Police Officer Stark, did you know John Kane prior

21  to this?

22       A    Never met him.

23       Q    Did you know of him in the neighborhood?

24       A    Not at all.

25       Q    When you were first called up to view that

People - P.O. Stark - Cross

1   apartment, did you secure the apartment as soon as you

2   realized what happened?

3        A    I never left the body.  I never left the

4   apartment.

5        Q    Did you touch anything or change anything in the

6   apartment?

7        A    Not at all.

8        Q    You mentioned a number of times here on direct

9   that the apartment was quite neat, is that correct, except

10  for the few things you mentioned?

11       A    Yes.

12       Q    Did you see any cigarette butts strewn around on

13  the floor?

14       A    No.

15       Q    You didn't move the body at all?

16       A    I never touched the body.

17       Q    So you wouldn't have been aware of any cigarette

18  butts under the body?

19              MR. BIANCAVILLA:  Objection.

20       A    No, sir.

21              THE COURT:  Sustained.

22              When I sustain the objection, don't answer.

23              THE WITNESS:  Okay.

24       Q    Police Officer, you testified that you -- may we

25  have that exhibit?

People - P.O. Stark - Cross

1              THE COURT:  Of course.  Do you want the

2     officer to step into the well?

3              MR. CHAMBERLAIN:  Please.

4              THE COURT:  Please step into the well.

5     Q    First of all, the stairs up to that hallway are

6   not shown to scale, are they?

7              MR. BIANCAVILLA:  Objection.

8              THE COURT:  What are you referring to?

9              MR. CHAMBERLAIN:  The stairs leading to the

10    hallway.

11             THE COURT:  Not the photographs but the

12    diagram?

13             MR. BIANCAVILLA:  Objection.  How would she

14    know?

15             THE COURT:  Well, if she does, she can answer

16    it.

17             MR. CHAMBERLAIN:  I assume she went up.

18             THE COURT:  Excuse me?

19             MR. CHAMBERLAIN:  I object to the comments.

20             THE COURT:  I don't want comments from

21    anybody.  No colloquy.  We went through this before.

22             MR. BIANCAVILLA:  Judge, the diagram is in

23    evidence.

24            THE COURT:  Excuse me.  Officer, do you know

25    if that diagram is to scale?

People - P.O. Stark - Cross

1          THE WITNESS:  No, I don't.

2     Q    Did you go up the stairs from the outside exit to

3   the hallway shown in that diagram?

4     A    Yes.

5     Q    Do you recall how many stairs there were?

6     A    More than four.

7     Q    More than four?

8     A    I didn't count.

9     Q    Is there a photograph of the stairs there?

10    A    15.

11    Q    15, does that accurately represent the stairs?

12    A    As far as I know, sir.

13    Q    And the hallway, would you describe the width of

14  the hallway, the width?

15    A    Narrow is the best I can describe it, narrow.

16    Q    Would there be room in that hallway for two people

17  to walk together down that hallway?

18          MR. BIANCAVILLA:  Objection.

19          THE COURT:  I'll permit it.

20    A    How large are the people?  I mean, I wouldn't

21  know, sir.

22    Q    Let's say your size, Officer?

23    A    Width, I --

24          MR. BIANCAVILLA:  Judge, I object.  It calls

25      for speculation.

People - P.O. Stark - Cross

1  A   I wouldn't know.

2        THE COURT:  If you don't know, Officer, I

3  don't want you to speculate.

4        THE WITNESS:  I don't know.

5  Q   Officer, when you walked out on the roof, that was

6  through an exit in the hallway; is that correct?

7  A   Yes.

8  Q   Was there any window looking into the kitchen

9  through the roof?

10  A   Yes.

11  Q   Would you point to what side of the roof that was

12  from?

13  A   Right here.

14  Q   This diagram does not show the portion of the roof

15  you were walking on but I take it from your testimony that

16  there was a continuation of a flat roof to the position

17  where you viewed the kitchen; is that right?

18  A   Yes.

19  Q   Did you also walk further to view the bedroom?

20  A   Yes.

21  Q   Thereafter did you walk further to view the living

22  room?

23  A   There were no windows in the living room.

24  Q   No windows.

25        Officer, before you left, did the people from

People - P.O. Stark - Cross

1  Crime Scene come down to the apartment?

2      A    I didn't leave the location until 0350 hours in

3  the morning.  I can't tell you who, Crime Scene, Homicide,

4  everybody.

5      Q    I take it during that period of time they were

6  conducting an investigation of the crime scene; is that

7  right?

8      A    To my knowledge, yes.

9      Q    Directing your attention, Officer, to October 17th

10 when you were called to 25 Elizabeth Street --

11             MR. BIANCAVILLA:  Objection.

12             THE COURT:  Sustained.

13             MR. BIANCAVILLA:  May the officer be seated,

14     Judge?

15             THE COURT:  Of course.

16             THE WITNESS:  Thank you.

17             THE COURT:  Wrong date.

18             MR. CHAMBERLAIN:  October 17th.

19             MR. BIANCAVILLA:  Objection.

20             THE COURT:  Sustained.

21     Q    What date were you called to 25 Elizabeth?

22     A    Excuse me?

23     Q    What date did you go down to 25 Elizabeth Street?

24     A    October 18th.

25     Q    October 18th.  Thank you.

People - P.O. Stark - Cross

1    Directing your attention to October 18th, did

2  Mr. Scrimo tell you anything else about the -- the crime --

3  the crime that you have described here?

4              MR. BIANCAVILLA:  Objection, and I'll ask to

5       approach, Judge.

6              THE COURT:  Come forward.

7              Step out, officer.

8              (Whereupon, the following took place at the

9       bench outside of the hearing of the jurors and

10       defendant.)

11              THE COURT:  Mr. Chamberlain, if you are

12       attempting to elicit self-serving statements of your

13       client, I will not permit that

14              MR. CHAMBERLAIN:  I'm attempting to elicit --

15              THE COURT:  Tell me what you want to ask.

16              MR. CHAMBERLAIN:  What -- the issue is.

17              COURT OFFICER:  Excuse me.  One of the jurors

18       needs to take a break.

19              THE COURT:  All right.  We'll take a break.

20              (Whereupon, the following took place in open

21       court.)

22              Do not discuss the case amongst yourselves or

23       with anyone else.  Keep an open mind.  Do not form or

24       express any opinions until the entire case has been

25       completed.

People - P.O. Stark - Cross

1      Do not read or listen to any accounts of the

2  case should they be reported in the media.  Do not

3  visit or view any place or premises that have been

4  mentioned.

5      You are not to permit any party to discuss

6  the case with you or attempt to influence you, and you

7  must promptly report to the Court any violation

8  thereof.

9      (Whereupon, the sworn jurors exited the

10  courtroom.)

11      THE COURT:  Mr. Chamberlain?

12      MR. CHAMBERLAIN:  Yes, Judge.

13      THE COURT:  Do you want to continue your

14  application?

15      MR. CHAMBERLAIN:  Certainly, your Honor.  The

16  portions already elicited concerning what the reasons,

17  in the suspect's, at that point, mind, or defendant's

18  mind, as to why he didn't do or say certain things are

19  only explainable by other things he told her in this

20  statement even though they may be self-serving.

21      I don't think the People should be allowed to

22  pick and choose portions of a statement that reflect

23  what was in the defendant's mind without the defense

24  being allowed to introduce statements that would make

25  that more explainable.

People - P.O. Stark - Cross

1              THE COURT:  Mr. Biancavilla?

2              MR. BIANCAVILLA:  Judge, the People have only

3      introduced those portions of these five pages of

4      statement that are an exception to the hearsay rule.

5      All the other portions of this statement are clearly

6      hearsay because they are clearly self-serving,

7      therefore, they are not an exception to the hearsay

8      rule.  We are only seeking to admit the portion of the

9      statement --

10             MR. CHAMBERLAIN:  I would like an offer of

11     proof as to how they are admissions or exceptions to

12     the hearsay rule.

13             MR. BIANCAVILLA:  I can give Mr. Chamberlain

14     Richardson.

15             THE COURT:  We have passed that point.  The

16     jury has heard it.  You didn't ask for an offer of

17     proof before.  I ruled on it prior to Officer Stark

18     taking the stand.

19             MR. CHAMBERLAIN:  I did ask, Judge, and the

20     Court ruled.  But the point is --

21             THE COURT:  First of all, Mr. Chamberlain,

22     you knew exactly what the People were going to elicit

23     with respect to testimony because we had this

24     discussion on the record at a quarter to 5:00

25     yesterday.

People - P.O. Stark - Cross

1          MR. CHAMBERLAIN:  No question, Judge, and I

2     knew this morning when we discussed it a little

3     earlier.  The point is that your Honor said,

4     notwithstanding my objection, you were going to let him

5     elicit this.  I did object.

6          THE COURT:  And I overruled.

7          MR. CHAMBERLAIN:  At that point you said --

8     that's correct, Judge, and at that point you said that

9     I could offer -- try to offer other statements.

10          THE COURT:  And I said that but, as I said

11     before on the record, I will not let you attempt to

12     introduce self-serving statements of your client

13     through this witness.

14          MR. CHAMBERLAIN:  There are other statements

15     as to the operation of my client's mind.  My point is,

16     having brought out what was in my client's mind, I

17     think it can only be explained by other statements and

18     I think I should be allowed to use those statements.

19          THE COURT:  Anything further,

20     Mr. Biancavilla?

21          MR. BIANCAVILLA:  Rely on our prior

22     conferences on this issue, Judge.

23          THE COURT:  Mr. Chamberlain, your objection

24     is overruled.

25          MR. CHAMBERLAIN:  I believe it was my

People - P.O. Stark - Cross

1    objection.

2                    MR. BIANCAVILLA:  You are right.

3                    THE COURT:  Sustained.

4                    MR. BIANCAVILLA:  Thank you.

5                    (Whereupon, a brief recess was taken.)

6                    COURT OFFICER:  Jury entering.

7                    (Whereupon, the sworn jurors entered the

8            courtroom and resumed their respective seats.)

9                    THE COURT:  Please have Police Officer Stark

10    come back in, please.

11                    (Whereupon, the witness resumed the witness

12            stand.)

13                    THE COURT:  Mr. Chamberlain?

14                    MR. CHAMBERLAIN:  Thank you.

15    CONTINUED CROSS

16    BY MR. CHAMBERLAIN:

17        Q    Officer Stark, you indicated that during the

18    course of this conversation on October 18th, 2000,

19    Mr. Scrimo told you about certain things that went on in a

20    bar called Y.L. Childs, do you remember that?

21        A    Yes.

22        Q    Did you tell this jury that he then told you that

23    Kane himself and Ruth, the victim, walked out together?

24        A    No.

25        Q    You didn't tell them that?

People - P.O. Stark - Cross

1    A    No.

2    Q    All right.  Between the time that you found the

3  body on Thursday, October 13th -- I'm sorry, April 13th,

4  2000 and October 18th of 2000, did you have anything else to

5  do with this case?

6    A    I believe I went to the grand jury.

7    Q    Your grand jury testimony solely concerned what

8  happened when you found the body; is that right?

9              MR. BIANCAVILLA:  Objection.

10             THE COURT:  Sustained.

11   Q    Do you recall the date you went to the grand jury?

12             MR. BIANCAVILLA:  Objection.  Relevancy.

13             THE COURT:  Yes, I don't see the relevancy.

14   Q    Well, the grand jury testimony preceded the

15  October 18th visit?

16             MR. BIANCAVILLA:  Objection.  Relevancy.

17             THE COURT:  I'll permit that.

18   A    Could you just re-ask the question?

19   Q    Do you recall when you testified before the grand

20  jury?

21   A    Not the exact date.

22   Q    Was it July of 2000?

23   A    I'm not sure but it was before October 18th.

24   Q    Other than testifying before the grand jury, did

25  you have anything else to do with this case?

People - P.O. Stark - Cross

1   A   I believe I conferenced with the DA's office prior

2   to the grand jury.

3   Q   Other than that, Officer Stark?

4   A   With regard to?

5   Q   Did you take any part in the investigation of this

6   case?

7   A   No.

8   Q   Did you speak to any of the witnesses?

9   A   No.

10  Q   Now, you've testified as to what Mr. Scrimo told

11  you his reasons were for not saying certain things.  Without

12  telling me what they were, did he also tell you other --

13  also tell you other things he was thinking about this case?

14          MR. BIANCAVILLA:  Objection.

15          THE COURT:  Sustained.

16  Q   Was there more information that he imparted to you

17  about this case?

18          MR. BIANCAVILLA:  Objection.

19          THE COURT:  Sustained.

20  Q   Was there any discussion between you and

21  Mr. Scrimo about Mr. Kane and Mr. Kane's --

22          MR. BIANCAVILLA:  Objection, Judge.

23          THE COURT:  Would you read that back to me

24      please?

25          (Whereupon, the court reporter read back the

People - P.O. Stark - Cross

1          requested question.)

2                    THE COURT:  Sustained.

3      Q    Was there any further discussion between you and

4    Mr. Scrimo about Mr. John Kane?

5                    MR. BIANCAVILLA:  Objection.

6                    THE COURT:  Sustained.

7                    MR. CHAMBERLAIN:  Nothing further.  Thank

8          you, Judge.

9                    THE COURT:  Anything further,

10         Mr. Biancavilla?

11                   MR. BIANCAVILLA:  No, Judge.

12                   THE COURT:  You may step down, Officer.

13                   THE WITNESS:  Thank you.

14                   (Whereupon, the witness was excused from the

15         witness stand.)

16                   THE COURT:  Counsel, come forward, please.

17                   (Whereupon, off-the-record discussion took

18         place at the bench outside of the hearing of the

19         jurors and defendant.)

20                   (Whereupon, the following occurred in open

21         court.)

22                   THE COURT:  Call your next witness, please,

23         Mr. Biancavilla.

24                   MR. BIANCAVILLA:  John Kane.

25                   MR. CHAMBERLAIN:  Judge --

Proceedings

1    THE COURT:  I don't want this in front of the

2  jury.  If you want to make a record, come forward,

3  please.

4    (Whereupon, the following took place at the

5    bench outside of the hearing of the jurors and the

6    defendant.)

7    THE COURT:  Mr. Biancavilla, you gave

8  Mr. Chamberlain a list of witnesses that you intended

9  to call today.  Do you still intend to call those

10  witnesses?

11    MR. BIANCAVILLA:  No.

12    THE COURT:  This is your last witness?

13    MR. BIANCAVILLA:  Yes, sir.

14    MR. CHAMBERLAIN:  There are police officers

15  outside.

16    THE COURT:  I'm not telling the People how to

17  present their case.  I would be very upset if he

18  intends to call a witness after Mr. Kane.

19    MR. BIANCAVILLA:  No.  No.

20    MR. CHAMBERLAIN:  I also noticed Newsday was

21  outside and they were called and told Kane would be

22  here this morning.

23    MR. BIANCAVILLA:  Nobody told anybody

24  anything.  I have a witness in the hallway.  May we

25  move on?

Proceedings

1    MR. CHAMBERLAIN:  If Newsday is called --

2    THE COURT:  Mr. Biancavilla?

3    MR. BIANCAVILLA:  No, I did not.  Let's move

4    on please.

5    MR. CHAMBERLAIN:  He didn't but his office

6    did.

7    THE COURT:  Mr. Chamberlain, Newsday has been

8    in this courtroom many of the days of this trial.

9    MR. CHAMBERLAIN:  That's fine.

10   MR. BIANCAVILLA:  Can we move on?

11   THE COURT:  Let's proceed.

12   MR. CHAMBERLAIN:  I may need a little time to

13   review notes.

14   THE COURT:  If you want to break after

15   direct, I have no problem with that.  Matter of fact,

16   what I will do is break for lunch.  Do you think we

17   will finish direct before lunch?

18   MR. BIANCAVILLA:  Sure.

19   THE COURT:  We'll break and give you over

20   lunch to review whatever notes you want.

21   MR. CHAMBERLAIN:  Fine.

22   (Whereupon, the following took place in open

23   court.)

24

25

Proceedings

1   J O H N   K A N E, a witness called on behalf of the People,

2   having been duly sworn, testified as follows:

3                   COURT OFFICER:  In a loud voice, give your

4        full name, spelling your last name.

5                   THE WITNESS:  John Kane, K-A-N-E.

6                   COURT OFFICER:  And your county of residence?

7                   THE WITNESS:  Suffolk County.

8                   COURT OFFICER:  Thank you.

9                   THE COURT:  You may inquire.

10                  MR. BIANCAVILLA:  Thank you, Judge.

11  DIRECT EXAMINATION

12  BY MR. BIANCAVILLA:

13       Q    Good morning, Mr. Kane?

14       A    Good morning.

15       Q    Mr. Kane, will you tell the jury how old you are?

16       A    Thirty-two.

17       Q    Are you currently employed?

18       A    Yes, I am.

19       Q    What type of work do you do?

20       A    I do floors for a living.

21       Q    When you say you do floors, will you explain that?

22       A    Carpet and oak floors, tile.

23       Q    How long have you been doing that?

24       A    On and off for about ten years.

25                  MR. CHAMBERLAIN:  I'm having difficulty

People - Kane - Direct

1    hearing.

2                THE COURT:  Move nearer to the microphone and

3    keep your voice up.

4                THE WITNESS:  All right.

5    Q    In April of 2000, did you belong to a dart team?

6    A    Yes.

7    Q    Where was the dart team?

8    A    Falcons' Nest in Farmingdale.

9    Q    What is the Falcons' Nest in Farmingdale?

10   A    It's a bar.

11   Q    Do you know the defendant in this case,

12   Paul Scrimo?

13   A    Yes.

14   Q    How long had you known Paul Scrimo in April of

15   2000?

16   A    About a year.

17   Q    How did you know him?

18   A    From the dart team at Falcons' Nest.

19   Q    On what nights did you play darts?

20   A    On Tuesday night.

21   Q    Was it a regular dart game every Tuesday night?

22   A    Yes.

23   Q    I am going to direct your attention to Tuesday,

24   April 11th of 2000.  Do you remember that night?

25   A    Yes.

People - Kane - Direct

1  Q    Where were you at approximately eight o'clock that

2  night?

3  A    I went down to the Falcon's Nest to play darts.

4  Q    Who was at the Falcon's Nest when you went down

5  there on Tuesday, April 11th.

6  A    The dart team and Paul Scrimo is on the dart team.

7  Q    Can you describe how Paul Scrimo appeared, his

8  appearance on the evening of April 11th, 2000?

9  A    He had just recently shaved his head.

10  Q    What did you do Tuesday night from eight o'clock

11  on?

12  A    We played darts at the Falcon's Nest.

13  Q    Was there a competition?

14  A    Yes.

15  Q    Was Mr. Scrimo with you the entire time?

16  A    Yes.

17  Q    What time was the dart tournament over?

18  A    At twelve o'clock.

19  Q    Were you drinking alcohol while you were playing

20  darts?

21  A    Yes.

22  Q    What did you drink that night?

23  A    Absolute, 7-Up and OJ.

24  Q    How about Mr. Scrimo?

25  A    Guinness.

People - Kane - Direct

1     Q    What time was the dart tournament over?

2     A    At twelve o'clock.

3     Q    Where did you go after the dart tournament?

4     A    Me and Paul went out drinking.  We went to Granny

5 O'Shea's.

6     Q    Where was that located?

7     A    On Main Street in Farmingdale.

8     Q    Did you and Mr. Scrimo go together?

9     A    Yes.

10    Q    How did you get there?

11    A    We walked.  It's not far from the Falcon's Nest

12 bar.

13    Q    What happened when you got to Granny O'Shea's?

14    A    I introduced Paul to the bartender, Penny, and we

15 had a drink.

16    Q    Approximately how long did you stay at Granny's?

17    A    Forty-five minutes.

18    Q    What time did you leave Granny's, if you remember?

19    A    It was one o'clock.

20    Q    Now, we are talking about into the morning of

21 Wednesday, April 12th?

22    A    Right.

23    Q    When you left Granny's, where did you go?

24    A    We went down Main Street to Conklin over to Y.L.

25 Childs bar.

People - Kane - Direct

1   Q   When you got to Y.L. Childs bar, what did you do?

2   A   We went in, went to the bar, got a couple of

3   stools and hung out and started drinking.

4                   MR. CHAMBERLAIN:  I didn't hear that.

5                   THE COURT:  Repeat your answer, please.

6   A   We went into the bar, went to the right-hand side

7   of the bar, grabbed a couple of stools and started drinking.

8   Q   Did you know anybody in the bar?  Did you

9   personally know anybody in the bar?

10  A   Ruthy came over to us after a while, yes.

11  Q   Where did you know Ruthy from?

12  A   I knew her from the Falcons Nest.

13  Q   How long had you known her?

14  A   About two years.

15  Q   You're referring to Ruth Williams?

16  A   Yes.

17  Q   So we are at the point where Ruthy came over to

18  you.  Tell the jury what happened?

19  A   Then we were hanging out, you know, drinking and

20  just talking and she was dancing.  She was flirting with me.

21  I made out with her and at this time Paul was like what

22  about me.  You know, she was like, oh, you're married, like

23  that.

24  Q   Did you stay at the bar the whole time?

25  A   No, like, you know, floated around, went to the

People - Kane - Direct

1   bathroom, you know, over to the pool tables, whatever.

2        Q    So you weren't at the bar the whole time?

3        A    Not sitting at the bar the entire time, no.

4        Q    How long would you say you were at Y.L. Childs

5   with Mr. Scrimo?

6        A    Approximately three hours, until closing, until

7   last call.

8        Q    What about Ruth?

9        A    Ruth left early in the evening.  I'm not sure at

10  what point she left.

11       Q    You left Y.L. Childs at closing?

12       A    Yes, at the last call.

13       Q    That was approximately what time?

14       A    Quarter to 4:00.

15       Q    And Ruthy had left before you?

16       A    Yes.

17       Q    When you left Y.L. Childs, what you did and

18  Mr. Scrimo do?

19       A    Then we walked down Main Street back toward the

20  Falcon's Nest.

21       Q    Did you have a conversation?

22       A    Yes, we were talking and I said, Why don't we go

23  over to Ruth's and have a drink?

24       Q    Had you been to Ruth's before?

25       A    Yes.

People - Kane - Direct

1    Q    Approximately how many times before?

2    A    Five, five times maybe.

3    Q    How long have you known Ruth for?

4              MR. CHAMBERLAIN:  I didn't hear the last

5    answer.

6              THE COURT:  Five times I have been to

7    Ruthy's?

8    A    I have known her for two years.

9    Q    So you had a conversation -- I'm sorry, what was

10   that conversation?

11   A    Yeah, I said, Let's go over to Ruthy's and have a

12   drink.

13   Q    Then what did you do?

14   A    He said, Okay, and we went over to Ruthy's behind

15   the Falcon's Nest Bar.

16   Q    Describe what happened?

17   A    I went in the first door up the stairs and then

18   down the hallway and I knocked on the door.  Ruthy answered

19   and we went in.  I asked her if she had any beers.  She said

20   no.  Scrimo said, I'll go to 7-Eleven and get beers.  And

21   Ruthy told him, you know, get me a pack of smokes.

22             MR. CHAMBERLAIN:  I didn't hear the last

23   word.

24             THE COURT:  Pack of smokes.

25   Q    What happened then?

                        People - Kane - Direct

1       A    He left.

2       Q    What did you do?

3       A    I was sitting at the table, at the kitchen table,

4   and me and Ruthy engaged in oral sex.

5       Q    Describe that for the jury please, what happened?

6       A    Well, she sat between my legs and gave me oral

7   sex.

8       Q    Now, describe how she was touching you at the

9   time?

10      A    Running her finger through my hair, grabbing me,

11  you know, stroking my behind.

12      Q    What happened then?

13      A    Then I had asked her to stop because I knew Scrimo

14  would be coming back soon.

15      Q    Then what happened?

16      A    So she stopped and I got up, zipped myself, and I

17  told her I was going to put on some tunes.

18              MR. CHAMBERLAIN:  Judge, I have a problem

19      with this witness because he drops the ends of words.

20      I'm missing a lot of this.

21              THE COURT:  Read back the last answer for

22      Mr. Chamberlain, please.

23              (Whereupon, the court reporter read back the

24          requested testimony.)

25              THE COURT:  Would you please keep your voice

People - Kane - Direct

```
 1        up, Mr. Kane.

 2                     Maybe if we close the window.

 3                     MR. CHAMBERLAIN:  It's not the window, Judge.

 4                     THE WITNESS:  I'll try.

 5                     THE COURT:  Tell me, Mr. Chamberlain, if you

 6        don't hear something, but keep your voice up as much as

 7        you can.

 8                     THE WITNESS:  All right.

 9        Q     You left off with you said you were putting on

10   tunes.

11        A     Yes.

12        Q     What did you do?

13        A     I got up from the kitchen table, went through the

14   bedroom into the living room over to the stereo and I went

15   through the CDs and found an Allman Brothers CD that I liked

16   and put that in.

17                     MR. CHAMBERLAIN:  I missed that.

18                     MR. BIANCAVILLA:  Judge, I can hear him

19        perfectly.

20                     MR. CHAMBERLAIN:  Maybe so, but I can't.  I

21        object to that.  I can't.

22                     THE COURT:  I don't want conversation.  I'll

23        have the witness keep his voice up.  If there's

24        something you can't hear, let me know and we'll have it

25        read back to you.
```

1434

People - Kane - Direct

1          MR. CHAMBERLAIN:  Please advise

2    Mr. Biancavilla not to make comments.

3          THE COURT:  Both of you, I don't want

4    colloquy.  Do we understand each other?

5          MR. BIANCAVILLA:  Yes, Judge.

6          MR. CHAMBERLAIN:  Yes.

7          THE COURT:  Please keep your voice up,

8    Mr. Kane.

9          Go ahead, Mr. Biancavilla.

10          MR. CHAMBERLAIN:  May we have the last answer

11    read back?

12          THE COURT:  Please read it back.

13          (Whereupon, the requested answer was read

14    back by the court reporter.)

15          THE COURT:  Okay.

16    Q    After you put the Allman Brothers CD in, what did

17  you do?

18    A    Then I went back through the bedroom into the

19  kitchen and Scrimo was back from the 7-Eleven with -- he had

20  a twelve pack of beers.

21    Q    What happened at that point?

22    A    Then we sat down.  We had a beer.  We were hanging

23  out.  I was listening to the tunes and --

24    Q    Where were you seated?

25    A    I was sitting in the chair at the kitchen table by

People - Kane - Direct

1    the phone, nearest to the phone.  Scrimo was sit -- seated

2    in the other seat closer to the doorway and Ruth was -- she

3    was kind of in between the refrigerator and stove, just kind

4    of hanging out, you know.

5        Q     What was happening at that point?

6        A     We was hanging out, you know, talking, having a

7    beer.  I started vegging out to the music, listening to the

8    lyrics of the music, and Scrimo and Ruthy were talking and

9    they had -- Scrimo had gotten up and said that, you know,

10   I'm not going to take this.  I'm out of here.  Like that.

11       Q     I'm sorry?

12       A     He said, I'm not going to take this.  I'm out of

13   here, and had gotten up and started walking down the hallway

14   to exit.

15       Q     What did you do?

16       A     I got up and went, you know, toward him.  I was

17   like, What are you doing?  We just got here.  We just got

18   some beers.  You know, hang out.

19             That's when Ruth said, Fuck it.  Let him go home

20   to his fat ugly wife.

21       Q     I didn't hear.

22       A     Fuck him.  Let him go home to his fat ugly wife.

23       Q     What happened at that point?

24       A     That's when Paul snapped.  He turned and pushed me

25   aside and made an A line right to Ruthy.

People - Kane - Direct

1   Q    Where was she standing when this happened?

2   A    She was standing in the kitchen in the doorway to

3   the bedroom.

4   Q    What happened?

5   A    He went at her and he grabbed her, you know, both

6   hands by the shoulders, threw her down and she fell into the

7   bedroom by the bed.

8   Q    And what happened?

9   A    Then I came running up.  I thought they were

10  getting into a fight.

11              MR. CHAMBERLAIN:  I didn't hear that?

12              THE COURT:  One second.

13              Read that back please.

14              (Whereupon, the court reporter read back the

15          requested answer.)

16              THE COURT:  You may continue.

17  A    And I came running up.  I grabbed -- I grabbed

18  Scrimo by the shoulders.  He was on top of her.  I grabbed

19  him by the shoulders.  He was like a rock.  I was like, What

20  the fuck?  What are you doing?  And that's when I looked

21  over his shoulder and saw that he was strangling her.

22  Q    Did you see her face?

23  A    Yes.

24  Q    What did you see about her face?

25  A    Her eyes were rolled up in the back of her head

People - Kane - Direct

1    and her mouth was agape, her mouth was opened.

2        Q    Then what happened?

3        A    I grabbed on and said, What the fuck?  I realized

4    he was killing her at this moment, you know, like, so I just

5    backed up and I started walking backwards, walking away

6    going, What the fuck?  What are you doing?  What the fuck?

7        Q    What happened then?

8        A    I backed up in the kitchen area and that's when

9    Scrimo had gotten up and he went to, like, my left, but in

10   the bedroom area.  He was out of my sight, you know, just

11   real quick.  I heard like a snapping, like something being

12   ripped out.  All right.  That's when Ruth was laying there.

13   She looked dead to me.  He came back, came up behind her,

14   wrapped it around her neck and pulled up on it.

15       Q    Could you describe for the jury how you saw him

16   pulling up on it?

17       A    Describe --

18       Q    Yes.  Standing up.

19       A    Wrapped it around her neck and yanked up on it

20   like this (demonstrating).

21       Q    Did you see what he had in his hand?

22       A    Excuse me?

23       Q    Could you see what was in his hand?

24       A    A cord of some sort.  I'm not sure what it was.

25       Q    What were you doing at that point?

People - Kane - Direct

1    A    I was still in the kitchen backed up against the

2  counter and that's when he screamed at me.  He said, Get the

3  fucking stereo, like that.

4    Q    What did you do?

5    A    I reluctantly went and stepped over Ruthy's legs

6  by Scrimo and went through the bedroom and in the living

7  room where the stereo was.

8    Q    What did you do then?

9    A    I frantically looked to see how to turn it off and

10  I shut it off, shut off the music.

11    Q    What happened then?

12    A    I came back through the bedroom and Paul was --

13  Paul wasn't there.  He was in the kitchen wiping down like

14  the seats and like the table with a napkin.

15    Q    What was he using, a napkin?

16    A    A napkin and some sort of rag.

17    Q    What did he do then?

18    A    That's when he screamed at me, get The beers, Get

19  the fucking beers.  So I grabbed the beers off the table and

20  put them in the case.  I grabbed the case and started

21  walking down the hallway.

22    Q    Where was he?

23    A    He was -- he came right behind me.

24    Q    What happened as you were walking down the

25  hallway?

People - Kane - Direct

1    A    We went through the first doors and he wiped off

2    the handle.  And when we went down the stairs, he wiped off

3    the handle to that door knob.

4                    MR. CHAMBERLAIN:  I didn't hear that.

5                    THE COURT:  Read the last response back,

6        please.

7                    (Whereupon, the court reporter read back the

8            requested answer.)

9                    THE COURT:  You may continue.

10   A    Then we left and we started going to the parking

11   lot and --

12   Q    Which direction did you walk when you left the

13   apartment?

14   A    West.

15   Q    Where did you walk to?

16   A    Towards the railroad tracks toward my home.

17   Q    Did you have any conversation as you were walking?

18   A    Yeah.  While we were walking, Scrimo was saying to

19   me, You know, don't say nothing.  It's all taken care of.

20   We are in this together.  Just keep your mouth shut.

21   Q    Where did you go at that point?

22   A    I went up to my apartment.

23   Q    When was the next time you saw Mr. Scrimo?

24   A    I seen him the next Tuesday at darts.

25   Q    Did you have a conversation at that time?

People - Kane - Direct

1    A    Yeah, but not much of one.  He just said to keep

2    your mouth shut, it's all taken care of.

3    Q    When was the next time you saw him after that?

4    A    I seen him the next Tuesday.

5    Q    The following Tuesday night?

6    A    Yeah, at darts again.

7    Q    Did you have a conversation with him at that

8    point?

9    A    Yeah.  He said something about the cops were

10   looking for a black guy and that Ruthy was seen having an

11   argument with somebody by the Downtown.

12   Q    Did you see him after that?

13   A    I seen him after that time, no.

14             MR. BIANCAVILLA:  Judge, may we have the

15        easel put up?

16             THE COURT:  Yes.

17             MR. BIANCAVILLA:  May we have People's 31

18        displayed for the jury?

19             THE COURT:  Do you want him to step down?

20             MR. BIANCAVILLA:  Yes.

21             THE COURT:  Please step down.

22   Q    Mr. Kane, I am going to ask you to take a look at

23   that picture and will you point to the jury the seat that

24   you were seated in by the telephone in the kitchen?

25        A    It would be right here.

People - Kane - Direct

1        THE COURT:  Which photograph?

2    Q     Look at the number underneath the photograph.

3    A     Eighteen.  I was sitting in this seat right here.

4    Q     Where was Mr. Scrimo?

5        MR. CHAMBERLAIN:  The exhibit number please?

6        THE COURT:  Eighteen.

7    A     Scrimo was sitting at this seat with the jacket --

8    that has the jacket on it.

9    Q     Now, look at the next photograph over.  Do you see

10   this photograph?

11   A     Yes.

12   Q     Read the number off underneath of it.

13   A     Twenty-one.

14   Q     When you left the apartment that night, is that

15   the position of Ruth Williams?

16   A     Yes.

17   Q     Please describe for the jury how you saw

18   Mr. Scrimo putting the cord around Ruth Williams' neck,

19   where was he standing in that photograph?

20   A     He was kind of sliding -- he was kind of squatting

21   behind her, kneeling like this behind her (demonstrating),

22   behind her on this side of her.  This is where he came from

23   when he disappeared out of my sight.  He came from that way.

24   He came back in this way.  He came behind her like this and

25   wrapped it around her and lifted it up, the cord

People - Kane - Direct

1    (demonstrating).

2        Q    When you were --

3             MR. CHAMBERLAIN:  For the record, Judge,

4    indicating kneeling in what, like this?

5             THE WITNESS:  Like this.

6             THE COURT:  Yes, it looked like he was

7    squatting down.

8             THE WITNESS:  Squatting down.

9             THE COURT:  Yes, the record will reflect

10   that.

11       Q    Demonstrate how you -- show the jury where you

12   went to shut the CD off?

13       A    Through the kitchen area this way, the bedroom

14   into the living room down here.  This is where the stereo

15   was.

16       Q    Now, that photograph below that particular room

17   there, is that the stereo that you shut off?

18       A    Yes.

19       Q    Now, show the jury on People's Exhibit 31 the

20   approximate area in the kitchen where Ruth was standing when

21   Mr. Scrimo first attacked her?

22       A    Thirty-one?

23       Q    I'm sorry.  The big exhibit is 31.  Just go to the

24   photograph.

25       A    This is the kitchen right here.  Standing right

People - Kane - Direct

1    here.  This is where the kitchen table is.  And this is the

2    hallway and this is where Scrimo came from, like this.

3                    MR. CHAMBERLAIN:  May we have that spot

4        marked as the doorway between the kitchen and the

5        bedroom; is that correct?

6                    MR. BIANCAVILLA:  I believe that's what he

7        just testified to.

8                    MR. CHAMBERLAIN:  It's not on the record.

9        Q    You are indicating?

10       A    Between the kitchen area and the bedroom, that

11   doorway that leads from the kitchen area to the bedroom.

12       Q    Now, when you left, please describe to the jury

13   how you left the apartment?

14       A    We left down the hallway and then down the stairs.

15       Q    Who exited the apartment first?

16       A    I did.

17       Q    Where was Mr. Scrimo when you exited the

18   apartment?

19       A    He was behind me.

20       Q    Thank you.  You can be seated.

21            After you exited the apartment, where did you go?

22       A    Excuse me?

23       Q    Where did you go after you left the apartment?

24       A    I went to my apartment.

25       Q    But who were you with when you left?

People - Kane - Direct

1    A    I was with Paul Scrimo.

2    Q    And you had conversation as you were walking home?

3    A    Yes, he said to me --

4         MR. CHAMBERLAIN:  Asked and answered, Judge.

5         THE COURT:  Overruled.

6    Q    What did he say to you?

7    A    He said to me, Don't worry about it.  Everything

8    is taken care of.  Just keep your mouth shut.  We are in

9    this together.

10   Q    When was the next time you saw him after that

11   night?

12   A    The next Tuesday at darts.

13   Q    What did he say to you?

14   A    He said, Just keep your mouth shut.  Everything is

15   taken care of.

16   Q    And the last time you saw him?

17   A    The last time I saw him was the following Tuesday

18   after that.

19   Q    What did he say?

20   A    He said, Don't worry about nothing.  The cops are

21   looking for some black guy.  She got into an argument

22   outside the downtown.

23        MR. BIANCAVILLA:  Thank you.  I have nothing

24        further of this witness.

25   A    Counsel, come forward.

Proceedings

1        THE COURT:  Please step down.

2        Ladies and gentlemen, at this point we are

3   going to break for lunch.  I am going to ask you to be

4   back here at 2:00 p.m.

5        Again, do not discuss the case amongst

6   yourselves or with anyone else.  Keep an open mind.  Do

7   not form or express any opinions until the entire case

8   has been completed.

9        Do not read or listen to any accounts of the

10  case should they be reported in the media.  Do not

11  visit or view any place or premises that have been

12  mentioned.

13        You are not to permit any party to discuss

14  the case with you or attempt to influence you, and you

15  must promptly report to the Court any violation

16  thereof.

17        Have a nice lunch.  We'll see you at two

18  o'clock.

19        (Whereupon, the sworn jurors exited the

20        courtroom.)

21        THE COURT:  Mr. Kane, do not discuss your

22  testimony with anybody with respect to this case and

23  we'll see you at two o'clock.  You are excused now.

24        Counsel, 2:00 p.m.

25        MR. BIANCAVILLA:  Thank you, Judge.

Proceedings

1          (Whereupon, a luncheon recess was taken.)

2          A F T E R N O O N    S E S S I O N

3          THE CLERK:  Case on trial continued.  All

4    parties are present.  The jurors are not present at

5    this time.

6          Are the People ready to proceed?

7          MR. BIANCAVILLA:  Yes.

8          THE CLERK:  Defendant?

9          MR. CHAMBERLAIN:  Defendant ready.

10          THE COURT:  Counsel, before we bring in the

11    jury, Mr. Chamberlain, at this point, based on some of

12    the prior conversations that I had with both you and

13    Mr. Biancavilla with respect to potential

14    cross-examination of Mr. Kane, I am going to ask you to

15    place on the record your good faith basis for asking

16    certain questions at this point.

17          MR. CHAMBERLAIN:  Judge, there are two

18    witnesses who testified previously before Judge Honorof

19    concerning prior drug purchases from Mr. Kane.

20          THE COURT:  This was under oath,

21    Mr. Chamberlain?

22          MR. CHAMBERLAIN:  Yes, it was.

23          There are other witnesses who also have

24    indicated that they purchased drugs from Mr. Kane.  I

25    intend to question concerning those people.

Proceedings

1    THE COURT:  Mr. Biancavilla?

2    MR. CHAMBERLAIN:  I --

3    THE COURT:  I'm sorry.  I thought you were

4    finished.  I want to make sure you're finished.  I'll

5    give you an opportunity if Mr. Biancavilla says

6    something you want to reply to.

7    MR. CHAMBERLAIN:  There may be a little

8    uncertainty as to some of the dates because many of

9    these people don't have exact dates.

10    THE COURT:  In the record that was unsealed

11    that Judge Honorof unsealed, was there any date within

12    that record?

13    MR. CHAMBERLAIN:  My understanding --

14    MR. BIANCAVILLA:  Judge, I believe it was

15    1998.  I think this was one incident.

16    THE COURT:  A month and a year, right.

17    MR. BIANCAVILLA:  A witness by the name of

18    Charles Ball, I believe his last name was, and he said

19    it was one incident involving the sale of a half a gram

20    of Kane that he claims Mr. Kane made to him and that

21    was some two years prior --

22    THE COURT:  It says here early August of 1998

23    Mr. Ball testified before Judge Honorof.

24    MR. BIANCAVILLA:  That was the date of the

25    incident?

Proceedings

1        THE COURT:  Yes.

2        MR. BIANCAVILLA:  And from what I understand,

3   that was the only one Judge Honorof heard.

4        THE COURT:  That's the one I am aware of.

5   That's why I am asking Mr. Chamberlain if there were

6   others.

7        MR. CHAMBERLAIN:  There were others, Judge.

8   Let me see if I can find it.

9        THE COURT:  Certainly.  Take your time.

10        MR. CHAMBERLAIN:  Early August, 1998, Judge.

11        THE COURT:  That was in the transcript before

12   Judge Honorof on December 27th, 2000; is that correct,

13   Mr. Chamberlain?

14        MR. CHAMBERLAIN:  That's correct.  There was

15   another witness who testified before Justice Honorof,

16   Judge Honorof at or about same time, to my knowledge.

17        MR. BIANCAVILLA:  Not according to Judge

18   Honorof.

19        THE COURT:  The only transcript I have before

20   me is --

21        MR. CHAMBERLAIN:  That's not correct.  There

22   may not be a transcript but Judge Honorof indicated

23   there are two witnesses.

24        THE COURT:  He may or may not be mistaken.

25   Judge Honorof, as you both are aware, unsealed the

Proceedings

1    record.  The only record I have is December 27th, 2000.

2    There was only one witness who testified and that was

3    Mr. Charles Ball who testified in this transcript about

4    a sale, a half of a gram of cocaine for $50 in early

5    August of 1998 at the Falcon's Nest bar.

6            MR. CHAMBERLAIN:  But there was another

7    witness who testified, Judge.

8            THE COURT:  That maybe, Mr. Chamberlain

9    that's why, as you are aware, the law says all

10   witnesses may be cross-examined about any immoral,

11   vicious or criminal acts which may reflect on their own

12   character and show them to be unworthy of belief,

13   provided the cross-examiner's questions are in good

14   faith and based upon a reasonable basis in fact.

15           Now, you've given me a reasonable fact basis

16   as to Ball.

17           MR. BIANCAVILLA:  May --

18           THE COURT:  I'll here you in a minute.

19           I'm asking if you are aware of any others.  I

20   don't want counsel to continually come up to the bench

21   during cross-examination.

22           MR. CHAMBERLAIN:  I understand, Judge.

23           Penny Shouse who testified here indicated she

24   had a problem testifying in response to purchasing

25   drugs in the past.

Proceedings

1          MR. BIANCAVILLA:  No, she didn't.

2          MR. CHAMBERLAIN:  Yes, she did.

3          THE COURT:  Mr. Biancavilla, let me hear from

4     Mr. Chamberlain, please.

5          MR. BIANCAVILLA:  I'm sorry.

6          MR. CHAMBERLAIN:  She indicated she got an

7     attorney an his first response, after talking to her at

8     length, was she should claim her fifth amendment rights

9     to not testify about prior drug use.

10         MR. BIANCAVILLA:  That's not true.

11         MR. CHAMBERLAIN:  It is true.

12         MR. BIANCAVILLA:  It's not true.

13         THE COURT:  Mr. Biancavilla?

14         MR. BIANCAVILLA:  With respect to the

15    incident, Charles Ball, the People submit, anything

16    occurring in August 1998 is much too remote in time

17    regarding this particular incident which happened two

18    years later.

19         I will refer to a case which is -- I'm going

20    to refer to a series of cases in my application, Judge,

21    so the Court is aware of the authority from which I am

22    speaking but, clearly, in People versus Barnhill, and

23    that is 188 AD2d 884, the court clearly set forth that

24    whatever cross-examination occurs has to be relevant

25    and if it's too remote in time, then it's not relevant.

Proceedings

1          THE COURT:  How many years was it that in

2     that case?

3          MR. BIANCAVILLA:  I am getting into that now.

4     Judge, with respect to Barnhill, the facts were that

5     none of the testimony offered constituted permissible

6     extrinsic evidence of Dow's and Chambers' bias,

7     hostility or interest.  The evidence of Dow's and

8     Chambers' consumption of cocaine was unspecified as to

9     dates, except as to one brief period of Dow's use

10    months after the crime were committed.  All of such

11    evidence either lacked probative value or was

12    completely insufficient to show that Dow and Chambers

13    were under the influence of drugs while testifying, or

14    at the time of the events to which they testified, or

15    that their power of perception or recollection were

16    actually impaired by the drug addiction.

17          The court went on to say the only function of

18    the evidence that the defendant sought to introduce of

19    Chambers' and Dow's use of cocaine and promotion of

20    prostitution was to attack their credibility by showing

21    their vicious, immoral or criminal acts.  This kind of

22    impeachment, however, is limited to cross-examination

23    and may not be established by extrinsic evidence.

24          My point is two things.  The extrinsic

25    evidence he wants to introduce after this witness

Proceedings

1    testifies --

2                THE COURT:  I'm only dealing with

3    cross-examination.

4                MR. BIANCAVILLA:  I understand that, but what

5    I am saying is that two years prior to this homicide,

6    Judge, I am arguing, is clearly much too remote in

7    time.  If he had done this six months prior to the

8    homicide, then I wouldn't get up here and argue that it

9    was irrelevant.

10               When we are talking about an individual

11   coming in here and testifying that two years prior to

12   this criminal act occurring, that he may or may not

13   have purchased a half a gram of cocaine from John Kane,

14   it is irrelevant because it's too remote and he's

15   talking about August 1998, Judge.  This homicide

16   happened in April of 2000.  That's my argument with

17   respect to Mr. Ball's testimony.

18               With respect to anyone else's testimony,

19   Mr. Chamberlain cannot come in here and point his

20   finger at John Kane and call him a drug dealer.  He can

21   ask him on specific dates and times, did you sell drugs

22   to X, Y and Z, but he can't just generalize without any

23   specific facts.

24               My point, with respect to Mr. Ball, is he

25   isn't coming in and saying in August of 1998 did he

Proceedings

1   sell cocaine to Charles Ball, because in August of 1998

2   is two years before this homicide.

3               MR. CHAMBERLAIN:  Judge, I would disagree

4   with that statement of law but I have another witness

5   by the name of Jennifer Hartman who purchased drugs

6   from Mr. Kane.

7               THE COURT:  What is your good faith basis for

8   that, Mr. Chamberlain?

9               MR. CHAMBERLAIN:  This witness would testify

10  that she purchased drugs, he cut the drugs, they were

11  bagged, and she grabbed, $30, I believe it was a bag --

12              THE COURT:  My question is your good faith

13  basis, something in fact.  Do you have a statement from

14  her?  Someone spoke to her?

15              MR. CHAMBERLAIN:  I have a statement from

16  her, not in writing, but I have a statement through an

17  investigator.

18              MR. BIANCAVILLA:  When did that happen,

19  Judge?  Two years or two weeks before the murder?

20  That's my point.

21              MR. CHAMBERLAIN:  The point of this is that

22  this witness not only claims she purchased drugs but

23  that the drugs were cut and when she tried to take some

24  of her money back from a hundred dollars in change he

25  had in the bar in the Falcon's Nest, he started to

Proceedings

1    choke her.

2              MR. BIANCAVILLA:  That doesn't answer my

3    question.  When did that happen?

4              THE COURT:  Let me get the date,

5    Mr. Chamberlain.

6              MR. CHAMBERLAIN:  I think 1997.

7              MR. BIANCAVILLA:  Again, it's too remote in

8    time.

9              THE COURT:  Mr. Biancavilla, I disagree with

10   you.

11             MR. BIANCAVILLA:  1997, Judge?

12             THE COURT:  The cases you cited are easily

13   distinguished because, first of all, it was after the

14   event, not before the event; and, second of all, it

15   was, in that case, it was equivocal as to the date.

16   They weren't specific as to the date.  In this

17   situation we have a date certain and we have testimony

18   under oath from Mr. Ball.

19             Now, with respect to -- what was the other

20   witness' name.

21             MR. CHAMBERLAIN:  Jennifer Hartman.

22             THE COURT:  Jennifer Hartman, the good faith

23   basis, Mr. Chamberlain has placed on the record, I

24   would permit Mr. Chamberlain to cross-examine the

25   witness with respect to that alleged act.

Proceedings

1          MR. CHAMBERLAIN:  With respect to the witness

2      from whom we don't have a transcript but did testify,

3      from my knowledge, before Judge Honorof in the bail

4      hearing --

5          THE COURT:  Were you present when this

6      witness testified?

7          MR. CHAMBERLAIN:  No, I wasn't present when

8      she went in.

9          THE COURT:  Did you speak to her?

10          MR. CHAMBERLAIN:  She was in jail and brought

11      into court.  I didn't speak to her beforehand.  I spoke

12      to her for a brief moment after she came out of court.

13      Her testimony was multiple purchases from Mr. Kane

14      including purchases just prior to the murder at which

15      time she shared cocaine purchased from Mr. Kane with

16      the victim.

17          THE COURT:  Did you actually speak to the

18      witness about this?

19          MR. CHAMBERLAIN:  Yes, I have, Judge.

20          THE COURT:  And she gave you that

21      information?

22          MR. CHAMBERLAIN:  She did, Judge.

23          THE COURT:  There's a good faith basis.

24          MR. CHAMBERLAIN:  And this happened to be the

25      witness -- withdrawn.

Proceedings

1   THE COURT:  I will permit you to

2   cross-examine with respect to that witness too.  Place

3   that reporter name on the record.

4          MR. CHAMBERLAIN:  Stephanie Domaradzki.

5          MR. BIANCAVILLA:  This is a witness that

6   Mr. Chamberlain is claiming testified before Judge

7   Honorof and Judge Honorof didn't have a reporter

8   present?

9          THE COURT:  I have no idea.

10          MR. BIANCAVILLA:  Judge Honorof appeared here

11   the other day and said the only witness that had

12   appeared before him he had a transcript for.

13          THE COURT:  Mr. Chamberlain is an officer of

14   the court.

15          MR. BIANCAVILLA:  I understand but I don't

16   understand why Judge Honorof would conduct a proceeding

17   in his courtroom without a court reporter, which we saw

18   with Ball.

19          THE COURT:  There has been no record

20   provided.

21          MR. BIANCAVILLA:  I believe there's been an

22   exhaustive search, Judge.  If you want to allow him to

23   cross-examine with respect to that, I take exception to

24   the ruling of the court.

25          MR. CHAMBERLAIN:  This witness -- Judge

Proceedings

1    Honorof didn't state here there was only one witness.

2              THE COURT:  Mr. Chamberlain, we don't have to

3    hear argument on this.  I have already granted your

4    application.

5              MR. CHAMBERLAIN:  Okay.

6              THE COURT:  I have a question for

7    Mr. Biancavilla.

8              MR. BIANCAVILLA:  Yes?

9              THE COURT:  For the record, do I need to

10   appoint an attorney for Mr. Kane.

11             MR. BIANCAVILLA:  No, Judge.  Mr. Kane had an

12   attorney in the initial portions of this proceeding.

13   He appeared with an attorney and the attorney told him

14   that it wasn't necessary for him to be represented any

15   longer.

16             THE COURT:  To your knowledge, do you know if

17   Mr. Kane is taking the fifth amendment?

18             MR. BIANCAVILLA:  He is not, Judge.

19             THE COURT:  Are we read to proceed?  Counsel,

20   anything further?

21             MR. CHAMBERLAIN:  Yes, Judge.  We have a

22   question regarding immunity.

23             MR. BIANCAVILLA:  He can ask Mr. Kane

24   anything he would like.  I wasn't involved in this case

25   in the beginning.  He had extensive conferences with

Proceedings

1   Assistant District Attorney Dempsey who handled the

2   case for the first two years.  He can ask Mr. Kane

3   anything he would like about what representations were

4   made to him by the district attorney's office, you

5   know, whether or not he appeared with an attorney, what

6   happened to his attorney.  I have no problem with any

7   of that cross-examination.

8          MR. CHAMBERLAIN:  None of that was revealed

9   to me, Judge, none of those have been revealed and it's

10  incumbent upon him not to have me ask a witness on the

11  stand who is a layman what arrangements were made with

12  respect to --

13         MR. BIANCAVILLA:  There wasn't --

14         MR. CHAMBERLAIN:  I would like to --

15         THE COURT:  Excuse me.  Mr. Biancavilla is an

16  officer of the court and he just told you there were no

17  arrangements.

18         MR. CHAMBERLAIN:  Judge, he told me a minute

19  ago I should ask Mr. Dempsey, that he doesn't know what

20  was done.

21         What I am saying is, if he was given

22  immunity, I should be told by the district attorney and

23  I should be told whether Mr. Kane had an attorney and

24  who that was and what the arrangements were for giving

25  him that immunity.  I should have been told that.

Proceedings

1          THE COURT:  Mr. Biancavilla?

2          MR. BIANCAVILLA:  Mr. Kane was not given any

3    immunity for anything.  He appeared on one occasion,

4    from what I understand, with an attorney and that was

5    it.

6          MR. CHAMBERLAIN:  When was that?

7          MR. BIANCAVILLA:  When the case first

8    occurred.  That was back in 2000.

9          MR. CHAMBERLAIN:  But Judge, did this man

10   testify before the grand jury?

11         MR. BIANCAVILLA:  Mr. Chamberlain, I'm not

12   here to answer your questions.

13         THE COURT:  Are you talking about the

14   attorney?  What are you talking about?

15         MR. CHAMBERLAIN:  I am talking about

16   Mr. Kane.

17         MR. BIANCAVILLA:  He knows Kane testified in

18   the grand jury.

19         THE COURT:  You have Rosario material, I

20   presume.

21         MR. CHAMBERLAIN:  Judge, I don't have any

22   Rosario material -- I really find it offensive to be

23   interrupted with words like geez and I think that's

24   improper here, Judge.

25              THE COURT:  I want you both to treat each

Proceedings

1    other like the professionals that you are.

2            MR. CHAMBERLAIN:  I would appreciate that.

3            Judge, I think I'm entitled to find out under

4    what circumstances Mr. Kane testified before the grand

5    jury.  Was he given immunity?

6            THE COURT:  Mr. Biancavilla just made a

7    representation as an officer of the court that he was

8    not.

9            MR. CHAMBERLAIN:  If he testified without

10   signing a waiver, then he automatically got immunity.

11           MR. BIANCAVILLA:  That's an operation of law.

12   Nobody gave him immunity.  He was called as a witness

13   to a --

14           THE COURT:  Mr. Chamberlain, you're an

15   experienced criminal attorney.  You understand this.

16           MR. CHAMBERLAIN:  No.  It's the People's

17   choice to subpoena someone before the grand jury and

18   they then make a determination whether or not to

19   request the waiver.

20           THE COURT:  Mr. Biancavilla has just told you

21   as an officer of the court that there was no waiver of

22   immunity.

23           MR. CHAMBERLAIN:  It's taken this argument

24   for me to find that out, Judge.

25           THE COURT:  Mr. Chamberlain, if you can point

Proceedings

1   to a section of the Criminal Procedure Law --

2            MR. BIANCAVILLA:  Mr. Chamberlain, was given

3   John Kane's grand jury testimony and, if he read it, he

4   would have seen clearly that at no time he was asked to

5   sign a waiver of immunity.  I am sure Mr. Chamberlain

6   knows after 40 years of practice that all of that is on

7   the record.

8            MR. CHAMBERLAIN:  I will ask Mr. Kane about

9   any arrangements made before he was subpoenaed.

10           THE COURT:  Mr. Chamberlain, you certainly

11  can ask Mr. Kane on cross-examination.

12           MR. CHAMBERLAIN:  I will, Judge.

13           THE COURT:  Counsel, are we ready for the

14  jury now?

15           THE DEFENDANT:  A moment, your Honor?  Can I

16  speak to him?

17           THE COURT:  Yes.

18

19           THE COURT:  Anything further, Counsel?

20           MR. CHAMBERLAIN:  One second.

21           We are ready.

22           THE COURT:  We'll get the jury.

23           (Whereupon, there was a brief pause in the

24       proceedings.)

25           MR. CHAMBERLAIN:  Judge, before the jury

Proceedings

1   comes in, I have something further.

2            THE COURT:  Yes?

3            MR. CHAMBERLAIN:  I have one further matter I

4   would like to bring up with respect to

5   cross-examination.

6            I have another witness who would corroborate

7   the testimony of Stephanie Domaradzki regarding

8   purchases in the Downtown who indicated that Mr. Kane

9   was barred the year prior --

10          THE COURT:  Was this witness present during

11   the alleged drug transaction?

12          MR. CHAMBERLAIN:  I am trying to recall the

13   witness' testimony.

14          THE COURT:  I won't let you have this witness

15   testify to hearsay.  Excuse me.  I won't let you

16   cross-examine Mr. Kane with respect to hearsay.

17          MR. CHAMBERLAIN:  All right, Judge.  I don't

18   know that he was present.  I know that Mr. Kane,

19   according to this witness, was barred for drug sales in

20   the Downtown.

21          THE COURT:  If you were to give me a good

22   faith basis with respect to that witness, that's a

23   different story.

24          MR. CHAMBERLAIN:  I have a statement from

25   that witness but I don't believe he was present -- I

Proceedings

1     know he was -- he was -- the person that barred Kane

2     from the Downtown for drug sales and he was aware of

3     Kane making drug sales.

4               THE COURT:   If you can tell me, based on

5     that, there's a good faith basis as to him being

6     present during the alleged drug sale, otherwise you

7     cannot.

8               MR. CHAMBERLAIN:   I don't have a specific

9     reference in the statement as to whether he was present

10    so I can't so represent to the Court.   He indicates

11    that he did, while acting as a doorman or bouncer, on

12    the instructions of the owner, bar Mr. Kane for drug

13    sales.   He indicated that Mr. Kane -- there were

14    various customer who would ask for John Doe when they

15    wanted to by cocaine.   He talked about one or two

16    specifics with respect to that but he doesn't indicate

17    his presence at that time.   I haven't asked him that

18    question.   I would have to find out whether he was or

19    not.

20              THE COURT:   Okay.   We can proceed,

21    Mr. Chamberlain?

22              MR. CHAMBERLAIN:   Yes, Judge.

23              I'm not to ask about this?

24              THE COURT:   Yes.

25              COURT OFFICER:   Jury entering.

People - Kane - Cross

1           (Whereupon, the sworn jurors entered the

2      courtroom and resumed their respective seats.)

3           THE CLERK:  Both sides stipulate all sworn

4   jurors are present and seated properly?

5           MR. BIANCAVILLA:  So stipulated.

6           MR. CHAMBERLAIN:  Yes.

7           THE COURT:  Good afternoon, ladies and

8   gentlemen.  We are ready to proceed with the trial.

9           Ask Mr. Kane to come in, please.

10          (Whereupon, the witness resumed the witness

11   stand.)

12           THE CLERK:  Mr. Kane, you are reminded you

13   are under oath.  You may be seated.

14           THE WITNESS:  Thank you.

15           THE COURT:  Mr. Chamberlain, you may inquire.

16           MR. CHAMBERLAIN:  Thank you, Judge.

17 CROSS-EXAMINATION

18 BY MR. CHAMBERLAIN:

19     Q    Mr. Kane, your appearance today is different than

20 it was in April of 2000?

21     A    Is different?

22     Q    Yes.  Did you wear a moustache at that time?

23     A    No.

24     Q    Is your hair groomed differently than it was then?

25     A    It's blonder now.

People - Kane - Cross

1    Q    Now, you indicated you were currently employed; is
2    that correct?

3    A    Yes.

4    Q    Would you tell us by whom?

5    A    Mike Buttino.

6    Q    How do you spell that?

7    A    B-U-T-T-I-N-O.

8    Q    Who is Mike Buttino?

9    A    Excuse me?

10   Q    Who is he?

11   A    He's my boss.

12   Q    What does he do?  Is it a company?

13   A    He owns J and B Floor Covering.

14   Q    Where are they located?

15   A    Bohemia.

16   Q    What kind -- they install floors, is that it?

17   A    Correct.

18   Q    Are you an employee on the books of that company?

19   A    Yes.

20   Q    And you get payroll, you get paid?

21   A    Correct.

22   Q    Now, when you were -- were you employed back in
23   April of 2000?

24   A    No.  I was doing odd jobs.

25   Q    Doing odd jobs?

People - Kane - Cross

1    A    Yes.

2    Q    Would you tell us how long -- what odd jobs you

3  had just prior to the period you testified to here, April

4  12th, 2000?

5    A    I was doing a dormer job with a David Duval.

6    Q    How many days was that?

7    A    Couple of weeks.

8    Q    What couple of weeks was that?

9    A    This is previous to the murder.

10   Q    Weren't you questioned by one of the homicide

11 detectives about your prior employment?

12   A    Excuse me?

13   Q    Do you recall a Detective Parpan?

14   A    No, I do not.

15   Q    Do you recollect a Detective McHugh?

16   A    Yes.

17   Q    Do you recall when you were brought in on May 2nd

18 being asked about your prior employment?

19   A    I don't recall.

20   Q    Do you recall telling them that you worked for two

21 days and that you hadn't worked for a couple of months

22 before that?

23   A    Could be, right.

24   Q    Could be right?

25   A    I did a dormer back in 2000 with Dave Duval.   It

People - Kane - Cross

1    took about two weeks to do.

2         Q    Mr. Kane, at that point in time were you a heavy

3    drinker?

4         A    Yes.

5         Q    Did you drink three or four days a week heavy?

6         A    Yes.

7         Q    If, in fact, you had not worked other than two

8    days in the prior two months, where did you get the income

9    to support yourself?

10        A    I did odd jobs.  People lent me money.  My sister

11   was always able to take care of me.

12        Q    How long a period of time did people lend you

13   money?

14        A    Until I did an odd job and was able to pay them

15   back.

16        Q    Did you file an income tax return for the year

17   2000?

18        A    No.

19        Q    What about the year 1999?

20        A    No.

21        Q    1998?

22        A    No.

23        Q    1997?

24                  MR. BIANCAVILLA:  Objection.  Relevancy.

25                  THE COURT:  Overruled.

People - Kane - Cross

1    Q    1997, did you?

2    A    No.

3    Q    Did you get free drinks when you were drinking

4    three or four day a week?

5    A    Did I get free drinks?

6    Q    Yes.

7    A    No.  I had a tab.

8    Q    You had a tab.  Did you pay that tab?

9    A    Excuse me?

10   Q    Did you pay the tab?

11   A    Yes.

12   Q    Where did you get the cash to pay the tab?

13   A    I would do odd jobs.

14   Q    What kind of odd jobs?

15   A    I would do a floor, a kitchen floor.  I would work

16   with Duval putting in a closet, anything for a couple of

17   bucks.

18   Q    Isn't it a fact that you sold drugs during that

19   period?

20   A    No.

21   Q    No?

22   A    No.

23   Q    Didn't you sell drugs to a young lady by the name

24   of Stephanie Domaradzki?

25   A    Never heard the name.

People - Kane - Cross

1    Q    Never heard the name.  Did you sell drugs to a

2    young lady who was a friend of Ruth's who partied with Ruth

3    just prior to the murder?

4                   MR. BIANCAVILLA:  Date and time, please.

5                   THE COURT:  He said just prior to the murder.

6    Overruled.

7    Q    How about April 11th, 2000?

8    A    No.

9    Q    No?

10   A    No.

11   Q    What about Charles Ball, do you know Charles Ball?

12   A    Yes, I believe so.

13   Q    Did you sell drugs to Charles Ball at any time?

14   A    No.

15   Q    Never?

16   A    No.

17   Q    What about Jennifer Hartman?

18                  MR. BIANCAVILLA:  Again, I would ask for a

19   date and time, if, in fact, there was one.

20                  MR. CHAMBERLAIN:  He said never.

21                  MR. BIANCAVILLA:  It's not a proper question.

22                  THE COURT:  I'll permit the question.

23   A    What was the question?

24   Q    Mr. Biancavilla would like me to ask you --

25                  THE COURT:  Excuse me.  No commentary.  Just

People - Kane - Cross

1     ask questions.

2         Q     With respect to Charles Ball, did you sell him

3     drugs in or about August of 1998?

4         A     No, I did not.

5         Q     Jennifer Hartman, do you know Jennifer Hartman?

6         A     No.

7         Q     Let me ask you, Mr. Kane, do you know the Falcon's

8     Nest?

9         A     Yes.

10        Q     Do you know the Downtown?

11        A     Yes.

12        Q     Do you know Granny's?

13        A     Yes.

14        Q     Do you know Y.L. Childs?

15        A     Yes.

16        Q     Do you frequent all of those places on a regular

17    basis?

18        A     What was the question?

19        Q     Did you frequent all of those places on a regular

20    basis?

21        A     Yes.

22        Q     Drinking heavily three or four nights, three or

23    four days a week at least?

24        A     Correct.

25        Q     And you didn't know any of these people?  You

People - Kane - Cross

1    didn't know Jennifer Hartman?

2        A    No.

3        Q    Do you recall an incident in the Falcon's Nest in

4    about 1997 when after selling drugs to Jennifer Hartman she

5    grabbed money off the bar because you had cut the drugs,

6    they were not what you represented, and you started to have

7    a physical altercation with her and choke her?

8                    MR. BIANCAVILLA:   Objection as to the form.

9                    THE COURT:   Do you understand the question,

10         Mr. Kane?

11                   THE WITNESS:   Yes.

12                   THE COURT:   Overruled.

13       A    No.

14       Q    Never happened?

15       A    No?

16       Q    Do you know, Mr. Kane -- when this thing all

17   happened, you had an attorney at the outset; is that right.

18       A    I did, yes.

19       Q    Who was that attorney?

20       A    I can't remember his name.  I had him for one day.

21       Q    And that was when you were about to testify in

22   this case?

23       A    When I went in to talk to the DA, I brought an

24   attorney and I had him for one day and I didn't need him

25   anymore.

People - Kane - Cross

1    Q    When you said when you went in to talk to the DA,

2   will you tell us when that was?

3    A    I don't know the date.

4    Q    ·Let me see if I can help you there a little bit.

5   You gave certain statements on various dates to detectives;

6   is that right?

7    A    Right.

8    Q    And then you testified in May at a preliminary

9   examination in this case, may of 2000, do you recall that?

10   A    Yes.

11   Q    That was in district court over -- actually it's

12  in this building; right?

13   A    Yes.

14   Q    After that in July of 2000, you testified before a

15  grand jury; is that right?

16   A    Yes.

17   Q    With respect to that frame work of time, when was

18  it that you went in to see the DA with this attorney?

19   A    This was before the first hearing.

20   Q    Before the first hearing?

21   A    Yes.

22   Q    The preliminary examination?

23   A    Yes.

24   Q    And you were subpoenaed by the People to testify

25  in that case?

People - Kane - Cross

1   A    Yes.

2   Q    And were you given to understand anything about

3   getting immunity for your testimony?

4   A    No.

5   Q    No?

6   A    For my testimony?

7   Q    Do you know what I mean by immunity, Mr. Kane?

8   A    No.  Explain it.

9           MR. BIANCAVILLA:  Objection.

10          THE COURT:  Sustained.

11  Q    Were you told anything about whether or not you

12  would be not charged with any crimes if you may have

13  testified to -- with respect to the incident you testified

14  to, the transaction you testified to?

15  A    Would I be charged?  What's the question?

16  Q    They told you you would be cut lose, do you

17  understand that?

18          MR. BIANCAVILLA:  Objection.

19          THE COURT:  Sustained as to form.

20  Q    Do you understand -- were you told anything about

21  what would happen after you testified with respect to your

22  possible liability for any of these crimes?

23          MR. BIANCAVILLA:  Objection.  Assuming facts

24      not in evidence.

25          THE COURT:  Yes.  Sustained.

People - Kane - Cross

1    Q    When you went before the grand jury in this case,

2    were you asked to sign a waiver of immunity?

3    A    A waiver of immunity, not that I can remember.

4    Q    When you went to talk to the district attorney

5    with that attorney whose name you can't remember, what, if

6    anything, did you understand was the result of that

7    conversation?

8              MR. BIANCAVILLA:  Object to the form.

9              THE COURT:  Do you understand, Mr. Kane?

10             THE WITNESS:  I believe so.

11             THE COURT:  You can answer.

12   A    Well, that I was going to help the DA.  I was

13   going to testify to what had happened and I didn't need an

14   attorney present.  My attorney said you don't need me.  I

15   wasn't being charged with anything.  I didn't commit a

16   crime.

17   Q    You weren't being charged with anything.  You had,

18   according to your testimony, invited somebody up to the

19   victim's apartment; is that right?

20   A    Repeat the question.

21   Q    According to your version, you had invited

22   Mr. Scrimo up to the victim's apartment?

23             MR. BIANCAVILLA:  Object to the form of the

24        question, according to your version.

25             THE COURT:  Sustained as to the word version.

People - Kane - Cross

1    Q    According to your testimony --

2              MR. BIANCAVILLA:  Again, that's -- objection

3    to the form.

4              THE COURT:  I'll permit it.

5              Go ahead, Mr. Chamberlain.  Is there a

6    question?

7    Q    You invited Mr. Scrimo up to the victim's

8    apartment; right?

9    A    I said to Paul, Let's go to Ruthy's.

10   Q    According to your testimony, Mr. Scrimo tried to

11   leave that night and you said, no, don't leave, right?

12   A    I said, Where are you going?  We just got here.

13   We just got the beer.  Hang out.

14   Q    Then, according to your testimony, you were

15   present when this victim was strangled; is that right?

16   A    Correct.

17   Q    And you put your hands on Mr. Scrimo's shoulder;

18   is that your testimony?

19   A    Yes.

20   Q    Did you do anything else, sir?

21   A    I pulled on his shoulder.

22   Q    You pulled on his shoulder with one hand or both

23   hand?

24   A    Both hands.

25   Q    Did you do anything else?

People - Kane - Cross

1    A    Did I do anything else?

2    Q    Did you do anything else to stop what was

3  happening?

4    A    No.

5    Q    What you say was happening.  Did you make any

6  phone calls?

7    A    No, I did not.

8    Q    Did you leave that place to go get help?

9    A    No, I did not.

10    Q    And thereafter you helped clean up the scene, did

11  you not?

12    A    I grabbed the beer bottles.

13    Q    You what?

14    A    I grabbed the beer bottles.

15    Q    The purpose of grabbing beer bottles was to take

16  evidence out of the scene; right?

17              MR. BIANCAVILLA:  Objection.

18              THE COURT:  Sustained as to form.

19    Q    What was your understanding of the reason for

20  grabbing the beer bottles?

21              MR. BIANCAVILLA:  Objection.

22              THE COURT:  Sustained as to form.

23    Q    Was there any discussion between you and the

24  defendant regarding grabbing the beer bottles?

25    A    He screamed at me to get the fucking beer bottles.

People - Kane - Cross

1    Q    Did he say why?

2    A    No, he did not.

3    Q    Did you know why at the time?

4         MR. BIANCAVILLA:  Objection.

5         THE COURT:  Sustained.

6    Q    Mr. Kane, you have given a number of statements

7    concerning this incident to the police prior to testifying

8    here, did you not?

9         MR. BIANCAVILLA:  Objection.  Assuming facts

10        not in evidence.

11        MR. CHAMBERLAIN:  Assuming facts not in

12        evidence?

13        THE COURT:  I'll permit that.

14        Overruled.

15   A    Repeat the question, please.

16        MR. BIANCAVILLA:  May I approach, please?

17        MR. CHAMBERLAIN:  Let me rephrase.

18        MR. BIANCAVILLA:  Briefly, Judge?

19        MR. CHAMBERLAIN:  I object to this.  I am

20        rephrasing.

21        THE COURT:  Are you withdrawing the question?

22        MR. BIANCAVILLA:  I am trying to avoid

23        getting up multiple times, Judge.

24        THE COURT:  Let's see what the question is.

25        If you still want to come forward, Mr. Biancavilla,

People - Kane - Cross

1      I'll let you.

2              Go ahead, Mr. Chamberlain.

3      Q    Were you contacted by the police on April 15th,

4  2000?

5      A    I am not sure of the date.

6      Q    Two or three days after the incident?

7      A    I contacted Detective McHugh.

8      Q    Weren't you stopped on the street as you were

9  walking down the street on April 15th?

10     A    I am not sure of that date.

11     Q    Does that refresh your recollection as to who

12  contacted who?

13     A    That was after I called Detective McHugh.

14     Q    You called first?

15     A    Yes, I did.

16     Q    What did you tell Detective McHugh when you saw

17  him on the 15th?

18     A    We sat up a meeting.

19     Q    At that meeting, what did you tell him?

20     A    I told him I didn't know anything about the

21  questions he asked me about this crime.

22     Q    Mr. Kane, is it fair to say that you didn't tell

23  the police the night of the incident; right?

24     A    Excuse me?

25     Q    You didn't say anything -- you didn't call the

People - Kane - Cross

1   police as this was happening or right after it happened?

2        A    No, I did not.

3        Q    When you got home that night, did you call the

4   police?

5        A    No, I did not.

6        Q    Did you tell anybody?

7        A    No, I didn't.

8        Q    Did you go about your normal daily routine?

9        A    I tried to.

10       Q    Pardon me?

11       A    Tried to, yes.

12       Q    You tried to.  Well, this all happened on a

13  Tuesday, early morning hours of Tuesday, April 12th.  Did

14  you do -- what did you do for the following week?

15       A    The next week I went to play darts.

16       Q    You went to where?

17       A    To play darts on a Tuesday night.

18       Q    Between that Tuesday and the time you went to play

19  darts, what did you do?

20       A    I don't recall exactly.

21       Q    But the next Tuesday night you go to play darts,

22  same place you go every Tuesday night?

23       A    Correct.

24       Q    Did you go there with the defendant, was he there?

25       A    He was there, yes.

People - Kane - Cross

1    Q    Did you play darts that night?

2    A    Yes.

3    Q    How long did you play darts?

4    A    Until twelve o'clock.

5    Q    Same as normal?

6    A    Correct.

7    Q    And then what did you do for next week?

8    A    The Tuesday after?

9    Q    What did you do for whole next week before the

10   Tuesday after?

11   A    I don't recall.

12   Q    Anything unusual or normal routine?

13   A    Normal routine.

14   Q    The following Tuesday, where did you go?  You went

15   back to what bar?

16   A    Falcon's Nest.

17   Q    Falcon's Nest.  What did you do that Tuesday?

18   A    Played darts.

19   Q    With this defendant?

20   A    Correct.

21   Q    And who else?

22   A    Everybody else that was on the dart team.

23   Q    How long did you play darts that time?

24   A    Until midnight.

25   Q    Then what did you do after darts?

People - Kane - Cross

1     A     I went home.

2     Q     Now, in between this -- between the date of the --

3  between April 12th and the first time you go to play darts,

4  you have a meeting with Detective McHugh?

5     A     Excuse me?

6     Q     What?

7     A     Can you repeat that.

8     Q     April 15th, did you meet with Detective McHugh?

9     A     I'm not sure of the date.

10    Q     Do you recall meeting with a homicide detective

11 two or three days after the incident?

12    A     On a Saturday.

13    Q     Did you discuss Ruth?

14    A     Yes.

15    Q     And what did you tell the detective about Ruth

16 that night?

17    A     That I knew her.

18    Q     That you knew her?

19    A     Correct.

20    Q     For how long?

21    A     Two years.

22    Q     Did you tell -- withdrawn.

23          Were you aware that other people knew that you

24 knew her at the time you saw Detective McHugh; right.

25               MR. BIANCAVILLA:   Objection.

People - Kane - Cross

1      THE COURT:  Sustained as to form.

2      Q      At the time that you met with Detective McHugh on

3    that Saturday after the murder, you were aware that they had

4    been conducting an investigation concerning this matter;

5    right?

6              MR. BIANCAVILLA:  Objection.

7              THE COURT:  Overruled.

8      A      I was aware of what -- can you repeat the

9    question?

10     Q      You were aware that the police had been conducting

11   an investigation for those three days, who knew the victim

12   and so forth?

13     A      Correct.

14     Q      And you were aware there were numerous people that

15   knew that you knew the victim and had had some prior

16   relationship with her?

17             MR. BIANCAVILLA:  Objection.  Calls for the

18        operation of several people's minds.

19             MR. CHAMBERLAIN:  If he knew.

20             MR. BIANCAVILLA:  If he knew, it wouldn't be

21        an exception to the hearsay rule.

22             THE COURT:  It would have to be observations,

23        Mr. Chamberlain.

24             Sustained.

25     Q      From your knowledge of the investigation that had

People - Kane - Cross

1    been going on or from your conversation with McHugh, you

2    were aware of the fact, were you not, that they had about

3    your prior relationship --

4         A    From what they had said to me --

5              MR. BIANCAVILLA:   Objection to the form of

6         the question.

7              THE COURT:   Sustained.

8         Q    Mr. Kane, at that time you told the detective what

9    about your prior relationship?

10        A    Can you repeat the question?

11        Q    What did you tell McHugh on that Saturday about

12   your relationship with Ruth Williams?

13        A    That I knew Ruth.

14        Q    That you knew her.   That was it?

15        A    And that I had sexual relations with her in the

16   past.

17        Q    That you had sexual relations with her.   Did you

18   tell them what type of sexual relations?

19        A    No.

20        Q    No.   You didn't tell him oral sex?

21        A    I don't recall if I said that or not.   I didn't

22   get into details with him, no.

23        Q    Did you tell him when you had these prior sexual

24   relations?

25        A    Did I tell him when?

People - Kane - Cross

1    Q    Yes, how long previous to that time.

2    A    I don't remember.  No.  No, I don't think so.

3    Q    Did you tell him that you were a boyfriend of

4  hers?

5    A    I know they asked me that and I said no.

6    Q    You said no.  Did you tell him that you had sexual

7  relations with her on one occasion or more?

8    A    Did I tell them?

9    Q    Did you tell the detective on this particular

10  Saturday whether you had relations one time or more than one

11  time?

12   A    I don't recall what I told him.

13   Q    Were you asked about the murder and where you were

14  at that time?

15   A    Yes.

16   Q    And what did you tell them?

17   A    I told them I didn't know anything about it.

18   Q    Did you tell them that you knew about the murder?

19   A    I don't recall.  They were asking me about it, I

20  mean.

21   Q    Did they ask you about a male white who had a

22  shaved head and tattoos that was in Y.L.Childs?

23   A    Yes.

24   Q    What did you tell them?

25   A    That I didn't know him.

People - Kane - Cross

1    Q    According to your testimony here that was untrue;

2    is that correct?

3              MR. BIANCAVILLA:  Objection, Judge.  Again, I

4         would ask to approach.

5              THE COURT:  You can approach.

6              Step down a minute, Mr. Kane

7              (Whereupon, the following took place at the

8         bench outside of the hearing of the jurors and

9         defendant.)

10             THE COURT:  Yes, Mr. Biancavilla?

11             MR. BIANCAVILLA:  Judge, the basis of my

12        objection is as follows:  Whether or not something is

13        untrue or not or whether or not something is a lie or

14        not is not a proper question.  That is a conclusion for

15        the jury to draw.

16             The only thing that is proper is as follows:

17        If a defendant seeks to impeach a witness by proving a

18        prior inconsistent statement, a proper foundation must

19        be laid by showing the evidence to be relevant and by

20        asking the witness whether he or she made such

21        statement specifying the time, place, the person to

22        whom it was made and the substance of such inconsistent

23        statement.

24             I have no problem with what has been done up

25        to that point.

People - Kane - Cross

1        THE COURT:  Are you reading from a case?

2        MR. BIANCAVILLA:  I'll cite the case.  It's

3    from Richardson, Judge.

4        MR. CHAMBERLAIN:  If I may be heard, Judge?

5        THE COURT:  Let Mr. Biancavilla finish.

6        MR. CHAMBERLAIN:  Sure.

7        MR. BIANCAVILLA:  I'm going to cite for that

8    particular proposition Richardson on Evidence, tenth

9    edition --

10       THE COURT:  Richardson.

11       MR. BIANCAVILLA:  What addition do you have?

12       THE COURT:  I have the eleventh.  It should

13   be the same.

14       MR. BIANCAVILLA:  It's not.  I'll show you

15   mine.

16           In this case, which is People versus

17   Concepcion 175 AD2d 324, and I was reading from that

18   case before, if a defendant seeks to impeach a witness

19   by proving a prior inconsistent statement, a proper

20   foundation must be laid by showing the evidence to be

21   relevant and by asking the witness whether he or she

22   made such statements, specifying the time, the place,

23   the person to whom it was made and the substance of the

24   inconsistent statement.

25           That is all that is permitted, Judge.  That

People - Kane - Cross

1     ultimate question -- I'll get Richardson and show you.

2              Here, Judge, 6-411.  I have it highlighted.

3     It's the same thing.

4              My point is, you cannot ask a witness, so,

5     you lied?  That's not a proper conclusion.  That's not

6     a proper question.  That's a conclusion he can argue to

7     the jury at some point in time, but you can't argue to

8     the witness because then the question becomes

9     argumentative.

10             THE COURT:  Mr. Chamberlain?

11             MR. CHAMBERLAIN:  Yes, Judge.

12             THE COURT:  Yes?

13             MR. CHAMBERLAIN:  Judge, we have -- this case

14    is not on point because the witness made the prior

15    statement and it clearly is contradicting his

16    testimony.

17             THE COURT:  I understand that.  I have no

18    problem with that part of it.

19             MR. CHAMBERLAIN:  And -- and his -- it's

20    clear to everybody that this is a direct contradiction.

21    He was not there.  He was --

22             THE COURT:  The question is whether you

23    should be allowed to ask the general question, so

24    therefore you're not telling the truth or therefore you

25    are lying.

People - Kane - Cross

1    You have an absolute right to argue to the

2    jury all those inconsistencies and make that argument.

3    MR. CHAMBERLAIN:  I'm not merely arguing

4    before a jury, Judge.  I think it's fair to bring out

5    this statement.  It's already in.  This case doesn't

6    apply.  The statement is was he aware when he was --

7    THE COURT:  Your last question,

8    Mr. Chamberlain, was so therefore you are not telling

9    the truth.

10    MR. CHAMBERLAIN:  No.

11    THE COURT:  That was your last question on

12    the record.

13    MR. CHAMBERLAIN:  No, that wasn't my last

14    question.

15    THE COURT:  Is that correct?

16    MR. BIANCAVILLA:  Absolutely.

17    THE COURT:  I'll ask the reporter to read me

18    back the last question.

19    MR. CHAMBERLAIN:  Judge, I will say --

20    (Whereupon, the court reporter read back the

21    requested question.)

22    THE COURT:  I understand your case,

23    Mr. Biancavilla, with respect to what needs to be

24    placed in evidence with respect to foundation for a

25    prior inconsistent statement.  The question whether

People - Kane - Cross

1    somebody is telling the truth, that by itself is not a

2    proper question.

3            However, if Mr. Chamberlain asked the

4    question, therefore, for example, what you told the

5    detectives on that date is not the truth --

6            MR. CHAMBERLAIN:  Whether or not he asked.

7            THE COURT:  On April 18th.  He can respond.

8            MR. BIANCAVILLA:  No, he can't, because that

9    is a question of fact and the only people that are fact

10   finders in this courtroom are the jury.  Okay.

11           That is what I am saying, Judge.  Only the

12   jury can find whether a witness is being truthful or

13   not.  He can argue until the cows come home on his

14   summation that because there was an inconsistent

15   statement between April -- April 15th and his testimony

16   today, that he's a liar.  I don't care how many times

17   he calls him a liar.  He can do that.

18           My point is that the jury in this courtroom

19   is the fact finder and only they can make the

20   determination.  That's my point.

21           THE COURT:  Credibility is an --

22           MR. CHAMBERLAIN:  That's not the issue.

23           THE COURT:  I understand Mr. Biancavilla's

24   argument, although his case doesn't lie exactly on

25   point.  It makes perfect sense that, in essence, you're

People - Kane - Cross

1    asking the witness to do what the jury is supposed to

2    do, and the jury is -- and it's supposed to be the

3    arbiter with respect to the issues of fact.  I will

4    tell them how to address prior inconsistent statements

5    in my charge.

6              MR. CHAMBERLAIN:  Judge, he has already

7    indicated it's untrue.

8              THE COURT:  You made your point.

9              MR. CHAMBERLAIN:  I understand.  Part of the

10   problem with this is it's not -- he is interrupting my

11   cross on something -- and he's doing it constantly.

12             THE COURT:  I'll not permit him to interrupt

13   your cross.

14             MR. CHAMBERLAIN:  Every time we come up here

15   it's an interruption.

16             THE COURT:  He has a legitimate point to

17   bring to my attention and in essence he's right.

18             MR. CHAMBERLAIN:  Judge, a witness aware of

19   whether he told -- his awareness of whether he told a

20   lie to the police is material.

21             THE COURT:  You're talking about something

22   different here.

23             MR. CHAMBERLAIN:  The question was when you

24   told --

25             THE COURT:  Mr. Chamberlain, may --

People - Kane - Cross

1    MR. CHAMBERLAIN:  May I finish?

2    THE COURT:  You are going back to the same

3 question before.

4    MR. CHAMBERLAIN:  The last question here was

5 what you told the police on April 15th was not true.

6 That was the question.  She just read it back.  That

7 was the question.

8    MR. BIANCAVILLA:  My argument is the same,

9 Judge.

10    MR. CHAMBERLAIN:  That's the question.

11    MR. BIANCAVILLA:  He elicited all of the

12 individual facts that he told the police on that

13 particular day.  Now, I'm sure he's going to elicit all

14 the individual facts about what he told the police on

15 May 2nd and what he then told this jury.

16    MR. CHAMBERLAIN:  I'm entitled to probe in

17 cross-examination.

18    MR. BIANCAVILLA:  That's not probing.

19    MR. CHAMBERLAIN:  If the witness is aware he

20 lied to the police, I am entitled.  The jury will be

21 the ultimate arbiter about who is telling the truth, no

22 question.  But I shouldn't be prevented from bringing

23 out that he lied to the police with knowledge.

24    THE COURT:  You can ask the question as to

25 whether -- what the witness told -- if his memory is

People - Kane - Cross

1    better, for example, today or on -- back then.

2              MR. CHAMBERLAIN:  No.  This is what he told

3    the police on the 15th of April, Judge, 2000, and the

4    question is when he told them that, was he aware that

5    was a lie.

6              THE COURT:  I understand your argument.

7              My ruling is I will permit you,

8    Mr. Chamberlain, to ask that question.

9              MR. CHAMBERLAIN:  Thank you, Judge.

10             (Whereupon, the following took place in open

11        court.)

12             THE COURT:  Will you read back the last

13    question for the witness, please.

14             (Whereupon, the court reporter read back the

15        requested question.)

16    Q    Referring, Mr. Kane, to what you told the

17    detective on the Saturday after the murder.

18    A    What did I tell him?

19    Q    You told him you weren't there; right?  You told

20    him you didn't know any male white with a shaved head and

21    tattoos?

22    A    Right, that's what I told him.

23    Q    And that was untrue; right?

24    A    Yes.

25    Q    Now, you then go and play darts the next two

People - Kane - Cross

1    Tuesday nights.   Did you have any further contact with the

2    police?

3         A     Just -- yeah, I did.

4         Q     When was that, Mr. Kane?

5         A     I'm not sure of the date.

6         Q     If I tell you there's been testimony here that you

7    were picked up on the street in Farmingdale the afternoon of

8    May 2nd, approximately two or more weeks later, May 2nd,

9    2000, does that refresh your recollection?

10        A     That sounds about right.

11        Q     What were you doing when the police arrived at

12   that point?

13        A     I was walking into town.

14        Q     Who arrived at that point?

15        A     Detective McHugh.

16        Q     Was it just McHugh?

17        A     I believe there was another officer there.

18        Q     And what happened after they arrived?

19        A     They asked me if I wanted to come and answer some

20   questions about what we had talked about that Saturday.

21        Q     And you said sure, I'd love to?

22        A     I said yes and I went with them.

23        Q     You want to come?

24        A     Excuse me?

25        Q     Did you say you want to come?

People - Kane - Cross

1     A     I said yes and I went with them.

2     Q     Did you call an attorney before you went with

3  them?

4     A     No.

5     Q     Were you advised of any rights at that time?

6     A     No.

7     Q     About what time in the afternoon was it when you

8  were -- when you were went with them?

9     A     Five.

10     Q     And were you then -- where did you go, by the way,

11  Mr. Kane?

12     A     Police headquarters.

13     Q     And did you go into an interrogation room or

14  interview room in homicide?

15     A     Yes.

16     Q     Who was there at that point?

17     A     Detective McHugh and another detective.

18     Q     Does the name Parpan refresh your recollection?

19     A     No, it does not.

20     Q     Was the other detective a fairly large man?

21     A     No, not that I recall.  No.

22     Q     Do you recall what happened at that point?

23     A     I told them about what had really happened.

24     Q     You told them about what had really happened and

25  did you tell them that right off, Mr. Kane?

People - Kane - Cross

1    A    No, I didn't.

2    Q    So you didn't tell them what really happened.  You

3  told them a lot of other stuff first; correct?

4    A    Correct.

5    Q    Did you tell them about your prior problems with

6  the law?

7              MR. BIANCAVILLA:  Objection.  Again, we are

8         going to have to approach, Judge.

9              THE COURT:  Come forward.

10              (Whereupon, the following took place at the

11         bench outside the hearing of the jurors and

12         defendant.)

13              MR. BIANCAVILLA:  Judge, for the record, the

14         only criminal history that this individual has is a

15         plea to possession of marijuana which occurred in

16         Ulster County.

17              Now, apparently when he was interviewed by

18         the police, he made reference to an incident that

19         happened in Kansas or Kentucky, I don't remember which

20         state, when he was 16 years old and a petit larceny

21         that occurred somewhere around 11 or 12 years ago.

22              Now, there's no criminal record with respect

23         to any of those.

24              THE COURT:  You think he got a youthful

25         offender adjudication?

People - Kane - Cross

1      MR. BIANCAVILLA:  There's no record of it and

2  it's something that happened when he was 16 years old

3  which is not probative of anything here.

4      The only thing that is probative is this

5  conviction which we have provided a copy of the

6  certificate of disposition to Mr. Chamberlain.

7      With respect to any cross-examination on

8  criminal conduct, he should only be asked what he was

9  convicted of, not what he was arrested for.  That's

10  what I'm speaking of.  He was convicted of possession

11  of marijuana.

12      THE COURT:  These were dismissals, dismissed

13  in satisfaction, or?

14      MR. BIANCAVILLA:  I wasn't there, Judge.

15  This is the certificate of disposition they gave me.

16      THE COURT:  Mr. Chamberlain?

17      MR. CHAMBERLAIN:  Judge, in the first place,

18  I am entitled to ask him about prior statements and

19  these statements include declarations against his

20  interest.  I am entitled to ask on that basis.  The

21  fact that Mr. Biancavilla says he hasn't found a prior

22  record from, it's not --

23      MR. BIANCAVILLA:  Since he was 16 years old.

24      MR. CHAMBERLAIN:  I don't care.

25      Please, don't interrupt.

People - Kane - Cross

1    Under New York law, 16 years old --

2         THE COURT:  What do you want to ask,

3    Mr. Chamberlain?

4         MR. CHAMBERLAIN:  His statement was not only

5    was he arrested in Kansas for robbery, but he did eight

6    months time.  It's not just an arrest.  He did time.

7         MR. BIANCAVILLA:  When he was 16 years old.

8         MR. CHAMBERLAIN:  He also told the detective.

9    And Judge Ort has it in his decision about this man's

10   credibility and his credibility in front of these

11   detectives is an issue in this case.  It's an issue and

12   these are declarations against prior interest.  It's

13   not a question of his prior record.

14        I have a right to ask him what he told them.

15   He also told them there is a stolen auto, petit larceny

16   in Suffolk, and then this drug case which resulted in

17   that conviction.

18        THE COURT:  What I want to ask him is with

19   respect to the Kentucky case?

20        MR. CHAMBERLAIN:  I want to ask him what he

21   told the detectives.

22        MR. BIANCAVILLA:  Judge, when he was 16 years

23   old?  Just because he told the detective doesn't make

24   it admissible at trial.

25        THE COURT:  It effects his credibility,

People - Kane - Cross

1  Mr. Biancavilla.

2          MR. BIANCAVILLA:  What's it probative of?

3  It's when he was 16 years old.

4          MR. CHAMBERLAIN:  His credibility is crucial

5  here.

6          MR. BIANCAVILLA:  This is ridiculous.  I'll

7  sit down.

8          THE COURT:  A person who has been convicted

9  of a crime is a competent witness, but the conviction

10 may be proved for the purpose of affecting the wieght

11 of his testimony, either by cross-examination, upon

12 which he shall be required to answer any relevant

13 question, or by the record.  The party cross-examining

14 is not concluded by such person's answer.  This general

15 rule allowing impeachment by showing conviction is

16 subject to important limitations to, when applied to

17 the accused as a witnesses, which is People versus

18 Sandoval which is relevant here.

19          It has always been the rule that conviction

20 must be of a crime, either of a felony or misdemeanor.

21 Thus, it has been held that since a police offense is

22 not a crime, a conviction of such offense cannot be

23 shown to affect the witness' credibility.

24          We have a possession of of marijuana which is

25 a violation.  That would not be permissible.

1499

People - Kane - Cross

1    Similarly, the fact that the witness has been

2    adjudicated youthful offender, juvenile delinquent,

3    wayward minor, or youthful offender, cannot be shown,

4    for these adjudications are not convictions of a crime.

5    The adjudication may not be admissible, but the

6    cross-examiner may elicit the conduct underlying the

7    adjudication.  So, too, the fact that the witness had

8    been convicted a traffic infraction cannot be shown to

9    affect his credibility.

10    MR. CHAMBERLAIN:  I'm not looking to show the

11    convictions, Judge.  I am looking to show that --

12    MR. CHAMBERLAIN:  Even the case that was

13    dismissed is not the issue.  I am entitled to ask him

14    about statements he made that are against his own

15    interest when his credibility was an issue here and it

16    certainly is in this trial.  It's crucial in this

17    trial, his credibility, and what he was telling these

18    detectives.  I am entitled to ask him.

19    THE COURT:  I have no indication here with

20    respect to that.

21    What is the alleged crime, Mr. Chamberlain?

22    MR. CHAMBERLAIN:  Robbery.

23    THE COURT:  As to whether he got YO or

24    youthful adjudication, no.  Do you know they have that

25    in Kansas?

People - Kane - Cross

1          MR. CHAMBERLAIN:  It wouldn't be juvenile

2    delinquency here.  It would be YO, as your Honor knows.

3    Whether they have it there or --

4          THE COURT:  There's also petit larceny in

5    Suffolk 10 to 11 years ago.

6          MR. CHAMBERLAIN:  That's what he told them.

7    I am entitled to ask about underlying acts.  These are

8    things he said.

9          THE COURT:  I will not permit you to go into

10   the possession of marijuana.  However, he said here,

11   with respect to the robbery, it says, with Joey,

12   question mark, eight months in jail, dash, dismissed.

13         MR. CHAMBERLAIN:  I am entitled to ask him

14   about that.  That's what he told the detectives.

15         THE COURT:  We are talking apples and oranges

16   here, Mr. Chamberlain.  You aren entitled, if he --

17         MR. BIANCAVILLA:  Why ask him anything about

18   his criminal history?

19         MR. CHAMBERLAIN:  I can't hear what's being

20   said.  I didn't hear Mr. Biancavilla.

21         MR. BIANCAVILLA:  My point is, I never

22   questioned him about that, so he hasn't said anything

23   inconsistent.  He wants to impeach him with that

24   statement.

25         THE COURT:  I'll let --

People - Kane - Cross

1                 MR. BIANCAVILLA:  If he had a criminal

2    history --

3                 THE COURT:  I am allowing Mr. Chamberlain to

4    ask him the question if he has been convicted of a

5    crime and you are bound by his answer.

6                 MR. BIANCAVILLA:  I am not sure he

7    understands this is not a crime.

8                 THE COURT:  I can't help that.

9                 MR. CHAMBERLAIN:  I am not talking about

10    that.

11                 THE COURT:  You can ask him the question

12    whether he has ever been convicted of a misdemeanor or

13    felony.

14                 MR. BIANCAVILLA:  Thank you.

15                 THE COURT:  Then, if it's inconsistent with

16    what he told the police officers, you can cross-examine

17    him with respect to that.

18                 MR. BIANCAVILLA:  My point is how would that

19    be inconsistent if he said it was dismissed.

20                 THE COURT:  It would not be.  I understand

21    that.

22                 MR. BIANCAVILLA:  Thank you.

23                 (Whereupon, the following took place in open

24       court.)

25

People - Kane - Cross

1    CONTINUED CROSS

2    BY MR. CHAMBERLAIN:

3        Q    Mr. Kane, were you convicted of a crime in Kansas?

4                MR. BIANCAVILLA:  Objection.  That wasn't the

5        question.

6                THE COURT:  No, that wasn't the question.

7        Q    Were you ever convicted of a crime?

8                MR. BIANCAVILLA:  Objection.

9                THE COURT:  Were you ever convicted of a

10       felony or misdemeanor?

11               THE WITNESS:  No.

12       Q    Did you tell the Detective McHugh and the other

13   detective --

14               MR. BIANCAVILLA:  I object again.

15       Q    -- that you had swerved eight months --

16               THE COURT:  Sustained.

17               MR. BIANCAVILLA:  Objection.

18               THE COURT:  Sustained.

19               Come forward, please.

20               Ladies and gentlemen, we are taking a short

21       break at this time.

22               Do not discuss the case amongst yourselves or

23       with anyone else.  Keep an open mind.  Do not form or

24       express any opinions until the entire case has been

25       completed.

People - Kane - Cross

1      Do not read or listen to any accounts of the

2  case should they be reported in the media.  Do not

3  visit or view any place or premises that have been

4  mentioned.

5      You are not to permit any party to discuss

6  the case with you or attempt to influence you, and you

7  must promptly report to the Court any violation

8  thereof.

9      (Whereupon, the sworn jurors exited the

10     courtroom.)

11     THE COURT:  Mr. Chamberlain, as I told you at

12  the bench, you are bound by the answer of what the

13  defendant told you.  I told you not to ask that

14  question because what's in there is not inconsistent

15  because he told the police officers it was dismissed.

16     MR. CHAMBERLAIN:  I am not sure that's what

17  he told the police officers, Judge.  But your Honor

18  said I could cross-examine him and after he said no,

19  which he has obviously been prepared to say by the

20  district attorney, after he said no, I could

21  cross-examine him on what he told the detectives.

22     THE COURT:  If it was inconsistent.

23     MR. CHAMBERLAIN:  Judge, he said robbery.

24  That is certainly a felony.

25     THE COURT:  Convictions, Mr. Chamberlain, not

People - Kane - Cross

1    dismissals.

2            MR. CHAMBERLAIN:  He said he spent eight

3    months in jail.

4            THE COURT:  But it might have been dismissed.

5    That happens once in a while.

6            MR. CHAMBERLAIN:  I am entitled to question

7    him on that, Judge.  Judge Ort, who read this hearing

8    transcript when this detective was questioned, put in

9    his decision on probable cause and the Huntley

10    decision, he said Mr. Kane has a reputation, including

11    prior arrest and serving time for robbery in Kansas,

12    along with other things.  That's in the decision.

13    That's the way he interpreted.

14            THE COURT:  That was a statement of fact

15    Judge Ort placed in his decision.

16            MR. CHAMBERLAIN:  That was after a hearing I

17    took part in where these detectives testify --

18            THE COURT:  What's that got to do with today?

19            MR. CHAMBERLAIN:  You told me I could

20    cross-examine.

21            THE COURT:  You could have shown him the

22    notes and asked if it refreshed his recollection.

23            MR. BIANCAVILLA:  Judge, you were correct, if

24    he did not testify inconsistently, if he did not

25    testify inconsistently, you cannot impeach someone with

People - Kane - Cross

1    something that is not inconsistent just to put it in

2    front of the jury.

3            THE COURT:  Give me the notes to read in the

4    record.

5            MR. CHAMBERLAIN:  Fine.  I'll show your Honor

6    a --

7            THE COURT:  Counsel, excuse me.  I have the

8    floor.

9            MR. CHAMBERLAIN:  He's interrupting, Judge.

10           THE COURT:  I don't want either one of you

11   interrupting.

12           Arrest, Kansas, a 16 year old, dash, robbery,

13   dash, with Joey, question mark, and Dave, question

14   mark, eight months in jail, dismissed.

15           Mr. Chamberlain, that's what he said.  Now,

16   when you asked him the question were you ever convicted

17   of a felony or misdemeanor, he answered no.  There's

18   nothing inconsistent here.  Perhaps this might refresh

19   his recollection as I said before.

20           Additionally, as I said before, sometimes

21   people are arrested and cases get dismissed.

22           MR. CHAMBERLAIN:  Yes, Judge.  I understand

23   that.

24           My recollection is that there was more to it.

25   I am looking for the decision at the hearing.

                    People - Kane - Cross

1           MR. BIANCAVILLA:  Judge --

2           MR. CHAMBERLAIN:  Please, let me finish.

3           THE COURT:  Let Mr. Chamberlain finish.

4           MR. BIANCAVILLA:  Sorry, Judge.

5           MR. CHAMBERLAIN:  But, your Honor, whether

6     this was dismissed -- I don't recall that from the

7     hearing.  I recall maybe after the fact it was

8     dismissed, and maybe it's referring to the next thing

9     which was an auto stolen in Pennsylvania.

10          THE COURT:  Mr. Chamberlain, mark it for ID

11    and ask if it refreshes his recollection.

12          MR. CHAMBERLAIN:  I will do that, Judge.

13          THE COURT:  We'll take a short break.

14          (Whereupon, a brief recess was taken.)

15          THE COURT:  Bring the jury in.

16          COURT OFFICER:  Jury entering.

17          (Whereupon, the sworn jurors entered the

18       courtroom and resumed their respective seats.)

19          THE CLERK:  Do both side stipulate that all

20    sworn jurors are present and seated properly?

21          MR. BIANCAVILLA:  So stipulated.

22          MR. CHAMBERLAIN:  So stipulated.

23          THE COURT:  Bring in the witness, please.

24          (Whereupon, the witness resumed the witness

25       stand.)

People - Kane - Cross

1          THE CLERK:  You are reminded you are still

2     under oath, sir.

3          THE COURT:  Mr. Chamberlain.

4          MR. CHAMBERLAIN:  Thank you, Judge.

5  CONTINUED CROSS

6  BY MR. CHAMBERLAIN:

7     Q     Before I go further, Mr. Kane, I notice a rather

8  prominent tattoo on your neck.  Did you have that tattoo in

9  April of 2000?

10    A     Yes.

11    Q     Going back to the question of the area when you

12 were being questioned by detectives -- Detective McHugh and

13 that other detective, I want to show you some --

14         THE COURT:  Do you want that marked,

15    Mr. Chamberlain?

16         MR. CHAMBERLAIN:  I guess we will.

17         (Whereupon, the above-mentioned item was

18    marked as Defendant's Exhibit Y for identification

19    only.)

20         COURT OFFICER:  Defendant's Y marked for

21    identification.

22    Q     Defendant's Y is a nine page document.  I would

23 direct your attention to the second page and ask you to read

24 at the bottom of that page.

25         Do those notes refresh your recollection as to

People - Kane - Cross

1  what you told the detectives on May 2nd regard a prior

2  incident in Kansas?

3                    MR. BIANCAVILLA:  Objection.

4                    THE COURT:  Sustained.  That's not the

5        question.

6        Q    Do they refresh your recollection as to what

7  occurred in Kansas?

8                    MR. BIANCAVILLA:  Objection.

9                    THE COURT:  Sustained.

10                   Mr. Kane, does that document refresh your

11       recollection as to whether you ever were convicted of

12       either a felony or misdemeanor?

13                   THE WITNESS:  That was the question?

14                   THE COURT:  Read back the question to the

15       witness, please.

16                   (Whereupon, the court reporter read back the

17            requested question.)

18                   THE WITNESS:  A misdemeanor?  Is that what

19       you are asking about, the upstate?

20                   MR. BIANCAVILLA:  Judge, I object.

21                   THE COURT:  Sustained.

22                   The jury should disregard that.

23                   That's a yes or no, Mr. Kane.  Can you answer

24       that question with a yes or no answer?  Does that

25       document refresh your recollection as to whether you

People - Kane - Cross

1       were ever convicted of a felony or misdemeanor?

2                   THE WITNESS:  Yes.

3                   THE COURT:  Ask another question.

4       Q    With your recollection refreshed, can you tell us

5   now what your recollection is?

6                   MR. BIANCAVILLA:  Objection.

7                   THE COURT:  Sustained.

8                   MR. CHAMBERLAIN:  Was that sustained?

9                   THE COURT:  Yes, it was, Mr. Chamberlain.

10      Q    Will you tell us whether or not you were ever

11  convicted of a felony or misdemeanor?

12      A    Yes.

13      Q    Where was that?

14      A    Where was that?

15      Q    Yes.

16      A    Upstate.

17                  MR. BIANCAVILLA:  Objection.

18                  THE COURT:  Sustained.

19                  MR. BIANCAVILLA:  Move to strike, Judge.

20                  THE COURT:  Counsel, come forward.

21                  Let's proceed.  The last objection was

22                  sustained.  The jury should disregard that

23      Q    Did that document refresh your recollection as to

24  any convictions in the state of Kansas?

25                  MR. BIANCAVILLA:  Objection.

People - Kane - Cross

 1          THE COURT:  Sustained.

 2     Q    Does that document refresh your recollection as to

 3   whether or not you were incarcerated for any period of

 4   time --

 5               MR. BIANCAVILLA:  Objection.

 6               THE COURT:  Sustained.

 7               MR. BIANCAVILLA:  Move to strike, Judge.

 8               THE COURT:  The jury should disregard the

 9       last question.

10     Q    Other than your recollection being refreshed for

11   upstate --

12               MR. BIANCAVILLA:  Judge, I am going to

13       object.

14               MR. CHAMBERLAIN:  He doesn't let me finish a

15       sentence.

16               MR. BIANCAVILLA:  Because everything he does

17       here is improper.

18               MR. CHAMBERLAIN:  I object to that and ask

19       for a mistrial.

20               THE COURT:  Mr. Chamberlain, anything you

21       have to say is at the bench.

22               Ladies and gentlemen, we are going to take a

23       short break.

24               Do not discuss the case amongst yourselves or

25       with anyone else.  Keep an open mind.  Do not form or