Proceedings

1   express any opinions until the entire case has been

2   completed.

3           Do not read or listen to any accounts of the

4   case should they be reported in the media.  Do not

5   visit or view any place or premises that have been

6   mentioned.

7           You are not to permit any party to discuss

8   the case with you or attempt to influence you, and you

9   must promptly report to the Court any violation

10  thereof.

11          (Whereupon, the sworn jurors exited the

12      courtroom.)

13          MR. CHAMBERLAIN:  May we have the witness

14  excused?

15          THE COURT:  Yes, please step out, Mr. Kane.

16          THE WITNESS:  Sure.

17          (Whereupon, the witness left the witness

18      stand and exited the courtroom.)

19          THE COURT:  Two things, Mr. Chamberlain.

20  One, you don't ask for a mistrial in front of a jury.

21  You want to approach the bench and make a record, you

22  can.  You don't do that.  Do we under each other?

23          MR. CHAMBERLAIN:  We do, Judge.  I apologize.

24  It was in the heat of the moment but I have

25  constantly --

1512

Proceedings

1    THE COURT:  Two, I understand that.  I have

2    admonished you both to stop it.

3    Mr. Biancavilla, you can make objections any

4    time you want.

5    MR. BIANCAVILLA:  My point is you told him

6    not to do something seven different times, seven

7    different ways.  He comes back out here every time in

8    front of the jury and keeps asking the same questions

9    that seven different times you told him not to ask.

10   That's the problem I have.

11   MR. CHAMBERLAIN:  That's inaccurate, Judge.

12   THE COURT:  Mr. Chamberlain, you have to ask

13   the question properly.  The rules of evidence say

14   questions are asked certain ways and you have to do

15   that.

16   MR. CHAMBERLAIN:  I have been asking

17   questions pursuant to your Honor's rulings which

18   include the fact that I could show the witness the

19   document and ask him if that refreshes his recollection

20   as to those incidents.  I did that.

21   THE COURT:  You asked him.  He said it did

22   and then you asked the question.  The upstate, as we

23   all know, was a certificate of disposition which was

24   shown to me for a violation, unlawful possession of

25   marijuana.  There may be others you can question him

Proceedings

1    on.

2              MR. CHAMBERLAIN:  I didn't tell him to answer

3    that question.

4              THE COURT:  I know you didn't but you're not

5    asking the question properly.

6              MR. CHAMBERLAIN:  I asked the question

7    exactly as I was instructed.  That was his answer.

8              Your Honor then directed the jury to

9    disregard that and I was trying to point the question

10   to something other than upstate and that's when he gets

11   up and says everything Mr. Chamberlain does is

12   improper.

13             These statements in front of this jury

14   prejudice my client's rights.  My client is on trial

15   for murder.  I am doing the best I can here and I am

16   getting -- this jury is getting prejudiced by this and

17   your Honor's rulings with respect to that.  He should

18   have been forcefully told not to make these comments

19   which he has done repeatedly before this jury.

20             THE COURT:  I will tell the jury in the end

21   they are to disregard any colloquy between counsel and

22   counsel and counsel and me.  There is no ground for a

23   mistrial here.  I told them in the beginning and will

24   again at the end.

25             Mr. Biancavilla made a legitimate objection

1514

Proceedings

1     and I have a right to rule.  You don't have to lose

2     your temper in front of a jury and move for a mistrial.

3          MR. CHAMBERLAIN:  I lost my temper --

4          THE COURT:  I understand.  I want you to both

5     to stop it.  Do we understand each other?

6          MR. CHAMBERLAIN:  Yes.

7          MR. BIANCAVILLA:  Yes, your Honor.

8          MR. CHAMBERLAIN:  May we have a short recess,

9     your Honor?

10          THE COURT:  We just had one.

11          MR. CHAMBERLAIN:  I didn't have one.

12          THE COURT:  We just had a recess three

13     minutes ago.

14          MR. CHAMBERLAIN:  Judge, may we break for the

15     day.  It's almost four o'clock and I have a lot further

16     to go with this witness.

17          THE COURT:  I'll work until 4:30 if you are

18     continuing.  I'll be glad to continue.  I'm not rushing

19     you.  Do what you feel is appropriate.  You want to

20     take two minutes, go ahead and take two minutes.

21          (Whereupon, a brief recess was taken.)

22          THE COURT:  One thing, your application for a

23     mistrial is denied.

24          MR. CHAMBERLAIN:  I respectfully except.

25          May we have the jury advised to disregard any

Proceedings

1    comments by Mr. Biancavilla?

2           THE COURT:  I will not specifically say to

3    one or the other because you have both been doing it.

4    I will advise the jury to disregard any comments,

5    colloquy between counsel or colloquy with me.  I will

6    be glad to do that.

7           COURT OFFICER:  Jury entering.

8           (Whereupon, the sworn jurors entered the

9        courtroom and resumed their respective seats.)

10          THE CLERK:  Do both sides stipulate all sworn

11   jurors are present and seated properly?

12          MR. BIANCAVILLA:  Yes.

13          MR. CHAMBERLAIN:  Yes.

14          THE COURT:  Ladies and gentlemen, there have

15   been some verbal exchanges between or among counsel.

16   You must disregard that entirely and you must not draw

17   any inferences from anything said by one counsel to the

18   other.

19          Additionally, you may have heard colloquy or

20   conversation between the Court and counsel.  Bear in

21   mind that such exchanges between the Court and counsel

22   do not constitute evidence in the case and you must

23   disregard it.

24          Finally, I instruct you that arguments made

25   during the course of trial are not evidence and must

1516

                          People - Kane - Cross

1        not be considered by you as such.

2                    Mr. Chamberlain, Mr. Biancavilla, are we

3        ready to proceed?

4                    MR. BIANCAVILLA:  Yes, your Honor.

5                    MR. CHAMBERLAIN:  Yes, Judge.

6                    THE COURT:  Bring the witness in.

7                    (Whereupon, the witness resumed the witness

8            stand.)

9    CONTINUED CROSS

10   BY MR. CHAMBERLAIN:

11       Q    Mr. Kane, will you review the same page of

12   Defendant's X.  Listen carefully to the question.

13                   THE COURT:  I believe it's Y,

14       Mr. Chamberlain.

15                   MR. CHAMBERLAIN:  Thank you, Judge.

16       Q    Listen carefully to the question, Mr. Kane.  Other

17   than what you have already testified to, other than that,

18   does that document refresh your recollection as to whether

19   or not you have been convicted of a felony or a misdemeanor

20   at any other place?

21       A    I don't know what a misdemeanor is, actually.  Can

22   you explain that to me?

23                   MR. BIANCAVILLA:  Objection.

24                   THE COURT:  Sustained.

25                   MR. CHAMBERLAIN:  What was the objection to?

People - Kane - Cross

1          THE COURT:  To explain what a misdemeanor

2     was.  I sustained the objection as to that.

3     Q     Does it refresh your recollection as to whether or

4     not, other than what you have already testified to, you have

5     been convicted of a crime --

6               MR. BIANCAVILLA:  Objection.

7               THE COURT:  Go ahead.

8     Q     -- at any other place?

9               THE COURT:  I'll permit that.

10              MR. CHAMBERLAIN:  Thank you.

11    A     No, it doesn't.

12              MR. BIANCAVILLA:  Objection.

13              MR. CHAMBERLAIN:  Don't object to his answer.

14    I object to that.

15              THE COURT:  Excuse me.

16              MR. CHAMBERLAIN:  I am sorry, Judge.  He is

17    objecting to the witness starting to answer like he's

18    directing the witness.  That's improper, Judge.

19              THE COURT:  Are you finished with your

20    answer?

21              THE WITNESS:  Do you want to read it over

22    again?

23              MR. CHAMBERLAIN:  Read the question back.

24              THE COURT:  Read it back.

25              (Whereupon, the court reporter read back the

People - Kane - Cross

1          requested question.)

2                    THE COURT:  Ask it again.

3                    MR. CHAMBERLAIN:  He was in the middle of an

4          answer, Judge.

5                    THE COURT:  Do you understand the question?

6                    THE WITNESS:  I don't see where we are at

7          with the question.

8                    THE COURT:  Start the question again.

9          Q    Other than, Mr. Kane, what you have already

10    testified to, do those -- does that document refresh your

11    recollection as to whether or not you have been convicted of

12    a crime any place other than the place you have already

13    indicated?

14                    MR. BIANCAVILLA:  Objection.

15                    THE COURT:  I'll permit it.

16         A    No.

17         Q    It doesn't, and that's your full answer now?

18         A    Convicted of a crime --

19                    MR. BIANCAVILLA:  Judge --

20                    THE COURT:  Sustained.

21         Q    All right.  Let me have that back.

22              During that interview with Detective McHugh and

23    that other detective, after asking about your background,

24    were you asked a series of questions concerning financial

25    problems and the dart team and who was on it, do you recall

People - Kane - Cross

1  any such questions?

2       A     About the dart team?

3       Q     Yeah.

4       A     Yeah.

5       Q     And about financial problems?

6       A     I don't remember anything about financial

7  problems.

8       Q     Did you tell the detectives you had financial

9  problems?

10      A     Not that I remember, no.

11      Q     Did you tell them that your prior work was two

12 months prior to that?

13      A     What was the question?

14      Q     That your prior work was two months prior --

15 withdrawn.

16            Did you tell them you had worked two nights

17 last -- working the last two nights and the prior work had

18 been two months previous?

19      A     Is that a question?

20      Q     Yes.  Did you tell them that?

21      A     Sounds familiar.  I'm's not sure.

22      Q     And you said about the dart team -- what did you

23 tell them about the dart team?

24      A     That there was a dart team on Tuesday night and

25 Paul Scrimo was on it.

People - Kane - Cross

1    Q    Did you tell them when it started and when it

2    ended?

3    A    Correct.

4    Q    Did you tell them how many teams there were?

5    A    Yes.

6    Q    Did you tell them how successful the team was?

7    A    I don't recall.

8    Q    Did you tell them they were undefeated?

9    A    I don't recall.

10   Q    You don't recall.  But you do recall discussing

11   the dart team and the fact that Mr. Scrimo was on it; right?

12   A    Correct.

13   Q    Do you recall telling them two other people had

14   been tossed off the team, Jerry and Jerry's old lady,

15   somebody by the name of Jerry had been tossed off?

16   A    I don't recall.

17   Q    In any event, you recall discussing with them this

18   dart team?

19   A    Yes.

20   Q    And that's the dart team that you had visited the

21   Tuesday after the murder and the subsequent Tuesday; right?

22   A    Correct.

23   Q    Then did you discuss Ruth with them?

24   A    Did I discuss Ruth?

25   Q    Yes.

People - Kane - Cross

1      A      Yes, with the detectives.

2      Q      Yes?

3      A      Yes.

4      Q      And you testified before this jury you used the

5    word Ruthy.  Did Ruth have a nickname?

6      A      I called her Ruthy.

7      Q      You called her Ruthy.  Did you tell the detectives

8    her nickname was Ruthless?

9      A      Right.

10     Q      By the way, Mr. Kane, did you have a nickname in

11   the area of the bar?

12     A      Probably but I don't recall it.

13     Q      You don't recall?

14     A      No.

15     Q      What about John D, does that refresh your

16   recollection?

17     A      No.

18     Q      John Doe?

19     A      Yes.

20     Q      Yes, and what's your middle initial, by the way,

21   Mr. Kane?

22     A      M.

23     Q      M.  Not D, M?

24     A      Yes.

25     Q      Do you have any reason for -- that you know of,

People - Kane - Cross

1   any reason why you had a nickname of John Doe in the

2   Farmingdale area?

3              MR. BIANCAVILLA:  Objection.

4              THE COURT:  I'll permit it.

5       A    No, I don't.

6       Q    Did you have any knowledge as to whether or not

7   John Doe was a term associated with any particular activity

8   in connection with bikers?

9              MR. BIANCAVILLA:  Objection.

10             THE COURT:  I'll permit it.

11      A    No.

12      Q    Did you have any knowledge about John Doe being a

13  name ascribe to people that supply drugs?

14      A    No.

15      Q    No?

16      A    No.

17      Q    John Doe is normally associated, Mr. Kane, with

18  being anonymous, not letting someone know your last name; is

19  that right?

20             MR. BIANCAVILLA:  Objection.

21      Q    Do you know?

22             THE COURT:  If he knows that.

23      A    What was the question?

24             THE COURT:  Do you understand the question?

25             THE WITNESS:  No.

People - Kane - Cross

1           THE COURT:  Repeat the question,

2  Mr. Chamberlain.

3    Q   John Doe is normally, the name John Doe is used,

4  it's to keep someone from knowing the real name; is that

5  right?

6           MR. BIANCAVILLA:  Objection.

7           THE COURT:  As to form, sustained.

8    Q   You have no idea why you were known as John Doe;

9  is that right?

10          MR. BIANCAVILLA:  Objection.  Assuming facts

11   not in evidence.

12         THE COURT:  Sustained.

13         MR. CHAMBERLAIN:  He just testified he didn't

14   know.

15         THE COURT:  That's right, he did.  Overruled.

16    A   What was the question?

17    Q   You have no idea why you were known by the

18  nickname John Doe?

19    A   No.

20    Q   Now, what else did you tell the detectives about

21  Ruth, or Ruthless, as you called her?

22          MR. BIANCAVILLA:  Objection.

23    A   I didn't call her that.

24         THE COURT:  Sustained.

25    Q   You testified here that you told them --

People - Kane - Cross

1    A    She had a nickname Ruthless.  That wasn't my

2  nickname for her.

3    Q    That was her nickname and you told that to the

4  detectives, did you not?

5    A    Correct.

6    Q    What was your name for her, sir?

7    A    Ruthy.

8    Q    Did you tell them how long you had known Ruthy?

9    A    Yes.

10    Q    What did you tell them?

11    A    Two years.

12    Q    Did you tell them anything else about her?

13    A    As far as?

14    Q    As far as what she was like, what your

15  relationship was, anything?

16    A    I don't recall exactly what I told them.

17    Q    Did you tell them that she was a drinker?

18    A    I met her in a bar.

19    Q    So you told them that she was a drinker; is that

20  right?

21    A    I don't recall.

22    Q    Did you tell them about your relationship with

23  her?

24    A    Yes.

25    Q    What did you tell them about the relationship?

People - Kane - Cross

1   A    That I knew Ruthy and I was intimate with her

2   sexually.

3   Q    Did you tell them of that intimacy sexually?

4   A    No, I didn't get into details.

5   Q    I have to be brutally frank here, and I apologize

6   to Mr. Kane and the jury, but didn't you tell them no

7   fucking, BJ only?

8   A    Excuse me?

9   Q    Didn't you tell them no fucking, blow job only?

10  A    I don't recall.

11  Q    Well, it was a fact that there was no fucking,

12  blow jobs only in the past?

13  A    Correct.

14  Q    What?

15  A    Correct.

16  Q    Did you tell them you never called her?

17  A    Excuse me.

18  Q    Did you tell them you never called her?

19  A    I don't recall.

20  Q    Did you tell them you just -- did you tell them

21  how many times you had had these sexual encounters?

22  A    I don't recall if I told them that.

23  Q    Would two or three times refresh your

24  recollection?

25  A    No, it doesn't.

People - Kane - Cross

1    Q    Let me show you the exhibit, defendant's Y, and
2    see if that -- middle of page four, does that refresh your
3    recollection?

4    A    Okay.  Your question?

5    Q    Is that what you told them, two or three times?

6    A    Yes.

7    Q    Is that true?

8    A    Yes.

9    Q    Wasn't it more like five or six times?

10   A    I don't recall.  It seems about three times.

11   Q    We have gone to two to three and now -- withdrawn.

12            MR. BIANCAVILLA:  Objection.

13            THE COURT:  It's withdrawn.

14   Q    Did you ever tell anyone five or six times,
15   Mr. Kane?

16   A    Not that I recall.

17   Q    Each time, whatever the number of times, it was
18   just in the vernacular, just a blow job; is that right?

19   A    Correct.

20   Q    Did you tell them about other people that saw
21   Ruth, Ruthy at that period of time, other boyfriends, other
22   persons?

23   A    Not that I recall.

24   Q    Just below the portion you just read, will you
25   take a look at that and see if it refreshes your

People - Kane - Cross

1    recollection?

2              Let me withdraw that question.

3              Did you tell them that you saw her a number of

4    times with a big blond guy?

5       A    Yes.  Yes, I did.

6       Q    Did you tell -- did you describe, did you call her

7    a player?

8       A    Not that I recall, no.

9       Q    I'll show you this, Mr. Kane, and ask you if that

10   refreshes your recollection, same page, two thirds of the

11   way down the page?

12      A    No, it doesn't recall my memory of saying that

13   but...

14      Q    It doesn't refresh your recollection as to what

15   you called her?

16      A    No, it doesn't.

17      Q    Do you know the term player?

18      A    Yes, I do.

19      Q    Was that a term that you have used previously?

20              MR. BIANCAVILLA:  Objection.

21              THE COURT:  Sustained.

22      Q    Do you recall discussing the last time you had had

23   oral sex with the victim?

24      A    With the victim?

25      Q    Yes, with -- this is all about May 2nd after you

1528

People - Kane - Cross

1    were picked up and brought to homicide and you're being

2    questioned by --

3                    MR. BIANCAVILLA:   Judge, objection.

4                    THE COURT:   Overruled.

5    A    Yes, I understand.

6    Q    Do you understand what we are talking about?

7    A    Yes.

8    Q    May 2nd, did you tell them about last time you had

9    been with the victim and had an instance of oral sex?

10   A    Yes.

11   Q    Pardon?

12   A    Yes.

13   Q    And how long prior to that May 2nd interview did

14   you tell them that was?

15   A    About a month before.

16   Q    Would four to six weeks refresh your recollection?

17   A    Yes, a month before.

18   Q    Before the murder; right?

19   A    Correct.

20   Q    You didn't tell them anything about that thing you

21   testified to here today about when you claim the murder

22   occurred?

23                   MR. BIANCAVILLA:   Objection to the form.

24                   THE COURT:   Sustained.   Sustained as to the

25        form, Mr. Chamberlain.

People - Kane - Cross

1    Q    This instance that you told them about had nothing

2    to do with the murder you testified to; is that correct?

3    A    That I just said about a month before?

4    Q    About four to six weeks before.

5    A    Did that have anything to do with the murder?

6    Q    Yes.

7    A    No.

8    Q    Up until that time, you hadn't told them anything

9    about being in her apartment on April 12th, 2000; right?

10   A    Right.

11   Q    And according to you, you had been in her

12   apartment then; right?

13   A    When?

14   Q    On April 12th.

15   A    Correct.

16   Q    And you had had, from April 12th until May 2nd to

17   think about what you were going to tell the police; isn't

18   that a fact?

19              MR. BIANCAVILLA:   Objection.

20              THE COURT:   Overruled.

21   A    Would you repeat the question?

22   Q    When you were being questioned by these homicide

23   detectives, you had from April 12th until May 2nd to think

24   about what you were going to tell the police?

25   A    Yes.

People - Kane - Cross

1    Q    And you told them that the last time you had oral

2    sex was four to six weeks before May 2nd; right?

3    A    Correct.

4    Q    And what did you tell -- where did you come from

5    on that occasion?

6    A    Excuse me?

7    Q    Where had you been prior to the oral sex?

8              MR. BIANCAVILLA:  Objection, Judge.

9              THE COURT:  What date?

10             MR. CHAMBERLAIN:  He said four to six weeks.

11             THE COURT:  Sustained.

12   Q    Are you talking about the last time you told the

13   detectives you had oral sex, did you tell them where you had

14   come from before you had oral sex?

15   A    Yes.

16   Q    Where was that?

17   A    Falcon's Nest.

18   Q    Where did the oral sex take place?

19   A    In Ruthy's apartment.

20   Q    Did you tell them where that apartment is located?

21   A    Yes.

22   Q    What did you tell them?

23   A    That it was above the Downtown.

24   Q    And then did you describe that incident to them,

25   that occasion?

People - Kane - Cross

1    A    Not that I recall.  Describe?  I just told them.

2    Q    Did you tell them that you played music, that you

3 had beer, and you had a blow job on the living room couch,

4 did you them that?

5    A    Sounds right.

6    Q    Did you tell them that you nodded off, woke up

7 between six and seven and went home?

8    A    Right.

9    Q    Did you tell them not, not naked, no bed, she, bra

10 and panties, no fucking ever?

11   A    Right.

12   Q    Ever?

13   A    Right.

14   Q    Mr. Kane, again I have to ask embarrassing

15 questions.  I do so reluctantly but this oral sex we are

16 talking about, was that strictly one way?  Did she perform

17 oral sex on you?

18   A    Correct.

19   Q    Did you ever perform oral sex on her?

20   A    No.

21   Q    Never?

22   A    No.

23   Q    Did you ever undress her?

24   A    Excuse me?

25   Q    Did you ever undress her?

People - Kane - Cross

1    A    Maybe take her shirt off.

2    Q    Other than her shirt?

3    A    No.

4    Q    Now, there was a further discussion, was there

5    not, concerning some money being owed?  I am talking about

6    the discussion between you and the two homicide detectives

7    on May 2nd.

8    A    Money being owed?

9    Q    Did somebody loan somebody some money?

10            MR. BIANCAVILLA:  Judge, I object.

11   Q    Did you tell them --

12            THE COURT:  Wait.  Wait.  There is an

13   objection on the floor.

14            MR. CHAMBERLAIN:  I'll withdraw that

15   question.

16            THE COURT:  What's the nature of the

17   objection.

18            MR. BIANCAVILLA:  No date or specific time.

19            THE COURT:  Please, be more specific,

20   Mr. Chamberlain.

21            MR. CHAMBERLAIN:  To be honest, I am having

22   trouble reading these notes here.

23            THE COURT:  That may be.

24   Q    This Friday, does that refresh your recollection

25   as to the time?

People - Kane - Cross

1    A    Excuse me?

2    Q    You were talking about somebody lending somebody

3    money and you said, the notes say, I think, Friday.  Does

4    that refresh your recollection?

5    A    No, it doesn't.

6    Q    Does the sum of $50 refresh your recollection.

7    A    No, it doesn't.

8    Q    Did you -- was there discussion between you and

9    Ruthy concerning some money that you owed her on the evening

10   of April 11th in the early morning hours of April 12th?

11   A    No.

12   Q    Was there -- do recall any conflict about the

13   amount of money owed?

14   A    No.

15   Q    You claimed a lower figure and she claimed a

16   higher figure?

17   A    No idea what you are talking about.

18   Q    When you told the detective somebody -- I think,

19   I'm not sure if this was Ross, but it may be Ross, lending

20   $50, was that conflict -- in connection with Ruth?

21           MR. BIANCAVILLA:  Objection to form.

22           THE COURT:  Sustained.

23   Q    Did you tell the detectives anything about

24   somebody loaning somebody $50?

25   A    Ross lent me fifty bucks.

People - Kane - Cross

1    Q    Ross lent you fifty bucks.  Was that in connection

2  with his telling you that Ruth had been killed?

3    A    Correct.

4    Q    So you are telling the detectives that when Ross

5  told you Ruth had been killed, he loaned you $50; is that

6  it?

7    A    I believe it was the same day, yes.

8    Q    What day was that?

9    A    I don't recall.

10    Q    So you're telling these detectives that Ross told

11  you that Ruthy had been killed?

12    A    Correct.

13    Q    Which is not true; right?

14             MR. BIANCAVILLA:  Objection.

15             THE COURT:  Overruled.

16             MR. CHAMBERLAIN:  Did we get an answer?

17             THE COURT:  No.

18    A    Question again?

19    Q    Which was not true, right?

20    A    That Ross told me about it?

21    Q    Yes.

22    A    He told me that day but I knew about it.

23    Q    That's not what you told the detectives?

24    A    No.

25    Q    Did you tell the detectives that night at the Y.L.

People - Kane - Cross

1    Childs, Mike, the bartender, had given you a card from the

2    police and you were told to call?

3        A    Which night?

4        Q    We are talking about when you told the detectives

5    on May 2nd that this would appear to refer to Friday after

6    the murder, two or three days after the murder?

7        A    Right.

8        Q    Right.  And that's why you called McHugh at

9    11:00 a.m. Saturday?

10       A    I called him that night.

11       Q    And you told the detectives on May 2nd who the

12   people were that were hanging out at Y.L. Childs until

13   closing; is that right?

14       A    Excuse me?

15       Q    Did you tell the detectives the people that were

16   hanging out at Y.L. Childs until closing?

17       A    Did I tell the detectives what?

18       Q    Who -- did you tell the detectives who was hanging

19   out at Y.L. Childs?

20       A    I don't recall.

21       Q    Do the names Nester, Hernandez, Diedra, Janet,

22   hanging out until closing refresh your recollection?

23       A    Yes.  Yes.

24       Q    And David Zaranich (phonetic)?

25       A    I don't recall that.

People - Kane - Cross

1     Q    Until 4:00 a.m., does that refresh your

2  recollection?

3     A    Yeah.

4     Q    Did you tell the detectives at that time anything

5  about the defendant, Scrimo, being with you?

6     A    No.

7     Q    He wasn't one of the people you indicated was

8  there; right?

9     A    Excuse me?

10     Q    He was not one of the people that you told the

11  detectives was there; right?

12     A    No.

13     Q    Mr. Kane, did you then tell the detectives that --

14  that there was a big bald guy there, not Paul?

15     A    I don't recall that.

16     Q    Well, he was not big -- let me show you page five,

17  I believe, page five --

18           THE COURT:  Defendant's Y.

19           MR. CHAMBERLAIN:  Defendant's Y.  Thank you,

20    Judge.

21     Q    The middle of the page.

22     A    I don't get these notes.  This is what I'm

23  supposedly saying to McHugh over the phone?

24     Q    No.  May 2nd, you are in Homicide?

25           MR. BIANCAVILLA:  Objection.

People - Kane - Cross

1    THE COURT:  Sustained.

2    Q    You're in Homicide, you are being questioned after

3  you are brought in there, you are being questioned by McHugh

4  and another detective?

5    A    Right.

6    Q    Right.  You are asked about a big bald guy?

7    A    Right.

8    Q    And what did you say about that?

9    A    That I didn't know a big bald guy with tattoos.

10   Q    Is that a question or answer?

11   A    It has nothing to do with these notes, but --

12   Q    The notes say that guy was not bald?

13        MR. BIANCAVILLA:  Objection to what the notes

14   say.

15        THE COURT:  Sustained.

16   Q    Were you asked about a big bald guy?

17   A    Yes.

18   Q    Did you tell the detectives he wasn't bald, he's

19  not big --

20   A    No.  No.

21   Q    He wasn't bald, his head was shaved?

22   A    I said I didn't know --

23   Q    Would you read the note?

24        MR. BIANCAVILLA:  Objection.  He's answering.

25        THE COURT:  He's answering your question.

People - Kane - Cross

1        MR. CHAMBERLAIN:  I'm sorry, Judge.

2    A    I remember him asking me if I knew a bald guy with

3 tattoos and I said, no, I didn't.

4    Q    Did they say a big bald guy?

5    A    A big bald guy with tattoos.

6    Q    Did you exchange -- did you say it was not Paul?

7    A    No, I don't remember saying that at all.  I was

8 saying I didn't know.

9    Q    Did you describe Paul --

10        MR. BIANCAVILLA:  Objection.  He's answering.

11        THE COURT:  Were you finished with your

12    response?

13        THE WITNESS:  Yes.

14        THE COURT:  Okay.  Ask another question.

15    Q    Would you read that note again and I ask you if

16 you describe Paul at that point?

17        MR. BIANCAVILLA:  Objection.

18        THE COURT:  As to form, sustained.

19    Q    Read the note and see if it refreshes your

20 recollection?

21        MR. BIANCAVILLA:  Objection.  He didn't a say

22    he needed to have his recollection refreshed.

23        THE COURT:  Ask your question first,

24    Mr. Chamberlain, and see if the witness can respond.

25    Q    Do you recall what you were told at this point in

People - Kane - Cross

1   the interview between you and McHugh in Homicide?  Do you

2   recall the details?

3       A    About Paul not having a shaved head at the time?

4       Q    Yes.

5       A    Yes.

6       Q    You told them that?

7       A    I told them that, right.

8       Q    Why did you tell them Paul didn't have a shaved

9   head?  They were asking -- Paul didn't have a bald head or

10  shaved head?

11      A    Shaved head.

12      Q    Didn't Paul have a shaved head?

13      A    Yes, he did.

14      Q    So it was a bald head; is that correct?

15      A    No.

16      Q    No, not his head?

17              MR. BIANCAVILLA:  Judge, I object.

18              THE COURT:  Sustained.

19              MR. CHAMBERLAIN:  Pardon me, Judge?

20              THE COURT:  Sustained.  I think this may be a

21      good time to break.

22              Ladies and gentlemen, we are going to break

23      now and ask you to be here at 9:30 tomorrow.

24              Do not discuss the case amongst yourselves or

25      with anyone else.  Keep an open mind.  Do not form or

People - Kane - Cross

1    express any opinions until the entire case has been

2    completed.

3                Do not read or listen to any accounts of the

4    case should they be reported in the media.  Do not

5    visit or view any place or premises that have been

6    mentioned.

7                You are not to permit any party to discuss

8    the case with you or attempt to influence you, and you

9    must promptly report to the Court any violation

10   thereof.

11               Have a pleasant evening and we'll see you

12   tomorrow morning

13               (Whereupon, the sworn jurors exited the

14       courtroom.)

15               THE COURT:  Mr. Kane, we'll see you tomorrow

16   morning at 9:30 a.m..  Do not discuss this case with

17   anybody.

18               THE WITNESS:  Okay.

19               (Whereupon, the witness left the witness

20       stand and exited the courtroom.)

21               MR. BIANCAVILLA:  For the record, I want to

22   set forth something with regard to permitting

23   Mr. Chamberlain to continually ask the defendant

24   whether something was truthful or not.

25               I set forth on the record the basic

Proceedings

1   foundation must be laid for impeachment of a witness

2   for a prior inconsistent statement.  I am reading from

3   Prince-Richardson on evidence, section 6-411.

4           Introduction of inconsistent oral statements

5   as impeaching evidence requires asking the witness

6   whether the statements were made specifying the time

7   and place, the person to whom made, and the language

8   and the substance of that language used.

9           Then, going on, Judge, if the witness without

10  explanation or qualification admits having made the

11  statement, that is the end of the inquiry because the

12  witness has discredited himself and there is no need

13  for contradiction.

14          The questions that he asked, Judge, again,

15  for the record, are improper because they call for a

16  conclusion that only the jurors should be drawing.

17          THE COURT:  Counsel, Mr. Chamberlain, I

18  expect you to be ready tomorrow, if you decide to put

19  on a case, to begin your case tomorrow.

20          MR. CHAMBERLAIN:  All right.

21          THE COURT:  I believe this is the People's

22  last witness.

23          MR. BIANCAVILLA:  Yes, it is.

24          MR. CHAMBERLAIN:  I'll be ready, at least in

25  part.  I indicated --

Proceedings

1       THE COURT:  You said you had a problem with

2  an expert regarding his not being able to be here

3  tomorrow.  You said it was a Jewish holiday.

4       MR. CHAMBERLAIN:  Yes, and there's at least

5  one other expert I may have trouble getting.

6       MR. BIANCAVILLA:  Whatever experts come in

7  tomorrow, I won't be prepared.  I need a date certain

8  for the expert so I can get mine up from South

9  Carolina.

10       MR. CHAMBERLAIN:  I don't expect to have any

11  experts tomorrow.

12       THE COURT:  Do you have witnesses tomorrow?

13       MR. CHAMBERLAIN:  Yes.  I think we'll

14  probably be able to fill the day.

15       MR. BIANCAVILLA:  May we have an offer of

16  proof on that, please?

17       MR. CHAMBERLAIN:  No.

18       THE COURT:  Excuse me.  That's my decision.

19       MR. CHAMBERLAIN:  We have discussed it.  I

20  have a whole list of witnesses.  I didn't get a

21  accurate list of witnesses.  I got a list this morning,

22  of five witnesses, none of whom were put on, and I

23  don't think there was any intention to put any of those

24  witnesses on.

25       MR. BIANCAVILLA:  My request for an offer of

Proceedings

1    proof is because their testimony may not be admissible

2    at this trial.  I want a ruling from the Court to make

3    that determination.

4              THE COURT:  With respect to the offer of

5    proof, Mr. Chamberlain, are these factual witnesses you

6    will be putting on?  That's what I would like to know

7    at this point.

8              MR. CHAMBERLAIN:  I think the answer is

9    basically, no, Judge, except for the witness we have

10   already discussed and you have indicated I can

11   cross-examine them --

12             THE COURT:  Well, there may be a problem with

13   that because subsequent to that statement I made, I had

14   my law secretary do research with respect to collateral

15   evidence and, apparently, I may not be correct with

16   respect to that.  The court of appeals has spoken.  I

17   will be glad to let you look at the cases that we

18   found.

19             MR. CHAMBERLAIN:  I think I am aware of the

20   rules on collateral evidence, Judge.  This is not

21   collateral.

22             THE COURT:  Give me an offer of proof and

23   I'll see if it's relevant.

24             MR. CHAMBERLAIN:  I think it's relevant when

25   we are talking about a witness or witnesses who will

Proceedings

1    place -- who will define the relationship between the

2    chief witness and the only witness that the People

3    really have in this case that ties this defendant to

4    the murder.

5           There may be other evidence, inferential

6    evidence, he may not have told the truth.  He may have

7    been near or gone to a particular point.  There's

8    nobody that ties this defendant to this murder other

9    than this witness and there's no physical evidence.

10   More importantly, there's an absence of physical

11   evidence, which should be there, that ties my defendant

12   to this murder.

13           THE COURT:  That's for summation.

14           MR. CHAMBERLAIN:  I understand.

15           THE COURT:  I'm concerned, if you are trying

16   to bring in collateral witnesses with respect to the

17   credibility of Mr. Kane.  That's why I said we did

18   research and I can tell you what the court of appeals

19   said and I'll be glad to let you look at those cases

20   now.

21           MR. CHAMBERLAIN:  I am interested in bringing

22   evidence of Mr. Kane's relationship with the victim.

23           THE COURT:  I have no problem with that.

24           MR. CHAMBERLAIN:  That I understand.

25           THE COURT:  I am concerned about, with

Proceedings

1    respect to the credibility of Mr. Kane, with respect to

2    those questions you asked on cross-examination, for

3    example, you gave me the offer that Mr. Ball would

4    testify to something else.

5            MR. CHAMBERLAIN:  I indicated --

6            THE COURT:  That was what he stated under

7    oath.

8            However, the general rule of evidence in the

9    State concerning impeachment of witnesses with respect

10   to collateral matters is that the cross-examiner is

11   bound by the answers of the witness to questions

12   concerning collateral matters inquired into solely to

13   affect credibility.

14           It is well established that the party who is

15   cross-examining a witness cannot introduce extrinsic

16   documentary evidence or call other witnesses to

17   contradict a witness' answers concerning collateral

18   matters solely for the purpose of impeaching that

19   witness' credibility.

20           The rule is premised on sound policy

21   considerations for if extrinsic documentary evidence

22   which is otherwise inadmissible is allowed to be

23   introduced to contradict each and every answer given by

24   a witness solely for the purpose of impeaching a

25   witness, numerous collateral minitrials would arise

Proceedings

1    involving the accuracy of each of the witness' answers.

2    The resulting length of the trial would by far outweigh

3    the limited probative value of such evidence.

4                I am reading from the case of People versus

5    Pavao, Court of Appeals, 59 NY2d 282.

6                MR. CHAMBERLAIN:  That's not my understanding

7    of law that goes way back, Judge.

8                THE COURT:  Do you plan on introducing

9    Mr. Ball?

10               MR. CHAMBERLAIN:  Yes, I do.

11               THE COURT:  What is the offer of proof with

12   respect to his testimony.

13               MR. CHAMBERLAIN:  I have indicated to the

14   Court -- you have a transcript of that.

15               THE COURT:  I just said the court of appeals

16   won't permit you to do that.

17               MR. BIANCAVILLA:  May I make reference to

18   another case?

19               THE COURT:  Yes.

20               MR. BIANCAVILLA:  So the record is clear, the

21   Second Department has also interpreted that case in the

22   matter of People v. Lyde, that's L-Y-D-E, 160 AD2d 817,

23   and that's a case from April the 19th, 1990, where the

24   Second Department said also  find no error with the

25   trial court's exclusion of testimony concerning the

Proceedings

1   complaining witness' reputation for bad moral character

2   and his alleged drug trafficking activities.

3   Impeachment of a witness by evidence of his reputation

4   in the community is limited to reputation for truth and

5   veracity and may not extend to general bad moral

6   character.  Additionally, impeachment by use of

7   immoral, vicious or criminal acts is appropriate only

8   on cross-examination and not by use of extrinsic

9   evidence.

10          That's a Second Department case that was

11   decided in 1990, Judge.

12          THE COURT:  The cite?

13          MR. BIANCAVILLA:  160 AD2d 817, and also

14   followed by the Third Department in People v. Barnhill

15   188 AD2d 884.  In Barnhill, the Third Department also

16   adopted the same rule from the Second Department which

17   interpreted Pavao as I have indicated on the record.

18          MR. CHAMBERLAIN:  Judge, may I be heard?

19          THE COURT:  Yes.

20          MR. CHAMBERLAIN:  The general rule about

21   prior acts with respect to hearsay exceptions for --

22   with respect to reputation is accurate.  However, a

23   reputation for truthfulness or veracity, credibility,

24   is -- can be brought out by people, and I respectfully

25   submit, can be brought out by people that know somebody

Proceedings

1    is a drug dealer.  I think it is inherently --

2              THE COURT:  Have you done research on this?

3    Have you got case law?

4              MR. CHAMBERLAIN:  I have done some research

5    on Richardson.

6              THE COURT:  Why don't you give that to me.

7              MR. CHAMBERLAIN:  It's in Richardson, Judge.

8              THE COURT:  I would be glad to do it myself

9    tonight, but I'm asking if you have case law with

10   respect to the proposition you're asking me to accept.

11             MR. CHAMBERLAIN:  Judge, I don't need to have

12   an argument with your Honor, but I can bring out, by

13   reputation -- it's a standard section of Richardson.

14             I would also like to say that in this

15   particular case I can bring out a witness' reputation

16   for truthfulness, which I don't think Mr. Biancavilla

17   will disagree with.  I think a witness who knows of

18   that reputation and has an element of a person being

19   untruthful because he's inherently -- because they know

20   he's a drug dealer, is relevant and should be

21   permitted.

22             Specifically, in this case, the witness has

23   now testified -- and he's testified that he has had

24   encounters with this poor woman who was murdered.  I

25   don't think that's anything that will support the

Proceedings

1    People's position that this was an act -- this

2    relationship was one of either companionship or

3    affection, which is what he opened to the jury on.

4            I think it implies -- and I will have

5    evidence that there was a relationship involving drugs,

6    that he was supplying drugs to her, and I have evidence

7    to support that.

8            THE COURT:  Mr. Chamberlain, may I suggest

9    you read, because I'm reading the next paragraph --

10           MR. CHAMBERLAIN:  I think I read it.

11           THE COURT:  59 NY2d 282, where, however, the

12   cross-examiner does not seek to contradict specific

13   answers given by a witness, but, rather, attempts only

14   to show that the witness has a bad reputation in the

15   community for truth and veracity, the rule is

16   different.  The rule in such cases is that other

17   qualified witnesses may be called to testify with

18   respect to the witness' reputation for untruthfulness

19           MR. CHAMBERLAIN:  Judge, I am saying --

20           THE COURT:  I'm saying you can't do it, but,

21   please.  Read Pavao 59 NY2d, 282, and I'm reading --

22           MR. CHAMBERLAIN:  I don't understand that.

23   Based on your Honor's prior ruling, I have now brought

24   out certain names in front of this jury believing I

25   would be able to get these people in.  I am going -- if

Proceedings

1   I can't --

2           THE COURT:  Make your record, but you're

3   incorrect, Mr. Chamberlain.

4           MR. CHAMBERLAIN:  I believe Judge Ort's

5   decision as to prior -- what appears to be brought out

6   with respect to credibility and the credibility of this

7   witness being central to this case, is already the law

8   of the case.  I would like that as part of this

9   argument, Judge Ort's decision after the Huntley

10  hearing.

11          THE COURT:  I read it and you are right,

12  Judge Ort's decision is on a Huntley hearing, finding

13  of facts with respect to a Huntley hearing.

14          What does that have to do with evidentiary

15  rulings by the trial judge?  He is saying certain

16  things and he is making findings and conclusions of law

17  based upon those findings.

18          With respect to the other part, you have an

19  absolute right to cross-examine, which you did when you

20  gave me the good faith basis on the record and I let

21  you cross-examine as to each and every one of those

22  alleged criminal acts these people have told you about.

23          Of course, as I said, you're bound by his

24  answer.  Now, I read to you what you are allowed to do

25  and I am going to suggest that you read Pavao and that

Proceedings

1    will explain to you what your witnesses can testify to

2    and what they can't.

3                MR. CHAMBERLAIN:  All right.

4                THE COURT:  Anything else?

5                MR. CHAMBERLAIN:  One last thing.  Judge,

6    with respect to the possibility of rebuttal, I would

7    like to have either a brief statement or for the court

8    reporter to read back what was stated on the record

9    with respect to a possible rebuttal case.

10               We have two witnesses that were jail house

11   informants that claim that my defendant made a

12   statement.  This was a sealed record by Judge Carter.

13   I would like to have that restated on the record at

14   this point or the record read back.

15               MR. BIANCAVILLA:  The record is what it is.

16               MR. CHAMBERLAIN:  I would like to know.

17               THE COURT:  I have no recollection,

18   Mr. Chamberlain.

19               MR. CHAMBERLAIN:  Mr. Biancavilla said they

20   would only be used, I believe, on rebuttal of my

21   client's testimony.

22               MR. BIANCAVILLA:  That's correct.

23               MR. CHAMBERLAIN:  Okay.  That's fine.  That's

24   all I need.  I'll read that case.

25               THE COURT:  Yes.

Proceedings

1                      *        *        *

2              (Whereupon, the above matter was adjourned to

3       April 17th, 2002.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1553

```
 1    STATE OF NEW YORK : NASSAU COUNTY

 2    COUNTY COURT      : PART XIV
      ----------------------------------------:
 3    THE PEOPLE OF THE STATE OF NEW YORK,    :
                                              :
 4                     - against -           : IND: 1456N-00
                                              :
 5    PAUL SCRIMO,                            :
                                              :    JURY TRIAL
 6    ----------------------------------------
                                 Defendant.   :
 7    ----------------------------------------x

 8                              May 17, 2002
                                262 Old Country Road
 9                              Mineola, New York

10
      B E F O R E:
11
                   THE HONORABLE JEFFREY BROWN,
12                 County Court Judge.

13
      A P P E A R A N C E S:
14

15              (As previously noted.)

16                         *       *       *

17              THE CLERK:   Case on trial continued, the People

18         versus Paul Scrimo.

19              You are Paul Scrimo?

20              THE DEFENDANT:  Yes.

21              THE CLERK:   Mr. Scrimo, you are appearing here

22         with counsel, Mr. Chamberlain?

23              THE DEFENDANT:  Yes.

24              THE CLERK:   Are the People ready?

25              MR. BIANCAVILLA:  Ready.
```

Proceedings

1       THE CLERK:  Defendant and counsel, ready?

2       MR. CHAMBERLAIN:  Ready.

3       THE COURT:  Bring in the jury.

4             (Whereupon, the sworn jurors entered the

5       courtroom and resumed their respective seats.)

6       THE CLERK:  Both sides stipulate the jurors are

7   all present and properly seated?

8       MR. BIANCAVILLA:  So stipulated.

9       THE CLERK:  Defendant?

10      MR. CHAMBERLAIN:  So stipulated.

11      THE COURT:  Good morning, ladies and gentlemen.

12  We are ready to continue with the trial.

13      Please ask Mr. Kane to come in.

14      COURT OFFICER:  Good morning, sir.  Please take

15  the stand.  You are reminded you are still under oath,

16  sir.

17            (Whereupon, the witness resumed the witness

18      stand.)

19      THE COURT:  You may inquire, Mr. Chamberlain.

20      MR. CHAMBERLAIN:  Thank you, Judge.

21  CONTINUED CROSS

22  BY MR. CHAMBERLAIN:

23  Q    Good morning, Mr. Kane.

24  A    Morning.

25  Q    May I ask you, did you drive yourself in today or

People - Kane - Cross

1    were you transported by someone?

2        A    Transported.

3        Q    By whom?

4        A    My father.

5        Q    I want to bring you back to the conversation of

6    the interview you were having on the evening of May 2nd

7    with two homicide detectives in the homicide room.   I

8    think where we left off was where you were being asked by

9    them about a big bald guy who you indicated was not bald.

10   Do you recall that?

11       A    No, I didn't say he was not bald.  I said I didn't

12   know a big bald tattooed guy.

13       Q    I will show you Defendant's Y for identification,

14   middle of page five.

15           Does that document refresh your recollection as to

16   whether or not you said it was not Paul?

17       A    I don't remember saying it wasn't Paul.

18       Q    It doesn't refresh your recollection?

19       A    No.

20       Q    Will you describe what Paul looked like to those

21   detectives at that time?

22           MR. BIANCAVILLA:  Objection to the form of the

23       question with respect to it relating to the notes.

24           THE COURT:  Just ask the question,

25       Mr. Chamberlain, without reference to the witness

People - Kane - Cross

1    looking at the notes.

2         Q    After the question did you know a big bald guy,

3    what, if anything, did you say to the detectives?

4         A    No.

5         Q    No?

6         A    No.

7         Q    What?

8         A    No.

9         Q    What else did you say?  Did you say anything about

10   Paul?

11        A    No, not that I remember.  No.

12        Q    Will you look at the notes, please, and see if

13   that refreshes your recollection?

14        A    It doesn't refresh my recollection.

15        Q    It does not?

16        A    No, it doesn't.

17        Q    Do you recall telling the detective that Paul was

18   not bald, he had a shaved head?

19        A    Can you repeat that?

20        Q    Do you recall telling the detectives that Paul was

21   not bald, he had a shaved head?

22        A    No, I don't remember saying that?

23        Q    Do you recall telling the detectives that Paul was

24   not big?

25        A    No, I don't remember saying that.

People - Kane - Cross

1    Q    Would you look at the notes, please.

2    A    I am looking at the notes.

3    Q    Right in the middle of the page?

4    A    Yes, I don't remember saying that, no.

5    Q    You don't remember saying that now?

6    A    Yes, I don't remember saying that.

7    Q    You don't say you didn't say it?

8         MR. BIANCAVILLA:  Objection.

9         THE COURT:  I haven't heard the question yet

10   but --

11   Q    You don't deny saying it then, you just don't

12   recall it now, is that your testimony?

13        MR. BIANCAVILLA:  Objection.

14        THE COURT:  It's a compound question,

15   Mr. Chamberlain.

16        Sustained.

17        MR. CHAMBERLAIN:  May I have the document,

18   please?

19   Q    Do you recall telling the detectives, I don't

20   think of Paul as a big bald guy?

21   A    I don't remember saying that, no.

22   Q    But you don't deny saying that?

23   A    I don't deny saying it.  I don't remember saying

24   that.

25   Q    Is that true, Paul was not a big bald guy but a

People - Kane - Cross

1    guy with a shaved head, is that it?

2              MR. BIANCAVILLA:  Objection.

3              THE COURT:  Sustained as to is it true.

4        Q    Did you tell the detectives you hardly ever see

5    him except for darts?

6        A    Yes, I believe so.

7        Q    And did you tell them anything else about

8    Mr. Scrimo?

9        A    Not that I remember, no.

10       Q    Did you tell them that he was in his forties?

11       A    I don't remember saying that now.

12       Q    Do you remember telling them he was a custodian?

13       A    No, I don't remember telling them that.

14       Q    That he was married with kids?

15       A    I don't recall saying that, no.

16       Q    Does Defendant's Y refresh your recollection as to

17   any of those items?

18       A    Where am I looking?

19             THE COURT:  Please refer the witness.

20             THE WITNESS:  I got it.

21       Q    It's the same page.  It's exactly right under the

22   other portion you just read from, toward the bottom of

23   page five.

24       A    I see it.

25       Q    Do you remember saying that?

People - Kane - Cross

1    A    No.  No.  I don't deny saying it, but I don't

2    remember saying it.

3    Q    Those statements that you just related were true

4    as far as you knew; right?

5         MR. BIANCAVILLA:  Objection.

6         THE COURT:  Sustained.

7    Q    At the time you were talking to those detectives,

8    were those statements consistent with what you knew about

9    Mr. Scrimo?

10        MR. BIANCAVILLA:  Objection.

11        THE COURT:  Sustained.

12   Q    Do you remember telling the detectives he was not

13   big, he was short, he was -- just a shaved head, not a

14   bald head?

15        MR. BIANCAVILLA:  Objection.  We have been

16     through this three times already.

17        THE COURT:  No, I'll permit it.

18   A    Can you repeat that, please?

19   Q    Do you remember telling the detectives that Paul

20   was not big, that he was short, just shaved, he did not

21   have a bald head?

22   A    I don't recall saying that.

23   Q    Do you remember telling them that with reference

24   to playing darts two to three weeks prior to when you were

25   seeing him on May 2nd was the first time he had shaved his

People - Kane - Cross

1    head?

2            MR. BIANCAVILLA:  Objection to the form of the

3        question, Judge.

4            THE COURT:  Do you understand the question?

5            THE WITNESS:  No, I don't.

6            THE COURT:  Repeat the question.

7            Sustained as to form.

8        Q    You were asked, were you not, about an incident of

9    what you were doing two to three weeks prior to the time

10   you were being interviewed on May 2nd, do you recall that?

11       A    Do I recall being asked about two week before?

12       Q    Two to three weeks before?

13       A    Could I remember what?

14       Q    Do you remember being asked about that by the

15   detectives?

16       A    No, I don't.

17       Q    Do you remember telling the detectives that was

18   the first time he had a shaved head?

19       A    No, I don't recall that.

20       Q    Do you recall being asked about Tuesday night at

21   darts about three weeks ago?

22       A    No, I don't remember that.

23       Q    Do you remember telling the detective that you

24   played darts three weeks ago with Scrimo, had a number of

25   drinks and then went to Granny's?

People - Kane - Cross

1    A    Right.

2    Q    Do you remember that?

3    A    On -- on what date was that?

4    Q    Three, about three weeks prior to the time of your

5    being questioned?

6    A    When was I questioned?

7    Q    May 2nd,2000.

8    A    Yes.

9    Q    Do you remember telling them then you're not sure

10   what Paul was -- if he was drinking but you then went to

11   Granny's?

12   A    Correct.

13   Q    Do you remember telling who you thought was there?

14   A    Who I thought was at Granny's?

15   Q    Did you tell the detectives then that you weren't

16   sure whether Ruth was there?

17   A    No.  I told him about introducing Paul to the

18   bartender.

19   Q    What about Ruth, do you recall telling the

20   detectives whether or not Ruth was at Granny's?

21   A    No, she wasn't there.

22   Q    Did you tell them what time you left Granny's

23   possibly?

24   A    I stayed about an hour.

25   Q    And did you tell them where you went then?

People - Kane - Cross

1    A    Yes.

2    Q    Did you tell them where you went to -- did you say

3    Y.L. Childs?

4    A    Yes.

5    Q    Did you tell them where you went to in Y.L.

6    Childs?

7    A    Correct.

8    Q    At that point you were still denying any

9    involvement or presence at the scene of this murder, were

10   you not?

11            MR. BIANCAVILLA:  Objection.

12            THE COURT:  Read the last question back.

13                (Whereupon, the court reporter read back the

14            requested question.)

15            THE COURT:  I'll permit that.

16   A    No.  I think I was telling them the story about

17   what happened.

18   Q    I show you page six of Defendant's Y for

19   identification and ask you to read page six and then page

20   seven and see if that refreshes your recollection as to

21   whether you recall telling them what you say happened?

22   A    I don't understand these notes at all.  It's a

23   bunch of gibberish.  I don't understand this.

24   Q    You don't understand page seven?  Is that a bunch

25   of gibberish?

People - Kane - Cross

1       A      I don't understand either page.

2       Q      Well, page six contains --

3              MR. BIANCAVILLA:  Objection.  They are not his

4       notes.

5              THE COURT:  Sustained.

6       Q      You were being questioned about where you went

7       that night; right?

8       A      Correct.

9       Q      And up until -- withdrawn.

10             Do you recall a time during that questioning when

11      you were told that we have evidence, we've talked to

12      people, we have evidence that you were there, we have

13      evidence that you were at the scene of the murder; do you

14      recall that?

15      A      Do I recall the police saying they have evidence

16      of me being there?

17      Q      Yes.

18      A      I don't recall that.  I'm sure they said it but I

19      don't recall it.

20      Q      Do you recall being told -- do you recall the --

21      let's see the page.

22             Do you recall being told that they had evidence

23      from the CSSU?

24      A      No.

25      Q      Do you recall being told that they had evidence

People - Kane - Cross

1    from the Crime Scene Search Unit proving you were there?

2         A    No, I didn't recall that.

3         Q    Would you believe that they told you that?

4         A    I'm sure they did.

5         Q    At that point, Mr. Kane, did you tell them

6    something different than what you had been telling them

7    previously?

8              MR. BIANCAVILLA:  Objection.

9              THE COURT:  Sustained as to form.

10        Q    After you were told that they had some evidence

11   tying you to the scene, was that -- what did you tell them

12   at that point?

13        A    I told them everything.  I told them the full

14   story.

15        Q    You told them the full story.  That was a story

16   that you had told for the first time, is that correct, at

17   that point?

18        A    Correct.

19        Q    That was the story that was over three week after

20   the incident; right?

21        A    Correct.

22        Q    That was the story --

23             MR. BIANCAVILLA:  Judge --

24        Q    -- all that time --

25             MR. BIANCAVILLA:  Objection.

People - Kane - Cross

1    THE COURT:  I haven't heard the question yet.

2    Q    That was the story that you had all that time to

3    make up after telling other stories?

4    MR. BIANCAVILLA:  Objection.

5    THE COURT:  Sustained.

6    Q    Did you tell them the story or did you tell them

7    that you were drinking and it was hard to remember?

8    MR. BIANCAVILLA:  Objection.

9    THE COURT:  I don't understand the question.

10   Sustained.

11   Q    Did you tell them after that you were drinking and

12   it was hard -- you were not sure of what was going on or

13   it was hard to remember?

14   A    I don't recall saying that, no.

15   Q    Middle of page seven?

16   MR. BIANCAVILLA:  I am going to ask to approach.

17   THE COURT:  Mr. Kane, step down.

18       (Whereupon, the following took place at the

19       bench outside the hearing of the jurors and

20       defendant.)

21   THE COURT:  Yes, Mr. Biancavilla?

22   MR. BIANCAVILLA:  My objection is, and you keep

23   letting him do this, there's been no foundation laid

24   for showing this witness Detective Parpan's notes.

25       The proper foundation for refreshing someone's

People - Kane - Cross

1    recollection is as follows.  If the witness answers

2    the question I don't recall, the next question is, is

3    there something that would refresh your recollection,

4    yes or no.  Then the question is what is it?  If he

5    says Detective Parpan's notes, then he can show him

6    Detective Parpan's notes.

7         You can't just throw a document at somebody and

8    say look at these notes and do they refresh your

9    recollection.  They are not his notes, Judge.

10        THE COURT:  Mr. Chamberlain?

11        MR. CHAMBERLAIN:  Judge, this witness has

12   repeatedly indicated he doesn't recall.  This -- these

13   questions are all asked in good faith and

14   Mr. Biancavilla knows it because he has a transcript.

15   I am following the exact transcript.

16        THE COURT:  I don't doubt the good faith aspect.

17   That's not his objection.

18        MR. CHAMBERLAIN:  My comment here is I am

19   entitled to ask this witness about prior statements.

20        THE COURT:  Yes, you are.

21        MR. CHAMBERLAIN:  I am entitled to show that he

22   didn't readily admit this thing, how it came out.

23        THE COURT:  Yes, you are.

24        MR. CHAMBERLAIN:  He has said patently he doesn't

25   recall.  I am entitled to go through -- and the notes

People - Kane - Cross

1    say, hard to remember, drinking, not sure of times,

2    conversations, etcetera.

3        THE COURT:  Mr. Chamberlain, I agree a hundred

4    percent.  The DA's objection is that you are

5    improperly using the document without laying a

6    foundation in order to refresh his recollection.

7        I will permit you to use -- I think I've even

8    said you can use a baloney sandwich to refresh a

9    witness' recollection as long as a proper foundation

10   has been laid.  If the witness answers I don't

11   recall, I will permit you to show him Defendant's

12   Exhibit Y --

13       MR. BIANCAVILLA:  That's not the proper

14   foundation.  If he says he can't recall, the next

15   question is, is there something that would refresh his

16   recollection.

17       THE COURT:  How does he know that?

18       MR. CHAMBERLAIN:  He will know?  These are not

19   his notes, Judge.

20       THE COURT:  Based on one of his answers about six

21   times ago, I doubt the notes will refresh his

22   recollection at this point.  He just said it was

23   gibberish.

24       MR. CHAMBERLAIN:  A foundation was laid

25   yesterday.  We went over these notes page by page, and

People - Kane - Cross

1    they will refresh his recollection, all of a sudden,

2    they are not.

3        I am entitled to ask him.

4        THE COURT:  I'm not doubting that you are allowed

5    to attempt to refresh his recollection.  He has

6    already told us on the record it's gibberish.  Perhaps

7    you are showing him something else in the notes that

8    is not refreshing his recollection.  I will permit him

9    to ask the question if Defendant's Y for

10   identification will refresh his recollection.  If he

11   says no, you are bound by it and that's it.

12       MR. CHAMBERLAIN:  I went through that yesterday,

13   Judge.

14       THE COURT:  You have to do it with respect to

15   each and every question because there may be something

16   that this document may refresh his recollection with

17   respect to and maybe something that the document will

18   not refresh his recollection to.

19       MR. CHAMBERLAIN:  With respect to the last thing

20   he just said, he didn't recall.  I've showed him what

21   we have been showing him to see if it refreshes his

22   recollection.

23       These interruptions are destructive of effective

24   cross-examination.  Mr. Biancavilla knows it.  The

25   jury is unhappy with these interruptions.

People - Kane - Cross

1    THE COURT:  Mr. Chamberlain, I have already

2    advised the jury to disregard colloquy and objections

3    because they are not in evidence.

4    MR. CHAMBERLAIN:  The People's case is based on

5    this witness and he's interrupting cross and it is a

6    completely disingenuous way of doing it.

7    THE COURT:  Mr. Chamberlain, if you ask a proper

8    question, Mr. Biancavilla would not be able to object.

9    That seems to be the problem during the course of this

10   trial.  Now --

11   MR. CHAMBERLAIN:  I'll ask it again.

12   THE COURT:  I will permit you to ask it properly

13   and I told you how to do it.

14   MR. CHAMBERLAIN:  My recollection, maybe I'm

15   wrong, but I'm almost sure he had just said I don't

16   recall and I showed him them.  Isn't that the proper

17   way?

18   THE COURT:  I said you can do it.

19   MR. CHAMBERLAIN:  Then why are we here if in fact

20   that's what happened.

21   THE COURT:  Excuse me.  Why are we here?  Because

22   the People objected, which they are entitled to do,

23   and he had a right to let out his objection as to the

24   foundation aspect.

25   I ruled that I will permit you, and I am not

People - Kane - Cross

1    going to require that additional step that the People

2    are asking for.  I said to you that you can present

3    the document to him, ask him if this document

4    refreshes his recollection as to the particular point

5    you are trying to bring up.  If it doesn't, that's

6    the end of it.

7         MR. CHAMBERLAIN:  I'll do it all over, Judge.

8         THE COURT:  You have to do it for each question,

9    Mr. Chamberlain, no way around that.

10        MR. CHAMBERLAIN:  Fine.

11             (Whereupon, the following took place in open

12             court.)

13   CONTINUED CROSS

14   BY MR. CHAMBERLAIN:

15        Q    Mr. Kane, I would like to redirect your attention

16   back to the portion of the interview between you and

17   Detectives McHugh and another homicide detective on the

18   evening of May 2nd.  Right after you were told that they

19   had evidence connecting you to the scene of the murder, do

20   you recall whether or not you said I can't remember, I was

21   drinking, I am not sure of the time, conversation or what

22   happened?

23        A    I don't recall saying that.

24        Q    You don't recall saying that.

25             I show you Defendant's Exhibit Y, page six, and

People - Kane - Cross

1    ask you if that refreshes your recollection as to whether

2    or not you said --

3         A    This is the same thing you showed me before.

4              THE COURT:  Does it refresh your recollection?

5         A    No, it doesn't.

6         Q    Do you deny saying I don't remember?

7              MR. BIANCAVILLA:  Objection.

8              THE COURT:  Sustained.

9              MR. CHAMBERLAIN:  May I have the notes back?

10             Just one minute, Judge.

11             THE COURT:  Yes, of course, Mr. Chamberlain.

12        Q    Now, Mr. Kane, do you recall being asked by the

13   detectives whether or not Ruth was coming on to you or --

14   at the bar earlier at Y.L. Childs?

15        A    If the police asked me is that?

16        Q    Yes.

17        A    Do I remember them asking me that, yes.

18        Q    What did you tell them?

19        A    I told them yes.

20        Q    Did you tell them that she was -- whether she was

21   kissing anybody, Scrimo or yourself?

22        A    Did they ask me that?  I told them that.

23        Q    What did you tell them?  Was she kissing Scrimo or

24   kissing you?

25        A    Me.

People - Kane - Cross

1    Q    And she was coming on to you; is that correct?

2    A    Correct.

3    Q    Did you tell the detective why she was --

4    withdrawn.

5         Did you tell the detectives when you went to the

6    back door -- what you related that night, you went to the

7    back door of Ruth's apartment; is that correct?

8    A    Correct.

9    Q    Was the back door open?

10   A    It was unlocked.

11   Q    It was unlocked.  Now, you then walked up the

12   stairs with Scrimo, according to your story?

13   A    Correct.

14   Q    You then walked up those stairs and down a long

15   hall to the back apartment?

16   A    Correct.

17   Q    You then were let in the back door by Ruth; is

18   that correct?

19   A    After knocking, yes.

20   Q    Did Ruth at any time go out with you or go out of

21   that back door at that time?

22   A    Did she ever go out of the back door?

23   Q    Yes.

24   A    Not that I know of.

25   Q    Not that you know of.  Now, you were asked

3473

People - Kane - Cross

1    after -- after this statement, and I'm going to get back
2    to what you claim happened in the apartment, but after
3    this, you then had a interview with Mr. Dempsey, did you
4    not?
5        A    I had an interview with him, yes.
6        Q    Was that on May 5th?
7        A    I am not sure of the date.
8        Q    Did you have another interview with him on
9    May 10th?
10       A    I'm not sure of the date.
11       Q    Did you then have another interview with him on
12   May 25th prior to a felony exam?
13       A    Yes.
14       Q    Did you then have another interview with him on
15   July 2nd prior to testifying before the grand jury?
16       A    Yes.
17       Q    Did you discuss the question about where you --
18   where Ruth had been during this encounter in the apartment
19   according to what you told the detective?
20       A    Can you repeat that?
21       Q    Was there any question raised as to where Ruth was
22   during that encounter?
23       A    During what encounter?
24       Q    During the encounter you related as to what
25   happened in the apartment?

People - Kane - Cross

1        MR. BIANCAVILLA:   I am objecting to the form of

2   the question.

3        THE COURT:  Yes, Mr. Chamberlain.

4   Q   You told this jury here --

5        MR. BIANCAVILLA:   Judge, I object to the

6   beginning of that question.

7        THE COURT:  You haven't heard the rest of the

8   question.

9        MR. BIANCAVILLA:   The objectionable portion is

10   the beginning, Judge.

11        THE COURT:  You are talking about that he

12   testified here.

13   Q   You told this jury here, as to an encounter that

14   took place in the apartment after you went upstairs; is

15   that correct?

16        MR. BIANCAVILLA:   Objection.

17        THE COURT:  I don't understand that question,

18   Mr. Chamberlain.

19   Q   Did you tell jury that after you went in almost

20   immediately Paul went out to get some beer?

21   A   Not immediately, but after a brief conversation.

22   Q   Like a minute or two?

23   A   Correct.

24   Q   And then Ruth was there during that conversation;

25   right?

People - Kane - Cross

1   A      Correct.

2   Q      Then you told the jury that you went -- first you

3   told the jury that Paul was gone for about how long?

4          MR. BIANCAVILLA:   Objection.

5   Q      How long was he gone for during that period?

6          THE COURT:   I will permit that.

7   A      About 10 minutes.

8   Q      During that 10 minutes you had a -- withdrawn.

9          Ruth performed oral sex on you; is that correct?

10  A      Correct.

11  Q      Would you tell the jury how she performed oral sex

12  on you?

13  A      She got down on her knees between my legs and

14  performed oral sex.

15  Q      Did she -- did you get undressed?

16  A      No.

17  Q      Did you take your pants off?

18  A      No.

19  Q      You just lowered your pants?

20  A      Correct.

21  Q      Where were you when this happened?

22  A      I was sitting in the kitchen.

23  Q      You were sitting in the kitchen?

24  A      Correct.

25  Q      You were sitting on a chair?

People - Kane - Cross

1    A    Correct.

2    Q    Did you tell the jury that during this performance

3    she was stroking or -- your behind?

4         MR. BIANCAVILLA:  I object to the form of the

5    question.

6         THE COURT:  Sustained as to form.

7    Q    Is that what happened, she was running her hands

8    over --

9    A    Stroking my back, stroking my ass, yes.

10   Q    Stroking your ass while you were seated?

11   A    Correct.

12   Q    Did she scratch you during that encounter?

13   A    Not to my knowledge.

14   Q    Well, wouldn't you know if you had been scratched?

15        MR. BIANCAVILLA:  Objection.

16        THE COURT:  Sustained.

17   Q    Did you ever testify that she had one hand on your

18   organ?

19        MR. BIANCAVILLA:  Objection.

20        THE COURT:  Sustained, form.

21   Q    Did she have one hand on your organ?

22   A    Correct.

23   Q    She didn't scratch there; right?

24        MR. BIANCAVILLA:  Objection.

25        THE COURT:  I'll permit that.

People - Kane - Cross

1   A    No.

2   Q    When she was stroking your back, you felt no

3   scratches; is that correct?

4   A    She was caressing me.  She was, like, you know --

5   I didn't feel no scratch.

6   Q    How was she caressing your back side, your ass, as

7   you put it, while you were seated on a chair?

8   A    Like this (demonstrating).

9   Q    Were you standing up at that time?

10  A    No.

11  Q    How long did that encounter take place, that

12  sexual act take place?

13  A    Seven minutes.

14  Q    Seven minutes?

15  A    He was gone ten.  I asked her to stop because I

16  knew Paul would be coming back.

17  Q    When you asked her to stop, you got up and you did

18  what, you went in to put on a CD?

19  A    Correct.

20  Q    Was it an Allman Brothers CD; is that what you

21  said?

22  A    Allman Brothers, yes.

23  Q    Did Ruth leave the apartment at that point?

24  A    Not to my knowledge.

25  Q    Well, she hadn't been downstairs when you first

People - Kane - Cross

1    came in; right?

2        A    Correct.

3        Q    She hadn't been any place with Scrimo prior to

4    that point, right, alone?

5        A    No.  Well, when I came back from putting on the

6    CD, Paul was in the apartment and so was Ruth, in the

7    kitchen.

8        Q    I see.  When you came back from putting on -- did

9    you say CD?

10       A    The CD.

11       Q    When you came back from putting on the CD, Paul

12   was in the apartment, and so was Ruth, in the kitchen?

13       A    Correct.

14       Q    You signed a statement on May 2nd after your

15   interview with the detective?

16       A    Correct.

17       Q    Did you tell the detective that you went into the

18   living room and put on an Allman Brothers CD in the

19   player, I went back into the kitchen and Paul came back

20   with a 12 pack of Budweiser bottles?

21       A    Correct.

22       Q    So you were in the kitchen and then Paul came

23   back; is that correct?

24       A    No.

25       Q    Well, did you -- do you recall being asked by a

                            People - Kane - Cross

1   juror --

2               MR. BIANCAVILLA:  Objection.

3               THE COURT:  Sustained.

4       Q    Mr. Kane, did you ever see Ruth leave the

5   apartment?

6       A    No.

7       Q    Was there any reason you knew of for her to leave

8   the apartment?

9               MR. BIANCAVILLA:  Objection.

10              THE COURT:  Sustained.

11      Q    Had there been any discussion about her going

12  anywhere when you went in to put that CD in the machine?

13      A    No.

14      Q    Were you asked these questions and did you give

15  these answers as to where Ruth was at the time that you

16  went in to put in the CD?

17              MR. BIANCAVILLA:  Objection.

18              THE COURT:  Sustained as to form.

19      Q    Mr. Kane, as you sit here, you don't recall where

20  Ruth was when you went in to put the CD --

21              MR. BIANCAVILLA:  Objection.

22              THE COURT:  Sustained as to form.

23      Q    Do you recall, Mr. Kane, where Ruth was when you

24  went in to put the CD in the --

25              MR. BIANCAVILLA:  Objection.

People - Kane - Cross

1    THE COURT:  I'll permit that.

2    A    Can you repeat that, please?

3    Q    Do you recall where Ruth was when you went in to

4    put the CD into the player?

5    A    When I left the kitchen to go put the CD in she

6    was in the kitchen.

7    Q    Was she there the whole time, do you recall?

8    A    I don't know.  I was in the living room looking

9    through the CDs.

10    Q    Were you asked about that in the grand jury

11    July 7th?

12    MR. BIANCAVILLA:  Objection.

13    THE COURT:  Sustained.

14    Q    Were you asked -- were you aware of various times

15    and what occurred on those times -- were you clear on

16    where people were and what occurred in that apartment?

17    MR. BIANCAVILLA:  Objection.

18    THE COURT:  Sustained.

19    Q    Do you recall the -- can you tell us a time

20    sequence as to where you were or where Ruth was during the

21    10 minutes that Scrimo was gone?

22    MR. BIANCAVILLA:  Objection.

23    THE COURT:  That's kind of ambiguous,

24    Mr. Chamberlain.  I'll let you ask the time-frame but

25    I think you should be more specific.

People - Kane - Cross

1    Q    Can you give us specifics as to where you were and

2  where she was during that time period?

3    A    In the kitchen.

4    Q    You're saying you knew exactly where you were the

5  whole time and exactly where she was?

6         MR. BIANCAVILLA:  Objection.

7    A    No.

8         THE COURT:  I'll let it stand.

9    Q    Do you recall page 91 of the grand jury minutes --

10        MR. BIANCAVILLA:  Objection.

11   Q    -- line 20?

12        THE COURT:  I don't have a copy.

13        MR. BIANCAVILLA:  Objection.  Improper

14   foundation.

15        MR. CHAMBERLAIN:  I object to the objection.  I

16   haven't asked a question.

17        THE COURT:  Excuse me.  Excuse me.  There's a

18   proper way of doing it, Mr. Chamberlain.

19        MR. CHAMBERLAIN:  Pardon me.

20        THE COURT:  There's a proper way.  Go ahead.  I

21   want to hear the question.

22   Q    Page 91, line 20 of the grand jury minutes, the

23   foreperson, do you remember -- with reference to --

24        THE COURT:  Just ask the question and answer,

25   Mr. Chamberlain, the proper way.

People - Kane - Cross

1      MR. BIANCAVILLA:  Excuse me, Judge.  Can we have

2  a specific date?

3      MR. CHAMBERLAIN:  What?

4      THE COURT:  Excuse me.

5      MR. BIANCAVILLA:  Can we have a specific date

6  that testimony occurred.

7      MR. CHAMBERLAIN:  July 6, 2000.

8      MR. BIANCAVILLA:  Thank you.

9  Q    The foreperson --

10     MR. BIANCAVILLA:  One moment, Mr. Chamberlain.

11 May I have a line, please?

12     MR. CHAMBERLAIN:  Line 20, Mr. Biancavilla.

13     MR. BIANCAVILLA:  Thank you, Mr. Chamberlain.

14 Page 91?

15     MR. CHAMBERLAIN:  Page 91.

16 Q    The foreperson --

17     MR. BIANCAVILLA:  Mr. Chamberlain, excuse me.

18 Your Honor, I need a moment.

19     THE COURT:  Mr. Chamberlain, give him a moment.

20 He needs to find the page in the grand jury minutes.

21     MR. BIANCAVILLA:  There was more than one date,

22 Judge.  That's the problem.

23     MR. CHAMBERLAIN:  Did you say something,

24 Mr. Biancavilla, there was more than one date?

25     MR. BIANCAVILLA:  Yes.

People - Kane - Cross

1    THE COURT:  Excuse me.  No colloquy.  Just give

2    Mr. Biancavilla a moment to find the grand jury

3    minutes.

4         MR. CHAMBERLAIN:  Judge, I only have one date.

5    That's why I am curious.

6         MR. BIANCAVILLA:  For Mr. Kane, there was only

7    one date but there was more than one date for the

8    presentation.

9         MR. CHAMBERLAIN:  I am talking about this

10   witness.

11        THE COURT:  Let's not have colloquy.

12        MR. BIANCAVILLA:  Judge, I am going to object.

13        THE COURT:  Can somebody please provide me with a

14   copy of grand jury testimony?

15        MR. BIANCAVILLA:  Here, Judge.

16        Judge, there should have been a copy in the

17   court file from when the court originally examined

18   it.

19        THE COURT:  I don't have it, unless Judge Ort has

20   it.

21        Let's continue.  There's nothing at this point

22   to overrule.

23        MR. CHAMBERLAIN:  Thank you, Judge.

24        THE COURT:  Ask the question, Mr. Chamberlain.

25   Q    Do you remember being asked this question giving

People - Kane - Cross

1   this answer, the foreperson --

2           THE COURT:  Excuse me.  Excuse me.

3           Read back the last question.

4               (Whereupon, the court reporter read back the

5           requested question.)

6       THE COURT:  Sustained.

7   Q    Mr. Kane, were you blurry on time as to when

8   people came and when things happened in that apartment?

9   A    Yeah, on the exact time.

10  Q    Were you blurry on what time different things

11  happened in the apartment?

12          MR. BIANCAVILLA:  Objection.

13      THE COURT:  Sustained as to form.

14  Q    Do you remember what time the events that you have

15  testified to here took place in that apartment?

16          MR. BIANCAVILLA:  Objection.

17      THE COURT:  You have to be more specific,

18      Mr. Chamberlain.  It's too ambiguous, the question.

19          Sustained.

20  Q    Did you -- were you aware of where Paul Scrimo

21  was, according to your testimony, when you were at the CD

22  player?

23          MR. BIANCAVILLA:  Objection, form of the

24      question, Judge.

25          THE COURT:  I'll permit that.

People - Kane - Cross

1    A    Can you repeat that, please?

2         MR. CHAMBERLAIN:  May we have it read back?

3         THE COURT:  Were you aware -- read back the

4    question.

5              (Whereupon, the court reporter read back the

6              requested question.)

7    A    He left to go to 7-Eleven to get beers and he was

8    on his way back, I assume.  That's why I stopped the

9    sexual encounter and put the music on.

10   Q    You then went back into the kitchen after that;

11   right?

12   A    Correct.

13   Q    And then he came back; right?

14   A    No.  I went back into the kitchen, Scrimo was in

15   the kitchen.

16   Q    So you were clear on that; is that it?

17        MR. BIANCAVILLA:  Objection.

18        THE COURT:  Sustained.

19   Q    You were clear on that?

20        MR. BIANCAVILLA:  Objection.

21        THE COURT:  Sustained.

22   Q    Were you --

23        MR. CHAMBERLAIN:  Objection?

24        THE COURT:  Clear on that, sustained.

25   Q    Mr. Scrimo, you were asked questions in the grand

                        People - Kane - Cross

1    jury, page 92 --

2              MR. BIANCAVILLA:  Objection.

3              THE COURT:  Sustained.

4        Q    Mr. Kane, you say you're clear on that --

5              MR. BIANCAVILLA:  Objection.

6              THE COURT:  Sustained.

7        Q    Did you ever tell anyone that you were blurry on

8    that exact point?

9              MR. BIANCAVILLA:  Objection.

10             THE COURT:  Sustained as to form.

11             MR. CHAMBERLAIN:  Judge --

12             THE COURT:  Yes, Mr. Chamberlain?

13             MR. CHAMBERLAIN:  I would like --

14             THE COURT:  What would you like to do?

15       Q    Would your testimony before the grand jury on

16   July 6th refresh your recollection on that point?

17             MR. BIANCAVILLA:  Objection.

18             THE COURT:  You first have to ask a question and

19        make it clear, Mr. Chamberlain.  Then he has to tell

20        us he needs his recollection refreshed, if he doesn't

21        recall.

22       Q    You say that you recall and were clear on where

23   you were when he came back; right?

24             MR. BIANCAVILLA:  Objection.

25             THE COURT:  Sustained as to form.

People - Kane - Cross

1    MR. CHAMBERLAIN:  Judge, I think I am entitled to

2    cross-examine.

3    THE COURT:  You certainly are but you have to ask

4    a proper question.

5    Q    Did you ever tell the grand jury --

6    THE COURT:  Sustained.  You can't ask it that

7    way.

8    Q    Let me show you the transcript --

9    MR. BIANCAVILLA:  Objection.

10   THE COURT:  Sustained.

11   Q    Can you tell us -- do you recall where Ruth was

12   when Paul came back with the beer?

13   A    I wasn't present.  I was in the living room.

14   Q    You were in the living room and where was Ruth?

15   A    To the best of my knowledge, she was in the

16   kitchen.  I couldn't see from the living room.

17   Q    Were you asked about a time sequence when you

18   testified before the grand jury?

19   MR. BIANCAVILLA:  Objection.

20   THE COURT:  Sustained.

21   Q    Did you tell the detectives that the defendant

22   brought back Budweiser beer?

23   A    Correct.

24   Q    Not Coors Light, not Coors beer?

25   A    Not Coors beer.

People - Kane - Cross

1   Q    And there was a beer bottle, Budweiser beer bottle

2   on the table, were you aware of that?

3        MR. BIANCAVILLA:  Objection.

4        THE COURT:  You can ask the question but

5   sustained as to form.

6   Q    When you left the apartment, was there a Budweiser

7   bottle left on the table?

8   A    I don't remember.

9   Q    Well, did you tell us that you cleared up the beer

10  bottles, put them in the case?

11  A    Yes.

12  Q    Were those Budweiser bottles or Coors Light?

13  A    I don't recall.

14  Q    Mr. Kane, when you indicated that the defendant

15  went at Ruth, she was standing, according to you, between

16  the kitchen and the bedroom?

17  A    Correct.

18  Q    Did she -- did he knock her right down?

19  A    In the hall -- in the doorway opening into the

20  bedroom.

21  Q    Did she fall against the bed?

22  A    She fell down to the ground.

23  Q    Right to the ground.  Did he hit her with

24  anything?

25  A    Excuse me?

                              People - Kane - Cross

1      Q     Did he hit her with anything?

2      A     No.

3      Q     Did you tell us that -- withdrawn.

4            Was he bent over her or was he kneeling down on

5      top of her?

6      A     He was on top of her.

7            THE COURT:  Counsel, I think we need to take a

8      break for a moment.

9            Do not discuss the case amongst yourselves or

10     with anyone else.  Keep an open mind.  Do not form or

11     express any opinions until the entire case has been

12     completed.

13           Do not read or listen to any accounts of the

14     case should they be reported in the media.  Do not

15     visit or view any place or premises that have been

16     mentioned.

17           You are not to permit any party to discuss the

18     case with you or attempt to influence you, and you

19     must promptly report to the Court any violation

20     thereof.

21           Please follow the court officers

22               (Whereupon, the sworn jurors exited the

23           courtroom.)

24           THE COURT:  Mr. Kane, please do not discuss the

25     case with anybody.  You may step down.

People - Kane - Cross

1          (Whereupon, a brief recess was taken.)

2          COURT OFFICER:  Jury entering.

3          (Whereupon, the sworn jurors entered the

4          courtroom and resumed their respective seats.)

5          THE CLERK:  The jury is present.

6          THE COURT:  Bring in the witness, please.

7          (Whereupon, the witness resumed the witness

8          stand.)

9          COURT OFFICER:  You are reminded, sir, you are

10         still under oath.

11         THE COURT:  Mr. Chamberlain?

12         MR. CHAMBERLAIN:  Thank you, Judge.

13    CONTINUED CROSS

14    BY MR. CHAMBERLAIN:

15         Q    I want to direct your attention, Mr. Kane, back to

16    the statement about a Budweiser beer bottle.  You said you

17    told the detectives -- when you left the apartment that

18    night, were you aware of any bottle being left on the

19    table?

20         A    No.

21         Q    During your questioning of the detective -- by the

22    detective, was there a mention to you that there had been

23    a Budweiser beer bottle found there?

24         A    No.

25         Q    You don't recall that?

People - Kane - Cross

1    A    I don't recall.

2    Q    The statement that you signed for them was that

3    Paul had brought back Budweiser?

4           MR. BIANCAVILLA:  Objection.

5           THE COURT:  Sustained.

6    Q    Is that what you told them, he brought back

7    Budweiser beer, bottles; correct?

8    A    Yes.

9    Q    Mr. Scrimo, we were at a point where you said that

10    the defendant was down over the victim strangling her; is

11    that correct?

12    A    Excuse me?

13           MR. BIANCAVILLA:  Objection to the form of the

14    question, Judge.

15           THE COURT:  Sustained.

16           MR. CHAMBERLAIN:  I'll withdraw it.

17           THE COURT:  Rephrase, Mr. Chamberlain.

18    Q    Going back to just before the break, you had

19    indicated the defendant was kneeling over the victim, do

20    you recall that?

21    A    No.  I said he was on her.

22    Q    He was on her?

23    A    Yeah, on top of her.

24    Q    Kneeling on top of her?

25    A    I didn't say that.  I said he was on top of her.

People - Kane - Cross

1    Q    Was he kneeling on top of her?

2    A    His knees were on the ground and she was between

3    his legs and he was on top of her strangling her.

4    Q    And he was strangling her?

5    A    Correct.

6    Q    And you were clearly aware he was strangling her

7    at that time?

8    A    At which time?

9    Q    When he was on top of her?

10   A    When I went over to pull him off, that's when I

11   realized he was strangling her.

12   Q    Did you realize -- did you try to pull him off

13   before you realized it or after you realized it?

14        MR. BIANCAVILLA:  Objection.

15        THE COURT:  I'll permit it.

16   A    I ran over, grabbed him by the shoulder and

17   realized he was strangling her.

18   Q    You grabbed him by the shoulder and then you

19   realized he was strangling her; is that your testimony?

20   A    Correct.

21   Q    What did you do when you realized he was

22   strangling her?

23   A    That's when I said, What the fuck, man?  What the

24   fuck?  What are you doing.

25   Q    I didn't ask what you said.  I asked what you did,

People - Kane - Cross

1    sir?

2              MR. BIANCAVILLA:  Objection.

3              THE COURT:  No argument.

4    Q    What did you do when you realized he was

5    strangling her?

6    A    I spoke --

7    Q    What?

8    A    I spoke.

9    Q    You spoke.  Other than speaking, what did you do?

10             MR. BIANCAVILLA:  Judge, I am going to ask that

11   the defendant be directed not to make comments while

12   the witness is testifying.

13             THE COURT:  Yes, I don't want any noise,

14   Mr. Scrimo.

15             THE DEFENDANT:  It's my throat, your Honor.

16             MR. CHAMBERLAIN:  I apologize, your Honor.

17   Q    What did you do, Mr. Kane?  Physically, what did

18   you do?

19   A    I got -- after I tried pulling him off --

20   Q    You tried pulling him off before?

21   A    Right.

22   Q    You realized he was strangling her.  When you

23   realized he was strangling her, what did you do?

24   A    I stood up and started backing away.

25   Q    You backed away.  And then you say, when you

People - Kane - Cross

1   backed away, he got up -- during the time -- after you

2   backed away, did you do anything else with respect to what

3   was going on?

4       A    Physically?

5       Q    Did you do anything else?

6       A    No.

7       Q    Did you try to make a phone call?

8       A    No.

9       Q    To your knowledge, the phone in the apartment was

10  still working, was it not?

11          MR. BIANCAVILLA:  Objection.

12          MR. CHAMBERLAIN:  Withdrawn.

13      Q    Did you have a phone with you, by any chance?

14          MR. BIANCAVILLA:  Objection.

15          THE COURT:  I'll permit that.

16      A    No.

17      Q    How long did this strangling go on after you

18  backed away?

19      A    It's hard to say, minute or two.

20      Q    You are kind of blurry on time?

21          MR. BIANCAVILLA:  Objection to the

22          characterization, Judge.

23          THE COURT:  Yes.  Sustained.

24      Q    Did you tell the grand jury that you were blurry

25  on time?

People - Kane - Cross

1        MR. BIANCAVILLA:  Objection.

2        THE COURT:  Sustained.  That's not proper.

3   Q    Are you blurry on times with respect to what

4   happened in that apartment?

5        MR. BIANCAVILLA:  Objection.

6        THE COURT:  The word blurry, Mr. Chamberlain?

7        MR. CHAMBERLAIN:  It's the word he used, Judge.

8        MR. BIANCAVILLA:  Objection.

9        THE COURT:  Sustained.

10  Q    Well, are you uncertain as to -- were you

11  uncertainty as to times as to what things had happened in

12  that apartment?

13  A    As far as what?

14  Q    As far as how long anything took place, as far as

15  what was going on?

16  A    It's hard to gauge when you're in that situation.

17  Q    I didn't ask you that?

18       MR. BIANCAVILLA:  Objection.

19       THE COURT:  Sustained.

20       Don't argue with the witness.  Just ask him a

21       question, Mr. Chamberlain.

22  Q    Now, you backed up.  You can't tell us exactly how

23  long this strangling took place --

24       MR. BIANCAVILLA:  Objection.  He's testifying.

25       MR. CHAMBERLAIN:  No, I am not.

People - Kane - Cross

1      THE COURT:  Sustained.

2      MR. CHAMBERLAIN:  Withdrawn.

3    Q    After -- well, whatever length of time it went on,

4  what did you do?  Did you do anything?

5    A    I -- while he was strangling her, no.  I backed up

6  into the kitchen and screamed to him --

7    Q    That was --

8      THE COURT:  Mr. Chamberlain, he wasn't finished

9    with his response.

10    A    And I screamed at him, What the fuck are you

11  doing?  What are you doing.

12    Q    You screamed at him.  That was -- she was

13  partially -- she was right in the doorway between the

14  kitchen and the bedroom, was she not?

15    A    Correct.

16    Q    That apartment is bathroom, kitchen, bedroom,

17  living room; right?

18    A    Correct.

19    Q    In that order.  And when you -- other than what

20  you said, did you do anything is the question?

21      MR. BIANCAVILLA:  Objection.

22      THE COURT:  Sustained as to form.

23    Q    During the period of time that he was strangling

24  her, did you do anything, sir?

25      MR. BIANCAVILLA:  Objection.

People - Kane - Cross

1      MR. CHAMBERLAIN:  What is the basis of that

2    objection.

3          THE COURT:  Excuse me.  Excuse me.

4          MR. CHAMBERLAIN:  I'm's sorry, Judge.

5          THE COURT:  Overruled.

6    A    Can you repeat the question.

7          THE COURT:  Read back the question for the

8    witness.

9               (Whereupon, the court reporter read back the

10              requested question.)

11   A    No.  I backed up into the kitchen and screamed at

12   him.

13   Q    At some point in time after he was strangling her,

14   he got up and he went someplace; is that your testimony?

15   A    Correct.

16   Q    You didn't go anywhere; is that right?  You just

17   stayed there while he was getting up and going someplace?

18   A    He got up and darted out of my sight.

19   Q    You didn't go anywhere?

20   A    No.

21   Q    You didn't do anything?

22   A    No.

23   Q    He went out of your sight, what did you do when he

24   went out of your sight, sir?

25   A    I looked at Ruth.

People - Kane - Cross

1    Q    You looked at Ruth?

2    A    Ruth was on the floor.

3    Q    Did you try to leave the apartment?

4    A    No.  I was in shock.

5    Q    Just answer the question as to what you did.  If I

6    ask you a question --

7         MR. BIANCAVILLA:  Objection.

8         THE COURT:  Mr. Chamberlain, if you want the

9    witness instructed, speak to me.

10        MR. CHAMBERLAIN:  I'm sorry, Judge.  Please

11   instruct the witness.

12        THE COURT:  Is there an objection,

13   Mr. Chamberlain.

14        MR. CHAMBERLAIN:  I am asking for instructions to

15   the witness merely to answer the question as to what

16   he did, not any operation of his mind.

17        THE COURT:  Yes.  Okay.

18        Mr. Kane, just tell us what you observed and

19   what you did.

20        THE WITNESS:  Yes.

21   Q    I take it the answer is you didn't do anything

22   when Mr. Scrimo went out of sight?

23   A    Correct.

24   Q    You didn't leave the apartment?

25   A    No.

People - Kane - Cross

1    Q    You didn't try to get help?

2    A    No.

3    Q    Did you check to see what was going on?  Did you

4    bend down to see what was going on with her?

5         MR. BIANCAVILLA:  Objection.

6         THE COURT:  Sustained.

7         MR. CHAMBERLAIN:  Withdrawn.

8    Q    How long was Mr. Scrimo out of your sight?

9    A    Seconds.

10   Q    You didn't see what he did?

11   A    No.

12   Q    But he came back with a cord, according to you?

13   A    Correct.

14   Q    One end in each hand; is that right?

15   A    Correct.

16   Q    And he then pulled it, I think you demonstrated

17   for the jury here, he stepped behind Ruth?

18   A    He --

19   Q    Behind her?

20   A    He strung it around her neck like this

21   (demonstrating).

22   Q    Put it around and pulled up?

23   A    And pulled it up like this (demonstrating).

24        MR. BIANCAVILLA:  I don't believe the jury can

25   see.

People - Kane - Cross

1        THE COURT:  Stand up.

2        MR. CHAMBERLAIN:  I'll take my exception to this.

3        THE COURT:  Mr. Chamberlain, if you have an

4    objection, there's a word, it's called objection.

5        Have a seat, Mr. Kane.

6        You can do it on redirect.

7        MR. CHAMBERLAIN:  Thank you, Judge.

8    Q    He pulled up in the manner which you previously

9    showed the jury when you were on direct; is that correct?

10       MR. BIANCAVILLA:  Objection.

11       THE COURT:  Overruled.

12   A    Could you repeat the question, please?

13       THE COURT:  Rephrase the question.

14       MR. CHAMBERLAIN:  I will withdraw the question,

15   Judge.

16   Q    After this act of strangulation, what, if

17   anything, did you do?  What did you do?

18   A    I listened to what Paul screamed at me.

19   Q    You what?

20   A    Paul Scrimo at me.

21   Q    I didn't ask you that, sir.

22       THE COURT:  Excuse me.

23       MR. BIANCAVILLA:  Objection.

24       THE COURT:  Excuse me.  He responded to your

25   question, Mr. Chamberlain, if you didn't hear it.

1601

People - Kane - Cross

1    MR. BIANCAVILLA:  I heard Paul screamed at me,

2    Judge, but that's not what I asked?

3    A    I listened to Paul.

4    Q    I asked what he did.

5    THE COURT:  You didn't hear the first part of his

6    response, Mr. Chamberlain.

7    Could you please read it back to Mr. Chamberlain

8         (Whereupon, the court reporter read back the

9         requested testimony.)

10    MR. CHAMBERLAIN:  I respectfully submit that's

11    not responsive to what he did, Judge.

12    THE COURT:  Overruled.

13    Q    Would you tell this jury, physically, what you

14    did, sir, at that point?

15    A    After Paul screamed at me?

16    Q    All right.  After Paul screamed at you.

17    A    I went through the bedroom into the living room to

18    shut off the music.

19    Q    You went through the bedroom into the living room.

20    What was the purpose of going to the living room?

21    MR. BIANCAVILLA:  Objection.

22    THE COURT:  Read that last question back.

23         (Whereupon, the court reporter read back the

24         requested testimony.)

25    THE COURT:  I'll permit that.

People - Kane - Cross

1    A    To shut off the music.

2    Q    Did you do anything besides shut off the music,

3    sir --

4    A    No.

5    Q    -- in the living room.

6         Did you wipe down the stereo for fingerprints?

7    A    No, I did not.

8    Q    Did anybody wipe down the stereo that night?  You

9    had touched it.  Did anyone wipe it down?

10   A    Not to my knowledge.

11   Q    Did anybody wipe down any prints in the living

12   room at all?

13   A    Not to my knowledge.

14   Q    Not to your knowledge.  You were there, weren't

15   you?

16   A    Yes.

17   Q    So the answer is, may have been, but you just

18   didn't know about it?

19        MR. BIANCAVILLA:  Objection.

20        THE COURT:  Sustained.

21   Q    Did anybody wipe down any doorways or sills

22   between the living room, the bedroom, the bedroom, the

23   kitchen, the kitchen, the bathroom, in the bathroom?

24        MR. BIANCAVILLA:  There's six questions there.

25        MR. CHAMBERLAIN:  Six places, one question.

People - Kane - Cross

1    Q    Did anybody wipe down those places?

2         THE COURT:  You're asking a compound question

3    that can have different answers.

4         Sustained.

5    Q    Would you tell this jury what was wiped down at

6    this point, if anything?

7    A    Paul was doing the wiping.  I don't know.

8    Q    Didn't you testify as to wipe --

9    A    I seen --

10        MR. BIANCAVILLA:  Objection.

11        THE COURT:  Sustained.

12   Q    Let me backtrack a little bit.  When you got,

13   right after the request to get the beers, did you testify

14   here that you reluctantly stepped over the victim; is that

15   your testimony?

16        MR. BIANCAVILLA:  Objection.

17        MR. CHAMBERLAIN:  Direct testimony yesterday.

18        MR. BIANCAVILLA:  Judge, it's completely out of

19   context.

20        MR. CHAMBERLAIN:  No, it's not.  I don't

21   understand that.

22        THE COURT:  I'll permit it.

23        Go ahead.

24   A    Can you repeat the question, please?

25   Q    Did you testify that you reluctantly stepped over

People - Kane - Cross

1    the victim to go in and turn off the stereo?

2        A    Correct.

3        Q    And then you proceeded to collect a bunch of beer

4    bottles?

5        A    No.  I went into the living room.

6        Q    And after you turned off the stereo, you then

7    proceeded to collect a bunch of beer bottles?

8        A    After Paul instructed me to, yes.

9        Q    After Paul instructed you to?

10       A    Screamed at me.

11       Q    Everything was Paul's way here?

12            MR. BIANCAVILLA:  Objection.

13            THE COURT:  Sustained.

14       Q    Paul did everything?

15            MR. BIANCAVILLA:  Objection.

16            THE COURT:  Sustained.  Ambiguous.

17       Q    Do you recall -- you say Paul told you that you

18   were in this together; is that correct?

19       A    Correct, yes.

20       Q    As you were leaving, did you believe that you were

21   in this together?

22            MR. BIANCAVILLA:  Objection.

23            THE COURT:  Sustained.

24       Q    Did you agree with that statement?

25            MR. BIANCAVILLA:  Objection.

People - Kane - Cross

1       THE COURT:  Sustained.

2   Q   To your knowledge were you in it together?

3       MR. BIANCAVILLA:  Objection.

4       THE COURT:  Sustained.

5   Q   Had you done anything other than what you have

6   told this jury here that evening, sir?

7   A   No.

8   Q   The cord around the victim's next, did you see

9   anybody wipe that off?

10  A   No.

11  Q   Did you see anybody pick up any hairs, fibers in

12  that location?

13  A   No.

14  Q   Did you see anybody pick up any cigarette butts in

15  that location?

16  A   No.

17  Q   Did you see anybody do anything other than the

18  wiping down of a table and the door knob and the picking

19  up of beer bottles, anything other than those items?

20  A   The chairs.

21  Q   What?

22  A   The chairs.

23  Q   Chairs.  Mr. Kane, when the victim was knocked

24  down, she wasn't put on the bed first and then put on the

25  floor, was she or was she --

People - Kane - Cross

1    A    No.

2    Q    She didn't touch the bed at all?

3    A    He knocked her down through the doorway.  She --

4    she hit the ground and I guess maybe her back hit the bed,

5    you know, the -- her back went up against the bed.

6    Q    Did anybody hit the side of her head?

7    A    No.

8    Q    Were there any blows to the side in different

9    places to the side of her head deep enough to make impacts

10   deep into the tissue?

11        MR. BIANCAVILLA:  Objection.

12        THE COURT:  Sustained.

13   Q    To make internal lacerations?

14        MR. BIANCAVILLA:  Objection.

15        THE COURT:  Sustained.

16   Q    Now, when she was knocked down, was she

17   struggling?

18   A    No, it didn't appear that way.

19   Q    Didn't appear that way.

20        Did you ever tell anybody that she was fighting

21   back.

22        MR. BIANCAVILLA:  Objection.

23        THE COURT:  Overruled.

24   A    No.

25   Q    Going back to your interview, the first time that

People - Kane - Cross

1   there was an interviewer on May 2nd, two homicide

2   detectives --

3        MR. BIANCAVILLA:  Objection to the

4     characterization and preamble.

5        MR. CHAMBERLAIN:  I'll withdraw and rephrase.

6        THE COURT:  Sustained.

7   Q    May 2nd, you're being interviewed by two homicide

8   detectives; right?

9   A    Correct.

10  Q    Do you remember that -- do you recall telling the

11  detective he was choking her and she was trying to fight

12  back?

13  A    No.  I recall saying at first I thought they were

14  fighting.

15  Q    Let me show you page eight of Defendant's Y?

16       MR. BIANCAVILLA:  Same objection as before,

17    Judge.

18       THE COURT:  Overruled.

19  Q    The portion on the page that's underlined,

20  Mr. Kane --

21       THE COURT:  What was the question?

22       MR. CHAMBERLAIN:  Will you read the question

23    back.

24       THE COURT:  There's no question, Mr. Chamberlain.

25            (Whereupon, the court reporter read back the

People - Kane - Cross

1           requested testimony.)

2           THE COURT:  Sustained.

3           MR. CHAMBERLAIN:  Judge, can I show the Court --

4           THE COURT:  Mr. Chamberlain, he didn't indicate

5       that he didn't recall.  He didn't indicate he needs

6       his recollection refreshed.  He gave a response.

7           MR. CHAMBERLAIN:  I am entitled to show

8       inconsistency.

9           MR. BIANCAVILLA:  Objection.

10          THE COURT:  That's different, Mr. Chamberlain,

11      but not to refresh his recollection.

12          Sustained.

13      Q    You testified at a preliminary examination on

14      May 25th, 2000, Mr. Kane --

15          MR. BIANCAVILLA:  Objection.

16          THE COURT:  I'll permit that.

17      A    On May -- May 25th?

18      Q    2000?

19      A    What -- what was the question.

20      Q    Do you remember testifying under oath in court

21      with respect to this incident?

22      A    Yeah.  Yes.

23      Q    Page seven --

24          THE COURT:  Line number?

25      Q    Line seven, do you recall being asked these

People - Kane - Cross

1    questions and giving these answers:

2            "QUESTION:  What happened when he ran after Ruth?

3            "ANSWER:  Well, he grabbed her with both hands,

4    threw her down from the kitchen like to the doorway

5    into the bedroom and he was hovering over her

6    checking her.

7            "QUESTION:  What did you do, if anything?

8            "ANSWER: I ran over to where that was happening.

9    They were just getting into a fight.  Then I grabbed

10   Paul by the shoulder and pulled him and he didn't

11   move and that's when I noticed he was choking Ruth

12   and her eyes were like rolling in the back of her

13   head and her mouth was open."

14           Do you recall those questions and answers?

15   A    Yes.

16   Q    Does that refresh your recollection as to whether

17   Ruth was fighting back?

18           MR. BIANCAVILLA:  Objection.

19           THE COURT:  Sustained.

20   Q    As you sit here today, Mr. Kane, is it your

21   testimony that Ruth didn't fight back?

22           MR. BIANCAVILLA:  Objection.

23           THE COURT:  He can answer the question but not

24   that way.

25           Form, sustained.

People - Kane - Cross

1    Q    As she was being choked, did Ruth fight back?

2    A    I said I thought they were getting into a fight.

3    Q    Are you talking about what you said at the time

4    you --

5    A    I believe that's what I said.

6    Q    They were just getting into a fight.

7         Does that mean you thought she was --

8         MR. BIANCAVILLA:  Objection.

9         THE COURT:  Sustained.

10   Q    Mr. Kane, you had a conversation, a number of

11   conversations with, I think it was the assistant district

12   attorney, William Dempsey.  Do you recall them?

13   A    Yes.

14   Q    And on various dates in May, July 2nd and before

15   you testified on July 6th, 2000, do you recall those

16   conversations generally?

17   A    Generally.

18   Q    Do you recall the conversation before testifying

19   about there being a problem with your testimony and

20   Francine Quinn's testimony not matching?

21        MR. BIANCAVILLA:  Objection.

22        THE COURT:  Sustained.

23        That's not the way to ask.

24   Q    Was there any discussion concerning what you say

25   you saw --

People - Kane - Cross

1      MR. BIANCAVILLA:  Objection.  Classic hearsay.

2      THE COURT:  Sustained.

3      MR. CHAMBERLAIN:  It's a question as to what the

4  witness said.

5      THE COURT:  What he said is different from what

6  Mr. Dempsey said.

7  Q    Do you recall what you said with respect to Ruth's

8  location on the night in question and whether she was

9  outside the back door at any time of her apartment with

10  the defendant?

11     MR. BIANCAVILLA:  Objection.

12     THE COURT:  Multiple questions.

13  Q    Do you recall anything that you said about where

14  Ruth was and whether she may have been outside the back

15  door of her apartment?

16     MR. BIANCAVILLA:  Objection.

17     THE COURT:  You have to set the foundation,

18  Mr. Chamberlain.

19  Q    Was there any discussion that you took part in

20  concerning Ruth's location in those conversations with

21  Mr. Dempsey?

22     MR. BIANCAVILLA:  Objection.

23     THE COURT:  Sustained.

24  Q    When you went to testify before the grand jury,

25  you had already been advised by an attorney; is that

People - Kane - Cross

1    correct?  You had already consulted an attorney?

2         A    Correct.

3         Q    You don't recall that attorney's name?

4         A    No, I do not.

5         Q    In your conversation with -- withdrawn.

6              Did you waive immunity when you testified before

7    you testified.

8              MR. BIANCAVILLA:  Objection, Judge.  We went

9         through this yesterday with this witness on more than

10        one occasion.

11             THE COURT:  This is the last time,

12        Mr. Chamberlain.  You have gone through it a couple of

13        times already.

14             MR. CHAMBERLAIN:  I went through it yesterday,

15        Judge?

16             THE COURT:  I'll permit it today but this is the

17        last time.

18        Q    Did you get immunity, do you know?

19        A    Immunity.  I didn't do anything so what do you

20   mean by immunity.

21             MR. CHAMBERLAIN:  May I have the answer stricken

22        as not responsive?

23             MR. BIANCAVILLA:  Judge --

24             THE COURT:  He told you he didn't understand.

25             MR. BIANCAVILLA:  Judge, I am going to ask to

People - Kane - Cross

1    approach if he continues this line of questioning.

2         THE COURT:  I'll let you ask the question but I

3    will rule on the objections, Mr. Chamberlain.

4         MR. CHAMBERLAIN:  Fine, Judge.

5    Q    Did you sign a waiver of immunity?  Did you waive

6    immunity when you testified agreeing to be prosecuted for

7    anything that might have happened?

8         MR. BIANCAVILLA:  Objection.

9         THE COURT:  Sustained.

10   Q    Did you waive immunity?

11        MR. BIANCAVILLA:  Objection.

12        THE COURT:  The first question you asked was

13   proper.

14   Q    Did you waive immunity?

15        THE COURT:  Did he sign something?

16   Q    Did you sign a waiver of immunity?

17        THE COURT:  If he knows.

18   A    I'm not sure.

19        MR. CHAMBERLAIN:  I didn't hear the answer.

20        THE COURT:  Not sure, was his response.

21   Q    You're not sure whether you signed anything.

22        What was your understanding with respect to

23   whether or not you could be prosecuted if you responded --

24   you were -- withdrawn.

25        You were put before the grand jury by the district

People - Kane - Cross

1    attorney; is that correct?

2        A    Right.

3        Q    You were responding to questions that he asked; is

4    that correct?

5        A    Correct.

6        Q    Was it your understanding that you would get

7    immunity for your answers to those questions?

8             MR. BIANCAVILLA:  Objection.

9             THE COURT:  Sustained.

10       Q    What was your understanding with respect to that

11   testimony as to whether or not you would get immunity?

12            MR. BIANCAVILLA:  Objection.

13            THE COURT:  Sustained as to his understanding.

14            MR. CHAMBERLAIN:  The problem here is what he

15       says he doesn't understand --

16            MR. BIANCAVILLA:  Judge, the --

17            THE COURT:  I don't want colloquy.  Ask

18       questions.

19       Q    Did Mr. Dempsey, in your conversations with the

20   district attorney, did he advise you that you would not be

21   prosecuted for what you testified to, yes or no?

22            MR. BIANCAVILLA:  Objection.

23            THE COURT:  Sustained.  Hearsay.

24       Q    Mr. Kane, shortly after -- withdrawn.

25            After this incident, did you move out of the

People - Kane - Cross

1    Farmingdale area?

2        A    Correct.

3        Q    Would you tell us approximately how long after?

4        A    Excuse me?

5        Q    When did you move out of the area?

6        A    After I had spoken to the police.

7        Q    After you had spoken to the police.  And did

8    you -- have you been back to the area ever since?

9             MR. BIANCAVILLA:  Objection.  Relevancy.

10            THE COURT:  Where is the relevancy?

11            Sustained.

12       Q    Have you had anything -- Fran Quinn, the

13   bartender -- the waitress at the Downtown was a friend of

14   yours, was she not?

15       A    I don't even remember a Fran Quinn.

16       Q    You don't remember her?

17       A    No.

18       Q    She testified that she knew you for two years

19   prior to that incident.  Would that refresh your

20   recollection?

21       A    I don't remember a Fran Quinn.

22       Q    Do you remember a Franny?

23       A    No.

24       Q    You don't remember your lawyer, you don't remember

25   Fran Quinn --

People - Kane - Cross

1    MR. BIANCAVILLA:  Objection, Judge.

2    THE COURT:  Sustained.

3    Q    You remember -- you remember what you say happened

4    in this apartment but you don't remember anyone, that's

5    about it?

6    A    Yes, I remember what happened.

7    Q    Do you remember Ruthy?

8    MR. BIANCAVILLA:  Objection.

9    THE COURT:  Overruled.

10   A    Yes.

11   Q    You knew Ruthy for how long prior to this?

12   MR. BIANCAVILLA:  Judge, I object.  We have been

13   through this all already.

14   THE COURT:  I understand.  This is

15   cross-examination and this is the last time,

16   Mr. Chamberlain.  You did cover that area before.  Go

17   ahead.

18   Q    You knew Ruthy for how long prior to her murder?

19   A    Two years.

20   Q    Were you a friend of Ruth?

21   A    Yes.

22   Q    Yes?

23   A    Yes.

24   Q    A boyfriend?

25   A    No.

People - Kane - Cross

1    Q      Were you a companion?

2           MR. BIANCAVILLA:  Objection.

3           THE COURT:  Well, sustained as to the word

4    companion.

5    Q      Did you ever take her out to dinner?

6    A      No.

7    Q      Did you ever take her to a movie?

8    A      No.

9    Q      Did you ever take her out for a walk?

10   A      No.

11   Q      Did you ever take her out for a drink?

12   A      I didn't take her anywhere.

13   Q      Did you ever show her any affection by any

14   actions?

15          MR. BIANCAVILLA:  Objection.

16          MR. CHAMBERLAIN:  I'll withdraw the question.

17   Q      Did you ever spend time with her at her apartment

18   that was not involved in any sexual engage -- sexual act?

19   A      Yes.

20   Q      You went up to her apartment on various occasions,

21   not for sex?

22   A      Yes.

23   Q      What did you do on those occasions?

24   A      Well, it wasn't -- you know -- can you repeat that

25   question?

1618

People - Kane - Cross

1    THE COURT:   Read it back to the witness.

2              (Whereupon, the court reporter read back the

3         requested question.)

4    A    It's not like we just went up there and had sex.

5    Q    Just sex?

6    A    No.   I said it's not like we just went up there

7    and had sex.

8    Q    But on each occasion you had sex; isn't that

9    correct?

10   A    We had, yes, oral.

11   Q    We had?

12   A    Oral sex.

13   Q    When you say we had oral sex, did you -- that was

14   all one way?

15             MR. BIANCAVILLA:   Objection.

16             THE COURT:   Sustained.

17   Q    Did you provide any -- what did you supply to Miss

18   Williams on these occasions when you had oral sex?

19             MR. BIANCAVILLA:   Objection.

20             THE COURT:   Sustained.

21   Q    Did you undress her on any of these occasions?

22             MR. BIANCAVILLA:   Objection.

23             THE COURT:   I'll permit it.

24   A    Can you repeat that, please?

25   Q    Did you undress her on any of these occasions?

People - Kane - Cross

1    A    She might have taken her shirt off.

2    Q    She might have taken her shirt off?

3         MR. BIANCAVILLA:   Objection.

4         THE COURT:   Sustained.

5    Q    Other than taking her shirt off -- withdrawn.

6         You never had sexual intercourse with her; right?

7    A    No.

8    Q    What was -- were you supplying anything else to

9    Ruth during this period of time?

10        MR. BIANCAVILLA:   Objection.

11        THE COURT:   Sustained as to form,

12   Mr. Chamberlain.

13   Q    When you went up to her apartment.   How many

14   occasions was it over the two years?

15        MR. BIANCAVILLA:   Again, I object.   This is all

16   repetitive from yesterday and this morning, Judge.

17        THE COURT:   Overruled.

18   Q    How many times?

19   A    Excuse me?

20   Q    How many times?

21   A    How many times what?

22   Q    How many times did you go up to her apartment to

23   have sex?

24   A    I told you I wouldn't just go up there to have

25   sex.

People - Kane - Cross

1    Q    You had sex every time you went up there; is that

2    correct?

3    A    Correct.

4    Q    And how many times was that?

5    A    Four or five times.

6    Q    What?

7    A    Four or five times.

8    Q    Did you supply her with anything other than

9    letting her give you a blow job on those occasions?

10         MR. BIANCAVILLA:  Objection.

11         THE COURT:  Sustained.

12         MR. CHAMBERLAIN:  One minute, please.

13         Nothing further.

14         THE COURT:  Mr. Biancavilla?

15         MR. BIANCAVILLA:  Briefly, Judge.

16         May we just put People's 31 on the easel,

17    please?

18         THE COURT:  Sure.

19         MR. BIANCAVILLA:  Judge, I would ask to be

20    permitted to ask Mr. Kane to step down.

21         THE COURT:  Step down to the easel, Mr. Kane.

22    REDIRECT EXAMINATION

23    BY MR. BIANCAVILLA:

24    Q    Mr. Kane, I am going to ask you to take a red

25    arrow and just place it in the photograph, People's 18,

                      People - Kane - Redirect

1    where Mr. Scrimo was seated, People's 18?  Do you see

2    where that is?

3         A    Yes (witness complying).

4         Q    Please place a blue arrow in the seat where you

5    were seated when you and Miss Williams engaged in oral

6    sex?

7         A    (Witness complying.)

8         Q    Now, would you place a red arrow where you

9    observed Mr. Scrimo throw Ruth Williams to the ground?

10        A    (Witness complying.)

11        Q    No.  No.  I'm sorry.  On the floor plan above that

12   photo.

13        A    Here?

14        Q    On the floor plan, put an arrow pointing point to

15   the doorway?

16        A    (Witness complying.)

17        Q    Now, my question is, when you got up and pulled

18   your pants back up, it was your testimony you went to the

19   living room to put on the stereo; correct?

20        A    Right.

21        Q    Could you just draw with this blue marker the

22   route you took through the apartment?

23        A    (Witness complying.)

24        Q    Just put a blue arrow pointing towards where the

25   stereo was located?

People - Kane - Redirect

1    A    (Witness complying.)

2    Q    Now, did you take that same basic route back into

3    the kitchen after you finished putting the stereo on?

4    A    Correct.

5    Q    Was it at that point when Mr. Scrimo had come back

6    from 7-Eleven?

7        MR. CHAMBERLAIN:  Objection to these yes or no

8        questions, Judge, was it at that point that he did

9        such and such.

10       THE COURT:  He's allowed to ask yes or no

11       questions.

12       MR. CHAMBERLAIN:  He's suggesting the answer.

13       THE COURT:  That is called leading perhaps?

14       MR. CHAMBERLAIN:  That's what I am saying.

15       THE COURT:  Sustained.

16   Q    Mr. Kane, after you put the CD in the stereo, what

17   happened?  What did you do?

18   A    I went back into the kitchen where Ruthy and

19   Scrimo were talking.

20   Q    Would you take a red marker and draw for the jury

21   where Mr. Scrimo was when Ruthy said to him let him go,

22   let him go home to his fat ugly wife?

23   A    Right here.

24   Q    Put an X there and just draw the route as to where

25   the direction went up to the point where he grabbed Ruthy?

People - Kane - Redirect

1    A    (Witness complying.)

2    Q    Just put an X there?

3    A    (Witness complying.)

4    Q    Now, draw an X where he pushed you out of the way

5    to get Ruthy.  Use the blue marker for that?

6    A    (Witness complying.)

7    Q    Now, would you just, while you are standing in

8    front of the jury, just demonstrate for the jury the

9    manner in which you saw Mr. Scrimo wrapping that cord

10   around Ruth's neck?

11        MR. CHAMBERLAIN:  I would object.  He testified

12    to this on direct.

13        THE COURT:  And you brought it up on cross,

14    Mr. Chamberlain.  The assistant district attorney has

15    a right to bring it up on redirect.

16        MR. CHAMBERLAIN:  I basically brought up that it

17    happened the way he testified on direct.

18        THE COURT:  Mr. Chamberlain, overruled.

19        MR. CHAMBERLAIN:  Fine.

20   Q    Please demonstrate for the jury the manner in

21   which Mr. Scrimo wrapped the cord around Miss William's

22   neck?

23   A    He had the cord like this and he put it around

24   her, like wrapped it around like this and yanked up on it

25   (demonstrating).

People - Kane - Recross

1    MR. BIANCAVILLA:  Let the record indicate he made

2    two circular motions and then pulled up with both

3    hands.

4    MR. CHAMBERLAIN:  The record should indicate he

5    didn't do that before, Judge.

6    THE COURT:  Excuse me.  The record shall so

7    indicate that.

8    MR. BIANCAVILLA:  I have no further questions for

9    Mr. Kane.

10   THE COURT:  You can sit down.

11   Recross, Mr. Chamberlain?

12   MR. CHAMBERLAIN:  Yes, Judge, I have a few.

13   RECROSS EXAMINATION.

14   BY MR. CHAMBERLAIN:

15   Q    Mr. Kane, you just testified in response to the

16   district attorney that Scrimo was inside the apartment

17   door when he turned and pushed you aside and went to --

18   directly at Ruth; is that correct?

19   A    Can you say that again, please?

20   MR. CHAMBERLAIN:  Judge, may I have him come

21   down?

22   THE COURT:  Please go down to the easel.

23   Q    The place where -- when Scrimo turned and went

24   directly at Ruth was the blue X; is that correct?

25   A    No.  Here (indicating).

People - Kane - Recross

1    Q    That's inside the apartment door?

2    A    Yes, in the hallway going to the exit.  It's this

3    hallway right here between the bathroom, right here, not

4    on the outside.  It's still in the apartment.

5    Q    You testified before they were down a hallway?

6    A    Right.

7    Q    Is that a hallway there?

8    A    This hallway right here (indicating).

9    Q    Do you recall prior testimony where you said he

10   went down a hallway, that would be the hallway outside;

11   right?

12        MR. BIANCAVILLA:  Objection.

13        THE COURT:  Sustained.

14   Q    Yesterday you indicated how the victim was -- how

15   he stood behind the victim and pulled up with a cord like

16   this?

17   A    I went like this yesterday too (indicating).

18   Q    You went like that yesterday?

19   A    Yes.  He wrapped it around her neck.

20        MR. CHAMBERLAIN:  Nothing further, Judge.

21        THE COURT:  Anything further, Mr. Biancavilla?

22        MR. BIANCAVILLA:  No, Judge.

23        THE COURT:  Mr. Kane, you may step out.

24            (Whereupon, the witness was excused from the

25        witness stand.)

Proceedings

1          THE COURT:  People, do you have any other

2     witnesses?

3          MR. BIANCAVILLA:  The People have no further

4     witnesses, your Honor.  The people rest.

5          THE COURT:  Ladies and gentlemen, at this point

6     we are going to excuse you for lunch and ask you to be

7     back here at two o'clock.

8          Do not discuss the case amongst yourselves or

9     with anyone else.  Keep an open mind.  Do not form or

10    express any opinions until the entire case has been

11    completed.

12         Do not read or listen to any accounts of the

13    case should they be reported in the media.  Do not

14    visit or view any place or premises that have been

15    mentioned.

16         You are not to permit any party to discuss the

17    case with you or attempt to influence you, and you

18    must promptly report to the Court any violation

19    thereof.

20         Have a nice lunch and we'll see you at two

21    o'clock

22              (Whereupon, the sworn jurors exited the

23         courtroom.)

24         THE COURT:  Are there any motions.

25         MR. CHAMBERLAIN:  I will reserve motions until

Proceedings

1    the end of the case, Judge.

2        THE COURT:  Excuse me?

3        MR. CHAMBERLAIN:  I move for a dismissal based

4    upon a failure to make out a prima facie case.

5        THE COURT:  People?

6        MR. BIANCAVILLA:  Rely on the record.

7        THE COURT:  Application denied.

8        Counsel, we will begin at two o'clock.

9        MR. BIANCAVILLA:  Judge, I would like the names

10   of witnesses and I would like an offer of proof at

11   this time regarding the relevancy of their testimony

12   and admissibility.

13       THE COURT:  Mr. Chamberlain, may we have an offer

14   of proof?

15       MR. CHAMBERLAIN:  We did that yesterday.

16       MR. BIANCAVILLA:  I would like to go through each

17   specific witness, Judge.

18       THE COURT:  The People are entitled to an offer

19   of proof at this point.  You know that.

20       MR. CHAMBERLAIN:  I made one yesterday, Judge,

21   with respect to the witnesses I knew.  I have to find

22   out who has shown up and consult with my client.  I am

23   not even sure what I am going to put on at this point.

24       MR. BIANCAVILLA:  He has them here in the

25   hallway.  I want and offer of proof as to each one.

Proceedings

1    THE COURT:  Mr. Chamberlain, I'll excuse you for

2    a few minutes.  We'll come back and deal with an offer

3    of proof in about five minutes.

4        MR. BIANCAVILLA:  Thank you, Judge.

5            (Whereupon, a brief recess was taken.)

6        THE COURT:  Mr. Chamberlain, are you ready at

7    this point to give me an offer of proof with respect

8    to your witnesses?

9        MR. CHAMBERLAIN:  Yes.  Just the witnesses who

10   are present here, specific witnesses?

11       THE COURT:  You toll us in conference you have an

12   expert witnesses.  I am talking about right now the

13   other witnesses that you have here today.

14       MR. CHAMBERLAIN:  Yes, Judge.

15       MR. BIANCAVILLA:  Not to interrupt you, but I

16   would like to hear one witness at a time and make

17   argument with respect to that witness.

18       THE COURT:  Yes.

19       MR. CHAMBERLAIN:  Judge, we have outside -- let's

20   take the one -- we have Mr. Ball outside.

21       THE COURT:  Start with Mr. Ball.  May I have an

22   offer of proof as to what he will testify to.

23       MR. CHAMBERLAIN:  He will testify to a drug

24   purchase from Mr. Kane.

25       THE COURT:  I thought I made that ruling

Proceedings

1    yesterday.

2          MR. CHAMBERLAIN:  My understanding is that's

3    correct, you made a ruling, but I'm not certain about

4    it and they already had been called to come in.

5          THE COURT:  Did you read the cases I gave you?

6          MR. CHAMBERLAIN:  Yes, I did, and what happens to

7    be a case I was going to cite to your Honor.

8          I still believe that there should be testimony

9    allowed with respect to prior drug sales by this

10   witness, in view of his involvement in this crime and

11   the relationship with the victim.

12         THE COURT:  I am going to read to you another

13   case, People versus Johnson, a Second Department

14   Appellate Division case, 143 AD2d 847.  I believe it's

15   right on point.

16         In the instant case it is clear from defense

17   counsel's offer of proof that the testimony of the

18   proposed witness would have been collateral to the

19   question of the defendant's guilt and was sought to

20   be introduced merely to impeach the credibility of a

21   prosecution witness.

22         It is well settled that a party who is

23   cross-examining a witness may not call other

24   witnesses to correct that witness' answer concerning

25   collateral matters solely to impeach credibility.

Proceedings

1    I'll also cite People versus Alvino 71 NY2d 233

2    at page 243 and 48, and People versus Pavao 15 NY2d

3    282, at pages 288 and 289.  This is right on point,

4    Mr. Chamberlain.

5        MR. CHAMBERLAIN:  Your Honor, these witnesses are

6    not collateral in the regard they will be testifying

7    in corroboration.

8        THE COURT:  Let's talk about Mr. Ball.  Mr. Ball,

9    you told me so far, was going to testify as to an

10   alleged drug sale between him and Mr. Kane; is that

11   correct?

12       MR. CHAMBERLAIN:  Yes, Judge.

13       THE COURT:  That is right on point.

14       MR. CHAMBERLAIN:  Pardon me?

15       THE COURT:  This case is directly on point.

16       MR. CHAMBERLAIN:  The testimony of Mr. Ball --

17       THE COURT:  He could be testifying to something

18   else, that's fine.

19       What else?

20       MR. CHAMBERLAIN:  The testimony of Mr. Ball, and

21   a number of witnesses, will indicate this is not

22   merely to attack, collateral, to attack Mr. Kane's

23   credibility but to establish his relationship to the

24   victim in this case and that involves drug sales

25   between these people and their knowledge of --

Proceedings

1    THE COURT:  With respect -- yes?

2    MR. CHAMBERLAIN:  -- and the victim.

3    One of the witnesses will testify about drug

4    sales directly to the victim.  For those reasons, I

5    think the witness would be an exception to the cases

6    your Honor has cited.

7    THE COURT:  No.  This is right on point,

8    Mr. Chamberlain.

9    I'll hear you, Mr. Biancavilla.

10   MR. BIANCAVILLA:  Judge, I believe the Court

11   cited the cases.  I have one further case to cite,

12   People v. Lyed, which is another Second Department

13   case decided in April, 1990, and the citation for that

14   is 160 AD2d 817, 1990, and in Lyed the Second

15   Department stated:

16   Testimony concerning the complaining witness'

17   reputation for bad moral character and his alleged

18   drug trafficking activities.  Impeachment of a

19   witness by evidence of his reputation in the

20   community is limited to reputation for truth and

21   veracity and may not extend to general bad moral

22   character.

23   Additionally, impeachment by use of immoral,

24   vicious, or criminal acts is appropriate only on

25   cross-examination and not by use of extrinsic

Proceedings

1   evidence.

2         This case cites People v. Pavao and Richardson

3   on Evidence, Judge.

4         THE COURT:  Mr. Chamberlain, with respect to

5   cross-examining -- excuse me.  With respect to putting

6   Mr. Ball on the stand to testify that he purchased

7   drugs from Mr. Kane, if that was your intention, this

8   is right on point with Lyed, with Johnson and Pavao,

9   and I won't permit you to do it.

10        Now, if you are going to introduce evidence with

11   respect to the witness' reputation for truth and

12   veracity, that's a different story.  However, I will

13   not let you get into specific acts with respect to --

14   in contravention of what you cross-examined Mr. Kane

15   on previously because that is improper according to

16   the cases and you can't do that.

17        Is there another reason you will be bringing

18   Mr. Ball in to testify?

19        MR. CHAMBERLAIN:  Judge, with respect to

20   Mr. Ball, would your Honor allow me to put him on to

21   testify to Mr. Kane's lack of veracity and his

22   reputation in the community for not having -- not

23   being truthful either?  People who are known as drug

24   dealers are known not to --

25        THE COURT:  As long as you don't mention drug

Proceedings

1    dealers.  If you do mention drug dealers, I'll say

2    you'll have a problem with me.

3         MR. BIANCAVILLA:  I don't want the questions

4    coming out in front of the jury.  That's why I am

5    asking for the offer of prove.  If he can lay the

6    proper foundation for truth fullness and veracity in

7    the community, he can put on whoever he wants.  But if

8    he can't lay the required foundation --

9         THE COURT:  Will read you Pavao?

10        MR. CHAMBERLAIN:  I read it, Judge.  I appreciate

11   your Honor making a copy available for me.  I have

12   read it.

13        THE COURT:  What it says is that they limit the

14   use of extrinsic impeaching testimony to attack a

15   witness' reputation for truth and veracity.

16        In doing so, we held, and that's the court, that

17   evidence of the witness' general reputation is

18   inadmissible for the purpose of impeaching his

19   testimony.

20        The rule set forth in Hinksman is not in

21   conflict with the policy considerations which

22   preclude parties from introducing for purpose of

23   impeachment extrinsic evidence to contradict a

24   witness' answers.

25        What it boils down to, Mr. Chamberlain, if you

Proceedings

1    can set the proper foundation with respect to truth

2    and veracity in the community, I will permit you to

3    put Mr. Ball on to testify.  But I don't want you

4    asking questions or elicit evidence with respect to

5    drug sales as we had earlier -- when we had the

6    colloquy on the record earlier about the sealed

7    record that was unsealed.

8         I am making it perfectly plain here so there are

9    no problems here.  You can't do that.  The cases

10   preclude you from doing that.  You can't offer

11   collateral evidence with respect to a witness you had

12   full opportunity to cross-examine.

13        MR. CHAMBERLAIN:  The sealed records you are

14   referring to is the sealed record of Mr. Ball?

15        THE COURT:  Yes.  Judge Honorof unsealed it and

16   Mr. Ball stated there was a drug sale from Mr. Kane to

17   Mr. Ball.

18        MR. BIANCAVILLA:  Judge, you're precluding him

19   from saying anything about drugs?

20        THE COURT:  Absolutely.

21        MR. BIANCAVILLA:  Thank you.

22        THE COURT:  You had the complete opportunity to

23   cross-examine with respect to all those issues,

24   Mr. Chamberlain.  Pavao is right on point with respect

25   to that.

Proceedings

1       MR. CHAMBERLAIN:  Not to belabor the point, but

2   didn't the court of appeals reverse for not allowing

3   testimony as to prior -- of this type where the court

4   refused to allow it.

5       What your Honor is referring to is Dicta

6   (phonetic).  The main ruling of the case was that

7   where a court refuses to allow that testimony,

8   there's a basic --

9       THE COURT:  Mr. Chamberlain, that had to do with

10  another reason that we are talking about the witness'

11  bad reputation in the community for truth and

12  veracity.  Here they are restating the general law

13  which has also been followed in the Second Department

14  by Johnson, and apparently followed by People versus

15  Alveno which is also a Court of Appeals case, as well

16  as People versus Lyed which has been read into the

17  record before.

18      Anybody else, Mr. Chamberlain?

19      MR. CHAMBERLAIN:  Yes, Judge.  We also discussed

20  Jennifer Hartman.

21      THE COURT:  Okay.

22      MR. CHAMBERLAIN:  She purchased previously --

23  there will be testimony that the material she

24  purchased was cut and was no good and then there

25  was --

Proceedings

1   THE COURT:  He denied that, that's correct, on

2   cross-examination.

3   MR. CHAMBERLAIN:  Yes, he did.

4   MR. BIANCAVILLA:  Same objection.

5   MR. CHAMBERLAIN:  He said he didn't recognize the

6   name.  He may recognize her after he sees her, I don't

7   know.

8   MR. BIANCAVILLA:  My objections are the same.

9   THE COURT:  Well, at this point you've had the

10  full opportunity to cross-examine Mr. Kane and you

11  could have attempted to refresh his recollection with

12  respect to Miss Hartman, which you didn't.  Therefore,

13  the same rules must apply because this is collateral.

14  Anybody else?

15  MR. CHAMBERLAIN:  Yes, Judge.  We have Stephanie

16  Domaradzki who would testify to purchasing drugs from

17  Mr. Kane.

18  THE COURT:  You additionally questioned with

19  respect to that; is that true?  You questioned

20  Mr. Kane with respect to that potential witness?

21  MR. BIANCAVILLA:  Same objection, Judge.

22  THE COURT:  Same ruling, Mr. Chamberlain.

23  MR. CHAMBERLAIN:  I haven't finished.

24  THE COURT:  I'm sorry.  Go ahead.  I thought that

25  was the only point of testimony.

Proceedings

1    MR. CHAMBERLAIN:  I think I should be allowed to

2    get into her testimony with respect to purchases at or

3    about the time of the crime, including purchases with

4    the victim from Mr. Kane on or about that date.

5    THE COURT:  What does a purchase with the victim

6    have to do with it?

7    MR. CHAMBERLAIN:  It has to do -- this is not

8    just a witness to a crime.  This is a person who was

9    present who was certainly, at the very least, and

10   based upon physical evidence, a participant in this

11   matter based on his own testimony, who at the very

12   least should have been charged with a felony of

13   accessory after the fact, facilitation of murder, and,

14   also, the relationship between the victim and the

15   witness is crucial to the issue here, the issues

16   before this jury.

17   It's a question of who did it.  He's not just a

18   witness.  What I see -- what he saw happening, he was

19   part and parcel of this and his relationship to the

20   victim is crucial in this case.

21   THE COURT:  Mr. Biancavilla?

22   MR. BIANCAVILLA:  Same objection, Judge.  It's

23   all collateral.

24   THE COURT:  Mr. Chamberlain, I have permitted you

25   to make your record.  These are all collateral to the

Proceedings

1    issue.  If you want to see Johnson, I will show you

2    but the cases are on point, Johnson, Lyed and Pavao.

3         MR. CHAMBERLAIN:  I submit it would be on point

4    as to what happened here, Judge, not collateral.  We

5    are talking about the date of the murder.  I

6    respectfully except.

7         THE COURT:  We are talking about rules of

8    evidence, Mr. Chamberlain.  The trial is run on rules

9    of evidence.

10        MR. CHAMBERLAIN:  I have a number of character

11   witnesses here, Judge.

12        THE COURT:  Yes?

13        MR. CHAMBERLAIN:  Do you want those?

14        MR. BIANCAVILLA:  Yes, I would like to know,

15   Judge.

16        THE COURT:  Yes, please.

17        MR. CHAMBERLAIN:  Martin Barten who is on the

18   People's list.  I think he's the manager of the

19   building in which -- he's the manager of the building

20   in which Mr. Scrimo is employed and has been employed

21   for about a dozen years, 15 years.

22        MR. BIANCAVILLA:  Wait.  Wait.  What character

23   trait will he be testifying to?

24        MR. CHAMBERLAIN:  To Mr. Scrimo's character and

25   the type of person he has been over the past 15 years

Proceedings

1    he has known him.

2         MR. BIANCAVILLA:  That's inadmissible, Judge.

3         MR. CHAMBERLAIN:  Well --

4         MR. BIANCAVILLA:  It has to be a specific

5    character trait, Judge, relating to the issue of

6    what -- I'll specifically refer the Court to a section

7    of Richardson.

8         MR. CHAMBERLAIN:  He'll testify to his

9    peacefulness.

10        MR. BIANCAVILLA:  Is that the only character

11   trait?

12        THE COURT:  Is that the character trait he's

13   going to testify to?

14        MR. CHAMBERLAIN:  Judge, I haven't had a chance

15   to really --

16        THE COURT:  I gave you the opportunity.  Why

17   didn't you do it while you were out there?

18        MR. CHAMBERLAIN:  I haven't had time.

19        THE COURT:  Talk to him.  Is he here?

20        MR. CHAMBERLAIN:  As far as I know, yes, Judge.

21        THE COURT:  We stand in recess so you can speak

22   to him.  I'll see you back here in a few minutes.  How

23   many more witnesses do you have?

24        MR. CHAMBERLAIN:  I have a number, Charles Ross,

25   who is a coach but he's not here yet; Sal Bucolo, the

Proceedings

1    board president; Robert Haliner, who works for the

2    post office; Keith Wilson who is a retired correction

3    officer; all of whom would testify that the defendant

4    is a peaceable man, that they have known him for

5    years, and that his character, his representation in

6    the community is excellent, that he is peaceable and

7    truthful.

8         THE COURT:  Mr. Biancavilla?

9         MR. BIANCAVILLA:  Yes.  First of all,

10   truthfulness and veracity are not properly before this

11   jury unless the defendant testifies so no character

12   evidence can be offered.

13        THE COURT:  We are talking about peacefulness.

14        MR. BIANCAVILLA:  No.  He said truthfulness.

15   Unless the defendant testifies -- and that's not

16   before this jury.  That's pursuant to People v.

17   Sullivan 177 AD2d 673.

18        The court found -- we further find that the

19   court did not err precluding the defendant from

20   introducing character evidence as to his reputation

21   for truth and veracity as such evidence did not

22   relate to the traits involved in the charges against

23   him.

24        Assault, murder, violent crimes, truth and

25   veracity are not an issue, unless the defendant takes

Proceedings

1    the stand first.

2         With respect to peacefulness, then the People

3    submit that is a character trait which a proper

4    foundation can be laid for and the introduction of

5    that evidence can be introduced but not peacefulness

6    and veracity, Judge.  I'm sorry.  Not truthfulness

7    and veracity.  I am sorry.

8         MR. CHAMBERLAIN:  The determination as to whether

9    the defendant takes the stand has not been made.

10        MR. BIANCAVILLA:  Then he has to wait for those

11   witnesses.

12        THE COURT:  Mr. Chamberlain, that's up to you.

13        MR. CHAMBERLAIN:  All those witnesses, Judge,

14   would testify to the defendant's reputation for

15   peacefulness and I think they would be cogent

16   witnesses on that source.

17        THE COURT:  Counsel, see you at two o'clock.

18        Anybody else?

19        MR. CHAMBERLAIN:  No, Judge, not at this point.

20        THE COURT:  I would ask you to contact your

21   experts and have them here for Monday.

22        MR. CHAMBERLAIN:  Unfortunately, as it turns out,

23   I found out one would be here today but I didn't know

24   how long it would take.

25        THE COURT:  You can bring them here this

Proceedings

1    afternoon.  Which expert?

2        MR. CHAMBERLAIN:  That would be Doctor Raffe.

3    He's an orthopedic surgeon.

4        THE COURT:  You can bring him up, if you like.

5        MR. BIANCAVILLA:  I have a witness to call from

6    the medical center to observe his testimony.  I won't

7    be able to get that individual this afternoon.  He

8    couldn't tell us yesterday who was going to be here.

9    He said he wasn't having any experts here.

10        THE COURT:  Have all your experts on Monday.

11        MR. BIANCAVILLA:  Fine.  I will have mine too.

12        THE COURT:  How many experts do you have at this

13    point?

14        MR. CHAMBERLAIN:  I have three but -- at this

15    point two would be plenty on Monday, I'm sure.

16        THE COURT:  Okay.

17        MR. CHAMBERLAIN:  Assuming we are going to do

18    that, Judge.

19        THE COURT:  Just be ready to proceed because this

20    jury has been here more than two weeks.  I would like

21    to continue today to finish.

22        MR. BIANCAVILLA:  So it's clear, so I know what

23    to prepare for this afternoon, you are not going to

24    permit the testimony of Charles Ball, Jennifer Hartman

25    or Stephanie -- I forget her last name.

Proceedings

1    THE COURT:  I will not permit them because it's

2    collateral, if that's the only evidence, if that's the

3    only testimony they will give that has to do with the

4    drug sales, I will not permit that because that's

5    collateral.  Okay?

6        MR. CHAMBERLAIN:  I respectfully except,

7    particularly with respect to the last named witnesses.

8    We hadn't discussed her yet.

9        THE COURT:  You certainly have an exception.

10            (Whereupon, a luncheon recess was taken.)

11            A F T E R N O O N   S E S S I O N

12        THE CLERK:  Case on trial continued.

13        THE COURT:  Mr. Chamberlain?

14        MR. CHAMBERLAIN:  Judge, we had a conference in

15   chambers regarding cross-examination of character

16   witnesses.  I would like to have that put on the

17   record in front of my client.  Rather than my stating

18   what Mr. Biancavilla's position would be, I think he

19   should.

20        THE COURT:  All right.  Earlier, Mr. Chamberlain,

21   you told us in your offer of proof that you were going

22   to introduce character witnesses with respect to your

23   client's peacefulness in the community.

24        MR. CHAMBERLAIN:  That's right.

25        THE COURT:  Mr. Biancavilla, do you wish to be

Proceedings

1    heard?

2         MR. BIANCAVILLA:   Basically, what we discussed in

3    chambers is based upon Richardson and relevant case

4    law.   Character witnesses for the accused may

5    legitimately be asked upon cross-examination whether

6    or not they heard particular reports or rumors

7    derogatory to the accused's reputation as testified to

8    by them.

9         If they came in and said he had a reputation in

10   the community for peacefulness, the People have every

11   intention of cross-examining them with regard to

12   certain rumors or statements made to various other

13   individuals which the People obtained statements

14   from.

15        They involve various statements that Mr. Scrimo

16   had made that he had committed a series of robberies,

17   one involved a stick up at a gas station in close

18   proximity to the Eighth Precinct station house.   In

19   that robbery he hit a gas station attendant in the

20   face with a blackjack, the fact that he stated that

21   he used to work as a bouncer in a Korean whorehouse

22   in Queens, basically, incidents of that nature.

23        Clearly, Judge, that type of cross-examination

24   is permitted under Richardson and the case law and

25   , the cross-examination must be limited to the witness'

Proceedings

1    here of these reports or rumors as it would affect

2    their reputation testimony.

3        Basically what Richardson says is that the rumor

4    or reports inquired into must be of such nature as to

5    tend to logically weaken the character of witness'

6    testimony that the defendant enjoys a good

7    reputation.  That's what the People intend to do with

8    respect to these character witnesses.

9        MR. CHAMBERLAIN:  For the record, the statements

10   Mr. Biancavilla referred to are statements from jail

11   house informants that were sealed in the beginning of

12   this trial.

13       THE COURT:  As long as the People have a good

14   faith basis for asking the questions, character

15   witnesses for the accused may legitimately be asked

16   upon cross-examination whether they have heard

17   particular reports or rumors derogatory to the

18   accused's reputation as testified to by them.  That's

19   section 4-406 from Richardson and People versus Kuss

20   42 NY2d 436.

21       This have you heard inquiry is permitted as

22   bearing on the credibility of witnesses, for if the

23   rumors or reports had come to their attention, the

24   value of their testimony as to the accused's good

25   reputation may seriously be impaired.  The

Proceedings

1    cross-examination must be limited to the witness'

2    hearing of these reports or rumors.

3         Now, if a character witness is going to be

4    placed on the stand who is going to testify to the

5    peacefulness of the defendant, the People, by the

6    case law and by the evidence as permitted by

7    Richardson on Evidence, the People can cross-examine

8    him with respect to statements that were heard by

9    another witness as long as he has a good faith basis

10   to ask these questions.

11        Mr. Biancavilla, do you have a good faith basis

12   for asking these questions?

13        MR. BIANCAVILLA:  Yes, we do, Judge.  These are

14   two witnesses, a gentleman by the name of Siran

15   Smith(phonetic) and Robert Gunther(phonetic).  They

16   were interviewed by both detectives from the Homicide

17   Squad and the assistant district attorney, William

18   Dempsey.  Both of those interviews revealed that while

19   Mr. Scrimo was incarcerated at the Nassau County Jail

20   these statements among others were in fact made to

21   them.

22        THE COURT:  Based on that, the People do have a

23   good faith basis, and the People would be able to

24   cross-examine the defendant with respect to those

25   statements that were made to Mr. Dempsey and the

Proceedings

1    inmates.

2         MR. CHAMBERLAIN:  Respectfully except.

3         May we have a minute or two, Judge?

4         THE COURT:  Of course.  I'll take a recess.

5         MR. CHAMBERLAIN:  We can probably stay right

6    here.  I have already discussed this with my client.

7         THE COURT:  I'll take a few minutes.

8              (Whereupon, a brief recess was taken.)

9         THE CLERK:  Case on trial continues.

10        THE COURT:  Mr. Chamberlain?

11        MR. CHAMBERLAIN:  At this time, the defense

12   rests.

13        THE COURT:  All right.  I have to bring the jury

14   in so you can rest in front of the jury.

15        Counsel, I will send the jury home until 9:30 in

16   the morning.  At that time we will have summations

17   and charge.

18        After the jury has left, I'll give you time to

19   prepare for the precharge conference.  We'll do that

20   this afternoon.

21        MR. CHAMBERLAIN:  Judge, I have to make a

22   suggestion that we ask the jury to come back at 10:00

23   so we have half an hour for precharge before --

24        THE COURT:  We'll do that this afternoon.

25        MR. CHAMBERLAIN:  I am not ready.

Proceedings

1    THE COURT:  To give you some insight, I will tell

2    you that anything you do over the weekend that you

3    want to bring to my attention, I will certainly permit

4    you to do that.  The only reason I do it is because,

5    summations and charge on that day, we should start as

6    early as possible.  I will give you the opportunity at

7    that point to give me any additional charges that you

8    want me to charge the jury.

9    MR. CHAMBERLAIN:  Thank you.

10   (Whereupon, a brief recess was taken.)

11   THE CLERK:  Recall the case on trial.  The

12   attorneys are present and the jury is not present.

13   THE COURT:  In order to complete the record, I

14   did some additional research with respect to the

15   issues.  I would like to put a couple of cases on the

16   record.

17   In any event, it is well established when the

18   defendant places his character in issue by presenting

19   a character witness, the People may cross-examine

20   that witness by inquiring as to whether he heard the

21   particular reports or rumors derogatory to the

22   defendant's reputation testified to by the witness.

23   I am citing from People versus Cruz 147 AD2d 584.

24   Additionally, in the case of -- it's a Second

25   Department case, People versus Coleman which is 195

Proceedings

1    AD2d 476:

2        The court did not improperly exercise it's

3    discretion permitting the prosecutor to question the

4    defendant's character witness about whether he heard

5    that the defendant had a previous arrest for a

6    burglary in the third degree.

7        Therefore, the Court is ruling that the People

8    would be permitted to question, since they have given

9    me a good faith basis for the information, they would

10   be able to question the character witness who would

11   testify with respect to peacefulness.

12       Counsel, at this point we will bring the jury

13   up.

14       Anything further, Mr. Chamberlain?

15       MR. CHAMBERLAIN:  Nothing further.

16       THE COURT:  Mr. Biancavilla?

17       MR. BIANCAVILLA:  Nothing, Judge.

18       THE COURT:  Let's bring them up.

19           (Whereupon, there was a brief pause in the

20       proceedings.)

21       THE COURT:  Bring the jury in.

22           (Whereupon, the sworn jurors entered the

23       courtroom and resumed their respective seats.)

24       THE CLERK:  Continuing case on trial.  All

25   parties are present.

Proceedings

1    Do counsel stipulate the jurors are present and

2    seated in the proper order?

3    MR. BIANCAVILLA:  So stipulated.

4    MR. CHAMBERLAIN:  So stipulated.

5    THE CLERK:  Thank you.

6    THE COURT:  Mr. Chamberlain?

7    MR. CHAMBERLAIN:  Yes, your Honor.  The defense

8    rests.

9    THE COURT:  Ladies and gentlemen, you have now

10   heard all the evidence you are going to hear in this

11   case.  The only thing left is summations of counsel

12   and my charge to you on the law.  That will take place

13   Monday morning at 9:30.

14   At this point we are going to excuse you for the

15   day but I am going to admonish you again, do not

16   discuss this case among yourselves or with anyone

17   else until the entire case is completed and that

18   means until you have heard the summations and I have

19   given you the charge as to the law which applies to

20   the counts of the indictment which will be given to

21   your for your consideration.

22   You must not read or listen to any account or

23   discussion of this case in the event it is reported

24   in newspaper or any other media and that includes

25   accessing the internet.

Proceedings

1      You must not visit or view the premises or place

2 where the offense or offenses charged were allegedly

3 committed or any other premises or place involved in

4 this case.

5      You are not to permit my party to discuss this

6 case with you or attempt to influence you and must

7 promptly report to the court any attempt within your

8 knowledge involving any attempt by any person to

9 improper influence any member of the jury.

10      Ladies and gentlemen, at this point we are going

11 to excuse you.  Please get here early enough that we

12 can start as close to 9:30 as possible.  Sometimes

13 parking is a problem.  Have a nice weekend and we'll

14 see you Monday morning

15           (Whereupon, the sworn jurors exited the

16      courtroom.)

17           (Whereupon, a brief recess was taken.)

18      THE COURT:  Counsel, at this point we are going

19 to have a brief charge conference, and what I am going

20 to do is I'm going to -- first let me preface this by

21 saying that even though what I am going to do today is

22 read what CJI sections I will be charging to this

23 jury, I will give you an opportunity on Monday before

24 you sum up to give me any additional charges or make

25 any additional exceptions at that point.

Proceedings

1      Additionally, after my charge, I'll even permit

2   you to come up and, if there are additional

3   exceptions or requests you want to make, I'll give

4   you an opportunity at that point and I will rule upon

5   that.

6      Counsel, I have provided each one of you a copy

7   of the proposed verdict sheet.

8      Is that acceptable to the People.

9      MR. BIANCAVILLA:  Yes.

10     MR. CHAMBERLAIN:  One exception, Your Honor.

11     THE COURT:  Yes, Mr. Chamberlain?

12     MR. CHAMBERLAIN:  I would ask that the Court

13  charge the jury that the two counts are different ways

14  of pleading the same act so they are not confused that

15  they are separate.

16     THE COURT:  That's why I put this here where it

17  says if, and only if, you find the defendant not

18  guilty of count one, then you must proceed to count

19  two.

20     If they find him guilty, for argument's sake, of

21  count one, they don't have to proceed to count two.

22  If they find him not guilty of count one, then they

23  must proceed to count two.  I think it's pretty

24  clear.

25     MR. CHAMBERLAIN:  I think the jury could still be

Proceedings

1    confused by the alternative language and I think I

2    would request -- I think it would be less confusing

3    for them if you indicated that -- must proceed to

4    count two, which is pleading murder two under an

5    alternate theory of the Penal Law so that they

6    understand there are difference theories for the same

7    act.

8         THE COURT:  Mr. Biancavilla?

9         MR. BIANCAVILLA:  Judge, we would object to that.

10   The basis for the objection is that you will read to

11   them the indictment at the time of the charge and they

12   will see the differences between count one and count

13   two.  Any further language within the verdict form is

14   not necessary, nor is it required under the law,

15   Judge.

16        MR. CHAMBERLAIN:  Judge, may I be heard?

17        THE COURT:  Yes, go ahead.

18        MR. CHAMBERLAIN:  It's a simple clarification.  I

19   don't have Mr. Biancavilla's faith in the layman jury

20   understanding the significance of reading -- from

21   reading an indictment put together with all of the

22   rest of the charges they have to absorb.  It's not

23   a --

24        MR. BIANCAVILLA:  If the jury has questions --

25        THE COURT:  All right.  I'll let you know.

Proceedings

1      Counsel, at this point I am going to read the

2  CJI section numbers to you with the titles so you

3  will know exactly what I am charging:

4      CJI 5.00 entitled final instructions; 5.01 --

5  these are all CJI charges -- summations of counsel;

6  5.05, review principles from pretrial charge; 5.10,

7  function of jury.

8      MR. CHAMBERLAIN:  I'm sorry, Judge?

9      THE COURT:  5.10, entitled function of jury;

10  5.11, function of court; 5.12, function of attorneys;

11  5.13, arguments of counsel; 5.15, byplay of counsel;

12  5.16, colloquy of court and counsel; 5.18, court's

13  questioning witnesses; 5.25, no inference from

14  rulings; 6.01 safeguards; 6.02, indictment not

15  evidence; 6.05, burden of proof; 6.10, presumption of

16  innocence; 6.20, reasonable doubt; a charge with

17  respect to juror expertise; and a charge with the use

18  of internet is prohibited; 6.30, jury not to consider

19  punishment; 7.01, witness, right to call; 7.02,

20  credibility of witnesses, 7.06, falsus in uno; 7.08,

21  police officer versus witness' credibility; a charge

22  with respect to reconciling discrepancies; 7.05, with

23  respect to the defendant not testifying in this case;

24  7.13, opinion evidence as to expert witnesses, and we

25  had Carlo Rossotti with respect to tool marking

Proceedings

1   impressions, Vito Shiraldi with respect to forensic

2   microscopy and Meghan Clement with respect to DNA;

3   7.22, impeachment of witnesses by prior inconsistent

4   statements; 7.23, impeachment by bias or prejudice; a

5   charge with respect to circumstantial evidence, the

6   differences between direct and circumstantial.

7           MR. CHAMBERLAIN:  Judge, 7.02 was impeachment?

8           THE COURT:  7.02 deals with credibility of

9   witnesses.

10          Now, a charge with respect to circumstantial and

11  direct evidence; a charge with respect to --

12          MR. CHAMBERLAIN:  Judge, excuse me for

13  interrupting.  Do you have that section number for the

14  circumstantial evidence charge?  There are a number of

15  them.

16          THE COURT:  I have my own here I use and will be

17  glad to let you read it, Mr. Chamberlain, at the

18  conclusion.

19          11.0 with respect to confessions, admissions and

20  statements; and what I am going to do is instruct the

21  jury that with respect to the statement made to the

22  Detective McHugh on April 20th and Detective McHugh

23  and Parpan on May 3rd, we have to deal with the

24  in-custody issue as well as the voluntariness issue.

25  With respect to the statement to Police Officer

Proceedings

1    Stark, we only have to deal with the voluntariness

2    issue.

3         Now we get to the specifics with respect to what

4    I tell the jury.  There's two counts, count one is

5    murder in the second degree; count two, again, is

6    murder in the second degree.  The first one is

7    intentional murder in the second degree and the

8    second one is depraved indifference.

9         CJI 42:06 which deals with the verdict sheet;

10   42:07, jury's duty to deliberate; 42:16, exhibits;

11   42:20 is designation of foreperson; 42:25 is the

12   requirement of unanimous verdict.

13        MR. CHAMBERLAIN:  May I interrupt, Judge?

14        THE COURT:  Yes.

15        MR. CHAMBERLAIN:  With respect to the requirement

16   of unanimous verdict, will you instruct the jury that

17   while they must confer and consider their fellow

18   jurymen, they must, at the end, individually vote

19   their own conscious.

20        THE COURT:  I give them a similar charge but not

21   under that subdivision.

22        CJI 42:07 on the jury's duty to deliberate, I

23   think will encompass your request, Mr. Chamberlain.

24        MR. CHAMBERLAIN:  All right then.

25        THE COURT:  Then I go into some conclusory

                              Proceedings

1    language.

2         Now, do the People have any exceptions?

3         MR. BIANCAVILLA:  No.

4         THE COURT:  Any additional requests by the

5    People?

6         MR. BIANCAVILLA:  Not at this time, Judge.

7         THE COURT:  Mr. Chamberlain, any exceptions?

8         MR. CHAMBERLAIN:  No.

9         THE COURT:  Any additional requests.

10        MR. CHAMBERLAIN:  Yes, Judge.  I would request

11   that the Court charge the jury CPL 190.40,

12   specifically that when a witness testifies before a

13   grand jury and answers questions responsive to the

14   inquiry of the People, they automatically get

15   immunity.

16        THE COURT:  Do you wish to be heard,

17   Mr. Biancavilla?

18        MR. BIANCAVILLA:  We object.  There's no basis

19   for that.

20        MR. CHAMBERLAIN:  There's every basis in the

21   world, Judge.

22        MR. BIANCAVILLA:  I'll provide you with case law.

23        MR. CHAMBERLAIN:  Will you please let me finish?

24   I'm so tired of this, Judge.

25        THE COURT:  Excuse me.  Excuse me.  Look, there's

Proceedings

1        no jury here.  Let's not start arguing.

2            MR. CHAMBERLAIN:  I'm not arguing in front of the

3        jury.

4            THE COURT:  I understand that.  I want to hear

5        from both of you and then I'll give my ruling or

6        reserve.

7            Mr. Biancavilla?

8            MR. CHAMBERLAIN:  I was in the middle of a

9        sentence when you interrupted.

10            THE COURT:  All right.  Mr. Chamberlain, why

11        don't you finish?

12            MR. CHAMBERLAIN:  He says there's no basis,

13        Judge.  He made a statement on the record in front of

14        this jury --

15            THE COURT:  Who made a statement?

16            MR. CHAMBERLAIN:  Mr. Biancavilla.

17            THE COURT:  I already told the jury what the

18        attorney say is of no moment, is not evidence and

19        should be disregarded, and I'll tell them that again

20        during my final charge.

21            MR. CHAMBERLAIN:  The felony minutes that we were

22        discussing showed that he signed no waiver, and, if he

23        signed no waiver, and this is -- he got immunity.

24            MR. BIANCAVILLA:  As does every other witness in

25        the State of New York who testifies before a grand

Proceedings

1    jury.  There was nothing elicited from the testimony

2    of this witness that he obtained -- that he made any

3    agreement with the district attorney's office in order

4    to obtain that immunity; therefore, it's irrelevant

5    before this jury, or you might as well give that

6    charge to every single jury trial we have.  That's my

7    point.

8         MR. CHAMBERLAIN:  It's clearly not irrelevant,

9    Judge.  It's the most relevant thing because he got

10   immunity and he got a free ride on his participation

11   in this matter, which, at the very least, included a

12   felony of criminal facilitation in the first degree

13   which is a felony.

14        His testimony on cross indicated either he

15   didn't know what he was talking about or he was

16   deliberately being evasive.  Mr. Biancavilla kept

17   objecting and said out loud, as an officer of the

18   court, you know he got immunity.

19        MR. BIANCAVILLA:  Judge, there was no agreement

20   for that.

21        MR. CHAMBERLAIN:  He got immunity.  It's a matter

22   of record.

23        MR. BIANCAVILLA:  There was no agreement to get

24   that immunity and, therefore --

25        THE COURT:  Counsel.

Proceedings

1      MR. BIANCAVILLA:  -- to be relevant --

2      THE COURT:  I'm reserving for a moment.  I

3  understand your arguments.

4      MR. BIANCAVILLA:  Thank you, Judge.

5      THE COURT:  Anything else?

6      MR. CHAMBERLAIN:  Yes, Judge.  The defense would

7  request a charge concerning Mr. Kane's -- Mr. Kane,

8  that the evidence might indicate that he was -- the

9  jury can find from the evidence that he was involved

10  in either accessorial conduct, which I would ask the

11  Court to define, or that he was involved in

12  facilitating a homicide by cleaning up the scene.

13     THE COURT:  Where is the evidence?

14     MR. CHAMBERLAIN:  He cleaned up the scene, Judge.

15  He cleaned up the evidence.  I will read from

16  Judge Ort's decision after a hearing --

17     THE COURT:  I understand that.  What Judge Ort

18  says is one thing.  What came out on the stand, yes,

19  he testified he cleaned up the evidence, but what does

20  that have to do with the accomplice charge?

21     MR. CHAMBERLAIN:  I think a reasonable view of

22  the evidence, Judge, could be that this man was an

23  accomplice.  He -- his testimony is he invites the

24  person he says committed the crime up there.  He

25  insists he not leave.  He does nothing to stop the

Proceedings

1   crime.  He helps clean up the crime afterwards.  He

2   doesn't report the crime.  He lies about it when he is

3   questioned about it, and he continues to lie about it

4   for a period of weeks.  All that is evidence of

5   accessorial conduct and any reasonable view of this

6   evidence would be that.

7        I think, Judge, my understanding of Judge Ort's

8   decision was it was a conclusion of law -- I'm

9   reading from Judge Ort's decision --

10       THE COURT:  I understand.  I have read his

11  decision, but what does Judge Ort's decision have to

12  do with the price of milk, so to speak?

13       That is his finding of fact with respect to a

14  Huntley hearing.  I'm the trial judge with respect to

15  this trial.  I have to make the determination as to

16  whether there's a reasonable view of the evidence.

17       MR. CHAMBERLAIN:  Judge, based upon the

18  statement, as Judge Ort found, and the evidence came

19  out here, John Kane admitted he assisted Mr. Scrimo in

20  tidying up the crime scene.

21       THE COURT:  Mr. Chamberlain, whatever came out in

22  the hearing may not come out in a trial.  Why are you

23  bringing up Judge Ort's decision?

24       MR. CHAMBERLAIN:  That evidence came out in the

25  trial.

Proceedings

1          THE COURT:   That's what you should argue, not

2     what's in Judge Ort's decision.

3          MR. BIANCAVILLA:   Judge, in response to

4     Mr. Chamberlain's comments, the People would concede

5     that evidence did come out during the trial.   However,

6     in People versus Dagnone 187 AD2d 604, Appellate

7     Division Second Department, decided on November 16th,

8     1992, the court stated as follows:

9          The trial court also properly declined the

10    defendant's request to charge that the jury could

11    determine as a question of fact whether the

12    prosecution's principal witness was an accomplice on

13    the murder count since there was no reasonable view

14    of the evidence to support such a charge.   Even if

15    the witness knowingly assisted the defendant in

16    disposing of the gun and his blood stained clothes

17    and gloves, so as to be guilty of the crime of

18    hindering prosecution as an accessory after the fact,

19    no accomplice charge would be warranted under CPL

20    60.22.

21         In addition, for the same proposition set forth

22    in this case, judge, I would cite People versus Sacco

23    at 199 AD2d 288, another Second Department case from

24    1993, and, People versus Pepe 259 AD2d 949, Fourth

25    Department, decided March 19th, 1999.

Proceedings

1      MR. CHAMBERLAIN:  With respect to the cases cited

2   by the People, at this point we are talking about

3   criminal facilitation.  The cases cited -- the

4   facilitation does not mean the accomplice testimony is

5   not on point.  I think the evidence shows he admitted

6   to facilitation.

7      THE COURT:  How did he admit to facilitation?

8   Where is a reasonable view of the evidence of that?

9      MR. CHAMBERLAIN:  He cleaned up the scene.

10      THE COURT:  Facilitation would be something that

11   happened before.

12      MR. CHAMBERLAIN:  No.  Afterward.  Afterward,

13   facilitation is --

14      THE COURT:  Did you hear what Mr. Biancavilla

15   just placed on the record?

16      MR. CHAMBERLAIN:  What he just placed on the

17   record is you can't use facilitation as evidence of

18   accomplice.  Under the accomplice theory, he can be

19   charged with the underlying murder.  I believe the

20   reason -- unlike that case, a reasonable view of the

21   evidence in this case is including the fact he invited

22   the person up, and according to him, he kept the

23   person from leaving.  He didn't do anything to stop

24   the crime.  He helped clean up the crime.  He didn't

25   report the crime.  He lies about the crime.

Proceedings

1    All that evidence would be evidence, not only of

2    facilitation, but I think all of that evidence unlike

3    the case he cited, that evidence, a reasonable view

4    of that evidence, would allow him to be charged as an

5    accomplice.  If he's charged as an accomplice, his

6    testimony requires corroboration and I would request

7    that charge.

8         THE COURT:  There's no reasonable view of the

9    evidence that Mr. Kane convinced the defendant to come

10   up there for the purposes of committing a crime.

11   There's no reasonable view of the evidence that

12   Mr. Kane did anything in advance to cause me to charge

13   with respect to accomplice.

14        MR. CHAMBERLAIN:  I respectfully submit, Judge,

15   the jury heard Mr. Kane say he lied.  The jury can

16   decide what part --

17        THE COURT:  What does that have to do with -- and

18   I'll read again, I happen to have Dagnone too, this is

19   what the Second Department said:

20        Even if the witness knowingly assisted the

21   defendant in the disposing of the gun and blood

22   stained clothes and glove, so as to be guilty of the

23   crime of hindering prosecution as an accessory after

24   the fact, no accomplice charge will be warranted

25   under CPL 60.22.

Proceedings

1   MR. CHAMBERLAIN:  I agree with that, Judge, but

2   this is not all after the fact.  That case is clearly

3   distinguishable from this case.

4   THE COURT:  What happened before?  You tell me.

5   Where is the reasonable view of the evidence that

6   something happened before the murder?

7   MR. CHAMBERLAIN:  The jury understands and they

8   can believe that he went up there -- I don't know what

9   he went up there for, but whether he went up --

10   THE COURT:  The only reasonable view of the

11   evidence was that they went up there to drink beer.

12   MR. CHAMBERLAIN:  That's assuming the jury

13   believes him.  Why would -- why would he -- why would

14   he insist on somebody -- his testimony was that the

15   defendant had already been told to go home.  This was

16   earlier in the bar.

17   Why would he ask that person to come up to drink

18   beer, just to drink beer?  Why would he ask that

19   person to stay -- there's a reasonable interpretation

20   of his conduct, particularly when he didn't do

21   anything to stop this thing and then cleaned up the

22   scene.  All that conduct indicates activity before

23   and after, and a jury can interpret that as he was

24   taking part in this crime.

25   THE COURT:  Mr. Biancavilla, would you like to be

Proceedings

1    heard?

2         MR. BIANCAVILLA:  I think I've said enough,

3    Judge.

4         THE COURT:  There's no reasonable view of the

5    evidence, Mr. Chamberlain, that would cause me to

6    charge an accomplice to the crime.  Accessory after

7    the fact is not an accomplice for the purpose of

8    corroboration requirements, nor is there any

9    reasonable view of the evidence that Mr. Kane did

10   anything before this murder to cause me to charge

11   accomplice.  You have an exception.

12        Anything further?

13        MR. BIANCAVILLA:  Nothing from the People, Judge.

14        THE COURT:  Mr. Chamberlain?

15        MR. CHAMBERLAIN:  You're not charging accessory

16   after the fact either?

17        THE COURT:  No, sir.

18        MR. CHAMBERLAIN:  Or criminal facilitation which

19   would include --

20        THE COURT:  Tell you what I will do for you.  I

21   am not charging -- I'll give you the opportunity over

22   the weekend, find me the cases that tell me I should

23   be charging this.  I know of none.

24        Anything further?

25        MR. BIANCAVILLA:  No, Judge.

Proceedings

1      MR. CHAMBERLAIN:  No, Judge.

2      THE COURT:  We'll see you Monday morning.

3                      *        *        *

4          (Whereupon, the above matter was adjourned to

5      May 20th, 2002.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25