```
 1   STATE OF NEW YORK : NASSAU COUNTY

 2   COUNTY COURT      : PART XIV
     ----------------------------------------:
 3   THE PEOPLE OF THE STATE OF NEW YORK,    :
                                             :
 4                    - against -            : IND: 1456N-00
                                             :
 5   PAUL SCRIMO,                            :
                                             :   JURY TRIAL
 6                                           :
                              Defendant.     :
 7   ----------------------------------------x

 8                         May 20, 2002
                           262 Old Country Road
 9                         Mineola, New York

10

     B E F O R E:
11
                   THE HONORABLE JEFFREY BROWN,
12                 County Court Judge.

13
     A P P E A R A N C E S:
14

15           (As previously noted.)

16                        *      *      *

17

18           THE CLERK:  Case on trial continues, Indictment

19      1456N of 2000, People versus Paul Scrimo.

20           All parties are present.  The jurors are not

21      present.

22           People ready?

23           MR. BIANCAVILLA:  Ready.

24           THE CLERK:  Defendant ready?

25           MR. CHAMBERLAIN:  Ready.
```

Proceedings

1    THE COURT:  Counsel, when we broke on Friday,

2    there were a couple of items that I reserved upon that

3    I will rule on now.

4        With respect to your request, Mr. Chamberlain,

5    as to how I should address the different counts, I

6    decided to do it this way.  I'll read it into the

7    record.

8        Now, we come to the second part of my charge in

9    which I will instruct you with respect to the

10   specific charges contained in the indictment.  The

11   indictment consists of two counts; count one, murder

12   in the second degree; and, count two, murder in the

13   second degree.

14       These two charges are based upon two different

15   subdivisions of the Penal Law and based upon two

16   different theories of law.

17       I think that should cover what you wanted,

18   Mr. Chamberlain.

19       MR. CHAMBERLAIN:  Fine, Judge.  Thank you.

20       THE COURT:  Additionally, the verdict sheet will

21   remain as is, so you are aware, I will not be changing

22   the verdict sheet.

23       Does either counsel have any objection to the

24   verdict sheet as it is?

25       MR. BIANCAVILLA:  No, Judge.

Proceedings

1    MR. CHAMBERLAIN:  No, Judge.

2    THE COURT:  Then we'll have it marked as a court

3    exhibit.

4    Additionally, with respect -- you asked me to

5    charge with respect to immunity.  I will not be doing

6    that.  There is no evidence with respect to immunity

7    in this trial.

8    The only questions with respect to it were

9    questions you asked, Mr. Chamberlain, which the

10    witness denied.  He didn't know whether he got it or

11    not.  So, with respect to that, I am not going to give

12    any charge -- I don't see any evidentiary reason to

13    charge it.

14    MR. CHAMBERLAIN:  My recollection, and I think it

15    will be the jury's recollection that counts, but my

16    recollection is that the witness did not recall

17    signing any waiver and without having signed a waiver,

18    as the district attorney said in front of the jury, he

19    would automatically get immunity.

20    THE COURT:  What the district attorney says is

21    not evidence, as you know, and I will direct -- I have

22    directed them a couple of times during the trial to

23    ignore what counsel says during the course of the

24    trial, and I will direct them again during the course

25    of my charge what counsel says is not evidence and

Proceedings

1    they should not consider it.

2         What the district attorney says during the heat

3    of battle while on trial is certainly not evidence

4    and should not be considered by the jury any way.

5         MR. CHAMBERLAIN:  Judge, if the jury finds --

6    has -- if the jury has a belief after listening to the

7    questions and answers that the defendant did not sign

8    a waiver, and I think that's a reasonable -- there's a

9    reasonable basis for that finding by the jury, then I

10   believe the jury should be instructed that, if they

11   find he did not sign a waiver, then that he got

12   immunity under the operation of 190 -- section 190 --

13   I think it's .40 or .45.  If he didn't sign a waiver,

14   he got immunity for that testimony.

15        THE COURT:  I understand what the law is,

16   Mr. Chamberlain, but the question here is whether

17   there's evidence as to require me to make that --

18   bring that charge to the jury.

19        You certainly could have, since you didn't get a

20   response from the witness, on your case, if you

21   desired, you could have called the assistant district

22   attorney and asked him questions, who presented the

23   case.  At this point there's no evidence before the

24   Court.

25        Mr. Biancavilla, do you wish to be heard with

Proceedings

1    respect to that?

2        MR. BIANCAVILLA:  No, your Honor.

3        THE COURT:  Counsel, one other thing before I

4    bring the jury in.  We have to have motions at the

5    conclusion of the whole case.

6        Mr. Chamberlain, do you have any additional

7    motions?

8        MR. CHAMBERLAIN:  I would move for a directed

9    verdict at the end of the case.

10       THE COURT:  People?

11       MR. BIANCAVILLA:  Rely on the record.

12       THE COURT:  Your motion is denied.

13       Anything else or are we ready for the jury?

14       MR. BIANCAVILLA:  Ready.

15       MR. CHAMBERLAIN:  Ready.

16       THE COURT:  We'll bring in the jury.

17           (Whereupon, there was a brief pause in the

18           proceedings.)

19       COURT OFFICER:  Jury entering.

20           (Whereupon, the sworn jurors entered the

21           courtroom and resumed their respective seats.)

22       THE CLERK:  Do both sides stipulate that all

23    sworn jurors are present and seated properly?

24       MR. BIANCAVILLA:  So stipulated.

25       MR. CHAMBERLAIN:  So stipulated.

Summation - Defendant

1    THE COURT:  Good morning, ladies and gentlemen.

2    I hope you had a nice weekend.

3    We are about to commence with the summations and

4    we will start with Mr. Chamberlain.

5    MR. CHAMBERLAIN:  Thank you, your Honor.

6    Mr. Biancavilla, ladies and gentlemen, it's been

7    a long trial and this is my last chance to talk to

8    you.  The system works that after the defense sums up

9    and says what we feel the evidence shows, the

10   district attorney goes, and we don't get another

11   chance and we abide by that system.

12   I will give you my recollection of what I

13   believe the evidence shows.  It's my recollection --

14   it's not what counts.  It will be your recollection

15   that counts, not the district attorney's recollection

16   that counts and, as the Judge will tell you, it's not

17   even his recollection that counts.  It's what your

18   recollection is.

19   You are the sole arbiters, the sole determiners

20   of the facts and what you believe here.  You should

21   base that not upon what was said by counsel or the

22   Court, not upon any rulings made, who may have gotten

23   a higher hand or done better in rulings or anything

24   like that.

25   You should base it upon the evidence that you

Summation - Defendant

1    evaluate, based upon your God given ability to

2    evaluate people, circumstances, opportunities to see

3    what people said they saw, whether they appear to be

4    telling the truth, whether they appear to be lying or

5    they have a motive to lie, whether they lied before.

6        I think one of the instructions the Court will

7    give you -- all of the law will come from the

8    Court -- but one of the instructions will be that if

9    you find anybody testified falsely with respect to

10   any material matter, you may, not must, but you may

11   disregard that person's entire testimony and you may

12   find that after evaluating the various things that

13   various people told you, that you may find that they

14   did testify falsely.  If you do, then it's up to you.

15       The important thing here is that you are the

16   ones that decide what the evidence is and how you

17   evaluate what people said.  You don't just accept

18   stories.  You evaluate whether they are truthful,

19   whether they had a reason to lie, whether they had a

20   reason, an opportunity to see, whether the story

21   makes sense and whether the combined evidence that

22   the People have presented proves the defendant's

23   guilt beyond a reasonable doubt.

24       Remember at the beginning of the trial we opened

25   and the judge instructed you that it's not the

Summation - Defendant

1    defense's burden to prove anything here, anything.

2    We are not here to try to tell you what happened.  We

3    don't have that burden.  We don't have that power and

4    we don't have the opportunity to do that.

5        What we are here to do is to tell you that,

6    based upon the evidence presented, the People not

7    only have failed to prove the defendant's guilt

8    beyond a reasonable doubt, but, in fact, the evidence

9    would tend to indicate that maybe somebody else's

10   guilt is much more likely.  That's your

11   determination.  We are not here to prove that.  We

12   are not assuming any burden.

13       With that preamble, let me try to review the

14   evidence as best as I recall it.  Again, let me

15   emphasize, and the Court will tell you, it's not my

16   recollection that counts.  If my recollection doesn't

17   jibe with yours, disregard it.  If you think the

18   Court recalls or the Court should sum up the

19   evidence, it's not the Court's recollection that

20   counts.  It's yours, solely yours, certainly not

21   mine, the district attorney's or the Court.

22       It's been a long trial.  We are in the beginning

23   of our fourth week here.  We spent two weeks on

24   actual taking of testimony.  All of that came from

25   the People.  From my recollection, there were

Summation - Defendant

1    something like 25 witnesses and what I would call a

2    mountain of evidence, a mountain, tremendous amount

3    of evidence, volumes, and exhibits.  You even have

4    things like the vials that the fingernails were

5    contained in, empty vials submitted in evidence.

6         You have brochures from a telephone

7    manufacturing company of telephones with a cord that

8    was not the cord involved here.  A lot of the

9    evidence was completely irrelevant, as far as I'm

10   concerned, because -- but you have mountains of

11   evidence.

12        One quick -- I will review the testimony as I

13   recall it, but I want to briefly review what I

14   consider the most important evidence and that is the

15   physical evidence, scientific evidence, which cannot

16   be changed.  There may have been some attempt here by

17   the prosecution to change results.  They took one

18   position of scientific analysis which they attempted

19   to change.

20        Physical evidence, scientific evidence,

21   basically, it's not capable of changing the story.

22   You can't have that embellished or expanded upon,

23   stretched as witnesses will do.  I believe you will

24   find that Mr. Kane did that.

25        Let me review the scientific evidence briefly.

Summation - Defendant

1    I am going to get into more detail when I get into a

2    review of scientific evidence.

3        THE COURT:  Mr. Chamberlain, will you speak up a

4    little bit, please?

5        MR. CHAMBERLAIN:  By and large, the scientific

6    evidence here points toward Mr. Kane.  That's very

7    significant.  Fingerprints; Mr. Kane's DNA; Mr. Kane,

8    all over the place; DNA all over the place.  Major

9    contributor, one in 6 billion, DNA records, one in

10   6 billion with respect to his DNA on cigarette butts;

11   all over the place, under the victim; DNA on -- major

12   contributor on the beer bottle that was left on the

13   table, under the fingernails, most significant,

14   Mr. Kane.

15       Now, the -- all of this evidence, except for

16   maybe one part with the fingerprints, was developed

17   after Mr. Kane gave the police a story that

18   implicated my guy and that they arrested Mr. Scrimo

19   on.

20       When they arrested Mr. Scrimo, based on Kane's

21   story, they had to use Kane.  Kane was their horse to

22   get them through and out of the gate, not only out of

23   the gate, but across the finish line.  Without Kane,

24   they have no case.  At that time we know they

25   arrested Scrimo.

1678

Summation - Defendant

1     When Kane subsequently testified at a

2     preliminary exam and then at the grand jury, the deal

3     was done.  Kane was not prosecuted.  My guy was

4     arrested and they are getting, subsequently, DNA

5     evidence tying Kane to the scene, but, more

6     importantly, not only tying Kane to the scene but

7     they are getting evidence that shows that my guy was

8     not there.

9          If you listen to Kane's story, it does not

10    explain the absence of evidence tying this man to the

11    murder.  It does not.  You cannot have a little bit

12    of wiping, as he claimed there was some wiping, and

13    explain why there are no hairs, no fibers, no DNA on

14    the cord, on the victim, under the fingernails,

15    nothing to tie this man to this scene.

16         The absence of evidence here, in my opinion,

17    should convince you beyond any doubt, not a

18    reasonable doubt, that he was not involved in this

19    crime.  That's what you are here to determine.

20         You're not here to determine whether they were

21    out drinking someplace.  You're not here to determine

22    whether or not they -- there was some contact

23    beforehand.  You are not here to determine the

24    original story told by Mr. Scrimo when he was

25    first -- when he first talked to the police, I think

Summation - Defendant

1    it was on the 20th of April, 2000, whether it was

2    complete or whether what he told them after he was

3    arrested in the early morning hours of May 3rd was

4    complete.

5        The issue is not whether three or four very

6    experienced, sophisticated homicide detectives who

7    were expert at getting admissions, at trying to put

8    words into people's mouths, put words into

9    Mr. Scrimo's mouth and whether or not -- the

10   implication is by what way he looked or in what he

11   said or how he said it or whether he was telling the

12   truth, it doesn't matter.  I would have a question

13   about that whole story, but it doesn't matter.  Even

14   if he wasn't telling the full truth, that's not the

15   issue.

16       The question really then is what evidence could

17   they have that convinces you beyond a reasonable·

18   doubt that he committed the murder.  That's what we

19   talked about when we opened here.  That's what you

20   are being asked to rule on here, to make a finding on

21   here, which is very important to the People, no

22   question.

23       They have taken a position here.  They have

24   staked their position on Kane's testimony and their

25   position is that it's -- that my defendant is guilty,

Summation - Defendant

1    and, if he's guilty, he should be put in jail,

2    probably for the rest of his life.

3         Now, it's very, very, very important, obviously,

4    for Mr. Scrimo, so I want to now take the time and,

5    if you will give me the time to do so, I apologize

6    for taking this time, but I want to review in some

7    detail what I recall of the evidence submitted here.

8    I think there were 25 witnesses.  There were a lot of

9    witnesses.

10        I think the first witness was a relative of the

11   deceased.  Obviously I am sympathetic to his loss.

12   There were a couple of witnesses from the deceased's

13   job that indicated she was a good worker.  One of the

14   witnesses indicated that the victim had a concern

15   about a police officer stalking her.  There was no

16   indication what, if anything, was done with respect

17   to that investigation and that information.

18        I think the fourth witness was Thomas Hartman

19   who was a bartender at Wild Childs.  I use the term,

20   by the way, ladies and gentlemen, wild, because, even

21   though it was Y.L., I think, in the vernacular, the

22   bar was known by wild because of the sound.  It

23   sounded like wild.  I'm going to use wild.  It's just

24   simpler.

25        Hartman was a bartender.  I think he had been at

Summation - Defendant

1    Granny's earlier that night, Granny O'Shea's, a

2    different bar.  He then went back to Wild Childs.  He

3    saw Ruth talking to a couple of people, one of them

4    he knew as John, and the other was a person he

5    described as bald and with tattoos.

6         Interestingly, when he was asked to identify

7    this defendant, he said no, it wasn't him.  That was

8    here, but he subsequently did identify photographs of

9    the defendant at the time, photographs taken of the

10   defendant at the time.

11        He didn't say anything about -- he did indicate

12   that some time after -- he indicated that there was a

13   incident with keys and then at some time after that

14   he thought Ruth Williams had taken his keys.  She

15   left shortly before closing, and then he indicated

16   that John and Paul --

17        THE COURT:  Please speak up, Mr. Chamberlain.

18        MR. CHAMBERLAIN:  Mr. Frank DeFalco was the next

19   witness and he indicated that he was the owner of

20   Falcon's Nest, that John and the defendant had been

21   there earlier playing darts.  He knew John well as

22   John Doe, and not only did he know him well as a

23   regular customer that frequented there, but they had

24   even named a drink after him, the John Doe, which is

25   an interesting factor.

Summation - Defendant

1        John Doe.  Why is somebody called John Doe?  It

2    is a name associated with somebody without a name.

3    That is one of the factors I'm going to ask you to

4    consider in terms of his credibility.  He was known

5    by that name.  I think a reasonable assumption is the

6    reason he was known by that name is he was a drug

7    dealer.  As Police Officer Stark told you, the

8    defendant told her the victim was trying to score

9    drugs from John Kane.

10        I think it's a reasonable assumption you can

11   make.  Why is somebody known by the name John Doe,

12   not by his real name?  His middle initial, by the

13   way, was not D.  Why John Doe?

14        I believe DeFalco also indicated that John Doe

15   drank heavily there and you heard from other

16   witnesses that John Doe was a heavy drinker.  You

17   heard that from him, three or four times a week,

18   heavy drinker.

19        Where did he get the money from?  Again, going

20   back to evaluating John Doe, he never filed income

21   tax returns.  His testimony was he worked, I think,

22   less than two days in the prior -- or two days in

23   more than two months.  That would be averaging out to

24   approximately less than twelve days a year.

25        How do you live?  How do you support yourself,

Summation - Defendant

1    particularly a heavy drinking habit when you go out

2    every night going from one bar to another, which is

3    what he did?  Where do you get the bread to do that?

4         Something you can consider, where do you get the

5    bread to support a heavy drinking habit every night

6    going from bar to bar where you are known as a

7    regular in all these bars?  Where does it come from?

8         I asked if he sold drugs.  He said no.  You have

9    to decide whether that's a credible answer.  You have

10   to decide, based upon this person's appearance, his

11   life style, his name, his habits, what was he doing?

12   What was his relationship with the victim?

13        We are going to get back to that, which is maybe

14   one of most important things.

15        The next witness was a Mellisa Netarnicola, who

16   was, I believe, a girlfriend of Tom Hartman, and she

17   testified that she had been somewhere in Wild Childs

18   in the early morning hours of April 12th, 2000, and

19   Ruth was acting wild, seductive I believe, taking her

20   strap down, although she was wearing a shirt

21   underneath, but she didn't see Ruth leave.

22        Penny Shouse was the next witness.  She was a

23   bartender at Granny's.  She had gone to -- she had

24   seen Ruth there.  I believe Ruth was with some other

25   man at the time.  I think that evening Ruth was with

Summation - Defendant

1    two other men before she ever saw these men.  One was

2    at the Downtown, a bald, stocky fellow, not this

3    defendant.  Then she was with some other fellow with

4    a toupee.  She left one, one left.  They were both,

5    these other men were both -- I think one left in

6    Granny's and then the other one left in Wild Childs.

7         On cross-examination Shouse was asked whether or

8    not she had ever seen Kane supply drugs.  She

9    immediately got an attorney and we were then only

10   allowed to ask her if she had gotten drugs, if she

11   had gotten drugs on the night in question or just

12   before testifying and she said no.  But Miss

13   Shouse -- I'm not sure about that so I won't say it.

14        I know that Miss Shouse was a friend of a Bill

15   DeLusa, I believe his name was, who did not testify.

16   He didn't testify.  He was the owner of Wild Childs,

17   and she indicated that she knew John Doe, or John,

18   well during the period involved, over two years ago.

19   As you have heard, he moved.  He left that area

20   shortly after the incident, after the murder, and did

21   not return.

22        The next witness was a Jerry Connell who was a

23   Verizon representative who testified to certain

24   records.  The only significant thing about his

25   testimony was that the telephone in that apartment

Summation - Defendant

1    was working.  The telephone was ringing, I think,

2    when the police arrived.

3         There were records of telephone calls coming in

4    and out after the poor lady was killed, and so there

5    was a phone available if Mr. Kane's story was -- if

6    Mr. Kane was there, as he said, and somebody was

7    trying to murder Ruth.  He had a telephone available.

8    It wasn't that it wasn't working.  It was working.

9         Francine Quinn was an interesting witness.  She

10   was a barmaid at the Downtown.  She knew John Kane

11   well from the two years previous.  She subsequently

12   and is presently under arrest and indictment for drug

13   sales at the Downtown, one of the places that

14   John Kane frequented.

15        She claims she saw Ruth with different men that

16   night at the Downtown and then at Wild Childs, but

17   then she saw John with a stocky man with a buzz cut,

18   buzz hair cut which, upon further prodding by the

19   assistant district attorney, she turned out to say,

20   was a shaved head.

21        She also testified about the incident with the

22   keys that Tom Hartman had testified to and that then

23   she left -- she testified she saw Ruth leave and she

24   left about 10 or 15 minute later.  She didn't say

25   whether or not Kane, or Doe, whatever you want to

Summation - Defendant

1    call him, and the defendant had left before.

2        Now, the timing is important because she claimed

3    that she walked quickly.  It was cold.  She walked

4    quickly, and you heard the detective,

5    Detective McHugh, testify it was about a three-minute

6    walk, normal walk.  She walked quickly from Wild

7    Childs around the Downtown to the back of where

8    Ruth's apartment was to where her car was parked in

9    the third row.

10       I think if you look at photograph, it's more

11    like 150 feet, 120 feet from the entrance way rather

12    than the 50 or so feet that she put.

13       She claimed she saw two people arguing who she

14    identified here as the defendant and Ruth.  She knew

15    Ruth.

16       Now, you have to make a determination as to

17    whether you credit that, if they were arguing -- I'll

18    withdraw that for a second.

19       She shortly -- I think the same day that

20    Mr. Scrimo was arrested -- was called into a lineup.

21    She was one of the witnesses who could not identify

22    Mr. Scrimo.  He was sitting there about, I believe,

23    somewhere around seven feet in front of her, well

24    lighted, big as life.  She couldn't identify him.

25       She then talks to some detectives afterward and

Summation - Defendant

1    then she tells you here she could identify him.  She

2    claims she identified him from tattoos but -- and

3    build, but if she did, if she did, her story about an

4    argument with him, having an argument with the victim

5    outside the back door simply -- and then saying,

6    pardon my French, then saying the word fuck, doesn't

7    square with Kane's version as to where this argument

8    took place.

9         Kane's version was very simple.  There was one

10    argument.  It boiled up quickly.  First he -- first

11    Scrimo had left and gone and gotten some beer.  He

12    said it was Budweiser.  Maybe that was an attempt to

13    explain the Budweiser bottle left on the table, but

14    he said he got some beer.

15         The receipt shows the beer was Coors beer, but

16    any way, he says it was about a ten-minute period.

17    Then he comes -- then Scrimo comes back and they sit

18    around chilling, cooling.  I think he said he was

19    vegging, sitting around.

20         They each have a beer for about another ten

21    minutes.  Then, all of a sudden, according to him,

22    there's a very explosive argument where she says

23    something to -- something to the victim -- the victim

24    said something to Scrimo, and he said I'm not taking

25    this, I'm out of here.

Summation - Defendant

1      He says wait a minute, where are you going, man,

2      we just got here.  And she says let him go home to

3      his fat ugly wife.

4          Now, that's one argument that happened like

5      that.  It could not have happened downstairs outside.

6      And if you believe the People's witness -- and they

7      put these people on saying believe them and they are

8      vouching for their credibility -- if you believe the

9      People's witness that the argument happened outside,

10     then maybe Scrimo was on his way out of there.

11         No.  Kane stopped him.  He was saying fuck it,

12     I'm out of here.  There's no way they can make the

13     two -- they tried, but there is no way they can make

14     the two jibe.  There's no way and that's important.

15         Timing-wise, it's important, and

16     credibility-wise it's important.  Kane tried to say,

17     well, I wasn't aware where the victim was.  There was

18     no explanation as to why the victim, under his

19     version of what happened that night, would leave the

20     apartment.  He never saw her leave.  She never said

21     anything about leaving.  It doesn't make sense in his

22     story.

23         Frankly, if you analyze his story, I don't think

24     his story makes sense because a person who has been

25     told earlier -- according to Kane, the victim tells

Summation - Defendant

1    Scrimo earlier that evening -- Kane says she is

2    coming on to him.  She's really interested in him and

3    he's brushing her off.

4         Why she's interested in him is a separate story,

5    but that's what Kane tells you.  And he says at that

6    time Scrimo says what about me.  And she says go home

7    to your wife, you're married, words to that effect,

8    you're married, go home to your wife.

9         At the bar, that's at Wild Childs, is there any

10   flack then?  No.  Does it make sense, ladies and

11   gentlemen?

12        The story the People would have you believe,

13   Mr. Kane's story, and that is, without any preamble,

14   Mr. Kane and Mr. Scrimo had gone up at Mr. Kane's

15   suggestion after about eight hours of drinking to

16   have a drink at the victim's apartment.  That's his

17   testimony.

18        They went up and they had been drinking since

19   they started playing darts about 8:00 p.m. the night

20   before.  It's now 4:00 a.m. on April 12th and Kane

21   says let's go up to Ruthy's and have a drink.

22        They go up, sit around.  Scrimo gets them beer.

23   They sit around.  They all have a beer, and then, all

24   of a sudden, according to him, there's some words.

25   Scrimo says I'm out of here, I'm not taking this.

Summation - Defendant

1     And she says let him go home to his fat ugly wife.

2     And he rushes by Kane and strangles her.

3          What is different from let him go home earlier

4     tonight when nothing happened to let him go home to

5     his fat ugly wife then, couple words?  Does that make

6     any sense?  That's what the district attorney is

7     asking you to believe and they are asking you to

8     believe Kane.

9          I will get to his credibility in a little more

10    detail as soon as I finish with this witness.  They

11    are asking you to believe that story, ladies and

12    gentlemen.  I just don't think that story is

13    believable.

14         Then Bost testified after Francine.  He was the

15    older gentleman who owned Captain Andy's where the

16    victim lived.  He found the body.

17         Detective Downes, very interesting detective.

18    My opinion, a very sharp detective.  He's a crime

19    scene collector.  He's an expert and did one hell of

20    a job here.

21         If you have any question about what he did,

22    because the records did not get into evidence, but he

23    testified, you can ask for a read back.

24         My recollection is the following.  And, you

25    know, it's important because the absence of evidence,

Summation - Defendant

1    after all the evidence that he collected, the absence

2    of evidence tying Mr. Scrimo to this murder scene is

3    probably the most significant factor in this case,

4    the absence of evidence.

5        So, if you have any question about what was

6    collected, go back and ask for a read back of

7    Detective Downes's testimony.

8        My recollection is there were 36 items, physical

9    items, that were collected, cigarette butts, hairs,

10   fibers, various items were collected from all over

11   that apartment, all over the apartment.  He

12   photographed 63, is my recollection, different pieces

13   of that apartment and the scene.  He listed those.

14       If you want a read back, go back.  He dusted all

15   over the apartment and he gave you a list, and the

16   record indicates any number of places in each room,

17   each separate room of that apartment, bathroom, the

18   kitchen, there was a bedroom, and then a living room.

19   That's the way it was laid out and each room, all

20   over the place, window sills, doorways, stereos.

21       No print, by the way, on the stereo that

22   Mr. Kane said he was using.  Why not?  According to

23   him Scrimo was never back there.  Did he brush off

24   anything?

25       There's an interesting question about the

Summation - Defendant

1    physical evidence in this case.  The evidence that

2    was found all shows it was Kane, but there may have

3    been more evidence that should have been found that

4    maybe is not explained by what Kane said was done

5    when he and Scrimo left the apartment.

6         He says they together cleaned up the scene.  He

7    said Scrimo did a little brushing off of the table,

8    the chair and couple of knobs.  He removed the beer

9    bottles.  He collected that evidence and took it out

10   of the scene.

11        If you have any question about the photographs,

12   the other evidence and the -- not only the

13   collection, Downes indicated what was done.  They

14   were sent to different forensic specialties in SIB,

15   latents -- by the way, my recollection, he took two

16   prints, he lifted two latent prints himself and sent

17   those in.  He dusted and there were many other prints

18   found by the experts.

19        He also, according to my recollection, he also

20   took a videotape.  He prepared a satellite photograph

21   of the area.  He prepared a diagram of the things to

22   scale, except for the stairs, and he found -- he told

23   you where he found these various items, including, by

24   the way, one of the cigarette butts which

25   subsequently went from him to SIB, from SIB over to

Summation - Defendant

1    DNA.  These butts, one of which was found under the

2    victim's body after she had been removed --

3         MR. BIANCAVILLA:  Objection.

4         THE COURT:  Ladies and gentlemen, it's your

5    recollection of the evidence that controls.  What

6    either counsel says does not control here.

7         If you want something read back, ladies and

8    gentlemen, that's why we have the court reporter.

9    We'll be glad to have something read back.

10        MR. CHAMBERLAIN:  Exactly.  Thank you, Judge.

11        If you have any question about what

12   Detective Downes did or what Detective Downes said,

13   please, ask for a read back.

14        My recollection is, in addition to taking

15   photographs of the carpet where the victim was found,

16   he took photographs of and lifted prints on the

17   doorway to the living room and bedroom.

18        According to Kane the victim's body was between

19   the kitchen and the living room.  There was no

20   testimony that my client ever went beyond that, but

21   Kane did.

22        With respect to physical evidence, there was

23   some evaluation, in my recollection, of the

24   fingernails taken from the victim.  The evaluation of

25   the fingernails is important.

Summation - Defendant

1    One of the fingernails, I think R3, came back to

2    Kane.  The material underneath was Kane's DNA.  The

3    other two fingernails, they didn't tie into anybody

4    other than the victim, but they indicated no seminal

5    fluid was found on them.

6        That's an interesting fact here.  There may have

7    been an absence of evidence to support Kane's

8    testimony about what he claimed occurred.  You may

9    find that you have a disbelief or are having trouble

10   believing Kane about this instance of alleged oral

11   sex on this occasion.  He may have had alleged oral

12   sex on other prior occasions, but there's no evidence

13   that he had it on this occasion.

14       It may have been he was trying to get it on this

15   occasion or it may have been there was an argument

16   about that or about drugs, but there's no evidence,

17   according to the physical evidence that was collected

18   at the scene from the victim, of any oral sex on this

19   occasion, no pubic hairs, no seminal fluid, no

20   evidence.

21       The next witness was the medical examiner who

22   indicated, interesting enough, there was an -- in

23   addition to the strangulation, which was deep enough

24   to cause fractured bones in the neck of the victim,

25   that she had blunt impact on at least two different

Summation - Defendant

1    locations on the side of her head, I believe one was

2    lower and one was upper.

3         Now -- and I believe it was the left side, by

4    the way, ladies and gentlemen, that's my recollection

5    of what he testified to.

6         Now, Kane's rendition of what happened here,

7    that the victim went straight down, does not explain

8    deep lacerations that were testified to by the

9    medical examiner that could be seen deep inside the

10   skin on the victim's head.

11        That is significant.  Where did they come from?

12   There was an attempt to say, well, she may have

13   fallen against some metal rung, but there's no metal

14   rung shown there.  If it had -- a metal rung would

15   have caused, at most, one.  And he indicated it was a

16   blunt force impact, not a sharp impact as a metal

17   rung may have caused.  But, at most, it would be one.

18        There was an attempt to say maybe the other was

19   hitting the floor, but there was a carpet there.

20   There's no explanation for those deep blunt force

21   impacts that the medical examiner found.

22        Doctor Manning was the next witness, the

23   toxicologist.  He indicated that the deceased was

24   intoxicated.  He did not detect any drugs except the

25   drug by the name of gamma hydroxybutyrate acid.

Summation - Defendant

1  Now, that is what -- he testified that's known

2  as a date rape type of drug.  It's the kind of drug

3  that somebody who wants to rape somebody might use.

4  He indicated he didn't think that was -- the amount

5  he found was -- he thought it was consistent with

6  normal suppression after death.  However, there was a

7  significant enough finding for him to make the claim

8  that that drug was in existence.

9  As to cocaine, he indicated that it would last

10 up to 48 hours.  The autopsy was more than 48 hour

11 after.  It was some time in the morning of the 14th

12 of April, more than 48 hours after this incident,

13 after the drinking the night before.  So that there's

14 no evidence as to whether or not this victim had been

15 taking cocaine that night one way or the other.

16 Detective Costello, the fingerprint expert, he

17 testified to the prints he found of Kane at the scene

18 and two other persons, one of whom was named John

19 Marks, not explained, and another by the name of

20 Steven Schwartz who had been arrested for a drug sale

21 some months later, I believe, November of 2000.

22 The detective in the case, the homicide

23 detective in this case, indicated he had spoken to

24 Schwartz some time after the arrest.  I believe it

25 was some time in April of 2000.  No explanation as to

Summation - Defendant

1    why he had spoken to Schwartz when his fingerprints

2    were not matched until November of 2000, but,

3    certainly, the fingerprints indicated that

4    Mr. Schwartz had been in the victim's apartment at

5    some time prior to her murder.

6        Detective McCarthy was the serologist.  Serology

7    is the study of bodily fluids, he told us.  He

8    claimed he noticed some reddish-brown coloring under

9    the fingernails when they were returned from the ME.

10       You'll see the photograph in evidence of the

11   deceased.  She had short fingernails and the

12   fingernail clippings were very slight.  They were

13   taken from the ME and sent to SIB.  That's the Nassau

14   County Police Department, Scientific Investigation

15   Bureau, and from there they were sent to LabCorp for

16   DNA analysis.

17       Now, a couple of things here.  One, no tests

18   were done, no serology tests were done for blood or

19   any other bodily fluid on these by the ME.  The

20   report indicated that and Detective McCarthy so

21   indicated.

22       Two, McCarthy did not, Detective McCarthy did

23   not examine these fingernails prior.  He didn't test

24   for blood beforehand.  He did not make any notation,

25   which a scientist should note of any significant

Summation - Defendant

1   finding under a microscope.  You note that.  You make

2   a notation right then and there.  He didn't make any

3   notation of the color.

4        But after LabCorp sends the fingernails, which

5   was their -- their report came out in June, long

6   after the defendant's arrest, he then decides to make

7   further analyses of just, just R3.

8        Why?  Why are we doing further analyses of R3?

9   What are the People doing here?  Are they collecting

10  evidence to determine who committed this crime or are

11  they trying to pin the tail on donkey.  They already

12  have the donkey.  They are now trying to pen it on

13  him.

14       What are they doing?  The evidence comes back

15  R3, DNA, conclusive, one in 6 billion.  It's Kane.

16  It's Kane's DNA.

17       Now, how do we explain that?  Well, now we are

18  going to try to lessen the blunt of that evidence.

19  We are going to try to detract from that.  So we are

20  going to try to say it's not blood.  It must be some

21  other kind of tissue, skin.  It didn't go deep enough

22  to cause blood.  You can have a scratch without

23  blood, but they are trying to lessen it.

24       That's what was being done here.  That's what

25  you have.  You have to analyze the timing on these

Summation - Defendant

1    tests and what was done in each case.  There's an

2    attempt to change the effect of scientific evidence

3    to try to point it from Kane, which it pointed to,

4    and to try to point it towards Scrimo.

5        Now, he admitted that the DNA test swabs, he

6    could have removed some of the material from the

7    fingernails, but, according to him, there was not

8    enough left.

9        Interestingly, again, the other two fingernails

10   were not tested for blood.  I think it was R2 and R5,

11   but they were tested for seminal fluid and they came

12   back negative, no seminal fluid.

13       If, in fact, they all had a reddish brown color,

14   why weren't they all tested or, more importantly, why

15   was -- why did he not test these things before they

16   were sent out to LabCorp, if, in fact, he had a

17   question about the type of material and the type of

18   tissue which was contained under the fingernails.

19       Detective Shiraldi, he's the scientific expert,

20   microscopic expert for hair, fiber, the cord,

21   cigarette butts, the tool marking.  Shiraldi was an

22   interesting witness.  He originally tested, before my

23   client was arrested, he tested the cord.  He

24   examined, I understand, the cord under the microscope

25   and he comes out with a finding it was a one

Summation - Defendant

1    directional cut.

2         Remember the cord?  You saw the photographs.

3    The cut on the ligature cord, one directional, which

4    he testified on direct there were three different

5    types, generally three types of cuts.  One is a one

6    directional cut which is with a knife; two is a

7    shearing type cut where the blades move across each

8    other like a scissor; and three is where you have a

9    pinch type cut where the blades come together to cut.

10   His finding was that this was a one directional cut.

11        After they arrest the defendant, they find a

12   leatherman tool, which a superintendent uses, many

13   people use, on his person.

14        Now, the tool mark expert who is fully qualified

15   to do a tool analysis decides, or the detectives

16   decide, or somebody decides, let's not go with

17   Shiraldi's findings because one directional doesn't

18   fit.  So they sent it off to the FBI.

19        One other factor, there's a little piece of

20   black material that -- little black dot on that tool

21   that looks like it's from the insulation on the cord.

22   They send that off to the FBI to be tested, along

23   with the tools.  It is after, again, timing is

24   important, after the defendant's arrest.

25        Shiraldi comes back on, after testifying on

Summation - Defendant

1    direct and cross that -- about cuts, he comes back on

2    redirect and he now says what he meant was one

3    directional was a scissor type -- that a scissor

4    would cause a one directional cut.

5        That's my understanding of his testimony on

6    direct.  Your recollection will control, but that's

7    certainly not my understanding, and it's not

8    consistent with scientific principles about tool

9    marks which he's an expert in.

10       Rossotti, the FBI agent, he was very clear the

11   leatherman tool is a shearing type.  A scissor is a

12   shearing type.  A one directional cut is not made by

13   a shearing type tool.  A one directional cut is not

14   made by a knife, a single direction, either cutting

15   through or against a piece of wood.  It's not where

16   the blades slide across each other.

17       This cord was not cut by a knife or any similar

18   type of tool.  It was cut by a shearing type tool

19   but, clearly, he could not say it was cut by this

20   particular tool, as Mr. Biancavilla was trying to get

21   from Shiraldi, that there was something unique about

22   this tool.

23       He could not say there was any -- that this

24   actually cut that cord and that was the report from

25   the FBI.  He was asked how many types of -- shearing

Summation - Defendant

1    types of tools are there and he said hundreds of

2    thousands.

3         Now, the material on the cord was not tested by

4    the FBI.  It was then tested by, subsequently, by

5    SIB.  We are now months and months later.  Clearly

6    that material could not have come from the cord, so,

7    again, an attempt, months and months after his

8    arrest, to tie this man to the scene, tie him to the

9    physical scientific evidence.

10        Clement was the next witness.  Clement was the

11   expert from North Carolina, the LabCorp expert.

12        The original tests -- and you'll have that in

13   evidence -- her original report was dated May 9.

14   It's dated May 9, but it's based on material sent to

15   her long before my defendant was arrested.

16        This report is interesting because it shows --

17   there was an evaluation of the beer bottle which

18   shows -- in the beer bottle, one Budweiser beer

19   bottle found on the table came from a mixture of

20   people, but the victim was excluded.  Ruth Williams

21   was not part of that group.  That's the initial

22   analysis.

23        The next report comes after my defendant has

24   been arrested.  It's dated June 23rd.  This is based

25   upon swabs sent from -- the oral swabs from

Summation - Defendant

1    John Kane -- there were no oral swabs taken from the

2    defendant -- an oral swab from John Kane.

3        Mr. Scrimo provided blood and the -- this report

4    indicates that, again -- this report is interesting.

5    With respect to the beer bottle, page three of this

6    report, the profile for the -- the profile for the

7    beer bottle was consistent with a mixture of DNA from

8    more than one individual, again, a mixture.

9        She says neither John Kane nor Paul Scrimo can

10   be excluded as contributors, but she goes on to say

11   there's a nine allele detected which could not have

12   been contributed by either of these individuals.

13       Now, that report, combined with the original

14   report excluding the victim, indicates there was some

15   other person there, at least whose DNA was on that

16   beer bottle, not the victim.  The victim was

17   excluded.

18       They couldn't exclude -- didn't include, but

19   they couldn't exclude Kane or the defendant.  But

20   there was another person there.  It couldn't have

21   been contributed by either of them.  This was

22   inconsistent, inconsistent with Kane's story.  This

23   would place a third person there, according to this

24   report, and that was never corrected in any of these

25   reports.

Summation - Defendant

1    She did, if you recall her testimony, she did

2    say in a November letter that she had changed her

3    conclusion about Ruth Williams being excluded, that

4    maybe Ruth Williams could have been included.

5         Interestingly, the last report, which was March

6    of 2001, they are sending it back again, again an

7    attempt to change the scientific evidence to point

8    toward this man.

9         They are now saying the June report, June 2000,

10   they couldn't provide any statistical analysis.  The

11   purpose of DNA is to include someone by a certain

12   statistical random percentage as to what the chance

13   is that he's the one that's on there.

14        In other places she provides the analysis, for

15   example, with respect to some of the cigarette butts,

16   one in six billion.  With respect to the fingernail

17   that ties Kane to the victim, Kane's DNA and the

18   victim's DNA, the statistical analysis was, I think

19   it was one in 2,600,000.  You can look at it.

20        The DNA profile from the fingernails are

21   consistent with a mixture of DNA from one individual.

22   John Kane cannot be excluded as a major contributor

23   to the DNA material in this sample and Ruth Williams,

24   item seven, cannot be included as a minor

25   contributor.  That's the material under the victim's

Summation - Defendant

1     fingernails.

2           The probability of randomly selecting an

3     unrelated individual for DNA testing consistent with

4     the major DNA profile is approximately, for the

5     Caucasian population, one in 2,600,000, 2,600,000.

6     That's an interesting statement there.

7           Up here she testified that when there's a

8     mixture, you can't provide statistical analysis, but

9     she does right here.  Kane was the major contributor

10    for this fingernail sample and she provided it.  For

11    him she could give that analysis.

12          When we get over to a year later when the

13    material is sent back to her, she now, again, has

14    Kane as a major contributor to the DNA material on

15    the beer bottle, but she says there's no difference

16    between -- that the one in 6,800 is for whoever was

17    there.

18          That makes no sense.  It makes no sense and is

19    inconsistent with her other report.  It's

20    inconsistent.  First of all, she was predicting.  She

21    was predicting statistical analysis for a mixed

22    sample.  She did it in June.

23          Second of all, she did it for a major

24    contributor, and, even in March of 2001, March 29th,

25    according to the -- her report, John Kane cannot --

Summation - Defendant

1  it was just on the beer bottle.  John Kane cannot be

2  excluded as a major contributor to the genetic

3  material in the sample.  Ruth Williams and

4  Paul Scrimo cannot be excluded as minor contributors.

5      Scientifically, the manner of testing, the

6  manner of reporting, that does not conform with what

7  her prior report was with respect to the other DNA

8  samples.

9      Now, the judge will explain to you how you can

10 evaluate expert testimony and I won't belabor that

11 point.  I suggest that there is -- there was a basis

12 here for believing that there was an attempt to

13 stretch and to get this defendant.

14     More importantly, although she's an expert with

15 respect to evaluating material sent to her for DNA

16 analysis, she may have had some prior experience as a

17 criminologist, but her testimony with respect to the

18 accumulation of DNA under the fingernails is, I

19 believe, a serious stretch.

20     You don't have to be a rocket scientist, ladies

21 and gentlemen, to know when it's more likely to get

22 material under fingernails.  For a lady, you know how

23 you get material under your fingernails, particularly

24 short fingernails.

25     You don't get it by brushing your hands over

Summation - Defendant

1    somebody, or, as Mr. Kane claimed, by grabbing his

2    behind.  Pardon me for being crude.  You don't get it

3    by just light touching.

4        Anything is possible.  But what is likely?  What

5    is reasonable?  You as mature intelligent adults can

6    determine whether or not it's more likely that

7    somebody is going to get material under fingernails

8    by being -- during a struggle, when the victim is

9    trying to prevent the -- prevent a strangulation, or

10   when she's brushing her hand lightly over somebody's

11   behind or through his hair.

12       If she -- it's my -- I think you can also figure

13   out that if there was a scratching during any of that

14   sex play, sex act, there would -- Mr. Kane would have

15   known about it and you would have heard about it.

16       Another stretching, by the way, no report is

17   made by the detective about the fact that Kane had

18   scratches, no notation of that, no examination of

19   Kane to see if he had scratches.  But, nevertheless,

20   we have testimony here that when Kane went in on

21   April the 15th, a few days after the incident, after

22   the murder, the detectives noticed he didn't have

23   scratches.

24       Why didn't he make a notation of that?  Did he

25   look at him, examine him?  No.  They are trying,

Summation - Defendant

1    after the fact, to get Kane out of the way, to show

2    Kane didn't do it, even though the evidence points to

3    Kane, so that they can convince you that Kane's story

4    is true and that this man did it.  That's what this

5    case is all about.  I think if you think about that

6    factor, you'll have to go no further in your

7    deliberations.

8         Where did the evidence point?  Lisa Lawson

9    indicated that some records from 7-Eleven were kept

10   in the regular course, but that the sale reported on,

11   I think it was People's 84, which is a record, was

12   not registered, did not ring up.  It was not totaled

13   as a sale and that's an interesting factor there with

14   respect to Hussain's testimony.

15        Detective Dempsey retires.  He's been around,

16   been a detective for some 39 years.  He claimed that

17   they were just sitting outside, he and three other

18   experienced detectives, for a number of hours, even

19   though -- I don't know whether he said he knew, but

20   other detectives knew exactly where Scrimo was on the

21   night of May 2nd.

22        They knew he was in the Falcon's Nest.  They

23   knew he was there to play darts.  They knew Kane was

24   meeting him for the third week in a row after the

25   murder.  It was that night, a Tuesday night, and they

Summation - Defendant

1    chose not to go in.  They chose to sit around for a

2    couple of hours outside, four detectives.  They are

3    sitting around waiting outside to arrest him outside

4    after he had been drinking and when he was alone,

5    when he was alone.

6         Why?  Were they incapable of going in there and

7    arresting him?  Heck, no.  They were fully capable.

8    They had no fear.  The reason they did that is so

9    nobody knows, so nobody calls his wife who calls an

10   attorney.  It was so they have a chance to

11   interrogate him overnight, which they did.

12        Now, Detective Dempsey, he says he read him his

13   rights.  I don't think he had a card, but I will

14   concede that Detective Dempsey, whom I know, has been

15   around long enough to know the rights by heart.  He

16   didn't need a card, but he certainly didn't have him

17   sign a card.  He didn't need a card because Dempsey

18   would know.

19        According to Dempsey he said we are arresting

20   you for murder.  He says I have been here all night.

21   And Dempsey says, no, we are arresting you for some

22   other murder.  But there is no further conversation

23   other than he said I didn't do anything.

24        Dempsey says there was no mention about a recent

25   court decision, but it's still -- Scrimo is being

Summation - Defendant

1    interrogated by two other homicide detectives,

2    Detective McHugh and Detective Parpan.  He mentions I

3    know you don't have to read me my rights anymore.

4         Now, Parpan tells us there was no further

5    comment on that.  We didn't say anything.  We didn't

6    say, yes, we do.  Nothing.  Merely do you understand

7    your rights and do you want to proceed?  According to

8    them, the answer is yes.

9         No rereading.  Big question, and one of the

10   issues here, and the Judge will tell you the law, but

11   the law is that -- the Judge is going to tell you

12   that the People have to prove beyond a reasonable

13   doubt, again, that the defendant was advised of his

14   rights and knowingly and intelligently waived those

15   rights before they can use any statement that they

16   may claim they took from him.  I don't think that

17   happened.

18        You are going to be the determiners of the

19   facts, but, remember the statement is made that I

20   understand you don't have to.  No correction on that,

21   merely do you want to proceed, yes, and go ahead.

22        We have from 1:00 a.m. to about 7:15

23   interrogation of the defendant on May 3rd, 2000.  We

24   have four detectives involved.  We have testimony

25   from three of them, and the testimony, basically, was

Summation - Defendant

 1    that the defendant was evasive or denied different

 2    things or didn't answer correctly or looked down or

 3    was sullen or withdrawn or was extremely

 4    sophisticated, but -- an extremely sophisticated

 5    story about extremely sophisticated homicide

 6    detectives, particularly Parpan who really could

 7    print a script for TV.  He remembers.  He seemed to

 8    recall, from two years ago, everything that was said

 9    in the sequence which it was said.

10        Detective McHugh was more relying on Parpan's

11    recollection because, if you heard him, Parpan took

12    the notes.  Parpan used his recollection to record

13    things and Detective McHugh read those notes to

14    refresh his recollection as to what was said.

15        What was all of this?  It was an attempt to try

16    to claim the defendant was being evasive or lying.

17    It was an extremely sophisticated attempt, but I

18    submit, ladies and gentlemen, that the inflections by

19    Detective Parpan, the way he made facial expressions,

20    the way he claimed the defendant then looked down or

21    refused to look him in the eye, looked withdrawn or

22    sullen, whatever, is part of a story that detectives

23    are trying to give you when they don't have any

24    admissions and that's what they had, no admissions.

25        In fact -- there's a question as to what was

Summation - Defendant

1    said.  Were these words being put in the defendant's

2    mouth?  Isn't it possible you did this?  Is it

3    possible you said that.

4        Assume for a second that some of those things

5    were exactly the way they were related -- and I doubt

6    they were the way they were related -- but assume for

7    a second that what you are being told two years after

8    the fact is exactly the way these conversations went

9    down.  So what?

10       There are reasons for people being scared to

11   death or being, for whatever reason, not being fully

12   responsive, not even sometimes telling the truth,

13   knowingly not telling the truth.  That does not prove

14   the defendant did anything.

15       If the -- the issue is not what he said.  The

16   issue is what proof did they have as to what he did.

17   And what was said and the way he looked, what his

18   internal thought process was, which was what they

19   were trying to present to you, anyway, not the issue.

20       I go back to Detective Parpan's notes concerning

21   his interview of John Kane.  He did a beautiful job

22   there in the first six or seven or eight -- seven

23   pages, I think, of his notes of the interview of

24   Kane, making Kane look like a bloody fool also.

25       MR. BIANCAVILLA:  Judge, I am going to object.

Summation - Defendant

1        THE COURT:  Sustained.

2        MR. CHAMBERLAIN:  The statements taken here were

3    not ever recorded.  There's no -- there's no statement

4    actually taken from my defendant.

5        All you have is some detectives talking about

6    some conversation they had over a period of six-plus

7    hours, which could have been audio taped but it was

8    not, which amounts to nothing more than an attempt to

9    fill the gaps to support what I believe is an

10   unbelievable statement by Mr. Kane.

11       And you have to recall that they had Kane there.

12   If, perhaps, there had been a statement by my

13   defendant that it was Kane, he would have been

14   charged too.

15       They had Kane there.  They had to rely on Kane,

16   but they got no admission and they arrested my

17   defendant based on what Kane told them.

18       Now, I believe McHugh was also asked if he had

19   ever asked John Doe whether he supplied drugs to Ruth

20   and he denied asking him that.  He is also asked

21   about a Ziplock bag that was taken from the victim's

22   car.

23       MR. BIANCAVILLA:  I am objecting, Judge.

24       THE COURT:  Sustained.

25       MR. CHAMBERLAIN:  Your Honor, my recollection

Summation - Defendant

1    is --

2           MR. BIANCAVILLA:  Objection.

3           THE COURT:  No colloquy.

4           Ladies and gentlemen, again, it's your

5    recollection of the evidence that controls here.  If

6    there's something that you don't recollect, through

7    your foreperson, send us a note and we'll have it

8    read back to you by the court reporter.

9           MR. CHAMBERLAIN:  Ladies and gentlemen, it's my

10   recollection detective -- there was a Ziplock bag with

11   stems and buds removed from the victim's car and

12   Detective McHugh was asked -- that was sent to SIB and

13   Detective McHugh was asked about those.

14          It's my recollection that he said he never got a

15   report back from SIB with respect to that bag, the

16   Ziplock bag of stems and buds that was taken from the

17   victim's car.

18          It's your recollection that controls, not my

19   recollection, as the Judge said, but that's my

20   recollection.

21          I would like to note my objection to the

22   district attorney's interruptions, Judge, when that's

23   my recollection.

24          THE COURT:  Please, no colloquy.

25          MR. CHAMBERLAIN:  Mr. Hussain testified.

Summation - Defendant

1    Mr. Hussain's testimony was, at best, difficult to

2    understand.  He didn't seem to know when he had seen a

3    particular poster.  He claimed he had seen it before

4    it was issued.  He didn't know what date he had signed

5    a statement but he seemed to believe that he had seen

6    the poster on Friday or Saturday after the murder.

7    The poster hadn't been issued until the following

8    week.

9       He also claims that -- he had no explanation as

10   to why the sale that was -- that he claimed had been

11   made had been aborted or not registered.  He had no

12   explanation as to why he had offered -- he claimed he

13   offered condoms.

14      Why would you offer condoms to somebody out of

15   the clear blue sky?  There was no claim that there

16   was any request for condoms.  Was there -- there was

17   no explanation as to why the condoms were not listed

18   as something that was being sold.  He said they were

19   paid for.  Where did the money go?  Why wasn't it

20   listed?  When did he come up with this?

21      Some time after, if you recall, after May 5th,

22   after the defendant's arrest on May 3rd, if in fact

23   his statement was that he knew the victim as a

24   regular customer, he didn't know her by name, but he

25   knew her by sight.

Summation - Defendant

1    He claimed a couple days after the murder on

2  Thursday, which was the 13th, Thursday night, he knew

3  there had been somebody murdered there and he found

4  out it was her on Thursday or the next day on Friday.

5  He knew who it was.

6    He also claimed he knew the defendant as a

7  regular customer.  Again, maybe not by name, but

8  here's somebody who would come in on a regular basis.

9  If in fact he knew this victim and if in fact he knew

10  the person that had come in just about the time she

11  was murdered, read the story in the papers and saw

12  the picture in the paper, why -- if he really knew

13  that information, he didn't somehow put it together

14  along with the condoms after the defendant's arrest

15  why didn't he say something to someone.

16    I had difficulty understanding Mr. Hussain.  You

17  may have understood him better than I did.  I didn't

18  understand some of things he said.  I think you may

19  have some trouble believing some of the things he

20  said.

21    But there is no explanation as to, if in fact

22  what he claims to have seen occurred, his not

23  reporting that.  What he claims after the detective's

24  interview him, the statement of May 5th, would

25  indicate something significant.  Then why didn't he

Summation - Defendant

1    report it?  You have no explanation here for that.

2         Finally, ladies and gentlemen, before I get to

3    Mr. Kane, I want to talk about Police Officer Stark.

4    She found the body.  She obviously was shook up from

5    her testimony.

6         She was not a witness -- she did not appear to

7    be a witness who had testified a lot of times in the

8    past.  She was convincing.  She didn't seem to be

9    telling a pat story.  She was telling a story like

10   you would tell it, if in fact that's what you recall

11   had happened.

12        I have no question about that or about the

13   substance of her story.  You were allowed to hear

14   part of her conversations with the defendant --

15        MR. BIANCAVILLA:  Objection.

16        THE COURT:  Sustained.

17        MR. BIANCAVILLA:  On, I believe it was

18   October 18th of 2000, she was called to the building

19   complex where the defendant is the superintendent for

20   the cooperative building.  The call was concerning a

21   prowler or somebody that had been in the basement.

22        Aside from that, the discussion concerning that

23   incident, she told you about what the defendant told

24   her, which confirmed the fact that he had purchased

25   some -- purchased some beer and cigarettes and gave

Summation - Defendant

1    them to Kane at some place in an alley.  She told you

2    also that he indicated that John Doe was providing

3    drugs to the victim.

4        I think, based upon all of the testimony here,

5    you have a very reasonable basis for believing that,

6    based upon all the information that you have from

7    John Doe, from all sources concerning him and this

8    victim, and the issue is going to be right down to

9    whether or not -- what you understand of that

10   relationship and what you believe of that

11   relationship, I think that's central to this case.

12       Whether the defendant gave him beer and

13   cigarettes, whether he was even at that apartment is

14   not the issue.  Whether he brought something there

15   and left it, whether he had an argument and left is

16   not the issue.  The issue is who committed this

17   murder.

18       I want to get into Kane's testimony before I

19   conclude here.  Mr. Kane, first of all, why -- first

20   of all, Mr. Kane's story, as I have already

21   indicated, as to the way this allegedly went down, is

22   not credible on its face.  Somebody doesn't, just

23   because of having been told to go home to your

24   wife -- when somebody says go home to your fat ugly

25   wife, somebody just doesn't go and kill somebody.

Summation - Defendant

1    That doesn't add up.

2          Mr. Kane further testified about what he did and

3    that doesn't add up.  You have to remember that

4    Mr. Kane's testimony was not what he had told the

5    police previously.

6          If in fact you are just a witness to a murder,

7    number one, you try to do something about it.  You

8    try to stop it.  He didn't.

9          If in fact you're there, if you can't stop it,

10   you try to call for some help.  He didn't.

11         If in fact you are just there as a witness, you

12   don't help clean up the scene and remove evidence

13   from the scene as he did, according to his story.

14         If in fact you are just a witness, you tell the

15   police.  You tell somebody and he didn't.

16         His claim is he walked home to his home.  Now,

17   does that make any sense to you, ladies and

18   gentlemen?  Do you believe that story?  If Mr. Kane

19   was not involved in this murder or if Kane's story

20   about Mr. Scrimo is true, and we are not here to

21   prove what Mr. Kane did, ladies and gentlemen, we

22   don't have that job, we don't have that burden, and

23   we are not assuming that burden, but if Mr. Kane's

24   story about Mr. Scrimo were true, why didn't he do

25   something about it?  Why didn't he say something

Summation - Defendant

1    about it?  Why did he lie about it the first time he

2    speaks to the police and he did?

3        He lied to the policeman.  There's no question

4    he lied on April 15th when he sees the police.  He

5    said the last time I saw her was -- oh, by the way,

6    the People knew he had some relationship with the

7    victim.  They knew that they could probably tie him

8    to the scene, so he said, yeah, in the past I have

9    been up there, a month or so ago for oral sex.  It

10   was just oral sex.  That's what he told them.  That's

11   on April 15th.

12       Then, if in fact the story that you are now

13   asked to believe were true, why did he do that?  Why

14   didn't he say right away, yes, I was there, I was

15   scared, he did it and I should have helped, but I

16   didn't.  He didn't do that.  He lied.

17       He was asked about whether he knew a bald headed

18   fellow, a large -- a bald headed fellow and he said

19   no because Scrimo wasn't bald and he wasn't large,

20   according to him.  Now, Scrimo was shaved, but he

21   wasn't bald.

22       Now, if in fact the story were true, why does he

23   go the following Tuesday night?  The murder takes

24   place Tuesday night, early Wednesday morning,

25   April 11th, April 12th.  April 18th, the next

Summation - Defendant

1    Tuesday, what does he do?  Well, between -- between

2    the 15th and April 18th, he goes about his normal

3    pursuits, which I assume was going from bar to bar

4    and doing what he does in these bars, selling drugs

5    or just drinking.

6         MR. BIANCAVILLA:  Objection.

7         THE COURT:  Ladies and gentlemen, again, it's

8    your recollection of the evidence that controls.  It's

9    not Mr. Chamberlain's or Mr. Biancavilla's

10   recollection of the evidence.

11        MR. CHAMBERLAIN:  You can determine on your own

12   what you think Mr. Kane's normal pursuits are based

13   upon all of the evidence here.

14        He goes about his normal pursuits, April 18th,

15   2000, night.  What does he do?  He goes and plays

16   darts all night long with Mr. Scrimo.

17        Is that the activity of somebody who was unable

18   to stop something and then didn't tell anybody?  Was

19   that the activity of an eye witness to a murder who

20   had no part in this or who did nothing himself?  That

21   doesn't make sense.

22        He place darts all night.  He goes about his

23   normal routine.  Another week goes by, another

24   Tuesday.  It's now April 25th.  What does he do?  He

25   goes and place darts all night long with Mr. Scrimo

Summation - Defendant

1    and others.

2         Ladies and gentlemen, if you had been a witness

3    to this murder, would any of you do that?  Does that

4    make sense to you?  The DA can you tell about all

5    this other evidence, but if you ask him, and ask

6    yourselves, is there anything that can explain that

7    behavior?

8         Another week goes by, another week of normal

9    activity.  Finally, it's now May 2nd, Tuesday night

10   or Tuesday afternoon.  Kane is scheduled to go play

11   darts again for the third week with Mr. Scrimo and

12   other people, again, at the Falcon's Nest.

13        This time he doesn't get to go.  He's picked up

14   by the police.  When he's picked up by the police, he

15   is questioned for a period -- number of hours by

16   Detective Parpan who takes the notes, and

17   Detective McHugh.  He talks about where he -- what he

18   did.  His background and his prior legal background.

19        MR. BIANCAVILLA:  Objection.

20        THE COURT:  Sustained.

21        MR. CHAMBERLAIN:  There was testimony to that,

22   Judge.

23        THE COURT:  Sustained.

24        MR. CHAMBERLAIN:  I didn't say what.

25        THE COURT:  Mr. Chamberlain, I ruled.  Please

Summation - Defendant

1    move on.

2         MR. CHAMBERLAIN:  He tells detectives that he was

3    a heavy drinker.  He was drunk three or four days a

4    week, drunk three or four days a week.  He tells them

5    the main bar was the Falcon's Nest, Granny's and Wild

6    Childs and a place call the Shamrock.  He was working

7    two nights -- prior work was two months ago.

8         He then is asked about darts and he says Tuesday

9    only.  He is asked who he plays darts with and he

10   tells them the people, including Paul Scrimo.

11   Paul Scrimo, by the way, is not a regular.  The

12   testimony is he only goes to the Falcon's Nest, aside

13   from the particular evening in question when Kane led

14   him around these other places, he only goes to

15   Falcon's Nest on Tuesday to play darts.  That's what

16   he says.

17        He calls Ruth Ruthless to the detectives.  He

18   claims at this point he's only seen her two to three

19   times previously.  To the detectives he said four or

20   five times.  He said her place the last time was four

21   to six weeks previously.  He said he had oral sex.

22   No intercourse, oral sex only.  He uses different

23   terms which I think would be demonstrative of oral

24   sex performed on him.

25        He then talked about some boyfriends of Ruth

Summation - Defendant

1    Williams.  He said he wasn't a boyfriend but he told

2    the police about some of her boyfriends, a big blond

3    guy.  He indicated she was a player and that he was

4    never seen with her in public.  He was again asked

5    about last time he saw her and he went back to it was

6    four to six weeks beforehand.  He went from Falcon's

7    Nest on that occasion to her apartment behind the

8    Downtown.  He described it as, again, the same type

9    of sexual activity.

10        MR. BIANCAVILLA:  Objection, Judge.  I am going

11   to object to this.

12        THE COURT:  Ladies and gentlemen, again, it is

13   your recollection that controls.

14        Mr. Chamberlain, or Mr. Biancavilla, what they

15   say is not evidence.  It is what your recollection is

16   and, again, I will tell you if there's something that

17   you don't recollect, let us know by note and we'll

18   have the court reporter read it back to you.

19        MR. CHAMBERLAIN:  Ladies and gentlemen, as the

20   Court has told you, this is my recollection of what

21   Mr. Kane admitted he had told the detectives when he

22   was questioned on May 2nd at Homicide.  That she

23   was -- it's your recollection, as the judge told you,

24   but this is my recollection of what he testified to.

25        He testified that she was never naked.  There

Summation - Defendant

1    was no sexual intercourse, ever.  He was asked

2    whether there was any money owed by her to him or by

3    him to her and he said -- Mr. Kane denied that.

4        He was asked on cross here whether or not he had

5    told the detectives about any money being loaned and

6    he said that Ross had loaned him $50.  That's what

7    they had asked him about.  Ross, I believe being the

8    bartender at the Falcon's Nest.

9        He was asked about who had been present at the

10   Falcon's Nest and he mentioned some names.  He was

11   then asked whether he had seen Ruth some place at

12   about the time of the murder.  He indicated -- he was

13   asked about a big bald guy and he said he was not

14   bald, he was not big.  He just had a shaved head.

15       He then described Scrimo for the detectives as

16   40ish, that he was a custodian, he was married with

17   kids.  He told them that he would see him only

18   Tuesday night at darts and he had seen him two or

19   three weeks ago and that was the first time Paul had

20   a shaved head.

21       He repeated he was not big, he was short, he was

22   just shaved, not tall.  Tuesday night three week ago,

23   he and Paul had been playing darts and they had gone

24   to Granny's and he thought that Paul might have been

25   drinking Guinness.

Summation - Defendant

```
 1          He was asked whether he saw Ruth at Granny's and
 2     he said he thought not.  He was then asked about Wild
 3     Childs and he said that Paul was -- he was there with
 4     Paul Scrimo, there were lots of people there.  He
 5     claims Ruth was already there, came over to us, they
 6     were talking, and he was then finally told you're
 7     lying.  We have evidence tying you to the scene.  We
 8     have Crime Scene Search Unit evidence showing you
 9     were there at the apartment at the time she was
10     murdered.
11          Now, ladies and gentlemen, I want you to think
12     about this because this is important.  This is a man
13     who had claimed he was witness to this murder but he
14     hadn't done anything to stop it, a man who had never
15     called the police, a man who had played -- gone about
16     his normal activities for three weeks, including
17     playing darts on two subsequent Tuesdays with the
18     defendant, a man who had briefly been questioned by
19     the police and lied, a man who continued to lie.  He
20     was a man who had weeks to make up a story.  He was a
21     man that had concern about his being charged here.
22          He's now being told we've got you, we've got you
23     there, we can prove that you were there at the time
24     of the murder.  He had plenty of time to makeup a
25     story.
```

Summation - Defendant

1      What does he do?  Does he say, no, I wasn't
2  there?  I'm going to continue to deny it.  I saw her
3  a week before when I had a sexual encounter with her.
4      What does he say?  He says, well, what am I
5  going to do now?  He's had time to think about this.
6  He's had weeks to think about this and what does he
7  say?  Oh, yeah, I was there, Scrimo came up, screamed
8  stayed, Scrimo blew his stack and did the job.  He
9  comes up with a story.  That's what you have here.
10  That's what you have.
11      The scenario shows you don't have a normal
12  witness here who says here is what I saw.  You had
13  somebody who had every reason to lie and to fend off
14  it wasn't me, it was him.  He had a patsy.  He had
15  somebody else to say did it.  That's what this
16  evidence shows.  I don't care what they put in here.
17  That's all this evidence shows.
18      As I'm saying all of this, I see clouds
19  filtering across your faces.  One of the clouds may
20  be the defendant's not getting up there.  We
21  discussed that loud and clear on voir dire when you
22  were selected.
23      The Court is going to tell you you may not draw
24  any inferences, nada, nothing, from that.  You can't
25  draw any inferences from that.  I can't make that

Summation - Defendant

1    strong enough.  The defendant, as I told you, might

2    not take the stand and you can't draw any inferences

3    from that.

4         The Court will tell you that not only can't you

5    draw any inference, you can't even speculate.  You

6    can't even speculate as to why.  You can't hold that

7    against him.  You can't put that in the equation here

8    and say, yes, but why didn't he -- you can't do that.

9    You have to rely on what you have.

10        That's the way the system works.  It may not be

11   perfect, but it's the best anybody's got any place.

12   It's a system that's tried and true.  You are sworn

13   to follow the Court's instructions.

14        I've been longer than I meant to, ladies and

15   gentlemen.  I am running down and I am going to close

16   very shortly.  I appreciate the time that you have

17   given me but I want to emphasize a few things.

18        During his cross, the defendant -- I'm sorry,

19   during his cross --

20        THE COURT:  Mr. Chamberlain, please keep your

21   voice up.  The reporter is having difficulty.

22        MR. CHAMBERLAIN:  I want to emphasize one last

23   point about the case, about the relationship between

24   Mr. Kane, Mr. John Doe, as he admitted he was called,

25   and the victim.  He claims in his statement here that

Summation - Defendant

1    she was coming on to him.  She was kissing him.  She

2    was kissing him.  She was coming on to him in the bar.

3    She wanted something from him, according to him.  He

4    claims that he had had oral sex with her, just oral

5    sex, whatever number of times, three, five, whatever.

6         He told you he never undressed her, and I hate

7    to get into details, but he had never done anything

8    that would indicate other than a mechanical

9    perfunctory performance on him for his gratification.

10   I don't want to go into any more detail, but I think

11   it's clear he was not providing anything that a

12   normal human being would want from a sexual

13   encounter.  He certainly was not providing

14   friendship, companionship.

15        You heard the district attorney in the opening

16   say Ruth Williams, like many people, was looking for

17   companionship, affection.  She was.  That's

18   understandable.

19        What was she getting from Mr. Kane?  He never

20   took her out, wouldn't be seen out with her, other

21   than if he happened to meet her in the bar, according

22   to him.  That's a pretty terrible thing to say and I

23   don't think it was justified.  She apparently was a

24   good person.  She worked hard.  She may have had some

25   bad habits, but she was neat, worked hard.  She

Summation - Defendant

1    didn't hurt anybody.

2          But what was she coming on to him for?  Think

3    about that, because I think that's central to this

4    case.  If you want to believe Kane, you have to

5    believe this victim was interested in him for some

6    reason, was getting something from him.

7          What was she getting?  What was he supplying?

8    He never took her to a movie, show, any place, even

9    for a drink.  Never had sex with her, never did

10   anything to gratify her.  What is she looking for?

11   What is he supplying to her?

12         You heard about -- from Stark from the mouth of

13   the defendant, she was looking for drugs.

14         Now, I am not here to cast aspersions about this

15   poor lady, but how do you explain the relationship?

16   Think about that and as you think about this cast.

17   Think about whether you want to believe Kane.  Was

18   this -- was this a -- did she like having him come up

19   here so they could do what he said they did and not

20   even take his pants off?  Was that something that was

21   good for her, something that she got out of this, or

22   was there something more to this relationship?

23         If there was something more, then what happened

24   here?  Did it happen the way Kane said or did it

25   happen because of a busted deal?  Did she want some

Summation - Defendant

1    drugs?  Did he owe her money?  Did she -- what was

2    she getting from him?  Was there an argument about

3    oral sex?

4        She wasn't getting anything out of this, ladies

5    and gentlemen, what he described.  She was getting

6    nada and he was getting everything and what was he

7    providing for that?

8        You are all -- we are all human beings.  You

9    have to think in human terms and there has to be some

10   way to explain this.

11       Remember the admonitions you were given as

12   jurors, remember that you will follow the Court's

13   instructions, the burden of proof is totally on the

14   People, totally.  We assume none.  We have none.

15       The proof must prove he killed, this man killed,

16   Ruth Williams beyond a reasonable doubt, that he

17   committed this murder.  I don't think there's enough

18   proof here to prove that.  I think, if anything,

19   there's more proof to prove that John Kane did it,

20   more proof.

21       I think, if Scrimo had provided a statement

22   against Kane, this would have been a cinch for the DA

23   to prove his guilt with the physical evidence.  The

24   physical evidence is compelling.  The absence of any

25   evidence tying Mr. Scrimo is compelling.

Summation - Defendant

1      All we need, and in your sworn duty, is to use

2  your God given common sense and find that the People

3  have not, and I believe you will, have not proven

4  Mr. Scrimo's guilt beyond a reasonable doubt.

5      Now the only way, as we said at the beginning --

6  all the mountains of evidence points the other way or

7  doesn't point either way -- the only way you can find

8  Mr. Scrimo guilty is to implicitly believe everything

9  Mr. Kane said, and it is not believable.  His actions

10  are not believable and he's not believable.

11      Thank you very much, ladies and gentlemen.

12      THE COURT:  Ladies and gentlemen, we are going to

13  take a break at this point.

14      Do not discuss the case amongst yourselves or

15  with anyone else.  Keep an open mind.  Do not form or

16  express any opinions until the entire case has been

17  completed.

18      Do not read or listen to any accounts of the

19  case should they be reported in the media.  Do not

20  visit or view any place or premises that have been

21  mentioned.

22      You are not to permit any party to discuss the

23  case with you or attempt to influence you, and you

24  must promptly report to the Court any violation

25  thereof.

Summation - People

1    We'll be back with you shortly, ladies and

2    gentlemen

3              (Whereupon, the sworn jurors exited the

4        courtroom.

5              (Whereupon, a brief recess was taken.)

6        THE CLERK:  Both sides stipulate all sworn jurors

7    are present and seated properly?

8        MR. BIANCAVILLA:  Yes.

9        THE CLERK:  Mr. Chamberlain?

10       MR. CHAMBERLAIN:  I'm sorry.  Yes.

11       THE CLERK:  Thank you.

12       THE COURT:  We are ready for the People's closing

13   argument now.  Mr. Biancavilla?

14       MR. BIANCAVILLA:  Thank you, your Honor.

15       May it please the Court, ladies and gentlemen of

16   the jury.  Good afternoon.

17       What you have just seen and heard by

18   Mr. Chamberlain is the final act, or the last act, of

19   a very desperate man because this case is about

20   Paul Scrimo and what this evidence has shown

21   throughout this trial is that Mr. Scrimo has been

22   trying to get out from under this murder, trying to

23   find a way to distance himself from this case from

24   the day the murder began.

25       The closing argument by Mr. Chamberlain was no

Summation - People

1   less than an attempt to continue the charade that

2   began --

3          MR. CHAMBERLAIN:   Objection.

4          MR. BIANCAVILLA:   -- the night Ruth Williams was

5   murdered.

6          THE COURT:   Sustained as to charade.

7          MR. BIANCAVILLA:   Now, you may ask, what do I

8   mean?  Mr. Chamberlain couched his closing argument.

9   He said it's his recollection that controls in terms

10  of what the evidence is in terms of what he was trying

11  to explain to you.

12         MR. CHAMBERLAIN:   Objection.  I didn't say that.

13         THE COURT:   Mr. Chamberlain, just make an

14  objection.

15         Overruled.

16         MR. BIANCAVILLA:   And as an example of what I am

17  talking about, he has to think that none of you

18  sitting in this jury box was paying much attention to

19  this trial or none of you in this jury box are very

20  bright.

21         As an example of what he tried to do throughout

22  this trial and closing argument are some of the

23  things he did in his closing argument, for example,

24  the first one that came to my attention -- and I'm

25  sure it came to your attention because I saw that all

Summation - People

1    of you were paying very close attention to the

2    testimony -- the testimony of Tom Hartman, he aptly

3    pointed out to you that Mr. Hartman came into the

4    courtroom and was unable to identify Mr. Scrimo as

5    the man that was in the bar that night.

6         Mr. Hartman truly was unable to identify

7    Mr. Scrimo as the man that was in the bar that night,

8    but what he neglected to tell you was that

9    Mr. Hartman, on May 3rd, picked out Mr. Scrimo from

10   the lineup that he saw on May 3rd.

11        Yes, Mr. Scrimo does not look the same as he did

12   when he sat in this lineup because we know that on

13   the night of the murder Mr. Scrimo looked like that,

14   and as you can see, ladies and gentlemen.

15   Mr. Scrimo's appearance has changed considerably from

16   the night of the murder to as he sits here today. I

17   would ask you to remember that and consider that.

18   Think about whose benefit is that for.

19        He mentions Mellisa Notarnicola, how she just

20   saw him in the bar.  But he neglected to complete her

21   testimony and tell you that Mellisa Notarnicola was

22   the witness that said Paul Scrimo and Ruthy Williams

23   were going at it on right side of the bar.

24        But the best, the best is the testimony of

25   Doctor Manning.  He tells you that the toxicology

Summation - People

1    report of Ruthy Williams showed that there was no

2    cocaine in her system.  Then he says that doesn't

3    mean anything because, you heard Doctor Manning,

4    Doctor Manning says that cocaine only stays in your

5    system for 48 hours.  And then, with a straight face,

6    he tells you that it doesn't mean anything because

7    the autopsy wasn't done until Friday, and that, if

8    cocaine only stays in your system for 48 hours, he

9    argues to you, that it doesn't mean anything because

10   it was gone by Friday.

11        Think about that argument.  Ladies and

12   gentlemen, Ruth Williams was dead and Doctor Manning

13   told you it takes 48 hours when you are alive to

14   process --

15        MR. CHAMBERLAIN:  Objection.

16        THE COURT:  Ladies and gentlemen, it's your

17   recollection of the evidence that controls.

18        MR. BIANCAVILLA:  -- cocaine to get out of your

19   system.  One your dead, you are not eliminating

20   anything else out of your system.

21        Ladies and gentlemen, remember that when you are

22   thinking about the arguments that Mr. Chamberlain is

23   trying to make here regarding the evidence.

24        With respect to whether or not Mr. Scrimo was

25   advised of his rights, at one moment he's telling you

Summation - People

1    he knows Detective Dempsey and he gave him his

2    rights, then he got his rights, and Detective Dempsey

3    doesn't need to use a rights card because Dempsey has

4    been around for 30 some years and Dempsey knows the

5    rights by heart, and in the same breath he argues

6    that at the same time he wasn't advised of his

7    rights.

8         What do you think that's about?  That's trying

9    to get you to chase a red herring, ladies and

10   gentlemen.  That's not there.  That's just an attempt

11   to create issues that are not there, and that's an

12   attempt to get you not to focus on what the evidence

13   in this case is and what the evidence in this case

14   shows.

15        Now, don't think you're something special here,

16   because Mr. Scrimo thought the police who

17   investigated this case were stupid.  So don't think

18   there's something special when they try to pedal

19   these arguments now, because what they were hoping

20   and what he was hoping, that the police would bite on

21   some misdirection and some bait he threw out there

22   trying to point the police in different directions

23   and that's no different than what they are trying to

24   do now.

25        I suggest to you that the police were not fooled

Summation - People

1   by this charade and I'm confident that you will not

2   be fooled by his charade.

3       MR. CHAMBERLAIN:  I object to these improper

4   comments, Judge.

5       THE COURT:  Sustained as to charade.

6       MR. BIANCAVILLA:  In a little while we are going

7   to go over the evidence and I'll probably take about

8   40 minutes.  I am going to take the evidence in this

9   case, ladies and gentlemen, and we are going to turn

10  it upside down and inside out and you're going to look

11  at it and I suggest to you when you are done turning

12  it upside down and turning it inside out, it's all

13  going to point to that man, the killer of Ruth

14  Williams.

15      Before I do that, I want to thank you for

16  participating as jurors in this case.  We've taken

17  you away from your businesses.  We have taken you

18  away from your daily routines and we've asked you to

19  come and sit here and now we are into almost the

20  third week of trial.  I appreciate your attentiveness

21  during the course of the trial and just ask you

22  continue to be attentive just a little longer while I

23  make my final remarks.

24      Witnesses, let me talk about witnesses for a

25  moment.  I am not going to go through each and every

Summation - People

1    one because I think, basically, what's important

2    about witnesses is that you understand, first of all,

3    that we have no control over our witnesses.  We take

4    our witnesses as we find them.

5        I would think that, using common sense, if you

6    are talking about a murder that occurred at 4:30 in

7    the morning and your witnesses are people whose lives

8    revolve around darts and going from bar to bar,

9    you're going to have some characters.

10       But you don't let them get away with murder

11   because it happened at 4:30 in the morning and you

12   don't let a guy get away with murder because some of

13   the witness' memory may be fuzzy because it was the

14   result of a night of drinking.

15       What I mean is this.  I would love to have been

16   able to stand up here during this trial and call as

17   my witness Colin Powell, Colin Powell, and put him in

18   that witness stand and have him describe to you what

19   happened that night.  Think about it.

20       Could you imagine if I put Colin Powell on this

21   witness stand and he was able to describe for you how

22   they were at Y.L. Childs, Colin Powell, John Kane,

23   Ruthy Williams and Paul Scrimo, and how they were

24   drinking together and how they went back to Ruth's

25   afterwards and Scrimo made the run to 7-Eleven.

Summation - People

1    Colin Powell, he's the picture of credibility.

2    But that's not reality, ladies and gentlemen.  We

3    take our witnesses as we find them.

4        By the way, I understand he wasn't available for

5    Tuesday night for darts, which is why he couldn't be

6    here, but this is what I am talking about.  We take

7    our witnesses as we find them.  We don't try to stage

8    anything here, ladies and gentlemen.  We give them to

9    you as we get them.

10       John Kane is a classic example.  John Kane came

11   in here, his hair, as you saw, was as long as it was

12   when this murder was committed.  John Kane still had

13   that beard growing down the middle of his chest, the

14   same as it was when this incident happened.

15       Mr. Chamberlain kept asking the witnesses what

16   Mr. Kane looked like at the time he was being

17   interviewed or at the time he was being questioned by

18   the police.  What did he expect, that he was going to

19   be different here today?  Did he expect us to stage

20   something and have him dressed up in a suit and tie,

21   all shaven?  We are not here to stage anything,

22   ladies and gentlemen.

23       What you should really begin to wonder about is

24   what they are trying to do here because this is not

25   the Mr. Scrimo of April 11th, 2000, and just because

Summation - People

1    you walk around in a suit and tie and have a

2    briefcase, that doesn't make you any less of a

3    killer.

4         So when Mr. Chamberlain, during jury selection,

5    said don't judge a book by its cover, what I am

6    suggesting to you is don't judge that book by its

7    cover.

8         The police, Mr. Chamberlain made various

9    comments about the police, about the police

10   investigation, how you can't believe the detectives

11   because the conversations that they had with

12   Mr. Scrimo weren't taped recorded.  They must be

13   making this up.  Everybody is getting together here

14   and trying point the finger at poor Paul Scrimo,

15   Meghan Clement from LabCorp, all the detectives,

16   Mohammed Hussain.

17        That's right.  Believe that, ladies and

18   gentlemen, everybody got together over a slurpee over

19   at 7-Eleven with Mr. Hussain and are trying to frame

20   Mr. Scrimo for this murder.

21        Think about how ridiculous that is.  If the

22   police were going to fabricate a statement that was

23   not recorded by Paul Scrimo, don't you think they

24   could have done better than what they did?  If they

25   are going to make something up, why not come on in

Summation - People

1    here, get on the stand and say he confessed, he told

2    us he killed Ruth William?

3         You would think two homicide detectives who have

4    over 50 years experience combined would do that, if

5    in fact they wanted to come in and lie, not come in

6    and give you a verbatim description of a conversation

7    they had.

8         So remember that, ladies and gentlemen, you're

9    going to use everyday life experiences when you are

10   judging somebody's credibility.  I'm sure you would

11   agree, if they were going to make something up, they

12   could have done better than that.

13        Let's take it a step further.  If they wanted

14   just to close out this murder and they wanted to just

15   move on, why the heck didn't they just hang it on

16   John Kane?  Think about it.

17        John Kane's DNA under the fingernails.

18   John Kane's fingerprint is on the CD, and, as

19   Mr. Chamberlain told you in his opening statement,

20   John has that long hair and beard.  He's that hippie

21   type.  He lives that dirty hippie lifestyle and you

22   can't trust him.  Those were Mr. Chamberlain's words

23   in his opening statement.

24        Think about it.  If McHugh and Parpan just

25   wanted to close the case, hey, hang it on Kane and

Summation - People

 1   let's move on.  Would it have made there lives

 2   easier.  It sure would have made my life easier.

 3         The problem with that is, in trying to hang this

 4   on Kane, none of other evidence makes any sense.

 5   We'll talk about that because, if you are trying to

 6   hang this murder on Kane, nothing else makes sense.

 7         His only hope, ladies and gentlemen, his only

 8   hope at this trial is to convince you that the only

 9   evidence that we have points to John Kane and he

10   keeps telling you that.  He reminded you of that.

11         He told you for two hours in his closing

12   argument that the only evidence in this case points

13   to John Kane, the DNA under the fingernails, the

14   fingerprints on the CD, John Kane said he was up in

15   the apartment, there's no DNA of Mr. Scrimo in the

16   apartment, there's no fingerprints of Mr. Scrimo in

17   the apartment.  And, you know what?  You can't

18   believe Kane because Kane is one of those dirty

19   hippies.

20         Well, I got a news flash for Mr. Scrimo, just

21   because there's no fingerprints in the apartment

22   doesn't mean that we can't prove he murdered Ruthy

23   Williams and killers have been convicted of murder,

24   ladies and gentlemen, long before the advent of DNA.

25   And as you will see there's evidence in this case

Summation - People

1    that's as good as DNA and as good as fingerprints,

2    and he left it all over this case.  You're going to

3    see what that it is in a minute.

4        Wouldn't it be great, wouldn't it be great if we

5    had Paul Scrimo's DNA on Ruthy Williams or the cord

6    that he strangled her with?  Wouldn't it be great if

7    we had his fingerprints?

8        But you know what?  Then you would have another

9    story about how the fingerprint got there.  Then you

10   would have another story about how the DNA got there

11   because throughout this case and throughout the

12   police investigation, all you heard was, let's see

13   what evidence the police have and then let's make up

14   a story to cover.  That's what has happened here.

15       And by the time we are done here, it's going to

16   be clear to you how that was done.  He did it from

17   the beginning and he did it right up to this closing

18   argument, so I think it's important that when we look

19   at this evidence, we start with the statements that

20   he gave to the police and you judge for yourselves,

21   whether he is making it up as he goes along depending

22   upon the evidence that he thinks that we have.

23       You have the luxury, ladies and gentlemen, of

24   sitting back now and reviewing his explanation and

25   you have the luxury of sitting back and reviewing his

Summation - People

1    explanations in the context, in the context of the

2    murder investigation.  When you're reviewing his

3    explanation, what I am asking you to do is to

4    determine whether or not what he is telling the

5    police is reasonable or unreasonable.

6        I want to take you back to jury selection when I

7    spoke to each one of about being a subway token

8    clerk.  I want each one of you, when you are

9    reviewing whether or not his explanations are

10   reasonable or unreasonable, think back in your mind

11   to that example I gave you.

12       Remember, you are a subway token clerk.  You are

13   going down into the subway on a beautiful sunny day

14   like today at lunch time.  All of a sudden you see

15   people coming down into the subway.  They are all

16   wet.  They have on rain coats and they have

17   umbrellas.  You have one person coming up to you and

18   saying the reason why everyone is wet and has rain

19   coats and umbrellas is because it's raining out.

20   Then you have another person coming up to you and

21   saying the reason why everyone has umbrellas and rain

22   coats is because a street sweeper went by and

23   splashed water on them.

24       I think it's clear.  Using your everyday God

25   given common sense, one explanation is reasonable,

Summation - People

1    the other is not reasonable.  When you are looking at

2    statements of Mr. Scrimo, determine whether they are

3    reasonable or unreasonable.

4        If they are unreasonable, and common sense tells

5    you they are unreasonable, then it is a logical step

6    for you to conclude he's lying.

7        Now, the next step is, once you determine he is

8    lying, then you determine why he's lying.  Now, if he

9    had nothing to hide regarding the murder of Ruth

10   Williams, why would he be lying?  There's no

11   explanation for that, ladies and gentlemen.

12       When you are looking at his answer, using that

13   test, if he is lying, he's hiding something.  And I

14   suggest to you that the evidence in this case is

15   going to prove to you beyond a reasonable doubt that

16   he is lying because he murdered Ruth Williams.

17       Now, you are going to be looking at three

18   statements, two interviews conducted by police

19   officers in this case, ladies and gentlemen, and one

20   interview which wasn't really an interview because

21   Mr. Scrimo called the police to his residence for a

22   particular purpose.  You are going to be looking at

23   the first two interviews, one which occurred on

24   April 20, one which occurred on May 3rd.

25       Now, I want you to think about something when

Summation - People

1    you are thinking about those interviews.  Both the

2    May 3rd interview and April 20th interview were

3    conducted by experienced detective, experienced

4    homicide detectives.

5         Remember this, the object of a question is to

6    obtain information that matters to you.  The object

7    of a question asked by a homicide investigator when

8    they are interviewing someone is to obtain

9    information that matters to them in connection with

10   the investigation.

11        There are times when information is given or

12   questions are asked of suspects just to see what

13   their reaction will be because that's what you do

14   when you are a homicide investigator.

15        Ladies and gentlemen, to a certain extent, you

16   do it in your everyday lives.  You have all had

17   experiences when you questioned people or have spoken

18   to people who you believe were not telling the truth.

19   You know when someone is not telling the truth.  You

20   know when someone is being evasive.  You know when

21   someone is trying to back pedal when they are backed

22   into a corner.

23        This is everyday life experience, ladies and

24   gentlemen.  We have all done it.  Homicide

25   investigators just do it more often because they are

1748

Summation - People

1    dealing with people every day in connection with the

2    investigations of murders.

3         So think about that when you are thinking about

4    the purpose of their questions.  When they question

5    somebody, they listen to the response.  They make

6    note of the response.  You recall Detective McHugh

7    made note of the responses when he interviewed

8    Mr. Scrimo on April 20th.

9         Detective Parpan made note of the responses and

10   reactions to the questions when the interview was

11   conducted on May 3rd.

12        Why?  Because the manner in which a person

13   responds and the reaction to the question is very

14   important in terms of determining whether or not

15   someone is telling the truth or someone is telling a

16   lie.  You know it ever day.

17        Listen to the description that Detective Parpan

18   gave you regarding some of the responses Mr. Scrimo

19   gave him.  You know when someone is telling a lie.

20   They can't look you in the eye and talk to you.  You

21   know when someone is telling a lie and needs to think

22   about what the answer is.  They look down.

23        These are normal everyday responses, ladies and

24   gentlemen, that common sense tells you people's

25   reactions are when they are lying.  Detective Parpan

Summation - People

1    and Detective McHugh were just explaining to you what

2    those reactions were when Mr. Scrimo was having a

3    conversation with them, and those conversations and

4    those reactions both Detective McHugh and

5    Detective Parpan made notes on.

6         So you listen to the conversations and think

7    about the testimony that you heard regarding the

8    statements that Mr. Scrimo made and you determine

9    whether or not you would reach the same conclusion as

10   Detective Parpan and McHugh and that is that he was

11   lying.

12        MR. CHAMBERLAIN:  I am going to object, Judge.

13        THE COURT:  Ladies and gentlemen, I will charge

14   you with respect to the law, with respect to what

15   factors you can consider when determining credibility

16   of any particular person.

17        MR. BIANCAVILLA:  Now, let's talk about the

18   April 20th interview.  That's a very important

19   interview and it's important for several reasons.

20        It's important because Detective McHugh, it's

21   important because, Mr. Scrimo's first contact with

22   the police, it's important because Detective McHugh

23   made note of Mr. Scrimo's appearance when he came in

24   for that interview, and what's important is what he

25   does say on that particular day, but what's most

Summation - People

1    important is what he doesn't say on that particular

2    day.

3        Here is the first contact.  At 4:00 p.m. on

4    April 20th, Mr. Scrimo sees Detective McHugh and

5    Detective Cole walking in the Village of Farmingdale.

6    At this point on the 20th, he knows, he knows that

7    the police are looking for him because he had that

8    information from the Tuesday night dart game on the

9    18th when he was told that Detective McHugh wanted to

10   speak to him about this particular incident.

11       At 4:10 on April 20th, 4:10 in the afternoon, he

12   calls the Nassau County Homicide Squad and gets

13   Detective Parpan on the phone and he says to

14   Detective Parpan that I heard from the bar that

15   Detective McHugh was looking for a big bald guy and

16   I'm a big bald guy.

17       Detective Parpan says, well, so am I.

18   Mr. Scrimo says, yeah, but I'm the big bald guy that

19   goes to that bar.  Detective Parpan says let me have

20   your phone number.  Mr. Scrimo said I have nothing to

21   add.  Detective Parpan tells him that I'll have

22   Detective McHugh get in touch with you.

23       A short time later McHugh calls Mr. Scrimo at

24   his home and says he would like to speak with him,

25   can he come over.  Mr. Scrimo tells him no, my wife

Summation - People

1    is coming home soon, It's not a good time.

2        So Detective McHugh tells him we are right

3    behind Captain Andy's where the command post is.  And

4    Mr. Scrimo says I'll come over and talk to you there.

5        What is the significance of that first contact,

6    ladies and gentlemen?  Think about it.  His call to

7    Detective Parpan was ten minutes, ten minutes after

8    he sees McHugh and Cole on Main Street in

9    Farmingdale.

10       He knew that Detective McHugh was looking for a

11   big bald guy.  He knew that Detective McHugh spotted

12   him walking northbound on Main Street because

13   Detective McHugh told you they made eye contact when

14   they passed each other on Main Street.  He knew that

15   it would only be a matter of time before the police

16   would get to him.

17       Remember what Detective McHugh told you.  They

18   had canvassed the bars the night of the murder.  They

19   had gone back and canvassed the bar after the body

20   was found on the 14th.  They had spoken to Francine

21   Quinn on the 14th and she told him that she had seen

22   her with a big bald guy with tattoos and John Kane.

23       The next Tuesday night, after the body was

24   found, was dart night and that's, presumably, the

25   first time Mr. Scrimo found out that the police were

Summation - People

1     looking for him.

2         MR. CHAMBERLAIN:  Objection, Judge, to

3     presumably.

4         THE COURT:  Sustained.

5         MR. BIANCAVILLA:  He doesn't call the police on

6     the 18th.  He doesn't call the police on the 19th.  It

7     isn't until the 20th that he sees Detective McHugh on

8     Main Street that he calls him.

9         Now, think about that.  Think about that and

10    this is why.  He is setting up a charade.

11        MR. CHAMBERLAIN:  I would object to that.

12        MR. BIANCAVILLA:  Judge, charade is fair comment

13    on the evidence and fair response to Mr. Chamberlain's

14    arguments.

15        MR. CHAMBERLAIN:  Not at all, Judge, not that

16    characterization.

17        MR. BIANCAVILLA:  I can characterize this case

18    and what they presented any way I want, Judge.

19        MR. CHAMBERLAIN:  Judge, he's commenting on his

20    operation of --

21        THE COURT:  No.  No.  Mr. Chamberlain.

22        I'll permit the assistant district attorney to

23    go forward.

24        MR. BIANCAVILLA:  Thank you, Judge.

25        He is setting up a charade, ladies and

Summation - People

1    gentlemen, a charade that he's going to call into

2    play at another conversation.  When he's interviewed

3    on May 3rd after his arrest, he is trying to keep a

4    step ahead of the police.

5        He had set up his charade on April 20th and when

6    they arrested him and brought him in, what did he

7    say?  What did he say?  Hi, guys, you got the wrong

8    guy, don't you remember I came to you, you didn't

9    have to come to me, I tried to help you out.

10       That's when Parpan first said to him you didn't

11   come to help us, The only reason why you called us

12   was because ten minutes earlier you saw McHugh on

13   Main Street and you knew that we had information

14   linking you to Ruth Williams, You knew that we were

15   looking for a big bald guy with tattoos, so don't

16   come in here and tell us, hey, guys, I tried to help

17   you, I came to you.  You didn't come to us first.

18   You only came to us when you knew we were about to

19   come to you.

20       That ladies and gentlemen, is important because

21   that's just the first of several times when

22   Mr. Scrimo tries to back pedal and tries to cover

23   himself and that's just the first one.

24       When he walked into the command bus behind

25   Captain Andy's, Detective McHugh made note of his

Summation - People

1   appearance.  He was wearing a long sleeved shirt,

2   none of his tattoos were showing, and he was wearing

3   a pair of black jeans.

4       This is what he tells Detective McHugh about his

5   knowledge of Ruth William.  He said he saw Ruth at

6   Y.L. Childs on Tuesday night at about 2:00 a.m.  He

7   said his wife is just now getting over being mad at

8   him for staying out so late, that he knew Ruth for

9   about two years from the Falcon's Nest.  He said he

10  knew her as Ruth or Ruthless, that he thought she was

11  nice looking and thought she looked younger than her

12  actual age.  He had a friend, Keith Nelson, who told

13  him she was into Pagans, witchcraft and turning

14  tricks up in the apartment.  He didn't even know she

15  lived above Captain Andy's.  By the way, he said his

16  kids go to a nursery school next to Captain Andy's.

17  He spoke to Ruth at Y.L. Childs for about ten minutes

18  and he doesn't remember what he talked to her about.

19      That's what he told Detective McHugh about his

20  knowledge of Ruth Williams and seeing her on Tuesday

21  night, April 11th, the night of the murder.  That's

22  everything he told him about his knowledge and

23  contact with Ruth Williams.

24      He went on an told them that on Tuesday night he

25  had played darts at the Falcon's Nest.  It went from

Summation - People

1   8:00, 8:30, to midnight.  He gave names of the people

2   on the dart team.  He said he was drinking absolute

3   and seltzer because of the Atkins diet.  He told

4   Detective McHugh, I'm a nonsmoker.  He said he went

5   to Granny O'Shea's for one beer, didn't know anyone

6   there, then he went to Y.L. Childs about 2:00 a.m..

7       He also told Detective McHugh he was the only

8   big bald guy with tattoos in Y.L. Childs at that time

9   in the morning and the only people he knew there in

10  Y.L. Childs was Ruth and some tomato with a spike in

11  her lower chin that he shot darts with.  Those are

12  the only people he said he knew at Y.L. Childs on the

13  morning of April 12th.

14      He said he spoke to Ruth for ten minutes,

15  doesn't remember what they talked about, that he left

16  Y.L. Childs at 3:00 a.m., walked straight down Main

17  Street and went straight home, didn't see anyone on

18  the street.

19      That was what he told Detective McHugh regarding

20  Tuesday night and then he made the comment, gee, I

21  wish I could help more, but who knew she would go

22  home and get herself killed.

23      Think about that.  He said he wished he could

24  help more but who knew she would go home and get

25  herself killed.

Summation - People

1    At the end of the interview, Detective McHugh

2    goes into his file and pulls out a picture and shows

3    it to him.  This is the picture Detective McHugh

4    showed.  He said, hey, by the way, did you ever see

5    this person before?

6        Now, you know what direct McHugh was doing at

7    this point, ladies and gentlemen.  This is the point

8    of the interview when he wants to see what the

9    reaction is, what information, if he throws some bait

10   out, what comes back.

11       This, ladies and gentlemen is bait and think

12   about what Mr. Scrimo's response is when he shows him

13   the bait.  He says, yeah, I know that guy.  He's a

14   drug dealer, regular in town, he used to live above

15   the Shamrock.  That's what he tells McHugh just

16   before he walked out the door, and he knows this guy,

17   he's a drug dealer in town, and he lives above the

18   Shamrock.  Then he leaves.

19       At 5:50 in the afternoon, Detective Parpan gets

20   a call and who is it?  Paul Scrimo.  He says, you

21   know, McHugh, you showed me a picture and I just

22   remember where I saw that guy, I see him every

23   morning.  We are on same schedule.  I see him every

24   morning at the same spot when I'm taking my kids to

25   school or I'm going to Home Depot.  As a matter of

Summation - People

1     fact, at nine o'clock in the morning you can find

2     that guy at a particular corner in the Village of

3     Farmingdale.  So they make note of that.

4         Now, think about something just for a moment.

5     If that was really true, if that was really true, why

6     wouldn't he say something to Detective McHugh when

7     Detective McHugh showed this to him.  If he actually

8     saw this guy every morning when he went to Home Depot

9     and dropped his kids off at school, why hadn't he

10    told McHugh when he showed him that, or was this

11    something he came up with as he was walking home,

12    trying to point the police in another direction,

13    trying to make Jeff Johnson the fall guy for this

14    murder.

15        Just consider that, ladies and gentlemen, and

16    does that also fit into the sham and the charade,

17    hey, I tried to help you catch this guy, I told you

18    about Jeff Johnson.

19        Then think about John Kane.  What did John Kane

20    tell you about this guy?  Remember that second

21    Tuesday, the 25th, two weeks after the murder where

22    John Kane says that after darts Mr. Scrimo says don't

23    worry about anything, keep your mouth shut, they are

24    looking for a black guy who had an argument with Ruth

25    behind the apartment.

Summation - People

1      How could John Kane know, ladies and gentlemen,

2  that Mr. Scrimo was shown this mug shot during the

3  course of his interview?  How would John Kane know to

4  say that if it wasn't true?

5      Don't worry about anything, they are looking for

6  some black guy, just keep your mouth shut, that was

7  what John Kane told you that Mr. Scrimo said to him

8  on the 25th.

9      Also think about what he doesn't tell the

10 police, ladies and gentlemen, during that April 20th

11 interview.  He doesn't tell the police that in the

12 early morning hours of April 12th he's going from bar

13 to bar with John Kane.  He doesn't tell them he's

14 hanging out at Y.L. Childs with Ruth and John Kane

15 for nearly two hours.  He doesn't tell them that he's

16 leaving at 4:00 a.m. and after closing.  He doesn't

17 say anything about kissing Ruth at the bar.  He

18 doesn't say anything about leaving the bar with

19 John Kane.  He doesn't say anything about leaving the

20 bar with Ruth and John Kane and walking down Main

21 Street.  He doesn't say anything about stopping at

22 7-Eleven.  He doesn't say anything about getting

23 beers and cigarette.

24     Now, are these facts about the night, ladies and

25 gentlemen, that could have been easily forgotten, or,

Summation - People

1      are they not being revealed by Mr. Scrimo because

2      he's try to distance himself from Ruth Williams and

3      he's trying to distance himself from John Kane?

4           Think about something, ladies and gentlemen.

5      Later on in the interview process, he's going to try

6      and backtrack.  He's going to try and cover himself

7      for not mentioning those names because he knows what

8      the significance was.  He knows he gave them the bare

9      amount of information because at that point he didn't

10     know what they knew and once he started finding out

11     what they knew, then he tries to change his story,

12     then he tries to backtrack and cover his initial

13     statements and you'll see how that happens.

14          Another observation that Detective McHugh made

15     when he walked into the command bus that day was that

16     black pouch that that leatherman tool was in.  That

17     black pouch was on his belt on his waist when he came

18     in for that particular interview on April 20th and

19     Detective McHugh made note of it when he walked in.

20          Now, think about something.  He was wearing that

21     on his belt when he came in for his interview on

22     April 20th.  That's the same one he was wearing on

23     the night he was arrested.  He was arrested coming

24     from darts on Tuesday night.  It's fair to say that

25     Mr. Scrimo always wore that because every time he was

1760

Summation - People

1    observed by the police and on the night he was

2    arrested, he was wearing it on his belt.  Where was

3    he coming from on the night he was arrested?  He was

4    coming from darts and he had it on his belt.

5        May 3rd, as he's coming home from darts, he's

6    arrested by Detective Cereghino and Detective Cole.

7    They put him in the back of Detective Dempsey's car.

8    He is given his rights by Detective Dempsey in the

9    car.

10        And remember what Detective Cerenghino said when

11    he arrested him, he took that black pouch off of him

12    and put it into property for scientific evaluation.

13        Now, during the interview -- the car ride to

14    police headquarters, he's given his rights by

15    Detective Dempsey.  He gets to police headquarters

16    and he's interviewed by Parpan and McHugh.

17        The first thing they do with him is that they

18    confirm the fact that he was given his rights and

19    that he wanted to speak to them without an attorney.

20    He agreed to that and he did that.  He agreed to talk

21    to them.

22        Now, they asked him what about Tuesday night

23    into Wednesday morning?  Tell us what happened, and

24    now, when he is confronted with other evidence, how

25    does he react?  When he's confronted at the end of

Summation - People

1      the interview about John Kane, we've got John Kane --

2      remember what Detective Parpan told you that he told

3      Mr. Scrimo, you know, when more than one person

4      knows, it's not a secret.  When he's confronted, what

5      does he say?  Well, ask John, John knows where we

6      were.

7          What do Detective Parpan and Detective McHugh

8      say to him?  Wait a minute, wait a minute, you never

9      told us about any John before, who is John?

10         You know, John is the guy I played darts with, I

11     told you we were out all night together.  And they

12     said you never told us about John.  What's with John?

13         Then they confront him with testimony regarding,

14     or information they had about what he was seen doing

15     at Y.L. Childs.  You know, we have got witnesses,

16     Mr. Scrimo, telling us that there was some light

17     sexual contact between you and Ruth at the bar.  Uh,

18     uh, uh, yeah.  Mr. Scrimo, you know, we have

19     witnesses who say you were making out with Ruth at

20     the bar.  Well, she just kissed me on the cheek.  No,

21     we have a witness who said you were really going at

22     it at the bar.  Well, I don't remember.  I was drunk.

23         Think about that.  What do you think that

24     response is all about?  Then he says, well, I went

25     straight home at 3:00 a.m..  They said are you sure

Summation - People

1    you went straight home?  Yeah, yeah, I went straight

2    home at 3:00 a.m..  Did you stop anywhere?  No, I

3    didn't stop anywhere.  You know, Mr. Scrimo, these

4    stores that are open late at night, you know, they

5    have security cameras, they have videotapes.  All of

6    a sudden, yeah, maybe I did stop at 7-Eleven.  Well,

7    what were you doing at 7-Eleven?  What time did you

8    go to 7-Eleven?  You know what, maybe it was much

9    later than three o'clock.

10        And that was only after Detective Parpan told

11   him, you know, those security cameras they have time

12   on it and that response was, well, maybe it was much

13   later than three o'clock, maybe I stopped there.

14   Well, what did you stop there for?  Cigarettes and

15   beer.  Well, you don't smoke what do you need

16   cigarettes for?  Well, sometimes I do.  You just were

17   out drinking all night.  What do you need beer for?

18   Well, you know, I'm a drunk, I do that.  Well, what

19   kind of cigarettes did you buy?  It's not important,

20   It's not important.  Yes, it is.  What kind of

21   cigarettes did you buy?  It's not important.  What

22   kind of beer did you by?  Not important.  It really

23   is important Mr. Scrimo.  No, it's not important.

24        Think about those comments, ladies and

25   gentlemen.  Think about his comments to

Summation - People

1    Detective Cerenghino when Detective Cerenghino goes

2    in.  You know, Mr. Scrimo, you keep telling

3    Detective Parpan you're a drunk, you have blackouts,

4    you don't remember, isn't it possible that you went

5    up to Ruth Williams's apartment that night?  He said,

6    well, I guess it's possible.

7        Then Cerenghino says, you know, we know you were

8    up in that apartment that night because we got

9    John Kane.  No.  No.  I wasn't up there.  I

10   definitely would have remembered that.

11       Think about that, ladies and gentlemen.  Now,

12   understand something, he knows at that point how

13   devastating all these inconsistencies are.  He knows

14   at that point how devastating all these lies are and

15   that's why we have the October 18th charade.

16       MR. CHAMBERLAIN:  I object to what he knows and

17   the comments, Judge.

18       THE COURT:  Overruled.

19       MR. BIANCAVILLA:  That's why we have the

20   October 18th charade after he is released on bail,

21   after he's out there.  That's what the October 18th

22   charade is about.

23       And what's the October 18th charade?  You heard

24   Police Officer Stark testify.  She was the police

25   officer who originally went to the scene.  Then on

Summation - People

1    October 18th, 2000, she gets a call to respond to a

2    disturbance at 25 Elizabeth Street, Elizabeth Gardens

3    where Mr. Scrimo works.

4         She says she pulls up in front of the place and

5    responds to that call and she see this man.  He walks

6    out of the place, throws his hands in the air and

7    says, I'm Paul Scrimo, I didn't do it, you know who

8    did it, John Kane, I have never been in that

9    apartment.  That's how he greets Police Officer Stark

10   responding to a call of a disturbance.

11        Police Officer Stark and Officer Wadsworth say,

12   that's fine, but what are we here about today?  He

13   explains to them about some vagrant who was in the

14   basement, said something to his wife and then flipped

15   a cigarette at him.

16        Then, without even being asked, he goes back and

17   starts talking about the night the murder.  This is

18   what he told Police Officer Stark:  Ruthy was hitting

19   on him at the bar, Y.L. Childs, but only to whisper

20   she wanted drugs from Kane, Kane deals drugs and

21   doesn't give any away for free, we walked back

22   towards her apartment, he went to buy cigarettes at

23   7-Eleven and Ruthy and John went to her apartment, he

24   then met Kane in an alleyway and gave him the beer

25   and cigarette, he went home because he knew his wife

Summation - People

1    would be mad at him if he stayed out any longer.  And

2    he finishes up with.  When they picked me up, I

3    didn't mention Kane because of the drugs.

4        He knows how devastating the inconsistencies

5    were and now he's playing for an audience.  He has

6    Police Officer Stark, who he knows was the first

7    police officer at the scene and found the body

8    because he says to her I'm -- I saw the photographs

9    of the body, I'm sorry you had to see that.

10       Think about that, ladies and gentlemen.  What is

11   he trying to do?  What is he trying to do?  He's

12   trying to cover himself with the fact he never told

13   the investigating detective any of the information he

14   just gave to Police Officer Stark on October 18th.

15       Think about what he told her.  He told her that

16   he was with Kane.  He told her that he was with

17   Ruthy.  He told them that he went to 7-Eleven and

18   bought cigarettes and beer and then went and gave it

19   to Kane in some alleyway.  And he also told them that

20   I even lied to the police when they arrested me

21   because I didn't want to be associated with Kane.

22       Think about that.  Think about that.  What is he

23   trying to do?  And he's trying to sell that swill to

24   all of you, ladies and gentlemen.  That's what they

25   are trying to do.

Summation - People

1      Here is where it all comes home to roost, ladies

2   and gentlemen, because the clean up, the clean up of

3   that crime scene by Mr. Scrimo is where this all

4   comes home, and he can't get away from it.  He can't

5   get around it no matter how hard he tries because the

6   clean up is where the charade started and the clean

7   up is where it's going to end.

8      You have to look at the clean up of that

9   apartment after that murder occurred in the context

10  of the April 20th statement and in the context of the

11  May 3rd statement, in the context of when the police

12  got the information about this purchasing of

13  cigarettes and beer from the 7-Eleven store and in

14  the context of the October 18th statement to the

15  police.

16     Think about it.  What was purchased at 7-Eleven?

17  A twelve pack of Coors Light, pack of Vantage Ultra

18  light 100s.  You saw the crime scene, ladies and

19  gentlemen.  We have diagrams depicting every piece of

20  evidence that was found in that apartment.

21     Where are the Coors Light?  They are gone.  They

22  are not there.  They are not there.

23     You know they were there, right?  You know that

24  they were there because, guess what, Mr. Scrimo in

25  his conversation with the police on October 18th told

Summation - People

1    them, told Police Officer Stark, you know, I did go

2    to the 7-Eleven store and I did by the cigarettes and

3    beer, but I went and gave them to Kane in an alley.

4    So you know they would have been up there, but when

5    the police get there, when Crime Scene gets there,

6    they are gone.  They are not there.

7         Why are they gone?  Think about it.  Why is the

8    Coors Light gone?  Ask yourselves, who would be

9    concerned about the Coors Light?  Who would be

10   worried if the Coors Light were found up in that

11   apartment?  Who would be concerned if the 12 pack of

12   Coors Light were found at the scene of the murder?

13   The person who bought them, the person who purchased

14   them, the person who they could be connected with.

15        Why would John Kane be worried about the Coors

16   Light?  John Kane didn't purchase the Coors Light.

17   John Kane was not in 7-Eleven.  Only one person would

18   be concerned about those Coors Lights being found at

19   that crime scene and only one person would be

20   connected with that 12 pack of Coors Light and that's

21   him.  That's him.

22        Something else not found at that crime scene,

23   the great crime scene detective, 36 different items

24   listed.  What else is missing?  The Vantage

25   cigarettes, ladies and gentlemen.  Where are the

Summation - People

1    Vantage cigarettes?  You know he bought them, not

2    only do you have the clerk saying he bought them, you

3    have the store record and you've got October 18th he

4    tells the police he bought them.

5        Where are they?  Where are they?  They are not

6    there.  There's not even an empty pack of cigarettes

7    there.  We've got a Vantage Ultra Light 100 found

8    underneath the body with the victim's DNA on it.  We

9    have a Vantage Ultra Light 100 found underneath the

10   ashtray with the victim's DNA on it.  Where is the

11   pack of cigarettes?  It's not there.

12       Same analysis, ladies and gentlemen.  Who up in

13   that apartment would be concerned if those packs --

14   that pack of cigarettes was found?  Why would

15   John Kane worry about that pack of cigarettes?  He

16   didn't buy it.  There's nothing about the cigarettes

17   to connect him with the crime.

18       It's not there because only Paul Scrimo would be

19   worried about that pack of cigarettes being found at

20   that crime scene because then it would be connected

21   to him.

22       The Budweiser bottle, what do you think that's

23   doing there?  John Kane told you, I don't remember

24   leaving a Budweiser bottle on the table, but I can

25   tell you where the Budweiser bottle came from

Summation - People

1  probably.  There is a mixture of DNA on that

2  Budweiser bottle.  Remember what Meghan Clement from

3  LabCorp told you?  There's a major contributor and

4  minor contributor; john Kane is a major contributor,

5  Mr. Scrimo is a minor contributor.

6      What does that mean?  John Kane was drinking out

7  of the bottle more than Mr. Scrimo was drinking out

8  of the bottle.  That's what that means.  That's why

9  there's a mixture of DNA on it, ladies and gentlemen.

10  That's why there's a mixture of DNA.

11      Scrimo doesn't care about the Budweiser bottle

12  because it can't connect him with the crime.  Scrimo

13  doesn't care about the cigarette butts because he's

14  not a smoker and they can't connect him with the

15  crime.  The only items missing from that crime scene,

16  ladies and gentlemen, are the items that could

17  connect Paul Scrimo with that murder, items that he

18  admitted to buying at 7-Eleven, items that the

19  7-Eleven clerk observed him buying and you have a

20  store record for.

21      Do you think that it's coincidence that the only

22  items missing from that crime scene are things that

23  connect him with that murder?  I suggest not, ladies

24  and gentlemen.

25      The reason why the Budweiser bottle was left is

Summation - People

1    he didn't care about the Budweiser bottle.  There

2    were no fingerprints on the Budweiser bottle, just

3    the cigarettes are gone and the Coors Light are gone.

4         Now, think about it.  I would take that, ladies

5    and gentlemen, over DNA and a fingerprint any day of

6    the week, because when the only items that are

7    missing from a crime scene can be shown to have been

8    purchased by this defendant, not only by independent

9    evidence but also by his own admission to Police

10   Officer Stark, and those are the only items that are

11   missing from a murder scene, that speaks volumes,

12   ladies and gentlemen, as much as any DNA or any

13   fingerprint.

14        Now, here is where it even gets more interesting

15   because you really have to think about the 7-Eleven

16   purchase and 7-Eleven clerk.  Down the road, he's got

17   a real problem.  He's got a real problem.  May 5th

18   the police department and detectives find that

19   7-Eleven clerk.  They find the 7-Eleven clerk and the

20   clerk remembers a sale about 4:00 a.m..  He remembers

21   the sale.  He made a sale to a regular customer.  He

22   made a sale to a regular customer, Mr. Scrimo.  He

23   makes a sale to a regular customer of particular

24   items and it was peculiar that Mr. Scrimo would be

25   buying a 12 pack of Coors Light and a package of

Summation - People

1    Vantage Ultra Light 100s.  He thought it was

2    peculiar, so peculiar because normally he has another

3    regular customer that buys those items and, in fact,

4    the clerk says to him you going to see the blonde

5    lady.  And he smiles and he says yeah, don't tell my

6    wife, and the clerk says take condoms.

7         Now, he's got a real problem because he's

8    already told Detective McHugh that he went straight

9    home and he's already told McHugh that he didn't stop

10   anywhere.  Now he finds out, uh-oh, uh-oh, they got

11   me at the 7-Eleven.

12        So what does he do?  This is all part of the

13   charade, ladies and gentlemen, on October 18th when

14   he sees Police Officer Stark, I got to cover myself,

15   they got me at the 7-Eleven at 4:00 o'clock in the

16   morning, what does he say?  What does he say?  Oh,

17   yeah, I went there, I bought the cigarettes, I bought

18   the beer, but I didn't go up in the apartment, I gave

19   them to Kane outside.

20        Come on.  Think about that.  What do you think

21   that's all about?  It's to cover himself because he

22   knows how devastating that piece of evidence is and

23   think about what the clerk told you.  Remember where

24   Scrimo lives, where the clerk describes to you,

25   Mr. Scrimo lives directly across from the 7-Eleven

Summation - People

1    store.

2         You can look at the map.  After he purchased

3    after he purchased the cigarettes and the beer and he

4    gave him the condoms, he walked out of the front door

5    and went to the right and to the right is where Ruthy

6    Williams lived.

7         Make no mistake about this charade, ladies and

8    gentlemen, make no mistake about it because that's

9    what it is, and that's all it is.

10        Now, the leatherman tool, the tool that was

11   found on Mr. Scrimo, think about who examined that

12   cord, ladies and gentlemen.  Detective Shiraldi

13   examined the cord, Carlos Rossotti from the FBI

14   examined it.  What did they determine?  The cord was

15   cut with an instrument that produces a shearing type

16   cut.

17        Detective Shiraldi demonstrated to you in the

18   room here the difference between a cut and shearing

19   type cut produced by that leatherman tool.  Rossotti

20   did his test cuts back in the FBI laboratory.  What

21   did he tell you?  No, I can't tell you that that tool

22   produced that particular type of cut, but I can tell

23   you that that tool makes the same type of cut that I

24   observed on the ligature that was wrapped around her

25   neck.

Summation - People

1       Think about something else that Detective

2   Shiraldi told you, his expert, his expert, went to

3   the Nassau County Police Department laboratory, took

4   the tool and cut several pieces of wire.  Think about

5   that.  His own expert used that tool.  Detective

6   Shiraldi and Carlos Rossotti came in here and told

7   you that that tool makes a shearing type cut.

8       MR. CHAMBERLAIN:  I object to the comment about

9   my expert.  It's an improper comment.

10       MR. BIANCAVILLA:  I just said he examined the

11   tool.  That's all I said.  I didn't say anything else.

12       THE COURT:  Ladies and gentlemen, it's your

13   recollection of the testimony as to what it is and,

14   again, you can have it read back if you desire.

15       MR. CHAMBERLAIN:  I am objecting to the

16   inference, not the facts.

17       THE COURT:  The objection is overruled.

18       I want to remind you, ladies and gentlemen, it's

19   your recollection, again, as to the testimony.

20       MR. BIANCAVILLA:  Now, think about the way that

21   cord was cut and think about the tool that was found

22   on the defendant at the time of his arrest, the tool

23   that he was wearing as he walked from the dart room,

24   the tool he was wearing during the interview on

25   April 20th with Detective McHugh.  Do you think it's a

Summation - People

1   coincidence that his tool produces the same shearing

2   type of cut that the ligature was cut with before

3   Ruthy Williams was strangled to death?  Think about

4   that.

5       At this point, ladies and gentlemen, we haven't

6   even spoken yet about John Kane, but let's review the

7   evidence that you have heard so far in this trial.

8       Paul Scrimo and Ruth Williams are at Y.L. Childs

9   together after two o'clock in the morning with

10  John Kane.  Three witnesses, Tom Hartman, Mellisa

11  Notarnicola and Francine Quinn put him there.

12  Mellisa Notarnicola sees him, as she describes it,

13  going at it with Ruthy on right side of the bar.

14  Francine Quinn says they were kissing.

15      Francine Quinn sees him, or a man that looks

16  just like the guy that she was at the bar with,

17  arguing outside of the apartment.

18      We know what time Ruth William got home.  How do

19  we know?  Because we have the telephone records.  The

20  telephone records show that Ruth Williams made a call

21  out of her apartment at 4:00 o'clock in the morning

22  to directory assistance.  That's why the Verizon

23  individual was here.  So we know Ruthy was home by

24  4:00 a.m. because she made that call to directory

25  assistance.

Summation - People

1    You have the 7-Eleven clerk who says that at

2    approximately four o'clock in the morning, he comes

3    in and buys a 12 pack of Coors Light, package of

4    Vantage Ultra Light 100s and he gives him a couple of

5    condoms.  He sees him walk out the door, goes in the

6    direction of Ruth Williams' apartment.

7    You've got the store records that show the sale

8    occurred at 4:12 in the morning.  We have a telephone

9    cord that is found wrapped around, and tied in a knot

10   around, Ruthy Williams' neck.  He is wearing a

11   leatherman tool, a leatherman tool that produces the

12   same type of shearing type cut found on the ligature

13   around Ruthy Williams' neck.

14   The only items missing from the apartment are

15   the Coors Light and cigarettes.  The items that he

16   purchased from 7-Eleven, the items that could connect

17   him with that murder scene.

18   He voluntarily goes to the police and lies to

19   them before he's arrested, never mentions Kane, never

20   mentions making out with Ruthy at the end of the bar,

21   never mentions going to the 7-Eleven store.

22   He lies to the detectives after he's arrested,

23   tries to say he told them about Kane, maybe I stopped

24   at 7-Eleven, won't tell them the beer he bought,

25   won't tell them the cigarettes he bought.  His answer

Summation - People

1    to all of the confrontational questions are I'm a

2    drunk, I don't remember.

3        Look at the story, how he changes it when he's

4    got Stark there on October 18th.  Well, you know, I

5    was really kissing Ruthy at the bar but the only

6    reason she was kissing me was to whisper in my ear

7    she wanted drugs from Kane, you know, I really did go

8    to the 7-Eleven store, I really did purchase that

9    beer and cigarettes, but I didn't go up in the

10   apartment, I gave it to Kane in the alleyway and I

11   never really told the police about Kane because, you

12   know, I didn't want to get involved in that drug

13   thing.

14       Think about that ladies and gentlemen, what a

15   mountain of evidence that is.  He's the last person

16   that's seen with her alive, and you have that

17   mountain of evidence and we haven't even gotten to

18   John Kane yet.  We haven't even gotten to John Kane

19   yet.

20       Now, I told you in the beginning, ladies and

21   gentlemen, that you and you, and each of you, were

22   fortunate because we have an eye witnesses to the

23   murder.

24       John Kane as the killer, which is what they want

25   you to believe, if John Kane is the killer, how come

Summation - People

1    he's doing that song and dance with the police?  How

2    come there are three different stories floating out

3    there in terms of what he did that night, what his

4    involvement was?  If John Kane is the killer, why is

5    he doing all that?  Why is he trying to distance

6    himself from Ruth and Kane?  Why wasn't he up front

7    with the police on the 20th?  Why was he fencing with

8    them on the 3rd?  Why did he deny going to 7-Eleven?

9    Why does he call in Pamela Stark on the 18th to cover

10   the first two stories he told, if John Kane is the

11   killer?  Why is he doing all that?  It doesn't make

12   sense.

13       The evidence of his lies and his charade only

14   makes sense, if he's the killer, and not if John Kane

15   was the killer.

16       If Kane was the killer, ladies and gentlemen,

17   and Kane was concerned about the crime scene, why are

18   the only things missing from the crime scene the

19   things, the two items, that can connect him with the

20   crime scene.

21       If Kane was cleaning up that crime scene to try

22   to distance himself, why is the Budweiser beer bottle

23   still on the table, the CD case still in the rack,

24   his fingerprints on it?  Why are his cigarette butts

25   still on the kitchen table?  If John Kane was

Summation - People

1    cleaning the crime scene, those things would have

2    been gone, ladies and gentlemen.

3        The only thing missing are things that connect

4    him with that murder.

5        Also, ladies and gentlemen, common sense tells

6    you Kane is way to small to have killed Ruthy

7    Williams the way she was murdered.  Common sense

8    tells you that.  Remember the crime scene?  Look at

9    the video of the crime scene.  That apartment, other

10   than the napkins on the floor by the exit, is

11   pristine.  Nothing is out of place.  Nothing is out

12   of order.  Remember the bed?

13       Look at the video.  There were clothes hanging

14   from the rail on top of the bed, not one of them is

15   out of place, not a wrinkle in the bed spread.

16       Remember what Detective McHugh told you,

17   John Kane weighed a 150 pounds when he was

18   interviewed by the police right after the murder.

19   Ruthy Williams was 5 feet 8, weighed a 165 pounds

20   when she was murdered.  She had Kane by 15 pounds.

21   There's no way John Kane could have taken her down to

22   the floor with one shot without messing up the bed,

23   without knocking something over, or without some type

24   of struggle which would have been seen in the crime

25   scene.

Summation - People

1      Look at the way the body was found and look at

2   the area around the body.  Nothing out of place.  It

3   took a big man, a powerful man to take her down in

4   one shot.  It took a big man and a powerful man to

5   crush her throat and break the bones that were

6   testified to by the medical examiner.

7      Ladies and gentlemen, there's no way that

8   John Kane could have overpowered Ruth Williams and

9   crushed her throat the way her throat was crushed

10  before that ligature was tied around her neck.

11     You heard John Kane testify.  He came in here.

12  He took the stand.  He looked at each and every one

13  of you.

14     Now, John Kane is what he is, ladies and

15  gentlemen.  I told you, we take our witnesses the way

16  we find them.  We don't try to dress them up, make

17  them look better than they are.  John Kane is what he

18  is.  John Kane May drink too much, his beard maybe a

19  little bizarre, but you can't hold that against him.

20  Common sense tells you he's no killer.

21     When he was testifying, did he seem evasive?

22  Was he making eye contact with you?  Did you get the

23  feeling that he was just looking at you and telling

24  you what happened that night?  Did he appear nervous?

25     He didn't, ladies and gentlemen.  He sat there.

Summation - People

1    He looked at you.  He told you what happened.

2    John Kane is John Kane, ladies and gentlemen.  His

3    life is installing floors, playing darts and drinking

4    too much.  It may be -- may not be much of a life,

5    but you know what, it's John Kane's life and that's

6    what it is.  It's John Kane's life.  He came in here

7    and he told you what he saw that night.

8         During the course of your deliberations, you're

9    going to have to determine what Mr. Scrimo's intent

10   was when this incident happened.  You're going to

11   have to determine what he intended when he put his

12   hands around her throat and he crushed her throat,

13   her voice box, as the doctor told you.

14        You're going to have to determine what his

15   intent was when he wrapped that ligature around her

16   neck.

17        Now, Ruth Williams, ladies and gentlemen, I

18   think it's fair to say, died a horrible death.  You

19   have to look at that photograph, when you are

20   thinking about what Mr. Scrimo was thinking when he

21   crushed her throat with his bare hands and then cut

22   that cord and wrapped it around her neck like that.

23   When you do that to someone, ladies and gentlemen,

24   you want them dead and you want them to stay dead and

25   that's exactly what he had in his mind when he did

Summation - People

1     that.   Make no mistake about it, there is no coming

2     back from that.

3          We have been through this case, ladies and

4     gentlemen.   We have reviewed all the evidence.   If

5     you use your common sense, it's not hard to figure

6     out from all the evidence what happened here.   If you

7     use your common sense, it's not really hard to figure

8     out what Ruthy and Scrimo were arguing about.   It's

9     not hard to figure out what caused him to jump up

10    from the table and say I don't need this crap, I'm

11    out of here, and then attack her after she made a

12    derogatory remark about his wife because, what have

13    you learned?

14         Paul Scrimo has known Ruthy Williams for over

15    two years.   He knew her from the bars.   He knew her

16    from his friend Keith Wilson.   Keith Wilson had told

17    him, you know, Ruthy turns tricks up there. Keith

18    Wilson told him that.

19         He was out drinking at Y.L. Childs.   He was

20    making out with her.   In the words of Mellisa

21    Notarnicola on the right side of the bar.

22         Francine Quinn described for you and Mellisa

23    described for you how she was dancing for him on the

24    right side of the bar, how she was dancing and taking

25    her straps off.

Summation - People

1    You know what was happening, ladies and

2    gentlemen.  He was drinking.  She was drinking.  He

3    knew how drunk she was when he was walking back to

4    that apartment.  They go up to her apartment, him and

5    Kane, and she's still drinking.

6        Remember Kane told you she's there with her

7    glass of wine.  Hey, hey, I'll go to 7-Eleven, I'll

8    get some beer, no problem.  He goes to 7-Eleven, gets

9    beer, gets the cigarettes, oh, yeah I'll take those

10   condoms.

11       He's going back, ladies and gentlemen, he's

12   going back and he's going to try to get lucky with

13   Ruthy Williams.  He goes back up to that apartment.

14   John is there.  John's chilling to the Allman

15   Brothers, sitting back drinking his beer, smoking a

16   cigarette, chilling to the Allman Brothers.

17       Paul is trying to get lucky.  She says no.

18   That's what the argument is about, ladies and

19   gentlemen.  He gets up.  He goes to leave.  He says

20   I'm out of here.  I am not taking anymore of this

21   crap.

22       John jumps up and goes chasing after him.  Dude,

23   where are you going, we just got here, have some

24   beers, just chill, just chill.

25       She makes the comment about his wife.  She

Summation - People

1   pushes the button.  John Kane told you what happened

2   next, ladies and gentlemen, how he pushed past him,

3   grabbed her by the throat and threw her right down on

4   the ground.  Just like that, she was dead.  Now she

5   is dead and has to stay dead.

6       They cleaned up.  They left.  When they left, he

7   was setting up a scene.  He got rid of stuff that

8   connected him with the murder.  He got rid of the

9   beer.  He got rid of the cigarettes, and he said to

10  Kane as they were walking home, don't worry about it.

11  It's all taken care of.  It's all taken care of.

12  That's what happened that night, ladies and

13  gentlemen.  It's that easy.  It's that simple.

14      You accept what's reasonable, reject what's

15  unreasonable.  Commons sense tells you I have proven

16  this case beyond a reasonable doubt.

17      Ladies and gentlemen, Ruthy Williams, at a

18  happier time, Ruthy may have lived a troubled life.

19  She may have made some bad decisions, but she didn't

20  deserve to die the way she died that night.

21      I am going to ask you to go out, deliberate, and

22  I'm asking you to come back in here and tell

23  Paul Scrimo he's not as smart as he thinks he is.  I

24  am asking you to go out and deliberate and hold him

25  accountable for what he did to Ruth that night.

Summation - People

1    Thank you.

2         THE COURT:  Ladies and gentlemen, at this time we

3    are going to break for lunch.  I am going to ask to be

4    back here at 2:30

5         Do not discuss the case amongst yourselves or

6    with anyone else.  Keep an open mind.  Do not form or

7    express any opinions until the entire case has been

8    completed.

9         Do not read or listen to any accounts of the

10   case should they be reported in the media.  Do not

11   visit or view any place or premises that have been

12   mentioned.

13        You are not to permit any party to discuss the

14   case with you or attempt to influence you, and you

15   must promptly report to the Court any violation

16   thereof.

17             (Whereupon, the sworn jurors exited the

18             courtroom.)

19        THE COURT:  Have a nice lunch.  We'll see you at

20   2:30.

21             (Whereupon, a luncheon break was taken.)

22             A F T E R N O O N   S E S S I O N

23        THE CLERK:  Case on trial continues.  All parties

24   are present.  The jurors are not present at this time.

25             People ready?