

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 29 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                  :
PAUL SCRIMO,               :
                  :
           Petitioner,     :   **MEMORANDUM DECISION AND**
                  :   **ORDER**
      – against –       :
                  :
WILLIAM LEE,          :   11-cv-4171 (AMD)
                  :
           Respondent.   :
                  :
------------------------------------------------------------ X

**ANN M. DONNELLY**, District Judge.

      The *pro se* petitioner, Paul Scrimo, seeks a writ of habeas corpus pursuant to 28 U.S.C. §

2254. On May 21, 2002, following a jury trial in Nassau County, New York, the petitioner was

convicted of one count of Murder in the Second Degree, and sentenced to an indeterminate prison

sentence from twenty-five years to life. The petitioner argues that his conviction is

unconstitutional because (1) the police did not have probable cause to arrest him, (2) the trial judge

made improper evidentiary rulings, (3) the prosecutor made improper comments in summation,

(4) his counsel was ineffective, (5) the verdict was against the weight of the evidence, and (6) he

was denied a fair appeal. For the reasons that follow, the petition is denied.

FACTUAL BACKGROUND

### 1. Investigation

      The petitioner's conviction arose out of the murder of Ruth Williams, a 48 years-old florist

who lived in Farmingdale, New York. (ECF 6-21, at 111.) On April 12, 2000, after a night of

drinking, the petitioner strangled Williams to death in her apartment. (ECF 6-23, at 109.) On

April 13, 2000, Williams' boss reported that she had not shown up for work. Police officers went

1

to her apartment, and discovered her fully-clothed body. (*Id.* at 118.) A black cord, which appeared to be from a telephone answering machine, was wrapped around her neck. (*Id.*) There was no sign of forced entry into the apartment, but the answering machine was pulled out of the wall. (*Id.* at 119.) The detectives vouchered evidence from the apartment, including a beer bottle and cigarette butts, and lifted fingerprints from various places in the apartment. (ECF 6-24, at 13, 69.)

Multiple witnesses told detectives that on the night she was murdered Williams was at Y.L. Childs, a local Farmingdale bar, with two men: John Kane and a second man, who was bald and had tattoos on his arms. (ECF 6-22, at 63.) Williams was kissing this man and "dancing all over him." (*Id.* at 9, 63-65, 123.) Another witness saw Williams and the bald man arguing in the parking lot around 4:00 A.M. (ECF 6-23, at 48.) Detectives interviewed John Kane, who initially denied any knowledge of the killing. (ECF 6-28, at 41.)

On April 20, 2000, after the petitioner saw detectives in the area of the murder, he left a message for one of the detectives. (*Id.* at 42.) The detective returned the petitioner's call, and the petitioner said that he knew detectives were "looking to speak to a big, bald-headed guy that was out at Y.L. Childs on Tuesday night." (*Id.* at 43.) Later that same day, the petitioner spoke with detectives, admitting that he knew the victim and was with her on the night she was killed. (*Id.* at 45.) He claimed, however, that he left the bar around 3:00 A.M. and went directly home. (*Id.* at 46-47.)

Almost two weeks later, detectives interviewed John Kane for a second time. (*Id.* at 51, 118.) This time, Kane admitted that he and the petitioner went to the victim's apartment in the early morning hours of April 12, 2000, and that the petitioner strangled her after an argument.

Detectives arrested the petitioner later that night, and recovered a Leatherman Tool from his belt. (ECF 6-29, 112-115.)

During the interviews that followed, the petitioner repeated his initial account of the hours leading up to the murder. (ECF 6-28, at 54.) As detectives confronted him with evidence that contradicted his account, the petitioner gradually changed his account, admitting that he stopped at a convenience store, that he had been kissing the victim at the bar, and that had been outside her apartment building. (*Id.* at 56-60; ECF 6-29, at 42.) The petitioner denied killing her, and ultimately asked for an attorney. (ECF 6-26, at 62.)

The petitioner's attorney arrived at the precinct, and the petitioner was placed in a line-up. (ECF 6-22, at 13.) Two witnesses could not identify anyone at the line-up, but a third witness identified the petitioner as the man he saw with Williams shortly before her murder. (*Id.* at 11; 6-23, at 1.) Six days later, one of the witnesses who had not made a line-up identification returned to the precinct with a newspaper article that had the petitioner's picture in it; she told the detectives that the petitioner was the man with Williams before the murder. (ECF 6-28, at 71.)

In October of 2000, the petitioner, while released on bond, (ECF 6-30, at 2), called the police to report a disturbance at his home. When officers arrived, the petitioner immediately put his hands in the air, identified himself, and started talking about the murder. He blamed John Kane for the murder, and said that he gave cigarettes and beer to Kane, but that Kane went to Williams' apartment by himself. (*Id.* at 24-26.)

### 2. Pre-Trial Proceedings

The petitioner was charged with two counts of Murder in the Second Degree in violation of New York Penal Law Section 125.25(1) and (2).

Before trial, the petitioner moved to suppress the Leatherman tool that the police took from him when he was arrested, the statements he made to the detectives at the police station, and the identification testimony at the line-up. After the hearing, the trial court denied the petitioner's motion in its entirety.[1]

### 3. The Evidence at Trial

The evidence at trial established that the petitioner murdered Williams in the early morning hours of April 12, 2000. Patrons of Y.L. Childs bar testified that Williams was with the petitioner and John Kane hours before she was murdered; she was dancing seductively, and at one point was "making out" with the petitioner. (ECF 6-22, at 63-65, 123.) John Kane also testified about the killing and the events that led up to it. (ECF 6-30, at 43.) Kane had known Ruth Williams for about two years. (*Id.* at 46.) Although Kane and Williams had several sexual encounters during that time, they were not dating. According to Kane, he and the petitioner played darts at Falcon's Nest bar until midnight on April 11, 2000. (*Id.* at 44.) They went to another bar until 1:00a.m., and then to Y.L. Childs, where they drank with Ruth Williams. Like the other witnesses, Kane said that the petitioner and Williams were kissing. (*Id.* at 46-47.)

Williams left the bar alone, before last call. Kane and the petitioner left later, at approximately 4:00a.m. At Kane's suggestion, they went to Williams' apartment. (*Id.* at 47.) Soon after they arrived, the petitioner left to buy beer and cigarettes at a nearby 7-Eleven. (*Id.* at 48.) The petitioner bought Coors Light beer and Vantage Ultra Light cigarettes. (ECF 6-29, at 66-71.) Mohammad Hussain, the 7-Eleven employee, knew the petitioner, the petitioner's wife, and Williams from the neighborhood. Since Williams was the only customer who bought Vantage

---

[1] The suppression hearing transcript and decision are not a part of the appellate record.

Ultra Lights, Hussein asked if they were for the "blonde lady." (*Id.*) The petitioner smiled and said that they were. He told Hussein not to tell his wife, and Hussein gave him two condoms. (*Id.*)

While the petitioner was out, Williams performed oral sex on Kane, but Kane told her to stop before the petitioner got back. (ECF 6-30, at 49.) The petitioner returned with the beer and cigarettes, and the three of them listened to music. (*Id.* at 51.) At one point, however, Williams and the petitioner got into an argument; the petitioner said that he "was not going to take this," and got up to leave. (*Id.* at 52.) Williams responded, "Let him go home to his fat, ugly wife." (*Id.*)

At that point, the petitioner "snapped," grabbed Williams, pushed her to the ground and strangled her. (*Id.* at 52-53.) Kane, far smaller than the petitioner, tried to pull him off of Williams, but could not do so, and screamed, "What the fuck!" Although Kane thought that Williams was already dead, the petitioner ripped a cord from the wall, wrapped it around Williams' neck, and "yanked up on it." (*Id.* at 52-54.) The petitioner screamed at Kane to turn off the stereo and pick up "the fucking beer," which Kane did. The petitioner wiped the area for fingerprints, and wiped the doorknob as they left the apartment. Kane took the beer bottles with him. (*Id.* at 55.) The petitioner told Kane that they were "in this together" and that he should "just keep [his] mouth shut." (*Id.* at 56.) When Kane saw the petitioner a week later at their darts tournament, the petitioner told him that "everything is taken care of" and reiterated that he should "keep [his] mouth shut." (*Id.* at 61.)

When Williams failed to show up to work, her supervisor called the police. Police Officer Pamela Stark went to Williams' apartment with the superintendent; she found Williams' fully clothed body on the floor of the bedroom, and a black cord wrapped around her neck. (ECF 6-30, at 5-11.) There was no sign of forced entry, and aside from some papers on the floor, the apartment was neat. (*Id.* at 11; ECF 6-23, at 120.) Officer Stark called for backup. (ECF 6-30, at 15.)

Detective Dennis Downes photographed and processed the apartment for evidence. He noted the condition of Williams' body, and that the answering machine had been pulled out of the wall. (ECF 6-23, at 109; 6-24, at 61.) He processed items in the apartment for fingerprints, and vouchered wine glasses, an ashtray, cigarette butts, and a Budweiser beer bottle. (ECF 6-24, at 13, 27.) There were no Coors Light bottles in the apartment, nor was there a package of Vantage Ultra Light cigarettes.

In the days following the discovery of Williams' body, Nassau County detectives interviewed witnesses and gathered evidence. (ECF 6-21, at 92.) Witnesses told the detectives that Williams was with John Kane and a bald man with tattoos in the hours before her murder. They interviewed Kane, who denied any knowledge of the murder. On April 20, 2000, the petitioner, a bald man with tattoos, passed detectives on the street. (ECF 6-28, at 42.) Shortly thereafter, he left a message for the detectives at the precinct. (*Id.*) Detective John McHugh returned the call, and the petitioner said that he knew the police were "looking to speak to a big, bald-headed guy that was out at Y.L. Childs on Tuesday night." He agreed to speak with the police about what he knew. (*Id.* at 43-44.)

In the interview that followed, the petitioner told them that he was the only "big, bald-headed guy in the bar" the night before Ruth Williams was killed. (*Id.* at 45.) He had known Williams for about two years, and that "she was the kind of woman you had to be careful with." He had heard from a friend that she was "into witchcraft, the Pagans," and that she "turned tricks." He claimed on the night before her murder he spoke to Williams for about ten minutes, and then went directly home. (*Id.* at 46-47.) He told the detective that he did not smoke. He also listed some of the people who were at the bar on the night of the murder. While he mentioned "a long-haired guy named John," he did not say anything specific about John Kane. The petitioner added

6

that he wished that he could "help or remember more, but who knew she was going to go home and get herself killed." (*Id.* at 48.)

At that point, Detective McHugh did not want the petitioner to think that he was a suspect, so he showed him a photograph of a black man named Jeff Johnson and asked if the petitioner knew who he was. The petitioner replied that he was a drug dealer who used to live near the Shamrock Bar. (*Id.* at 50.) The detective asked the petitioner to call them if he had any additional information to give.

After the petitioner left, he called the precinct and asked Detective Brian Parpan to give Detective McHugh a message about "the black man" in the photograph that Detective McHugh showed him. (ECF 6-29, at 29.) The petitioner said, "Now that I think about it, I see that person every day at about 9:00a.m." (*Id.* at 29-30.) The petitioner also specified the street where he would see the man, and said that if Detective McHugh was "looking for that person, he's there on a regular schedule and that's where he would be." (*Id.*) Detective Parpan passed the information on to Detective McHugh. The petitioner also told John Kane that "the cops were looking for a black guy." (ECF 6-30, at 57.)

On May 2, 2000, detectives stopped the petitioner outside Falcons Nest bar, and told him they were arresting him for the murder of Ruth Williams. (*Id.* at 112-113.) Detective James Cereghino removed the Leatherman tool that was attached to the petitioner's belt, and took him to the precinct. (*Id.* at 114.) Detective Robert Dempsey advised the petitioner of his constitutional rights, and the petitioner agreed to talk to the police without a lawyer. (*Id.* at 7.)

Once at the precinct, Detective McHugh and Detective Parpan interviewed the petitioner about the murder. The petitioner told the detectives that they had the wrong man, that he had nothing to hide, and reminded them that he had called them. (*Id.* at 32.) Detective Parpan told

him to "start at the beginning," and at first, the petitioner told essentially the same story that he had told Detective McHugh on April 20th, including that he "went right home" from Y.L. Childs, at 3:00a.m. (*Id.* 32-35.) Detective Parpan asked him if he was "sure" that he went directly home, and commented that there were 24-hour stores in the area, and that many of them had security cameras. (*Id.* 35.) At that point, the petitioner "got very nervous," and put his head down. After a short period, he admitted that he bought beer and cigarettes at 7-Eleven. (*Id.* at 37.) The detective confirmed that the petitioner did not smoke, and asked why he was buying cigarettes; the petitioner replied, "Well, sometimes I smoke," but would not tell the detectives the brand of beer or cigarettes that he bought, saying that it was "not important." Because the petitioner also said that his wife did not drink and that he "rarely" drank at home, Detective Parpan asked him to explain "why at this hour in the morning, when you claim to have been drinking all night and neither of you drink much at home, you found it necessary to stop at the 7-eleven and buy beer." (*Id.* at 39.) The petitioner responded that he was an alcoholic and "that's what alcoholics do." (*Id.* at 36, 39.) As for the petitioner's claim that he got home by 3:00a.m., Detective Parpan reminded him that there were timers on security cameras; the petitioner conceded that he could have gotten home "much later." (*Id.* at 42.)

At one point, the petitioner repeated that he had tried "to help" in the investigation, and that he should not be a suspect because he "only talked to her for a few minutes." (*Id.* at 39-40.) Detective Parpan asked the petitioner, "Aren't you leaving something out, Paul?" The petitioner denied that he was, and the detective asked, "How about some light sexual contact maybe?" The petitioner looked surprised, and said that Williams had only kissed him on the cheek. When the detective told him that people had seen him "making out" with Williams, the petitioner claimed that he did not remember because he was drunk. (*Id.* at 40-42.) The detectives told the petitioner

that they knew he had lied to them, that they knew he was at Williams' apartment, and that he was using "drunkenness to cover up things you can't get out of." (*Id.*)

The petitioner, who was "very nervous," responded that they should talk to "John," and claimed—for the first time—that he had been with John the entire night. (ECF 6-28, at 58-60; ECF 6-29, at 42.) At one point, Detective Parpan said, "Look, did this happen maybe because she made a remark, maybe she said something that set you off?" The petitioner replied, "I can't help you with this. We are on different sides here." (ECF 6-29, at 47.)

After a break, two different detectives—Cereghino and Cole—spoke to the petitioner. (*Id.* at 116.) The petitioner denied going to Williams' apartment. After reviewing what the petitioner had said, Detective Cereghino asked why it was that he only remembered certain things. The petitioner replied that he was a "heavy drinker," and had "blackouts," and that it was "possible" that he was in Williams' apartment. (*Id.* at 118.) Detective Cereghino said that the police knew he was in the apartment, and asked him if he had seen John Kane earlier that evening. "Any idea where John Kane's been for the last several hours. He's been with us. We know what happened in the apartment that night." The petitioner did not respond, and the detectives left the room. (*Id.*)

Detectives McHugh and Parpan returned, and told the petitioner that he had been lying and that he kept changing his story. The petitioner responded, "[Y]ou call them lies, I call it self-protection . . . My son trusted the police and now he's in jail. If I tell you my side, I may wind up in jail." The detective asked the petitioner to tell them his "side;" the petitioner said that he "would like his attorney to tell . . . his side," and requested an attorney. The detectives ended the interview. (*Id.* at 48.)

After the petitioner's attorney arrived, the detectives placed the petitioner in a line-up, which three Y.L. Childs patrons viewed separately. Two of them, Francine Quinn and Jennifer

DeRenzis, did not identify anyone at the line-up. The third, Tom Hardman, identified the petitioner. (ECF 6-22, at 13.) Six days later, Quinn saw a Newsday article that included a picture of the petitioner. (ECF 6-28, at 71.) Quinn returned to the precinct with the article, and told the detectives that the petitioner was the man with Williams on the night of the murder. (*Id.*)

On October 18, 2000, the petitioner called the police to report a "disturbance."[2] When Officer Pamela Stark and her partner responded to the call, the petitioner immediately put his hands in the air, identified himself, and stated "I didn't do it. John Kane did." (ECF 6-30, at 2, 24.) The other officer asked why he had called the police, and the petitioner told them about an "ongoing problem" with a "male Hispanic," who was no longer in the area. The petitioner continued to discuss Williams' murder, and said that "Ruthy" was "kissing on him," but "only to whisper in his ear that she wanted drugs from Kane," who the petitioner said was a drug dealer. (*Id.* at 25.) He also claimed that he did not go to Williams apartment with Kane because his "old lady" was going to be "really angry." (*Id.* at 25-26.) Instead, he gave Kane beer and cigarettes in an alleyway. The petitioner had not told the detectives about Kane previously "because of the drugs." (*Id.*)

## PROCEDURAL HISTORY

The petitioner appealed his conviction to the Appellate Division, Second Department. He argued that there was no probable cause for his arrest, that detectives gave improper testimony about the petitioner's statements, that the Leatherman tool should not have been admitted into evidence and that an in-court demonstration was unfair, that the trial court should not have precluded evidence of Kane's prior bad acts, that trial counsel was ineffective, that the prosecutor's comments in summation were improper, and that the verdict was against the weight of the

---

[2] The petitioner had been released on bond.

evidence. On November 10, 2009, the Appellate Division affirmed the petitioner's conviction. *People v. Scrimo*, 887 N.Y.S.2d 863 (N.Y. App. Div. 2009).

The petitioner applied for leave to appeal to the New York Court of Appeals. In that application, he reasserted his previous arguments, and added a claim that the trial court should not have precluded evidence that Kane sold drugs and that Williams did drugs. The application was denied, *People v. Scrimo*, 925 N.E.2d 943 (N.Y. 2010), as was the petitioner's application for reconsideration. *People v. Scrimo*, 15 N.Y.3d 778 (N.Y. 2010.)

On September 21, 2010, the petitioner moved to vacate his judgment, pursuant to Criminal Procedural Law § 440.10. He argued that he was actually innocent, that New York Criminal Procedure Law Section 470.25(1) was unconstitutionally vague, and that the Appellate Division abused its discretion and misapplied the harmless error standard when it dismissed his claims as "without merit." The petition was denied on November 24, 2010. In January of 2010, the petitioner sought leave to appeal the denial of the motion to vacate the judgment to the Appellate Division, Second Department, which was denied as well.

On August 26, 2011, the petitioner filed this *pro se* petition for a writ of habeas corpus. (ECF 1.)

## DISCUSSION

### 1. Legal Standard

A federal court reviewing a habeas petition must not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This doctrine applies to both substantive and procedural state law grounds. *Id.* at 729-30.

A "federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Murdock v. Sposato*, No. 14-cv-2931, 2016 WL 5173256, at *3 (E.D.N.Y. Sept. 21, 2016) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). Alternatively, a federal habeas court may grant a writ if the state court unreasonably applies a correct legal principle to the facts. *Id.* (citing *Williams*, 529 U.S. at 413).

A petitioner can seek federal habeas corpus relief only after he exhausts state court remedies, giving the state courts a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

**2. Claims**

The petitioner raises six claims: (1) that the police did not have probable cause to arrest him, (2) that some of the court's evidentiary rulings were improper, (3) that the prosecutor made unfairly prejudicial comments in summation; (4) that his counsel was ineffective, (5) that the verdict was against the weight of the evidence, and (6) that he was denied a fair appeal. The government concedes that the petitioner exhausted all claims except his claim about the prosecutor's statements in summation. I address each argument in turn.

A. Probable Cause for Arrest

The petitioner argues that the detectives did not have probable cause to arrest him, and therefore, the Leatherman tool he was carrying should have been suppressed. This claim is not a

proper subject for habeas review and is, in any event, meritless.

In *Stone v. Powell*, 428 U.S. 465, 481 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Following *Powell,* the Second Circuit has held that federal courts should review Fourth Amendment claims in habeas petitions only if: (1) the state provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (2) the state provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process. *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).

The petitioner does not claim that he was denied the opportunity to litigate his Fourth Amendment claim, nor could he do so persuasively. The petitioner litigated his Fourth Amendment motion at a pre-trial suppression hearing, and appealed the trial judge's denial of that motion to the Second Department. *See Scrimo*, 887 N.Y.S.2d at 863. Thus, the state corrective process was both available to and used by the petitioner. Accordingly, his claim that the police lacked probable cause to arrest him is not cognizable on habeas review. *See, e.g., Plunkett v. Johnson*, 828 F. 2d 954, 956 (2d Cir. 1987) (denying habeas relief when the petitioner's Fourth Amendment claim was litigated in a suppression hearing and subject to appellate review); *White v. West,* No. 04–cv–02886, 2010 WL 5300526, at *12 (E.D.N.Y. Dec. 6, 2010) (denying habeas review where the "[p]etitioner litigated his Fourth Amendment claims both at the suppression hearing and on direct appeal to [the] Second Department [and] [b]y raising his Fourth Amendment claims in these state fora, petitioner demonstrated that state process was

available, and indeed, that he availed himself of that process.").

Even if the Fourth Amendment claim were cognizable, the trial court correctly found there was probable cause to arrest the petitioner. Detectives interviewed witnesses who saw Williams with a bald man on the night she was murdered. Then, the petitioner called detectives, on his own, and told them that he was with Williams before she was murdered. Finally, Kane told the detectives that he saw the petitioner kill Williams in her apartment. This evidence gave the police probable cause to arrest the petitioner. *See Leerdam v. N.Y. City Police Dep't*, No. 04-cv-6676, 2007 WL 489246, at *3 (S.D.N.Y. Feb. 15. 2007) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received information from some person-normally the putative victim or an eye witness-who it seems reasonable to believe is telling the truth."); *People v. Mitchell*, 566 N.Y.S.2d 321 (N.Y. App. Div. 1991) (finding probable cause where "the record establishes that the defendant was arrested after witnesses to the instant homicide implicated him to investigating detectives.").

### B. Evidentiary Rulings

The petitioner also argues that the trial court's evidentiary rulings denied him a fair trial. Specifically, the petitioner claims that the trial court improperly permitted detectives to testify about his demeanor and veracity during questioning, that the admission of expert testimony about the Leatherman tool was erroneous, and that he was unfairly precluded from introducing evidence that Williams did drugs and Kane sold drugs.

Habeas corpus relief is available only where there has been a violation of a constitutional right. 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 68 (1991). Generally, state court rulings on evidentiary matters are state law issues and do not rise to the level of a constitutional violation. *Warren v. Miller,* 78 F.Supp.2d 120, 134-35 (E.D.N.Y. 2000). "When presenting an

evidentiary ruling for federal review, a petitioner bears a heavy burden of establishing that her constitutional rights were deprived." *Alfini v. Lord,* 245 F. Supp. 2d 493, 499 (E.D.N.Y. 2003). Even an incorrect state court evidentiary ruling does not warrant habeas relief, unless the error deprived the petitioner of a fundamentally fair trial. *See Washington v. Schriver,* 255 F.3d 45, 56 (2d Cir. 2001); *McLean v. McGinnis,* 29 F.Supp.2d 83, 93 (E.D.N.Y. 1998). To determine whether an evidentiary ruling denies a defendant of a fair trial, evidence must have "[a] substantial and injurious effect or influence in determining the jury's verdict." *McClean,* 29 F.Supp.2d at 93 (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637-38 (1993)). The evidence must be "crucial, critical, highly significant," and is reviewed "in light of the entire record before the jury." *Collins v. Scully,* 755 F.2d 16, 18-19 (2d Cir. 1985).

The trial court did not abuse its discretion by allowing detectives to testify about the petitioner's demeanor when the police questioned him. When a defendant waives his Fifth Amendment right and agrees to speak with officers, the officers are entitled to testify about his demeanor during questioning. *See e.g. United States v. Jenkins*, 687 F. App'x 71, 73 (2d Cir. 2017) ("[The defendant] did not remain silent but responded to questions posed to him. Consequently, the government was entitled to comment on his demeanor while he gave those responses."); *United States v. Varanese*, 417 F. App'x 52, 55 (2d Cir. 2011) (finding officers' testimony about the defendant's "nervous demeanor" was admissible). Moreover, the detectives did not, as the petitioner claims, testify that the petitioner was a "liar." Rather, they described what they said to him and how he reacted, including the fact that they accused him of lying during the interrogation. (ECF 6-29, at 44.) There was nothing improper in this testimony.

Nor did the trial judge abuse his discretion in allowing Detective Schiraldi and Agent Rosati to testify that the cuts on the cord used to strangle the victim were consistent with the

petitioner's Leatherman tool. First, the evidence that the petitioner carried a tool that was capable of cutting the cord was obviously relevant. Second, both witnesses said, multiple times, that the results of their tests were "inconclusive" and that they could not say for a fact that the petitioner's tool made the cuts found on the cord. (ECF 6-26, at 50, 57.) Moreover, the petitioner's lawyer did a thorough and effective cross-examination of both witnesses. Thus, even if the testimony was improperly admitted—and it was not—it could not have had any material effect on the outcome of the trial.

The petitioner also argues that he was denied the right to present a defense when the judge precluded his attorney from calling witnesses to testify that Williams used drugs, and that Kane sold drugs. "A defendant's right to present relevant evidence is not . . . unlimited; rather it is subject to reasonable restrictions." *Wade v. Mantello,* 333 F.3d 51, 58 (2d Cir. 2003) (internal quotation marks omitted). Courts properly exclude testimony about third-party culpability when the "marginal relevance [is] outweighed by dangers of prejudice and confusion," or when the evidence is "collateral, rather than material, to the issues in the case." *Id.* at 60; *United States v. Scopo*, 861 F.2d 339, 345 (2d Cir. 1988). Here, the trial court did not abuse its discretion in precluding counsel from calling certain witnesses, because the subject—narcotics use—was collateral and not clearly linked to the April 12, 2000 murder.

Moreover, despite the fact that the victim's toxicology report showed no evidence of drugs in her system, counsel was permitted to and did explore the subject of the victim's drug use, her relationship to Kane, and whether Kane sold drugs. (ECF 6-24, at 143.) Counsel asked the witnesses if they had seen Williams use drugs; they said they had not. (ECF 6-30, at 85-86.) Counsel also cross-examined Kane about his drug use and whether he sold drugs. And, the court allowed counsel to mention the fact that police found drugs in Williams' car in his summation.

(ECF 6-32, at 47, 63.) What the trial court would not permit was extrinsic proof of a collateral matter: the court did not allow counsel to call a witness to ask him whether Kane had sold drugs two years before Williams' murder. This ruling was not an abuse of the court's discretion. Accordingly, the trial court's rulings, allowing the defendant to raise the issues of drug use and sales, were fair and appropriate. In any event, even assuming the judge committed constitutional errors—and he did not—any error is harmless in light of the other evidence of the petitioner's guilt.

### C. The Prosecutor's Summation

During his summation, the prosecutor characterized the petitioner's defense as "a charade," "a swill," and "a sham." The trial court sustained three objections to the term "charade," and allowed the remaining comments to stand. (ECF 6-32, 67, 71, 85.) The petitioner argues that the prosecutor's remarks denied him a fair trial. His claim is both procedurally barred and without merit.

Under the adequate and independent state ground doctrine, a federal court will "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Davis v. Racette,* 99 F.Supp.3d 379, 387 n. 3 (E.D.N.Y. 2015) (internal quotation marks omitted) (citing *Coleman,* 501 U.S. at 729). "In the context of federal habeas review, if a state prisoner's federal challenge was not addressed in state court because the prisoner failed to meet a state procedural requirement, federal habeas review is barred." *Id.* (citing *Coleman,* 501 U.S. at 730).

On appeal, the Second Department found that the petitioner's complaints about the prosecutor's summation were not preserved. *Scrimo*, 887 N.Y.S.2d 863.

"Once it is determined that a claim is procedurally barred under state rules, a federal court still may review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate the failure to consider the claim will result in a miscarriage of justice." *Coleman,* 501 U.S. at 750. "A miscarriage of justice is demonstrated [only] in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent." *Id.* The petitioner does not offer any reason for his default, nor does he argue that he is actually innocent. Therefore, his claim is procedurally barred.

Even if the petitioner's claim were not barred, I would reject it. "[F]ederal courts reviewing habeas claims brought by state prisoners and premised upon prosecutorial misconduct in summation [] distinguish between 'ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process.'" *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The test is whether "the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair." *Id.* To prevail, the petitioner "must demonstrate that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir. 1994).

Courts reverse convictions based on prosecutorial misconduct "only if it causes the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Williams*, 642 F. App'x 12, 16 (2d Cir. 2016)

(internal quotation marks omitted). "In assessing whether a defendant has sustained substantial prejudice, we consider the severity of the alleged misconduct, any curative measures taken by the trial court, and the likelihood of conviction absent the challenged conduct." *Id.*

The trial court sustained the defense attorney's objections to the term "charade" three times, and counsel did not request any additional relief. *See e.g. Sheehan v. Perez*, No. 14-cv-6477, 2015 WL 7756106 (E.D.N.Y. Dec. 1, 2015) ("[T]he prosecutor's summation comments denigrating defense counsel were improper, but did not deprive Petitioner of a fair trial because the trial court sustained objections to the comments.") While the prosecutor used the terms "charade," "swill," and "sham" at other points in summation, these comments are not the sort of egregious misconduct that warrants habeas relief, particularly when viewed in the context of the entire summation. Given the weight of the evidence against the petitioner, the comments could not have affected the trial.

### D. Ineffective Assistance of Counsel

The petitioner argues that he was deprived the effective assistance of counsel. According to the petitioner, his lawyer was ineffective because he (1) did not object to the detectives' testimony about the petitioner's demeanor, (2) failed to object to the admission of the Leatherman tool and the expert's demonstration before the jury, (3) failed to call a rebuttal expert, (4) failed to object to photographs of the victim; (5) failed to request a consciousness of guilt charge; and (6) "rambled" so that the court "repeatedly [had to] explain things to him."

To establish ineffective assistance of counsel, the petitioner must demonstrate that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that he was prejudiced by his counsel's deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The petitioner cannot meet the first part of

the *Strickland* test merely by showing that his counsel employed a losing strategy or made a mistake; instead, the petitioner must establish that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Lanfranco v. Murray,* 313 F.3d 112, 118 (2d Cir. 2002) (citing *Strickland,* 466 U.S. at 687). The petitioner only can establish the prejudice prong of the *Strickland* test if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Charles v. Fischer,* 516 F. Supp. 2d 210, 216 (E.D.N.Y. 2007)

In applying the two-part test, "judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The relevant inquiry focuses "on the fundamental fairness of the proceeding whose results are being challenged." *Id.* at 696. The "central concern is not with grading counsel's performance but with discerning whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir. 1990) (internal quotations omitted). The burden is on the petitioner to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689.

Counsel in this case mounted a vigorous defense. He challenged the admissibility of evidence, thoroughly cross-examined witnesses, and raised appropriate objections throughout the trial. Nevertheless, the petitioner argues that his attorney was ineffective because he did not object to the detectives' testimony about the petitioner's demeanor during the interrogation. Since the detectives' testimony was proper, as I described above, the lawyer could not have been ineffective for failing to object to it. "The failure of a lawyer to invoke meritless objections cannot constitute

constitutionally deficient performance."[3] *Parks v. Sheahan*, 104 F. Supp. 3d 271, 285 (E.D.N.Y. 2015); *Jenkins v. Dolce*, No. 14-CV-6977 WFK, 2015 WL 5732097, at *5 (E.D.N.Y. Sept. 28, 2015)*, certificate of appealability denied* (Feb. 16, 2016) (holding that the petitioner did not demonstrated any prejudice that resulted from trial counsel's failure to "object to the prosecutor's comments during cross-examination and summation about Petitioner's pre-trial silence.").

Next, the petitioner argues that his counsel should have objected to the admission of the Leatherman tool and to the government's demonstration of the tool. The simple answer to this claim is that counsel made both objections: he challenged the admissibility of the Leatherman tool at the pre-trial suppression hearing and he objected several times to the government's demonstration, arguing that it was confusing, misleading, and inaccurate. (ECF 6-25, at 30-32, 39.) Since he actually made the objections, he was not ineffective. *See e.g. Figueroa v. Ercole*, No. 09-cv-7225, 2013 WL 3655903, at *23 (S.D.N.Y. July 15, 2013) ("The defense did object and, therefore, as a factual matter alone, it cannot be said that defense counsel was ineffective in failing to object to the prosecutor's explanation.").

The petitioner also argues that his lawyer should have called a rebuttal expert to counter the testimony concerning the Leatherman tool. However, his lawyer did a thorough and effective cross-examination of the government's experts; the experts admitted that their results were "inconclusive," and they could not definitively say that the petitioner's tool made the cuts found on the cord. (ECF 6-26, at 50, 57); *See e.g., Hernandez v. Uhler*, No. 15-cv-6684, 2017 WL

---

[3] The petitioner also argues that his lawyer should have objected to photographs of the victim when she was alive and to the testimony of her brother, employer, and co-worker; the petitioner claims that this evidence "garner[ed] sympathy from the jury." The petitioner has not shown that the evidence and testimony was improper, and therefore, there is no basis for concluding his lawyer was ineffective by failing to object. *Harrington v. United States,* 689 F.3d 124, 130 (2d Cir. 2012) ("[A] petitioner cannot show prejudice if the claim or objection that an attorney failed to pursue lacks merit.").

3670031, at *3 (E.D.N.Y. Aug. 25, 2017) (holding that the petitioner failed to "demonstrate his initial burden because he did not demonstrate that an expert could rebut the assertions of the prosecution expert or that he was prejudiced by the absence of such testimony."). Counsel's decision not to call a rebuttal witness was logical; after all, that witness would have been subject to cross-examination, and the results could have undone everything that counsel established his on cross-examination of the prosecutor's witnesses.

The petitioner next argues that his lawyer should have requested that the court charge the jury on "consciousness of guilt." In reviewing jury instructions, courts must review "the entire charge and discern whether the instruction delivered a correct interpretation of the law." *United States v. Carr,* 880 F.2d 1550, 1555 (2d Cir. 1989) (external citations omitted). The issue is not whether the district court included specific words in its instruction, but whether the entire instruction accurately conveyed the law. *United States v. Pendergrass*, 648 F. App'x 29, 33 (2d Cir. 2016).

A review of the entire charge demonstrates that it was a correct statement of the law. The petitioner's argument—which seems to be that the judge should have charged the jury that there could have been "an innocent purpose" for his inconsistent statements—is not persuasive. The judge explained that it was for the jury to determine the facts and to assess credibility. (ECF 6-33, at 16.) Moreover, the judge told the jury that if two inferences could be drawn from the petitioner's conduct—one consistent with innocence and the other consistent with guilt—they were required to draw the inference consistent with innocence. (*Id.* at 68.) These instructions, which the jury is presumed to have followed, accurately conveyed the concept about which the petitioner complains.

Last, the petitioner claims that his lawyer "rambled" and required explanations from the trial judge. The trial record demonstrates that the petitioner's lawyer vigorously and effectively

represented the petitioner throughout trial. He pursued a logical strategy that John Kane was the killer. Even if the lawyer had been "unconventional" or made demonstrable errors—and I do not find that he did—this would not be proof of ineffectiveness. The petitioner's "displeasure with defense counsel's trial strategy is not sufficient to establish ineffectiveness under the stringent requirements of *Strickland*." *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir. 1991).

## E. The Weight of the Evidence

The petitioner argues that jury's verdict was not supported by the weight of the evidence at trial. A challenge to a verdict based on the weight of the evidence is different than a challenge to the sufficiency of the evidence: "[T]he 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles." *Wilson v. Senkowski*, No. 02-cv-231, 2003 WL 21031975, at *7 (S.D.N.Y. May 7, 2003) (internal citation marks omitted); *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001). It is well-settled in this Circuit that because "a weight of the evidence claim" is purely a state law claim, it is not cognizable on federal habeas review. *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus."). Accordingly, the petitioner's argument fails.

Even if the petitioner had a sufficiency of the evidence argument, there was ample evidence to support the jury's verdict. Witnesses saw the petitioner with Williams shortly before she was killed, and John Kane saw the petitioner strangle Williams. The jury also heard about the petitioner's attempts to deflect the investigation away from himself, and his shifting statements about the murder. This testimonial evidence was buttressed by physical evidence as well: the cut

23

on the cord used to strangle Williams was consistent with the petitioner's Leatherman tool, and the petitioner could not be excluded as a contributor to the DNA on a beer bottle in Williams' apartment. Taken together, this evidence was sufficient to support the jury's verdict.

F. Right to a Fair Appeal

Finally, the petitioner claims that he was denied a right to a fair appeal because the Appellate Division found that his claim of prosecutorial misconduct was "without merit," and erroneously applied the harmless error standard to his claim. *See Scrimo*, 67 A.D. 3d at 825. Generally, "[h]abeas petitioners who claim that a state appellate court failed to address an issue normally frame the argument as one of adjudication." *Rodriguez v. Connell*, No. 05-cv-0517, 2009 WL 792092, at \*6, fn 4 (E.D.N.Y. Mar. 23, 2009).[4] However, "the low adjudication threshold can be cleared by an appellate court's boilerplate holding that 'defendant's remaining contentions are without merit.'" *Id.* (citing *Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir. 2002). The Appellate Division's written decision met this threshold.

Moreover, the petitioner's argument that the Appellate Division improperly applied the wrong standard of appellate review is not cognizable on habeas review. A federal court's power to grant a writ of habeas corpus extends only to errors in the application of federal law. A state court's alleged failure to apply state law or its own procedural rules, even if well-established, is not cognizable on federal habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). In any event, the argument is meritless because the Appellate Division cited the three reasons for rejecting the petitioner's argument; only one of those reasons was that any error was harmless. The petitioner does not explain why the Appellate Division's other reasons for rejecting the claim—

---

[4] Generally, courts find a denial of the right to a fair appeal only when the appellate record is incomplete. *See e.g. Shakur v. Spitzer*, No. 04-cv-6134, 2005 WL 2647941, at \*3 (S.D.N.Y. Oct. 17, 2005) (arguing a petitioner was denied a fair appeal because there were missing transcripts).

that the prosecutor's statements were fair comment and responsive to the defendant's summation—were incorrect. Indeed, a review of the record supports the Appellate Division's conclusion that the prosecutor's summation was not unfairly prejudicial. As the Appellate Division found, any error was harmless.

## CONCLUSION

Accordingly, the petition for writ of habeas corpus is denied in its entirety. The case is dismissed. A certificate of appealability will not be issued. *See* 28 U.S.C. § 2253(c).

**SO ORDERED.**

s/Ann M. Donnelly
Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
September 29, 2017